UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, in its Capacity as Receiver for NextBank, N.A., <br><br> 550 17th Street, N.W. <br> Washington, D.C. 20429 <br><br> Plaintiff, <br><br> v. <br> THE BANK OF NEW YORK, as Indenture Trustee of the NextCard Credit Card Master Note Trust, <br><br> 101 Barclay Street <br> New York, New York 10007 <br><br> Defendant. | Case No. _____ |

## COMPLAINT

Plaintiff Federal Deposit Insurance Corporation, in its capacity as Receiver for NextBank, N.A., (the "FDIC Receiver") for its Complaint allege as follows:

### JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1819(b)(2) and 28 U.S.C. § 1345.

2.  This Court has personal jurisdiction over the Bank of New York, as Indenture Trustee of the NextCard Credit Card Master Note Trust ("BONY"), because BONY purposefully availed itself of the United States District Court for the District of Columbia in the

related case of *Bank of New York v. FDIC*, No. 03-1221 (D.D.C.), and on information and belief BONY transacts business in the District of Columbia.

3. Venue in the United States District Court for the District of Columbia is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## PARTIES

4. Plaintiff FDIC Receiver is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. §§ 1811, *et seq.*

5. Defendant BONY is the Indenture Trustee of the NextCard Credit Card Master Note Trust (the "Trust").

## FACTS

**The Transaction**

    **NextBank's Credit Card Business**

6. NextBank, N.A. ("NextBank") was a national banking association having as its sole business the issuance of consumer credit cards, primarily through the internet. By February 2002, NextBank had 1.2 million credit card holders.

7. NextBank financed the credit card business by securitizing the monthly payments due from the credit card holders, selling several series of Notes to investors, and using the proceeds from the sale of Notes to fund payments to merchants for charges by credit card holders. The payments by cardholders on credit card balances over time funded NextBank's ability to pay for new purchases and to pay interest to the Noteholders and itself. The portion of the payments allocated to NextBank itself was known as the Transferor Interest.

**The Notes**

8.  The original purchasers of the greatest number of Notes here are among the nation's largest and most sophisticated investors: Credit Suisse First Boston, Goldman Sachs & Co., J.P. Morgan, Deutsche Bank, and Barclays Capital. The Noteholders holding a majority of the outstanding notes now are investment funds: Millennium Partners, L.P., First Millennium, Inc., and RMK Advantage Income Fund. BONY serves as the "Indenture Trustee" in the transaction at issue and as such represents the interests of the Noteholders.

9.  The Noteholders purchased particular series of Notes and particular classes of Notes within each series. Only the Class C and D Notes (the two riskiest classes) in Series 2000-1 and Series 2001-1 remain; all others have been paid in full and suffered no loss.

**The Cash Flows**

10. There are three different possible periods of cash flows in the life of this financing transaction.

11. First, each series of Notes began with a period known as the "**revolving period**" during which the Noteholders were paid only interest and no principal. During the revolving period, the funds not required to pay interest were used to fund additional credit card purchases and to pay Noteholders of other series.

12. Second, following the revolving period, principal was to be paid to each class of Notes in fixed amounts at scheduled intervals known as a "**controlled amortization period**." Principal was to be paid first to the Class A Noteholders, then to the Class B Noteholders, then to the Class C Noteholders, and then to the Class D Noteholders.

13. Third, if a redemption event occurred during the revolving period, then an "**early amortization**" period could begin. In an early amortization period, the collections of credit card payments and finance charges are unavailable for use to fund new charges, since the

bulk of collections are remitted to Noteholders to pay principal and interest. Early amortization functions like a controlled amortization period, but it is triggered by an event other than a scheduled pay out.

**The Transaction Documents**

14. The structure of NextBank's financing was accomplished through an integrated set of "Transaction Documents": the Trust Agreement, the Master Indenture and Indenture Supplements, the Transfer and Servicing Agreement, and the Administration Agreement.

15. First, in the **Trust Agreement**, NextBank created the NextCard Credit Card Master Note Trust (the "Trust") to hold the credit card receivables and to pay the Noteholders interest and ultimately principal on the Notes. NextBank was the "Owner" of the Trust, and as such, held an "undivided beneficial interest in the Trust Assets" including the credit card receivables. The Trust was a shell entity with no employees or infrastructure of any kind and was entirely dependent on NextBank and its personnel to carry out its operations.

