UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its Capacity as
Receiver for NextBank, N.A.,

Plaintiff,

v.

THE BANK OF NEW YORK, as Indenture
Trustee of the NextCard Credit Card Master
Note Trust,

Defendant.

Case No. 06-CV-1975-ESH

Hon. Ellen Segal Huvelle

**DECLARATION OF SCOTT H. CHRISTENSEN IN SUPPORT OF
THE FDIC RECEIVER'S EMERGENCY MOTION TO STAY RELATED CASES**

I, Scott H. Christensen, hereby declare as follows:

1.      I am an attorney admitted to practice before this Court.  I am an associate

of the firm Hughes Hubbard & Reed LLP, attorneys representing Plaintiff Federal Deposit

Insurance Corporation, in its Capacity as Receiver for NextBank, N.A. (the "FDIC Receiver") in

this civil action.  I have personal knowledge of the information contained in this Declaration and,

if called as a witness, could and would competently testify thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Answer of

First Millennium, Inc. and Millennium Partners, L.P. to the Interpleader Complaint, with

attachments, filed in the Supreme Court of the State of New York, County of New York in *Bank*

*of New York v. First Millennium, Inc.*, No. 650234/2006 (N.Y. Sup. Ct.).

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Notice of

Motion for Summary Judgment, the Memorandum of Law in Support of Motion for Summary

Judgment, and the Affidavit in Support of Motion for Summary Judgment of Interpleader

Defendants First Millennium, Inc. and Millennium Partners, L.P., with attachments, filed in the

Supreme Court of the State of New York, County of New York in *Bank of New York v. First*

*Millennium, Inc.*, No. 650234/2006 (N.Y. Sup. Ct.).

I declare under penalty of perjury that the foregoing is true and correct and that

this Declaration was executed at Washington, D.C. on November 30, 2006.

_____
Scott H. Christensen

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on November 30, 2006, true and accurate copies of foregoing Declaration of Scott H. Christensen in Support of the FDIC Receiver's Emergency Motion to Stay Related Cases were served by mail upon:

> John L. Douglas
> H. Stephen Harris, Jr.
> Alston & Bird LLP
> One Atlantic Center
> 1201 West Peachtree Street
> Atlanta, Georgia 30309-3424

> Paul F. Brinkman
> Alston & Bird LLP
> 601 Pennsylvania Avenue, N.W.
> North Building, 10th Floor
> Washington, D.C.  20004-2601

The undersigned further certifies that true an accurate copies of this document, without attachments, were sent by electronic mail to counsel listed above and to Noteholders' counsel:

> Michael J. Edelman
> Vedder Price, Kaufman & Kammholz, P.C.
> 805 Third Avenue
> New York, New York 10022

Scott H. Christensen

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

Interpleader Plaintiff,

-against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

Interpleader Defendants.

Index No. 650234/2006

**ANSWER OF FIRST MILLENNIUM,
INC. AND MILLENNIUM
PARTNERS, L.P. TO THE
<u>INTERPLEADER COMPLAINT</u>**

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P.
(together, "Millennium") by their attorneys, Vedder, Price, Kaufman & Kammholz, P.C., as and
for their Answer to the Interpleader Complaint (the "Complaint") of Interpleader Plaintiff The
Bank of New York, in its capacity as Indenture Trustee (in such capacity, the "Indenture
Trustee"), state as follows:

1.      Paragraph 1 of the Complaint alleges conclusions of law to which no response is
required.   To the extent that a response is deemed to be required, Millennium denies the
allegations contained in paragraph 1 of the Complaint, except admits that the Indenture Trustee
serves as the Indenture Trustee under the Master Indenture dated as of December 11, 2000 (as
amended and supplemented, the "Indenture"), between NextCard Credit Card Master Note Trust,
as issuer (the "Issuer"), and Indenture Trustee, and admits that the Indenture Trustee, in its
capacity as indenture trustee, holds certain assets (the "Collateral") of Issuer.

2.      Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint, except admits that the Indenture Trustee is the Indenture Trustee under the Indenture.

3.      Millennium admits the allegations contained in paragraph 3 of the Complaint.

4.      Millennium admits the allegations contained in paragraph 4 of the Complaint.

5.      Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 of the Complaint.

6.      Millennium admits the allegations contained in paragraph 6 of the Complaint.

7.      Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint.

8.      Millennium admits the allegations contained in paragraph 8 of the Complaint.

9.      Millennium admits the allegations contained in paragraph 9 of the Complaint.

10.     Millennium denies the allegations contained in paragraph 10 of the Complaint, except admits that Millennium and Interpleader Defendant RMK Advantage Fund (together, the "Directing Noteholders") have notified the Indenture Trustee that, as a result of the Issuer's default under the terms of the Indenture, the Indenture Trustee is now obligated, pursuant to the terms of the Notes and the Indenture, to collect and retain the proceeds of the Receivables and other Collateral for the benefit of the holders of notes under the Indenture (collectively, the "Noteholders"), and to take certain other actions with respect thereto (such notification, the "Instructions").

11.     Millennium denies the allegations contained in paragraph 11 of the Complaint, except admits that the Directing Noteholders issued the Instructions to the Indenture Trustee, as is their right pursuant to the express terms of the Indenture, and admits that the Directing

2

Noteholders notified the Indenture Trustee that its failure to follow the Instructions would constitute an actionable breach of the Master Indenture.

12.    Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint.

13.    Millennium denies the allegations contained in paragraph 13 of the Complaint, except admits that Millennium has disputed the FDIC's claims to the Collateral.

14.    Paragraph 14 of the Complaint asserts conclusions of law to which no response is required.    To the extent that a response is deemed to be required, Millennium denies the allegations contained in paragraph 14 of the Complaint.

15.    Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint.

16.    Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint, except admits that Millennium has not participated collusively in the bringing of this action.

## MILLENNIUM'S CLAIM TO THE COLLATERAL

By way of affirmative claim to the Collateral, Millennium alleges as follows.

17.    The secured financing obligations that constitute the subject of this action are part of a securitization in which a special purpose entity was established to own credit card receivables (the "Receivables"), which special purpose entity, in turn borrowed money from noteholders ("Noteholders") pursuant to the terms of an Indenture  and Notes and that were collateralized by such Receivables.

18.    The special purpose entity, NextCard Credit Card Master Note Trust (the "Issuer"), was established as a Delaware business trust pursuant to a Trust Agreement, dated as

of December 1, 2000 (the "Trust Agreement"), between NextBank, N.A. (NextBank"), as transferor, and Wilmington Trust Company, as owner trustee (the "Owner Trustee").

19.    The Issuer and the Indenture Trustee entered into that certain Master Indenture, dated as of December 11, 2000 (the "Master Indenture"), which was supplemented by:  the Series 99-1 Indenture Supplement dated as of December 11, 2000; the Series 2000-1 Indenture Supplement dated as of December 13, 2000 (the "2000-1 Indenture Supplement"); and the Series 2001-1 Indenture Supplement dated as of May 8, 2001 (the "2001-1 Indenture Supplement"; the three Indenture Supplements together are referred to hereinafter as the "Indenture Supplements," and the Master Indenture as amended together with the Indenture Supplements are referred to hereinafter as the "Indenture").  Copies of the Master Indenture and the 2000-1 Indenture Supplement are annexed hereto, respectively, as Exhibits A and B.  (For purposes of this litigation, the 2000-1 Indenture Supplement and the 2001-1 Indenture Supplement are substantially identical.)

20.    Under the terms of the Master Indenture, the Issuer was required to maintain an office or agency within the County of New York, New York. *See* Exhibit A, at § 3.02.

21.    To evidence its obligations under the Indenture, the Issuer delivered certain asset-backed notes (the "Notes") that were secured by a portfolio of credit card receivables owned by the Issuer.

22.    Under the terms of the Notes and the Indenture, the Indenture Trustee agreed to make loans to the Issuer under the terms of the Indenture and the Notes.  As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

| Series 2000-1 Notes: | |
|---|---|
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |

**TOTAL NOTES:**                                                    **$112,109,000.00**

The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2000-1 Notes." The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2001-1 Notes." Representative copies of the outstanding Series 2000-1 Notes and Series 2001-1 Notes are annexed hereto as Exhibit C.

23. Millennium currently holds unpaid principal in the following Notes: (a) Series 2000-1 Class C Notes: $16,243,500.00; (b) Series 2000-1 Class D Notes: $6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes: $13,000,000.00. Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes.

**The Obligations of the Issuer under the Notes Became Due and**
**Payable on the Redemption Event that Occurred on February 7, 2002**

24. Pursuant to the express terms of the Notes, the Issuer agreed to repay the "entire unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the Redemption Date, if any" (as such terms are defined in the Indenture) and to pay interest due thereon pursuant to the terms thereof. *See* Exhibit C, at p. 3 for each of the Notes.

25. The Indenture provides that a receivership of NextBank constitutes a "Trust Redemption Event" and a "Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders

immediately upon the occurrence of such event," which date, by definition, would constitute a "Redemption Date." *See* Exhibit A, § 5.01 (Master Indenture).

26.    NextBank entered into receivership on February 7, 2002.

27.    NextBank's entry into receivership constituted a Redemption Event which triggered the Notes to become due by their own terms. *See* Exhibit C, at p. 3 for each of the Notes.

28.    To the extent (if any) that Nextbank was a party to, or signatory of, the Indenture, in accordance with its rights in the NextBank receivership, the Federal Deposit Insurance Corporation (the "FDIC") repudiated NextBank's obligations under such contracts in July 2002.

29.    As a separate, independent entity, the Issuer is not the subject of the FDIC NextBank receivership.

30.    As a Redemption Event, NextBank's entry into receivership  also caused the commencement of the Early Amortization Period (as defined in the Indenture), whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes.

**The Issuer's Failure to Repay Principal When Due Constituted an Event of Default**

31.    Contrary to its obligations under both the Notes and the Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes.  The Issuer's failure to honor its contractual repayment obligations caused it to fail to make payments of principal due to

6

the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default").

32.     Section 5.03 of the Master Indenture states that if any of several listed Events of Default were to occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all of the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer . . ., and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

*See* Exhibit A, § 5.03.

33.     Due to the Issuer's failure to repay its obligations when due, Millennium and RMK Advantage Income Fund, who together constituted a majority of the outstanding Notes (the "Majority Noteholders"), directed that the Indenture Trustee (a) declare an event of default and accelerate all obligations on the Notes and (b) exercise remedies against the Collateral and the Receivables. In accordance with such instruction, by letter dated November 14, 2006 (the "Indenture Trustee's Acceleration Letter"), a copy of which is annexed hereto as Exhibit D, the Indenture Trustee notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable" and demanded that "all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, [be] immediately due and payable." *See* Exhibit D.

7

34.    In addition, on November 16, 2006 the Majority Noteholders also notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable." A copy of the Majority Noteholders' notice of event of default and acceleration is attached hereto as Exhibit E. The Majority Noteholders also "demand[ed] that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon." *See* Exhibit E.

35.    Despite these demands, the Issuer has failed to repay in full the Notes.

36.    In addition to declaring a notice of event of default and the acceleration, the Majority Noteholders instructed the Indenture Trustee to exercise remedies against the Receivables and Collateral pursuant to the terms of the Indenture.

**The Noteholders' Right to the Interpleader Assets Is**
**Mandated Under the Express Terms of the Master Indenture**

37.    Prior to filing this interpleader action, the interpleader plaintiff started exercising remedies to exercise control over the Receivables and the Collateral as directed by the Majority Noteholders. Shortly thereafter, the FDIC, in its capacity as the receiver of NextBank, threatened the Indenture Trustee with contempt and damages for starting to exercise such remedies. The Indenture Trustee responded by informing Millennium that the Indenture Trustee was going to rescind its enforcement actions, whereupon the Directing Noteholders demanded that the Indenture Trustee continue exercising such remedies and stated that the Indenture Trustee would be held responsible for any resulting damages to the Noteholders. Immediately thereafter, on November 16, 2006, the interpleader plaintiff commenced this interpleader action.

NEWYORK/#170755.3

38.    The assets that are the subject of this interpleader action constitute (a) amounts held in the so-called "Spread Accounts" (as defined in the Indenture) and (b) the Receivables and proceeds of the Receivables.

**A.    The Spread Accounts**

39.    The Indenture Trustee currently holds approximately $22 million in the Spread Accounts.

40.    The amounts currently owed to the C Noteholders substantially exceed the amounts in the Spread Accounts for each series of Notes.

41.    Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Accounts and the proceeds thereof.  *See* Exhibit B, § 4.11(a) (Indenture Supplement).

42.    Following the occurrence of an event of default and acceleration of the Notes, the Spread Accounts are required to be liquidated, with the funds distributed in accordance with the distribution scheme established under Section 5.02 of the Indenture Supplements for payment to the C Holders:

> [A]n amount equal to the balance on deposit [in the Spread Accounts shall be deposited] into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02 [of the Indenture Supplements], to fund any shortfalls in amounts owed to such Noteholders.

*See* Exhibit B, § 4.11(e).

43.    Section 5.02 of the Indenture Supplements, in turn, in relevant part, directs that distributions of the Spread Accounts be payable for interest and principal due to the Class C Noteholders of each Series.

NEWYORK/#170755.3

44.    As the principal and interest amounts owed to Class C Noteholders under each series of Notes is substantially in excess of the amounts on deposit in the Spread Accounts for each series of Notes, the Class C Noteholders, including Millennium, are entitled to the full amounts now held by the Indenture Trustee in the Spread Accounts.

**B.    The Receivables**

45.    The Indenture Trustee currently holds approximately $72 million worth of Receivables and proceeds of Receivables.

46.    Under the express terms of the Master Indenture, "all money and property [collected by the Indenture Trustee] pursuant to [] Article V following acceleration of the maturities of the Notes . . . shall [be paid] in the following order": (a) first, to the Indenture Trustee for fees and expenses, (b) second, to holders of Notes (in order of priority) "for amounts due and unpaid [on such] Notes for interest and principal, ratably, and (c) last, to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement." *See* Exhibit A, § 5.05(b).

47.    The Indenture provides the Indenture Trustee with numerous powers to take control of the collections of the Receivables and Collateral (and the proceeds thereof) after an event of default and acceleration. Master Indenture Section 5.06 expressly grants the Indenture Trustee with authority may take action to "maintain possession" and control of the Collateral in an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ." Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture.

NEWYORK/#170755.3

*See* Exhibit A, § 8.01.   These collections include all proceeds of the Receivables, all of which are required to be distributed in accordance with Section 5.05(b).

48.    A majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables.   *See* Exhibit A, Master Indenture, § 8.01.  In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series."  Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture.  The Majority Noteholders repeatedly specifically directed the Indenture Trustee to take all such actions in accordance with their rights under Section 5.12 of the Indenture.

49.    In accordance with these rights under the Indenture, after the event of default and acceleration issued by both the Indenture Trustee and the Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the scheme provided in Section 5.05(b) of the Master Indenture.

50.    Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

11

## DEMAND FOR RELIEF

WHEREFORE, Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. demand judgment:

51.    In their favor and against all adverse interpleader defendants and requiring interpleader plaintiff to distribute all interpleader assets to the Noteholders in accordance with the terms of the Indenture;

52.    Awarding said defendants their costs and attorneys' fees incurred in defending this action to the full extent allowed by law; and

53.    Awarding said defendants such other and further relief as this Court deems just and proper.


Dated: New York, New York
       November 20 , 2006

                                        VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.


                                        By: _____
                                              Michael J. Edelman
                                              Michael G. Davies
                                              805 Third Avenue
                                              New York, New York  10022-2203
                                              Tel:  (212) 407-7700
                                              Fax:  (212) 407-7799

                                        *Attorneys for Interpleader Defendants*
                                        *FIRST MILLENNIUM, INC. AND*
                                        *MILLENNIUM PARTNERS, L.P.*

12

**NEXTCARD CREDIT CARD MASTER NOTE TRUST**

Issuer

and

**THE BANK OF NEW YORK**

Indenture Trustee

**MASTER INDENTURE**

Dated as of December 11, 2000

DOCSSF1:490698

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS..................................................................... 2
    Section 1.01.  Definitions ..................................................... 2
    Section 1.02.  Other Definitional Provisions ................................. 13
ARTICLE II       THE NOTES ........................................................... 14
    Section 2.01.  Form Generally ............................................... 14
    Section 2.02.  Denominations ................................................ 15
    Section 2.03.  Execution, Authentication and Delivery........................ 15
    Section 2.04.  Authenticating Agent ......................................... 15
    Section 2.05.  Registration of and Limitations on Transfer and Exchange of
                   Notes. ....................................................... 16
    Section 2.06.  Mutilated, Destroyed, Lost or Stolen Notes.................... 18
    Section 2.07.  Persons Deemed Owners ........................................ 18
    Section 2.08.  Appointment of Paying Agent .................................. 19
    Section 2.09.  Access to List of Noteholders' Names and Addresses ........... 19
    Section 2.10.  Cancellation ................................................. 20
    Section 2.11.  Release of Collateral........................................ 20
    Section 2.12.  New Issuances................................................ 20
    Section 2.13.  Book-Entry Notes ............................................ 21
    Section 2.14.  Notices to Clearing Agency or Foreign Clearing Agency........ 22
    Section 2.15.  Definitive Notes ............................................ 23
    Section 2.16.  Global Note ................................................. 23
    Section 2.17.  Meetings of Noteholders ..................................... 23
    Section 2.18.  Uncertificated Classes....................................... 24
ARTICLE III      COVENANTS OF ISSUER ................................................ 24
    Section 3.01.  Payment of Principal and Interest ........................... 24
    Section 3.02.  Maintenance of Office or Agency.............................. 24
    Section 3.03.  Money for Note Payments to Be Held in Trust ................. 24
    Section 3.04.  Existence ................................................... 25
    Section 3.05.  Protection of Trust ......................................... 26
    Section 3.06.  Opinions as to Collateral................................... 26
    Section 3.07.  Performance of Obligations; Servicing of Receivables ........ 27

# TABLE OF CONTENTS
## (continued)

Page

Section 3.08.  Negative Covenants ........................................................ 28

Section 3.09.  Statements as to Compliance ........................................ 29

Section 3.10.  Issuer May Consolidate, Etc., Only on Certain Terms ............... 29

Section 3.11.  Successor Substituted.................................................... 30

Section 3.12.  No Other Business ......................................................... 31

Section 3.13.  No Borrowing ................................................................ 31

Section 3.14.  Servicer's Obligations.................................................... 31

Section 3.15.  Guarantees, Loans, Advances and Other Liabilities................ 31

Section 3.16.  Capital Expenditures...................................................... 31

Section 3.17.  Removal of Administrator .............................................. 31

Section 3.18.  Restricted Payments ...................................................... 31

Section 3.19.  Notice of Events of Default ........................................... 32

Section 3.20.  Further Instruments and Acts ......................................... 32

ARTICLE IV    SATISFACTION AND DISCHARGE............................. 32

Section 4.01.  Satisfaction and Discharge of this Indenture .................... 32

Section 4.02.  Application of Trust Money............................................. 33

ARTICLE V    REDEMPTION EVENTS, DEFAULTS AND REMEDIES ......... 33

Section 5.01.  Redemption Events ........................................................ 33

Section 5.02.  Events of Default ........................................................... 34

Section 5.03.  Acceleration of Maturity; Rescission and Annulment ............ 35

Section 5.04.  Collection of Indebtedness and Suits for Enforcement by Indenture
              Trustee................................................................... 35

Section 5.05.  Remedies; Priorities ...................................................... 37

Section 5.06.  Optional Preservation of the Collateral............................ 39

Section 5.07.  Limitation on Suits........................................................ 39

Section 5.08.  Unconditional Rights of Noteholders to Receive Principal and
              Interest.................................................................. 40

Section 5.09.  Restoration of Rights and Remedies ............................... 40

Section 5.10.  Rights and Remedies Cumulative .................................... 40

Section 5.11.  Delay or Omission Not Waiver....................................... 40

Section 5.12.  Rights of Noteholders to Direct Indenture Trustee ............ 41

**TABLE OF CONTENTS**
(continued)

Page

Section 5.13.  Waiver of Past Defaults ........................................................... 41

Section 5.14.  Undertaking for Costs ............................................................. 41

Section 5.15.  Waiver of Stay or Extension Laws ........................................... 42

Section 5.16.  Sale of Receivables ................................................................. 42

Section 5.17.  Action on Notes ...................................................................... 42

ARTICLE VI      THE INDENTURE TRUSTEE ................................................ 43

Section 6.01.  Duties of the Indenture Trustee............................................... 43

Section 6.02.  Notice of Redemption Event or Event of Default...................... 44

Section 6.03.  Rights of Indenture Trustee..................................................... 45

Section 6.04.  Not Responsible for Recitals or Issuance of Notes.................... 46

Section 6.05.  May Hold Notes...................................................................... 46

Section 6.06.  Money Held in Trust................................................................ 46

Section 6.07.  Compensation, Reimbursement and Indemnification............... 46

Section 6.08.  Replacement of Indenture Trustee ........................................... 47

Section 6.09.  Successor Indenture Trustee by Merger.................................... 48

Section 6.10.  Appointment of Co-Indenture Trustee or Separate
                Indenture Trustee .................................................................. 48

Section 6.11.  Eligibility; Disqualification ..................................................... 49

Section 6.12.  Preferential Collection of Claims Against ................................. 49

Section 6.13.  Tax Returns............................................................................ 49

Section 6.14.  Representations and Covenants of the Indenture Trustee ......... 50

Section 6.15.  Custody of the Collateral ........................................................ 50

ARTICLE VII     NOTEHOLDERS' LIST AND REPORTS BY INDENTURE
                TRUSTEE AND ISSUER................................................................. 50

Section 7.01.  Issuer to Furnish Indenture Trustee Names and Addresses of
                Noteholders ........................................................................... 50

Section 7.02.  Preservation of Information; Communications to Noteholders ... 51

Section 7.03.  Reports by Issuer.................................................................... 51

Section 7.04.  Reports by Indenture Trustee .................................................. 51

ARTICLE VIII    ALLOCATION AND APPLICATION OF COLLECTIONS ..................... 52

Section 8.01.  Collection of Money ............................................................... 52

# TABLE OF CONTENTS
## (continued)

Page

Section 8.02.   Rights of Noteholders ........................................................................ 52
Section 8.03.   Establishment of Collection Account and Special Funding Account ...... 52
Section 8.04.   Collections and Allocations ................................................................ 54
Section 8.05.   Shared Principal Collections ............................................................. 55
Section 8.06.   Additional Withdrawals from the Collection Account ........................... 55
Section 8.07.   Allocation of Collateral to Series or Groups....................................... 56
Section 8.08.   Excess Finance Charge Collections .................................................. 56
Section 8.09.   Release of Collateral; Eligible Loan Documents ................................. 57
Section 8.10.   Opinion of Counsel........................................................................... 57

ARTICLE IX       DISTRIBUTIONS AND REPORTS TO NOTEHOLDERS ................... 57
ARTICLE X        SUPPLEMENTAL INDENTURES ............................................... 58

Section 10.01. Supplemental Indentures Without Consent of Noteholders.................... 58
Section 10.02. Supplemental Indentures with Consent of Noteholders........................... 59
Section 10.03. Execution of Supplemental Indentures ................................................. 60
Section 10.04. Effect of Supplemental Indenture ....................................................... 60
Section 10.05. Conformity With Trust Indenture Act .................................................. 61
Section 10.06. Reference in Notes to Supplemental Indentures..................................... 61

ARTICLE XI       TERMINATION................................................................................ 61

Section 11.01. Termination of Trust ......................................................................... 61
Section 11.02. Final Distribution.............................................................................. 61
Section 11.03. Termination Distributions .................................................................. 62
Section 11.04. Defeasance ..................................................................................... 62

ARTICLE XII      MISCELLANEOUS ......................................................................... 63

Section 12.01. Compliance Certificates and Opinions etc........................................... 63
Section 12.02. Form of Documents Delivered to Indenture Trustee .............................. 65
Section 12.03. Acts of Noteholders ......................................................................... 65
Section 12.04. Notices, Etc. to Indenture Trustee and Issuer ...................................... 66
Section 12.05. Notices to Noteholders; Waiver......................................................... 66
Section 12.06. Alternate Payment and Notice Provisions ........................................... 67
Section 12.07. Conflict with Trust Indenture Act....................................................... 67

**TABLE OF CONTENTS**
(continued)

Page

Section 12.08. Effect of Headings and Table of Contents ........................................ 67

Section 12.09. Successors and Assigns .................................................................... 67

Section 12.10. Severability ....................................................................................... 67

Section 12.11. Benefits of Indenture ........................................................................ 68

Section 12.12. Legal Holidays .................................................................................. 68

Section 12.13. GOVERNING LAW .......................................................................... 68

Section 12.14. Counterparts ...................................................................................... 68

Section 12.15. Trust Obligation ................................................................................. 68

Section 12.16. No Petition ......................................................................................... 68

RECONCILIATION AND TIE BETWEEN TRUST INDENTURE
ACT OF 1939 AND INDENTURE PROVISIONS[*]

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03, 7.04 |
| (d) | 7.04 |
| 314(a) | 3.09, 7.03(a) |
| (b) | 3.06 |
| (c)(1) | 2.11, 8.09(c), 12.01(a) |
| (c)(2) | 2.11, 8.09(c), 12.01(a) |
| (c)(3) | 2.11, 8.09(c), 12.01(a) |
| (d)(1) | 2.11, 8.09(c), 12.01(b) |
| (d)(2) | Not Applicable |
| (d)(3) | Not Applicable |
| (e) | 12.01(a) |
| 315(a) | 6.01(b) |
| (b) | 6.02 |
| (c) | 6.01(c) |
| (d) | 6.01(d) |
| (d)(1) | 6.01(d) |
| (d)(2) | 6.01(d) |
| (d)(3) | 6.01(d) |
| (e) | 5.14 |
| 316(a)(1)(A) | 5.12 |
| 316(a)(1)(B) | 5.13 |
| 316(a)(2) | Not Applicable |
| 316(b) | 5.08 |
| 317(a)(1) | 5.04 |
| 317(a)(2) | 5.04(d) |
| 317(b) | 5.04(a) |
| 318(a) | 12.07 |

---

[*]This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

An extra section break has been inserted above this paragraph. Do not delete this section break if you plan to add text after the Table of Contents/Authorities.  Deleting this break will cause Table of Contents/Authorities headers and footers to appear on any pages following the Table of Contents/Authorities.

This MASTER INDENTURE, dated as of December 11, 2000 (herein, as amended, modified or supplemented from time to time as permitted hereby, called this "**Indenture**"), between NextCard Credit Card Master Note, Trust, a business trust organized under the laws of the State of Delaware (herein, together with its permitted successors and assigns, called the "**Issuer**" or the "**Trust**"), and The Bank of New York, a New York banking corporation, as indenture trustee (herein, together with its successors in the trusts hereunder, called the "**Indenture Trustee**"). This Indenture may be supplemented at any time and from time to time by an indenture supplement in accordance with Article X hereof (an "**Indenture Supplement**," and any Indenture Supplement together with this Indenture and amendments hereof collectively referred to as the "**Agreement**"). If a conflict exists between the terms and provisions of this Indenture and any Indenture Supplement, the terms and provisions of the Indenture Supplement shall be controlling with respect to the related Series.

## PRELIMINARY STATEMENT

The Issuer has duly authorized the execution and delivery of this Indenture to provide for an issue of its asset backed notes (the "**Notes**") as provided in this Indenture. All covenants and agreements made by the Issuer herein are for the benefit and security of the Noteholders. The Issuer is entering into this Indenture, and the Indenture Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

Simultaneously with the delivery of this Indenture the Issuer is entering into the Transfer and Servicing Agreement with NextBank, N.A., a national banking association, as Transferor and Servicer (in such respective capacities, the "**Transferor**" or the "**Servicer**"), pursuant to which (a) the Transferor will convey to the Issuer all of its right, title and interest in, to and under the Receivables and (b) the Servicer will agree to service the Receivables and make collections thereon on behalf of the Noteholders.

Under the Transfer and Servicing Agreement, Receivables arising in the Accounts from time to time will be conveyed thereunder to the Issuer.

## GRANTING CLAUSES

The Issuer hereby Grants to the Indenture Trustee, for the benefit of the Holders of the Notes, all of the Issuer's right, title and interest, whether now owned or hereafter acquired, in, to and under (a) the Receivables existing at the close of business on the Initial Cut-Off Date, in the case of Receivables arising in the Initial Accounts and the Prior Additional Accounts, and on each Addition Cut-Off Date, in the case of Receivables arising in the Additional Accounts, and in each case thereafter created from time to time, (b) all Interchange and Recoveries allocable to the Issuer as provided in the Transfer and Servicing Agreement and all monies due or to become due and all amounts received or receivable with respect thereto, (c) all moneys and other property credited to the Collection Account, the Series Accounts and the Special Funding Account (including any subaccounts of such account), and all interest, dividends, earnings, income and other distributions from time to time received, receivable or otherwise distributed or distributable thereto or in respect thereof (including any accrued discount realized on liquidation of any investment purchased at a discount), (d) all rights, remedies, powers, privileges and claims of the Issuer under or with respect to any Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement (whether arising pursuant to the terms of such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement or otherwise available to the Issuer at law or in equity), including, without limitation, the rights of the Issuer to enforce such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement, and to give or withhold any and all consents, requests, notices, directions, approvals, extensions or waivers under or with respect to such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement to the same extent as

the Issuer could but for the assignment and security interest granted to the Indenture Trustee for the benefit of the Noteholders, (e) the property conveyed to the Issuer under any Participation Interest Supplement and the right to receive Recoveries attributed to cardholder charges for merchandise and services in the Accounts, (f) all money, accounts, general intangibles, chattel paper, instruments, documents, goods, investment property, deposit accounts, certificates of deposit, letters of credit, and advices of credit consisting of, arising from, or related to the foregoing, (g) all other property of the Issuer, and (h) all present and future claims, demands, causes and chose in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds, products, rents, receipts or profits of the conversion, voluntary or involuntary, into cash or other property, all cash and non-cash proceeds, and other property consisting of, arising from or relating to all or any part of any of the foregoing; in each case, excluding the Transferor Interest and all amounts distributable to the Holders of any Certificates pursuant to the terms of any Transaction Document (collectively, the "Collateral").

### LIMITED RECOURSE

The obligation of the Issuer to make payments of principal of, interest on and other amounts with respect to, the Notes is limited by recourse only to the Collateral.

### ARTICLE I

### DEFINITIONS

Section 1.01.    Definitions.

Whenever used in this Indenture, the following words and phrases shall have the following meanings, and the definitions of such terms are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

"Account Owner" shall have the meaning specified in the Transfer and Servicing Agreement.

"Accumulation Period" shall mean, with respect to any Series, or any Class within a Series, a period following the Revolving Period during which Collections of Principal Receivables are accumulated in an account for the benefit of the Noteholders of such Series or Class within such Series, which shall be the controlled accumulation period, the principal accumulation period, the early accumulation period, the optional accumulation period, the limited accumulation period or other accumulation period, in each case as defined with respect to such Series in the related Indenture Supplement.

"Act" shall have the meaning specified in subsection 12.03(a).

"Administration Agreement" shall mean the Administration Agreement, dated as of December 1, 2000 among the Issuer and the Administrator, as the same may be amended, supplemented or otherwise modified from time to time.

"Administrator" shall mean NextBank, or its permitted successors and assigns, or any successor Administrator under the Administration Agreement.

"Adverse Effect" shall have the meaning specified in the Transfer and Servicing Agreement.

"Aggregate Investor Percentage" shall mean, with respect to Principal Receivables, Finance Charge Receivables and Defaulted Receivables, as the case may be, as of any date of determination, the sum of such Series Percentages of all Series of Notes issued and outstanding on such date of determination; provided, however, that the Aggregate Investor Percentage shall not exceed 100%.

"Agreement" shall mean this Master Indenture, as the same may be amended, supplemented or otherwise modified from time to time, including, with respect to any Series or Class, the related Indenture Supplement.

"Amortization Period" shall mean, with respect to any Series, or any Class within a Series, a period following the Revolving Period during which Collections of Principal Receivables are distributed to Noteholders, which shall be the controlled amortization period, the principal amortization period, the rapid amortization period, the optional amortization period, the limited amortization period or other amortization period, in each case as defined with respect to such Series in the related Indenture Supplement.

"Applicants" shall have the meaning specified in Section 2.09.

"Authorized Officer" shall mean:

(a)    with respect to the Issuer, any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to the Issuer and who is identified on the list of Authorized Officers, containing the specimen signature of each such Person, delivered by the Owner Trustee to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter) and any Vice President or more senior officer of the Administrator who is authorized to act for the Administrator in matters relating to the Issuer and to be acted upon by the Administrator pursuant to the Administration Agreement and who is identified on the list of Authorized Officers (containing the specimen signatures of such officers) delivered by the Administrator to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter).

(b)    with respect to the Transferor, any officer of the Transferor who is authorized to act for the Transferor in matters relating to the Transferor and who is identified on the list of Authorized Officers, containing the specimen signature of each such Person, delivered by the Transferor to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter)

(c)    with respect to the Servicer, any officer of the Servicer who is authorized to act for the Servicer in matters relating to the Servicer and who is identified on the list of Authorized Officers, containing the specimen signature of each such Person, delivered by the Servicer to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter)

"Bearer Notes" shall have the meaning specified in Section 2.01.

"Beneficial Owner" shall mean, with respect to a Book-Entry Note, the Person who is the owner of such Book-Entry Note, as reflected on the books of the Clearing Agency or Foreign Clearing Agency, or on the books of a Person maintaining an account with such Clearing Agency or Foreign Clearing Agency (directly as a Clearing Agency Participant or as an Indirect Participant, in accordance with the rules of such Clearing Agency or Foreign Clearing Agency).

"Book-Entry Notes" shall mean beneficial interests in the Notes, ownership and transfers of which shall be made through book entries by a Clearing Agency or Foreign Clearing Agency as described in Section 2.13.

"Certificates" shall have the meaning specified in the Trust Agreement.

"Class" shall mean, with respect to any Series, any one of the classes of Notes of that Series.

"Clearing Agency" shall mean an organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934, as amended, and serving as clearing agency for a Series or Class of Book-Entry Notes.

"Clearing Agency Participant" shall mean a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Clearstream" shall mean Clearstream Banking, *société anonyme*, a professional depository incorporated under the laws of Luxembourg, and its successors.

"Closing Date" shall mean, with respect to any Series, the closing date specified in the related Indenture Supplement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning specified in the Granting Clause of this Indenture.

"Collection Account" shall have the meaning specified in Section 8.03.

"Collections" shall have the meaning specified in the Transfer and Servicing Agreement.

"Commission" shall mean the Securities and Exchange Commission and its successors in interest.

"Corporate Trust Office" means the principal office of the Indenture Trustee at which at any particular time its corporate trust business shall be administered, which office at date of the execution of this Indenture is located at 101 Barclay Street, 12 East, New York, New York 10286, or at such other address as the Indenture Trustee may designate from time to time by notice to the Noteholders and the Transferor, or the principal corporate trust office of any successor Indenture Trustee (the address of which the successor Indenture Trustee will notify the Noteholders and the Transferor); provided that for the purposes of Section 3.02, the address of any such office shall be in the Borough of Manhattan of the City of New York.

"Coupon" shall have the meaning specified in Section 2.01.

"Default" shall mean any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Defeasance" shall have the meaning specified in subsection 11.04(a).

"<u>Defeased Series</u>" shall have the meaning specified in subsection 11.04(a).

"<u>Definitive Notes</u>" shall mean Notes in definitive, fully registered form.

"<u>Deposit Date</u>" shall mean each day on which the Servicer deposits Collections in the Collection Account.

"<u>Determination Date</u>" shall mean, unless otherwise specified in the Indenture Supplement for a particular Series, the earlier of the third Business Day and the fifth calendar day (or if the fifth calendar day is not a Business Day, then the preceding Business Day) preceding the seventeenth day of each calendar month.

"<u>Discount Percentage</u>" shall have the meaning specified in the Transfer and Servicing Agreement.

"<u>Distribution Date</u>" shall mean, with respect to any Series, the date specified in the applicable Indenture Supplement.

"<u>Dollars</u>," "<u>$</u>" or "<u>U.S. $</u>" shall mean United States dollars.

"<u>DTC</u>" shall mean The Depository Trust Company.

"<u>Eligible Institution</u>" shall mean a depository institution (which may be the Owner Trustee or the Indenture Trustee) organized under the laws of the United States or any one of the states thereof, including the District of Columbia (or any domestic branch of a foreign bank) which depository institution at all times (a) has either (i) a long-term unsecured debt rating of Aa3 or better by Moody's or (ii) a certificate of deposit rating of P-1 by Moody's, (b) has either (i) a long-term unsecured debt rating of AA- by Standard & Poor's or (ii) a certificate of deposit rating of A-1+ by Standard & Poor's and (c) is a member of the FDIC. Notwithstanding the previous sentence, any institution the appointment of which satisfies the Rating Agency Condition shall be considered an Eligible Institution. If so qualified, the Servicer may be considered an Eligible Institution for the purposes of this definition.

"<u>Eligible Investments</u>" shall mean, as of any date of determination, the following instruments, investment property, or other property, other than securities issued by or obligations of NextBank:

(a)     direct obligations of, or obligations fully guaranteed as to timely payment by, the United States of America;

(b)     demand deposits, time deposits or certificates of deposit (having original maturities of no more than 365 days) of depository institutions or trust companies incorporated under the laws of the United States of America or any state thereof, including the District of Columbia (or domestic branches of foreign banks) and subject to supervision and examination by federal or state banking or depository institution authorities; <u>provided</u> that at the time of the Trust's investment or contractual commitment to invest therein, the short-term debt rating of such depository institution or trust company shall be in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch;

(c)     commercial paper or other short-term obligations (having original or remaining maturities of no more than thirty (30) days) (including short-term obligations of NextCard)

having, at the time of the Trust's investment or contractual commitment to invest therein, a rating in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch;

(d)     demand deposits, time deposits and certificates of deposit which (i) are scheduled to mature on a date occurring no later than the immediately succeeding Distribution Date, (ii) are fully insured by the FDIC and (iii) have, at the time of the Trust's investment therein, a rating in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch;

(e)     bankers' acceptances (having original maturities of no more than 365 days) issued by any depository institution or trust company referred to in clause (b) above;

(f)     money market funds having, at the time of the Trust's investment therein, a rating in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch (including funds for which the Indenture Trustee or any of its Affiliates is investment manager or advisor);

(g)     time deposits (other than those referred to in clause (d) above), with a Person the commercial paper of which has a credit rating satisfactory to Standard & Poor's, Moody's and, if rated by Fitch, Fitch and which are scheduled to mature on a date occurring no later than the immediately succeeding Distribution Date; or

(h)     any other investment of a type or rating that satisfies the Rating Agency Condition.

"Enhancement Agreement" shall mean any agreement, instrument or document governing the terms of any Series Enhancement or pursuant to which any Series Enhancement is issued or outstanding.

"Euroclear Operator" shall mean Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear System.

"Event of Default" shall have the meaning specified in Section 5.02.

"Excess Allocation Series" shall mean a Series that, pursuant to the Indenture Supplement therefor, is entitled to receive certain excess Collections of Finance Charge Receivables, as more specifically set forth in such Indenture Supplement. If so specified in the Indenture Supplement for a Group of Series, each such Series may be an Excess Allocation Series only for the other Series in such Group.

"Excess Finance Charge Collections" shall have the meaning specified in Section 8.08.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Finance Charge Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Finance Charge Shortfalls" shall have the meaning specified in Section 8.08.

"Final Maturity Date" shall mean, with respect to any Series, the final maturity date for such Series specified in the related Indenture Supplement.

"Foreign Clearing Agency" shall mean Clearstream and the Euroclear Operator.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Global Note" shall have the meaning specified in Section 2.16.

"Grant" means to mortgage, pledge, bargain, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to this Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Group" shall mean, with respect to any Series, the group of Series, if any, in which the related Indenture Supplement specifies such Series is to be included.

"Indenture" shall mean this Master Indenture, dated as of December 11, 2000, between the Issuer and the Indenture Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Indenture Supplement" shall mean, with respect to any Series, a supplement to the Indenture, executed and delivered in connection with the original issuance of the Notes of such Series pursuant to Section 10.01, and an amendment to the Indenture executed pursuant to Sections 10.01 or 10.02, and, in either case, including all amendments thereof and supplements thereto.

"Indenture Trustee" shall mean The Bank of New York, in its capacity as trustee under the Agreement, its successors in interest and any successor indenture trustee under the Agreement.

"Independent" shall mean, when used with respect to any specified Person, that the Person (a) is in fact independent of the Issuer, any other obligor upon the Notes, the Transferor and any Affiliate of any of the foregoing Persons, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Transferor or any Affiliate of any of the foregoing Persons and (c) is not connected with the Issuer, any such other obligor, the Transferor or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

"Independent Certificate" shall mean a certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 12.01, made by an Independent appraiser or other expert appointed by an Issuer Order, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

"Indirect Participant" shall mean other Persons such as securities brokers and dealers, banks and trust companies that clear or maintain a custodial relationship with a participant of DTC, either directly or indirectly.

"Insolvency Event" shall have the meaning specified in subsection 5.01(a).

"Invested Amount" shall mean, with respect to any Series and for any date, an amount equal to the "Invested Amount" or "Adjusted Invested Amount," as applicable, specified in the related Indenture Supplement.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended.

"Issuer" shall mean the Trust.

"Issuer Order" and "Issuer Request" shall mean a written order or request signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Indenture Trustee.

"Lien" shall have the meaning specified in the Transfer and Servicing Agreement.

"Monthly Period" shall mean, with respect to each Distribution Date, unless otherwise provided in an Indenture Supplement, the period from and including the first day of the preceding calendar month to and including the last day of such calendar month; provided, however, that the initial Monthly Period with respect to any Series will commence on the Closing Date with respect to such Series.

"New Issuance" shall have the meaning specified in subsection 2.12(a).

"NextBank" shall mean NextBank, N.A., a national banking association, and its successors and permitted assigns.

"NextCard" shall mean NextCard, Inc, a Delaware corporation, and its successors and permitted assigns.

"Note Interest Rate" shall mean, as of any particular date of determination and with respect to any Series or Class, the interest rate as of such date specified therefor in the related Indenture Supplement.

"Note Owner" shall mean, with respect to a Book-Entry Note, the Person who is the owner of such Book-Entry Note, as reflected on the books of the Clearing Agency, or on the books of a Person maintaining an account with such Clearing Agency (directly as a Clearing Agency Participant or as an indirect participant, in accordance with the rules of such Clearing Agency).

"Note Register" shall have the meaning specified in Section 2.05.

"Noteholder" or "Holder" shall mean the Person in whose name a Note is registered on the Note Register and, if applicable, the holder of any Bearer Note, Global Note, or Coupon, as the case may be, or such other Person deemed to be a "Noteholder" or "Holder" in any related Indenture Supplement.

"Notes" shall mean all Series of Notes issued by the Trust pursuant to the Indenture and the applicable Indenture Supplement.

"Officer's Certificate" shall mean, unless otherwise specified in this Indenture, a certificate delivered to the Indenture Trustee signed by any Authorized Officer of the Issuer, Transferor,

or Servicer, as applicable, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 12.01.

"Opinion of Counsel" shall mean a written opinion of counsel, who may be counsel for, or an employee of, the Person providing the opinion and who shall be reasonably acceptable to the Indenture Trustee; provided that a Tax Opinion shall be an opinion of nationally recognized tax counsel.

"Outstanding" shall mean, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture except:

(i)     Notes theretofore canceled by the Transfer Agent and Registrar or delivered to the Transfer Agent and Registrar for cancellation;

(ii)     Notes or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Indenture Trustee or any Paying Agent in trust for the Holders of such Notes (provided, however, that if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor, satisfactory to the Indenture Trustee, has been made); and

(iii)     Notes in exchange for or in lieu of other Notes which have been authenticated and delivered pursuant to this Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a Protected Purchaser;

provided that in determining whether the Holders of the requisite Outstanding Amount of the Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by the Issuer, any other obligor upon the Notes, the Transferor, the Servicer or any Affiliate of any of the foregoing Persons shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Indenture Trustee actually knows to be so owned shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledge establishes to the satisfaction of the Indenture Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes, the Transferor, the Servicer or any Affiliate of any of the foregoing Persons. In making any such determination, the Indenture Trustee may rely on the representations of the pledgee and shall not be required to undertake any independent investigation.

"Outstanding Amount" means the aggregate principal amount of all Notes Outstanding at the date of determination and, with respect to the Notes of a particular Series, the aggregate principal amount of all Notes of such Series which are Outstanding at the date of determination.

"Owner Trustee" shall mean Wilmington Trust Company, not in its individual capacity, but solely as owner trustee under the Trust Agreement, its successors in interest and any successor owner trustee under the Trust Agreement.

"Paired Series" shall mean (i) each Series which has been paired with another Series (which Series may be prefunded or partially prefunded), such that the reduction of the Invested Amount or Adjusted Invested Amount of such Series results in the increase of the Invested Amount of such other Series, as described in the related Indenture Supplements, and (ii) such other Series.

"Paying Agent" shall mean any paying agent appointed pursuant to Section 2.08 and shall initially be the Indenture Trustee; provided that if the Indenture Supplement for a Series so provides, a separate or additional Paying Agent may be appointed with respect to such Series.

"Permitted Assignee" shall mean any Person who, if it were to purchase Receivables (or interests therein) in connection with a sale thereof pursuant to Sections 5.05(a) and 5.16, would not cause the Trust to be taxable as a publicly traded partnership for federal income tax purposes.

"Principal Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Principal Sharing Series" shall mean a Series that, pursuant to the Indenture Supplement therefor, is entitled to receive Shared Principal Collections. If so specified in the Indenture Supplement for a Group of Series, each such Series may be Principal Sharing Series only for the other Series in such Group.

"Principal Shortfalls" shall have the meaning specified in Section 8.05.

"Principal Terms" shall mean, with respect to any Series, (a) the name or designation; (b) the initial principal amount (or method for calculating such amount), the Invested Amount and the Required Transferor Interest; (c) the Note Interest Rate for each Class of Notes of such Series (or method for the determination thereof); (d) the payment date or dates and the date or dates from which interest shall accrue; (e) the method for allocating Collections to Noteholders; (f) the designation of any Series Accounts and the terms governing the operation of any such Series Accounts; (g) the Servicing Fee; (h) the issuer and terms of any form of Series Enhancements with respect thereto; (i) the terms on which the Notes of such Series may be exchanged for Notes of another Series, repurchased by the Transferor or remarketed to other investors; (j) the Final Maturity Date; (k) the number of Classes of Notes of such Series and, if more than one Class, the rights and priorities of each such Class; (l) the extent to which the Notes of such Series will be issuable in temporary or permanent global form (and, in such case, the depositary for such global note or notes, the terms and conditions, if any, upon which such global note may be exchanged, in whole or in part, for Definitive Notes, and the manner in which any interest payable on a temporary or global note will be paid); (m) whether the Notes of such Series may be issued in bearer form and any limitations imposed thereon; (n) the priority of such Series with respect to any other Series; (o) whether such Series will be part of a Group; (p) whether such Series will be a Principal Sharing Series; (q) whether such Series will be an Excess Allocation Series; (r) the Distribution Date; (s) whether such Series will or may be a Paired Series and the Series with which it will be paired, if applicable; and (t) any other terms of such Series.

"Proceeding" shall mean any suit in equity, action at law or other judicial or administrative proceeding.

"Protected Purchaser" shall have the meaning set forth in the New York Uniform Commercial Code.

"Qualified Account" shall mean either (a) a segregated account with an Eligible Institution or (b) a segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States or any one of the states thereof, including the District of Columbia (or any domestic branch of a foreign bank), and acting as a trustee for funds deposited in such account, so long as any of the unsecured, unguaranteed senior debt securities of such depository institution shall have a credit rating from each Rating Agency in one of its generic credit rating categories that signifies investment grade.

"Rating Agency" shall mean, with respect to any outstanding Series or Class, each rating agency, as specified in the applicable Indenture Supplement, selected by the Transferor to rate the Notes of such Series or Class.

"Rating Agency Condition" shall mean, with respect to any action, that each Rating Agency shall have notified the Transferor and the Indenture Trustee in writing that such action will not result in a reduction or withdrawal of the then existing rating of any outstanding Series or Class with respect to which it is a Rating Agency or, with respect to any outstanding Series or Class not rated by any Rating Agency, the written consent of such Series or Class as specified in the Indenture Supplement for such Series.

"Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Record Date" shall mean, with respect to any Distribution Date, the last day of the calendar month immediately preceding such Distribution Date unless otherwise specified for a Series in the related Indenture Supplement.

"Redemption Date" shall mean, with respect to any Series, the date or dates, if any, specified in the related Indenture Supplement.

"Redemption Event" shall mean, with respect to any Series, a Trust Redemption Event or a Series Redemption Event.

"Registered Notes" shall have the meaning specified in Section 2.01.

"Required Transferor Interest" shall mean, with respect to any date, an amount equal to the product of (i) the Required Transferor Percentage and (ii) the aggregate amount of Principal Receivables.

"Required Transferor Percentage" shall mean 9%; provided, however, that the Transferor may reduce the Required Transferor Percentage upon (x) thirty (30) days prior notice to the Indenture Trustee and each Rating Agency, (y) satisfaction of the Rating Agency Condition with respect thereto and (z) delivery to the Indenture Trustee of a certificate of a Vice President or more senior officer of the Transferor stating that the Transferor reasonably believes that such reduction will not, based on the facts known to such officer at the time of such certification, then or thereafter have an Adverse Effect; provided further that the Required Transferor Percentage shall not at any time be less than 2%.

"Responsible Officer" shall mean, when used with respect to the Indenture Trustee, any officer (a) within the Corporate Trust Office of the Indenture Trustee including any vice president, assistant vice president, assistant treasurer, assistant secretary, trust officer or any other officer of the Indenture Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers or to whom any corporate trust matter is referred at the Corporate Trust Office because of such officer's knowledge of and familiarity with the particular subject and (b) who shall have direct responsibility for the administration of the Agreement and the other Transaction Documents.

"Revolving Period" shall have, with respect to each Series, the meaning specified in the related Indenture Supplement.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Seller" shall mean any of NextBank or another Account Owner, in its capacity as seller under the Receivables Purchase Agreement.

"Series" shall mean any series of Notes issued pursuant to this Indenture and the related Indenture Supplement.

"Series Account" shall mean any deposit, trust, securities escrow or similar account maintained for the benefit of the Noteholders of any Series or Class, as specified in any Indenture Supplement.

"Series Enhancement" shall mean the rights and benefits provided to the Trust or the Noteholders of any Series or Class pursuant to any letter of credit, surety bond, cash collateral account, collateral invested amount, spread account, reserve account, guaranteed rate agreement, maturity liquidity facility, tax protection agreement, interest rate swap agreement, interest rate cap agreement or other similar arrangement. The subordination of any Series or Class to another Series or Class shall be deemed to be a Series Enhancement.

"Series Enhancer" shall mean the Person or Persons providing any Series Enhancement, other than (except to the extent otherwise provided with respect to any Series in the Indenture Supplement for such Series) the Noteholders of any Series or Class which is subordinated to another Series or Class.

"Series Issuance Date" shall mean, with respect to any Series, the date on which the Notes of such Series are to be originally issued in accordance with Section 2.12 and the related Indenture Supplement.

"Series Redemption Event" shall have, with respect to any Series, the meaning specified pursuant to the related Indenture Supplement.

"Servicer" shall have the meaning specified in the Transfer and Servicing Agreement.

"Shared Excess Finance Charge Collections" shall mean, with respect to any Distribution Date, the aggregate amount for all outstanding Series that the related Indenture Supplements specify are to be treated as "Shared Excess Finance Charge Collections" for such Distribution Date.

"Shared Principal Collections" shall have the meaning specified in Section 8.05.

"Special Funding Account" shall have the meaning set forth in Section 8.03.

"Special Funding Amount" shall mean the amount on deposit in the Special Funding Account.

"Tax Opinion" shall mean, with respect to any action, an Opinion of Counsel to the effect that, for federal income tax purposes, (a) such action will not adversely affect the tax characterization as debt of the Notes of any outstanding Series or Class that were characterized as debt at the time of their issuance, (b) such action will not cause the Trust to be deemed to be an association (or publicly traded partnership) taxable as a corporation and (c) such action will not cause or constitute an event in which gain or loss would be recognized by any Noteholder.

"Termination Proceeds" shall have the meaning specified in subsection 11.02(c).

"Transaction Documents" shall mean, with respect to any Series of Notes, the Certificate of Trust, the Trust Agreement, the Receivables Purchase Agreements, the Transfer and Servicing Agreement, this Indenture, the related Indenture Supplement, the Administration Agreement and such other documents and certificates delivered in connection therewith.

"Transfer Agent and Registrar" shall have the meaning specified in Section 2.05.

"Transfer and Servicing Agreement" shall mean the Transfer and Servicing Agreement, dated as of December 11, 2000, among the Transferor, the Servicer and the Issuer, as the same may be amended, supplemented or otherwise modified from time to time.

"Transfer Date" shall mean the Business Day immediately preceding each Distribution Date.

"Transferor" shall have the meaning specified in the Transfer and Servicing Agreement.

"Transferor Interest" shall mean on any date of determination an amount equal to (a) the sum of (i) an amount equal to the aggregate balance of Principal Receivables at the end of the day immediately prior to such date of determination *plus* (ii) the Special Funding Amount at the end of the day immediately prior to such date of determination *minus* (b) the aggregated Invested Amounts with respect to all Series of Notes issued and outstanding on such date of determination.

"Transferor Percentage" shall mean, on any date of determination, when used with respect to Principal Receivables, Finance Charge Receivables and Defaulted Receivables, a percentage equal to 100% *minus* the Aggregate Investor Percentage with respect to such category of Receivables.

"Trust" shall mean the NextCard Credit Card Master Note Trust.

"Trust Agreement" shall mean the Trust Agreement relating to the Trust, dated as of December 1, 2000, between NextBank and the Owner Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Trust Indenture Act" or "TIA" shall mean the Trust Indenture Act of 1939, as amended.

"Trust Redemption Event" shall have, with respect to each Series, the meaning specified in Section 5.01.

"UCC" shall have the meaning specified in the Transfer and Servicing Agreement.

Section 1.02.    Other Definitional Provisions.

(a)    With respect to any Series, all terms used herein and not otherwise defined herein shall have meanings ascribed to them in the Trust Agreement, the Transfer and Servicing Agreement or the related Indenture Supplement, as applicable.

(b)    All terms defined in this Indenture shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(c)    As used in this Indenture and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Indenture or in any such certificate or other document, and accounting terms partly defined in this Indenture or in any such

certificate or other document to the extent not defined, shall have the respective meanings given to them under GAAP. To the extent that the definitions of accounting terms in this Indenture or in any such certificate or other document are inconsistent with the meanings of such terms under GAAP, the definitions contained in this Indenture or in any such certificate or other document shall control.

(d)    Any reference to each Rating Agency shall only apply to any specific rating agency if such rating agency is then rating any outstanding Series.

(e)    Unless otherwise specified, references to any amount as on deposit or outstanding on any particular date shall mean such amount at the close of business on such day.

(f)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture; references to any subsection, Section, Schedule or Exhibit are references to subsections, Sections, Schedules and Exhibits in or to this Indenture unless otherwise specified; and the term "including" means "including without limitation."

(g)    Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes.

"indenture security holder" means a Noteholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Indenture Trustee.

"obligor" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule have the meaning assigned to them by such definitions.

## ARTICLE II

## THE NOTES

Section 2.01.    Form Generally.

Any Series or Class of Notes, together with the Indenture Trustee's certificate of authentication related thereto, may be issued in bearer form (the "Bearer Notes") with attached interest coupons and a special coupon (collectively, the "Coupons") or in fully registered form (the "Registered Notes") and shall be in substantially the form of an exhibit to the related Indenture Supplement with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture or such Indenture Supplement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the officers executing such Notes, as evidenced by their execution of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference

thereto on the face of the Note. The terms of any Notes set forth in an exhibit to the related Indenture Supplement are part of the terms of this Indenture, as applicable.

The Definitive Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods, all as determined by the officers executing such Notes, as evidenced by its execution of such Notes.

Each Note will be dated the Closing Date and each Definitive Note will be dated as of the date of its authentication.

Section 2.02.    Denominations.

Except as otherwise specified in the related Indenture Supplement and the Notes, each class of Notes of each Series shall be issued in fully registered form in minimum amounts of $1,000 and in integral multiples of $1,000 in excess thereof (except that one Note of each Class may be issued in a different amount, so long as such amount exceeds the applicable minimum denomination for such Class), and shall be issued upon initial issuance as one or more Notes in an aggregate original principal amount equal to the applicable Invested Amount for such Class or Series.

Section 2.03.    Execution, Authentication and Delivery.

Each Note shall be executed by manual or facsimile signature on behalf of the Issuer by an Authorized Officer.

Notes bearing the manual or facsimile signature of an individual who was, at the time when such signature was affixed, authorized to sign on behalf of the Issuer shall not be rendered invalid, notwithstanding the fact that such individual ceased to be so authorized prior to the authentication and delivery of such Notes or does not hold such office at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Indenture Trustee for authentication and delivery, and the Indenture Trustee shall authenticate and deliver such Notes as provided in this Indenture or the related Indenture Supplement and not otherwise.

No Note shall be entitled to any benefit under this Indenture or the applicable Indenture Supplement or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein or in the related Indenture Supplement executed by or on behalf of the Indenture Trustee by the manual signature of a duly authorized signatory, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.04.    Authenticating Agent.

(a)    The Indenture Trustee may appoint one or more authenticating agents with respect to the Notes which shall be authorized to act on behalf of the Indenture Trustee in authenticating the Notes in connection with the issuance, delivery, registration of transfer, exchange or repayment of the Notes. Whenever reference is made in this Indenture to the authentication of Notes by the Indenture Trustee or the Indenture Trustee's certificate of authentication, such reference shall be deemed to include authentication on behalf of the Indenture Trustee by an authenticating agent and a certificate of authentication executed on behalf of the Indenture Trustee by an authenticating agent. Each authenticating agent must be acceptable to the Issuer and the Servicer.

(b)    Any institution succeeding to the corporate agency business of an authenticating agent shall continue to be an authenticating agent without the execution or filing of any power or any further act on the part of the Indenture Trustee or such authenticating agent.

(c)    An authenticating agent may at any time resign by giving written notice of resignation to the Indenture Trustee, the Issuer and the Servicer. The Indenture Trustee may at any time terminate the agency of an authenticating agent by giving notice of termination to such authenticating agent and to the Issuer and the Servicer. Upon receiving such a notice of resignation or upon such a termination, or in case at any time an authenticating agent shall cease to be acceptable to the Indenture Trustee or the Issuer and the Servicer, the Indenture Trustee may promptly appoint a successor authenticating agent. Any successor authenticating agent upon acceptance of its appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an authenticating agent. No successor authenticating agent shall be appointed unless acceptable to the Issuer and the Servicer.

(d)    The Issuer agrees to pay to each authenticating agent from time to time reasonable compensation for its services under this Section 2.04.

(e)    The provisions of Sections 6.01 and 6.04 shall be applicable to any authenticating agent.

(f)    Pursuant to an appointment made under this Section 2.04, the Notes may have endorsed thereon, in lieu of or in addition to the Indenture Trustee's certificate of authentication, an alternative certificate of authentication in substantially the following form:

"This is one of the Notes described in the within-mentioned Agreement.

_____

_____
as Authenticating Agent
for the Indenture Trustee

By:_____
Authorized Signatory"

Section 2.05.    Registration of and Limitations on Transfer and Exchange of Notes.

The Issuer shall cause to be kept a register (the '**Note Register**') in which the entity acting as transfer agent and registrar (the "**Transfer Agent and Registrar**") shall provide for the registration of Notes and the registration of transfers of Notes. The Indenture Trustee initially shall be the Transfer Agent and Registrar for the purpose of registering Notes and transfers of Notes as herein provided. Upon any resignation of any Transfer Agent and Registrar, the Issuer shall promptly appoint a successor or, if it elects not to make such an appointment, assume the duties of Transfer Agent and Registrar.

If a Person other than the Indenture Trustee is appointed by the Issuer as Transfer Agent and Registrar, the Issuer will give the Indenture Trustee prompt written notice of the appointment of a Transfer Agent and Registrar and of the location, and any change in the location, of the Transfer Agent

and Registrar and Note Register. The Indenture Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof, and the Indenture Trustee shall have the right to rely upon a certificate executed on behalf of the Transfer Agent and Registrar by an officer thereof as to the names and addresses of the Noteholders and the principal amounts and numbers of such Notes.

Upon surrender for registration of transfer of any Note at the office or agency of the Transfer Agent and Registrar, to be maintained as provided in Section 3.02, if the requirements of Section 8-401 of the UCC are met, the Issuer shall execute, and upon receipt of such surrendered Note the Indenture Trustee shall authenticate and deliver to the Noteholder, in the name of the designated transferee or transferees, one or more new Notes (of the same Series and Class) in any authorized denominations of like aggregate principal amount.

At the option of a Noteholder, Notes may be exchanged for other Notes (of the same Series and Class) in any authorized denominations and of like aggregate principal amount, upon surrender of such Notes to be exchanged at the office or agency of the Transfer Agent and Registrar. Whenever any Notes are so surrendered for exchange, if the requirements of Section 8-401 of the UCC are met, the Issuer shall execute, and upon receipt of such surrendered Note the Indenture Trustee shall authenticate and deliver to the Noteholder, the Notes which the Noteholder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or exchange of Notes shall evidence the same obligations, evidence the same debt, and be entitled to the same rights and privileges under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed by, or be accompanied by a written instrument of transfer in a form satisfactory to the Indenture Trustee duly executed by, the Noteholder thereof or its attorney-in-fact duly authorized in writing, and by such other documents as the Indenture Trustee may reasonably require.

The registration of transfer of any Note shall be subject to the additional requirements, if any, set forth in the related Indenture Supplement.

No service charge shall be made for any registration of transfer or exchange of Notes, but the Issuer and Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of such Notes.

All Notes surrendered for registration of transfer and exchange shall be canceled by the Issuer and delivered to the Indenture Trustee for subsequent destruction without liability on the part of either. The Indenture Trustee shall destroy the Global Note upon its exchange in full for Definitive Notes and shall deliver a certificate of destruction to the Transferor. Such certificate shall also state that a certificate or certificates of each Foreign Clearing Agency referred to in the applicable Indenture Supplement was received with respect to each portion of the Global Note exchanged for Definitive Notes.

Unless otherwise set forth in an Indenture Supplement, the preceding provisions of this Section 2.05 notwithstanding, the Issuer shall not be required to make, and the Transfer Agent and Registrar need not register, transfers or exchanges of Notes for a period of twenty (20) days preceding the due date for any payment with respect to the Note.

If and so long as any Series of Notes are listed on the Luxembourg Stock Exchange and such exchange shall so require, the Indenture Trustee shall appoint a co-transfer agent and co-registrar in Luxembourg or another European city. Any reference in this Indenture to the Transfer Agent and Registrar shall include any co-transfer agent and co-registrar unless the context otherwise requires. The

Indenture Trustee will enter into any appropriate agency agreement with any co-transfer agent and co-registrar not a party to this Indenture, which will implement the provisions of this Indenture that relate to such agent. The Indenture Trustee initially appoints Kredietbank S.A. Luxembourgeoise, at its office located at 43 Boulevard Royal, L-2955 Luxembourg, as Transfer Agent and Registrar for each Series of Notes listed on the Luxembourg Stock Exchange.

Section 2.06.    Mutilated, Destroyed, Lost or Stolen Notes.

If (a) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its reasonable satisfaction of the destruction, loss or theft of any Note, and (b) in case of destruction, loss, or theft there is delivered to the Indenture Trustee such security or indemnity as may be required by it to hold the Issuer, the Noteholders and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Transfer Agent and Registrar or the Indenture Trustee that such Note has been acquired by a Protected Purchaser, the Issuer shall execute, and the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of like tenor (including the same date of issuance) and principal amount, bearing a number not contemporaneously outstanding; provided, however, that if any such mutilated, destroyed, lost or stolen Note shall have become or within seven (7) days shall be due and payable, or shall have been selected or called for redemption, instead of issuing a replacement Note, the Issuer may pay such Note without surrender thereof, except that any mutilated Note shall be surrendered. If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a Protected Purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a Protected Purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 2.06, the Issuer may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee or the Transfer Agent and Registrar) connected therewith.

Every replacement Note issued pursuant to this Section 2.06 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute complete and indefeasible evidence of debt of the Trust, as if originally issued, whether or not the mutilated, destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.06 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.07.    Persons Deemed Owners.

Prior to due presentment for registration of transfer of any Note, the Issuer, the Indenture Trustee and any agent of the Transferor, the Issuer or the Indenture Trustee shall treat the Person in whose name any Note is registered as the owner of such Note for the purpose of receiving distributions pursuant to the terms of the applicable Indenture Supplement and for all other purposes whatsoever, whether or not

such Note is overdue, and neither the Issuer, the Transferor, the Indenture Trustee nor any agent of the Issuer, the Transferor or the Indenture Trustee shall be affected by any notice to the contrary.

Section 2.08.    Appointment of Paying Agent.

(a)    The Issuer reserves the right at any time to vary or terminate the appointment of a Paying Agent for the Notes, and to appoint additional or other Paying Agents, provided that it will at all times maintain the Indenture Trustee as Paying Agent.

If and so long as any Notes are listed on the Luxembourg Stock Exchange and such exchange shall so require, the Indenture Trustee will appoint a co-paying agent in Luxembourg or another European city. The Indenture Trustee will enter into any appropriate agency agreement with any co-paying agent not a party to this Indenture, which will implement the provisions of this Indenture that relate to such agent. The Indenture Trustee initially appoints Kredietbank S.A. Luxembourgeoise, at its office located at 43 Boulevard Royal, L-2955 Luxembourg, as Paying Agent for each Series of Notes listed on the Luxembourg Stock Exchange.

Notice of all changes in the identity or specified office of a Paying Agent will be delivered promptly to the Noteholders by the Indenture Trustee.

(b)    The Indenture Trustee shall cause the Paying Agent (other than itself) to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee that such Paying Agent will hold all sums, if any, held by it for payment to the Noteholders in trust for the benefit of the Noteholders entitled thereto until such sums shall be paid to such Noteholders and shall agree, and if the Indenture Trustee is the Paying Agent it hereby agrees, that it shall comply with all requirements of the Code regarding the withholding by the Indenture Trustee of payments in respect of federal income taxes due from the Beneficial Owners.

Section 2.09.    Access to List of Noteholders' Names and Addresses.

(a)    The Issuer will furnish or cause to be furnished to the Indenture Trustee, the Servicer, any Noteholder or the Paying Agent, within five (5) Business Days after receipt by the Issuer of a written request therefor from the Indenture Trustee, the Servicer, such Noteholder or the Paying Agent, respectively, a list of the names and addresses of the Noteholders. Unless otherwise provided in the related Indenture Supplement, holders of 10% of the Outstanding Amount of the Notes of any Series (the "**Applicants**") may apply in writing to the Indenture Trustee, and if such application states that the Applicants desire to communicate with other Noteholders of any Series with respect to their rights under this Indenture or under the Notes and is accompanied by a copy of the communication which such Applicants propose to transmit, then the Indenture Trustee, after having been adequately indemnified by such Applicants for its costs and expenses, shall afford or shall cause the Transfer Agent and Registrar to afford such Applicants access during normal business hours to the most recent list of Noteholders held by the Indenture Trustee and shall give the Servicer notice that such request has been made, within five (5) Business Days after the receipt of such application. Such list shall be as of a date no more than forty-five (45) days prior to the date of receipt of such Applicants' request.

(b)    Every Noteholder, by receiving and holding a Note, agrees that none of the Issuer, the Indenture Trustee, the Transfer Agent and Registrar and the Servicer or any of their respective agents and employees shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Noteholders hereunder, regardless of the sources from which such information was derived.

Section 2.10.    <u>Cancellation</u>.

All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly canceled by it. Pursuant to an Issuer Request, the Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any lawful manner whatsoever, and all Notes so delivered shall be promptly canceled by the Indenture Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Notes held by the Indenture Trustee shall be destroyed unless the Issuer shall direct by a timely order that they be returned to it.

Section 2.11.    <u>Release of Collateral</u>

Subject to Section 12.01, the Indenture Trustee shall release property from the lien of this Indenture only upon receipt of an Issuer Request accompanied by an Officer's Certificate, an Opinion of Counsel and Independent Certificates in accordance with TIA §314(c) and 314(d) or an Opinion of Counsel in lieu of such Independent Certificates to the effect that the TIA does not require any such Independent Certificates.

Section 2.12.    <u>New Issuances</u>

(a)    Pursuant to one or more Indenture Supplements, the Transferor may from time to time direct the Owner Trustee in writing, on behalf of the Issuer, to issue one or more new Series of Notes (a "<u>New Issuance</u>"). The Notes of all outstanding Series shall be equally and ratably entitled as provided herein to the benefits of this Indenture without preference, priority or distinction, all in accordance with the terms and provisions of this Indenture and the applicable Indenture Supplement except, with respect to any Series or Class, as provided in the related Indenture Supplement. Interest on the Notes of all outstanding Series shall be paid on each Distribution Date as specified in the Indenture Supplement relating to such outstanding Series. Principal of the Notes of each outstanding Series shall be paid as specified in the Indenture Supplement relating to such outstanding Series.

(b)    On or before the Series Issuance Date relating to any new Series of Notes, the parties hereto will execute and deliver an Indenture Supplement which will specify the Principal Terms of such Series. The terms of such Indenture Supplement may modify or amend the terms of this Indenture solely as applied to such new Series. The obligation of the Owner Trustee to execute, on behalf of the Issuer, the Notes of any Series and of the Indenture Trustee to authenticate such Notes and to execute and deliver the related Indenture Supplement (other than any Series issued pursuant to an Indenture Supplement dated as of December 11, 2000) is subject to the satisfaction of the following conditions:

(i)    on or before the fifth day immediately preceding the Series Issuance Date the Transferor shall have given the Owner Trustee, the Indenture Trustee, the Servicer and each Rating Agency notice (unless such notice requirement is otherwise waived) of such issuance and the Series Issuance Date;

(ii)    the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee any related Indenture Supplement, in form satisfactory to the Owner Trustee (as such and in its individual capacity) and the Indenture Trustee, executed by each party hereto (other than the Indenture Trustee);

(iii)    the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee any related Enhancement Agreement executed by the provider of the credit enhancement and the other parties thereto;

(iv)    the Rating Agency Condition shall have been satisfied with respect to such issuance;

(v)    such issuance will not result in any Adverse Effect and the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee an Officer's Certificate, dated the Series Issuance Date to the effect that (i) the Transferor reasonably believes that such issuance will not, based on the facts known to such officer at the time of such certification, have an Adverse Effect, and (ii) all conditions precedent to such execution, authentication, and delivery have been satisfied;

(vi)    there shall have been delivered to the Owner Trustee and the Indenture Trustee (with a copy to each Rating Agency) a Tax Opinion, dated the Series Issuance Date with respect to such issuance; and

(vii)    the aggregate amount of Principal Receivables plus the principal amount of any Participation Interest theretofore conveyed to the Trust as of the Series Issuance Date shall be greater than the Required Minimum Principal Balance and the Transferor Interest shall be greater than the Required Transferor Interest, each as of the Series Issuance Date and after giving effect to such issuance.

Any Note held by the Transferor at any time after the date of its initial issuance may be transferred or exchanged only upon the delivery to the Owner Trustee and the Indenture Trustee of a Tax Opinion dated as of the date of such transfer or exchange, as the case may be, with respect to such transfer or exchange.

(c)    Upon satisfaction of the above conditions, pursuant to Section 2.03, the Owner Trustee, on behalf of the Issuer, shall execute and the Indenture Trustee shall authenticate and deliver the Notes of such Series as provided in this Indenture and the applicable Indenture Supplement. Notwithstanding the provisions of this Section 2.12, prior to the execution of any Indenture Supplement (other than any Indenture Supplement dated as of December 11, 2000), the Indenture Trustee and Owner Trustee shall be entitled to receive and rely upon an Opinion of Counsel stating that the execution of such Indenture Supplement is authorized or permitted by this Indenture and any Indenture Supplement related to any outstanding Series. The Indenture Trustee and Owner Trustee may, but shall not be obligated to, enter into any such Indenture Supplement which adversely affects the Indenture Trustee's or Owner Trustee's (as such or in its individual capacity) own rights, duties, benefits, protections, privileges or immunities under this Indenture.

(d)    The Issuer may direct the Indenture Trustee to deposit the net proceeds from any New Issuance in the Special Funding Account. The Issuer may also specify that on any Transfer Date the proceeds from the sale of any new Series may be withdrawn from the Special Funding Account and treated as Shared Principal Collections.

Section 2.13.    <u>Book-Entry Notes</u>.

Unless otherwise provided in any related Indenture Supplement, the Notes, upon original issuance, shall be issued in the form of typewritten Notes representing the Book-Entry Notes to be delivered to the depository specified in such Indenture Supplement which shall be the Clearing Agency or Foreign Clearing Agency, by or on behalf of such Series.

The Notes of each Series shall, unless otherwise provided in the related Indenture Supplement, initially be registered in the Note Register in the name of the nominee of the Clearing Agency or Foreign Clearing Agency for such Book-Entry Notes and shall be delivered to the Indenture Trustee or, pursuant to such Clearing Agency's or Foreign Clearing Agency's instructions held by the Indenture Trustee's agent as custodian for the Clearing Agency or Foreign Clearing Agency.

Unless and until Definitive Notes are issued under the limited circumstances described in Section 2.15, no Beneficial Owner shall be entitled to receive a Definitive Note representing such Beneficial Owner's interest in such Note. Unless and until Definitive Notes have been issued to the Beneficial Owners pursuant to Section 2.15:

(a)    the provisions of this Section 2.13 shall be in full force and effect with respect to each such Series;

(b)    the Indenture Trustee shall be entitled to deal with the Clearing Agency or Foreign Clearing Agency and the Clearing Agency Participants for all purposes of this Indenture (including the payment of principal of and interest on the Notes of each such Series) as the authorized representatives of the Beneficial Owners;

(c)    to the extent that the provisions of this Section 2.13 conflict with any other provisions of this Indenture, the provisions of this Section 2.13 shall control with respect to each such Series;

(d)    the rights of Beneficial Owners of each such Series shall be exercised only through the Clearing Agency or Foreign Clearing Agency and the applicable Clearing Agency Participants and shall be limited to those established by law and agreements between such Beneficial Owners and the Clearing Agency or Foreign Clearing Agency and/or the Clearing Agency Participants. Pursuant to the depository agreement applicable to a Series, unless and until Definitive Notes of such Series are issued pursuant to Section 2.15, the initial Clearing Agency shall make book-entry transfers among the Clearing Agency Participants and receive and transmit distributions of principal and interest on the Notes to such Clearing Agency Participants; and

(e)    whenever this Indenture requires or permits actions to be taken based upon instructions or directions of the Holders of Notes evidencing a specified percentage of the Outstanding Amount of the Notes, the Clearing Agency or Foreign Clearing Agency shall be deemed to represent such percentage only to the extent that they have received instructions to such effect from the Beneficial Owners and/or Clearing Agency Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to a Responsible Officer of the Indenture Trustee.

Section 2.14.    Notices to Clearing Agency or Foreign Clearing Agency.

Whenever a notice or other communication to the Noteholders is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 2.15, the Indenture Trustee shall give all such notices and communications specified herein to be given to Noteholders to the Clearing Agency or Foreign Clearing Agency, as applicable, and shall have no obligation to the Beneficial Owners.

22

Section 2.15.  <u>Definitive Notes</u>.

If (i) (a) the Issuer advises the Indenture Trustee in writing that the Clearing Agency or Foreign Clearing Agency is no longer willing or able to discharge properly its responsibilities as Clearing Agency or Foreign Clearing Agency with respect to the Book-Entry Notes of a given Class and (b) the Indenture Trustee or Issuer is unable to locate and reach an agreement on satisfactory terms with a qualified successor, (ii) the Issuer, at its option, advises the Indenture Trustee in writing that it elects to terminate the book-entry system through the Clearing Agency or Foreign Clearing Agency with respect to such Class or (iii) after the occurrence of a Servicer Default, Beneficial Owners aggregating a majority of the Outstanding Amount of the Notes (or such other percentage as specified in the related Indenture Supplement) of such Class advise the Indenture Trustee and the applicable Clearing Agency or Foreign Clearing Agency through the applicable Clearing Agency Participants in writing that the continuation of a book-entry system is no longer in the best interests of the Beneficial Owners of such Class, the Clearing Agency or Foreign Clearing Agency, as the case may be, shall notify all Beneficial Owners of such Class of the occurrence of such event and of the availability of Definitive Notes to Beneficial Owners of such Class requesting the same.  Upon surrender to the Indenture Trustee of the Notes of such Class, accompanied by registration instructions from the applicable Clearing Agency, the Issuer shall execute and the Indenture Trustee shall authenticate Definitive Notes of such Class and shall recognize the registered holders of such Definitive Notes as Noteholders under this Indenture.  Neither the Issuer nor the Indenture Trustee shall be liable for any delay in delivery of such instructions, and the Issuer and the Indenture Trustee may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes of such Series, all references herein to obligations imposed upon or to be performed by the applicable Clearing Agency or Foreign Clearing Agency shall be deemed to be imposed upon and performed by the Indenture Trustee, to the extent applicable with respect to such Definitive Notes and to the extent that the Indenture Trustee is able to so perform, and the Indenture Trustee shall recognize the registered holders of the Definitive Notes of such Series as Noteholders of such Series hereunder.  Definitive Notes will be transferable and exchangeable at the offices of the Transfer Agent and Registrar.

Section 2.16.  <u>Global Note</u>.

If specified in the related Indenture Supplement for any Series, Notes may be initially issued in the form of a single temporary Global Note (the "**Global Note**") in bearer form, without interest coupons, in the denomination of the Initial Invested Amount and substantially in the form attached to the related Indenture Supplement.  Unless otherwise specified in the related Indenture Supplement, the provisions of this Section 2.16 shall apply to such Global Note.  The Global Note will be authenticated by the Indenture Trustee upon the same conditions, in substantially the same manner and with the same effect as the Definitive Notes.  The Global Note may be exchanged in the manner described in the related Indenture Supplement for Registered Notes or Bearer Notes in definitive form.  Except as otherwise specifically provided in the Indenture Supplement, any Notes that are issued in bearer form pursuant to this Indenture shall be issued in accordance with the requirements of Code section 163(f)(2).

Section 2.17.  <u>Meetings of Noteholders</u>.

To the extent provided by the Indenture Supplement for any Series issued in whole or in part in Bearer Notes, the Servicer or the Indenture Trustee may at any time call a meeting of the Noteholders of such Series, to be held at such time and at such place as the Servicer or the Indenture Trustee, as the case may be, shall determine, for the purpose of approving a modification of or amendment to, or obtaining a waiver of, any covenant or condition set forth in this Indenture with respect to such Series or in the Notes of such Series, subject to Article X.

Section 2.18.    Uncertificated Classes.

Notwithstanding anything to the contrary contained in this Article II or in Article XI, unless otherwise specified in any Indenture Supplement, any provisions contained in this Article II and in Article XI relating to the registration, form, execution, authentication, delivery, presentation, cancellation and surrender of Notes shall not be applicable to any uncertificated Notes, provided, however, that, except as otherwise specifically provided in the Indenture Supplement, any such uncertificated Notes shall be issued in "registered form" within the meaning of Code section 163(f)(1).

ARTICLE III

COVENANTS OF ISSUER

Section 3.01.    Payment of Principal and Interest.

(a)  The Issuer will duly and punctually pay principal and interest in accordance with the terms of the Notes as specified in the relevant Indenture Supplement.

(b)    The Noteholders of a Series as of the Record Date in respect of a Distribution Date shall be entitled to the interest accrued and payable and principal payable on such Distribution Date as specified in the related Indenture Supplement.  All payment obligations under a Note are discharged to the extent such payments are made to the Noteholder of record.

Section 3.02.    Maintenance of Office or Agency.

The Issuer will maintain an office or agency within the Borough of Manhattan, City of New York and such other locations as may be set forth in an Indenture Supplement where Notes may be presented or surrendered for payment, where Notes may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer hereby initially appoints the Indenture Trustee at its Corporate Trust Office to serve as its agent for the foregoing purposes.  The Issuer will give prompt written notice to the Indenture Trustee and the Noteholders of the location, and of any change in the location, of any such office or agency.  If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee at its Corporate Trust Office as its agent to receive all such presentations, surrenders, notices and demands.

Section 3.03.    Money for Note Payments to Be Held in Trust.

As specified in Section 8.03 herein and in the related Indenture Supplement, all payments of amounts due and payable with respect to the Notes which are to be made from amounts withdrawn from the Collection Account and the Special Funding Account shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Collection Account or the Special Funding Account shall be paid over to or at the direction of the Issuer except as provided in this Section 3.03 and in the related Indenture Supplement.

Whenever the Issuer shall have a Paying Agent in addition to the Indenture Trustee, it will, on or before the Business Day next preceding each Distribution Date, direct the Indenture Trustee to deposit with such Paying Agent on or before such Distribution Date an aggregate sum sufficient to pay the amounts then becoming due, such sum to be (i) held in trust for the benefit of Persons entitled thereto and (ii) invested, pursuant to an Issuer Order, by the Paying Agent in an Eligible Investment in

accordance with the terms of the related Indenture Supplement. For all investments made by a Paying Agent under this Section 3.03, such Paying Agent shall be entitled to all of the rights and obligations of the Indenture Trustee under the related Indenture Supplement, such rights and obligations being incorporated in this paragraph by this reference.

The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 3.03, that such Paying Agent, in acting as Paying Agent, is an express agent of the Issuer and, further, that such Paying Agent will:

　　　　(i)　　hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

　　　　(ii)　　give the Indenture Trustee notice of any default by the Issuer (or any other obligor upon the Notes) of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

　　　　(iii)　　at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

　　　　(iv)　　immediately resign as a Paying Agent and forthwith pay to the Indenture Trustee all sums held by it by in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment; and

　　　　(v)　　comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Order direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which such sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Section 3.04.　　Existence.

The Issuer will keep in full effect its existence, rights and franchises as a business trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Collateral and each other related instrument or agreement.

Section 3.05.    Protection of Trust.

The Issuer will from time to time prepare, or cause to be prepared, execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(a)    Grant more effectively all or any portion of the Collateral as security for the Notes;

(b)    maintain or preserve the lien (and the priority thereof) of this Indenture or to carry out more effectively the purposes hereof;

(c)    perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture;

(d)    enforce any of the Collateral; or

(e)    preserve and defend title to the Collateral securing the Notes and the rights therein of the Indenture Trustee and the Noteholders secured thereby against the claims of all Persons and parties.

The Issuer hereby designates the Indenture Trustee its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required pursuant to this Section 3.05.

The Issuer shall pay or cause to be paid any taxes levied on all or any part of Receivables securing the Notes.

Section 3.06.    Opinions as to Collateral

(a)    On the Series Issuance Date relating to any new Series of Notes, the Issuer shall furnish to the Indenture Trustee an Opinion of Counsel (with a copy to each Rating Agency) either stating that, in the opinion of such counsel, such action has been taken to perfect the security interest of this Indenture, including without limitation with respect to the recording and filing of this Indenture, any indentures supplemental hereto, and any other requisite documents, and with respect to the execution and filing of any financing statements and continuation statements, as are so necessary and reciting the details of such action, or stating that, in the opinion of such counsel, no such action is necessary to maintain the perfection of such security interest, and that such perfected security interest is of first priority.

(b)    On or before May 30 in each calendar year, beginning in 2002, the Issuer shall furnish to the Indenture Trustee an Opinion of Counsel (with a copy to each Rating Agency) either stating that, in the opinion of such counsel, such action has been taken to perfect security interest of this Indenture, including without limitation with respect to the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is so necessary and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the perfection of such security interest, and that such perfected security interest is of first priority. Such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such

counsel, be required to maintain the perfection of the lien and security interest of this Indenture until May 30 in the following calendar year.

Section 3.07.    Performance of Obligations; Servicing of Receivables.

(a)    The Issuer will not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Collateral or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as expressly provided in this Indenture, the Transfer and Servicing Agreement or such other instrument or agreement.

(b)    The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer. Initially, the Issuer has contracted with the Administrator to assist the Issuer in performing its duties under this Indenture.

(c)    The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the other Transaction Documents and in the instruments and agreements relating to the Collateral, including but not limited to filing or causing to be filed all UCC financing statements and continuation statements required to be filed by the terms of this Indenture and the Transfer and Servicing Agreement in accordance with and within the time periods provided for herein and therein. Except as otherwise expressly provided herein or therein, the Issuer shall not waive, amend, modify, supplement or terminate any Transaction Document or any provision thereof without the consent of the Holders of 66-2/3% of the Outstanding Amount of the Notes of each adversely affected Series.

(d)    If the Issuer shall have knowledge of the occurrence of a Servicer Default under the Transfer and Servicing Agreement, the Issuer shall cause the Indenture Trustee to promptly notify the Rating Agencies thereof, and shall cause the Indenture Trustee to specify in such notice the action, if any, being taken with respect to such default. If a Servicer Default shall arise from the failure of the Servicer to perform any of its duties or obligations under the Transfer and Servicing Agreement with respect to the Receivables, the Issuer shall take all reasonable steps available to it to remedy such failure.

(e)    On and after the receipt by the Servicer of a Termination Notice pursuant to Section 7.01 of the Transfer and Servicing Agreement, the Servicer shall continue to perform all servicing functions under the Transfer and Servicing Agreement until the date specified in the Termination Notice or otherwise specified by the Indenture Trustee or until a date mutually agreed upon by the Servicer and the Indenture Trustee. As promptly as possible after the giving of a Termination Notice to the Servicer, the Indenture Trustee shall appoint a Successor Servicer, and such Successor Servicer shall accept its appointment by a written assumption in a form acceptable to the Indenture Trustee. In the event that a Successor Servicer has not been appointed and accepted its appointment at the time when the Servicer ceases to act as Servicer, the Indenture Trustee without further action shall automatically be appointed the Successor Servicer. The Indenture Trustee may delegate any of its servicing obligations to an Affiliate or agent in accordance with subsection 3.01(b) and Section 5.07 of the Transfer and Servicing Agreement. Notwithstanding the foregoing, the Indenture Trustee shall, if it is legally unable so to act, petition at the expense of the Servicer a court of competent jurisdiction to appoint any established institution qualifying as an Eligible Servicer as the Successor Servicer. The Indenture Trustee shall give prompt notice to each Rating Agency and each Series Enhancer upon the appointment of a Successor Servicer. Upon its appointment, the Successor Servicer shall be the successor in all respects to the Servicer with respect to servicing functions under the Transfer and Servicing Agreement and shall be subject to all the

responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions thereof, and all references in this Indenture to the Servicer shall be deemed to refer to the Successor Servicer. In connection with any Termination Notice, the Indenture Trustee will review any bids which it obtains from Eligible Servicers and shall be permitted to appoint any Eligible Servicer submitting such a bid as a Successor Servicer for servicing compensation, subject to the limitations set forth in Section 7.02 of the Transfer and Servicing Agreement.

(f)    Without derogating from the absolute nature of the assignment granted to the Indenture Trustee under this Indenture or the rights of the Indenture Trustee hereunder, the Issuer agrees (i) that it will not, without the prior written consent of the Indenture Trustee and holders of at least 66-2/3% of the Outstanding Amount of the Notes of each Series, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Collateral (except to the extent otherwise provided in the Transfer and Servicing Agreement) or the Transaction Documents (except to the extent otherwise provided in the Transaction Documents), or waive timely performance or observance by the Servicer or the Transferor under the Transfer and Servicing Agreement; and (ii) that any such amendment shall not (A) increase or reduce in any manner the amount of, or accelerate or delay the timing of, collections of payments on the Receivables or distributions that are required to be made for the benefit of the Noteholders or (B) reduce the aforesaid percentage of the Notes that is required to consent to any such amendment, without the consent of the Holders of all the Outstanding Notes. If any such amendment, modification, supplement or waiver shall be so consented to by the Indenture Trustee and such Noteholders, the Issuer agrees, promptly following a request by the Indenture Trustee to do so, to execute and deliver, in its own name and at its own expense, such agreements, instruments, consents and other documents as the Indenture Trustee may deem necessary or appropriate in the circumstances and to provide each Rating Agency with notice of such amendment, modification, supplement or waiver.

Section 3.08.    Negative Covenants.

So long as any Notes are Outstanding, the Issuer will not:

(a)    sell, transfer, exchange, or otherwise dispose of any part of the Collateral except as expressly permitted by this Indenture, any Indenture Supplement, the Trust Agreement or the Transfer and Servicing Agreement;

(b)    claim any credit on, or make any deduction from, the principal and interest payable in respect of the Notes (other than amounts properly withheld from such payments under the Code or applicable state law) or assert any claim against any present or former Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(c)    (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (B) permit any Lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof or any interest therein or the proceeds thereof or (C) permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral; or

(d)    voluntarily dissolve or liquidate in whole or in part.

Section 3.09.     <u>Statements as to Compliance</u>.

The Issuer will deliver to the Indenture Trustee, within 120 days after the end of each fiscal year of the Issuer (commencing within 120 days after the end of the fiscal year 2001), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that

(i)     a review of the activities of the Issuer during the 12-month period ending at the end of such fiscal year (or in the case of the fiscal year ending December 31, 2001, the period from the Closing Date to December 31, 2001) and of performance under this Indenture has been made under such Authorized Officer's supervisions, and

(ii)     to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture throughout such year, or, if there has been a default in the compliance of any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.10.     <u>Issuer May Consolidate, Etc., Only on Certain Terms</u>.

(a)     The Issuer shall not consolidate or merge with or into any other Person, unless:

(1)     the Person (if other than the Issuer) formed by or surviving such consolidation or merger (i) shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia, (ii) shall not be subject to regulation as an "investment company" under the Investment Company Act and (iii) shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in a form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed;

(2)     immediately after giving effect to such transaction, no Event of Default or Redemption Event shall have occurred and be continuing;

(3)     the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that (i) such consolidation or merger and such supplemental indenture comply with this Section 3.10, (ii) all conditions precedent in this Section 3.10 relating to such transaction have been complied with (including any filing required by the Exchange Act), and (iii) such supplemental indenture is duly authorized, executed and delivered and is valid, binding and enforceable against such person;

(4)     the Rating Agency Condition shall have been satisfied with respect to such transaction;

(5)     the Issuer shall have received a Tax Opinion and an Opinion of Counsel dated the date of such consolidation or merger (and shall have delivered copies thereof to the Indenture Trustee and each Rating Agency) to the effect that such transaction will not have any material adverse tax consequence to any Noteholder; and

(6)     any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken.

(b)    The Issuer shall not convey or transfer any of its properties or assets, including those included in the Collateral, substantially as an entirety to any Person, unless:

(1)    the Person that acquires by conveyance or transfer the properties and assets of the Issuer the conveyance or transfer of which is hereby restricted shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state, or the District of Columbia, (B) expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agree by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of Holders of the Notes, (D) unless otherwise provided in such supplemental indenture, expressly agree to indemnify, defend and hold harmless the Issuer against and from any loss, liability or expense arising under or related to this Indenture and the Notes, (E) expressly agree by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes and (F) not be an "investment company" as defined in the Investment Company Act;

(2)    immediately after giving effect to such transaction, no Event of Default or Redemption Event shall have occurred and be continuing;

(3)    the Rating Agency Condition shall have been satisfied with respect to such transaction;

(4)    the Issuer shall have received a Tax Opinion and an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee) to the effect that such transaction will not have any material adverse tax consequence to any Noteholder;

(5)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(6)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such conveyance or transfer and such supplemental indenture comply with this Section 3.10 and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

Section 3.11.    Successor Substituted.

Upon any consolidation or merger, or any conveyance or transfer of the properties and assets of the Issuer substantially as an entirety in accordance with Section 3.10 hereof, the Person formed by or surviving such consolidation or merger (if other than the Issuer) or the Person to which such conveyance or transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein. In the event of any such conveyance or transfer, the Person named as the Issuer in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner

prescribed in this Section 3.11 shall be released from its obligations under this Indenture as issued immediately upon the effectiveness of such conveyance or transfer, provided that the Issuer shall not be released from any obligations or liabilities to the Indenture Trustee or the Noteholders arising prior to such effectiveness.

Section 3.12.    No Other Business.

The Issuer shall not engage in any business other than the activities set forth in Section 2.03 of the Trust Agreement and all activities incidental thereto or other than as required or authorized by the terms of the Transaction Documents.

Section 3.13.    No Borrowing.

The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except as expressly provided for pursuant to the terms of the Transaction Documents and the Notes.

Section 3.14.    Servicer's Obligations. The Issuer shall cause the Servicer to comply with all of its obligations under the Transaction Documents.

Section 3.15.    Guarantees, Loans, Advances and Other Liabilities.

Except as contemplated by this Indenture or the Transfer and Servicing Agreement, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

Section 3.16.    Capital Expenditures.

The Issuer shall not make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty).

Section 3.17.    Removal of Administrator.

So long as any Notes are outstanding, the Issuer shall not remove the Administrator without cause unless the Rating Agency Condition shall have been satisfied in connection with such removal.

Section 3.18.    Restricted Payments.

The Issuer shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer or to the Servicer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Issuer may make, or cause to be made, (x) distributions as contemplated by, and to the extent funds are available for such purpose under, the Transfer and Servicing Agreement or the Trust Agreement and (y) payments to the

Indenture Trustee pursuant to Section 6.07 hereof. The Issuer will not, directly or indirectly, make payments to or distributions from the Collection Account except in accordance with the Transaction Documents.

        Section 3.19.    Notice of Events of Default.

        The Issuer agrees to give the Indenture Trustee and the Rating Agencies prompt written notice of each Event of Default hereunder and, immediately after obtaining knowledge of any of the following occurrences, written notice of each default on the part of the Servicer or the Transferor of its obligations under the Transfer and Servicing Agreement, each default on the part of a Seller of its obligations under the Receivables Purchase Agreement and any action taken by the Indenture Trustee pursuant to Section 5.05 of this Indenture.

        Section 3.20.    Further Instruments and Acts.

        Upon request of the Indenture Trustee, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

<div align="center">ARTICLE IV</div>

<div align="center">SATISFACTION AND DISCHARGE</div>

        Section 4.01.    Satisfaction and Discharge of this Indenture.

        This Indenture shall cease to be of further effect with respect to the Notes except as to (a) rights of registration of transfer and exchange, (b) substitution of mutilated, destroyed, lost or stolen Notes, (c) the rights of Noteholders to receive payments of principal thereof and interest thereon, (d) Sections 3.03, 3.07, 3.08, 3.11, 12.16 and 3.12, (e) the rights and immunities of the Indenture Trustee hereunder, including the rights of the Indenture Trustee under Section 6.07, and the obligations of the Indenture Trustee under Section 4.02, and (f) the rights of Noteholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee and payable to all or any of them, and the Indenture Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes when:

        (i)    either

        (A)    all Notes theretofore authenticated and delivered (other than (1) Notes which have been destroyed, lost or stolen and which have been replaced, or paid as provided in Section 2.06, and (2) Notes for whose full payment (principal and interest) money has theretofore been deposited in trust or segregated and held in trust by the Indenture Trustee) have been delivered to the Indenture Trustee for cancellation; or

        (B)    all Notes not theretofore delivered to the Indenture Trustee for cancellation:

        (1)    have become due and payable;

        (2)    will become due and payable at the Final Maturity Date for such Class or Series of Notes; or

(3)     are to be called for redemption within one year under arrangements satisfactory to the Indenture Trustee for the giving of notice of redemption by the Indenture Trustee in the name, and at the expense, of the Issuer;

and the Issuer, in the case of (1), (2) or (3) above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Indenture Trustee for cancellation when due at the Final Maturity Date for such Class or Series of Notes or the Redemption Date (if Notes shall have been called for redemption pursuant to the related Indenture Supplement), as the case may be;

(ii)     the Issuer has paid or caused to be paid all other sums payable hereunder by the Issuer; and

(iii)     the Issuer has delivered to the Indenture Trustee an Officer's Certificate, an Opinion of Counsel and (if required by the TIA or the Indenture Trustee) an Independent Certificate from a firm of certified public accountants, each meeting the applicable requirements of Section 12.01(a) and each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Section 4.02.     Application of Trust Money.

All monies deposited with the Indenture Trustee pursuant to Section 4.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes, this Indenture and the applicable Indenture Supplement, to make payments, either directly or through any Paying Agent, as the Indenture Trustee may determine, to the Noteholders and for the payment in respect of which such monies have been deposited with the Indenture Trustee, of all sums due and to become due thereon for principal and interest; but such monies need not be segregated from other funds except to the extent required herein or in the Transfer and Servicing Agreement or required by law.

ARTICLE V

REDEMPTION EVENTS, DEFAULTS AND REMEDIES

Section 5.01.     Redemption Events.

If any one of the following events (each, a "**Trust Redemption Event**") shall occur:

(a)     NextCard, the Transferor or any of the Account Owners shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to NextCard, such Transferor or Account Owner of or relating to all or substantially all of its property, or a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against NextCard, such Transferor or Account Owner; or NextCard, any Transferor or Account Owner shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make any assignment for the benefit of its creditors or voluntarily suspend payment of its obligations (any such event, an "**Insolvency Event**");

provided, however, that if the Rating Agency Condition is first satisfied with respect to an Insolvency Event with respect to NextCard, such Insolvency Event shall not be a Trust Redemption Event;

(b)    a Transfer Restriction Event shall occur; or

(c)    the Trust shall become subject to regulation by the Securities and Exchange Commission as an "investment company" within the meaning of the Investment Company Act;

then a Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders immediately upon the occurrence of such event.

Upon the occurrence of a Redemption Event, an Amortization Period shall commence and payment on the Notes of each Series will be made in accordance with the terms of the related Indenture Supplement.

Section 5.02.    Events of Default.

"**Event of Default**," wherever used herein, means with respect to any Series any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    default in the payment of the principal of any Note of that Series, if and to the extent not previously paid, when the same becomes due and payable; or

(b)    default in the payment of any interest on any Note of that Series when the same becomes due and payable, and such default shall continue after the earlier to occur of (i) the next following date upon which interest becomes due and payable and (ii) the date occurring thirty-five (35) days following the date on which such interest became due and payable; or

(c)    default in the observance or performance of any covenant or agreement of the Issuer made in this Indenture made in respect of the Notes of such Series (other than a covenant, or agreement, a default in the observance or performance of which is elsewhere in this Section 5.02 specifically dealt with) (all of such covenants and agreements in this Indenture which are not expressly stated to be for the benefit of a particular Series being deemed to be in respect of the Notes of all Series for this purpose), and such default shall continue or not be cured for a period of sixty (60) days after there shall have been given, by written registered or certified mail, return receipt requested to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 50% of the Outstanding Amount of the Notes of such Series, a written notice specifying such default and requiring it to be remedied and stating that such notice is a "**Notice of Default**" hereunder and, as a result of such default, the interests of the Holders of the Notes are materially and adversely affected and continue to be materially and adversely affected during the 60-day period; or

(d)    the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, conservator, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Issuer or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of sixty (60) consecutive days; or

(e)     the commencement by the Issuer of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment of or the taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator or similar official of the Issuer, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay, or the admission in writing by the Issuer of its inability to pay, its debts as such debts become due, or the taking of action by the Issuer in furtherance of any of the foregoing.

The Issuer shall deliver to the Indenture Trustee, within five (5) days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which with the giving of notice and the lapse of time would become an Event of Default, its status and what action the Issuer is taking or proposes to take with respect thereto.

Section 5.03.     Acceleration of Maturity; Rescission and Annulment.

If an Event of Default described in paragraph (a), (b) or (c) of Section 5.02 should occur and be continuing with respect to a Series, then and in every such case the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer (and to the Indenture Trustee if declared by Noteholders), and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

If an Event of Default described in paragraph (d) or (e) of Section 5.02 should occur and be continuing, then the unpaid principal of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall automatically become, and shall be deemed to be declared, due and payable.

At any time after such declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article V provided, the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes of such Series, by written notice to the Issuer and the Indenture Trustee, may rescind and annul such declaration and its consequences.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.04.     Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.

(a)     The Issuer covenants that if (i) default is made in the payment of any interest on any Note when the same becomes due and payable, and such default shall continue after the earlier to occur of (x) the next following date upon which interest becomes due and payable and (y) the date occurring thirty-five (35) days following the date on which such interest became due and payable, or (ii) default is made in the payment of principal of any Note, if and to the extent not previously paid, when the same becomes due and payable, the Issuer will, upon demand of the Indenture Trustee, pay to it, for the benefit of the Holders of the Notes of the affected Series, the whole amount then due and payable on such Notes for principal and interest, with interest upon the overdue principal, and, to the extent payment at such rate of interest shall be legally enforceable, interest upon overdue installments of interest, at the applicable Note Interest Rate borne by the Notes of such Series, and in addition thereto will pay such

further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)     In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor upon such Notes and collect in the manner provided by law out of the property of the Issuer or other obligor upon such Notes, wherever situated, the moneys adjudged or decreed to be payable.

(c)     If an Event of Default occurs and is continuing, the Indenture Trustee may, as more particularly provided in Section 5.05, in its discretion, proceed to protect and enforce its rights and the rights of the Noteholders of the affected Series, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)     In case there shall be pending, relative to the Issuer or any other obligor upon the Notes of the affected Series, or any Person having or claiming an ownership interest in the Collateral, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or in case a receiver, conservator, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator, custodian or other similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Issuer or other obligor upon the Notes of such Series, or to the creditors or property of the Issuer or such other obligor, the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section 5.04, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes of such Series and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence or bad faith) and of the Noteholders of such Series allowed in such Proceedings;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes of such Series in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)     to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders of such Series and of the Indenture Trustee on their behalf; and

(iv)    to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes of such Series allowed in any judicial Proceedings relative to the Issuer, its creditors and its property;

and any trustee, receiver, conservator, liquidator, custodian, assignee, sequestrator or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of negligence or bad faith.

(e)    Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)    All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or Proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the benefit of the Holders of the Notes of the affected Series as provided herein.

(g)    In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Holders of the Notes of the affected Series, and it shall not be necessary to make any such Noteholder a party to any such Proceedings.

Section 5.05.    Remedies; Priorities.

(a)    If an Event of Default shall have occurred and be continuing with respect to any Series, and the Notes of such Series have been accelerated pursuant to Section 5.03, the Indenture Trustee may do one or more of the following (subject to Sections 5.06 and 12.16):

(i)    institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes of the affected Series or under this Indenture with respect thereto, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes moneys adjudged due;

(ii)    subject to the last paragraph of this subsection 5.05(a), take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series;

(iii)    at the direction of the Holders of a majority of the Outstanding Amount of such Notes, cause the Issuer to sell Principal Receivables in an amount equal to the

Invested Amount with respect to the accelerated Series and the related Finance Charge Receivables (or interests therein) in accordance with Section 5.16 hereof;

provided, however, that the Indenture Trustee may not exercise the remedy described in subparagraph (iii) above unless (A) the Holders of 100% of the Outstanding Amount of the Notes of the affected Series consent thereto, (B) the Indenture Trustee determines that any proceeds of such exercise distributable to the Noteholders of the affected Series are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest or (C) the Indenture Trustee determines that the Collateral may not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of Holders of at least 66-2/3% of the Outstanding Amount of each Class of the Notes of such Series. In determining such sufficiency or insufficiency with respect to clause (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Collateral for such purpose.

The remedies provided in this Section 5.05(a) are the exclusive remedies provided to the Noteholders with respect to an Event of Default and each of the Noteholders (by their acceptance of their respective interests in the Notes) and the Indenture Trustee hereby expressly waive any other remedy that may be available under the applicable UCC.

(b)    If the Indenture Trustee collects any money or property pursuant to this Article V following the acceleration of the maturities of the Notes of the affected Series pursuant to Section 5.03 (so long as such declaration shall not have been rescinded or annulled), it shall pay the money or property in the following order:

FIRST: to the Indenture Trustee for amounts due pursuant to Section 6.07;

SECOND: to Holders of the Class A Notes of such Series for amounts due and unpaid on such Class A Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class A Notes for interest and principal;

THIRD: to Holders of the Class B Notes of such Series for amounts due and unpaid on such Class B Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class B Notes for interest and principal;

FOURTH: to the Holders of the Class C Notes of such Series for amounts due and unpaid on such Class C Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class C Notes for interest and principal;

FIFTH: to the Holders of the Class D Notes of such Series for amounts due and unpaid on such Class D Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class D Notes for interest and principal;

SIXTH: to the Holders of all other Classes of Notes, if any, of such Series for amounts due and unpaid on such Notes for interest and principal, according to the amounts due and payable on each such Class of Notes for interest and principal, sequentially in the priority for payment under the related Indenture Supplement; and

SEVENTH: to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement.

(c)    The Indenture Trustee may, upon notification to the Issuer, fix a record date and payment date for any payment to Noteholders of the affected Series pursuant to this Section 5.05. At least fifteen (15) days before such record date, the Indenture Trustee shall mail or send by facsimile to each such Noteholder a notice that states the record date, the payment date and the amount to be paid.

(d)    In addition to the application of money or property referred to in subsection 5.05(b) for an accelerated Series, amounts then held in the Collection Account, Special Funding Account or any Series Accounts for such Series and any amounts available under the Series Enhancement for such Series shall be used to make payments to the Holders of the Notes of such Series and the Series Enhancer for such Series in accordance with the terms of this Indenture, the related Indenture Supplement and the Series Enhancement for such Series. Following the sale of the Collateral (or portion thereof) for a Series and the application of the proceeds of such sale to such Series and the application of the amounts then held in the Collection Account, the Special Funding Account and any Series Accounts for such Series as are allocated to such Series and any amounts available under the Series Enhancement for such Series, such Series shall no longer be entitled to any allocation of Collections or other property constituting the Collateral under this Indenture and the Notes of such Series shall no longer be Outstanding.

Section 5.06.    <u>Optional Preservation of the Collateral</u>. If the Notes of any Series have been declared to be due and payable under Section 5.03 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, and the Indenture Trustee has not received directions from the Noteholders pursuant to Section 5.12, the Indenture Trustee may, but need not, elect to maintain possession of the portion of the Collateral which secures such Notes. It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes, and the Indenture Trustee shall take such desire into account when determining whether or not to maintain possession of the Collateral. In determining whether to maintain possession of the Collateral, the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Collateral for such purpose.

Section 5.07.    <u>Limitation on Suits</u>.

No Noteholder shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    the Holders of not less than 25% of the Outstanding Amount of any affected Series of Notes have made written request to the Indenture Trustee to institute such proceeding in its own name as indenture trustee;

(b)    such Noteholder or Noteholders has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(c)    such Noteholder or Noteholders has offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Indenture Trustee for sixty (60) days after its receipt of such request and offer of indemnity has failed to institute any such Proceeding; and

(e)     no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by a majority of the Outstanding Amount of the Notes of such Series;

it being understood and intended that no one or more Noteholders of the affected Series shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Noteholders of such Series or to obtain or to seek to obtain priority or preference over any other Noteholders of such Series or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two (2) or more groups of Noteholders of such affected Series, each representing less than a majority of the Outstanding Amount of such Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.08.     <u>Unconditional Rights of Noteholders to Receive Principal and Interest</u>.

Notwithstanding any other provision in this Indenture, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal of and interest in respect of such Note as such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

Section 5.09.     <u>Restoration of Rights and Remedies</u>.

If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned, or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.10.     <u>Rights and Remedies Cumulative</u>.

No right, remedy, power or privilege herein conferred upon or reserved to the Indenture Trustee or to the Noteholders is intended to be exclusive of any other right, remedy, power or privilege, and every right, remedy, power or privilege shall, to the extent permitted by law, be cumulative. The assertion or exercise of any right or remedy shall not preclude any other further assertion or the exercise of any other appropriate right or remedy.

Section 5.11.     <u>Delay or Omission Not Waiver</u>.

No failure to exercise and no delay in exercising, on the part of the Indenture Trustee or of any Noteholder or other Person, any right or remedy occurring hereunder upon any Event of Default shall impair any such right or remedy or constitute a waiver thereof of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.12.    Rights of Noteholders to Direct Indenture Trustee.

A majority of the Outstanding Amount of the Notes of any affected Series if an Event of Default with respect to such Series has occurred and is continuing) shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee with respect to the Notes; provided, however, that subject to Section 6.01:

(a)    the Indenture Trustee shall have the right to decline any such direction if the Indenture Trustee, after being advised by counsel, determines that the action so directed is in conflict with any rule of law or with this Indenture, and

(b)    the Indenture Trustee shall have the right to decline any such direction if the Indenture Trustee in good faith shall, by a Responsible Officer of the Indenture Trustee, determine that the Proceedings so directed would be illegal or involve the Indenture Trustee in personal liability or be unjustly prejudicial to the Noteholders not parties to such direction.

Section 5.13.    Waiver of Past Defaults.

Prior to the declaration of the acceleration of the maturity of the Notes of the affected Series as provided in Section 5.03, a majority of the Outstanding Amount of the Notes of such Series may, on behalf of all such Noteholders, waive in writing any past default with respect to such Notes and its consequences, except a default:

(a)    in the payment of the principal or interest in respect of any Note of such Series, or

(b)    in respect of a covenant or provision hereof that under Section 10.02 hereof cannot be modified or amended without the consent of the Noteholder of each Outstanding Note affected.

Upon any such written waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 5.14.    Undertaking for Costs.

All parties to this Indenture agree, and each Noteholder by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.14 shall not apply to any suit instituted by the Indenture Trustee, to any suit instituted by any Noteholder, or group of Noteholders (in compliance with Section 5.08 hereof), holding in the aggregate more than 10% of the principal balance of the Outstanding Notes of the affected Series, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal or interest in respect of any Note on or after the Distribution Date on which any of such amounts was due (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.15.   Waiver of Stay or Extension Laws.

The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may adversely affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.16.   Sale of Receivables.

(a)   The method, manner, time, place and terms of any sale of Receivables (or interests therein) pursuant to Section 5.05(a)(iii) shall be commercially reasonable. The Indenture Trustee may from time to time postpone any sale by public announcement made at the time and place of such sale. The Indenture Trustee hereby expressly waives its right to any amount fixed by law as compensation for any sale.

(b)   The Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer in connection with any sale of Receivables pursuant to Section 5.05(a)(iii). No purchaser or transferee at any such sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

(c)   In its exercise of the foreclosure remedy pursuant to Section 5.05(a)(iii), the Indenture Trustee shall solicit bids from Permitted Assignees for the sale of Principal Receivables in an amount equal to the Invested Amount with respect to the affected Series of Notes at the time of sale and the related Finance Charge Receivables (or interests therein). The Transferor or any of its affiliates (other than NextBank) who are Permitted Assignees shall be entitled to participate in, and to receive from the Indenture Trustee a copy of each other bid submitted in connection with, such bidding process; provided that (a) at least one participant other than the Transferor and any of its affiliates must submit a bona fide offer, and (b) the Transferor and any of its affiliates are prohibited from bidding an amount which exceeds fair value for the transferred assets. The Indenture Trustee shall sell such Receivables (or interests therein) to the bidder with the highest cash purchase offer. The proceeds of any such sale shall be applied in accordance with Section 5.05(b).

Section 5.17.   Action on Notes.

The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer. Any money or property collected by the Indenture Trustee shall be applied as specified in the applicable Indenture Supplement.

# ARTICLE VI

## THE INDENTURE TRUSTEE

Section 6.01.    Duties of the Indenture Trustee.

(a)    If an Event of Default has occurred and is continuing with respect to a Series of Notes and a Responsible Officer shall have actual knowledge or written notice of such Event of Default, the Indenture Trustee shall, prior to the receipt of directions, if any, from a majority of the Outstanding Amount of the Notes of such Series, exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; and

(ii)    in the absence of bad faith or negligence on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; provided, however, the Indenture Trustee, upon receipt of any resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Indenture Trustee which are specifically required to be furnished pursuant to any provision of this Indenture or any Indenture Supplement, shall examine them to determine whether they substantially conform to the requirements of this Indenture or any Indenture Supplement. The Indenture Trustee shall give prompt written notice to the Noteholders of such Series and each Rating Agency of any material lack of conformity of any such instrument to the applicable requirements of this Indenture or any Indenture Supplement discovered by the Indenture Trustee which would entitle a majority of the Outstanding Amount of the Notes of such Series to take any action pursuant to this Indenture or any Indenture Supplement.

(c)    In case a Redemption Event has occurred and is continuing with respect to a Series and a Responsible Officer shall have actual knowledge or written notice of such Redemption Event, the Indenture Trustee shall, prior to the receipt of directions, if any, from a majority of the Outstanding Amount of the Notes of such Series, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)    No provision of this Indenture shall be construed to relieve the Indenture Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection (d) shall not be construed to limit the effect of subsection (a) of this Section 6.01;

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith, unless it shall be proved that the Indenture Trustee was negligent in ascertaining the pertinent facts; and

(iii)     the Indenture Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Indenture and/or the direction of a majority of the Outstanding Amount of the Notes of each outstanding Series of Notes relating to the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee, or for exercising any trust or power conferred upon the Indenture Trustee, under this Indenture. The Indenture Trustee shall not be liable for any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Servicer, the Transferor or the Trust in compliance with the terms of this Indenture or any Indenture Supplement.

(e)     No provision of this Indenture shall require the Indenture Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(f)     Every provision of this Indenture that in any way relates to the Indenture Trustee is subject to subsections (a), (b), (c), (d) and (e) of this Section 6.01.

(g)     Except as expressly provided in this Indenture, the Indenture Trustee shall have no power to vary the Collateral, including, without limitation, by (i) accepting any substitute payment obligation for a Receivable initially transferred to the Trust under the Transfer and Servicing Agreement, (ii) adding any other investment, obligation or security to the Trust or (iii) withdrawing from the Trust any Receivable (except as otherwise provided in the Transfer and Servicing Agreement).

(h)     The Indenture Trustee shall have no responsibility or liability for investment losses on Eligible Investments (other than Eligible Investments on which the institution acting as Indenture Trustee is an obligor).

(i)     The Indenture Trustee shall notify each Rating Agency (i) of any change in any rating of the Notes by any other Rating Agency of which a Responsible Officer has actual knowledge, (ii) immediately of the occurrence of any Event of Default or Redemption Event of which a Responsible Officer has actual knowledge and (iii) immediately of potential Redemption Events or Events of Default of which a Responsible Officer has actual notice from the Servicer.

(j)     For all purposes under this Indenture, the Indenture Trustee shall not be deemed to have notice or knowledge of any Event of Default, Redemption Event or Servicer Default unless a Responsible Officer has actual knowledge thereof or has received written notice thereof. For purposes of determining the Indenture Trustee's responsibility and liability hereunder, any reference to an Event of Default, Redemption Event or Servicer Default shall be construed to refer only to such event of which the Indenture Trustee is deemed to have notice as described in this subsection 6.01(j).

Section 6.02.     Notice of Redemption Event or Event of Default.

Upon the occurrence of any Redemption Event or Event of Default of which a Responsible Officer has actual knowledge or has received notice thereof, the Indenture Trustee shall transmit by mail to all Noteholders as their names and addresses appear on the Note Register and the Rating Agencies, notice of such Redemption Event or Event of Default hereunder known to the Indenture Trustee within thirty (30) days after it occurs or within ten (10) Business Days after it receives such notice or obtains actual notice, if later.

Section 6.03.    Rights of Indenture Trustee.

Except as otherwise provided in Section 6.01 hereof:

(a)    The Indenture Trustee may conclusively rely and shall fully be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    Whenever in the administration of this Indenture the Indenture Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Indenture Trustee (unless other evidence is specifically prescribed herein) may, in the absence of bad faith on its part, rely upon an Officer's Certificate of the Issuer. The Issuer shall provide a copy of such Officer's Certificate to the Noteholders at or prior to the time the Indenture Trustee receives such Officer's Certificate;

(c)    As a condition to the taking, suffering or omitting of any action by it hereunder, the Indenture Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(d)    The Indenture Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or to honor the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Indenture Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(e)    The Indenture Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Indenture Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Indenture Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Servicer, personally or by agent or attorney;

(f)    The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Indenture Trustee shall not be responsible for (i) any misconduct or negligence on the part of any agent, attorney, custodians or nominees appointed with due care by it hereunder or (ii) the supervision of such agents, attorneys, custodians or nominees after such appointment with due care;

(g)    The Indenture Trustee shall not be liable for any actions taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights conferred upon the Indenture Trustee by this Indenture; and

(h)    In the event that the Indenture Trustee is also acting as Paying Agent and Transfer Agent and Registrar, the rights and protections afforded to the Indenture Trustee pursuant to this Article VI shall also be afforded to such Paying Agent and Transfer Agent and Registrar.

Section 6.04.    Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, except the certificate of authentication of the Indenture Trustee, shall be taken as the statements of the Issuer, and the Indenture Trustee assumes no responsibility for their correctness. The Indenture Trustee makes no representation as to the validity or sufficiency of the Agreement, the Notes, or any related document. The Indenture Trustee shall not be accountable for the use or application by the Issuer of the proceeds from the Notes.

Section 6.05.    May Hold Notes.

The Indenture Trustee, any Paying Agent, Transfer Agent and Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer with the same rights it would have if it were not Indenture Trustee, Paying Agent, Transfer Agent and Registrar or such other agent.

Section 6.06.    Money Held in Trust.

Money held by the Indenture Trustee in trust hereunder need not be segregated from other funds held by the Indenture Trustee in trust hereunder except to the extent required herein or required by law. The Indenture Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon in writing by the Indenture Trustee and the Issuer.

Section 6.07.    Compensation, Reimbursement and Indemnification.

The Servicer shall pay to the Indenture Trustee from time to time reasonable compensation for all services rendered by the Indenture Trustee under this Agreement (which compensation shall not be limited by any law on compensation of a trustee of an express trust). The Servicer shall reimburse the Indenture Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts. Pursuant to the Transfer and Servicing Agreement, the Issuer shall direct the Servicer to indemnify and the Servicer shall indemnify the Indenture Trustee against any and all loss, liability or expense (including the fees of either in-house counsel or outside counsel, but not both) incurred by it in connection with the administration of this trust and the performance of its duties hereunder. The Indenture Trustee shall notify the Issuer and the Servicer promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Issuer and the Servicer shall not relieve the Issuer or the Servicer of its obligations hereunder unless such loss, liability or expense could have been avoided with such prompt notification and then only to the extent of such loss, expense or liability which could have been so avoided. The Servicer shall defend any claim against the Indenture Trustee; the Indenture Trustee may have separate counsel and, if it does, the Servicer shall pay the fees and expenses of such counsel. The Servicer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

The Servicer's payment obligations to the Indenture Trustee pursuant to this Section 6.07 shall survive the discharge of this Indenture. When the Indenture Trustee incurs expenses after the occurrence of a Default specified in subsection 5.02(d) or (e) with respect to the Issuer, the expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

Notwithstanding anything herein to the contrary, the Indenture Trustee's right to enforce any of the Servicer's payment obligations pursuant to this Section 6.07 shall be subject to the provisions of Section 12.16.

Section 6.08.    Replacement of Indenture Trustee.

No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this Section 6.08. The Indenture Trustee may resign at any time by giving thirty (30) days written notice to the Issuer. A majority of the Outstanding Amount of the Notes, upon delivery of notice of such removal to the Issuer, may remove the Indenture Trustee by so notifying the Indenture Trustee and may appoint a successor Indenture Trustee. The Issuer shall remove the Indenture Trustee if:

(i)     the Indenture Trustee fails to comply with Section 6.11;

(ii)    the Indenture Trustee is adjudged a bankrupt or insolvent;

(iii)   a receiver of the Indenture Trustee or of its property shall be appointed, or any public officer takes charge of the Indenture Trustee or its property or its affairs for the purpose of rehabilitation, conservation or liquidation; or

(iv)    the Indenture Trustee otherwise becomes legally unable to act.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer shall promptly appoint a successor Indenture Trustee. The Issuer shall furnish each Rating Agency with a copy of any notice of resignation or removal of a retiring Indenture Trustee pursuant to this Section 6.08 promptly after receiving such notice, in the case of a resignation by a retiring Indenture Trustee, or delivering such notice, in the case of a removal of a retiring Indenture Trustee by the Issuer.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee, the Administrator and the Issuer. Thereupon the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture. The successor Indenture Trustee shall mail a notice of its succession to all of the Noteholders and each Rating Agency. The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within sixty (60) days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or the Holders of a majority of the Outstanding Amount of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with Section 6.11, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section 6.08, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee.

Section 6.09.    <u>Successor Indenture Trustee by Merger.</u>

If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking associa tion, the resulting, surviving or transferee corporation or banking association without any further act shall be the successor Indenture Trustee; <u>provided</u> that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11. The Indenture Trustee shall provide the Rating Agencies prior written notice of any such transaction.

In case at the time such successor or successors by merger, conversion, consolidation or transfer to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor Indenture Trustee and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10.    <u>Appointment of Co-Indenture Trustee or Separate Indenture Trustee.</u>

(a)    Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Collateral may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Collateral, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders, such title to the Collateral, or any part hereof, and, subject to the other provisions of this Section 6.10, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.08 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Collateral or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee. Every such instrument shall be filed with the Indenture Trustee.

(d)    Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 6.11:    Eligibility; Disqualification.

The Indenture Trustee shall at all times satisfy the requirements of TIA §310(a). The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and its long-term unsecured debt shall be rated at least Baa3 by Moody's, at least BBB- by Standard & Poor's and, if rated by Fitch, at least BBB- by Fitch. The Indenture Trustee shall comply with TIA §310(b), including the optional provision permitted by the second sentence of TIA §310(b)(9); provided, however, that there shall be excluded from the operation of TIA §310(b)(1) any indenture or indentures under which other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA §310(b)(1) are met.

Section 6.12.    Preferential Collection of Claims Against .

The Indenture Trustee shall comply with TIA §311(a), excluding any creditor relationship listed in TIA §311(b). An Indenture Trustee who has resigned or been removed shall be subject to TIA §311(a) to the extent indicated.

Section 6.13.    Tax Returns.

In the event the Trust shall be required to file tax returns, the Servicer shall prepare or shall cause to be prepared such tax returns and shall provide such tax returns to the Owner Trustee for signature at least five (5) days before such tax returns are due to be filed. The Servicer, in accordance with the terms of each Indenture Supplement, shall also prepare or shall cause to be prepared all tax information required by law to be distributed to Noteholders and shall deliver such information to the Owner Trustee at least five (5) days prior to the date it is required by law to be distributed to Noteholders. The Owner Trustee, upon written request, will furnish the Servicer with all such information known to the Owner Trustee as may be reasonably requested and required in connection with the preparation of all tax returns of the Trust, and shall, upon request, execute such returns. In no event shall the Owner Trustee be personally liable for any liabilities, costs or expenses of the Trust or any Noteholder arising under any tax law, including without limitation, federal, state or local income or excise taxes or any other tax imposed on or measured by income (or any interest or penalty with respect thereto arising from a failure to comply therewith).

Section 6.14.    <u>Representations and Covenants of the Indenture Trustee.</u>

The Indenture Trustee represents, warrants and covenants that:

(i)    The Indenture Trustee is a banking corporation duly organized and validly existing under the laws of the State of New York;

(ii)    The Indenture Trustee has full power and authority to deliver and perform this Indenture and has taken all necessary action to authorize the execution, delivery and performance by it of this Indenture and other Transaction Documents to which it is a party; and

(iii)    Each of this Indenture and other Transaction Documents to which it is a party has been duly executed and delivered by the Indenture Trustee and constitutes its legal, valid and binding obligation in accordance with its terms.

Section 6.15.    <u>Custody of the Collateral</u>

The Indenture Trustee shall hold such of the Collateral as consists of instruments, deposit accounts, negotiable documents, money, goods, letters of credit, and advices of credit in the State of New York. The Indenture Trustee shall hold such of the Collateral as constitutes investment property through a securities intermediary, which securities intermediary shall agree with the Indenture Trustee that (a) such investment property shall at all times be credited to a securities account of the Indenture Trustee, (b) such securities intermediary shall treat the Indenture Trustee as entitled to exercise the rights that comprise each financial asset credited to such securities account, (c) all property credited to such securities account shall be treated as financial assets, (d) such securities intermediary shall comply with entitlement orders originated by the Indenture Trustee without the further consent of any other person or entity, (e) such securities intermediary shall not agree with any person or entity other than the Indenture Trustee to comply with entitlement orders originated by any person or entity other than the Indenture Trustee, (f) such securities accounts and the property credited thereto shall not be subject to any lien, security interest, right of set-off, or encumbrance in favor of such securities intermediary or anyone claiming through it (other than the Indenture Trustee), and (g) such agreement shall be governed by the laws of the State of New York. Terms used in this Section 6.15 that are defined in the New York UCC and not otherwise defined herein shall have the meaning set forth in the New York UCC. Except as permitted by this Section 6.15, the Indenture Trustee shall not hold any part of the Collateral through an agent or a nominee.

<div align="center">ARTICLE VII</div>

<div align="center">NOTEHOLDERS' LIST AND REPORTS BY INDENTURE TRUSTEE AND ISSUER</div>

Section 7.01.    <u>Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders.</u>

The Issuer will furnish or cause to be furnished to the Indenture Trustee (a) upon each transfer of a Note, a list, in such form as the Indenture Trustee may reasonably require, of the names, addresses and taxpayer identification numbers of the Noteholders as they appear on the Note Register as of the most recent Record Date, and (b) at such other times, as the Indenture Trustee may request in writing, within ten (10) days after receipt by the Issuer of any such request, a list of similar form and content as of a date not more than ten (10) days prior to the time such list is furnished; <u>provided, however,</u> that for so long as the Indenture Trustee is the Transfer Agent and Registrar, no such list shall be required to be furnished.

Section 7.02.    Preservation of Information; Communications to Noteholders.

(a)    The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Noteholders contained in the most recent list furnished to the Indenture Trustee as provided in Section 7.01 and the names, addresses and taxpayer identification numbers of the Noteholders received by the Indenture Trustee in its capacity as Transfer Agent and Registrar. The Indenture Trustee may destroy any list furnished to it as provided in Section 7.01 upon receipt of a new list so furnished.

(b)    Noteholders may communicate, pursuant to TIA §312(b), with other Noteholders with respect to their rights under this Indenture or under the Notes.

(c)    The Issuer, the Indenture Trustee and the Transfer Agent and Registrar shall have the protection of TIA §312(c).

Section 7.03.    Reports by Issuer.

(a)    The Issuer shall:

(i)    file with the Indenture Trustee, within fifteen (15) days after the Issuer is required to file the same with the Commission, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) which the Issuer may be required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act;

(ii)    file with the Indenture Trustee and the Commission in accordance with rules and regulations prescribed from time to time by the Commission such additional information, documents and reports with respect to compliance by the Issuer with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

(iii)    supply to the Indenture Trustee (and the Indenture Trustee shall transmit by mail to all Noteholders) such summaries of any information, documents and reports required to be filed by the Issuer pursuant to clauses (i) and (ii) of this subsection 7.03(a) as may be required by rules and regulations prescribed from time to time by the Commission.

(b)    Unless the Issuer otherwise determines, the fiscal year of the Issuer shall end on December 31 of each year.

Section 7.04.    Reports by Indenture Trustee.

If required by TIA §313(a), within sixty (60) days after each March 31 beginning with March 31, 2002, the Indenture Trustee shall mail to each Noteholder as required by TIA §313(c) a brief report dated as of such date that complies with TIA §313(a). The Indenture Trustee also shall comply with TIA §313(b).

A copy of each report at the time of its mailing to Noteholders shall be filed by the Indenture Trustee with the Commission and each stock exchange, if any, on which the Notes are listed. The Issuer shall notify the Indenture Trustee if and when the Notes are listed on any stock exchange.

ARTICLE VIII

ALLOCATION AND APPLICATION OF COLLECTIONS

Section 8.01.    Collection of Money.

Except as otherwise expressly provided herein and in the related Indenture Supplement, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture. Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under the Transfer and Servicing Agreement or any other Transaction Document, the Indenture Trustee may, and upon the request of a majority of the Holders of the Outstanding Amount of the Notes of an affected Series shall, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings. Any such action shall be without prejudice to any right to claim a Redemption Event or a Default or Event of Default under this Indenture and to proceed thereafter as provided in Article V hereof.

Section 8.02.    Rights of Noteholders.

The Collateral shall secure the obligation of the Trust to pay to the Holders of the Notes of each Series principal and interest and other amounts payable pursuant to this Indenture and the related Indenture Supplement. Except as specifically set forth in the Indenture Supplement with respect thereto, the Notes of any Series or Class shall not have rights to payment from any Series Account or Series Enhancement allocated for the benefit of any other Series or Class.

Section 8.03.    Establishment of Collection Account and Special
                 Funding Account.

The Servicer, for the benefit of the Noteholders, shall establish and maintain with the Indenture Trustee or its nominee in the name of the Indenture Trustee, on behalf of the Trust, one or more Qualified Accounts (including any subaccount thereof) bearing a designation clearly indicating that the funds and other property credited thereto are held for the benefit of the Noteholders (collectively, the "**Collection Account**"). The Indenture Trustee shall possess all right, title and interest in all monies, instruments, investment property, documents, certificates of deposit and other property credited from time to time to the Collection Account and in all proceeds, earnings, income, revenue, dividends and distributions thereof for the benefit of the Noteholders.

The Collection Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders. Except as expressly provided in this Indenture and the Transfer and Servicing Agreement, the Servicer agrees that it shall have no right of setoff or banker's lien against, and no right to otherwise deduct from, any funds held in the Collection Account for any amount owed to it by the Indenture Trustee, the Trust, any Noteholder or any Series Enhancer. If, at any time, the Collection Account ceases to be a Qualified Account, the Indenture Trustee (or the Servicer on its behalf) shall within ten (10) Business Days (or such longer period, not to exceed thirty (30) calendar days, as to which each Rating Agency may consent) establish a new Collection Account meeting the conditions specified above, transfer any monies, documents, instruments, investment property, certificates of deposit and other property to such new Collection Account and from the date such new Collection Account is established, it shall be the "**Collection Account.**" Pursuant to the authority granted to the Servicer in subsection 3.01(b) of the Transfer and Servicing Agreement, the Servicer shall have the power, revocable

by the Indenture Trustee, to make withdrawals and payments from the Collection Account and to instruct the Indenture Trustee to make withdrawals and payments from the Collection Account for the purposes of carrying out the Servicer's or the Indenture Trustee's duties hereunder and under the Transfer and Servicing Agreement, as applicable. The Servicer shall reduce deposits into the Collection Account payable by the Transferor on any Deposit Date to the extent the Transferor is entitled to receive funds from the Collection Account on such Deposit Date, but only to the extent such reduction would not reduce the Transferor Interest to an amount less than the Required Transferor Interest.

Funds on deposit in the Collection Account (other than investment earnings and amounts deposited pursuant to Section 2.06, 6.01, or 7.01 of the Transfer and Servicing Agreement or Section 11.02 of this Indenture) shall at the written direction of the Servicer be invested by the Indenture Trustee in Eligible Investments selected by the Servicer. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Noteholders pursuant to Section 6.15. Investments of funds representing Collections collected during any Monthly Period shall be invested in Eligible Investments that will mature so that such funds will be available no later than the close of business on each monthly Transfer Date following such Monthly Period. No such Eligible Investment shall be disposed of prior to its maturity; provided, however, that the Indenture Trustee may sell, liquidate or dispose of any such Eligible Investment before its maturity, at the written direction of the Servicer, if such sale, liquidation or disposal would not result in a loss of all or part of the principal portion of such Eligible Investment or if, prior to the maturity of such Eligible Investment, a default occurs in the payment of principal, interest or any other amount with respect to such Eligible Investment. Unless directed by the Servicer, funds deposited in the Collection Account on a Transfer Date with respect to the immediately succeeding Distribution Date are not required to be invested overnight. On each Distribution Date, all interest and other investment earnings (net of losses and investment expenses) on funds on deposit in the Collection Account shall be paid to the Transferor, except as otherwise specified in any Indenture Supplement. The Indenture Trustee shall bear no responsibility or liability for any losses resulting from investment or reinvestment of any funds in accordance with this Section 8.03 nor for the selection of Eligible Investments in accordance with the provisions of this Indenture and any Indenture Supplement (other than Eligible Investments on which the institution acting as Indenture Trustee is an obligor).

The Servicer, for the benefit of the Noteholders, shall establish and maintain with the Indenture Trustee or its nominee in the name of the Indenture Trustee, on behalf of the Trust, a Qualified Account (including any subaccounts thereof) bearing a designation clearly indicating that the funds and other property credited thereto are held for the benefit of the Noteholders (the "**Special Funding Account**"). The Indenture Trustee shall possess all right, title and interest in all monies, instruments, investment property, documents, certificates of deposit and other property credited from time to time to the Special Funding Account and in all proceeds, dividends, distributions, earnings, income and revenue thereof for the benefit of the Noteholders. The Special Funding Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders. Except as expressly provided in this Indenture and the Transfer and Servicing Agreement, the Servicer shall have no right of setoff or banker's lien against, and no right to otherwise deduct from, any funds and other property held in the Special Funding Account for any amount owed to it by the Indenture Trustee, the Trust, any Noteholder or any Series Enhancer. If, at any time, the Special Funding Account ceases to be a Qualified Account, the Indenture Trustee (or the Servicer on its behalf) shall within ten (10) Business Days (or such longer period, not to exceed thirty (30) calendar days, as to which each Rating Agency may consent) establish a new Special Funding Account meeting the conditions specified above, transfer any monies, documents, instruments, investment property, certificates of deposit and other property to such new Special Funding Account and from the date such new Special Funding Account is established, it shall be the "**Special Funding Account**."

Funds on deposit in the Special Funding Account shall at the written direction of the Servicer be invested by the Indenture Trustee in Eligible Investments selected by the Servicer. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Noteholders pursuant to Section 6.15. Funds on deposit in the Special Funding Account on any Distribution Date will be invested in Eligible Investments that will mature so that such funds will be available no later than the close of business on the Transfer Date following such Monthly Period. No such Eligible Investment shall be disposed of prior to its maturity; provided, however, that the Indenture Trustee may sell, liquidate or dispose of an Eligible Investment before its maturity, at the written direction of the Servicer, if such sale, liquidation or disposal would not result in a loss of all or part of the principal portion of such Eligible Investment or if, prior to the maturity of such Eligible Investment, a default occurs in the payment of principal, interest or any other amount with respect to such Eligible Investment. Unless directed by the Servicer, funds deposited in the Special Funding Account on a Transfer Date with respect to the immediately succeeding Distribution Date are not required to be invested overnight. On each Distribution Date, all interest and other investment earnings (net of losses and investment expenses) on funds on deposit in the Special Funding Account shall be treated as Collections of Finance Charge Receivables with respect to the last day of the related Monthly Period except as otherwise specified in the related Indenture Supplement. On each Business Day on which funds are on deposit in the Special Funding Account and on which no Series is in an Accumulation Period or Amortization Period, the Servicer shall determine the amount (if any) by which the Transferor Interest exceeds the Required Transferor Interest on such date and shall instruct the Indenture Trustee to withdraw any such excess from the Special Funding Account and pay such amount to the Holders of the Transferor Certificates; provided, however, that, if an Accumulation Period or Amortization Period has commenced and is continuing with respect to one or more outstanding Series, any funds on deposit in the Special Funding Account shall be treated as Shared Principal Collections and shall be allocated and distributed in accordance with Section 8.05 and the terms of each Indenture Supplement.

Section 8.04.    Collections and Allocations.

(a)      The Servicer will apply or will instruct the Indenture Trustee to apply all funds on deposit in the Collection Account as described in this Article VIII and in each Indenture Supplement. Except as otherwise provided below, the Servicer shall deposit Collections into the Collection Account as promptly as possible after the Date of Processing of such Collections, but in no event later than the second Business Day following the Date of Processing. Subject to the express terms of any Indenture Supplement, but notwithstanding anything else in this Indenture or the Transfer and Servicing Agreement to the contrary, if one or more of the following conditions is satisfied: (i) NextBank remains the Servicer; NextCard guarantees the performance of the Servicer's obligations (unless the Rating Agencies shall consent to the deletion of such guarantee) and achieves and maintains a commercial paper rating of not less than A-1 by Standard & Poor's, not less than P-1 by Moody's and, if rated by Fitch, not less than F1 by Fitch, and NextBank remains a wholly-owned NextCard subsidiary (directly or indirectly) and in the event that there is any material change in the financing relationship between NextBank and NextCard, (A) NextBank shall have notified each Rating Agency and (B) the Rating Agency Condition shall be satisfied with respect to such material change, or (ii) any other arrangements are made such that the Rating Agency Condition is satisfied with respect thereto, and for two (2) Business Days following any reduction of any such rating or change in ownership, the Servicer need not make the daily deposits of Collections into the Collection Account as provided in the preceding sentence, but may make a single deposit in the Collection Account in immediately available funds not later than 1:00 p.m., New York City time, on the Transfer Date immediately preceding the Distribution Date following the Monthly Period with respect to which such deposit relates. Subject to the first proviso in Section 8.05, but notwithstanding anything else in this Indenture or the Transfer and Servicing Agreement to the contrary, with respect to any Monthly Period, whether the Servicer is required to make deposits of collections pursuant to the first or the second preceding sentence, (i) the Servicer will only be required to deposit

Collections into the Collection Account up to the aggregate amount of Collections required to be deposited into any Series Account or, without duplication, distributed on or prior to the related Distribution Date to Noteholders or to any Series Enhancer pursuant to the terms of any Indenture Supplement or Enhancement Agreement and (ii) if at any time prior to such Distribution Date the amount of Collections deposited in the Collection Account exceeds the amount required to be deposited pursuant to clause (i) above, the Servicer will be permitted to withdraw the excess from the Collection Account and pay such amounts pursuant to the terms of the Transaction Documents. Subject to the immediately preceding sentence, the Servicer may retain its Servicing Fee with respect to a Series and shall not be required to deposit it in the Collection Account. To the extent that, in accordance with this subsection 8.04(a), the Servicer has retained amounts which would otherwise be required to be deposited into the Collection Account or any Series Account with respect to any Monthly Period, the Servicer shall be required to deposit such amounts in the Collection Account or such Series Account on the related Distribution Date to the extent necessary to make required distributions on the related Distribution Date, including any amounts which are required to be applied as Reallocated Principal Collections, and pay any amounts remaining after making such deposit pursuant to the terms of the Transaction Documents.

(b)    Collections of Finance Charge Receivables, Principal Receivables and Defaulted Receivables will be allocated to each Series of Notes and to the Holders of the Transferor Certificates in accordance with this Article VIII and each Indenture Supplement and amounts so allocated to any Series will not, except as specified in the related Indenture Supplement, be available to the Noteholders of any other Series. Allocations of the foregoing amounts between the Holders of the Notes and the Holders of the Transferor Certificates, among the Series and among the Classes in any Series, shall be set forth in the related Indenture Supplement or Indenture Supplements.

Section 8.05.    Shared Principal Collections.

On each Distribution Date, (a) the Servicer shall allocate Shared Principal Collections (as described below) to each Principal Sharing Series, *pro rata*, in proportion to the Principal Shortfalls, if any, with respect to each such Series and (b) the Servicer shall withdraw from the Collection Account and pay to the Holders of the Transferor Certificates an amount equal to the excess, if any, of (x) the aggregate amount for all outstanding Series of Collections of Principal Receivables which the related Indenture Supplements specify are to be treated as "**Shared Principal Collections**" for such Distribution Date over (y) the aggregate amount for all outstanding Series which the related Indenture Supplements specify are "**Principal Shortfalls**" for such Series and for such Distribution Date; provided, however, that if the Transferor Interest as of such Distribution Date (determined after giving effect to the Principal Receivables or Participation Interests transferred to the Trust on such date) is less than the Required Transferor Interest, the Servicer will not distribute to the Holders of the Transferor Certificates any such amounts that otherwise would be distributed to the Holders of the Transferor Certificates, but shall deposit such funds in the Special Funding Account. The Transferor may, at its option, instruct the Indenture Trustee to deposit Shared Principal Collections which are otherwise payable to the Holders of the Transferor Certificates pursuant to the provisions set forth above into the Special Funding Account. Notwithstanding the foregoing, a Group of Series may specify in their related Indenture Supplements that Shared Principal Collections from such Series shall be allocated as provided above but only among the Series in such Group.

Section 8.06.    Additional Withdrawals from the Collection Account.

On or before the Determination Date with respect to any Monthly Period, the Servicer shall determine the amounts payable to NextBank or any other Account Owner with respect to such Monthly Period under the Transfer and Servicing Agreement or any applicable Receivables Purchase Agreement in respect of amounts credited to the Collection Account that were not transferred to the Trust

under the Transfer and Servicing Agreement, and the Servicer shall withdraw such amounts not belonging to the Trust from the Collection Account and pay such amounts to NextBank or any other Account Owner, as applicable.

Section 8.07.    Allocation of Collateral to Series or Groups.

To the extent so provided in the Indenture Supplement for any Series or in an Indenture Supplement otherwise executed pursuant to Section 10.01, Receivables conveyed to the Trust pursuant to Section 2.01 of the Transfer and Servicing Agreement and Receivables or Participation Interests conveyed to the Trust pursuant to Section 2.09 of the Transfer and Servicing Agreement or any Participation Interest Supplement, and all Collections received with respect thereto may be allocated or applied in whole or in part to one or more Series or Groups as may be provided in such Indenture Supplement; provided, however, that any such allocation or application shall be effective only upon satisfaction of the following conditions:

(i)    on or before the fifth Business Day immediately preceding such allocation, the Servicer shall have given the Indenture Trustee and each Rating Agency written notice of such allocation;

(ii)    the Rating Agency Condition shall have been satisfied with respect to such allocation; and

(iii)    the Servicer shall have delivered to the Indenture Trustee an Officer's Certificate, dated the date of such allocation, to the effect that the Servicer reasonably believes that such allocation will not have an Adverse Effect.

Any such Indenture Supplement may provide that (i) such allocation to one or more particular Series or Groups may terminate upon the occurrence of certain events specified therein and (ii) that upon the occurrence of any such event, such assets and any Collections with respect thereto, shall be reallocated to other Series or Groups or to all Series, all as shall be provided in such Indenture Supplement.

Section 8.08.    Excess Finance Charge Collections.

On each Distribution Date, (a) the Servicer shall allocate Excess Finance Charge Collections (as described below) to each Excess Allocation Series, *pro rata*, in proportion to the Finance Charge Shortfalls (as described below), if any, with respect to each such Series and (b) the Servicer shall withdraw from the Collection Account and pay to the Holders of the Transferor Certificates an amount equal to the excess, if any, of (x) the aggregate amount for all outstanding Series of Collections of Finance Charge Receivables which the related Supplements specify are to be treated as "**Excess Finance Charge Collections**" for such Distribution Date over (y) the aggregate amount for all outstanding Series which the related Supplements specify are "**Finance Charge Shortfalls**" for such Series and such Distribution Date; provided, however, that the sharing of Excess Finance Charge Collections among Series will continue only until such time, if any, at which the Transferor shall deliver to the Indenture Trustee an Officer's Certificate to the effect that, in the reasonable belief of the Transferor, the continued sharing of Excess Finance Charge Collections among Series would have adverse regulatory implications with respect to an Account Owner. Notwithstanding the foregoing, a Group of Series may specify in their related Indenture Supplements that Excess Finance Charge Collections from such Series shall be allocated as provided above but only among the Series in such Group.

Section 8.09.    Release of Collateral; Eligible Loan Documents.

(a)    The Indenture Trustee may, and when required by the provisions of this Indenture shall, execute instruments to release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same, in a manner and under circumstances which are not inconsistent with the provisions of this Indenture. No party relying upon an instrument executed by the Indenture Trustee as provided in this Article VIII shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

(b)    In order to facilitate the servicing of the Receivables by the Servicer, the Indenture Trustee upon Issuer Order shall authorize the Servicer to execute in the name and on behalf of the Indenture Trustee instruments of satisfaction or cancellation, or of partial or full release or discharge, and other comparable instruments with respect to the Receivables (and the Indenture Trustee shall execute any such documents on request of the Servicer), subject to the obligations of the Servicer under the Transfer and Servicing Agreement.

(c)    The Indenture Trustee shall, at such time as there are no Notes outstanding, release and transfer, without recourse, all of the Collateral that secured the Notes (other than any cash held for the payment of the Notes pursuant to Section 4.02). The Indenture Trustee shall release property from the lien of this Indenture pursuant to this Section 8.09(c) only upon receipt of an Issuer Order accompanied by an Officer's Certificate, an Opinion of Counsel and (if required by the TIA) Independent Certificates in accordance with TIA §314(c) and 314(d)(1) meeting the applicable requirements of Section 12.01.

(d)    Notwithstanding anything to the contrary in this Indenture, the Transfer and Servicing Agreement and the Trust Agreement, immediately prior to the release of any portion of the Collateral or any funds on deposit in the Series Accounts pursuant to this Indenture, the Indenture Trustee shall remit to the Transferor for its own account any funds that, upon such release, would otherwise be remitted to the Issuer.

Section 8.10.    Opinion of Counsel

The Indenture Trustee shall receive at least seven (7) days notice when requested by the Issuer to take any action pursuant to subsection 8.09(a), accompanied by copies of any instruments involved, and the Indenture Trustee shall also require, as a condition to such action, an Opinion of Counsel, in form and substance reasonably satisfactory to the Indenture Trustee, stating the legal effect of any such action, outlining the steps required to complete the same, and concluding that all conditions precedent to the taking of such action have been complied with and such action will not materially and adversely impair the security for the Notes or the rights of the Noteholders in contravention of the provisions of this Indenture; provided, however, that such Opinion of Counsel shall not be required to express an opinion as to the fair value of the Collateral. The Indenture Trustee and counsel rendering any such opinion may rely, without independent investigation, on the accuracy and validity of any certificate or other instrument delivered to the Indenture Trustee in connection with any such action.

ARTICLE IX

DISTRIBUTIONS AND REPORTS TO NOTEHOLDERS

Distributions shall be made to, and reports shall be provided to, Noteholders as set forth in the applicable Indenture Supplement. The identity of the Noteholders with respect to distributions and reports shall be determined according to the immediately preceding Record Date.

ARTICLE X

SUPPLEMENTAL INDENTURES

Section 10.01.  <u>Supplemental Indentures Without Consent of Noteholders</u>.

(a)  Without the consent of the Holders of any Notes, but upon satisfaction of the Rating Agency Condition, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, at any time and from time to time, may enter into one or more indentures supplemental hereto (which shall conform to the provisions of the TIA as in force at the date of the execution thereof), in form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)  to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(ii)  to evidence the succession, in compliance with Section 3.11 hereof, of another person to the Issuer, and the assumption by any such successor of the covenants of the Issuer herein and in the Notes contained;

(iii)  to add to the covenants of the Issuer, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Issuer;

(iv)  to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(v)  to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture or to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; <u>provided</u> that such action shall not adversely affect the interests of the Holders of the Notes;

(vi)  to evidence and provide for the acceptance of the appointment hereunder by a successor indenture trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one indenture trustee, pursuant to the requirements of Article VI;

(vii)  to modify, eliminate or add to the provisions of this Indenture to such extent as shall be necessary to effect the qualification of this Indenture under the TIA or under any similar federal statute hereafter enacted and to add to this Indenture such other provisions as may be expressly required by the TIA;

(viii)  to provide for the issuance of one or more new Series of Notes, in accordance with the provisions of Section 2.12 hereof; or

(ix)  to provide for the termination of any interest rate swap agreement or other form of credit enhancement in accordance with the provisions of the related Indenture Supplement.

The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b)    The Issuer and the Indenture Trustee, when authorized by an Issuer Order, may, also without the consent of any Noteholders of any Series then Outstanding but upon satisfaction of the Rating Agency Condition with respect to the Notes of all Series, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however that (i) the Transferor shall have delivered to the Indenture Trustee an Officer's Certificate, dated the date of any such action, stating that the Transferor reasonably believes that such action will not have an Adverse Effect and (ii) a Tax Opinion shall have been delivered to each Rating Agency. Additionally, notwithstanding the preceding sentence, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, may, without the consent of any Noteholders of any Series then Outstanding or the Series Enhancers for any Series, enter into an indenture or indentures supplemental hereto to add, modify or eliminate such provisions as may be necessary or advisable in order to enable all or a portion of the Trust (i) to qualify as, and to permit an election to be made to cause the Trust to be treated as, a "financial asset securitization investment trust" as described in the provisions of Section 860L of the Code, and (ii) to avoid the imposition of state or local income or franchise taxes imposed on the Trust's property or its income; provided, however, that (i) the Transferor delivers to the Indenture Trustee and the Owner Trustee an Officer's Certificate to the effect that the proposed amendments meet the requirements set forth in this subsection 10.01(b), (ii) the Rating Agency Condition will have been satisfied and (iii) such amendment does not affect the rights, duties or obligations of the Indenture Trustee or the Owner Trustee hereunder. The amendments which the Transferor may make without the consent of Noteholders pursuant to the preceding sentence may include, without limitation, the addition of a sale of Receivables.

Section 10.02.    Supplemental Indentures with Consent of Noteholders.

The Issuer and the Indenture Trustee, when authorized by an Issuer Order, also may, upon satisfaction of the Rating Agency Condition and with the consent of the Holders of not less than a majority of the Outstanding Amount of the Notes of each adversely affected Series of Notes, by Act of such Holders delivered to the Issuer and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of such Noteholders under this Indenture; provided, however that no such supplemental indenture shall, without the consent of the Holder of each outstanding Note affected thereby:

(a)    change the due date of any installment of principal of or interest on any Note, or reduce the principal amount thereof, the interest rate specified thereon or the redemption price with respect thereto or change any place of payment where, or the coin or currency in which, any Note or any interest thereon is payable;

(b)    impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes on or after the respective due dates thereof (or, in the case of redemption, on or after the Redemption Date);

(c)    reduce the percentage of the Outstanding Amount of the Notes of any Series outstanding the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences as provided for in this Indenture;

(d)    reduce the percentage of the aggregate outstanding amount of any Notes, the consent of the Holders of which is required to direct the Indenture Trustee to sell or liquidate the Collateral if the proceeds of such sale would be insufficient to pay the principal amount and accrued but unpaid interest on the outstanding Notes of such Series;

(e)    decrease the percentage of the aggregate principal amount of the Notes required to amend the sections of this Indenture which specify the applicable percentage of the aggregate principal amount of the Notes of such Series necessary to amend the Indenture or any Transaction Documents which require such consent;

(f)    modify or alter the provisions of this Indenture prohibiting the voting of Notes held by the Trust, any other obligor on the Notes, a Seller or any affiliate thereof; or

(g)    permit the creation of any Lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral for any Notes or, except as otherwise permitted or contemplated herein, terminate the lien of this Indenture on any such Collateral at any time subject hereto or deprive the Holder of any Note of the security provided by the lien of this Indenture.

The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes, whether theretofore or thereafter authenticated and delivered hereunder.  The Indenture Trustee shall not be liable for any such determination made in good faith.

It shall not be necessary for any Act of Noteholders under this Section 10.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Issuer and the Indenture Trustee of any Supplement Indenture pursuant to this Section 10.02, the Indenture Trustee shall mail to the Holders of the Notes to which such amendment or supplemental indenture relates written notice setting forth in general terms the substance of such Supplement Indenture.  Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 10.03.    Execution of Supplemental Indentures.

In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this Article X or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.01 and 6.02, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture.  The Indenture Trustee or Owner Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's or Owner Trustee's (as such or in its individual capacity) own rights, duties, liabilities, benefits, protections, privileges or immunities under this Indenture or otherwise.

Section 10.04.    Effect of Supplemental Indenture.

Upon the execution of any supplemental indenture under this Article X, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes, and every Holder of Notes theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

Section 10.05.   Conformity With Trust Indenture Act.

Every amendment of this Indenture and every supplemental indenture executed pursuant to this Article X shall conform to the requirements of the TIA as then in effect so long as this Indenture shall then be qualified under the TIA.

Section 10.06.   Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental. indenture pursuant to this Article X may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for the outstanding Notes.

# ARTICLE XI

# TERMINATION

Section 11.01.   Termination of Trust.

The Trust and the respective obligations and responsibilities of the Indenture Trustee created hereby (other than the obligation of the Indenture Trustee to make payments to Noteholders as hereinafter set forth) shall terminate, except with respect to the duties described in subsection 11.02(b), as provided in the Trust Agreement.

Section 11.02.   Final Distribution.

(a)     The Servicer shall give the Indenture Trustee at least thirty (30) days prior notice of the Distribution Date on which the Noteholders of any Series or Class may surrender their Notes for payment of the final distribution on and cancellation of such Notes (or, in the event of a final distribution resulting from the application of Section 2.06, 6.01 or 7.01 of the Transfer and Servicing Agreement, notice of such Distribution Date promptly after the Servicer has determined that a final distribution will occur, if such determination is made less than thirty (30) days prior to such Distribution Date). Such notice shall be accompanied by an Officer's Certificate setting forth the information specified in Section 3.05 of the Transfer and Servicing Agreement covering the period during the then-current calendar year through the date of such notice. Not later than the fifth day of the month in which the final distribution in respect of such Series or Class is payable to Noteholders, the Indenture Trustee shall provide notice to Noteholders of such Series or Class specifying (i) the date upon which final payment of such Series or Class will be made upon presentation and surrender of Notes of such Series or Class at the office or offices therein designated, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such payment date is not applicable, payments being made only upon presentation and surrender of such Notes at the office or offices therein specified (which, in the case of Bearer Notes, shall be outside the United States). The Indenture Trustee shall give such notice to the Transfer Agent and Registrar and the Paying Agent at the time such notice is given to Noteholders.

(b)     Notwithstanding a final distribution to the Noteholders of any Series or Class (or the termination of the Trust), except as otherwise provided in this paragraph, all funds then on deposit in the Collection Account and any Series Account allocated to such Noteholders shall continue to be held in trust for the benefit of such Noteholders and the Paying Agent or the Indenture Trustee shall pay such

funds to such Noteholders upon surrender of their Notes, if certificated (and any excess shall be paid in accordance with the terms of any Enhancement Agreement). In the event that all such Noteholders shall not surrender their Notes for cancellation within six (6) months after the date specified in the notice from the Indenture Trustee described in paragraph (a), the Indenture Trustee shall give a second notice to the remaining such Noteholders to surrender their Notes for cancellation and receive the final distribution with respect thereto (which surrender and payment, in the case of Bearer Notes, shall be outside the United States). If within one year after the second notice all such Notes shall not have been surrendered for cancellation, the Indenture Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining such Noteholders concerning surrender of their Notes, and the cost thereof shall be paid out of the funds in the Collection Account or any Series Account held for the benefit of such Noteholders. The Indenture Trustee and the Paying Agent shall pay to the Issuer any monies held by them for the payment of principal or interest that remains unclaimed for two (2) years. After payment to the Issuer, Noteholders entitled to the money must look to the Issuer for payment as general creditors unless an applicable abandoned property law designates another Person.

Section 11.03.    Termination Distributions.

Upon the termination of the Trust pursuant to the terms of the Trust Agreement, the Indenture Trustee shall assign and convey to the Holders of the Transferor Certificates or any of their designees, without recourse, representation or warranty, all right, title and interest of the Trust in the Receivables, whether then existing or thereafter created, all Interchange and Recoveries related thereto, all monies due or to become due and all amounts received or receivable with respect thereto (including all moneys then held in the Collection Account or any Series Account) and all proceeds thereof, except for amounts held by the Indenture Trustee pursuant to subsection 11.02(b). The Indenture Trustee shall execute and deliver such instruments of transfer and assignment, in each case without recourse, as shall be reasonably requested by the Holders of the Transferor Certificates to vest in the Holders of the Transferor Certificates or any of their designees all right, title and interest which the Indenture Trustee had in the Collateral and such other property.

Section 11.04.    Defeasance.

Notwithstanding anything to the contrary in this Indenture and unless otherwise specified with respect to any Series in the applicable Indenture Supplement:

(a)    The Issuer may at its option be discharged from its obligations hereunder with respect to any Series or all outstanding Series (each, a "**Defeased Series**") on the date the applicable conditions set forth in subsection 11.04(c) are satisfied (a "**Defeasance**"); provided, however, that the following rights, obligations, powers, duties and immunities shall survive with respect to each Defeased Series until otherwise terminated or discharged hereunder: (i) the rights of the Holders of Notes of the Defeased Series to receive, solely from the trust fund provided for in subsection 11.04(c), payments in respect of principal of and interest on such Notes when such payments are due; (ii) the Issuer's obligations with respect to such Notes under Sections 2.05 and 2.06; (iii) the rights, powers, trusts, duties, and immunities of the Indenture Trustee, the Paying Agent and the Registrar hereunder; and (iv) this Section 11.04 and Section 12.16.

(b)    Subject to subsection 11.04(c), the Issuer at its option may cause Collections allocated to each Defeased Series and available to purchase additional Receivables to be applied to purchase Eligible Investments rather than additional Receivables.

(c)    The following shall be the conditions precedent to any Defeasance under subsection 11.04(a):

(i)      the Issuer irrevocably shall have deposited or caused to be deposited with the Indenture Trustee (such deposit to be made from other than the Issuer's or any Affiliate of the Issuer's funds), under the terms of an irrevocable trust agreement in form and substance satisfactory to the Indenture Trustee, as trust funds in trust for making the payments described below, (A) Dollars in an amount equal to, or (B) Eligible Investments which through the scheduled payment of principal and interest in respect thereof will provide, not later than the due date of payment thereon, money in an amount equal to, or (C) a combination thereof, in each case sufficient to pay and discharge (without relying on income or gain from reinvestment of such amount), and which shall be applied by the Indenture Trustee to pay and discharge, all remaining scheduled interest and principal payments on all outstanding Notes of each Defeased Series on the dates scheduled for such payments in this Indenture and the applicable Indenture Supplements and all amounts owing to the Series Enhancers with respect to each Defeased Series;

(ii)      a statement from a firm of nationally recognized independent public accountants (who may also render other services to the Issuer) to the effect that such deposit is sufficient to pay the amounts specified in clause (i) above;

(iii)      prior to its exercise of its right pursuant to this Section 11.04 with respect to any Defeased Series to substitute money or Eligible Investments for Receivables, the Issuer shall have delivered to the Indenture Trustee an Opinion of Counsel to the effect contemplated by clause (b) of the definition in this Indenture of the term "**Tax Opinion**" (the preparation and delivery of which shall not be at the expense of the Indenture Trustee) with respect to such deposit and termination of obligations, and an Opinion of Counsel to the effect that such deposit and termination of obligations will not result in the Trust being required to register as an "investment company" within the meaning of the Investment Company Act;

(iv)      the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate of the Transferor stating that the Transferor reasonably believes that such deposit and termination of obligations will not, based on the facts known to such officer at the time of such certification, then cause a Redemption Event with respect to any Series or any event that, with the giving of notice or the lapse of time, would result in the occurrence of a Redemption Event with respect to any Series; and

(v)      the Rating Agency Condition shall have been satisfied and the Issuer shall have delivered copies of such written notice to the Servicer and the Indenture Trustee.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01.   <u>Compliance Certificates and Opinions etc.</u>

(a)      Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with, (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with and (iii) (if required by the TIA) an Independent Certificate from a firm of certified public accountants meeting the applicable requirements of this Section 12.01, except that, in the case of any such application or request as to which

the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(i) a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(ii) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(iii) a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv) a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

(b)     (i) Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee that is to be made the basis for the release of any property or securities subject to the lien of this Indenture, the Issuer shall, in addition to any obligation imposed in subsection 12.01(a) or elsewhere in this Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within ninety (90) days of such deposit) to the Issuer of the Collateral or other property or securities to be so deposited.

(ii) Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the Issuer shall also deliver to the Indenture Trustee (if required by the TIA) an Independent Certificate as to the same matters, if the fair value to the Issuer of the securities to be so deposited and of all other such securities made the basis of any such withdrawal or release since the commencement of the then-current fiscal year of the Issuer, as set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of the Outstanding Amount of the Notes, but such a certificate need not be furnished with respect to any securities so deposited if the fair value thereof to the Issuer as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the Outstanding Amount of the Notes.

(iii) Other than with respect to the release of any Defaulted Receivables and Receivables in Removed Accounts, whenever any property or securities is to be released from the lien of this Indenture, the Issuer shall also furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within ninety (90) days of such release) of the property or securities proposed to be released and stating that in the opinion of such person the proposed release will not impair the security under this Indenture in contravention of the provisions hereof.

(iv) Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above, the Issuer shall also furnish to the Indenture Trustee (if required by the TIA) an Independent Certificate as to the same matters if the fair value of the property or securities and of all other property, other than Defaulted Receivables and Receivables in Removed Accounts, or securities released from the lien of this Indenture since the commencement of the then current

calendar year, as set forth in the certificates required by clause (iii) above and this clause (iv), equals 10% or more of the Outstanding Amount of the Notes, but such certificate need not be furnished in the case of any release of property or securities if the fair value thereof as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the then Outstanding Amount of the Notes.

(v)    Notwithstanding Section 2.11 or any other provision of this Section 12.01, the Issuer may (A) collect, liquidate, sell or otherwise dispose of Receivables as and to the extent permitted or required by the Transaction Documents and (B) make cash payments out of the Series Accounts as and to the extent permitted or required by the Transaction Documents.

Section 12.02.    Form of Documents Delivered to Indenture Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such officer's certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Servicer, a Seller, the Issuer or the Administrator, stating that the information with respect to such factual matters is in the possession of the Servicer, a Seller, the Issuer or the Administrator, unless such an Authorized Officer or Counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two (2) or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

Section 12.03.    Acts of Noteholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agent duly appointed in writing and satisfying any requisite percentages as to minimum number or dollar

value of outstanding principal amount represented by such Noteholders; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 12.03.

       (b)     The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Indenture Trustee deems sufficient.

       (c)     The ownership of Notes shall be proved by the Note Register.

       (d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 12.04.   <u>Notices, Etc. to Indenture Trustee and Issuer.</u>

       Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by the Agreement to be made upon, given or furnished to, or filed with:

       (a)     the Indenture Trustee by any Noteholder or by the Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to a Responsible Officer, by facsimile transmission or by other means acceptable to the Indenture Trustee to or with the Indenture Trustee at its Corporate Trust Office; or

       (b)     the Issuer by the Indenture Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed, first-class postage prepaid, to the Issuer addressed to it at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attention: Corporate Trust Department, or at any other address previously furnished in writing to the Indenture Trustee by the Issuer. A copy of each notice to the Issuer shall be sent in writing and mailed, first-class postage prepaid, to the Administrator at 250 East Carpenter Freeway, Irving, Texas 75062.

Section 12.05.   <u>Notices to Noteholders; Waiver.</u>

       Where the Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed by registered or certified mail or first class postage prepaid or national overnight courier service to each Noteholder affected by such event, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall conclusively be presumed to have been duly given.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to any Rating Agency, failure to give such notice shall not affect any other rights or obligations created hereunder and shall not under any circumstance constitute a Default or Event of Default.

Section 12.06.    Alternate Payment and Notice Provisions.

Notwithstanding any provision of this Indenture or any of the Notes to the contrary, the Issuer, with the consent of the Indenture Trustee, may enter into any agreement with any Holder of a Note providing for a method of payment, or notice by the Indenture Trustee or any Paying Agent to such Holder, that is different from the methods provided for in this Indenture for such payments or notices. The Issuer will furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee will cause payments to be made and notices to be given in accordance with such agreements.

Section 12.07.    Conflict with Trust Indenture Act.

If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of the TIA, such required provision shall control.

The provisions of TIA §§310 through 317 that impose duties on any person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 12.08.    Effect of Headings and Table of Contents.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 12.09.    Successors and Assigns.

All covenants and agreements in this Indenture by the Issuer shall bind its successors and assigns, whether so expressed or not.

Section 12.10.    Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.11.  Benefits of Indenture.

Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Noteholders, the Servicer and the Transferor, any benefit.

Section 12.12.  Legal Holidays.

In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due; and no interest shall accrue for the period from and after any such nominal date.

Section 12.13.  **GOVERNING LAW.**

**THE INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.**

Section 12.14.  Counterparts.

This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 12.15.  Trust Obligation.

No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their individual capacity) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.  For all purposes of this Indenture, in the performance of any duties or obligations hereunder, the Owner Trustee (as such or in its individual capacity) shall be subject to, and entitled to the benefits of, the terms and provisions of the Trust Agreement.

Section 12.16.  No Petition.

The Indenture Trustee, by entering into this Indenture, and each Noteholder, by accepting a Note, hereby covenant and agree that they will not at any time institute against the Issuer, or join in instituting against the Issuer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers thereunto duly authorized and attested, all as of the day and year first above written.

NEXTCARD CREDIT CARD MASTER
NOTE TRUST,
    as Issuer

By:  Wilmington Trust Company,
        not in its individual capacity,
        but solely as Owner Trustee

By:  _____
      Name:
      Title:

THE BANK OF NEW YORK,
    as Indenture Trustee

By:_____
      Name:
      Title:

[Signature Page to Master Indenture]

DOCSSF1:490698

Acknowledged and Accepted:

NEXTBANK, N.A.,
as Transferor and Servicer


By:_____
    Name:
    Title:

[Signature Page to Master Indenture]

**NEXTCARD CREDIT CARD MASTER NOTE TRUST**

Issuer

and

**THE BANK OF NEW YORK**

Indenture Trustee

SERIES 2000-1 INDENTURE SUPPLEMENT

Dated as of December 13, 2000

TABLE OF CONTENTS

<u>Page</u>

ARTICLE I

CREATION OF THE SERIES 2000-1 NOTES

Section 1.01    Designation ...................................................................................1

ARTICLE II

DEFINITIONS

Section 2.01    Definitions.....................................................................................2

ARTICLE III

SERVICING FEE

Section 3.01    Servicing Compensation ............................................................16

ARTICLE IV

RIGHTS OF SERIES 2000-1 NOTEHOLDERS
AND ALLOCATION AND APPLICATION OF COLLECTIONS

Section 4.01    Collections and Allocations .......................................................17
Section 4.02    Determination of Monthly Interest .............................................19
Section 4.03    Determination of Monthly Principal ...........................................21
Section 4.04    Application of Available Finance Charge Collections and Available
                Principal Collections..................................................................21
Section 4.05    Investor Charge-Offs .................................................................25
Section 4.06    Reallocated Principal Collections ..............................................25
Section 4.07    Excess Finance Charge Collections ...........................................25
Section 4.08    Shared Principal Collections......................................................26
Section 4.09    Principal Funding Account ........................................................26
Section 4.10    Reserve Account .......................................................................27
Section 4.11    Spread Account.........................................................................29
Section 4.12    Determination of LIBOR ...........................................................31
Section 4.13    Investment Instructions.............................................................31

ARTICLE V

DELIVERY OF SERIES 2000-1 NOTES;
DISTRIBUTIONS: REPORTS TO SERIES 2000-1 NOTEHOLDERS

Section 5.01    Delivery and Payment for the Series 2000-1 Notes...........................................33
Section 5.02    Distributions....................................................................................................33
Section 5.03    Reports and Statements to Series 2000-1 Noteholders.......................................34

ARTICLE VI

SERIES 2000-1 REDEMPTION EVENTS

Section 6.01    Series 2000-1 Redemption Events.....................................................................36

ARTICLE VII

REDEMPTION OF SERIES 2000-1 NOTES; FINAL DISTRIBUTIONS;
SERIES TERMINATION

Section 7.01    Optional Redemption of Series 2000-1 Notes: Final Distributions....................38
Section 7.02    Series Termination.............................................................................................39

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.01    Ratification of Indenture...................................................................................40
Section 8.02    Form of Delivery of the Series 2000-1 Notes....................................................40
Section 8.03    Counterparts.....................................................................................................40
Section 8.04    GOVERNING LAW..........................................................................................40
Section 8.05    Limitation of Liability.......................................................................................40
Section 8.06    Transfer of the Class D Notes...........................................................................40
Section 8.07    Private Placement of Securities.........................................................................41
Section 8.08    Representations and Warranties of Class A Noteholders, Class B
                Noteholders and Class C Noteholders...............................................................41
Section 8.09    Regulation S Global Notes.................................................................................43
Section 8.10    Special Transfer Provisions................................................................................45
Section 8.11    Settlement Procedures........................................................................................47

SERIES 2000-1 INDENTURE SUPPLEMENT, dated as of December 13, 2000 (the "Indenture Supplement")) between NEXTCARD CREDIT CARD MASTER NOTE TRUST, a business trust organized and existing under the laws of the State of Delaware (herein, the "Issuer" or the "Trust"), and The Bank of New York, a banking corporation organized and existing under the laws of the State of New York, not in its individual capacity, but solely as indenture trustee (herein, together with its successors in the trusts thereunder as provided in the Master Indenture referred to below, the "Indenture Trustee") under the Master Indenture, dated as of December 11, 2000 (the "Indenture') between the Issuer and the Indenture Trustee (the Indenture, together with this Indenture Supplement; the "Agreement").

Pursuant to Section 2.12 of the Indenture, the Transferor may direct the Issuer to issue one or more Series of Notes. The Principal Terms of this Series are set forth in this Indenture Supplement to the Indenture.

# ARTICLE I

## CREATION OF THE SERIES 2000-1 NOTES

Section 1.01    Designation.    (a) There is hereby created and designated a Series of Notes to be issued pursuant to the Indenture and this Indenture Supplement to be known as "NextCard Credit Card Master Note Trust, Series 2000-1" or the "Series 2000-1 Notes." The Series 2000-1 Notes shall be issued in four Classes, the first of which shall be known as the "Class A Series 2000-1 Floating Rate Asset Backed Notes," the second of which shall be known as the "Class B Series 2000-1 Floating Rate Asset Backed Notes," the third of which shall be known as the "Class C Series 2000-1 Floating Rate Asset Backed Notes," and the fourth of which shall be known as the "Class D Series 2000-1 Floating Rate Asset Backed Notes." The Series 2000-1 Notes shall be due and parable on the Series 2000-1 Final Maturity Date.

(b)    Series 2000-1 shall be included in Group One and shall be a Principal Sharing Series with respect to Group One only. Series 2000-1 shall be an Excess Allocation Series with respect to Group One only. Series 2000-1 shall not be subordinated to any other Series.

(c)    In the event that any terra or provision contained herein shall conflict with or be inconsistent with any term or provision contained in the Indenture, the terms and provisions of this Indenture Supplement shall be controlling. All capitalized terms not otherwise defined herein are defined in the Indenture, the Transfer and Servicing Agreement or the Trust Agreement.

[END OF ARTICLE I]

# ARTICLE II

## DEFINITIONS

Section 2.01   Definitions.   (a) Whenever used in this Indenture Supplement; the following words and phrases shall have the following meanings, and the definitions of such terms are applicable to the singular as well as the plural forms of such terms and the masculine as well as the feminine and neuter genders of such terms.

"Accumulation Period Factor" shall mean, with respect to any Monthly Period, a fraction, the numerator of which is equal to the sum of the initial invested amounts of all outstanding Series, and the denominator of which is equal to the sum of (a) the Initial Invested Amount; (b) the initial Invested amounts of all outstanding Series (other than Series 2000-1) which are not expected to be in their revolving periods, and (c) the initial invested amounts of all other outstanding Series which are not allocating Shared Principal Collections to other Series and are in their revolving periods; *provided, however* that this definition may be changed at any time if the Rating Agency Condition is satisfied.

"Accumulation Period Length" shall have the meaning assigned such term in subsection 4.04(e).

"Accumulation Shortfall" shall initially mean zero and shall thereafter mean, with respect to any Monthly Period during the Controlled Accumulation Period, the excess, if any, of the Controlled Deposit Amount for the previous Monthly Period over the amount deposited into the Principal Funding Account pursuant to subsection 4.04(c)(i) for the previous Monthly Period.

"Additional Interest" shall mean, with respect to any Distribution Date, Class A Additional Interest, Class B Additional Interest; Class C Additional Interest and Class D Additional Interest for such Distribution Date.

"Adjusted Invested Amount" shall mean, as of any date of determination, an amount equal to the Invested Amount as of such date, *minus* the amount on deposit in the Principal Funding Account on such date.

"Authenticating Agent" shall mean any Authenticating Agent pursuant to Section 2.04 of the Indenture.

"Available Finance Charge Collections" shall mean, with respect to any Monthly Period, an amount equal to the sum of (a) the Investor Finance Charge Collections for such Month Period, *plus* (b) the Excess Finance Charge Collections allocated to Series 2000-1 for such Monthly Period, *plus* (c) Principal Funding Investment Proceeds, if any, with respect to the related Distribution Date, *plus* (d) amounts, if any, to be withdrawn from the Reserve Account which will be deposited into the Collection Account on the related Distribution Date to be treated as Available Finance Charge Collections pursuant to subsection 4.10(d).

"Available Principal Collections" shall mean, with respect to any Monthly Period, an amount equal to the sum of (a) the Investor Principal Collections for such Monthly Period *minus* (b) the amount of Reallocated Principal Collections with respect to such Monthly Period which pursuant to Section 4.06 are required to be applied on the related Distribution Date, *plus* (c) any Shared Principal Collections with respect to other Principal Sharing Series in Group One (including any amounts on deposit in the Special Funding Account that are allocated to Series 2000-1 pursuant to the Agreement for application as Shared Principal Collections), *plus* (d) the aggregate amount to be treated as Available Principal Collections pursuant to subsections 4.04(a)(v), (vi) and (viii) for the related Distribution Date.

"Available Reserve Account Amount" shall mean, with respect to any Distribution Date, the lesser of (a) the amount on deposit in the Reserve Account on such date (after taking into account any interest and earnings retained in the Reserve Account pursuant to subsection 4.10(b) on such date, but before giving effect to any deposit made or to be made pursuant to subsection 4.04(a)(ix) to the Reserve Account on such date) and (b) the Required Reserve Account Amount.

"Available Spread Account Amount" shall mean, with respect to any Distribution Date, an amount equal to the lesser of (a) the amount on deposit in the Spread Account (exclusive of Investment Earnings, unless and until the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture) on such date (before giving effect to any deposit to, or withdrawal from, the Spread Account made or to be made with respect to such date) and (b) the Required Spread Account Amount for such Distribution Date.

"Base Rate" shall mean, with respect to any Monthly Period, the annualized percentage equivalent of a fraction, the numerator of which is equal to the sum of the Monthly Interest and the Monthly Servicing Fee, each with respect to the related Distribution Date, and the denominator of which is the Note Principal Balance as of the first day of such Monthly Period.

"Class A Additional Interest" shall have the meaning specified in subsection 4.02(a).

"Class A Interest Shortfall" shall have the meaning specified in subsection 4.02(a).

"Class A Monthly Interest" shall have the meaning specified in subsection 4.02(a).

"Class A Note Initial Principal Balance" shall mean $357,500,000.

"Class A Note Interest Rate" shall mean a per annum rate of 0.200% in excess of LIBOR as determined on the related LIBOR Determination Date with respect to each Interest Period.

"Class A Note Principal Balance" shall mean, on any date of determination, an amount equal to (a) the Class A Note Initial Principal Balance, *minus* (b) the aggregate amount of principal payments made to the Class A Noteholders on or prior to such date.

"Class A Noteholder" shall mean the Person in whose name a Class A Note is registered in the Note Register.

"Class A Notes" shall mean any one of the Notes executed by the Issuer and authenticated by or on behalf of the Indenture Trustee, substantially in the form of Exhibit A-1, Exhibit A-2, or Exhibit A-3.

"Class A Required Amount" shall mean, with respect to any Distribution Date, an amount equal to the excess of the amount described in subsection 4.04(a)(ii) over the Available Finance Charge Collections applied to pay such amount pursuant to subsection 4.04(a).

"Class B Additional Interest" shall have the meaning specified in subsection 4.02(b).

"Class B Interest Shortfall" shall have the meaning specified in subsection 4.02(b).

"Class B Monthly Interest" shall have the meaning specified in subsection 4.02(b).

"Class D Note Interest Rate" shall mean a per annum rate of 3.750% in excess of LIBOR as determined on the related LIBOR Determination Date with respect to each Interest Period; provided however, that prior to the occurrence of an Event of Default and in connection with a transfer of the Class D Notes by the Transferor to a Person other than the Issuer, any other obligor upon the Notes, the Servicer, or any Affiliate of the Transferor or any of the other foregoing Persons, subject to satisfaction of the Rating Agency Condition, this per annum rate in excess of LIBOR shall be increased upon delivery by the Issuer to the Indenture Trustee an Issuer Order specifying the amount of such increase.

"Class D Note Principal Balance" shall mean, on any date of determination, an amount equal to (a) the Class D Note Initial Principal Balance, *minus* (b) the aggregate amount of principal payments made to the Class D Noteholders on or prior to such date.

"Class D Noteholder" shall mean the Person in whose name a Class D Note is registered in the Note Register.

"Class D Notes" shall mean any one of the Notes executed by the Issuer and authenticated by or on behalf of the Indenture Trustee, substantially in the form of Exhibit A-10.

"Closing Date" shall mean December 13, 2000.

"Controlled Accumulation Amount" shall mean, (or any Distribution Date with respect to the Controlled Accumulation Period, $41,666,667; *provided, however*, that if the Accumulation Period Length is determined to be less than twelve (12) months pursuant to

subsection 4.04(e), the Controlled Accumulation Amount for each Distribution Date with respect to the Controlled Accumulation Period will be equal to (i) the product of (x) the Initial Invested Amount and (y) the Accumulation Period Factor for such Monthly Period divided by (ii) the Required Accumulation Factor Number.

"Controlled Accumulation Period" shall mean, unless a Redemption Event shall have occurred prior thereto, the period commencing at the close of business on December 1, 2002 or such later date as is determined in accordance with subsection 4.04(e), and ending on the first to occur of (a) the commencement of the Early Amortization Period, (b) the payment in full of the Note Principal Balance and (c) the Series 2000-1 Final Maturity Date.

"Controlled Deposit Amount" shall mean, for any Distribution Date with respect to the Controlled Accumulation Period, an amount equal to the sum of the Controlled Accumulation Amount for such Distribution Date and any existing Accumulation Shortfall.

"Covered Amount" shall mean an amount, determined as of each Distribution Date with respect to any Interest Period, equal to the sum of (a) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class A Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account up to the Class A Note Principal Balance as of the Record Date preceding such Distribution Date, *plus* (b) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class B Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account in excess of the Class A Note Principal Balance as of the Record Date preceding such Distribution Date, up to the Class B Note Principal Balance, *plus* (c) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class C Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account in excess of the sum of the Class A Note Principal Balance and the Class B Note Principal Balance as of the Record Date preceding such Distribution Date, up to the Class C Note Principal Balance, *plus* (d) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class D Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account in excess of the sum of the Class A Note Principal Balance, the B Note Principal Balance and the Class C Note Principal Balance as of the Record Date preceding such Distribution Date, up to the Class D Note Principal Balance.

"Distribution Compliance Period" shall mean the period from the Closing Date through and including the later of (a) the 40th day after the later of the commencement of the offering of the Class A Notes, Class B Notes and Class C Notes to persons other than distributors in reliance upon Regulation S and the Closing Date.

"Distribution Date" shall mean January 15, 2001 and the fifteenth day of each calendar month thereafter, or if such fifteenth day is not a Business Day, the next succeeding Business Day.

"DWAC" shall mean the DTC Deposit and Withdrawal at Custodian system.

"Early Amortization Period" shall mean the period commencing on the Business Day immediately preceding the day on which a Redemption Event with respect to Series 2000-1 is deemed to have occurred, and ending on the first to occur of (1) the payment in fill of the Note Principal Balance and (ii) the Series 2000-1 Final Maturity Date.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Excess Spread Percentage" shall mean, with respect to any Monthly Period, the amount, if any, by which the Portfolio Yield exceeds the Base Rate.

"Expected Final Principal Payment Date" shall mean the December 2003 Distribution Date.

"Finance Charge Shortfall" shall have the meaning specified in Section 4.07.

"Fixed Investor Percentage" shall mean, with respect to any Monthly Period, the percentage equivalent (which percentage shall never exceed 100%) of a fraction, (a) the numerator of which is the Invested Amount as of the close of business on the last day of the Revolving Period and (b) the denominator of which is the greater of (i) the sum of (a) the total amount of Principal Receivables in the Trust as of the close of business on the last day of the immediately preceding Monthly Period (or with respect to the first Monthly Period, the total amount of Principal Receivables in the Trust as of the Series 2000-1 Cut-Off Date) and (b) the principal amount on deposit in the Special Funding Account as of the close of business on such last day (or with respect to the first Monthly Period, the Series 2000-1 Cut-Off Date) and (ii) the sum of the numerators used to calculate the investor percentages for allocations with respect to Principal Receivables for all Series outstanding as of the date as to which such determination is being made; *provided, however*, that if after the commencement of the Controlled Accumulation Period or the Early Amortization Period a Redemption Event occurs with respect to another Series that was designated in the Indenture Supplement therefor as a Series that is a "Paired Series" with respect to Series 2000-1, the Transferor may, by written notice delivered to the Indenture Trustee and the Servicer, designate a different numerator for the foregoing fraction, provided that (x) such numerator is not less than the Adjusted Invested Amount as of the last day of the revolving period for such Paired Series and (y) such action shall be taken only upon satisfaction of the Rating Agency Condition and (z) the Transferor shall have delivered to the Indenture Trustee an Officer's Certificate to the effect that, based on the facts known to such officer at that time, in the reasonable belief of the Transferor, such designation will not cause a Redemption Event or an event that, after the giving of notice or the lapse of time, would constitute a Redemption Event, to occur with respect to Series 2000-1; *provided further, however*, that with respect to any Monthly Period in which an Addition Date or a Removal Date occurs, the amount in clause (b)(i)(A) above shall be (1) the aggregate amount of Principal Receivables in the Trust as of the close of business on the last day of the prior Monthly Period, for the period from and including the first day of such Monthly Period to but excluding the related Addition Date or Removal Date, as the case may be, and (2) the aggregate amount of Principal Receivables in the Trust as of the close of business on the related Addition Date or

Removal Date, as the case may be, after adjusting for the aggregate amount of Principal Receivables added to or removed from the Trust on the related Addition Date or Removal Date, as the case may be, for the period from and including the related Addition Date or Removal Date, as the case may be, to and including the last day of such Monthly Period.

"Floating Investor Percentage" shall mean, with respect to any Monthly Period, the percentage equivalent (which percentage shall never exceed 100%) of a fraction, (a) the numerator of which is the Adjusted Invested Amount as of the close of business on the last day of the preceding Monthly Period (or with respect to the first Monthly Period, the Initial Invested Amount) and (b) the denominator of which is the greater of (i) the sum of (a) the total amount of Principal Receivables in the Trust as of the close of business on such last day (or with respect to the first Monthly Period, the total amount of Principal Receivables in the Trust on the Closing Date) and (b) the principal amount on deposit in the Special Funding Account as of the close of business on such last day (or with respect to the first Monthly Period, as of the Closing Date) and (ii) the sum of the numerators used to calculate the investor percentages for allocations with respect to Finance Charge Receivables, Defaulted Amounts or Principal Receivables, as applicable, for all Series outstanding as of the date as to which such determination is being made; *provided, however*; that with respect to any Monthly Period in which an Addition Date or a Removal Date occurs, the amount in clause (b)(i)(A) above shall be (1) the aggregate amount of Principal Receivables in the Trust as of the close of business on the last day of the prior Monthly Period, for the period from and including the first day of such Monthly Period to but excluding the related Addition Date or Removal Date, as the case may be, and (2) the aggregate amount of Principal Receivables in the Trust as of the close of business on the related Addition Date or Removal Date, as the case may be, after adjusting for the aggregate amount of Principal Receivables added to or removed from the Trust on the related Addition Date or Removal Date, as the case may be, for the period from and including the related Addition Date or Removal Date, as the case may be, to and including the last day of such Monthly Period.

"Group One" shall mean Series 2000-1 and each other Series hereafter specified in the related Indenture Supplement to be included in Group One.

"Initial Invested Amount" shall mean $500,000,000.

"Initial Purchasers" shall have the meaning specified in Section 8.08.

"Interest Period" shall mean, with respect to any Distribution Date, the period from and including the Distribution Date immediately preceding such Distribution Date (or, in the case of the first Distribution Date, from and including the Closing Date) to but excluding such Distribution Date.

"Invested Amount" shall mean, as of any date of determination, an amount equal to the initial principal amount of the Series 2000-1 Notes *minus* the amount of principal previously paid to the Series 2000-1 Noteholders, *minus* the excess, if any, of the aggregate amount of Investor Charge-Offs and Reallocated Principal Collections over the reimbursements of such amounts pursuant to subsection 4.04(a)(vi) prior to such date.

"Investment Earnings" shall mean, with respect to any Distribution Date, all interest and earnings on Eligible Investments included in the Spread Account (net of losses and investment expenses) during the period commencing on and including the Distribution Date immediately preceding such Distribution Date and ending on but excluding such Distribution Date.

"Investor Charge-Offs" shall have the meaning specified in Section 4.05.

"Investor Default Amount" shall mean, with respect to any Distribution Date, an amount equal to the product of (a) the Defaulted Amount for the related Monthly Period and (b) the Floating Investor Percentage for such Monthly Period.

"Investor Finance Charge Collections" shall mean, with respect to any Monthly Period, an amount equal to the product of the Investor Percentage for such Monthly Period and Collections of Finance Charge Receivables (including Recoveries treated as Collections of Finance Charge Receivables) deposited in the Collection Account for such Monthly Period.

"Investor Percentage" shall mean, for any Monthly Period, (a) with respect to Finance Charge Receivables and Defaulted Amounts at any time and Principal Receivables during the Revolving Period, the Floating Investor Percentage and (b) with respect to Principal Receivables during the Controlled Accumulation Period or the Early Amortization Period, the Fixed Investor Percentage.

"Investor Principal Collections" shall mean, with respect to any Monthly Period, the aggregate amount retained in the Collection Account for Series 2000-1 pursuant to subsection 4.01(c)(ii) for such Monthly Period.

"LIBOR" shall mean, for any Interest Period, the London interbank offered rate for one-month United States dollar deposits determined by the Indenture Trustee for each Interest Period in accordance with the provisions of Section 4.12.

"LIBOR Determination Date" shall mean (i) December 11, 2000 for the period from and including the Closing Date through and including January 14, 2001 and (ii) the second London Business Day prior to the commencement of the second and each subsequent Interest Period.

"London Business Day" shall mean any Business Day on which dealings in deposits in United States dollars are transacted in the London interbank market.

"Modified Excess Spread Percentage" shall mean, with respect to the first Monthly Period an amount equal to the percentage equivalent of a fraction, the numerator of which is (y) the product of (a) an amount equal to the excess, if any, of (i) the amount of Collections of Finance Charge Receivables deposited in the Collection Account and allocable to the Series 2000-1 Noteholders for such first Monthly Period after subtracting the Investor Default Amount for such Monthly Period *over* (ii) the sum of (A) the product of (I) the Class A Monthly Interest for the related Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period and (b) the denominator of which is the actual number of days in the related Interest Period *plus* (B) the product of (I) the Class B

Monthly Interest for such Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period and (b) the denominator of which is the actual number of days in such Interest Period *plus* (C) the product of (I) the Class C Monthly Interest for such Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period *plus* (D) the product of (I) the Class D Monthly Interest for such Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period and (b) the denominator of which is the actual number of days in such Interest Period *plus* (E) the Monthly Servicing Fee with respect to the Distribution Date relating to such first Monthly Period, *times* (b) a fraction, the numerator of which is 360 and the denominator of which is 19; and the denominator of which is (z) the Initial Invested Amount.

"Monthly Interest" shall mean, with respect to any Distribution Date, the sum of the Class A Monthly Interest, the Class B Monthly Interest, the Class C Monthly Interest and the Class D Monthly Interest for such Distribution Date.

"Monthly Principal" shall mean the monthly principal distributable in respect of the Notes as calculated in accordance with Section 4.03.

"Monthly Principal Reallocation Amount" shall mean, with respect to any Monthly Period, an amount equal to the sum of:

(A)    the lower of (i) the sum of the Class A Required Amount, the Monthly Servicing Fee and any unpaid Monthly Servicing Fee and (ii) the greater of (a)(x) the product of (I) 28.5% and (II) the Initial Invested Amount *minus* (y) the amount of unreimbursed Investor Charge-Offs (after giving effect to Investor Charge-Offs for the related Monthly Period) and unreimbursed Reallocated Principal Collections (as of the previous Distribution Date) and (b) zero;

(B)    the lower of (i) the sum of the Class B Required Amount and (ii) the greater of (a)(x) the product of (I) 15.0% and (II) the Initial Invested Amount *minus* (y) the amount of unreimbursed Investor Charge-Offs (after giving effect to Investor Charge-Offs for the related Monthly Period) and unreimbursed Reallocated Principal Collections (as of the previous Distribution Date and as required in (A) above) and (B) zero; and

(C)    the lower of (i) the sum of the Class C Required Amount and (ii) the greater of (a)(x) the product of (I) 3.5% and (II) the Initial Invested Amount *minus* (y) the amount of unreimbursed Investor Charge-Offs (after giving effect to Investor Charge-Offs for the related Monthly Period) and unreimbursed Reallocated Principal Collections (as of the previous Distribution Date and as required in (A) and (B) above) and (b) zero.

"Monthly Servicing Fee" shall have the meaning specified in subsection 3.01.

"Note Principal Balance" shall mean, on any date of determination, an amount equal to the sum of the Class A Note Principal Balance, the Class B Note Principal Balance, the Class C Note Principal Balance and the Class D Note Principal Balance.

"Percentage Allocation" shall have the meaning set forth in subsection 4.0l(c)(ii)(y).

"Permanent Regulation S Global Note" shall mean any of the permanent Regulation S Class A global note, the permanent Regulations S Class B global note or the permanent Regulation S Class C global note in the form of Exhibit A-3 Exhibit A-6 or Exhibit A-9, respectively..

"Portfolio Adjusted Yield" shall mean, with respect to any Distribution Date, the average of the percentages obtained for each of the three (3) preceding Monthly Periods by subtracting the Base Rate for each such Monthly Period from the Portfolio Yield for each such Monthly Period.

"Portfolio Yield" shall mean, with respect to any Monthly Period, the annualized percentage equivalent of a fraction, (a) the numerator of which is equal to the sum of (i) Investor Finance Charge Collections with respect to such Monthly Period, *plus* (ii) the Principal Funding Investment Proceeds deposited the Collection Account on the Distribution Date related to such Monthly Period, *plus* (iii) the amount of the Reserve Draw Amount (up to the Available Reserve Account Amount) *plus* any amounts of interest and earnings described in Section 4.10, each deposited into the Collection Account on the Distribution Date relating to such Monthly Period, such sum to be calculated on a cash basis after subtracting the Investor Default Amount for such Monthly Period, and (b) the denominator of which is the Note Principal Balance as of the first day of such Monthly Period; *provided, however,* that Excess Finance Charge Collections that are allocated to Series 2000-1 with respect to such Monthly Period may be added to the numerator if the Transferor shall have provided ten (10) Business Days prior written notice of such action to each Rating Agency and the Transferor, the Servicer and the Indenture Trustee shall have received notification in writing from each Rating Agency that such action will not result in a reduction or withdrawal of its then existing rating of the Notes or any outstanding Series or Class with respect to which it is a Rating Agency.

"Principal Funding Account" shall have the meaning set forth in subsection 4.09(a).

"Principal Funding Account Balance" shall mean, with respect to any date of determination, the principal amount, if any, on deposit in the Principal Funding Account on such date of determination.

"Principal Funding Investment Proceeds" shall mean, with respect to each Distribution Date, the investment earnings on funds in the Principal Funding Account (net of investment expenses and losses) for the period from and including the immediately preceding Distribution Date to but excluding such Distribution Date.

"Principal Payment Rate" shall mean, for any Monthly Period, the percentage equivalent of fraction, the numerator of which is the aggregate amount of Collections of

Principal Receivables during such Monthly Period and the denominator of which is the aggregate amount of Principal Receivables outstanding as of the first day of such Monthly Period.

"Quarterly Excess Spread Percentage" shall mean (a) with respect to the January 2001 Distribution Date, the Modified Excess Spread Percentage, (b) with respect to the February 2001 Distribution Date, the percentage equivalent of a fraction the numerator of which is the sum of (i) the Modified Excess Spread Percentage for the first Monthly Period and (ii) the Excess Spread Percentage with respect to the January 2001 Monthly Period and the denominator of which is two (2), (c) with respect to the March 2001 Distribution Date, the percentage equivalent of a fraction the numerator of which is the sum of (i) the Modified Excess Spread Percentage for the first Monthly Period, (ii) the Excess Spread Percentage with respect to the January 2001 Monthly Period and (iii) the Excess Spread Percentage with respect to the February 2001 Monthly Period and the denominator of which is three (3) and (d) with respect to the April 2001 Distribution Date and each Distribution Date thereafter, the percentage equivalent of a fraction the numerator of which is the sum of the Excess Spread Percentages with respect to the immediately preceding three Monthly Periods and the denominator of which is three (3).

"QIBS" shall mean qualified institutional buyers as defined in Rule 144A.

"Rating Agency" shall mean each of Standard & Poor's and Moody's.

"Reallocated Principal Collections" shall mean, with respect to any Distribution Date, Investor Principal Collections applied in accordance with Section 4.06 in an amount not to exceed the Monthly Principal Reallocation Amount for the related Monthly Period.

"Reallocated Principal Reserves" shall have the meaning set forth in subsection 4.01(c).

"Reallocated Principal Reserves Release Date" shall mean, (a) with respect to the December 2000 Monthly Period, the first Deposit Date in January 2001 on which the Servicer deter-mines that the Collections of Finance Charge Receivables allocated to the Series 2000-1 Noteholders and retained in the Collection Account pursuant to subsection 4.01(c)(ii)(x) equals or exceeds the sum of Monthly Servicing Fee, the Class A Monthly Interest, the Class B Monthly Interest and the Class C Monthly Interest payable on the Distribution Date following such Monthly Period, and (b) with respect to any Monthly Period thereafter, the later of (x) first Deposit Date in such Monthly Period on which the Servicer determines that Collections of Finance Charge Receivables allocated to the Series 2000-1 Noteholders and retained in the Collection Account pursuant to subsection 4.01(c)(ii)(x) equals or exceeds the turn of Monthly Servicing Fee, the Class A Monthly Interest, the Class B Monthly Interest and the Class C Monthly Interest payable on the Distribution Date following such Monthly Period, and (y) the LIBOR Determination Date occurring in such Monthly Period.

"Reassignment Amount" shall mean, with respect to any Distribution Date, after giving effect to any deposits and distributions otherwise to be made on such Distribution Date; the sum of (i) the outstanding principal balance of the Series 2000-1 Notes on such Distribution Date, *plus* (ii) Monthly Interest for such Distribution Date and any Monthly Interest previously due but not distributed to the Series 2000-1 Noteholders, *plus* (iii) the amount of Additional

Interest, if any, for such Distribution Date and any Additional Interest previously due but not distributed to the Series 2000-1 Noteholders on a prior Distribution Date.

"Reference Banks" shall mean four major banks in the London interbank market selected by the Servicer.

"Regulation S" shall mean Regulation S promulgated under the Securities Act.

"Regulation S Certificate" shall have the meaning specified in subsection 8.02(b).

"Regulation S Global Notes" shall mean the Temporary Regulation S Global Notes and the Permanent Regulation S Global Notes, as applicable.

"Release Date" shall have the meaning specified in subsection 8.02(b).

"Required Accumulation Factor Number" shall be equal to a fraction, rounded upwards to the nearest whole number, the numerator of which is one and the denominator of which is equal to the lowest monthly principal payment rate on the Accounts, expressed as a decimal, for the 12 months preceding the date of such calculation; *provided, however,* that this definition may be changed at any time if the Rating Agency Condition is satisfied.

"Required Reallocated Principal Reserves" shall mean, with respect to any Monthly Period, an amount equal to the product of (a) 3.5%, (b) the Principal Payment Rate for the immediately preceding Monthly Period and (c) the Invested Amount as of the first day of such Monthly Period.

"Required Reserve Account Amount" shall mean, with respect to any Distribution Date on or after the Reserve Account Funding Date, an amount equal to (a) 0.50% of the Note Principal Balance or (b) any other amount designated by the Transferor, *provided, however,* that if such designation is of a lesser amount, the Transferor shall (i) provide the Servicer and the Indenture Trustee with evidence that the Rating Agency Condition shall have been satisfied and (ii) deliver to the Indenture Trustee a certificate of an Authorized Officer to the effect that, based on the facts known to such officer at such time, in the reasonable belief of the Transferor, such designation will not cause a Redemption Event or an event that, after the giving of notice or the lapse of time, would cause a Redemption Event to occur with respect to Series 2000-1.

"Required Spread Account Amount" shall mean, with respect to any date of determination, the product of (i) the Spread Account Percentage in effect on such date and (ii) the Initial Invested Amount; provided that the Required Spread Account Amount shall not exceed the sum of the Class C Note Principal Balance and the Class D Note Principal Balance mimic the excess, if any, of the Principal Funding Account Balance over the sum of the Class A Note Principal Balance and the Class B Note Principal Balance on such date of determination; *provided, however,* that on and after the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture, the Required Spread Account Amount shall equal the Note Principal Balance.

"Required Transferor Interest" shall have the meaning specified in the Indenture.

"Reserve Account" shall have the meaning specified in subsection 4.10(a).

"Reserve Account Funding Date" shall mean the Distribution Date designated by the Servicer which occurs not later than, the earliest of (a) the Distribution Date with respect to the Monthly Period which commences three (3) months prior to the commencement of the Controlled Accumulation Period; (b) the first Distribution Date for which the Portfolio Adjusted Yield is less than 2%, but in such event the Reserve Account Funding Date shall not be required to occur earlier than the Distribution Date with respect to the Monthly Period which commences twelve (12) months prior to the commencement of the Controlled Accumulation Period; (c) the first Distribution Date for which the Portfolio Adjusted Yield is less than 3%, but in such event the Reserve Account Funding Date shall not be required to occur earlier than the Distribution Date with respect to the Monthly Period which commences six (6) months prior to the commencement of the Controlled Accumulation Period; and (d) the first Distribution Date for which the Portfolio Adjusted Yield is less than 4%, but in such event the Reserve Account Funding Date shall not be required to occur earlier than the Distribution Date with respect to the Monthly Period which commences four (4) months prior to the commencement of the Controlled Accumulation Period.

"Reserve Account Surplus" shall mean, as of any Distribution Date following the Reserve Account Funding Date, the amount, if any, by which the amount on deposit in the Reserve Account exceeds the Required Reserve Account Amount, *provided, however*, that on any Distribution Date upon which an Event of Default with respect to the Series 2000-1 Notes has occurred and is continuing, the Reserve Account Surplus shall be equal to zero.

"Reserve Draw Amount" shall mean, with respect to each Distribution Date relating to the Controlled Accumulation Period or the first Distribution Date relating to the Early Amortization Period, the amount, if any, by which the Principal Funding Investment Proceeds for such Distribution Date are less than the Covered Amount determined as of such Distribution Date.

"Revolving Period" shall mean the period beginning on the Closing Date and ending on the earlier of the close of business on the day immediately preceding the day the Controlled Accumulation Period commences or the Early Amortization Period commences.

"Rule 144A" shall mean Rule 144A promulgated under the Securities Act.

"Rule 144A Global Note" shall mean any of the Rule 144A Class A global note, the Rule 144A Class B global note or the Rule 144A Class C global note in the form of Exhibit A-1, Exhibit A-4 or Exhibit A-7, respectively.

"Series 2000-1" shall mean the Series of Notes the terms of which are specified in this Indenture Supplement.

"Series 2000-1 Cut-Off Date" shall mean December 1, 2000.

"Series 2000-1 Final Maturity Date" shall mean the earlier to occur of (a) the Distribution Date on which the Note Principal Balance is paid in fill and (b) the December 2006 Distribution Date.

"Series 2000-1 Note" shall mean a Class A Note, a Class B Note, a Class C Note or a Class D Note.

"Series 2000-1 Noteholder" shall mean a Class A Noteholder, a Class B Noteholder, a Class C Noteholder or a Class D Noteholder.

"Series 2000-1 Principal Shortfall" shall have the meaning specified in subsection 4.08.

"Series 2000-1 Redemption Event" shall have the meaning specified in Section 6.01.

"Servicing Fee Rate" shall mean 2% per annum.

"Servicing Fee Required Amount" shall mean, with respect to any Distribution Date, an amount equal to the excess of the amount described in subsection 4.04(a)(i) over the Available Finance Charge Collections applied to pay such amount pursuant to subsection 4.04(a).

"Spread Account" shall have the meaning specified in subsection 4.11(a).

"Spread Account Deficiency" shall mean the excess, if any, of the Required Spread Account Amount over the Available Spread Account Amount

"Spread Account Percentage" shall mean, (i) 4.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is greater than or equal to 4.0%, (ii) 4.5%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 4.0% and greater than or equal to 3.5%, (iii) 5.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 3.5% and greater than or equal to 3.0%, (iv) 5.5%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 3.0% and greater than or equal to 2.5%, (v) 6.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 2.5% and greater than or equal to 2.0%, and (vi) 7.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 2.0%, *provided*, that if a Redemption Event with respect to Series 2000-1 has occurred, the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

"Telerate Page 3750" shall mean the display page currently so designated on the Bridge Telerate Capital Markets Report (or such other page as may replace that page in that service for the purpose of displaying comparable rates or prices).

"Temporary Regulation S Global Note" shall mean any of the temporary Regulation S Class A global note, the temporary Regulation S Class B global note or the temporary Regulation S Class C global note in the form of Exhibit A-2, Exhibit A-5 or Exhibit A-8, respectively.

"Transfer" shall have the meaning specified in Section 8.06.

(b)    Each capitalized term defined herein shall relate to the Series 2000-1 Notes and no other Series of Notes issued by the Trust, unless the context otherwise requires. All capitalized terms used herein and not otherwise defined herein have the meanings ascribed to them in the Indenture or the Transfer and Servicing Agreement. In the event that any term or provision contained herein shall conflict with or be inconsistent with any term or provision contained in the Indenture or the Transfer and Servicing Agreement, the terms and provisions of this Indenture Supplement shall govern.

(c)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Indenture Supplement shall refer to this Indenture Supplement as a whole and not to any particular provision of this Indenture Supplement; references to any Article, subsection, Section or Exhibit are references to Articles, subsections, Sections and Exhibits in or to this Indenture Supplement unless otherwise specified, and the term "including" means "including without limitation."

<div align="center">[END OF ARTICLE II]</div>

# ARTICLE III

## SERVICING FEE

Section 3.01  <u>Servicing Compensation</u>.  The share of the Servicing Fee allocable to the Series 2000-1 Noteholders with respect to any Distribution Date (the "Monthly Servicing Fee") shall be equal to one-twelfth of the product of (a) the Servicing Fee Rate and (b) (i) the Adjusted Invested Amount as of the last day of the Monthly Period preceding such Distribution Date, *minus* (ii) the product of the amount, if any, on deposit in the Special Funding Account as of the last day of the Monthly Period preceding such Distribution Date and the Floating Investor Percentage with respect to such Monthly Period. The remainder of the Servicing Fee shall be paid by the Holders of the Transferor Certificates or the noteholders of other Series (as provided in the related Indenture Supplements) and in no event shall the Trust, the Indenture Trustee or the Series 2000-1 Noteholders be liable for the share of the Servicing Fee to be paid by the Holders of the Transferor Certificates or the noteholders of any other Series. To the extent that the Monthly Servicing Fee is not paid in full pursuant to the preceding provisions of this Section 3.01, and Section 4.04, it shall be paid by the Holders of the Transferor Certificates.

[END OF ARTICLE III]

## ARTICLE IV

## RIGHTS OF SERIES 2000-1 NOTEHOLDERS
## AND ALLOCATION AND APPLICATION OF COLLECTIONS

Section 4.01    Collections and Allocations.

(a)    Allocations.    Prior to the close of business on each Deposit Date, collections of Finance Charge Receivables and Principal Receivables and Defaulted Receivables allocated to Series 2000-1 pursuant to Article VIII of the Indenture shall be allocated and distributed as set forth in this Article.

(b)    Payments to the Transferor.    The Servicer shall on Deposit Dates withdraw from the Collection Account and pay to the Holders of the Transferor Certificates the following amounts:

(i)    an amount equal to the Transferor Percentage for the related Monthly Period of Collections of Finance Charge Receivables to the extent such amount is deposited in the Collection Account; and

(ii)    an amount equal to the Transferor Percentage for the related Monthly Period of Collections of Principal Receivables deposited in the Collection Account, if the Transferor Interest (determined after giving effect to any Principal Receivables transferred to the Trust on such Deposit Date) exceeds the Required Transferor Interest.

The withdrawals to be made from the Collection Account pursuant to this subsection 4.01(b) do not apply to deposits into the Collection Account that do not represent Collections, including payment of the purchase price for the Receivables or the Notes pursuant to, respectively; Section 2.06 or 7.01 of the Transfer and Servicing Agreement or Section 11.04 of the Indenture and payment of the purchase price for the Series 2000-1 Notes pursuant to Section 7.01 of this Indenture Supplement.

(c)    Allocations to the Series 2000-1 Noteholders.    The Servicer shall prior to the close of business on any Deposit Date, allocate, or cause the Indenture Trustee to allocate, to the Series 2000-1 Noteholders the following amounts as set forth below:

(i)    Allocations of Finance Charge Collections.    The Servicer shall allocate, or cause the Indenture Trustee to allocate, to the Series 2000-1 Noteholders and retain in the Collection Account for application as provided herein an amount equal to the product of (a) the Investor Percentage and (b) the aggregate amount of Collections of Finance Charge Receivables deposited in the Collection Account on such Deposit Date.

(ii)    Allocations of Principal Collections.    The Servicer shall allocate, or shall cause the Indenture Trustee to allocate, to the Series 2000-1 Noteholders the following amounts as set forth below:

(x) · Allocations During the Revolving Period. During the Revolving Period an amount equal to the product of (I) the Investor Percentage and (II) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date, shall be allocated to the Series 2000-1 Noteholders and shall (A) if such Deposit Date occurs on or prior to the Reallocated Principal Reserves Release Date for the applicable Monthly Period, be retained in the Collection Account for application as Reallocated Principal Collections on the related Distribution Date as provided herein, and (B) if such Deposit Date occurs after the Reallocated Principal Reserves Release Date for the applicable Monthly Period, be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account. Notwithstanding the immediately preceding sentence, for any Deposit Date occurring during the initial Monthly Period, the Servicer shall cause the Indenture Trustee to allocate to the Series 2000-1 Noteholders an amount equal to the product of (I) 3.5%, (II) the Investor Percentage and (III) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date and such amount shall be retained in the Collection Account (such amounts, together with collections of Principal Receivables retained in the Collection Account pursuant to clause (A) of the immediately preceding sentence, are hereinafter referred to as "Reallocated Principal Reserves") and shall be retained in the Collection Account for application as Reallocated Principal Collections on the related Distribution Date as provided herein, and the Servicer shall cause the Indenture Trustee to allocate to the Series 2000-1 Noteholders an amount equal to the product of (I) 96.5%, (II) the Investor Percentage and (III) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date and such amount shall be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest as calculated on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account.

(y) Allocations During the Controlled Accumulation Period. During the Controlled Accumulation Period an amount equal to the product of (I) the Investor Percentage and (II) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date (the product for any such date is hereinafter referred to as a "Percentage Allocation") shall be allocated to the Series 2000-1 Noteholders and deposited in the Principal

Funding Account until applied as provided herein; *provided, however* that if the sum of such Percentage Allocation and all preceding Percentage Allocations with respect to the same Monthly Period exceeds the Controlled Deposit Amount during the Controlled Accumulation Period for the related Distribution Date, then such excess shall not be treated as a Percentage Allocation and shall be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest as calculated on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account.

(z)    Allocations During the Early Amortization Period. During the Early Amortization Period, an amount equal to the product of (I) the Investor Percentage and (II) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date, shall be allocated to the Series 2000-1 Noteholders and retained in the Collection Account until applied as provided herein; *provided, however*, that after the date on which an amount of such Collections equal to the Adjusted Invested Amount has been deposited into the Collection Account and allocated to the Series 2000-1 Noteholders, amounts allocated to the Series 2000-1 Noteholders pursuant to this subsection (z) shall be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest as calculated on such date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account.

Section 4.02    Determination of Monthly Interest.    (a) The amount of monthly interest ("Class A Monthly Interest") distributable from the Collection Account with respect to the Class A Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (b) the Class A Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class A Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class A Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine the excess, if any (the "Class A Interest Shortfall"), of (x) the Class A Monthly Interest for such Distribution Date over (y) the aggregate amount of funds allocated and available to par such Class A Monthly Interest on such Distribution Date. If the Class A Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class A Interest Shortfall is fully paid, an additional amount ("Class A Additional

Interest") equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* the Class A Note Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class A Interest Shortfall (or the portion thereof which has not been paid on the Class A Notes) shall be payable as provided herein with respect to the Class A Notes. Notwithstanding anything to the contrary herein, Class A Additional Interest shall be payable or distributed to the Class A Noteholders only to the extent permitted by applicable law.

(b)    The amount of monthly interest ("Class B Monthly Interest") distributable from the Collection Account with respect to the Class B Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (b) the Class B Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class B Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class B Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine the excess, if any (the "Class B Interest Shortfall"), of (x) the Class B Monthly Interest for such Distribution Date over (y) the aggregate amount of funds allocated and available to pay such Class B Monthly Interest on such Distribution Date. If the Class B Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class B Interest Shortfall is fully paid, an additional amount ("Class B Additional Interest") equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (ii) the Class B Note Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class B Interest Shortfall (or the portion thereof which has not been paid to the Class B Notes) shall be payable as provided herein with respect to the Class B Notes. Notwithstanding anything to the contrary herein, Class B Additional Interest shall be payable or distributed to the Class B Noteholders only to the extent permitted by applicable law.

(c)    The amount of monthly interest ("Class C Monthly Interest") distributable from the Collection Account with respect to the Class C Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (B) the Class C Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class C Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date; the Class C Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine an amount (the "Class C Interest Shortfall equal to (r) the aggregate Class C Monthly Interest for such Distribution Date *minus* (y) the aggregate amount of funds allocated and available to pay such Class C Monthly Interest on such Distribution Date. If the Class C Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class C Interest Shortfall is fully paid, an additional amount ("Class C Additional Interest") shall be payable as provided herein with respect to the Class C Notes equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (ii) the Class C Note

Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class C Interest Shortfall (or the portion thereof which has not been paid to the Class C Noteholders (after giving effect to the application of the proceeds of any draw made on the Spread Account as provided in subsections 4.04(a)(iv) and 4.11(c) for the purpose of paying such amount with respect to such Distribution Date)). Notwithstanding anything to the contrary herein, Class C Additional Interest shall be payable or distributed to the Class C Noteholders only to the extent permitted by applicable law.

(d)     The amount of monthly interest ("Class D Monthly Interest") distributable from the Collection Account with respect to the Class D Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (B) the Class D Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class D Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class D Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine an amount (the "Class D Interest Shortfall") equal to (x) the aggregate Class D Monthly Interest for such Distribution Date *minus* (y) the aggregate amount of funds allocated and available to pay such Class D Monthly Interest on such Distribution Date. If the Class D Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class D Interest Shortfall is fully paid, an additional amount ("Class D Additional Interest") shall be payable as provided herein with respect to the Class D Notes equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (ii) the Class D Note Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class D Interest Shortfall (or the portion thereof which has not been paid to the Class D Noteholders (after giving effect to the application of the proceeds of any draw made on the Spread Account as provided in subsections 4.04(a)(vii) and 4.11(c) for the purpose of paying such amount with respect to such Distribution Date)). Notwithstanding anything to the contrary herein, Class D Additional Interest shall be payable or distributed to the Class D Noteholders only to the extent permitted by applicable law.

Section 4.03    <u>Determination of Monthly Principal</u>.    The amount of monthly principal distributable from the Collection Account with respect to the Notes on each Distribution Date (the "Monthly Principal"), beginning with the Distribution Date in the month following the month in which the Controlled Accumulation Period or, if earlier, the Early Amortization Period, begins, shall be equal to the least of (i) the Available Principal Collections on deposit in the Collection Account with respect to such Distribution Date, (ii) for each Distribution Date with respect to the Controlled Accumulation Period, the Controlled Deposit Amount for such Distribution Date and (iii) the Adjusted Invested Amount (after taking into account any adjustments to be made on such Distribution Date pursuant to Sections 4.05 and 4.06) prior to any deposit into the Principal Funding Account on such Distribution Date.

Section 4.04    <u>Application of Available Finance Charge Collections and Available Principal Collections</u>.    The Servicer shall apply, or shall cause the Indenture Trustee to apply by written instruction to the Indenture Trustee, on each Distribution Date, Available

Finance Charge Collections and Available Principal Collections on deposit in the Collection Account with respect to such Distribution Date to make the following distributions:

(a)    On each Distribution Date, an amount equal to the Available Finance Charge Collections with respect to such Distribution Date will be distributed or deposited in the following priority:

(i)    an amount equal to the Monthly Servicing Fee for such Distribution Date, *plus* the amount of any Monthly Servicing Fee previously due but not distributed to the Servicer on a prior Distribution Date, shall be distributed to the Servicer (unless such amount has been netted against deposits to the Collection Account in accordance with Section 8.04 of the Indenture);

(ii)    an amount equal to Class A Monthly Interest for such Distribution Date, *plus* the amount of any Class A Monthly Interest previously due but not distributed to Class A Noteholders on a prior Distribution Date, *plus* the amount of any Class A Additional Interest for such Distribution Date, *plus* the amount of any Class A Additional Interest previously due but not distributed to Class A Noteholders on a prior Distribution Date, shall be distributed to the Paying Agent for payment to Class A Noteholders on such Distribution Date;

(iii)    an amount equal to Class B Monthly Interest for such Distribution Date, *plus* the amount of any Class B Monthly Interest previously due but not distributed to Class B Noteholders on a prior Distribution Date, *plus* the amount of any Class B Additional Interest for such Distribution Date, *plus* the amount of any Class B Additional Interest previously due but not distributed to Class B Noteholders on a prior Distribution Date, shall be distributed to the Paying Agent for payment to Class B Noteholders on such Distribution Date;

(iv)    an amount equal to Class C Monthly Interest for such Distribution Date, *plus* the amount of any Class C Monthly Interest previously due but not distributed to Class C Noteholders on a prior Distribution Date, *plus* the amount of any Class C Additional Interest for such Distribution Date, *plus* the amount of any Class C Additional Interest previously due but not distributed to Class C Noteholders on a prior Distribution Date, shall be distributed to the Paying Agent for payment to Class C Noteholders on such Distribution Date; *provided, however*, that, in the event that the Class C Monthly Interest exceeds the amount of Available Finance Charge Collections available (after giving effect to subsections 404(a)(i), (ii) and (iii) above) to fund such Class C Monthly Interest, a draw will be made from amounts available for distribution in the Spread Account (at the *times* and in the amounts specified in Section 4.11) and shall be distributed to the Paying Agent for payment to the Class C Noteholders on such Distribution Date in accordance with this subsection 4.04(a)(iv);

(v)    an amount equal to the Investor Default Amount, if any, for such Distribution Date shall be treated as a portion of Available Principal Collections for such Distribution Date;

(vi)    an amount equal to the sum of the aggregate amount of Investor Charge-Offs and the amount of Reallocated Principal Collections which have not been previously -reimbursed pursuant to this subparagraph (vi) shall be treated as a portion of Available Principal Collections for such Distribution Date;

(vii)    an amount equal to Class D Monthly Interest for such Distribution Date, *plus* the amount of any Class D Monthly Interest previously due but not distributed to the Class D Noteholders on a prior Distribution Date, *plus* the amount of any Class D Additional Interest for such Distribution Date, *plus* the amount of any Class D Additional Interest previously due but not distributed to the Class D Noteholders on a prior Distribution Date shall be distributed to the Paying Agent for payment to the Class D Noteholders on such Distribution Date; *provided, however*, that, in the event that the Class D Monthly Interest exceeds the amount of Available Finance Charge Collections available (after giving effect to subsections 4.04(a)(i)-(vi) above) to fund such Class D Monthly Interest, a draw will be made from amounts available for distribution in the Spread Account (at the times and in the amounts specified in Section 4.11) and shall be distributed to the Paying Agent for payment to the Class D Noteholders on such Distribution Date in accordance with this subsection 4.04(a)(vii);

(viii)    upon the occurrence of an Event of Default with respect to Series 2000-.1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections for such Distribution Date for distribution to the Series 2000-1 Noteholders;

(ix)    on each Distribution Date from and after the Reserve Account Funding Date, but prior to the date on which the Reserve Account terminates as described in subsection 4.10(f), an amount up to the excess, if any, of the Required Reserve Account Amount veer the Available Reserve Account Amount shall be deposited into the Reserve Account;

(x)    an amount equal to the amounts required to be deposited in the Spread Account pursuant to Section 4.11 shall be deposited into the Spread Account as provided in Section 4.11;

(xi)    any other amounts the Trust mar be liable for from time to time that are not referred to in clauses (i)-(x) above will be applied by the Indenture Trustee; and

(xii)    the balance, if any, will constitute a portion of Excess Finance Charge Collections for such Distribution Date and will be available for allocation to other Series in Group One or to the Holders of the Transferor Certificates as described in Section 8.08 of the Indenture and Section 4.01.

(b)    On each Distribution Date with respect to the Revolving Period, an amount equal to the Available Principal Collections deposited in the Collection Account for the related Monthly Period shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture.

NYLIB5 830015.1                                    -23-

(c)    On each Distribution Date with respect to the Controlled Accumulation Period or the Early Amortization Period, an amount equal to the Available Principal Collections deposited in the Collection Account for the related Monthly Period shall be distributed or deposited in the following order of priority:

(i)    during the Controlled Accumulation Period, an amount equal to the Monthly Principal for such Distribution Date shall be deposited into the Principal Funding Account;

(ii)    during the Early Amortization Period, an amount equal to the Monthly Principal for such Distribution Date shall be distributed to the Paying Agent for payment to the Class A Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class A Note Principal Balance has been paid in full;

(iii)    after giving effect to the distribution referred to in clause (ii) above, during the Early Amortization Period, an amount equal to the Monthly Principal remaining, if any, shall be distributed to the Paying Agent for payment to the Class B Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class B Note Principal Balance has been paid in full;

(iv)    after giving effect to the distributions referred to in clauses (ii) and (iii) above, during the Early Amortization Period, art amount equal to the Monthly Principal remaining, if any, shall be distributed to the Paying Agent for payment to the Class C Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class C Note Principal Balance has been paid in full;

(v)    after giving effect to the distributions referred to in clauses (ii), (iii) and (iv) above, during the Early Amortization Period, an amount equal to the Monthly Principal remaining, if any, shall be distributed to the Paying Agent for payment to the Class D Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class D Note Principal Balance has been paid in full; and

(vi)    in the case of each of the Controlled Accumulation Period and the Early Amortization Period, the balance of such Available Principal Collections remaining after application m accordance with clause (i) through (v) above shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture.

On the earlier to occur of (i) the first Distribution Date with respect to the Early Amortization Period and (ii) the Expected Final Principal Payment Date, the Indenture Trustee, acting in accordance with instructions from the Servicer, shall withdraw from the Principal Funding Account and distribute to the Paying Agent for payment to the Class A Noteholders, the Class B Noteholders, the Class C Noteholders and the Class D Noteholders, the amounts deposited into the Principal Funding Account pursuant to subsection 4.04(c)(i).

(d)    The Controlled Accumulation Period is scheduled to commence on December 1, 2002; *provided, however*, that, if the Accumulation Period Length (determined as described below) is less than twelve (12) months, the date on which the Controlled Accumulation Period actually commences will be delayed to the first Business Day of the month

that is the number of whole months prior to the Expected Final Principal Payment Date at least equal to the Accumulation Period Length and, as a result, the number of Monthly Periods in the Controlled Accumulation Period will at least equal the Accumulation Period Length. On the Determination Date immediately preceding the November 2002 Distribution Date, and each Determination Date thereafter until the Controlled Accumulation Period begins, the Servicer will determine the "Accumulation Period Length" which will equal the number of whole months such that the sum of the Accumulation Period Factors for each month during such period will be equal to or greater than the Required Accumulation Factor Number *provided, however*; that the Accumulation Period Length will not be determined to be less than one month; *provided, further, however*; that the determination of the Accumulation Period Length mar be changed at any time if the Rating Agency Condition is satisfied.

Section 4.05   Investor Charge-Offs.   On each Determination Date, the Servicer shall calculate the Investor Default Amount, if any, for the related Distribution Date. If, on any Distribution Date, the Investor Default Amount for such Distribution Date exceeds the amount of Available Finance Charge Collections allocated with respect thereto pursuant to subsection 4.04(a)(v) with respect to such Distribution Date, the Invested Amount (after giving effect to any reductions for any Reallocated Principal Collections on such Distribution Date) will be reduced by the amount of such excess, but not by more than the lesser of the Investor Default Amount and the Invested Amount (after giving effect to any reductions for any Reallocated Principal Collections on such Distribution Date) for such Distribution Date (such reduction, an "Investor Charge-Off").

Section 4.06   Reallocated Principal Collections.   On the Reallocated Principal Reserves Release Date with respect to any Monthly Period, the Servicer shall allocate, or cause the Indenture Trustee to allocate, all Reallocated Principal Reserves with respect to such Monthly Period first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, for retention in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second for payment to the Holders of the Transferor Certificates only if the Transferor Interest on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise for deposit in the Special Funding Account. On each Distribution Date, the Servicer shall apply, or shall cause the Indenture Trustee to apply, Reallocated Principal Collections with respect to such Distribution Date, to be paid first from Reallocated Principal Reserves, to fund any deficiency pursuant to and in the priority set forth in subsections 4.04(a)(i), (ii), (iii) and (iv). On each Distribution Date, the Invested Amount shall be reduced by the amount of Reallocated Principal Collections for such Distribution Date.  After application of Reallocated Principal Reserves on any Distribution Date in accordance with the provisions hereof, any remaining Reallocated Principal Reserves for such Distribution Date shall be allocated as described in the first sentence of this Section 4.06.

Section 4.07   Excess Finance Charge Collections.   Series 2000-1 shall be an Excess Allocation Series with respect to Group One only. Subject to Section 8.08 of the Indenture, Excess Finance Charge Collections with respect to the Excess Allocation Series in Group One for any Distribution Date will be allocated to Series 2000-1 in an amount equal to the product of (x) the aggregate amount of Excess Finance Charge Collections with respect to all the

Excess Allocation Series in Group One for such Distribution Date and (y) a fraction, the numerator of which is the Finance Charge Shortfall for Series 2000-1 for such Distribution Date and the denominator of which is the aggregate amount of Finance Charge Shortfalls for all the Excess Allocation Series in Group One for such Distribution Date. The "Finance Charge Shortfall" for Series 2000-1 for any Distribution Date will be equal to the excess, if any, of (a) the full amount required to be paid, without duplication, pursuant to subsections 4.04(a)(i) through (xi) on such Distribution Date over (b) the Investor Finance Charge Collections with respect to such Distribution Date.

Section 4.08   Shared Principal Collections.   Subject to Section 8.05 of the Indenture, Shared Principal Collections with respect to the Series in Group One for any Distribution Date will be allocated to Series 2000-1 in an amount equal to the product of (x) the aggregate amount of Shared Principal Collections with respect to all Principal Sharing Series in Group One for such Distribution Date and (y) a fraction, the numerator of which is the Series 2000-1 Principal Shortfall for such Distribution Date and the denominator of which is the aggregate amount of Principal Shortfalls for all the Series which are Principal Sharing Series in Group One for such Distribution Date. The "Series 2000-1 Principal Shortfall" will be equal to (a) for any Distribution Date with respect to the Revolving Period, zero, (b) for any Distribution Date with respect to the Controlled Accumulation Period, the excess, if any, of the Controlled Deposit Amount with respect to such Distribution Date over the amount of Available Principal Collections for such Distribution Date (excluding any portion thereof attributable to Shared Principal Collections), and (c) for any Distribution Date with respect to the Early Amortization Period, the excess, if any, of the Adjusted Invested Amount over the amount of Available Principal Collections for such Distribution Date (excluding any portion thereof attributable to Shared Principal Collections).

Section 4.09   Principal Funding Account.   (a) The Indenture Trustee shall establish and maintain with an Eligible Institution, which may be the Indenture Trustee, for the benefit of the Series 2000-1 Noteholders, a segregated trust account with the corporate trust department of such Eligible Institution (the "Principal Funding Account"), bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Series 2000-1 Noteholders. The Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Principal Funding Account and in all proceeds thereof. The Principal Funding Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Series 2000-1 Noteholders. If at any time the institution holding the Principal Funding Account ceases to be an Eligible Institution, the Servicer shall notify the Indenture Trustee, and the Indenture Trustee upon being notified (or the Servicer on its behalf) shall, within ten (10) Business Days, establish a new Principal Funding Account meeting the conditions specified above with an Eligible Institution, and shall transfer any cash or any investments to such new Principal Funding Account The Indenture Trustee, at the direction of the Servicer, shall (i) make withdrawals from the Principal Funding Account from time to time, in the amounts and for the purposes set forth in this Indenture Supplement, and (ii) on each Distribution Date (from and after the commencement of the Controlled Accumulation Period) prior to the termination of the Principal Funding Account, make deposits into the Principal Funding Account in the amounts specified in, and otherwise in accordance with, subsection 4.04(c)(i).

(b)    Funds on deposit in the Principal Funding Account shall be invested at the direction of the Servicer by the Indenture Trustee in Eligible Investments. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Series 2000-1 Noteholders pursuant to Section 6.15 of the Indenture. Funds on deposit in the Principal Funding Account on any Distribution Date, after giving effect to any withdrawals from the Principal Funding Account on such Distribution Date, shall be invested in such investments that will mature so that such funds will be available for withdrawal on or prior to the following Distribution Date.

On each Distribution Date with respect to the Controlled Accumulation Period and on the first Distribution Date with respect to the Early Amortization Period, the Indenture Trustee, acting at the Servicer's direction given on or before such Distribution Date, shall transfer from the Principal Funding Account to the Collection Account the Principal Funding Investment Proceeds on deposit in the Principal Funding Account for application as Available Finance Charge Collections in accordance with Section 4.04.

Principal Funding Investment Proceeds (including reinvested interest) shall not be considered part of the amounts on deposit in the Principal Funding Account for purposes of this Indenture Supplement.

Section 4.10    <u>Reserve Account</u>.  (a) The Indenture Trustee shall establish and maintain with an Eligible Institution, which may be the Indenture Trustee, for the benefit of the Series 2000-1 Noteholders, a segregated trust account with the corporate trust department of such Eligible Institution (the "Reserve Account"), bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Series 2000-1 Noteholders. The Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Reserve Account and in all proceeds thereof. The Reserve Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Series 2000-1 Noteholders. If at any time the institution holding the Reserve Account ceases to be an Eligible Institution, the Servicer shall notify the Indenture Trustee, and the Indenture Trustee upon being notified (or the Servicer on its behalf) shall, within ten (10) Business Days, establish a new Reserve Account meeting the conditions specified above with an Eligible Institution, and shall transfer any cash or any investments to such new Reserve Account. The Indenture Trustee, at the direction of the Servicer, shall (i) make withdrawals from the Reserve Account from time to time in an amount up to the Available Reserve Account Amount at such time; for the purposes set forth in this Indenture Supplement, and (ii) on each Distribution Date (from and after the Reserve Account Funding Date) prior to termination of the Reserve Account, make a deposit into the Reserve Account in the amount specified in, and otherwise in accordance with, subsection 4.04(a)(ix).

(b)    Funds on deposit in the Reserve Account shall be invested at the direction of the Servicer by the Indenture Trustee in Eligible Investments. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Series 2000-1 Noteholders pursuant to Section 6.15 of the Indenture. Funds on deposit in the Reserve Account on any Distribution Date, after giving effect to any withdrawals from the Reserve Account on such Distribution Date, shall be invested in such investments that will mature so that such funds will be available for withdrawal on or prior to the following Distribution Date.

On each Distribution Date, all interest and earnings (net of losses and investment expenses) accrued since the preceding Distribution Date on funds on deposit in the Reserve Account shall be retained in the Reserve Account (to the extent that the Available Reserve Account Amount is less than the Required Reserve Account Amount) and the balance, if any, shall be deposited into the Collection Account and included in Available Finance Charge Collections for such Distribution Date. For purposes of determining the availability of funds or the balance in the Reserve Account for any reason under this Indenture Supplement, except as otherwise provided in the preceding sentence, investment earnings on such funds shall be deemed not to be available or on deposit.

(c)    On or before each Distribution Date with respect to the Controlled Accumulation Period and on or before the first Distribution Date with respect to the Early Amortization Period, the Servicer shall calculate the Reserve Draw Amount; *provided, however*, that such amount will be reduced to the extent that Funds otherwise would be available for deposit in the Reserve Account under Section 4.04(a)(ix) with respect to such Distribution Date.

(d)    In the event that for any Distribution Date the Reserve Draw Amount is greater than zero, the Reserve Draw Amount, up to the Available Reserve Account Amount, shall be withdrawn from the Reserve Account on such Distribution Date by the Indenture Trustee (acting in accordance with the instructions of the Servicer) and deposited into the Collection Account for application as Available Finance Charge Collections for such Distribution Date.

(e)    In the event that the Reserve Account Surplus on any Distribution Date, after giving effect to all deposits to and withdrawals from the Reserve Account with respect to such Distribution Date, is greater than zero, the Indenture Trustee, acting in accordance with the instructions of the Servicer, shall withdraw from the Reserve Account an amount equal to such Reserve Account Surplus and (i) deposit such amounts in the Spread Account, to the extent that funds on deposit in the Spread Account are less than the Required Spread Account Amount, and (ii) distribute any such amounts remaining after application pursuant to subsection 4.10(e)(i) to the holders of the Transferor Certificates.

(f)    Upon the earliest to occur of (i) the termination of the Trust pursuant to Article VIII of the Trust Agreement, (ii) the first Distribution Date relating to the Early Amortization Period and (iii) the Expected Final Principal Payment Date, the Indenture Trustee, acting in accordance with the instructions of the Servicer, after the prior payment of all amounts owing to the Series 2000-1 Noteholders that are payable from the Reserve Account as provided herein, shall withdraw from the Reserve Account all amounts, if any, on deposit in the Reserve Account and (i) deposit such amounts in the Spread Account, to the extent that funds on deposit in the Spread Account are less than the Required Spread Account Amount, and (ii) distribute any such amounts remaining after application pursuant to subsection 4.10(f)(i) to the holders of the Transferor Certificates and the Reserve Account shall thereafter be deemed to have terminated for purposes of this Indenture Supplement.

(g)    Notwithstanding the foregoing provisions of this Section 4.10, following the occurrence of an Event of Default with respect to the Series 2000-1 Notes and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture, the Servicer shall withdraw from the Reserve Account all amounts on deposit therein and the Indenture

Trustee or the Servicer shall deposit such amounts in the Collection Account for distribution to the Noteholders in accordance with Section 5.02 to fund any shortfalls in amounts owed to such Noteholders.

Section 4.11    Spread Account. (a) On or prior to the Closing Date, the Indenture Trustee shall establish and maintain with an Eligible Institution, which may be the Indenture Trustee for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor; a segregated account with the corporate trust department of such Eligible Institution (the "Spread Account"), bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor. Except as otherwise provided in this Section 4.11, the Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Spread Account and in all proceeds thereof. The Spread Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor. If at any time the institution holding the Spread Account ceases to be an Eligible Institution, the Servicer shall notify the Indenture Trustee, and the Indenture Trustee upon being notified (or the Servicer on its behalf) shall, within ten (10) Business Days (or such longer period as to which the Rating Agencies may consent) establish a new Spread Account meeting the conditions specified above with an Eligible Institution and shall transfer any cash or any investments to such new Spread Account. The Indenture Trustee, at the direction of the Servicer, shall (i) make withdrawals from the Spread Account from time to time in an amount up to the Available Spread Account Amount at such time, for the purposes set forth in this Indenture Supplement, and (ii) on each Distribution Date prior to termination of the Spread Account, make a deposit into the Spread Account in the amount specified in, and otherwise in accordance with, subsection 4.11(e).

(b)    Funds on deposit in the Spread Account shall be invested at the direction of the Servicer by the Indenture Trustee in Eligible Investments; *provided, however,* that, for purposes of the investment of funds on deposit in the Spread Account, references in the definition of "Eligible Investments" to a rating in the "highest rating category" shall be modified to require a rating of at least A-1 by Standard & Poor's and P-1 by Moody's. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor pursuant to Section 6.15 of the Indenture. Funds on deposit in the Spread Account on any Distribution Date, after giving effect to any withdrawals from and deposits to the Spread Account on such Distribution Date, shall be invested in such investments that will mature so that such funds will be available for withdrawal on or prior to the following Distribution Date.

On each Distribution Date (but subject to subsections 411(c) and 411(d)), the Investment Earnings, if any, accrued since the preceding Distribution Date on funds on deposit in the Spread Account shall be paid to the Transferor by the Indenture Trustee. For purposes of determining the availability of funds or the balance in the Spread Account for any reason under this Indenture Supplement (subject to subsections 4.11(c) and 4.11(d)), all Investment Earnings shall be deemed not to be available or on deposit.

(c)    If on any Distribution Date, the aggregate amount available for distribution pursuant to subsections 4.04(a)(iv) and 4.04(a)(vii) is less than the aggregate amount

required to be distributed pursuant to subsections 4.04(a)(iv) and 404(a)(vii) (without giving effect to any limitation based on Available Finance Charge Collections), the Indenture Trustee, at the direction of the Servicer, shall withdraw from the Spread Account the amount of such deficiency up to the Available Spread Account Amount and, if the Available Spread Account Amount is less than such deficiency, Investment Earnings credited to the Spread Account, and deposit such amount in the Collection Account for payment first to the Class C Noteholders in respect of interest pursuant to subsection 4.04(a)(iv) on the Class C Notes and then to the Class D Noteholders in respect of interest pursuant to subsection 4.04(a)(vii) on the Class D Notes.

(d)    On the Series 2000-1 Final Maturity Date, the Indenture Trustee at the direction of the Servicer shall withdraw from the Spread Account an amount equal to the lesser of (i) the sum of the Class C Note Principal Balance and the Class D Note Principal Balance (after any payments to be made pursuant to subsection 4.04(c) on such date) and (ii) the Available Spread Account Amount and, if the Available Spread Account Amount is not sufficient to reduce the Class C Note Principal Balance and the Class D Note Principal Balance to zero, Investment Earnings credited to the Spread Account up to the amount required to reduce the Class C Note Principal Balance and the Class D Note Principal Balance to zero, and the Indenture Trustee or the Servicer shall deposit such amounts into the Collection Account for distribution first to the Class C Noteholders and then to the Class D Noteholders in accordance with subsections 5.02(e) and 5.02(g).

(e)    On any day following the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture, the Servicer shall withdraw from the Spread Account an amount equal to the balance on deposit therein and the Indenture Trustee or the Servicer shall deposit such amounts into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02, to fund any shortfalls in amounts owed to such Noteholders.

(f)    If on any Distribution Date, after giving effect to all withdrawals from the Spread Account, the Available Spread Account Amount is less than the Required Spread Account Amount then in effect, Available Finance Charge Collections shall be deposited into the Spread Account under the circumstances set forth in subsection 4.04(a)(x) up to the amount of the Spread Account Deficiency.

(g)    After the Spread Account Percentage has been increased above 4.0% pursuant to any of clauses (ii) through (vi) of the definition thereof, the Spread Account Percentage shall remain at that percentage until (a) further increased to a higher required percentage specified in clauses (ii) through (vi) of the definition thereof or (b) the Distribution Date on which the Quarterly Excess Spread Percentage has increased to a level above that for the then current Spread Account Percentage, in which case the Spread Account Percentage shall be decreased to the appropriate percentage in clauses (ii) through (iv) of the definition thereof (but only if the Quarterly Excess Spread Percentage was at or above such level on each of the prior two Distribution Dates) or, if the Quarterly Excess Spread Percentage is greater than or equal to 4.0%, the Spread Account Percentage will be 4.0% (but only if the Quarterly Excess Spread

Percentage was at or above such level on each of the prior two Distribution Dates). Notwithstanding the foregoing, if a Redemption Event with respect to Series 2000-1 has occurred, the Spread Account Percentage shall equal 7.0% (as provided in the definition of Spread Account Percentage) and shall no longer be subject to reduction.

(h)    If on any Distribution Date, after giving effect to all withdrawals from and deposits to the Spread Account, the amount on deposit in the Spread Account would exceed the Required Spread Account Amount then in effect, the Indenture Trustee shall, at the written direction of the Servicer, release such excess to the Transferor, *provided, that* such Distribution Date does not occur on any day following the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture. On the date on which the Class C Note Principal Balance and the Class D Note Principal Balance has been paid in full (including amounts to be paid to the Class C Noteholders and the Class D Noteholders pursuant to subsection 4.11(d) above), the Indenture Trustee, at the direction of the Servicer, shall withdraw from the Spread Account all amounts then remaining in the Spread Account and pay such amounts to the Transferor.

Section 4.12    Determination of LIBOR.    (a) On each LIBOR Determination Date, the Indenture Trustee shall determine LIBOR on the basis of the rate for deposits in United States dollars for a one-month period which appears on Telerate Page 3750 as of 11:00 a.m., London time, on such date. If such rate does not appear on Telerate Page 3730, the rate for that LIBOR Determination Date shall be determined on the basis of the rates at which deposits in United States dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on that day to prime banks in the London interbank market for a one-month period. The Indenture Trustee shall request the principal London office of each of the Reference Banks to provide a quotation of its rate. If at least two (2) such quotations are provided, the rate for that LIBOR Determination Date shall be the arithmetic mean of the quotations. If fewer than two (2) quotations are provided as requested, the rate for that LIBOR Determination Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by the Servicer, at approximately 11:00 a.m., New York City time, on that day for loans in United States dollars to leading European banks for a one-month period.

(b)    The Class A Note Interest Rate, Class B Note Interest Rate, Class C Note Interest Rate and Class D Note Interest Rate applicable to the then current and the immediately preceding Interest Periods mat be obtained by telephoning the Indenture Trustee at its corporate trust office at (212) 853-5738 or such other telephone number as shall be designated by the Indenture Trustee for such purpose by prior written notice by the Indenture Trustee to each Series 2000-1 Noteholder from time to time.

(c)    On each LIBOR Determination Date, the Indenture Trustee shall send to the Transferor by facsimile transmission, notification of LIBOR for the following Interest Period.

Section 4.13    Investment Instructions. Ant investment instructions required to be given to the Indenture Trustee pursuant to the terms hereof must be given to the Indenture Trustee no later than 11:00 a.m., New York City time, on the date such investment is to be made. In the event the Indenture Trustee receives such investment instruction later than such time, the Indenture Trustee may, but shall have no obligation to, make such investment. In the event the

Indenture Trustee is unable to make art investment required in an investment instruction received by the Indenture Trustee after 10:00 a.m., New York City time, on such day, such investment shall be made by the Indenture Trustee on the next succeeding Business Day. In no event shall the Indenture Trustee be liable for ant investment not made pursuant to investment instructions received after 10:00 a.m., New York City time, on the date such investment is requested to be made.

[END OF ARTICLE IV]

# ARTICLE V

## DELIVERY OF SERIES 2000-1 NOTES;
## DISTRIBUTIONS: REPORTS TO SERIES 2000-1 NOTEHOLDERS

Section 5.01  <u>Delivery and Payment for the Series 2000-1 Notes</u>. The Issuer shall execute and issue, and the Indenture Trustee shall authenticate, the Series 2000-1 Notes in accordance with Section 2.03 of the Indenture. The Indenture Trustee shall deliver the Series 2000-1 Notes to or upon the order of the Trust when so authenticated.

Section 5.02  <u>Distributions</u>. (a) On each Distribution Date, the Paying Agent shall distribute to each Class A Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such Class A Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay interest on the Class A Notes pursuant to this Indenture Supplement.

(b)  On each Distribution Date, the Paying Agent shall distribute to each Class A Noteholder of record on the related Record Date such Class A Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class A Notes pursuant to this Indenture Supplement.

(c)  On each Distribution Date, the Paying Agent shall distribute to each Class B Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such Class B Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay interest on the Class B Notes pursuant to this Indenture Supplement.

(d)  On each Distribution Date, the Paying Agent shall distribute to each Class B Noteholder of record on the related Record Date such Class B Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class B Notes pursuant to this Indenture Supplement.

(e)  On each Distribution Date, the Paying Agent shall distribute to each Class C Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture such Class C Noteholder's *pro rata* share of the amounts held by the Paying Agent including amounts held by the Paying Agent with respect to amounts withdrawn from the Spread Account (at the *times* and in the amounts specified in Section 4.11)) that are allocated and available on such Distribution Date to pay interest on the Class C Notes pursuant to this Indenture Supplement.

(f)  On each Distribution Date, the Paying Agent shall distribute to each Class C Noteholder of record on the related Record Date such Class C Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class C Notes pursuant to this Indenture Supplement.

(g)     On each Distribution Date, the Paying Agent shall distribute to each Class D Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such Class D Noteholder's *pro rata* share of the amounts held by the Paying Agent (including amounts held by the Paying Agent with respect to amounts withdrawn from the Spread Account (at the times and in the amounts specified in Section 4.11)) that are allocated and available on such Distribution Date to pay interest on the Class D Notes pursuant to this Indenture Supplement.

(h)     On each Distribution Date, the Paying Agent shall distribute to each Class D Noteholder of record on the related Record Date such Class D Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class D Notes pursuant to this Indenture Supplement.

(i)     The distributions to be made pursuant to this Section 5.02 are subject to the provisions of Sections 2.06, 6.01 and 7.01 of the Transfer and Servicing Agreement, Section 11.02 of the Indenture and Section 7.01 of this Indenture Supplement.

(j)     Except as provided in Section 11.02 of the Indenture with respect to a final distribution, distributions to Series 2000-1 Noteholders hereunder shall be made by (i) check mailed to each Series 2000-1 Noteholder (at such Noteholder's address as it appears in the Note Register), except that with respect to any Series 2000-1 Notes registered in the name of the nominee of a Clearing Agency, such distribution shall be made in immediately available funds and (ii) without presentation or surrender of any Series 2000-1 Note or the making of any notation thereon.

Section 5.03     <u>Reports and Statements to Series 2000-1 Noteholders</u>. (a) On each Distribution Date, the Paying Agent, an behalf of the Indenture Trustee, shall forward to each Series 2000-1 Noteholder and each Rating Agency a statement substantially in the form of Exhibit C prepared by the Servicer.

(b)     Not later than the second Business Day preceding each Distribution Date, the Servicer shall deliver to the Owner Trustee, the Indenture Trustee, the Paying Agent and each Rating Agency a statement substantially in the form of Exhibit C prepared by the Servicer and (ii) a certificate of an Authorized Officer substantially in the form of Exhibit D; provided that the Servicer may amend the form of Exhibit C and Exhibit D, from time to time, with the consent of the Indenture Trustee.

(c)     A copy of each statement or certificate provided pursuant to paragraph (a) or (b) may be obtained by any Series 2000-1 Noteholder by a request in writing to the Servicer.

(d)     On or before January 31 of each calendar year, beginning with calendar year 2001, the Paying Agent. on behalf of the Indenture Trustee, shall furnish or cause to be furnished to each Person who at any time during the preceding calendar year was a Series 2000-1 Noteholder, a statement prepared by the Servicer containing the information which is required to be contained in the statement to Series 2000-1 Noteholders, as set forth in paragraph (a) above, aggregated for such calendar year or the applicable portion thereof during which such Person

was a Series 2000-1 Noteholder, together with other information as is required to be provided by an issuer of indebtedness under the Code. Such obligation of the Paying Agent shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Paying Agent pursuant to any requirements of the Code as from time to time in effect.

[END OF ARTICLE V]

(g)    without limiting the foregoing, the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture;

then, in the case of any event described in subparagraph (a), (b) or (d), after the applicable grace period, if any, set forth in such subparagraphs, either the Indenture Trustee or the Holders of Series 2000-1 Notes evidencing more than 50% of the aggregate unpaid principal amount of Series 2000-1 Notes by notice then given in writing to the Transferor and the Servicer (and to the Indenture Trustee if given by the Series 2000-1 Noteholders) may declare that a "Series Redemption Event" with respect to Series 2000-1 (a "Series 2000-1 Redemption Event") has occurred as of the date of such notice, and, in the case of any event described in subparagraph (c), (e), (f) or (g), a Series 2000-1 Redemption Event shall occur without any notice or other action on the part of the Indenture Trustee or the Series 2000-1 Noteholders immediately upon the occurrence of such event.

<center>[END OF ARTICLE VI]</center>

**ARTICLE VI**

**SERIES 2000-1 REDEMPTION EVENTS**

Section 6.01    Series 2000-1 Redemption Events. If any one of the following events shall occur with respect to the Series 2000-1 Notes:

(a)    failure on the part of the Transferor (i) to make any payment or deposit required to be made by the Transferor by the terms of the Transfer and Servicing Agreement, the Indenture or this Indenture Supplement on or before the date occurring five (5) Business Days after the date such payment or deposit is required to be made therein or herein or (ii) duly to observe or perform any other covenants or agreements of the Transferor set forth in the Transfer and Servicing Agreement, the Indenture or this Indenture Supplement, which failure has a material adverse effect on the Series 2000-1 Noteholders and which continues unremedied for a period of sixty (60) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Transferor by the Indenture Trustee, or to the Transferor and the Indenture Trustee by any Holder of the Series 2000-1 Notes;

(b)    any representation or warranty made by the Transferor in the Transfer and Servicing Agreement, or any information contained in a computer file or microfiche list required to be delivered by the Transferor pursuant to Section 2.01 or subsection 2.09(h) of the Transfer and Servicing Agreement shall prove to have been incorrect in any material respect when made or when delivered, which continues to be incorrect in any material respect for a period of sixty (60) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Transferor by the Indenture Trustee, or to the Transferor and the Indenture Trustee by any Holder of the Series 2000-1 Notes and as a result of which the interests of the Series 2000-1 Noteholders are materially and adversely affected for such period; *provided, however*, that a Series 2000-1 Redemption Event pursuant to this subsection 6.01(b) shall not be deemed to have occurred hereunder if the Transferor has accepted reassignment of the related Receivable, or all of such Receivables, if applicable, during such period in accordance with the provisions of the Transfer and Servicing Agreement;

(c)    a failure by the Transferor to convey Receivables in Additional Accounts or Participation Interests to the Trust within five (5) Business Days after the day on which it is required to convey such Receivables or Participation Interests pursuant to subsection 2.09(a) of the Transfer and Servicing Agreement;

(d)    any Servicer Default shall occur;

(e)    the average of the Portfolio Yields for any three consecutive Monthly Periods is reduced to a rate which is less than the average of the Base Rates for such period:

(f)    the Class A Note Principal Balance or the Class B Note Principal Balance, Class C Note Principal Balance or the Class D Note Principal Balance shall not be paid in full on the Expected Final Principal Payment Date; or

# ARTICLE VII

## REDEMPTION OF SERIES 2000-1 NOTES; FINAL DISTRIBUTIONS; SERIES TERMINATION

Section 7.01    Optional Redemption of Series 2000-1 Notes: Final Distributions. (a) On any day occurring on or after the date on which the outstanding principal balance of the Series 2000-1 Notes is reduced to 5% or less of the initial outstanding principal balance of Series 2000-1 Notes, the Issuer shall have the option to redeem the Series 2000-1 Notes, at a purchase price equal to (i) if such day is a Distribution Date, the Reassignment Amount for such Distribution Date or (ii) if such day is not a Distribution Date, the Reassignment Amount for the Distribution Date following such day.

(b)    The Issuer shall give the Servicer and the Indenture Trustee at least thirty (30) days prior written notice of the date on which the Issuer intends to exercise such optional redemption. Not later than 12:00 noon, New York City time, on such day the Issuer shall deposit into the Collection Account in immediately available funds the excess of the Reassignment Amount over the amount, if any, on deposit in the Principal Funding Account. Such redemption option is subject to payment in full of the Reassignment Amount. Following such deposit into the Collection Account in accordance with the foregoing, the Invested Amount for Series 2000-1 shall be reduced to zero and the Series 2000-1 Noteholders shall have no further security interest in the Receivables. The Reassignment Amount shall be distributed as set forth in subsection 7.01(d).

(c)    (i) The amount to be paid by the Transferor with respect to Series 2000-1 in connection with a reassignment of Receivables to the Transferor pursuant to Section 2.06 of the Transfer and Servicing Agreement shall equal the Reassignment Amount for the first Distribution Date following the Monthly Period in which the reassignment obligation arises under the Transfer and Servicing Agreement.

(ii)    The amount to be paid by the Transferor with respect to Series 2000-1 in connection with a repurchase of the Notes pursuant to Section 7.01 of the Transfer and Servicing Agreement shall equal the Reassignment Amount for the Distribution Date of such repurchase.

(d)    With respect to the Reassignment Amount deposited into the Collection Account pursuant to Section 7.01, the Indenture Trustee shall, in accordance with the written direction of the Servicer, not later than 12:00 noon, New York City time, on the related Distribution Date, make deposits or distributions of the following amounts (in the priority set forth below and, in each case, after giving effect to any deposits and distributions otherwise to be made on such date) in immediately available funds: (i) (x) the Class A Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class A Noteholders and (y) an amount equal to the sum of (A) Class A Monthly Interest for such Distribution Date, (B) any Class A Monthly Interest previously due but not distributed to the Class A Noteholders on a prior Distribution Date and (C) the amount of Class A Additional Interest, if any, for such Distribution Date and any Class A Additional Interest previously due

but not distributed to the Class A Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class A Noteholders, (ii) (x) the Class B Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class B Noteholders and (y) an amount equal to the sum of (A) Class B Monthly Interest for such Distribution Date, (B) any Class B Monthly Interest previously due but not distributed to the Class B Noteholders on a prior Distribution Date and (C) the amount of Class B Additional Interest, if any, for such Distribution Date and any Class B Additional Interest previously due but not distributed to the Class B Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class B Noteholders, (iii) (x) the Class C Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class C Noteholders and (y) an amount equal to the sum of (A) Class C Monthly Interest for such Distribution Date, (B) any Class C Monthly Interest previously due but not distributed to the Class C Noteholders on a prior Distribution Date and (C) the amount of Class C Additional Interest, if any, for such Distribution Date and any Class C Additional Interest previously due but not distributed to the Class C Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class C Noteholders, (iv) (x) the Class D Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class D Noteholders and (y) an amount equal to the sum of (A) Class D Monthly Interest for such Distribution Date, (B) any Class D Monthly Interest previously due but not distributed to the Class D Noteholders on a prior Distribution Date and (C) the amount of Class D Additional Interest, if any, for such Distribution Date and any Class D Additional Interest previously due but not distributed to the Class D Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class D Noteholders and (v) any excess shall be released to the Issuer.

(e)     Notwithstanding anything to the contrary in this Indenture Supplement, the Indenture or the Transfer and Servicing Agreement, all amounts distributed to the Paying Agent pursuant to subsection 7.01(d) for payment to the Series 2000-1 Noteholders shall be deemed distributed in full to the Series 2000-1 Noteholders on the date on which such funds are distributed to the Paying Agent pursuant to this Section 7.01 and shall be deemed to be a final distribution pursuant to Section 11.02 of the Indenture.

Section 7.02   Series Termination. On the Series 2000-1 Final Maturity Date, the right of the Series 2000-1 Noteholders to receive payments from the Issuer will be limited solely to the right to receive payments pursuant to Section 5.05 of the Indenture.

[END OF ARTICLE VII]

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01  Ratification of Indenture. As supplemented by this Indenture Supplement, the Indenture is in all respects ratified and confirmed and the Indenture as so supplemented by this Indenture Supplement shall be read, taken and construed as one and the same instrument.

Section 8.02  Form of Delivery of the Series 2000-1 Notes.  (a) The Class A Notes, the Class B Notes and the Class C Notes shall be Book-Entry Notes. The Series 2000-1 Notes shall be delivered as Registered Notes as provided in Section 2.01 of the Indenture.

(b)     Class A Noteholders, Class B Noteholders and Class C Noteholders of a beneficial interest in the Class A Notes, Class B Notes or Class Notes, as applicable, sold in reliance on Regulation S as Temporary Regulation S Global Notes are prohibited from receiving distributions or from exchanging beneficial interests in such Temporary Regulation S Global Notes for Permanent Regulation S Global Notes until the later of (i) the expiration of the Distribution Compliance Period (the "Release Date") and (ii) the furnishing of a certificate, substantially in the form of Exhibit E attached hereto, certifying that the beneficial owner of the Temporary Regulation S Global Notes is a non-United States Person (a "Regulation S Certificate").

Section 8.03  Counterparts. This Indenture Supplement may be executed in two or more counterparts, and by different parties on separate counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument

Section 8.04  GOVERNING LAW.  THIS   INDENTURE   SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 8.05  Limitation of Liability. Notwithstanding any other provision herein or elsewhere, this Agreement has been executed and delivered by Wilmington Trust Company, not in its individual capacity, but solely in its capacity as Owner Trustee of the Trust, in no event shall Wilmington Trust Company in its individual capacity have any liability in respect of the representations, warranties, or obligations of the Trust hereunder or under any other document, as to all of which recourse shall be had solely to the assets of the Trust, and for all purposes of this Agreement and each other document, the Owner Trustee (as such or in its individual capacity) shall be subject to, and entitled to the benefits of, the terms and provisions of the Trust Agreement.

Section 8.06  Transfer of the Class D Notes. To the fullest extent permitted by applicable law, the Class D Notes (or any interest therein) may not be directly or in directly sold, transferred, assigned, participated, pledged or otherwise disposed of to any Person (each such

transaction, a "Transfer"); *provided, however,* that a Transfer of a Class D Note shall be permitted if (A) the Transferor shall have delivered a Tax Opinion to the Indenture Trustee with respect to such Transfer and (B) the transferee establishes to the Servicer that it is the beneficial owner for United States federal income tax purposes and that it is and will remain a "United States person" for such purposes for so long as it holds any interest in a Class D Note. Prior to any such Transfer by the Transferor, the Class D Notes shall not be treated by any Person as having been issued for United States federal income tax purposes.

Section 8.07    Private Placement of Securities. The Series 2000-1 Notes have not been registered under the Securities Act or any state securities law. No transfer of any Series 2000-1 Note shall be made except in accordance with Sections 8.06 and 8.09 of this Indenture Supplement. The Series 2000-1 Notes shall bear a legend to the effect set forth in Exhibits A-1, A-2, A-3 A-4 A-5, A-6, A-7, A-8, A-9, and A-10, respectively. Neither the Trust nor the Indenture Trustee is obligated to register the Series 2000-1 Notes under the Securities Act or to take any other action not otherwise required under this Indenture Supplement or the Indenture to permit the transfer of the Series 2000-1 Notes without registration. No Class A Note, Class B Note or Class C Note may be transferred unless it is transferred in compliance with Section 8.08 and (i) to the Transferor, (ii) pursuant to Rule 144A under the Securities Act, or (iii) to persons other than U.S. Persons in offshore transactions pursuant to Regulation S under the Securities Act and, in each case, in compliance with any applicable state securities or "blue sky" laws.

Section 8.08    Representations and Warranties of Class A Noteholders, Class B Noteholders and Class C Noteholders. Each purchaser of a Class A Note, Class B Note or Class C Note will be deemed to have acknowledged, represented, warranted and agreed by its purchase of a Class A Note, Class B Note or Class C Note as follows:

(a)      that (A) (i) it is QIB, (ii) it is aware that the sale to it is being made in reliance on Rule 144A and, if it is acquiring such Class A Note or any interest or participation therein for the account of another QIB, such other QIB is aware that the sale is being made in reliance on Rule 144A and (iii) it is acquiring its Class A Note, Class B Note or Class C Note for its own account or an account or the accounts of other QIBs or (B) it is not a U.S. Person and is purchasing its Class A Note, Class B Note or Class C Note or any interest or participation therein in an offshore transaction meeting the requirements of Rules 903 and 904 of Regulation S;

(b)      it understands that the Class A Notes, Class B Notes or Class C Notes are being offered only in a transaction not involving any public offering within the meaning of the Securities Act, and that it will not pledge, re-offer or resell or otherwise transfer any Class A Note, Class B Note or Class C Note or any interest therein except (i) to the Transferor, (ii) inside the United Stares in accordance with Rule 144A to a person who the seller reasonably believes is a QIB that purchases for its own account or for the account of a QIB to whom notice is given that the re-offer, resale, pledge or transfer is being made in reliance on Rule 144A or (iii) outside the United States in an offshore transaction in accordance with Rule 903 or 904 of Regulation S, in each case in compliance with all applicable state securities or "blue sky" laws;

(c)    it understands that each Class A Note, Class B Note or Class C Note will bear a legend set forth on the forms of Class A Notes, Class B Note or Class C Notes included as Exhibits A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8 and A-9;

(d)    if it is acquiring its Class A Note, Class B Note or Class C Note or any interest or participation therein in an "offshore transaction" (as defined in Regulation S), it acknowledges that its Class A Note, Class B Note or Class C Note initially will be represented by the Temporary Regulation S Global Note and that transfers thereof or any interest or participation therein are restricted as provided herein and in the Indenture; if it is a QIB, it acknowledges that the Class A Notes, Class B Notes and Class C Notes offered in reliance on Rule 144A will be represented by the Rule 144A Global Note and that transfers thereof or any interest or participation therein are restricted as provided herein and in the Indenture;

(e)    it acknowledges that the Indenture Trustee, the Trust, the Transferor and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations, warranties and agreements. If it is acquiring any Class A Note, Class B Note or Class C Note as a fiduciary or agent for one or more investor accounts, it will be deemed to have represented that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgements, representations, warranties and agreements on behalf of each such account;

(f)    with respect to any foreign purchaser claiming an exemption from United States income or withholding tax, that it has delivered to the Indenture Trustee a true and complete United States Internal Revenue Form W-8BEN, W-8ECI Form 1001 or Form 4224 (or any successor form) indicating such exemption;

(g)    it acknowledges that transfers of the Class A Notes, Class B Notes and Class C Notes or any interest or participation therein shall otherwise be subject in all respects to the restrictions applicable thereto contained in this Indenture Supplement and the Indenture;

(h)    it acknowledges that none of the Owner Trustee, the Indenture Trustee or Goldman, Sachs & Co., Barclays Capital, Inc. or Credit Suisse First Boston (collectively, the "Initial Purchasers") or any person representing the Trust, the Owner Trustee, the Indenture Trustee or the Initial Purchasers has made any representation to it with respect to the Trust or the offering or sale of any of the Class A Notes, Class B Notes or Class C Notes, other than the information contained in the Offering Memorandum, dated as of December 6, 2000 or the Offering Memorandum Supplement thereto, dated as of December 6, 2000, which have been delivered to it and upon which it is relying in making its investment decision with respect to the Class A Notes, the Class B Notes or the Class C Notes. It has had access to such financial and other information concerning the Trust, the Transferor and the Class A Notes, the Class B Notes and the Class C Notes as it has deemed necessary in connection with its decision to purchase such Class A Notes, Class B Notes or Class C Notes;

(i)    if it is acquiring any Class A Notes, Class B Notes or Class C Notes, or any interest or participation therein, as a fiduciary or agent for one or more investor accounts, it represents that it has the sole investment discretion with respect to such account and that it has

the full power to make the acknowledgements, representations and agreements contained herein on behalf of each of those accounts;

(j)    it acknowledges that it will not transfer any Class A Notes, Class B Notes or Class C Notes sold pursuant to Regulation S to any other party, other than to a QIB subsequent to the expiration of the Distribution Compliance Period;

(k)    it acknowledges that by its purchase or acquisition of the Class A Notes, Class B Notes or Class Notes, it will be deemed to have represented (and will be deemed to have repeated such representation on each date on which any Class A Notes, Class B Notes or Class C Notes are held by such Plan (as defined under ERISA)) that either (i) or (ii) is true:

(i)    the funds that it used to acquire the Class A Notes, Class B Notes or Class C Notes are not the assets of a Plan or an entity which entity's underlying assets include Plan Assets (as defined under ERISA) (or a governmental plan that is subject to any federal, state or local law that is substantially similar to the provisions of Section 406 of ERISA or Section 4973 of the Code); or

(ii)    its purchase, holding and disposition of the Class A Notes, Class B Notes or Class C Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or in the case of a governmental plan that is subject to any federal, state or local provision that is substantially similar to Section 406 of ERISA or Section 4975 of the Code) by reason of PTCE 96-23, PTCE 95-60, PTCE 91-38, PTCE 90-1, PTCE 84-14 or some other applicable exemption (or in the case of a governmental plan, any other applicable federal, state or local law); and

(l)    it acknowledges that the Transferor, the Owner Trustee, the Indenture Trustee, the Initial Purchasers and others will rely on the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that if any of the foregoing acknowledgements, representations and agreements deemed to have been made by it are no longer accurate, it shall promptly notify the Transferor, the Owner Trustee, the Indenture Trustee and the Initial Purchasers.

Any transfer, resale, pledge or other transfer of the Class A Notes, Class B Notes and Class C Notes contrary to the restrictions set forth above and in this Indenture Supplement and the Indenture shall be deemed void *ab initio* by the Indenture Trustee. As used in this Section 8.08, the terms "United States" and "U.S. persons" have the respective meanings given them in Regulation S.

Section 8.09    Regulation S Global Notes.    (a) The Class A Notes, Class B Notes and Class C Notes issued in reliance on Regulation S will initially be in the form of Temporary Regulation S Global Notes. Any interest in a Class A Note, Class B Note or Class C Note evidenced by the Temporary Regulation S Global Note is exchangeable for an interest in a Permanent Regulation S Global Note upon the later of (i) the Release Date and (ii) the furnishing of a Regulation S Certificate.

(b)    On or prior to the Release Date, each beneficial owner of a Temporary Regulation S Global Note shall deliver to the Euroclear Operator or Clearstream (as applicable) a

Regulation S Certificate; *provided, however*, that any beneficial owner of a Temporary Regulation S Global Note on the Release Date on any Distribution Date that has previously delivered a Regulation S Certificate hereunder shall not be required to deliver any subsequent Regulation S Certificate (unless the certificate previously delivered is no longer true as of such subsequent date, in which case such beneficial owner shall promptly notify the Euroclear Operator or Clearstream, as applicable, thereof and shall deliver an updated Regulation S Certificate). The Euroclear Operator and/or Clearstream, as applicable, shall deliver to the Paying Agent or the Indenture Trustee a certificate substantially in the form of Exhibit F (a "Non—U.S. Certificate") attached hereto promptly upon the receipt of each such Regulation S Certificate, and no such beneficial owner (or transferee from such beneficial owner) shall be entitled to receive an interest in a Permanent Regulation S Global Note or any payment of principal or interest on or any other payment with respect to its beneficial interest in a Temporary Regulation S Global Note prior to the Paying Agent or the Indenture Trustee receiving such Non-U.S. Certificate from the Euroclear Operator or Clearstream with respect to the portion of the Temporary-Regulation S Global Note owned by such beneficial owner (and, with respect to an interest in the Permanent Regulation S Global Note, prior to the Release Date).

(c)    Any payments of principal of interest on or any other payment on a Temporary Regulation S Global Note received by the Euroclear Operator or Clearstream with respect to any portion of such Regulation S Global Note owned by a beneficial owner of a Class A Note, Class B Note or Class C Note that has not delivered the Regulation S Certificate required by this Section 8.09 shall be held by the Euroclear Operator and Clearstream solely as agents for the Paying Agent and the Indenture Trustee. The Euroclear Operator and Clearstream shall remit such payments to the applicable beneficial owner of a Class A Note, Class B Note or Class C Note (or to a Euroclear System or Clearstream member on behalf of such beneficial owner of a Class A Note, Class B Note or Class C Note) only after the Euroclear Operator or Clearstream has received the requisite Regulation S Certificate. Until the Paying Agent or the Indenture Trustee has received a Non-U.S. Certificate from the Euroclear Operator or Clearstream, as applicable, the Paying Agent or the Indenture Trustee may revoke the right of the Euroclear Operator or Clearstream, as applicable, to hold any payments made with respect to such portion of such Temporary Regulation S Global Note. If the Paying Agent or the Indenture Trustee exercises its right of revocation pursuant to the immediately preceding sentence, the Euroclear Operator or Clearstream, as applicable, shall return such payments to the Paying Agent or the Indenture Trustee and the Indenture Trustee shall hold such payments in the Collection Account until the Euroclear Operator or Clearstream, as applicable, has provided the necessary Non-U.S. Certificates to the Paying Agent or the Indenture Trustee (at which time the Paying Agent shall forward such payments to the Euroclear Operator or Clearstream, as applicable, to be remitted to the beneficial owner of a Class A Note, Class B Note of Class C Note that is entitled thereto on the records of the Euroclear Operator or Clearstream (or on the records of their respective members)).

(d)    Each beneficial owner of a Class A Note, Class B Note or Class C Note with respect to a Temporary Regulation S Global Note shall exchange its interest therein for an interest in a Permanent Regulation S Global Note on or after the Release Date upon furnishing to the Euroclear Operator or Clearstream (as applicable) the Regulation S Certificate and upon receipt by the Paying Agent or the Indenture Trustee, as applicable, of the Non-U.S. Certificate from the Euroclear Operator or Clearstream, as applicable, in each case pursuant to the terms of

this Section 8.09. On and after the Release Date, upon receipt by the Paying Agent or the Indenture Trustee of any Non-U.S. Certificate from the Euroclear Operator or Clearstream described in the immediately preceding sentence (i) with respect to the first such certification, the Trust shall execute, upon receipt of an order to authenticate, and the Indenture Trustee shall authenticate the applicable Permanent Regulation S Global Note and (ii) with respect to the first and all subsequent certifications, the Indenture Trustee shall exchange on behalf of the applicable beneficial owners the portion of the applicable Temporary Regulation S Global Note covered by such certification for a comparable portion of the applicable Permanent Regulation S Global Note. Upon any exchange of a portion of a Temporary Regulation S Global Note for a comparable portion of a Permanent Regulation S Global Note, the Indenture Trustee shall endorse on the schedules affixed to each of such Regulation S Global Notes (or on continuations of such schedules affixed to each of such Regulation S Global Notes and made parts thereof) appropriate notations evidencing the date of transfer and (x) with respect to the Temporary Regulation S Global Note, a decrease in the principal amount thereof equal to the amount covered by the applicable certification and (y) with respect to the Permanent Regulation S Global Note, an increase in the principal amount thereof equal to the principal amount of the decrease in the Temporary Regulation S Global Note pursuant to clause (x) above.

Section 8.10  <u>Special Transfer Provisions</u>.  (a) If a holder of a beneficial interest in the Rule 144A Global Note wishes at any time to exchange its interest in the Rule 144A Global Note for an interest in the Regulation S Global Note, or to transfer its interest in the Rule 144A Global Note to a person who wishes to take delivery thereof in the form of an interest in the Regulation S Global Note, such holder may, subject to the rules and procedures of the Clearing Agency and to the requirements set forth in the following sentence, exchange or cause the exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in the Regulation S Global Note. Upon receipt by the Indenture Trustee of (1) instructions given in accordance with the Clearing Agency's procedures from or on behalf of a beneficial owner of the Rule 144A Global Note, directing the Indenture Trustee (via DWAC), as transfer agent, to credit or cause to be credited a beneficial interest in the Regulation S Global Note in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, (2) a written order in accordance with the Clearing Agency's procedures containing information regarding the Euroclear System or Clearstream account to be credited with such increase and the name of such account, and (3) a certificate given by such beneficial owner stating that the exchange or transfer of such interest has been made pursuant to and in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act, the Indenture Trustee, as transfer agent, shall promptly deliver appropriate instructions to the Clearing Agency (via DWAC), its nominee, or the custodian for the Clearing Agency, as the case may be, to reduce or reflect on its records a reduction of the Rule 144A Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be so exchanged or transferred from the relevant participant, and the Indenture Trustee, as transfer agent, shall promptly deliver appropriate instructions (via DWAC) to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, concurrently with such reduction, to increase or reflect on its records an increase of the principal amount of such Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the person specified in such instructions (who may be the Euroclear Operator or Clearstream or another agent member of the Euroclear System or Clearstream, or both, as the case may be, acting for and on behalf of them) a

beneficial interest in such Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note. Notwithstanding anything to the contrary, the Indenture Trustee may conclusively rely upon the completed schedule set forth in the certificate evidencing the Class A Notes, the Class B Notes and the Class C Notes.

(b)    If a holder of a beneficial interest in the Regulation S Global Note wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the Rule 144A Global Note, or to transfer its interest in the Regulation S Global Note to a person who wishes to take delivery thereof in the form of an interest in the Rule 144A Global Note, such holder may, subject to the rules and procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, and to the requirements set forth in the following sentence, exchange or cause the exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Note. Upon receipt by the Indenture Trustee, as transfer agent, of (1) instructions given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, from or on behalf of a beneficial owner of the Regulation S Global Note directing the Indenture Trustee, as transfer agent, to credit or cause to be credited a beneficial interest in the Rule 144A Global Note in an amount equal to the beneficial interest in the Regulation S Global Note to be exchanged or transferred, (2) a written order given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, containing information regarding the account with the Clearing Agency to be credited with such increase and the name of such account, and (3) a certificate given by such beneficial owner stating that the person transferring such interest in such Regulation S Global Note reasonably believes that the person acquiring such interest in the Rule 144A Global Note is a QIB and is obtaining such beneficial interest for its own account or the account of a QIB in a transaction meeting the requirements of Rule 144A and any applicable securities laws of any state of the United States or any other jurisdiction, the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, to reduce or reflect on its records a reduction of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in such Regulation S Global Note to be exchanged or transferred, and the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, concurrently with such reduction, to increase or reflect on its records an increase of the principal amount of the Rule 144A Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note. Notwithstanding anything to the contrary, the Indenture Trustee may conclusively rely upon the completed schedule set forth in the certificate evidencing the Class A Notes, Class B Notes or Class C Notes.

(c)    Any beneficial interest in one of the Class A Notes, Class B Notes or Class C Notes that is transferred to a person who takes delivery in the form of an interest in the other Class A Note, Class B Note or Class C Note will, upon transfer, cease to be an interest in such Class A Note, Class B Note or Class C Note and become an interest in the other Class A Note, Class B Note or Class C Note and, accordingly, will thereafter be subject to all transfer

restrictions and oilier procedures applicable to beneficial interests in such other Class A Note, Class B Note or Class C Note for as long as it remains such an interest.

(d) Until the provision of the certifications required by Section 8.09, beneficial interests in a Regulation S Global Note may only be held through the Euroclear System or Clearstream or another agent member of the Euroclear System or Clearstream acting for and on behalf of them. Interests in the Regulation S Global Note may be exchanged for interests in the Rule 144A Global Note only in accordance with the certification requirements described above.

Section 8.11   Settlement Procedures. As described more fully in the Settlement Memorandum attached hereto as Exhibit G, on the Closing Date the Initial Purchasers shall wire funds in the amount of the net purchaser price for the Class A Notes, the Class B Notes and the Class C Notes to the an account maintained by the Indenture Trustee (the "Net Proceeds Account"). The Indenture Trustee shall apply the amount wired by the Initial Purchasers for deposit in the Net Proceeds Account in accordance with the Settlement Memorandum included as Exhibit G hereto.

[END OF ARTICLE VIII]

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned have caused this Indenture Supplement to be duly executed and delivered by their respective duly authorized officers on the day and year first above written.

NEXTCARD CREDIT CARD MASTER NOTE TRUST, as Issuer

By: Wilmington Trust Company, not in its individual capacity, but solely as Owner Trustee

By:_____
    Name: James P. Lawler
    Title: Vice President

THE BANK OF NEW YORK, as Indenture Trustee

By:_____
    Name: MAURO PALLADINO
    Title: VICE PRESIDENT

Acknowledged and Accepted:

NEXTBANK, N.A., as Servicer

By:_____
Name: Bruce Rigione
Title: CFO

[Signature Page to Series 2000-1 Indenture Supplement]

FORM OF PERMANENT REGULATION S GLOBAL NOTE

THIS GLOBAL NOTE IS A PERMANENT GLOBAL NOTE FOR PURPOSES OF REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). NEITHER THIS PERMANENT GLOBAL NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD OR DELIVERED, EXCEPT AS PERMITTED UNDER THE INDENTURE REFERRED TO BELOW.

NO BENEFICIAL OWNERS OF THIS PERMANENT GLOBAL NOTE SHALL BE ENTITLED TO RECEIVE PAYMENT OF PRINCIPAL OR INTEREST HEREON UNLESS THE REQUIRED CERTIFICATIONS HAVE BEEN DELIVERED PURSUANT TO THE TERMS OF THE INDENTURE.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAW. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE, OR ANY INTEREST OR PARTICIPATION HEREIN, MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) TO THE ISSUER, (2) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB") PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, OR (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT. EACH BENEFICIAL OWNER OF A NOTE BY ACCEPTING A BENEFICIAL INTEREST IN THIS NOTE, UNLESS SUCH PERSON ACQUIRED THIS NOTE IN A TRANSFER DESCRIBED IN CLAUSE (3) ABOVE, IS DEEMED TO REPRESENT THAT IT IS EITHER A QIB PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF ANOTHER QIB.

PRIOR TO PURCHASING ANY NOTES, PURCHASERS SHOULD CONSULT COUNSEL WITH RESPECT TO THE AVAILABILITY AND CONDITIONS OF EXEMPTION FROM THE RESTRICTION ON RESALE OR TRANSFER. NONE OF NEXTCARD, INC., THE TRANSFEROR OR THE ISSUER HAS AGREED TO REGISTER THE NOTES UNDER THE SECURITIES ACT, TO QUALIFY THE NOTES UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR TO PROVIDE REGISTRATION RIGHTS TO ANY PURCHASER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

Up to $57,500,000

No. R-1

SEE REVERSE FOR CERTAIN DEFINITIONS

CUSIP NO. _____
USIN: _____
COMMON CODE: _____

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF, AND EACH HOLDER OF A BENEFICIAL INTEREST IN THIS NOTE, COVENANTS AND AGREES THAT IT WILL NOT AT ANY TIME INSTITUTE AGAINST THE ISSUER OR NEXTBANK, N.A. OR JOIN IN ANY INSTITUTION AGAINST THE ISSUER OR NEXTBANK, N.A., OF, ANY BANKRUPTCY PROCEEDINGS UNDER ANY UNITED STATES FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW IN CONNECTION WITH ANY OBLIGATIONS RELATING TO THE NOTES OR THE INDENTURE.

THE HOLDER OF THIS NOTE, BY ACCEPTANCE OF THIS NOTE, AND EACH HOLDER OF A BENEFICIAL INTEREST IN THIS NOTE, BY THE ACQUISITION OF A BENEFICIAL INTEREST THEREIN, AGREE TO TREAT THE NOTES AS INDEBTEDNESS OF NEXTCARD CREDIT CARD MASTER NOTE TRUST FOR APPLICABLE FEDERAL, STATE, AND LOCAL INCOME AND FRANCHISE TAX LAW AND FOR PURPOSES OF ANY OTHER TAX IMPOSED ON OR MEASURED BY INCOME.

A-9-2

NEXTCARD CREDIT CARD MASTER NOTE TRUST

SERIES 2000-1, CLASS C ASSET BACKED NOTE

NextCard Credit Card Master Note Trust, a Delaware business trust (herein referred to as the "Issuer"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, subject to the following provisos, a principal sum UP TO FIFTY-SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($57,500,000) payable in an amount equal to the aggregate amount, if any, payable from the Collection Account in respect of principal on the Notes pursuant to Section 4.04 of the Indenture Supplement. The entire unpaid principal amount of this Note shall be due and payable on the earlier of the Series 2000-1 Maturity Date and the Redemption Date, if any. The aggregate principal sum of the Regulation S Global Notes and the Rule 144A Global Note shall not exceed $57,500,000. The Issuer will pay interest on the Notes with respect to each Interest Period, in accordance with Sections 4.02 and 4.04 of the Indenture Supplement. Such principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.

The principal of and interest on this Class C Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

Reference is made to the further provisions of this Class C Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Class C Note.

Unless the certificate of authentication hereon has been executed by the Authentication Agent whose name appears below by manual signature, this Class C Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Issuer has caused this Class C Note to be duly executed.

NEXTCARD CREDIT CARD MASTER NOTE TRUST,
as Issuer

By:  WILMINGTON TRUST COMPANY,
not in its individual capacity but solely as
Owner Trustee under the Trust Agreement

By:_____
Name:
Title:

Date:  December 13, 2000

A-9-4

**AUTHENTICATION AGENT'S CERTIFICATE OF AUTHENTICATION**

This is one of the Class C Notes described in the within-mentioned Indenture.

THE BANK OF NEW YORK,
as Indenture Trustee

By: _____
Name:
Title:

Date: December 13, 2000

A-9-5

[REVERSE OF NOTE]

This Note is one of the Notes of a duly authorized issue of Notes of the Issuer, designated as its Class C Asset Backed Notes, Series 2000-1 (herein called the "Class C Notes"), all issued under a Master Indenture dated as of December 11, 2000 (such indenture, as supplemented by the Series 2000-1 Indenture Supplement dated as of December 13, 2000 among the parties to the Master Indenture (the "Indenture Supplement"), is herein called the "Indenture"), between the Issuer and The Bank of New York, as indenture trustee (the "Indenture Trustee", which term includes any successor Indenture Trustee under the Indenture), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights and obligations thereunder of the Issuer, the Indenture Trustee and the Holders of the Class C Notes. The Class C Notes are subject to all terms of the Indenture. All terms used in this Class C Note that are not defined herein shall have the meanings assigned to them in or pursuant to the Indenture, as supplemented or amended.

The Class C Notes are and will be equally and ratably entitled to the benefits of the Indenture without preference, priority or distinction, all in accordance with the terms and provisions of the Indenture.

Payments of interest on and principal of this Class C Note due and payable on any Distribution Date, to the extent not in full payment of this Class C Note, shall be made by check mailed to the Person whose name appears as the registered Holder of this Class C Note (or one or more predecessor Class C Notes) on the Note Register as of the close of business on each Record Date (the "Registered Holder"), except that with respect to Class C Notes registered on the Record Date in the name of the nominee of the Clearing Agency (initially, such nominee to be Cede & Co.), payments will be made by wire transfer in immediately available funds to the account designated by such nominee. Such checks shall be mailed to the Person entitled thereto at the address of such Person as it appears on the Note Register as of the applicable Record Date without requiring that this Class C Note be submitted for notation of payment. Any reduction in the principal amount of this Class C Note (or any one or more predecessor Class C Notes) effected by any payments made on any Distribution Date shall be binding upon all future Holders of this Class C Note and of any Class C Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not noted hereon. Any final payment shall be made in accordance with provisions of the Indenture.

As provided in the Indenture, the Class C Notes will be redeemed in whole, but not in part, on the Redemption Date, if any.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Class C Note may be registered on the Note Register upon surrender of this Class C Note for registration of transfer at the office or agency designated by the Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Note Registrar duly executed by, the Holder hereof or his attorney-in-fact duly authorized in writing, and such other documents as the Note Registrar may reasonably require, and thereupon one or more new Notes of authorized denominations and in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Class C Note, but the Note Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

On any redemption, purchase, exchange or cancellation of any of the Notes represented by this Permanent Regulation S Global Note, details of such redemption, purchase, exchange or cancellation shall be entered by the Paying Agent in Schedule A hereto recording any such redemption, purchase, exchange or cancellation and shall be signed on by or on behalf of the Issuer. Upon any such redemption, purchase,

A-9-6

exchange or cancellation, the principal amount of this Permanent Regulation S Global Note and the Notes represented by this Permanent Regulation S Global Note shall be reduced or increased, as appropriate, by the principal amount so redeemed, purchased, exchanged or cancelled.

If a holder of a beneficial interest in the Regulation S Global Note wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the Rule 144A Global Note, or to transfer its interest in the Regulation S Global Note to a person who wishes to take delivery thereof in the form of an interest in the Rule 144A Global Note, such holder may, subject to the rules and procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, and to the requirements set forth in the following sentence, exchange or cause the exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Note. Upon receipt by the Indenture Trustee, as transfer agent, of (1) instructions given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, from or on behalf of a beneficial owner of the Regulation S Global Note directing the Indenture Trustee, as transfer agent, to credit or cause to be credited a beneficial interest in the Rule 144A Global Note in an amount equal to the beneficial interest in the Regulation S Global Note to be exchanged or transferred, (2) a written order given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, containing information regarding the account with the Clearing Agency to be credited with such increase and the name of such account, and (3) a certificate given by such beneficial owner stating that the person transferring such interest in such Regulation S Global Note reasonably believes that the person acquiring such interest in the Rule 144A Global Note is a QIB and is obtaining such beneficial interest for its own account or the account of a QIB in a transaction meeting the requirements of Rule 144A and any applicable securities laws of any state of the United States or any other jurisdiction, the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, to reduce or reflect on its records a reduction of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in such Regulation S Global Note to be exchanged or transferred, and the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, concurrently with such reduction, to increase or reflect on its records an increase of the principal amount of the Rule 144A Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note. Notwithstanding anything to the contrary, the Indenture Trustee may conclusively rely upon the completed schedule set forth in the certificate evidencing the Class C Global Notes.

Each Noteholder or beneficial owner, by acceptance of a Class C Note or, in the case of a beneficial owner, a beneficial interest in a Class C Note, covenants and agrees that no recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer or the Indenture Trustee on the Class C Notes or under the Indenture or any certificate or other writing delivered in connection therewith, against (i) the Indenture Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director or employee of the Indenture Trustee in its individual capacity, any holder of a beneficial interest in the Issuer or the Indenture Trustee or of any successor or assign of the Indenture Trustee in its individual capacity, except as any such Person may have expressly agreed and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.

Prior to the due presentment for registration of transfer of this Class C Note, the Issuer, the Indenture Trustee, the Paying Agent, the Authentication Agent, the Note Registrar and any agent of the foregoing shall treat the Person in whose name this Class C Note (as of the day of determination or as of such other date as may be specified in the Indenture) is registered as the owner hereof for all purposes,

DOCSSF1:498752.4

whether or not this Class C Note be overdue, and neither the Issuer, the Indenture Trustee, the Paying Agent, the Authentication Agent, the Note Registrar nor any such agent of the foregoing shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders of the Notes under the Indenture at any time by the Issuer and the Indenture Trustee with the consent of a majority of Holders. The Indenture also contains provisions permitting the Holders of Series 2000-1 Notes representing specified percentages of the aggregate principal balance of the Series 2000-1 Notes, on behalf of the Holders of all the Series 2000-1 Notes, to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Class C Note (or any one of more predecessor Notes) shall be conclusive and binding upon such Holder and upon all future Holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Class C Note. The Indenture also permits, subject to the conditions set forth in the Indenture, the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of Holders of the Class C Notes issued thereunder or without the consent of holders of Series of Notes not affected thereby.

The Class C Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Class C Note and the Indenture shall be governed by and construed in accordance with the laws of the State of New York, including Section 5-1401 of the New York General Obligations Law, but otherwise without regard to its conflict of law principles.

No reference herein to the Indenture and no provision of this Class C Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C Note at the times, place, and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Transaction Documents, neither any owner of a beneficial interest in the Issuer, nor any of its partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on, or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Note or the Indenture. The Holder of this Class C Note by the acceptance hereof agrees that, except as expressly provided in the Transaction Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Class C Note.

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee

_____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____  _____*

Signature Guaranteed:

_____

\* NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatsoever.

A-9-9

SCHEDULE A

**SCHEDULE OF EXCHANGES BETWEEN THIS PERMANENT REGULATION S GLOBAL
NOTE OR THE RULE 144A GLOBAL NOTE,
OR REDEMPTIONS OR PURCHASES AND CANCELLATIONS**

The following increases or decreases in principal amount of this Permanent Regulation S Global Note or redemptions, purchases or cancellation of this Permanent Regulation S Global Note have been made:

| Date of exchange, or redemption or purchase or cancellation | Increase or decrease in principal amount of this Permanent Regulation S Global Note due to exchanges between the Rule 144A Global Note and this Permanent Regulation S Global Note | Remaining principal amount of this Permanent Regulation S Global Note following such exchange, or redemption or purchase or cancellation | Notation made by or on behalf of the Issuer |
|---|---|---|---|
| ———————— | ———————— | ———————— | ———————— |
| ———————— | ———————— | ———————— | ———————— |

A-9-10

EXHIBIT A-10

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAW. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE, OR ANY INTEREST OR PARTICIPATION HEREIN, MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) TO THE ISSUER OR ITS AFFILIATES OR (2) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB") PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT. EACH NOTE OWNER BY ACCEPTING A BENEFICIAL INTEREST IN THIS NOTE IS DEEMED TO REPRESENT THAT IT IS EITHER A QIB PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF ANOTHER QIB.

THIS NOTE MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN THAT IS SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR TO ANY OTHER "BENEFIT PLAN INVESTOR" (AS DEFINED IN UNITED STATES DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101(f)(2)), INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE SUPPLEMENT.

REGISTRATION OF TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN WILL REQUIRE DELIVERY OF SUCH CERTIFICATES AND OTHER REQUIREMENTS AS ARE REQUIRED BY THE INDENTURE SUPPLEMENT, AS MORE SPECIFICALLY SET FORTH THEREIN.

BEFORE PURCHASING THIS NOTE, PURCHASERS SHOULD CONSULT COUNSEL WITH RESPECT TO THE AVAILABILITY AND CONDITIONS OF EXEMPTION FROM THE RESTRICTION ON RESALE OR TRANSFER. THE SELLER HAS NOT AGREED TO REGISTER THIS NOTE UNDER THE SECURITIES ACT, TO QUALIFY THIS NOTE UNDER THE SECURITIES LAWS OF ANY STATE OR JURISDICTION OR TO PROVIDE REGISTRATION RIGHTS TO ANY PURCHASER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL BALANCE OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF COVENANTS AND AGREES THAT IT WILL NOT AT ANY TIME INSTITUTE AGAINST THE ISSUER, OR JOIN IN INSTITUTING AGAINST THE ISSUER, ANY BANKRUPTCY,

2000-1 Class D                              -1-

REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER ANY UNITED STATES FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

FOLLOWING THE TRANSFER OF THIS CLASS D NOTE BY THE TRANSFEROR, THE HOLDER OF THIS CLASS D NOTE, BY ACCEPTANCE OF THIS NOTE, AND EACH HOLDER OF A BENEFICIAL INTEREST THEREIN, AGREE TO TREAT THE CLASS D NOTES AS INDEBTEDNESS OF THE ISSUER FOR APPLICABLE FEDERAL, STATE, AND LOCAL INCOME AND FRANCHISE TAX LAW AND FOR PURPOSES OF ANY OTHER TAX IMPOSED ON, OR MEASURED BY, INCOME.

REGISTERED                                                    $6,000,000.00

No. R _18                                              CUSIP NO. 65334UAD5

## NEXTCARD CREDIT CARD MASTER NOTE TRUST

### SERIES 2000-1

### CLASS D FLOATING RATE ASSET BACKED NOTE

NextCard Credit Card Master Note Trust, a Delaware business trust (herein referred to as the "**Issuer**" or the "**Trust**"), for value received, hereby promises to pay to **FIRST MILLENNIUM, INC.**, or registered assigns, subject to the following provisions, the principal sum of **SIX MILLION DOLLARS** ($6,000,000.00), or such greater or lesser amount as determined in accordance with the Indenture. The entire unpaid principal amount of this Note shall be due and payable on the earlier of the Series 2000-1 Final Maturity Date and the Redemption Date, if any. The Trust will pay interest on the Class D Notes with respect to each Interest Period in accordance with Sections 4.02 and 4.04 of the Indenture Supplement and will pay principal, if any, due on the Class D Notes on each Distribution Date in accordance with Section 4.01, 4.03 and 4.04 of the Indenture Supplement. Such principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.

The principal of and interest on this Class D Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

Reference is made to the further provisions of this Class D Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note.

Unless the certificate of authentication hereon has been executed by or on behalf of the Indenture Trustee, by manual signature, this Class D Note shall not be entitled to any benefit under the Indenture or the Indenture Supplement referred to on the reverse hereof, or be valid for any purpose.

**THIS CLASS D NOTE IS SUBORDINATED TO THE EXTENT NECESSARY TO FUND PAYMENTS ON THE CLASS A, THE CLASS B AND THE CLASS C NOTES TO THE EXTENT SPECIFIED IN THE INDENTURE SUPPLEMENT.**

IN WITNESS WHEREOF, the Issuer has caused this Class D Note to be duly executed.

NEXTCARD CREDIT CARD MASTER NOTE TRUST,
as Issuer

By:   WILMINGTON TRUST COMPANY, not in its individual
capacity but solely as Owner Trustee under the Trust
Agreement

By: _____

Name:   Jeanne M. Oller
Title:   Senior Financial Services Officer

Dated: 01/18 , 2006

-4-

PAGE 06

INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Class D Notes described in the within-mentioned Indenture.

THE BANK OF NEW YORK,
as Indenture Trustee

By: _____
Authorized Signatory

Assistant Vice President

-5-

**[REVERSE OF NOTE]**

This Class D Note is one of a duly authorized issue of Notes of the Issuer, designated as NextCard Credit Card Master Note Trust, Series 2000-1 (the "**Series 2000-1 Notes**"), issued under a Master Indenture dated as of December 11, 2000 (the "**Master Indenture**"), between the Issuer and The Bank of New York, as indenture trustee (the "**Indenture Trustee**"), as supplemented by the Indenture Supplement dated as of December 13, 2000 (the "**Indenture Supplement**"), and representing the right to receive certain payments from the Issuer. The term "Indenture," unless the context otherwise requires, refers to the Master Indenture as supplemented by the Indenture Supplement. The Notes are subject to all of the terms of the Indenture. All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in or pursuant to the Indenture. In the event of any conflict or inconsistency between the Indenture and this Note, the Indenture shall control.

The Class A Notes, the Class B Notes and the Class C Notes will also be issued under the Indenture.

The Noteholder, by its acceptance of this Note, agrees that it will look solely to the property of the Trust allocated to the payment of this Note for payment hereunder and that the Indenture Trustee is not liable to the Noteholders for any amount payable under the Note or the Indenture or, except as expressly provided in the Indenture, subject to any liability under the Indenture.

This Note does not purport to summarize the Indenture and reference is made to the Indenture for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights, duties and immunities of the Indenture Trustee.

The Class D Note Initial Principal Balance is $17,500,000. The Class D Note Principal Balance on any date of determination will be an amount equal to (a) the Class D Note Initial Principal Balance, *minus* (b) the aggregate amount of principal payments made to the Class D Notcholders on or prior to such date.

The Expected Final Principal Payment Date is the December 2003 Distribution Date, but principal with respect to the Class D Notes may be paid earlier or later under certain circumstances described in the Indenture. If for one or more months during the Controlled Accumulation Period there are not sufficient funds to deposit into the Principal Funding Account the Controlled Deposit Amount, then to the extent that excess funds are not available on subsequent Distribution Dates with respect to the Controlled Accumulation Period to make up for such shortfalls, the final payment of principal of the Notes will occur later than the Expected Final Principal Payment Date. Payments of principal of the Notes shall be payable in accordance with the provisions of the Indenture.

Subject to the terms and conditions of the Indenture, the Transferor may, from time to time, direct the Owner Trustee, on behalf of the Trust, to issue one or more new Series of Notes.

On each Distribution Date, the Paying Agent shall distribute to each Class D Noteholder of record on the related Record Date (except for the final distribution in respect of this Class D Note) such Class D Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay interest and principal on the Class D Notes pursuant to the Indenture Supplement. Except as provided in the Indenture with respect to a final distribution, distributions to Series 2000-1 Noteholders shall be made by (i) check mailed to each Series 2000-1 Noteholder (at such Noteholder's address as it appears in the Note Register), except that with respect to any Series 2000-1 Notes registered in the name of the nominee of a Clearing Agency or with an initial principal balance of at least $5,000,000, such distribution shall be made by wire transfer of immediately available funds, *provided, that,* the Holder of any such Note shall have notified the Paying Agent at least five (5) Business Days prior to the related Record Date of the account at a bank or other entity having appropriate facilities to which such distribution should be made, and (ii) without presentation or surrender of any Series 2000-1 Note or the making of any notation thereon. Final payment of this Class D Note will be made only upon presentation and surrender of this Class D Note at the office or agency specified in the notice of final distribution delivered by the Indenture Trustee to the Series 2000-1 Noteholders in accordance with the Indenture.

On any day occurring on or after the date on which the outstanding principal balance of the Series 2000-1 Notes is reduced to 5% or less of the initial outstanding principal balance of the Series 2000-1 Notes, the Issuer shall have the option to redeem the Series 2000-1 Notes, at a purchase price equal to (i) if such day is a Distribution Date, the Reassignment Amount for such Distribution Date or (ii) if such day is not a Distribution Date, the Reassignment Amount for the Distribution Date following such day.

**This Class D Note does not represent an obligation of, or an interest in, NextBank, N.A., NextCard, Inc. or any of their Affiliates and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency or instrumentality.**

Each Noteholder, by accepting a Note, hereby covenants and agrees that it will not at any time institute against the Issuer, or join in instituting against the Issuer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.

Except as otherwise provided in the Indenture Supplement, the Class D Notes are issuable only in minimum denominations of $100,000 and integral multiples of $1,000. Subject to Section 8.06 of the Indenture Supplement, the transfer of this Class D Note shall be registered in the Note Register upon surrender of this Class D Note for registration of transfer at any office or agency maintained by the Transfer Agent and Registrar accompanied by a written instrument of transfer, in a form satisfactory to the Indenture Trustee or the Transfer Agent and Registrar, duly executed by the Class D Noteholder or such Class D Noteholder's attorney, and duly authorized in writing with such signature guaranteed, and thereupon one or more new Class D Notes in any authorized denominations of like aggregate principal amount will be issued to the designated transferee or transferees.

As provided in the Indenture and subject to certain limitations therein set forth, Class D Notes are exchangeable for new Class D Notes in any authorized denominations and of like aggregate principal amount, upon surrender of such Notes to be exchanged at the office or agency of the Transfer Agent and Registrar. No service charge may be imposed for any such exchange but the Issuer or Transfer Agent and Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

The Issuer, the Transferor, the Indenture Trustee and any agent of the Issuer, the Transferor or the Indenture Trustee shall treat the person in whose name this Class D Note is registered as the owner hereof for all purposes, and neither the Issuer, the Transferor, the Indenture Trustee nor any agent of the Issuer, the Transferor or the Indenture Trustee shall be affected by notice to the contrary.

THIS CLASS D NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

ASSIGNMENT

Social Security or other identifying number of assignee _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within certificate and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said certificate on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                                    _____ 1/

                                                         Signature Guaranteed:


                                                         _____


_____

1/  NOTE: The signature to this Assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatsoever.

-9-

NextCard Credit Card Master Note Trust

Series 2000-1 and Series 2001-1 Asset Backed Notes

**DIRECTIONS TO INDENTURE TRUSTEE AND
INDEMNIFICATION REGARDING (A) NOTICE OF EVENT OF
DEFAULT AND ACCELERATION AND (B) EXERCISE OF
REMEDIES UNDER MASTER INDENTURE SECTION 5.05**
November 9, 2006
**(this letter of instruction, the "Instruction Letter")**

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), and to the Transfer and Servicing Agreement, as amended (together with the Master Indenture, the **"Agreements"**), dated as of December 11, 2000, between NextBank, N.A. (**"NextBank"**), as transferor and servicer, and the Issuer, and acknowledged and accepted by the Indenture Trustee. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Agreements.

The parties identified in Schedule 1 to this Instruction Letter (the **"Directing Holders"**) are the beneficial owner of the Notes designated on the signature and certification page provided by or on behalf of such owners. Each Directing Holder represents and warrants to the Indenture Trustee that it is either (i) the legal and beneficial owner of such Notes or (ii) the nominee or advisor for the legal and beneficial owner of such Notes, authorized by such beneficial owner to execute and deliver this Instruction Letter to the Indenture Trustee on behalf of such legal and beneficial owner.

Pursuant to the applicable terms of the Agreements:

(i)    the Directing Holders hereby irrevocably direct the Indenture Trustee to execute the Notice of Event Default and Acceleration under Master Indenture in substantially the form annexed hereto as <u>Exhibit A</u> (updated to reflect the addressees in the carbon copies in accordance with the Indenture Trustee's records) and to deliver such notice in accordance with the terms thereof on or prior to November 14, 2006;

(ii)    from and after the delivery of the Notice of Event of Default and Acceleration, in accordance with Section 5.05(a)(ii) of the Master Indenture, the Directing Holders hereby irrevocably direct that the Indenture Trustee (a) to exercise control over the Collateral in accordance with section 8.01 of the Master Indenture, (b) to continue to hold the Collateral and collection of proceeds therefrom through (unless otherwise ordered by a court of competent jurisdiction) the date that all Notes are fully repaid in accordance with the provisions hereof without regard to the occurrence of any Final Maturity Date with respect to any Series, (c) to the extent necessary to carry out these instructions, pursuant to Section 8.03 of the Indenture, to revoke the power of the Servicer to make distributions other than as specifically authorized in this

Instruction Letter, and (d) subject to the following provisions, cause all moneys and proceeds received from the Issuer or from the Collateral to be applied in accordance with the distribution waterfall set forth in Section 5.05(b) of the Master Indenture, provided that (A) such distributions in accordance with this provision shall continue through (unless otherwise ordered by a court of competent jurisdiction) the full repayment of the Notes, in each case regardless of the occurrence of any Final Maturity Date with respect to any Series, and (B) the Indenture Trustee shall only make distributions the "FIRST" subclause in Section 5.05(b) pending the first to occur of the following (a "**Release Event**"): (1) upon receipt of authorization to distribute proceeds from the court in the New York Suit in accordance with the instructions of such court or from such other court of competent jurisdiction, (2) upon receipt of directions from the Directing Holders to distribute such proceeds in accordance with Section 5.05(b) of the Master Indenture, or (3) upon receipt of collection of the amounts needed to fully satisfy all outstanding Notes, to distribute such proceeds in accordance with Section 5.05(b) of the Indenture; provided further that, from and after the date hereof, pending the occurrence of the Release Event, that the Indenture Trustee shall hold (unless otherwise ordered by a court of competent jurisdiction), all proceeds from the Collateral in an escrow account (or if such is not practicable as reasonably determined by the Indenture Trustee, held in the Collections Account) for the benefit of the Noteholders; provided further that amounts paid to the Indenture Trustee under the "FIRST" clause of such Section 5.05(b) of the Master Indenture shall be limited as follows: (x) the current fees and expenses of the Indenture Trustee shall not exceed $600,000 (the "**Past Amounts**") with respect to pending out-of-pocket expenses relating to the action entitled The Bank of New York v. Federal Deposit Insurance Company in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH) (the "**FDIC Suit**"), (y) the reasonable fees and expenses in connection with (i) the Issuer Suit (as defined herein), (ii) the fees and expenses relating to the appeal (the "**Appeal**") of that certain Memorandum Opinion issued in the FDIC Suit on or about September 28, 2006, (iii) any expenses and costs incurred by the Indenture Trustee and its agents and professionals in defending against any Proceedings or efforts in which parties seek the disgorgement of any amounts distributed pursuant to the Directions; and (iv) other matters related to this Instruction Letter, which fees and expenses shall be subject to review as to reasonableness by the Directing Holders, and (z) to reimburse Vedder, Price, Kaufman & Kammholz, P.C. ("**Vedder Price**"), as co-counsel for the Indenture Trustee as provided herein;

(iii)    the Directing Holders hereby irrevocably direct the Indenture Trustee to take appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes in accordance with section 5.05(a)(i) and (ii) of the Master Indenture, and specifically including, but not limited to:

(a)    promptly after the delivery of the Notice of Event Default and Acceleration, but in any event on or prior to November 17, 2006, execute the Notice of Exercise of Remedies under Section 5.05(a) of the Master Indenture in substantially the form annexed hereto as Exhibit B

(updated to reflect the addressees in the carbon copies in accordance with the Indenture Trustee's records) and to deliver such notice in accordance with the terms thereof as soon as reasonably practicable after the delivery of the Notice of Default under Indenture and Notice of Acceleration; and

(b)    in accordance with sections 5.03 and 5.05(a)(i). promptly after the delivery of the Notice of Event Default and Acceleration, but in any event on or prior to November 17, 2006, commence an action in the Supreme Court of the State of New York sitting in New York County (the "**Issuer Suit**"), which action will seek (i) to obtain a judgment against the Issuer for the full unpaid principal and interest due on the accelerated Notes, (ii) to the extent deemed necessary or advisable by the Directing Holders, to obtain a declaratory judgment authorizing the payment of all amounts due to the Series C and Series D Noteholders in accordance with Indenture Section 5.05(b); and (iii) to obtain any other injunctive relief to the extent required or deemed advisable by the Directing Holders for the continuation of the existence of Issuer and the Collateral and the continuation of the distributions of Available Finance Charge Collections, Available Principal Amount Collections and other distributions from the Collateral in accordance with the Section 5.05(b) of the Master Indenture until all unpaid principal and interest have on the Notes under all Series have been repaid in full, all to be effected in accordance with the terms of the Master Indenture without regard to the occurrence of any Final Maturity Date with respect to any Series, which injunctive or declaratory actions may include, without limitation, the authority to calculate Available Principal Collections with respect to each Series using the Invested Amount for each Series as of January 31, 2002 (less any principal amounts actually repaid to the Noteholders); and

(c)    the Directing Holder hereby irrevocably direct that any amounts recovered in the Issuer Suit be distributed in accordance with the provisions of Section 5.05(b) of the Master Indenture;

(iv)    the Directing Holders hereby irrevocably direct the Indenture Trustee to pursue the appeal (the "**Appeal**") to the United States Court of Appeals for the District of Columbia of the decision of the court in the action entitled The Bank of New York v. Federal Deposit Insurance Company in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH);

(v)    the Directing Holders hereby irrevocably direct the Indenture Trustee to distribute the amounts held in the Spread Accounts in accordance with the terms of the Indenture;

(vi)    the Directing Holders hereby irrevocably direct the Indenture Trustee (a) to prosecute, pursue, settle, withdraw, dismiss and/or abandon each of the Appeal and the Issuer Suit in accordance with the directions from the Directing Holders (or, as the case may be, a purchaser or transferee from any undersigned Directing Holder, to the extent of the interest so sold or transferred in

3

accordance with the terms of this Instruction Letter) or, if no such directions are given promptly after a request is made by the Indenture Trustee, in accordance with the reasonable discretion of the Indenture Trustee, and (b) with respect to any other Direction, if the Directing Holders (or, as the case may be, a purchaser or transferee from any undersigned Directing Holder, to the extent of the interest so sold or transferred in accordance with the terms of this Instruction Letter) so instruct the Indenture Trustee in writing, to cease continuation of any such Direction provided that such instruction is in conformance with the terms of the Indenture and applicable law;

(vii) the Directing Holders hereby irrevocably direct the Indenture Trustee to retain Vedder Price, at such firm's standard hourly rates, to serve as co-counsel with Alston & Bird LLP ("**Alston & Bird**") for the above actions and Directions, provided, however, that such fees and expenses of Vedder Price shall be payable from distributions under Master Indenture Section 5.05(b) and shall be non recourse to the Indenture Trustee. As Co-Counsel, Vedder Price shall provide Alston in a timely and reasonable manner Vedder Price's analysis and recommended course of action on strategic decisions in the course of the actions and Directions and input on pleadings in the Appeal and the Issuer Suit; and Alston & Bird LLP shall provide Vedder Price with reasonable advance notice (to the extent practicable) with respect to the foregoing. Vedder Price shall not serve as counsel of record in any litigation, and Alston & Bird shall remain lead counsel to the Indenture Trustee in all litigation and in connection with all other legal aspects of issues related to the Indenture Trustee's duties as Indenture Trustee;

(viii) the Directing Holders hereby irrevocably direct the Indenture Trustee to organize a conference call with the Noteholders to review these matters with any Noteholders who wish to attend such a conference call.

The foregoing directions are referred to herein as the "**Directions.**"

Pursuant to Section 6.03(d) of the Master Indenture, each of the undersigned Directing Holders, subject to the provisions of this Instruction Letter, hereby agrees to, and shall, pay and reimburse any and all (and with respect to each of the undersigned other than RMK Advantage Income Fund, which obligations shall be on a joint and several basis, but, with respect to RMK Advantage Income Fund, it shall only be liable for its pro rata share of such obligations (based upon outstanding Notes)), the Indenture Trustee and each director, officer, employee and agent of the Indenture Trustee (the Indenture Trustee and each such other person being an "**Indemnified Person**") on demand for, and to indemnify, defend and hold harmless each such Indemnified Person from and against, any and all of the following losses, liabilities, judgments, claims, causes of action, reasonable out-of-pocket costs and expenses (including reasonable fees and disbursements of counsel, employees, agents and persons not regularly in the Indenture Trustee's employ) (collectively referred to herein as "**Losses**") incurred or suffered by an Indemnified Person in any way, directly or indirectly, arising out of, related to, or connected with, the compliance by any Indemnified Person with the terms of this Instruction Letter and the Directions set forth herein or the taking or not taking of action in accordance with this Instruction Letter and the Directions set forth herein:

(i)      all costs and expenses associated with the Directions;

(ii)      all costs and expenses incurred by the Indenture Trustee and its agents and professionals in defending against any Proceedings or efforts in which parties seek the disgorgement of any amounts distributed pursuant to the Directions;

(iii)      any claim, cause of action, litigation, proceeding, action or investigation (whether civil or administrative, but excluding criminal, and whether sounding in tort, contract or otherwise and whether or not such Indemnified Person is a party to such litigation, proceeding, action or investigation) in any way, directly or indirectly, arising out of, related to, or connected with, the compliance by any Indemnified Person with the terms of this Instruction Letter and the Directions set forth herein or the taking or not taking of action by any Indemnified Person in accordance with this Instruction Letter and the Directions set forth herein; and

(iv)      Losses resulting from, arising out of, or in any manner connected with, directly or indirectly, (a) a determination that any Indemnified Person breached any duty as a result of relying upon and complying with, and taking or not taking of any action in accordance with, this Instruction Letter and the Directions set forth herein, and (b) the enforcement of this Instruction Letter;

provided, however, that the foregoing indemnity (the "**Indemnity**") shall not be applicable to any Losses suffered or incurred by an Indemnified Person as a result of such Indemnified Person's gross negligence or willful misconduct as determined by a judgment of a court that is binding on such Indemnified Person, is final and is not subject to review on appeal.  Amounts payable by the Directing Holder with respect to the Indemnity shall be invoiced (with supporting detail) to the Directing Holder on a monthly basis, and shall be payable by the Directing Holder within thirty (30) days of such Directing Holder's receipt of such invoice.  Amounts not paid by the Directing Holder when due shall accrue interest at the prime rate and such interest shall be payable on demand to the Indenture Trustee.

The Directing Holders hereby acknowledge and agree that, notwithstanding the Directions, the Indenture Trustee may discontinue pursuing the exercise of remedies under Section 5.05 of the Master Indenture or taking any other actions to carry out the Directions upon 30 days notice to the Directing Holder if it is anticipated that the distributions to the Indenture Trustee under Section 5.05(b) will not be sufficient to cover the fees and expenses (including the internal costs and expenses of the Indenture Trustee) associated with these Instructions and the Indenture Trustee has not received reasonable assurances that additional funds will be made available to cover such fees and expenses.  It is further understood and agreed that (a) the Indenture Trustee's professionals shall render invoices for their services at least once every 60 days; (b) the reasonable fees and expenses of the Indenture Trustee's professionals shall be paid within thirty (30) days after the presentation of an invoice for such reasonable fees and expenses to the Indenture Trustee and the Directing Holders; and (c) the Indenture Trustee shall have the right to discontinue pursuing any of the Appeal, the Issuer Suit or any of the other Directions if any such fees and expenses have not been

paid within such (30) days. The Indenture Trustee shall have no obligation to advance any funds to pay any such expenses. Notwithstanding any other provision of this Instruction Letter, the rights and obligations of the Indenture Trustee under this Instruction Letter shall be subject to the standards and provisions set forth in Section 6.03 of the Master Indenture as though such Section were set forth in and referred to this Instruction Letter.

The Indenture Trustee and any legal counsel engaged to carry out these Instructions ("**Legal Counsel**") shall cooperate and coordinate with the Directing Holders in connection with such action and all related matters. The Directing Holder shall have full, complete and timely access to all information developed or discovered in connection with any of the actions taken pursuant to this Instruction Letter and the Directions set forth herein, including, without limitation, the authority to communicate and discuss with any Legal Counsel any issues or matters relating to such actions or proceedings it may so desire from time to time. The Indenture Trustee agrees to direct each Legal Counsel to fully disclose and discuss, provide information with respect to and answer any questions regarding such issues and matters as the Directing Holder may request from time to time, and such parties shall be deemed covered by a joint prosecution and defense privilege with respect to any suits, actions or appeals commenced or relating to these Instructions.

This Instruction Letter and the representations and warranties contained herein shall be binding upon the Indenture Trustee, the Directing Holders and their successors and assigns. This Instruction Letter shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. In addition, the Directing Holders hereby agree that it shall not sell, transfer, convey, assign or exchange its Notes, unless such purchaser or transferee agrees, in writing, to be bound by this Instruction Letter (including the indemnification provisions hereunder). Unless consented to in writing by the Indenture Trustee, which consent may not be unreasonably withheld, no such transfer will release the Directing Holders from its obligation to provide the Indemnity provided hereunder.

Except as otherwise provided herein, no termination, amendment, modification or waiver of this Instruction Letter (including without limitation the Indemnity provided hereunder) shall be given effect without the prior written consent of the Directing Holders and the Indenture Trustee.

The Directing Holders hereby represent and warrant that this Instruction Letter (including without limitation the Indemnity provided hereunder) has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency or other similar laws affecting creditors' rights generally and (ii) general principles of equity; and hereby waives any defenses based upon the invalidity of such representations and warranties.

The Indemnity provided herein shall be in addition to any other remedies, relief or indemnification available to any Indemnified Person. The rights and remedies conferred hereunder shall be cumulative and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies or the subsequent exercise of such right or remedy.

6

The terms of this Instruction Letter (including without limitation the Indemnity provided hereunder) will be governed by and construed in accordance with the laws of the State of New York (without giving effect to any law that would result in the application of the laws of any other jurisdiction). All actions and proceedings relating to or arising from, directly or indirectly, this Instruction Letter (including without limitation the Indemnity provided hereunder) may be brought by any Indemnified Person in courts located within the State of New York and the Directing Holders and the Indenture Trustee hereby submit to personal jurisdiction of such courts for such actions or proceedings.

Notwithstanding anything to the contrary in this Instruction Letter or the Directions, the Directing Holders' indemnification provided hereunder shall not be responsible for or cover the Past Amounts. Further, notwithstanding anything to the contrary in this Instruction Letter or the Directions, nothing herein affects the rights (if any) or obligations (if any) of any person or entity with respect to the payment or entitlement to payment for the Past Amounts.

The certification attached hereto and the signature pages to this Instruction Letter may be executed by the Indenture Trustee and the Directing Holders, as the case may be, in separate counterparts and the Indenture Trustee is hereby instructed to accept the signature pages as such counterparts. Facsimile signatures and signature pages provided in the form of a "pdf" or similar imaged document transmitted by electronic mail shall be deemed original signatures for all purposes hereunder.

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __Millennium Partners, L.P.__

(Print Name of Authorized Signature): _Fred Stone_

Title: ~~Secretary~~ _Senior Managing Director_

Signature: _____

Address: _666 5th Avenue, 8th Floor, New York, New York 10103_

Phone: _(212) 841-4100_

FAX: _(212) 841-4141_

E-mail: _fstone@mlp.com_

Class of Securities: _NextCard 2001-1A C_

CUSIP No.: _65334UAG8_

Total Current Principal Amount of Securities Owned as of the Date Hereof: _$19,240,000_

Total Original Principal Amount of Securities Owned as of the Date Hereof: _$40,000,000_

DTC Participant Name: _____

DTC Participant No.: _2474_

Date: _November 9, 2006_

14

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:   Millennium Partners, L.P.

(Print Name of Authorized Signature): Fred Stone

Title: ~~Secretary~~  Senior Managing Director

Signature: _____

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2000-1A C

CUSIP No.:  65334UAC7

Total Current Principal Amount of Securities Owned as of the Date Hereof: $16,243,500

Total Original Principal Amount of Securities Owned as of the Date Hereof: $24,500,000

DTC Participant Name: _____

DTC Participant No.:  2474

Date:  November 9, 2006

14

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  First Millennium, Inc.

(Print Name of Authorized Signature):  Fred Stone

Title:  ~~Secretary~~  Senior Managing Director

Signature:

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2000-1A D

CUSIP No.:  65334UAD5

Total Current Principal Amount of Securities Owned as of the Date Hereof: $6,000,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $6,000,000

DTC Participant Name:  N/A

DTC Participant No.:  N/A

Date:  November 9, 2006

*14*

**SCHEDULE 1**

**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: First Millennium, Inc.

(Print Name of Authorized Signature): Fred Stone

Title: Secretary / Senior Managing Director

Signature:

Address: 666 5th Avenue, 8th Floor, New York, New York 10103

Phone: (212) 841-4100

FAX: (212) 841-4141

E-mail: fstone@mlp.com

Class of Securities: NextCard 2001-1A D

CUSIP No.: 65334UAH6

Total Current Principal Amount of Securities Owned as of the Date Hereof: $13,000,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $13,000,000

DTC Participant Name: N/A

DTC Participant No.: N/A

Date: November 9, 2006

**SCHEDULE 1 (CONTINUED)**

## B. EXECUTION BY NOMINEE OR ADVISOR

The undersigned hereby represents and warrants that it is the nominee or advisor for the beneficial owner indicated below of NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes, and that the beneficial owner has granted to the undersigned the power and authority to deliver this Certification to the Indenture Trustee on behalf of such beneficial owner.

Name of Beneficial Owner: RMK Advantage Income Fund
Name of Nominee or Advisor: Daymaster & Co.
(Print Name of Authorized Signature): Jim Kelsoe
Title: Managing Director
Signature:
Address: 1100 Ridgeway Loop Road, Suite 510, Memphis, TN 38120
Phone: 901-374-7814
FAX: 901-374-7827
E-mail: jim.kelsoe@morgankeegan.com
Class of Securities: Series 2000-1A / Class C
CUSIP No.: 65334UC7
Total Current Principal Amount of Securities with Respect to Which Certification is
   Made as of the Date Hereof: $6,640,464.00
Total Original Principal Amount of Securities with Respect to Which Certification is
   Made as of the Date Hereof: $10,000,000.00
DTC Participant Name: State Street Bank & Trust
DTC Participant No.: 997
Date: November 4, 2006

# EXHIBIT A

**Notice of Event Default and Acceleration under Master Indenture**

November __, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

Re:    NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1
       Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER
       INDENTURE AND NOTICE OF ACCELERATION FOR BOTH
       SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (the **"Noteholders"**) arising from the secured loans made to the Issuer under the Master Indenture, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes.

The Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to any Series, the Indenture Trustee may pursuant to section 5.03 of the Master Indenture, by delivery of written notice to the Issuer, declare all of the Notes with respect to such Series to be immediately due and payable, whereupon the unpaid principal amount of such Notes, together with accrued but unpaid interest thereon through the date of acceleration and all other amounts due under the Master Indenture and the Notes shall immediately become due and payable.

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes. NextBank, N.A.'s entry into receivership on February 7, 2002 constituted a Trust Redemption Event which triggered the commencement of the Early Amortization Period, whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1

Notes and Series 2001-1 Notes. Contrary to its obligations under the Master Indenture and the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes, Issuer failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. The Issuer's failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $56,486,500.00 |
| | |
| TOTAL NOTES: | $112,109,000.00 |

The Indenture Trustee, pursuant to a directive of the Noteholders, hereby declares all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable. The Indenture Trustee hereby demands that the Issuer immediately pay in full the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholder expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture
    Trustee


By  _____
    Name:
    Title:

cc:    The Administrator
        [Does trustee have this address?]
     The Servicer
        [Does trustee have this address?]
     FDIC
     [Does trustee have this address?]
     Scott H. Christensen, Esq.
     H. Stephen Harris, Esq.
     Michael J. Edelman, Esq.

# EXHIBIT B

**Notice of Exercise of Remedies**

November __, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

Re:     NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset
        Backed Notes - **NOTIFICATION OF EXERCISE OF REMEDIES UNDER
        MASTER INDENTURE SECTIONS 5.04 AND 5.05(a)**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the "**Master Indenture**"), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the "**Issuer**") and The Bank of New York, as indenture trustee (the "**Indenture Trustee**"), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (collectively, the "**Noteholders**") arising from the secured loans made to the Issuer under the Master Indenture and the Indenture Supplements, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes. Pursuant to that certain Notice of Default under Master Indenture and Notice of Acceleration, dated November 14, 2006, the Indenture Trustee has accelerated all obligations due under the Series 2000-1 Notes and Series 2001-1 Notes, whereupon the following principal amounts of Notes became due and payable:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| | |
| TOTAL OUTSTANDING PRINCIPAL AMOUNT OF NOTES: | **$112,109,000.00** |

Sections 5.04 and 5.05(a) of the Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to the Notes, and the Notes have been accelerated pursuant to Section 5.03 of the Master Indenture, the Indenture Trustee may take any appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Noteholders.

Notice is hereby given that the Indenture Trustee (a) is commencing a Proceeding against the Issuer before the Supreme Court of the State of New York sitting in New York County with respect to the Series 2000-1 Notes and Series 2001-1 Notes seeking to obtain a judgment against the issuer for the unpaid principal and interest on such Notes issued by the Issuer and for related relief and (b) is seeking to enforce remedies against the Collateral.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture Trustee

By _____
Name:
Title:

cc:     The Administrator
            [Does trustee have this address?]
        The Servicer
            [Does trustee have this address?]
        FDIC
            [Does trustee have this address if different from the Administrator?]
        Scott H. Christensen, Esq.
        H. Stephen Harris, Esq.
        Michael J. Edelman, Esq.

November 16, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

Re:    NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER INDENTURE AND NOTICE OF ACCELERATION FOR BOTH SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (the "Noteholders") arising from the secured loans made to the Issuer under the Master Indenture, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes. The undersigned Noteholders hold a majority of the Outstanding Amount of each of the Series 2000-1 Notes and the Series 2001-1 Notes.

The Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to any Series, Noteholders holding a majority of the Outstanding Amount of each Series may pursuant to section 5.03 of the Master Indenture, by delivery of written notice to the Issuer and the Indenture Trustee, declare all of the Notes with respect to such Series to be immediately due and payable, whereupon the unpaid principal amount of such Notes, together with accrued but unpaid interest thereon through the date of acceleration and all other amounts due under the Master Indenture and the Notes shall immediately become due and payable.

NYLIB5 770952.1

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes. Pursuant to the express terms of each of the Notes, "the entire principal amount of this Note shall be due and payable on the earlier of the [Final] Maturity Date and the Redemption Date, if any." NextBank N.A.'s entry into receivership on February 7, 2002 is a Redemption Date under the terms of the Notes. Accordingly, the Issuer is liable under the Notes for the full outstanding unpaid principal on the Notes, which the Issuer has failed to repay. The Issuer's failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay the principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---:|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $56,486,500.00 |
| | |
| TOTAL NOTES: | $112,109,000.00 |

The Undersigned Noteholders hereby declare all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable. The Undersigned Noteholders hereby demand that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the

2

Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

BY THE NOTEHOLDERS ON THE
ATTACHED SIGNATURE PAGES

cc:    **Owner Trustee**
Mr. Erwin Soriano
Wilmington Trust Co.
Rodney Square North
1100 North Market St.
Wilmington, DE  19890
(via registered mail and email)

**Servicer**
Ms. Karlyn Knieriem
Finance Officer
The First National Bank of Omaha
1620 Dodge Street
Stop 3396
Omaha, Nebraska, 68197
(via registered mail and email)

Mr. Matt Tunink
The First National Bank of Omaha
Servicer of the NextCard Master Note Trust
1620 Dodge Street
Stop 3395
Omaha, Nebraska  68197
(via registered mail and email)

**Administrator**
NextBank, N.A.
NextCard Credit Card Master Note Trust
595 Market Street, Suite 1800
San Francisco, California 94105
(via registered mail)

3

**Counsel to the FDIC**
Scott H. Christensen, Esq.
Hughes,Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC  20006-2401
(via registered mail and email)

**Federal Deposit Insurance Corporation**
Federal Deposit Insurance Corporation
c/o Tom M. Reeves, Esq.
Counsel, Legal Division
550 17th Street; NW
Room H-10710
Washington, DC 20429
(via registered mail and email)

**The Indenture Trustee**
Ms. Loretta Lundberg
Vice President-Default Group, Corporate Trust Administration
The Bank of New York
21W, Corporate Trust Administration
101 Barclay Street
New York, NY 10007-2119
(via registered mail and email)

**Counsel to the Indenture Trustee,**
**The Bank of New York**
John L. Douglas, Esq.
H. Stephen Harris, Jr. Esq.
Alston & Bird LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3449

**Counsel for Millennium Partners LLP**
Michael J. Edelman, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.

4

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  Millennium Partners, L.P.

(Print Name of Authorized Signature):  Fred Stone

Title:  Senior Managing Director

Signature:  _____

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2001-1A C

CUSIP No.:  65334UAG8

Total Current Principal Amount of Securities Owned as of the Date Hereof: $19,240,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $40,000,000

DTC Participant Name:  _____

DTC Participant No.:  2474

Date:  November 9, 2006

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __Millennium Partners, L.P.__
(Print Name of Authorized Signature): ___Fred Stone___
Title: ___Senior Managing Director___
Signature: ___
Address: _666 5th Avenue, 8th Floor, New York, New York 10103_
Phone: _(212) 841-4100_
FAX: _(212) 841-4141_
E-mail: _fstone@mlp.com_
Class of Securities: _NextCard 2000-1A C_
CUSIP No.: _65334UAC7_
Total Current Principal Amount of Securities Owned as of the Date Hereof: _$16,243,500_
Total Original Principal Amount of Securities Owned as of the Date Hereof: _$24,500,000_
DTC Participant Name: ___
DTC Participant No.: _2474_
Date: _November 9, 2006_

16

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  First Millennium, Inc.

(Print Name of Authorized Signature):    Fred Stone

Title:    Secretary

Signature:

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2000-1A D

CUSIP No.:  65334UAD5

Total Current Principal Amount of Securities Owned as of the Date Hereof: $6,000,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $6,000,000

DTC Participant Name:  N/A

DTC Participant No.:  N/A

Date:  November 9, 2006

**SIGNATURE PAGES FOR NOTEHOLDERS FOR THIS NOTICE OF DEFAULT AND ACCELERATION OF THE NOTES:**

**EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __First Millennium, Inc.__

(Print Name of Authorized Signature): __Fred Stone__

Title: __Secretary__

Signature: _____

Address: __666 5th Avenue, 8th Floor, New York, New York 10103__

Phone: __(212) 841-4100__

FAX: __(212) 841-4141__

E-mail: __fstone@mlp.com__

Class of Securities: __NextCard 2001-1A D__

CUSIP No.: __65334UAH6__

Total Current Principal Amount of Securities Owned as of the Date Hereof: __$13,000,000__

Total Original Principal Amount of Securities Owned as of the Date Hereof: __$13,000,000__

DTC Participant Name: __N/A__

DTC Participant No.: __N/A__

Date: __November 8, 2006__

## EXECUTION BY NOMINEE OR ADVISOR

The undersigned hereby represents and warrants that it is the nominee or advisor for the beneficial owner indicated below of NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes, and that the beneficial owner has granted to the undersigned the power and authority to deliver this Certification to the Indenture Trustee on behalf of such beneficial owner.

Name of Beneficial Owner:  RMK Advantage Income Fund

Name of Nominee or Advisor:  Daymaster & Co.

(Print Name of Authorized Signature):  Jim Kelsoe

Title:  Managing Director

Signature:

Class of Securities:  Series 2000-1A / Class C

CUSIP No.:  65334UC7

Total Current Principal Amount of Securities with Respect to Which Certification is
    Made as of the Date Hereof:  $6,640,464.00

Total Original Principal Amount of Securities with Respect to Which Certification is
    Made as of the Date Hereof:  $10,000,000

DTC Participant Name:

DTC Participant No.:

Date:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

            Interpleader Plaintiff,

        -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

            Interpleader Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Index No. 650234/06

**NOTICE OF MOTION
FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT
REQUESTED**

SIRS:

      PLEASE TAKE NOTICE that upon the affidavit of Philip Schockling sworn to

November 20, 2006, the exhibits annexed thereto, the accompanying memorandum of law, and

all pleadings and prior proceedings heretofore had herein, Interpleader Defendants First

Millennium, Inc. and Millennium Partners, L.P. will move this Court in Room 130 of the New

York County Courthouse, 60 Centre Street, New York, New York, on December 6, 2006, at 9:30

a.m. or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3212 granting

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. summary

judgment in their favor and against all adverse interpleader defendants and ordering inerpleader

plaintiff to distribute all interpleader assets to said interpleader defendants and other Noteholders

in accordance with the terms of the Indenture.

      Pursuant to CPLR 2214, answering affidavits, if any, are required to be served upon the

undersigned by November 29, 2006.

Dated: New York, New York
       November 20, 2006

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____

   Michael J. Edelman
   Michael G. Davies
   805 Third Avenue
   New York, New York  10022-2203
   Tel:  (212) 407-7700

*Attorneys for Interpleader Defendants*
*FIRST MILLENNIUM, INC. AND*
*MILLENNIUM PARTNERS, L.P.*

To:

Alston & Bird LLP
Attorneys for Interpleader Plaintiff The Bank of New York

Defendant RMK Advantage Fund

Defendant Federal Deposit Insurance Corporation

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK



------------------------------------------------

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                    Interpleader Plaintiff,

              -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                    Interpleader Defendants.

------------------------------------------------

Index No. 650234/06

**MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO CPLR 3212**
**FOR SUMMARY JUDGMENT OF INTERPLEADER DEFENDANTS**
**FIRST MILLENNIUM, INC. AND MILLENNIUM PARTNERS, L.P.**

                       VEDDER, PRICE, KAUFMAN
                        & KAMMHOLZ, P.C.
                       805 Third Avenue
                       New York, New York  10022
                       Tel:  (212) 407-7700
                       Fax: (212) 407-7799

                       *Attorneys for Interpleader Defendants First*
                       *Millennium, Inc. and Millennium Partners, L.P.*

# TABLE OF CONTENTS

<div align="right">**Page**</div>

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF THE CASE ...................................................................................1

ARGUMENT:  MILLENNIUM IS ENTITLED TO SUMMARY JUDGMENT ON ITS
    CLAIMS .................................................................................................................9

    1.  Standard for Summary Judgment .................................................................9

    2.  Promissory Notes Issued by Issuer are Due to Millennium and Other
        Noteholders..............................................................................................9

    3.  Millennium and Other Noteholders are Entitled to the Interpleader
        Assets......................................................................................................10

CONCLUSION ...........................................................................................................12

<div align="center">i</div>

## TABLE OF AUTHORITIES

## CASES

Di Sabato v. Soffes, 9 A.D.2d 297, 193 N.Y.S.2d 184 (1st Dept. 1959) ........................................9

Drug Guild Distributors v. 3-9 Drugs Inc., 277 A.D.2d 197, 715 N.Y.S.2d 442
   (2nd Dept. 2000)........................................................................................................................9

Marine Midland Bank v. Scallen, 161 A.D.2d 103, 554 N.Y. 541 (1st Dept. 1990) ...................10

Moezinia v. Baroukhian, 247 A.D.2d 452 (2nd Dept. 1998) ........................................................10

Neuhaus v. McGovern, 293 A.D.2d 727, 741 N.Y.S.2d 436 (2nd Dept. 2002)...........................10

Thomson v. Rubenstein, 31 A.D.3d 434, 818 N.Y.S.2d 516 (2nd Dept. 2006)...........................10

## PRELIMINARY STATEMENT

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. (together, "Millennium") by their attorneys, Vedder, Price, Kaufman & Kammholz, P.C., respectfully submit this memorandum of law in support of their Motion for Summary Judgment in favor of Millennium, filed contemporaneously herewith in the instant action.

## STATEMENT OF THE CASE

The material facts are uncontested. The dispute regarding the entitlement of the interpleader assets concerns the application of the facts to the financing documents. The relevant, undisputed facts are set out in the affidavit of Philip Schockling, sworn to November 20, 2006 (the "Affidavit"), submitted in support of the motion.[1] Millennium respectfully refers the Court to the Affidavit and to the exhibits attached thereto for a full recitation of the relevant facts and circumstances.

### The Securitization

The subject matter of this action consists of a securitized secured financing in which a special purpose entity – NextCard Credit Card Master Note Trust (the "Issuer") – was established to own credit card receivables (the "Receivables"). This special purpose entity in turn borrowed money from noteholders ("Noteholders") pursuant to the terms of a Master Indenture, dated as of December 11, 2000 (the "Master Indenture"), between Issuer and the Indenture Trustee, as supplemented from time to time (as supplemented, the "Indenture"), and as evidenced by notes issued by the Issuer (the "Notes"). Copies of the Master Indenture, the form of indenture supplement and the Notes are annexed to the Affidavit, respectively, as Exhibits A, B and C. The obligations owed by Issuer under the Notes and the Indenture were collateralized

---

[1] References to Exhibits refer to the Exhibits annexed to the Affidavit. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Affidavit.

by such Receivables (the "Collateral").  The interpleader plaintiff holds the Receivables and the Collateral as security for the Noteholders in accordance with the terms of the Indenture.

All of the relevant agreements are governed by New York law and the Notes were made expressly subject to Section 5-1401 of the General Obligations Law.[2]

## The Outstanding Obligations under the Notes and the Indenture

Pursuant to the express terms of the Notes, the Issuer agreed to repay the "entire unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the Redemption Date, if any" (as such terms are defined in the Master Indenture) and to pay interest due thereon pursuant to the terms thereof.  *See* Exhibit C p. 3.  The Notes became due by their own terms upon the entry into receivership of NextBank, N.A. on February 7, 2002.  *See* Affidavit, at ¶ 12-13.  (As a separate, independent entity, the Issuer is not the subject of the FDIC NextBank receivership.  *See* Affidavit, at ¶ 15.)

As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| | |
| **TOTAL NOTES:** | **$112,109,000.00** |

*See* Affidavit at ¶ 8  Millennium currently holds unpaid principal in the following Notes:

(a) Series 2000-1 Class C Notes:  $16,243,500.00; (b) Series 2000-1 Class D Notes:

---

[2] *See, e.g.*, Exhibit A at 68 (Master Indenture); Exhibit B at 40 (Indenture Supplement); Exhibit C at 8-9 of each of the Notes.

$6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes: $13,000,000.00. Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes. *See* Affidavit at ¶ 9.

As a Redemption Event, NextBank's entry into receivership also caused the commencement of the Early Amortization Period (as defined in the Indenture), whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes. *See* Affidavit at ¶ 16.

## The Issuer's Defaults

Contrary to its obligations under both the Notes and the Master Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. *See* Affidavit, at ¶ 17. The Issuer's failure to honor its contractual repayment obligations caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. *Id.* Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default"). *Id.*

At the time that interpleader plaintiff commenced this action, the Issuer was in default of its obligations to Millennium, the other Noteholders and the Indenture Trustee on the Notes and the Indenture. *See* Affidavit, at ¶¶ 19-21.

3

**Acceleration of Notes and All Obligations Now Due and Payable**

Section 5.03 of the Master Indenture states that if any of several listed Events of Default were to occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all of the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer . . ., and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

*See* Exhibit A, § 5.03.

Due to the Issuer's failure to repay its obligations when due, Millennium and RMK Advantage Income Fund, who together constituted a majority of the outstanding Notes (the "Majority Noteholders"), directed that the Indenture Trustee (a) declare an event of default and accelerate all obligations on the Notes and (b) exercise remedies against the Collateral and the Receivables. *See* Affidavit, at ¶ 19  In accordance with such instruction, by letter dated November 14, 2006, the Indenture Trustee issued a notice of event of default and accelerated all obligations under the Notes and the Indenture. *Id*. In addition, on November 16, 2006, prior to the initiation of this suit, the Majority Noteholders also issued a notice of event of default and accelerated all obligations under the Notes and the Indenture. notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable." *Id*. As a result of these demands, the full $112,109,000.00 of unpaid principal on all Notes, plus all accrued and unpaid interest thereon, plus all other amounts due thereon are now due. *See* Affidavit, at ¶ 20.

4

Despite these demands, the Issuer has failed to repay in full the Notes. *See* Affidavit, at ¶ 21.

**Entitlement of Noteholders to All Receivables and Collateral under the Indenture**

The Indenture provides the Indenture Trustee with numerous powers to take control of the collections of the Receivables and Collateral after an event of default and acceleration. *See* Affidavit, at ¶ 34. Master Indenture Section 5.06 expressly grants the Indenture Trustee with authority to take action to "maintain possession" and control of the Collateral in an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ." *Id.* Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture.

*See* Exhibit A, § 8.01. These collections include all proceeds of the Receivables, all of which are required to be distributed in accordance with Section 5.05(b). *See* Affidavit, at ¶ 34.

In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables. *See* Exhibit A, § 8.01. In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series." Finally, Master Indenture Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture. In fact, the Majority Noteholders repeatedly specifically directed the Indenture Trustee to take all

NEWYORK/#170758.2

such actions in accordance with their rights under Section 5.12 of the Indenture. *See* Affidavit, at ¶ 35.

## The Interpleader Assets

Prior to starting the Interpleader, the interpleader plaintiff started exercising remedies to exercise control over the Receivables and the Collateral as directed by the Majority Noteholders. Shortly thereafter, the FDIC, in its capacity as the receiver of NextBank, threatened the Indenture Trustee with damages for starting to exercise such remedies. The Indenture Trustee responded by informing Millennium that the Indenture Trustee was contemplating rescinding its enforcement actions, whereupon the Directing Noteholders demanded that the Indenture Trustee continue exercising such remedies and stated that the Indenture Trustee would be held responsible for any resulting damages to the Noteholders. Immediately thereafter, on November 16, 2006, the interpleader plaintiff commenced this interpleader action. *See* Affidavit, at ¶ 23.

The assets that are the subject of this interpleader action constitute (a) amounts held in the so-called "Spread Accounts" (as defined in the Indenture) and (b) the Receivables and proceeds of the Receivables. *See* Affidavit, at ¶ 24.

The Indenture Trustee currently holds approximately $22 million in the Spread Accounts. *See* Affidavit, at ¶ 26. Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Accounts and the proceeds thereof. *See* Exhibit B, § 4.11(a) (Indenture Supplement). Following the occurrence of an event of default and acceleration of the Notes, the Spread Accounts are required to be liquidated, with the funds distributed in accordance with the distribution scheme established under Section 5.02 of the Indenture Supplements for payment to the C Holders:

6

> [A]n amount equal to the balance on deposit [in the Spread Accounts shall
> be deposited] into the Collection Account for distribution to the Class C
> Noteholders, the Class D Noteholders, the Class A Noteholders and the
> Class B Noteholders, in that order of priority, in accordance with Section
> 5.02 [of the Indenture Supplements], to fund any shortfalls in amounts
> owed to such Noteholders.

*See* Exhibit B, § 4.11(e).

Section 5.02 of the Indenture Supplements, in turn, in relevant part, directs that

distributions of the Spread Accounts be payable for interest and principal due to the Class C

Noteholders of each Series.

As the principal and interest amounts owed to Class C Noteholders under each series of

Notes is substantially in excess of the amounts on deposit in the Spread Accounts for each series

of Notes, the Class C Noteholders, including Millennium, are entitled to the full amounts now

held by the Indenture Trustee in the Spread Accounts. *See* Affidavit, at 31.

With respect to the Receivables, the Indenture provides the Indenture Trustee with

numerous powers to take control of the collections of the Receivables and Collateral after an

event of default and acceleration. Master Indenture Section 5.06 expressly grants the Indenture

Trustee with authority may take action to "maintain possession" and control of the Collateral in

an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ."

Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall
> receive and collect, directly and without intervention or assistance of
> any . . . intermediary, all money and other property payable to or
> receivable by the Indenture Trustee pursuant to [the] Indenture. The
> Indenture Trustee shall hold all such money and property received by it in
> trust for the Noteholders and shall apply it as provided in this Indenture.

7

*See* Exhibit A, § 8.01. These collections include all proceeds of the Receivables. *See* Affidavit, at ¶ 34. In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables. *See* Exhibit A, § 8.01.

In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series." Finally, as set forth above, Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture. In fact, the Majority Noteholders repeatedly specifically directed the Indenture Trustee to take all such actions in accordance with their rights under Section 5.12 of the Indenture. *See* Affidavit, at ¶ 35.

Under the express terms of the Master Indenture, "all money and property [collected by the Indenture Trustee] pursuant to [] Article V[3] following acceleration of the maturities of the Notes . . . shall [be paid] in the following order": (a) first, to the Indenture Trustee for fees and expenses, (b) second, to holders of Notes (in order of priority) "for amounts due and unpaid [on such] Notes for interest and principal, ratably, and (c) last, to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement." *See* Exhibit A, § 5.05(b).

Accordingly, pursuant to the express provisions of the Indenture, after payment of the Indenture Trustee's fees, the Indenture requires that all proceeds of Receivables collections be made to the Noteholders prior to such amounts being distributed to any other party. *See* Affidavit, at ¶ 36.

---

[3]    Article V of the Master Indenture includes (a) Redemption Events (§ 5.01), Events of Default (§ 5.02), acceleration (§ 5.03), enforcement actions (§ 5.04), remedies (§ 5.05), preservation of collateral (§ 5.06), unconditional rights of Noteholders to receive principal and interest, § 5.12 (Noteholders' right to direct Indenture Trustee to take remedies, rights and powers under Indenture).

In accordance with these rights under the Indenture, after the event of default and acceleration issued by both the Indenture Trustee and the Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the distribution scheme provided in Section 5.05(b) of the Master Indenture. Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes. *Id.*

## ARGUMENT

## MILLENNIUM IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS

1. Standard for Summary Judgment

CPLR 3212 provides that where there exists no genuine issue of material fact, the court shall grant summary judgment for the moving party. CPLR 3212(b). To defeat a summary judgment motion, a defendant must "establish by affidavits or other evidence [that it] has a *bona fide* defense to the action." *Di Sabato v. Soffes*, 9 A.D.2d 297, 300, 193 N.Y.S.2d 184 (1st Dept. 1959); *Drug Guild Distributors v. 3-9 Drugs Inc.*, 277 A.D.2d 197, 715 N.Y.S.2d 442 (2nd Dept. 2000) (where movant shows *prima facie* entitlement to summary judgment, burden shifts to opposing party to produce evidence in admissible form to establish existence of a material issue of fact).

2. Promissory Notes Issued by Issuer are Due to Millennium and Other Noteholders

Under New York law, proof of execution of a promissory note and subsequent failure to make required payment thereon establish a *prima facie* case for recovery on the note. *See*

9

*Thomson v. Rubenstein*, 31 A.D.3d 434, 818 N.Y.S.2d 516 (2nd Dept. 2006) (*citing to Neuhaus v. McGovern*, 293 A.D.2d 727, 728, 741 N.Y.S.2d 436 (2nd Dept. 2002); *Moezinia v. Baroukhian*, 247 A.D.2d 452, 453 (2nd Dept. 1998)); *Marine Midland Bank v. Scallen*, 161 A.D.2d 103, 554 N.Y. 541 (1st Dept. 1990) (same).

As is set forth in the accompanying affidavit, Millennium and the other Noteholders are the holders of valid and binding promissory notes pursuant to whose terms the Issuer has been, and continues to be, in default. Issuer owes all amounts due under the Notes and the Indenture. Accordingly, Millennium has established a *prima facie* case for recovery on the Notes. Pursuant to the express terms of the Indenture, the Noteholders are owed in excess of $112 million. Millennium itself is owed a face principal amount of $54,483,500.00, along with additional amounts for interest and other obligations under the Notes and the Indenture. *See* Affidavit, at ¶ 9.

3.    Millennium and Other Noteholders are Entitled to the Interpleader Assets

Entitlement to the interpleader assets is governed by the terms of the Indenture and the Notes. In accordance with their express rights, the Noteholders directed that (a) the Notes and obligations under the Indenture be accelerated, (b) the Indenture Trustee disburse the proceeds of the Spread Accounts to the Noteholders holding Class C notes, and (c) the Indenture Trustee take control over and collect all Receivables and the proceeds of such Receivables. *See* Affidavit at ¶ 19. These are the assets that are the subject to this interpleader action. *See* Affidavit, at ¶ 24.

Pursuant to the express terms of the Indenture, the Indenture Trustee is entitled to take control over the Receivables and all collections of the proceeds of the Receivables. *See* Affidavit at ¶ 34. Further, the Noteholders specifically directed the Indenture Trustee to exercise its rights and powers under the Indenture pursuant to Section 5.12 of the Master Indenture. Affidavit at ¶ 35. After the event of default and acceleration issued by both the Indenture Trustee and the

10

Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the distribution scheme provided in Section 5.05(b) of the Master Indenture, which sums are required to be distributed to the Noteholders under the terms of Section 5.05(b) of the Indenture.

In sum, it is undisputed that Millennium and the other Noteholders lent moneys to the Issuer and the Issuer has failed to repay in excess of $112 million in face principal amount of such loans.  It is also undisputed that the Noteholders have the right to direct that the Indenture Trustee take control over all Receivables and Collateral as an exercise of remedies under the Indenture.  It is further undisputed that any property and moneys so collected by the Indenture Trustee are required to be distributed under the distribution scheme established under Section 5.05(b) of the Indenture.  Under this distribution scheme, after payment of the Indenture Trustee's fees and expenses, the Noteholders hold senior rights to the Receivables, proceeds and other moneys and property collected by the Indenture Trustee.  Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables and other interpleader assets are required to be distributed under the terms of the Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

Further, pursuant to the express terms of the Indenture, the Noteholders holding Class C Notes have priority entitlement to receive all of the amounts held in the Spread Accounts. Accordingly, the Spread Account interpleader assets are required to be distributed to holders of the Class C Notes (including Millennium).

11

## CONCLUSION

By reason of the foregoing, interpleader defendants First Millennium, Inc. and Millennium Partners, L.P. respectfully request that an order be entered granting summary judgment in their favor and against all adverse interpleader defendants and requiring the interpleader plaintiff Indenture Trustee to distribute all interpleader assets to the Noteholders (a) with respect to the Spread Accounts, to the Noteholders holding Class C Notes, in accordance with the terms of the Indenture, and (b) for all other interpleader assets, in accordance with Section 5.05(b) of the Indenture (after payment of the Indenture Trustee's fees and expenses).

Dated: New York, New York
      November 20, 2006

                    Respectfully submitted,

                    VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____
                    Michael G. Davies
                    Michael J. Edelman
                    805 Third Avenue
                    New York, New York  10022-2203
                    Tel:  (212) 407-7700
                    Fax:  (212) 407-7799

                    *Attorneys for Interpleader Defendants*
                    *FIRST MILLENNIUM, INC. AND MILLENNIUM*
                    *PARTNERS, L.P.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                Interpleader Plaintiff,

              -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

              Interpleader Defendants.

Index No. 650234/06

-------------------------------------------------

**AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT OF INTERPLEADER DEFENDANTS FIRST
MILLENNIUM, INC. AND MILLENNIUM PARTNERS, L.P.**

STATE OF NEW YORK   )
                     ) ss.:
COUNTY OF NEW YORK  )

PHILIP SCHOCKLING, being duly sworn, deposes and says:

1.     I am a portfolio manager for each of First Millennium, Inc. and of Millennium

Partners, L.P. (along with First Millennium, Inc., "Millennium"), two of the interpleader

defendants in the above-captioned action.  I make this affidavit in support of Millennium's

motion, pursuant to CPLR § 3212, for summary judgment on the Interpleader Complaint of

Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the

NextCard Credit Card Master Note Trust (the "Indenture Trustee").

2.     I have personal knowledge of the facts set forth in this affidavit.

**The Underlying Transaction**

3.     The material facts of this action are not in dispute.    The secured financing

obligations that constitute the subject of this action are part of a securitization in which a special

purpose entity was established to own credit card receivables (the "Receivables"), which special

purpose entity in turn borrowed money from noteholders ("Noteholders") pursuant to the terms

of an Indenture and Notes and that were collateralized by such Receivables (the "Collateral").

4.     The special purpose entity, NextCard Credit Card Master Note Trust (the

"Issuer"), was established as a Delaware business trust pursuant to a Trust Agreement, dated as

of December 1, 2000 (the "Trust Agreement"), between NextBank, N.A. (NextBank"), as

transferor, and Wilmington Trust Company, as owner trustee (the "Owner Trustee").

5.     The Issuer and the Indenture Trustee entered into that certain Master Indenture,

dated as of December 11, 2000 (the "Master Indenture"), which was supplemented by:   the

Series 99-1 Indenture Supplement dated as of December 11, 2000; the Series 2000-1 Indenture

Supplement dated as of December 13, 2000 (the "2000-1 Indenture Supplement"); and the Series

2001-1 Indenture Supplement dated as of May 8, 2001 (the "2001-1 Indenture Supplement"; the

three Indenture Supplements together are referred to hereinafter as the "Indenture Supplements,"

and the Master Indenture as amended together with the Indenture Supplements are referred to

hereinafter as the "Indenture").   Copies of the Master Indenture and the 2000-1 Indenture

Supplement are annexed hereto, respectively, as Exhibits A and B.   (For purposes of this

litigation, the 2000-1 Indenture Supplement and the 2001-1 Indenture Supplement are

substantially identical.)

6.     Under the terms of the Master Indenture, the Issuer was required to maintain an

office or agency within the County of New York, New York. *See* Exhibit A, at § 3.02.

2

7.    To evidence its obligations under the Indenture, the Issuer delivered certain asset-backed notes (the "Notes") that were secured by a portfolio of credit card receivables owned by the Issuer.

8.    Under the terms of the Notes and the Indenture, the Indenture Trustee agreed to make loans to the Issuer under the terms of the Indenture and the Notes.  As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C  Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C  Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| **TOTAL NOTES:** | **$112,109,000.00** |

The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2000-1 Notes."  The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2001-1 Notes."  Representative copies of the outstanding Series 2000-1 Notes and Series 2001-1 Notes are annexed hereto as Exhibit C.

9.    Millennium currently holds unpaid principal in the following Notes: (a) Series 2000-1  Class  C  Notes:    $16,243,500.00;  (b) Series  2000-1  Class  D  Notes: $6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes:  $13,000,000.00.  Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes.

NEWYORK/#170756.3

**The Obligations of the Issuer under the Notes Became Due and**
**Payable on the Redemption Event that Occurred on February 7, 2002**

10.    Pursuant to the express terms of the Notes, the Issuer agreed to repay the "entire unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the Redemption Date, if any" (as such terms are defined in the Indenture) and to pay interest due thereon pursuant to the terms thereof. *See* Exhibit C, at p. 3 for each of the Notes.

11.    The Indenture provides that a receivership of NextBank constitutes a "Trust Redemption Event" and a "Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders immediately upon the occurrence of such event," which date, by definition, would constitute a "Redemption Date." *See* Exhibit A, § 5.01.

12.    NextBank entered into receivership on February 7, 2002.

13.    NextBank's entry into receivership constituted a Redemption Event which triggered the Notes to become due by their own terms. *See* Exhibit C, at p. 3 for each of the Notes.

14.    To the extent (if any) that Nextbank was a party to, or signatory of, the Indenture, in accordance with its rights in the NextBank receivership, the Federal Deposit Insurance Corporation (the "FDIC") repudiated NextBank's obligations under such contracts in July 2002.

15.    As a separate, independent entity, the Issuer is not the subject of the FDIC NextBank receivership.

16.    As a Redemption Event, NextBank's entry into receivership also caused the commencement of the Early Amortization Period (as defined in the Indenture), whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with

4

Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes.

**The Issuer's Failure to Repay Principal When Due Constituted an Event of Default**

17.    Contrary to its obligations under both the Notes and the Master Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. The Issuer's failure to honor its contractual repayment obligations caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof.  Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default").

18.    Section 5.03 of the Master Indenture states that if any of several listed Events of Default were to occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all of the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer . . ., and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

*See* Exhibit A, § 5.03.

19.    Due to the Issuer's failure to repay its obligations when due, Millennium and RMK Advantage Income Fund, who together constituted a majority of the outstanding Notes (the

5

"Majority Noteholders"), directed that the Indenture Trustee (a) declare an event of default and accelerate all obligations on the Notes and (b) exercise remedies against the Collateral and the Receivables. In accordance with such instruction, by letter dated November 14, 2006 (the "Indenture Trustee's Acceleration Letter"), a copy of which is annexed hereto as Exhibit D, the Indenture Trustee notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable" and demanded that "all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, [be] immediately due and payable." *See* Exhibit D.

20.    In addition, on November 16, 2006 the Majority Noteholders also notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable." A copy of the Majority Noteholders' notice of event of default and acceleration is attached hereto as Exhibit E. The Majority Noteholders also "demand[ed] that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon." *See* Exhibit E.

21.    Despite these demands, the Issuer has failed to repay in full the Notes.

22.    In addition to declaring a notice of event of default and the acceleration, the Majority Noteholders instructed the Indenture Trustee to exercise remedies against the Receivables and Collateral pursuant to the terms of the Indenture.

**The Noteholders' Right to the Interpleader Assets Is**
**Mandated Under the Express Terms of the Master Indenture**

23.    Prior to filing this interpleader action, the interpleader plaintiff started exercising remedies to exercise control over the Receivables and the Collateral as directed by the Majority

6

Noteholders. Shortly thereafter, the FDIC, in its capacity as the receiver of NextBank, threatened the Indenture Trustee with contempt and damages for starting to exercise such remedies. The Indenture Trustee responded by informing Millennium that the Indenture Trustee was going to rescind its enforcement actions, whereupon the Directing Noteholders demanded that the Indenture Trustee continue exercising such remedies and stated that the Indenture Trustee would be held responsible for any resulting damages to the Noteholders. Immediately thereafter, on November 16, 2006, the interpleader plaintiff commenced this interpleader action.

24.     The assets that are the subject of this interpleader action constitute (a) amounts held in the so-called "Spread Accounts" (as defined in the Indenture) and (b) the Receivables and proceeds of the Receivables.

25.     Most of the assets that are the subject of this interpleader action constitute Receivables. The remainder constitute moneys held by the Indenture Trustee in the Spread Accounts.

## A.     The Spread Accounts

26.     The Indenture Trustee currently holds approximately $22 million in the Spread Accounts.

27.     The amounts currently owed to the C Noteholders substantially exceed the amounts in the Spread Accounts for each series of Notes.

28.     Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Accounts and the proceeds thereof. *See* Exhibit B, § 4.11(a) (Indenture Supplement).

29.     Following the occurrence of an event of default and acceleration of the Notes, the Spread Accounts are required to be liquidated, with the funds distributed in accordance with the

NEWYORK/#170756.3

distribution scheme established under Section 5.02 of the Indenture Supplements for payment to the C Holders:

> [A]n amount equal to the balance on deposit [in the Spread Accounts shall be deposited] into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02 [of the Indenture Supplements], to fund any shortfalls in amounts owed to such Noteholders.

*See* Exhibit B, § 4.11(e).

30.    Section 5.02 of the Indenture Supplements, in turn, in relevant part, directs that distributions of the Spread Accounts be payable for interest and principal due to the Class C Noteholders of each Series.

31.    As the principal and interest amounts owed to Class C Noteholders under each series of Notes is substantially in excess of the amounts on deposit in the Spread Accounts for each series of Notes, the Class C Noteholders, including Millennium, are entitled to the full amounts now held by the Indenture Trustee in the Spread Accounts.

**B.    The Receivables**

32.    The Indenture Trustee currently holds approximately $72 million worth of Receivables and proceeds of Receivables.

33.    Under the express terms of the Master Indenture, "all money and property [collected by the Indenture Trustee] pursuant to [] Article V[1] following acceleration of the maturities of the Notes . . . shall [be paid] in the following order": (a) first, to the Indenture Trustee for fees and expenses, (b) second, to holders of Notes (in order of priority) "for amounts

---

[1]    Article V of the Master Indenture includes (a) Redemption Events (§ 5.01), Events of Default (§ 5.02), acceleration (§ 5.03), enforcement actions (§ 5.04), remedies (§ 5.05), preservation of collateral (§ 5.06), unconditional rights of Noteholders to receive principal and interest, § 5.12 (Noteholders' right to direct Indenture Trustee to take remedies, rights and powers under Indenture).

NEWYORK/#170756.3

due and unpaid [on such] Notes for interest and principal, ratably, and (c) last, to the Issuer for

distribution pursuant to Article IV of the related Indenture Supplement." *See* Exhibit A,

§ 5.05(b).

34.    The Indenture provides the Indenture Trustee with numerous powers to take

control of the collections of the Receivables and Collateral after an event of default and

acceleration.    Master Indenture Section 5.06 expressly grants the Indenture Trustee with

authority may take action to "maintain possession" and control of the Collateral in an amount

"sufficient . . . for the payment of principal of and interest on the Notes . . . ." Further, Section

8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall
> receive and collect, directly and without intervention or assistance of
> any . . . intermediary, all money and other property payable to or
> receivable by the Indenture Trustee pursuant to [the] Indenture. The
> Indenture Trustee shall hold all such money and property received by it in
> trust for the Noteholders and shall apply it as provided in this Indenture.

*See* Exhibit A, § 8.01. These collections include all proceeds of the Receivables, all of which

are required to be distributed in accordance with Section 5.05(b).

35.    In addition, a majority of Noteholders can direct that the Indenture Trustee take

such actions to take control of the receipt of the proceeds of the Receivables. *See* Exhibit A,

§ 8.01. In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an

event of default and acceleration, the Indenture Trustee may take any "appropriate action to

protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes

of the affected Series." Finally, as set forth above, Section 5.12 gives the Noteholders the right

to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the

Indenture.    In fact, the Majority Noteholders repeatedly specifically directed the Indenture

NEWYORK/#170756.3

Trustee to take all such actions in accordance with their rights under Section 5.12 of the Indenture.

36.    In accordance with these rights under the Indenture, after the event of default and acceleration issued by both the Indenture Trustee and the Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the distribution scheme provided in Section 5.05(b) of the Master Indenture.  Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

**The Pleadings**

37.    Annexed hereto as Exhibit F is a copy of the Interpleader Complaint.

38.    Annexed hereto as Exhibit G is a copy of the Answer of First Millennium, Inc. and Millennium Partners, L.P. to the Interpleader Complaint, without exhibits.

**Conclusion**

39.    I know of no defense of any other party that would entitle such party to superior rights to the Noteholders in the assets that are the subject to this interpleader.  Accordingly, the Noteholders, including Millennium, are entitled to receive in full the assets that are the subject of this interpleader.

10

**WHEREFORE,** by reason of the foregoing, interpleader defendants First Millennium, Inc. and of Millennium Partners, L.P. respectfully request that an order be entered granting summary judgment in their favor and against all adverse interpleading defendants and requiring the interpleader plaintiff Indenture Trustee to distribute all interpleader assets to the Noteholders (a) with respect to the Spread Accounts, to the Noteholders holding Class C Notes in accordance with the terms of the Indenture, and (b) for all other interpleader assets, in accordance with Section 5.05(b) of the Indenture (after payment of the Indenture Trustee's fees and expenses).

_____
PHILIP SCHOCKLING

Sworn to and subscribed before me
this 20th day of November, 2006

_____
Notary Public


**Danielle Scotto**
**Notary Public, State of New York**
**No. 01SC6119482**
**Qualified in Kings County**
**Commission Expires Nov 29, 200_8_**

11

**NEXTCARD CREDIT CARD MASTER NOTE TRUST**

Issuer

and

**THE BANK OF NEW YORK**

Indenture Trustee

**MASTER INDENTURE**

Dated as of December 11, 2000

DOCSSF1:490698

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS...................................................................... 2
    Section 1.01.  Definitions ................................................................ 2
    Section 1.02.  Other Definitional Provisions ................................... 13
ARTICLE II     THE NOTES .................................................................... 14
    Section 2.01.  Form Generally ......................................................... 14
    Section 2.02.  Denominations ......................................................... 15
    Section 2.03.  Execution, Authentication and Delivery.................... 15
    Section 2.04.  Authenticating Agent ............................................... 15
    Section 2.05.  Registration of and Limitations on Transfer and Exchange of
                   Notes. .................................................................. 16
    Section 2.06.  Mutilated, Destroyed, Lost or Stolen Notes.............. 18
    Section 2.07.  Persons Deemed Owners ......................................... 18
    Section 2.08.  Appointment of Paying Agent ................................. 19
    Section 2.09.  Access to List of Noteholders' Names and Addresses ... 19
    Section 2.10.  Cancellation ............................................................. 20
    Section 2.11.  Release of Collateral ................................................ 20
    Section 2.12.  New Issuances......................................................... 20
    Section 2.13.  Book-Entry Notes .................................................... 21
    Section 2.14.  Notices to Clearing Agency or Foreign Clearing Agency .... 22
    Section 2.15.  Definitive Notes ...................................................... 23
    Section 2.16.  Global Note ............................................................. 23
    Section 2.17.  Meetings of Noteholders ......................................... 23
    Section 2.18.  Uncertificated Classes............................................. 24
ARTICLE III    COVENANTS OF ISSUER .............................................. 24
    Section 3.01.  Payment of Principal and Interest ............................ 24
    Section 3.02.  Maintenance of Office or Agency............................. 24
    Section 3.03.  Money for Note Payments to Be Held in Trust ......... 24
    Section 3.04.  Existence ................................................................. 25
    Section 3.05.  Protection of Trust .................................................. 26
    Section 3.06.  Opinions as to Collateral.......................................... 26
    Section 3.07.  Performance of Obligations; Servicing of Receivables ... 27

**TABLE OF CONTENTS**
(continued)

Page

Section 3.08.   Negative Covenants ............................................. 28

Section 3.09.   Statements as to Compliance ............................... 29

Section 3.10.   Issuer May Consolidate, Etc., Only on Certain Terms ............ 29

Section 3.11.   Successor Substituted ........................................ 30

Section 3.12.   No Other Business ........................................... 31

Section 3.13.   No Borrowing ................................................ 31

Section 3.14.   Servicer's Obligations....................................... 31

Section 3.15.   Guarantees, Loans, Advances and Other Liabilities................ 31

Section 3.16.   Capital Expenditures......................................... 31

Section 3.17.   Removal of Administrator .................................... 31

Section 3.18.   Restricted Payments ......................................... 31

Section 3.19.   Notice of Events of Default ................................. 32

Section 3.20.   Further Instruments and Acts ............................... 32

ARTICLE IV      SATISFACTION AND DISCHARGE............................. 32

Section 4.01.   Satisfaction and Discharge of this Indenture ............... 32

Section 4.02.   Application of Trust Money................................... 33

ARTICLE V       REDEMPTION EVENTS, DEFAULTS AND REMEDIES ......... 33

Section 5.01.   Redemption Events .......................................... 33

Section 5.02.   Events of Default ........................................... 34

Section 5.03.   Acceleration of Maturity; Rescission and Annulment ............ 35

Section 5.04.   Collection of Indebtedness and Suits for Enforcement by Indenture Trustee......................................................... 35

Section 5.05.   Remedies; Priorities ........................................ 37

Section 5.06.   Optional Preservation of the Collateral...................... 39

Section 5.07.   Limitation on Suits.......................................... 39

Section 5.08.   Unconditional Rights of Noteholders to Receive Principal and Interest........................................................... 40

Section 5.09.   Restoration of Rights and Remedies.......................... 40

Section 5.10.   Rights and Remedies Cumulative ............................. 40

Section 5.11.   Delay or Omission Not Waiver............................... 40

Section 5.12.   Rights of Noteholders to Direct Indenture Trustee ............ 41

**TABLE OF CONTENTS**
(continued)

Page

Section 5.13.  Waiver of Past Defaults ................................................................. 41

Section 5.14.  Undertaking for Costs .................................................................... 41

Section 5.15.  Waiver of Stay or Extension Laws ................................................. 42

Section 5.16.  Sale of Receivables ........................................................................ 42

Section 5.17.  Action on Notes .............................................................................. 42

ARTICLE VI       THE INDENTURE TRUSTEE ............................................................ 43

Section 6.01.  Duties of the Indenture Trustee ..................................................... 43

Section 6.02.  Notice of Redemption Event or Event of Default ........................... 44

Section 6.03.  Rights of Indenture Trustee ............................................................ 45

Section 6.04.  Not Responsible for Recitals or Issuance of Notes ........................ 46

Section 6.05.  May Hold Notes .............................................................................. 46

Section 6.06.  Money Held in Trust ....................................................................... 46

Section 6.07.  Compensation, Reimbursement and Indemnification ..................... 46

Section 6.08.  Replacement of Indenture Trustee .................................................. 47

Section 6.09.  Successor Indenture Trustee by Merger .......................................... 48

Section 6.10.  Appointment of Co-Indenture Trustee or Separate
Indenture Trustee ............................................................................ 48

Section 6.11.  Eligibility; Disqualification ............................................................ 49

Section 6.12.  Preferential Collection of Claims Against ....................................... 49

Section 6.13.  Tax Returns ..................................................................................... 49

Section 6.14.  Representations and Covenants of the Indenture Trustee ................ 50

Section 6.15.  Custody of the Collateral ................................................................ 50

ARTICLE VII      NOTEHOLDERS' LIST AND REPORTS BY INDENTURE
TRUSTEE AND ISSUER ................................................................ 50

Section 7.01.  Issuer to Furnish Indenture Trustee Names and Addresses of
Noteholders ..................................................................................... 50

Section 7.02.  Preservation of Information; Communications to Noteholders ........ 51

Section 7.03.  Reports by Issuer ............................................................................ 51

Section 7.04.  Reports by Indenture Trustee .......................................................... 51

ARTICLE VIII     ALLOCATION AND APPLICATION OF COLLECTIONS ................. 52

Section 8.01.  Collection of Money ....................................................................... 52

## TABLE OF CONTENTS
### (continued)

Section 8.02.  Rights of Noteholders ................................................................. 52

Section 8.03.  Establishment of Collection Account and Special Funding Account ...... 52

Section 8.04.  Collections and Allocations ....................................................... 54

Section 8.05.  Shared Principal Collections ...................................................... 55

Section 8.06.  Additional Withdrawals from the Collection Account ............................ 55

Section 8.07.  Allocation of Collateral to Series or Groups............................................ 56

Section 8.08.  Excess Finance Charge Collections ............................................. 56

Section 8.09.  Release of Collateral; Eligible Loan Documents .................................... 57

Section 8.10.  Opinion of Counsel.................................................................. 57

ARTICLE IX      DISTRIBUTIONS AND REPORTS TO NOTEHOLDERS ........................ 57

ARTICLE X       SUPPLEMENTAL INDENTURES ................................................. 58

Section 10.01. Supplemental Indentures Without Consent of Noteholders..................... 58

Section 10.02. Supplemental Indentures with Consent of Noteholders........................... 59

Section 10.03. Execution of Supplemental Indentures ................................................. 60

Section 10.04. Effect of Supplemental Indenture ..................................................... 60

Section 10.05. Conformity With Trust Indenture Act ................................................. 61

Section 10.06. Reference in Notes to Supplemental Indentures..................................... 61

ARTICLE XI      TERMINATION ................................................................. 61

Section 11.01. Termination of Trust ............................................................... 61

Section 11.02. Final Distribution................................................................... 61

Section 11.03. Termination Distributions .......................................................... 62

Section 11.04. Defeasance ......................................................................... 62

ARTICLE XII     MISCELLANEOUS ........................................................... 63

Section 12.01. Compliance Certificates and Opinions etc........................................... 63

Section 12.02. Form of Documents Delivered to Indenture Trustee ............................... 65

Section 12.03. Acts of Noteholders ................................................................ 65

Section 12.04. Notices, Etc. to Indenture Trustee and Issuer .......................................... 66

Section 12.05. Notices to Noteholders; Waiver .................................................... 66

Section 12.06. Alternate Payment and Notice Provisions ............................................. 67

Section 12.07. Conflict with Trust Indenture Act ...................................................... 67

**TABLE OF CONTENTS**
(continued)

Page

Section 12.08. Effect of Headings and Table of Contents ........................................... 67

Section 12.09. Successors and Assigns .................................................................. 67

Section 12.10. Severability ................................................................................... 67

Section 12.11. Benefits of Indenture ..................................................................... 68

Section 12.12. Legal Holidays .............................................................................. 68

Section 12.13. GOVERNING LAW ...................................................................... 68

Section 12.14. Counterparts ................................................................................. 68

Section 12.15. Trust Obligation ............................................................................ 68

Section 12.16. No Petition ................................................................................... 68

RECONCILIATION AND TIE BETWEEN TRUST INDENTURE
ACT OF 1939 AND INDENTURE PROVISIONS[*]

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03, 7.04 |
| (d) | 7.04 |
| 314(a) | 3.09, 7.03(a) |
| (b) | 3.06 |
| (c)(1) | 2.11, 8.09(c), 12.01(a) |
| (c)(2) | 2.11, 8.09(c), 12.01(a) |
| (c)(3) | 2.11, 8.09(c), 12.01(a) |
| (d)(1) | 2.11, 8.09(c), 12.01(b) |
| (d)(2) | Not Applicable |
| (d)(3) | Not Applicable |
| (e) | 12.01(a) |
| 315(a) | 6.01(b) |
| (b) | 6.02 |
| (c) | 6.01(c) |
| (d) | 6.01(d) |
| (d)(1) | 6.01(d) |
| (d)(2) | 6.01(d) |
| (d)(3) | 6.01(d) |
| (e) | 5.14 |
| 316(a)(1)(A) | 5.12 |
| 316(a)(1)(B) | 5.13 |
| 316(a)(2) | Not Applicable |
| 316(b) | 5.08 |
| 317(a)(1) | 5.04 |
| 317(a)(2) | 5.04(d) |
| 317(b) | 5.04(a) |
| 318(a) | 12.07 |

[*]This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

An extra section break has been inserted above this paragraph. Do not delete this section break if you plan to add text after the Table of Contents/Authorities.  Deleting this break will cause Table of Contents/Authorities headers and footers to appear on any pages following the Table of Contents/Authorities.

DOCSSF1:490698

This MASTER INDENTURE, dated as of December 11, 2000 (herein, as amended, modified or supplemented from time to time as permitted hereby, called this "**Indenture**"), between NextCard Credit Card Master Note, Trust, a business trust organized under the laws of the State of Delaware (herein, together with its permitted successors and assigns, called the "**Issuer**" or the "**Trust**"), and The Bank of New York, a New York banking corporation, as indenture trustee (herein, together with its successors in the trusts hereunder, called the "**Indenture Trustee**"). This Indenture may be supplemented at any time and from time to time by an indenture supplement in accordance with Article X hereof (an "**Indenture Supplement**," and any Indenture Supplement together with this Indenture and amendments hereof collectively referred to as the "**Agreement**"). If a conflict exists between the terms and provisions of this Indenture and any Indenture Supplement, the terms and provisions of the Indenture Supplement shall be controlling with respect to the related Series.

## PRELIMINARY STATEMENT

The Issuer has duly authorized the execution and delivery of this Indenture to provide for an issue of its asset backed notes (the "**Notes**") as provided in this Indenture. All covenants and agreements made by the Issuer herein are for the benefit and security of the Noteholders. The Issuer is entering into this Indenture, and the Indenture Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

Simultaneously with the delivery of this Indenture the Issuer is entering into the Transfer and Servicing Agreement with NextBank, N.A., a national banking association, as Transferor and Servicer (in such respective capacities, the "**Transferor**" or the "**Servicer**"), pursuant to which (a) the Transferor will convey to the Issuer all of its right, title and interest in, to and under the Receivables and (b) the Servicer will agree to service the Receivables and make collections thereon on behalf of the Noteholders.

Under the Transfer and Servicing Agreement, Receivables arising in the Accounts from time to time will be conveyed thereunder to the Issuer.

## GRANTING CLAUSES

The Issuer hereby Grants to the Indenture Trustee, for the benefit of the Holders of the Notes, all of the Issuer's right, title and interest, whether now owned or hereafter acquired, in, to and under (a) the Receivables existing at the close of business on the Initial Cut-Off Date, in the case of Receivables arising in the Initial Accounts and the Prior Additional Accounts, and on each Addition Cut-Off Date, in the case of Receivables arising in the Additional Accounts, and in each case thereafter created from time to time, (b) all Interchange and Recoveries allocable to the Issuer as provided in the Transfer and Servicing Agreement and all monies due or to become due and all amounts received or receivable with respect thereto, (c) all moneys and other property credited to the Collection Account, the Series Accounts and the Special Funding Account (including any subaccounts of such account), and all interest, dividends, earnings, income and other distributions from time to time received, receivable or otherwise distributed or distributable thereto or in respect thereof (including any accrued discount realized on liquidation of any investment purchased at a discount), (d) all rights, remedies, powers, privileges and claims of the Issuer under or with respect to any Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement (whether arising pursuant to the terms of such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement or otherwise available to the Issuer at law or in equity), including, without limitation, the rights of the Issuer to enforce such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement, and to give or withhold any and all consents, requests, notices, directions, approvals, extensions or waivers under or with respect to such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement to the same extent as

the Issuer could but for the assignment and security interest granted to the Indenture Trustee for the benefit of the Noteholders, (e) the property conveyed to the Issuer under any Participation Interest Supplement and the right to receive Recoveries attributed to cardholder charges for merchandise and services in the Accounts, (f) all money, accounts, general intangibles, chattel paper, instruments, documents, goods, investment property, deposit accounts, certificates of deposit, letters of credit, and advices of credit consisting of, arising from, or related to the foregoing, (g) all other property of the Issuer, and (h) all present and future claims, demands, causes and chose in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds, products, rents, receipts or profits of the conversion, voluntary or involuntary, into cash or other property, all cash and non-cash proceeds, and other property consisting of, arising from or relating to all or any part of any of the foregoing; in each case, excluding the Transferor Interest and all amounts distributable to the Holders of any Certificates pursuant to the terms of any Transaction Document (collectively, the "<u>Collateral</u>").

<center>LIMITED RECOURSE</center>

The obligation of the Issuer to make payments of principal of, interest on and other amounts with respect to, the Notes is limited by recourse only to the Collateral.

<center>ARTICLE I</center>

<center>DEFINITIONS</center>

Section 1.01.    <u>Definitions</u>.

Whenever used in this Indenture, the following words and phrases shall have the following meanings, and the definitions of such terms are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

"<u>Account Owner</u>" shall have the meaning specified in the Transfer and Servicing Agreement.

"<u>Accumulation Period</u>" shall mean, with respect to any Series, or any Class within a Series, a period following the Revolving Period during which Collections of Principal Receivables are accumulated in an account for the benefit of the Noteholders of such Series or Class within such Series, which shall be the controlled accumulation period, the principal accumulation period, the early accumulation period, the optional accumulation period, the limited accumulation period or other accumulation period, in each case as defined with respect to such Series in the related Indenture Supplement.

"<u>Act</u>" shall have the meaning specified in subsection 12.03(a).

"<u>Administration Agreement</u>" shall mean the Administration Agreement, dated as of December 1, 2000 among the Issuer and the Administrator, as the same may be amended, supplemented or otherwise modified from time to time.

"<u>Administrator</u>" shall mean NextBank, or its permitted successors and assigns, or any successor Administrator under the Administration Agreement.

"<u>Adverse Effect</u>" shall have the meaning specified in the Transfer and Servicing Agreement.

"Aggregate Investor Percentage" shall mean, with respect to Principal Receivables, Finance Charge Receivables and Defaulted Receivables, as the case may be, as of any date of determination, the sum of such Series Percentages of all Series of Notes issued and outstanding on such date of determination; provided, however, that the Aggregate Investor Percentage shall not exceed 100%.

"Agreement" shall mean this Master Indenture, as the same may be amended, supplemented or otherwise modified from time to time, including, with respect to any Series or Class, the related Indenture Supplement.

"Amortization Period" shall mean, with respect to any Series, or any Class within a Series, a period following the Revolving Period during which Collections of Principal Receivables are distributed to Noteholders, which shall be the controlled amortization period, the principal amortization period, the rapid amortization period, the optional amortization period, the limited amortization period or other amortization period, in each case as defined with respect to such Series in the related Indenture Supplement.

"Applicants" shall have the meaning specified in Section 2.09.

"Authorized Officer" shall mean:

(a)     with respect to the Issuer, any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to the Issuer and who is identified on the list of Authorized Officers, containing the specimen signature of each such Person, delivered by the Owner Trustee to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter) and any Vice President or more senior officer of the Administrator who is authorized to act for the Administrator in matters relating to the Issuer and to be acted upon by the Administrator pursuant to the Administration Agreement and who is identified on the list of Authorized Officers (containing the specimen signatures of such officers) delivered by the Administrator to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter).

(b)     with respect to the Transferor, any officer of the Transferor who is authorized to act for the Transferor in matters relating to the Transferor and who is identified on the list of Authorized Officers, containing the specimen signature of each such Person, delivered by the Transferor to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter)

(c)     with respect to the Servicer, any officer of the Servicer who is authorized to act for the Servicer in matters relating to the Servicer and who is identified on the list of Authorized Officers, containing the specimen signature of each such Person, delivered by the Servicer to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter)

"Bearer Notes" shall have the meaning specified in Section 2.01.

"Beneficial Owner" shall mean, with respect to a Book-Entry Note, the Person who is the owner of such Book-Entry Note, as reflected on the books of the Clearing Agency or Foreign Clearing Agency, or on the books of a Person maintaining an account with such Clearing Agency or Foreign Clearing Agency (directly as a Clearing Agency Participant or as an Indirect Participant, in accordance with the rules of such Clearing Agency or Foreign Clearing Agency).

"Book-Entry Notes" shall mean beneficial interests in the Notes, ownership and transfers of which shall be made through book entries by a Clearing Agency or Foreign Clearing Agency as described in Section 2.13.

"Certificates" shall have the meaning specified in the Trust Agreement.

"Class" shall mean, with respect to any Series, any one of the classes of Notes of that Series.

"Clearing Agency" shall mean an organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934, as amended, and serving as clearing agency for a Series or Class of Book-Entry Notes.

"Clearing Agency Participant" shall mean a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Clearstream" shall mean Clearstream Banking, *société anonyme*, a professional depository incorporated under the laws of Luxembourg, and its successors.

"Closing Date" shall mean, with respect to any Series, the closing date specified in the related Indenture Supplement.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning specified in the Granting Clause of this Indenture.

"Collection Account" shall have the meaning specified in Section 8.03.

"Collections" shall have the meaning specified in the Transfer and Servicing Agreement.

"Commission" shall mean the Securities and Exchange Commission and its successors in interest.

"Corporate Trust Office" means the principal office of the Indenture Trustee at which at any particular time its corporate trust business shall be administered, which office at date of the execution of this Indenture is located at 101 Barclay Street, 12 East, New York, New York 10286, or at such other address as the Indenture Trustee may designate from time to time by notice to the Noteholders and the Transferor, or the principal corporate trust office of any successor Indenture Trustee (the address of which the successor Indenture Trustee will notify the Noteholders and the Transferor); provided that for the purposes of Section 3.02, the address of any such office shall be in the Borough of Manhattan of the City of New York.

"Coupon" shall have the meaning specified in Section 2.01.

"Default" shall mean any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Defeasance" shall have the meaning specified in subsection 11.04(a).

"Defeased Series" shall have the meaning specified in subsection 11.04(a).

"Definitive Notes" shall mean Notes in definitive, fully registered form.

"Deposit Date" shall mean each day on which the Servicer deposits Collections in the Collection Account.

"Determination Date" shall mean, unless otherwise specified in the Indenture Supplement for a particular Series, the earlier of the third Business Day and the fifth calendar day (or if the fifth calendar day is not a Business Day, then the preceding Business Day) preceding the seventeenth day of each calendar month.

"Discount Percentage" shall have the meaning specified in the Transfer and Servicing Agreement.

"Distribution Date" shall mean, with respect to any Series, the date specified in the applicable Indenture Supplement.

"Dollars," "$" or "U.S. $" shall mean United States dollars.

"DTC" shall mean The Depository Trust Company.

"Eligible Institution" shall mean a depository institution (which may be the Owner Trustee or the Indenture Trustee) organized under the laws of the United States or any one of the states thereof, including the District of Columbia (or any domestic branch of a foreign bank) which depository institution at all times (a) has either (i) a long-term unsecured debt rating of Aa3 or better by Moody's or (ii) a certificate of deposit rating of P-1 by Moody's, (b) has either (i) a long-term unsecured debt rating of AA- by Standard & Poor's or (ii) a certificate of deposit rating of A-1+ by Standard & Poor's and (c) is a member of the FDIC. Notwithstanding the previous sentence, any institution the appointment of which satisfies the Rating Agency Condition shall be considered an Eligible Institution. If so qualified, the Servicer may be considered an Eligible Institution for the purposes of this definition.

"Eligible Investments" shall mean, as of any date of determination, the following instruments, investment property, or other property, other than securities issued by or obligations of NextBank:

(a)    direct obligations of, or obligations fully guaranteed as to timely payment by, the United States of America;

(b)    demand deposits, time deposits or certificates of deposit (having original maturities of no more than 365 days) of depository institutions or trust companies incorporated under the laws of the United States of America or any state thereof, including the District of Columbia (or domestic branches of foreign banks) and subject to supervision and examination by federal or state banking or depository institution authorities; provided that at the time of the Trust's investment or contractual commitment to invest therein, the short-term debt rating of such depository institution or trust company shall be in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch;

(c)    commercial paper or other short-term obligations (having original or remaining maturities of no more than thirty (30) days) (including short-term obligations of NextCard)

having, at the time of the Trust's investment or contractual commitment to invest therein, a rating in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch;

(d)       demand deposits, time deposits and certificates of deposit which (i) are scheduled to mature on a date occurring no later than the immediately succeeding Distribution Date, (ii) are fully insured by the FDIC and (iii) have, at the time of the Trust's investment therein, a rating in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch;

(e)       bankers' acceptances (having original maturities of no more than 365 days) issued by any depository institution or trust company referred to in clause (b) above;

(f)       money market funds having, at the time of the Trust's investment therein, a rating in the highest rating category of Standard & Poor's, of Moody's and, if rated by Fitch, of Fitch (including funds for which the Indenture Trustee or any of its Affiliates is investment manager or advisor);

(g)       time deposits (other than those referred to in clause (d) above), with a Person the commercial paper of which has a credit rating satisfactory to Standard & Poor's, Moody's and, if rated by Fitch, Fitch and which are scheduled to mature on a date occurring no later than the immediately succeeding Distribution Date; or

(h)       any other investment of a type or rating that satisfies the Rating Agency Condition.

"Enhancement Agreement" shall mean any agreement, instrument or document governing the terms of any Series Enhancement or pursuant to which any Series Enhancement is issued or outstanding.

"Euroclear Operator" shall mean Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear System.

"Event of Default" shall have the meaning specified in Section 5.02.

"Excess Allocation Series" shall mean a Series that, pursuant to the Indenture Supplement therefor, is entitled to receive certain excess Collections of Finance Charge Receivables, as more specifically set forth in such Indenture Supplement. If so specified in the Indenture Supplement for a Group of Series, each such Series may be an Excess Allocation Series only for the other Series in such Group.

"Excess Finance Charge Collections" shall have the meaning specified in Section 8.08.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Finance Charge Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Finance Charge Shortfalls" shall have the meaning specified in Section 8.08.

"Final Maturity Date" shall mean, with respect to any Series, the final maturity date for such Series specified in the related Indenture Supplement.

"Foreign Clearing Agency" shall mean Clearstream and the Euroclear Operator.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Global Note" shall have the meaning specified in Section 2.16.

"Grant" means to mortgage, pledge, bargain, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to this Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Group" shall mean, with respect to any Series, the group of Series, if any, in which the related Indenture Supplement specifies such Series is to be included.

"Indenture" shall mean this Master Indenture, dated as of December 11, 2000, between the Issuer and the Indenture Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Indenture Supplement" shall mean, with respect to any Series, a supplement to the Indenture, executed and delivered in connection with the original issuance of the Notes of such Series pursuant to Section 10.01, and an amendment to the Indenture executed pursuant to Sections 10.01 or 10.02, and, in either case, including all amendments thereof and supplements thereto.

"Indenture Trustee" shall mean The Bank of New York, in its capacity as trustee under the Agreement, its successors in interest and any successor indenture trustee under the Agreement.

"Independent" shall mean, when used with respect to any specified Person, that the Person (a) is in fact independent of the Issuer, any other obligor upon the Notes, the Transferor and any Affiliate of any of the foregoing Persons, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Transferor or any Affiliate of any of the foregoing Persons and (c) is not connected with the Issuer, any such other obligor, the Transferor or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

"Independent Certificate" shall mean a certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 12.01, made by an Independent appraiser or other expert appointed by an Issuer Order, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

"Indirect Participant" shall mean other Persons such as securities brokers and dealers, banks and trust companies that clear or maintain a custodial relationship with a participant of DTC, either directly or indirectly.

"Insolvency Event" shall have the meaning specified in subsection 5.01(a).

"Invested Amount" shall mean, with respect to any Series and for any date, an amount equal to the "Invested Amount" or "Adjusted Invested Amount," as applicable, specified in the related Indenture Supplement.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended.

"Issuer" shall mean the Trust.

"Issuer Order" and "Issuer Request" shall mean a written order or request signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Indenture Trustee.

"Lien" shall have the meaning specified in the Transfer and Servicing Agreement.

"Monthly Period" shall mean, with respect to each Distribution Date, unless otherwise provided in an Indenture Supplement, the period from and including the first day of the preceding calendar month to and including the last day of such calendar month; provided, however, that the initial Monthly Period with respect to any Series will commence on the Closing Date with respect to such Series.

"New Issuance" shall have the meaning specified in subsection 2.12(a).

"NextBank" shall mean NextBank, N.A., a national banking association, and its successors and permitted assigns.

"NextCard" shall mean NextCard, Inc, a Delaware corporation, and its successors and permitted assigns.

"Note Interest Rate" shall mean, as of any particular date of determination and with respect to any Series or Class, the interest rate as of such date specified therefor in the related Indenture Supplement.

"Note Owner" shall mean, with respect to a Book-Entry Note, the Person who is the owner of such Book-Entry Note, as reflected on the books of the Clearing Agency, or on the books of a Person maintaining an account with such Clearing Agency (directly as a Clearing Agency Participant or as an indirect participant, in accordance with the rules of such Clearing Agency).

"Note Register" shall have the meaning specified in Section 2.05.

"Noteholder" or "Holder" shall mean the Person in whose name a Note is registered on the Note Register and, if applicable, the holder of any Bearer Note, Global Note, or Coupon, as the case may be, or such other Person deemed to be a "Noteholder" or "Holder" in any related Indenture Supplement.

"Notes" shall mean all Series of Notes issued by the Trust pursuant to the Indenture and the applicable Indenture Supplement.

"Officer's Certificate" shall mean, unless otherwise specified in this Indenture, a certificate delivered to the Indenture Trustee signed by any Authorized Officer of the Issuer, Transferor,

or Servicer, as applicable, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 12.01.

"Opinion of Counsel" shall mean a written opinion of counsel, who may be counsel for, or an employee of, the Person providing the opinion and who shall be reasonably acceptable to the Indenture Trustee; provided that a Tax Opinion shall be an opinion of nationally recognized tax counsel.

"Outstanding" shall mean, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture except:

(i)    Notes theretofore canceled by the Transfer Agent and Registrar or delivered to the Transfer Agent and Registrar for cancellation;

(ii)    Notes or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Indenture Trustee or any Paying Agent in trust for the Holders of such Notes (provided, however, that if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor, satisfactory to the Indenture Trustee, has been made); and

(iii)    Notes in exchange for or in lieu of other Notes which have been authenticated and delivered pursuant to this Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a Protected Purchaser;

provided that in determining whether the Holders of the requisite Outstanding Amount of the Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by the Issuer, any other obligor upon the Notes, the Transferor, the Servicer or any Affiliate of any of the foregoing Persons shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Indenture Trustee actually knows to be so owned shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Indenture Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes, the Transferor, the Servicer or any Affiliate of any of the foregoing Persons. In making any such determination, the Indenture Trustee may rely on the representations of the pledgee and shall not be required to undertake any independent investigation.

"Outstanding Amount" means the aggregate principal amount of all Notes Outstanding at the date of determination and, with respect to the Notes of a particular Series, the aggregate principal amount of all Notes of such Series which are Outstanding at the date of determination.

"Owner Trustee" shall mean Wilmington Trust Company, not in its individual capacity, but solely as owner trustee under the Trust Agreement, its successors in interest and any successor owner trustee under the Trust Agreement.

"Paired Series" shall mean (i) each Series which has been paired with another Series (which Series may be prefunded or partially prefunded), such that the reduction of the Invested Amount or Adjusted Invested Amount of such Series results in the increase of the Invested Amount of such other Series, as described in the related Indenture Supplements, and (ii) such other Series.

"Paying Agent" shall mean any paying agent appointed pursuant to Section 2.08 and shall initially be the Indenture Trustee; provided that if the Indenture Supplement for a Series so provides, a separate or additional Paying Agent may be appointed with respect to such Series.

"Permitted Assignee" shall mean any Person who, if it were to purchase Receivables (or interests therein) in connection with a sale thereof pursuant to Sections 5.05(a) and 5.16, would not cause the Trust to be taxable as a publicly traded partnership for federal income tax purposes.

"Principal Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Principal Sharing Series" shall mean a Series that, pursuant to the Indenture Supplement therefor, is entitled to receive Shared Principal Collections. If so specified in the Indenture Supplement for a Group of Series, each such Series may be Principal Sharing Series only for the other Series in such Group.

"Principal Shortfalls" shall have the meaning specified in Section 8.05.

"Principal Terms" shall mean, with respect to any Series, (a) the name or designation; (b) the initial principal amount (or method for calculating such amount), the Invested Amount and the Required Transferor Interest; (c) the Note Interest Rate for each Class of Notes of such Series (or method for the determination thereof); (d) the payment date or dates and the date or dates from which interest shall accrue; (e) the method for allocating Collections to Noteholders; (f) the designation of any Series Accounts and the terms governing the operation of any such Series Accounts; (g) the Servicing Fee; (h) the issuer and terms of any form of Series Enhancements with respect thereto; (i) the terms on which the Notes of such Series may be exchanged for Notes of another Series, repurchased by the Transferor or remarketed to other investors; (j) the Final Maturity Date; (k) the number of Classes of Notes of such Series and, if more than one Class, the rights and priorities of each such Class; (l) the extent to which the Notes of such Series will be issuable in temporary or permanent global form (and, in such case, the depositary for such global note or notes, the terms and conditions, if any, upon which such global note may be exchanged, in whole or in part, for Definitive Notes, and the manner in which any interest payable on a temporary or global note will be paid); (m) whether the Notes of such Series may be issued in bearer form and any limitations imposed thereon; (n) the priority of such Series with respect to any other Series; (o) whether such Series will be part of a Group; (p) whether such Series will be a Principal Sharing Series; (q) whether such Series will be an Excess Allocation Series; (r) the Distribution Date; (s) whether such Series will or may be a Paired Series and the Series with which it will be paired, if applicable; and (t) any other terms of such Series.

"Proceeding" shall mean any suit in equity, action at law or other judicial or administrative proceeding.

"Protected Purchaser" shall have the meaning set forth in the New York Uniform Commercial Code.

"Qualified Account" shall mean either (a) a segregated account with an Eligible Institution or (b) a segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States or any one of the states thereof, including the District of Columbia (or any domestic branch of a foreign bank), and acting as a trustee for funds deposited in such account, so long as any of the unsecured, unguaranteed senior debt securities of such depository institution shall have a credit rating from each Rating Agency in one of its generic credit rating categories that signifies investment grade.

"Rating Agency" shall mean, with respect to any outstanding Series or Class, each rating agency, as specified in the applicable Indenture Supplement, selected by the Transferor to rate the Notes of such Series or Class.

"Rating Agency Condition" shall mean, with respect to any action, that each Rating Agency shall have notified the Transferor and the Indenture Trustee in writing that such action will not result in a reduction or withdrawal of the then existing rating of any outstanding Series or Class with respect to which it is a Rating Agency or, with respect to any outstanding Series or Class not rated by any Rating Agency, the written consent of such Series or Class as specified in the Indenture Supplement for such Series.

"Receivables" shall have the meaning specified in the Transfer and Servicing Agreement.

"Record Date" shall mean, with respect to any Distribution Date, the last day of the calendar month immediately preceding such Distribution Date unless otherwise specified for a Series in the related Indenture Supplement.

"Redemption Date" shall mean, with respect to any Series, the date or dates, if any, specified in the related Indenture Supplement.

"Redemption Event" shall mean, with respect to any Series, a Trust Redemption Event or a Series Redemption Event.

"Registered Notes" shall have the meaning specified in Section 2.01.

"Required Transferor Interest" shall mean, with respect to any date, an amount equal to the product of (i) the Required Transferor Percentage and (ii) the aggregate amount of Principal Receivables.

"Required Transferor Percentage" shall mean 9%; provided, however, that the Transferor may reduce the Required Transferor Percentage upon (x) thirty (30) days prior notice to the Indenture Trustee and each Rating Agency, (y) satisfaction of the Rating Agency Condition with respect thereto and (z) delivery to the Indenture Trustee of a certificate of a Vice President or more senior officer of the Transferor stating that the Transferor reasonably believes that such reduction will not, based on the facts known to such officer at the time of such certification, then or thereafter have an Adverse Effect; provided further that the Required Transferor Percentage shall not at any time be less than 2%.

"Responsible Officer" shall mean, when used with respect to the Indenture Trustee, any officer (a) within the Corporate Trust Office of the Indenture Trustee including any vice president, assistant vice president, assistant treasurer, assistant secretary, trust officer or any other officer of the Indenture Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers or to whom any corporate trust matter is referred at the Corporate Trust Office because of such officer's knowledge of and familiarity with the particular subject and (b) who shall have direct responsibility for the administration of the Agreement and the other Transaction Documents.

"Revolving Period" shall have, with respect to each Series, the meaning specified in the related Indenture Supplement.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Seller" shall mean any of NextBank or another Account Owner, in its capacity as seller under the Receivables Purchase Agreement.

"Series" shall mean any series of Notes issued pursuant to this Indenture and the related Indenture Supplement.

"Series Account" shall mean any deposit, trust, securities escrow or similar account maintained for the benefit of the Noteholders of any Series or Class, as specified in any Indenture Supplement.

"Series Enhancement" shall mean the rights and benefits provided to the Trust or the Noteholders of any Series or Class pursuant to any letter of credit, surety bond, cash collateral account, collateral invested amount, spread account, reserve account, guaranteed rate agreement, maturity liquidity facility, tax protection agreement, interest rate swap agreement, interest rate cap agreement or other similar arrangement. The subordination of any Series or Class to another Series or Class shall be deemed to be a Series Enhancement.

"Series Enhancer" shall mean the Person or Persons providing any Series Enhancement, other than (except to the extent otherwise provided with respect to any Series in the Indenture Supplement for such Series) the Noteholders of any Series or Class which is subordinated to another Series or Class.

"Series Issuance Date" shall mean, with respect to any Series, the date on which the Notes of such Series are to be originally issued in accordance with Section 2.12 and the related Indenture Supplement.

"Series Redemption Event" shall have, with respect to any Series, the meaning specified pursuant to the related Indenture Supplement.

"Servicer" shall have the meaning specified in the Transfer and Servicing Agreement.

"Shared Excess Finance Charge Collections" shall mean, with respect to any Distribution Date, the aggregate amount for all outstanding Series that the related Indenture Supplements specify are to be treated as "Shared Excess Finance Charge Collections" for such Distribution Date.

"Shared Principal Collections" shall have the meaning specified in Section 8.05.

"Special Funding Account" shall have the meaning set forth in Section 8.03.

"Special Funding Amount" shall mean the amount on deposit in the Special Funding Account.

"Tax Opinion" shall mean, with respect to any action, an Opinion of Counsel to the effect that, for federal income tax purposes, (a) such action will not adversely affect the tax characterization as debt of the Notes of any outstanding Series or Class that were characterized as debt at the time of their issuance, (b) such action will not cause the Trust to be deemed to be an association (or publicly traded partnership) taxable as a corporation and (c) such action will not cause or constitute an event in which gain or loss would be recognized by any Noteholder.

"Termination Proceeds" shall have the meaning specified in subsection 11.02(c).

"Transaction Documents" shall mean, with respect to any Series of Notes, the Certificate of Trust, the Trust Agreement, the Receivables Purchase Agreements, the Transfer and Servicing Agreement, this Indenture, the related Indenture Supplement, the Administration Agreement and such other documents and certificates delivered in connection therewith.

"Transfer Agent and Registrar" shall have the meaning specified in Section 2.05.

"Transfer and Servicing Agreement" shall mean the Transfer and Servicing Agreement, dated as of December 11, 2000, among the Transferor, the Servicer and the Issuer, as the same may be amended, supplemented or otherwise modified from time to time.

"Transfer Date" shall mean the Business Day immediately preceding each Distribution Date.

"Transferor" shall have the meaning specified in the Transfer and Servicing Agreement.

"Transferor Interest" shall mean on any date of determination an amount equal to (a) the sum of (i) an amount equal to the aggregate balance of Principal Receivables at the end of the day immediately prior to such date of determination *plus* (ii) the Special Funding Amount at the end of the day immediately prior to such date of determination *minus* (b) the aggregated Invested Amounts with respect to all Series of Notes issued and outstanding on such date of determination.

"Transferor Percentage" shall mean, on any date of determination, when used with respect to Principal Receivables, Finance Charge Receivables and Defaulted Receivables, a percentage equal to 100% *minus* the Aggregate Investor Percentage with respect to such category of Receivables.

"Trust" shall mean the NextCard Credit Card Master Note Trust.

"Trust Agreement" shall mean the Trust Agreement relating to the Trust, dated as of December 1, 2000, between NextBank and the Owner Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Trust Indenture Act" or "TIA" shall mean the Trust Indenture Act of 1939, as amended.

"Trust Redemption Event" shall have, with respect to each Series, the meaning specified in Section 5.01.

"UCC" shall have the meaning specified in the Transfer and Servicing Agreement.

Section 1.02.    Other Definitional Provisions.

(a)    With respect to any Series, all terms used herein and not otherwise defined herein shall have meanings ascribed to them in the Trust Agreement, the Transfer and Servicing Agreement or the related Indenture Supplement, as applicable.

(b)    All terms defined in this Indenture shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(c)    As used in this Indenture and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Indenture or in any such certificate or other document, and accounting terms partly defined in this Indenture or in any such

certificate or other document to the extent not defined, shall have the respective meanings given to them under GAAP. To the extent that the definitions of accounting terms in this Indenture or in any such certificate or other document are inconsistent with the meanings of such terms under GAAP, the definitions contained in this Indenture or in any such certificate or other document shall control.

(d)    Any reference to each Rating Agency shall only apply to any specific rating agency if such rating agency is then rating any outstanding Series.

(e)    Unless otherwise specified, references to any amount as on deposit or outstanding on any particular date shall mean such amount at the close of business on such day.

(f)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture; references to any subsection, Section, Schedule or Exhibit are references to subsections, Sections, Schedules and Exhibits in or to this Indenture unless otherwise specified; and the term "including" means "including without limitation."

(g)    Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes.

"indenture security holder" means a Noteholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Indenture Trustee.

"obligor" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule have the meaning assigned to them by such definitions.

ARTICLE II

THE NOTES

Section 2.01.    Form Generally.

Any Series or Class of Notes, together with the Indenture Trustee's certificate of authentication related thereto, may be issued in bearer form (the "Bearer Notes") with attached interest coupons and a special coupon (collectively, the "Coupons") or in fully registered form (the "Registered Notes") and shall be in substantially the form of an exhibit to the related Indenture Supplement with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture or such Indenture Supplement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the officers executing such Notes, as evidenced by their execution of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference

thereto on the face of the Note. The terms of any Notes set forth in an exhibit to the related Indenture Supplement are part of the terms of this Indenture, as applicable.

The Definitive Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods, all as determined by the officers executing such Notes, as evidenced by its execution of such Notes.

Each Note will be dated the Closing Date and each Definitive Note will be dated as of the date of its authentication.

Section 2.02.    Denominations.

Except as otherwise specified in the related Indenture Supplement and the Notes, each class of Notes of each Series shall be issued in fully registered form in minimum amounts of $1,000 and in integral multiples of $1,000 in excess thereof (except that one Note of each Class may be issued in a different amount, so long as such amount exceeds the applicable minimum denomination for such Class), and shall be issued upon initial issuance as one or more Notes in an aggregate original principal amount equal to the applicable Invested Amount for such Class or Series.

Section 2.03.    Execution, Authentication and Delivery.

Each Note shall be executed by manual or facsimile signature on behalf of the Issuer by an Authorized Officer.

Notes bearing the manual or facsimile signature of an individual who was, at the time when such signature was affixed, authorized to sign on behalf of the Issuer shall not be rendered invalid, notwithstanding the fact that such individual ceased to be so authorized prior to the authentication and delivery of such Notes or does not hold such office at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Indenture Trustee for authentication and delivery, and the Indenture Trustee shall authenticate and deliver such Notes as provided in this Indenture or the related Indenture Supplement and not otherwise.

No Note shall be entitled to any benefit under this Indenture or the applicable Indenture Supplement or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein or in the related Indenture Supplement executed by or on behalf of the Indenture Trustee by the manual signature of a duly authorized signatory, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.04.    Authenticating Agent.

(a)    The Indenture Trustee may appoint one or more authenticating agents with respect to the Notes which shall be authorized to act on behalf of the Indenture Trustee in authenticating the Notes in connection with the issuance, delivery, registration of transfer, exchange or repayment of the Notes. Whenever reference is made in this Indenture to the authentication of Notes by the Indenture Trustee or the Indenture Trustee's certificate of authentication, such reference shall be deemed to include authentication on behalf of the Indenture Trustee by an authenticating agent and a certificate of authentication executed on behalf of the Indenture Trustee by an authenticating agent. Each authenticating agent must be acceptable to the Issuer and the Servicer.

(b)     Any institution succeeding to the corporate agency business of an authenticating agent shall continue to be an authenticating agent without the execution or filing of any power or any further act on the part of the Indenture Trustee or such authenticating agent.

(c)     An authenticating agent may at any time resign by giving written notice of resignation to the Indenture Trustee, the Issuer and the Servicer.  The Indenture Trustee may at any time terminate the agency of an authenticating agent by giving notice of termination to such authenticating agent and to the Issuer and the Servicer.  Upon receiving such a notice of resignation or upon such a termination, or in case at any time an authenticating agent shall cease to be acceptable to the Indenture Trustee or the Issuer and the Servicer, the Indenture Trustee may promptly appoint a successor authenticating agent.  Any successor authenticating agent upon acceptance of its appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an authenticating agent.  No successor authenticating agent shall be appointed unless acceptable to the Issuer and the Servicer.

(d)     The Issuer agrees to pay to each authenticating agent from time to time reasonable compensation for its services under this Section 2.04.

(e)     The provisions of Sections 6.01 and 6.04 shall be applicable to any authenticating agent.

(f)     Pursuant to an appointment made under this Section 2.04, the Notes may have endorsed thereon, in lieu of or in addition to the Indenture Trustee's certificate of authentication, an alternative certificate of authentication in substantially the following form:

"This is one of the Notes described in the within-mentioned Agreement.

_____

_____
as Authenticating Agent
for the Indenture Trustee

By:_____
                Authorized Signatory"

Section 2.05.    Registration of and Limitations on Transfer and Exchange of Notes.

The Issuer shall cause to be kept a register (the "**Note Register**") in which the entity acting as transfer agent and registrar (the "**Transfer Agent and Registrar**") shall provide for the registration of Notes and the registration of transfers of Notes.  The Indenture Trustee initially shall be the Transfer Agent and Registrar for the purpose of registering Notes and transfers of Notes as herein provided.  Upon any resignation of any Transfer Agent and Registrar, the Issuer shall promptly appoint a successor or, if it elects not to make such an appointment, assume the duties of Transfer Agent and Registrar.

If a Person other than the Indenture Trustee is appointed by the Issuer as Transfer Agent and Registrar, the Issuer will give the Indenture Trustee prompt written notice of the appointment of a Transfer Agent and Registrar and of the location, and any change in the location, of the Transfer Agent

and Registrar and Note Register. The Indenture Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof, and the Indenture Trustee shall have the right to rely upon a certificate executed on behalf of the Transfer Agent and Registrar by an officer thereof as to the names and addresses of the Noteholders and the principal amounts and numbers of such Notes.

Upon surrender for registration of transfer of any Note at the office or agency of the Transfer Agent and Registrar, to be maintained as provided in Section 3.02, if the requirements of Section 8-401 of the UCC are met, the Issuer shall execute, and upon receipt of such surrendered Note the Indenture Trustee shall authenticate and deliver to the Noteholder, in the name of the designated transferee or transferees, one or more new Notes (of the same Series and Class) in any authorized denominations of like aggregate principal amount.

At the option of a Noteholder, Notes may be exchanged for other Notes (of the same Series and Class) in any authorized denominations and of like aggregate principal amount, upon surrender of such Notes to be exchanged at the office or agency of the Transfer Agent and Registrar. Whenever any Notes are so surrendered for exchange, if the requirements of Section 8-401 of the UCC are met, the Issuer shall execute, and upon receipt of such surrendered Note the Indenture Trustee shall authenticate and deliver to the Noteholder, the Notes which the Noteholder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or exchange of Notes shall evidence the same obligations, evidence the same debt, and be entitled to the same rights and privileges under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed by, or be accompanied by a written instrument of transfer in a form satisfactory to the Indenture Trustee duly executed by, the Noteholder thereof or its attorney-in-fact duly authorized in writing, and by such other documents as the Indenture Trustee may reasonably require.

The registration of transfer of any Note shall be subject to the additional requirements, if any, set forth in the related Indenture Supplement.

No service charge shall be made for any registration of transfer or exchange of Notes, but the Issuer and Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of such Notes.

All Notes surrendered for registration of transfer and exchange shall be canceled by the Issuer and delivered to the Indenture Trustee for subsequent destruction without liability on the part of either. The Indenture Trustee shall destroy the Global Note upon its exchange in full for Definitive Notes and shall deliver a certificate of destruction to the Transferor. Such certificate shall also state that a certificate or certificates of each Foreign Clearing Agency referred to in the applicable Indenture Supplement was received with respect to each portion of the Global Note exchanged for Definitive Notes.

Unless otherwise set forth in an Indenture Supplement, the preceding provisions of this Section 2.05 notwithstanding, the Issuer shall not be required to make, and the Transfer Agent and Registrar need not register, transfers or exchanges of Notes for a period of twenty (20) days preceding the due date for any payment with respect to the Note.

If and so long as any Series of Notes are listed on the Luxembourg Stock Exchange and such exchange shall so require, the Indenture Trustee shall appoint a co-transfer agent and co-registrar in Luxembourg or another European city. Any reference in this Indenture to the Transfer Agent and Registrar shall include any co-transfer agent and co-registrar unless the context otherwise requires. The

Indenture Trustee will enter into any appropriate agency agreement with any co-transfer agent and co-registrar not a party to this Indenture, which will implement the provisions of this Indenture that relate to such agent. The Indenture Trustee initially appoints Kredietbank S.A. Luxembourgeoise, at its office located at 43 Boulevard Royal, L-2955 Luxembourg, as Transfer Agent and Registrar for each Series of Notes listed on the Luxembourg Stock Exchange.

Section 2.06.    Mutilated, Destroyed, Lost or Stolen Notes.

If (a) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its reasonable satisfaction of the destruction, loss or theft of any Note, and (b) in case of destruction, loss, or theft there is delivered to the Indenture Trustee such security or indemnity as may be required by it to hold the Issuer, the Noteholders and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Transfer Agent and Registrar or the Indenture Trustee that such Note has been acquired by a Protected Purchaser, the Issuer shall execute, and the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of like tenor (including the same date of issuance) and principal amount, bearing a number not contemporaneously outstanding; provided, however, that if any such mutilated, destroyed, lost or stolen Note shall have become or within seven (7) days shall be due and payable, or shall have been selected or called for redemption, instead of issuing a replacement Note, the Issuer may pay such Note without surrender thereof, except that any mutilated Note shall be surrendered. If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a Protected Purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a Protected Purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 2.06, the Issuer may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee or the Transfer Agent and Registrar) connected therewith.

Every replacement Note issued pursuant to this Section 2.06 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute complete and indefeasible evidence of debt of the Trust, as if originally issued, whether or not the mutilated, destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.06 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.07.    Persons Deemed Owners.

Prior to due presentment for registration of transfer of any Note, the Issuer, the Indenture Trustee and any agent of the Transferor, the Issuer or the Indenture Trustee shall treat the Person in whose name any Note is registered as the owner of such Note for the purpose of receiving distributions pursuant to the terms of the applicable Indenture Supplement and for all other purposes whatsoever, whether or not

such Note is overdue, and neither the Issuer, the Transferor, the Indenture Trustee nor any agent of the Issuer, the Transferor or the Indenture Trustee shall be affected by any notice to the contrary.

Section 2.08.    Appointment of Paying Agent.

(a)    The Issuer reserves the right at any time to vary or terminate the appointment of a Paying Agent for the Notes, and to appoint additional or other Paying Agents, provided that it will at all times maintain the Indenture Trustee as Paying Agent.

If so long as any Notes are listed on the Luxembourg Stock Exchange and such exchange shall so require, the Indenture Trustee will appoint a co-paying agent in Luxembourg or another European city. The Indenture Trustee will enter into any appropriate agency agreement with any co-paying agent not a party to this Indenture, which will implement the provisions of this Indenture that relate to such agent. The Indenture Trustee initially appoints Kredietbank S.A. Luxembourgeoise, at its office located at 43 Boulevard Royal, L-2955 Luxembourg, as Paying Agent for each Series of Notes listed on the Luxembourg Stock Exchange.

Notice of all changes in the identity or specified office of a Paying Agent will be delivered promptly to the Noteholders by the Indenture Trustee.

(b)    The Indenture Trustee shall cause the Paying Agent (other than itself) to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee that such Paying Agent will hold all sums, if any, held by it for payment to the Noteholders in trust for the benefit of the Noteholders entitled thereto until such sums shall be paid to such Noteholders and shall agree, and if the Indenture Trustee is the Paying Agent it hereby agrees, that it shall comply with all requirements of the Code regarding the withholding by the Indenture Trustee of payments in respect of federal income taxes due from the Beneficial Owners.

Section 2.09.    Access to List of Noteholders' Names and Addresses.

(a)    The Issuer will furnish or cause to be furnished to the Indenture Trustee, the Servicer, any Noteholder or the Paying Agent, within five (5) Business Days after receipt by the Issuer of a written request therefor from the Indenture Trustee, the Servicer, such Noteholder or the Paying Agent, respectively, a list of the names and addresses of the Noteholders. Unless otherwise provided in the related Indenture Supplement, holders of 10% of the Outstanding Amount of the Notes of any Series (the "**Applicants**") may apply in writing to the Indenture Trustee, and if such application states that the Applicants desire to communicate with other Noteholders of any Series with respect to their rights under this Indenture or under the Notes and is accompanied by a copy of the communication which such Applicants propose to transmit, then the Indenture Trustee, after having been adequately indemnified by such Applicants for its costs and expenses, shall afford or shall cause the Transfer Agent and Registrar to afford such Applicants access during normal business hours to the most recent list of Noteholders held by the Indenture Trustee and shall give the Servicer notice that such request has been made, within five (5) Business Days after the receipt of such application. Such list shall be as of a date no more than forty-five (45) days prior to the date of receipt of such Applicants' request.

(b)    Every Noteholder, by receiving and holding a Note, agrees that none of the Issuer, the Indenture Trustee, the Transfer Agent and Registrar and the Servicer or any of their respective agents and employees shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Noteholders hereunder, regardless of the sources from which such information was derived.

Section 2.10.    Cancellation.

All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly canceled by it. Pursuant to an Issuer Request, the Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any lawful manner whatsoever, and all Notes so delivered shall be promptly canceled by the Indenture Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Notes held by the Indenture Trustee shall be destroyed unless the Issuer shall direct by a timely order that they be returned to it.

Section 2.11.    Release of Collateral.

Subject to Section 12.01, the Indenture Trustee shall release property from the lien of this Indenture only upon receipt of an Issuer Request accompanied by an Officer's Certificate, an Opinion of Counsel and Independent Certificates in accordance with TIA §314(c) and 314(d) or an Opinion of Counsel in lieu of such Independent Certificates to the effect that the TIA does not require any such Independent Certificates.

Section 2.12.    New Issuances.

(a)    Pursuant to one or more Indenture Supplements, the Transferor may from time to time direct the Owner Trustee in writing, on behalf of the Issuer, to issue one or more new Series of Notes (a "**New Issuance**"). The Notes of all outstanding Series shall be equally and ratably entitled as provided herein to the benefits of this Indenture without preference, priority or distinction, all in accordance with the terms and provisions of this Indenture and the applicable Indenture Supplement except, with respect to any Series or Class, as provided in the related Indenture Supplement. Interest on the Notes of all outstanding Series shall be paid on each Distribution Date as specified in the Indenture Supplement relating to such outstanding Series. Principal of the Notes of each outstanding Series shall be paid as specified in the Indenture Supplement relating to such outstanding Series.

(b)    On or before the Series Issuance Date relating to any new Series of Notes, the parties hereto will execute and deliver an Indenture Supplement which will specify the Principal Terms of such Series. The terms of such Indenture Supplement may modify or amend the terms of this Indenture solely as applied to such new Series. The obligation of the Owner Trustee to execute, on behalf of the Issuer, the Notes of any Series and of the Indenture Trustee to authenticate such Notes and to execute and deliver the related Indenture Supplement (other than any Series issued pursuant to an Indenture Supplement dated as of December 11, 2000) is subject to the satisfaction of the following conditions:

(i)    on or before the fifth day immediately preceding the Series Issuance Date the Transferor shall have given the Owner Trustee, the Indenture Trustee, the Servicer and each Rating Agency notice (unless such notice requirement is otherwise waived) of such issuance and the Series Issuance Date;

(ii)    the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee any related Indenture Supplement, in form satisfactory to the Owner Trustee (as such and in its individual capacity) and the Indenture Trustee, executed by each party hereto (other than the Indenture Trustee);

(iii)    the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee any related Enhancement Agreement executed by the provider of the credit enhancement and the other parties thereto;

(iv)    the Rating Agency Condition shall have been satisfied with respect to such issuance;

(v)    such issuance will not result in any Adverse Effect and the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee an Officer's Certificate, dated the Series Issuance Date to the effect that (i) the Transferor reasonably believes that such issuance will not, based on the facts known to such officer at the time of such certification, have an Adverse Effect, and (ii) all conditions precedent to such execution, authentication, and delivery have been satisfied;

(vi)    there shall have been delivered to the Owner Trustee and the Indenture Trustee (with a copy to each Rating Agency) a Tax Opinion, dated the Series Issuance Date with respect to such issuance; and

(vii)    the aggregate amount of Principal Receivables plus the principal amount of any Participation Interest theretofore conveyed to the Trust as of the Series Issuance Date shall be greater than the Required Minimum Principal Balance and the Transferor Interest shall be greater than the Required Transferor Interest, each as of the Series Issuance Date and after giving effect to such issuance.

Any Note held by the Transferor at any time after the date of its initial issuance may be transferred or exchanged only upon the delivery to the Owner Trustee and the Indenture Trustee of a Tax Opinion dated as of the date of such transfer or exchange, as the case may be, with respect to such transfer or exchange.

(c)    Upon satisfaction of the above conditions, pursuant to Section 2.03, the Owner Trustee, on behalf of the Issuer, shall execute and the Indenture Trustee shall authenticate and deliver the Notes of such Series as provided in this Indenture and the applicable Indenture Supplement. Notwithstanding the provisions of this Section 2.12, prior to the execution of any Indenture Supplement (other than any Indenture Supplement dated as of December 11, 2000), the Indenture Trustee and Owner Trustee shall be entitled to receive and rely upon an Opinion of Counsel stating that the execution of such Indenture Supplement is authorized or permitted by this Indenture and any Indenture Supplement related to any outstanding Series. The Indenture Trustee and Owner Trustee may, but shall not be obligated to, enter into any such Indenture Supplement which adversely affects the Indenture Trustee's or Owner Trustee's (as such or in its individual capacity) own rights, duties, benefits, protections, privileges or immunities under this Indenture.

(d)    The Issuer may direct the Indenture Trustee to deposit the net proceeds from any New Issuance in the Special Funding Account. The Issuer may also specify that on any Transfer Date the proceeds from the sale of any new Series may be withdrawn from the Special Funding Account and treated as Shared Principal Collections.

Section 2.13.    <u>Book-Entry Notes</u>.

Unless otherwise provided in any related Indenture Supplement, the Notes, upon original issuance, shall be issued in the form of typewritten Notes representing the Book-Entry Notes to be delivered to the depository specified in such Indenture Supplement which shall be the Clearing Agency or Foreign Clearing Agency, by or on behalf of such Series.

The Notes of each Series shall, unless otherwise provided in the related Indenture Supplement, initially be registered in the Note Register in the name of the nominee of the Clearing Agency or Foreign Clearing Agency for such Book-Entry Notes and shall be delivered to the Indenture Trustee or, pursuant to such Clearing Agency's or Foreign Clearing Agency's instructions held by the Indenture Trustee's agent as custodian for the Clearing Agency or Foreign Clearing Agency.

Unless and until Definitive Notes are issued under the limited circumstances described in Section 2.15, no Beneficial Owner shall be entitled to receive a Definitive Note representing such Beneficial Owner's interest in such Note. Unless and until Definitive Notes have been issued to the Beneficial Owners pursuant to Section 2.15:

(a)     the provisions of this Section 2.13 shall be in full force and effect with respect to each such Series;

(b)     the Indenture Trustee shall be entitled to deal with the Clearing Agency or Foreign Clearing Agency and the Clearing Agency Participants for all purposes of this Indenture (including the payment of principal of and interest on the Notes of each such Series) as the authorized representatives of the Beneficial Owners;

(c)     to the extent that the provisions of this Section 2.13 conflict with any other provisions of this Indenture, the provisions of this Section 2.13 shall control with respect to each such Series;

(d)     the rights of Beneficial Owners of each such Series shall be exercised only through the Clearing Agency or Foreign Clearing Agency and the applicable Clearing Agency Participants and shall be limited to those established by law and agreements between such Beneficial Owners and the Clearing Agency or Foreign Clearing Agency or the Clearing Agency Participants. Pursuant to the depository agreement applicable to a Series, unless and until Definitive Notes of such Series are issued pursuant to Section 2.15, the initial Clearing Agency shall make book-entry transfers among the Clearing Agency Participants and receive and transmit distributions of principal and interest on the Notes to such Clearing Agency Participants; and

(e)     whenever this Indenture requires or permits actions to be taken based upon instructions or directions of the Holders of Notes evidencing a specified percentage of the Outstanding Amount of the Notes, the Clearing Agency or Foreign Clearing Agency shall be deemed to represent such percentage only to the extent that they have received instructions to such effect from the Beneficial Owners and/or Clearing Agency Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to a Responsible Officer of the Indenture Trustee.

Section 2.14.     Notices to Clearing Agency or Foreign Clearing Agency.

Whenever a notice or other communication to the Noteholders is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 2.15, the Indenture Trustee shall give all such notices and communications specified herein to be given to Noteholders to the Clearing Agency or Foreign Clearing Agency, as applicable, and shall have no obligation to the Beneficial Owners.

Section 2.15.    Definitive Notes.

If (i) (a) the Issuer advises the Indenture Trustee in writing that the Clearing Agency or Foreign Clearing Agency is no longer willing or able to discharge properly its responsibilities as Clearing Agency or Foreign Clearing Agency with respect to the Book-Entry Notes of a given Class and (b) the Indenture Trustee or Issuer is unable to locate and reach an agreement on satisfactory terms with a qualified successor, (ii) the Issuer, at its option, advises the Indenture Trustee in writing that it elects to terminate the book-entry system through the Clearing Agency or Foreign Clearing Agency with respect to such Class or (iii) after the occurrence of a Servicer Default, Beneficial Owners aggregating a majority of the Outstanding Amount of the Notes (or such other percentage as specified in the related Indenture Supplement) of such Class advise the Indenture Trustee and the applicable Clearing Agency or Foreign Clearing Agency through the applicable Clearing Agency Participants in writing that the continuation of a book-entry system is no longer in the best interests of the Beneficial Owners of such Class, the Clearing Agency or Foreign Clearing Agency, as the case may be, shall notify all Beneficial Owners of such Class of the occurrence of such event and of the availability of Definitive Notes to Beneficial Owners of such Class requesting the same.  Upon surrender to the Indenture Trustee of the Notes of such Class, accompanied by registration instructions from the applicable Clearing Agency, the Issuer shall execute and the Indenture Trustee shall authenticate Definitive Notes of such Class and shall recognize the registered holders of such Definitive Notes as Noteholders under this Indenture.  Neither the Issuer nor the Indenture Trustee shall be liable for any delay in delivery of such instructions, and the Issuer and the Indenture Trustee may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes of such Series, all references herein to obligations imposed upon or to be performed by the applicable Clearing Agency or Foreign Clearing Agency shall be deemed to be imposed upon and performed by the Indenture Trustee, to the extent applicable with respect to such Definitive Notes and to the extent that the Indenture Trustee is able to so perform, and the Indenture Trustee shall recognize the registered holders of the Definitive Notes of such Series as Noteholders of such Series hereunder.  Definitive Notes will be transferable and exchangeable at the offices of the Transfer Agent and Registrar.

Section 2.16.    Global Note.

If specified in the related Indenture Supplement for any Series, Notes may be initially issued in the form of a single temporary Global Note (the "**Global Note**") in bearer form, without interest coupons, in the denomination of the Initial Invested Amount and substantially in the form attached to the related Indenture Supplement.  Unless otherwise specified in the related Indenture Supplement, the provisions of this Section 2.16 shall apply to such Global Note.  The Global Note will be authenticated by the Indenture Trustee upon the same conditions, in substantially the same manner and with the same effect as the Definitive Notes.  The Global Note may be exchanged in the manner described in the related Indenture Supplement for Registered Notes or Bearer Notes in definitive form.  Except as otherwise specifically provided in the Indenture Supplement, any Notes that are issued in bearer form pursuant to this Indenture shall be issued in accordance with the requirements of Code section 163(f)(2).

Section 2.17.    Meetings of Noteholders.

To the extent provided by the Indenture Supplement for any Series issued in whole or in part in Bearer Notes, the Servicer or the Indenture Trustee may at any time call a meeting of the Noteholders of such Series, to be held at such time and at such place as the Servicer or the Indenture Trustee, as the case may be, shall determine, for the purpose of approving a modification of or amendment to, or obtaining a waiver of, any covenant or condition set forth in this Indenture with respect to such Series or in the Notes of such Series, subject to Article X.

Section 2.18.    Uncertificated Classes.

Notwithstanding anything to the contrary contained in this Article II or in Article XI, unless otherwise specified in any Indenture Supplement, any provisions contained in this Article II and in Article XI relating to the registration, form, execution, authentication, delivery, presentation, cancellation and surrender of Notes shall not be applicable to any uncertificated Notes, provided, however, that, except as otherwise specifically provided in the Indenture Supplement, any such uncertificated Notes shall be issued in "registered form" within the meaning of Code section 163(f)(1).

## ARTICLE III

## COVENANTS OF ISSUER

Section 3.01.    Payment of Principal and Interest.

(a)  The Issuer will duly and punctually pay principal and interest in accordance with the terms of the Notes as specified in the relevant Indenture Supplement.

(b)    The Noteholders of a Series as of the Record Date in respect of a Distribution Date shall be entitled to the interest accrued and payable and principal payable on such Distribution Date as specified in the related Indenture Supplement. All payment obligations under a Note are discharged to the extent such payments are made to the Noteholder of record.

Section 3.02.    Maintenance of Office or Agency.

The Issuer will maintain an office or agency within the Borough of Manhattan, City of New York and such other locations as may be set forth in an Indenture Supplement where Notes may be presented or surrendered for payment, where Notes may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer hereby initially appoints the Indenture Trustee at its Corporate Trust Office to serve as its agent for the foregoing purposes. The Issuer will give prompt written notice to the Indenture Trustee and the Noteholders of the location, and of any change in the location, of any such office or agency. If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee at its Corporate Trust Office as its agent to receive all such presentations, surrenders, notices and demands.

Section 3.03.    Money for Note Payments to Be Held in Trust.

As specified in Section 8.03 herein and in the related Indenture Supplement, all payments of amounts due and payable with respect to the Notes which are to be made from amounts withdrawn from the Collection Account and the Special Funding Account shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Collection Account or the Special Funding Account shall be paid over to or at the direction of the Issuer except as provided in this Section 3.03 and in the related Indenture Supplement.

Whenever the Issuer shall have a Paying Agent in addition to the Indenture Trustee, it will, on or before the Business Day next preceding each Distribution Date, direct the Indenture Trustee to deposit with such Paying Agent on or before such Distribution Date an aggregate sum sufficient to pay the amounts then becoming due, such sum to be (i) held in trust for the benefit of Persons entitled thereto and (ii) invested, pursuant to an Issuer Order, by the Paying Agent in an Eligible Investment in

accordance with the terms of the related Indenture Supplement. For all investments made by a Paying Agent under this Section 3.03, such Paying Agent shall be entitled to all of the rights and obligations of the Indenture Trustee under the related Indenture Supplement, such rights and obligations being incorporated in this paragraph by this reference.

The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 3.03, that such Paying Agent, in acting as Paying Agent, is an express agent of the Issuer and, further, that such Paying Agent will:

(i)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(ii)     give the Indenture Trustee notice of any default by the Issuer (or any other obligor upon the Notes) of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

(iii)     at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(iv)     immediately resign as a Paying Agent and forthwith pay to the Indenture Trustee all sums held by it by in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment; and

(v)     comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Order direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which such sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Section 3.04.     Existence.

The Issuer will keep in full effect its existence, rights and franchises as a business trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Collateral and each other related instrument or agreement.

Section 3.05.     Protection of Trust.

The Issuer will from time to time prepare, or cause to be prepared, execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(a)     Grant more effectively all or any portion of the Collateral as security for the Notes;

(b)     maintain or preserve the lien (and the priority thereof) of this Indenture or to carry out more effectively the purposes hereof;

(c)     perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture;

(d)     enforce any of the Collateral; or

(e)     preserve and defend title to the Collateral securing the Notes and the rights therein of the Indenture Trustee and the Noteholders secured thereby against the claims of all Persons and parties.

The Issuer hereby designates the Indenture Trustee its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required pursuant to this Section 3.05.

The Issuer shall pay or cause to be paid any taxes levied on all or any part of Receivables securing the Notes.

Section 3.06.     Opinions as to Collateral

(a)  On the Series Issuance Date relating to any new Series of Notes, the Issuer shall furnish to the Indenture Trustee an Opinion of Counsel (with a copy to each Rating Agency) either stating that, in the opinion of such counsel, such action has been taken to perfect the security interest of this Indenture, including without limitation with respect to the recording and filing of this Indenture, any indentures supplemental hereto, and any other requisite documents, and with respect to the execution and filing of any financing statements and continuation statements, as are so necessary and reciting the details of such action, or stating that, in the opinion of such counsel, no such action is necessary to maintain the perfection of such security interest, and that such perfected security interest is of first priority.

(b)     On or before May 30 in each calendar year, beginning in 2002, the Issuer shall furnish to the Indenture Trustee an Opinion of Counsel (with a copy to each Rating Agency) either stating that, in the opinion of such counsel, such action has been taken to perfect security interest of this Indenture, including without limitation with respect to the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is so necessary and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the perfection of such security interest, and that such perfected security interest is of first priority.  Such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such

counsel, be required to maintain the perfection of the lien and security interest of this Indenture until May 30 in the following calendar year.

Section 3.07.    Performance of Obligations; Servicing of Receivables.

(a)    The Issuer will not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Collateral or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as expressly provided in this Indenture, the Transfer and Servicing Agreement or such other instrument or agreement.

(b)    The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer. Initially, the Issuer has contracted with the Administrator to assist the Issuer in performing its duties under this Indenture.

(c)    The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the other Transaction Documents and in the instruments and agreements relating to the Collateral, including but not limited to filing or causing to be filed all UCC financing statements and continuation statements required to be filed by the terms of this Indenture and the Transfer and Servicing Agreement in accordance with and within the time periods provided for herein and therein. Except as otherwise expressly provided herein or therein, the Issuer shall not waive, amend, modify, supplement or terminate any Transaction Document or any provision thereof without the consent of the Holders of 66-2/3% of the Outstanding Amount of the Notes of each adversely affected Series.

(d)    If the Issuer shall have knowledge of the occurrence of a Servicer Default under the Transfer and Servicing Agreement, the Issuer shall cause the Indenture Trustee to promptly notify the Rating Agencies thereof, and shall cause the Indenture Trustee to specify in such notice the action, if any, being taken with respect to such default. If a Servicer Default shall arise from the failure of the Servicer to perform any of its duties or obligations under the Transfer and Servicing Agreement with respect to the Receivables, the Issuer shall take all reasonable steps available to it to remedy such failure.

(e)    On and after the receipt by the Servicer of a Termination Notice pursuant to Section 7.01 of the Transfer and Servicing Agreement, the Servicer shall continue to perform all servicing functions under the Transfer and Servicing Agreement until the date specified in the Termination Notice or otherwise specified by the Indenture Trustee or until a date mutually agreed upon by the Servicer and the Indenture Trustee. As promptly as possible after the giving of a Termination Notice to the Servicer, the Indenture Trustee shall appoint a Successor Servicer, and such Successor Servicer shall accept its appointment by a written assumption in a form acceptable to the Indenture Trustee. In the event that a Successor Servicer has not been appointed and accepted its appointment at the time when the Servicer ceases to act as Servicer, the Indenture Trustee without further action shall automatically be appointed the Successor Servicer. The Indenture Trustee may delegate any of its servicing obligations to an Affiliate or agent in accordance with subsection 3.01(b) and Section 5.07 of the Transfer and Servicing Agreement. Notwithstanding the foregoing, the Indenture Trustee shall, if it is legally unable so to act, petition at the expense of the Servicer a court of competent jurisdiction to appoint any established institution qualifying as an Eligible Servicer as the Successor Servicer. The Indenture Trustee shall give prompt notice to each Rating Agency and each Series Enhancer upon the appointment of a Successor Servicer. Upon its appointment, the Successor Servicer shall be the successor in all respects to the Servicer with respect to servicing functions under the Transfer and Servicing Agreement and shall be subject to all the

responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions thereof, and all references in this Indenture to the Servicer shall be deemed to refer to the Successor Servicer. In connection with any Termination Notice, the Indenture Trustee will review any bids which it obtains from Eligible Servicers and shall be permitted to appoint any Eligible Servicer submitting such a bid as a Successor Servicer for servicing compensation, subject to the limitations set forth in Section 7.02 of the Transfer and Servicing Agreement.

(f)    Without derogating from the absolute nature of the assignment granted to the Indenture Trustee under this Indenture or the rights of the Indenture Trustee hereunder, the Issuer agrees (i) that it will not, without the prior written consent of the Indenture Trustee and holders of at least 66-2/3% of the Outstanding Amount of the Notes of each Series, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Collateral (except to the extent otherwise provided in the Transfer and Servicing Agreement) or the Transaction Documents (except to the extent otherwise provided in the Transaction Documents), or waive timely performance or observance by the Servicer or the Transferor under the Transfer and Servicing Agreement; and (ii) that any such amendment shall not (A) increase or reduce in any manner the amount of, or accelerate or delay the timing of, collections of payments on the Receivables or distributions that are required to be made for the benefit of the Noteholders or (B) reduce the aforesaid percentage of the Notes that is required to consent to any such amendment, without the consent of the Holders of all the Outstanding Notes. If any such amendment, modification, supplement or waiver shall be so consented to by the Indenture Trustee and such Noteholders, the Issuer agrees, promptly following a request by the Indenture Trustee to do so, to execute and deliver, in its own name and at its own expense, such agreements, instruments, consents and other documents as the Indenture Trustee may deem necessary or appropriate in the circumstances and to provide each Rating Agency with notice of such amendment, modification, supplement or waiver.

Section 3.08.    Negative Covenants.

So long as any Notes are Outstanding, the Issuer will not:

(a)    sell, transfer, exchange, or otherwise dispose of any part of the Collateral except as expressly permitted by this Indenture, any Indenture Supplement, the Trust Agreement or the Transfer and Servicing Agreement;

(b)    claim any credit on, or make any deduction from, the principal and interest payable in respect of the Notes (other than amounts properly withheld from such payments under the Code or applicable state law) or assert any claim against any present or former Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(c)    (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (B) permit any Lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof or any interest therein or the proceeds thereof or (C) permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral; or

(d)    voluntarily dissolve or liquidate in whole or in part.

Section 3.09.    Statements as to Compliance.

The Issuer will deliver to the Indenture Trustee, within 120 days after the end of each fiscal year of the Issuer (commencing within 120 days after the end of the fiscal year 2001), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that

(i)    a review of the activities of the Issuer during the 12-month period ending at the end of such fiscal year (or in the case of the fiscal year ending December 31, 2001, the period from the Closing Date to December 31, 2001) and of performance under this Indenture has been made under such Authorized Officer's supervisions, and

(ii)    to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture throughout such year, or, if there has been a default in the compliance of any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.10.    Issuer May Consolidate, Etc., Only on Certain Terms.

(a)    The Issuer shall not consolidate or merge with or into any other Person, unless:

(1)    the Person (if other than the Issuer) formed by or surviving such consolidation or merger (i) shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia, (ii) shall not be subject to regulation as an "investment company" under the Investment Company Act and (iii) shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in a form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed;

(2)    immediately after giving effect to such transaction, no Event of Default or Redemption Event shall have occurred and be continuing;

(3)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that (i) such consolidation or merger and such supplemental indenture comply with this Section 3.10, (ii) all conditions precedent in this Section 3.10 relating to such transaction have been complied with (including any filing required by the Exchange Act), and (iii) such supplemental indenture is duly authorized, executed and delivered and is valid, binding and enforceable against such person;

(4)    the Rating Agency Condition shall have been satisfied with respect to such transaction;

(5)    the Issuer shall have received a Tax Opinion and an Opinion of Counsel dated the date of such consolidation or merger (and shall have delivered copies thereof to the Indenture Trustee and each Rating Agency) to the effect that such transaction will not have any material adverse tax consequence to any Noteholder; and

(6)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken.

(b)    The Issuer shall not convey or transfer any of its properties or assets, including those included in the Collateral, substantially as an entirety to any Person, unless:

(1)    the Person that acquires by conveyance or transfer the properties and assets of the Issuer the conveyance or transfer of which is hereby restricted shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state, or the District of Columbia, (B) expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agree by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of Holders of the Notes, (D) unless otherwise provided in such supplemental indenture, expressly agree to indemnify, defend and hold harmless the Issuer against and from any loss, liability or expense arising under or related to this Indenture and the Notes, (E) expressly agree by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes and (F) not be an "investment company" as defined in the Investment Company Act;

(2)    immediately after giving effect to such transaction, no Event of Default or Redemption Event shall have occurred and be continuing;

(3)    the Rating Agency Condition shall have been satisfied with respect to such transaction;

(4)    the Issuer shall have received a Tax Opinion and an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee) to the effect that such transaction will not have any material adverse tax consequence to any Noteholder;

(5)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(6)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such conveyance or transfer and such supplemental indenture comply with this Section 3.10 and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

Section 3.11.    Successor Substituted.

Upon any consolidation or merger, or any conveyance or transfer of the properties and assets of the Issuer substantially as an entirety in accordance with Section 3.10 hereof, the Person formed by or surviving such consolidation or merger (if other than the Issuer) or the Person to which such conveyance or transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein. In the event of any such conveyance or transfer, the Person named as the Issuer in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner

prescribed in this Section 3.11 shall be released from its obligations under this Indenture as issued immediately upon the effectiveness of such conveyance or transfer, provided that the Issuer shall not be released from any obligations or liabilities to the Indenture Trustee or the Noteholders arising prior to such effectiveness.

Section 3.12.    No Other Business.

The Issuer shall not engage in any business other than the activities set forth in Section 2.03 of the Trust Agreement and all activities incidental thereto or other than as required or authorized by the terms of the Transaction Documents.

Section 3.13.    No Borrowing.

The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except as expressly provided for pursuant to the terms of the Transaction Documents and the Notes.

Section 3.14.    Servicer's Obligations. The Issuer shall cause the Servicer to comply with all of its obligations under the Transaction Documents.

Section 3.15.    Guarantees, Loans, Advances and Other Liabilities.

Except as contemplated by this Indenture or the Transfer and Servicing Agreement, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

Section 3.16.    Capital Expenditures.

The Issuer shall not make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty).

Section 3.17.    Removal of Administrator.

So long as any Notes are outstanding, the Issuer shall not remove the Administrator without cause unless the Rating Agency Condition shall have been satisfied in connection with such removal.

Section 3.18.    Restricted Payments.

The Issuer shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer or to the Servicer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Issuer may make, or cause to be made, (x) distributions as contemplated by, and to the extent funds are available for such purpose under, the Transfer and Servicing Agreement or the Trust Agreement and (y) payments to the

Indenture Trustee pursuant to Section 6.07 hereof. The Issuer will not, directly or indirectly, make payments to or distributions from the Collection Account except in accordance with the Transaction Documents.

Section 3.19.    Notice of Events of Default.

The Issuer agrees to give the Indenture Trustee and the Rating Agencies prompt written notice of each Event of Default hereunder and, immediately after obtaining knowledge of any of the following occurrences, written notice of each default on the part of the Servicer or the Transferor of its obligations under the Transfer and Servicing Agreement, each default on the part of a Seller of its obligations under the Receivables Purchase Agreement and any action taken by the Indenture Trustee pursuant to Section 5.05 of this Indenture.

Section 3.20.    Further Instruments and Acts.

Upon request of the Indenture Trustee, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

ARTICLE IV

SATISFACTION AND DISCHARGE

Section 4.01.    Satisfaction and Discharge of this Indenture.

This Indenture shall cease to be of further effect with respect to the Notes except as to (a) rights of registration of transfer and exchange, (b) substitution of mutilated, destroyed, lost or stolen Notes, (c) the rights of Noteholders to receive payments of principal thereof and interest thereon, (d) Sections 3.03, 3.07, 3.08, 3.11, 12.16 and 3.12, (e) the rights and immunities of the Indenture Trustee hereunder, including the rights of the Indenture Trustee under Section 6.07, and the obligations of the Indenture Trustee under Section 4.02, and (f) the rights of Noteholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee and payable to all or any of them, and the Indenture Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes when:

(i)     either

(A)     all Notes theretofore authenticated and delivered (other than (1) Notes which have been destroyed, lost or stolen and which have been replaced, or paid as provided in Section 2.06, and (2) Notes for whose full payment (principal and interest) money has theretofore been deposited in trust or segregated and held in trust by the Indenture Trustee) have been delivered to the Indenture Trustee for cancellation; or

(B)     all Notes not theretofore delivered to the Indenture Trustee for cancellation:

(1)     have become due and payable;

(2)     will become due and payable at the Final Maturity Date for such Class or Series of Notes; or

(3)     are to be called for redemption within one year under arrangements satisfactory to the Indenture Trustee for the giving of notice of redemption by the Indenture Trustee in the name, and at the expense, of the Issuer;

and the Issuer, in the case of (1), (2) or (3) above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Indenture Trustee for cancellation when due at the Final Maturity Date for such Class or Series of Notes or the Redemption Date (if Notes shall have been called for redemption pursuant to the related Indenture Supplement), as the case may be;

(ii)     the Issuer has paid or caused to be paid all other sums payable hereunder by the Issuer; and

(iii)     the Issuer has delivered to the Indenture Trustee an Officer's Certificate, an Opinion of Counsel and (if required by the TIA or the Indenture Trustee) an Independent Certificate from a firm of certified public accountants, each meeting the applicable requirements of Section 12.01(a) and each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Section 4.02.     Application of Trust Money.

All monies deposited with the Indenture Trustee pursuant to Section 4.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes, this Indenture and the applicable Indenture Supplement, to make payments, either directly or through any Paying Agent, as the Indenture Trustee may determine, to the Noteholders and for the payment in respect of which such monies have been deposited with the Indenture Trustee, of all sums due and to become due thereon for principal and interest; but such monies need not be segregated from other funds except to the extent required herein or in the Transfer and Servicing Agreement or required by law.

ARTICLE V

REDEMPTION EVENTS, DEFAULTS AND REMEDIES

Section 5.01.     Redemption Events.

If any one of the following events (each, a "**Trust Redemption Event**") shall occur:

(a)     NextCard, the Transferor or any of the Account Owners shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to NextCard, such Transferor or Account Owner or of or relating to all or substantially all of its property, or a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against NextCard, such Transferor or Account Owner; or NextCard, any Transferor or Account Owner shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make any assignment for the benefit of its creditors or voluntarily suspend payment of its obligations (any such event, an "**Insolvency Event**");

provided, however, that if the Rating Agency Condition is first satisfied with respect to an Insolvency Event with respect to NextCard, such Insolvency Event shall not be a Trust Redemption Event;

(b)     a Transfer Restriction Event shall occur; or

(c)     the Trust shall become subject to regulation by the Securities and Exchange Commission as an "investment company" within the meaning of the Investment Company Act;

then a Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders immediately upon the occurrence of such event.

Upon the occurrence of a Redemption Event, an Amortization Period shall commence and payment on the Notes of each Series will be made in accordance with the terms of the related Indenture Supplement.

Section 5.02.     Events of Default.

"**Event of Default**," wherever used herein, means with respect to any Series any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default in the payment of the principal of any Note of that Series, if and to the extent not previously paid, when the same becomes due and payable; or

(b)     default in the payment of any interest on any Note of that Series when the same becomes due and payable, and such default shall continue after the earlier to occur of (i) the next following date upon which interest becomes due and payable and (ii) the date occurring thirty-five (35) days following the date on which such interest became due and payable; or

(c)     default in the observance or performance of any covenant or agreement of the Issuer made in this Indenture made in respect of the Notes of such Series (other than a covenant, or agreement, a default in the observance or performance of which is elsewhere in this Section 5.02 specifically dealt with) (all of such covenants and agreements in this Indenture which are not expressly stated to be for the benefit of a particular Series being deemed to be in respect of the Notes of all Series for this purpose), and such default shall continue or not be cured for a period of sixty (60) days after there shall have been given, by written registered or certified mail, return receipt requested to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 50% of the Outstanding Amount of the Notes of such Series, a written notice specifying such default and requiring it to be remedied and stating that such notice is a "**Notice of Default**" hereunder and, as a result of such default, the interests of the Holders of the Notes are materially and adversely affected and continue to be materially and adversely affected during the 60-day period; or

(d)     the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, conservator, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Issuer or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of sixty (60) consecutive days; or

(e)    the commencement by the Issuer of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment of or the taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator or similar official of the Issuer, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay, or the admission in writing by the Issuer of its inability to pay, its debts as such debts become due, or the taking of action by the Issuer in furtherance of any of the foregoing.

The Issuer shall deliver to the Indenture Trustee, within five (5) days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which with the giving of notice and the lapse of time would become an Event of Default, its status and what action the Issuer is taking or proposes to take with respect thereto.

Section 5.03.    Acceleration of Maturity; Rescission and Annulment.

If an Event of Default described in paragraph (a), (b) or (c) of Section 5.02 should occur and be continuing with respect to a Series, then and in every such case the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer (and to the Indenture Trustee if declared by Noteholders), and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

If an Event of Default described in paragraph (d) or (e) of Section 5.02 should occur and be continuing, then the unpaid principal of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall automatically become, and shall be deemed to be declared, due and payable.

At any time after such declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article V provided, the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes of such Series, by written notice to the Issuer and the Indenture Trustee, may rescind and annul such declaration and its consequences.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.04.    Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.

(a)    The Issuer covenants that if (i) default is made in the payment of any interest on any Note when the same becomes due and payable, and such default shall continue after the earlier to occur of (x) the next following date upon which interest becomes due and payable and (y) the date occurring thirty-five (35) days following the date on which such interest became due and payable, or (iii) default is made in the payment of principal of any Note, if and to the extent not previously paid, when the same becomes due and payable, the Issuer will, upon demand of the Indenture Trustee, pay to it, for the benefit of the Holders of the Notes of the affected Series, the whole amount then due and payable on such Notes for principal and interest, with interest upon the overdue principal, and, to the extent payment at such rate of interest shall be legally enforceable, interest upon overdue installments of interest, at the applicable Note Interest Rate borne by the Notes of such Series, and in addition thereto will pay such

further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)     In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor upon such Notes and collect in the manner provided by law out of the property of the Issuer or other obligor upon such Notes, wherever situated, the moneys adjudged or decreed to be payable.

(c)     If an Event of Default occurs and is continuing, the Indenture Trustee may, as more particularly provided in Section 5.05, in its discretion, proceed to protect and enforce its rights and the rights of the Noteholders of the affected Series, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)     In case there shall be pending, relative to the Issuer or any other obligor upon the Notes of the affected Series, or any Person having or claiming an ownership interest in the Collateral, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or in case a receiver, conservator, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator, custodian or other similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Issuer or other obligor upon the Notes of such Series, or to the creditors or property of the Issuer or such other obligor, the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section 5.04, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes of such Series and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence or bad faith) and of the Noteholders of such Series allowed in such Proceedings;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes of such Series in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)     to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders of such Series and of the Indenture Trustee on their behalf; and

(iv)   to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes of such Series allowed in any judicial Proceedings relative to the Issuer, its creditors and its property;

and any trustee, receiver, conservator, liquidator, custodian, assignee, sequestrator or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of negligence or bad faith.

(e)   Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)   All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or Proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the benefit of the Holders of the Notes of the affected Series as provided herein.

(g)   In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Holders of the Notes of the affected Series, and it shall not be necessary to make any such Noteholder a party to any such Proceedings.

Section 5.05.   Remedies; Priorities.

(a)   If an Event of Default shall have occurred and be continuing with respect to any Series, and the Notes of such Series have been accelerated pursuant to Section 5.03, the Indenture Trustee may do one or more of the following (subject to Sections 5.06 and 12.16):

(i)   institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes of the affected Series or under this Indenture with respect thereto, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes moneys adjudged due;

(ii)   subject to the last paragraph of this subsection 5.05(a), take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series;

(iii)   at the direction of the Holders of a majority of the Outstanding Amount of such Notes, cause the Issuer to sell Principal Receivables in an amount equal to the

Invested Amount with respect to the accelerated Series and the related Finance Charge Receivables (or interests therein) in accordance with Section 5.16 hereof;

provided, however, that the Indenture Trustee may not exercise the remedy described in subparagraph (iii) above unless (A) the Holders of 100% of the Outstanding Amount of the Notes of the affected Series consent thereto, (B) the Indenture Trustee determines that any proceeds of such exercise distributable to the Noteholders of the affected Series are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest or (C) the Indenture Trustee determines that the Collateral may not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of Holders of at least 66-2/3% of the Outstanding Amount of each Class of the Notes of such Series. In determining such sufficiency or insufficiency with respect to clause (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Collateral for such purpose.

The remedies provided in this Section 5.05(a) are the exclusive remedies provided to the Noteholders with respect to an Event of Default and each of the Noteholders (by their acceptance of their respective interests in the Notes) and the Indenture Trustee hereby expressly waive any other remedy that may be available under the applicable UCC.

(b)     If the Indenture Trustee collects any money or property pursuant to this Article V following the acceleration of the maturities of the Notes of the affected Series pursuant to Section 5.03 (so long as such declaration shall not have been rescinded or annulled), it shall pay the money or property in the following order:

FIRST:  to the Indenture Trustee for amounts due pursuant to Section 6.07;

SECOND:  to Holders of the Class A Notes of such Series for amounts due and unpaid on such Class A Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class A Notes for interest and principal;

THIRD:  to Holders of the Class B Notes of such Series for amounts due and unpaid on such Class B Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class B Notes for interest and principal;

FOURTH:  to the Holders of the Class C Notes of such Series for amounts due and unpaid on such Class C Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class C Notes for interest and principal;

FIFTH:  to the Holders of the Class D Notes of such Series for amounts due and unpaid on such Class D Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class D Notes for interest and principal;

SIXTH:  to the Holders of all other Classes of Notes, if any, of such Series for amounts due and unpaid on such Notes for interest and principal, according to the amounts due and payable on each such Class of Notes for interest and principal, sequentially in the priority for payment under the related Indenture Supplement; and

SEVENTH: to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement.

(c)    The Indenture Trustee may, upon notification to the Issuer, fix a record date and payment date for any payment to Noteholders of the affected Series pursuant to this Section 5.05. At least fifteen (15) days before such record date, the Indenture Trustee shall mail or send by facsimile to each such Noteholder a notice that states the record date, the payment date and the amount to be paid.

(d)    In addition to the application of money or property referred to in subsection 5.05(b) for an accelerated Series, amounts then held in the Collection Account, Special Funding Account or any Series Accounts for such Series and any amounts available under the Series Enhancement for such Series shall be used to make payments to the Holders of the Notes of such Series and the Series Enhancer for such Series in accordance with the terms of this Indenture, the related Indenture Supplement and the Series Enhancement for such Series. Following the sale of the Collateral (or portion thereof) for a Series and the application of the proceeds of such sale to such Series and the application of the amounts then held in the Collection Account, the Special Funding Account and any Series Accounts for such Series as are allocated to such Series and any amounts available under the Series Enhancement for such Series, such Series shall no longer be entitled to any allocation of Collections or other property constituting the Collateral under this Indenture and the Notes of such Series shall no longer be Outstanding.

Section 5.06.    Optional Preservation of the Collateral. If the Notes of any Series have been declared to be due, and payable under Section 5.03 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, and the Indenture Trustee has not received directions from the Noteholders pursuant to Section 5.12, the Indenture Trustee may, but need not, elect to maintain possession of the portion of the Collateral which secures such Notes. It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes, and the Indenture Trustee shall take such desire into account when determining whether or not to maintain possession of the Collateral. In determining whether to maintain possession of the Collateral, the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Collateral for such purpose.

Section 5.07.    Limitation on Suits.

No Noteholder shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    the Holders of not less than 25% of the Outstanding Amount of any affected Series of Notes have made written request to the Indenture Trustee to institute such proceeding in its own name as indenture trustee;

(b)    such Noteholder or Noteholders has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(c)    such Noteholder or Noteholders has offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Indenture Trustee for sixty (60) days after its receipt of such request and offer of indemnity has failed to institute any such Proceeding; and

(e)      no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by a majority of the Outstanding Amount of the Notes of such Series;

it being understood and intended that no one or more Noteholders of the affected Series shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Noteholders of such Series or to obtain or to seek to obtain priority or preference over any other Noteholders of such Series or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two (2) or more groups of Noteholders of such affected Series, each representing less than a majority of the Outstanding Amount of such Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.08.     Unconditional Rights of Noteholders to Receive Principal and Interest.

Notwithstanding any other provision in this Indenture, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal of and interest in respect of such Note as such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

Section 5.09.     Restoration of Rights and Remedies.

If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned, or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.10.     Rights and Remedies Cumulative.

No right, remedy, power or privilege herein conferred upon or reserved to the Indenture Trustee or to the Noteholders is intended to be exclusive of any other right, remedy, power or privilege, and every right, remedy, power or privilege shall, to the extent permitted by law, be cumulative. The assertion or exercise of any right or remedy shall not preclude any other further assertion or the exercise of any other appropriate right or remedy.

Section 5.11.     Delay or Omission Not Waiver.

No failure to exercise and no delay in exercising, on the part of the Indenture Trustee or of any Noteholder or other Person, any right or remedy occurring hereunder upon any Event of Default shall impair any such right or remedy or constitute a waiver thereof of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.12.    <u>Rights of Noteholders to Direct Indenture Trustee.</u>

A majority of the Outstanding Amount of the Notes of any affected Series if an Event of Default with respect to such Series has occurred and is continuing) shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee with respect to the Notes; <u>provided, however,</u> that subject to Section 6.01:

(a)    the Indenture Trustee shall have the right to decline any such direction if the Indenture Trustee, after being advised by counsel, determines that the action so directed is in conflict with any rule of law or with this Indenture, and

(b)    the Indenture Trustee shall have the right to decline any such direction if the Indenture Trustee in good faith shall, by a Responsible Officer of the Indenture Trustee, determine that the Proceedings so directed would be illegal or involve the Indenture Trustee in personal liability or be unjustly prejudicial to the Noteholders not parties to such direction.

Section 5.13.    <u>Waiver of Past Defaults.</u>

Prior to the declaration of the acceleration of the maturity of the Notes of the affected Series as provided in Section 5.03, a majority of the Outstanding Amount of the Notes of such Series may, on behalf of all such Noteholders, waive in writing any past default with respect to such Notes and its consequences, except a default:

(a)    in the payment of the principal or interest in respect of any Note of such Series, or

(b)    in respect of a covenant or provision hereof that under Section 10.02 hereof cannot be modified or amended without the consent of the Noteholder of each Outstanding Note affected.

Upon any such written waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 5.14.    <u>Undertaking for Costs.</u>

All parties to this Indenture agree, and each Noteholder by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.14 shall not apply to any suit instituted by the Indenture Trustee, to any suit instituted by any Noteholder, or group of Noteholders (in compliance with Section 5.08 hereof), holding in the aggregate more than 10% of the principal balance of the Outstanding Notes of the affected Series, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal or interest in respect of any Note on or after the Distribution Date on which any of such amounts was due (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.15.    Waiver of Stay or Extension Laws.

The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may adversely affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.16.    Sale of Receivables.

(a)    The method, manner, time, place and terms of any sale of Receivables (or interests therein) pursuant to Section 5.05(a)(iii) shall be commercially reasonable. The Indenture Trustee may from time to time postpone any sale by public announcement made at the time and place of such sale.   The Indenture Trustee hereby expressly waives its right to any amount fixed by law as compensation for any sale.

(b)    The Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer in connection with any sale of Receivables pursuant to Section 5.05(a)(iii).   No purchaser or transferee at any such sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

(c)    In its exercise of the foreclosure remedy pursuant to Section 5.05(a)(iii), the Indenture Trustee shall solicit bids from Permitted Assignees for the sale of Principal Receivables in an amount equal to the Invested Amount with respect to the affected Series of Notes at the time of sale and the related Finance Charge Receivables (or interests therein). The Transferor or any of its affiliates (other than NextBank) who are Permitted Assignees shall be entitled to participate in, and to receive from the Indenture Trustee a copy of each other bid submitted in connection with, such bidding process; provided that (a) at least one participant other than the Transferor and any of its affiliates must submit a bona fide offer, and (b) the Transferor and any of its affiliates are prohibited from bidding an amount which exceeds fair value for the transferred assets.   The Indenture Trustee shall sell such Receivables (or interests therein) to the bidder with the highest cash purchase offer.   The proceeds of any such sale shall be applied in accordance with Section 5.05(b).

Section 5.17.    Action on Notes.

The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.   Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer.   Any money or property collected by the Indenture Trustee shall be applied as specified in the applicable Indenture Supplement.

ARTICLE VI

THE INDENTURE TRUSTEE

Section 6.01.    Duties of the Indenture Trustee.

(a)    If an Event of Default has occurred and is continuing with respect to a Series of Notes and a Responsible Officer shall have actual knowledge or written notice of such Event of Default, the Indenture Trustee shall, prior to the receipt of directions, if any, from a majority of the Outstanding Amount of the Notes of such Series, exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; and

(ii)    in the absence of bad faith or negligence on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; provided, however, the Indenture Trustee, upon receipt of any resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Indenture Trustee which are specifically required to be furnished pursuant to any provision of this Indenture or any Indenture Supplement, shall examine them to determine whether they substantially conform to the requirements of this Indenture or any Indenture Supplement.  The Indenture Trustee shall give prompt written notice to the Noteholders of such Series and each Rating Agency of any material lack of conformity of any such instrument to the applicable requirements of this Indenture or any Indenture Supplement discovered by the Indenture Trustee which would entitle a majority of the  Outstanding Amount of the Notes of such Series to take any action pursuant to this Indenture or any Indenture Supplement.

(c)    In case a Redemption Event has occurred and is continuing with respect to a Series and a Responsible Officer shall have actual knowledge or written notice of such Redemption Event, the Indenture Trustee shall, prior to the receipt of directions, if any, from a majority of the Outstanding Amount of the Notes of such Series, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)    No provision of this Indenture shall be construed to relieve the Indenture Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection (d) shall not be construed to limit the effect of subsection (a) of this Section 6.01;

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith, unless it shall be proved that the Indenture Trustee was negligent in ascertaining the pertinent facts; and

(iii)     the Indenture Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with this Indenture and/or the direction of a majority of the Outstanding Amount of the Notes of each outstanding Series of Notes relating to the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee, or for exercising any trust or power conferred upon the Indenture Trustee, under this Indenture. The Indenture Trustee shall not be liable for any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Servicer, the Transferor or the Trust in compliance with the terms of this Indenture or any Indenture Supplement.

(e)     No provision of this Indenture shall require the Indenture Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(f)     Every provision of this Indenture that in any way relates to the Indenture Trustee is subject to subsections (a), (b), (c), (d) and (e) of this Section 6.01.

(g)     Except as expressly provided in this Indenture, the Indenture Trustee shall have no power to vary the Collateral, including, without limitation, by (i) accepting any substitute payment obligation for a Receivable initially transferred to the Trust under the Transfer and Servicing Agreement, (ii) adding any other investment, obligation or security to the Trust or (iii) withdrawing from the Trust any Receivable (except as otherwise provided in the Transfer and Servicing Agreement).

(h)     The Indenture Trustee shall have no responsibility or liability for investment losses on Eligible Investments (other than Eligible Investments on which the institution acting as Indenture Trustee is an obligor).

(i)     The Indenture Trustee shall notify each Rating Agency (i) of any change in any rating of the Notes by any other Rating Agency of which a Responsible Officer has actual knowledge, (ii) immediately of the occurrence of any Event of Default or Redemption Event of which a Responsible Officer has actual knowledge and (iii) immediately of potential Redemption Events or Events of Default of which a Responsible Officer has actual notice from the Servicer.

(j)     For all purposes under this Indenture, the Indenture Trustee shall not be deemed to have notice or knowledge of any Event of Default, Redemption Event or Servicer Default unless a Responsible Officer has actual knowledge thereof or has received written notice thereof. For purposes of determining the Indenture Trustee's responsibility and liability hereunder, any reference to an Event of Default, Redemption Event or Servicer Default shall be construed to refer only to such event of which the Indenture Trustee is deemed to have notice as described in this subsection 6.01(j).

Section 6.02.     Notice of Redemption Event or Event of Default.

Upon the occurrence of any Redemption Event or Event of Default of which a Responsible Officer has actual knowledge or has received notice thereof, the Indenture Trustee shall transmit by mail to all Noteholders as their names and addresses appear on the Note Register and the Rating Agencies, notice of such Redemption Event or Event of Default hereunder known to the Indenture Trustee within thirty (30) days after it occurs or within ten (10) Business Days after it receives such notice or obtains actual notice, if later.

Section 6.03.    Rights of Indenture Trustee.

Except as otherwise provided in Section 6.01 hereof:

(a)    The Indenture Trustee may conclusively rely and shall fully be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    Whenever in the administration of this Indenture the Indenture Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Indenture Trustee (unless other evidence is specifically prescribed herein) may, in the absence of bad faith on its part, rely upon an Officer's Certificate of the Issuer. The Issuer shall provide a copy of such Officer's Certificate to the Noteholders at or prior to the time the Indenture Trustee receives such Officer's Certificate;

(c)    As a condition to the taking, suffering or omitting of any action by it hereunder, the Indenture Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(d)    The Indenture Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or to honor the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Indenture Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(e)    The Indenture Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but the Indenture Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Indenture Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Servicer, personally or by agent or attorney;

(f)    The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Indenture Trustee shall not be responsible for (i) any misconduct or negligence on the part of any agent, attorney, custodians or nominees appointed with due care by it hereunder or (ii) the supervision of such agents, attorneys, custodians or nominees after such appointment with due care;

(g)    The Indenture Trustee shall not be liable for any actions taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights conferred upon the Indenture Trustee by this Indenture; and

(h)    In the event that the Indenture Trustee is also acting as Paying Agent and Transfer Agent and Registrar, the rights and protections afforded to the Indenture Trustee pursuant to this Article VI shall also be afforded to such Paying Agent and Transfer Agent and Registrar.

Section 6.04.    Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, except the certificate of authentication of the Indenture Trustee, shall be taken as the statements of the Issuer, and the Indenture Trustee assumes no responsibility for their correctness. The Indenture Trustee makes no representation as to the validity or sufficiency of the Agreement, the Notes, or any related document. The Indenture Trustee shall not be accountable for the use or application by the Issuer of the proceeds from the Notes.

Section 6.05.    May Hold Notes.

The Indenture Trustee, any Paying Agent, Transfer Agent and Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer with the same rights it would have if it were not Indenture Trustee, Paying Agent, Transfer Agent and Registrar or such other agent.

Section 6.06.    Money Held in Trust.

Money held by the Indenture Trustee in trust hereunder need not be segregated from other funds held by the Indenture Trustee in trust hereunder except to the extent required herein or required by law. The Indenture Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon in writing by the Indenture Trustee and the Issuer.

Section 6.07.    Compensation, Reimbursement and Indemnification.

The Servicer shall pay to the Indenture Trustee from time to time reasonable compensation for all services rendered by the Indenture Trustee under this Agreement (which compensation shall not be limited by any law on compensation of a trustee of an express trust). The Servicer shall reimburse the Indenture Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts. Pursuant to the Transfer and Servicing Agreement, the Issuer shall direct the Servicer to indemnify and the Servicer shall indemnify the Indenture Trustee against any and all loss, liability or expense (including the fees of either in-house counsel or outside counsel, but not both) incurred by it in connection with the administration of this trust and the performance of its duties hereunder. The Indenture Trustee shall notify the Issuer and the Servicer promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Issuer and the Servicer shall not relieve the Issuer or the Servicer of its obligations hereunder unless such loss, liability or expense could have been avoided with such prompt notification and then only to the extent of such loss, liability or expense which could have been so avoided. The Servicer shall defend any claim against the Indenture Trustee; the Indenture Trustee may have separate counsel and, if it does, the Servicer shall pay the fees and expenses of such counsel. The Servicer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

The Servicer's payment obligations to the Indenture Trustee pursuant to this Section 6.07 shall survive the discharge of this Indenture. When the Indenture Trustee incurs expenses after the occurrence of a Default specified in subsection 5.02(d) or (e) with respect to the Issuer, the expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

Notwithstanding anything herein to the contrary, the Indenture Trustee's right to enforce any of the Servicer's payment obligations pursuant to this Section 6.07 shall be subject to the provisions of Section 12.16.

Section 6.08.     Replacement of Indenture Trustee.

No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this Section 6.08. The Indenture Trustee may resign at any time by giving thirty (30) days written notice to the Issuer. A majority of the Outstanding Amount of the Notes, upon delivery of notice of such removal to the Issuer, may remove the Indenture Trustee by so notifying the Indenture Trustee and may appoint a successor Indenture Trustee. The Issuer shall remove the Indenture Trustee if:

(i)     the Indenture Trustee fails to comply with Section 6.11;

(ii)     the Indenture Trustee is adjudged a bankrupt or insolvent;

(iii)     a receiver of the Indenture Trustee or of its property shall be appointed, or any public officer takes charge of the Indenture Trustee or its property or its affairs for the purpose of rehabilitation, conservation or liquidation; or

(iv)     the Indenture Trustee otherwise becomes legally unable to act.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer shall promptly appoint a successor Indenture Trustee. The Issuer shall furnish each Rating Agency with a copy of any notice of resignation or removal of a retiring Indenture Trustee pursuant to this Section 6.08 promptly after receiving such notice, in the case of a resignation by a retiring Indenture Trustee, or delivering such notice, in the case of a removal of a retiring Indenture Trustee by the Issuer.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee, the Administrator and the Issuer. Thereupon the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture. The successor Indenture Trustee shall mail a notice of its succession to all of the Noteholders and each Rating Agency. The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within sixty (60) days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or the Holders of a majority of the Outstanding Amount of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with Section 6.11, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section 6.08, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee.

Section 6.09.    Successor Indenture Trustee by Merger.

If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation or banking association without any further act shall be the successor Indenture Trustee; provided that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11. The Indenture Trustee shall provide the Rating Agencies prior written notice of any such transaction.

In case at the time such successor or successors by merger, conversion, consolidation or transfer to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor Indenture Trustee and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10.    Appointment of Co-Indenture Trustee or Separate Indenture Trustee.

(a)    Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Collateral may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Collateral, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders, such title to the Collateral, or any part hereof, and, subject to the other provisions of this Section 6.10, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.08 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Collateral or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee. Every such instrument shall be filed with the Indenture Trustee.

(d)    Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 6.11:    Eligibility; Disqualification.

The Indenture Trustee shall at all times satisfy the requirements of TIA §310(a). The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and its long-term unsecured debt shall be rated at least Baa3 by Moody's, at least BBB- by Standard & Poor's and, if rated by Fitch, at least BBB- by Fitch. The Indenture Trustee shall comply with TIA §310(b), including the optional provision permitted by the second sentence of TIA §310(b)(9); provided, however, that there shall be excluded from the operation of TIA §310(b)(1) any indenture or indentures under which other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA §310(b)(1) are met.

Section 6.12.    Preferential Collection of Claims Against .

The Indenture Trustee shall comply with TIA §311(a), excluding any creditor relationship listed in TIA §311(b). An Indenture Trustee who has resigned or been removed shall be subject to TIA §311(a) to the extent indicated.

Section 6.13.    Tax Returns.

In the event the Trust shall be required to file tax returns, the Servicer shall prepare or shall cause to be prepared such tax returns and shall provide such tax returns to the Owner Trustee for signature at least five (5) days before such tax returns are due to be filed. The Servicer, in accordance with the terms of each Indenture Supplement, shall also prepare or shall cause to be prepared all tax information required by law to be distributed to Noteholders and shall deliver such information to the Owner Trustee at least five (5) days prior to the date it is required by law to be distributed to Noteholders. The Owner Trustee, upon written request, will furnish the Servicer with all such information known to the Owner Trustee as may be reasonably requested and required in connection with the preparation of all tax returns of the Trust, and shall, upon request, execute such returns. In no event shall the Owner Trustee be personally liable for any liabilities, costs or expenses of the Trust or any Noteholder arising under any tax law, including without limitation, federal, state or local income or excise taxes or any other tax imposed on or measured by income (or any interest or penalty with respect thereto arising from a failure to comply therewith).

Section 6.14.    <u>Representations and Covenants of the Indenture Trustee</u>.

The Indenture Trustee represents, warrants and covenants that:

(i)    The Indenture Trustee is a banking corporation duly organized and validly existing under the laws of the State of New York;

(ii)    The Indenture Trustee has full power and authority to deliver and perform this Indenture and has taken all necessary action to authorize the execution, delivery and performance by it of this Indenture and other Transaction Documents to which it is a party; and

(iii)    Each of this Indenture and other Transaction Documents to which it is a party has been duly executed and delivered by the Indenture Trustee and constitutes its legal, valid and binding obligation in accordance with its terms.

Section 6.15.    <u>Custody of the Collateral</u>

The Indenture Trustee shall hold such of the Collateral as consists of instruments, deposit accounts, negotiable documents, money, goods, letters of credit, and advices of credit in the State of New York. The Indenture Trustee shall hold such of the Collateral as constitutes investment property through a securities intermediary, which securities intermediary shall agree with the Indenture Trustee that (a) such investment property shall at all times be credited to a securities account of the Indenture Trustee, (b) such securities intermediary shall treat the Indenture Trustee as entitled to exercise the rights that comprise each financial asset credited to such securities account, (c) all property credited to such securities account shall be treated as financial assets, (d) such securities intermediary shall comply with entitlement orders originated by the Indenture Trustee without the further consent of any other person or entity, (e) such securities intermediary shall not agree with any person or entity other than the Indenture Trustee to comply with entitlement orders originated by any person or entity other than the Indenture Trustee, (f) such securities accounts and the property credited thereto shall not be subject to any lien, security interest, right of set-off, or encumbrance in favor of such securities intermediary or anyone claiming through it (other than the Indenture Trustee), and (g) such agreement shall be governed by the laws of the State of New York. Terms used in this Section 6.15 that are defined in the New York UCC and not otherwise defined herein shall have the meaning set forth in the New York UCC. Except as permitted by this Section 6.15, the Indenture Trustee shall not hold any part of the Collateral through an agent or a nominee.

<center>ARTICLE VII</center>

<center>NOTEHOLDERS' LIST AND REPORTS BY INDENTURE TRUSTEE AND ISSUER</center>

Section 7.01.    <u>Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders</u>.

The Issuer will furnish or cause to be furnished to the Indenture Trustee (a) upon each transfer of a Note, a list, in such form as the Indenture Trustee may reasonably require, of the names, addresses and taxpayer identification numbers of the Noteholders as they appear on the Note Register as of the most recent Record Date, and (b) at such other times, as the Indenture Trustee may request in writing, within ten (10) days after receipt by the Issuer of any such request, a list of similar form and content as of a date not more than ten (10) days prior to the time such list is furnished; provided, however, that for so long as the Indenture Trustee is the Transfer Agent and Registrar, no such list shall be required to be furnished.

Section 7.02.    Preservation of Information; Communications to Noteholders.

(a)    The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Noteholders contained in the most recent list furnished to the Indenture Trustee as provided in Section 7.01 and the names, addresses and taxpayer identification numbers of the Noteholders received by the Indenture Trustee in its capacity as Transfer Agent and Registrar. The Indenture Trustee may destroy any list furnished to it as provided in Section 7.01 upon receipt of a new list so furnished.

(b)    Noteholders may communicate, pursuant to TIA §312(b), with other Noteholders with respect to their rights under this Indenture or under the Notes.

(c)    The Issuer, the Indenture Trustee and the Transfer Agent and Registrar shall have the protection of TIA §312(c).

Section 7.03.    Reports by Issuer.

(a)    The Issuer shall:

(i)    file with the Indenture Trustee, within fifteen (15) days after the Issuer is required to file the same with the Commission, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) which the Issuer may be required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act;

(ii)    file with the Indenture Trustee and the Commission in accordance with rules and regulations prescribed from time to time by the Commission such additional information, documents and reports with respect to compliance by the Issuer with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

(iii)    supply to the Indenture Trustee (and the Indenture Trustee shall transmit by mail to all Noteholders) such summaries of any information, documents and reports required to be filed by the Issuer pursuant to clauses (i) and (ii) of this subsection 7.03(a) as may be required by rules and regulations prescribed from time to time by the Commission.

(b)    Unless the Issuer otherwise determines, the fiscal year of the Issuer shall end on December 31 of each year.

Section 7.04.    Reports by Indenture Trustee.

If required by TIA §313(a), within sixty (60) days after each March 31 beginning with March 31, 2002, the Indenture Trustee shall mail to each Noteholder as required by TIA §313(c) a brief report dated as of such date that complies with TIA §313(a). The Indenture Trustee also shall comply with TIA §313(b).

A copy of each report at the time of its mailing to Noteholders shall be filed by the Indenture Trustee with the Commission and each stock exchange, if any, on which the Notes are listed. The Issuer shall notify the Indenture Trustee if and when the Notes are listed on any stock exchange.

ARTICLE VIII

ALLOCATION AND APPLICATION OF COLLECTIONS

Section 8.01.    Collection of Money.

Except as otherwise expressly provided herein and in the related Indenture Supplement, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture. Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under the Transfer and Servicing Agreement or any other Transaction Document, the Indenture Trustee may, and upon the request of a majority of the Holders of the Outstanding Amount of the Notes of an affected Series shall, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings. Any such action shall be without prejudice to any right to claim a Redemption Event or a Default or Event of Default under this Indenture and to proceed thereafter as provided in Article V hereof.

Section 8.02.    Rights of Noteholders.

The Collateral shall secure the obligation of the Trust to pay to the Holders of the Notes of each Series principal and interest and other amounts payable pursuant to this Indenture and the related Indenture Supplement. Except as specifically set forth in the Indenture Supplement with respect thereto, the Notes of any Series or Class shall not have rights to payment from any Series Account or Series Enhancement allocated for the benefit of any other Series or Class.

Section 8.03.    Establishment of Collection Account and Special Funding Account.

The Servicer, for the benefit of the Noteholders, shall establish and maintain with the Indenture Trustee or its nominee in the name of the Indenture Trustee, on behalf of the Trust, one or more Qualified Accounts (including any subaccount thereof) bearing a designation clearly indicating that the funds and other property credited thereto are held for the benefit of the Noteholders (collectively, the "Collection Account"). The Indenture Trustee shall possess all right, title and interest in all monies, instruments, investment property, documents, certificates of deposit and other property credited from time to time to the Collection Account and in all proceeds, earnings, income, revenue, dividends and distributions thereof for the benefit of the Noteholders.

The Collection Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders. Except as expressly provided in this Indenture and the Transfer and Servicing Agreement, the Servicer agrees that it shall have no right of setoff or banker's lien against, and no right to otherwise deduct from, any funds held in the Collection Account for any amount owed to it by the Indenture Trustee, the Trust, any Noteholder or any Series Enhancer. If, at any time, the Collection Account ceases to be a Qualified Account, the Indenture Trustee (or the Servicer on its behalf) shall within ten (10) Business Days (or such longer period, not to exceed thirty (30) calendar days, as to which each Rating Agency may consent) establish a new Collection Account meeting the conditions specified above, transfer any monies, documents, instruments, investment property, certificates of deposit and other property to such new Collection Account and from the date such new Collection Account is established, it shall be the "Collection Account." Pursuant to the authority granted to the Servicer in subsection 3.01(b) of the Transfer and Servicing Agreement, the Servicer shall have the power, revocable

by the Indenture Trustee, to make withdrawals and payments from the Collection Account and to instruct the Indenture Trustee to make withdrawals and payments from the Collection Account for the purposes of carrying out the Servicer's or the Indenture Trustee's duties hereunder and under the Transfer and Servicing Agreement, as applicable. The Servicer shall reduce deposits into the Collection Account payable by the Transferor on any Deposit Date to the extent the Transferor is entitled to receive funds from the Collection Account on such Deposit Date, but only to the extent such reduction would not reduce the Transferor Interest to an amount less than the Required Transferor Interest.

Funds on deposit in the Collection Account (other than investment earnings and amounts deposited pursuant to Section 2.06, 6.01, or 7.01 of the Transfer and Servicing Agreement or Section 11.02 of this Indenture) shall at the written direction of the Servicer be invested by the Indenture Trustee in Eligible Investments selected by the Servicer. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Noteholders pursuant to Section 6.15. Investments of funds representing Collections collected during any Monthly Period shall be invested in Eligible Investments that will mature so that such funds will be available no later than the close of business on each monthly Transfer Date following such Monthly Period. No such Eligible Investment shall be disposed of prior to its maturity; provided, however, that the Indenture Trustee may sell, liquidate or dispose of any such Eligible Investment before its maturity, at the written direction of the Servicer, if such sale, liquidation or disposal would not result in a loss of all or part of the principal portion of such Eligible Investment or if, prior to the maturity of such Eligible Investment, a default occurs in the payment of principal, interest or any other amount with respect to such Eligible Investment. Unless directed by the Servicer, funds deposited in the Collection Account on a Transfer Date with respect to the immediately succeeding Distribution Date are not required to be invested overnight. On each Distribution Date, all interest and other investment earnings (net of losses and investment expenses) on funds on deposit in the Collection Account shall be paid to the Transferor, except as otherwise specified in any Indenture Supplement. The Indenture Trustee shall bear no responsibility or liability for any losses resulting from investment or reinvestment of any funds in accordance with this Section 8.03 nor for the selection of Eligible Investments in accordance with the provisions of this Indenture and any Indenture Supplement (other than Eligible Investments on which the institution acting as Indenture Trustee is an obligor).

The Servicer, for the benefit of the Noteholders, shall establish and maintain with the Indenture Trustee or its nominee in the name of the Indenture Trustee, on behalf of the Trust, a Qualified Account (including any subaccounts thereof) bearing a designation clearly indicating that the funds and other property credited thereto are held for the benefit of the Noteholders (the "**Special Funding Account**"). The Indenture Trustee shall possess all right, title and interest in all monies, instruments, investment property, documents, certificates of deposit and other property credited from time to time to the Special Funding Account and in all proceeds, dividends, distributions, earnings, income and revenue thereof for the benefit of the Noteholders. The Special Funding Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders. Except as expressly provided in this Indenture and the Transfer and Servicing Agreement, the Servicer shall have no right of setoff or banker's lien against, and no right to otherwise deduct from, any funds and other property held in the Special Funding Account for any amount owed to it by the Indenture Trustee, the Trust, any Noteholder or any Series Enhancer. If, at any time, the Special Funding Account ceases to be a Qualified Account, the Indenture Trustee (or the Servicer on its behalf) shall within ten (10) Business Days (or such longer period, not to exceed thirty (30) calendar days, as to which each Rating Agency may consent) establish a new Special Funding Account meeting the conditions specified above, transfer any monies, documents, instruments, investment property, certificates of deposit and other property to such new Special Funding Account and from the date such new Special Funding Account is established, it shall be the "**Special Funding Account**."

Funds on deposit in the Special Funding Account shall at the written direction of the Servicer be invested by the Indenture Trustee in Eligible Investments selected by the Servicer. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Noteholders pursuant to Section 6.15. Funds on deposit in the Special Funding Account on any Distribution Date will be invested in Eligible Investments that will mature so that such funds will be available no later than the close of business on the Transfer Date following such Monthly Period. No such Eligible Investment shall be disposed of prior to its maturity; provided, however, that the Indenture Trustee may sell, liquidate or dispose of an Eligible Investment before its maturity, at the written direction of the Servicer, if such sale, liquidation or disposal would not result in a loss of all or part of the principal portion of such Eligible Investment or if, prior to the maturity of such Eligible Investment, a default occurs in the payment of principal, interest or any other amount with respect to such Eligible Investment. Unless directed by the Servicer, funds deposited in the Special Funding Account on a Transfer Date with respect to the immediately succeeding Distribution Date are not required to be invested overnight. On each Distribution Date, all interest and other investment earnings (net of losses and investment expenses) on funds on deposit in the Special Funding Account shall be treated as Collections of Finance Charge Receivables with respect to the last day of the related Monthly Period except as otherwise specified in the related Indenture Supplement. On each Business Day on which funds are on deposit in the Special Funding Account and on which no Series is in an Accumulation Period or Amortization Period, the Servicer shall determine the amount (if any) by which the Transferor Interest exceeds the Required Transferor Interest on such date and shall instruct the Indenture Trustee to withdraw any such excess from the Special Funding Account and pay such amount to the Holders of the Transferor Certificates; provided, however, that, if an Accumulation Period or Amortization Period has commenced and is continuing with respect to one or more outstanding Series, any funds on deposit in the Special Funding Account shall be treated as Shared Principal Collections and shall be allocated and distributed in accordance with Section 8.05 and the terms of each Indenture Supplement.

Section 8.04.    Collections and Allocations.

(a)    The Servicer will apply or will instruct the Indenture Trustee to apply all funds on deposit in the Collection Account as described in this Article VIII and in each Indenture Supplement. Except as otherwise provided below, the Servicer shall deposit Collections into the Collection Account as promptly as possible after the Date of Processing of such Collections, but in no event later than the second Business Day following the Date of Processing. Subject to the express terms of any Indenture Supplement, but notwithstanding anything else in this Indenture or the Transfer and Servicing Agreement to the contrary, if one or more of the following conditions is satisfied: (i) NextBank remains the Servicer; NextCard guarantees the performance of the Servicer's obligations (unless the Rating Agencies shall consent to the deletion of such guarantee) and achieves and maintains a commercial paper rating of not less than A-1 by Standard & Poor's, not less than P-1 by Moody's and, if rated by Fitch, not less than F1 by Fitch, and NextBank remains a wholly-owned NextCard subsidiary (directly or indirectly) and in the event that there is any material change in the financing relationship between NextBank and NextCard, (A) NextBank shall have notified each Rating Agency and (B) the Rating Agency Condition shall be satisfied with respect to such material change, or (ii) any other arrangements are made such that the Rating Agency Condition is satisfied with respect thereto, and for two (2) Business Days following any reduction of any such rating or change in ownership, the Servicer need not make the daily deposits of Collections into the Collection Account as provided in the preceding sentence, but may make a single deposit in the Collection Account in immediately available funds not later than 1:00 p.m., New York City time, on the Transfer Date immediately preceding the Distribution Date following the Monthly Period with respect to which such deposit relates. Subject to the first proviso in Section 8.05, but notwithstanding anything else in this Indenture or the Transfer and Servicing Agreement to the contrary, with respect to any Monthly Period, whether the Servicer is required to make deposits of collections pursuant to the first or the second preceding sentence, (i) the Servicer will only be required to deposit

Collections into the Collection Account up to the aggregate amount of Collections required to be deposited into any Series Account or, without duplication, distributed on or prior to the related Distribution Date to Noteholders or to any Series Enhancer pursuant to the terms of any Indenture Supplement or Enhancement Agreement and (ii) if at any time prior to such Distribution Date the amount of Collections deposited in the Collection Account exceeds the amount required to be deposited pursuant to clause (i) above, the Servicer will be permitted to withdraw the excess from the Collection Account and pay such amounts pursuant to the terms of the Transaction Documents.  Subject to the immediately preceding sentence, the Servicer may retain its Servicing Fee with respect to a Series and shall not be required to deposit it in the Collection Account.  To the extent that, in accordance with this subsection 8.04(a), the Servicer has retained amounts which would otherwise be required to be deposited into the Collection Account or any Series Account with respect to any Monthly Period, the Servicer shall be required to deposit such amounts in the Collection Account or such Series Account on the related Distribution Date to the extent necessary to make required distributions on the related Distribution Date, including any amounts which are required to be applied as Reallocated Principal Collections, and pay any amounts remaining after making such deposit pursuant to the terms of the Transaction Documents.

(b)     Collections of Finance Charge Receivables, Principal Receivables and Defaulted Receivables will be allocated to each Series of Notes and to the Holders of the Transferor Certificates in accordance with this Article VIII and each Indenture Supplement and amounts so allocated to any Series will not, except as specified in the related Indenture Supplement, be available to the Noteholders of any other Series.  Allocations of the foregoing amounts between the Holders of the Notes and the Holders of the Transferor Certificates, among the Series and among the Classes in any Series, shall be set forth in the related Indenture Supplement or Indenture Supplements.

Section 8.05.     Shared Principal Collections.

On each Distribution Date, (a) the Servicer shall allocate Shared Principal Collections (as described below) to each Principal Sharing Series, *pro rata*, in proportion to the Principal Shortfalls, if any, with respect to each such Series and (b) the Servicer shall withdraw from the Collection Account and pay to the Holders of the Transferor Certificates an amount equal to the excess, if any, of (x) the aggregate amount for all outstanding Series of Collections of Principal Receivables which the related Indenture Supplements specify are to be treated as "**Shared Principal Collections**" for such Distribution Date over (y) the aggregate amount for all outstanding Series which the related Indenture Supplements specify are "**Principal Shortfalls**" for such Series and for such Distribution Date; provided, *however*, that if the Transferor Interest as of such Distribution Date (determined after giving effect to the Principal Receivables or Participation Interests transferred to the Trust on such date) is less than the Required Transferor Interest, the Servicer will not distribute to the Holders of the Transferor Certificates any such amounts that otherwise would be distributed to the Holders of the Transferor Certificates, but shall deposit such funds in the Special Funding Account.  The Transferor may, at its option, instruct the Indenture Trustee to deposit Shared Principal Collections which are otherwise payable to the Holders of the Transferor Certificates pursuant to the provisions set forth above into the Special Funding Account. Notwithstanding the foregoing, a Group of Series may specify in their related Indenture Supplements that Shared Principal Collections from such Series shall be allocated as provided above but only among the Series in such Group.

Section 8.06.     Additional Withdrawals from the Collection Account.

On or before the Determination Date with respect to any Monthly Period, the Servicer shall determine the amounts payable to NextBank or any other Account Owner with respect to such Monthly Period under the Transfer and Servicing Agreement or any applicable Receivables Purchase Agreement in respect of amounts credited to the Collection Account that were not transferred to the Trust

under the Transfer and Servicing Agreement, and the Servicer shall withdraw such amounts not belonging to the Trust from the Collection Account and pay such amounts to NextBank or any other Account Owner, as applicable.

Section 8.07.    Allocation of Collateral to Series or Groups.

To the extent so provided in the Indenture Supplement for any Series or in an Indenture Supplement otherwise executed pursuant to Section 10.01, Receivables conveyed to the Trust pursuant to Section 2.01 of the Transfer and Servicing Agreement and Receivables or Participation Interests conveyed to the Trust pursuant to Section 2.09 of the Transfer and Servicing Agreement or any Participation Interest Supplement, and all Collections received with respect thereto may be allocated or applied in whole or in part to one or more Series or Groups as may be provided in such Indenture Supplement; provided, however, that any such allocation or application shall be effective only upon satisfaction of the following conditions:

(i)    on or before the fifth Business Day immediately preceding such allocation, the Servicer shall have given the Indenture Trustee and each Rating Agency written notice of such allocation;

(ii)    the Rating Agency Condition shall have been satisfied with respect to such allocation; and

(iii)    the Servicer shall have delivered to the Indenture Trustee an Officer's Certificate, dated the date of such allocation, to the effect that the Servicer reasonably believes that such allocation will not have an Adverse Effect.

Any such Indenture Supplement may provide that (i) such allocation to one or more particular Series or Groups may terminate upon the occurrence of certain events specified therein and (ii) that upon the occurrence of any such event, such assets and any Collections with respect thereto, shall be reallocated to other Series or Groups or to all Series, all as shall be provided in such Indenture Supplement.

Section 8.08.    Excess Finance Charge Collections.

On each Distribution Date, (a) the Servicer shall allocate Excess Finance Charge Collections (as described below) to each Excess Allocation Series, *pro rata*, in proportion to the Finance Charge Shortfalls (as described below), if any, with respect to each such Series and (b) the Servicer shall withdraw from the Collection Account and pay to the Holders of the Transferor Certificates an amount equal to the excess, if any, of (x) the aggregate amount for all outstanding Series of Collections of Finance Charge Receivables which the related Supplements specify are to be treated as "**Excess Finance Charge Collections**" for such Distribution Date over (y) the aggregate amount for all outstanding Series which the related Supplements specify are "**Finance Charge Shortfalls**" for such Series and such Distribution Date; provided, however, that the sharing of Excess Finance Charge Collections among Series will continue only until such time, if any, at which the Transferor shall deliver to the Indenture Trustee an Officer's Certificate to the effect that, in the reasonable belief of the Transferor, the continued sharing of Excess Finance Charge Collections among Series would have adverse regulatory implications with respect to an Account Owner. Notwithstanding the foregoing, a Group of Series may specify in their related Indenture Supplements that Excess Finance Charge Collections from such Series shall be allocated as provided above but only among the Series in such Group.

Section 8.09.    Release of Collateral; Eligible Loan Documents.

(a)    The Indenture Trustee may, and when required by the provisions of this Indenture shall, execute instruments to release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same, in a manner and under circumstances which are not inconsistent with the provisions of this Indenture.  No party relying upon an instrument executed by the Indenture Trustee as provided in this Article VIII shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

(b)    In order to facilitate the servicing of the Receivables by the Servicer, the Indenture Trustee upon Issuer Order shall authorize the Servicer to execute in the name and on behalf of the Indenture Trustee instruments of satisfaction or cancellation, or of partial or full release or discharge, and other comparable instruments with respect to the Receivables (and the Indenture Trustee shall execute any such documents on request of the Servicer), subject to the obligations of the Servicer under the Transfer and Servicing Agreement.

(c)    The Indenture Trustee shall, at such time as there are no Notes outstanding, release and transfer, without recourse, all of the Collateral that secured the Notes (other than any cash held for the payment of the Notes pursuant to Section 4.02).  The Indenture Trustee shall release property from the lien of this Indenture pursuant to this Section 8.09(c) only upon receipt of an Issuer Order accompanied by an Officer's Certificate, an Opinion of Counsel and (if required by the TIA) Independent Certificates in accordance with TIA §314(c) and 314(d)(1) meeting the applicable requirements of Section 12.01.

(d)    Notwithstanding anything to the contrary in this Indenture, the Transfer and Servicing Agreement and the Trust Agreement, immediately prior to the release of any portion of the Collateral or any funds on deposit in the Series Accounts pursuant to this Indenture, the Indenture Trustee shall remit to the Transferor for its own account any funds that, upon such release, would otherwise be remitted to the Issuer.

Section 8.10.    Opinion of Counsel

The Indenture Trustee shall receive at least seven (7) days notice when requested by the Issuer to take any action pursuant to subsection 8.09(a), accompanied by copies of any instruments involved, and the Indenture Trustee shall also require, as a condition to such action, an Opinion of Counsel, in form and substance reasonably satisfactory to the Indenture Trustee, stating the legal effect of any such action, outlining the steps required to complete the same, and concluding that all conditions precedent to the taking of such action have been complied with and such action will not materially and adversely impair the security for the Notes or the rights of the Noteholders in contravention of the provisions of this Indenture; provided, however, that such Opinion of Counsel shall not be required to express an opinion as to the fair value of the Collateral. The Indenture Trustee and counsel rendering any such opinion may rely, without independent investigation, on the accuracy and validity of any certificate or other instrument delivered to the Indenture Trustee in connection with any such action.

ARTICLE IX

DISTRIBUTIONS AND REPORTS TO NOTEHOLDERS

Distributions shall be made to, and reports shall be provided to, Noteholders as set forth in the applicable Indenture Supplement.  The identity of the Noteholders with respect to distributions and reports shall be determined according to the immediately preceding Record Date.

ARTICLE X

SUPPLEMENTAL INDENTURES

Section 10.01.  Supplemental Indentures Without Consent of Noteholders.

(a)    Without the consent of the Holders of any Notes, but upon satisfaction of the Rating Agency Condition, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, at any time and from time to time, may enter into one or more indentures supplemental hereto (which shall conform to the provisions of the TIA as in force at the date of the execution thereof), in form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(ii)    to evidence the succession, in compliance with Section 3.11 hereof, of another person to the Issuer, and the assumption by any such successor of the covenants of the Issuer herein and in the Notes contained;

(iii)    to add to the covenants of the Issuer, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Issuer;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(v)    to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture or to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; provided that such action shall not adversely affect the interests of the Holders of the Notes;

(vi)    to evidence and provide for the acceptance of the appointment hereunder by a successor indenture trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one indenture trustee, pursuant to the requirements of Article VI;

(vii)    to modify, eliminate or add to the provisions of this Indenture to such extent as shall be necessary to effect the qualification of this Indenture under the TIA or under any similar federal statute hereafter enacted and to add to this Indenture such other provisions as may be expressly required by the TIA;

(viii)    to provide for the issuance of one or more new Series of Notes, in accordance with the provisions of Section 2.12 hereof; or

(ix)    to provide for the termination of any interest rate swap agreement or other form of credit enhancement in accordance with the provisions of the related Indenture Supplement.

The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b)    The Issuer and the Indenture Trustee, when authorized by an Issuer Order, may, also without the consent of any Noteholders of any Series then Outstanding but upon satisfaction of the Rating Agency Condition with respect to the Notes of all Series, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however that (i) the Transferor shall have delivered to the Indenture Trustee an Officer's Certificate, dated the date of any such action, stating that the Transferor reasonably believes that such action will not have an Adverse Effect and (ii) a Tax Opinion shall have been delivered to each Rating Agency. Additionally, notwithstanding the preceding sentence, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, may, without the consent of any Noteholders of any Series then Outstanding or the Series Enhancers for any Series, enter into an indenture or indentures supplemental hereto to add, modify or eliminate such provisions as may be necessary or advisable in order to enable all or a portion of the Trust (i) to qualify as, and to permit an election to be made to cause the Trust to be treated as, a "financial asset securitization investment trust" as described in the provisions of Section 860L of the Code, and (ii) to avoid the imposition of state or local income or franchise taxes imposed on the Trust's property or its income; provided, however, that (i) the Transferor delivers to the Indenture Trustee and the Owner Trustee an Officer's Certificate to the effect that the proposed amendments meet the requirements set forth in this subsection 10.01(b), (ii) the Rating Agency Condition will have been satisfied and (iii) such amendment does not affect the rights, duties or obligations of the Indenture Trustee or the Owner Trustee hereunder. The amendments which the Transferor may make without the consent of Noteholders pursuant to the preceding sentence may include, without limitation, the addition of a sale of Receivables.

Section 10.02.    Supplemental Indentures with Consent of Noteholders.

The Issuer and the Indenture Trustee, when authorized by an Issuer Order, also may, upon satisfaction of the Rating Agency Condition and with the consent of the Holders of not less than a majority of the Outstanding Amount of the Notes of each adversely affected Series of Notes, by Act of such Holders delivered to the Issuer and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of such Noteholders under this Indenture; provided, however that no such supplemental indenture shall, without the consent of the Holder of each outstanding Note affected thereby:

(a)    change the due date of any installment of principal of or interest on any Note, or reduce the principal amount thereof, the interest rate specified thereon or the redemption price with respect thereto or change any place of payment where, or the coin or currency in which, any Note or any interest thereon is payable;

(b)    impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes on or after the respective due dates thereof (or, in the case of redemption, on or after the Redemption Date);

(c)    reduce the percentage of the Outstanding Amount of the Notes of any Series outstanding the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences as provided for in this Indenture;

(d)    reduce the percentage of the aggregate outstanding amount of any Notes, the consent of the Holders of which is required to direct the Indenture Trustee to sell or liquidate the Collateral if the proceeds of such sale would be insufficient to pay the principal amount and accrued but unpaid interest on the outstanding Notes of such Series;

(e)    decrease the percentage of the aggregate principal amount of the Notes required to amend the sections of this Indenture which specify the applicable percentage of the aggregate principal amount of the Notes of such Series necessary to amend the Indenture or any Transaction Documents which require such consent;

(f)    modify or alter the provisions of this Indenture prohibiting the voting of Notes held by the Trust, any other obligor on the Notes, a Seller or any affiliate thereof; or

(g)    permit the creation of any Lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral for any Notes or, except as otherwise permitted or contemplated herein, terminate the lien of this Indenture on any such Collateral at any time subject hereto or deprive the Holder of any Note of the security provided by the lien of this Indenture.

The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes, whether theretofore or thereafter authenticated and delivered hereunder. The Indenture Trustee shall not be liable for any such determination made in good faith.

It shall not be necessary for any Act of Noteholders under this Section 10.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Issuer and the Indenture Trustee of any Supplement Indenture pursuant to this Section 10.02, the Indenture Trustee shall mail to the Holders of the Notes to which such amendment or supplemental indenture relates written notice setting forth in general terms the substance of such Supplement Indenture. Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 10.03.    Execution of Supplemental Indentures.

In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this Article X or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.01 and 6.02, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture. The Indenture Trustee or Owner Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's or Owner Trustee's (as such or in its individual capacity) own rights, duties, liabilities, benefits, protections, privileges or immunities under this Indenture or otherwise.

Section 10.04.    Effect of Supplemental Indenture.

Upon the execution of any supplemental indenture under this Article X, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes, and every Holder of Notes theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

Section 10.05.   Conformity With Trust Indenture Act.

Every amendment of this Indenture and every supplemental indenture executed pursuant to this Article X shall conform to the requirements of the TIA as then in effect so long as this Indenture shall then be qualified under the TIA.

Section 10.06.   Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article X may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for the outstanding Notes.

# ARTICLE XI

# TERMINATION

Section 11.01.   Termination of Trust.

The Trust and the respective obligations and responsibilities of the Indenture Trustee created hereby (other than the obligation of the Indenture Trustee to make payments to Noteholders as hereinafter set forth) shall terminate, except with respect to the duties described in subsection 11.02(b), as provided in the Trust Agreement.

Section 11.02.   Final Distribution.

(a)     The Servicer shall give the Indenture Trustee at least thirty (30) days prior notice of the Distribution Date on which the Noteholders of any Series or Class may surrender their Notes for payment of the final distribution on and cancellation of such Notes (or, in the event of a final distribution resulting from the application of Section 2.06, 6.01 or 7.01 of the Transfer and Servicing Agreement, notice of such Distribution Date promptly after the Servicer has determined that a final distribution will occur, if such determination is made less than thirty (30) days prior to such Distribution Date).  Such notice shall be accompanied by an Officer's Certificate setting forth the information specified in Section 3.05 of the Transfer and Servicing Agreement covering the period during the then-current calendar year through the date of such notice.  Not later than the fifth day of the month in which the final distribution in respect of such Series or Class is payable to Noteholders, the Indenture Trustee shall provide notice to Noteholders of such Series or Class specifying (i) the date upon which final payment of such Series or Class will be made upon presentation and surrender of Notes of such Series or Class at the office or offices therein designated, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such payment date is not applicable, payments being made only upon presentation and surrender of such Notes at the office or offices therein specified (which, in the case of Bearer Notes, shall be outside the United States).  The Indenture Trustee shall give such notice to the Transfer Agent and Registrar and the Paying Agent at the time such notice is given to Noteholders.

(b)     Notwithstanding a final distribution to the Noteholders of any Series or Class (or the termination of the Trust), except as otherwise provided in this paragraph, all funds then on deposit in the Collection Account and any Series Account allocated to such Noteholders shall continue to be held in trust for the benefit of such Noteholders and the Paying Agent or the Indenture Trustee shall pay such

funds to such Noteholders upon surrender of their Notes, if certificated (and any excess shall be paid in accordance with the terms of any Enhancement Agreement). In the event that all such Noteholders shall not surrender their Notes for cancellation within six (6) months after the date specified in the notice from the Indenture Trustee described in paragraph (a), the Indenture Trustee shall give a second notice to the remaining such Noteholders to surrender their Notes for cancellation and receive the final distribution with respect thereto (which surrender and payment, in the case of Bearer Notes, shall be outside the United States). If within one year after the second notice all such Notes shall not have been surrendered for cancellation, the Indenture Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining such Noteholders concerning surrender of their Notes, and the cost thereof shall be paid out of the funds in the Collection Account or any Series Account held for the benefit of such Noteholders. The Indenture Trustee and the Paying Agent shall pay to the Issuer any monies held by them for the payment of principal or interest that remains unclaimed for two (2) years. After payment to the Issuer, Noteholders entitled to the money must look to the Issuer for payment as general creditors unless an applicable abandoned property law designates another Person.

Section 11.03.   Termination Distributions.

Upon the termination of the Trust pursuant to the terms of the Trust Agreement, the Indenture Trustee shall assign and convey to the Holders of the Transferor Certificates or any of their designees, without recourse, representation or warranty, all right, title and interest of the Trust in the Receivables, whether then existing or thereafter created, all Interchange and Recoveries related thereto, all monies due or to become due and all amounts received or receivable with respect thereto (including all moneys then held in the Collection Account or any Series Account) and all proceeds thereof, except for amounts held by the Indenture Trustee pursuant to subsection 11.02(b). The Indenture Trustee shall execute and deliver such instruments of transfer and assignment, in each case without recourse, as shall be reasonably requested by the Holders of the Transferor Certificates to vest in the Holders of the Transferor Certificates or any of their designees all right, title and interest which the Indenture Trustee had in the Collateral and such other property.

Section 11.04.   Defeasance.

Notwithstanding anything to the contrary in this Indenture and unless otherwise specified with respect to any Series in the applicable Indenture Supplement:

(a)     The Issuer may at its option be discharged from its obligations hereunder with respect to any Series or all outstanding Series (each, a "**Defeased Series**") on the date the applicable conditions set forth in subsection 11.04(c) are satisfied (a "**Defeasance**"); provided, however, that the following rights, obligations, powers, duties and immunities shall survive with respect to each Defeased Series until otherwise terminated or discharged hereunder: (i) the rights of the Holders of Notes of the Defeased Series to receive, solely from the trust fund provided for in subsection 11.04(c), payments in respect of principal of and interest on such Notes when such payments are due; (ii) the Issuer's obligations with respect to such Notes under Sections 2.05 and 2.06; (iii) the rights, powers, trusts, duties, and immunities of the Indenture Trustee, the Paying Agent and the Registrar hereunder; and (iv) this Section 11.04 and Section 12.16.

(b)     Subject to subsection 11.04(c), the Issuer at its option may cause Collections allocated to each Defeased Series and available to purchase additional Receivables to be applied to purchase Eligible Investments rather than additional Receivables.

(c)     The following shall be the conditions precedent to any Defeasance under subsection 11.04(a):

(i)     the Issuer irrevocably shall have deposited or caused to be deposited with the Indenture Trustee (such deposit to be made from other than the Issuer's or any Affiliate of the Issuer's funds), under the terms of an irrevocable trust agreement in form and substance satisfactory to the Indenture Trustee, as trust funds in trust for making the payments described below, (A) Dollars in an amount equal to, or (B) Eligible Investments which through the scheduled payment of principal and interest in respect thereof will provide, not later than the due date of payment thereon, money in an amount equal to, or (C) a combination thereof, in each case sufficient to pay and discharge (without relying on income or gain from reinvestment of such amount), and which shall be applied by the Indenture Trustee to pay and discharge, all remaining scheduled interest and principal payments on all outstanding Notes of each Defeased Series on the dates scheduled for such payments in this Indenture and the applicable Indenture Supplements and all amounts owing to the Series Enhancers with respect to each Defeased Series;

(ii)     a statement from a firm of nationally recognized independent public accountants (who may also render other services to the Issuer) to the effect that such deposit is sufficient to pay the amounts specified in clause (i) above;

(iii)     prior to its exercise of its right pursuant to this Section 11.04 with respect to any Defeased Series to substitute money or Eligible Investments for Receivables, the Issuer shall have delivered to the Indenture Trustee an Opinion of Counsel to the effect contemplated by clause (b) of the definition in this Indenture of the term "**Tax Opinion**" (the preparation and delivery of which shall not be at the expense of the Indenture Trustee) with respect to such deposit and termination of obligations, and an Opinion of Counsel to the effect that such deposit and termination of obligations will not result in the Trust being required to register as an "investment company" within the meaning of the Investment Company Act;

(iv)     the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate of the Transferor stating that the Transferor reasonably believes that such deposit and termination of obligations will not, based on the facts known to such officer at the time of such certification, then cause a Redemption Event with respect to any Series or any event that, with the giving of notice or the lapse of time, would result in the occurrence of a Redemption Event with respect to any Series; and

(v)     the Rating Agency Condition shall have been satisfied and the Issuer shall have delivered copies of such written notice to the Servicer and the Indenture Trustee.

<div align="center">

ARTICLE XII

MISCELLANEOUS

</div>

Section 12.01.   <u>Compliance Certificates and Opinions etc.</u>

(a)     Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with, (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with and (iii) (if required by the TIA) an Independent Certificate from a firm of certified public accountants meeting the applicable requirements of this Section 12.01, except that, in the case of any such application or request as to which

the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(i)     a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(ii)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(iii)     a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)     a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

(b)     (i)     Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee that is to be made the basis for the release of any property or securities subject to the lien of this Indenture, the Issuer shall, in addition to any obligation imposed in subsection 12.01(a) or elsewhere in this Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within ninety (90) days of such deposit) to the Issuer of the Collateral or other property or securities to be so deposited.

(ii)     Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the Issuer shall also deliver to the Indenture Trustee (if required by the TIA) an Independent Certificate as to the same matters, if the fair value to the Issuer of the securities to be so deposited and of all other such securities made the basis of any such withdrawal or release since the commencement of the then-current fiscal year of the Issuer, as set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of the Outstanding Amount of the Notes, but such a certificate need not be furnished with respect to any securities so deposited if the fair value thereof to the Issuer as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the Outstanding Amount of the Notes.

(iii)     Other than with respect to the release of any Defaulted Receivables and Receivables in Removed Accounts, whenever any property or securities is to be released from the lien of this Indenture, the Issuer shall also furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within ninety (90) days of such release) of the property or securities proposed to be released and stating that in the opinion of such person the proposed release will not impair the security under this Indenture in contravention of the provisions hereof.

(iv)     Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above, the Issuer shall also furnish to the Indenture Trustee (if required by the TIA) an Independent Certificate as to the same matters if the fair value of the property or securities and of all other property, other than Defaulted Receivables and Receivables in Removed Accounts, or securities released from the lien of this Indenture since the commencement of the then current

calendar year, as set forth in the certificates required by clause (iii) above and this clause (iv), equals 10% or more of the Outstanding Amount of the Notes, but such certificate need not be furnished in the case of any release of property or securities if the fair value thereof as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the then Outstanding Amount of the Notes.

(v)    Notwithstanding Section 2.11 or any other provision of this Section 12.01, the Issuer may (A) collect, liquidate, sell or otherwise dispose of Receivables as and to the extent permitted or required by the Transaction Documents and (B) make cash payments out of the Series Accounts as and to the extent permitted or required by the Transaction Documents.

Section 12.02.   Form of Documents Delivered to Indenture Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such officer's certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Servicer, a Seller, the Issuer or the Administrator, stating that the information with respect to such factual matters is in the possession of the Servicer, a Seller, the Issuer or the Administrator, unless such an Authorized Officer or Counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two (2) or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

Section 12.03.   Acts of Noteholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agent duly appointed in writing and satisfying any requisite percentages as to minimum number or dollar

value of outstanding principal amount represented by such Noteholders; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 12.03.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Indenture Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 12.04.   Notices, Etc. to Indenture Trustee and Issuer.

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by the Agreement to be made upon, given or furnished to, or filed with:

(a)     the Indenture Trustee by any Noteholder or by the Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to a Responsible Officer, by facsimile transmission or by other means acceptable to the Indenture Trustee to or with the Indenture Trustee at its Corporate Trust Office; or

(b)     the Issuer by the Indenture Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed, first-class postage prepaid, to the Issuer addressed to it at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attention:  Corporate Trust Department, or at any other address previously furnished in writing to the Indenture Trustee by the Issuer. A copy of each notice to the Issuer shall be sent in writing and mailed, first-class postage prepaid, to the Administrator at 250 East Carpenter Freeway, Irving, Texas 75062.

Section 12.05.   Notices to Noteholders; Waiver.

Where the Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed by registered or certified mail or first class postage prepaid or national overnight courier service to each Noteholder affected by such event, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall conclusively be presumed to have been duly given.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to any Rating Agency, failure to give such notice shall not affect any other rights or obligations created hereunder and shall not under any circumstance constitute a Default or Event of Default.

Section 12.06.    Alternate Payment and Notice Provisions.

Notwithstanding any provision of this Indenture or any of the Notes to the contrary, the Issuer, with the consent of the Indenture Trustee, may enter into any agreement with any Holder of a Note providing for a method of payment, or notice by the Indenture Trustee or any Paying Agent to such Holder, that is different from the methods provided for in this Indenture for such payments or notices. The Issuer will furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee will cause payments to be made and notices to be given in accordance with such agreements.

Section 12.07.    Conflict with Trust Indenture Act.

If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of the TIA, such required provision shall control.

The provisions of TIA §§310 through 317 that impose duties on any person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 12.08.    Effect of Headings and Table of Contents.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 12.09.    Successors and Assigns.

All covenants and agreements in this Indenture by the Issuer shall bind its successors and assigns, whether so expressed or not.

Section 12.10.    Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.11.  Benefits of Indenture.

Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Noteholders, the Servicer and the Transferor, any benefit.

Section 12.12.  Legal Holidays.

In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

Section 12.13.  **GOVERNING LAW.**

**THE INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.**

Section 12.14.  Counterparts.

This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 12.15.  Trust Obligation.

No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their individual capacity) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity. For all purposes of this Indenture, in the performance of any duties or obligations hereunder, the Owner Trustee (as such or in its individual capacity) shall be subject to, and entitled to the benefits of, the terms and provisions of the Trust Agreement.

Section 12.16.  No Petition.

The Indenture Trustee, by entering into this Indenture, and each Noteholder, by accepting a Note, hereby covenant and agree that they will not at any time institute against the Issuer, or join in instituting against the Issuer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers thereunto duly authorized and attested, all as of the day and year first above written.

<div style="margin-left: 40%;">

NEXTCARD CREDIT CARD MASTER
NOTE TRUST,
    as Issuer

By:  Wilmington Trust Company,
      not in its individual capacity,
      but solely as Owner Trustee


By: _____
    Name:
    Title:



THE BANK OF NEW YORK,
    as Indenture Trustee



By:_____
    Name:
    Title:

</div>

[Signature Page to Master Indenture]

Acknowledged and Accepted:

    NEXTBANK, N.A.,
    as Transferor and Servicer


By:_____
    Name:
    Title:

[Signature Page to Master Indenture]

**NEXTCARD CREDIT CARD MASTER NOTE TRUST**

Issuer

and

**THE BANK OF NEW YORK**

Indenture Trustee

SERIES 2000-1 INDENTURE SUPPLEMENT

Dated as of December 13, 2000

NYLIB5 830015.1

TABLE OF CONTENTS

Page

ARTICLE I

CREATION OF THE SERIES 2000-1 NOTES

Section 1.01    Designation ..................................................................................................1

ARTICLE II

DEFINITIONS

Section 2.01    Definitions....................................................................................................2

ARTICLE III

SERVICING FEE

Section 3.01    Servicing Compensation ............................................................................16

ARTICLE IV

RIGHTS OF SERIES 2000-1 NOTEHOLDERS
AND ALLOCATION AND APPLICATION OF COLLECTIONS

Section 4.01    Collections and Allocations .......................................................................17
Section 4.02    Determination of Monthly Interest .............................................................19
Section 4.03    Determination of Monthly Principal ..........................................................21
Section 4.04    Application of Available Finance Charge Collections and Available
                Principal Collections.................................................................................21
Section 4.05    Investor Charge-Offs .................................................................................25
Section 4.06    Reallocated Principal Collections...............................................................25
Section 4.07    Excess Finance Charge Collections ...........................................................25
Section 4.08    Shared Principal Collections......................................................................26
Section 4.09    Principal Funding Account .........................................................................26
Section 4.10    Reserve Account ........................................................................................27
Section 4.11    Spread Account ..........................................................................................29
Section 4.12    Determination of LIBOR ...........................................................................31
Section 4.13    Investment Instructions..............................................................................31

ARTICLE V

DELIVERY OF SERIES 2000-1 NOTES;
DISTRIBUTIONS: REPORTS TO SERIES 2000-1 NOTEHOLDERS

Section 5.01    Delivery and Payment for the Series 2000-1 Notes............................................33
Section 5.02    Distributions..............................................................................................33
Section 5.03    Reports and Statements to Series 2000-1 Noteholders.......................................34

ARTICLE VI

SERIES 2000-1 REDEMPTION EVENTS

Section 6.01    Series 2000-1 Redemption Events .......................................................................36

ARTICLE VII

REDEMPTION OF SERIES 2000-1 NOTES; FINAL DISTRIBUTIONS;
SERIES TERMINATION

Section 7.01    Optional Redemption of Series 2000-1 Notes: Final Distributions...................38
Section 7.02    Series Termination ............................................................................................39

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.01    Ratification of Indenture ...................................................................................40
Section 8.02    Form of Delivery of the Series 2000-1 Notes....................................................40
Section 8.03    Counterparts.....................................................................................................40
Section 8.04    GOVERNING LAW.........................................................................................40
Section 8.05    Limitation of Liability.......................................................................................40
Section 8.06    Transfer of the Class D Notes...........................................................................40
Section 8.07    Private Placement of Securities ........................................................................41
Section 8.08    Representations and Warranties of Class A Noteholders, Class B
                Noteholders and Class C Noteholders ...............................................................41
Section 8.09    Regulation S Global Notes................................................................................43
Section 8.10    Special Transfer Provisions ..............................................................................45
Section 8.11    Settlement Procedures.......................................................................................47

SERIES 2000-1 INDENTURE SUPPLEMENT, dated as of December 13, 2000 (the "Indenture Supplement")) between NEXTCARD CREDIT CARD MASTER NOTE TRUST, a business trust organized and existing under the laws of the State of Delaware (herein, the "Issuer" or the "Trust"), and The Bank of New York, a banking corporation organized and existing under the laws of the State of New York, not in its individual capacity, but solely as indenture trustee (herein, together with its successors in the trusts thereunder as provided in the Master Indenture referred to below, the "Indenture Trustee") under the Master Indenture, dated as of December 11, 2000 (the "Indenture") between the Issuer and the Indenture Trustee (the Indenture, together with this Indenture Supplement; the "Agreement").

Pursuant to Section 2.12 of the Indenture, the Transferor may direct the Issuer to issue one or more Series of Notes. The Principal Terms of this Series are set forth in this Indenture Supplement to the Indenture.

## ARTICLE I

## CREATION OF THE SERIES 2000-1 NOTES

Section 1.01   <u>Designation</u>.  (a) There is hereby created and designated a Series of Notes to be issued pursuant to the Indenture and this Indenture Supplement to be known as "NextCard Credit Card Master Note Trust, Series 2000-1" or the "Series 2000-1 Notes." The Series 2000-1 Notes shall be issued in four Classes, the first of which shall be known as the "Class A Series 2000-1 Floating Rate Asset Backed Notes," the second of which shall be known as the "Class B Series 2000-1 Floating Rate Asset Backed Notes," the third of which shall be known as the "Class C Series 2000-1 Floating Rate Asset Backed Notes," and the fourth of which shall be known as the "Class D Series 2000-1 Floating Rate Asset Backed Notes." The Series 2000-1 Notes shall be due and parable on the Series 2000-1 Final Maturity Date.

(b)     Series 2000-1 shall be included in Group One and shall be a Principal Sharing Series with respect to Group One only. Series 2000-1 shall be an Excess Allocation Series with respect to Group One only. Series 2000-1 shall not be subordinated to any other Series.

(c)     In the event that any terra or provision contained herein shall conflict with or be inconsistent with any term or provision contained in the Indenture, the terms and provisions of this Indenture Supplement shall be controlling. All capitalized terms not otherwise defined herein are defined in the Indenture, the Transfer and Servicing Agreement or the Trust Agreement.

[END OF ARTICLE I]

## ARTICLE II

## DEFINITIONS

Section 2.01  Definitions.  (a) Whenever used in this Indenture Supplement; the following words and phrases shall have the following meanings, and the definitions of such terms are applicable to the singular as well as the plural forms of such terms and the masculine as well as the feminine and neuter genders of such terms.

"Accumulation Period Factor" shall mean, with respect to any Monthly Period, a fraction, the numerator of which is equal to the sum of the initial invested amounts of all outstanding Series, and the denominator of which is equal to the sum of (a) the Initial Invested Amount; (b) the initial Invested amounts of all outstanding Series (other than Series 2000-1) which are not expected to be in their revolving periods, and (c) the initial invested amounts of all other outstanding Series which are not allocating Shared Principal Collections to other Series and are in their revolving periods; *provided, however* that this definition may be changed at any time if the Rating Agency Condition is satisfied.

"Accumulation Period Length" shall have the meaning assigned such term in subsection 4.04(e).

"Accumulation Shortfall" shall initially mean zero and shall thereafter mean, with respect to any Monthly Period during the Controlled Accumulation Period, the excess, if any, of the Controlled Deposit Amount for the previous Monthly Period over the amount deposited into the Principal Funding Account pursuant to subsection 4.04(c)(i) for the previous Monthly Period.

"Additional Interest" shall mean, with respect to any Distribution Date, Class A Additional Interest, Class B Additional Interest; Class C Additional Interest and Class D Additional Interest for such Distribution Date.

"Adjusted Invested Amount" shall mean, as of any date of determination, an amount equal to the Invested Amount as of such date, *minus* the amount on deposit in the Principal Funding Account on such date.

"Authenticating Agent" shall mean any Authenticating Agent pursuant to Section 2.04 of the Indenture.

"Available Finance Charge Collections" shall mean, with respect to any Monthly Period, an amount equal to the sum of (a) the Investor Finance Charge Collections for such Month Period, *plus* (b) the Excess Finance Charge Collections allocated to Series 2000-1 for such Monthly Period, *plus* (c) Principal Funding Investment Proceeds, if any, with respect to the related Distribution Date, *plus* (d) amounts, if any, to be withdrawn from the Reserve Account which will be deposited into the Collection Account on the related Distribution Date to be treated as Available Finance Charge Collections pursuant to subsection 4.10(d).

"Available Principal Collections" shall mean, with respect to any Monthly Period, an amount equal to the sum of (a) the Investor Principal Collections for such Monthly Period *minus* (b) the amount of Reallocated Principal Collections with respect to such Monthly Period which pursuant to Section 4.06 are required to be applied on the related Distribution Date, *plus* (c) any Shared Principal Collections with respect to other Principal Sharing Series in Group One (including any amounts on deposit in the Special Funding Account that are allocated to Series 2000-1 pursuant to the Agreement for application as Shared Principal Collections), *plus* (d) the aggregate amount to be treated as Available Principal Collections pursuant to subsections 4.04(a)(v), (vi) and (viii) for the related Distribution Date.

"Available Reserve Account Amount" shall mean, with respect to any Distribution Date, the lesser of (a) the amount on deposit in the Reserve Account on such date (after taking into account any interest and earnings retained in the Reserve Account pursuant to subsection 4.10(b) on such date, but before giving effect to any deposit made or to be made pursuant to subsection 4.04(a)(ix) to the Reserve Account on such date) and (b) the Required Reserve Account Amount.

"Available Spread Account Amount" shall mean, with respect to any Distribution Date, an amount equal to the lesser of (a) the amount on deposit in the Spread Account (exclusive of Investment Earnings, unless and until the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture) on such date (before giving effect to any deposit to, or withdrawal from, the Spread Account made or to be made with respect to such date) and (b) the Required Spread Account Amount for such Distribution Date.

"Base Rate" shall mean, with respect to any Monthly Period, the annualized percentage equivalent of a fraction, the numerator of which is equal to the sum of the Monthly Interest and the Monthly Servicing Fee, each with respect to the related Distribution Date, and the denominator of which is the Note Principal Balance as of the first day of such Monthly Period.

"Class A Additional Interest" shall have the meaning specified in subsection 4.02(a).

"Class A Interest Shortfall" shall have the meaning specified in subsection 4.02(a).

"Class A . Monthly Interest" shall have the meaning specified in subsection 4.02(a).

"Class A Note Initial Principal Balance" shall mean $357,500,000.

"Class A Note Interest Rate" shall mean a per annum rate of 0.200% in excess of LIBOR as determined on the related LIBOR Determination Date with respect to each Interest Period.

"Class A Note Principal Balance" shall mean, on any date of determination, an amount equal to (a) the Class A Note Initial Principal Balance, *minus* (b) the aggregate amount of principal payments made to the Class A Noteholders on or prior to such date.

"Class A Noteholder" shall mean the Person in whose name a Class A Note is registered in the Note Register.

"Class A Notes" shall mean any one of the Notes executed by the Issuer and authenticated by or on behalf of the Indenture Trustee, substantially in the form of Exhibit A-1, Exhibit A-2, or Exhibit A-3.

"Class A Required Amount" shall mean, with respect to any Distribution Date, an amount equal to the excess of the amount described in subsection 4.04(a)(ii) over the Available Finance Charge Collections applied to pay such amount pursuant to subsection 4.04(a).

"Class B Additional Interest" shall have the meaning specified in subsection 4.02(b).

"Class B Interest Shortfall" shall have the meaning specified in subsection 4.02(b).

"Class B Monthly Interest" shall have the meaning specified in subsection 4.02(b).

"Class D Note Interest Rate" shall mean a per annum rate of 3.750% in excess of LIBOR as determined on the related LIBOR Determination Date with respect to each Interest Period; provided however, that prior to the occurrence of an Event of Default and in connection with a transfer of the Class D Notes by the Transferor to a Person other than the Issuer, any other obligor upon the Notes, the Servicer, or any Affiliate of the Transferor or any of the other foregoing Persons, subject to satisfaction of the Rating Agency Condition, this per annum rate in excess of LIBOR shall be increased upon delivery by the Issuer to the Indenture Trustee an Issuer Order specifying the amount of such increase.

"Class D Note Principal Balance" shall mean, on any date of determination, an amount equal to (a) the Class D Note Initial Principal Balance, *minus* (b) the aggregate amount of principal payments made to the Class D Noteholders on or prior to such date.

"Class D Noteholder" shall mean the Person in whose name a Class D Note is registered in the Note Register.

"Class D Notes" shall mean any one of the Notes executed by the Issuer and authenticated by or on behalf of the Indenture Trustee, substantially in the form of Exhibit A-10.

"Closing Date" shall mean December 13, 2000.

"Controlled Accumulation Amount" shall mean, (or any Distribution Date with respect to the Controlled Accumulation Period, $41,666,667; *provided, however*; that if the Accumulation Period Length is determined to be less than twelve (12) months pursuant to

subsection 4.04(e), the Controlled Accumulation Amount for each Distribution Date with respect to the Controlled Accumulation Period will be equal to (i) the product of (x) the Initial Invested Amount and (y) the Accumulation Period Factor for such Monthly Period divided by (ii) the Required Accumulation Factor Number.

"Controlled Accumulation Period" shall mean, unless a Redemption Event shall have occurred prior thereto, the period commencing at the close of business on December 1, 2002 or such later date as is determined in accordance with subsection 4.04(e), and ending on the first to occur of (a) the commencement of the Early Amortization Period, (b) the payment in full of the Note Principal Balance and (c) the Series 2000-1 Final Maturity Date.

"Controlled Deposit Amount" shall mean, for any Distribution Date with respect to the Controlled Accumulation Period, an amount equal to the sum of the Controlled Accumulation Amount for such Distribution Date and any existing Accumulation Shortfall.

"Covered Amount" shall mean an amount, determined as of each Distribution Date with respect to any Interest Period, equal to the sum of (a) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class A Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account up to the Class A Note Principal Balance as of the Record Date preceding such Distribution Date, *plus* (b) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class B Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account in excess of the Class A Note Principal Balance as of the Record Date preceding such Distribution Date, up to the Class B Note Principal Balance, *plus* (c) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class C Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account in excess of the sum of the Class A Note Principal Balance and the Class B Note Principal Balance as of the Record Date preceding such Distribution Date, up to the Class C Note Principal Balance, *plus* (d) the product of (i) a fraction, the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360, *times* (ii) the Class D Note Interest Rate in effect with respect to such Interest Period, *times* (iii) the aggregate amount on deposit in the Principal Funding Account an excess of the sum of the Class A Note Principal Balance, the B Note Principal Balance and the Class C Note Principal Balance as of the Record Date preceding such Distribution Date, up to the Class D Note Principal Balance.

"Distribution Compliance Period" shall mean the period from the Closing Date through and including the later of (a) the 40th day after the later of the commencement of the offering of the Class A Notes, Class B Notes and Class C Notes to persons other than distributors in reliance upon Regulation S and the Closing Date.

"Distribution Date" shall mean January 15, 2001 and the fifteenth day of each calendar month thereafter, or if such fifteenth day is not a Business Day, the next succeeding Business Day.

"DWAC" shall mean the DTC Deposit and Withdrawal at Custodian system.

"Early Amortization Period" shall mean the period commencing on the Business Day immediately preceding the day on which a Redemption Event with respect to Series 2000-1 is deemed to have occurred, and ending on the first to occur of (1) the payment in fill of the Note Principal Balance and (ii) the Series 2000-1 Final Maturity Date.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Excess Spread Percentage" shall mean, with respect to any Monthly Period, the amount, if any, by which the Portfolio Yield exceeds the Base Rate.

"Expected Final Principal Payment Date" shall mean the December 2003 Distribution Date.

"Finance Charge Shortfall" shall have the meaning specified in Section 4.07.

"Fixed Investor Percentage" shall mean, with respect to any Monthly Period, the percentage equivalent (which percentage shall never exceed 100%) of a fraction, (a) the numerator of which is the Invested Amount as of the close of business on the last day of the Revolving Period and (b) the denominator of which is the greater of (i) the sum of (a) the total amount of Principal Receivables in the Trust as of the close of business on the last day of the immediately preceding Monthly Period (or with respect to the first Monthly Period, the total amount of Principal Receivables in the Trust as of the Series 2000-1 Cut-Off Date) and (b) the principal amount on deposit in the Special Funding Account as of the close of business on such last day (or with respect to the first Monthly Period, the Series 2000-1 Cut-Off Date) and (ii) the sum of the numerators used to calculate the investor percentages for allocations with respect to Principal Receivables for all Series outstanding as of the date as to which such determination is being made; *provided, however*, that if after the commencement of the Controlled Accumulation Period or the Early Amortization Period a Redemption Event occurs with respect to another Series that was designated in the Indenture Supplement therefor as a Series that is a "Paired Series" with respect to Series 2000-1, the Transferor may, by written notice delivered to the Indenture Trustee and the Servicer, designate a different numerator for the foregoing fraction, provided that (x) such numerator is not less than the Adjusted Invested Amount as of the last day of the revolving period for such Paired Series and (y) such action shall be taken only upon satisfaction of the Rating Agency Condition and (z) the Transferor shall have delivered to the Indenture Trustee an Officer's Certificate to the effect that, based on the facts known to such officer at that time, in the reasonable belief of the Transferor, such designation will not cause a Redemption Event or an event that, after the giving of notice or the lapse of time, would constitute a Redemption Event, to occur with respect to Series 2000-1; *provided further, however*, that with respect to any Monthly Period in which an Addition Date or a Removal Date occurs, the amount in clause (b)(i)(A) above shall be (1) the aggregate amount of Principal Receivables in the Trust as of the close of business on the last day of the prior Monthly Period, for the period from and including the first day of such Monthly Period to but excluding the related Addition Date or Removal Date, as the case may be, and (2) the aggregate amount of Principal Receivables in the Trust as of the close of business on the related Addition Date or

Removal Date, as the case may be, after adjusting for the aggregate amount of Principal Receivables added to or removed from the Trust on the related Addition Date or Removal Date, as the case may be, for the period from and including the related Addition Date or Removal Date, as the case may be, to and including the last day of such Monthly Period.

"Floating Investor Percentage" shall mean, with respect to any Monthly Period, the percentage equivalent (which percentage shall never exceed 100%) of a fraction, (a) the numerator of which is the Adjusted Invested Amount as of the close of business on the last day of the preceding Monthly Period (or with respect to the first Monthly Period, the Initial Invested Amount) and (b) the denominator of which is the greater of (i) the sum of (a) the total amount of Principal Receivables in the Trust as of the close of business on such last day (or with respect to the first Monthly Period, the total amount of Principal Receivables in the Trust on the Closing Date) and (b) the principal amount on deposit in the Special Funding Account as of the close of business on such last day (or with respect to the first Monthly Period, as of the Closing Date) and (ii) the sum of the numerators used to calculate the investor percentages for allocations with respect to Finance Charge Receivables, Defaulted Amounts or Principal Receivables, as applicable, for all Series outstanding as of the date as to which such determination is being made; *provided, however*, that with respect to any Monthly Period in which an Addition Date or a Removal Date occurs, the amount in clause (b)(i)(A) above shall be (1) the aggregate amount of Principal Receivables in the Trust as of the close of business on the last day of the prior Monthly Period, for the period from and including the first day of such Monthly Period to but excluding the related Addition Date or Removal Date, as the case may be, and (2) the aggregate amount of Principal Receivables in the Trust as of the close of business on the related Addition Date or Removal Date, as the case may be, after adjusting for the aggregate amount of Principal Receivables added to or removed from the Trust on the related Addition Date or Removal Date, as the case may be, for the period from and including the related Addition Date or Removal Date, as the case may be, to and including the last day of such Monthly Period.

"Group One" shall mean Series 2000-1 and each other Series hereafter specified in the related Indenture Supplement to be included in Group One.

"Initial Invested Amount" shall mean $500,000,000.

"Initial Purchasers" shall have the meaning specified in Section 8.08.

"Interest Period" shall mean, with respect to any Distribution Date, the period from and including the Distribution Date immediately preceding such Distribution Date (or, in the case of the first Distribution Date, from and including the Closing Date) to but excluding such Distribution Date.

"Invested Amount" shall mean, as of any date of determination, an amount equal to the initial principal amount of the Series 2000-1 Notes *minus* the amount of principal previously paid to the Series 2000-1 Noteholders, *minus* the excess, if any, of the aggregate amount of Investor Charge-Offs and Reallocated Principal Collections over the reimbursements of such amounts pursuant to subsection 4.04(a)(vi) prior to such date.

"Investment Earnings" shall mean, with respect to any Distribution Date, all interest and earnings on Eligible Investments included in the Spread Account (net of losses and investment expenses) during the period commencing on and including the Distribution Date immediately preceding such Distribution Date and ending on but excluding such Distribution Date.

"Investor Charge-Offs" shall have the meaning specified in Section 4.05.

"Investor Default Amount" shall mean, with respect to any Distribution Date, an amount equal to the product of (a) the Defaulted Amount for the related Monthly Period and (b) the Floating Investor Percentage for such Monthly Period.

"Investor Finance Charge Collections" shall mean, with respect to any Monthly Period, an amount equal to the product of the Investor Percentage for such Monthly Period and Collections of Finance Charge Receivables (including Recoveries treated as Collections of Finance Charge Receivables) deposited in the Collection Account for such Monthly Period.

"Investor Percentage" shall mean, for any Monthly Period, (a) with respect to Finance Charge Receivables and Defaulted Amounts at any time and Principal Receivables during the Revolving Period, the Floating Investor Percentage and (b) with respect to Principal Receivables during the Controlled Accumulation Period or the Early Amortization Period, the Fixed Investor Percentage.

"Investor Principal Collections" shall mean, with respect to any Monthly Period, the aggregate amount retained in the Collection Account for Series 2000-1 pursuant to subsection 4.01(c)(ii) for such Monthly Period.

"LIBOR" shall mean, for any Interest Period, the London interbank offered rate for one-month United States dollar deposits determined by the Indenture Trustee for each Interest Period in accordance with the provisions of Section 4.12.

"LIBOR Determination Date" shall mean (i) December 11, 2000 for the period from and including the Closing Date through and including January 14, 2001 and (ii) the second London Business Day prior to the commencement of the second and each subsequent Interest Period.

"London Business Day" shall mean any Business Day on which dealings in deposits in United States dollars are transacted in the London interbank market.

"Modified Excess Spread Percentage" shall mean, with respect to the first Monthly Period an amount equal to the percentage equivalent of a fraction, the numerator of which is (y) the product of (a) an amount equal to the excess, if any, of (i) the amount of Collections of Finance Charge Receivables deposited in the Collection Account and allocable to the Series 2000-1 Noteholders for such first Monthly Period after subtracting the Investor Default Amount for such Monthly Period *over* (ii) the sum of (A) the product of (I) the Class A Monthly Interest for the related Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period and (b) the denominator of which is the actual number of days in the related Interest Period *plus* (B) the product of (I) the Class B

Monthly Interest for such Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period and (b) the denominator of which is the actual number of days in such Interest Period *plus* (C) the product of (I) the Class C Monthly Interest for such Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period *plus* (D) the product of (I) the Class D Monthly Interest for such Interest Period *times* (II) a fraction (a) the numerator of which is the actual number of days in such first Monthly Period and (b) the denominator of which is the actual number of days in such Interest Period *plus* (E) the Monthly Servicing Fee with respect to the Distribution Date relating to such first Monthly Period, *times* (b) a fraction, the numerator of which is 360 and the denominator of which is 19; and the denominator of which is (z) the Initial Invested Amount.

"Monthly Interest" shall mean, with respect to any Distribution Date, the sum of the Class A Monthly Interest, the Class B Monthly Interest, the Class C Monthly Interest and the Class D Monthly Interest for such Distribution Date.

"Monthly Principal" shall mean the monthly principal distributable in respect of the Notes as calculated in accordance with Section 4.03.

"Monthly Principal Reallocation Amount" shall mean, with respect to any Monthly Period, an amount equal to the sum of:

(A)    the lower of (i) the sum of the Class A Required Amount, the Monthly Servicing Fee and any unpaid Monthly Servicing Fee and (ii) the greater of (a)(x) the product of (I) 28.5% and (II) the Initial Invested Amount *minus* (y) the amount of unreimbursed Investor Charge-Offs (after giving effect to Investor Charge-Offs for the related Monthly Period) and unreimbursed Reallocated Principal Collections (as of the previous Distribution Date) and (b) zero;

(B)    the lower of (i) the sum of the Class B Required Amount and (ii) the greater of (a)(x) the product of (I) 15.0% and (II) the Initial Invested Amount *minus* (y) the amount of unreimbursed Investor Charge-Offs (after giving effect to Investor Charge-Offs for the related Monthly Period) and unreimbursed Reallocated Principal Collections (as of the previous Distribution Date and as required in (A) above) and (B) zero; and

(C)    the lower of (i) the sum of the Class C Required Amount and (ii) the greater of (a)(x) the product of (I) 3.5% and (II) the Initial Invested Amount *minus* (y) the amount of unreimbursed Investor Charge-Offs (after giving effect to Investor Charge-Offs for the related Monthly Period) and unreimbursed Reallocated Principal Collections (as of the previous Distribution Date and as required in (A) and (B) above) and (b) zero.

"Monthly Servicing Fee" shall have the meaning specified in subsection 3.01.

"Note Principal Balance" shall mean, on any date of determination, an amount equal to the sum of the Class A Note Principal Balance, the Class B Note Principal Balance, the Class C Note Principal Balance and the Class D Note Principal Balance.

"Percentage Allocation" shall have the meaning set forth in subsection 4.0l(c)(ii)(y).

"Permanent Regulation S Global Note" shall mean any of the permanent Regulation S Class A global note, the permanent Regulations S Class B global note or the permanent Regulation S Class C global note in the form of Exhibit A-3 Exhibit A-6 or Exhibit A-9, respectively..

"Portfolio Adjusted Yield" shall mean, with respect to any Distribution Date, the average of the percentages obtained for each of the three (3) preceding Monthly Periods by subtracting the Base Rate for each such Monthly Period from the Portfolio Yield for each such Monthly Period.

"Portfolio Yield" shall mean, with respect to any Monthly Period, the annualized percentage equivalent of a fraction, (a) the numerator of which is equal to the sum of (i) Investor Finance Charge Collections with respect to such Monthly Period, *plus* (ii) the Principal Funding Investment Proceeds deposited the Collection Account on the Distribution Date related to such Monthly Period, *plus* (iii) the amount of the Reserve Draw Amount (up to the Available Reserve Account Amount) *plus* any amounts of interest and earnings described in Section 4.10, each deposited into the Collection Account on the Distribution Date relating to such Monthly Period, such sum to be calculated on a cash basis after subtracting the Investor Default Amount for such Monthly Period, and (b) the denominator of which is the Note Principal Balance as of the first day of such Monthly Period; *provided, however,* that Excess Finance Charge Collections that are allocated to Series 2000-1 with respect to such Monthly Period may be added to the numerator if the Transferor shall have provided ten (10) Business Days prior written notice of such action to each Rating Agency and the Transferor, the Servicer and the Indenture Trustee shall have received notification in writing from each Rating Agency that such action will not result in a reduction or withdrawal of its then existing rating of the Notes or any outstanding Series or Class with respect to which it is a Rating Agency.

"Principal Funding Account" shall have the meaning set forth in subsection 4.09(a).

"Principal Funding Account Balance" shall mean, with respect to any date of determination, the principal amount, if any, on deposit in the Principal Funding Account on such date of determination.

"Principal Funding Investment Proceeds" shall mean, with respect to each Distribution Date, the investment earnings on funds in the Principal Funding Account (net of investment expenses and losses) for the period from and including the immediately preceding Distribution Date to but excluding such Distribution Date.

"Principal Payment Rate" shall mean, for any Monthly Period, the percentage equivalent of fraction, the numerator of which is the aggregate amount of Collections of

Principal Receivables during such Monthly Period and the denominator of which is the aggregate amount of Principal Receivables outstanding as of the first day of such Monthly Period.

"Quarterly Excess Spread Percentage" shall mean (a) with respect to the January 2001 Distribution Date, the Modified Excess Spread Percentage, (b) with respect to the February 2001 Distribution Date, the percentage equivalent of a fraction the numerator of which is the sum of (i) the Modified Excess Spread Percentage for the first Monthly Period and (ii) the Excess Spread Percentage with respect to the January 2001 Monthly Period and the denominator of which is two (2), (c) with respect to the March 2001 Distribution Date, the percentage equivalent of a fraction the numerator of which is the sum of (i) the Modified Excess Spread Percentage for the first Monthly Period, (ii) the Excess Spread Percentage with respect to the January 2001 Monthly Period and (iii) the Excess Spread Percentage with respect to the February 2001 Monthly Period and the denominator of which is three (3) and (d) with respect to the April 2001 Distribution Date and each Distribution Date thereafter, the percentage equivalent of a fraction the numerator of which is the sum of the Excess Spread Percentages with respect to the immediately preceding three Monthly Periods and the denominator of which is three (3).

"QIBS" shall mean qualified institutional buyers as defined in Rule 144A.

"Rating Agency" shall mean each of Standard & Poor's and Moody's.

"Reallocated Principal Collections" shall mean, with respect to any Distribution Date, Investor Principal Collections applied in accordance with Section 4.06 in an amount not to exceed the Monthly Principal Reallocation Amount for the related Monthly Period.

"Reallocated Principal Reserves" shall have the meaning set forth in subsection 4.01(c).

"Reallocated Principal Reserves Release Date" shall mean, (a) with respect to the December 2000 Monthly Period, the first Deposit Date in January 2001 on which the Servicer deter-mines that the Collections of Finance Charge Receivables allocated to the Series 2000-1 Noteholders and retained in the Collection Account pursuant to subsection 4.0l(c)(ii)(x) equals or exceeds the sum of Monthly Servicing Fee, the Class A Monthly Interest, the Class B Monthly Interest and the Class C Monthly Interest payable on the Distribution Date following such Monthly Period, and (b) with respect to any Monthly Period thereafter, the later of (x) first Deposit Date in such Monthly Period on which the Servicer determines that Collections of Finance Charge Receivables allocated to the Series 2000-1 Noteholders and retained in the Collection Account pursuant to subsection 4.01(c)(ii)(x) equals or exceeds the turn of Monthly Servicing Fee, the Class A Monthly Interest, the Class B Monthly Interest and the Class C Monthly Interest payable on the Distribution Date following such Monthly Period, and (y) the LIBOR Determination Date occurring in such Monthly Period.

"Reassignment Amount" shall mean, with respect to any Distribution Date, after giving effect to any deposits and distributions otherwise to be made on such Distribution Date; the sum of (i) the outstanding principal balance of the Series 2000-1 Notes on such Distribution Date, *plus* (ii) Monthly Interest for such Distribution Date and any Monthly Interest previously due but not distributed to the Series 2000-1 Noteholders, *plus* (iii) the amount of Additional

Interest, if any, for such Distribution Date and any Additional Interest previously due but not distributed to the Series 2000-1 Noteholders on a prior Distribution Date.

"Reference Banks" shall mean four major banks in the London interbank market selected by the Servicer.

"Regulation S" shall mean Regulation S promulgated under the Securities Act.

"Regulation S Certificate" shall have the meaning specified in subsection 8.02(b).

"Regulation S Global Notes" shall mean the Temporary Regulation S Global Notes and the Permanent Regulation S Global Notes, as applicable.

"Release Date" shall have the meaning specified in subsection 8.02(b).

"Required Accumulation Factor Number" shall be equal to a fraction, rounded upwards to the nearest whole number, the numerator of which is one and the denominator of which is equal to the lowest monthly principal payment rate on the Accounts, expressed as a decimal, for the 12 months preceding the date of such calculation; *provided, however*, that this definition may be changed at any time if the Rating Agency Condition is satisfied.

"Required Reallocated Principal Reserves" shall mean, with respect to any Monthly Period, an amount equal to the product of (a) 3.5%, (b) the Principal Payment Rate for the immediately preceding Monthly Period and (c) the Invested Amount as of the first day of such Monthly Period.

"Required Reserve Account Amount" shall mean, with respect to any Distribution Date on or after the Reserve Account Funding Date, an amount equal to (a) 0.50% of the Note Principal Balance or (b) any other amount designated by the Transferor, *provided, however*, that if such designation is of a lesser amount, the Transferor shall (i) provide the Servicer and the Indenture Trustee with evidence that the Rating Agency Condition shall have been satisfied and (ii) deliver to the Indenture Trustee a certificate of an Authorized Officer to the effect that, based on the facts known to such officer at such time, in the reasonable belief of the Transferor, such designation will not cause a Redemption Event or an event that, after the giving of notice or the lapse of time, would cause a Redemption Event to occur with respect to Series 2000-1.

"Required Spread Account Amount" shall mean, with respect to any date of determination, the product of (i) the Spread Account Percentage in effect on such date and (ii) the Initial Invested Amount; provided that the Required Spread Account Amount shall not exceed the sum of the Class C Note Principal Balance and the Class D Note Principal Balance mimic the excess, if any, of the Principal Funding Account Balance over the sum of the Class A Note Principal Balance and the Class B Note Principal Balance on such date of determination; *provided, however*, that on and after the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture, the Required Spread Account Amount shall equal the Note Principal Balance.

"Required Transferor Interest" shall have the meaning specified in the Indenture.

"Reserve Account" shall have the meaning specified in subsection 4.10(a).

"Reserve Account Funding Date" shall mean the Distribution Date designated by the Servicer which occurs not later than, the earliest of (a) the Distribution Date with respect to the Monthly Period which commences three (3) months prior to the commencement of the Controlled Accumulation Period; (b) the first Distribution Date for which the Portfolio Adjusted Yield is less than 2%, but in such event the Reserve Account Funding Date shall not be required to occur earlier than the Distribution Date with respect to the Monthly Period which commences twelve (12) months prior to the commencement of the Controlled Accumulation Period; (c) the first Distribution Date for which the Portfolio Adjusted Yield is less than 3%, but in such event the Reserve Account Funding Date shall not be required to occur earlier than the Distribution Date with respect to the Monthly Period which commences six (6) months prior to the commencement of the Controlled Accumulation Period; and (d) the first Distribution Date for which the Portfolio Adjusted Yield is less than 4%, but in such event the Reserve Account Funding Date shall not be required to occur earlier than the Distribution Date with respect to the Monthly Period which commences four (4) months prior to the commencement of the Controlled Accumulation Period.

"Reserve Account Surplus" shall mean, as of any Distribution Date following the Reserve Account Funding Date, the amount, if any, by which the amount on deposit in the Reserve Account exceeds the Required Reserve Account Amount, *provided, however*, that on any Distribution Date upon which an Event of Default with respect to the Series 2000-1 Notes has occurred and is continuing, the Reserve Account Surplus shall be equal to zero.

"Reserve Draw Amount" shall mean, with respect to each Distribution Date relating to the Controlled Accumulation Period or the first Distribution Date relating to the Early Amortization Period, the amount, if any, by which the Principal Funding Investment Proceeds for such Distribution Date are less than the Covered Amount determined as of such Distribution Date.

"Revolving Period" shall mean the period beginning on the Closing Date and ending on the earlier of the close of business on the day immediately preceding the day the Controlled Accumulation Period commences or the Early Amortization Period commences.

"Rule 144A" shall mean Rule 144A promulgated under the Securities Act.

"Rule 144A Global Note" shall mean any of the Rule 144A Class A global note, the Rule 144A Class B global note or the Rule 144A Class C global note in the form of Exhibit A-1, Exhibit A-4 or Exhibit A-7, respectively.

"Series 2000-1" shall mean the Series of Notes the terms of which are specified in this Indenture Supplement.

"Series 2000-1 Cut-Off Date" shall mean December 1, 2000.

"Series 2000-1 Final Maturity Date" shall mean the earlier to occur of (a) the Distribution Date on which the Note Principal Balance is paid in fill and (b) the December 2006 Distribution Date.

"Series 2000-1 Note" shall mean a Class A Note, a Class B Note, a Class C Note or a Class D Note.

"Series 2000-1 Noteholder" shall mean a Class A Noteholder, a Class B Noteholder, a Class C Noteholder or a Class D Noteholder.

"Series 2000-1 Principal Shortfall" shall have the meaning specified in subsection 4.08.

"Series 2000-1 Redemption Event" shall have the meaning specified in Section 6.01.

"Servicing Fee Rate" shall mean 2% per annum.

"Servicing Fee Required Amount" shall mean, with respect to any Distribution Date, an amount equal to the excess of the amount described in subsection 4.04(a)(i) over the Available Finance Charge Collections applied to pay such amount pursuant to subsection 4.04(a).

"Spread Account" shall have the meaning specified in subsection 4.11(a).

"Spread Account Deficiency" shall mean the excess, if any, of the Required Spread Account Amount over the Available Spread Account Amount

"Spread Account Percentage" shall mean, (i) 4.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is greater than or equal to 4.0%, (ii) 4.5%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 4.0% and greater than or equal to 3.5%, (iii) 5.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 3.5% and greater than or equal to 3.0%, (iv) 5.5%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 3.0% and greater than or equal to 2.5%, (v) 6.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 2.5% and greater than or equal to 2.0%, and (vi) 7.0%, if the Quarterly Excess Spread Percentage on such Distribution Date is less than 2.0%, *provided*, that if a Redemption Event with respect to Series 2000-1 has occurred, the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

"Telerate Page 3750" shall mean the display page currently so designated on the Bridge Telerate Capital Markets Report (or such other page as may replace that page in that service for the purpose of displaying comparable rates or prices).

"Temporary Regulation S Global Note" shall mean any of the temporary Regulation S Class A global note, the temporary Regulation S Class B global note or the temporary Regulation S Class C global note in the form of Exhibit A-2, Exhibit A-5 or Exhibit A-8, respectively.

"Transfer" shall have the meaning specified in Section 8.06.

(b)    Each capitalized term defined herein shall relate to the Series 2000-1 Notes and no other Series of Notes issued by the Trust, unless the context otherwise requires. All capitalized terms used herein and not otherwise defined herein have the meanings ascribed to them in the Indenture or the Transfer and Servicing Agreement. In the event that any term or provision contained herein shall conflict with or be inconsistent with any term or provision contained in the Indenture or the Transfer and Servicing Agreement, the terms and provisions of this Indenture Supplement shall govern.

(c)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Indenture Supplement shall refer to this Indenture Supplement as a whole and not to any particular provision of this Indenture Supplement; references to any Article, subsection, Section or Exhibit are references to Articles, subsections, Sections and Exhibits in or to this Indenture Supplement unless otherwise specified, and the term "including" means "including without limitation."

[END OF ARTICLE II]

_____

# ARTICLE III

## SERVICING FEE

Section 3.01   <u>Servicing Compensation</u>.  The share of the Servicing Fee allocable to the Series 2000-1 Noteholders with respect to any Distribution Date (the "Monthly Servicing Fee") shall be equal to one-twelfth of the product of (a) the Servicing Fee Rate and (b) (i) the Adjusted Invested Amount as of the last day of the Monthly Period preceding such Distribution Date, *minus* (ii) the product of the amount, if any, on deposit in the Special Funding Account as of the last day of the Monthly Period preceding such Distribution Date and the Floating Investor Percentage with respect to such Monthly Period. The remainder of the Servicing Fee shall be paid by the Holders of the Transferor Certificates or the noteholders of other Series (as provided in the related Indenture Supplements) and in no event shall the Trust, the Indenture Trustee or the Series 2000-1 Noteholders be liable for the share of the Servicing Fee to be paid by the Holders of the Transferor Certificates or the noteholders of any other Series. To the extent that the Monthly Servicing Fee is not paid in full pursuant to the preceding provisions of this Section 3.01, and Section 4.04, it shall be paid by the Holders of the Transferor Certificates.

[END OF ARTICLE III]

**ARTICLE IV**

**RIGHTS OF SERIES 2000-1 NOTEHOLDERS
AND ALLOCATION AND APPLICATION OF COLLECTIONS**

Section 4.01   Collections and Allocations.

(a)   Allocations.   Prior to the close of business on each Deposit Date, collections of Finance Charge Receivables and Principal Receivables and Defaulted Receivables allocated to Series 2000-1 pursuant to Article VIII of the Indenture shall be allocated and distributed as set forth in this Article.

(b)   Payments to the Transferor.   The Servicer shall on Deposit Dates withdraw from the Collection Account and pay to the Holders of the Transferor Certificates the following amounts:

(i)   an amount equal to the Transferor Percentage for the related Monthly Period of Collections of Finance Charge Receivables to the extent such amount is deposited in the Collection Account; and

(ii)   an amount equal to the Transferor Percentage for the related Monthly Period of Collections of Principal Receivables deposited in the Collection Account, if the Transferor Interest (determined after giving effect to any Principal Receivables transferred to the Trust on such Deposit Date) exceeds the Required Transferor Interest.

The withdrawals to be made from the Collection Account pursuant to this subsection 4.01(b) do not apply to deposits into the Collection Account that do not represent Collections, including payment of the purchase price for the Receivables or the Notes pursuant to, respectively; Section 2.06 or 7.01 of the Transfer and Servicing Agreement or Section 11.04 of the Indenture and payment of the purchase price for the Series 2000-1 Notes pursuant to Section 7.01 of this Indenture Supplement.

(c)   Allocations to the Series 2000-1 Noteholders.   The Servicer shall prior to the close of business on any Deposit Date, allocate, or cause the Indenture Trustee to allocate, to the Series 2000-1 Noteholders the following amounts as set forth below:

(i)   Allocations of Finance Charge Collections.   The Servicer shall allocate, or cause the Indenture Trustee to allocate, to the Series 2000-1 Noteholders and retain in the Collection Account for application as provided herein an amount equal to the product of (a) the Investor Percentage and (b) the aggregate amount of Collections of Finance Charge Receivables deposited in the Collection Account on such Deposit Date.

(ii)   Allocations of Principal Collections.   The Servicer shall allocate, or shall cause the Indenture Trustee to allocate, to the Series 2000-1 Noteholders the following amounts as set forth below:

(x) ·   <u>Allocations During the Revolving Period</u>. During the Revolving Period an amount equal to the product of (I) the Investor Percentage and (II) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date, shall be allocated to the Series 2000-1 Noteholders and shall (A) if such Deposit Date occurs on or prior to the Reallocated Principal Reserves Release Date for the applicable Monthly Period, be retained in the Collection Account for application as Reallocated Principal Collections on the related Distribution Date as provided herein, and (B) if such Deposit Date occurs after the Reallocated Principal Reserves Release Date for the applicable Monthly Period, be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account. Notwithstanding the immediately preceding sentence, for any Deposit Date occurring during the initial Monthly Period, the Servicer shall cause the Indenture Trustee to allocate to the Series 2000-1 Noteholders an amount equal to the product of (I) 3.5%, (II) the Investor Percentage and (III) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date and such amount shall be retained in the Collection Account (such amounts, together with collections of Principal Receivables retained in the Collection Account pursuant to clause (A) of the immediately preceding sentence, are hereinafter referred to as "Reallocated Principal Reserves") and shall be retained in the Collection Account for application as Reallocated Principal Collections on the related Distribution Date as provided herein, and the Servicer shall cause the Indenture Trustee to allocate to the Series 2000-1 Noteholders an amount equal to the product of (I) 96.5%, (II) the Investor Percentage and (III) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date and such amount shall be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest as calculated on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account.

(y)   <u>Allocations During the Controlled Accumulation Period</u>. During the Controlled Accumulation Period an amount equal to the product of (I) the Investor Percentage and (II) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date (the product for any such date is hereinafter referred to as a "Percentage Allocation") shall be allocated to the Series 2000-1 Noteholders and deposited in the Principal

Funding Account until applied as provided herein; *provided, however* that if the sum of such Percentage Allocation and all preceding Percentage Allocations with respect to the same Monthly Period exceeds the Controlled Deposit Amount during the Controlled Accumulation Period for the related Distribution Date, then such excess shall not be treated as a Percentage Allocation and shall be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest as calculated on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account.

(z)    <u>Allocations During the Early Amortization Period</u>. During the Early Amortization Period, an amount equal to the product of (I) the Investor Percentage and (II) the aggregate amount of Collections of Principal Receivables deposited in the Collection Account on such Deposit Date, shall be allocated to the Series 2000-1 Noteholders and retained in the Collection Account until applied as provided herein; *provided, however*, that after the date on which an amount of such Collections equal to the Adjusted Invested Amount has been deposited into the Collection Account and allocated to the Series 2000-1 Noteholders, amounts allocated to the Series 2000-1 Noteholders pursuant to this subsection (z) shall be first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, retained in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second paid to the Holders of the Transferor Certificates only if the Transferor Interest as calculated on such date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise shall be deposited in the Special Funding Account.

Section 4.02    <u>Determination of Monthly Interest</u>.    (a) The amount of monthly interest ("Class A Monthly Interest") distributable from the Collection Account with respect to the Class A Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (b) the Class A Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class A Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class A Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine the excess, if any (the "Class A Interest Shortfall"), of (x) the Class A Monthly Interest for such Distribution Date over (y) the aggregate amount of funds allocated and available to par such Class A Monthly Interest on such Distribution Date. If the Class A Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class A Interest Shortfall is fully paid, an additional amount ("Class A Additional

Interest") equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* the Class A Note Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class A Interest Shortfall (or the portion thereof which has not been paid on the Class A Notes) shall be payable as provided herein with respect to the Class A Notes. Notwithstanding anything to the contrary herein, Class A Additional Interest shall be payable or distributed to the Class A Noteholders only to the extent permitted by applicable law.

(b)    The amount of monthly interest ("Class B Monthly Interest") distributable from the Collection Account with respect to the Class B Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (b) the Class B Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class B Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class B Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine the excess, if any (the "Class B Interest Shortfall"), of (x) the Class B Monthly Interest for such Distribution Date over (y) the aggregate amount of funds allocated and available to pay such Class B Monthly Interest on such Distribution Date. If the Class B Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class B Interest Shortfall is fully paid, an additional amount ("Class B Additional Interest") equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (ii) the Class B Note Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class B Interest Shortfall (or the portion thereof which has not been paid to the Class B Noteholders) shall be payable as provided herein with respect to the Class B Notes. Notwithstanding anything to the contrary herein, Class B Additional Interest shall be payable or distributed to the Class B Noteholders only to the extent permitted by applicable law.

(c)    The amount of monthly interest ("Class C Monthly Interest") distributable from the Collection Account with respect to the Class C Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (B) the Class C Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class C Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class C Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine an amount (the "Class C Interest Shortfall equal to (r) the aggregate Class C Monthly Interest for such Distribution Date *minus* (y) the aggregate amount of funds allocated and available to pay such Class C Monthly Interest on such Distribution Date. If the Class C Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class C Interest Shortfall is fully paid, an additional amount ("Class C Additional Interest") shall be payable as provided herein with respect to the Class C Notes equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (ii) the Class C Note

Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class C Interest Shortfall (or the portion thereof which has not been paid to the Class C Noteholders (after giving effect to the application of the proceeds of any draw made on the Spread Account as provided in subsections 4.04(a)(iv) and 4.11(c) for the purpose of paying such amount with respect to such Distribution Date)). Notwithstanding anything to the contrary herein, Class C Additional Interest shall be payable or distributed to the Class C Noteholders only to the extent permitted by applicable law.

(d)    The amount of monthly interest ("Class D Monthly Interest") distributable from the Collection Account with respect to the Class D Notes on any Distribution Date shall be an amount equal to the product of (i) (A) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (B) the Class D Note Interest Rate in effect with respect to the related Interest Period and (ii) the Class D Note Principal Balance as of the close of business on the last day of the preceding Monthly Period (or, with respect to the initial Distribution Date, the Class D Note Initial Principal Balance).

On the Determination Date preceding each Distribution Date, the Servicer shall determine an amount (the "Class D Interest Shortfall") equal to (x) the aggregate Class D Monthly Interest for such Distribution Date *minus* (y) the aggregate amount of funds allocated and available to pay such Class D Monthly Interest on such Distribution Date. If the Class D Interest Shortfall with respect to any Distribution Date is greater than zero, on each subsequent Distribution Date until such Class D Interest Shortfall is fully paid, an additional amount ("Class D Additional Interest") shall be payable as provided herein with respect to the Class D Notes equal to the product of (i) a fraction, the numerator of which is the actual number of days in the related Interest Period and the denominator of which is 360, *times* (ii) the Class D Note Interest Rate in effect with respect to the related Interest Period *times* (iii) such Class D Interest Shortfall (or the portion thereof which has not been paid to the Class D Noteholders (after giving effect to the application of the proceeds of any draw made on the Spread Account as provided in subsections 4.04(a)(vii) and 4.11(c) for the purpose of paying such amount with respect to such Distribution Date)). Notwithstanding anything to the contrary herein, Class D Additional Interest shall be payable or distributed to the Class D Noteholders only to the extent permitted by applicable law.

Section 4.03    <u>Determination of Monthly Principal</u>.    The amount of monthly principal distributable from the Collection Account with respect to the Notes on each Distribution Date (the "Monthly Principal"), beginning with the Distribution Date in the month following the month in which the Controlled Accumulation Period or, if earlier, the Early Amortization Period, begins, shall be equal to the least of (i) the Available Principal Collections on deposit in the Collection Account with respect to such Distribution Date, (ii) for each Distribution Date with respect to the Controlled Accumulation Period, the Controlled Deposit Amount for such Distribution Date and (iii) the Adjusted Invested Amount (after taking into account any adjustments to be made on such Distribution Date pursuant to Sections 4.05 and 4.06) prior to any deposit into the Principal Funding Account on such Distribution Date.

Section 4.04    <u>Application of Available Finance Charge Collections and Available Principal Collections</u>. The Servicer shall apply, or shall cause the Indenture Trustee to apply by written instruction to the Indenture Trustee, on each Distribution Date, Available

Finance Charge Collections and Available Principal Collections on deposit in the Collection Account with respect to such Distribution Date to make the following distributions:

(a)     On each Distribution Date, an amount equal to the Available Finance Charge Collections with respect to such Distribution Date will be distributed or deposited in the following priority:

(i)     an amount equal to the Monthly Servicing Fee for such Distribution Date, *plus* the amount of any Monthly Servicing Fee previously due but not distributed to the Servicer on a prior Distribution Date, shall be distributed to the Servicer (unless such amount has been netted against deposits to the Collection Account in accordance with Section 8.04 of the Indenture);

(ii)     an amount equal to Class A Monthly Interest for such Distribution Date, *plus* the amount of any Class A Monthly Interest previously due but not distributed to Class A Noteholders on a prior Distribution Date, *plus* the amount of any Class A Additional Interest for such Distribution Date, *plus* the amount of any Class A Additional Interest previously due but not distributed to Class A Noteholders on a prior Distribution Date, shall be distributed to the Paying Agent for payment to Class A Noteholders on such Distribution Date;

(iii)     an amount equal to Class B Monthly Interest for such Distribution Date, *plus* the amount of any Class B Monthly Interest previously due but not distributed to Class B Noteholders on a prior Distribution Date, *plus* the amount of any Class B Additional Interest for such Distribution Date, *plus* the amount of any Class B Additional Interest previously due but not distributed to Class B Noteholders on a prior Distribution Date, shall be distributed to the Paying Agent for payment to Class B Noteholders on such Distribution Date;

(iv)     an amount equal to Class C Monthly Interest for such Distribution Date, *plus* the amount of any Class C Monthly Interest previously due but not distributed to Class C Noteholders on a prior Distribution Date, *plus* the amount of any Class C Additional Interest for such Distribution Date, *plus* the amount of any Class C Additional Interest previously due but not distributed to Class C Noteholders on a prior Distribution Date, shall be distributed to the Paying Agent for payment to Class C Noteholders on such Distribution Date; *provided, however,* that, in the event that the Class C Monthly Interest exceeds the amount of Available Finance Charge Collections available (after giving effect to subsections 404(a)(i), (ii) and (iii) above) to fund such Class C Monthly Interest, a draw will be made from amounts available for distribution in the Spread Account (at the *times* and in the amounts specified in Section 4.11) and shall be distributed to the Paying Agent for payment to the Class C Noteholders on such Distribution Date in accordance with this subsection 4.04(a)(iv);

(v)     an amount equal to the Investor Default Amount, if any, for such Distribution Date shall be treated as a portion of Available Principal Collections for such Distribution Date;

(vi)    an amount equal to the sum of the aggregate amount of Investor Charge-Offs and the amount of Reallocated Principal Collections which have not been previously -reimbursed pursuant to this subparagraph (vi) shall be treated as a portion of Available Principal Collections for such Distribution Date;

(vii)    an amount equal to Class D Monthly Interest for such Distribution Date, *plus* the amount of any Class D Monthly Interest previously due but not distributed to the Class D Noteholders on a prior Distribution Date, *plus* the amount of any Class D Additional Interest for such Distribution Date, *plus* the amount of any Class D Additional Interest previously due but not distributed to the Class D Noteholders on a prior Distribution Date shall be distributed to the Paying Agent for payment to the Class D Noteholders on such Distribution Date; *provided, however,* that, in the event that the Class D Monthly Interest exceeds the amount of Available Finance Charge Collections available (after giving effect to subsections 4.04(a)(i)-(vi) above) to fund such Class D Monthly Interest, a draw will be made from amounts available for distribution in the Spread Account (at the times and in the amounts specified in Section 4.11) and shall be distributed to the Paying Agent for payment to the Class D Noteholders on such Distribution Date in accordance with this subsection 4.04(a)(vii);

(viii)    upon the occurrence of an Event of Default with respect to Series 2000-.1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections for such Distribution Date for distribution to the Series 2000-1 Noteholders;

(ix)    on each Distribution Date from and after the Reserve Account Funding Date, but prior to the date on which the Reserve Account terminates as described in subsection 4.10(f), an amount up to the excess, if any, of the Required Reserve Account Amount veer the Available Reserve Account Amount shall be deposited into the Reserve Account;

(x)    an amount equal to the amounts required to be deposited in the Spread Account pursuant to Section 4.11 shall be deposited into the Spread Account as provided in Section 4.11;

(xi)    any other amounts the Trust mar be liable for from time to time that are not referred to in clauses (i)-(x) above will be applied by the Indenture Trustee; and

(xii)    the balance, if any, will constitute a portion of Excess Finance Charge Collections for such Distribution Date and will be available for allocation to other Series in Group One or to the Holders of the Transferor Certificates as described in Section 8.08 of the Indenture and Section 4.01.

(b)    On each Distribution Date with respect to the Revolving Period, an amount equal to the Available Principal Collections deposited in the Collection Account for the related Monthly Period shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture.

(c)    On each Distribution Date with respect to the Controlled Accumulation Period or the Early Amortization Period, an amount equal to the Available Principal Collections deposited in the Collection Account for the related Monthly Period shall be distributed or deposited in the following order of priority:

(i)    during the Controlled Accumulation Period, an amount equal to the Monthly Principal for such Distribution Date shall be deposited into the Principal Funding Account;

(ii)    during the Early Amortization Period, an amount equal to the Monthly Principal for such Distribution Date shall be distributed to the Paying Agent for payment to the Class A Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class A Note Principal Balance has been paid in full;

(iii)    after giving effect to the distribution referred to in clause (ii) above, during the Early Amortization Period, an amount equal to the Monthly Principal remaining, if any, shall be distributed to the Paying Agent for payment to the Class B Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class B Note Principal Balance has been paid in full;

(iv)    after giving effect to the distributions referred to in clauses (ii) and (iii) above, during the Early Amortization Period, art amount equal to the Monthly Principal remaining, if any, shall be distributed to the Paying Agent for payment to the Class C Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class C Note Principal Balance has been paid in full;

(v)    after giving effect to the distributions referred to in clauses (ii), (iii) and (iv) above, during the Early Amortization Period, an amount equal to the Monthly Principal remaining, if any, shall be distributed to the Paying Agent for payment to the Class D Noteholders on such Distribution Date and on each subsequent Distribution Date until the Class D Note Principal Balance has been paid in full; and

(vi)    in the case of each of the Controlled Accumulation Period and the Early Amortization Period, the balance of such Available Principal Collections remaining after application m accordance with clause (i) through (v) above shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture.

On the earlier to occur of (i) the first Distribution Date with respect to the Early Amortization Period and (ii) the Expected Final Principal Payment Date, the Indenture Trustee, acting in accordance with instructions from the Servicer, shall withdraw from the Principal Funding Account and distribute to the Paying Agent for payment to the Class A Noteholders, the Class B Noteholders, the Class C Noteholders and the Class D Noteholders, the amounts deposited into the Principal Funding Account pursuant to subsection 4.04(c)(i).

(d)    The Controlled Accumulation Period is scheduled to commence on December 1, 2002; *provided, however*; that, if the Accumulation Period Length (determined as described below) is less than twelve (12) months, the date on which the Controlled Accumulation Period actually commences will be delayed to the first Business Day of the month

that is the number of whole months prior to the Expected Final Principal Payment Date at least equal to the Accumulation Period Length and, as a result, the number of Monthly Periods in the Controlled Accumulation Period will at least equal the Accumulation Period Length. On the Determination Date immediately preceding the November 2002 Distribution Date, and each Determination Date thereafter until the Controlled Accumulation Period begins, the Servicer will determine the "Accumulation Period Length" which will equal the number of whole months such that the sum of the Accumulation Period Factors for each month during such period will be equal to or greater than the Required Accumulation Factor Number *provided, however*; that the Accumulation Period Length will not be determined to be less than one month; *provided, further*, *however*; that the determination of the Accumulation Period Length mar be changed at any time if the Rating Agency Condition is satisfied.

Section 4.05  Investor Charge-Offs.  On each Determination Date, the Servicer shall calculate the Investor Default Amount, if any, for the related Distribution Date. If, on any Distribution Date, the Investor Default Amount for such Distribution Date exceeds the amount of Available Finance Charge Collections allocated with respect thereto pursuant to subsection 4.04(a)(v) with respect to such Distribution Date, the Invested Amount (after giving effect to any reductions for any Reallocated Principal Collections on such Distribution Date) will be reduced by the amount of such excess, but not by more than the lesser of the Investor Default Amount and the Invested Amount (after giving effect to any reductions for any Reallocated Principal Collections on such Distribution Date) for such Distribution Date (such reduction, an "Investor Charge-Off").

Section 4.06  Reallocated Principal Collections.  On the Reallocated Principal Reserves Release Date with respect to any Monthly Period, the Servicer shall allocate, or cause the Indenture Trustee to allocate, all Reallocated Principal Reserves with respect to such Monthly Period first, if any other Principal Sharing Series in Group One is outstanding and in its amortization period or accumulation period, for retention in the Collection Account for application, to the extent necessary, as Shared Principal Collections to other Series in Group One on the related Distribution Date, and second for payment to the Holders of the Transferor Certificates only if the Transferor Interest on such Deposit Date is greater than the Required Transferor Interest (after giving effect to all Principal Receivables transferred to the Trust on such day) and otherwise for deposit in the Special Funding Account. On each Distribution Date, the Servicer shall apply, or shall cause the Indenture Trustee to apply, Reallocated Principal Collections with respect to such Distribution Date, to be paid first from Reallocated Principal Reserves, to fund any deficiency pursuant to and in the priority set forth in subsections 4.04(a)(i), (ii), (iii) and (iv). On each Distribution Date, the Invested Amount shall be reduced by the amount of Reallocated Principal Collections for such Distribution Date.  After application of Reallocated Principal Reserves on any Distribution Date in accordance with the provisions hereof, any remaining Reallocated Principal Reserves for such Distribution Date shall be allocated as described in the first sentence of this Section 4.06.

Section 4.07  Excess Finance Charge Collections.  Series 2000-1 shall be an Excess Allocation Series with respect to Group One only. Subject to Section 8.08 of the Indenture, Excess Finance Charge Collections with respect to the Excess Allocation Series in Group One for any Distribution Date will be allocated to Series 2000-1 in an amount equal to the product of (x) the aggregate amount of Excess Finance Charge Collections with respect to all the

Excess Allocation Series in Group One for such Distribution Date and (y) a fraction, the numerator of which is the Finance Charge Shortfall for Series 2000-1 for such Distribution Date and the denominator of which is the aggregate amount of Finance Charge Shortfalls for all the Excess Allocation Series in Group One for such Distribution Date. The "Finance Charge Shortfall" for Series 2000-1 for any Distribution Date will be equal to the excess, if any, of (a) the full amount required to be paid, without duplication, pursuant to subsections 4.04(a)(i) through (xi) on such Distribution Date over (b) the Investor Finance Charge Collections with respect to such Distribution Date.

Section 4.08  Shared Principal Collections.    Subject to Section 8.05 of the Indenture, Shared Principal Collections with respect to the Series in Group One for any Distribution Date will be allocated to Series 2000-1 in an amount equal to the product of (x) the aggregate amount of Shared Principal Collections with respect to all Principal Sharing Series in Group One for such Distribution Date and (y) a fraction, the numerator of which is the Series 2000-1 Principal Shortfall for such Distribution Date and the denominator of which is the aggregate amount of Principal Shortfalls for all the Series which are Principal Sharing Series in Group One for such Distribution Date. The "Series 2000-1 Principal Shortfall" will be equal to (a) for any Distribution Date with respect to the Revolving Period, zero, (b) for any Distribution Date with respect to the Controlled Accumulation Period, the excess, if any, of the Controlled Deposit Amount with respect to such Distribution Date over the amount of Available Principal Collections for such Distribution Date (excluding any portion thereof attributable to Shared Principal Collections), and (c) for any Distribution Date with respect to the Early Amortization Period, the excess, if any, of the Adjusted Invested Amount over the amount of Available Principal Collections for such Distribution Date (excluding any portion thereof attributable to Shared Principal Collections).

Section 4.09  Principal Funding Account.    (a) The Indenture Trustee shall establish and maintain with an Eligible Institution, which may be the Indenture Trustee, for the benefit of the Series 2000-1 Noteholders, a segregated trust account with the corporate trust department of such Eligible Institution (the "Principal Funding Account"), bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Series 2000-1 Noteholders. The Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Principal Funding Account and in all proceeds thereof. The Principal Funding Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Series 2000-1 Noteholders. If at any time the institution holding the Principal Funding Account ceases to be an Eligible Institution, the Servicer shall notify the Indenture Trustee, and the Indenture Trustee upon being notified (or the Servicer on its behalf) shall, within ten (10) Business Days, establish a new Principal Funding Account meeting the conditions specified above with an Eligible Institution, and shall transfer any cash or any investments to such new Principal Funding Account The Indenture Trustee, at the direction of the Servicer, shall (i) make withdrawals from the Principal Funding Account from time to time, in the amounts and for the purposes set forth in this Indenture Supplement, and (ii) on each Distribution Date (from and after the commencement of the Controlled Accumulation Period) prior to the termination of the Principal Funding Account, make deposits into the Principal Funding Account in the amounts specified in, and otherwise in accordance with, subsection 4.04(c)(i).

(b)    Funds on deposit in the Principal Funding Account shall be invested at the direction of the Servicer by the Indenture Trustee in Eligible Investments. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Series 2000-1 Noteholders pursuant to Section 6.15 of the Indenture. Funds on deposit in the Principal Funding Account on any Distribution Date, after giving effect to any withdrawals from the Principal Funding Account on such Distribution Date, shall be invested in such investments that will mature so that such funds will be available for withdrawal on or prior to the following Distribution Date.

On each Distribution Date with respect to the Controlled Accumulation Period and on the first Distribution Date with respect to the Early Amortization Period, the Indenture Trustee, acting at the Servicer's direction given on or before such Distribution Date, shall transfer from the Principal Funding Account to the Collection Account the Principal Funding Investment Proceeds on deposit in the Principal Funding Account for application as Available Finance Charge Collections in accordance with Section 4.04.

Principal Funding Investment Proceeds (including reinvested interest) shall not be considered part of the amounts on deposit in the Principal Funding Account for purposes of this Indenture Supplement.

Section 4.10    Reserve Account. (a) The Indenture Trustee shall establish and maintain with an Eligible Institution, which may be the Indenture Trustee, for the benefit of the Series 2000-1 Noteholders, a segregated trust account with the corporate trust department of such Eligible Institution (the "Reserve Account"), bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Series 2000-1 Noteholders. The Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Reserve Account and in all proceeds thereof. The Reserve Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Series 2000-1 Noteholders. If at any time the institution holding the Reserve Account ceases to be an Eligible Institution, the Servicer shall notify the Indenture Trustee, and the Indenture Trustee upon being notified (or the Servicer on its behalf) shall, within ten (10) Business Days, establish a new Reserve Account meeting the conditions specified above with an Eligible Institution, and shall transfer any cash or any investments to such new Reserve Account. The Indenture Trustee, at the direction of the Servicer, shall (i) make withdrawals from the Reserve Account from time to time in an amount up to the Available Reserve Account Amount at such time; for the purposes set forth in this Indenture Supplement, and (ii) on each Distribution Date (from and after the Reserve Account Funding Date) prior to termination of the Reserve Account, make a deposit into the Reserve Account in the amount specified in, and otherwise in accordance with, subsection 4.04(a)(ix).

(b)    Funds on deposit in the Reserve Account shall be invested at the direction of the Servicer by the Indenture Trustee in Eligible Investments. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Series 2000-1 Noteholders pursuant to Section 6.15 of the Indenture. Funds on deposit in the Reserve Account on any Distribution Date, after giving effect to any withdrawals from the Reserve Account on such Distribution Date, shall be invested in such investments that will mature so that such funds will be available for withdrawal on or prior to the following Distribution Date.

On each Distribution Date, all interest and earnings (net of losses and investment expenses) accrued since the preceding Distribution Date on funds on deposit in the Reserve Account shall be retained in the Reserve Account (to the extent that the Available Reserve Account Amount is less than the Required Reserve Account Amount) and the balance, if any, shall be deposited into the Collection Account and included in Available Finance Charge Collections for such Distribution Date. For purposes of determining the availability of funds or the balance in the Reserve Account for any reason under this Indenture Supplement, except as otherwise provided in the preceding sentence, investment earnings on such funds shall be deemed not to be available or on deposit.

(c)    On or before each Distribution Date with respect to the Controlled Accumulation Period and on or before the first Distribution Date with respect to the Early Amortization Period, the Servicer shall calculate the Reserve Draw Amount; *provided, however,* that such amount will be reduced to the extent that Funds otherwise would be available for deposit in the Reserve Account under Section 4.04(a)(ix) with respect to such Distribution Date.

(d)    In the event that for any Distribution Date the Reserve Draw Amount is greater than zero, the Reserve Draw Amount, up to the Available Reserve Account Amount, shall be withdrawn from the Reserve Account on such Distribution Date by the Indenture Trustee (acting in accordance with the instructions of the Servicer) and deposited into the Collection Account for application as Available Finance Charge Collections for such Distribution Date.

(e)    In the event that the Reserve Account Surplus on any Distribution Date, after giving effect to all deposits to and withdrawals from the Reserve Account with respect to such Distribution Date, is greater than zero, the Indenture Trustee, acting in accordance with the instructions of the Servicer, shall withdraw from the Reserve Account an amount equal to such Reserve Account Surplus and (i) deposit such amounts in the Spread Account, to the extent that funds on deposit in the Spread Account are less than the Required Spread Account Amount, and (ii) distribute any such amounts remaining after application pursuant to subsection 4.10(e)(i) to the holders of the Transferor Certificates.

(f)    Upon the earliest to occur of (i) the termination of the Trust pursuant to Article VIII of the Trust Agreement, (ii) the first Distribution Date relating to the Early Amortization Period and (iii) the Expected Final Principal Payment Date, the Indenture Trustee, acting in accordance with the instructions of the Servicer, after the prior payment of all amounts owing to the Series 2000-1 Noteholders that are payable from the Reserve Account as provided herein, shall withdraw from the Reserve Account all amounts, if any, on deposit in the Reserve Account and (i) deposit such amounts in the Spread Account, to the extent that funds on deposit in the Spread Account are less than the Required Spread Account Amount, and (ii) distribute any such amounts remaining after application pursuant to subsection 4.10(f)(i) to the holders of the Transferor Certificates and the Reserve Account shall thereafter be deemed to have terminated for purposes of this Indenture Supplement.

(g)    Notwithstanding the foregoing provisions of this Section 4.10, following the occurrence of an Event of Default with respect to the Series 2000-1 Notes and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture, the Servicer shall withdraw from the Reserve Account all amounts on deposit therein and the Indenture

Trustee or the Servicer shall deposit such amounts in the Collection Account for distribution to the Noteholders in accordance with Section 5.02 to fund any shortfalls in amounts owed to such Noteholders.

Section 4.11    Spread Account. (a) On or prior to the Closing Date, the Indenture Trustee shall establish and maintain with an Eligible Institution, which may be the Indenture Trustee for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor, a segregated account with the corporate trust department of such Eligible Institution (the "Spread Account"), bearing a designation clearly indicating that the funds deposited therein are held for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor. Except as otherwise provided in this Section 4.11, the Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Spread Account and in all proceeds thereof. The Spread Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor. If at any time the institution holding the Spread Account ceases to be an Eligible Institution, the Servicer shall notify the Indenture Trustee, and the Indenture Trustee upon being notified (or the Servicer on its behalf) shall, within ten (10) Business Days (or such longer period as to which the Rating Agencies may consent) establish a new Spread Account meeting the conditions specified above with an Eligible Institution and shall transfer any cash or any investments to such new Spread Account. The Indenture Trustee, at the direction of the Servicer, shall (i) make withdrawals from the Spread Account from time to time in an amount up to the Available Spread Account Amount at such time, for the purposes set forth in this Indenture Supplement, and (ii) on each Distribution Date prior to termination of the Spread Account, make a deposit into the Spread Account in the amount specified in, and otherwise in accordance with, subsection 4.11(e).

(b)    Funds on deposit in the Spread Account shall be invested at the direction of the Servicer by the Indenture Trustee in Eligible Investments; provided, however, that, for purposes of the investment of funds on deposit in the Spread Account, references in the definition of "Eligible Investments" to a rating in the "highest rating category" shall be modified to require a rating of at least A-1 by Standard & Poor's and P-1 by Moody's. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Class C Noteholders, the Class D Noteholders and the Transferor pursuant to Section 6.15 of the Indenture. Funds on deposit in the Spread Account on any Distribution Date, after giving effect to any withdrawals from and deposits to the Spread Account on such Distribution Date, shall be invested in such investments that will mature so that such funds will be available for withdrawal on or prior to the following Distribution Date.

On each Distribution Date (but subject to subsections 411(c) and 411(d)), the Investment Earnings, if any, accrued since the preceding Distribution Date on funds on deposit in the Spread Account shall be paid to the Transferor by the Indenture Trustee. For purposes of determining the availability of funds or the balance in the Spread Account for any reason under this Indenture Supplement (subject to subsections 4.11(c) and 4.11(d)), all Investment Earnings shall be deemed not to be available or on deposit.

(c)    If on any Distribution Date, the aggregate amount available for distribution pursuant to subsections 4.04(a)(iv) and 4.04(a)(vii) is less than the aggregate amount

required to be distributed pursuant to subsections 4.04(a)(iv) and 404(a)(vii) (without giving effect to any limitation based on Available Finance Charge Collections), the Indenture Trustee, at the direction of the Servicer, shall withdraw from the Spread Account the amount of such deficiency up to the Available Spread Account Amount and, if the Available Spread Account Amount is less than such deficiency, Investment Earnings credited to the Spread Account, and deposit such amount in the Collection Account for payment first to the Class C Noteholders in respect of interest pursuant to subsection 4.04(a)(iv) on the Class C Notes and then to the Class D Noteholders in respect of interest pursuant to subsection 4.04(a)(vii) on the Class D Notes.

(d)    On the Series 2000-1 Final Maturity Date, the Indenture Trustee at the direction of the Servicer shall withdraw from the Spread Account an amount equal to the lesser of (i) the sum of the Class C Note Principal Balance and the Class D Note Principal Balance (after any payments to be made pursuant to subsection 4.04(c) on such date) and (ii) the Available Spread Account Amount and, if the Available Spread Account Amount is not sufficient to reduce the Class C Note Principal Balance and the Class D Note Principal Balance to zero, Investment Earnings credited to the Spread Account up to the amount required to reduce the Class C Note Principal Balance and the Class D Note Principal Balance to zero, and the Indenture Trustee or the Servicer shall deposit such amounts into the Collection Account for distribution first to the Class C Noteholders and then to the Class D Noteholders in accordance with subsections 5.02(e) and 5.02(g).

(e)    On any day following the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture, the Servicer shall withdraw from the Spread Account an amount equal to the balance on deposit therein and the Indenture Trustee or the Servicer shall deposit such amounts into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02, to fund any shortfalls in amounts owed to such Noteholders.

(f)    If on any Distribution Date, after giving effect to all withdrawals from the Spread Account, the Available Spread Account Amount is less than the Required Spread Account Amount then in effect, Available Finance Charge Collections shall be deposited into the Spread Account under the circumstances set forth in subsection 4.04(a)(x) up to the amount of the Spread Account Deficiency.

(g)    After the Spread Account Percentage has been increased above 4.0% pursuant to any of clauses (ii) through (vi) of the definition thereof, the Spread Account Percentage shall remain at that percentage until (a) further increased to a higher required percentage specified in clauses (ii) through (vi) of the definition thereof or (b) the Distribution Date on which the Quarterly Excess Spread Percentage has increased to a level above that for the then current Spread Account Percentage, in which case the Spread Account Percentage shall be decreased to the appropriate percentage in clauses (ii) through (iv) of the definition thereof (but only if the Quarterly Excess Spread Percentage was at or above such level on each of the prior two Distribution Dates) or, if the Quarterly Excess Spread Percentage is greater than or equal to 4.0%, the Spread Account Percentage will be 4.0% (but only if the Quarterly Excess Spread

Percentage was at or above such level on each of the prior two Distribution Dates). Notwithstanding the foregoing, if a Redemption Event with respect to Series 2000-1 has occurred, the Spread Account Percentage shall equal 7.0% (as provided in the definition of Spread Account Percentage) and shall no longer be subject to reduction.

(h)    If on any Distribution Date, after giving effect to all withdrawals from and deposits to the Spread Account, the amount on deposit in the Spread Account would exceed the Required Spread Account Amount then in effect, the Indenture Trustee shall, at the written direction of the Servicer, release such excess to the Transferor, *provided, that* such Distribution Date does not occur on any day following the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture. On the date on which the Class C Note Principal Balance and the Class D Note Principal Balance has been paid in full (including amounts to be paid to the Class C Noteholders and the Class D Noteholders pursuant to subsection 4.11(d) above), the Indenture Trustee, at the direction of the Servicer, shall withdraw from the Spread Account all amounts then remaining in the Spread Account and pay such amounts to the Transferor.

Section 4.12    Determination of LIBOR.    (a) On each LIBOR Determination Date, the Indenture Trustee shall determine LIBOR on the basis of the rate for deposits in United States dollars for a one-month period which appears on Telerate Page 3750 as of 11:00 a.m., London time, on such date. If such rate does not appear on Telerate Page 3730, the rate for that LIBOR Determination Date shall be determined on the basis of the rates at which deposits in United States dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on that day to prime banks in the London interbank market for a one-month period. The Indenture Trustee shall request the principal London office of each of the Reference Banks to provide a quotation of its rate. If at least two (2) such quotations are provided, the rate for that LIBOR Determination Date shall be the arithmetic mean of the quotations. If fewer than two (2) quotations are provided as requested, the rate for that LIBOR Determination Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by the Servicer, at approximately 11:00 a.m., New York City time, on that day for loans in United States dollars to leading European banks for a one-month period.

(b)    The Class A Note Interest Rate, Class B Note Interest Rate, Class C Note Interest Rate and Class D Note Interest Rate applicable to the then current and the immediately preceding Interest Periods mat be obtained by telephoning the Indenture Trustee at its corporate trust office at (212) 853-5738 or such other telephone number as shall be designated by the Indenture Trustee for such purpose by prior written notice by the Indenture Trustee to each Series 2000-1 Noteholder from time to time.

(c)    On each LIBOR Determination Date, the Indenture Trustee shall send to the Transferor by facsimile transmission, notification of LIBOR for the following Interest Period.

Section 4.13    Investment Instructions. Ant investment instructions required to be given to the Indenture Trustee pursuant to the terms hereof must be given to the Indenture Trustee no later than 11:00 a.m., New York City time, on the date such investment is to be made. In the event the Indenture Trustee receives such investment instruction later than such time, the Indenture Trustee may, but shall have no obligation to, make such investment. In the event the

Indenture Trustee is unable to make art investment required in an investment instruction received by the Indenture Trustee after 10:00 a.m., New York City time, on such day, such investment shall be made by the Indenture Trustee on the next succeeding Business Day.  In no event shall the Indenture Trustee be liable for ant investment not made pursuant to investment instructions received after 10:00 a.m., New York City time, on the date such investment is requested to be made.

<div align="center">[END OF ARTICLE IV]</div>

**ARTICLE V**

**DELIVERY OF SERIES 2000-1 NOTES;**
**DISTRIBUTIONS: REPORTS TO SERIES 2000-1 NOTEHOLDERS**

Section 5.01   Delivery and Payment for the Series 2000-1 Notes.   The Issuer shall execute and issue, and the Indenture Trustee shall authenticate, the Series 2000-1 Notes in accordance with Section 2.03 of the Indenture. The Indenture Trustee shall deliver the Series 2000-1 Notes to or upon the order of the Trust when so authenticated.

Section 5.02   Distributions.   (a) On each Distribution Date, the Paying Agent shall distribute to each Class A Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such Class A Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay interest on the Class A Notes pursuant to this Indenture Supplement.

(b)     On each Distribution Date, the Paying Agent shall distribute to each Class A Noteholder of record on the related Record Date such Class A Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class A Notes pursuant to this Indenture Supplement.

(c)     On each Distribution Date, the Paying Agent shall distribute to each Class B Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such Class B Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay interest on the Class B Notes pursuant to this Indenture Supplement.

(d)     On each Distribution Date, the Paying Agent shall distribute to each Class B Noteholder of record on the related Record Date such Class B Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class B Notes pursuant to this Indenture Supplement.

(e)     On each Distribution Date, the Paying Agent shall distribute to each Class C Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture such Class C Noteholder's *pro rata* share of the amounts held by the Paying Agent including amounts held by the Paying Agent with respect to amounts withdrawn from the Spread Account (at the *times* and in the amounts specified in Section 4.11)) that are allocated and available on such Distribution Date to pay interest on the Class C Notes pursuant to this Indenture Supplement.

(f)     On each Distribution Date, the Paying Agent shall distribute to each Class C Noteholder of record on the related Record Date such Class C Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class C Notes pursuant to this Indenture Supplement.

(g)    On each Distribution Date, the Paying Agent shall distribute to each Class D Noteholder of record on the related Record Date (other than as provided in Section 11.02 of the Indenture) such Class D Noteholder's *pro rata* share of the amounts held by the Paying Agent (including amounts held by the Paying Agent with respect to amounts withdrawn from the Spread Account (at the times and in the amounts specified in Section 4.11)) that are allocated and available on such Distribution Date to pay interest on the Class D Notes pursuant to this Indenture Supplement.

(h)    On each Distribution Date, the Paying Agent shall distribute to each Class D Noteholder of record on the related Record Date such Class D Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay principal of the Class D Notes pursuant to this Indenture Supplement.

(i)    The distributions to be nude pursuant to this Section 5.02 are subject to the provisions of Sections 2.06, 6.01 and 7.01 of the Transfer and Servicing Agreement, Section 11.02 of the Indenture and Section 7.01 of this Indenture Supplement.

(j)    Except as provided in Section 11.02 of the Indenture with respect to a final distribution, distributions to Series 2000-1 Noteholders hereunder shall be made by (i) check mailed to each Series 2000-1 Noteholder (at such Noteholder's address as it appears in the Note Register), except that with respect to any Series 2000-1 Notes registered in the name of the nominee of a Clearing Agency, such distribution shall be made in immediately available funds and (ii) without presentation or surrender of any Series 2000-1 Note or the making of any notation thereon.

Section 5.03    <u>Reports and Statements to Series 2000-1 Noteholders.</u> (a) On each Distribution Date, the Paying Agent, an behalf of the Indenture Trustee, shall forward to each Series 2000-1 Noteholder and each Rating Agency a statement substantially in the form of Exhibit C prepared by the Servicer.

(b)    Not later than the second Business Day preceding each Distribution Date, the Servicer shall deliver to the Owner Trustee, the Indenture Trustee, the Paying Agent and each Rating Agency a statement substantially in the form of Exhibit C prepared by the Servicer and (ii) a certificate of an Authorized Officer substantially in the form of Exhibit D; provided that the Servicer may amend the form of Exhibit C and Exhibit D, from time to time, with the consent of the Indenture Trustee.

(c)    A copy of each statement or certificate provided pursuant to paragraph (a) or (b) may be obtained by any Series 2000-1 Noteholder by a request in writing to the Servicer.

(d)    On or before January 31 of each calendar year, beginning with calendar year 2001, the Paying Agent. on behalf of the Indenture Trustee, shall furnish or cause to be furnished to each Person who at any time during the preceding calendar year was a Series 2000-1 Noteholder, a statement prepared by the Servicer containing the information which is required to be contained in the statement to Series 2000-1 Noteholders, as set forth in paragraph (a) above, aggregated for such calendar year or the applicable portion thereof during which such Person

was a Series 2000-1 Noteholder, together with other information as is required to be provided by an issuer of indebtedness under the Code. Such obligation of the Paying Agent shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Paying Agent pursuant to any requirements of the Code as from time to time in effect.

[END OF ARTICLE V]

# ARTICLE VI

## SERIES 2000-1 REDEMPTION EVENTS

Section 6.01    Series 2000-1 Redemption Events. If any one of the following events shall occur with respect to the Series 2000-1 Notes:

(a)    failure on the part of the Transferor (i) to make any payment or deposit required to be made by the Transferor by the terms of the Transfer and Servicing Agreement, the Indenture or this Indenture Supplement on or before the date occurring five (5) Business Days after the date such payment or deposit is required to be made therein or herein or (ii) duly to observe or perform any other covenants or agreements of the Transferor set forth in the Transfer and Servicing Agreement, the Indenture or this Indenture Supplement, which failure has a material adverse effect on the Series 2000-1 Noteholders and which continues unremedied for a period of sixty (60) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Transferor by the Indenture Trustee, or to the Transferor and the Indenture Trustee by any Holder of the Series 2000-1 Notes;

(b)    any representation or warranty made by the Transferor in the Transfer and Servicing Agreement, or any information contained in a computer file or microfiche list required to be delivered by the Transferor pursuant to Section 2.01 or subsection 2.09(h) of the Transfer and Servicing Agreement shall prove to have been incorrect in any material respect when made or when delivered, which continues to be incorrect in any material respect for a period of sixty (60) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Transferor by the Indenture Trustee, or to the Transferor and the Indenture Trustee by any Holder of the Series 2000-1 Notes and as a result of which the interests of the Series 2000-1 Noteholders are materially and adversely affected for such period; provided, however, that a Series 2000-1 Redemption Event pursuant to this subsection 6.01(b) shall not be deemed to have occurred hereunder if the Transferor has accepted reassignment of the related Receivable, or all of such Receivables, if applicable, during such period in accordance with the provisions of the Transfer and Servicing Agreement;

(c)    a failure by the Transferor to convey Receivables in Additional Accounts or Participation Interests to the Trust within five (5) Business Days after the day on which it is required to convey such Receivables or Participation Interests pursuant to subsection 2.09(a) of the Transfer and Servicing Agreement;

(d)    any Servicer Default shall occur;

(e)    the average of the Portfolio Yields for any three consecutive Monthly Periods is reduced to a rate which is less than the average of the Base Rates for such period;

(f)    the Class A Note Principal Balance or the Class B Note Principal Balance, Class C Note Principal Balance or the Class D Note Principal Balance shall not be paid in full on the Expected Final Principal Payment Date; or

(g)    without limiting the foregoing, the occurrence of an Event of Default with respect to Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes pursuant to Section 5.03 of the Indenture;

then, in the case of any event described in subparagraph (a), (b) or (d), after the applicable grace period, if any, set forth in such subparagraphs, either the Indenture Trustee or the Holders of Series 2000-1 Notes evidencing more than 50% of the aggregate unpaid principal amount of Series 2000-1 Notes by notice then given in writing to the Transferor and the Servicer (and to the Indenture Trustee if given by the Series 2000-1 Noteholders) may declare that a "Series Redemption Event" with respect to Series 2000-1 (a "Series 2000-1 Redemption Event") has occurred as of the date of such notice, and, in the case of any event described in subparagraph (c), (e), (f) or (g), a Series 2000-1 Redemption Event shall occur without any notice or other action on the part of the Indenture Trustee or the Series 2000-1 Noteholders immediately upon the occurrence of such event.

<div align="center">[END OF ARTICLE VI]</div>

## ARTICLE VII

## REDEMPTION OF SERIES 2000-1 NOTES; FINAL DISTRIBUTIONS; SERIES TERMINATION

Section 7.01    Optional Redemption of Series 2000-1 Notes: Final Distributions. (a) On any day occurring on or after the date on which the outstanding principal balance of the Series 2000-1 Notes is reduced to 5% or less of the initial outstanding principal balance of Series 2000-1 Notes, the Issuer shall have the option to redeem the Series 2000-1 Notes, at a purchase price equal to (i) if such day is a Distribution Date, the Reassignment Amount for such Distribution Date or (ii) if such day is not a Distribution Date, the Reassignment Amount for the Distribution Date following such day.

(b)    The Issuer shall give the Servicer and the Indenture Trustee at least thirty (30) days prior written notice of the date on which the Issuer intends to exercise such optional redemption. Not later than 12:00 noon, New York City time, on such day the Issuer shall deposit into the Collection Account in immediately available funds the excess of the Reassignment Amount over the amount, if any, on deposit in the Principal Funding Account. Such redemption option is subject to payment in full of the Reassignment Amount. Following such deposit into the Collection Account in accordance with the foregoing, the Invested Amount for Series 2000-1 shall be reduced to zero and the Series 2000-1 Noteholders shall have no further security interest in the Receivables. The Reassignment Amount shall be distributed as set forth in subsection 7.01(d).

(c)    (i) The amount to be paid by the Transferor with respect to Series 2000-1 in connection with a reassignment of Receivables to the Transferor pursuant to Section 2.06 of the Transfer and Servicing Agreement shall equal the Reassignment Amount for the first Distribution Date following the Monthly Period in which the reassignment obligation arises under the Transfer and Servicing Agreement.

(ii)    The amount to be paid by the Transferor with respect to Series 2000-1 in connection with a repurchase of the Notes pursuant to Section 7.01 of the Transfer and Servicing Agreement shall equal the Reassignment Amount for the Distribution Date of such repurchase.

(d)    With respect to the Reassignment Amount deposited into the Collection Account pursuant to Section 7.01, the Indenture Trustee shall, in accordance with the written direction of the Servicer, not later than 12:00 noon, New York City time, on the related Distribution Date, make deposits or distributions of the following amounts (in the priority set forth below and, in each case, after giving effect to any deposits and distributions otherwise to be made on such date) in immediately available funds: (i) (x) the Class A Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class A Noteholders and (y) an amount equal to the sum of (A) Class A Monthly Interest for such Distribution Date, (B) any Class A Monthly Interest previously due but not distributed to the Class A Noteholders on a prior Distribution Date and (C) the amount of Class A Additional Interest, if any, for such Distribution Date and any Class A Additional Interest previously due

but not distributed to the Class A Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class A Noteholders, (ii) (x) the Class B Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class B Noteholders and (y) an amount equal to the sum of (A) Class B Monthly Interest for such Distribution Date, (B) any Class B Monthly Interest previously due but not distributed to the Class B Noteholders on a prior Distribution Date and (C) the amount of Class B Additional Interest, if any, for such Distribution Date and any Class B Additional Interest previously due but not distributed to the Class B Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class B Noteholders, (iii) (x) the Class C Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class C Noteholders and (y) an amount equal to the sum of (A) Class C Monthly Interest for such Distribution Date, (B) any Class C Monthly Interest previously due but not distributed to the Class C Noteholders on a prior Distribution Date and (C) the amount of Class C Additional Interest, if any, for such Distribution Date and any Class C Additional Interest previously due but not distributed to the Class C Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class C Noteholders, (iv) (x) the Class D Note Principal Balance on such Distribution Date will be distributed to the Paying Agent for payment to the Class D Noteholders and (y) an amount equal to the sum of (A) Class D Monthly Interest for such Distribution Date, (B) any Class D Monthly Interest previously due but not distributed to the Class D Noteholders on a prior Distribution Date and (C) the amount of Class D Additional Interest, if any, for such Distribution Date and any Class D Additional Interest previously due but not distributed to the Class D Noteholders on any prior Distribution Date, will be distributed to the Paying Agent for payment to the Class D Noteholders and (v) any excess shall be released to the Issuer.

(e)     Notwithstanding anything to the contrary in this Indenture Supplement, the Indenture or the Transfer and Servicing Agreement, all amounts distributed to the Paying Agent pursuant to subsection 7.01(d) for payment to the Series 2000-1 Noteholders shall be deemed distributed in full to the Series 2000-1 Noteholders on the date on which such funds are distributed to the Paying Agent pursuant to this Section 7.01 and shall be deemed to be a final distribution pursuant to Section 11.02 of the Indenture.

Section 7.02   Series Termination. On the Series 2000-1 Final Maturity Date, the right of the Series 2000-1 Noteholders to receive payments from the Issuer will be limited solely to the right to receive payments pursuant to Section 5.05 of the Indenture.

[END OF ARTICLE VII]

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01    Ratification of Indenture. As supplemented by this Indenture Supplement, the Indenture is in all respects ratified and confirmed and the Indenture as so supplemented by this Indenture Supplement shall be read, taken and construed as one and the same instrument.

Section 8.02    Form of Delivery of the Series 2000-1 Notes.    (a) The Class A Notes, the Class B Notes and the Class C Notes shall be Book-Entry Notes. The Series 2000-1 Notes shall be delivered as Registered Notes as provided in Section 2.01 of the Indenture.

(b)    Class A Noteholders, Class B Noteholders and Class C Noteholders of a beneficial interest in the Class A Notes, Class B Notes or Class Notes, as applicable, sold in reliance on Regulation S as Temporary Regulation S Global Notes are prohibited from receiving distributions or from exchanging beneficial interests in such Temporary Regulation S Global Notes for Permanent Regulation S Global Notes until the later of (i) the expiration of the Distribution Compliance Period (the "Release Date") and (ii) the furnishing of a certificate, substantially in the form of Exhibit E attached hereto, certifying that the beneficial owner of the Temporary Regulation S Global Notes is a non-United States Person (a "Regulation S Certificate").

Section 8.03    Counterparts. This Indenture Supplement may be executed in two or more counterparts, and by different parties on separate counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument

Section 8.04    GOVERNING LAW.  THIS  INDENTURE  SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 8.05    Limitation of Liability. Notwithstanding any other provision herein or elsewhere, this Agreement has been executed and delivered by Wilmington Trust Company, not in its individual capacity, but solely in its capacity as Owner Trustee of the Trust, in no event shall Wilmington Trust Company in its individual capacity have any liability in respect of the representations, warranties, or obligations of the Trust hereunder or under any other document, as to all of which recourse shall be had solely to the assets of the Trust, and for all purposes of this Agreement and each other document, the Owner Trustee (as such or in its individual capacity) shall be subject to, and entitled to the benefits of, the terms and provisions of the Trust Agreement.

Section 8.06    Transfer of the Class D Notes. To the fullest extent permitted by applicable law, the Class D Notes (or any interest therein) may not be directly or in directly sold, transferred, assigned, participated, pledged or otherwise disposed of to any Person (each such

transaction, a "Transfer"); *provided, however*, that a Transfer of a Class D Note shall be permitted if (A) the Transferor shall have delivered a Tax Opinion to the Indenture Trustee with respect to such Transfer and (B) the transferee establishes to the Servicer that it is the beneficial owner for United States federal income tax purposes and that it is and will remain a "United States person" for such purposes for so long as it holds any interest in a Class D Note. Prior to any such Transfer by the Transferor, the Class D Notes shall not be treated by any Person as having been issued for United States federal income tax purposes.

Section 8.07    Private Placement of Securities.    The Series 2000-1 Notes have not been registered under the Securities Act or any state securities law. No transfer of any Series 2000-1 Note shall be made except in accordance with Sections 8.06 and 8.09 of this Indenture Supplement. The Series 2000-1 Notes shall bear a legend to the effect set forth in Exhibits A-1, A-2, A-3 A-4 A-5, A-6, A-7, A-8, A-9, and A-10, respectively. Neither the Trust nor the Indenture Trustee is obligated to register the Series 2000-1 Notes under the Securities Act or to take any other action not otherwise required under this Indenture Supplement or the Indenture to permit the transfer of the Series 2000-1 Notes without registration. No Class A Note, Class B Note or Class C Note may be transferred unless it is transferred in compliance with Section 8.08 and (i) to the Transferor, (ii) pursuant to Rule 144A under the Securities Act, or (iii) to persons other than U.S. Persons in offshore transactions pursuant to Regulation S under the Securities Act and, in each case, in compliance with any applicable state securities or "blue sky" laws.

Section 8.08    Representations and Warranties of Class A Noteholders, Class B Noteholders and Class C Noteholders.    Each purchaser of a Class A Note, Class B Note or Class C Note will be deemed to have acknowledged, represented, warranted and agreed by its purchase of a Class A Note, Class B Note or Class C Note as follows:

(a)    that (A) (i) it is QIB, (ii) it is aware that the sale to it is being made in reliance on Rule 144A and, if it is acquiring such Class A Note or any interest or participation therein for the account of another QIB, such other QIB is aware that the sale is being made in reliance on Rule 144A and (iii) it is acquiring its Class A Note, Class B Note or Class C Note for its own account or an account or the accounts of other QIBs or (B) it is not a U.S. Person and is purchasing its Class A Note, Class B Note or Class C Note or any interest or participation therein in an offshore transaction meeting the requirements of Rules 903 and 904 of Regulation S;

(b)    it understands that the Class A Notes, Class B Notes or Class C Notes are being offered only in a transaction not involving any public offering within the meaning of the Securities Act, and that it will not pledge, re-offer or resell or otherwise transfer any Class A Note, Class B Note or Class C Note or any interest therein except (i) to the Transferor, (ii) inside the United States in accordance with Rule 144A to a person who the seller reasonably believes is a QIB that purchases for its own account or for the account of a QIB to whom notice is given that the re-offer, resale, pledge or transfer is being made in reliance on Rule 144A or (iii) outside the United States in an offshore transaction in accordance with Rule 903 or 904 of Regulation S, in each case in compliance with all applicable state securities or "blue sky" laws;

(c)    it understands that each Class A Note, Class B Note or Class C Note will bear a legend set forth on the forms of Class A Notes, Class B Note or Class C Notes included as Exhibits A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8 and A-9;

(d)    if it is acquiring its Class A Note, Class B Note or Class C Note or any interest or participation therein in an "offshore transaction" (as defined in Regulation S), it acknowledges that its Class A Note, Class B Note or Class C Note initially will be represented by the Temporary Regulation S Global Note and that transfers thereof or any interest or participation therein are restricted as provided herein and in the Indenture; if it is a QIB, it acknowledges that the Class A Notes, Class B Notes and Class C Notes offered in reliance on Rule 144A will be represented by the Rule 144A Global Note and that transfers thereof or any interest or participation therein are restricted as provided herein and in the Indenture;

(e)    it acknowledges that the Indenture Trustee, the Trust, the Transferor and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations, warranties and agreements. If it is acquiring any Class A Note, Class B Note or Class C Note as a fiduciary or agent for one or more investor accounts, it will be deemed to have represented that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgements, representations, warranties and agreements on behalf of each such account;

(f)    with respect to any foreign purchaser claiming an exemption from United States income or withholding tax, that it has delivered to the Indenture Trustee a true and complete United States Internal Revenue Form W-8BEN, W-8ECI Form 1001 or Form 4224 (or any successor form) indicating such exemption;

(g)    it acknowledges that transfers of the Class A Notes, Class B Notes and Class C Notes or any interest or participation therein shall otherwise be subject in all respects to the restrictions applicable thereto contained in this Indenture Supplement and the Indenture;

(h)    it acknowledges that none of the Owner Trustee, the Indenture Trustee or Goldman, Sachs & Co., Barclays Capital, Inc. or Credit Suisse First Boston (collectively, the "Initial Purchasers") or any person representing the Trust, the Owner Trustee, the Indenture Trustee or the Initial Purchasers has made any representation to it with respect to the Trust or the offering or sale of any of the Class A Notes, Class B Notes or Class C Notes, other than the information contained in the Offering Memorandum, dated as of December 6, 2000 or the Offering Memorandum Supplement thereto, dated as of December 6, 2000, which have been delivered to it and upon which it is relying in making its investment decision with respect to the Class A Notes, the Class B Notes or the Class C Notes. It has had access to such financial and other information concerning the Trust, the Transferor and the Class A Notes, the Class B Notes and the Class C Notes as it has deemed necessary in connection with its decision to purchase such Class A Notes, Class B Notes or Class C Notes;

(i)    if it is acquiring any Class A Notes, Class B Notes or Class C Notes, or any interest or participation therein, as a fiduciary or agent for one or more investor accounts, it represents that it has the sole investment discretion with respect to such account and that it has

the full power to make the acknowledgements, representations and agreements contained herein on behalf of each of those accounts;

(j)    it acknowledges that it will not transfer any Class A Notes, Class B Notes or Class C Notes sold pursuant to Regulation S to any other party, other than to a QIB subsequent to the expiration of the Distribution Compliance Period;

(k)    it acknowledges that by its purchase or acquisition of the Class A Notes, Class B Notes or Class Notes, it will be deemed to have represented (and will be deemed to have repeated such representation on each date on which any Class A Notes, Class B Notes or Class C Notes are held by such Plan (as defined under ERISA)) that either (i) or (ii) is true:

(i)    the funds that it used to acquire the Class A Notes, Class B Notes or Class C Notes are not the assets of a Plan or an entity which entity's underlying assets include Plan Assets (as defined under ERISA) (or a governmental plan that is subject to any federal, state or local law that is substantially similar to the provisions of Section 406 of ERISA or Section 4973 of the Code); or

(ii)    its purchase, holding and disposition of the Class A Notes, Class B Notes or Class C Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or in the case of a governmental plan that is subject to any federal, state or local provision that is substantially similar to Section 406 of ERISA or Section 4975 of the Code) by reason of PTCE 96-23, PTCE 95-60, PTCE 91-38, PTCE 90-1, PTCE 84-14 or some other applicable exemption (or in the case of a governmental plan, any other applicable federal, state or local law); and

(l)    it acknowledges that the Transferor, the Owner Trustee, the Indenture Trustee, the Initial Purchasers and others will rely on the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that if any of the foregoing acknowledgements, representations and agreements deemed to have been made by it are no longer accurate, it shall promptly notify the Transferor, the Owner Trustee, the Indenture Trustee and the Initial Purchasers.

Any transfer, resale, pledge or other transfer of the Class A Notes, Class B Notes and Class C Notes contrary to the restrictions set forth above and in this Indenture Supplement and the Indenture shall be deemed void *ab initio* by the Indenture Trustee. As used in this Section 8.08, the terms "United States" and "U.S. persons" have the respective meanings given them in Regulation S.

Section 8.09    Regulation S Global Notes. (a) The Class A Notes, Class B Notes and Class C Notes issued in reliance on Regulation S will initially be in the form of Temporary Regulation S Global Notes. Any interest in a Class A Note, Class B Note or Class C Note evidenced by the Temporary Regulation S Global Note is exchangeable for an interest in a Permanent Regulation S Global Note upon the later of (i) the Release Date and (ii) the furnishing of a Regulation S Certificate.

(b)    On or prior to the Release Date, each beneficial owner of a Temporary Regulation S Global Note shall deliver to the Euroclear Operator or Clearstream (as applicable) a

Regulation S Certificate; *provided, however*, that any beneficial owner of a Temporary Regulation S Global Note on the Release Date on any Distribution Date that has previously delivered a Regulation S Certificate hereunder shall not be required to deliver any subsequent Regulation S Certificate (unless the certificate previously delivered is no longer true as of such subsequent date, in which case such beneficial owner shall promptly notify the Euroclear Operator or Clearstream, as applicable, thereof and shall deliver an updated Regulation S Certificate). The Euroclear Operator and/or Clearstream, as applicable, shall deliver to the Paying Agent or the Indenture Trustee a certificate substantially in the form of Exhibit F (a "Non—U.S. Certificate") attached hereto promptly upon the receipt of each such Regulation S Certificate, and no such beneficial owner (or transferee from such beneficial owner) shall be entitled to receive an interest in a Permanent Regulation S Global Note or any payment of principal or interest on or any other payment with respect to its beneficial interest in a Temporary Regulation S Global Note prior to the Paying Agent or the Indenture Trustee receiving such Non-U.S. Certificate from the Euroclear Operator or Clearstream with respect to the portion of the Temporary-Regulation S Global Note owned by such beneficial owner (and, with respect to an interest in the Permanent Regulation S Global Note, prior to the Release Date).

(c)    Any payments of principal of interest on or any other payment on a Temporary Regulation S Global Note received by the Euroclear Operator or Clearstream with respect to any portion of such Regulation S Global Note owned by a beneficial owner of a Class A Note, Class B Note or Class C Note that has not delivered the Regulation S Certificate required by this Section 8.09 shall be held by the Euroclear Operator and Clearstream solely as agents for the Paying Agent and the Indenture Trustee. The Euroclear Operator and Clearstream shall remit such payments to the applicable beneficial owner of a Class A Note, Class B Note or Class C Note (or to a Euroclear System or Clearstream member on behalf of such beneficial owner of a Class A Note, Class B Note or Class C Note) only after the Euroclear Operator or Clearstream has received the requisite Regulation S Certificate. Until the Paying Agent or the Indenture Trustee has received a Non-U.S. Certificate from the Euroclear Operator or Clearstream, as applicable, the Paying Agent or the Indenture Trustee may revoke the right of the Euroclear Operator or Clearstream, as applicable, to hold any payments made with respect to such portion of such Temporary Regulation S Global Note. If the Paying Agent or the Indenture Trustee exercises its right of revocation pursuant to the immediately preceding sentence, the Euroclear Operator or Clearstream, as applicable, shall return such payments to the Paying Agent or the Indenture Trustee and the Indenture Trustee shall hold such payments in the Collection Account until the Euroclear Operator or Clearstream, as applicable, has provided the necessary Non-U.S. Certificates to the Paying Agent or the Indenture Trustee (at which time the Paying Agent shall forward such payments to the Euroclear Operator or Clearstream, as applicable, to be remitted to the beneficial owner of a Class A Note, Class B Note of Class C Note that is entitled thereto on the records of the Euroclear Operator or Clearstream (or on the records of their respective members)).

(d)    Each beneficial owner of a Class A Note, Class B Note or Class C Note with respect to a Temporary Regulation S Global Note shall exchange its interest therein for an interest in a Permanent Regulation S Global Note on or after the Release Date upon furnishing to the Euroclear Operator or Clearstream (as applicable) the Regulation S Certificate and upon receipt by the Paying Agent or the Indenture Trustee, as applicable, of the Non-U.S. Certificate from the Euroclear Operator or Clearstream, as applicable, in each case pursuant to the terms of

this Section 8.09. On and after the Release Date, upon receipt by the Paying Agent or the Indenture Trustee of any Non-U.S. Certificate from the Euroclear Operator or Clearstream described in the immediately preceding sentence (i) with respect to the first such certification, the Trust shall execute, upon receipt of an order to authenticate, and the Indenture Trustee shall authenticate the applicable Permanent Regulation S Global Note and (ii) with respect to the first and all subsequent certifications, the Indenture Trustee shall exchange on behalf of the applicable beneficial owners the portion of the applicable Temporary Regulation S Global Note covered by such certification for a comparable portion of the applicable Permanent Regulation S Global Note. Upon any exchange of a portion of a Temporary Regulation S Global Note for a comparable portion of a Permanent Regulation S Global Note, the Indenture Trustee shall endorse on the schedules affixed to each of such Regulation S Global Notes (or on continuations of such schedules affixed to each of such Regulation S Global Notes and made parts thereof) appropriate notations evidencing the date of transfer and (x) with respect to the Temporary Regulation S Global Note, a decrease in the principal amount thereof equal to the amount covered by the applicable certification and (y) with respect to the Permanent Regulation S Global Note, an increase in the principal amount thereof equal to the principal amount of the decrease in the Temporary Regulation S Global Note pursuant to clause (x) above.

Section 8.10    Special Transfer Provisions.  (a) If a holder of a beneficial interest in the Rule 144A Global Note wishes at any time to exchange its interest in the Rule 144A Global Note for an interest in the Regulation S Global Note, or to transfer its interest in the Rule 144A Global Note to a person who wishes to take delivery thereof in the form of an interest in the Regulation S Global Note, such holder may, subject to the rules and procedures of the Clearing Agency and to the requirements set forth in the following sentence, exchange or cause the exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in the Regulation S Global Note. Upon receipt by the Indenture Trustee of (1) instructions given in accordance with the Clearing Agency's procedures from or on behalf of a beneficial owner of the Rule 144A Global Note, directing the Indenture Trustee (via DWAC), as transfer agent, to credit or cause to be credited a beneficial interest in the Regulation S Global Note in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, (2) a written order in accordance with the Clearing Agency's procedures containing information regarding the Euroclear System or Clearstream account to be credited with such increase and the name of such account, and (3) a certificate given by such beneficial owner stating that the exchange or transfer of such interest has been made pursuant to and in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act, the Indenture Trustee, as transfer agent, shall promptly deliver appropriate instructions to the Clearing Agency (via DWAC), its nominee, or the custodian for the Clearing Agency, as the case may be, to reduce or reflect on its records a reduction of the Rule 144A Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be so exchanged or transferred from the relevant participant, and the Indenture Trustee, as transfer agent, shall promptly deliver appropriate instructions (via DWAC) to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, concurrently with such reduction, to increase or reflect on its records an increase of the principal amount of such Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the person specified in such instructions (who may be the Euroclear Operator or Clearstream or another agent member of the Euroclear System or Clearstream, or both, as the case may be, acting for and on behalf of them) a

beneficial interest in such Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note. Notwithstanding anything to the contrary, the Indenture Trustee may conclusively rely upon the completed schedule set forth in the certificate evidencing the Class A Notes, the Class B Notes and the Class C Notes.

(b)    If a holder of a beneficial interest in the Regulation S Global Note wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the Rule 144A Global Note, or to transfer its interest in the Regulation S Global Note to a person who wishes to take delivery thereof in the form of an interest in the Rule 144A Global Note, such holder may, subject to the rules and procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, and to the requirements set forth in the following sentence, exchange or cause the exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Note. Upon receipt by the Indenture Trustee, as transfer agent, of (1) instructions given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, from or on behalf of a beneficial owner of the Regulation S Global Note directing the Indenture Trustee, as transfer agent, to credit or cause to be credited a beneficial interest in the Rule 144A Global Note in an amount equal to the beneficial interest in the Regulation S Global Note to be exchanged or transferred, (2) a written order given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, containing information regarding the account with the Clearing Agency to be credited with such increase and the name of such account, and (3) a certificate given by such beneficial owner stating that the person transferring such interest in such Regulation S Global Note reasonably believes that the person acquiring such interest in the Rule 144A Global Note is a QIB and is obtaining such beneficial interest for its own account or the account of a QIB in a transaction meeting the requirements of Rule 144A and any applicable securities laws of any state of the United States or any other jurisdiction, the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, to reduce or reflect on its records a reduction of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in such Regulation S Global Note to be exchanged or transferred, and the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, concurrently with such reduction, to increase or reflect on its records an increase of the principal amount of the Rule 144A Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note. Notwithstanding anything to the contrary, the Indenture Trustee may conclusively rely upon the completed schedule set forth in the certificate evidencing the Class A Notes, Class B Notes or Class C Notes.

(c)    Any beneficial interest in one of the Class A Notes, Class B Notes or Class C Notes that is transferred to a person who takes delivery in the form of an interest in the other Class A Note, Class B Note or Class C Note will, upon transfer, cease to be an interest in such Class A Note, Class B Note or Class C Note and become an interest in the other Class A Note, Class B Note or Class C Note and, accordingly, will thereafter be subject to all transfer

restrictions and oilier procedures applicable to beneficial interests in such other Class A Note, Class B Note or Class C Note for as long as it remains such an interest.

(d)    Until the provision of the certifications required by Section 8.09, beneficial interests in a Regulation S Global Note may only be held through the Euroclear System or Clearstream or another agent member of the Euroclear System or Clearstream acting for and on behalf of them. Interests in the Regulation S Global Note may be exchanged for interests in the Rule 144A Global Note only in accordance with the certification requirements described above.

Section 8.11    <u>Settlement Procedures</u>. As described more fully in the Settlement Memorandum attached hereto as Exhibit G, on the Closing Date the Initial Purchasers shall wire funds in the amount of the net purchaser price for the Class A Notes, the Class B Notes and the Class C Notes to the an account maintained by the Indenture Trustee (the "Net Proceeds Account"). The Indenture Trustee shall apply the amount wired by the Initial Purchasers for deposit in the Net Proceeds Account in accordance with the Settlement Memorandum included as Exhibit G hereto.

<div align="center">[END OF ARTICLE VIII]</div>

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

IN WITNESS WHEREOF, the undersigned have caused this Indenture Supplement to be duly executed and delivered by their respective duly authorized officers on the day and year first above written.

NEXTCARD CREDIT CARD MASTER
NOTE TRUST, as Issuer

By:  Wilmington Trust Company, not in its
individual capacity, but solely as Owner
Trustee

By:_____
Name:  James P. Lawler
Title:  Vice President

THE BANK OF NEW YORK, as Indenture
Trustee

By:_____
Name:  MAURO PALLADINO
Title:  VICE PRESIDENT

Acknowledged and Accepted:

NEXTBANK, N.A., as Servicer

By:_____
Name:  Bruce Rigione
Title:  CFO

[Signature Page to Series 2000-1 Indenture Supplement]

FORM OF PERMANENT REGULATION S GLOBAL NOTE

THIS GLOBAL NOTE IS A PERMANENT GLOBAL NOTE FOR PURPOSES OF REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT").  NEITHER THIS PERMANENT GLOBAL NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD OR DELIVERED, EXCEPT AS PERMITTED UNDER THE INDENTURE REFERRED TO BELOW.

NO BENEFICIAL OWNERS OF THIS PERMANENT GLOBAL NOTE SHALL BE ENTITLED TO RECEIVE PAYMENT OF PRINCIPAL OR INTEREST HEREON UNLESS THE REQUIRED CERTIFICATIONS HAVE BEEN DELIVERED PURSUANT TO THE TERMS OF THE INDENTURE.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAW. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE, OR ANY INTEREST OR PARTICIPATION HEREIN, MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) TO THE ISSUER, (2) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB") PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, OR (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT.  EACH BENEFICIAL OWNER OF A NOTE BY ACCEPTING A BENEFICIAL INTEREST IN THIS NOTE, UNLESS SUCH PERSON ACQUIRED THIS NOTE IN A TRANSFER DESCRIBED IN CLAUSE (3) ABOVE, IS DEEMED TO REPRESENT THAT IT IS EITHER A QIB PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF ANOTHER QIB.

PRIOR TO PURCHASING ANY NOTES, PURCHASERS SHOULD CONSULT COUNSEL WITH RESPECT TO THE AVAILABILITY AND CONDITIONS OF EXEMPTION FROM THE RESTRICTION ON RESALE OR TRANSFER.  NONE OF NEXTCARD, INC., THE TRANSFEROR OR THE ISSUER HAS AGREED TO REGISTER THE NOTES UNDER THE SECURITIES ACT, TO QUALIFY THE NOTES UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR TO PROVIDE REGISTRATION RIGHTS TO ANY PURCHASER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

Up to $57,500,000

No. R-1

SEE REVERSE FOR CERTAIN DEFINITIONS

CUSIP NO. _____
USIN: _____
COMMON CODE: _____

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF, AND EACH HOLDER OF A BENEFICIAL INTEREST IN THIS NOTE, COVENANTS AND AGREES THAT IT WILL NOT AT ANY TIME INSTITUTE AGAINST THE ISSUER OR NEXTBANK, N.A. OR JOIN IN ANY INSTITUTION AGAINST THE ISSUER OR NEXTBANK, N.A., OF, ANY BANKRUPTCY PROCEEDINGS UNDER ANY UNITED STATES FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW IN CONNECTION WITH ANY OBLIGATIONS RELATING TO THE NOTES OR THE INDENTURE.

THE HOLDER OF THIS NOTE, BY ACCEPTANCE OF THIS NOTE, AND EACH HOLDER OF A BENEFICIAL INTEREST IN THIS NOTE, BY THE ACQUISITION OF A BENEFICIAL INTEREST THEREIN, AGREE TO TREAT THE NOTES AS INDEBTEDNESS OF NEXTCARD CREDIT CARD MASTER NOTE TRUST FOR APPLICABLE FEDERAL, STATE, AND LOCAL INCOME AND FRANCHISE TAX LAW AND FOR PURPOSES OF ANY OTHER TAX IMPOSED ON OR MEASURED BY INCOME.

DOCSSF1:498752.4

NEXTCARD CREDIT CARD MASTER NOTE TRUST

SERIES 2000-1, CLASS C ASSET BACKED NOTE

NextCard Credit Card Master Note Trust, a Delaware business trust (herein referred to as the "Issuer"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, subject to the following provisos, a principal sum UP TO FIFTY-SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($57,500,000) payable in an amount equal to the aggregate amount, if any, payable from the Collection Account in respect of principal on the Notes pursuant to Section 4.04 of the Indenture Supplement. The entire unpaid principal amount of this Note shall be due and payable on the earlier of the Series 2000-1 Maturity Date and the Redemption Date, if any. The aggregate principal sum of the Regulation S Global Notes and the Rule 144A Global Note shall not exceed $57,500,000. The Issuer will pay interest on the Notes with respect to each Interest Period, in accordance with Sections 4.02 and 4.04 of the Indenture Supplement. Such principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.

The principal of and interest on this Class C Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

Reference is made to the further provisions of this Class C Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Class C Note.

Unless the certificate of authentication hereon has been executed by the Authentication Agent whose name appears below by manual signature, this Class C Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Issuer has caused this Class C Note to be duly executed.

NEXTCARD CREDIT CARD MASTER NOTE TRUST,
as Issuer

By:    WILMINGTON TRUST COMPANY,
not in its individual capacity but solely as
Owner Trustee under the Trust Agreement

By:_____
Name:
Title:

Date:  December 13, 2000

A-9-4

## AUTHENTICATION AGENT'S CERTIFICATE OF AUTHENTICATION

This is one of the Class C Notes described in the within-mentioned Indenture.

THE BANK OF NEW YORK,
as Indenture Trustee

By: _____
Name:
Title:

Date:  December 13, 2000

A-9-5

[REVERSE OF NOTE]

This Note is one of the Notes of a duly authorized issue of Notes of the Issuer, designated as its Class C Asset Backed Notes, Series 2000-1 (herein called the "Class C Notes"), all issued under a Master Indenture dated as of December 11, 2000 (such indenture, as supplemented by the Series 2000-1 Indenture Supplement dated as of December 13, 2000 among the parties to the Master Indenture (the "Indenture Supplement"), is herein called the "Indenture"), between the Issuer and The Bank of New York, as indenture trustee (the "Indenture Trustee", which term includes any successor Indenture Trustee under the Indenture), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights and obligations thereunder of the Issuer, the Indenture Trustee and the Holders of the Class C Notes. The Class C Notes are subject to all terms of the Indenture. All terms used in this Class C Note that are not defined herein shall have the meanings assigned to them in or pursuant to the Indenture, as supplemented or amended.

The Class C Notes are and will be equally and ratably entitled to the benefits of the Indenture without preference, priority or distinction, all in accordance with the terms and provisions of the Indenture.

Payments of interest on and principal of this Class C Note due and payable on any Distribution Date, to the extent not in full payment of this Class C Note, shall be made by check mailed to the Person whose name appears as the registered Holder of this Class C Note (or one or more predecessor Class C Notes) on the Note Register as of the close of business on each Record Date (the "Registered Holder"), except that with respect to Class C Notes registered on the Record Date in the name of the nominee of the Clearing Agency (initially, such nominee to be Cede & Co.), payments will be made by wire transfer in immediately available funds to the account designated by such nominee. Such checks shall be mailed to the Person entitled thereto at the address of such Person as it appears on the Note Register as of the applicable Record Date without requiring that this Class C Note be submitted for notation of payment. Any reduction in the principal amount of this Class C Note (or any one or more predecessor Class C Notes) effected by any payments made on any Distribution Date shall be binding upon all future Holders of this Class C Note and of any Class C Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not noted hereon. Any final payment shall be made in accordance with provisions of the Indenture.

As provided in the Indenture, the Class C Notes will be redeemed in whole, but not in part, on the Redemption Date, if any.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Class C Note may be registered on the Note Register upon surrender of this Class C Note for registration of transfer at the office or agency designated by the Issuer pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Note Registrar duly executed by, the Holder hereof or his attorney-in-fact duly authorized in writing, and such other documents as the Note Registrar may reasonably require, and thereupon one or more new Notes of authorized denominations and in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Class C Note, but the Note Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

On any redemption, purchase, exchange or cancellation of any of the Notes represented by this Permanent Regulation S Global Note, details of such redemption, purchase, exchange or cancellation shall be entered by the Paying Agent in Schedule A hereto recording any such redemption, purchase, exchange or cancellation and shall be signed on by or on behalf of the Issuer. Upon any such redemption, purchase,

A-9-6

exchange or cancellation, the principal amount of this Permanent Regulation S Global Note and the Notes represented by this Permanent Regulation S Global Note shall be reduced or increased, as appropriate, by the principal amount so redeemed, purchased, exchanged or cancelled.

If a holder of a beneficial interest in the Regulation S Global Note wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the Rule 144A Global Note, or to transfer its interest in the Regulation S Global Note to a person who wishes to take delivery thereof in the form of an interest in the Rule 144A Global Note, such holder may, subject to the rules and procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, and to the requirements set forth in the following sentence, exchange or cause the exchange or transfer or cause the transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Note. Upon receipt by the Indenture Trustee, as transfer agent, of (1) instructions given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, from or on behalf of a beneficial owner of the Regulation S Global Note directing the Indenture Trustee, as transfer agent, to credit or cause to be credited a beneficial interest in the Rule 144A Global Note in an amount equal to the beneficial interest in the Regulation S Global Note to be exchanged or transferred, (2) a written order given in accordance with the procedures of the Euroclear System or Clearstream and the Clearing Agency, as the case may be, containing information regarding the account with the Clearing Agency to be credited with such increase and the name of such account, and (3) a certificate given by such beneficial owner stating that the person transferring such interest in such Regulation S Global Note reasonably believes that the person acquiring such interest in the Rule 144A Global Note is a QIB and is obtaining such beneficial interest for its own account or the account of a QIB in a transaction meeting the requirements of Rule 144A and any applicable securities laws of any state of the United States or any other jurisdiction, the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, to reduce or reflect on its records a reduction of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in such Regulation S Global Note to be exchanged or transferred, and the Indenture Trustee, as transfer agent, shall promptly deliver (via DWAC) appropriate instructions to the Clearing Agency, its nominee, or the custodian for the Clearing Agency, as the case may be, concurrently with such reduction, to increase or reflect on its records an increase of the principal amount of the Rule 144A Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note. Notwithstanding anything to the contrary, the Indenture Trustee may conclusively rely upon the completed schedule set forth in the certificate evidencing the Class C Global Notes.

Each Noteholder or beneficial owner, by acceptance of a Class C Note or, in the case of a beneficial owner, a beneficial interest in a Class C Note, covenants and agrees that no recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer or the Indenture Trustee on the Class C Notes or under the Indenture or any certificate or other writing delivered in connection therewith, against (i) the Indenture Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director or employee of the Indenture Trustee in its individual capacity, any holder of a beneficial interest in the Issuer or the Indenture Trustee or of any successor or assign of the Indenture Trustee in its individual capacity, except as any such Person may have expressly agreed and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.

Prior to the due presentment for registration of transfer of this Class C Note, the Issuer, the Indenture Trustee, the Paying Agent, the Authentication Agent, the Note Registrar and any agent of the foregoing shall treat the Person in whose name this Class C Note (as of the day of determination or as of such other date as may be specified in the Indenture) is registered as the owner hereof for all purposes,

A-9-7

whether or not this Class C Note be overdue, and neither the Issuer, the Indenture Trustee, the Paying Agent, the Authentication Agent, the Note Registrar nor any such agent of the foregoing shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders of the Notes under the Indenture at any time by the Issuer and the Indenture Trustee with the consent of a majority of Holders. The Indenture also contains provisions permitting the Holders of Series 2000-1 Notes representing specified percentages of the aggregate principal balance of the Series 2000-1 Notes, on behalf of the Holders of all the Series 2000-1 Notes, to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Class C Note (or any one of more predecessor Notes) shall be conclusive and binding upon such Holder and upon all future Holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Class C Note. The Indenture also permits, subject to the conditions set forth in the Indenture, the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of Holders of the Class C Notes issued thereunder or without the consent of holders of Series of Notes not affected thereby.

The Class C Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Class C Note and the Indenture shall be governed by and construed in accordance with the laws of the State of New York, including Section 5-1401 of the New York General Obligations Law, but otherwise without regard to its conflict of law principles.

No reference herein to the Indenture and no provision of this Class C Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C Note at the times, place, and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Transaction Documents, neither any owner of a beneficial interest in the Issuer, nor any of its partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on, or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Note or the Indenture. The Holder of this Class C Note by the acceptance hereof agrees that, except as expressly provided in the Transaction Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Class C Note.

A-9-8

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee

_____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____    _____

Signature Guaranteed:

---

\* NOTE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatsoever.

A-9-9

SCHEDULE A

**SCHEDULE OF EXCHANGES BETWEEN THIS PERMANENT REGULATION S GLOBAL NOTE OR THE RULE 144A GLOBAL NOTE, OR REDEMPTIONS OR PURCHASES AND CANCELLATIONS**

The following increases or decreases in principal amount of this Permanent Regulation S Global Note or redemptions, purchases or cancellation of this Permanent Regulation S Global Note have been made:

| Date of exchange, or redemption or purchase or cancellation | Increase or decrease in principal amount of this Permanent Regulation S Global Note due to exchanges between the Rule 144A Global Note and this Permanent Regulation S Global Note | Remaining principal amount of this Permanent Regulation S Global Note following such exchange, or redemption or purchase or cancellation | Notation made by or on behalf of the Issuer |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

A-9-10

EXHIBIT A-10

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAW. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE, OR ANY INTEREST OR PARTICIPATION HEREIN, MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (1) TO THE ISSUER OR ITS AFFILIATES OR (2) PURSUANT TO RULE 144A UNDER THE SECURITIES ACT TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB") PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT. EACH NOTE OWNER BY ACCEPTING A BENEFICIAL INTEREST IN THIS NOTE IS DEEMED TO REPRESENT THAT IT IS EITHER A QIB PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF ANOTHER QIB.

THIS NOTE MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN THAT IS SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR TO ANY OTHER "BENEFIT PLAN INVESTOR" (AS DEFINED IN UNITED STATES DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101(f)(2)), INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE SUPPLEMENT.

REGISTRATION OF TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN WILL REQUIRE DELIVERY OF SUCH CERTIFICATES AND OTHER REQUIREMENTS AS ARE REQUIRED BY THE INDENTURE SUPPLEMENT, AS MORE SPECIFICALLY SET FORTH THEREIN.

BEFORE PURCHASING THIS NOTE, PURCHASERS SHOULD CONSULT COUNSEL WITH RESPECT TO THE AVAILABILITY AND CONDITIONS OF EXEMPTION FROM THE RESTRICTION ON RESALE OR TRANSFER. THE SELLER HAS NOT AGREED TO REGISTER THIS NOTE UNDER THE SECURITIES ACT, TO QUALIFY THIS NOTE UNDER THE SECURITIES LAWS OF ANY STATE OR JURISDICTION OR TO PROVIDE REGISTRATION RIGHTS TO ANY PURCHASER.

AS SET FORTH HEREIN, THE OUTSTANDING PRINCIPAL BALANCE OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF COVENANTS AND AGREES THAT IT WILL NOT AT ANY TIME INSTITUTE AGAINST THE ISSUER, OR JOIN IN INSTITUTING AGAINST THE ISSUER, ANY BANKRUPTCY,

REORGANIZATION, ARRANGEMENT, INSOLVENCY OR LIQUIDATION PROCEEDINGS, OR OTHER PROCEEDINGS UNDER ANY UNITED STATES FEDERAL OR STATE BANKRUPTCY OR SIMILAR LAW.

FOLLOWING THE TRANSFER OF THIS CLASS D NOTE BY THE TRANSFEROR, THE HOLDER OF THIS CLASS D NOTE, BY ACCEPTANCE OF THIS NOTE, AND EACH HOLDER OF A BENEFICIAL INTEREST THEREIN, AGREE TO TREAT THE CLASS D NOTES AS INDEBTEDNESS OF THE ISSUER FOR APPLICABLE FEDERAL, STATE, AND LOCAL INCOME AND FRANCHISE TAX LAW AND FOR PURPOSES OF ANY OTHER TAX IMPOSED ON, OR MEASURED BY, INCOME.

REGISTERED                                                    $6,000,000.00

No. R _18                                                CUSIP NO. 65334UAD5

## NEXTCARD CREDIT CARD MASTER NOTE TRUST

### SERIES 2000-1

### CLASS D FLOATING RATE ASSET BACKED NOTE

NextCard Credit Card Master Note Trust, a Delaware business trust (herein referred to as the "**Issuer**" or the "**Trust**"), for value received, hereby promises to pay to **FIRST MILLENNIUM, INC.**, or registered assigns, subject to the following provisions, the principal sum of **SIX MILLION DOLLARS** ($6,000,000.00), or such greater or lesser amount as determined in accordance with the Indenture. The entire unpaid principal amount of this Note shall be due and payable on the earlier of the Series 2000-1 Final Maturity Date and the Redemption Date, if any. The Trust will pay interest on the Class D Notes with respect to each Interest Period in accordance with Sections 4.02 and 4.04 of the Indenture Supplement and will pay principal, if any, due on the Class D Notes on each Distribution Date in accordance with Section 4.01, 4.03 and 4.04 of the Indenture Supplement. Such principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.

The principal of and interest on this Class D Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

Reference is made to the further provisions of this Class D Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note.

Unless the certificate of authentication hereon has been executed by or on behalf of the Indenture Trustee, by manual signature, this Class D Note shall not be entitled to any benefit under the Indenture or the Indenture Supplement referred to on the reverse hereof, or be valid for any purpose.

**THIS CLASS D NOTE IS SUBORDINATED TO THE EXTENT NECESSARY TO FUND PAYMENTS ON THE CLASS A, THE CLASS B AND THE CLASS C NOTES TO THE EXTENT SPECIFIED IN THE INDENTURE SUPPLEMENT.**

IN WITNESS WHEREOF, the Issuer has caused this Class D Note to be duly executed.

NEXTCARD CREDIT CARD MASTER NOTE TRUST,
as Issuer

By:  WILMINGTON TRUST COMPANY, not in its individual
     capacity but solely as Owner Trustee under the Trust
     Agreement


By: _____

Name:    Jeanne M. Oller
Title:   Senior Financial Services Officer


Dated: _01/18_ , _2006_

-4-

INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Class D Notes described in the within-mentioned Indenture.

THE BANK OF NEW YORK,
as Indenture Trustee

By: _Antonio Vargas_
Authorized Signatory

Assistant Vice President

-5-

**[REVERSE OF NOTE]**

This Class D Note is one of a duly authorized issue of Notes of the Issuer, designated as NextCard Credit Card Master Note Trust, Series 2000-1 (the "**Series 2000-1 Notes**"), issued under a Master Indenture dated as of December 11, 2000 (the "**Master Indenture**"), between the Issuer and The Bank of New York, as indenture trustee (the "**Indenture Trustee**"), as supplemented by the Indenture Supplement dated as of December 13, 2000 (the "**Indenture Supplement**"), and representing the right to receive certain payments from the Issuer. The term "Indenture," unless the context otherwise requires, refers to the Master Indenture as supplemented by the Indenture Supplement. The Notes are subject to all of the terms of the Indenture. All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in or pursuant to the Indenture. In the event of any conflict or inconsistency between the Indenture and this Note, the Indenture shall control.

The Class A Notes, the Class B Notes and the Class C Notes will also be issued under the Indenture.

The Noteholder, by its acceptance of this Note, agrees that it will look solely to the property of the Trust allocated to the payment of this Note for payment hereunder and that the Indenture Trustee is not liable to the Noteholders for any amount payable under the Note or the Indenture or, except as expressly provided in the Indenture, subject to any liability under the Indenture.

This Note does not purport to summarize the Indenture and reference is made to the Indenture for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights, duties and immunities of the Indenture Trustee.

The Class D Note Initial Principal Balance is $17,500,000. The Class D Note Principal Balance on any date of determination will be an amount equal to (a) the Class D Note Initial Principal Balance, *minus* (b) the aggregate amount of principal payments made to the Class D Notcholders on or prior to such date.

The Expected Final Principal Payment Date is the December 2003 Distribution Date, but principal with respect to the Class D Notes may be paid earlier or later under certain circumstances described in the Indenture. If for one or more months during the Controlled Accumulation Period there are not sufficient funds to deposit into the Principal Funding Account the Controlled Deposit Amount, then to the extent that excess funds are not available on subsequent Distribution Dates with respect to the Controlled Accumulation Period to make up for such shortfalls, the final payment of principal of the Notes will occur later than the Expected Final Principal Payment Date. Payments of principal of the Notes shall be payable in accordance with the provisions of the Indenture.

Subject to the terms and conditions of the Indenture, the Transferor may, from time to time, direct the Owner Trustee, on behalf of the Trust, to issue one or more new Series of Notes.

On each Distribution Date, the Paying Agent shall distribute to each Class D Noteholder of record on the related Record Date (except for the final distribution in respect of this Class D Note) such Class D Noteholder's *pro rata* share of the amounts held by the Paying Agent that are allocated and available on such Distribution Date to pay interest and principal on the Class D Notes pursuant to the Indenture Supplement. Except as provided in the Indenture with respect to a final distribution, distributions to Series 2000-1 Noteholders shall be made by (i) check mailed to each Series 2000-1 Noteholder (at such Noteholder's address as it appears in the Note Register), except that with respect to any Series 2000-1 Notes registered in the name of the nominee of a Clearing Agency or with an initial principal balance of at least $5,000,000, such distribution shall be made by wire transfer of immediately available funds, *provided, that,* the Holder of any such Note shall have notified the Paying Agent at least five (5) Business Days prior to the related Record Date of the account at a bank or other entity having appropriate facilities to which such distribution should be made, and (ii) without presentation or surrender of any Series 2000-1 Note or the making of any notation thereon. Final payment of this Class D Note will be made only upon presentation and surrender of this Class D Note at the office or agency specified in the notice of final distribution delivered by the Indenture Trustee to the Series 2000-1 Noteholders in accordance with the Indenture.

On any day occurring on or after the date on which the outstanding principal balance of the Series 2000-1 Notes is reduced to 5% or less of the initial outstanding principal balance of the Series 2000-1 Notes, the Issuer shall have the option to redeem the Series 2000-1 Notes, at a purchase price equal to (i) if such day is a Distribution Date, the Reassignment Amount for such Distribution Date or (ii) if such day is not a Distribution Date, the Reassignment Amount for the Distribution Date following such day.

**This Class D Note does not represent an obligation of, or an interest in, NextBank, N.A., NextCard, Inc. or any of their Affiliates and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency or instrumentality.**

Each Noteholder, by accepting a Note, hereby covenants and agrees that it will not at any time institute against the Issuer, or join in instituting against the Issuer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.

Except as otherwise provided in the Indenture Supplement, the Class D Notes are issuable only in minimum denominations of $100,000 and integral multiples of $1,000. Subject to Section 8.06 of the Indenture Supplement, the transfer of this Class D Note shall be registered in the Note Register upon surrender of this Class D Note for registration of transfer at any office or agency maintained by the Transfer Agent and Registrar accompanied by a written instrument of transfer, in a form satisfactory to the Indenture Trustee or the Transfer Agent and Registrar, duly executed by the Class D Noteholder or such Class D Noteholder's attorney, and duly authorized in writing with such signature guaranteed, and thereupon one or more new Class D Notes in any authorized denominations of like aggregate principal amount will be issued to the designated transferee or transferees.

-7-

As provided in the Indenture and subject to certain limitations therein set forth, Class D Notes are exchangeable for new Class D Notes in any authorized denominations and of like aggregate principal amount, upon surrender of such Notes to be exchanged at the office or agency of the Transfer Agent and Registrar. No service charge may be imposed for any such exchange but the Issuer or Transfer Agent and Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

The Issuer, the Transferor, the Indenture Trustee and any agent of the Issuer, the Transferor or the Indenture Trustee shall treat the person in whose name this Class D Note is registered as the owner hereof for all purposes, and neither the Issuer, the Transferor, the Indenture Trustee nor any agent of the Issuer, the Transferor or the Indenture Trustee shall be affected by notice to the contrary.

THIS CLASS D NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

# ASSIGNMENT

Social Security or other identifying number of assignee _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____
(name and address of assignee)

the within certificate and all rights thereunder, and hereby irrevocably constitutes and appoints _____, attorney, to transfer said certificate on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                              _____ 1/

                                              Signature Guaranteed:

                                              _____

_____

1/    NOTE:  The signature to this Assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatsoever.

**NextCard Credit Card Master Note Trust**

**Series 2000-1 and Series 2001-1 Asset Backed Notes**

**DIRECTIONS TO INDENTURE TRUSTEE AND
INDEMNIFICATION REGARDING (A) NOTICE OF EVENT OF
DEFAULT AND ACCELERATION AND (B) EXERCISE OF
REMEDIES UNDER MASTER INDENTURE SECTION 5.05**
November 9, 2006
**(this letter of instruction, the "Instruction Letter")**

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), and to the Transfer and Servicing Agreement, as amended (together with the Master Indenture, the **"Agreements"**), dated as of December 11, 2000, between NextBank, N.A. (**"NextBank"**), as transferor and servicer, and the Issuer, and acknowledged and accepted by the Indenture Trustee. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Agreements.

The parties identified in Schedule 1 to this Instruction Letter (the **"Directing Holders"**) are the beneficial owner of the Notes designated on the signature and certification page provided by or on behalf of such owners. Each Directing Holder represents and warrants to the Indenture Trustee that it is either (i) the legal and beneficial owner of such Notes or (ii) the nominee or advisor for the legal and beneficial owner of such Notes, authorized by such beneficial owner to execute and deliver this Instruction Letter to the Indenture Trustee on behalf of such legal and beneficial owner.

Pursuant to the applicable terms of the Agreements:

(i)    the Directing Holders hereby irrevocably direct the Indenture Trustee to execute the Notice of Event Default and Acceleration under Master Indenture in substantially the form annexed hereto as <u>Exhibit A</u> (updated to reflect the addressees in the carbon copies in accordance with the Indenture Trustee's records) and to deliver such notice in accordance with the terms thereof on or prior to November 14, 2006;

(ii)    from and after the delivery of the Notice of Event of Default and Acceleration, in accordance with Section 5.05(a)(ii) of the Master Indenture, the Directing Holders hereby irrevocably direct that the Indenture Trustee (a) to exercise control over the Collateral in accordance with section 8.01 of the Master Indenture, (b) to continue to hold the Collateral and collection of proceeds therefrom through (unless otherwise ordered by a court of competent jurisdiction) the date that all Notes are fully repaid in accordance with the provisions hereof without regard to the occurrence of any Final Maturity Date with respect to any Series, (c) to the extent necessary to carry out these instructions, pursuant to Section 8.03 of the Indenture, to revoke the power of the Servicer to make distributions other than as specifically authorized in this

Instruction Letter, and (d) subject to the following provisions, cause all moneys and proceeds received from the Issuer or from the Collateral to be applied in accordance with the distribution waterfall set forth in Section 5.05(b) of the Master Indenture, provided that (A) such distributions in accordance with this provision shall continue through (unless otherwise ordered by a court of competent jurisdiction) the full repayment of the Notes, in each case regardless of the occurrence of any Final Maturity Date with respect to any Series, and (B) the Indenture Trustee shall only make distributions the "FIRST" subclause in Section 5.05(b) pending the first to occur of the following (a "**Release Event**"): (1) upon receipt of authorization to distribute proceeds from the court in the New York Suit in accordance with the instructions of such court or from such other court of competent jurisdiction, (2) upon receipt of directions from the Directing Holders to distribute such proceeds in accordance with Section 5.05(b) of the Master Indenture, or (3) upon receipt of collection of the amounts needed to fully satisfy all outstanding Notes, to distribute such proceeds in accordance with Section 5.05(b) of the Indenture; provided further that, from and after the date hereof, pending the occurrence of the Release Event, that the Indenture Trustee shall hold (unless otherwise ordered by a court of competent jurisdiction), all proceeds from the Collateral in an escrow account (or if such is not practicable as reasonably determined by the Indenture Trustee, held in the Collections Account) for the benefit of the Noteholders; provided further that amounts paid to the Indenture Trustee under the "FIRST" clause of such Section 5.05(b) of the Master Indenture shall be limited as follows: (x) the current fees and expenses of the Indenture Trustee shall not exceed $600,000 (the "**Past Amounts**") with respect to pending out-of-pocket expenses relating to the action entitled The Bank of New York v. Federal Deposit Insurance Company in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH) (the "**FDIC Suit**"), (y) the reasonable fees and expenses in connection with (i) the Issuer Suit (as defined herein), (ii) the fees and expenses relating to the appeal (the "**Appeal**") of that certain Memorandum Opinion issued in the FDIC Suit on or about September 28, 2006, (iii) any expenses and costs incurred by the Indenture Trustee and its agents and professionals in defending against any Proceedings or efforts in which parties seek the disgorgement of any amounts distributed pursuant to the Directions; and (iv) other matters related to this Instruction Letter, which fees and expenses shall be subject to review as to reasonableness by the Directing Holders, and (z) to reimburse Vedder, Price, Kaufman & Kammholz, P.C. ("**Vedder Price**"), as co-counsel for the Indenture Trustee as provided herein;

(iii)    the Directing Holders hereby irrevocably direct the Indenture Trustee to take appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes in accordance with section 5.05(a)(i) and (ii) of the Master Indenture, and specifically including, but not limited to:

(a)    promptly after the delivery of the Notice of Event Default and Acceleration, but in any event on or prior to November 17, 2006, execute the Notice of Exercise of Remedies under Section 5.05(a) of the Master Indenture in substantially the form annexed hereto as Exhibit B

2

(updated to reflect the addressees in the carbon copies in accordance with the Indenture Trustee's records) and to deliver such notice in accordance with the terms thereof as soon as reasonably practicable after the delivery of the Notice of Default under Indenture and Notice of Acceleration; and

(b)    in accordance with sections 5.03 and 5.05(a)(i). promptly after the delivery of the Notice of Event Default and Acceleration, but in any event on or prior to November 17, 2006, commence an action in the Supreme Court of the State of New York sitting in New York County (the "**Issuer Suit**"), which action will seek (i) to obtain a judgment against the Issuer for the full unpaid principal and interest due on the accelerated Notes, (ii) to the extent deemed necessary or advisable by the Directing Holders, to obtain a declaratory judgment authorizing the payment of all amounts due to the Series C and Series D Noteholders in accordance with Indenture Section 5.05(b); and (iii) to obtain any other injunctive relief to the extent required or deemed advisable by the Directing Holders for the continuation of the existence of Issuer and the Collateral and the continuation of the distributions of Available Finance Charge Collections, Available Principal Amount Collections and other distributions from the Collateral in accordance with the Section 5.05(b) of the Master Indenture until all unpaid principal and interest have on the Notes under all Series have been repaid in full, all to be effected in accordance with the terms of the Master Indenture without regard to the occurrence of any Final Maturity Date with respect to any Series, which injunctive or declaratory actions may include, without limitation, the authority to calculate Available Principal Collections with respect to each Series using the Invested Amount for each Series as of January 31, 2002 (less any principal amounts actually repaid to the Noteholders); and

(c)    the Directing Holder hereby irrevocably direct that any amounts recovered in the Issuer Suit be distributed in accordance with the provisions of Section 5.05(b) of the Master Indenture;

(iv)    the Directing Holders hereby irrevocably direct the Indenture Trustee to pursue the appeal (the "**Appeal**") to the United States Court of Appeals for the District of Columbia of the decision of the court in the action entitled The Bank of New York v. Federal Deposit Insurance Company in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH);

(v)    the Directing Holders hereby irrevocably direct the Indenture Trustee to distribute the amounts held in the Spread Accounts in accordance with the terms of the Indenture;

(vi)    the Directing Holders hereby irrevocably direct the Indenture Trustee (a) to prosecute, pursue, settle, withdraw, dismiss and/or abandon each of the Appeal and the Issuer Suit in accordance with the directions from the Directing Holders (or, as the case may be, a purchaser or transferee from any undersigned Directing Holder, to the extent of the interest so sold or transferred in

accordance with the terms of this Instruction Letter) or, if no such directions are given promptly after a request is made by the Indenture Trustee, in accordance with the reasonable discretion of the Indenture Trustee, and (b) with respect to any other Direction, if the Directing Holders (or, as the case may be, a purchaser or transferee from any undersigned Directing Holder, to the extent of the interest so sold or transferred in accordance with the terms of this Instruction Letter) so instruct the Indenture Trustee in writing, to cease continuation of any such Direction provided that such instruction is in conformance with the terms of the Indenture and applicable law;

(vii) the Directing Holders hereby irrevocably direct the Indenture Trustee to retain Vedder Price, at such firm's standard hourly rates, to serve as co-counsel with Alston & Bird LLP ("**Alston & Bird**") for the above actions and Directions, provided, however, that such fees and expenses of Vedder Price shall be payable from distributions under Master Indenture Section 5.05(b) and shall be non recourse to the Indenture Trustee.  As Co-Counsel, Vedder Price shall provide Alston in a timely and reasonable manner Vedder Price's analysis and recommended course of action on strategic decisions in the course of the actions and Directions and input on pleadings in the Appeal and the Issuer Suit; and Alston & Bird LLP shall provide Vedder Price with reasonable advance notice (to the extent practicable) with respect to the foregoing.  Vedder Price shall not serve as counsel of record in any litigation, and Alston & Bird shall remain lead counsel to the Indenture Trustee in all litigation and in connection with all other legal aspects of issues related to the Indenture Trustee's duties as Indenture Trustee;

(viii)  the Directing Holders hereby irrevocably direct the Indenture Trustee to organize a conference call with the Noteholders to review these matters with any Noteholders who wish to attend such a conference call.

The foregoing directions are referred to herein as the "**Directions.**"

Pursuant to Section 6.03(d) of the Master Indenture, each of the undersigned Directing Holders, subject to the provisions of this Instruction Letter, hereby agrees to, and shall, pay and reimburse and be liable to (and with respect to each of the undersigned other than RMK Advantage Income Fund, which obligations shall be on a joint and several basis, but, with respect to RMK Advantage Income Fund, it shall only be liable for its pro rata share of such obligations (based upon outstanding Notes)), the Indenture Trustee and each director, officer, employee and agent of the Indenture Trustee (the Indenture Trustee and each such other person being an "**Indemnified Person**") on demand for, and to indemnify, defend and hold harmless each such Indemnified Person from and against, any and all of the following losses, liabilities, judgments, claims, causes of action, reasonable out-of-pocket costs and expenses (including reasonable fees and disbursements of counsel, employees, agents and persons not regularly in the Indenture Trustee's employ) (collectively referred to herein as "**Losses**") incurred or suffered by an Indemnified Person in any way, directly or indirectly, arising out of, related to, or connected with, the compliance by any Indemnified Person with the terms of this Instruction Letter and the Directions set forth herein or the taking or not taking of action in accordance with this Instruction Letter and the Directions set forth herein:

4

(i) all costs and expenses associated with the Directions;

(ii) all costs and expenses incurred by the Indenture Trustee and its agents and professionals in defending against any Proceedings or efforts in which parties seek the disgorgement of any amounts distributed pursuant to the Directions;

(iii) any claim, cause of action, litigation, proceeding, action or investigation (whether civil or administrative, but excluding criminal, and whether sounding in tort, contract or otherwise and whether or not such Indemnified Person is a party to such litigation, proceeding, action or investigation) in any way, directly or indirectly, arising out of, related to, or connected with, the compliance by any Indemnified Person with the terms of this Instruction Letter and the Directions set forth herein or the taking or not taking of action by any Indemnified Person in accordance with this Instruction Letter and the Directions set forth herein; and

(iv) Losses resulting from, arising out of, or in any manner connected with, directly or indirectly, (a) a determination that any Indemnified Person breached any duty as a result of relying upon and complying with, and taking or not taking of any action in accordance with, this Instruction Letter and the Directions set forth herein, and (b) the enforcement of this Instruction Letter;

provided, however, that the foregoing indemnity (the "**Indemnity**") shall not be applicable to any Losses suffered or incurred by an Indemnified Person as a result of such Indemnified Person's gross negligence or willful misconduct as determined by a judgment of a court that is binding on such Indemnified Person, is final and is not subject to review on appeal.  Amounts payable by the Directing Holder with respect to the Indemnity shall be invoiced (with supporting detail) to the Directing Holder on a monthly basis, and shall be payable by the Directing Holder within thirty (30) days of such Directing Holder's receipt of such invoice.  Amounts not paid by the Directing Holder when due shall accrue interest at the prime rate and such interest shall be payable on demand to the Indenture Trustee.

The Directing Holders hereby acknowledge and agree that, notwithstanding the Directions, the Indenture Trustee may discontinue pursuing the exercise of remedies under Section 5.05 of the Master Indenture or taking any other actions to carry out the Directions upon 30 days notice to the Directing Holder if it is anticipated that the distributions to the Indenture Trustee under Section 5.05(b) will not be sufficient to cover the fees and expenses (including the internal costs and expenses of the Indenture Trustee) associated with these Instructions and the Indenture Trustee has not received reasonable assurances that additional funds will be made available to cover such fees and expenses.  It is further understood and agreed that (a) the Indenture Trustee's professionals shall render invoices for their services at least once every 60 days; (b) the reasonable fees and expenses of the Indenture Trustee's professionals shall be paid within thirty (30) days after the presentation of an invoice for such reasonable fees and expenses to the Indenture Trustee and the Directing Holders; and (c) the Indenture Trustee shall have the right to discontinue pursuing any of the Appeal, the Issuer Suit or any of the other Directions if any such fees and expenses have not been

paid within such (30) days. The Indenture Trustee shall have no obligation to advance any funds to pay any such expenses. Notwithstanding any other provision of this Instruction Letter, the rights and obligations of the Indenture Trustee under this Instruction Letter shall be subject to the standards and provisions set forth in Section 6.03 of the Master Indenture as though such Section were set forth in and referred to this Instruction Letter.

The Indenture Trustee and any legal counsel engaged to carry out these Instructions ("**Legal Counsel**") shall cooperate and coordinate with the Directing Holders in connection with such action and all related matters. The Directing Holder shall have full, complete and timely access to all information developed or discovered in connection with any of the actions taken pursuant to this Instruction Letter and the Directions set forth herein, including, without limitation, the authority to communicate and discuss with any Legal Counsel any issues or matters relating to such actions or proceedings it may so desire from time to time. The Indenture Trustee agrees to direct each Legal Counsel to fully disclose and discuss, provide information with respect to and answer any questions regarding such issues and matters as the Directing Holder may request from time to time, and such parties shall be deemed covered by a joint prosecution and defense privilege with respect to any suits, actions or appeals commenced or relating to these Instructions.

This Instruction Letter and the representations and warranties contained herein shall be binding upon the Indenture Trustee, the Directing Holders and their successors and assigns. This Instruction Letter shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. In addition, the Directing Holders hereby agree that it shall not sell, transfer, convey, assign or exchange its Notes, unless such purchaser or transferee agrees, in writing, to be bound by this Instruction Letter (including the indemnification provisions hereunder). Unless consented to in writing by the Indenture Trustee, which consent may not be unreasonably withheld, no such transfer will release the Directing Holders from its obligation to provide the Indemnity provided hereunder.

Except as otherwise provided herein, no termination, amendment, modification or waiver of this Instruction Letter (including without limitation the Indemnity provided hereunder) shall be given effect without the prior written consent of the Directing Holders and the Indenture Trustee.

The Directing Holders hereby represent and warrant that this Instruction Letter (including without limitation the Indemnity provided hereunder) has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency or other similar laws affecting creditors' rights generally and (ii) general principles of equity; and hereby waives any defenses based upon the invalidity of such representations and warranties.

The Indemnity provided herein shall be in addition to any other remedies, relief or indemnification available to any Indemnified Person. The rights and remedies conferred hereunder shall be cumulative and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies or the subsequent exercise of such right or remedy.

6

The terms of this Instruction Letter (including without limitation the Indemnity provided hereunder) will be governed by and construed in accordance with the laws of the State of New York (without giving effect to any law that would result in the application of the laws of any other jurisdiction). All actions and proceedings relating to or arising from, directly or indirectly, this Instruction Letter (including without limitation the Indemnity provided hereunder) may be brought by any Indemnified Person in courts located within the State of New York and the Directing Holders and the Indenture Trustee hereby submit to personal jurisdiction of such courts for such actions or proceedings.

Notwithstanding anything to the contrary in this Instruction Letter or the Directions, the Directing Holders' indemnification provided hereunder shall not be responsible for or cover the Past Amounts. Further, notwithstanding anything to the contrary in this Instruction Letter or the Directions, nothing herein affects the rights (if any) or obligations (if any) of any person or entity with respect to the payment or entitlement to payment for the Past Amounts.

The certification attached hereto and the signature pages to this Instruction Letter may be executed by the Indenture Trustee and the Directing Holders, as the case may be, in separate counterparts and the Indenture Trustee is hereby instructed to accept the signature pages as such counterparts. Facsimile signatures and signature pages provided in the form of a "pdf" or similar imaged document transmitted by electronic mail shall be deemed original signatures for all purposes hereunder.

## SCHEDULE 1
## SIGNATURE AND CERTIFICATION PAGE

### Complete Section A or B as appropriate:

### A. EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  Millennium Partners, L.P.
(Print Name of Authorized Signature):  Fred Stone
Title:  ~~Secretary~~  Senior Managing Director
Signature:
Address:  666 5th Avenue, 8th Floor, New York, New York 10103
Phone:  (212) 841-4100
FAX:  (212) 841-4141
E-mail:  fstone@mlp.com
Class of Securities:  NextCard 2001-1A C
CUSIP No.:  65334UAG8
Total Current Principal Amount of Securities Owned as of the Date Hereof: $19,240,000
Total Original Principal Amount of Securities Owned as of the Date Hereof: $40,000,000
DTC Participant Name:
DTC Participant No.:  2474
Date:  November 9, 2006

14

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  Millennium Partners, L.P.
(Print Name of Authorized Signature):  Fred Stone
Title:  Secretary  Senior Managing Director
Signature:
Address:  666 5th Avenue, 8th Floor, New York, New York 10103
Phone:  (212) 841-4100
FAX:  (212) 841-4141
E-mail:  fstone@mlp.com
Class of Securities:  NextCard 2000-1A C
CUSIP No.:  65334UAC7
Total Current Principal Amount of Securities Owned as of the Date Hereof: $16,243,500
Total Original Principal Amount of Securities Owned as of the Date Hereof: $24,500,000
DTC Participant Name:
DTC Participant No.:  2474
Date:  November 9, 2006

14

## SCHEDULE 1
## SIGNATURE AND CERTIFICATION PAGE

### Complete Section A or B as appropriate:

### A. EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __First Millennium, Inc.__

(Print Name of Authorized Signature): _Fred Stone_

Title: ~~Secretary~~ , Senior Managing Director

Signature: _____

Address: _666 5th Avenue, 8th Floor, New York, New York 10103_

Phone: _(212) 841-4100_

FAX: _(212) 841-4141_

E-mail: _fstone@mlp.com_

Class of Securities: _NextCard 2000-1A D_

CUSIP No.: _65334UAD5_

Total Current Principal Amount of Securities Owned as of the Date Hereof: _$6,000,000_

Total Original Principal Amount of Securities Owned as of the Date Hereof: _$6,000,000_

DTC Participant Name: _N/A_

DTC Participant No.: _N/A_

Date: _November 9, 2006_

14

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __First Millennium, Inc.__

(Print Name of Authorized Signature): __Fred Stone__

Title: ~~Secretary~~ _Senior Managing Director_

Signature: _[signature]_

Address: __666 5th Avenue, 8th Floor, New York, New York 10103__

Phone: __(212) 841-4100__

FAX: __(212) 841-4141__

E-mail: __fstone@mlp.com__

Class of Securities: __NextCard 2001-1A D__

CUSIP No.: __65334UAH6__

Total Current Principal Amount of Securities Owned as of the Date Hereof: __$13,000,000__

Total Original Principal Amount of Securities Owned as of the Date Hereof: __$13,000,000__

DTC Participant Name: __N/A__

DTC Participant No.: __N/A__

Date: __November 9, 2006__

_14_

**SCHEDULE 1 (CONTINUED)**

## B. EXECUTION BY NOMINEE OR ADVISOR

The undersigned hereby represents and warrants that it is the nominee or advisor for the beneficial owner indicated below of NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes, and that the beneficial owner has granted to the undersigned the power and authority to deliver this Certification to the Indenture Trustee on behalf of such beneficial owner.

Name of Beneficial Owner:  RMK Advantage Income Fund

Name of Nominee or Advisor:  Daymaster & Co.

(Print Name of Authorized Signature):  Jim Kelsoe

Title:  Managing Director

Signature:

Address:  1100 Ridgeway Loop Road, Suite 510, Memphis, TN  38120

Phone:  901-374-7814

FAX:  901-374-7827

E-mail:  jim.kelsoe@morgankeegan.com

Class of Securities:  Series 2000-1A / Class C

CUSIP No.:  65334UC7

Total Current Principal Amount of Securities with Respect to Which Certification is Made as of the Date Hereof:  $6,640,464.00

Total Original Principal Amount of Securities with Respect to Which Certification is Made as of the Date Hereof:  $10,000,000.00

DTC Participant Name:  State Street Bank & Trust

DTC Participant No.:  997

Date:  November 14, 2006

# EXHIBIT A

Notice of Event Default and Acceleration under Master Indenture

November __, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention:  Corporate Trust Department

> Re:    NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1
> Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER
> INDENTURE AND NOTICE OF ACCELERATION FOR BOTH
> SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), as supplemented by the Indenture Supplements.  Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (the **"Noteholders"**) arising from the secured loans made to the Issuer under the Master Indenture, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee.  Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes.

The Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to any Series, the Indenture Trustee may pursuant to section 5.03 of the Master Indenture, by delivery of written notice to the Issuer, declare all of the Notes with respect to such Series to be immediately due and payable, whereupon the unpaid principal amount of such Notes, together with accrued but unpaid interest thereon through the date of acceleration and all other amounts due under the Master Indenture and the Notes shall immediately become due and payable.

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes.  NextBank, N.A.'s entry into receivership on February 7, 2002 constituted a Trust Redemption Event which triggered the commencement of the Early Amortization Period, whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1

Notes and Series 2001-1 Notes. Contrary to its obligations under the Master Indenture and the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes, Issuer failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. The Issuer's failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $56,486,500.00 |
| | |
| TOTAL NOTES: | **$112,109,000.00** |

The Indenture Trustee, pursuant to a directive of the Noteholders, hereby declares all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable. The Indenture Trustee hereby demands that the Issuer immediately pay in full the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholder expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture
    Trustee


By  _____
    Name:
    Title:

cc:    The Administrator
        [Does trustee have this address?]
    The Servicer
        [Does trustee have this address?]
    FDIC
    [Does trustee have this address?]
    Scott H. Christensen, Esq.
    H. Stephen Harris, Esq.
    Michael J. Edelman, Esq.

# EXHIBIT B

**Notice of Exercise of Remedies**

November __, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

> Re:   NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes - **NOTIFICATION OF EXERCISE OF REMEDIES UNDER MASTER INDENTURE SECTIONS 5.04 AND 5.05(a)**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (collectively, the **"Noteholders"**) arising from the secured loans made to the Issuer under the Master Indenture and the Indenture Supplements, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes. Pursuant to that certain Notice of Default under Master Indenture and Notice of Acceleration, dated November 14, 2006, the Indenture Trustee has accelerated all obligations due under the Series 2000-1 Notes and Series 2001-1 Notes, whereupon the following principal amounts of Notes became due and payable:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| | |
| **TOTAL OUTSTANDING PRINCIPAL AMOUNT OF NOTES:** | **$112,109,000.00** |

Sections 5.04 and 5.05(a) of the Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to the Notes, and the Notes have been accelerated pursuant to Section 5.03 of the Master Indenture, the Indenture Trustee may take any appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Noteholders.

Notice is hereby given that the Indenture Trustee (a) is commencing a Proceeding against the Issuer before the Supreme Court of the State of New York sitting in New York County for with respect to the Series 2000-1 Notes and Series 2001-1 Notes seeking to obtain a judgment against the issuer for the unpaid principal and interest on such Notes issued by the Issuer and for related relief and (b) is seeking to enforce remedies against the Collateral.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture Trustee

By _____
Name:
Title:

cc:    The Administrator
          [Does trustee have this address?]
       The Servicer
          [Does trustee have this address?]
       FDIC
          [Does trustee have this address if different from the Administrator?]
       Scott H. Christensen, Esq.
       H. Stephen Harris, Esq.
       Michael J. Edelman, Esq.

November 16, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

Re:   NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER INDENTURE AND NOTICE OF ACCELERATION FOR BOTH SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the "**Master Indenture**"), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the "**Issuer**") and The Bank of New York, as indenture trustee (the "**Indenture Trustee**"), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (the "**Noteholders**") arising from the secured loans made to the Issuer under the Master Indenture, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes. The undersigned Noteholders hold a majority of the Outstanding Amount of each of the Series 2000-1 Notes and the Series 2001-1 Notes.

The Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to any Series, Noteholders holding a majority of the Outstanding Amount of each Series may pursuant to section 5.03 of the Master Indenture, by delivery of written notice to the Issuer and the Indenture Trustee, declare all of the Notes with respect to such Series to be immediately due and payable, whereupon the unpaid principal amount of such Notes, together with accrued but unpaid interest thereon through the date of acceleration and all other amounts due under the Master Indenture and the Notes shall immediately become due and payable.

NYLIB5 770952.1

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes. Pursuant to the express terms of each of the Notes, "the entire principal amount of this Note shall be due and payable on the earlier of the [Final] Maturity Date and the Redemption Date, if any." NextBank N.A.'s entry into receivership on February 7, 2002 is a Redemption Date under the terms of the Notes. Accordingly, the Issuer is liable under the Notes for the full outstanding unpaid principal on the Notes, which the Issuer has failed to repay. The Issuer's failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay the principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $56,486,500.00 |
| | |
| TOTAL NOTES: | $112,109,000.00 |

The Undersigned Noteholders hereby declare all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable. The Undersigned Noteholders hereby demand that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the

2

Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

BY THE NOTEHOLDERS ON THE
ATTACHED SIGNATURE PAGES

cc:    **Owner Trustee**
Mr. Erwin Soriano
Wilmington Trust Co.
Rodney Square North
1100 North Market St.
Wilmington, DE 19890
(via registered mail and email)

**Servicer**
Ms. Karlyn Knieriem
Finance Officer
The First National Bank of Omaha
1620 Dodge Street
Stop 3396
Omaha, Nebraska, 68197
(via registered mail and email)

Mr. Matt Tunink
The First National Bank of Omaha
Servicer of the NextCard Master Note Trust
1620 Dodge Street
Stop 3395
Omaha, Nebraska 68197
(via registered mail and email)

**Administrator**
NextBank, N.A.
NextCard Credit Card Master Note Trust
595 Market Street, Suite 1800
San Francisco, California 94105
(via registered mail)

3

**Counsel to the FDIC**
Scott H. Christensen, Esq.
Hughes, Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC 20006-2401
(via registered mail and email)

**Federal Deposit Insurance Corporation**
Federal Deposit Insurance Corporation
c/o Tom M. Reeves, Esq.
Counsel, Legal Division
550 17th Street; NW
Room H-10710
Washington, DC 20429
(via registered mail and email)

**The Indenture Trustee**
Ms. Loretta Lundberg
Vice President-Default Group, Corporate Trust Administration
The Bank of New York
21W, Corporate Trust Administration
101 Barclay Street
New York, NY 10007-2119
(via registered mail and email)

**Counsel to the Indenture Trustee.**
**The Bank of New York**
John L. Douglas, Esq.
H. Stephen Harris, Jr. Esq.
Alston & Bird LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3449

**Counsel for Millennium Partners LLP**
Michael J. Edelman, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.

4

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  Millennium Partners, L.P.

(Print Name of Authorized Signature):  Fred Stone

Title:  Senior Manager Director

Signature:

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2001-1A C

CUSIP No.:  65334UAG8

Total Current Principal Amount of Securities Owned as of the Date Hereof: $19,240,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $40,000,000

DTC Participant Name:

DTC Participant No.:  2474

Date:  November 9, 2006

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:   Millennium Partners, L.P.

(Print Name of Authorized Signature):   Fred Stone

Title:   Senior Managing Director

Signature:

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities: NextCard 2000-1A C

CUSIP No.:  65334UAC7

Total Current Principal Amount of Securities Owned as of the Date Hereof: $16,243,500

Total Original Principal Amount of Securities Owned as of the Date Hereof: $24,500,000

DTC Participant Name:

DTC Participant No.:  2474

Date:  November 9, 2006

16

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __First Millennium, Inc.__

(Print Name of Authorized Signature): __Fred Stone__

Title: __Secretary__

Signature: __[signature]__

Address: __666 5th Avenue, 8th Floor, New York, New York 10103__

Phone: __(212) 841-4100__

FAX: __(212) 841-4141__

E-mail: __fstone@mlp.com__

Class of Securities: __NextCard 2000-1A D__

CUSIP No.: __65334UAD5__

Total Current Principal Amount of Securities Owned as of the Date Hereof: __$6,000,000__

Total Original Principal Amount of Securities Owned as of the Date Hereof: __$6,000,000__

DTC Participant Name: __N/A__

DTC Participant No.: __N/A__

Date: __November 9, 2006__

16

**SIGNATURE PAGES FOR NOTEHOLDERS FOR THIS NOTICE OF DEFAULT AND ACCELERATION OF THE NOTES:**

**EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:   First Millennium, Inc.
(Print Name of Authorized Signature):   Fred Stone
Title:   Secretary
Signature:
Address:   666 5th Avenue, 8th Floor, New York, New York 10103
Phone:   (212) 841-4100
FAX:   (212) 841-4141
E-mail:   fstone@mlp.com
Class of Securities:   NextCard 2001-1A D
CUSIP No.:   65334UAH6
Total Current Principal Amount of Securities Owned as of the Date Hereof: $13,000,000
Total Original Principal Amount of Securities Owned as of the Date Hereof: $13,000,000
DTC Participant Name:   N/A
DTC Participant No.:   N/A
Date:   November 8, 2006

16

## EXECUTION BY NOMINEE OR ADVISOR

The undersigned hereby represents and warrants that it is the nominee or advisor for the beneficial owner indicated below of NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes, and that the beneficial owner has granted to the undersigned the power and authority to deliver this Certification to the Indenture Trustee on behalf of such beneficial owner.

Name of Beneficial Owner:  RMK Advantage Income Fund

Name of Nominee or Advisor:  Daymaster & Co.

(Print Name of Authorized Signature):  Jim Kelsoe

Title:  Managing Director

Signature:

Class of Securities:  Series 2000-1A / Class C

CUSIP No.:  65334UC7

Total Current Principal Amount of Securities with Respect to Which Certification is
        Made as of the Date Hereof:  $6,640,464.00

Total Original Principal Amount of Securities with Respect to Which Certification is
        Made as of the Date Hereof:  $10,000,000

DTC Participant Name:

DTC Participant No.:

Date:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK, in its capacity as Indenture Trustee of the NextCard Credit Card Master Note Trust, | INTERPLEADER COMPLAINT |
| Interpleader Plaintiff, | |
| - against - | Index No._____ |
| FIRST MILLENNIUM, INC., MILLENNIUM PARTNERS, L.P., RMK ADVANTAGE FUND, and FEDERAL DEPOSIT INSURANCE CORPORATION, | |
| Interpleader Defendants. | |

Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the NextCard

Credit Card Master Note Trust, by its attorneys, Alston & Bird LLP, as and for its Interpleader

Complaint, alleges:

## INTRODUCTION

1.        This is an interpleader action brought in accordance with CPLR 1006 for the

purpose of obtaining adjudication of the respective rights of the Interpleader Defendants with

respect to certain assets held by the Interpleader Plaintiff.  Interpleader Plaintiff, which serves as

indenture trustee, faces competing claims to the assets by the Interpleader Defendants and cannot

determine, without hazard to itself, how to proceed.

## PARTIES

2.        Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee

of the NextCard Credit Card Master Note Trust, ("BNY") is a New York banking corporation

1

with its principal place of business in New York, New York. BNY is the indenture trustee under the Indenture, as defined below.

3.      Interpleader Defendant First Millennium, Inc. is, upon information and belief, a New York corporation with its principal place of business in New York, New York.

4.      Interpleader Defendant Millennium Partners, L.P. is, upon information and belief, a limited partnership organized under the laws of the State of New York, with its principal place of business in New York, New York.

5.      Interpleader Defendant RMK Advantage Fund is, upon information and belief, a limited partnership organized under the laws of the State of Tennessee, with its principal place of business in Memphis, Tennessee.

6.      Interpleader Defendants First Millennium, Inc., Millennium Partners, L.P. and RMK Advantage Fund (collectively, the "Noteholders") hold a majority of the outstanding Notes that are the subject of the Indenture, as defined below.

7.      Interpleader Defendant Federal Deposit Insurance Corporation ("FDIC") is a federal regulatory agency with an office located in New York, New York, which serves as the receiver for non-party NextBank, N.A ("NextBank").

## BACKGROUND

8.      Interpleader Plaintiff BNY is a party to a master indenture agreement, dated as of December 11, 2000, as supplemented by indenture supplements (the "Indenture"). Pursuant to the Indenture, certain asset-backed notes (the "Notes") were issued that are secured by a portfolio of credit card receivables. The credit cards were issued by non-party NextBank.

9.      Pursuant to the terms of the Indenture, BNY holds certain collateral that is the subject of the instant dispute (the "Collateral"). The Collateral consists of credit card

2

receivables, proceeds received from credit card receivables, funds in accounts referred to as the "Spread Accounts," and certain other assets.

10.    The Noteholders have notified BNY that, as a result of NextBank's entry into receivership and certain subsequent events, BNY is now obligated, pursuant to the terms of the Indenture, to turn over to them (and other holders of Notes) certain Collateral and take certain other actions with respect to the Collateral for their benefit (the "Instructions").

11.    The Noteholders have taken the position that BNY's failure to turn Collateral over to them or follow the Instructions will constitute a breach of BNY's obligations pursuant to the Indenture. The Noteholders have further notified BNY that they will consider instituting legal proceedings against BNY if it does not follow the Instructions concerning the Collateral.

12.    The FDIC has disputed the Noteholders' claims to the Collateral and the Noteholders' Instructions. The FDIC has further informed BNY that, in accordance with the terms of the Indenture and a decision rendered by the United States District Court for the District of Columbia, in an action entitled *Bank of New York v. FDIC*, ___ F. Supp. 2d ___, No. 03-1221, 2006 WL 2772860 (D.D.C. Sept. 27, 2006) (the "District Court Decision"), BNY must turn certain Collateral over to the FDIC and cannot take actions with respect to the Collateral pursuant to the Noteholders' Instructions. The FDIC has taken the position that, if BNY turns Collateral over to the Noteholders and follows the Instructions with respect to the Collateral, BNY might be acting in contempt of the District Court Decision, and the FDIC has indicated that it is considering legal action.

13.    The Noteholders have disputed the FDIC's claims to the Collateral and the FDIC's efforts to cause BNY not to follow their Instructions concerning the Collateral.

14.     Interpleader Plaintiff BNY faces competing claims to the Collateral and cannot determine, without hazard to itself, how it should proceed with respect to the Collateral it holds.

15.     Interpleader Plaintiff BNY is ready and willing to deliver the Collateral to such person or persons as the Court shall direct.

16.     The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

## PLEA FOR RELIEF

**WHEREFORE,** Interpleader Plaintiff BNY demands judgment:

1.     That Interpleader Defendants and each of them be restrained by injunction from commencing or prosecuting any action or proceeding against Interpleader Plaintiff in relation to the Collateral.

2.     That Interpleader Defendants be required to interplead together concerning their respective claims to the Collateral.

3.     That Interpleader Plaintiff's costs and disbursements, including legal fees and expenses, be paid out of the Collateral.

4.     That Interpleader Plaintiff have such other and further relief as the court may deem just, proper and equitable, including reasonable attorneys' fees.

Dated: New York, New York
      November 16, 2006

                          ALSTON & BIRD LLP

                          _____
                          Michael E. Johnson
                          Birgit Kurtz
                          90 Park Avenue
                          New York, New York
                          (212) 210-9400

                          *Attorneys for Interpleader Plaintiff*
                          *The Bank of New York, in its capacity as*
                          *Indenture Trustee of the NextCard Credit*
                          *Card Master Note Trust*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                    Interpleader Plaintiff,

                    -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                    Interpleader Defendants.

-----------------------------------------------------

Index No. 650234/2006

**ANSWER OF FIRST MILLENNIUM,
INC. AND MILLENNIUM
PARTNERS, L.P. TO THE
<u>INTERPLEADER COMPLAINT</u>**

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. (together, "Millennium") by their attorneys, Vedder, Price, Kaufman & Kammholz, P.C., as and for their Answer to the Interpleader Complaint (the "Complaint") of Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee (in such capacity, the "Indenture Trustee"), state as follows:

1.      Paragraph 1 of the Complaint alleges conclusions of law to which no response is required.  To the extent that a response is deemed to be required, Millennium denies the allegations contained in paragraph 1 of the Complaint, except admits that the Indenture Trustee serves as the Indenture Trustee under the Master Indenture dated as of December 11, 2000 (as amended and supplemented, the "Indenture"), between NextCard Credit Card Master Note Trust, as issuer (the "Issuer"), and Indenture Trustee, and admits that the Indenture Trustee, in its capacity as indenture trustee, holds certain assets (the "Collateral") of Issuer.

2.      Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint, except admits that the Indenture Trustee is the Indenture Trustee under the Indenture.

3.      Millennium admits the allegations contained in paragraph 3 of the Complaint.

4.      Millennium admits the allegations contained in paragraph 4 of the Complaint.

5.      Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 of the Complaint.

6.      Millennium admits the allegations contained in paragraph 6 of the Complaint.

7.      Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint.

8.      Millennium admits the allegations contained in paragraph 8 of the Complaint.

9.      Millennium admits the allegations contained in paragraph 9 of the Complaint.

10.     Millennium denies the allegations contained in paragraph 10 of the Complaint, except admits that Millennium and Interpleader Defendant RMK Advantage Fund (together, the "Directing Noteholders") have notified the Indenture Trustee that, as a result of the Issuer's default under the terms of the Indenture, the Indenture Trustee is now obligated, pursuant to the terms of the Notes and the Indenture, to collect and retain the proceeds of the Receivables and other Collateral for the benefit of the holders of notes under the Indenture (collectively, the "Noteholders"), and to take certain other actions with respect thereto (such notification, the "Instructions").

11.     Millennium denies the allegations contained in paragraph 11 of the Complaint, except admits that the Directing Noteholders issued the Instructions to the Indenture Trustee, as is their right pursuant to the express terms of the Indenture, and admits that the Directing

2

Noteholders notified the Indenture Trustee that its failure to follow the Instructions would constitute an actionable breach of the Master Indenture.

12.    Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint.

13.    Millennium denies the allegations contained in paragraph 13 of the Complaint, except admits that Millennium has disputed the FDIC's claims to the Collateral.

14.    Paragraph 14 of the Complaint asserts conclusions of law to which no response is required.    To the extent that a response is deemed to be required, Millennium denies the allegations contained in paragraph 14 of the Complaint.

15.    Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint.

16.    Millennium denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint, except admits that Millennium has not participated collusively in the bringing of this action.

## MILLENNIUM'S CLAIM TO THE COLLATERAL

By way of affirmative claim to the Collateral, Millennium alleges as follows.

17.    The secured financing obligations that constitute the subject of this action are part of a securitization in which a special purpose entity was established to own credit card receivables (the "Receivables"), which special purpose entity, in turn borrowed money from noteholders ("Noteholders") pursuant to the terms of an Indenture  and Notes and that were collateralized by such Receivables.

18.    The special purpose entity, NextCard Credit Card Master Note Trust (the "Issuer"), was established as a Delaware business trust pursuant to a Trust Agreement, dated as

3

of December 1, 2000 (the "Trust Agreement"), between NextBank, N.A. (NextBank"), as transferor, and Wilmington Trust Company, as owner trustee (the "Owner Trustee").

19.    The Issuer and the Indenture Trustee entered into that certain Master Indenture, dated as of December 11, 2000 (the "Master Indenture"), which was supplemented by: the Series 99-1 Indenture Supplement dated as of December 11, 2000; the Series 2000-1 Indenture Supplement dated as of December 13, 2000 (the "2000-1 Indenture Supplement"); and the Series 2001-1 Indenture Supplement dated as of May 8, 2001 (the "2001-1 Indenture Supplement"; the three Indenture Supplements together are referred to hereinafter as the "Indenture Supplements," and the Master Indenture as amended together with the Indenture Supplements are referred to hereinafter as the "Indenture"). Copies of the Master Indenture and the 2000-1 Indenture Supplement are annexed hereto, respectively, as Exhibits A and B. (For purposes of this litigation, the 2000-1 Indenture Supplement and the 2001-1 Indenture Supplement are substantially identical.)

20.    Under the terms of the Master Indenture, the Issuer was required to maintain an office or agency within the County of New York, New York. *See* Exhibit A, at § 3.02.

21.    To evidence its obligations under the Indenture, the Issuer delivered certain asset-backed notes (the "Notes") that were secured by a portfolio of credit card receivables owned by the Issuer.

22.    Under the terms of the Notes and the Indenture, the Indenture Trustee agreed to make loans to the Issuer under the terms of the Indenture and the Notes. As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

Series 2000-1 Notes:
    Class C Notes:                                 $38,122,500.00
    Class D Notes:                                 $17,500,000.00
    Total Outstanding Principal Amount of Series 2000-1 Notes:    $55,622,500.00

Series 2001-1 Notes:
    Class C Notes:                                 $31,986,500.00
    Class D Notes:                                 $24,500,000.00
    Total Outstanding Principal Amount of Series 2001-1 Notes:    $56,486,500.00

**TOTAL NOTES:**                                           **$112,109,000.00**

The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2000-1 Notes." The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2001-1 Notes." Representative copies of the outstanding Series 2000-1 Notes and Series 2001-1 Notes are annexed hereto as Exhibit C.

23.    Millennium currently holds unpaid principal in the following Notes: (a) Series 2000-1 Class C Notes: $16,243,500.00; (b) Series 2000-1 Class D Notes: $6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes: $13,000,000.00. Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes.

**The Obligations of the Issuer under the Notes Became Due and Payable on the Redemption Event that Occurred on February 7, 2002**

24.    Pursuant to the express terms of the Notes, the Issuer agreed to repay the "entire unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the Redemption Date, if any" (as such terms are defined in the Indenture) and to pay interest due thereon pursuant to the terms thereof. *See* Exhibit C, at p. 3 for each of the Notes.

25.    The Indenture provides that a receivership of NextBank constitutes a "Trust Redemption Event" and a "Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders

immediately upon the occurrence of such event," which date, by definition, would constitute a "Redemption Date." *See* Exhibit A, § 5.01 (Master Indenture).

26.    NextBank entered into receivership on February 7, 2002.

27.    NextBank's entry into receivership constituted a Redemption Event which triggered the Notes to become due by their own terms. *See* Exhibit C, at p. 3 for each of the Notes.

28.    To the extent (if any) that Nextbank was a party to, or signatory of, the Indenture, in accordance with its rights in the NextBank receivership, the Federal Deposit Insurance Corporation (the "FDIC") repudiated NextBank's obligations under such contracts in July 2002.

29.    As a separate, independent entity, the Issuer is not the subject of the FDIC NextBank receivership.

30.    As a Redemption Event, NextBank's entry into receivership  also caused the commencement of the Early Amortization Period (as defined in the Indenture), whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes.

**The Issuer's Failure to Repay Principal When Due Constituted an Event of Default**

31.    Contrary to its obligations under both the Notes and the Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes.  The Issuer's failure to honor its contractual repayment obligations caused it to fail to make payments of principal due to

6

the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues

through the date hereof.  Such failure to pay principal of the Notes when due and payable

constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series

2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default").

      32.    Section 5.03 of the Master Indenture states that if any of several listed Events of

Default were to occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less
> than a majority of the Outstanding Amount of such Series may
> declare all of the Notes of such Series to be immediately due and
> payable, by a notice in writing to the Issuer . . ., and upon any such
> declaration the unpaid principal amount of such Notes, together
> with accrued and unpaid interest thereon through the date of
> acceleration, shall become immediately due and payable.

*See* Exhibit A, § 5.03.

      33.    Due to the Issuer's failure to repay its obligations when due, Millennium and

RMK Advantage Income Fund, who together constituted a majority of the outstanding Notes (the

"Majority Noteholders"), directed that the Indenture Trustee (a) declare an event of default and

accelerate all obligations on the Notes and (b) exercise remedies against the Collateral and the

Receivables.  In accordance with such instruction, by letter dated November 14, 2006 (the

"Indenture Trustee's Acceleration Letter"), a copy of which is annexed hereto as Exhibit D, the

Indenture Trustee notified the Issuer of the occurrence and continuation of the Principal Payment

Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be

due and payable" and demanded that "all the unpaid principal of all Notes now outstanding,

together with accrued but unpaid interest thereon and other amounts due thereunder, [be]

immediately due and payable."  *See* Exhibit D.

34.    In addition, on November 16, 2006 the Majority Noteholders also notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable." A copy of the Majority Noteholders' notice of event of default and acceleration is attached hereto as Exhibit E. The Majority Noteholders also "demand[ed] that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon." *See* Exhibit E.

35.    Despite these demands, the Issuer has failed to repay in full the Notes.

36.    In addition to declaring a notice of event of default and the acceleration, the Majority Noteholders instructed the Indenture Trustee to exercise remedies against the Receivables and Collateral pursuant to the terms of the Indenture.

**The Noteholders' Right to the Interpleader Assets Is**
**Mandated Under the Express Terms of the Master Indenture**

37.    Prior to filing this interpleader action, the interpleader plaintiff started exercising remedies to exercise control over the Receivables and the Collateral as directed by the Majority Noteholders.    Shortly thereafter, the FDIC, in its capacity as the receiver of NextBank, threatened the Indenture Trustee with contempt and damages for starting to exercise such remedies. The Indenture Trustee responded by informing Millennium that the Indenture Trustee was going to rescind its enforcement actions, whereupon the Directing Noteholders demanded that the Indenture Trustee continue exercising such remedies and stated that the Indenture Trustee would be held responsible for any resulting damages to the Noteholders.    Immediately thereafter, on November 16, 2006, the interpleader plaintiff commenced this interpleader action.

8

38.     The assets that are the subject of this interpleader action constitute (a) amounts held in the so-called "Spread Accounts" (as defined in the Indenture) and (b) the Receivables and proceeds of the Receivables.

**A.     The Spread Accounts**

39.     The Indenture Trustee currently holds approximately $22 million in the Spread Accounts.

40.     The amounts currently owed to the C Noteholders substantially exceed the amounts in the Spread Accounts for each series of Notes.

41.     Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Accounts and the proceeds thereof.  *See* Exhibit B, § 4.11(a) (Indenture Supplement).

42.     Following the occurrence of an event of default and acceleration of the Notes, the Spread Accounts are required to be liquidated, with the funds distributed in accordance with the distribution scheme established under Section 5.02 of the Indenture Supplements for payment to the C Holders:

> [A]n amount equal to the balance on deposit [in the Spread Accounts shall be deposited] into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02 [of the Indenture Supplements], to fund any shortfalls in amounts owed to such Noteholders.

*See* Exhibit B, § 4.11(e).

43.     Section 5.02 of the Indenture Supplements, in turn, in relevant part, directs that distributions of the Spread Accounts be payable for interest and principal due to the Class C Noteholders of each Series.

44.    As the principal and interest amounts owed to Class C Noteholders under each series of Notes is substantially in excess of the amounts on deposit in the Spread Accounts for each series of Notes, the Class C Noteholders, including Millennium, are entitled to the full amounts now held by the Indenture Trustee in the Spread Accounts.

**B.    The Receivables**

45.    The Indenture Trustee currently holds approximately $72 million worth of Receivables and proceeds of Receivables.

46.    Under the express terms of the Master Indenture, "all money and property [collected by the Indenture Trustee] pursuant to [] Article V following acceleration of the maturities of the Notes . . . shall [be paid] in the following order":  (a) first, to the Indenture Trustee for fees and expenses, (b) second, to holders of Notes (in order of priority) "for amounts due and unpaid [on such] Notes for interest and principal, ratably, and (c) last, to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement."  *See* Exhibit A, § 5.05(b).

47.    The Indenture provides the Indenture Trustee with numerous powers to take control of the collections of the Receivables and Collateral (and the proceeds thereof) after an event of default and acceleration.  Master Indenture Section 5.06 expressly grants the Indenture Trustee with authority may take action to "maintain possession" and control of the Collateral in an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ."  Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture.  The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture.

10

*See* Exhibit A, § 8.01.   These collections include all proceeds of the Receivables, all of which are required to be distributed in accordance with Section 5.05(b).

48.      A majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables.   *See* Exhibit A, Master Indenture, § 8.01.  In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series."  Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture.  The Majority Noteholders repeatedly specifically directed the Indenture Trustee to take all such actions in accordance with their rights under Section 5.12 of the Indenture.

49.      In accordance with these rights under the Indenture, after the event of default and acceleration issued by both the Indenture Trustee and the Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the scheme provided in Section 5.05(b) of the Master Indenture.

50.      Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

11

## DEMAND FOR RELIEF

WHEREFORE, Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. demand judgment:

51.    In their favor and against all adverse interpleader defendants and requiring interpleader plaintiff to distribute all interpleader assets to the Noteholders in accordance with the terms of the Indenture;

52.    Awarding said defendants their costs and attorneys' fees incurred in defending this action to the full extent allowed by law; and

53.    Awarding said defendants such other and further relief as this Court deems just and proper.

Dated: New York, New York
       November **20** , 2006

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By:_____

Michael J. Edelman
Michael G. Davies
805 Third Avenue
New York, New York  10022-2203
Tel:  (212) 407-7700
Fax:  (212) 407-7799

*Attorneys for Interpleader Defendants*
*FIRST MILLENNIUM, INC. AND*
*MILLENNIUM PARTNERS, L.P.*

12