16. Following the creation of the Trust, NextBank, BONY, and the Trust executed the **Master Indenture**, in which the Trust authorized the issuance and sale of Notes secured by and paid from the credit card receivables transferred to the Trust. NextBank was an intended beneficiary of the Master Indenture and indeed signed the agreement. Additional terms specific to particular series of Notes, were set forth in series-specific **Indenture Supplements**. Each Note provided for monthly payments of interest with a structured pay-out of principal at the end of the Note's term. All cash flows from the credit card receivables were allocated and distributed to Noteholders and NextBank according to the Master Indenture, the Indenture Supplements, and the Transfer and Servicing Agreement.

17. The Master Indenture contained an *ipso facto* automatic acceleration clause that is triggered by a "redemption event," a term that includes the appointment of the FDIC as Receiver. Section 5.01 of the Master Indenture provides that, upon the FDIC's appointment as Receiver, an early amortization period would begin, which would require an automatic accelerated repayment of principal on the Notes. Section 5.02 of the Master Indenture provides that, non-payment of the principal on any Note when it becomes due is an "event of default."

18. In addition, the **Transfer and Servicing Agreement** provided the procedure for transferring credit card receivables to the Trust and servicing those receivables. NextBank was both the Transferor and the Servicer. As Transferor, NextBank was responsible for transferring the receivables to the Trust. As Servicer, NextBank was responsible for collecting payments on the receivables, depositing those collections in an account, keeping track of which collections were finance charge receivables and which were principal receivables, and allocating the collections received between the Noteholders and the Transferor pursuant to the Master Indenture, the Indenture Supplements and the Transfer and Servicing Agreement.

19. Fourth, under the **Administration Agreement**, NextBank was responsible for carrying out the Trust's duties under the other Transaction Documents.

**The Offering Memoranda**

20. The Notes were offered for sale to the Noteholders through an Offering Memorandum and Offering Memorandum Supplements for each series. The "risk factors" listed in the Offering Memoranda explicitly warned potential Noteholders that the FDIC could exercise its statutory powers to block early amortization. Thus, the Offering Memoranda stated that "the FDIC may have <u>the power . . . to prevent</u> or require <u>the commencement of an early amortization period</u>," and "prevent, limit, or require the early liquidation of the receivables and termination of

the trust." They also warned that "if the FDIC were appointed as a receiver or conservator of the bank, certain administrative expenses of the receiver or conservator may have priority over the interest of the trust in the receivables."

**The Opinion Letters**

21. The Noteholders and BONY required opinion letters from NextBank's counsel as to whether BONY's interest in receivables could be enforced against NextBank "should the Federal Deposit Insurance Corporation (the 'FDIC') be appointed as conservator or receiver for [NextBank]."

22. Investors can take comfort from such opinion letters only if the assumptions on which the opinions are based are consistent with the investors' understanding of how the transaction is structured and is to operate. Were that not the case, investors would demand opinions based on different assumptions.

23. The opinions are based on the assumption that the Noteholders and BONY would not attempt to foreclose on receivables based solely on insolvency or the appointment of a receiver, noting an opinion letter from the FDIC that declares unenforceable a default caused *ipso facto* by the appointment of a receiver. That FDIC opinion letter was issued by John L. Douglas, BONY's counsel in the related litigation:

> a secured creditor of an insured depository institution for which a receiver had been appointed could liquidate the creditor's properly pledged collateral by commercially reasonable "self-help" methods, provided that no involvement of the receiver was required <u>and that there was a default other than through an ipso facto provision in the contract. The appointment of a receiver is not a default enforceable against the FDIC or the RTC under any contract except as specifically provided for in FIRREA.</u>

6

John L. Douglas, General Counsel, *Self-Help Liquidation of Collateral by Second Claimants in Insured Depository Institution Receiverships*, FDIC Interpretive Ltr., No. FDIC-89-49, 1989 WL 609503 (Dec. 15, 1989) (emphasis added).

**The Receivership**

    **The FDIC Is Appointed Receiver**

        24.    On the basis of routine examinations in 2000 and 2001, the Office of the Comptroller of the Currency ("OCC") concluded that NextBank's risk management policies and procedures were inadequate and that the bank's assets were of lower credit quality than initially projected. *See* Office of the Comptroller of the Currency, "OCC Closes NextBank and Appoints FDIC Receiver," (Feb. 7, 2002) (available at http://www.occ.treas.gov/ftp/release/2002-09.txt). In late 2001, the OCC determined that NextBank was improperly accounting for poor credit quality on delinquent accounts. *See id.*

        25.    The FDIC is a federal agency created by Congress in 1933 to supervise banks, insure deposits, and help maintain a stable and sound banking system. *See, e.g.*, http://www.fdic.gov/about/learn/symbol/index.html. The FDIC as receiver succeeds to "all rights, titles, powers, and privileges of the insured depository institution," 12 U.S.C. § 1821(d)(2)(A)(i) (2002), and is charged with the duty to "preserve and conserve the assets and property of such institution," *id.* § 1821(d)(2)(B)(iv). Congress has granted the FDIC as receiver broad powers to manage and protect the assets of failed banks.

        26.    On February 7, 2002, the Office of the Comptroller of the Currency appointed the FDIC as Receiver for NextBank. *See* Office of the Comptroller of the Currency, "OCC Closes NextBank and Appoints FDIC Receiver," (Feb. 7, 2002) (available at http://www.occ.treas.gov/ftp/release/2002-09.txt). The Department of Treasury summarized the rise and fall of NextBank as follows:

> In less than two and a half years, NextBank opened as OCC's first Internet-only credit card bank, grew six-fold from $300 million to over $2 billion in managed assets, never turned a profit, and failed. * * * NextBank's failure can be attributed primarily to improperly managed rapid growth that led to unacceptable high levels of credit risk, losses, and operational problems. Supervisory files repeatedly note that NextBank lacked the systems, controls, and expertise to properly support its excessive growth in a safe and sound manner.

27. At the February 7, 2002 FDIC Board meeting, the Board authorized the FDIC Receiver to keep the credit card business going.

28. On February 8, 2002, the FDIC Receiver informed BONY that NextBank had been placed in receivership. The FDIC Receiver explained that the receivership estate and the Noteholders "would be best served by allowing for an orderly sales process of NextBank's interest in the portfolio," and that the FDIC Receiver "did not believe that the early amortization trigger clause, *ipso facto* clause, was enforceable against the FDIC." BONY did not object.

29. The FDIC Receiver enforced all terms of the Master Indenture except the automatic acceleration provision, the *ipso facto* clause, and the credit card business proceeded just as it had before NextBank's insolvency.

30. On February 12, 2002, the FDIC Receiver informed BONY in writing that it would maintain the *status quo* and continue to enforce the Transaction Documents to keep the credit card business functioning, declaring the *ipso facto* automatic acceleration clause unenforceable under 12 U.S.C. § 1821(e)(12)(A). The FDIC Receiver explained that Section 1821(e)(12)(A) "provides that the FDIC as receiver with the authority to enforce contracts entered into by a depository institution, even if such a contract permits termination, acceleration or default solely by reason of insolvency or the appointment of a receiver." Because the automatic acceleration provision in the Master Indenture is triggered "solely by reason of

insolvency or the appointment of a receiver," it is "in direct contravention" of the applicable banking law. Again, BONY did not object.

31. Instead, BONY wrote to Noteholders on February 14, 2002 advising them that the FDIC Receiver had stated that the *ipso facto* automatic acceleration provision was unenforceable against the FDIC Receiver, as the Noteholders had been warned could happen when they purchased the Notes:

> as disclosed in the Offering Memorandum Supplemental to the Offering Memorandum dated December 6, 2000, <u>the FDIC may have the power to prevent the triggering of automatic default or acceleration provisions, such as the Early Amortization Period</u>, regardless of the terms of the Transfer and Servicing Agreement, the Indenture, or the instructions of those authorized to direct the Indenture Trustee's actions. The Indenture Trustee is currently engaged in discussions with the FDIC and has been informed that, pursuant to the terms of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"), <u>the FDIC is exercising its power to prevent the triggering of automatic default or acceleration provisions</u>, including those that relate to the commencement of an Early Amortization Period or the occurrence of an Insolvency Event or a Servicer Default. Specifically, the section of FIRREA cited by the FDIC provides that the receiver <u>may enforce any contract entered into by the depository institution</u> "notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver." 12 U.S.C. § 1821(e)(12)(A). Accordingly, the FDIC has taken the position that no Early Amortization Period may commence and no Insolvency Event or Servicer Default would occur.

32. At the February 15, 2002 FDIC Board meeting, the board noted that the FDIC Receiver had informed BONY "that the [FDIC Receiver] had the authority through the Financial Institutions Reform, Recovery and Enforcement Act of 1989 to avoid or declare unenforceable the early amortization trigger, which the Trustee does not appear to challenge."

**Early Amortization Occurs in July 2002**

33. The FDIC Receiver kept the credit card business running for several months, but the financial performance of the credit card portfolio continued to decline. On July 10, 2002, the FDIC Receiver notified BONY that the credit card portfolio failed to meet a financial performance threshold, which triggered early amortization based on portfolio performance, a trigger separate from and unrelated to the *ipso facto* clause. As a result, the FDIC Receiver gave notice to the card holders and refused to authorize any further extensions of credit on the credit card accounts. The FDIC Receiver prohibited new charges on the credit cards as soon as early amortization began in order to avoid using Deposit Insurance Fund monies. *See* 12 U.S.C. § 1823(c)(4).

34. The FDIC Receiver then exercised another of its statutory powers—the power to repudiate contacts that are burdensome to the orderly administration of the failed bank's affairs, 12 U.S.C. § 1821(e)(1)—and formally repudiated the Master Indenture, Indenture Supplements, and related documents.

35. All Noteholders continued to be paid monthly interest as card holders paid down their credit card balances. The Class A and Class B Noteholders were fully repaid all principal and interest, the Class C Noteholders were repaid approximately half of their principal, and the Class C and D Noteholders continue to receive all interest.

**Procedural History**

36. On November 23, 2004, this Court dismissed Count Two of the Complaint in related action, *Bank of New York v. FDIC*, No. 03-1221 (D.D.C.). This Court held that it was "absolutely clear error" to conclude that the Noteholders were entitled to the Transferor Interest.

> I do not see anything in the contracts that gives the right to the transfer interest to the bank. They never had the right, the fact they

10

> repudiated, didn't give you the right, you didn't step in under the contract into some shoes you didn't have before.
>
> The transfer interest is always excluded the collateral. [BONY's] rights are in the collateral. Their rights are in there meaning Next Bank, who then became the FDIC.

(Nov. 23, 2004 Hr'g Tr. at 53.)

      37.    On July 27, 2005, the FDIC Receiver, BONY, and two Noteholders (CS First Boston LLC and Millennium Partners LLP) entered into a settlement agreement of all remaining claims and counterclaims except for BONY's Count Six. On September 7, 2005, this Court dismissed all claims and counterclaims except Count Six pursuant to the parties' settlement. On September 15, 2005, BONY starting distributing the FDIC Receiver monthly payments of the Transferor Interest pursuant to the settlement agreement.

      38.    On September 27, 2006, this Court entered judgment against BONY on the one remaining claim in BONY's Complaint (Count Six). *Bank of New York v. FDIC*, ___ F. Supp. 2d ___, No. 03-1221, 2006 WL 2772860 (D.D.C. Sept. 27, 2006). BONY asserted in Count Six that the FDIC Receiver was liable for having enforced the Master Indenture notwithstanding the accelerated repayment provision triggered by the appointment of the FDIC Receiver. This Court held that the 12 U.S.C. § 1821(e)(12)(A) gave the FDIC Receiver the statutory power to enforce the Master Indenture.

      39.    BONY filed a notice of appeal on October 27, 2006 (D.C. Circuit No. 06-5358).

**BONY's Recent Actions**

      40.    On November 14, 2006, BONY issued a "Notice of Default under Master Indenture and Notice of Acceleration for Both Series 2000-1 Notes and Series 2001-1 Notes." BONY claims that the appointment of the FDIC Receiver in February 2002 caused a default

under the Master Indenture: "NextBank, N.A.'s entry into receivership on February 7, 2002 constituted a Trust Redemption Event which triggered the commencement of the Early Amortization Period, whereupon the Issuer was required to commence making payments of principal on the Notes . . . ." BONY, "pursuant to a directive of the Noteholders," declared that $112,109,000.00 is "immediately due and payable" under the Notes. The Noteholders instructed BONY to withhold funds that would normally be distributed to the FDIC Receiver on November 15, 2006, and BONY seized those funds.

41.     Counsel for the FDIC Receiver advised BONY, the Noteholders, the Servicer, and Wilmington Trust Co. on November 15, 2006 that the Notice of Default has no effect for reasons explained by this Court in its recent decision and judgment against BONY. *See Bank of New York v. FDIC*, ___ F. Supp. 2d ___, No. 03-1221, 2006 WL 2772860 (D.D.C. Sept. 27, 2006). In response, BONY's counsel stated on November 16, 2006 that the Noteholders believe that this Court's had no effect on their ability to demand immediate payment of from the Trust itself.

42.     BONY then filed an interpleader action in New York state court, asking that court to take control of the assets belonging to the FDIC Receiver that are in BONY's control. At 10:35 p.m. on November 16, 2006, the FDIC Receiver's counsel received a "courtesy copy" of the action styled *Bank of New York v. First Millennium, Inc.*, No. ___ (N.Y. Sup. Ct.). That action purports to allow the New York court to take control of the assets and determine whether and how they should be distributed to the FDIC Receiver.

43.     In response to the FDIC Receiver's assertion that BONY's notice of default had no effect, the Noteholders themselves sent a separate notice of default on the night of November 16, 2006. The Noteholders' notice states that "NextBank N.A.'s entry into

receivership on February 7, 2002 is a Redemption Date under the terms of the Notes. Accordingly, the Issuer is liable under the Notes for the full outstanding unpaid principal on the Notes, which the Issuer has failed to repay." The Noteholders "demand that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon."

## COUNT ONE
(Injunctive Relief for Statutory Violation)

44. The FDIC Receiver repeats and realleges the allegations of paragraphs 1 through 43 as if fully set forth herein.

45. In the absence of injunctive relief, FDIC Receiver will lose the protections afforded to it by Congress under 12 U.S.C. § 1821(e)(13)(A), because BONY is seeking to enforce an *ispo facto* accelerated repayment provision in Master Indenture that is unenforceable under the statute.

46. In the absence of injunctive relief from this Court, the FDIC Receiver will be severely prejudiced by this violation in its statutory receivership responsibilities.

47. The FDIC Receiver has a likelihood of success on the merits of its claim for a statutory violation.

48. Granting injunctive relief in favor of the FDIC Receiver is in the public interest.

49. No other interested parties will suffer substantial harm if the Court grants the FDIC Receiver's request.

50. The FDIC Receiver has no adequate remedy at law.

## COUNT TWO
(Breach of Settlement Agreement)

51. The FDIC Receiver repeats and realleges its allegations contained in Paragraphs 1 through 50 above with the same force and effect as if fully set forth herein.

52. Under the Settlement Agreement, the FDIC Receiver is entitled to the Transferor Interest and related funds now being held by BONY.

53. The Settlement Agreement is a valid and binding agreement between BONY and the FDIC Receiver. BONY and the FDIC Receiver intended to be bound by this agreement and agreed to all material terms set forth therein.

54. The FDIC Receiver performed its obligations under the Settlement Agreement. BONY, however, failed to comply with its obligations under that agreement.

55. As a result of BONY's breach of the agreements, the FDIC Receiver has suffered damages. As of November 16, 2006 the FDIC Receiver was owed approximately $4,000,000, which is the monthly distributions due for October 2006. The amount due will continue to increase monthly as credit card holders make their payments.

56. As a result, BONY has breached the Settlement Agreement and owes the FDIC Receiver approximately $4,000,000 in connection with this claim.

## COUNT THREE
(Conversion)

57. The FDIC Receiver repeats and realleges its allegations contained in Paragraphs 1 through 56 above with the same force and effect as if fully set forth herein.

58. As the Transferor, the FDIC Receiver is entitled to the Transferor Interest and related funds now being held by BONY as Indenture Trustee and to additional monthly

payments as the collections are received by the Servicer. The Transferor Interest is an asset of the receivership estate that embodies a right to distributions from the Collection Account.

59. BONY has wrongfully retained amounts due to the FDIC Receiver with respect to the Transferor Interest in the Collection Account and continues to wrongfully withhold such amounts.

60. BONY's retention and withholding of amounts due to the FDIC Receiver with respect to the Transferor Interest interferes with and is in defiance of the FDIC Receiver's ownership right in such property.

61. As of November 16, 2006 the FDIC Receiver was owed approximately $4,000,000, which is the monthly distributions due for October 2006. The amount due will continue to increase monthly as credit card holders make their payments.

62. As a result, BONY has converted and owes the FDIC Receiver approximately $4,000,000 in connection with this claim.

## PRAYER FOR RELIEF

WHEREFORE, the FDIC Receiver requests:

(a) a preliminary and permanent injunction against BONY;

(b) Plaintiffs' attorneys' fees, costs, and expenses incurred in this action; and

(c) such other and further relief as may be just and proper.

Dated: November 17, 2006

Of Counsel:

Tom M. Reeves (KS Sup. Ct. No. 7259)
  Counsel
Federal Deposit Insurance Corporation

HUGHES HUBBARD & REED LLP

_/s/ Dennis S. Klein_
Dennis S. Klein, D.C. Bar No. 361457
Scott H. Christensen, D.C. Bar No. 476439
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C. 20006-2401

550 17th Street, N.W., Room VS-D-7068
Washington, D.C. 20429
Telephone: (703) 562-2433
Facsimile: (703) 562-2475
E-mail: TReeves@FDIC.gov

Telephone: (202) 721-4600
Facsimile: (202) 721-4646

Attorneys for Plaintiff Federal Deposit Insurance Corporation, in its Capacity as Receiver for NextBank, N.A.

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver for NextBank, N.A. | THE BANK OF NEW YORK, as Indenture Tenants of the NextCard Credit Card Master Note Trust, |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) __88888__
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Dennis Klein, D.C. Bar No. 361457<br>Scott H. Christensen, D.C. Bar No. 476439<br>HUGHES HUBBARD & REED LLP<br>1775 I Street, N.W.<br>Washington, D.C. 20006-2401<br>Telephone: (202) 721-4600<br>Facsimile: (202) 721-4646 | John L. Douglas<br>H. Stephen Harris, Jr.<br>Alton & Bird LLP<br>One Atlantic Center<br>1201 West Peachtree Street<br>Atlanta, Georgia 30309-3424 |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**( ) A. Antitrust**
- [ ] 410 Antitrust

**( ) B. Personal Injury/Malpractice**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Medical Malpractice
- [ ] 365 Product Liability
- [ ] 368 Asbestos Product Liability

**( ) C. Administrative Agency Review**
- [ ] 151 Medicare Act

Social Security:
- [ ] 861 HIA ((1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g)
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g)

Other Statutes
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

**(●) D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**( ) E. General Civil (Other)  OR  ( ) F. Pro Se General Civil**

Real Property
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

Personal Property
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

Bankruptcy
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

Prisoner Petitions
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

Property Rights
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

Federal Tax Suits
- [ ] 870 Taxes (US plaintiff or defendant
- [ ] 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 RR & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

Other Statutes
- [ ] 400 State Reapportionment
- [x] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation

- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 900 Appeal of fee determination under equal access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
● 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Injunctive Relief for statutory violations pursuant to 12 U.S.C. 1821(e)(13)(A); Breach of Settlement Agreement; and Conversion.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐   DEMAND $ at least $4,000,000.00   Check YES only if demanded in complaint
JURY DEMAND: YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE 11/17/06   SIGNATURE OF ATTORNEY OF RECORD [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on November 17, 2006, true and accurate copies of foregoing Civil Cover Sheet, Summons, Complaint, Motion For Temporary Restraining Order and Preliminary and Permanent Injunction, Memorandum of Points and Authorities, Application for Temporary Restraining Order and Preliminary and Permanent Injunction, Proposed Order for Temporary Restraining Order, Proposed Order for Preliminary and Permanent Injunction, and Exhibits were served by hand delivery upon:

> Paul F. Brinkman
> Alston & Bird LLP
> 601 Pennsylvania Avenue, N.W.
> North Building, 10th Floor
> Washington, D.C. 20004-2601

and by e-mail and first class mail upon:

> John L. Douglas
> H. Stephen Harris, Jr.
> Alston & Bird LLP
> One Atlantic Center
> 1201 West Peachtree Street
> Atlanta, Georgia 30309-3424

_____
Scott H. Christensen