UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its Capacity as
Receiver for NextBank, N.A.,

                        Plaintiff,

            v.

THE BANK OF NEW YORK, as Indenture
Trustee of the NextCard Credit Card Master
Note Trust,

                        Defendant.

Case No. 06-CV-1975-ESH

Hon. Ellen Segal Huvelle

**DECLARATION OF SCOTT H. CHRISTENSEN IN SUPPORT OF
THE FDIC RECEIVER'S MOTION FOR JUDGMENT**

I, Scott H. Christensen, hereby declare as follows:

1.      I am an attorney admitted to practice before this Court.  I am an associate

of the firm Hughes Hubbard & Reed LLP, attorneys representing Plaintiff Federal Deposit

Insurance Corporation, in its Capacity as Receiver for NextBank, N.A. (the "FDIC Receiver") in

the civil action entitled *FDIC v. Bank of New York*, No. 06-1975-ESH.  I have personal

knowledge of the information contained in this Declaration and, if called as a witness, could and

would competently testify thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from

the Offering Memorandum dated December 6, 2000 and Offering Memorandum Supplements for

the Series 2000-1 Asset Backed Notes.

DC 562190_1.DOC

3.     Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Offering Circular dated April 20, 2001 and Offering Circular Supplement for the Series 2001-1 Asset Backed Notes.

4.     Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the Master Indenture dated as of December 11, 2000.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the Transferor Certificate issued to NextBank, N.A. dated December 11, 2000.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the February 12, 2002 Letter from William F. Kroener, III, General Counsel, FDIC, to Suzanne Andrews, Esq., Senior Counsel, The Bank of New York.

7.     Attached hereto as Exhibit 6 is a true and correct copy of the February 14, 2002 Letter from The Bank of New York to Series 2000-1 Noteholders.

8.     Attached hereto as Exhibit 7 is a true and correct copy of the February 14, 2002 Letter from The Bank of New York to Series 2001-1 Noteholders.

9.     Attached hereto as Exhibit 8 is a true and correct copy of the July 10, 2002 Letter from Herbert Held, FDIC to The Bank of New York .

10.     Attached hereto as Exhibit 9 is a true and correct copy of the Proof of Claim submitted by The Bank of New York on October 8, 2002.

11.     Attached hereto as Exhibit 10 is a true and correct copy of the April 11, 2003 Letter from Arthur Cook, FDIC to Loretta Lundberg, The Bank of New York.

12.     Attached hereto as Exhibit 11 is a true and correct copy of the Complaint filed by The Bank of New York on June 5, 2003 in *Bank of New York v. FDIC*, No. 03-1221 (D.D.C.).

13.     Attached hereto as Exhibit 12 is a true and correct copy of the transcript of the November 23, 2004 hearing before this Court in *Bank of New York v. FDIC*, No. 03-1221 (D.D.C.).

14.     Attached hereto as Exhibit 13 is a true and correct copy of the July 27, 2005 settlement agreement in *Bank of New York v. FDIC*, No. 03-1221 (D.D.C.).

15.     Attached hereto as Exhibit 14 is a true and correct copy of the August 2, 2005 emails from H. Stephen Harris, Jr. to Scott H. Christensen.

16.     Attached hereto as Exhibit 15 are true and correct copies of the Monthly Noteholder Statements from The Bank of New York for Series 2000-1 and Series 2001-1 Notes from September 15, 2005 through October 16, 2006.

17.     Attached hereto as Exhibit 16 is a true and correct copy of the November 13, 2006 opinion letter from Vedder, Price, Kaufman & Kammholz, P.C.

18.     Attached hereto as Exhibit 17 is a true and correct copy of the November 9, 2006 instructions to The Bank of New York from Noteholders First Millennium, Inc., Millennium Partners, L.P. and RMK Advantage Income Fund.

19.     Attached hereto as Exhibit 18 is a true and correct copy of the December 14, 2006 "Memorandum of Law of Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. in Opposition to Motion of Interpleader Defendant Federal Deposit Insurance Corporation for a Stay of this Interpleader Case" filed in *Bank of New York v. First Millennium, Inc.*, No. 06-13388 (S.D.N.Y.).

20.     Attached hereto as Exhibit 19 is a true and correct copy of the November 14, 2006 "Notice of Default" from The Bank of New York.

21.     Attached hereto as Exhibit 20 is a true and correct copy of the November 15, 2006 letter from Scott H. Christensen to H. Stephen Harris, Jr.

22.    Attached hereto as Exhibit 21 is a true and correct copy of the November 16, 2006 "Notice of Default" from Noteholders First Millennium, Inc., Millennium Partners, L.P. and RMK Advantage Income Fund.

23.    Attached hereto as Exhibit 22 is a true and correct copy of the November 21, 2006 Stipulation filed with this Court.

24.    Attached hereto as Exhibit 23 is a true and correct copy of the November 16, 2006 interpleader complaint filed by The Bank of New York in the Supreme Court of the State of New York, County of New York in *Bank of New York v. First Millennium, Inc.*, No. 650234/2006 (N.Y. Sup. Ct.).

25.    Attached hereto as Exhibit 24 is a true and correct copy of the Notice of Motion for Summary Judgment, the Memorandum of Law in Support of Motion for Summary Judgment, and the Affidavit in Support of Motion for Summary Judgment of Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P., filed in the Supreme Court of the State of New York, County of New York in *Bank of New York v. First Millennium, Inc.*, No. 650234/2006 (N.Y. Sup. Ct.).

26.    Attached hereto as Exhibit 25 is a true and correct copy of the November 21, 2006 Notice of Removal of *Bank of New York v. First Millennium, Inc.*, No. 650234/2006 (N.Y. Sup. Ct.).

27.    Attached hereto as Exhibit 26 is a true and correct copy of the December 7, 2006 orders from the Honorable Charles S. Haight, Jr. in *Bank of New York v. First Millennium, Inc.*, No. 06-13388 (S.D.N.Y).

28.    Attached hereto as Exhibit 27 is a true and correct copy of the December 14, 2006 "The Bank of New York's Memorandum of Law in Opposition to the FDIC Receiver's Motion for a Stay."

29.    Attached hereto as Exhibit 28 are true and correct copies of the Monthly Noteholder Statements from The Bank of New York for Series 2000-1 and Series 2001-1 Notes for November 15, 2006.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed at Washington, D.C. on December 15, 2006.

Scott H. Christensen

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 15, 2006, true and accurate copies of foregoing Declaration of Scott H. Christensen in Support of the FDIC Receiver's Motion for Judgment were served by mail upon:

> John L. Douglas
> H. Stephen Harris, Jr.
> Alston & Bird LLP
> One Atlantic Center
> 1201 West Peachtree Street
> Atlanta, Georgia 30309-3424

> Paul F. Brinkman
> Alston & Bird LLP
> 601 Pennsylvania Avenue, N.W.
> North Building, 10th Floor
> Washington, D.C. 20004-2601

Scott H. Christensen

Offering Memorandum

# NextCard Credit Card Master Note Trust

Issuer

## NextBank, N.A.

Transferor and Servicer

## Asset Backed Notes

**You should consider carefully the risk factors beginning on page 9 in this offering memorandum.**

A note is not a deposit and neither the notes nor the underlying accounts or receivables are insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency.

The notes are obligations of NextCard Credit Card Master Note Trust only and are not obligations of NextBank, N.A., NextCard, Inc. or any other person.

This offering memorandum may be used to offer and sell notes of a series only if accompanied by the offering memorandum supplement for that series.

**The Trust —**

- may periodically issue asset backed notes in one or more series with one or more classes; and

- will have an interest in —

  - receivables in a portfolio of VISA® and MasterCard® revolving credit card accounts;

  - payments due on those receivables; and

  - other property described in this offering memorandum and in the accompanying offering memorandum supplement.

**The Notes —**

- will be paid only from the trust assets;

- may have one or more forms of credit enhancement; and

- will be issued as part of a designated series which may include one or more classes of notes and credit enhancement.

The notes have not been registered with the Securities and Exchange Commission or any state securities commission. Neither the Securities and Exchange Commission nor any state securities commission has approved these notes or determined that this offering memorandum and the accompanying offering memorandum supplement are accurate or complete. Any representation to the contrary is a criminal offense.

December 6, 2000

FDIC00387

# TABLE OF CONTENTS

Page

Important Notice about Information Presented in this Offering Memorandum
  and the Accompanying Offering Memorandum Supplement ....................................
Offering Memorandum Summary ...................................................................... 3
Risk Factors.......................................................................................... 4
The Issuer............................................................................................. 9
The Bank's Credit Card Activities.................................................................. 19
The Trust Portfolio ................................................................................. 19
Maturity Considerations............................................................................. 25
Use of Proceeds ..................................................................................... 26
Description of the Notes............................................................................ 27
The Indenture ....................................................................................... 27
Credit Enhancement.................................................................................. 54
Note Ratings ........................................................................................ 60
Certain Legal Aspects of the Receivables........................................................... 62
Federal Income Tax Consequences .................................................................... 63
ERISA Considerations................................................................................ 65
Reports to Noteholders.............................................................................. 68
Index of Terms for Offering Memorandum ............................................................. 69
Annex I: Global Clearance, Settlement and Tax Documentation Procedures .......................... 70
                                                                                            A-1

2

FDIC00388

**Important Notice about Information Presented in this**
**Offering Memorandum and the Accompanying Offering Memorandum Supplement**

We provide information to you about the notes in two separate documents: (a) this offering memorandum, which provides general information, some of which may not apply to your series of notes, and (b) the accompanying offering memorandum supplement, which describes the specific terms of your series of notes, including:

- the terms, including interest rates, for each class being offered;

- the timing of interest and principal payments;

- information about the receivables;

- information about credit enhancement, if any, for each class;

- the ratings for each class being offered; and

- the method for selling the notes.

If the terms of your series of notes vary between this offering memorandum and the accompanying offering memorandum supplement, you should rely on the information in the offering memorandum supplement.

You should rely only on the information provided in this offering memorandum and the accompanying offering memorandum supplement. We have not authorized anyone to provide you with different information. We are not offering the notes in any state where the offer is not permitted.

We include cross references in this offering memorandum and the accompanying offering memorandum supplement to captions in these materials where you can find further related discussions. The following Table of Contents and the Table of Contents in the accompanying offering memorandum supplement provide the pages on which these captions are located.

This offering memorandum uses defined terms. You can find a listing of the pages where definitions can be found under the caption "*Index of Terms for Offering Memorandum*" beginning on page 70 in this offering memorandum.

FDIC00389

## Offering Memorandum Summary

*This summary highlights selected information and does not contain all of the information that you need to consider in making your investment decision. You should carefully read this entire document and the accompanying offering memorandum supplement before you purchase any notes.*

### Issuer

NextCard Credit Card Master Note Trust, a Delaware statutory business trust, is the issuer of the notes. The trust's principal place of business is located at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attention: Corporate Trust Administration. Its phone number is (302) 651-8951.

The trust is a master trust and will issue notes in series. Each series of notes will consist of one or more classes. The classes of a series may be issued at the same time or at different times. The notes of each series will be issued pursuant to an indenture supplement to an indenture, in each case between the trust and the indenture trustee.

Some classes or series may not be offered by this offering memorandum. They may be offered, for example, in a public offering.

### Indenture Trustee

The Bank of New York
101 Barclay Street
New York, New York 10286
(212) 815-5738

### Transferor, Servicer and Administrator

NextBank, N.A., sometimes referred to herein as the **"bank,"** is the transferor of the credit card receivables to the trust. The bank also will service the receivables for the trust and will act as the trust's administrator. Its address is 595 Market Street, Suite 1800, San Francisco, California 94105. Its phone number is (415) 836-9700. The bank is a wholly-owned subsidiary of NextCard, Inc.

Under the transfer and servicing agreement, the transferor may designate one or more of its affiliates to be an additional transferor. When we use the term **"transferor"** in this offering memorandum, we are including those additional transferors.

In limited cases, the servicer may resign or be removed, and either the indenture trustee or a third party may be appointed as the new servicer. The bank or any new servicer, is called the **"servicer."** The servicer receives a servicing fee from the trust, and each series is obligated to pay a portion of that fee.

### Trust Assets

The bank is the account owner of the credit card receivables. It has designated selected VISA® and MasterCard® revolving credit card accounts from its portfolio and has transferred those receivables to the trust under the transfer and servicing agreement.

All new receivables generated in the accounts will be transferred automatically to the trust. The total amount of receivables in the trust fluctuates daily as new receivables are generated and payments are received on existing receivables.

The receivables transferred to the trust are the primary trust assets. Additional similar assets may be transferred to the trust as described under *"Description of the Notes — Addition of Trust Assets"* in this offering memorandum. The transferor may also remove receivables that it transferred to the trust as described under *"Description of the Notes — Removal of Accounts"* in this offering memorandum.

For more information about the receivables, see *"The Trust Portfolio"* in this offering memorandum.

### Collections and Allocations

The servicer receives collections on the receivables, deposits those collections in the collection account and keeps track of them as finance charge receivables or principal receivables.

The servicer then allocates those collections among each series of notes outstanding and the transferor interest. The

---

\* Visa® and MasterCard® are federally registered servicemarks of VISA U.S.A., Inc. and MasterCard International Incorporated, respectively.

FDIC00390

servicer allocates (a) collections of finance charge receivables and principal receivables and (b) receivables in accounts written off as uncollectible to each series based on varying percentages. The accompanying offering memorandum supplement describes the allocation percentages applicable to your series.

The interest in the assets not allocated to any series of notes is the transferor interest. The principal amount of the transferor interest fluctuates with the amount of the principal receivables held in the trust and the amount of notes outstanding. The transfer and servicing agreement requires the transferor to transfer receivables in additional accounts to the trust (a) if the transferor interest, averaged over any 30-day period, is less than a designated size, referred to as the required transferor interest, or (b) if the total amount of principal receivables in the trust portfolio plus the principal amount of any participations transferred to the trust are less than a designated amount, referred to as the required minimum principal balance. The transferor may sell all or part of its interest in the transferor interest by issuing a supplemental certificate. The transferor interest does not provide credit enhancement for your series or any other series.

### Interest Payments on the Notes

Each note entitles the holder to receive payments of interest as described in the applicable offering memorandum supplement. If a series of notes consists of more than one class, each class may differ in, among other things, priority of payments, payment dates, interest rates, methods for computing interest, and rights to series enhancement.

Each class of notes may have fixed, floating or any other type of interest rate. Generally, interest will be paid monthly, quarterly, semi-annually or on other scheduled dates over the life of the notes. See *"Description of the Notes — Interest Payments"* in this offering memorandum.

### Principal Payments on the Notes

Each note entitles the holder to receive payments of principal as described in the applicable offering memorandum supplement. If a series of notes consists of more than one class, each class may differ in, among other things, the amounts allocated for principal payments, priority of payments, payment dates,

maturity, and rights to series enhancement. See *"Description of the Notes — Principal Payments"* in this offering memorandum.

### Revolving Period

Each series of notes will begin with a period during which the trust will not pay or accumulate principal for payment to the noteholders. The period when no principal is paid or accumulated is known as the **"revolving period."** The trust, during the revolving period, will pay available principal to noteholders of other series in a group as shared principal collections or to the transferor as holder of the transferor interest, or in certain circumstances will deposit the available principal in the special funding account. The revolving period for a series begins on the closing date described in the applicable offering memorandum supplement and ends at the start of an amortization period or an accumulation period.

Following the revolving period, each class of notes will have one or more of the following periods in which:

- principal is accumulated in specified amounts per month and paid on an expected principal payment date, known as a **"controlled accumulation period"**;

- principal is paid in fixed amounts at scheduled intervals, known as a **"controlled amortization period"**; or

- principal is paid or accumulated in varying amounts each month based on the amount of principal receivables collected following a redemption event, known as an **"early amortization period"** or **"early accumulation period,"** respectively.

### Controlled Accumulation Period

If a series or class of notes is in a controlled accumulation period, the trust is expected to pay available principal to those noteholders on the date specified in the offering memorandum supplement for that series. We call this date an **"expected principal payment date."** If the series has more than one class, each class may have a different priority for payment. For a period of time prior to the expected principal payment date, the trust will deposit specified amounts of available principal

FDIC00391

in a trust account. The controlled accumulation period for a series or class begins on a date specified in the applicable offering memorandum supplement and ends when any one of the following occurs:

- the notes of that series or class are paid in full;

- the early amortization or early accumulation period starts; or

- the latest date by which principal and interest for the series of notes can be paid, known as the **"series final maturity date."**

### Controlled Amortization Period

If a series or class of notes is in a controlled amortization period, the trust will pay available principal up to a fixed amount to those noteholders on each distribution date during that period. The trust will pay available principal in a fixed amount, plus any amounts not previously paid. If the series has more than one class, each class may have a different priority for payment. The controlled amortization period for a series or class starts on the date specified in the applicable offering memorandum supplement and ends when any one of the following occurs:

- the notes of that series or class are paid in full;

- the early amortization or early accumulation period starts; or

- the series final maturity date.

### Early Amortization or Accumulation Period

If a series or class of notes is in an early amortization or early accumulation period, the trust will pay available principal to those noteholders on each distribution date or accumulate available principal by making a deposit into an account on each distribution date. If the series has more than one class, each class may have a different priority for payment. The early amortization period or early accumulation period for a series or class starts on the day a redemption event occurs and ends when either of the following occurs:

- the notes of that series or class are paid in full; or

- the series final maturity date.

### Redemption Events

A redemption event for any series of notes will include adverse events described in the offering memorandum supplement for that series. In addition, the following will be redemption events for all series:

- certain bankruptcy, insolvency or similar events relating to the transferor;

- the transferor is unable to transfer receivables to the trust as required under the transfer and servicing agreement; or

- the trust becomes subject to regulation as an "investment company" under the Investment Company Act of 1940.

See *"Description of the Notes — Redemption Events"* in this offering memorandum.

### Events of Default

The indenture and related indenture supplement governing the terms and conditions of the notes include a list of adverse events called events of default.

If an event of default occurs, then, after any applicable cure period, the indenture trustee or the holders of a majority in principal amount of the affected series of notes may accelerate those notes by declaring the principal amount of those notes to be immediately due and payable. That declaration may, under certain circumstances, be rescinded by the holders of a majority in principal amount of the affected series of notes.

Events of default include the following:

- the trust fails to pay interest on any note on or prior to the distribution date following the distribution date on which it was due;

- the trust fails to pay in full principal on any note when it is due;

- the trust defaults on any covenant or breaches any agreement under the indenture, the default or breach is materially adverse to noteholders and the default or breach continues unremedied for 60 days after written notice of the default or breach is given to the trust by the indenture trustee or

6

FDIC00392

to the trust and the indenture trustee by holders of at least 50% in principal amount of the affected notes; or

- the occurrence of certain bankruptcy, insolvency, reorganization or similar events relating to the trust.

It is not an event of default if the principal of a note is not paid on its expected principal payment date.

After an event of default and the acceleration of a series of notes, funds on deposit in the collection account and any trust accounts with respect to that series will be applied to pay principal of and interest on those notes to the extent permitted by law. After an event of default, principal collections and finance charge collections allocated to the series of notes will be applied to make monthly principal and interest payments on those notes until the earlier of the date those notes are paid in full or the final maturity date of those notes.

See *"The Indenture — Events of Default; Rights upon Event of Default"* in this offering memorandum for a description of the events of default and their consequences to noteholders.

**Shared Excess Finance Charge Collections**

Any series may be included in a group of series. If specified in the offering memorandum supplement for any of these series, to the extent that collections of finance charge receivables allocated to a series are not needed for that series, those collections may be used to cover certain shortfalls of other series in the same group. See *"Description of the Notes — Shared Excess Finance Charge Collections"* in this offering memorandum.

**Shared Principal Collections**

If a series is identified in its offering memorandum supplement as being in a group of series, to the extent that collections of principal receivables allocated to that series are not needed for that series, those collections may be applied to cover principal payments for other principal sharing series in the same group, and vice versa. Certain principal payments for certain principal sharing series in the same group may have priority in receiving those collections over other principal payments for other principal sharing series in that group.

See *"Description of the Notes — Shared Principal Collections"* in this offering memorandum.

**Credit Enhancement**

Each class of a series may be entitled to credit enhancement. Credit enhancement for the notes of any class may take the form of one or more of the following:

- subordination
- collateral interest
- insurance policy
- cash collateral guaranty or account
- swap arrangements
- interest rate cap agreement

- letter of credit
- surety bond
- spread account
- reserve account
- guaranteed rate agreement
- tax protection agreement

The type, characteristics and amount of any credit enhancement for a series will be:

- based on several factors, including the characteristics of the receivables and accounts at the time a series of notes is issued; and
- established based on the requirements of the rating agencies.

See *"Credit Enhancement"* in this offering memorandum.

**Tax Status**

Subject to important considerations described under *"Federal Income Tax Consequences"* in this offering memorandum, Orrick, Herrington & Sutcliffe LLP, as special tax counsel to the trust, is of the opinion that, for United States federal income tax purposes (1) the notes will be treated as indebtedness and (2) the trust will not be an association or a publicly traded partnership taxable as a corporation. In addition, noteholders will agree, by acquiring notes, to treat the notes as debt of the transferor for federal, state and local income and franchise tax purposes.

FDIC00393

**Note Ratings**

As specified in the accompanying offering memorandum supplement, the notes offered by this offering memorandum and an accompanying offering memorandum supplement may be rated by one or more nationally recognized rating organizations. A rating is not a recommendation to buy, sell or hold securities, and may be revised or withdrawn at any time by the assigning agency. Each rating should be evaluated independently of any other rating. See *"Note Ratings"* in this offering memorandum.

FDIC00394

## RISK FACTORS

*You should consider the following risk factors in deciding whether to purchase the notes.*

**It may not be possible to find an investor to purchase your notes**

You may have limited ability to sell your notes. The initial purchasers may assist in resales of the notes but they are not required to do so. A secondary market for any notes may not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow you to resell any of your notes.

You may not resell or transfer your notes unless all conditions to resale and transfer in the indenture and indenture supplement are satisfied, and such notes are registered under the Securities Act and applicable state securities laws or an exemption from such registration is available. None of the transferor, NextCard, Inc. or the trust is required to register the notes at any time under any law. Accordingly, you may transfer the notes, or any interest or participation therein, only as provided in the indenture and indenture supplement and as described in this offering memorandum and the accompanying offering memorandum supplement. The notes should be purchased only by investors who are sophisticated in business and financial matters, who have sufficient means to bear the risk of loss of their investment, who have substantial income and who have no need for liquidity with respect to their investment. See *"Notice to Investors"* and *"Plan of Distribution — Investment Considerations; Transfer Restrictions"* in the accompanying offering memorandum supplement.

**Some liens would be given priority over your notes which could cause delayed or reduced payments**

A court could conclude that the transfer of receivables by the bank to the trust is not a sale but rather the grant of a security interest in those receivables. If so, and even though steps have been taken to give the trust and the indenture trustee a first priority perfected security interest in the receivables, other interests could be given preference. For instance, a tax or governmental lien (or other lien imposed under applicable state or federal law without consent) on the property of the bank arising before receivables come into existence may be senior to the trust's interest in the receivables. Additionally, if a receiver or conservator were appointed for the bank, the fees and expenses of the receiver or conservator might be paid from the receivables before the trust receives any payments on the receivables. If insolvency proceedings were commenced by or against the servicer or if certain time periods were to elapse, moreover, the trust may not have a first-priority perfected security interest in collections commingled with other funds of the servicer. If any of these events were to occur, payments to you could be delayed or reduced. See *"Certain Legal*

FDIC00395

*Aspects of the Receivables—Transfer of Receivables"
and "Description of the Notes—Representations and
Warranties"* in this offering memorandum.

**If a conservator or receiver were appointed for the bank, delays or reductions in payment of your notes could occur**

The bank is chartered as a national banking association and is regulated and supervised by the Office of the Comptroller of the Currency, which is authorized to appoint the Federal Deposit Insurance Corporation (the "**FDIC**") as conservator or receiver for the bank if certain events occur relating to the bank's financial condition or the propriety of its actions. In addition, the FDIC could appoint itself as conservator or receiver for the bank.

The Federal Deposit Insurance Act, as amended by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (the "**FDIA**"), provides that certain agreements and transfers of property by a financial institution cannot be enforced against the FDIC as conservator or receiver. Opinions and policy statements issued by the FDIC suggest that, because of the manner in which these transactions are structured, the FDIC would respect the security interest granted by the bank in the receivables pursuant to the transfer and servicing agreement. If the FDIC were to assert a contrary position, however, payments of principal and interest on your notes could be delayed and possibly reduced.

Even if the security interest were respected, the FDIC could—

- require the trust and the indenture trustee to go through the administrative claims procedure established by the FDIC in order to obtain collections on the receivables;

- request a stay of any actions by the trust or the indenture trustee to enforce the transfer and servicing agreement or the notes against the bank; or

- repudiate the transfer and servicing agreement and limit the claims of the trust and the holders of the notes to their "actual direct compensatory damages."

If the FDIC were to take any of these actions, the amount payable to you could be lower than the outstanding principal and accrued interest on the notes, thus resulting in losses to you.

In addition, regardless of the terms of the transfer and servicing agreement, the indenture, or the instructions of those authorized to direct the indenture trustee's actions, the FDIC may have the power (i) to prevent or require the commencement of an early amortization period, (ii)

10

FDIC00396

to prevent, limit, or require the early liquidation of the receivables and termination of the trust, or (iii) to require, prohibit, or limit the continued transfer of receivables to the trust. The FDIC, moreover, could prevent the trust, the indenture trustee, or the noteholders from appointing a successor servicer under the transfer and servicing agreement. If any of these events were to occur, payments to noteholders could be delayed or reduced.

See *"Certain Legal Aspects of the Receivables—Certain Matters Relating to Conservatorship, Receivership and Bankruptcy"* in this offering memorandum.

**The account owner may change the terms and conditions of the accounts in a way that reduces collections**

As owner of the accounts, the bank retains the right to change various account terms including finance charges, other fees and the required monthly minimum payment. However, the bank may not reduce the rate at which finance charges accrue or other fees are assessed if such reduction could reasonably be expected to cause a redemption event or event of default to occur, or if such reduction is not also applied to similar accounts of the bank and not just accounts designated for the trust, unless such reduction is required by law or market conditions. Changes in interest and fees could decrease the effective yield on the accounts and this could result in an early payment of principal of your notes. Changes could also cause a reduction in the credit ratings on your notes.

**Changes to consumer protection laws may impede collection efforts or reduce collections**

Federal and state consumer protection laws regulate the creation and enforcement of consumer loans, including credit card accounts and receivables. Changes or additions to those regulations could make it more difficult for the servicer of the receivables to collect payments on the receivables or reduce the finance charges and other fees that the account owner can charge on credit card account balances, resulting in reduced collections.

Receivables that do not comply with consumer protection laws may not be valid or enforceable under their terms against the obligors on those receivables.

If a cardholder sought protection under federal or state bankruptcy or debtor relief laws, a court could reduce or discharge completely the cardholder's obligations to repay amounts due on its account and, as a result, the related receivables would be written off as uncollectible. See *"Certain Legal Aspects of the Receivables-Consumer Protection Laws"* in this offering memorandum.

11

**The start-up nature of the bank's business makes the possibility of higher delinquency and/or default rates on the receivables, the occurrence of a redemption event, or a transfer of servicing more likely than under a more established program**

*Limited Operating History and Losses.* The bank and its affiliates have had an operating history of credit card originations only since December 1997 and even more limited experience in the servicing of credit card receivables. From its inception until the date hereof, NextCard, Inc., the parent of the bank, has not achieved profitability and expects to incur net losses for at least the next year. NextCard, Inc. cannot be certain that it will be able either to maintain its recent revenue growth rates or to generate adequate revenue to achieve profitability. If NextCard, Inc.'s revenue does not meet its internally developed projections, its net losses will be even greater than anticipated and the business, operating results and financial condition of the bank and its affiliates may be materially and adversely affected. Failure to achieve break-even status or profitability within the expected time frames might result in the inability of the bank and it's affiliates to continue as going concerns, which could result in a redemption event and/or a transfer of servicing. Any transfer of servicing is likely to result in temporary disruptions in payments on your notes.

*An Unseasoned Credit Card Portfolio Makes Prediction of Delinquency and Loss Levels Difficult.* The trust will be formed in December 2000 and will have no substantial assets other than its interest in the receivables conveyed to the trust and the proceeds from these receivables. As of September 30, 2000 approximately 73% of the accounts in the trust portfolio had been originated within the last 12 months and approximately 97% of the accounts in the trust portfolio had been originated within the last 24 months. As a result, the current portfolio history may not be indicative of the portfolio performance as the receivables and accounts mature. The bank anticipates that the level of future credit losses will increase as the trust portfolio continues to increase in size and season.

*Dependence on External Financing Facilities.* The bank is dependent on continued access to short- and long-term sources of funding for its continued operations. To the extent that the bank or its affiliates are unable to maintain existing facilities, arrange new warehouse, repurchase or other credit facilities or obtain additional commitments to sell or securitize receivables for cash, the bank may have to curtail its current rate of originations. If this occurs, it will have a material adverse effect on the bank's ability to replace paid off receivables in the pool with new receivables, which will adversely

FDIC00398

affect the yield to maturity of your notes and might result in a redemption event.

*Interest Rate on the Receivables is Subject to Change and is Affected by Incentive Programs.* To attract new customers, the bank has offered and may continue to offer low introductory interest rates that increase after expiration of the introductory period. In addition, the bank offers fixed rate products that may increase if customers fail to pay their credit card bills on a timely, consistent basis. Given the bank's limited operating history, there can be no assurance what percentage of customers will continue to use their NextCard credit cards after they are re-priced. If fewer customers than anticipated continue to use their NextCard credit cards after they are re-priced and/or pay off existing balances in faster than anticipated amounts, the required portfolio yield for your series of notes may not be achieved on a consistent basis, which could result in a redemption event.

*Credit Card Originations are Being Made to an Untested Customer Base.* The bank targets its credit card products to Internet users, which are an emerging market segment. As such, there is less historical experience with respect to the credit risk and performance of these consumers. The bank has limited experience developing and implementing proprietary credit criteria. As a result, as compared to issuers targeting traditional market segments any or all of the following could occur:

- a greater number of cardholder payment defaults or other unfavorable payment behavior;

- an increase in fraud by its cardholders or third parties; and

- changes in the traditional patterns of customer loyalty and usage.

In addition, because the bank is targeting a new customer base, it has comparatively little information about the potential size of its target market, its customer usage patterns and other factors that could significantly affect the demand for its products and services. Moreover, general economic factors, such as the rate of inflation, unemployment levels and interest rates may affect its target market customers more severely than other market segments, which could increase its delinquencies and losses. If any of these events occur the yield on your class of notes will be adversely affected, and if greater than anticipated losses occur you may not recover the full amount of principal on your notes.

*Intense and Increasing Competition Could Negatively Impact Your Investment.* The financial services market is

FDIC00399

rapidly evolving and intensely competitive. The recently enacted Gramm-Leach-Bliley Act of 1999, which permits the affiliation of commercial banks, insurance companies and securities firms, may increase the level of competition in the financial services market, including the credit card business. The bank operates in this competitive environment with a number of other companies, many of whom have significantly longer operating histories, greater name recognition, larger customer bases and significantly greater financial, technical and marketing resources than it does. Other credit card issuers and traditional commercial banks may increasingly compete in the online credit card market. Existing Internet providers and new Internet entrants may launch new websites using commercially available software. In addition, companies that provide alternate online payment methods, such as debit card and micropayment offerings, may compete for business with the bank. While the credit card market traditionally has been very fragmented, the Internet could change traditional market dynamics and enable new competitors to rapidly acquire significant market share. Increased competition could require the bank to reduce the interest rates it charges on its customers' balances. This could have a material adverse effect on the portfolio yield and thus on the yield earned on your notes. In addition such competitors may respond more quickly than the bank can to new or emerging technologies and changes in customer requirements. They may be able to:

- devote greater resources to the development, promotion and sale of their products and services;

- replicate the bank's products and services;

- engage in more extensive research and development;

- undertake farther-reaching marketing campaigns;

- adopt more aggressive pricing policies;

- make more attractive offers to existing and potential employees and strategic partners;

- more quickly develop new products and services or enhance existing products and services;

- bundle consumer products and services in a manner that the bank cannot provide; and

- establish cooperative relationships among themselves or with third parties, including large Internet participants, to increase the ability of their products and services to address the needs of prospective customers of the bank and its affiliates.

The bank cannot assure you that it will be able to compete successfully in the marketplace or that competitive pressures will not materially and adversely

14

FDIC00400

affect its business, results of operation or financial condition and possibly result in a redemption event.

*The Website Has and May Continue to Experience Operating Difficulties.* NextCard, Inc.'s website has in the past experienced, and may in the future experience, slower than normal response times or other problems, such as system unavailability. Customers may become dissatisfied by any system failure that interrupts or delays the ability to provide services to them and may choose to either cancel or no longer use their NextCard credit cards. Any interruption or delay in its operations could materially and adversely affect both originations and collections. The bank's systems and operations also are vulnerable to damage or interruption from human error, natural disasters, power losses, telecommunication failures, break-ins, sabotage, computer viruses, acts of vandalism and similar events. The bank and its affiliates currently have not fully tested "end-to-end" back-up systems for many aspects of their operations. A failure of a single aspect of the bank's system could cause interruptions or delays in its entire operation, which may adversely affect its performance as servicer and may result in a transfer of servicing and temporary disruptions in payments on your notes. If such problems continue over any extended period of time, it might result in a redemption event due to higher delinquencies and/or increased default rates.

*A Servicing Transfer, If One Occurs, Could Be Disruptive To Servicing.* The occurrence of a redemption event may necessitate the transfer of servicing operations. During and immediately following a servicing transfer, interruptions in servicing may occur and the receivables may suffer a higher delinquency and/or default rate over a period of several months until a new servicer is fully able to service the portfolio on an on-going basis.

As demonstrated by the foregoing factors, there is a higher likelihood of greater than anticipated delinquencies and/or defaults, the occurrence of a redemption event, or a transfer of servicing, due to the start up nature of the business of the bank, than there would be under a more established credit card program. You should be aware that a higher delinquency rate may delay payment of principal to you and that a higher default rate may result in increased charge-offs allocated to your series of notes. As a result you may not receive the full amount of principal and interest due you, resulting in a lower than anticipated yield or a loss of some or all of your investment. Also, if a redemption event occurs you may receive a faster repayment of principal on your notes than anticipated. You will bear the reinvestment risk associated with any accelerated repayments of principal.

FDIC00401

**Limited remedies for breaches of representations could reduce or delay payments**

The bank, as transferor of the receivables, makes representations and warranties relating to the validity and enforceability of the receivables arising under the accounts in the trust portfolio, and as to the perfection and priority of the trust's interest in the receivables. However, neither the owner trustee nor the indenture trustee will make any examination of the receivables or the related assets to determine the presence of defects, compliance with the representations and warranties or for any other purpose.

A representation or warranty relating to the receivables may be violated if the related obligors have defenses to payment or offset rights, or creditors of the account owner or the transferor claim rights to the trust assets. If a representation or warranty is violated, the transferor may have an opportunity to cure the violation. If it is unable to cure the violation within the specified time period or if there is no right to cure the violation, the transferor must accept reassignment of the receivables affected by the violation. These reassignments are the only remedy for breaches of representations and warranties, even if your damages exceed your share of the reassignment price. See *"Description of the Notes— Representations and Warranties"* in this offering memorandum.

**Payment patterns of receivables could reduce collections**

The receivables transferred to the trust may be paid at any time. We cannot assure the creation of additional receivables in the trust's accounts or that any particular pattern of cardholder payments will occur. A significant decline in the amount of new receivables generated could result in the occurrence of a redemption event for one or more series and the commencement of the early amortization period or, if applicable, the early accumulation period for each of those series. If a redemption event occurs, you could receive payment of principal sooner than expected. The bank's ability to compete in the current industry environment will affect its ability to generate new receivables and might also affect payment patterns on the receivables. In addition, changes in finance charges can alter the monthly payment rates of cardholders. A significant decrease in monthly payment rates could slow the return or accumulation of principal during an amortization period or accumulation period. See "Maturity Considerations" in this offering memorandum.

**Subordinated classes bear losses before senior classes**

One or more classes of notes in a series may be subordinated to one or more senior classes of notes in the same series. Principal allocations to the subordinated class or classes will not begin until each of

FDIC00402

the more senior classes has been paid in full. Additionally, if collections of finance charge receivables allocated to a series are insufficient to cover amounts due for that series' senior notes, the Invested Amount for the series might be reduced. This would reduce the amount of the collections of finance charge receivables available to the subordinated notes in future periods and could cause a possible delay or reduction in principal and interest payments on the subordinated notes.

**Allocations of charged-off receivables could reduce payments to you**

The servicer will write off the receivables arising in accounts in the trust portfolio if the receivables become uncollectible. Your series will be allocated a portion of these charged-off receivables. See "*Description of Series Provisions—Allocation Percentages*" and "*Receivables Performance—Delinquency and Loss Experience*" in the accompanying offering memorandum supplement. If the amount of charged-off receivables allocated to your series of notes exceeds the amount of funds available to reimburse those charge-offs, you may not receive the full amount of principal and interest due to you. See "*Description of Series Provisions— Reallocated Principal Collections*," "*— Application of Collections*" and "*— Defaulted Receivables; Investor Charge-Offs*" in the accompanying offering memorandum supplement.

**Recharacterization of principal receivables would reduce principal receivables and may require addition of new receivables**

As described under "*Description of the Notes — Discount Option*," the transferor may designate a percentage of the receivables that would otherwise be treated as principal receivables to be treated as finance charge receivables. This designation should decrease the likelihood of an early amortization event occurring as a result of a reduction of the average net portfolio yield for a given period. However, this designation will also reduce the aggregate amount of principal receivables, which may increase the likelihood that the transferor will be required to add receivables to the trust. If the transferor were unable to add receivables and could not make a sufficient cash deposit into the special funding account, one or more series of notes, including your series, could go into early amortization.

**The note interest rate and the receivables interest rate may re-set at different times, resulting in reduced or early payments to you**

Some accounts may have finance charges set at a variable rate based on a designated index (for example, the prime rate). A series of notes may bear interest either at a fixed rate or at a floating rate based on a different index. If the interest rate charged on the accounts declines, collections of finance charge receivables may be reduced without a corresponding

FDIC00403

reduction in the amounts of interest payable on your notes and other amounts required to be paid out of collections of finance charge receivables. This could result in delayed or reduced payments to you.

A decrease in the spread, or difference, between collections of finance charge receivables and those collections allocated to make interest payments on your notes could reduce the portfolio yield and increase the risk of early repayment of your notes.

**Issuance of additional series by the trust may affect the timing of payments to you**

The trust is expected to issue additional series from time to time. The trust may issue additional series with terms that are different from your series without your prior review or consent. It is a condition to the issuance of each new series that each rating agency that has rated an outstanding series confirm in writing that the issuance of the new series will not result in a reduction or withdrawal of its then-existing rating of any class of any outstanding series. The rating agency confirmation primarily will be based on the trust's ability to pay principal by the final maturity date and interest on each distribution date. The rating agency confirmation will not consider how the terms of a new series could affect the timing and amounts of payments on your series.

**Withdrawal or downgrading of initial ratings may adversely affect the resale prices for the notes**

A security rating is not a recommendation to buy, sell or hold securities. Similar ratings on different types of securities do not necessarily mean the same thing. You should analyze the significance of each rating independently from any other rating. Any rating agency may change its rating of the notes after the notes are issued if that rating agency believes that circumstances have changed. Any subsequent withdrawal or downgrading of a rating may reduce the price that a subsequent purchaser will be willing to pay for the applicable notes and may reduce the liquidity of your notes.

**The notes are not suitable investments for all investors**

The notes are not a suitable investment for any investor that requires a regular or predictable schedule of payments or payment on specific dates. The notes are complex investments. Only investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment and default risks, the tax consequences of the investment and the interaction of these factors, should consider purchasing the notes.

FDIC00404

**THE ISSUER**

NextCard Credit Card Master Note Trust is a statutory business trust created under the laws of the State of Delaware. It is operated under a trust agreement, dated as of December 1, 2000, between the bank, as transferor, and Wilmington Trust Company, as owner trustee. We refer to NextCard Credit Card Master Note Trust as the "**issuer**" or the "**trust**" and Wilmington Trust Company, in its capacity as owner trustee of the issuer, as the "**owner trustee**."

The activities of the issuer are limited to:

- acquiring, owning and managing the trust assets and the proceeds of those assets;
- issuing and making payments on the notes; and
- engaging in related activities.

The bank, in its capacity as "**administrator**" under the administration agreement, dated as of December 1, 2000, between the administrator and the issuer, will provide the notices and perform on behalf of the issuer certain other administrative obligations required by the transfer and servicing agreement, the indenture and the indenture supplement for each series, and will be compensated for acting as the administrator.

The issuer's principal offices are in Delaware, in care of Wilmington Trust Company, as owner trustee, at the following address:  Rodney Square North, 1100 Market Street, Wilmington, Delaware 19890-0001, Attention:  Corporate Trust Department.

The transferor will pay the fees of the owner trustee and will reimburse it for certain liabilities and expenses.

**THE BANK'S CREDIT CARD ACTIVITIES**

**Overview**

The bank is an Internet-based provider of consumer credit. The bank's parent, NextCard, Inc., was the first to offer instant online credit card approval and provide consumers with a choice of customized offers based on their unique credit profile and history. The bank markets NextCard credit cards to consumers through a website, www.nextcard.com (the "**NextCard Web site**").

NextCard, Inc. began accepting applications for NextCard credit cards on December 23, 1997. Until September 30, 1999, all NextCard accounts were issued solely through a strategic alliance with Heritage Bank of Commerce ("**Heritage Bank**"), a San Jose, California based depository institution, using NextCard, Inc.'s program guidelines. NextCard, Inc. originated credit card relationships with potential customers and serviced the related credit card accounts on behalf of Heritage Bank pursuant to an Account Origination Agreement. Heritage Bank's obligation to establish new credit card accounts for NextCard, Inc. terminated in October 1999 and the bank acquired all the NextCard accounts originated by Heritage Bank on December 15, 1999.

The portfolio of credit card accounts owned by NextBank, N.A. (the "**bank**"), referred to as the "**bank portfolio**," currently consists of VISA® and MasterCard® credit card accounts. Some of these accounts are designated as trust accounts. The receivables which will be included in the trust have been and will be generated from transactions made by holders of these trust accounts. The receivables which will be included in the trust will be serviced by the bank pursuant to the transfer and servicing agreement. Certain data processing and administrative functions associated with this servicing are performed on behalf of the bank by First Data Resources, Inc. ("**FDR**"). See "— *Description of FDR*" in this offering memorandum. The bank is an account owner and as transferor transfers receivables to the trust. In the future, the transferor may enter into receivables purchase agreements to purchase receivables from third parties and transfer such receivables to the trust, provided that the transferor has received written confirmation from each rating agency that such receivables purchase agreement will not result in a reduction or withdrawal of its then-existing rating of any outstanding series or class and the transferor has

FDIC00405

Principal will be paid to you in increments, up to the amount specified in the accompanying offering memorandum supplement, if your series features controlled amortization and this period begins. Your class of notes might also begin to pay principal to you if the accompanying offering memorandum supplement specifies that your class will begin early amortization. Early amortization will begin for all classes of your series when a redemption event occurs. During any amortization period, principal will be paid to you only on a distribution date.

If the series described in the accompanying offering memorandum supplement features multiple classes, different classes of your series may have differing priorities for the accumulation or payment of principal. This means that noteholders of other classes could begin to receive payments of principal before you do.

We can give you no assurance that principal will be available when expected, either to accumulate or to pay to you. The expected principal payment date for your class of notes is based upon assumptions about payment rates on the receivables, as detailed in the accompanying offering memorandum supplement. We can give you no assurance that these payment rate assumptions will be correct. Payment rates depend on collections of receivables. Collections can vary seasonally and are also affected by general economic conditions and the payment habits of individual cardholders. The accompanying offering memorandum supplement will provide historical payment rates, delinquencies, total charge-offs and other information relating to the trust portfolio and, for certain historical periods prior to the availability of trust portfolio information, the bank portfolio. We cannot assure you that future events will be consistent with this historical performance. The life of your notes might be longer than expected if principal is collected more slowly. The accompanying offering memorandum supplement may provide that if the principal payment rate falls below a specified level, a redemption event will occur. The occurrence of any redemption event may substantially shorten the average life of your notes.

## USE OF PROCEEDS

Net proceeds from the sale of each series of notes offered by this offering memorandum will be paid to the transferor. Unless otherwise specified in the related offering memorandum supplement, the transferor will use these net proceeds to reduce the outstanding principal amount of other series of notes issued to third party commercial paper conduits, purchase additional receivables or for general corporate purposes.

## DESCRIPTION OF THE NOTES

The notes will be issued in series. Each series will represent an obligation of the trust. Each series of notes will be issued pursuant to the indenture, as supplemented by an indenture supplement, in each case entered into by the trust and The Bank of New York, as the "**Indenture trustee**." The following summaries describe certain provisions common to each series of notes. The accompanying offering memorandum supplement gives you additional information specific to the notes of your series. The summaries are not complete and are subject to, and are qualified by, all of the provisions of the transfer and servicing agreement, the indenture and the related indenture supplement.

**General**

The notes will be secured by and paid from the assets of the trust. Each series will be allocated collections of principal receivables and finance charge receivables based on a percentage called the "**Investor Percentage**." The Investor Percentage will be based on the Invested Amount for a series. The "**Invested Amount**" for a series on any date will be equal to:

- the initial outstanding principal amount of that series of notes as of the related closing date for that series (increased by the principal balance of any notes of that series issued after the closing date for that series); *minus*

- the amount of principal paid to the related noteholders prior to that date; *minus*

- the amount of unreimbursed Investor Charge-Offs with respect to that series prior to that date.

FDIC00413

If so specified in the offering memorandum supplement relating to any series of notes, under certain circumstances the Invested Amount may be further adjusted by the amount of principal allocated to noteholders, the funds on deposit in any specified account, and any other amount specified in the accompanying offering memorandum supplement.

Each series of notes may consist of one or more classes, one or more of which may be senior notes and one or more of which may be subordinated notes. Each class of a series will evidence the right to receive a specified portion of each distribution of principal or interest or both. Each class of a series may differ from other classes in some aspects, including:

- amounts allocated to principal payments;

- maturity date;

- interest rate; and

- availability and amount of enhancement.

Payments and deposits of interest and principal will be made on distribution dates to noteholders in whose names the notes were registered on the record dates specified in the accompanying offering memorandum supplement. Interest will be distributed to noteholders in the amounts, for the periods and on the dates specified in the accompanying offering memorandum supplement.

The transferor initially will own the **"Transferor Interest"** which represents the right to receive all cash flows from the trust assets not required to make payments on the notes or to series enhancers. The holder of the Transferor Interest, subject to certain limitations, will have the right to a percentage, called the **"Transferor Percentage,"** of all cardholder payments from the receivables in the trust. The Transferor Interest may be transferred, in whole or in part, subject to certain limitations and conditions described in the trust agreement, and, at the discretion of the transferor, the Transferor Interest may be held either in an uncertificated form or in the form of a certificate representing the Transferor Interest, called a **"transferor certificate."** See "— *Certain Matters Regarding the Transferor and the Servicer*" in this offering memorandum.

During the revolving period, the Invested Amount of a series will remain constant except under certain limited circumstances. See "— *Defaulted Receivables; Rebates and Fraudulent Charges; Investor Charge-Offs*" in this offering memorandum. The amount of principal receivables in the trust, however, will vary each day as new principal receivables are created and others are paid. The amount of the Transferor Interest will fluctuate each day, therefore, to reflect the changes in the amount of the principal receivables in the trust. When a series is amortizing, the Invested Amount of that series will decline as customer payments of principal receivables are collected and distributed, or accumulated for distribution, to the noteholders. As a result, the Transferor Interest will generally increase to reflect reductions in the Invested Amount for that series and will also change to reflect the variations in the amount of principal receivables in the trust. The Transferor Interest may also be reduced as the result of new issuances. See "— *New Issuances*" in this offering memorandum.

Generally, notes offered through the offering memorandum and the accompanying offering memorandum supplement:

- will be represented by notes registered in the name of a DTC nominee;

- will be available for purchase in minimum denominations of $100,000 and multiples of $1,000 in excess of that amount; and

- will be available for purchase in book-entry form only.

The accompanying offering memorandum supplement will specify if your notes have different characteristics from those listed above.

DTC has informed the transferor that its nominee will be Cede & Co. Accordingly, Cede & Co. is expected to be the holder of record of each series of notes. As an owner of beneficial interests in the notes, called a **"note owner,"** you will generally not be entitled to a definitive note representing your

FDIC00414

**Surety Bond or Insurance Policy**

If so specified in the accompanying offering memorandum supplement, insurance with respect to a series or one or more of the related classes will be provided by one or more insurance companies. Such insurance will guarantee, with respect to one or more classes of the related series, distributions of interest or principal in the manner and amount specified in the accompanying offering memorandum supplement.

If so specified in the accompanying offering memorandum supplement, a surety bond will be purchased for the benefit of the holders of any series or class of that series to assure distributions of interest or principal with respect to that series or class of notes in the manner and amount specified in the accompanying offering memorandum supplement.

**Spread Account**

If so specified in the accompanying offering memorandum supplement, support for a series or one or more of the related classes will be provided by the periodic deposit of certain available excess cash flow from the trust assets into an account, referred to as the "**spread account**," intended to assist with subsequent distribution of interest and principal on the notes of that class or series in the manner specified in the accompanying offering memorandum supplement.

**Reserve Account**

If so specified in the accompanying offering memorandum supplement, support for a series or one or more of the related classes or any related enhancement will be provided by the establishment of an account, referred to as the "**reserve account**." The reserve account may be funded, to the extent provided in the accompanying offering memorandum supplement, by an initial cash deposit, the retention of certain periodic distributions of principal or interest or both otherwise payable to one or more classes of notes, including the subordinated notes, or the provision of a letter of credit, guarantee, insurance policy or other form of credit or any combination of these arrangements. The reserve account will be established to assist with the subsequent distribution of principal or interest on the notes of that series or the related class or any other amount owing on any related enhancement in the manner provided in the accompanying offering memorandum supplement.

## NOTES RATINGS

Any rating of the notes by a rating agency will indicate:

- its view on the likelihood that noteholders will receive required interest and principal payments; and

- its evaluation of the receivables and the availability of any credit enhancement for the notes.

Among the things a rating will not indicate are:

- the likelihood that interest or principal payments will be paid on a scheduled date;

- the likelihood that a redemption event will occur;

- the likelihood that a U.S. withholding tax will be imposed on non-U.S. noteholders;

- the marketability of the notes;

- the market price of the notes; or

- whether the notes are an appropriate investment for any purchaser.

A rating will not be a recommendation to buy, sell or hold the notes. A rating may be lowered or withdrawn at any time by a rating agency.

The transferor may request a rating of the notes offered by this offering memorandum and the accompanying offering memorandum supplement from one or more rating agencies. Rating agencies other than those requested could assign a rating to the notes and, if so, that rating could be lower than

FDIC00448

any rating assigned by a rating agency chosen by the transferor. Except as otherwise expressly stated, any reference in this offering memorandum or the accompanying offering memorandum supplement to a "rating agency" refers to a rating agency selected by the transferor to rate the notes of a series or class issued by the trust.

## CERTAIN LEGAL ASPECTS OF THE RECEIVABLES

### Transfer of Receivables

In the transfer and servicing agreement, the transferor will represent and warrant that its transfer of receivables constitutes a valid sale and assignment of all of its right, title and interest in and to the receivables, or creates in favor of the trust a valid first-priority perfected security interest in the transferor's rights in the receivables in existence at the time that the receivables are transferred and a valid first-priority perfected security interest in the transferor's rights in the receivables arising in accounts designated for the trust on and after their creation. For a discussion of the trust's rights arising from these representations and warranties not being satisfied, see *"Description of the Notes — Representations and Warranties"* in this offering memorandum.

The transferor will represent in the transfer and servicing agreement that the receivables are "accounts" or "general intangibles" for purposes of the UCC. Both the sale of accounts and the transfer of accounts as security for an obligation are subject to the provisions of Article 9 of the UCC. In addition, a transfer of general intangibles as security for an obligation is subject to the provisions of Article 9 of the UCC. Therefore, appropriate UCC financing statements will be filed to perfect the trust's and the indenture trustee's security interest in the receivables. Article 9 of the UCC, however, does not apply to the sale of general intangibles. As a consequence, some other action under applicable state law may be required in order to perfect such a sale against the interests of third parties.

There are certain limited circumstances in which prior or subsequent transferees of receivables could have an interest in those receivables with priority over the trust's interest. Under the transfer and servicing agreement, however, the transferor will represent and warrant that it has transferred the receivables to the trust free and clear of the lien of any third party (other than the indenture trustee), and the transferor will covenant that it will not sell, pledge, assign, transfer, or grant any lien on any receivable other than to the trust and the indenture trustee. Nevertheless, a tax, governmental or other nonconsensual lien on property of the transferor arising prior to the time a receivable comes into existence may have priority over the interest of the trust in such receivable. Furthermore, if the FDIC were appointed as a receiver or conservator of the bank, certain administrative expenses of the receiver or conservator may have priority over the interest of the trust in the receivables.

If and for as long as:

(1)   (a)   the bank remains the servicer under the transfer and servicing agreement;

        (b)   NextCard, Inc. guarantees the performance of the servicer's obligations and achieves and maintains a commercial paper rating of not less than A-1 by Standard & Poor's, not less than P-1 by Moody's and, if rated by Fitch, not less than F1 by Fitch; and

        (c)   the bank remains a wholly-owned subsidiary of NextCard, Inc. (directly or indirectly) and, in the event of a material change in the financial relationship between them:

            (i)   the bank notifies each rating agency; and

            (ii)   written confirmation is received from each rating agency that the material change will not result in a reduction or withdrawal of its then-existing rating of any outstanding series or class; or

(2)   any other arrangements are made and written confirmation is received from each rating agency that the arrangements will not result in a reduction or withdrawal of its then-existing rating of any outstanding series or class,

FDIC00449

cash collections held by the servicer may be commingled with other funds of the servicer prior to each distribution date and, in the event of the insolvency of the servicer or the lapse of certain time periods, the trust may not have a first-priority perfected security interest in such collections. In such an event, the amount payable to you could be lower than the outstanding principal and accrued interest on the notes, thus resulting in losses to you. However, if neither condition specified in (1) or (2) above is satisfied, the servicer will begin within five business days to deposit collections directly into the collection account within two business days of each date of processing.

## Certain Matters Relating to Conservatorship, Receivership and Bankruptcy

The bank is chartered as a national banking association and is regulated and supervised by the Office of the Comptroller of the Currency, which is authorized to appoint the FDIC as conservator or receiver for the bank if certain events occur relating to the bank's financial condition or the propriety of its actions. In addition, the FDIC could appoint itself as conservator or receiver for the bank.

The FDIA provides that certain agreements and transfers of property by a financial institution cannot be enforced against the FDIC as conservator or receiver. Opinions and policy statements issued by the FDIC suggest that, because of the manner in which these transactions are structured, the FDIC would respect the security interest granted by the bank in the receivables pursuant to the transfer and servicing agreement. Nevertheless, if the FDIC were to assert a contrary position, or were to require the trust and the indenture trustee to go through the administrative claims procedure established by the FDIC in order to obtain collections on the receivables, or were to request a stay of any actions by the trust or the indenture trustee to enforce the transfer and servicing agreement or the notes against the bank, delays in payments on outstanding series of notes and possible reductions in the amount of those payments could occur.

In addition, the FDIC as conservator or receiver for the bank could repudiate the transfer and servicing agreement. The FDIA would limit the damages for any such repudiation to the trust's "actual direct compensatory damages" determined as of the date that the FDIC were appointed as conservator or receiver for the bank. The FDIC, moreover, could delay its decision whether to repudiate the transfer and servicing agreement for a reasonable period following its appointment as conservator or receiver for the bank. Therefore, if the FDIC as conservator or receiver for the bank were to repudiate the transfer and servicing agreement, the amount payable to you could be lower than the outstanding principal and accrued interest on the notes, thus resulting in losses to you.

In addition, regardless of the terms of the transfer and servicing agreement, the indenture, or the instructions of those authorized to direct the indenture trustee's actions, the FDIC may have the power (i) to prevent or require the commencement of an early amortization period, (ii) to prevent, limit, or require the early liquidation of the receivables and termination of the trust, or (iii) to require, prohibit, or limit the continued transfer of receivables to the trust. The FDIC, moreover, could prevent the trust, the indenture trustee, or the noteholders from appointing a successor servicer under the transfer and servicing agreement. If any of these events were to occur, payments to noteholders could be delayed or reduced.

## Consumer Protection Laws

The relationship of the consumer and the provider of consumer credit is extensively regulated by federal and state consumer protection laws. With respect to credit accounts issued by the bank, the most significant federal laws include the Federal Truth-in-Lending, Equal Credit Opportunity, Fair Credit Reporting and Fair Debt Collection Practices Acts. These statutes impose various disclosure requirements either before or when an account is opened, or both, and at the end of monthly billing cycles, and, in addition, limit account holder liability for unauthorized use prohibit certain discriminatory practices in extending credit, and regulate practices followed in collections. In addition, account holders are entitled under these laws to have payments and credits applied to the revolving credit account promptly and to request prompt resolution of billing errors. Congress and the states may enact new laws and amendments to existing laws to regulate further the consumer revolving credit industry. The trust may be liable for certain violations of consumer protection laws that apply to the receivables, either as assignee from the transferor with respect to obligations arising before transfer of the receivables to the trust or as the party directly responsible for obligations arising after the transfer. In addition, an account

FDIC00450

No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this offering memorandum. You must not rely on any unauthorized information or representations. This offering memorandum is an offer to sell only the notes offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this offering memorandum is current only as of its date.

---

## NextCard Credit Card Master Note Trust
### Issuer

## NextBank, N.A.
### Transferor and Servicer

---

$482,500,000

# NextCard Credit Card Master Note Trust

## Series 2000-1 Asset Backed Notes

$357,500,000 Class A
Asset Backed Notes

$67,500,000 Class B
Asset Backed Notes

$57,500,000 Class C
Asset Backed Notes

---

OFFERING MEMORANDUM

---

## Goldman, Sachs & Co.
## Barclays Capital
## Credit Suisse First Boston

FDIC00460

Offering Memorandum Supplement to Offering Memorandum Dated December 6, 2000

# $482,500,000

# NextCard Credit Card Master Note Trust

Issuer

## NextBank, N.A.

Transferor and Servicer

## Series 2000-1 Asset Backed Notes

<table>
<tr><th></th><th>Class A notes</th><th>Class B notes</th><th>Class C notes</th></tr>
<tr><td>Principal amount</td><td>$357,500,000</td><td>$67,500,000</td><td>$57,500,000</td></tr>
<tr><td>Issue Price</td><td>99.726507%</td><td>99.728958%</td><td>99.732377%</td></tr>
<tr><td>Interest rate per annum</td><td>One-month LIBOR plus 0.200%</td><td>One-month LIBOR plus 0.800%</td><td>One-month LIBOR plus 1.650%</td></tr>
<tr><td>Interest payment dates</td><td>Monthly on the 15th, beginning on January 15, 2001</td><td>Monthly on the 15th, beginning on January 15, 2001</td><td>Monthly on the 15th, beginning on January 15, 2001</td></tr>
<tr><td>Expected principal payment date</td><td>December 15, 2003</td><td>December 15, 2003</td><td>December 15, 2003</td></tr>
<tr><td>Final maturity date</td><td>December 15, 2006</td><td>December 15, 2006</td><td>December 15, 2006</td></tr>
</table>

**You should consider carefully the risk factors beginning on page 9 in the offering memorandum.**

A note is not a deposit and neither the notes nor the underlying accounts or receivables are insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency.

The notes are obligations of NextCard Credit Card Master Note Trust only and are not obligations of NextBank, N.A., NextCard, Inc. or any other person.

This offering memorandum supplement may be used to offer and sell the Class A notes, the Class B notes and the Class C notes only if accompanied by the offering memorandum.

The Class B notes are subordinated to the Class A notes. The Class C notes are subordinated to the Class A and the Class B notes. The trust is also issuing Class D notes in the amount of $17,500,000 that are subordinated to the Class A, the Class B and the Class C notes. A spread account will provide credit enhancement for the Class C and Class D notes.

This offering memorandum supplement and the accompanying offering memorandum relate to the offering of the Class A, the Class B and the Class C notes only.

We expect to issue the Class A notes, the Class B notes and the Class C notes on or about December 13, 2000. We will deliver the Class A notes, the Class B notes and the Class C notes in book-entry form.

The Class A, the Class B and the Class C notes are being offered only to (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act")) or (b) persons other than U.S. persons in offshore transactions in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act. Any resale of the Class A, the Class B or the Class C notes or any interest or participation therein will be subject to restrictions under the Securities Act and as described under "Notice to Investors." You should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time or until final payment of principal thereof is made.

The Class A, the Class B and the Class C notes have not been registered with the Securities and Exchange Commission or any state securities commission. Neither the Securities and Exchange Commission nor any state securities commission has approved these notes or determined that this offering memorandum supplement and the accompanying offering memorandum are accurate or complete. Any representation to the contrary is a criminal offense.

## Goldman, Sachs & Co.

### Barclays Capital

#### Credit Suisse First Boston

December 6, 2000

FDIC00461

# TABLE OF CONTENTS

| | Page |
|---|---|
| Important Notice about Information Presented in this Offering Memorandum Supplement and the Accompanying Offering Memorandum | S-3 |
| Notice to Investors | S-4 |
| Transaction Summary | S-9 |
| Summary of Terms | S-10 |
| Receivables Performance | S-15 |
| The Trust Portfolio | S-18 |
| Maturity Considerations | S-23 |
| The Bank | S-24 |
| Description of Series Provisions | S-24 |
| ERISA Considerations | S-43 |
| Plan of Distribution | S-45 |
| Legal Matters | S-47 |
| Index of Terms for Offering Memorandum Supplement | S-48 |
| Annex I: Other Series Issued and Outstanding | I-1 |

FDIC00462

## Important Notice about Information Presented in this
## Offering Memorandum Supplement and the Accompanying Offering Memorandum

We provide information to you about the Class A, the Class B and the Class C notes in two separate documents: (a) the accompanying offering memorandum, which provides general information, some of which may not apply to your series of notes, and (b) this offering memorandum supplement, which describes the specific terms of your series of notes.

If the terms of your series of notes vary between this offering memorandum supplement and the accompanying offering memorandum, you should rely on the information in this offering memorandum supplement.

You should rely only on the information provided in this offering memorandum supplement and the accompanying offering memorandum. We have not authorized anyone to provide you with different information. We are not offering the notes in any state where the offer is not permitted.

We include cross references in this offering memorandum supplement and the accompanying offering memorandum to captions in these materials where you can find further related discussions. The following Table of Contents and the Table of Contents in the accompanying offering memorandum provide the pages on which these captions are located.

This offering memorandum supplement uses defined terms. You can find a listing of the pages where definitions can be found under the caption *"Index of Terms for Offering Memorandum Supplement"* beginning on page S-47 in this offering memorandum supplement and under the caption *"Index of Terms for Offering Memorandum"* beginning on page 69 in the accompanying offering memorandum.

THIS OFFERING MEMORANDUM SUPPLEMENT AND THE ACCOMPANYING OFFERING MEMORANDUM DO NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE CLASS A, THE CLASS B AND THE CLASS C NOTES OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SUCH SECURITIES IN ANY JURISDICTION IN WHICH THAT OFFER OR SOLICITATION IS UNLAWFUL. NEITHER THE DELIVERY OF THIS OFFERING MEMORANDUM SUPPLEMENT AND THE ACCOMPANYING OFFERING MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION HEREIN OR THEREIN SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY DATE AFTER THE DATE HEREOF.

The distribution of this offering memorandum supplement and the accompanying offering memorandum and the offering of the Class A, the Class B and the Class C notes in certain jurisdictions may be restricted by law. Persons into whose possession this offering memorandum supplement and the accompanying offering memorandum comes are required by the Initial Purchasers, the owner trustee and NextBank, N.A. to inform themselves about and to observe those restrictions.

No action has been taken by NextBank, N.A., NextCard Credit Card Master Note Trust or the Initial Purchasers that would permit an offering of the Class A, the Class B or the Class C notes or the circulation or distribution of this offering memorandum supplement, the accompanying offering memorandum or any other offering material in relation to NextBank, N.A., NextCard Credit Card Master Note Trust or the Class A, the Class B or the Class C notes in any country or jurisdiction where action for that purpose is required.

FDIC00463

**Transaction Summary**

| | |
|---|---|
| Trust: | NextCard Credit Card Master Note Trust |
| Transferor and Servicer: | NextBank, N.A. |
| Indenture Trustee: | The Bank of New York |
| Owner Trustee: | Wilmington Trust Company |
| Closing Date: | December 13, 2000 |
| Servicing Fee Rate: | 2.00% per annum |
| Clearance and Settlement: | DTC/Clearstream/Euroclear |
| Primary Trust Assets: | Receivables originated in VISA® and MasterCard® accounts |

| | Class A | Class B | Class C |
|---|---|---|---|
| Principal Amount: | $357,500,000 | $67,500,000 | $57,500,000 |
| Percentage of Series:* | 71.5% | 13.5% | 11.5% |
| Anticipated Ratings: Moody's/Standard & Poor's | Aaa/AAA | A1/A | Baa2/BBB |
| Credit Enhancement: | subordination of Class B, Class C and Class D | subordination of Class C and Class D | subordination of Class D and spread account |
| Interest Rate Per Annum: | One-month LIBOR plus 0.200% | One-month LIBOR plus 0.800% | One-month LIBOR plus 1.650% |
| Interest Accrual Method: | actual/360 | actual/360 | actual/360 |
| Interest Payment Dates: | Monthly (15th) | Monthly (15th) | Monthly (15th) |
| Interest Rate Index Reset Date: | 2 London business days before each interest payment date | 2 London business days before each interest payment date | 2 London business days before each interest payment date |
| First Interest Payment Date: | January 15, 2001 | January 15, 2001 | January 15, 2001 |
| Expected Principal Payment Date: | December 15, 2003 | December 15, 2003 | December 15, 2003 |
| Commencement of Accumulation Period (subject to adjustment): | December 1, 2002 | December 1, 2002 | December 1, 2002 |
| Final Maturity Date: | December 15, 2006 | December 15, 2006 | December 15, 2006 |

| | |
|---|---|
| ERISA eligibility: (investors should consult with their counsel) | Yes, subject to important considerations described under *"ERISA Considerations"* in this offering memorandum supplement and in the accompanying offering memorandum. |
| Debt for United States Federal Income Tax Purposes: (investors should consult with their tax counsel) | Yes, subject to important considerations described under *"Federal Income Tax Consequences"* in the accompanying offering memorandum. |

---

\* The initial percentage of Series 2000-1 comprised by the Class D notes is 3.5%, the Class D Notes will have an initial principal amount of $17,500,000 and the Class D Notes will bear interest at one-month LIBOR as determined each month plus 3.750%. The Class D note interest rate may be increased subject to confirmation from each rating agency that such increase will not result in a reduction or withdrawal of its then-existing rating of any outstanding series or class. The Class D notes are expected to be rated Ba2 and BB by Moody's and Standard & Poor's, respectively.

FDIC00469

## Summary of Terms

*This summary highlights selected information and does not contain all of the information that you need to consider in making your investment decision. You should carefully read this entire document and the accompanying offering memorandum before you purchase any notes. You should consider carefully the risk factors beginning on page 9 in the accompanying offering memorandum before making an investment in the Class A, Class B or Class C notes.*

### The Issuer

The notes will be issued by NextCard Credit Card Master Note Trust, a Delaware statutory business trust, pursuant to an indenture supplement to an indenture, each between the trust and the indenture trustee.

The indenture trustee is The Bank of New York.

### Offered Securities

#### Interest

The Class A notes will bear interest at one-month LIBOR as determined each month plus 0.200% per annum.

The Class B notes will bear interest at one-month LIBOR as determined each month plus 0.800% per annum.

The Class C notes will bear interest at one-month LIBOR as determined each month plus 1.650% per annum.

For each class of the Series 2000-1 notes, interest will be calculated as follows:

$$\frac{\text{Principal balance at end of prior monthly period}}{} \times \frac{\text{Number of days in interest period}}{360} \times \text{Interest rate}$$

Each interest period begins on and includes a distribution date and ends on but excludes the next distribution date. However, the first interest period will begin on and include the closing date.

Interest on the Class A , the Class B and the Class C notes will be paid on each distribution date, beginning on January 15, 2001 and the 15th day of each following month if the 15th is a business day and, if not, the following business day.

You may obtain the interest rates for the current interest period and the immediately preceding interest period by telephoning the indenture trustee at (212) 853-5738.

See *"Description of Series Provisions— Interest Payments"* in this offering memorandum supplement for a description of how and when LIBOR will be determined.

#### Principal

Principal of each of the Class A, the Class B and the Class C notes is expected to be paid in full on the December 15, 2003 distribution date. This date is referred to as the expected principal payment date for each of the Class A, the Class B and the Class C notes. However, no principal will be paid on the Class C notes until the Class A notes and the Class B notes are paid in full, and no principal will be paid on the Class B notes until the Class A notes are paid in full .

We are scheduled to begin accumulating collections of principal receivables starting December 1, 2002 for payment to the Class A, the Class B and the Class C noteholders on the expected principal payment date for each class of notes, but we may begin accumulating at a later date.

Principal of the Class A, the Class B and the Class C notes may be paid earlier or later than the expected principal payment date. If specified adverse events known as redemption events occur, principal may be paid earlier than expected. If collections of the credit card receivables are less than expected or are collected more slowly than expected, then principal payments may be delayed. If the Class A, the Class B and the Class C notes are not paid on the expected principal payment date, collections of principal receivables will continue to be used to pay principal on the Class A, the Class B and the Class C notes until the notes are paid or until the final maturity date of December 15, 2006, whichever occurs first. You will not be entitled to any premium for early or late payment of principal.

For more information about principal payments, see *"Maturity Considerations," "Description of Series Provisions—Principal*

FDIC00470

Payments" and "—Allocation Percentages" in this offering memorandum supplement.

## Credit Enhancement

Credit enhancement for the Class A notes is provided by the subordination of the Class B notes, the Class C notes and the Class D notes.

Credit enhancement for the Class B notes is provided by the subordination of the Class C notes and the Class D notes.

Credit enhancement for the Class C notes is provided by the subordination of the Class D notes and the spread account.

Credit enhancement for your series is for your series' benefit only, and you are not entitled to the benefits of credit enhancement available to other series.

For more information about credit enhancement, see "Description of Series Provisions—Reallocated Principal Collections," "—Application of Collections" and "—Defaulted Receivables; Investor Charge-Offs" in this offering memorandum supplement.

## Spread Account

A spread account will provide credit enhancement for the Class C notes and the Class D notes. The spread account is not available to fund payments with respect to the Class A notes or the Class B notes, except following an event of default and, only after payment in full of the Class C and Class D notes. The spread account initially will be funded in an amount equal to 4.0% of the Series 2000-1 notes. After the Series 2000-1 notes are issued, deposits into the spread account will be made each month from Available Finance Charge Collections up to the Required Spread Account Amount as described in this prospectus supplement under "Description of Series Provisions—Spread Account." The spread account will be used to make payments on the Class C notes and the Class D notes if collections of receivables allocated to the Series 2000-1 notes are insufficient to make required payments on the Class C notes or the Class D notes.

## Events of Default

The Series 2000-1 notes are subject to specified events of default described under "The

Indenture—Events of Default; Rights upon Event of Default" in the accompanying offering memorandum. These include, among other things, the failure to pay interest on or prior to the distribution date following the distribution date on which it was due or to pay principal when it is due on the final maturity date.

In the case of an event of default involving certain bankruptcy, insolvency or similar events relating to the trust, the principal amount of the Series 2000-1 notes automatically will be deemed to be immediately due and payable. If any other event of default occurs and continues with respect to the Series 2000-1 notes, the indenture trustee or holders of more than 50% of the then-outstanding principal balance of those notes may declare the principal amount of the notes to be immediately due and payable. These declarations may, under certain circumstances, be rescinded by holders of more than 50% of the then-outstanding principal balance of the Series 2000-1 notes.

After an event of default and the acceleration of the Series 2000-1 notes, funds on deposit in the collection account, the principal funding account, the spread account and the reserve account will be applied to pay principal of and interest on the Series 2000-1 notes to the extent permitted by law. Principal collections and finance charge collections allocated to Series 2000-1 will be applied to make monthly principal and interest payments on the Series 2000-1 notes until the earlier of the date those notes are paid in full or the final maturity date of those notes.

If the Series 2000-1 notes are accelerated or the issuer fails to pay the principal of the Series 2000-1 notes on the final maturity date, subject to certain conditions described in the offering memorandum under "The Indenture—Events of Default; Rights upon Event of Default," the indenture trustee may, if legally permitted, cause the trust to sell principal receivables in an amount equal to the invested amount for Series 2000-1 and the related finance charge receivables.

## Other Interests in the Trust

### Other Series of Notes

The trust will issue other series of notes secured by the assets of the trust from time to time in the future. The issuance of future series

FDIC00471

will occur without prior review or consent by you or any other noteholder.

### The Transferor Interest

The interest in the trust not securing your series or any other series is the transferor interest. The transferor interest is owned by the transferor. The transferor may, however, sell all or a portion of its interest in the transferor interest. The transferor interest does not provide credit enhancement for your series or any other series.

### The Receivables

The primary assets of the trust are receivables in VISA [*] and MasterCard [*] revolving credit card accounts. The receivables consist of principal receivables and finance charge receivables.

The following information is as of September 30, 2000:

- Receivables in the trust: $920,476,709

- Accounts designated to the trust: 591,467

For more information, see *"Receivables Performance"* and *"The Trust Portfolio"* in this offering memorandum supplement.

### Servicing and Allocations of Collections

The bank, as servicer, will collect payments on the receivables and will deposit those collections in an account. It will keep track of those collections that are finance charge receivables and those that are principal receivables. First Data Resources, Inc. performs certain core processing services for the bank. See *"The Bank's Credit Card Activities"* in the accompanying offering memorandum.

The servicer will daily allocate collections received among:

- your series;

- other series outstanding; and

- the transferor interest in the trust.

---

[*]   VISA [*] and MasterCard [*] are federally registered servicemarks of VISA U.S.A. Inc. and MasterCard International Inc., respectively

The amount allocated to your series will be determined based mainly upon the size of the invested amount of your series compared to the total amount of principal receivables in the trust. At the time of issuance of the Series 2000-1 notes, the invested amount for Series 2000-1 will be $500,000,000.

You are entitled to receive payments of interest and principal only from collections of receivables and other trust assets allocated to your series. If the invested amount of your series declines, amounts allocated and available for payment to your series and to you may be reduced. For a description of the allocation calculations and the events which may lead to these reductions, see *"Description of Series Provisions—Allocation Percentages"* and *"—Reallocated Principal Collections"* in this offering memorandum supplement.

### Application of Collections

### Finance Charge Collections

The trust will apply your series' share of collections of finance charge receivables each month in the following order of priority:

- to pay the servicing fee;

- to pay interest on the Class A notes;

- to pay interest on the Class B notes;

- to pay interest on the Class C notes;

- to cover your series' allocation of defaulted receivables;

- to cover reductions in your series' invested amount resulting from investor charge-offs allocated to your series and from reallocated principal collections, in each case that have not been reimbursed;

- to pay interest on the Class D notes;

- upon the occurrence of an event of default with respect to Series 2000-1, to be applied as principal collections;

- to fund, in limited circumstances, a reserve account to cover interest payment shortfalls for Class A, Class B, Class C and Class D during the accumulation period;

- to fund, in limited circumstances, a spread account to cover interest and

FDIC00472

principal payment shortfalls for Class C and Class D notes;

- to fund any other amounts the trust may be liable for from time to time that are not otherwise provided for above; and

- to other series in group one or to the holders of the transferor certificates.

For a more detailed description of these applications, see *"Description of Series Provisions—Application of Collections"* in this offering memorandum supplement.

### *Principal Collections*

The trust will apply your series' share of principal collections each month as follows:

- During the revolving period, no principal will be paid to you or accumulated in a trust account. Instead, your series' share of principal collections will be treated as shared principal collections and may be available to make principal payments for other series or will be paid to the holders of the transferor certificates.

- The accumulation period is scheduled to begin on December 1, 2002, but may begin at a later date. During the accumulation period, your series' share of principal collections will be deposited in a trust account, up to a controlled deposit amount. On the expected principal payment date, amounts on deposit in that account will be paid first to the Class A noteholders, then to the Class B noteholders, then to the Class C noteholders and then to the Class D noteholders.

- If a redemption event (described below) that applies to Series 2000-1 or to all series occurs, the early amortization period could begin. During the early amortization period, your series' share of principal collections will be paid first to the Class A noteholders, then to the Class B noteholders, then to the Class C noteholders and then to the Class D noteholders.

- During any of the above periods, principal collections allocated to your series, may be reallocated, if necessary, to make required interest payments on the Class A notes, the Class B notes and the Class C notes, and required servicing fee payments, not made from available finance charge collections.

- Any remaining principal collections will first be made available to other series and then be paid to the holders of the transferor certificates or deposited in the special funding account.

For a more detailed description of these applications, see *"Description of Series Provisions—Application of Collections"* in this offering memorandum supplement.

### Redemption Events

The documents under which the Series 2000-1 notes will be issued include a list of adverse events known as redemption events. If a redemption event that applies to Series 2000-1 or to all series occurs, the trust will use collections of principal receivables allocated to Series 2000-1 each month to pay principal on the Series 2000-1 notes.

Redemption events may occur if the transferor fails to make required payments or deposits, violates other covenants and agreements or makes representations and warranties that are materially incorrect.

The following also are redemption events:

- The three-month average of the portfolio yield on the trust portfolio, calculated after subtracting the amount of receivables that are written off as uncollectible allocated to Series 2000-1, is less than the three-month average of the weighted average interest rate plus the servicing fee rate for Series 2000-1;

- The Class A notes, the Class B notes, the Class C notes or the Class D notes are not paid in full on their expected principal payment date;

- Certain bankruptcy, insolvency or similar events relating to the transferor;

FDIC00473

- The transferor is unable to transfer receivables to the trust as required under the transfer and servicing agreement;

- The transferor does not transfer receivables in additional accounts to the trust within 5 business days of when required under the transfer and servicing agreement;

- Certain defaults of the servicer;

- The trust becomes subject to regulation as an "investment company" under the Investment Company Act of 1940; or

- An event of default occurs for the Series 2000-1 notes and their maturity date is accelerated.

For a more detailed discussion of the redemption events, see *"Description of Series Provisions—Redemption Events"* in this offering memorandum supplement and *"Description of the Notes—Redemption Events"* in the accompanying offering memorandum.

**Optional Redemption**

The servicer has the option to repurchase your notes when the outstanding principal amount for your series has been reduced to 5% or less of the initial principal amount. See *"Description of the Notes—Final Payment of Principal; Termination"* in the accompanying offering memorandum.

**Denominations**

Beneficial interests in the Class A, the Class B and the Class C notes may be purchased in minimum denominations of $100,000 and multiples of $1,000 in excess of that amount.

**Registration, Clearance and Settlement**

The Class A, the Class B and the Class C notes will be delivered in book-entry form and will be registered in the name of Cede & Co., as the nominee of The Depository Trust Company. Except in certain limited circumstances, you will not receive a definitive instrument representing your notes. See *"Description of the Notes—Definitive Notes"* in the accompanying offering memorandum.

You may elect to hold your Class A, Class B or Class C notes through The Depository Trust Company, in the United States, or

Clearstream Banking, *société anonyme* or the Euroclear System, in Europe.

Transfers will be made in accordance with the rules and operating procedures of those clearing systems. See *"Description of the Notes—Book-Entry Registration"* in the accompanying offering memorandum.

**Tax Status**

Subject to important considerations described under *"Federal Income Tax Consequences"* in the accompanying offering memorandum, Orrick, Herrington & Sutcliffe LLP, as special tax counsel to the trust, is of the opinion that under existing law the Class A, the Class B and the Class C notes will be characterized as debt for federal income tax purposes. By your acceptance of a Class A, Class B or Class C note, you will agree to treat your Class A, Class B or Class C notes as debt for federal, state and local income and franchise tax purposes. See *"Federal Income Tax Consequences"* in the accompanying offering memorandum for additional information concerning the application of federal income tax laws.

**ERISA Considerations**

Subject to important considerations described under *"ERISA Considerations"* in this offering memorandum supplement and in the accompanying offering memorandum, the Class A, the Class B and the Class C notes are eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. A fiduciary or other person contemplating purchasing the Class A, the Class B or the Class C notes on behalf of or with plan assets of any plan or account should consult with its counsel regarding whether the purchase or holding of the Class A, the Class B or the Class C notes could give rise to a transaction prohibited or not otherwise permissible under ERISA or Section 4975 of the Internal Revenue Code.

**Exchange Listing**

We will apply to list the Class A, the Class B and the Class C notes on the Luxembourg Stock Exchange. We cannot guarantee that the application for the listing will be accepted.

FDIC00474

Class D Supplement to Offering Memorandum Supplement and Offering Memorandum Dated
December 6, 2000

# $17,500,000

# NextCard Credit Card Master Note Trust

Issuer

## NextBank, N.A.

Transferor and Servicer

## Series 2000-1 Class D Asset Backed Notes

<table>
<tr><td>Issue Price</td><td>100%</td></tr>
<tr><td>Interest rate per annum</td><td>One-month LIBOR plus 6.50%</td></tr>
<tr><td>Interest payment dates</td><td>Monthly on the 15th</td></tr>
<tr><td>Expected principal payment date</td><td>December 15, 2003</td></tr>
<tr><td>Final maturity date</td><td>December 15, 2006</td></tr>
</table>

You should consider carefully the risk factors beginning on page 9 in the offering memorandum.

A note is not a deposit and neither the notes nor the underlying accounts or receivables are insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency.

The notes are obligations of NextCard Credit Card Master Note Trust only and are not obligations of NextBank, N.A., NextCard, Inc. or any other person.

This offering memorandum supplement may be used to offer and sell the Class D notes only if accompanied by the offering memorandum.

The Class D notes are subordinated to the $357,500,000 Class A notes, the $67,500,000 Class B notes and the $57,500,000 Class C notes. A spread account provides credit enhancement for the Class C and Class D notes.

The attached offering memorandum supplement and accompanying offering memorandum relate to the prior offering of the Class A, the Class B and the Class C notes and should be read together with this Class D Supplement with respect to the offering of the Class D Notes.

We will deliver the Class D notes in definitive fully registered form beginning on or about March 15, 2001 (the "Class D Closing Date").

The Class D notes are being offered only to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act")). Any resale of the Class D notes or any interest or participation therein will be subject to restrictions under the Securities Act and as described under "Notice to Investors." You should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time or until final payment of principal thereof is made.

The Class D notes have not been registered with the Securities and Exchange Commission or any state securities commission. Neither the Securities and Exchange Commission nor any state securities commission has approved these notes or determined that this offering memorandum supplement and the accompanying offering memorandum are accurate or complete. Any representation to the contrary is a criminal offense.

# Goldman, Sachs & Co.

## Placement Agent

March 15, 2001

# TABLE OF CONTENTS

| | Page |
|---|---|
| Important Notice about Information Presented in this Class D Supplement and the Accompanying Offering Memorandum Supplement and Offering Memorandum | CD-3 |
| Notice to Investors | CD-4 |
| Transaction Summary | CD-6 |
| Summary of Terms | CD-7 |
| Maturity Considerations | CD-12 |
| ERISA Considerations | CD-13 |
| Federal Income Tax Consequences | CD-14 |
| Plan of Distribution | CD-18 |
| Index of Terms for Class D Supplement | CD-20 |
| Form of Investor Representation Letter | CD-21 |

DOCSSF1:516610.3
13424-1 DS6

FDIC00594

## Transaction Summary

Trust:                                          NextCard Credit Card Master Note Trust
Transferor and Servicer:                        NextBank, N.A.
Indenture Trustee:                              The Bank of New York
Owner Trustee:                                  Wilmington Trust Company
Class D Closing Date(s):                        Beginning on or about March 15, 2001
Servicing Fee Rate:                             2.00% per annum
Primary Trust Assets:                           Receivables originated in VISA® and MasterCard® accounts

| | **Class D** |
|---|---|
| Principal Amount: | $17,500,000 |
| Percentage of Series: | 3.5% |
| Ratings: | |
| Moody's/Standard & Poor's | Ba2/BB |
| Credit Enhancement: | Spread account for Class C Notes and Class D Notes |
| Interest Rate Per Annum: | One-month LIBOR plus 6.50% |
| Interest Accrual Method: | actual/360 |
| Interest Payment Dates: | Monthly (15th) |
| Interest Rate Index Reset Date: | 2 London business days before each interest payment date |
| First Interest Payment Date: | January 15, 2001 |
| Expected Principal Payment Date: | December 15, 2003 |
| Commencement of Accumulation Period (subject to adjustment): | December 1, 2002 |
| Final Maturity Date: | December 15, 2006 |

ERISA eligibility: (investors should consult with their counsel)

Not eligible. See "ERISA Considerations" in this Class D supplement and in the accompanying offering memorandum.

Status for United States Federal Income Tax Purposes: (investors should consult with their tax counsel)

Reported by the Transferor as debt, but see important considerations described under "Federal Income Tax Consequences" in this Class D Supplement and in the accompanying offering memorandum. No opinion will be rendered regarding the status of the Class D Notes for Federal or any state tax purpose.

## Summary of Terms

*This summary highlights selected information and does not contain all of the information that you need to consider in making your investment decision. You should carefully read this entire document and the accompanying offering memorandum supplement and offering memorandum before you purchase any Class D notes. You should consider carefully the risk factors beginning on page 9 in the accompanying offering memorandum before making an investment in the Class D notes.*

### The Issuer

The notes were issued by NextCard Credit Card Master Note Trust, a Delaware statutory business trust, pursuant to an indenture supplement to an indenture, each between the trust and the indenture trustee.

The indenture trustee is The Bank of New York.

### Offered Securities

#### Interest

The Class D notes bear interest at one-month LIBOR as determined each month plus 6.50% per annum.

For each class of the Series 2000-1 notes, interest will be calculated as follows:

$$\frac{\text{Principal balance at end of prior monthly period} \times \text{Number of days in interest period} \times \text{Interest rate}}{360}$$

Each interest period begins on and includes a distribution date and ends on but excludes the next distribution date. However, the first interest period will begin on and include the closing date.

Interest on the Class D notes is paid on each distribution date, beginning on January 15, 2001 and the 15th day of each following month if the 15th is a business day and, if not, the following business day.

You may obtain the interest rates for the current interest period and the immediately preceding interest period by telephoning the indenture trustee at (212) 853-5738.

See *"Description of Series Provisions— Interest Payments"* in the accompanying offering memorandum supplement for a description of how and when LIBOR will be determined.

### Principal

Principal of each of the Class A, the Class B, the Class C and the Class D notes is expected to be paid in full on the December 15, 2003 distribution date. This date is referred to as the expected principal payment date for each of the Class A, the Class B, the Class C and the Class D notes. However, no principal will be paid on the Class D notes until the Class A notes, the Class B notes and the Class C notes are paid in full.

We are scheduled to begin accumulating collections of principal receivables starting December 1, 2002 for payment to the Class A, the Class B, the Class C and the Class D noteholders on the expected principal payment date for each class of notes, but we may begin accumulating at a later date.

Principal of the Class A, the Class B, the Class C and the Class D notes may be paid earlier or later than the expected principal payment date. If specified adverse events known as redemption events occur, principal may be paid earlier than expected. If collections of the credit card receivables are less than expected or are collected more slowly than expected, then principal payments may be delayed. If the Class A, the Class B, the Class C and the Class D notes are not paid on the expected principal payment date, collections of principal receivables will continue to be used to pay principal on the Class A, the Class B, the Class C and the Class D notes until the notes are paid or until the final maturity date of December 15, 2006, whichever occurs first. You will not be entitled to any premium for early or late payment of principal.

For more information about principal payments, see *"Maturity Considerations"* in this Class D Supplement and *"Description of Series Provisions—Principal Payments"* and *"— Allocation Percentages"* in the accompanying offering memorandum supplement.

FDIC00599

## Credit Enhancement

Credit enhancement for the Class C and Class D notes is provided by the spread account.

The subordination of the Class D notes provides credit enhancement for the Class A Notes, the Class B Notes and the Class C Notes.

Credit enhancement for your series is for your series' benefit only, and you are not entitled to the benefits of credit enhancement available to other series.

For more information about credit enhancement, see *"Description of Series Provisions—Reallocated Principal Collections," "—Application of Collections"* and *"—Defaulted Receivables; Investor Charge-Offs"* in the accompanying offering memorandum supplement.

## Spread Account

A spread account provides credit enhancement for the Class C notes and the Class D notes. The spread account is not available to fund payments with respect to the Class A notes or the Class B notes, except following an event of default and, only after payment in full of the Class C and Class D notes. The spread account was initially funded in an amount equal to 4.0% of the Series 2000-1 notes. Deposits into the spread account are required to be made each month from Available Finance Charge Collections up to the Required Spread Account Amount as described in the offering memorandum supplement under *"Description of Series Provisions—Spread Account."* As described in the offering memorandum supplement under *"Description of the Series Provisions—Spread Account Distributions,"* the spread account will be used to make payments on the Class C notes and the Class D notes if collections of receivables allocated to the Series 2000-1 notes are insufficient to make certain required payments on the Class C notes or the Class D notes.

## Events of Default

The Series 2000-1 notes are subject to specified events of default described under *"The Indenture—Events of Default; Rights upon Event of Default"* in the accompanying offering

memorandum. These include, among other things, the failure to pay interest on or prior to the distribution date following the distribution date on which it was due or to pay principal when it is due on the final maturity date.

In the case of an event of default involving certain bankruptcy, insolvency or similar events relating to the trust, the principal amount of the Series 2000-1 notes automatically will be deemed to be immediately due and payable. If any other event of default occurs and continues with respect to the Series 2000-1 notes, the indenture trustee or holders of more than 50% of the then-outstanding principal balance of those notes may declare the principal amount of the notes to be immediately due and payable. These declarations may, under certain circumstances, be rescinded by holders of more than 50% of the then-outstanding principal balance of the Series 2000-1 notes.

After an event of default and the acceleration of the Series 2000-1 notes, funds on deposit in the collection account, the principal funding account, the spread account and the reserve account will be applied to pay principal of and interest on the Series 2000-1 notes to the extent permitted by law. Principal collections and finance charge collections allocated to Series 2000-1 will be applied to make monthly principal and interest payments on the Series 2000-1 notes until the earlier of the date those notes are paid in full or the final maturity date of those notes.

If the Series 2000-1 notes are accelerated or the issuer fails to pay the principal of the Series 2000-1 notes on the final maturity date, subject to certain conditions described in the offering memorandum under *"The Indenture—Events of Default; Rights upon Event of Default,"* the indenture trustee may, if legally permitted, cause the trust to sell principal receivables in an amount equal to the invested amount for Series 2000-1 and the related finance charge receivables.

## Other Interests in the Trust

### Other Series of Notes

The trust will issue other series of notes secured by the assets of the trust from time to time in the future. The issuance of future series will occur without prior review or consent by you or any other noteholder.

## The Transferor Interest

The interest in the trust not securing your series or any other series is the transferor interest. The transferor interest is owned by the transferor. The transferor may, however, sell all or a portion of its interest in the transferor interest. The transferor interest does not provide credit enhancement for your series or any other series.

## Servicing and Allocations of Collections

The bank, as servicer, collects payments on the receivables and deposits those collections in an account. It keeps track of those collections that are finance charge receivables and those that are principal receivables. First Data Resources, Inc. performs certain core processing services for the bank. See "*The Bank's Credit Card Activities*" in the accompanying offering memorandum.

The servicer daily allocates collections received among:

- your series;
- other series outstanding; and
- the transferor interest in the trust.

The amount allocated to your series is determined based mainly upon the size of the invested amount of your series compared to the total amount of principal receivables in the trust. At the time of issuance of the Series 2000-1 notes, the invested amount for Series 2000-1 was $500,000,000.

You are entitled to receive payments of interest and principal only from collections of receivables and other trust assets allocated to your series. If the invested amount of your series declines, amounts allocated and available for payment to your series and to you may be reduced. For a description of the allocation calculations and the events which may lead to these reductions, see "*Description of Series Provisions—Allocation Percentages*" and "*—Reallocated Principal Collections*" in the accompanying offering memorandum supplement.

## Application of Collections

### Finance Charge Collections

The trust applies your series' share of collections of finance charge receivables each month in the following order of priority:

- to pay the servicing fee;
- to pay interest on the Class A notes;
- to pay interest on the Class B notes;
- to pay interest on the Class C notes;
- to cover your series' allocation of defaulted receivables;
- to cover reductions in your series' invested amount resulting from investor charge-offs allocated to your series and from reallocated principal collections, in each case that have not been reimbursed;
- to pay interest on the Class D notes;
- upon the occurrence of an event of default with respect to Series 2000-1, to be applied as principal collections;
- to fund, in limited circumstances, a reserve account to cover interest payment shortfalls for Class A, Class B, Class C and Class D during the accumulation period;
- to fund, in limited circumstances, a spread account to cover interest and principal payment shortfalls for Class C and Class D notes;
- to fund any other amounts the trust may be liable for from time to time that are not otherwise provided for above; and
- to other series in group one or to the holders of the transferor certificates.

For a more detailed description of these applications, see "*Description of Series Provisions—Application of Collections*" in the accompanying offering memorandum supplement.

### Principal Collections

The trust applies your series' share of principal collections each month as follows:

**FDIC00601**

- During the revolving period, no principal will be paid to you or accumulated in a trust account. Instead, your series' share of principal collections is treated as shared principal collections and may be available to make principal payments for other series or be paid to the holders of the transferor certificates.

- The accumulation period is scheduled to begin on December 1, 2002, but may begin at a later date. During the accumulation period, your series' share of principal collections will be deposited in a trust account, up to a controlled deposit amount. On the expected principal payment date, amounts on deposit in that account will be paid first to the Class A noteholders, then to the Class B noteholders, then to the Class C noteholders and then to the Class D noteholders.

- If a redemption event (described below) that applies to Series 2000-1 or to all series occurs, the early amortization period could begin. During the early amortization period, your series' share of principal collections will be paid first to the Class A noteholders, then to the Class B noteholders, then to the Class C noteholders and then to the Class D noteholders.

- During any of the above periods, principal collections allocated to your series, may be reallocated, if necessary, to make required interest payments on the Class A notes, the Class B notes and the Class C notes and required servicing fee payments, not made from available finance charge collections.

- Any remaining principal collections will first be made available to other series and then be paid to the holders of the transferor certificates or deposited in the special funding account.

For a more detailed description of these applications, see *"Description of Series Provisions—Application of Collections"* in the accompanying offering memorandum supplement.

## Redemption Events

The documents under which the Series 2000-1 notes were issued include a list of adverse events known as redemption events. If a redemption event that applies to Series 2000-1 or to all series occurs, the trust will use collections of principal receivables allocated to Series 2000-1 each month to pay principal on the Series 2000-1 notes.

Redemption events may occur if the transferor fails to make required payments or deposits, violates other covenants and agreements or makes representations and warranties that are materially incorrect.

The following also are redemption events:

- The three-month average of the portfolio yield on the trust portfolio, calculated after subtracting the amount of receivables that are written off as uncollectible allocated to Series 2000-1, is less than the three-month average of the weighted average interest rate plus the servicing fee rate for Series 2000-1;

- The Class A notes, the Class B notes, the Class C notes or the Class D notes are not paid in full on their expected principal payment date;

- Certain bankruptcy, insolvency or similar events relating to the transferor;

- The transferor is unable to transfer receivables to the trust as required under the transfer and servicing agreement;

- The transferor does not transfer receivables in additional accounts to the trust within 5 business days of when required under the transfer and servicing agreement;

- Certain defaults of the servicer;

- The trust becomes subject to regulation as an "investment company" under the Investment Company Act of 1940; or

- An event of default occurs for the Series 2000-1 notes and their maturity date is accelerated.

For a more detailed discussion of the redemption events, see *"Description of Series Provisions—Redemption Events"* in the accompanying offering memorandum supplement and *"Description of the Notes— Redemption Events"* in the accompanying offering memorandum.

## Optional Redemption

The servicer has the option to repurchase your notes when the outstanding principal amount for your series has been reduced to 5% or less of the initial principal amount. See *"Description of the Notes—Final Payment of Principal; Termination"* in the accompanying offering memorandum.

## Denominations

Beneficial interests in the Class D notes may be purchased in minimum denominations of $100,000 and multiples of $1,000 in excess of that amount.

## Registration

The Class D notes will be delivered in definitive fully registered form.

## Tax Status

For a discussion of certain tax consequences to purchasers of the Class D notes, see "Certain Tax Consequences" herein.

## ERISA Considerations

The Class D notes may not be sold or transferred to any employee benefit or other plan subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") (each, a "**Plan**"), to any person acting on behalf of or with "plan assets" of any Plan, or to any other "benefit plan investor" (as defined in U.S. Department of Labor Regulation Section 2510.3-101(f)(2) (a "**Benefit Plan Investor**"), including an insurance company general account or an employee benefit plan that is not subject to Title I of ERISA, such as a foreign plan, except in accordance with the restrictions set forth herein. See "ERISA Considerations" herein.

FDIC00603

DOCSSF1:516610.3
10424-1 DS6

Offering Circular

# NextCard Credit Card Master Note Trust

Issuer

## NextBank, N.A.

Transferor and Servicer

## Asset Backed Notes

**The Trust —**

- may periodically issue asset backed notes in one or more series with one or more classes; and

- will have an interest in —

    - receivables in a portfolio of VISA® and MasterCard® revolving credit card accounts;

    - payments due on those receivables; and

    - other property described in this offering circular and in the accompanying offering circular supplement.

**The Notes —**

- will be paid only from the trust assets;

- may have one or more forms of credit enhancement; and

- will be issued as part of a designated series which may include one or more classes of notes and credit enhancement.

---

You should consider carefully the risk factors beginning on page 8 in this offering circular.

A note is not a deposit and neither the notes nor the underlying accounts or receivables are insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency.

The notes are obligations of NextCard Credit Card Master Note Trust only and are not obligations of NextBank, N.A., NextCard, Inc. or any other person.

This offering circular may be used to offer and sell notes of a series only if accompanied by the offering circular supplement for that series.

---

The notes have not been registered with the Securities and Exchange Commission or any state securities commission. Neither the Securities and Exchange Commission nor any state securities commission has approved these notes or determined that this offering circular and the accompanying offering circular supplement are accurate or complete. Any representation to the contrary is a criminal offense.

April 20, 2001

FDIC00868

## TABLE OF CONTENTS

**Page**

IMPORTANT NOTICE ABOUT INFORMATION
    PRESENTED IN THIS OFFERING CIRCULAR
    AND THE ACCOMPANYING OFFERING
    CIRCULAR SUPPLEMENT .................3
OFFERING CIRCULAR SUMMARY...................4
RISK FACTORS.......................................8
THE ISSUER.........................................17
THE BANK'S CREDIT CARD ACTIVITIES...................17
THE TRUST PORTFOLIO.............................23
MATURITY CONSIDERATIONS..........................24

**Page**

USE OF PROCEEDS........................................25
DESCRIPTION OF THE NOTES .........................25
THE INDENTURE .........................................51
CREDIT ENHANCEMENT ................................56
NOTES RATINGS .........................................58
CERTAIN LEGAL ASPECTS OF THE RECEIVABLES....59
FEDERAL INCOME TAX CONSEQUENCES..................61
ERISA CONSIDERATIONS................................64
REPORTS TO NOTEHOLDERS .............................64
INDEX OF TERMS FOR OFFERING CIRCULAR .............65
ANNEX I GLOBAL CLEARANCE, SETTLEMENT
    AND TAX DOCUMENTATION PROCEDURES....A-1

FDIC00869

## Important Notice about Information Presented in this
## Offering Circular and the Accompanying Offering Circular Supplement

We provide information to you about the notes in two separate documents: (a) this offering circular, which provides general information, some of which may not apply to your series of notes, and (b) the accompanying offering circular supplement, which describes the specific terms of your series of notes, including:

- the terms, including interest rates, for each class being offered;

- the timing of interest and principal payments;

- information about the receivables;

- information about credit enhancement, if any, for each class;

- the ratings for each class being offered; and

- the method for selling the notes.

If the terms of your series of notes vary between this offering circular and the accompanying offering circular supplement, you should rely on the information in the offering circular supplement.

You should rely only on the information provided in this offering circular and the accompanying offering circular supplement. We have not authorized anyone to provide you with different information. We are not offering the notes in any state where the offer is not permitted.

We include cross references in this offering circular and the accompanying offering circular supplement to captions in these materials where you can find further related discussions. The following Table of Contents and the Table of Contents in the accompanying offering circular supplement provide the pages on which these captions are located.

This offering circular uses defined terms. You can find a listing of the pages where definitions can be found under the caption *"Index of Terms for Offering Circular"* beginning on page 65 in this offering circular.

FDIC00870

# Offering Circular Summary

*This summary highlights selected information and does not contain all of the information that you need to consider in making your investment decision. You should carefully read this entire document and the accompanying offering circular supplement before you purchase any notes.*

### Issuer

NextCard Credit Card Master Note Trust, a Delaware statutory business trust, is the issuer of the notes. The trust's principal place of business is located at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attention: Corporate Trust Administration. Its phone number is (302) 651-8951.

The trust is a master trust and will issue notes in series. Each series of notes will consist of one or more classes. The classes of a series may be issued at the same time or at different times. The notes of each series will be issued pursuant to an indenture supplement to an indenture, in each case between the trust and the indenture trustee.

Some classes or series may not be offered by this offering circular. They may be offered, for example, in a public offering.

### Indenture Trustee

The indenture trustee is the Bank of New York located at 101 Barclay Street, New York, New York 10286, (212) 815-2976.

### Transferor, Servicer and Administrator

NextBank, N.A., sometimes referred to herein as the "bank," is the transferor of the credit card receivables to the trust. The bank also will service the receivables for the trust and will act as the trust's administrator. Its address is 595 Market Street, Suite 1800, San Francisco, California 94105. Its phone number is (415) 836-9700. The bank is a wholly-owned subsidiary of NextCard, Inc.

Under the transfer and servicing agreement, the transferor may designate one or more of its affiliates to be an additional transferor. When we use the term "transferor" in this offering circular, we are including those additional transferors.

In limited cases, the servicer may resign or be removed, and either the indenture trustee or a third party may be appointed as the new servicer. The bank or any new servicer, is called the "servicer." The

servicer receives a servicing fee from the trust, and each series is obligated to pay a portion of that fee.

### Trust Assets

The bank is the account owner of the credit card receivables. It has designated selected VISA[*] and MasterCard[*] revolving credit card accounts from its portfolio and has transferred those receivables to the trust under the transfer and servicing agreement.

All new receivables generated in the accounts will be transferred automatically to the trust. The total amount of receivables in the trust fluctuates daily as new receivables are generated and payments are received on existing receivables.

The receivables transferred to the trust are the primary trust assets. Additional similar assets may be transferred to the trust as described under *"Description of the Notes —Addition of Trust Assets"* in this offering circular. The transferor may also remove receivables that it transferred to the trust as described under *"Description of the Notes — Removal of Accounts"* in this offering circular.

For more information about the receivables, see *"The Trust Portfolio"* in this offering circular.

### Collections and Allocations

The servicer receives collections on the receivables, deposits those collections in the collection account and keeps track of them as finance charge receivables or principal receivables.

The servicer then allocates those collections among each series of notes outstanding and the transferor interest. The servicer allocates (a) collections of finance charge receivables and principal receivables and (b) receivables in accounts written off as uncollectible to each series based on varying percentages. The accompanying offering circular supplement describes the allocation percentages applicable to your series.

---

[*]   VISA[*] and MasterCard[*] are federally registered servicemarks of VISA U.S.A., Inc. and MasterCard International Incorporated, respectively.

FDIC00871

The interest in the assets not allocated to any series of notes is the transferor interest. The principal amount of the transferor interest fluctuates with the amount of the principal receivables held in the trust and the amount of notes outstanding. The transfer and servicing agreement requires the transferor to transfer receivables in additional accounts to the trust (a) if the transferor interest, averaged over any 30-day period, is less than a designated size, referred to as the required transferor interest, or (b) if the total amount of principal receivables in the trust portfolio plus the principal amount of any participations transferred to the trust are less than a designated amount, referred to as the required minimum principal balance. The transferor may sell all or part of its interest in the transferor interest by issuing a supplemental certificate. The transferor interest does not provide credit enhancement for your series or any other series.

## Interest Payments on the Notes

Each note entitles the holder to receive payments of interest as described in the applicable offering circular supplement. If a series of notes consists of more than one class, each class may differ in, among other things, priority of payments, payment dates, interest rates, methods for computing interest, and rights to series enhancement.

Each class of notes may have fixed, floating or any other type of interest rate. Generally, interest will be paid monthly, quarterly, semi-annually or on other scheduled dates over the life of the notes. See *"Description of the Notes — Interest Payments"* in this offering circular.

## Principal Payments on the Notes

Each note entitles the holder to receive payments of principal as described in the applicable offering circular supplement. If a series of notes consists of more than one class, each class may differ in, among other things, the amounts allocated for principal payments, priority of payments, payment dates, maturity, and rights to series enhancement. See *"Description of the Notes — Principal Payments"* in this offering circular.

### Revolving Period

Each series of notes will begin with a period during which the trust will not pay or accumulate principal for payment to the noteholders. The period when no principal is paid or accumulated is known as the "revolving period." The trust, during the

revolving period, will pay available principal to noteholders of other series in a group as shared principal collections or to the transferor as holder of the transferor interest, or in certain circumstances will deposit the available principal in the special funding account. The revolving period for a series begins on the closing date described in the applicable offering circular supplement and ends at the start of an amortization period or an accumulation period.

Following the revolving period, each class of notes will have one or more of the following periods in which:

- principal is accumulated in specified amounts per month and paid on an expected principal payment date, known as a **"controlled accumulation period;"**

- principal is paid in fixed amounts at scheduled intervals, known as a **"controlled amortization period;"** or

- principal is paid or accumulated in varying amounts each month based on the amount of principal receivables collected following a redemption event, known as an **"early amortization period"** or **"early accumulation period,"** respectively.

### Controlled Accumulation Period

If a series or class of notes is in a controlled accumulation period, the trust is expected to pay available principal to those noteholders on the date specified in the offering circular supplement for that series. We call this date an **"expected principal payment date."** If the series has more than one class, each class may have a different priority for payment. For a period of time prior to the expected principal payment date, the trust will deposit specified amounts of available principal in a trust account. The controlled accumulation period for a series or class begins on a date specified in the applicable offering circular supplement and ends when any one of the following occurs:

- the notes of that series or class are paid in full;

- the early amortization or early accumulation period starts; or

- the latest date by which principal and interest for the series of notes can be paid, known as the "series final maturity date."

**FDIC00872**

5

*Controlled Amortization Period*

If a series or class of notes is in a controlled amortization period, the trust will pay available principal up to a fixed amount to those noteholders on each distribution date during that period. The trust will pay available principal in a fixed amount, plus any amounts not previously paid. If the series has more than one class, each class may have a different priority for payment. The controlled amortization period for a series or class starts on the date specified in the applicable offering circular supplement and ends when any one of the following occurs:

- the notes of that series or class are paid in full;

- the early amortization or early accumulation period starts; or

- the series final maturity date.

*Early Amortization or Accumulation Period*

If a series or class of notes is in an early amortization or early accumulation period, the trust will pay available principal to those noteholders on each distribution date or accumulate available principal by making a deposit into an account on each distribution date. If the series has more than one class, each class may have a different priority for payment. The early amortization period or early accumulation period for a series or class starts on the day a redemption event occurs and ends when either of the following occurs:

- the notes of that series or class are paid in full; or

- the series final maturity date.

*Redemption Events*

A redemption event for any series of notes will include adverse events described in the offering circular supplement for that series. In addition, the following will be redemption events for all series:

- certain bankruptcy, insolvency or similar events relating to the transferor;

- the transferor is unable to transfer receivables to the trust as required under the transfer and servicing agreement; or

- the trust becomes subject to regulation as an "investment company" under the Investment Company Act of 1940.

See *"Description of the Notes — Redemption Events"* in this offering circular.

**Events of Default**

The indenture and related indenture supplement governing the terms and conditions of the notes include a list of adverse events called events of default.

If an event of default occurs, then, after any applicable cure period, the indenture trustee or the holders of a majority in principal amount of the affected series of notes may accelerate those notes by declaring the principal amount of those notes to be immediately due and payable. That declaration may, under certain circumstances, be rescinded by the holders of a majority in principal amount of the affected series of notes.

Events of default include the following:

- the trust fails to pay interest on any note on or prior to the distribution date following the distribution date on which it was due;

- the trust fails to pay in full principal on any note when it is due;

- the trust defaults on any covenant or breaches any agreement under the indenture, the default or breach is materially adverse to noteholders and the default or breach continues unremedied for 60 days after written notice of the default or breach is given to the trust by the indenture trustee or to the trust and the indenture trustee by holders of at least 50% in principal amount of the affected notes; or

- the occurrence of certain bankruptcy, insolvency, reorganization or similar events relating to the trust.

It is not an event of default if the principal of a note is not paid on its expected principal payment date.

After an event of default and the acceleration of a series of notes, funds on deposit in the collection account and any trust accounts with respect to that series will be applied to pay principal of and interest on those notes to the extent permitted by law. After an event of default, principal collections and finance charge collections allocated to the series of notes will be applied to make monthly principal and interest

6

FDIC00873

payments on those notes until the earlier of the date those notes are paid in full or the final maturity date of those notes.

See *"The Indenture — Events of Default; Rights upon Event of Default"* in this offering circular for a description of the events of default and their consequences to noteholders.

## Shared Excess Finance Charge Collections

Any series may be included in a group of series. If specified in the offering circular supplement for any of these series, to the extent that collections of finance charge receivables allocated to a series are not needed for that series, those collections may be applied to cover certain shortfalls of other series in the same group. See *"Description of the Notes — Shared Excess Finance Charge Collections"* in this offering circular.

## Shared Principal Collections

If a series is identified in its offering circular supplement as being in a group of series, to the extent that collections of principal receivables allocated to that series are not needed for that series, those collections may be applied to cover principal payments for other principal sharing series in the same group, and vice versa. Certain principal payments for certain principal sharing series in the same group may have priority in receiving those collections over other principal payments for other principal sharing series in that group.

See *"Description of the Notes — Shared Principal Collections"* in this offering circular.

## Credit Enhancement

Each class of a series may be entitled to credit enhancement. Credit enhancement for the notes of any class may take the form of one or more of the following:

- subordination
- collateral interest
- insurance policy
- cash collateral guaranty or account
- swap arrangements
- interest rate cap agreement
- letter of credit
- surety bond
- spread account
- reserve account
- guaranteed rate agreement
- tax protection agreement

The type, characteristics and amount of any credit enhancement for a series will be:

- based on several factors, including the characteristics of the receivables and accounts at the time a series of notes is issued; and
- established based on the requirements of the rating agencies.

See *"Credit Enhancement"* in this offering circular.

## Tax Status

Subject to important considerations described under *"Federal Income Tax Consequences"* in this offering circular, Orrick, Herrington & Sutcliffe LLP, as special tax counsel to the trust, is of the opinion that, for United States federal income tax purposes (1) except as provided in the related offering circular supplement, the notes will be treated as indebtedness and (2) the trust will not be an association or a publicly traded partnership taxable as a corporation. In addition, noteholders will agree, by acquiring notes, to treat the notes as debt of the transferor for federal, state and local income and franchise tax purposes.

## Note Ratings

As specified in the accompanying offering circular supplement, the notes offered by this offering circular and an accompanying offering circular supplement may be rated by one or more nationally recognized rating organizations. A rating is not a recommendation to buy, sell or hold securities, and may be revised or withdrawn at any time by the assigning agency. Each rating should be evaluated independently of any other rating. See *"Note Ratings"* in this offering circular.

FDIC00874

7

## Risk Factors

*You should* consider *the following risk factors in deciding whether to purchase the notes.*

**It may not be possible to find an investor to purchase your notes.**

You may have limited ability to sell your notes. The initial purchasers may assist in resales of the notes but they are not required to do so. A secondary market for any notes may not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow you to resell any of your notes.

You may not resell or transfer your notes unless all conditions to resale and transfer in the indenture and indenture supplement are satisfied, and such notes are registered under the Securities Act and applicable state securities laws or an exemption from such registration is available. None of the transferor, NextCard, Inc. or the trust is required to register the notes at any time under any law. Accordingly, you may transfer the notes, or any interest or participation therein, only as provided in the indenture and indenture supplement and as described in this offering circular and the accompanying offering circular supplement. The notes should be purchased only by investors who are sophisticated in business and financial matters, who have sufficient means to bear the risk of loss of their investment, who have substantial income and who have no need for liquidity with respect to their investment. See *"Notice to Investors"* and *"Plan of Distribution — Investment Considerations; Transfer Restrictions"* in the accompanying offering circular supplement.

**Some liens would be given priority over your notes which could cause delayed or reduced payments.**

A court could conclude that the transfer of receivables by the bank to the trust is not a sale but rather the grant of a security interest in those receivables. If so, and even though steps have been taken to give the trust and the indenture trustee a first priority perfected security interest in the receivables, other interests could be given preference. For instance, a tax or governmental lien (or other lien imposed under applicable state or federal law without consent) on the property of the bank arising before receivables come into existence may be senior to the trust's interest in the receivables. Additionally, if a receiver or conservator were appointed for the bank, the fees and expenses of the receiver or conservator might be paid from the receivables before the trust receives any payments on the receivables. If insolvency proceedings were commenced by or against the servicer or if certain time periods were to elapse, moreover, the trust may not have a first-priority perfected security interest in collections commingled with other funds of the servicer. If any of these events were to occur, payments to you could be delayed or reduced. See *"Certain Legal Aspects of the Receivables—Transfer of Receivables"* and *"Description of the Notes— Representations and Warranties"* in this offering circular.

FDIC00875

**If a conservator or receiver were appointed for the bank, delays or reductions in payment of your notes could occur.**

The bank is chartered as a national banking association and is regulated and supervised by the Office of the Comptroller of the Currency, which is authorized to appoint the Federal Deposit Insurance Corporation (the "FDIC") as conservator or receiver for the bank if certain events occur relating to the bank's financial condition or the propriety of its actions. In addition, the FDIC could appoint itself as conservator or receiver for the bank.

The Federal Deposit Insurance Act, as amended by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (the "FDIA"), provides that certain agreements and transfers of property by a financial institution cannot be enforced against the FDIC as conservator or receiver. Opinions and policy statements issued by the FDIC suggest that, because of the manner in which these transactions are structured, the FDIC would respect the security interest granted by the bank in the receivables pursuant to the transfer and servicing agreement. If the FDIC were to assert a contrary position, however, payments of principal and interest on your notes could be delayed and possibly reduced.

Even if the security interest were respected, the FDIC could:

- require the trust and the indenture trustee to go through the administrative claims procedure established by the FDIC in order to obtain collections on the receivables;

- request a stay of any actions by the trust or the indenture trustee to enforce the transfer and servicing agreement or the notes against the bank; or

- repudiate the transfer and servicing agreement and limit the claims of the trust and the holders of the notes to their "actual direct compensatory damages."

If the FDIC were to take any of these actions, the amount payable to you could be lower than the outstanding principal and accrued interest on the notes, thus resulting in losses to you.

In addition, regardless of the terms of the transfer and servicing agreement, the indenture, or the instructions of those authorized to direct the indenture trustee's actions, the FDIC may have the power (i) to prevent or require the commencement of an early amortization period, (ii) to prevent, limit, or require the early liquidation of the receivables and termination of the trust, or (iii) to require, prohibit, or limit the continued transfer of receivables to the trust. The FDIC, moreover, could prevent the trust, the indenture trustee, or the noteholders from appointing a successor servicer under the transfer and servicing agreement. If any of these events were to occur, payments to noteholders could be delayed or reduced.

See *"Certain Legal Aspects of the Receivables—Certain Matters Relating to Conservatorship, Receivership and Bankruptcy"* in this offering circular.

FDIC00876

**The account owner may change the terms and conditions of the accounts in a way that reduces collections.**

As owner of the accounts, the bank retains the right to change various account terms including finance charges, other fees and the required monthly minimum payment. However, the bank may not reduce the rate at which finance charges accrue or other fees are assessed if such reduction could reasonably be expected to cause a redemption event or event of default to occur, or if such reduction is not also applied to similar accounts of the bank and not just accounts designated for the trust, unless such reduction is required by law or market conditions. Changes in interest and fees could decrease the effective yield on the accounts and this could result in an early payment of principal of your notes. Changes could also cause a reduction in the credit ratings on your notes.

**Changes to consumer protection laws may impede collection efforts or reduce collections.**

Federal and state consumer protection laws regulate the creation and enforcement of consumer loans, including credit card accounts and receivables. Changes or additions to those regulations could make it more difficult for the servicer of the receivables to collect payments on the receivables or reduce the finance charges and other fees that the account owner can charge on credit card account balances, resulting in reduced collections.

Receivables that do not comply with consumer protection laws may not be valid or enforceable under their terms against the obligors on those receivables.

If a cardholder sought protection under federal or state bankruptcy or debtor relief laws, a court could reduce or discharge completely the cardholder's obligations to repay amounts due on its account and, as a result, the related receivables would be written off as uncollectible. See *"Certain Legal Aspects of the Receivables-Consumer Protection Laws"* in this offering circular.

**The start-up nature of the bank's business makes the possibility of higher delinquency and/or default rates on the receivables, the occurrence of a redemption event, or a transfer of servicing more likely than under a more established program.**

*Limited Operating History and Losses.* The bank and its affiliates have had an operating history of credit card originations only since December 1997 and even more limited experience in the servicing of credit card receivables. From its inception until the date hereof, NextCard, Inc., the parent of the bank, has not achieved profitability and expects to incur net losses for at least the next year. NextCard, Inc. cannot be certain that it will be able either to maintain its recent revenue growth rates or to generate adequate revenue to achieve profitability. If NextCard, Inc.'s revenue does not meet its internally developed projections, its net losses will be even greater than anticipated and the business, operating results and financial condition of the bank and its affiliates may be materially and adversely affected. Failure to achieve break-even status or profitability within the expected time frames might result in the inability of the bank and its affiliates to continue as going concerns, which could result in a redemption event and/or a transfer of servicing. Any transfer of servicing is likely to result in temporary disruptions in payments on your notes.

FDIC00877

*An Unseasoned Credit Card Portfolio Makes Prediction of Delinquency and Loss Levels Difficult.* The trust will be formed in December 2000 and will have no substantial assets other than its interest in the receivables conveyed to the trust and the proceeds from these receivables. As of February 28, 2001 approximately 61% of the accounts in the trust portfolio had been originated within the last 12 months and approximately 94% of the accounts in the trust portfolio had been originated within the last 24 months. As a result, the current portfolio history may not be indicative of the portfolio performance as the receivables and accounts mature. The bank anticipates that the level of future credit losses will increase as the trust portfolio continues to increase in size and season.

*Dependence on External Financing Facilities.* The bank is dependent on continued access to short- and long-term sources of funding for its continued operations. To the extent that the bank or its affiliates are unable to maintain existing facilities, arrange new warehouse, repurchase or other credit facilities or obtain additional commitments to sell or securitize receivables for cash, the bank may have to curtail its current rate of originations. If this occurs, it will have a material adverse effect on the bank's ability to replace paid off receivables in the pool with new receivables, which will adversely affect the yield to maturity of your notes and might result in a redemption event.

*Interest Rate on the Receivables is Subject to Change and is Affected by Incentive Programs.* To attract new customers, the bank has offered and may continue to offer low introductory interest rates that increase after expiration of the introductory period. In addition, the bank offers fixed rate products that may increase if customers fail to pay their credit card bills on a timely, consistent basis. Given the bank's limited operating history, there can be no assurance what percentage of customers will continue to use their NextCard credit cards after they are re-priced. If fewer customers than anticipated continue to use their NextCard credit cards after they are re-priced and/or pay off existing balances in faster than anticipated amounts, the required portfolio yield for your series of notes may not be achieved on a consistent basis, which could result in a redemption event.

*Credit Card Originations are Being Made to an Untested Customer Base.* The bank targets its credit card products to Internet users, which are an emerging market segment. As such, there is less historical experience with respect to the credit risk and performance of these consumers. The bank has limited experience developing and implementing proprietary credit criteria. As a result, as compared to issuers targeting traditional market segments any or all of the following could occur:

- a greater number of cardholder payment defaults or other unfavorable payment behavior;

- an increase in fraud by its cardholders or third parties; and

- changes in the traditional patterns of customer loyalty and usage.

FDIC00878

In addition, because the bank is targeting a new customer base, it has comparatively little information about the potential size of its target market, its customer usage patterns and other factors that could significantly affect the demand for its products and services. Moreover, general economic factors, such as the rate of inflation, unemployment levels and interest rates may affect its target market customers more severely than other market segments, which could increase its delinquencies and losses. If any of these events occur the yield on your class of notes will be adversely affected, and if greater than anticipated losses occur you may not recover the full amount of principal on your notes.

*Intense and Increasing Competition Could Negatively Impact Your Investment.* The financial services market is rapidly evolving and intensely competitive. The Gramm-Leach-Bliley Act of 1999, which permits the affiliation of commercial banks, insurance companies and securities firms, may increase the level of competition in the financial services market, including the credit card business. The bank operates in this competitive environment with a number of other companies, many of whom have significantly longer operating histories, greater name recognition, larger customer bases and significantly greater financial, technical and marketing resources than it does. Other credit card issuers and traditional commercial banks may increasingly compete in the online credit card market. Existing Internet providers and new Internet entrants may launch new websites using commercially available software. In addition, companies that provide alternate online payment methods, such as debit card and micropayment offerings, may compete for business with the bank. While the credit card market traditionally has been very fragmented, the Internet could change traditional market dynamics and enable new competitors to rapidly acquire significant market share. Increased competition could require the bank to reduce the interest rates it charges on its customers' balances. This could have a material adverse effect on the portfolio yield and thus on the yield earned on your notes. In addition such competitors may respond more quickly than the bank can to new or emerging technologies and changes in customer requirements. They may be able to:

- devote greater resources to the development, promotion and sale of their products and services;

- replicate the bank's products and services;

- engage in more extensive research and development;

- undertake farther-reaching marketing campaigns;

- adopt more aggressive pricing policies;

- make more attractive offers to existing and potential employees and strategic partners;

- more quickly develop new products and services or enhance existing products and services;

- bundle consumer products and services in a manner that the bank cannot provide; and

- establish cooperative relationships among themselves or with third parties, including large Internet participants, to increase the ability of their products and services to address the needs of prospective customers of the bank and its affiliates.

**FDIC00879**

The bank cannot assure you that it will be able to compete successfully in the marketplace or that competitive pressures will not materially and adversely affect its business, results of operation or financial condition and possibly result in a redemption event.

*The Website Has and May Continue to Experience Operating Difficulties.* NextCard, Inc.'s website has in the past experienced, and may in the future experience, slower than normal response times or other problems, such as system unavailability. Customers may become dissatisfied by any system failure that interrupts or delays the ability to provide services to them and may choose to either cancel or no longer use their NextCard credit cards. Any interruption or delay in its operations could materially and adversely affect both originations and collections. The bank's systems and operations also are vulnerable to damage or interruption from human error, natural disasters, power losses, telecommunication failures, break-ins, sabotage, computer viruses, acts of vandalism and similar events. The bank and its affiliates currently have not fully tested "end-to-end" back-up systems for many aspects of their operations. A failure of a single aspect of the bank's system could cause interruptions or delays in its entire operation, which may adversely affect its performance as servicer and may result in a transfer of servicing and temporary disruptions in payments on your notes. If such problems continue over any extended period of time, it might result in a redemption event due to higher delinquencies and/or increased default rates.

*A Servicing Transfer, If One Occurs, Could Be Disruptive To Servicing.* The occurrence of a redemption event may necessitate the transfer of servicing operations. During and immediately following a servicing transfer, interruptions in servicing may occur and the receivables may suffer a higher delinquency and/or default rate over a period of several months until a new servicer is fully able to service the portfolio on an on-going basis.

As demonstrated by the foregoing factors, there is a higher likelihood of greater than anticipated delinquencies and/or defaults, the occurrence of a redemption event, or a transfer of servicing, due to the start up nature of the business of the bank, than there would be under a more established credit card program. You should be aware that a higher delinquency rate may delay payment of principal to you and that a higher default rate may result in increased charge-offs allocated to your series of notes. As a result you may not receive the full amount of principal and interest due to you, resulting in a lower than anticipated yield or a loss of some or all of your investment. Also, if a redemption event occurs you may receive a faster repayment of principal on your notes than anticipated. You will bear the reinvestment risk associated with any accelerated repayments of principal.

**Limited remedies for breaches of representations could reduce or delay payments.**

The bank, as transferor of the receivables, makes representations and warranties relating to the validity and enforceability of the receivables arising under the accounts in the trust portfolio, and as to the perfection and priority of the trust's interest in the receivables. However, neither the owner trustee nor the indenture trustee will make any examination of the receivables or the related assets to determine the presence of defects, compliance with the representations and warranties or for any other purpose.

FDIC00880

A representation or warranty relating to the receivables may be violated if the related obligors have defenses to payment or offset rights, or creditors of the account owner or the transferor claim rights to the trust assets. If a representation or warranty is violated, the transferor may have an opportunity to cure the violation. If it is unable to cure the violation within the specified time period or if there is no right to cure the violation, the transferor must accept reassignment of the receivables affected by the violation. These reassignments are the only remedy for breaches of representations and warranties, even if your damages exceed your share of the reassignment price. See *"Description of the Notes—Representations and Warranties"* in this offering circular.

**Payment patterns of receivables could reduce collections.**

The receivables transferred to the trust may be paid at any time. We cannot assure the creation of additional receivables in the trust's accounts or that any particular pattern of cardholder payments will occur. A significant decline in the amount of new receivables generated could result in the occurrence of a redemption event for one or more series and the commencement of the early amortization period or, if applicable, the early accumulation period for each of those series. If a redemption event occurs, you could receive payment of principal sooner than expected. The bank's ability to compete in the current industry environment will affect its ability to generate new receivables and might also affect payment patterns on the receivables. In addition, changes in finance charges can alter the monthly payment rates of cardholders. A significant decrease in monthly payment rates could slow the return or accumulation of principal during an amortization period or accumulation period. See "Maturity Considerations" in this offering circular.

**Subordinated classes bear losses before senior classes.**

One or more classes of notes in a series may be subordinated to one or more senior classes of notes in the same series. Principal allocations to the subordinated class or classes will not begin until each of the more senior classes has been paid in full. Additionally, if collections of finance charge receivables allocated to a series are insufficient to cover amounts due for that series' senior notes, the Invested Amount for the series might be reduced. This would reduce the amount of the collections of finance charge receivables available to the subordinated notes in future periods and could cause a possible delay or reduction in principal and interest payments on the subordinated notes.

**Allocations of charged-off receivables could reduce payments to you.**

The servicer will write off the receivables arising in accounts in the trust portfolio if the receivables become uncollectible. Your series will be allocated a portion of these charged-off receivables. See *"Description of Series Provisions—Allocation Percentages"* and *"Receivables Performance—Delinquency and Loss Experience"* in the accompanying offering circular supplement. If the amount of charged-off receivables allocated to your series of notes exceeds the amount of funds available to reimburse those charge-offs, you may not receive the full amount of principal and interest due to you. See *"Description of Series Provisions—Reallocated Principal Collections,"* *"— Application of Collections"* and *"— Defaulted Receivables; Investor Charge-Offs"* in the accompanying offering circular supplement.

FDIC00881



**Recharacterization of principal receivables would reduce principal receivables and may require addition of new receivables.**

As described under "*Description of the Notes — Discount Option*," the transferor may designate a percentage of the receivables that would otherwise be treated as principal receivables to be treated as finance charge receivables. This designation should decrease the likelihood of an early amortization event occurring as a result of a reduction of the average net portfolio yield for a given period. However, this designation will also reduce the aggregate amount of principal receivables, which may increase the likelihood that the transferor will be required to add receivables to the trust. If the transferor were unable to add receivables and could not make a sufficient cash deposit into the special funding account, one or more series of notes, including your series, could go into early amortization.

**The note interest rate and the receivables interest rate may re-set at different times, resulting in reduced or early payments to you.**

Some accounts may have finance charges set at a variable rate based on a designated index (for example, the prime rate). A series of notes may bear interest either at a fixed rate or at a floating rate based on a different index. If the interest rate charged on the accounts declines, collections of finance charge receivables may be reduced without a corresponding reduction in the amounts of interest payable on your notes and other amounts required to be paid out of collections of finance charge receivables. This could result in delayed or reduced payments to you.

A decrease in the spread, or difference, between collections of finance charge receivables and those collections allocated to make interest payments on your notes could reduce the portfolio yield and increase the risk of early repayment of your notes.

**Issuance of additional series by the trust may affect the timing of payments to you.**

The trust is expected to issue additional series from time to time. The trust may issue additional series with terms that are different from your series without your prior review or consent. It is a condition to the issuance of each new series that each rating agency that has rated an outstanding series confirm in writing that the issuance of the new series will not result in a reduction or withdrawal of its then-existing rating of any class of any outstanding series. The rating agency confirmation primarily will be based on the trust's ability to pay principal by the final maturity date and interest on each distribution date. The rating agency confirmation will not consider how the terms of a new series could affect the timing and amounts of payments on your series.

**Withdrawal or downgrading of initial ratings may adversely affect the resale prices for the notes.**

A security rating is not a recommendation to buy, sell or hold securities. Similar ratings on different types of securities do not necessarily mean the same thing. You should analyze the significance of each rating independently from any other rating. Any rating agency may change its rating of the notes after the notes are issued if that rating agency believes that circumstances have changed. Any subsequent withdrawal or downgrading of a rating may reduce the price that a subsequent purchaser will be willing to pay for the applicable notes and may reduce the liquidity of your notes.

FDIC00882

**The notes are not suitable investments for all investors.**

The notes are not a suitable investment for any investor that requires a regular or predictable schedule of payments or payment on specific dates. The notes are complex investments. Only investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment and default risks, the tax consequences of the investment and the interaction of these factors, should consider purchasing the notes.

16

FDIC00883

## The Issuer

NextCard Credit Card Master Note Trust is a statutory business trust created under the laws of the State of Delaware. It is operated under a trust agreement, dated as of December 1, 2000, between the bank, as transferor, and Wilmington Trust Company, as owner trustee. We refer to NextCard Credit Card Master Note Trust as the "**issuer**" or the "**trust**" and Wilmington Trust Company, in its capacity as owner trustee of the issuer, as the "**owner trustee.**"

The activities of the issuer are limited to:

- acquiring, owning and managing the trust assets and the proceeds of those assets;
- issuing and making payments on the notes; and
- engaging in related activities.

The activities of the issuer described above may be amended to provide for the transfer of the receivables from the trust to a bankruptcy remote special purpose entity and from such entity to the trust. Any such amendment may also provide for the bankruptcy remote special purpose entity to replace the bank as transferor under the trust agreement. Each noteholder, by acceptance of a note, shall be deemed to consent to any such amendment.

The bank, in its capacity as "**administrator**" under the administration agreement, dated as of December 1, 2000, between the administrator and the issuer, will provide the notices and perform on behalf of the issuer certain other administrative obligations required by the transfer and servicing agreement, the master indenture and the indenture supplement for each series, and will be compensated for acting as the administrator.

The issuer's principal offices are in Delaware, in care of Wilmington Trust Company, as owner trustee, at the following address: Rodney Square North, 1100 Market Street, Wilmington, Delaware 19890-0001, Attention: Corporate Trust Department.

The transferor will pay the fees of the owner trustee and will reimburse it for certain liabilities and expenses.

## The Bank's Credit Card Activities

### Overview

NextBank, N.A. (the "**bank**") is an Internet-based provider of consumer credit. The bank's parent, NextCard, Inc., was the first to offer instant online credit card approval and provide consumers with a choice of customized offers based on their unique credit profile and history. The bank markets NextCard credit cards to consumers through its website, www.nextcard.com (the "**NextCard Website**").

NextCard, Inc. began accepting applications for NextCard credit cards on December 23, 1997. Until September 30, 1999, all NextCard accounts were issued solely through a strategic alliance with Heritage Bank of Commerce ("**Heritage Bank**"), a San Jose, California based depository institution, using NextCard, Inc.'s underwriting criteria and other guidelines. NextCard, Inc. originated credit card relationships with potential customers and serviced the related credit card accounts on behalf of Heritage Bank pursuant to an Account Origination Agreement. Heritage Bank's obligation to establish new credit card accounts for NextCard, Inc. terminated in October 1999, and the bank acquired all the NextCard accounts originated by Heritage Bank on December 15, 1999.

The portfolio of credit card accounts owned by NextBank, N.A., referred to as the "**bank portfolio**," currently consists of VISA® and MasterCard® credit card accounts. Some of these accounts are designated as trust accounts. The receivables which will be included in the trust have been and will be generated from transactions made by holders of these trust accounts. The receivables which will be included in the trust will be serviced by the bank pursuant to the transfer and servicing agreement. Certain data processing and administrative functions associated with this servicing are performed on behalf of the bank by First Data Resources, Inc. ("**FDR**"). See *"— Description of FDR"* in this offering circular. The bank is an account owner, and as transferor, transfers receivables to the trust. In the future, the transferor may enter into receivables purchase agreements to purchase receivables from third parties and transfer such receivables to the trust, provided that the transferor has received written confirmation from each rating agency that such receivables purchase agreement will not result in a reduction or withdrawal of its

FDIC00884

vary seasonally and are also affected by general economic conditions and the payment habits of individual cardholders. The accompanying offering circular supplement will provide historical payment rates, delinquencies, total charge-offs and other information relating to the trust portfolio and, for certain historical periods prior to the availability of trust portfolio information, the bank portfolio. We cannot assure you that future events will be consistent with this historical performance. The life of your notes might be longer than expected if principal is collected more slowly. The accompanying offering circular supplement may provide that if the principal payment rate falls below a specified level, a redemption event will occur. The occurrence of any redemption event may substantially shorten the average life of your notes.

## Use of Proceeds

Net proceeds from the sale of each series of notes offered by this offering circular will be paid to the transferor. Unless otherwise specified in the related offering circular supplement, the transferor will use these net proceeds to reduce the outstanding principal amount of other series of notes issued to third party commercial paper conduits, purchase additional receivables or for general corporate purposes.

## Description of the Notes

The notes will be issued in series. Each series will represent an obligation of the trust. Each series of notes will be issued pursuant to the indenture, as supplemented by an indenture supplement, in each case entered into by the trust and The Bank of New York, as the "**indenture trustee.**" The following summaries describe certain provisions common to each series of notes. The accompanying offering circular supplement gives you additional information specific to the notes of your series. The summaries are not complete and are subject to, and are qualified by, all of the provisions of the transfer and servicing agreement, the indenture and the related indenture supplement.

### General

The notes will be secured by and paid from the assets of the trust. Each series will be allocated collections of principal receivables and finance charge receivables based on a percentage called the "**Investor Percentage.**" The Investor Percentage will be based on the Invested Amount for a series. The "**Invested Amount**" for a series on any date will be equal to:

- the initial outstanding principal amount of that series of notes as of the related closing date for that series (increased by the principal balance of any notes of that series issued after the closing date for that series); *minus*

- the amount of principal paid to the related noteholders prior to that date; *minus*

- the amount of unreimbursed Investor Charge-Offs with respect to that series prior to that date.

If so specified in the offering circular supplement relating to any series of notes, under certain circumstances the Invested Amount may be further adjusted by the amount of principal allocated to noteholders, the funds on deposit in any specified account, and any other amount specified in the accompanying offering circular supplement.

Each series of notes may consist of one or more classes, one or more of which may be senior notes and one or more of which may be subordinated notes. Each class of a series will evidence the right to receive a specified portion of each distribution of principal or interest or both. Each class of a series may differ from other classes in some aspects, including:

- amounts allocated to principal payments;

- maturity date;

- interest rate; and

- availability and amount of enhancement.

Payments and deposits of interest and principal will be made on distribution dates to noteholders in whose names the notes were registered on the record dates specified in the accompanying offering circular supplement.

FDIC00892

Interest will be distributed to noteholders in the amounts, for the periods and on the dates specified in the accompanying offering circular supplement.

The transferor initially will own the "**Transferor Interest**" which represents the right to receive all cash flows from the trust assets not required to make payments on the notes or to series enhancers. The holder of the Transferor Interest, subject to certain limitations, will have the right to a percentage, called the "**Transferor Percentage**," of all cardholder payments from the receivables in the trust. The Transferor Interest may be transferred, in whole or in part, subject to certain limitations and conditions described in the trust agreement and, at the discretion of the transferor, the Transferor Interest may be held either in an uncertificated form or in the form of a certificate representing the Transferor Interest, called a "**transferor certificate.**" See "— *Certain Matters Regarding the Transferor and the Servicer*" in this offering circular.

During the revolving period, the Invested Amount of a series will remain constant except under certain limited circumstances. See "— *Defaulted Receivables; Rebates and Fraudulent Charges; Investor Charge-Offs*" in this offering circular. The amount of principal receivables in the trust, however, will vary each day as new principal receivables are created and others are paid. The amount of the Transferor Interest will fluctuate each day, therefore, to reflect the changes in the amount of the principal receivables in the trust. When a series is amortizing, the Invested Amount of that series will decline as customer payments of principal receivables are collected and distributed, or accumulated for distribution, to the noteholders. As a result, the Transferor Interest will generally increase to reflect reductions in the Invested Amount for that series and will also change to reflect the variations in the amount of principal receivables in the trust. The Transferor Interest may also be reduced as the result of new issuances. See "—*New Issuances*" in this offering circular.

Generally, notes offered through the offering circular and the accompanying offering circular supplement:

- will be represented by notes registered in the name of a nominee of The Depository Trust Company ("**DTC**");

- will be available for purchase in minimum denominations of $100,000 and multiples of $1,000 in excess of that amount; and

- will be available for purchase in book-entry form only.

The accompanying offering circular supplement will specify if your notes have different characteristics from those listed above.

DTC has informed the transferor that its nominee will be Cede & Co. Accordingly, Cede & Co. is expected to be the holder of record of each series of notes. As an owner of beneficial interests in the notes, called a "**note owner,**" you will generally not be entitled to a definitive note representing your interest in the issued notes because you will own notes through a book-entry record maintained by DTC. References in this offering circular and the accompanying offering circular supplement to distributions, reports, notices and statements to noteholders refer to DTC or Cede & Co., as registered holder of the notes, for distribution to you in accordance with DTC procedures. All references in this offering circular and the accompanying offering circular supplement to actions by noteholders shall refer to actions taken by DTC upon instructions from DTC Participants.

The accompanying offering circular supplement may state that application will be made to list your series or class of notes on the Luxembourg Stock Exchange or another exchange.

**Book-Entry Registration**

Following is a description of the form your notes will take. We also describe how your notes may be transferred and how payments will be made to you.

The information in this section concerning DTC and DTC's book-entry system has been provided by DTC. The transferor has not independently verified the accuracy of this information.

Unless your notes are initially issued in definitive form, you may hold your notes through DTC in the U.S., Clearstream, Luxembourg or Euroclear in Europe or in any other manner described in the accompanying offering

FDIC00893

series. The maximum amount available at any time to be paid under a letter of credit will be set forth in the accompanying offering circular supplement.

## Cash Collateral Guaranty or Account

If so specified in the accompanying offering circular supplement, support for a series or one or more of the related classes will be provided by a guaranty, referred to as the "**cash collateral guaranty**" secured by the deposit of cash or certain permitted investments in an account, referred to as the "**cash collateral account**," reserved for the beneficiaries of the cash collateral guaranty or by a cash collateral account alone. The amount available pursuant to the cash collateral guaranty or the cash collateral account will be the lesser of amounts on deposit in the cash collateral account and an amount specified in the accompanying offering circular supplement. The accompanying offering circular supplement will set forth the circumstances under which payments are made to beneficiaries of the cash collateral guaranty from the cash collateral account or from the cash collateral account directly.

## Surety Bond or Insurance Policy

If so specified in the accompanying offering circular supplement, insurance with respect to a series or one or more of the related classes will be provided by one or more insurance companies. Such insurance will guarantee, with respect to one or more classes of the related series, distributions of interest or principal in the manner and amount specified in the accompanying offering circular supplement.

If so specified in the accompanying offering circular supplement, a surety bond will be purchased for the benefit of the holders of any series or class of that series to assure distributions of interest or principal with respect to that series or class of notes in the manner and amount specified in the accompanying offering circular supplement.

## Spread Account

If so specified in the accompanying offering circular supplement, support for a series or one or more of the related classes will be provided by the periodic deposit of certain available excess cash flow from the trust assets into an account, referred to as the "spread account," intended to assist with subsequent distribution of interest and principal on the notes of that class or series in the manner specified in the accompanying offering circular supplement.

## Reserve Account

If so specified in the accompanying offering circular supplement, support for a series or one or more of the related classes or any related enhancement will be provided by the establishment of an account, referred to as the "reserve account." The reserve account may be funded, to the extent provided in the accompanying offering circular supplement, by an initial cash deposit, the retention of certain periodic distributions of principal or interest or both otherwise payable to one or more classes of notes, including the subordinated notes, or the provision of a letter of credit, guarantee, insurance policy or other form of credit or any combination of these arrangements. The reserve account will be established to assist with the subsequent distribution of principal or interest on the notes of that series or the related class or any other amount owing on any related enhancement in the manner provided in the accompanying offering circular supplement.

# Notes Ratings

Any rating of the notes by a rating agency will indicate:

- its view on the likelihood that noteholders will receive required interest and principal payments; and

- its evaluation of the receivables and the availability of any credit enhancement for the notes.

Among the things a rating will not indicate are:

- the likelihood that interest or principal payments will be paid on a scheduled date;

- the likelihood that a redemption event will occur;

58

FDIC00925

- the likelihood that a U.S. withholding tax will be imposed on non-U.S. noteholders;

- the marketability of the notes;

- the market price of the notes; or

- whether the notes are an appropriate investment for any purchaser.

A rating will not be a recommendation to buy, sell or hold the notes. A rating may be lowered or withdrawn at any time by a rating agency.

The transferor may request a rating of the notes offered by this offering circular and the accompanying offering circular supplement from one or more rating agencies. Rating agencies other than those requested could assign a rating to the notes and, if so, that a rating could be lower than any rating assigned by a rating agency chosen by the transferor. Except as otherwise expressly stated, any reference in this offering circular or the accompanying offering circular supplement to a "rating agency" refers to a rating agency selected by the transferor to rate the notes of a series or class issued by the trust.

## Certain Legal Aspects of the Receivables

### Transfer of Receivables

In the transfer and servicing agreement, the transferor will represent and warrant that its transfer of receivables constitutes a valid sale and assignment of all of its right, title and interest in and to the receivables, or creates in favor of the trust a valid first-priority perfected security interest in the transferor's rights in the receivables in existence at the time that the receivables are transferred and a valid first-priority perfected security interest in the transferor's rights in the receivables arising in accounts designated for the trust on and after their creation. For a discussion of the trust's rights arising from these representations and warranties not being satisfied, see *"Description of the Notes — Representations and Warranties"* in this offering circular.

The transferor will represent in the transfer and servicing agreement that the receivables are "accounts" or "general intangibles" for purposes of the UCC. Both the sale of accounts and the transfer of accounts as security for an obligation are subject to the provisions of Article 9 of the UCC. In addition, a transfer of general intangibles as security for an obligation is subject to the provisions of Article 9 of the UCC. Therefore, appropriate UCC financing statements will be filed to perfect the trust's and the indenture trustee's security interest in the receivables. Article 9 of the UCC, however, does not apply to the sale of general intangibles. As a consequence, some other action under applicable state law may be required in order to perfect such a sale against the interests of third parties.

There are certain limited circumstances in which prior or subsequent transferees of receivables could have an interest in those receivables with priority over the trust's interest. Under the transfer and servicing agreement, however, the transferor will represent and warrant that it has transferred the receivables to the trust free and clear of the lien of any third party (other than the indenture trustee), and the transferor will covenant that it will not sell, pledge, assign, transfer, or grant any lien on any receivable other than to the trust and the indenture trustee. Nevertheless, a tax, governmental or other nonconsensual lien on property of the transferor arising prior to the time a receivable comes into existence may have priority over the interest of the trust in such receivable. Furthermore, if the FDIC were appointed as a receiver or conservator of the bank, certain administrative expenses of the receiver or conservator may have priority over the interest of the trust in the receivables.

If and for as long as:

(1)    (a)    the bank remains the servicer under the transfer and servicing agreement;

(b)    NextCard, Inc. guarantees the performance of the servicer's obligations and achieves and maintains a commercial paper rating of not less than A-1 by Standard & Poor's, not less than P-1 by Moody's and, if rated by Fitch, not less than F-1 by Fitch; and

(c)    the bank remains a wholly-owned subsidiary of NextCard, Inc. (directly or indirectly) and, in the event of a material change in the financial relationship between them:

(i)    the bank notifies each rating agency; and

FDIC00926

(ii)    written confirmation is received from each rating agency that the material change will not result in a reduction or withdrawal of its then-existing rating of any outstanding series or class; or

(2)    any other arrangements are made and written confirmation is received from each rating agency that the arrangements will not result in a reduction or withdrawal of its then-existing rating of any outstanding series or class,

cash collections held by the servicer may be commingled with other funds of the servicer prior to each distribution date and, in the event of the insolvency of the servicer or the lapse of certain time periods, the trust may not have a first-priority perfected security interest in such collections. In such an event, the amount payable to you could be lower than the outstanding principal and accrued interest on the notes, thus resulting in losses to you. However, if neither condition specified in (1) or (2) above is satisfied, the servicer will begin within five business days to deposit collections directly into the collection account within two business days of each date of processing.

**Certain Matters Relating to Conservatorship, Receivership and Bankruptcy**

The bank is chartered as a national banking association and is regulated and supervised by the Office of the Comptroller of the Currency, which is authorized to appoint the FDIC as conservator or receiver for the bank if certain events occur relating to the bank's financial condition or the propriety of its actions. In addition, the FDIC could appoint itself as conservator or receiver for the bank.

The FDIA provides that certain agreements and transfers of property by a financial institution cannot be enforced against the FDIC as conservator or receiver. Opinions and policy statements issued by the FDIC suggest that, because of the manner in which these transactions are structured, the FDIC would respect the security interest granted by the bank in the receivables pursuant to the transfer and servicing agreement. Nevertheless, if the FDIC were to assert a contrary position, or were to require the trust and the indenture trustee to go through the administrative claims procedure established by the FDIC in order to obtain collections on the receivables, or were to request a stay of any actions by the trust or the indenture trustee to enforce the transfer and servicing agreement or the notes against the bank, delays in payments on outstanding series of notes and possible reductions in the amount of those payments could occur.

In addition, the FDIC as conservator or receiver for the bank could repudiate the transfer and servicing agreement. The FDIA would limit the damages for any such repudiation to the trust's "actual direct compensatory damages" determined as of the date that the FDIC were appointed as conservator or receiver for the bank. The FDIC, moreover, could delay its decision whether to repudiate the transfer and servicing agreement for a reasonable period following its appointment as conservator or receiver for the bank. Therefore, if the FDIC as conservator or receiver for the bank were to repudiate the transfer and servicing agreement, the amount payable to you could be lower than the outstanding principal and accrued interest on the notes, thus resulting in losses to you.

In addition, regardless of the terms of the transfer and servicing agreement, the indenture, or the instructions of those authorized to direct the indenture trustee's actions, the FDIC may have the power (i) to prevent or require the commencement of an early amortization period, (ii) to prevent, limit, or require the early liquidation of the receivables and termination of the trust, or (iii) to require, prohibit, or limit the continued transfer of receivables to the trust. The FDIC, moreover, could prevent the trust, the indenture trustee, or the noteholders from appointing a successor servicer under the transfer and servicing agreement. If any of these events were to occur, payments to noteholders could be delayed or reduced.

**Consumer Protection Laws**

The relationship of the consumer and the provider of consumer credit is extensively regulated by federal and state consumer protection laws. With respect to credit accounts issued by the bank, the most significant federal laws include the Federal Truth-in-Lending, Equal Credit Opportunity, Fair Credit Reporting and Fair Debt Collection Practices Acts. These statutes impose various disclosure requirements either before or when an account is opened, or both, and at the end of monthly billing cycles, and, in addition, limit account holder liability for unauthorized use, prohibit certain discriminatory practices in extending credit, and regulate practices followed in collections. In addition, account holders are entitled under these laws to have payments and credits applied to the revolving credit account promptly and to request prompt resolution of billing errors. Congress and the states may enact new laws and amendments to existing laws to regulate further the consumer revolving credit industry. The trust may be liable for

60

FDIC00927

# $700,000,000

# NextCard Credit Card Master Note Trust

### Series 2001-1 Asset Backed Notes
### $521,500,000 Class A Asset Backed Notes
### $87,500,000 Class B Asset Backed Notes
### $66,500,000 Class C Asset Backed Notes
### $24,500,000 Class D Asset Backed Notes

## OFFERING CIRCULAR SUPPLEMENT

## NextBank, N.A.
Transferor and Servicer

Initial Purchasers of the Class A, Class B and Class C notes

## Credit Suisse First Boston
## Barclays Capital
## Deutsche Banc Alex. Brown
## Goldman, Sachs & Co.
## JPMorgan

Initial Purchaser of the Class D notes

## Credit Suisse First Boston

FDIC00937

Offering Circular Supplement to Offering Circular Dated April 20, 2001

# $700,000,000

## NextCard Credit Card Master Note Trust
Issuer

## NextBank, N.A.
Transferor and Servicer

### Series 2001-1 Asset Backed Notes

You should consider carefully the risk factors beginning on page 8 in the Offering Circular.

A note is not a deposit and neither the notes nor the underlying accounts or receivables are insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency.

The notes are obligations of NextCard Credit Card Master Note Trust only and are not obligations of NextBank, N.A., NextCard, Inc. or any other person.

This offering circular supplement may be used to offer and sell the notes only if accompanied by the Offering Circular.

| | Class A notes | Class B notes | Class C notes | Class D notes |
|---|---|---|---|---|
| Principal amount | $ 521,500,000 | $ 87,500,000 | $ 66,500,000 | $ 24,500,000 |
| Issue price | 100.00% | 100.00% | 100.00% | 100.00% |
| Interest rate per annum | One-month LIBOR plus 0.30% | One-month LIBOR plus 0.88% | One-month LIBOR plus 1.60% | One-month LIBOR plus 6.35% |
| Interest payment dates | Monthly on the 15th, beginning on June 15, 2001 | Monthly on the 15th, beginning on June 15, 2001 | Monthly on the 15th, beginning on June 15, 2001 | Monthly on the 15th, beginning on June 15, 2001 |
| Expected principal payment date | April 15, 2004 | April 15, 2004 | April 15, 2004 | April 15, 2004 |
| Final maturity date | April 16, 2007 | April 16, 2007 | April 16, 2007 | April 16, 2007 |

The Class B notes are subordinated to the Class A notes. The Class C notes are subordinated to the Class A and the Class B notes. The Class D notes are subordinated to the Class A, the Class B and the Class C notes. A spread account will provide credit enhancement for the notes.

We expect to issue the notes on or about May 8, 2001. We will deliver the Class A notes, the Class B notes and the Class C notes in book-entry form. We will deliver the Class D notes in definitive fully registered form beginning on or about May 8, 2001.

The notes have not been registered under the Securities Act. The notes may not be offered or sold within the United States or to U.S. persons, except to (a) qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A or (b) except in the case of the Class D notes, to certain persons in offshore transactions in reliance on Regulation S. You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.

Any resale of the notes or any interest or participation therein will be subject to restrictions under the Securities Act and as described under "Notice to Investors." You should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time or until final payment of principal thereof is made.

Neither the Securities and Exchange Commission nor any state securities commission has approved these note or determined that this offering circular supplement and the accompanying offering circular are accurate or complete. Any representation to the contrary is a criminal offense.

Initial Purchasers of the Class A, Class B and Class C notes

## Credit Suisse First Boston

### Barclays Capital

### Deutsche Banc Alex. Brown

### Goldman, Sachs & Co.

### JPMorgan

Initial Purchaser of the Class D notes
## Credit Suisse First Boston

April 20, 2001

FDIC00938

## TABLE OF CONTENTS

Page

IMPORTANT NOTICE ABOUT INFORMATION
    PRESENTED IN THIS OFFERING
    CIRCULAR SUPPLEMENT AND THE
    ACCOMPANYING OFFERING CIRCULAR ............S-3
NOTICE TO INVESTORS..................................................S-4
TRANSACTION SUMMARY ..........................................S-10
SUMMARY OF TERMS....................................................S-11
RECEIVABLES PERFORMANCE .................................S-16
THE TRUST PORTFOLIO ..............................................S-19
MATURITY CONSIDERATIONS....................................S-24
THE BANK .........................................................................S-25

Page

DESCRIPTION OF SERIES PROVISIONS.......................S-26
ERISA CONSIDERATIONS............................................S-44
FEDERAL INCOME TAX CONSEQUENCES................S-47
PLAN OF DISTRIBUTION...............................................S-50
LEGAL MATTERS............................................................S-54
INDEX OF TERMS FOR OFFERING CIRCULAR
    SUPPLEMENT ..........................................................S-55
ANNEX I: OTHER SERIES ISSUED AND
    OUTSTANDING.......................................................I-1
ANNEX II: FORM OF INVESTOR
    REPRESENTATION LETTER..................................II-1

FDIC00939

## Important Notice about Information Presented in this
## Offering Circular Supplement and the Accompanying Offering Circular

We provide information to you about the notes in two separate documents: (a) the accompanying offering circular, which provides general information, some of which may not apply to your series of notes, and (b) this offering circular supplement, which describes the specific terms of your series of notes.

If the terms of your series of notes vary between this offering circular supplement and the accompanying offering circular, you should rely on the information in this offering circular supplement.

You should rely only on the information contained in this offering circular supplement and the accompanying offering circular or to which we have referred you. We have not authorized anyone to provide you with information that is different. This offering circular supplement and the accompanying offering circular may only be used where it is legal to sell these securities. The information in this offering circular supplement and the accompanying offering circular may only be accurate on the date of this offering circular supplement.

We include cross references in this offering circular supplement and the accompanying offering circular to captions in these materials where you can find further related discussions. The following Table of Contents and the Table of Contents in the accompanying offering circular provide the pages on which these captions are located.

This offering circular supplement uses defined terms. You can find a listing of the pages where definitions can be found under the caption *"Index of Terms for Offering Circular Supplement"* beginning on page S-55 in this offering circular supplement and under the caption *"Index of Terms for Offering Circular"* beginning on page 65 in the accompanying offering circular.

THIS OFFERING CIRCULAR SUPPLEMENT AND THE ACCOMPANYING OFFERING CIRCULAR DO NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE NOTES OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SUCH SECURITIES IN ANY JURISDICTION IN WHICH THAT OFFER OR SOLICITATION IS UNLAWFUL. NEITHER THE DELIVERY OF THIS OFFERING CIRCULAR SUPPLEMENT AND THE ACCOMPANYING OFFERING CIRCULAR NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION HEREIN OR THEREIN SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY DATE AFTER THE DATE HEREOF.

The distribution of this offering circular supplement and the accompanying offering circular and the offering of the notes in certain jurisdictions may be restricted by law. Persons into whose possession this offering circular supplement and the accompanying offering circular comes are required by the Initial Purchasers, the owner trustee and NextBank, N.A. to inform themselves about and to observe those restrictions.

No action has been taken by NextBank, N.A., NextCard Credit Card Master Note Trust or the Initial Purchasers that would permit an offering of the notes or the circulation or distribution of this offering circular supplement, the accompanying offering circular or any other offering material in relation to NextBank, N.A., NextCard Credit Card Master Note Trust or the notes in any country or jurisdiction where action for that purpose is required.

FDIC00940

## Transaction Summary

| | |
|---|---|
| *Trust:* | NextCard Credit Card Master Note Trust |
| *Transferor and Servicer:* | NextBank, N.A. |
| *Indenture Trustee:* | The Bank of New York |
| *Owner Trustee:* | Wilmington Trust Company |
| *Closing Date:* | May 8, 2001 |
| *Servicing Fee Rate:* | 2.00% per annum |
| *Clearance and Settlement:* | Class A, Class B and Class C – DTC/Clearstream/Euroclear |
| | Class D – Definitive Notes |
| *Primary Trust Assets:* | Receivables originated in VISA® and MasterCard® accounts |

| | Class A | Class B | Class C | Class D |
|---|---|---|---|---|
| *Principal Amount:* | $521,500,000 | $87,500,000 | $66,500,000 | $24,500,000 |
| *Percentage of Series:* | 74.5% | 12.5% | 9.5% | 3.5% |
| *Anticipated Ratings: Moody's/Standard & Poor's* | Aaa/AAA | A1/A | Baa2/BBB | Ba2/BB |
| *Credit Enhancement:* | subordination of Class B, Class C and Class D and spread account | subordination of Class C and Class D and spread account | subordination of Class D and spread account | spread account |
| *Interest Rate Per Annum:* | One-month LIBOR plus 0.30% | One-month LIBOR plus 0.88% | One-month LIBOR plus 1.60% | One-month LIBO plus 6.35% |
| *Interest Accrual Method:* | actual/360 | actual/360 | actual/360 | actual/360 |
| *Interest Payment Dates:* | Monthly (15th) | Monthly (15th) | Monthly (15th) | Monthly (15th) |
| *Interest Rate Index Reset Date:* | 2 London business days before each interest payment date | 2 London business days before each interest payment date | 2 London business days before each interest payment date | 2 London busines days before each interest payment date |
| *First Interest Payment Date:* | June 15, 2001 | June 15, 2001 | June 15, 2001 | June 15, 2001 |
| *Expected Principal Payment Date:* | April 15, 2004 | April 15, 2004 | April 15, 2004 | April 15, 2004 |
| *Commencement of Accumulation Period (subject to adjustment):* | April 1, 2003 | April 1, 2003 | April 1, 2003 | April 1, 2003 |
| *Final Maturity Date:* | April 16, 2007 | April 16, 2007 | April 16, 2007 | April 16, 2007 |

| | |
|---|---|
| *ERISA eligibility: (investors should consult with their counsel)* | Yes, for the Class A, the Class B and the Class C notes, subject to important considerations described under *"ERISA Considerations"* in this offering circular supplement and in the accompanying offering circular. |
| | The Class D notes are not ERISA eligible. See *"ERISA Considerations"* in this offering circular supplement and in the accompanying offering circular. |
| *Debt for United States Federal Income Tax Purposes: (investors should consult with their tax counsel)* | Yes, for the Class A, the Class B and the Class C notes, subject to important considerations described under *"Federal Income Tax Consequences"* in the accompanying offering circular. |
| | The Class D notes will be reported by the transferor as debt, and each investor in Class D notes will agree to so report the Class D notes, but see important considerations described under *"Federal Income Tax Consequences"* in this offering circular supplement and in the accompanying offering circular. No opinion will be rendered regarding the status of the Class D notes for Federal or any state tax purpos |

FDIC00947

## Summary of Terms

*This summary highlights selected information and does not contain all of the information that you need to consider in making your investment decision. You should carefully read this entire document and the accompanying offering circular before you purchase any notes. You should consider carefully the risk factors beginning on page 8 in the accompanying offering circular before making an investment in the notes.*

### The Issuer

The notes will be issued by NextCard Credit Card Master Note Trust, a Delaware statutory business trust, pursuant to an indenture supplement to an indenture, each between the trust and the indenture trustee.

The indenture trustee is The Bank of New York.

### Offered Securities

#### *Interest*

The Class A notes will bear interest at one-month LIBOR as determined each month plus 0.30% per annum.

The Class B notes will bear interest at one-month LIBOR as determined each month plus 0.88% per annum.

The Class C notes will bear interest at one-month LIBOR as determined each month plus 1.60% per annum.

The Class D notes will bear interest at one-month LIBOR as determined each month plus 6.35% per annum.

For each class of the Series 2001-1 notes, interest will be calculated as follows:

$$\text{Principal balance at end of prior monthly period} \quad \times \quad \frac{\text{Number of days in interest period}}{360} \quad \times \quad \text{Interest rate}$$

Each interest period begins on and includes a distribution date and ends on but excludes the next distribution date. However, the first interest period will begin on and include the closing date.

Interest on the notes will be paid on each distribution date, beginning on June 15, 2001 and the 15th day of each following month if the 15th is a business day and, if not, the following business day.

You may obtain the interest rates for the current interest period and the immediately preceding interest period by telephoning the indenture trustee at (212) 815-2976.

See *"Description of Series Provisions— Interest Payments"* in this offering circular supplement for a description of how and when LIBOR will be determined.

#### *Principal*

Principal of each of the Class A, the Class B, the Class C and the Class D notes is expected to be paid in full on the April 2004 distribution date. This date is referred to as the expected principal payment date for each of the Class A, the Class B, the Class C and the Class D notes. However, no principal will be paid on the Class D notes until the Class A notes, the Class B notes and the Class C notes are paid in full, no principal will be paid on the Class C notes until the Class A notes and the Class B notes are paid in full, and no principal will be paid on the Class B notes until the Class A notes are paid in full .

We are scheduled to begin accumulating collections of principal receivables starting April 1, 2003 for payment to the Class A, the Class B, the Class C and the Class D noteholders on the expected principal payment date for each class of notes, but we may begin accumulating at a later date.

Principal of the Class A, the Class B, the Class C and the Class D notes may be paid earlier or later than the expected principal payment date. If specified adverse events known as redemption events occur, principal may be paid earlier than expected. If collections of the credit card receivables are less than expected or are collected more slowly than expected, then principal payments may be delayed. If the Class A, the Class B, the Class C and the Class D notes are not paid on the expected principal payment date, collections of principal receivables will continue to be used to pay principal on the Class A, the Class B, the Class C and the Class D notes until the notes are paid or until the final maturity date of April 16, 2007, whichever occurs first. You will not be entitled to any premium for early or late payment of principal.

For more information about principal payments, see *"Maturity Considerations," "Description of Series Provisions—Principal Payments"* and

FDIC00948

*"—Allocation Percentages"* in this offering circular supplement.

## Credit Enhancement

Credit enhancement for the Class A notes is provided by the subordination of the Class B notes, the Class C notes and the Class D notes and the spread account.

Credit enhancement for the Class B notes is provided by the subordination of the Class C notes and the Class D notes and the spread account.

Credit enhancement for the Class C notes is provided by the subordination of the Class D notes and the spread account.

Credit enhancement for the Class D notes is provided by the spread account.

The subordination of the Class D notes provides credit enhancement for the Class A notes, the Class B notes and the Class C notes.

Credit enhancement for your series is for your series' benefit only, and you are not entitled to the benefits of credit enhancement available to other series.

For more information about credit enhancement, see *"Description of Series Provisions—Reallocated Principal Collections," "—Application of Collections," "—Spread Account," "Subordination"* and *"—Defaulted Receivables; Investor Charge-Offs"* in this offering circular supplement.

## Spread Account

A spread account will provide credit enhancement for the notes. The spread account initially will be funded in an amount equal to 4.0% of the Series 2001-1 notes. After the Series 2001-1 notes are issued, deposits into the spread account will be made each month from Available Finance Charge Collections up to the Required Spread Account Amount as described in this prospectus supplement under *"Description of Series Provisions—Spread Account."* The spread account will be used to make interest payments on the notes and cover your series' allocation of defaulted receivables if collections of receivables allocated to the Series 2001-1 notes are insufficient for these purposes and, on the Series 2001-1 final maturity date, to make principal payments on the Class C notes and the Class D notes if collections of receivables allocated to the Series 2001-1 notes and treated as principal collections are insufficient to make required principal

payments on the Class C notes and the Class D notes. In addition, following an event of default and acceleration of the notes, amounts on deposit in the spread account will be available to fund amounts owed on all classes of notes.

## Events of Default

The Series 2001-1 notes are subject to specified events of default described under *"The Indenture—Events of Default; Rights upon Event of Default"* in the accompanying offering circular. These include, among other things, the failure to pay interest on or prior to the distribution date following the distribution date on which it was due or to pay principal when it is due on the final maturity date.

In the case of an event of default involving certain bankruptcy, insolvency or similar events relating to the trust, the principal amount of the Series 2001-1 notes automatically will be deemed to be immediately due and payable. If any other event of default occurs and continues with respect to the Series 2001-1 notes, the indenture trustee or holders of more than 50% of the then-outstanding principal balance of those notes may declare the principal amount of the notes to be immediately due and payable. These declarations may, under certain circumstances, be rescinded by holders of more than 50% of the then-outstanding principal balance of the Series 2001-1 notes.

After an event of default and the acceleration of the Series 2001-1 notes, funds on deposit in the collection account, the principal funding account, the spread account and the reserve account will be applied to pay principal of and interest on the Series 2001-1 notes to the extent permitted by law. Principal collections and finance charge collections allocated to Series 2001-1 will be applied to make monthly principal and interest payments on the Series 2001-1 notes until the earlier of the date those notes are paid in full or the final maturity date of those notes.

If the Series 2001-1 notes are accelerated or the issuer fails to pay the principal of the Series 2001-1 notes on the final maturity date, subject to certain conditions described in the accompanying offering circular under *"The Indenture—Events of Default; Rights upon Event of Default,"* the indenture trustee may, if legally permitted, cause the trust to sell principal receivables in an amount equal to the invested amount for Series 2001-1 and the related finance charge receivables.

FDIC00949

## Other Interests in the Trust

### Other Series of Notes

The trust will issue other series of notes secured by the assets of the trust from time to time in the future. The issuance of future series will occur without prior review or consent by you or any other noteholder.

### The Transferor Interest

The interest in the trust not securing your series or any other series is the transferor interest. The transferor interest is owned by the transferor. The transferor may, however, sell all or a portion of its interest in the transferor interest. The transferor interest does not provide credit enhancement for your series or any other series.

## The Receivables

The primary assets of the trust are receivables in VISA ® and MasterCard ®* revolving credit card accounts. The receivables consist of principal receivables and finance charge receivables.

The following information is as of February 28, 2001:

- Receivables in the trust: $1,284,864,915
- Accounts designated to the trust: 844,348

For more information, see *"Receivables Performance"* and *"The Trust Portfolio"* in this offering circular supplement.

## Servicing and Allocations of Collections

The bank, as servicer, will collect payments on the receivables and will deposit those collections in an account. It will keep track of those collections that are finance charge receivables and those that are principal receivables. First Data Resources, Inc. performs certain core processing services for the bank. See *"The Bank's Credit Card Activities"* in the accompanying offering circular.

The servicer will daily allocate collections received among:

- your series;
- other series outstanding; and
- the transferor interest in the trust.

---

* VISA ® and MasterCard ® are federally registered servicemarks of VISA U.S.A., Inc. and MasterCard International Inc., respectively.

The amount allocated to your series will be determined based mainly upon the size of the invested amount of your series compared to the total amount of principal receivables in the trust. At the time of issuance of the Series 2001-1 notes, the invested amount for Series 2001-1 will be $700,000,000.

You are entitled to receive payments of interest and principal only from collections of receivables and other trust assets allocated to your series. If the invested amount of your series declines, amounts allocated and available for payment to your series and to you may be reduced. For a description of the allocation calculations and the events which may lead to these reductions, see *"Description of Series Provisions—Allocation Percentages"* and *"—Reallocated Principal Collections"* in this offering circular supplement.

## Application of Collections

### Finance Charge Collections

The trust will apply your series' share of collections of finance charge receivables each month in the following order of priority:

- to pay the servicing fee;
- to pay interest on the Class A notes;
- to pay interest on the Class B notes;
- to pay interest on the Class C notes;
- to cover your series' allocation of defaulted receivables;
- to cover reductions in your series' invested amount resulting from investor charge-offs allocated to your series and from reallocated principal collections, in each case that have not been reimbursed;
- to pay interest on the Class D notes;
- upon the occurrence of an event of default with respect to Series 2001-1, to be applied as principal collections;
- to fund, in limited circumstances, a reserve account to cover interest payment shortfalls for Class A, Class B, Class C and Class D during the accumulation period;
- to fund, in limited circumstances, the spread account;
- to fund any other amounts the trust may be liable for from time to time that are not otherwise provided for above; and

FDIC00950

- to other series in group one or to the holders of the transferor certificates.

For a more detailed description of these applications, see *"Description of Series Provisions— Application of Collections"* in this offering circular supplement.

### Principal Collections

The trust will apply your series' share of principal collections each month as follows:

- During the revolving period, no principal will be paid to you or accumulated in a trust account. Instead, your series' share of principal collections will be treated as shared principal collections and may be available to make principal payments for other series or will be paid to the holders of the transferor certificates.

- The accumulation period is scheduled to begin on April 1, 2003, but may begin at a later date. During the accumulation period, your series' share of principal collections will be deposited in a trust account, up to a controlled deposit amount. On the expected principal payment date, amounts on deposit in that account will be paid first to the Class A noteholders, then to the Class B noteholders, then to the Class C noteholders and then to the Class D noteholders.

- If a redemption event (described below) that applies to Series 2001-1 or to all series occurs, the early amortization period could begin. During the early amortization period, your series' share of principal collections will be paid first to the Class A noteholders, then to the Class B noteholders, then to the Class C noteholders and then to the Class D noteholders.

- During any of the above periods, principal collections allocated to your series may be reallocated, if necessary, to make required interest payments on the Class A notes, the Class B notes and the Class C notes, and required servicing fee payments, not made from available finance charge collections and spread account draws.

- Any remaining principal collections will first be made available to other series and then be paid to the holders of the

transferor certificates or deposited in the special funding account.

For a more detailed description of these applications, see *"Description of Series Provisions— Application of Collections"* in this offering circular supplement.

### Redemption Events

The documents under which the Series 2001-1 notes will be issued include a list of adverse events known as redemption events. If a redemption event that applies to Series 2001-1 or to all series occurs, the trust will use collections of principal receivables allocated to Series 2001-1 each month to pay principal on the Series 2001-1 notes.

Redemption events may occur if the transferor fails to make required payments or deposits, violates other covenants and agreements or makes representations and warranties that are materially incorrect.

The following also are redemption events:

- The three-month average of the portfolio yield on the trust portfolio, calculated after subtracting the amount of receivables that are written off as uncollectible allocated to Series 2001-1, is less than the three-month average of the weighted average interest rate plus the servicing fee rate for Series 2001-1;

- The Class A notes, the Class B notes, the Class C notes or the Class D notes are not paid in full on their expected principal payment date;

- Certain bankruptcy, insolvency or similar events relating to the transferor;

- The transferor is unable to transfer receivables to the trust as required under the transfer and servicing agreement;

- The transferor does not transfer receivables in additional accounts to the trust within 5 business days of when required under the transfer and servicing agreement;

- Certain defaults of the servicer;

- The trust becomes subject to regulation as an "investment company" under the Investment Company Act of 1940; or

- An event of default occurs for the Series 2001-1 notes and their maturity date is accelerated.

FDIC00951

For a more detailed discussion of the redemption events, see *"Description of Series Provisions—Redemption Events"* in this offering circular supplement and *"Description of the Notes—Redemption Events"* in the accompanying offering circular.

## Optional Redemption

The servicer has the option to repurchase your notes when the outstanding principal amount for your series has been reduced to 5% or less of the initial principal amount. See *"Description of the Notes—Final Payment of Principal; Termination"* in the accompanying offering circular.

## Denominations

Beneficial interests in the notes may be purchased in minimum denominations of $100,000 and multiples of $1,000 in excess of that amount.

## Registration, Clearance and Settlement

The Class A, the Class B and the Class C notes will be delivered in book-entry form and will be registered in the name of Cede & Co., as the nominee of The Depository Trust Company. Except in certain limited circumstances, you will not receive a definitive instrument representing your notes. See *"Description of the Notes—Definitive Notes"* in the accompanying offering circular.

You may elect to hold your Class A, Class B or Class C notes through The Depository Trust Company, in the United States, or Clearstream Banking, *société anonyme* or the Euroclear System, in Europe.

Transfers of the Class A, the Class B and the Class C notes will be made in accordance with the rules and operating procedures of those clearing systems. See *"Description of the Notes—Book-Entry Registration"* in the accompanying offering circular.

The Class D notes will be delivered in definitive fully registered form.

## Tax Status

Subject to important considerations described under *"Federal Income Tax Consequences"* in the accompanying offering circular, Orrick, Herrington & Sutcliffe LLP, as special tax counsel to the trust, is of the opinion that under existing law the Class A, the Class B and the Class C notes will be characterized as debt for federal income tax purposes. By your

acceptance of a Class A, Class B, Class C or Class D note, you will agree to treat your Class A, Class B, Class C or Class D notes as debt for federal, state and local income and franchise tax purposes. See *"Federal Income Tax Consequences"* in the accompanying offering circular for additional information concerning the application of federal income tax laws. The Class D notes will be reported by the transferor as debt for federal income tax purposes, but no opinion will be rendered regarding the status of the Class D notes for federal or any state tax purpose.

For a discussion of certain tax consequences to purchasers of the Class D notes, see *"Certain Tax Consequences"* herein.

## ERISA Considerations

Subject to important considerations described under *"ERISA Considerations"* in this offering circular supplement and in the accompanying offering circular, the Class A, the Class B and the Class C notes are eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. A fiduciary or other person contemplating purchasing the Class A, the Class B or the Class C notes on behalf of or with plan assets of any plan or account should consult with its counsel regarding whether the purchase or holding of the Class A, the Class B or the Class C notes could give rise to a transaction prohibited or not otherwise permissible under ERISA or Section 4975 of the Internal Revenue Code.

The Class D notes may not be sold or transferred to any employee benefit or other plan subject to ERISA or Section 4975 of the Internal Revenue Code (each, a **"Plan"**), to any person acting on behalf of or with "plan assets" of any Plan (**"Plan Assets"**), or to any other "benefit plan investor" (as defined in U.S. Department of Labor Regulation Section 2510.3-101(f)(2)) (a **"Benefit Plan Investor"**), including an insurance company general account or an employee benefit plan that is not subject to Title I of ERISA, such as a foreign plan, except in accordance with the restrictions set forth herein. See *"ERISA Considerations"* herein.

## Exchange Listing

We will apply to list the Class A, the Class B and the Class C notes on the Luxembourg Stock Exchange. We cannot guarantee that the application for the listing will be accepted.

FDIC00952

**NEXTCARD CREDIT CARD MASTER NOTE TRUST**

Issuer

and

**THE BANK OF NEW YORK**

Indenture Trustee

**MASTER INDENTURE**

Dated as of December 11, 2000

DOCSSF1:492698.5

FDIC00138

This MASTER INDENTURE, dated as of December 11, 2000 (herein, as amended, modified or supplemented from time to time as permitted hereby, called this "**Indenture**"), between NextCard Credit Card Master Note Trust, a business trust organized under the laws of the State of Delaware (herein, together with its permitted successors and assigns, called the "**Issuer**" or the "**Trust**"), and The Bank of New York, a New York banking corporation, as indenture trustee (herein, together with its successors in the trusts hereunder, called the "**Indenture Trustee**"). This Indenture may be supplemented at any time and from time to time by an indenture supplement in accordance with Article X hereof (an "**Indenture Supplement**," and any Indenture Supplement together with this Indenture and amendments hereof collectively referred to as the "**Agreement**"). If a conflict exists between the terms and provisions of this Indenture and any Indenture Supplement, the terms and provisions of the Indenture Supplement shall be controlling with respect to the related Series.

## PRELIMINARY STATEMENT

The Issuer has duly authorized the execution and delivery of this Indenture to provide for an issue of its asset backed notes (the "**Notes**") as provided in this Indenture. All covenants and agreements made by the Issuer herein are for the benefit and security of the Noteholders. The Issuer is entering into this Indenture, and the Indenture Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

Simultaneously with the delivery of this Indenture the Issuer is entering into the Transfer and Servicing Agreement with NextBank, N.A., a national banking association, as Transferor and Servicer (in such respective capacities, the "**Transferor**" or the "**Servicer**"), pursuant to which (a) the Transferor will convey to the Issuer all of its right, title and interest in, to and under the Receivables and (b) the Servicer will agree to service the Receivables and make collections thereon on behalf of the Noteholders.

Under the Transfer and Servicing Agreement, Receivables arising in the Accounts from time to time will be conveyed thereunder to the Issuer.

## GRANTING CLAUSES

The Issuer hereby Grants to the Indenture Trustee, for the benefit of the Holders of the Notes, all of the Issuer's right, title and interest, whether now owned or hereafter acquired, in, to and under (a) the Receivables existing at the close of business on the Initial Cut-Off Date, in the case of Receivables arising in the Initial Accounts and the Prior Additional Accounts, and on each Addition Cut-Off Date, in the case of Receivables arising in the Additional Accounts, and in each case thereafter created from time to time, (b) all Interchange and Recoveries allocable to the Issuer as provided in the Transfer and Servicing Agreement and all monies due or to become due and all amounts received or receivable with respect thereto, (c) all moneys and other property credited to the Collection Account, the Series Accounts and the Special Funding Account (including any subaccounts of such account), and all interest, dividends, earnings, income and other distributions from time to time received, receivable or otherwise distributed or distributable thereto or in respect thereof (including any accrued discount realized on liquidation of any investment purchased at a discount), (d) all rights, remedies, powers, privileges and claims of the Issuer under or with respect to any Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement (whether arising pursuant to the terms of such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement or otherwise available to the Issuer at law or in equity), including, without limitation, the rights of the Issuer to enforce such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement, and to give or withhold any and all consents, requests, notices, directions, approvals, extensions or waivers under or with respect to such Series Enhancement, the Trust Agreement or the Transfer and Servicing Agreement to the same extent as

FDIC00140

the Issuer could but for the assignment and security interest granted to the Indenture Trustee for the benefit of the Noteholders, (e) the property conveyed to the Issuer under any Participation Interest Supplement and the right to receive Recoveries attributed to cardholder charges for merchandise and services in the Accounts, (f) all money, accounts, general intangibles, chattel paper, instruments, documents, goods, investment property, deposit accounts, certificates of deposit, letters of credit, and advices of credit consisting of, arising from, or related to the foregoing, (g) all other property of the Issuer, and (h) all present and future claims, demands, causes and chose in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds, products, rents, receipts or profits of the conversion, voluntary or involuntary, into cash or other property, all cash and non-cash proceeds, and other property consisting of, arising from or relating to all or any part of any of the foregoing; in each case, excluding the Transferor Interest and all amounts distributable to the Holders of any Certificates pursuant to the terms of any Transaction Document (collectively, the "**Collateral**").

## LIMITED RECOURSE

The obligation of the Issuer to make payments of principal of, interest on and other amounts with respect to, the Notes is limited by recourse only to the Collateral.

## ARTICLE I

## DEFINITIONS

Section 1.01.    <u>Definitions</u>.

Whenever used in this Indenture, the following words and phrases shall have the following meanings, and the definitions of such terms are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

"<u>Account Owner</u>" shall have the meaning specified in the Transfer and Servicing Agreement.

"<u>Accumulation Period</u>" shall mean, with respect to any Series, or any Class within a Series, a period following the Revolving Period during which Collections of Principal Receivables are accumulated in an account for the benefit of the Noteholders of such Series or Class within such Series, which shall be the controlled accumulation period, the principal accumulation period, the early accumulation period, the optional accumulation period, the limited accumulation period or other accumulation period, in each case as defined with respect to such Series in the related Indenture Supplement.

"<u>Act</u>" shall have the meaning specified in subsection 12.03(a).

"<u>Administration Agreement</u>" shall mean the Administration Agreement, dated as of December 1, 2000 among the Issuer and the Administrator, as the same may be amended, supplemented or otherwise modified from time to time.

"<u>Administrator</u>" shall mean NextBank, or its permitted successors and assigns, or any successor Administrator under the Administration Agreement.

"<u>Adverse Effect</u>" shall have the meaning specified in the Transfer and Servicing Agreement.

**FDIC00141**

"Transaction Documents" shall mean, with respect to any Series of Notes, the Certificate of Trust, the Trust Agreement, the Receivables Purchase Agreements, the Transfer and Servicing Agreement, this Indenture, the related Indenture Supplement, the Administration Agreement and such other documents and certificates delivered in connection therewith.

"Transfer Agent and Registrar" shall have the meaning specified in Section 2.05.

"Transfer and Servicing Agreement" shall mean the Transfer and Servicing Agreement, dated as of December 11, 2000, among the Transferor, the Servicer and the Issuer, as the same may be amended, supplemented or otherwise modified from time to time.

"Transfer Date" shall mean the Business Day immediately preceding each Distribution Date.

"Transferor" shall have the meaning specified in the Transfer and Servicing Agreement.

"Transferor Interest" shall mean on any date of determination an amount equal to (a) the sum of (i) an amount equal to the aggregate balance of Principal Receivables at the end of the day immediately prior to such date of determination *plus* (ii) the Special Funding Amount at the end of the day immediately prior to such date of determination *minus* (b) the aggregated Invested Amounts with respect to all Series of Notes issued and outstanding on such date of determination.

"Transferor Percentage" shall mean, on any date of determination, when used with respect to Principal Receivables, Finance Charge Receivables and Defaulted Receivables, a percentage equal to 100% *minus* the Aggregate Investor Percentage with respect to such category of Receivables.

"Trust" shall mean the NextCard Credit Card Master Note Trust.

"Trust Agreement" shall mean the Trust Agreement relating to the Trust, dated as of December 1, 2000, between NextBank and the Owner Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Trust Indenture Act" or "TIA" shall mean the Trust Indenture Act of 1939, as amended.

"Trust Redemption Event" shall have, with respect to each Series, the meaning specified in Section 5.01.

"UCC" shall have the meaning specified in the Transfer and Servicing Agreement.

Section 1.02.    Other Definitional Provisions.

(a)    With respect to any Series, all terms used herein and not otherwise defined herein shall have meanings ascribed to them in the Trust Agreement, the Transfer and Servicing Agreement or the related Indenture Supplement, as applicable.

(b)    All terms defined in this Indenture shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(c)    As used in this Indenture and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Indenture or in any such certificate or other document, and accounting terms partly defined in this Indenture or in any such

FDIC00152

Section 2.10.    Cancellation.

All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly canceled by it.  Pursuant to an Issuer Request, the Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any lawful manner whatsoever, and all Notes so delivered shall be promptly canceled by the Indenture Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture.  All canceled Notes held by the Indenture Trustee shall be destroyed unless the Issuer shall direct by a timely order that they be returned to it.

Section 2.11.    Release of Collateral.

Subject to Section 12.01, the Indenture Trustee shall release property from the lien of this Indenture only upon receipt of an Issuer Request accompanied by an Officer's Certificate, an Opinion of Counsel and Independent Certificates in accordance with TIA §314(c) and 314(d) or an Opinion of Counsel in lieu of such Independent Certificates to the effect that the TIA does not require any such Independent Certificates.

Section 2.12.    New Issuances.

(a)    Pursuant to one or more Indenture Supplements, the Transferor may from time to time direct the Owner Trustee in writing, on behalf of the Issuer, to issue one or more new Series of Notes (a "**New Issuance**").  The Notes of all outstanding Series shall be equally and ratably entitled as provided herein to the benefits of this Indenture without preference, priority or distinction, all in accordance with the terms and provisions of this Indenture and the applicable Indenture Supplement except, with respect to any Series or Class, as provided in the related Indenture Supplement.   Interest on the Notes of all outstanding Series shall be paid on each Distribution Date as specified in the Indenture Supplement relating to such outstanding Series.  Principal of the Notes of each outstanding Series shall be paid as specified in the Indenture Supplement relating to such outstanding Series.

(b)    On or before the Series Issuance Date relating to any new Series of Notes, the parties hereto will execute and deliver an Indenture Supplement which will specify the Principal Terms of such Series.  The terms of such Indenture Supplement may modify or amend the terms of this Indenture solely as applied to such new Series.  The obligation of the Owner Trustee to execute, on behalf of the Issuer, the Notes of any Series and of the Indenture Trustee to authenticate such Notes and to execute and deliver the related Indenture Supplement (other than any Series issued pursuant to an Indenture Supplement dated as of December 11, 2000) is subject to the satisfaction of the following conditions:

(i)    on or before the fifth day immediately preceding the Series Issuance Date the Transferor shall have given the Owner Trustee, the Indenture Trustee, the Servicer and each Rating Agency notice (unless such notice requirement is otherwise waived) of such issuance and the Series Issuance Date;

(ii)    the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee any related Indenture Supplement, in form satisfactory to the Owner Trustee (as such and in its individual capacity) and the Indenture Trustee, executed by each party hereto (other than the Indenture Trustee);

FDIC00159

(iii)    the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee any related Enhancement Agreement executed by the provider of the credit enhancement and the other parties thereto;

(iv)    the Rating Agency Condition shall have been satisfied with respect to such issuance;

(v)    such issuance will not result in any Adverse Effect and the Transferor shall have delivered to the Owner Trustee and the Indenture Trustee an Officer's Certificate, dated the Series Issuance Date to the effect that (i) the Transferor reasonably believes that such issuance will not, based on the facts known to such officer at the time of such certification, have an Adverse Effect, and (ii) all conditions precedent to such execution, authentication, and delivery have been satisfied;

(vi)    there shall have been delivered to the Owner Trustee and the Indenture Trustee (with a copy to each Rating Agency) a Tax Opinion, dated the Series Issuance Date with respect to such issuance; and

(vii)    the aggregate amount of Principal Receivables plus the principal amount of any Participation Interest theretofore conveyed to the Trust as of the Series Issuance Date shall be greater than the Required Minimum Principal Balance and the Transferor Interest shall be greater than the Required Transferor Interest, each as of the Series Issuance Date and after giving effect to such issuance.

Any Note held by the Transferor at any time after the date of its initial issuance may be transferred or exchanged only upon the delivery to the Owner Trustee and the Indenture Trustee of a Tax Opinion dated as of the date of such transfer or exchange, as the case may be, with respect to such transfer or exchange.

(c)    Upon satisfaction of the above conditions, pursuant to Section 2.03, the Owner Trustee, on behalf of the Issuer, shall execute and the Indenture Trustee shall authenticate and deliver the Notes of such Series as provided in this Indenture and the applicable Indenture Supplement. Notwithstanding the provisions of this Section 2.12, prior to the execution of any Indenture Supplement (other than any Indenture Supplement dated as of December 11, 2000), the Indenture Trustee and Owner Trustee shall be entitled to receive and rely upon an Opinion of Counsel stating that the execution of such Indenture Supplement is authorized or permitted by this Indenture and any Indenture Supplement related to any outstanding Series. The Indenture Trustee and Owner Trustee may, but shall not be obligated to, enter into any such Indenture Supplement which adversely affects the Indenture Trustee's or Owner Trustee's (as such or in its individual capacity) own rights, duties, benefits, protections, privileges or immunities under this Indenture.

(d)    The Issuer may direct the Indenture Trustee to deposit the net proceeds from any New Issuance in the Special Funding Account. The Issuer may also specify that on any Transfer Date the proceeds from the sale of any new Series may be withdrawn from the Special Funding Account and treated as Shared Principal Collections.

Section 2.13.    Book-Entry Notes.

Unless otherwise provided in any related Indenture Supplement, the Notes, upon original issuance, shall be issued in the form of typewritten Notes representing the Book-Entry Notes to be delivered to the depository specified in such Indenture Supplement which shall be the Clearing Agency or Foreign Clearing Agency, by or on behalf of such Series.

FDIC00160

counsel, be required to maintain the perfection of the lien and security interest of this Indenture until May 30 in the following calendar year.

Section 3.07.     Performance of Obligations; Servicing of Receivables.

(a)     The Issuer will not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Collateral or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as expressly provided in this Indenture, the Transfer and Servicing Agreement or such other instrument or agreement.

(b)     The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer. Initially, the Issuer has contracted with the Administrator to assist the Issuer in performing its duties under this Indenture.

(c)     The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the other Transaction Documents and in the instruments and agreements relating to the Collateral, including but not limited to filing or causing to be filed all UCC financing statements and continuation statements required to be filed by the terms of this Indenture and the Transfer and Servicing Agreement in accordance with and within the time periods provided for herein and therein. Except as otherwise expressly provided herein or therein, the Issuer shall not waive, amend, modify, supplement or terminate any Transaction Document or any provision thereof without the consent of the Holders of 66-2/3% of the Outstanding Amount of the Notes of each adversely affected Series.

(d)     If the Issuer shall have knowledge of the occurrence of a Servicer Default under the Transfer and Servicing Agreement, the Issuer shall cause the Indenture Trustee to promptly notify the Rating Agencies thereof, and shall cause the Indenture Trustee to specify in such notice the action, if any, being taken with respect to such default. If a Servicer Default shall arise from the failure of the Servicer to perform any of its duties or obligations under the Transfer and Servicing Agreement with respect to the Receivables, the Issuer shall take all reasonable steps available to it to remedy such failure.

(e)     On and after the receipt by the Servicer of a Termination Notice pursuant to Section 7.01 of the Transfer and Servicing Agreement, the Servicer shall continue to perform all servicing functions under the Transfer and Servicing Agreement until the date specified in the Termination Notice or otherwise specified by the Indenture Trustee or until a date mutually agreed upon by the Servicer and the Indenture Trustee. As promptly as possible after the giving of a Termination Notice to the Servicer, the Indenture Trustee shall appoint a Successor Servicer, and such Successor Servicer shall accept its appointment by a written assumption in a form acceptable to the Indenture Trustee. In the event that a Successor Servicer has not been appointed and accepted its appointment at the time when the Servicer ceases to act as Servicer, the Indenture Trustee without further action shall automatically be appointed the Successor Servicer. The Indenture Trustee may delegate any of its servicing obligations to an Affiliate or agent in accordance with subsection 3.01(b) and Section 5.07 of the Transfer and Servicing Agreement. Notwithstanding the foregoing, the Indenture Trustee shall, if it is legally unable so to act, petition at the expense of the Servicer a court of competent jurisdiction to appoint any established institution qualifying as an Eligible Servicer as the Successor Servicer. The Indenture Trustee shall give prompt notice to each Rating Agency and each Series Enhancer upon the appointment of a Successor Servicer. Upon its appointment, the Successor Servicer shall be the successor in all respects to the Servicer with respect to servicing functions under the Transfer and Servicing Agreement and shall be subject to all the

FDIC00166

responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions thereof, and all references in this Indenture to the Servicer shall be deemed to refer to the Successor Servicer. In connection with any Termination Notice, the Indenture Trustee will review any bids which it obtains from Eligible Servicers and shall be permitted to appoint any Eligible Servicer submitting such a bid as a Successor Servicer for servicing compensation, subject to the limitations set forth in Section 7.02 of the Transfer and Servicing Agreement.

(f)       Without derogating from the absolute nature of the assignment granted to the Indenture Trustee under this Indenture or the rights of the Indenture Trustee hereunder, the Issuer agrees (i) that it will not, without the prior written consent of the Indenture Trustee and holders of at least 66-2/3% of the Outstanding Amount of the Notes of each Series, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Collateral (except to the extent otherwise provided in the Transfer and Servicing Agreement) or the Transaction Documents (except to the extent otherwise provided in the Transaction Documents), or waive timely performance or observance by the Servicer or the Transferor under the Transfer and Servicing Agreement; and (ii) that any such amendment shall not (A) increase or reduce in any manner the amount of, or accelerate or delay the timing of, collections of payments on the Receivables or distributions that are required to be made for the benefit of the Noteholders or (B) reduce the aforesaid percentage of the Notes that is required to consent to any such amendment, without the consent of the Holders of all the Outstanding Notes. If any such amendment, modification, supplement or waiver shall be so consented to by the Indenture Trustee and such Noteholders, the Issuer agrees, promptly following a request by the Indenture Trustee to do so, to execute and deliver, in its own name and at its own expense, such agreements, instruments, consents and other documents as the Indenture Trustee may deem necessary or appropriate in the circumstances and to provide each Rating Agency with notice of such amendment, modification, supplement or waiver.

Section 3.08.    Negative Covenants.

So long as any Notes are Outstanding, the Issuer will not:

(a)       sell, transfer, exchange, or otherwise dispose of any part of the Collateral except as expressly permitted by this Indenture, any Indenture Supplement, the Trust Agreement or the Transfer and Servicing Agreement;

(b)       claim any credit on, or make any deduction from, the principal and interest payable in respect of the Notes (other than amounts properly withheld from such payments under the Code or applicable state law) or assert any claim against any present or former Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(c)       (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (B) permit any Lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof or any interest therein or the proceeds thereof or (C) permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral; or

(d)       voluntarily dissolve or liquidate in whole or in part.

FDIC00167

prescribed in this Section 3.11 shall be released from its obligations under this Indenture as issued immediately upon the effectiveness of such conveyance or transfer, provided that the Issuer shall not be released from any obligations or liabilities to the Indenture Trustee or the Noteholders arising prior to such effectiveness.

Section 3.12.    No Other Business.

The Issuer shall not engage in any business other than the activities set forth in Section 2.03 of the Trust Agreement and all activities incidental thereto or other than as required or authorized by the terms of the Transaction Documents.

Section 3.13.    No Borrowing.

The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except as expressly provided for pursuant to the terms of the Transaction Documents and the Notes.

Section 3.14.    Servicer's Obligations. The Issuer shall cause the Servicer to comply with all of its obligations under the Transaction Documents.

Section 3.15.    Guarantees, Loans, Advances and Other Liabilities.

Except as contemplated by this Indenture or the Transfer and Servicing Agreement, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

Section 3.16.    Capital Expenditures.

The Issuer shall not make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty).

Section 3.17.    Removal of Administrator.

So long as any Notes are outstanding, the Issuer shall not remove the Administrator without cause unless the Rating Agency Condition shall have been satisfied in connection with such removal.

Section 3.18.    Restricted Payments.

The Issuer shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer or to the Servicer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Issuer may make, or cause to be made, (x) distributions as contemplated by, and to the extent funds are available for such purpose under, the Transfer and Servicing Agreement or the Trust Agreement and (y) payments to the

FDIC00170

(3)    are to be called for redemption within one year under arrangements satisfactory to the Indenture Trustee for the giving of notice of redemption by the Indenture Trustee in the name, and at the expense, of the Issuer;

and the Issuer, in the case of (1), (2) or (3) above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Indenture Trustee for cancellation when due at the Final Maturity Date for such Class or Series of Notes or the Redemption Date (if Notes shall have been called for redemption pursuant to the related Indenture Supplement), as the case may be;

(ii)    the Issuer has paid or caused to be paid all other sums payable hereunder by the Issuer; and

(iii)    the Issuer has delivered to the Indenture Trustee an Officer's Certificate, an Opinion of Counsel and (if required by the TIA or the Indenture Trustee) an Independent Certificate from a firm of certified public accountants, each meeting the applicable requirements of Section 12.01(a) and each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Section 4.02.    Application of Trust Money.

All monies deposited with the Indenture Trustee pursuant to Section 4.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes, this Indenture and the applicable Indenture Supplement, to make payments, either directly or through any Paying Agent, as the Indenture Trustee may determine, to the Noteholders and for the payment in respect of which such monies have been deposited with the Indenture Trustee, of all sums due and to become due thereon for principal and interest; but such monies need not be segregated from other funds except to the extent required herein or in the Transfer and Servicing Agreement or required by law.

ARTICLE V

REDEMPTION EVENTS, DEFAULTS AND REMEDIES

Section 5.01.    Redemption Events.

If any one of the following events (each, a "**Trust Redemption Event**") shall occur:

(a)    NextCard, the Transferor or any of the Account Owners shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to NextCard, such Transferor or Account Owner or of or relating to all or substantially all of its property, or a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against NextCard, such Transferor or Account Owner; or NextCard, any Transferor or Account Owner shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make any assignment for the benefit of its creditors or voluntarily suspend payment of its obligations (any such event, an "**Insolvency Event**");

FDIC00172

provided, however, that if the Rating Agency Condition is first satisfied with respect to an Insolvency Event with respect to NextCard, such Insolvency Event shall not be a Trust Redemption Event;

      (b)    a Transfer Restriction Event shall occur; or

      (c)    the Trust shall become subject to regulation by the Securities and Exchange Commission as an "investment company" within the meaning of the Investment Company Act;

then a Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders immediately upon the occurrence of such event.

      Upon the occurrence of a Redemption Event, an Amortization Period shall commence and payment on the Notes of each Series will be made in accordance with the terms of the related Indenture Supplement.

      Section 5.02.    Events of Default.

      "**Event of Default**," wherever used herein, means with respect to any Series any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

      (a)    default in the payment of the principal of any Note of that Series, if and to the extent not previously paid, when the same becomes due and payable; or

      (b)    default in the payment of any interest on any Note of that Series when the same becomes due and payable, and such default shall continue after the earlier to occur of (i) the next following date upon which interest becomes due and payable and (ii) the date occurring thirty-five (35) days following the date on which such interest became due and payable; or

      (c)    default in the observance or performance of any covenant or agreement of the Issuer made in this Indenture made in respect of the Notes of such Series (other than a covenant, or agreement, a default in the observance or performance of which is elsewhere in this Section 5.02 specifically dealt with) (all of such covenants and agreements in this Indenture which are not expressly stated to be for the benefit of a particular Series being deemed to be in respect of the Notes of all Series for this purpose), and such default shall continue or not be cured for a period of sixty (60) days after there shall have been given, by written registered or certified mail, return receipt requested to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 50% of the Outstanding Amount of the Notes of such Series, a written notice specifying such default and requiring it to be remedied and stating that such notice is a "**Notice of Default**" hereunder and, as a result of such default, the interests of the Holders of the Notes are materially and adversely affected and continue to be materially and adversely affected during the 60-day period; or

      (d)    the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, conservator, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Issuer or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of sixty (60) consecutive days; or

FDIC00173

(e)    the commencement by the Issuer of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment of or the taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator or similar official of the Issuer, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay, or the admission in writing by the Issuer of its inability to pay, its debts as such debts become due, or the taking of action by the Issuer in furtherance of any of the foregoing.

The Issuer shall deliver to the Indenture Trustee, within five (5) days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which with the giving of notice and the lapse of time would become an Event of Default, its status and what action the Issuer is taking or proposes to take with respect thereto.

Section 5.03.    Acceleration of Maturity; Rescission and Annulment.

If an Event of Default described in paragraph (a), (b) or (c) of Section 5.02 should occur and be continuing with respect to a Series, then and in every such case the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer (and to the Indenture Trustee if declared by Noteholders), and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

If an Event of Default described in paragraph (d) or (e) of Section 5.02 should occur and be continuing, then the unpaid principal of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall automatically become, and shall be deemed to be declared, due and payable.

At any time after such declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article V provided, the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes of such Series, by written notice to the Issuer and the Indenture Trustee, may rescind and annul such declaration and its consequences.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.04.    Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.

(a)    The Issuer covenants that if (i) default is made in the payment of any interest on any Note when the same becomes due and payable, and such default shall continue after the earlier to occur of (x) the next following date upon which interest becomes due and payable and (y) the date occurring thirty-five (35) days following the date on which such interest became due and payable, or (iii) default is made in the payment of principal of any Note, if and to the extent not previously paid, when the same becomes due and payable, the Issuer will, upon demand of the Indenture Trustee, pay to it, for the benefit of the Holders of the Notes of the affected Series, the whole amount then due and payable on such Notes for principal and interest, with interest upon the overdue principal, and, to the extent payment at such rate of interest shall be legally enforceable, interest upon overdue installments of interest, at the applicable Note Interest Rate borne by the Notes of such Series, and in addition thereto will pay such

FDIC00174

further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)    In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor upon such Notes and collect in the manner provided by law out of the property of the Issuer or other obligor upon such Notes, wherever situated, the moneys adjudged or decreed to be payable.

(c)    If an Event of Default occurs and is continuing, the Indenture Trustee may, as more particularly provided in Section 5.05, in its discretion, proceed to protect and enforce its rights and the rights of the Noteholders of the affected Series, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)    In case there shall be pending, relative to the Issuer or any other obligor upon the Notes of the affected Series, or any Person having or claiming an ownership interest in the Collateral, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or in case a receiver, conservator, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator, custodian or other similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Issuer or other obligor upon the Notes of such Series, or to the creditors or property of the Issuer or such other obligor, the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section 5.04, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)    to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes of such Series and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence or bad faith) and of the Noteholders of such Series allowed in such Proceedings;

(ii)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes of such Series in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)    to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders of such Series and of the Indenture Trustee on their behalf; and

FDIC00175

(iv)    to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes of such Series allowed in any judicial Proceedings relative to the Issuer, its creditors and its property;

and any trustee, receiver, conservator, liquidator, custodian, assignee, sequestrator or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of negligence or bad faith.

(e)    Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)    All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or Proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the benefit of the Holders of the Notes of the affected Series as provided herein.

(g)    In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Holders of the Notes of the affected Series, and it shall not be necessary to make any such Noteholder a party to any such Proceedings.

Section 5.05.    Remedies; Priorities.

(a)    If an Event of Default shall have occurred and be continuing with respect to any Series, and the Notes of such Series have been accelerated pursuant to Section 5.03, the Indenture Trustee may do one or more of the following (subject to Sections 5.06 and 12.16):

(i)    institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes of the affected Series or under this Indenture with respect thereto, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes moneys adjudged due;

(ii)    subject to the last paragraph of this subsection 5.05(a), take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series;

(iii)    at the direction of the Holders of a majority of the Outstanding Amount of such Notes, cause the Issuer to sell Principal Receivables in an amount equal to the

FDIC00176

Invested Amount with respect to the accelerated Series and the related Finance Charge Receivables (or interests therein) in accordance with Section 5.16 hereof;

provided, however, that the Indenture Trustee may not exercise the remedy described in subparagraph (iii) above unless (A) the Holders of 100% of the Outstanding Amount of the Notes of the affected Series consent thereto, (B) the Indenture Trustee determines that any proceeds of such exercise distributable to the Noteholders of the affected Series are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest or (C) the Indenture Trustee determines that the Collateral may not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of Holders of at least 66-2/3% of the Outstanding Amount of each Class of the Notes of such Series. In determining such sufficiency or insufficiency with respect to clause (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Collateral for such purpose.

The remedies provided in this Section 5.05(a) are the exclusive remedies provided to the Noteholders with respect to an Event of Default and each of the Noteholders (by their acceptance of their respective interests in the Notes) and the Indenture Trustee hereby expressly waive any other remedy that may be available under the applicable UCC.

(b)    If the Indenture Trustee collects any money or property pursuant to this Article V following the acceleration of the maturities of the Notes of the affected Series pursuant to Section 5.03 (so long as such declaration shall not have been rescinded or annulled), it shall pay the money or property in the following order:

FIRST: to the Indenture Trustee for amounts due pursuant to Section 6.07;

SECOND: to Holders of the Class A Notes of such Series for amounts due and unpaid on such Class A Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class A Notes for interest and principal;

THIRD: to Holders of the Class B Notes of such Series for amounts due and unpaid on such Class B Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class B Notes for interest and principal;

FOURTH: to the Holders of the Class C Notes of such Series for amounts due and unpaid on such Class C Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class C Notes for interest and principal;

FIFTH: to the Holders of the Class D Notes of such Series for amounts due and unpaid on such Class D Notes for interest and principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Class D Notes for interest and principal;

SIXTH: to the Holders of all other Classes of Notes, if any, of such Series for amounts due and unpaid on such Notes for interest and principal, according to the amounts due and payable on each such Class of Notes for interest and principal, sequentially in the priority for payment under the related Indenture Supplement; and

FDIC00177

SEVENTH: to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement.

(c)     The Indenture Trustee may, upon notification to the Issuer, fix a record date and payment date for any payment to Noteholders of the affected Series pursuant to this Section 5.05. At least fifteen (15) days before such record date, the Indenture Trustee shall mail or send by facsimile to each such Noteholder a notice that states the record date, the payment date and the amount to be paid.

(d)     In addition to the application of money or property referred to in subsection 5.05(b) for an accelerated Series, amounts then held in the Collection Account, Special Funding Account or any Series Accounts for such Series and any amounts available under the Series Enhancement for such Series shall be used to make payments to the Holders of the Notes of such Series and the Series Enhancer for such Series in accordance with the terms of this Indenture, the related Indenture Supplement and the Series Enhancement for such Series. Following the sale of the Collateral (or portion thereof) for a Series and the application of the proceeds of such sale to such Series and the application of the amounts then held in the Collection Account, the Special Funding Account and any Series Accounts for such Series as are allocated to such Series and any amounts available under the Series Enhancement for such Series, such Series shall no longer be entitled to any allocation of Collections or other property constituting the Collateral under this Indenture and the Notes of such Series shall no longer be Outstanding.

Section 5.06.   Optional Preservation of the Collateral.  If the Notes of any Series have been declared to be due and payable under Section 5.03 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, and the Indenture Trustee has not received directions from the Noteholders pursuant to Section 5.12, the Indenture Trustee may, but need not, elect to maintain possession of the portion of the Collateral which secures such Notes. It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes, and the Indenture Trustee shall take such desire into account when determining whether or not to maintain possession of the Collateral. In determining whether to maintain possession of the Collateral, the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Collateral for such purpose.

Section 5.07.   Limitation on Suits.

No Noteholder shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)     the Holders of not less than 25% of the Outstanding Amount of any affected Series of Notes have made written request to the Indenture Trustee to institute such proceeding in its own name as indenture trustee;

(b)     such Noteholder or Noteholders has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(c)     such Noteholder or Noteholders has offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)     the Indenture Trustee for sixty (60) days after its receipt of such request and offer of indemnity has failed to institute any such Proceeding; and

(e)    no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by a majority of the Outstanding Amount of the Notes of such Series;

it being understood and intended that no one or more Noteholders of the affected Series shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Noteholders of such Series or to obtain or to seek to obtain priority or preference over any other Noteholders of such Series or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two (2) or more groups of Noteholders of such affected Series, each representing less than a majority of the Outstanding Amount of such Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.08.    Unconditional Rights of Noteholders to Receive Principal and Interest.

Notwithstanding any other provision in this Indenture, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal of and interest in respect of such Note as such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

Section 5.09.    Restoration of Rights and Remedies.

If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned, or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.10.    Rights and Remedies Cumulative.

No right, remedy, power or privilege herein conferred upon or reserved to the Indenture Trustee or to the Noteholders is intended to be exclusive of any other right, remedy, power or privilege, and every right, remedy, power or privilege shall, to the extent permitted by law, be cumulative. The assertion or exercise of any right or remedy shall not preclude any other further assertion or the exercise of any other appropriate right or remedy.

Section 5.11.    Delay or Omission Not Waiver.

No failure to exercise and no delay in exercising, on the part of the Indenture Trustee or of any Noteholder or other Person, any right or remedy occurring hereunder upon any Event of Default shall impair any such right or remedy or constitute a waiver thereof of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

FDIC00179

Section 5.12.    Rights of Noteholders to Direct Indenture Trustee.

A majority of the Outstanding Amount of the Notes of any affected Series if an Event of Default with respect to such Series has occurred and is continuing) shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee with respect to the Notes; provided, however, that subject to Section 6.01:

(a)    the Indenture Trustee shall have the right to decline any such direction if the Indenture Trustee, after being advised by counsel, determines that the action so directed is in conflict with any rule of law or with this Indenture, and

(b)    the Indenture Trustee shall have the right to decline any such direction if the Indenture Trustee in good faith shall, by a Responsible Officer of the Indenture Trustee, determine that the Proceedings so directed would be illegal or involve the Indenture Trustee in personal liability or be unjustly prejudicial to the Noteholders not parties to such direction.

Section 5.13.    Waiver of Past Defaults.

Prior to the declaration of the acceleration of the maturity of the Notes of the affected Series as provided in Section 5.03, a majority of the Outstanding Amount of the Notes of such Series may, on behalf of all such Noteholders, waive in writing any past default with respect to such Notes and its consequences, except a default:

(a)    in the payment of the principal or interest in respect of any Note of such Series, or

(b)    in respect of a covenant or provision hereof that under Section 10.02 hereof cannot be modified or amended without the consent of the Noteholder of each Outstanding Note affected.

Upon any such written waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 5.14.    Undertaking for Costs.

All parties to this Indenture agree, and each Noteholder by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.14 shall not apply to any suit instituted by the Indenture Trustee, to any suit instituted by any Noteholder, or group of Noteholders (in compliance with Section 5.08 hereof), holding in the aggregate more than 10% of the principal balance of the Outstanding Notes of the affected Series, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal or interest in respect of any Note on or after the Distribution Date on which any of such amounts was due (or, in the case of redemption, on or after the applicable Redemption Date).

FDIC00180

Section 5.15.    Waiver of Stay or Extension Laws.

The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may adversely affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.16.    Sale of Receivables.

(a)    The method, manner, time, place and terms of any sale of Receivables (or interests therein) pursuant to Section 5.05(a)(iii) shall be commercially reasonable. The Indenture Trustee may from time to time postpone any sale by public announcement made at the time and place of such sale. The Indenture Trustee hereby expressly waives its right to any amount fixed by law as compensation for any sale.

(b)    The Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer in connection with any sale of Receivables pursuant to Section 5.05(a)(iii). No purchaser or transferee at any such sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

(c)    In its exercise of the foreclosure remedy pursuant to Section 5.05(a)(iii), the Indenture Trustee shall solicit bids from Permitted Assignees for the sale of Principal Receivables in an amount equal to the Invested Amount with respect to the affected Series of Notes at the time of sale and the related Finance Charge Receivables (or interests therein). The Transferor or any of its affiliates (other than NextBank) who are Permitted Assignees shall be entitled to participate in, and to receive from the Indenture Trustee a copy of each other bid submitted in connection with, such bidding process; provided that (a) at least one participant other than the Transferor and any of its affiliates must submit a bona fide offer, and (b) the Transferor and any of its affiliates are prohibited from bidding an amount which exceeds fair value for the transferred assets. The Indenture Trustee shall sell such Receivables (or interests therein) to the bidder with the highest cash purchase offer. The proceeds of any such sale shall be applied in accordance with Section 5.05(b).

Section 5.17.    Action on Notes.

The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer. Any money or property collected by the Indenture Trustee shall be applied as specified in the applicable Indenture Supplement.

FDIC00181

Section 6.04.    Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, except the certificate of authentication of the Indenture Trustee, shall be taken as the statements of the Issuer, and the Indenture Trustee assumes no responsibility for their correctness. The Indenture Trustee makes no representation as to the validity or sufficiency of the Agreement, the Notes, or any related document. The Indenture Trustee shall not be accountable for the use or application by the Issuer of the proceeds from the Notes.

Section 6.05.    May Hold Notes.

The Indenture Trustee, any Paying Agent, Transfer Agent and Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer with the same rights it would have if it were not Indenture Trustee, Paying Agent, Transfer Agent and Registrar or such other agent.

Section 6.06.    Money Held in Trust.

Money held by the Indenture Trustee in trust hereunder need not be segregated from other funds held by the Indenture Trustee in trust hereunder except to the extent required herein or required by law. The Indenture Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon in writing by the Indenture Trustee and the Issuer.

Section 6.07.    Compensation, Reimbursement and Indemnification.

The Servicer shall pay to the Indenture Trustee from time to time reasonable compensation for all services rendered by the Indenture Trustee under this Agreement (which compensation shall not be limited by any law on compensation of a trustee of an express trust). The Servicer shall reimburse the Indenture Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts. Pursuant to the Transfer and Servicing Agreement, the Issuer shall direct the Servicer to indemnify and the Servicer shall indemnify the Indenture Trustee against any and all loss, liability or expense (including the fees of either in-house counsel or outside counsel, but not both) incurred by it in connection with the administration of this trust and the performance of its duties hereunder. The Indenture Trustee shall notify the Issuer and the Servicer promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Issuer and the Servicer shall not relieve the Issuer or the Servicer of its obligations hereunder unless such loss, liability or expense could have been avoided with such prompt notification and then only to the extent of such loss, expense or liability which could have been so avoided. The Servicer shall defend any claim against the Indenture Trustee; the Indenture Trustee may have separate counsel and, if it does, the Servicer shall pay the fees and expenses of such counsel. The Servicer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

The Servicer's payment obligations to the Indenture Trustee pursuant to this Section 6.07 shall survive the discharge of this Indenture. When the Indenture Trustee incurs expenses after the occurrence of a Default specified in subsection 5.02(d) or (e) with respect to the Issuer, the expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

(c)     Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee.  Every such instrument shall be filed with the Indenture Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 6.11.     Eligibility; Disqualification.

The Indenture Trustee shall at all times satisfy the requirements of TIA §310(a).  The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and its long-term unsecured debt shall be rated at least Baa3 by Moody's, at least BBB- by Standard & Poor's and, if rated by Fitch, at least BBB- by Fitch.  The Indenture Trustee shall comply with TIA §310(b), including the optional provision permitted by the second sentence of TIA §310(b)(9); provided, however, that there shall be excluded from the operation of TIA §310(b)(1) any indenture or indentures under which other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA §310(b)(1) are met.

Section 6.12.     Preferential Collection of Claims Against .

The Indenture Trustee shall comply with TIA §311(a), excluding any creditor relationship listed in TIA §311(b).  An Indenture Trustee who has resigned or been removed shall be subject to TIA §311(a) to the extent indicated.

Section 6.13.     Tax Returns.

In the event the Trust shall be required to file tax returns, the Servicer shall prepare or shall cause to be prepared such tax returns and shall provide such tax returns to the Owner Trustee for signature at least five (5) days before such tax returns are due to be filed.  The Servicer, in accordance with the terms of each Indenture Supplement, shall also prepare or shall cause to be prepared all tax information required by law to be distributed to Noteholders and shall deliver such information to the Owner Trustee at least five (5) days prior to the date it is required by law to be distributed to Noteholders.  The Owner Trustee, upon written request, will furnish the Servicer with all such information known to the Owner Trustee as may be reasonably requested and required in connection with the preparation of all tax returns of the Trust, and shall, upon request, execute such returns.  In no event shall the Owner Trustee be personally liable for any liabilities, costs or expenses of the Trust or any Noteholder arising under any tax law, including without limitation, federal, state or local income or excise taxes or any other tax imposed on or measured by income (or any interest or penalty with respect thereto arising from a failure to comply therewith).

FDIC00186

## ARTICLE VIII

## ALLOCATION AND APPLICATION OF COLLECTIONS

Section 8.01.    Collection of Money.

Except as otherwise expressly provided herein and in the related Indenture Supplement, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture. Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under the Transfer and Servicing Agreement or any other Transaction Document, the Indenture Trustee may, and upon the request of a majority of the Holders of the Outstanding Amount of the Notes of an affected Series shall, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings. Any such action shall be without prejudice to any right to claim a Redemption Event or a Default or Event of Default under this Indenture and to proceed thereafter as provided in Article V hereof.

Section 8.02.    Rights of Noteholders.

The Collateral shall secure the obligation of the Trust to pay to the Holders of the Notes of each Series principal and interest and other amounts payable pursuant to this Indenture and the related Indenture Supplement. Except as specifically set forth in the Indenture Supplement with respect thereto, the Notes of any Series or Class shall not have rights to payment from any Series Account or Series Enhancement allocated for the benefit of any other Series or Class.

Section 8.03.    Establishment of Collection Account and Special Funding Account.

The Servicer, for the benefit of the Noteholders, shall establish and maintain with the Indenture Trustee or its nominee in the name of the Indenture Trustee, on behalf of the Trust, one or more Qualified Accounts (including any subaccount thereof) bearing a designation clearly indicating that the funds and other property credited thereto are held for the benefit of the Noteholders (collectively, the "Collection Account"). The Indenture Trustee shall possess all right, title and interest in all monies, instruments, investment property, documents, certificates of deposit and other property credited from time to time to the Collection Account and in all proceeds, earnings, income, revenue, dividends and distributions thereof for the benefit of the Noteholders.

The Collection Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders. Except as expressly provided in this Indenture and the Transfer and Servicing Agreement, the Servicer agrees that it shall have no right of setoff or banker's lien against, and no right to otherwise deduct from, any funds held in the Collection Account for any amount owed to it by the Indenture Trustee, the Trust, any Noteholder or any Series Enhancer. If, at any time, the Collection Account ceases to be a Qualified Account, the Indenture Trustee (or the Servicer on its behalf) shall within ten (10) Business Days (or such longer period, not to exceed thirty (30) calendar days, as to which each Rating Agency may consent) establish a new Collection Account meeting the conditions specified above, transfer any monies, documents, instruments, investment property, certificates of deposit and other property to such new Collection Account and from the date such new Collection Account is established, it shall be the "Collection Account." Pursuant to the authority granted to the Servicer in subsection 3.01(b) of the Transfer and Servicing Agreement, the Servicer shall have the power, revocable

by the Indenture Trustee, to make withdrawals and payments from the Collection Account and to instruct the Indenture Trustee to make withdrawals and payments from the Collection Account for the purposes of carrying out the Servicer's or the Indenture Trustee's duties hereunder and under the Transfer and Servicing Agreement, as applicable. The Servicer shall reduce deposits into the Collection Account payable by the Transferor on any Deposit Date to the extent the Transferor is entitled to receive funds from the Collection Account on such Deposit Date, but only to the extent such reduction would not reduce the Transferor Interest to an amount less than the Required Transferor Interest.

Funds on deposit in the Collection Account (other than investment earnings and amounts deposited pursuant to Section 2.06, 6.01, or 7.01 of the Transfer and Servicing Agreement or Section 11.02 of this Indenture) shall at the written direction of the Servicer be invested by the Indenture Trustee in Eligible Investments selected by the Servicer. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Noteholders pursuant to Section 6.15. Investments of funds representing Collections collected during any Monthly Period shall be invested in Eligible Investments that will mature so that such funds will be available no later than the close of business on each monthly Transfer Date following such Monthly Period. No such Eligible Investment shall be disposed of prior to its maturity; provided, however, that the Indenture Trustee may sell, liquidate or dispose of any such Eligible Investment before its maturity, at the written direction of the Servicer, if such sale, liquidation or disposal would not result in a loss of all or part of the principal portion of such Eligible Investment or if, prior to the maturity of such Eligible Investment, a default occurs in the payment of principal, interest or any other amount with respect to such Eligible Investment. Unless directed by the Servicer, funds deposited in the Collection Account on a Transfer Date with respect to the immediately succeeding Distribution Date are not required to be invested overnight. On each Distribution Date, all interest and other investment earnings (net of losses and investment expenses) on funds on deposit in the Collection Account shall be paid to the Transferor, except as otherwise specified in any Indenture Supplement. The Indenture Trustee shall bear no responsibility or liability for any losses resulting from investment or reinvestment of any funds in accordance with this Section 8.03 nor for the selection of Eligible Investments in accordance with the provisions of this Indenture and any Indenture Supplement (other than Eligible Investments on which the institution acting as Indenture Trustee is an obligor).

The Servicer, for the benefit of the Noteholders, shall establish and maintain with the Indenture Trustee or its nominee in the name of the Indenture Trustee, on behalf of the Trust, a Qualified Account (including any subaccounts thereof) bearing a designation clearly indicating that the funds and other property credited thereto are held for the benefit of the Noteholders (the "**Special Funding Account**"). The Indenture Trustee shall possess all right, title and interest in all monies, instruments, investment property, documents, certificates of deposit and other property credited from time to time to the Special Funding Account and in all proceeds, dividends, distributions, earnings, income and revenue thereof for the benefit of the Noteholders. The Special Funding Account shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders. Except as expressly provided in this Indenture and the Transfer and Servicing Agreement, the Servicer shall have no right of setoff or banker's lien against, and no right to otherwise deduct from, any funds and other property held in the Special Funding Account for any amount owed to it by the Indenture Trustee, the Trust, any Noteholder or any Series Enhancer. If, at any time, the Special Funding Account ceases to be a Qualified Account, the Indenture Trustee (or the Servicer on its behalf) shall within ten (10) Business Days (or such longer period, not to exceed thirty (30) calendar days, as to which each Rating Agency may consent) establish a new Special Funding Account meeting the conditions specified above, transfer any monies, documents, instruments, investment property, certificates of deposit and other property to such new Special Funding Account and from the date such new Special Funding Account is established, it shall be the "**Special Funding Account**."

FDIC00190

Funds on deposit in the Special Funding Account shall at the written direction of the Servicer be invested by the Indenture Trustee in Eligible Investments selected by the Servicer. All such Eligible Investments shall be held by the Indenture Trustee for the benefit of the Noteholders pursuant to Section 6.15. Funds on deposit in the Special Funding Account on any Distribution Date will be invested in Eligible Investments that will mature so that such funds will be available no later than the close of business on the Transfer Date following such Monthly Period. No such Eligible Investment shall be disposed of prior to its maturity; provided, however, that the Indenture Trustee may sell, liquidate or dispose of an Eligible Investment before its maturity, at the written direction of the Servicer, if such sale, liquidation or disposal would not result in a loss of all or part of the principal portion of such Eligible Investment or if, prior to the maturity of such Eligible Investment, a default occurs in the payment of principal, interest or any other amount with respect to such Eligible Investment. Unless directed by the Servicer, funds deposited in the Special Funding Account on a Transfer Date with respect to the immediately succeeding Distribution Date are not required to be invested overnight. On each Distribution Date, all interest and other investment earnings (net of losses and investment expenses) on funds on deposit in the Special Funding Account shall be treated as Collections of Finance Charge Receivables with respect to the last day of the related Monthly Period except as otherwise specified in the related Indenture Supplement. On each Business Day on which funds are on deposit in the Special Funding Account and on which no Series is in an Accumulation Period or Amortization Period, the Servicer shall determine the amount (if any) by which the Transferor Interest exceeds the Required Transferor Interest on such date and shall instruct the Indenture Trustee to withdraw any such excess from the Special Funding Account and pay such amount to the Holders of the Transferor Certificates; provided, however; that, if an Accumulation Period or Amortization Period has commenced and is continuing with respect to one or more outstanding Series, any funds on deposit in the Special Funding Account shall be treated as Shared Principal Collections and shall be allocated and distributed in accordance with Section 8.05 and the terms of each Indenture Supplement.

Section 8.04.    <u>Collections and Allocations</u>.

(a)    The Servicer will apply or will instruct the Indenture Trustee to apply all funds on deposit in the Collection Account as described in this Article VIII and in each Indenture Supplement. Except as otherwise provided below, the Servicer shall deposit Collections into the Collection Account as promptly as possible after the Date of Processing of such Collections, but in no event later than the second Business Day following the Date of Processing. Subject to the express terms of any Indenture Supplement, but notwithstanding anything else in this Indenture or the Transfer and Servicing Agreement to the contrary, if one or more of the following conditions is satisfied: (i) NextBank remains the Servicer; NextCard guarantees the performance of the Servicer's obligations (unless the Rating Agencies shall consent to the deletion of such guarantee) and achieves and maintains a commercial paper rating of not less than A-1 by Standard & Poor's, not less than P-1 by Moody's and, if rated by Fitch, not less than F1 by Fitch, and NextBank remains a wholly-owned NextCard subsidiary (directly or indirectly) and in the event that there is any material change in the financing relationship between NextBank and NextCard, (A) NextBank shall have notified each Rating Agency and (B) the Rating Agency Condition shall be satisfied with respect to such material change, or (ii) any other arrangements are made such that the Rating Agency Condition is satisfied with respect thereto, and for two (2) Business Days following any reduction of any such rating or change in ownership, the Servicer need not make the daily deposits of Collections into the Collection Account as provided in the preceding sentence, but may make a single deposit in the Collection Account in immediately available funds not later than 1:00 p.m., New York City time, on the Transfer Date immediately preceding the Distribution Date following the Monthly Period with respect to which such deposit relates. Subject to the first proviso in Section 8.05, but notwithstanding anything else in this Indenture or the Transfer and Servicing Agreement to the contrary, with respect to any Monthly Period, whether the Servicer is required to make deposits of collections pursuant to the first or the second preceding sentence, (i) the Servicer will only be required to deposit

FDIC00191

Collections into the Collection Account up to the aggregate amount of Collections required to be deposited into any Series Account or, without duplication, distributed on or prior to the related Distribution Date to Noteholders or to any Series Enhancer pursuant to the terms of any Indenture Supplement or Enhancement Agreement and (ii) if at any time prior to such Distribution Date the amount of Collections deposited in the Collection Account exceeds the amount required to be deposited pursuant to clause (i) above, the Servicer will be permitted to withdraw the excess from the Collection Account and pay such amounts pursuant to the terms of the Transaction Documents. Subject to the immediately preceding sentence, the Servicer may retain its Servicing Fee with respect to a Series and shall not be required to deposit it in the Collection Account. To the extent that, in accordance with this subsection 8.04(a), the Servicer has retained amounts which would otherwise be required to be deposited into the Collection Account or any Series Account with respect to any Monthly Period, the Servicer shall be required to deposit such amounts in the Collection Account or such Series Account on the related Distribution Date to the extent necessary to make required distributions on the related Distribution Date, including any amounts which are required to be applied as Reallocated Principal Collections, and pay any amounts remaining after making such deposit pursuant to the terms of the Transaction Documents.

(b)     Collections of Finance Charge Receivables, Principal Receivables and Defaulted Receivables will be allocated to each Series of Notes and to the Holders of the Transferor Certificates in accordance with this Article VIII and each Indenture Supplement and amounts so allocated to any Series will not, except as specified in the related Indenture Supplement, be available to the Noteholders of any other Series. Allocations of the foregoing amounts between the Holders of the Notes and the Holders of the Transferor Certificates, among the Series and among the Classes in any Series, shall be set forth in the related Indenture Supplement or Indenture Supplements.

Section 8.05.     Shared Principal Collections.

On each Distribution Date, (a) the Servicer shall allocate Shared Principal Collections (as described below) to each Principal Sharing Series, *pro rata*, in proportion to the Principal Shortfalls, if any, with respect to each such Series and (b) the Servicer shall withdraw from the Collection Account and pay to the Holders of the Transferor Certificates an amount equal to the excess, if any, of (x) the aggregate amount for all outstanding Series of Collections of Principal Receivables which the related Indenture Supplements specify are to be treated as "**Shared Principal Collections**" for such Distribution Date over (y) the aggregate amount for all outstanding Series which the related Indenture Supplements specify are "**Principal Shortfalls**" for such Series and for such Distribution Date; provided, however, that if the Transferor Interest as of such Distribution Date (determined after giving effect to the Principal Receivables or Participation Interests transferred to the Trust on such date) is less than the Required Transferor Interest, the Servicer will not distribute to the Holders of the Transferor Certificates any such amounts that otherwise would be distributed to the Holders of the Transferor Certificates, but shall deposit such funds in the Special Funding Account. The Transferor may, at its option, instruct the Indenture Trustee to deposit Shared Principal Collections which are otherwise payable to the Holders of the Transferor Certificates pursuant to the provisions set forth above into the Special Funding Account. Notwithstanding the foregoing, a Group of Series may specify in their related Indenture Supplements that Shared Principal Collections from such Series shall be allocated as provided above but only among the Series in such Group.

Section 8.06.     Additional Withdrawals from the Collection Account.

On or before the Determination Date with respect to any Monthly Period, the Servicer shall determine the amounts payable to NextBank or any other Account Owner with respect to such Monthly Period under the Transfer and Servicing Agreement or any applicable Receivables Purchase Agreement in respect of amounts credited to the Collection Account that were not transferred to the Trust

FDIC00192

under the Transfer and Servicing Agreement, and the Servicer shall withdraw such amounts not belonging to the Trust from the Collection Account and pay such amounts to NextBank or any other Account Owner, as applicable.

Section 8.07.    Allocation of Collateral to Series or Groups.

To the extent so provided in the Indenture Supplement for any Series or in an Indenture Supplement otherwise executed pursuant to Section 10.01, Receivables conveyed to the Trust pursuant to Section 2.01 of the Transfer and Servicing Agreement and Receivables or Participation Interests conveyed to the Trust pursuant to Section 2.09 of the Transfer and Servicing Agreement or any Participation Interest Supplement, and all Collections received with respect thereto may be allocated or applied in whole or in part to one or more Series or Groups as may be provided in such Indenture Supplement; provided, however, that any such allocation or application shall be effective only upon satisfaction of the following conditions:

(i)    on or before the fifth Business Day immediately preceding such allocation, the Servicer shall have given the Indenture Trustee and each Rating Agency written notice of such allocation;

(ii)    the Rating Agency Condition shall have been satisfied with respect to such allocation; and

(iii)    the Servicer shall have delivered to the Indenture Trustee an Officer's Certificate, dated the date of such allocation, to the effect that the Servicer reasonably believes that such allocation will not have an Adverse Effect.

Any such Indenture Supplement may provide that (i) such allocation to one or more particular Series or Groups may terminate upon the occurrence of certain events specified therein and (ii) that upon the occurrence of any such event, such assets and any Collections with respect thereto, shall be reallocated to other Series or Groups or to all Series, all as shall be provided in such Indenture Supplement.

Section 8.08.    Excess Finance Charge Collections.

On each Distribution Date, (a) the Servicer shall allocate Excess Finance Charge Collections (as described below) to each Excess Allocation Series, pro rata, in proportion to the Finance Charge Shortfalls (as described below), if any, with respect to each such Series and (b) the Servicer shall withdraw from the Collection Account and pay to the Holders of the Transferor Certificates an amount equal to the excess, if any, of (x) the aggregate amount for all outstanding Series of Collections of Finance Charge Receivables which the related Supplements specify are to be treated as "**Excess Finance Charge Collections**" for such Distribution Date over (y) the aggregate amount for all outstanding Series which the related Supplements specify are "**Finance Charge Shortfalls**" for such Series and such Distribution Date; provided, however, that the sharing of Excess Finance Charge Collections among Series will continue only until such time, if any, at which the Transferor shall deliver to the Indenture Trustee an Officer's Certificate to the effect that, in the reasonable belief of the Transferor, the continued sharing of Excess Finance Charge Collections among Series would have adverse regulatory implications with respect to an Account Owner. Notwithstanding the foregoing, a Group of Series may specify in their related Indenture Supplements that Excess Finance Charge Collections from such Series shall be allocated as provided above but only among the Series in such Group.

FDIC00193

(b)     The Issuer and the Indenture Trustee, when authorized by an Issuer Order, may, also without the consent of any Noteholders of any Series then Outstanding but upon satisfaction of the Rating Agency Condition with respect to the Notes of all Series, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however that (i) the Transferor shall have delivered to the Indenture Trustee an Officer's Certificate, dated the date of any such action, stating that the Transferor reasonably believes that such action will not have an Adverse Effect and (ii) a Tax Opinion shall have been delivered to each Rating Agency. Additionally, notwithstanding the preceding sentence, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, may, without the consent of any Noteholders of any Series then Outstanding or the Series Enhancers for any Series, enter into an indenture or indentures supplemental hereto to add, modify or eliminate such provisions as may be necessary or advisable in order to enable all or a portion of the Trust (i) to qualify as, and to permit an election to be made to cause the Trust to be treated as, a "financial asset securitization investment trust" as described in the provisions of Section 860L of the Code, and (ii) to avoid the imposition of state or local income or franchise taxes imposed on the Trust's property or its income; provided, however, that (i) the Transferor delivers to the Indenture Trustee and the Owner Trustee an Officer's Certificate to the effect that the proposed amendments meet the requirements set forth in this subsection 10.01(b), (ii) the Rating Agency Condition will have been satisfied and (iii) such amendment does not affect the rights, duties or obligations of the Indenture Trustee or the Owner Trustee hereunder. The amendments which the Transferor may make without the consent of Noteholders pursuant to the preceding sentence may include, without limitation, the addition of a sale of Receivables.

Section 10.02.    Supplemental Indentures with Consent of Noteholders.

The Issuer and the Indenture Trustee, when authorized by an Issuer Order, also may, upon satisfaction of the Rating Agency Condition and with the consent of the Holders of not less than a majority of the Outstanding Amount of the Notes of each adversely affected Series of Notes, by Act of such Holders delivered to the Issuer and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of such Noteholders under this Indenture; provided, however that no such supplemental indenture shall, without the consent of the Holder of each outstanding Note affected thereby:

(a)     change the due date of any installment of principal of or interest on any Note, or reduce the principal amount thereof, the interest rate specified thereon or the redemption price with respect thereto or change any place of payment where, or the coin or currency in which, any Note or any interest thereon is payable;

(b)     impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes on or after the respective due dates thereof (or, in the case of redemption, on or after the Redemption Date);

(c)     reduce the percentage of the Outstanding Amount of the Notes of any Series outstanding the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences as provided for in this Indenture;

FDIC00195

Section 10.05.  <u>Conformity With Trust Indenture Act</u>.

Every amendment of this Indenture and every supplemental indenture executed pursuant to this Article X shall conform to the requirements of the TIA as then in effect so long as this Indenture shall then be qualified under the TIA.

Section 10.06.  <u>Reference in Notes to Supplemental Indentures</u>.

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article X may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for the outstanding Notes.

<div align="center">

ARTICLE XI

TERMINATION

</div>

Section 11.01.  <u>Termination of Trust</u>.

The Trust and the respective obligations and responsibilities of the Indenture Trustee created hereby (other than the obligation of the Indenture Trustee to make payments to Noteholders as hereinafter set forth) shall terminate, except with respect to the duties described in subsection 11.02(b), as provided in the Trust Agreement.

Section 11.02.  <u>Final Distribution</u>.

(a)    The Servicer shall give the Indenture Trustee at least thirty (30) days prior notice of the Distribution Date on which the Noteholders of any Series or Class may surrender their Notes for payment of the final distribution on and cancellation of such Notes (or, in the event of a final distribution resulting from the application of Section 2.06, 6.01 or 7.01 of the Transfer and Servicing Agreement, notice of such Distribution Date promptly after the Servicer has determined that a final distribution will occur, if such determination is made less than thirty (30) days prior to such Distribution Date). Such notice shall be accompanied by an Officer's Certificate setting forth the information specified in Section 3.05 of the Transfer and Servicing Agreement covering the period during the then-current calendar year through the date of such notice. Not later than the fifth day of the month in which the final distribution in respect of such Series or Class is payable to Noteholders, the Indenture Trustee shall provide notice to Noteholders of such Series or Class specifying (i) the date upon which final payment of such Series or Class will be made upon presentation and surrender of Notes of such Series or Class at the office or offices therein designated, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such payment date is not applicable, payments being made only upon presentation and surrender of such Notes at the office or offices therein specified (which, in the case of Bearer Notes, shall be outside the United States). The Indenture Trustee shall give such notice to the Transfer Agent and Registrar and the Paying Agent at the time such notice is given to Noteholders.

(b)    Notwithstanding a final distribution to the Noteholders of any Series or Class (or the termination of the Trust), except as otherwise provided in this paragraph, all funds then on deposit in the Collection Account and any Series Account allocated to such Noteholders shall continue to be held in trust for the benefit of such Noteholders and the Paying Agent or the Indenture Trustee shall pay such

FDIC00197

funds to such Noteholders upon surrender of their Notes, if certificated (and any excess shall be paid in accordance with the terms of any Enhancement Agreement). In the event that all such Noteholders shall not surrender their Notes for cancellation within six (6) months after the date specified in the notice from the Indenture Trustee described in paragraph (a), the Indenture Trustee shall give a second notice to the remaining such Noteholders to surrender their Notes for cancellation and receive the final distribution with respect thereto (which surrender and payment, in the case of Bearer Notes, shall be outside the United States). If within one year after the second notice all such Notes shall not have been surrendered for cancellation, the Indenture Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining such Noteholders concerning surrender of their Notes, and the cost thereof shall be paid out of the funds in the Collection Account or any Series Account held for the benefit of such Noteholders. The Indenture Trustee and the Paying Agent shall pay to the Issuer any monies held by them for the payment of principal or interest that remains unclaimed for two (2) years. After payment to the Issuer, Noteholders entitled to the money must look to the Issuer for payment as general creditors unless an applicable abandoned property law designates another Person.

Section 11.03.  Termination Distributions.

Upon the termination of the Trust pursuant to the terms of the Trust Agreement, the Indenture Trustee shall assign and convey to the Holders of the Transferor Certificates or any of their designees, without recourse, representation or warranty, all right, title and interest of the Trust in the Receivables, whether then existing or thereafter created, all Interchange and Recoveries related thereto, all monies due or to become due and all amounts received or receivable with respect thereto (including all moneys then held in the Collection Account or any Series Account) and all proceeds thereof, except for amounts held by the Indenture Trustee pursuant to subsection 11.02(b). The Indenture Trustee shall execute and deliver such instruments of transfer and assignment, in each case without recourse, as shall be reasonably requested by the Holders of the Transferor Certificates to vest in the Holders of the Transferor Certificates or any of their designees all right, title and interest which the Indenture Trustee had in the Collateral and such other property.

Section 11.04.  Defeasance.

Notwithstanding anything to the contrary in this Indenture and unless otherwise specified with respect to any Series in the applicable Indenture Supplement:

(a)      The Issuer may at its option be discharged from its obligations hereunder with respect to any Series or all outstanding Series (each, a "**Defeased Series**") on the date the applicable conditions set forth in subsection 11.04(c) are satisfied (a "**Defeasance**"); provided, however, that the following rights, obligations, powers, duties and immunities shall survive with respect to each Defeased Series until otherwise terminated or discharged hereunder: (i) the rights of the Holders of Notes of the Defeased Series to receive, solely from the trust fund provided for in subsection 11.04(c), payments in respect of principal of and interest on such Notes when such payments are due; (ii) the Issuer's obligations with respect to such Notes under Sections 2.05 and 2.06; (iii) the rights, powers, trusts, duties, and immunities of the Indenture Trustee, the Paying Agent and the Registrar hereunder; and (iv) this Section 11.04 and Section 12.16.

(b)      Subject to subsection 11.04(c), the Issuer at its option may cause Collections allocated to each Defeased Series and available to purchase additional Receivables to be applied to purchase Eligible Investments rather than additional Receivables.

(c)      The following shall be the conditions precedent to any Defeasance under subsection 11.04(a):

**FDIC00198**

(i)     the Issuer irrevocably shall have deposited or caused to be deposited with the Indenture Trustee (such deposit to be made from other than the Issuer's or any Affiliate of the Issuer's funds), under the terms of an irrevocable trust agreement in form and substance satisfactory to the Indenture Trustee, as trust funds in trust for making the payments described below, (A) Dollars in an amount equal to, or (B) Eligible Investments which through the scheduled payment of principal and interest in respect thereof will provide, not later than the due date of payment thereon, money in an amount equal to, or (C) a combination thereof, in each case sufficient to pay and discharge (without relying on income or gain from reinvestment of such amount), and which shall be applied by the Indenture Trustee to pay and discharge, all remaining scheduled interest and principal payments on all outstanding Notes of each Defeased Series on the dates scheduled for such payments in this Indenture and the applicable Indenture Supplements and all amounts owing to the Series Enhancers with respect to each Defeased Series;

(ii)    a statement from a firm of nationally recognized independent public accountants (who may also render other services to the Issuer) to the effect that such deposit is sufficient to pay the amounts specified in clause (i) above;

(iii)    prior to its exercise of its right pursuant to this Section 11.04 with respect to any Defeased Series to substitute money or Eligible Investments for Receivables, the Issuer shall have delivered to the Indenture Trustee an Opinion of Counsel to the effect contemplated by clause (b) of the definition in this Indenture of the term "**Tax Opinion**" (the preparation and delivery of which shall not be at the expense of the Indenture Trustee) with respect to such deposit and termination of obligations, and an Opinion of Counsel to the effect that such deposit and termination of obligations will not result in the Trust being required to register as an "investment company" within the meaning of the Investment Company Act;

(iv)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate of the Transferor stating that the Transferor reasonably believes that such deposit and termination of obligations will not, based on the facts known to such officer at the time of such certification, then cause a Redemption Event with respect to any Series or any event that, with the giving of notice or the lapse of time, would result in the occurrence of a Redemption Event with respect to any Series; and

(v)    the Rating Agency Condition shall have been satisfied and the Issuer shall have delivered copies of such written notice to the Servicer and the Indenture Trustee.

<center>ARTICLE XII</center>

<center>MISCELLANEOUS</center>

Section 12.01.  <u>Compliance Certificates and Opinions etc.</u>

(a)    Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with, (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with and (iii) (if required by the TIA) an Independent Certificate from a firm of certified public accountants meeting the applicable requirements of this Section 12.01, except that, in the case of any such application or request as to which

**FDIC00199**

Section 12.11.  Benefits of Indenture.

Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Noteholders, the Servicer and the Transferor, any benefit.

Section 12.12.  Legal Holidays.

In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

Section 12.13.  **GOVERNING LAW.**

**THE INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.**

Section 12.14.  Counterparts.

This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 12.15.  Trust Obligation.

No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their individual capacity) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity. For all purposes of this Indenture, in the performance of any duties or obligations hereunder, the Owner Trustee (as such or in its individual capacity) shall be subject to, and entitled to the benefits of, the terms and provisions of the Trust Agreement.

Section 12.16.  No Petition.

The Indenture Trustee, by entering into this Indenture, and each Noteholder, by accepting a Note, hereby covenant and agree that they will not at any time institute against the Issuer, or join in instituting against the Issuer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.

**FDIC00204**

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers thereunto duly authorized and attested, all as of the day and year first above written.

NEXTCARD CREDIT CARD MASTER
NOTE TRUST,
  as Issuer

By:  Wilmington Trust Company,
    not in its individual capacity,
    but solely as Owner Trustee

By: _____
  Name: _____
  Title:   JAMES P. LAWLER
      Vice President

THE BANK OF NEW YORK,
  as Indenture Trustee

By:_____
  Name: _____
  Title: _____

DOCSSF1:490698

FDIC00205

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers thereunto duly authorized and attested, all as of the day and year first above written.

NEXTCARD CREDIT CARD MASTER
NOTE TRUST,
as Issuer

By: Wilmington Trust Company,
not in its individual capacity,
but solely as Owner Trustee

By: _____
Name:
Title:

THE BANK OF NEW YORK,
as Indenture Trustee

By: _____
Name:
Title:

[Signature Page to Master Indenture]

FDIC00206

Acknowledged and Accepted:

NEXTBANK, N.A.,
as Transferor and Servicer

By: _____

Name:   Bruce G. Rigione
Title:    Senior Vice President,
            Chief Financial Officer,
            Treasurer

**FDIC00207**

DOCSSF1:490698

EXHIBIT B

### Transferor Certificate

THIS TRANSFEROR CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NEITHER THIS TRANSFEROR CERTIFICATE NOR ANY PORTION HEREOF MAY BE OFFERED OR SOLD EXCEPT IN COMPLIANCE WITH THE REGISTRATION PROVISIONS OF SUCH ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM SUCH REGISTRATION PROVISIONS.

THIS TRANSFEROR CERTIFICATE IS NOT PERMITTED TO BE TRANSFERRED, ASSIGNED, EXCHANGED OR OTHERWISE PLEDGED OR CONVEYED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE TRUST AGREEMENT REFERRED TO HEREIN.

No. R-2                                                                                                One Unit

### NEXTCARD CREDIT CARD MASTER NOTE TRUST
### TRANSFEROR CERTIFICATE

### THIS CERTIFICATE REPRESENTS AN INTEREST
### IN CERTAIN ASSETS OF THE
### NEXTCARD CREDIT CARD MASTER NOTE TRUST

Evidencing an interest in a trust, the corpus of which consists primarily of receivables generated from time to time in the ordinary course of business in a portfolio of revolving credit card accounts transferred by NextBank (the "**Transferor**").

(Not an interest in or obligation of the Transferor
or any affiliate thereof)

This certifies that NEXTBANK, N.A. is the registered owner of an undivided beneficial interest in the assets of a trust (the "**Trust**"), subject to the lien of the Notes as provided in the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "**Indenture**"), between The Bank of New York, as Indenture Trustee and the Trust, established pursuant to the Trust Agreement, dated as of December 1, 2000 (as amended and supplemented, the "**Trust Agreement**"), between the Transferor, and Wilmington Trust Company, as owner trustee (not in its individual capacity, but solely as owner trustee the "**Owner Trustee**"). The corpus of the Trust consists of (a) a portfolio of certain receivables (the "**Receivables**") existing in the revolving credit card accounts identified under the Transfer and Servicing Agreement, dated as of December 11, 2000, as amended from time to time (the "**Transfer and Servicing Agreement**"), among the Transferor, NextBank, N.A., as Servicer (the "**Servicer**") and the Trust, as Issuer, from time to time (the "**Accounts**"), (b) certain funds collected or to be collected from accountholders in respect of the Receivables, (c) all funds which are from time to time on deposit in the Collection Account, Special Funding Account and in the Series Accounts, (d) the benefits of any Series Enhancements issued and to be issued by Series Enhancers with respect to one or more Series of Notes and (e) all other assets and interests constituting the Trust, including Interchange and Recoveries allocated to the Trust pursuant to the Transfer and Servicing Agreement. Although a summary of certain provisions of the Transfer and Servicing Agreement, the Trust Agreement and the Indenture (collectively, the "**Agreements**") is set forth below, this Certificate does not purport to summarize the Agreements and reference is made to the Agreements for information with respect to the interests, rights, benefits, obligations, proceeds and duties evidenced hereby and the rights, duties and obligations of the Owner Trustee. A copy of the Agreements may be requested from the Owner Trustee

by writing to the Owner Trustee at the Corporate Trust Office. To the extent not defined herein, the capitalized terms used herein have the meanings ascribed to them in the Agreements.

This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreements, to which Agreements, as amended and supplemented from time to time, the Transferor by virtue of the acceptance hereof assents and is bound.

The Receivables consist of Principal Receivables which arise generally from the purchase of merchandise and services and amounts advanced to cardholders as cash advances and Finance Charge Receivables which arise generally from Periodic Rate Finance Charges, Late Fees and other fees and charges with respect to the Accounts.

This Certificate (this "**Certificate**") is the Transferor Certificate, which represents the undivided beneficial interest in certain assets of the Trust, subject to the lien of the Notes, including the right to receive a portion of the Collections and other amounts at the times and in the amounts specified in the Indenture. In addition to the Transferor Certificate, (a) Notes will be issued to investors pursuant to the Indenture and (b) Supplemental Certificates may be issued pursuant to the Trust Agreement.

Unless otherwise specified in an Indenture Supplement with respect to a particular Series, the Transferor has entered into the Transfer and Servicing Agreement, and this Certificate is issued, with the intention that, for federal, state and local income and franchise tax purposes, (a) the Notes of each Series which are characterized as indebtedness at the time of their issuance will qualify as indebtedness of the Transferor secured by the Receivables and (b) the Trust shall not be treated as an association (or a publicly traded partnership) taxable as a corporation. The Transferor by the acceptance of this Certificate, agrees to treat the Notes for federal, state and local income and franchise tax purposes as indebtedness of the Transferor.

Subject to certain conditions and exceptions specified in the Agreements, the obligations created by the Agreements and the Trust created thereby shall terminate upon the earlier of (a) at the option of the Transferor, the day on which the rights of all Series of Notes to receive payments from the Trust have terminated (the "Trust Termination Date") and (b) dissolution of the Trust in accordance with applicable law.

Unless the certificate of authentication hereon has been executed by or on behalf of the Owner Trustee, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trust has caused this Certificate to be duly executed.

NEXTCARD CREDIT CARD MASTER NOTE TRUST

By: WILMINGTON TRUST COMPANY
not in its individual capacity, but solely as
Owner Trustee

By: _____
    Name:    JAMES J. LAWLER
    Title:   Vice President

Dated:  December _11_, 2000

**FDIC**

Federal Deposit Insurance Corporation
550 17th Street NW, Washington, DC 20429

General Counsel

February 12, 2002

VIA TELECOPY

Suzanne Andrews, Esq.
Senior Counsel
The Bank of New York
1 Wall Street
Legal Department, 29th Floor
New York, NY 10286

Dear Ms. Andrews:

As you are aware, on February 7, 2002, the FDIC was appointed receiver for Nextbank, N.A. On February 8, 2002, representatives of the FDIC, in its capacity as receiver, met with representatives of The Bank of New York, Indenture Trustee under the NextCard Credit Card Master Note Trust, in Phoenix, Arizona. The purpose of the meeting was to apprise the Trustee of the receiver's intentions with regard to the orderly disposition of the assets of Nextbank and to request the Trustee to cooperate with the FDIC in order to maximize the potential recovery for the bondholders as well as the FDIC, and to cause as little disruption as possible to the 1.2 million cardholders who hold Nextbank Visa credit cards. Although the purpose of the meeting was to request the cooperation of the Trustee for the mutual benefit of all concerned, and we were pleased with the Trustee's initial indications in this regard, we wish to reiterate the FDIC's legal position.

Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), the FDIC was granted broad powers that are designed to protect the public from the ramifications of the failure of depository institutions. Upon its appointment as receiver, the FDIC, as receiver, succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution...." 12 U.S.C. § 1821 (d)(2)(A)(I). The power to control an institution's assets includes the power to "conduct all business of the institution," 12 U.S.C. § 1821(d)(2)(B)(I), "perform all functions of the institution ... consistent with the appointment as conservator or receiver, " 12 U.S.C. § 1821(d)(2)(B)(iii), and "preserve and conserve the assets and property of such institution." 12 U.S.C. § 1821(d)(2)(B)(iv). The primary objective of the FDIC as receiver is to maximize the value of the assets of the failed institutions. 12 U.S.C. § 1441a(b)(3)(I); see also Resolution Trust Corp v. Diamond, 45 F.3d 665, 676-77 (2d Cir. 1995). 12 U.S.C. § 1821(e)(12)(A) provides the FDIC as receiver with the authority to enforce contracts entered into by a depository

FDIC01187

institution, even if such a contract permits termination, acceleration or default solely by reason of insolvency or the appointment of a receiver. The section states:

> "The conservator or receiver may enforce any contract, other than a director's or officer's liability insurance contract or depository institution bond, entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver."

12 U.S.C. § 1821(e)(12)(A).

The Master Indenture Agreement between NextCard Credit Card Master Note Trust (the "Trust") and the Bank of New York, and the Transfer and Servicing Agreement between Nextbank and the Trust, each contain an automatic default or acceleration provision that is unenforceable under 12 U.S.C. § 1821(e)(12)(A). Because these provisions are triggered "solely by reason of, insolvency or the appointment of a receiver," they are in direct contravention of FIRREA. We assume that the Trustee will recognize these rights and act or refrain from acting accordingly. The FDIC is prepared to assert its rights under FIRREA should the need arise.

We hope that this letter clarifies the FDIC's position. Please feel free to contact Henry Griffin, at 202-736-0100, if you have any further questions.

Sincerely,

William F. Kroener, III
General Counsel

cc:    Standard & Poor's
       Moody's Investors Service
       J. Michael Shepherd
       Gerry Comizio (Thacher Proffitt)

FDIC01188

# THE BANK OF NEW YORK

NEW YORK'S FIRST BANK - FOUNDED 1784 BY ALEXANDER HAMILTON

February 14, 2002

5 PENN PLAZA, NEW YORK, NY 10001

Re:  NextCard Credit Card Master Note Trust, Series 2000-1
Asset Backed Notes, Series 2000-1 Class A (CUSIP NO.
U64974AA3), Class B (CUSIP NO. U64974AB1) and
Class C (Rule 144A CUSIP NO. 65334UAC7; Reg. S
CUSIP NO. U64974AC9)

Dear Series 2000-1 Noteholder:

Reference is hereby made to the Master Indenture (the "Indenture"), dated as of December 1, 2000 between NextCard Credit Card Master Note Trust, as issuer (the "Issuer") and The Bank of New York, as indenture trustee (the "Indenture Trustee"). Further reference is hereby made to the Series 2000-1 Indenture Supplement (the "Supplement"), dated as of December 13, 2000, between the Issuer and the Indenture Trustee. This notice is being provided by the Indenture Trustee pursuant to Section 6.02 of the Indenture. Capitalized terms used and not otherwise defined herein shall have the meanings assigned in the Indenture and the Supplement.

On February 7, 2002, the Office of the Comptroller of the Currency ("OCC") announced that it had closed NextBank NA, Phoenix, Arizona ("NextBank"), the Transferor and Servicer under the Transfer and Servicing Agreement, and that the OCC had appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. Such action by the OCC constitutes a Redemption Event under Section 5.01(a) of the Indenture, and would, if not cured within sixty days, constitute a Servicer Default pursuant to Section 7.01 of the Transfer and Servicing Agreement.

Section 5.01(b) of the Indenture provides that, upon the occurrence of a Redemption Event, an Amortization Period shall commence and payment on the Notes will be made in accordance with the terms of the Supplement. The Supplement provides that an Early Amortization Period shall commence on the Business Day immediately preceding the day on which a Redemption Event is deemed to have occurred. During an Early Amortization Event, payments in respect of principal on the Notes are to be made in accordance with Section 4.01(c)(ii)(z) of the Supplement.

Section 7.01 of the Transfer and Servicing Agreement provides that, if within sixty days a Servicer Default is not cured, the Indenture Trustee shall have the right to appoint a new Servicer.

However, as disclosed in the Offering Memorandum Supplement to the Offering Memorandum dated December 6, 2000, the FDIC may have the power to prevent the triggering of automatic default or acceleration provisions, such as an Early Amortization

HPW-NY:LEGAL.46519-1:1-508-00076:02-14-2002 4-24 PM

**FDIC01190**

## THE BANK OF NEW YORK

Period, regardless of the terms of the Transfer and Servicing Agreement, the Indenture, or the instructions of those authorized to direct the Indenture Trustee's actions. The Indenture Trustee is currently engaged in discussions with the FDIC and has been informed that, pursuant to the terms of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"), the FDIC is exercising its power to prevent the triggering of automatic default or acceleration provisions, including those that relate to the commencement of an Early Amortization Period or the occurrence of an Insolvency Event or a Servicer Default. Specifically, the section of FIRREA cited by the FDIC provides that the receiver may enforce any contract entered into by the depository institution "notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver." 12 U.S.C. § 1821(e)(12)(A). Accordingly, the FDIC has taken the position that no Early Amortization Period may commence and no Insolvency Event or Servicer Default would occur.

While the matter remains in discussion with the FDIC, payments of principal to the Noteholders will continue to be made in accordance with Section 4.01(c) of the Supplement as if a Redemption Event had not occurred under the Indenture. Furthermore, the FDIC has represented that, as it now stands in the shoes of NextBank, it is currently acting as Servicer under the Transfer and Servicing Agreement, and therefore there is no prospective Servicer Default that needs curing.

If you have any questions with respect to the foregoing, please contact one of the representatives of the Indenture Trustee indicated below.

THE BANK OF NEW YORK, not in its individual capacity but solely as Indenture Trustee under the Indenture

By:

Name:

Title:    NEIL F. WILLIAMSON
          ASSISTANT TREASURER

Address:

The Bank of New York
5 Penn Plaza, 16th Floor
New York, New York 10001

Cassandra Shedd
Assistant Vice President
Direct Dial:    (212) 328-7543
Telecopier:     (212) 328-7623

Neil Williamson
Assistant Treasurer
Direct Dial:    (212) 328-7582
Telecopier:     (212) 328-7623

FDIC01191

[TPW: NYLEGAL:46519.1] 18363-00060 02/14/2002 4:24 PM

# THE BANK OF NEW YORK

NEW YORK'S FIRST BANK - FOUNDED 1784 BY ALEXANDER HAMILTON

February 14, 2002

5 PENN PLAZA, NEW YORK, NY 10001

> Re:    NextCard Credit Card Master Note Trust, Series 2001-1
>        Asset Backed Notes, Series 2001-1 Floating Rate Asset
>        Backed Variable Funding Note

Dear Series 2001-1 Noteholder:

Reference is hereby made to the Master Indenture (the "Indenture"), dated as of December 11, 2000 between NextCard Credit Card Master Note Trust, as issuer (the "Issuer") and The Bank of New York, as indenture trustee (the "Indenture Trustee"). Further reference is hereby made to the Series 2000-99-2 Indenture Supplement (the "Supplement"), dated as of May 8, 2001, between the Issuer and the Indenture Trustee. This notice is being provided by the Indenture Trustee pursuant to Section 6.02 of the Indenture. Capitalized terms used and not otherwise defined herein shall have the meanings assigned in the Indenture and the Supplement.

On February 7, 2002, the Office of the Comptroller of the Currency ("OCC") announced that it had closed NextBank NA, Phoenix, Arizona ("NextBank"), the Transferor and Servicer under the Transfer and Servicing Agreement, and that the OCC had appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. Such action by the OCC constitutes a Redemption Event under Section 5.01(a) of the Indenture, and would, if not cured within sixty days, constitute a Servicer Default pursuant to Section 7.01 of the Transfer and Servicing Agreement.

Section 5.01(b) of the Indenture provides that, upon the occurrence of a Redemption Event, an Amortization Period shall commence and payment on the Notes will be made in accordance with the terms of the Supplement. The Supplement provides that an Early Amortization Period shall commence on the Business Day immediately preceding the day on which a Redemption Event is deemed to have occurred. During an Early Amortization Event, payments in respect of principal on the Notes are to be made in accordance with Section 4.01(c)(ii)(z) of the Supplement.

Section 7.01 of the Transfer and Servicing Agreement provides that, if within sixty days a Servicer Default is not cured, the Indenture Trustee shall have the right to appoint a new Servicer.

It appears that the FDIC may have the power to prevent the triggering of automatic default or acceleration provisions, such as an Early Amortization Period, regardless of the terms of the Transfer and Servicing Agreement, the Indenture, or the instructions of those authorized to direct the Indenture Trustee's actions. The Indenture Trustee is currently

FDIC01192

## THE BANK OF NEW YORK

engaged in discussions with the FDIC and has been informed that, pursuant to the terms of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"), the FDIC is exercising its power to prevent the triggering of automatic default or acceleration provisions, including those that relate to the commencement of an Early Amortization Period or the occurrence of an Insolvency Event or a Servicer Default. Specifically, the section of FIRREA cited by the FDIC provides that the receiver may enforce any contract entered into by the depository institution "notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver." 12 U.S.C. § 1821(e)(12)(A). Accordingly, the FDIC has taken the position that no Early Amortization Period may commence and no Insolvency Event or Servicer Default would occur.

While the matter remains in discussion with the FDIC, payments of principal to the Noteholders will continue to be made in accordance with Section 4.01(c) of the Supplement as if a Redemption Event had not occurred under the Indenture. Furthermore, the FDIC has represented that, as it now stands in the shoes of NextBank, it is currently acting as Servicer under the Transfer and Servicing Agreement, and therefore there is no prospective Servicer Default that needs curing.

If you have any questions with respect to the foregoing, please contact one of the representatives of the Indenture Trustee indicated below.

THE BANK OF NEW YORK, not in its individual capacity but solely as Indenture Trustee under the Indenture

By: _____

Name: NEIL F. WILLIAMSON
Title: ASSISTANT TREASURER

Address:

The Bank of New York
5 Penn Plaza, 16th Floor
New York, New York 10001

Cassandra Shedd
Assistant Vice President
Direct Dial:    (212) 328-7543
Telecopier:     (212) 328-7623

Neil Williamson
Assistant Treasurer
Direct Dial:    (212) 328-7582
Telecopier:     (212) 328-7623

FDIC01193

# FDIC

**Federal Deposit Insurance Corporation**
550 17th St. NW Washington DC, 20429

Division of Resolutions and Receiverships

July 10, 2002

## BY FACSIMILE AND BY CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

NextCard Credit Card Master Note Trust, Issuer
c/o Wilmington Trust Company, Owner Trustee
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-001
Attn: Corporate Trust Administration

The Bank of New York, as Indenture Trustee
101 Barclay Street
12th Floor East
New York, New York 10286

> Re: FIN # 4653 - NextBank, N.A.
>     Phoenix, Arizona - In Receivership
>     Closing Date: February 7, 2002

Dear Sir or Madam:

The above-captioned depository institution (the "Institution") was closed on February 7, 2002, and the Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States the Receiver is charged with the duty of winding up the affairs of the Institution. In order to achieve this goal, the Receiver is given the right under 12 U.S.C. Section 1821(e) to repudiate contracts entered into by the Institution when it determines such contracts to be burdensome, and where such repudiation will promote the orderly administration of the institution's affairs.

The Institution's records indicate that you are a party to one or more of the contracts referred to in Exhibit A to this letter. The Receiver has determined that these contracts are burdensome and that disaffirmance of these contracts will promote the orderly administration of the Institution's affairs. The purpose of this letter is to inform you that the Receiver has elected to disaffirm the contracts identified in Exhibit A to the full extent, if any, that they represent an enforceable obligation of the Institution or the Receiver and any other related agreements that impose continuing obligations on the Institution. This disaffirmance shall be effective as of July 10, 2002.

Since the contracts being repudiated appear related to a securitization, please be advised that, pursuant to 12 C.F.R. § 360.6, the repudiation of such contracts excuses the Receiver from

any continuing obligations or duties imposed by the contracts. However, the Receiver will not seek to reclaim, recover or recharacterize as property of the Institution or the receivership any financial assets transferred by the Institution in connection with the securitization.

You may determine that the Receiver's decision to disaffirm your contracts gives you a claim against the receivership estate. If so, you must file the enclosed proof of claim form with the Receiver in accordance with the instructions contained in the enclosed "Notice of Creditor Claim" letter. Please file any claims no later than ninety (90) days from July 10, 2002.

If you have any questions concerning any of the matters discussed in this letter, you may contact the Receiver at the address provided in the enclosed materials.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER OF
NEXTBANK, N.A.

By: _____

Title: _____

Enclosures:  Notice of Creditor Claim Letter
             Proof of Claim Form

cc:  Claims Manager
     Closing Manager

# EXHIBIT A

## CONTRACTS SUBJECT TO REPUDIATION

- Master Indenture dated as of December 11, 2000 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer, and any and all amendments thereto, including, but not limited to:

- Amendment Number 1 to NextCard Credit Card Master Note Trust Master Indenture dated as of April 1, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Amendment Number 2 to NextCard Credit Card Master Note Trust Master Indenture dated as of June 1, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Transfer and Servicing Agreement dated as of December 11, 2000 between NextBank, N.A., as Transferor and Servicer, and NextCard Credit Card Master Note Trust, as Issuer, and any and all amendments thereto, including, but not limited to:

- Amendment Number 1 to Transfer and Servicing Agreement dated as of April 1, 2001 between Nextbank, N.A., as Transferor and Servicer, and NextCard Credit Card Master Note Trust, as Issuer

- Series 2000-99-1 Supplement to Transfer and Servicing Agreement dated as of December 11, 2000 between Nextbank, N.A., as Transferor and Servicer, and NextCard Credit Card Master Note Trust, as Issuer

- Administration Agreement dated as of December 1, 2000 between NextCard Credit Card Master Note Trust, as Issuer, and NextBank, N.A., as Administrator

- Series 2000-99-1 Indenture Supplement dated as of December 11, 2000 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Amendment Number 1 to Series 2000-99-1 Indenture Supplement dated January 17, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Amendment Number 2 to Series 2000-99-1 Indenture Supplement dated as of April 1, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Amendment Number 3 to Series 2000-99-1 Indenture Supplement dated as of April 3, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Amendment Number 4 to Series 2000-99-1 Indenture Supplement dated as of September 7, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Transferor and Servicer

- Fee letter among ING Baring (U.S.) Capital Markets LLC, as Agent, Holland Limited Securitization, Inc., as Purchaser, and NextCard Credit Card Master Note Trust, as Issuer dated January 1, 2000

- Note Purchase Agreement dated as of December 11, 2000 among NextBank, N.A., as Transferor and Servicer, Holland Limited Securitization, Inc., as Purchaser, NextCard Credit Card Master Note Trust, as Issuer, and ING Baring (U.S.) Capital Markets LLC, as Agent for Purchaser

- Series 2000-1 Indenture Supplement dated as of December 13, 2000 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Servicer

- NextCard Credit Card Master Note Trust Series 2000-1 Asset Backed Notes Purchase Agreement dated December 6, 2000

- Series 2001-1 Indenture Supplement dated as of May 8, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Servicer

- NextCard Credit Card Master Note Trust Series 2001-1 Asset Backed Notes Purchase Agreement dated April 20, 2001

- Amendment No. 2 to NextCard Credit Card Master Note Trust Master Indenture dated June 1, 2001 between NextCard Credit Card Master Note Trust, as Issuer, The Bank of New York, as Indenture Trustee, and NextBank, N.A., as Servicer

repudiationdoxA.doc

**Federal Deposit Insurance Corporation as Receiver for:**
**6853 - NextBank, N.A., Phoenix, AZ**
*(Name of Bank/Financial Institution and Location)*

## PROOF OF CLAIM

SSN/Tax ID# (1)_____

Personally appeared before me, the undersigned (2)_____Loretta A. Lundberg_____
_____
*(Name of person making the claim)*

who, being duly sworn, says that the ___NextBank, N.A.___ now in liquidation is justly indebted to:
*(Name of Bank/Financial Institution)*

(3) The Bank of New York, as Indenture Trustee of the Next Card Credit Card Master Note Trust
*(Individual/Joint Corporation/Partnership/Firm/Agency)*

in the sum of (4)_____See Attachment A_____ Dollars upon the following Claim:[1]

|  | Description of (individual) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | (5)<br><br>See Attachment A, with accompanying exhibits, which describes claims in detail. | 500000002-000 | See Attachment A |
|  | Total Claim: (6) |  |  |

Deponent further states that he/she makes this claim on behalf of The Bank of New York, as Indenture Trustee of the Next Card Credit Card Master Note Trust

And that no part of said debt has been paid, that (7) The Bank of New York, as Indenture Trustee of the Next Card Credit Card Master Note Trust
*(Individual/Joint Corporation/Partnership/Firm/Agency)*

has given no endorsement or assignment of the same or any part thereof and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

NAME (8)_____      Vice President
*(Signature of Person making the Claim)*                    *(Title)*

FIRM ____The Bank of New York, as Indenture Trustee____
*(if applicable)*

ADDRESS(9)__101 Barclay Street, Floor 8W__

CITY/STATE/ZIP ___New York, NY 10286___

TELEPHONE NUMBER _(212) 815-5373_

State of (10)_New York_
County (11)_New York_
*Sworn to and subscribed by (12) ___Irene Siegel___ before me

This (13) ___7___ day of _October_, 20 _02_

Commission Expires: _4/25/02_  ___Irene Siegel___
*(Signature of Officer Administering Oath)*

IRENE SIEGEL
Notary Public, State of New York
No. 24-4927694
Qualified in Kings County
Certificate Filed in New York County
Commission Expires April 25, ~~2006~~

RLS7222

[1]       This proof of claim is the second of two claims being filed simultaneously by the Indenture Trustee.

ATTACHMENT A TO THE PROOF OF CLAIM OF
THE BANK OF NEW YORK, AS INDENTURE TRUSTEE
OF THE NEXTCARD CREDIT CARD MASTER NOTE TRUST

1.    Introductory Statement

The undersigned is authorized to file this Proof of Claim on behalf of The Bank of New

York (the "Indenture Trustee"), as Indenture Trustee of the NextCard Credit Card Master Note

Trust (the "Trust"), against the Federal Deposit Insurance Corporation (the "FDIC"), as receiver

of NextBank, N.A. ("NextBank").[1]

2.    Summary of Claims

The Indenture Trustee files this proof of claim in connection with the FDIC's failure to

begin an amortization period upon its appointment as receiver of NextBank.  As a direct result,

the Trust has been injured in an amount not less than $245,154,649, plus interest.[2]

The bases for the indebtedness and the amount thereof were determined after diligent

efforts by the Indenture Trustee and its attorneys to resolve the disputes with the FDIC, and after

a thorough investigation and analysis of the claims.  The Indenture Trustee believes, however,

that the FDIC may be continuing to withhold funds that are the property of and should be held

for the benefit of the Trust and the Noteholders (as defined below).  Further, the Indenture

Trustee continues to investigate other areas where it believes that the FDIC may have acted

improperly.  **This Proof of Claim is filed with full reservation of rights as set forth herein,**

**including, but not limited to, the right to assert additional amended Proofs of Claim and**

**the right to file a claim against the FDIC pursuant to the Federal Tort Claims Act.  Such**

---

[1]      This proof of claim is the second of two proofs of claim being simultaneously filed by the Indenture
Trustee.

[2]      The Indenture Trustee has requested that the FDIC provide access to documentation relating to its and
NextBank's involvement with the Trust Receivables.  Accordingly, the Indenture Trustee expressly reserves the
right to supplement and amend this proof of claim as additional information becomes available.

1

additional amended Proofs of Claim may allege additional and/or different facts and claims than those stated herein, or allege claims stated herein with additional specificity, based on existing or subsequently obtained information and/or documents resulting from the Indenture Trustee's further investigation and/or discovery from the FDIC, NextBank and/or others.

3.    Grounds for Liability

The grounds upon which the FDIC is liable to the Indenture Trustee are as follows:

a.    Background[3]

Although the documents are complex, the basic structure of these types of securitization transactions is fairly straightforward. First, credit cards are issued, in this case by NextBank. A servicer, here NextBank, is appointed to service the credit card accounts (*i.e.*, collect payments, etc.), for which the servicer is compensated. Certain rights and interests in the credit card accounts, including the right to receive monies paid by credit card holders in connection with these accounts, are transferred to a trust. This trust then pledges the receivables to the indenture trustee, which is an independent third party, in exchange for the issuance of certain notes. The credit card accounts serve as collateral for the payment of all amounts due under the notes. The notes are then sold by the trust to an investment bank, which then sells the notes to certain financial institutions or other entities.

i.    The Trust

The Trust was established pursuant to a Trust Agreement dated December 1, 2000 between NextBank and Wilmington Trust Company, as owner trustee (the "Trust Agreement").

---

[3]    For a complete discussion of the background, the Indenture Trustee refers to the first proof of claims being simultaneously filed by the Indenture Trustee.

At the same time, pursuant to a Master Indenture dated December 11, 2000 between the Trust, as Issuer, and the Indenture Trustee (as amended, the "Indenture") (as supplemented, the "Indenture Supplement"), certain asset backed notes (the "Notes") were issued, which were secured by a portfolio of credit card receivables currently valued in excess of $1 billion (the "Trust Receivables"). NextBank is not a party to the Indenture or the Indenture Supplements, and has no direct rights thereunder. The credit cards were issued by NextBank. The Trust Receivables have been pledged to the Indenture Trustee as collateral for the payment of all amounts due under the Notes. The Notes are held by a number of financial institutions and other entities (the "Noteholders") to which the Indenture Trustee owes a fiduciary responsibility.

During the normal operation of the Trust, as provided in Article VIII of the Indenture and Article IV of the Indenture Supplements, funds representing interest payable on the Notes are distributed by the Indenture Trustee to the Noteholders on a regular basis. As provided in Section 5.01 of the Indenture, the occurrence of certain events, which includes the appointment of the FDIC as receiver for NextBank on February 7, 2002, constitute a "Trust Redemption Event," requiring the commencement of an "Amortization Period." During an Amortization Period, as provided in the Indenture Supplements, the Indenture Trustee begins to pay principal, in addition to interest, to the Noteholders until the principal balance of the Notes is paid in full.

Until February 7, 2002, the Trust was operating normally and was not in an early amortization period.

ii.    The Receivership of NextBank

On February 7, 2002, NextBank was closed by the Office of the Comptroller of the Currency, which named the FDIC as receiver of NextBank. As a result, the FDIC stepped into the shoes of NextBank as Servicer under the Transfer and Servicing Agreement, and serviced the

3

Trust Receivables after February 7th. By letter dated February 12, 2002, the FDIC declared that, pursuant to the provisions of the Financial Institution Reform, Recovery and Enforcement Act, 12 U.S.C. § 1811 *et seq.* ("FIRREA"), an Amortization Period should not be commenced. (A copy of the February 12, 2002 letter is annexed as Exhibit 1.)

        b.     The FDIC's Failure To Begin an Amortization Period
              Upon Its Appointment as Receiver of NextBank

Under Section 5.01(a) of the Indenture, the appointment of the FDIC as receiver for NextBank constituted a Trust Redemption Event. Section 5.01 of the Indenture provides that, upon the occurrence of a Trust Redemption Event, an Amortization Period shall commence, and payment on the Notes shall thereafter be made in accordance with the terms of the Indenture Supplements. However, the FDIC delayed the commencement of an Amortization Period until at least July 2002. As a result, the FDIC used collections received on the Trust Receivables to purchase additional Trust Receivables instead of applying these collections to pay down the outstanding principal of the Notes. In addition, this failure to amortize has resulted in a greater allocation of losses to the Notes than would have otherwise occurred under the terms of the Indenture.

Pursuant to the investigation undertaken by the Indenture Trustee, it believes that the FDIC's failure to declare an Amortization Period resulted in a reduction of at least $756,746,113 of collections that would otherwise have been available to amortize the Notes. Instead, the Indenture Trustee believes that, during the period from February through the end of June, 2002, the FDIC purchased and added approximately $511,591,465 new Trust Receivables to the Trust, leaving a shortfall of $245,154,649.

4

As a result, the FDIC owes the Trust at least $245,154,649, plus interest, in connection with this claim.

5.    No Judgment

No judgment has been rendered on the Indenture Trustee's claims set forth herein as of the date of this Proof of Claim.

6.    Credits

The amount of all known payments or credits with respect to the claims set forth in this Proof of Claim, if any, have been credited and deducted from the amount owed as set forth herein. The Indenture Trustee's investigation of the facts and circumstances surrounding the claims set forth herein is ongoing. Therefore, payments or credits may exist which have not yet been discovered or verified.

7.    Setoff

The claims set forth in this Proof of Claim (or any other claim the Indenture Trustee may have against NextBank) are not subject to any known setoffs or counterclaims.

8.    Recoupment

The Indenture Trustee reserves all recoupment rights with respect to the claims set forth herein or any other claims.

9.    Non-Waiver and Reservation of Rights

This Proof of Claim is filed pursuant to a notice sent by the FDIC to the Indenture Trustee that all claims must be filed by the October 8, 2002 bar date. The Indenture Trustee files this Proof of Claim to protect it from forfeiture of its claims by operation of the bar date

5

established by the Receiver. The filing of this Proof of Claim does not constitute a waiver or release of the rights of the Indenture Trustee against any person, entity or property, including entities other than the FDIC. The Indenture Trustee is not waiving any right to deny or assert a defense to any alleged liability by its assertion of the grounds upon which the claims set forth herein are based.

The Indenture Trustee specifically reserves the right to amend, modify and supplement this Proof of Claim in any manner whatsoever, including, without limitation, the right to assert any other claims it may have against the FDIC or NextBank, to file additional Proofs of Claim for additional claims (including legal costs and expenses), and to assert, without limitation, any claim to which the Indenture Trustee might be entitled, at law or in equity, or to show any further or additional payments, credits or setoffs that may be discovered after the date hereof with respect to the claims set forth herein or any other claims.

The Indenture Trustee further specifically reserves the right to amend and supplement this Proof of Claim to account for additional discovered facts after full disclosure of all relevant facts in these proceedings or elsewhere, as well as to account for future payments to be credited to the FDIC. Such additional amended Proofs of Claim may allege additional and/or different facts and claims than those stated herein, or allege claims stated herein with additional specificity, based on existing or subsequently obtained information and/or documents resulting from the Indenture Trustee's further investigation and/or discovery from the FDIC, NextBank and/or others. The Indenture Trustee is auditing all activities undertaken by NextBank and the FDIC, and reserves all rights to assert any and all claims discovered pursuant to this audit, including, but not limited to, any discrepancies relating to funds provided by the FDIC to the

Indenture Trustee. The Indenture Trustee reserves all rights accruing to it, and the filing of this Proof of Claim is not intended to be and shall not be construed as:

    i)      an election of remedy;

    ii)     a waiver or limitation of any rights or defenses of the Indenture Trustee; or

    iii)    a waiver of any of the Indenture Trustee's claims against any other parties liable to the Indenture Trustee.

Finally, the Indenture Trustee reserves all rights and intends to file a claim, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, against the Federal Deposit Insurance Corporation for claims relating to actions or omissions by the Federal Deposit Insurance Corporation in excess of its statutory authority as a receiver.

10. <u>Severability</u>

If any part hereof is for any reason held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other part hereof, and the terms and conditions hereof shall be construed thereafter as if such invalid, illegal, or unenforceable part had never been contained herein.

7

11.    <u>Notices</u>

All notices concerning this Proof of Claim should be sent to:

Joel B. Harris, Esq.
Charles A. Dietzgen, Esq.
Thacher Proffitt & Wood
11 West 42nd Street
New York, NY 10036

with a copy to:

Loretta Lundberg
Vice President - Corporate Trust Administration
The Bank of New York
101 Barclay Street, Floor 8W
New York, New York 10286

and with a copy to:

Robert Kochenthal, Esq.
Managing Counsel
Legal Department
1 Wall Street, 29th Floor
New York, New York 10286

Dated: New York, New York
        October 7, 2002

# FDIC

Federal Deposit Insurance Corp
1910 Pacific Avenue, 2nd Floor Dallas, TX

Division of Resolutions and Receiverships

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
RECEIPT NO.: 7001 0360 0001 1256 8538

Loretta Lundberg
Vice President-Corporate Trust Administration
The Bank of New York
101 Barclay Street, Floor 8W
New York, N.Y. 10286

Subject:       #4563 NextBank, N.A.
               Phoenix, AZ in receivership February 7, 2002
               Proofs of Claim of The Bank of New York, as Indenture Trustee
               NOTICE OF DETERMINATION OF CLAIM

Dear Ms. Lundberg:

The Proofs of Claim filed on behalf of The Bank of New York as Indenture Trustee of the Next Card Credit Card Master Note Trust ("BONY") against the NextBank, N.A. ("NextBank") receivership (copies of which, without attachments, are enclosed for your convenience) have been reviewed by the Federal Deposit Insurance Corporation as receiver of NextBank (the "Receiver"). In addition, the Receiver has reviewed the supplemental information submitted by BONY by letter dated March 4, 2003 ("March 4 Response") in response to the Receiver's Request for Clarification dated December 27, 2002 ("Clarification Request"). Based upon this review, the Receiver has determined that your Proofs of Claim should be DISALLOWED in part and ALLOWED in part, as set out in greater detail below.

1.     Claim for $3,028,385.91 Resulting from the Receiver Having Wrongfully Retained Payments for Post-repudiation Servicing of Trust Receivables

       In accordance with 12 U.S.C. § 1821(d)(5)(D), this claim is disallowed because BONY has failed to provide proof satisfactory to the Receiver that the Receiver was not entitled to retain the claimed amounts.

2.     Claim for $12,149,551.17 Wrongfully Retained by the Receiver in Connection with the Transferor's Interest.

       In accordance with 12 U.S.C. § 1821(d)(5)(D), these claims are disallowed because BONY has failed to provide proof satisfactory to the Receiver that the Receiver was not entitled to retain the claimed amounts.

2

3.    Claim for $ 642,039.20 in Unpaid Expenses.

BONY has asserted claims for unpaid expenses in connection with five (5) specific items. The Receiver has reviewed the documentation submitted in support of this portion of the claim and conducted such analysis as the Receiver deems appropriate in light of the Claimant's responsibility to prove its claim to the satisfaction of the Receiver under 12 U.S.C. § 1821(d)(5)(D). The Receiver has determined that claims aggregating $ 143,457.39, allocated as described below, should be allowed as valid claims against the receivership estate. Inasmuch as, per your Proof of Claim, the FDIC has already paid $52,132.08 of your total claimed expenses, the Receiver's payment to you on account of this claim will be reduced to $91,325.31 (wired on April 4, 2003 to ABA# 021000018, GLA# 111-565). The remainder of the claimed amounts is disallowed as lacking adequate substantiation of any obligation on the part of the Receiver to pay the claimed amounts.

The allowed amounts are allocated as follows: (1) $107,846.40 in connection with the legal fees and related disbursements of Thatcher Proffitt & Wood; (2) $ 30,070.99 in connection with the retention of Auriemma Consulting Group; (3) $540.00 for proxy services provided by DTC; and (4) $5,000 in annual Trust administration fees. With respect to the allowed legal fees and related disbursements, the Receiver disallowed all fees incurred on and after August 1, 2002. With respect to fees incurred between February 6 2002 and July 31, 2002 the Receiver reviewed the materials provided in support of the claimed amounts and allowed only those fees determined to be reimbursable under the terms of the relevant Trust documents. In addition, the Receiver has determined that the allowed amounts should be paid as administrative expenses of the receivership.

4.    Claim for at least $ 39,134,120.11 for Damages Due to Improper Servicing

In accordance with 12 U.S.C. § 1821 (d)(5)(D), this claim is disallowed because BONY has failed to provide proof satisfactory to the Receiver with regard to either the substantive allegations of improper servicing or the claimed amount of damages incurred.

5.    Claim for $ 610,494.61 Resulting from Improper Setoff

The Receiver notes that the substance of this claim has already been addressed in a letter from the FDIC to BONY dated March 27, 2003. Claimant's attention is directed to that letter.

6.    Claim for $ 245,154,649 due to FDIC's Failure to Begin Early Amortization upon Appointment as Receiver

In accordance with 12 U.S.C. § 1821 (d)(5)(D), this claim is disallowed because BONY has failed to provide proof satisfactory to the Receiver with respect to either the substantive basis for the claim or the claimed amount of damages incurred.

Pursuant to 12 U.S.C. § 1821(d)(6), if BONY does not agree with any disallowance, BONY has the right to file suit on its claim (or continue an action commenced before the appointment of the Receiver) in the United States District (or Territorial) Court for the District within which the failed institution's principal

3

place of business was located, or the United States District Court for the District of Columbia, within sixty (60) days from the date of this notice.

THE FAILURE TO FILE SUIT (or continue an action commenced before the appointment of the Receiver) BEFORE THE END OF THE SIXTY (60) DAY PERIOD WILL RESULT IN THE CLAIM BEING FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM

BONY may not, in lieu of filing suit in the proper federal court or continuing a suit commenced before the appointment of the Receiver), request administrative review of its claims. The Federal Deposit Insurance Corporation does not offer and will not agree to administrative review of claims.

As set forth above, this notice serves to notify BONY of the disallowance of certain of BONY's claims, either in part or in their entirety, and BONY's rights in the event that it disagrees with this final claims determination. In determining whether to bring suit against the Receiver, however, we believe BONY will want to give due consideration to the implications of the statutory claims priorities that would be applicable even if BONY were to be successful in proving its claims and obtaining a judgment with respect thereto. You should note that any claim for damages by any claimant against the Receiver, if satisfactorily proven and allowed through either the statutory claims process or through subsequent legal action, will result only in the issuance of a Receiver's Certificate representing a claim against the NextBank receivership estate and having the same priority as the allowed claims of other general creditors. All such allowed claims are then paid pro-rata in accordance with the priorities set forth in 12 U.S.C. § 1821(d)(11). The priority scheme established by this statute requires that all administrative expenses of the receivership and all deposit claims be paid in full before any dividends may be paid to general creditors.

Sincerely,

Arthur Cook
Claims Agent

Enclosure



FILED

JUN 0 5 2003

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

The Bank of New York, One Wall Street,
New York, New York 10286, as Indenture
Trustee of the NextCard Credit Card
Master Note Trust,

                    Plaintiff,

          -against-

Federal Deposit Insurance Corporation, in
its Capacity as Receiver for NextBank,
N.A.

                    Defendant.

Case No. _____

TRIAL BY JURY REQUESTED

CASE NUMBER  1:03CV01221

JUDGE: Thomas Penfield Jackson

DECK TYPE: General Civil

DATE STAMP: 06/05/2003

JURY ACTION

## COMPLAINT

Plaintiff The Bank of New York, as Indenture Trustee (the "Indenture Trustee") of

the NextCard Credit Card Master Note Trust, a Delaware business trust (the "Trust"), by

and through its undersigned attorneys, brings this civil action against Defendant Federal

Deposit Insurance Corporation (the "FDIC") in its capacity as receiver for NextBank,

N.A. ("NextBank") and requests trial by jury in order to recover damages sustained due

to the conduct of the FDIC, as described in detail below.  For its complaint, the Indenture

Trustee alleges the following:

1.       Plaintiff seeks damages from the FDIC based on conduct by the FDIC

with respect to the assets and properties of the Trust and the failure to honor obligations

with respect thereto, which has resulted in significant damages to the Plaintiff and the

Trust.

2.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

and 12 U.S.C. § 1821(d)(6).

3.     Venue is proper in this judicial district pursuant to 12 U.S.C.
§ 1821(d)(6) and 28 U.S.C. § 1391(e).

**The Parties**

4.     Plaintiff Indenture Trustee is a New York banking corporation with its
principal place of business at One Wall Street, New York, New York 10286.  Plaintiff
Indenture Trustee is the indenture trustee of the Trust, which is a Delaware business
trust.

5.     Defendant FDIC is a federal agency with its headquarters located at 550
17th Street, N.W., Washington, DC  20429-9990.  Pursuant to the provisions of the
Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*, Defendant FDIC serves as the
receiver of NextBank.  NextBank was declared insolvent by the Office of the
Comptroller of the Currency on or about February 7, 2002, and the FDIC was appointed
receiver thereof in accordance with the provisions of applicable law.

**Factual Background**

Establishment of the Trust and Indenture

6.     The Trust was established as a Delaware business trust pursuant to a Trust
Agreement dated as of December 1, 2000 between NextBank and Wilmington Trust
Company, as owner trustee (the "Trust Agreement").  Plaintiff is not a party to the Trust
Agreement.

7.     A Master Indenture dated as of December 11, 2000 was entered into
between the Trust and the Plaintiff Indenture Trustee, which was supplemented by:  the
Series 99-1 Indenture Supplement dated as of December 11, 2000; the Series 2000-1
Indenture Supplement dated as of December 13, 2000; and the Series 2001-1 Indenture

- 2 -

Supplement dated as of May 8, 2001 (the three Indenture Supplements are referred to hereinafter as the "Indenture Supplements," and the Master Indenture as amended together with the Indenture Supplements are referred to hereinafter as the "Master Indenture"). Pursuant to the Master Indenture, certain asset-backed notes (the "Notes") were issued which were secured by a portfolio of credit card receivables owned by the Trust (the "Trust Receivables"). The credit cards were issued by NextBank. The Trust Receivables were sold by NextBank to the Trust. The Indenture Trustee acts as indenture trustee of the Trust, which is the ultimate repository for payments of the Trust Receivables. NextBank is not a party to the Master Indenture.

8. A Transfer and Servicing Agreement (as amended, the "Transfer and Servicing Agreement") was entered into on December 11, 2000 by and between NextBank and the Trust, under which NextBank sold credit card receivables to the Trust and services them for the benefit of the Trust.

9. The Trust is a legal entity separate and apart from NextBank. The Trust Receivables were acquired by the Trust from NextBank pursuant to the Transfer and Servicing Agreement, as part of a securitization within the meaning of 12 C.F.R. § 360.6(a)(4). At the time of the transfer of the Trust Receivables, NextBank received adequate consideration for the Trust Receivables. Section 2.01 of the Transfer and Servicing Agreement expressly reflects the intent of the parties that the transfer of the Trust Receivables shall be treated as a sale. U.C.C. financing statements have been filed to perfect (i) the Trust's ownership interest and security interest in the Trust Receivables, and (ii) the Indenture Trustee's security interest in the Trust Receivables, on behalf of the Noteholders to secure repayment of the Notes.

## Administration of the Trust Receivables

10.     Pursuant to the terms and conditions of the Transfer and Servicing Agreement, NextBank acted as the Transferor and Servicer of the Trust.

11.     As Servicer, NextBank processed cardholder accounts and collected and distributed the Trust Receivables.  NextBank's compensation for these services was equal to an annualized rate of 2% of the total amount of principal receivables included in the Trust, calculated and payable on a monthly basis.

12.     NextBank was also the Transferor of the Trust Receivables.  In that capacity, NextBank transferred the Trust Receivables into the Trust and was responsible for maintaining collateral for the Notes, such that the value of the Trust Receivables plus the amount on deposit in a special funding account maintained by the Indenture Trustee exceeded the value of the Notes by a certain amount (the "Required Transferor Amount").

13.     As Transferor, NextBank was entitled, among other things, to (i) a monthly payment of a certain percentage (the "Transferor Percentage") of the principal and related finance charges of the Trust Receivables collected during the preceding month (the "Transferor Interest"); and (ii) a payment of any residual cash remaining after the payment of all amounts due on the Notes (the "Residual Interest").  Any right to the Transferor Percentage of the principal collections is limited to those circumstances where the Transferor Interest exceeds the "Required Transferor Interest," which is an amount required to be held by the Indenture Trustee for the benefit of the Noteholders.

- 4 -

14.     Pursuant to the Transfer and Servicing Agreement, payment of the Notes has priority over the Residual Interest, such that all amounts due on the Notes must be paid, to the fullest extent possible, before the Transferor may receive the Residual Interest from the Trust.

15.     As Transferor, NextBank agreed to the terms and conditions of the Transferor Certificate, which states in relevant part as follows: "This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreements [defined as the Transfer and Servicing Agreement, the Trust Agreement and the Master Indenture], to which Agreements, as amended and supplemented from time to time, the Transferor by virtue of the acceptance hereof assents and is bound."

16.     NextBank acted as Transferor and Servicer of the Trust Receivables until February 7, 2002.

<u>Involvement of the FDIC</u>

17.     On February 7, 2002, NextBank was closed by the Office of the Comptroller of the Currency, and the FDIC was appointed as receiver of NextBank.

18.     The failure of NextBank and the appointment of the FDIC as receiver created an automatic "Trust Redemption Event" under the Master Indenture, triggering the amortization of the Notes, and requiring the Servicer to make principal payments to the Noteholders. As receiver, on February 7, 2002, the FDIC succeeded NextBank as Servicer of the Trust Receivables. Under the Master Indenture, amortization occurs automatically without any action on the part of the Indenture Trustee or any other person.

19.     On or about February 12, 2002, the FDIC notified the Indenture Trustee that it was refusing to commence initiation of the Amortization Period and that it took the position that initiation of the Amortization Period would be contrary to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), as incorporated into the Federal Deposit Insurance Act.  Attached as Exhibit A are copies of the FDIC's letters to the Indenture Trustee relating to such notice.

20.     Notwithstanding the amortization, the FDIC, as Servicer, continued to apply the proceeds of the Trust Receivables as if no Trust Redemption Event had occurred and failed to distribute any principal to the Noteholders until August 15, 2002, in violation of the Master Indenture.

<u>FDIC Assumes the Role of Servicer</u>

21.     From February 7, 2002 to July 10, 2002, the FDIC, as receiver of NextBank, acted as Transferor and Servicer of the Trust Receivables under the Transfer and Servicing Agreement.

22.     On or about July 10, 2002, the FDIC, as receiver for NextBank, repudiated the Transfer and Servicing Agreement pursuant to the FDIC's power under the authority of 12 U.S.C. § 1821(e).

23.     Notwithstanding the repudiation of the Transfer and Servicing Agreement, the FDIC agreed to continue to service the Trust Receivables until July 31, 2002 on the same terms as set forth in the Transfer and Servicing Agreement.  This agreement was not in writing, but the Indenture Trustee agreed to allow the FDIC to continue to service the Trust Receivables under this informal arrangement.  The FDIC

was to be compensated for its services as if the Transfer and Servicing Agreement were in effect.

24.     Following the repudiation, and near the close of the period during which the FDIC agreed to service the Trust Receivables under the informal arrangement, and pursuant to Section 7.02 of the Transfer and Servicing Agreement, the Indenture Trustee appointed First National Bank of Omaha ("FNBO") as Successor Servicer effective August 1, 2002. FNBO agreed to service the Trust Receivables in accordance with the terms and conditions of the Transfer and Servicing Agreement, and was so compensated by the Indenture Trustee.

25.     The Indenture Trustee provided timely notification to the FDIC of the appointment of FNBO as Successor Servicer, and indicated its desire to have FNBO assume servicing the Trust Receivables as of August 1, 2002.

26.     Notwithstanding the FDIC's repudiation of the Transfer and Servicing Agreement, the expiration of the informal arrangement, and the notice of and the willingness and ability of FNBO to assume the servicing of the Trust Receivables, the FDIC refused to relinquish control of the Trust Receivables, continued to service the same as if the Transfer and Servicing Agreement were not repudiated, and refused to allow FNBO to fulfill the servicing function until September 24, 2002.

27.     During the period from August 1, 2002 to September 24, 2002, while the FDIC wrongfully continued to service the Trust Receivables, it also improperly retained the servicing fee provided in the Transfer and Servicing Agreement (i.e., a fee equal to an annualized rate of 2% of the total amount of principal receivables included in the Trust, calculated and payable on a monthly basis).



## The FDIC's Failure to Pay Trustee Expenses While Acting As Servicer

28.     Pursuant to Section 6.07 of the Master Indenture, the Servicer is obligated to pay certain expenses incurred by the Indenture Trustee.

29.     During the period from February 9, 2002 to July 10, 2002, while the FDIC was acting as Servicer under the Transfer and Servicing Agreement, the Indenture Trustee incurred expenses of $263,781.38. Under the Master Indenture, the Indenture Trustee was entitled to reimbursement of these expenses and sought reimbursement from the FDIC.

30.     During the period from July 10, 2002 to August 1, 2002, the period following the repudiation but during which the FDIC was acting as Servicer under an arrangement with the Indenture Trustee allowing it to continue to perform such services and retain the servicing fee required thereunder, the Indenture Trustee incurred expenses of $231,871.27. The Indenture Trustee was entitled to reimbursement of these fees from the Servicer. Since the FDIC continued to act as Servicer for the Trust Receivables, the Indenture Trustee thus sought reimbursement from the FDIC.

31.     During the period from August 1, 2002 to September 24, 2002, the period when the FDIC continued to act as Servicer for the Trust Receivables notwithstanding the repudiation of the Transfer and Servicing Agreement and the appointment of FNBO as Successor Servicer, and for which the FDIC took a servicing fee, the Indenture Trustee incurred expenses of $310,434.13. Again, the Indenture Trustee was entitled to reimbursement of these fees from the Servicer. Since the FDIC continued to act as Servicer for the Trust Receivables, the Indenture Trustee sought reimbursement from the FDIC.



32.     In total, the Indenture Trustee incurred fees of $806,086.78 from February 9, 2002 to September 24, 2002.  The FDIC has reimbursed only $143,457.39 of the fees and has refused to pay the remainder.  Therefore, the Indenture Trustee is entitled to reimbursement from the FDIC in the amount of $662,629.39.

<u>The FDIC's Invalid Claim to the Transferor Interest</u>

33.     On or about July 10, 2002, the FDIC, as receiver for NextBank, repudiated the Transfer and Servicing Agreement and purported to repudiate the Master Indenture, although NextBank was not a party to the Master Indenture.

34.     The allocation and distribution of funds relating to the Transferor Interest is set forth in the Master Indenture.  Section 8.04(a) of the Master Indenture, the first proviso of Section 8.05 of the Master Indenture, and Section 4.01(b)(ii) of each of the Indenture Supplements specifically provide that, if the Transferor Interest is less than the Required Transferor Interest, the Servicer will not distribute any principal collections relating to the Transferor Interest to the Transferor.  Instead, these monies must be deposited into the Special Funding Account and, pursuant to Section 8.03 of the Master Indenture, are allocable and distributable to the Noteholders.

35.     Nonetheless, while it acted as Servicer and had access to the Trust assets, the FDIC unilaterally and wrongfully deducted and retained monies relating to the Transferor Interest before making the required transfer of Trust funds to the Indenture Trustee.  The amount wrongfully misappropriated exceeds $12 million.

<u>Improper Retention of Funds from the Trust</u>

36.     The FDIC withheld from the Trust during September 2002 the amount of $12,759,952.28 to cover payments by cardholders later returned for insufficient funds

("NSF Amounts") and refunds issued to the credit card holders due to overpayments ("Credit Balance Refunds").

37.     The FDIC has since determined that it withheld $2,449,952.28 more than necessary to cover the actual NSF Amounts and Credit Balance Refunds, but has not yet remitted that amount to the Indenture Trustee.

<div align="center">Filing of Claims and Compliance with Claims Process</div>

38.     The Indenture Trustee filed timely Proofs of Claim with the FDIC on October 7, 2002 setting forth six separate claims: (1) improper withholding of servicing fees (briefly described in paragraphs 21-27 above and the subject of Count One of this Complaint); (2) improper retention of the Transferor Interest (briefly described in paragraphs 33-35 above and the subject of Counts Two and Three of this Complaint); (3) failure to reimburse fees and expenses incurred by the Indenture Trustee (briefly described in paragraphs 28-32 above and the subject of Count Four of this Complaint); (4) negligent servicing of the Trust Receivables (a claim that the Indenture Trustee has elected not to pursue); (5) improper retention of NSF funds and credit balance refunds (briefly described in paragraphs 36-37 above and the subject of Count Five of this Complaint); and (6) the improper allocation of payments received on the Trust Receivables following the failure of NextBank (briefly described in paragraphs 17-20 above and the subject of Count Six of the Complaint). *See* Proofs of Claim attached hereto at Exhibit B.

39.     On March 27, 2003, the FDIC sent a letter, attached hereto as Exhibit C, to the Indenture Trustee demanding that the Indenture Trustee return to the FDIC that portion of the Transferor Interest that it believes it is entitled to, and offering to allow

the Indenture Trustee to offset from such payment approximately $2.4 million in NSF Amounts and Credit Balance Refunds it admits properly belong to the Trust (recovery of these funds is the subject of Count Five of the Complaint).

40.    By an undated letter faxed to the Indenture Trustee on April 11, 2003, attached hereto as Exhibit D, the FDIC disallowed five of the claims presented in the Proof of Claim and partially allowed the Indenture Trustee's claim for unpaid expenses.

41.    Pursuant to 12 U.S.C. § 1821(d)(6), the Indenture Trustee has timely filed this action.

## COUNT ONE
### (Conversion of Servicing Fees)

42.    Plaintiff repeats and realleges the allegation in paragraphs 1 through 41 above as if fully set forth herein.

43.    The FDIC repudiated the Transfer and Servicing Agreement effective on or about July 10, 2002, pursuant to the FDIC's power to repudiate such agreements under the authority of 12 U.S.C. § 1821(e). As a result of this repudiation, it became the responsibility of the Indenture Trustee to find a replacement Servicer, pursuant to Section 7.02(a) of the Transfer and Servicing Agreement.

44.    Based upon an informal agreement between the FDIC and the Indenture Trustee, the FDIC agreed to continue to service the Trust Receivables from July 10, 2002 to and including July 31, 2002 on the same basis as set forth in the Transfer and Servicing Agreement. This interim period was designed to allow the Indenture Trustee sufficient time to obtain a replacement Servicer.

45.     On or about July 29, 2002, the Indenture Trustee appointed FNBO, an experienced servicer, as Successor Servicer, effective August 1, 2002. By letter dated July 31, 2002, the Indenture Trustee informed the FDIC of FNBO's appointment.

46.     The FDIC refused to permit FNBO to act as Servicer of the Trust Receivables and continued to act as Servicer of the Trust Receivables without authority until on or about September 24, 2002.

47.     On September 18, 2002, the FDIC wrongfully took $3,028,385.91 in Trust monies without the consent of the Indenture Trustee or any of the Noteholders, claiming this amount as the FDIC's servicing fee for the months of August and September, 2002. The FDIC withdrew this "fee" from the assets of the Trust.

48.     The FDIC was not entitled to withdraw this "fee" from the assets of the Trust, and has thus wrongfully converted assets that rightfully belong to the Trust and the Noteholders. As a result, the FDIC owes the Trust at least $3,028,385.91 in connection with this claim.

**COUNT TWO**
(Conversion of Transferor Interest Following the Repudiation)

49.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 48 above as if fully set forth herein.

50.     On or about July 10, 2002, the FDIC purported to repudiate the Master Indenture pursuant to the FDIC's power to repudiate such agreements under the authority of 12 U.S.C. § 1821(e), even though NextBank was not a party to the Master Indenture. In purporting to repudiate the Master Indenture, the FDIC determined, in accordance with the statute, that performance of the agreement was burdensome or that repudiation would promote the orderly administration of the affairs of NextBank.

- 12 -

51.     In purporting to repudiate the Master Indenture, which provides for the allocation and distribution of funds relating to the Transferor Interest, the FDIC also repudiated, to the extent the purported repudiation was effective, any claim to the Transferor Interest as of the date of the purported repudiation.

52.     Notwithstanding the purported repudiation, the FDIC wrongfully converted funds relating to the Transferor Interest on and after the date of the purported repudiation.

53.     The FDIC has wrongfully converted at least $13,475,595.15 in connection with the Transferor Interest following the purported repudiation.

**COUNT THREE**
(Conversion of Transferor Interest)

54.     Plaintiff repeats and realleges the allegation in paragraphs 1 through 53 above as if fully set forth herein.

55.     Even if the FDIC is entitled to the Transferor Interest, Section 8.04(a) of the Master Indenture, the first proviso of Section 8.05 of the Master Indenture, and Section 4.01(b)(ii) of each of the Indenture Supplements specifically provide that, if the Transferor Interest is less than the Required Transferor Interest, the Servicer will not distribute any principal collections relating to the Transferor Interest to the Transferor. Instead, these monies must be deposited into the Special Funding Account and, pursuant to Section 8.03 of the Master Indenture, are allocable and distributable to the Noteholders.

56.     From on or about July 10, 2002 through September 24, 2002, the Transferor Interest did not exceed the Required Transferor Interest.  As a result, pursuant to Section 8.04(a) and the first proviso of Section 8.05 of the Master Indenture, all

- 13 -



principal collections relating to the Transferor Interest since that time were required to have been transferred to the Special Funding Account for the benefit of the Noteholders.

57. Instead of paying the Transferor Interest into the Special Funding Account, the FDIC wrongfully converted these funds. The amount wrongfully converted is approximately $12,149,551.17.

## COUNT FOUR
(Conversion of Monies Owed to Indenture Trustee for Trust Expenses)

58. Plaintiff repeats and realleges the allegations in paragraphs 1 through 57 above as if fully set forth herein.

59. The FDIC operated as Servicer from and after the date of failure of NextBank through (i) the date of repudiation on July 10, 2002, (ii) on an informal basis with the consent of the Indenture Trustee, through July 31, 2002, and (iii) without the consent of the Indenture Trustee from August 1, 2002 through September 24, 2002.

60. During this combined period, from February 7, 2002 to September 24, 2002, and despite being without authorization to serve as Servicer from August 1, 2002 to September 24, 2002, the FDIC collected fees for servicing Trust Receivables, and it prevented FNBO from acting as Servicer during this period. The FDIC was thus obligated as Servicer to pay the expenses of the Indenture Trustee. While it received the servicing fees for this period, the FDIC has failed to pay the Indenture Trustee's expenses.[1]

61. The expenses incurred from February 7, 2002 through September 24, 2002

---

[1]     Plaintiff, as set forth in Count One, maintains that the FDIC improperly retained the Servicing Fee for August and September, 2002. Thus, to the extent this claim seeks expenses incurred in August and September, it is an alternative claim.

- 14 -

total $796,462.07. Of the total expenses, the FDIC has remitted only $143,457.39. As a result, the FDIC has wrongfully converted and owes the Trust at least $653,004.68.

## COUNT FIVE
(Conversion of Trust Funds Related To NSF Amounts and Credit Balance Refunds)

62.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 61 above as if fully set forth herein.

63.     By letter dated September 25, 2002, the FDIC informed the Indenture Trustee that the FDIC had set off and retained $7,858,834.98, purportedly representing $3,030,832.12 related to Credit Balance Refunds and $4,828,002.86 related to NSF Amounts.

64.     The FDIC claims that these amounts relate to monies previously transferred to the Trust for distribution to the Noteholders on and after July 10, 2002.

65.     By letter dated March 27, 2003, the FDIC conceded that it had wrongfully retained $2,449,498.78 in such funds. Upon information and belief, the Indenture Trustee alleges that this amount has increased since March 27, 2003.

66.     As a result the FDIC has converted and owes the Trust at least $2,449,498.78 in connection with this claim.

## COUNT SIX
(Conversion of Trust Assets for Failure to Begin Amortization Period)

67.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 66 above as if fully set forth herein.

68.     During the normal operation of the Trust, as provided in Article VIII of the Master Indenture and, specifically, Article IV of the Indenture Supplements, funds

representing interest payable on the Notes are distributed by the Indenture Trustee to the Noteholders on a regular basis.

69.     As provided in Section 5.01 of the Master Indenture, the occurrence of certain events, including the appointment of the FDIC as receiver for NextBank on February 7, 2002, constitute a "Trust Redemption Event," requiring the commencement of an "Amortization Period."

70.     During an Amortization Period, as provided in the Indenture Supplements, principal, in addition to interest, is required to be paid to the Noteholders until the principal balance of the Notes is paid in full.

71.     The percentage of principal collections payable monthly to the Noteholders is fixed at the start of the Amortization Period.  In contrast, the percentage of losses allocable to the Noteholders during the Amortization Period decreases as their principal is paid down.

72.     Until February 7, 2002, the Trust was operating normally and was not in an early amortization period.

73.     Under Section 5.01(a) of the Master Indenture, the appointment of the FDIC as receiver for NextBank constituted a Trust Redemption Event.  Section 5.01 of the Master Indenture provides that, upon the occurrence of a Trust Redemption Event, an Amortization Period shall commence, and payment on the Notes shall thereafter be made in accordance with the terms of the Indenture Supplements.

74.     The FDIC ignored the commencement of an Amortization Period and continued to act as if an Amortization Period had not commenced until at least July 2002. The FDIC had no right to interfere with the property and the economic and contractual

rights of third parties in relation to assets which are separate and apart from the receivership estate. Distributions to Noteholders should have been made in accordance with the terms of the Master Indenture. The FDIC failed to apply these collections to pay down the outstanding principal of the Notes, as required by the Master Indenture. In addition, this failure to amortize has resulted in a greater allocation of losses to the Notes than would have otherwise occurred under the terms of the Master Indenture.

75. As a result of its failure to begin the Amortization Period at the proper time, the FDIC wrongfully took and converted the assets of the Trust, without proper or just compensation, in violation of (i) the property rights of third persons, that is, the Noteholders and the Indenture Trustee, on their behalf, and (ii) the perfected first priority security interest of the Indenture Trustee on behalf of the Noteholders to such assets to secure repayment of the Notes. Accordingly, the FDIC owes the Trust in excess of $800 million in connection with this claim.

## Prayer for Relief

WHEREFORE, the Indenture Trustee demands judgment as follows:

For judgment against the FDIC on all Counts in the

Complaint and for money damages as requested;

For plaintiff's attorneys' fees, costs, and disbursements in

connection with the bringing of this action; and

For any other relief as the Court deems just and proper

under the circumstances.

Respectfully submitted this ___5th___ day of June, 2003.

John L. Douglas ✗✗
D.C. Bar No. 479569
H. Stephen Harris, Jr.
D.C. Bar No. 481092 *HD 25372*
Paul F. Brinkman
D.C. Bar No. 441681

Alston & Bird LLP
1201 W. Peachtree St.
Atlanta, GA 30309
Tel.: (404) 881-7000
Fax: (404) 881-7777

Alston & Bird LLP
601 Pennsylvania Ave. NW
North Bldg., 10th Floor
Washington, DC 20004
Tel.: (202) 756-3303
Fax: (202) 756-3333

Counsel for Plaintiff
The Bank of New York,
as Indenture Trustee of the
NextCard Credit Card
Master Note Trust

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------------------X
                              :
THE BANK OF NEW YORK          :
                              :
            Plaintiff         :   Civil Action No.
                              :      03-1221
      v.                      :
                              :
F.D.I.C.,                     :
                              :
                 Defendant    :   Washington, D.C.
                              :   Tuesday, November 23, 2004
------------------------------X   2:30 p.m.
```

TRANSCRIPT OF INITIAL SCHEDULING CONFERENCE
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          H. Stephen Harris, Jr., Esq.
                            Lynn A. Soukup, Esq.
                            Jay Smith, Esq.
                            Alston & Bird, LLP
                            601 Pennsylvania Ave., N.W.
                            North Bldg., 10th Floor
                            Washington, D.C.  20004-2601
                            (202) 256-3492


For the Defendant:          George A. Davidson, Esq.
                            Dennis Klein, Esq.
                            Scott Christensen, Esq.
                            Hughes Hubbard & Reed, LLP
                            One Battery Park Plaza
                            New York, NY  10004-1482
                            (212) 422-4726



Court Reporter:             Lisa Walker Griffith, RPR
                            U.S. District Courthouse
                            Room 4802-A
                            Washington, D.C.  20001
                            (202) 898-1068



Proceedings recorded by mechanical stenography, transcript
produced by computer.

```
 1                    P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Civil action number 03-1221.

 3    The Bank of New York v. FDIC, H. Stephen Harris, Jr. for

 4    the plaintiff.  George A. Davidson, Dennis S. Klein and

 5    Scott Christensen for the defendants.

 6            MR. HARRIS:  Your Honor, I'm Steve Harris of

 7    Alston & Bird, representing the Bank of New York, which

 8     is the plaintiff.  With me at counsel table are Lynn

 9    Soukup and Jay Smith of my firm.

10            MR. DAVIDSON:  Good afternoon, Your Honor.

11    George Davidson of Hughes, Hubbard & Reed.  With me are

12    Dennis Klein and Scott Christensen of my firm.  We're

13    representing the FDIC as receiver.

14            THE COURT:  I have inherited this case from

15    Judge Jackson.  We're here on a combined motion.  I have

16    before me a motion for reconsideration.  Second of all, I

17    guess we also determined that answers have been filed and

18    an I.S.C. is occurring simultaneously, I think.

19            I will be happy to hear from you.  I've read

20    the transcript of Judge Jackson's argument, if that

21    eliminates anything.  I guess the movant here would be

22    the FDIC.  So I'll hear from Mr. Davidson first.

23            MR. DAVIDSON:  Your Honor, Judge Jackson, of

24    course, had the sort of damocles of a very short period

25    before his term as a judge came to an end.  And he came
```

1    very close to granting this motion to dismiss.  He didn't

2    quite get there.

3           I would be happy to kind of bring you through

4    the whole process to where Judge Jackson got, or I can

5    start where we think he went wrong.

6           THE COURT:  The latter I think is best.  Let's

7    take up the second, I guess it is Count VI first.  Okay?

8           MR. DAVIDSON:  Yes.  In Count VI, Judge Jackson

9    really accepted our argument that the Next Bank should be

10   regarded as having entered into, for purposes of statute,

11   all the contracts which made this business work, and

12   which permitted the FDIC then to carry it on when it took

13   over as receiver.

14          One of the contracts had as a formal party this

15   trust which the bank had created for the purposes of this

16   transaction.  The trust which is not recognized as being

17   real by the IRS for its purposes.  And all the duties of

18   the trust were to be performed by Next Bank.

19          Next Bank actually signed the trust agreement,

20   as well as -- the trust indenture, as well as the trust.

21    So for a whole set of reasons which we explained to

22   Judge Jackson, he was persuaded that the Next Bank should

23   be regarded as having entered into all the contracts that

24   would permit the whole exercise to go forward.

25          THE COURT:  So, you are claiming you are a

1    party to the master indenture.  And you have the right to

2    cancel or not enforce amortization.    But are you then

3    -- what happens months later when you say everything

4    comes to an end so to speak?  What is the state of

5    affairs then?

6              MR. DAVIDSON:  When the FDIC concluded that it

7    could not profitably operate the business and it didn't

8    make any sense for anybody to have it continue, that did

9    trigger a so-called early amortization event.

10             When that happens, instead of a lot of the

11   money coming back to the bank so it can keep re-lending

12   it to further card holders, almost all of the money goes

13   to the note holders and starts to pay down their

14   principal as well as to keep their interest current.

15             So that's been happening for a couple of years,

16   Your Honor.  And in fact, these notes are all current as

17   far as interest.

18             THE COURT:  They are?

19             MR. DAVIDSON:  Yes, and are actually and

20   gradually having the principal paid back as well.  There

21   is another administrator in place that is doing that and

22   reports regularly to the parties as to how that is going.

23             THE COURT:  There is one count here for

24   conversion that is being challenged, and one that is not.

25    Is there some reason for that distinction?  That they

                                                              4

1    wanted to get stretched?

2         MR. DAVIDSON:  Well, Your Honor, we felt that

3    the one we moved against was acceptable as a resolution

4    on the motion to dismiss.  The other one we have to get

5    into facts.  So that is the way we proceeded.

6         We also, as the parties told Judge Jackson, and

7    as we have advised Your Honor, it is these two counts

8    which really are the barrier to having the parties be

9    able to deal with the whole case on their own without the

10   need for the Court's assistance.

11        So, you don't find the parties I think with

12   that level of confidence usually.  But our clients are

13   clear on that, that they think they can work out

14   everything else with the aid of the Court's decision on

15   these two counts.

16        THE COURT:  Is it your position as to Count II

17   that you have repudiated the transfers for certificates

18   or not?

19        MR. DAVIDSON:  We have not repudiated the

20   transfer or certificate.  There is no occasion to

21   repudiate the transfer or certificate.  It is like a

22   stock certificate or any other incidents of ownership.

23   It is not something that needs repudiating nor would

24   repudiation of any of these agreements have any impact on

25   the right to retain what the transfer or certificate gave

                                                    5

1     one the right to.

2          The whole premise of a conversion claim is that

3     you have the person making the claim have some claim of

4     ownership to the asset at issue.  The problem with Bank

5     of New York's claim here is that it does not.  And never

6     did.  And there is nothing in any of the papers which

7     would suggest that it did.

8          THE COURT:  The only thing -- in the argument

9     they say it is false.  You can react to it and then they

10    can tell me where do I find the support for this.  All of

11    the documents are clear that it was to be a separate

12    interest free from their lien.  I don't know what lien we

13    have in mind here.  Do you understand what that means?

14         MR. DAVIDSON:  Your Honor, that sounds like my

15    argument.

16         THE COURT:  Sorry.  Okay.  They're saying it

17    was not separate from their lien.  I think there must be

18    the --

19         MR. DAVIDSON:  Right.

20         THE COURT:  You are probably right about that.

21     I'm sorry, yes.  They said on page 32, probably Mr.

22    Harris.  Rights of Next Bank were subject to the rights

23    of the note holders and the lien of the notes.

24         Where do I find out what the lien is?  Is there

25    a definition or an explanation?

6

1              MR. DAVIDSON:  Your Honor, there is a, we

2    showed Judge Jackson which is an excerpt from the master

3    indenture.  And if I might --

4              THE COURT:  I have the master indenture here,

5    maybe I don't have the whole thing.

6              MR. DAVIDSON:  This is easy because it is in

7    the granting clause which starts on page one and goes

8    over to page two of the master indenture.  So one doesn't

9    have to get too deeply into it.  But basically --

10             THE COURT:  Good.

11             MR. DAVIDSON:  Basically, what it does is, it

12   gives assets, listed assets A. through H., it gives

13   listed assets A. through H. to the lien.  But then at the

14   end it says:  In each case excluding the transfer or

15   interest.  So the collateral that secures the note is

16   defined as A. through H. except for the transfer or

17   interest, which is thus clearly not subject to the --

18             THE COURT:  So it is your view that the lien is

19   A. through H.?

20             MR. DAVIDSON:  The lien is A. through H. except

21   for the transfer or interest.

22             THE COURT:  All right.  To be perfectly frank,

23   I have some, since I am at liberty to say whether I think

24   there is an error of law, et cetera, you may well be

25   right on Count VI.  But I don't actually know if you

7

1    apply a basic contract principle, which I think has to be

2    applied as unambiguous.

3            Do you have any case that says a party, that a

4    party, I mean a party to a lawsuit is, when they say

5    they're bound by an agreement that that makes them a

6    party to the agreement?  Or similarly the same thing for

7    that signature?

8            It may well be that Judge Jackson's result is

9    utterly sensible and right.  But can I say that as a

10   matter of law that this contract is unambiguous on its

11   face such that I can reach that conclusion?

12           MR. DAVIDSON:  Your Honor, the issue really is

13   whether, within the meaning of the statute, the Next Bank

14   should have been deemed to have, quote, "entered into

15   this contract."  And that is the language of the statute

16   which we've got to fit in.

17           THE COURT:  Let's go back to that for a minute.

18   Let's see -- "Enforce any contract entered into by the

19   depository institution."  Do I have anything that tells

20   me what that means?  Other than common sense?

21           MR. DAVIDSON:  Your Honor, there is no case

22   which construes that language.  We put before Judge

23   Jackson a whole variety of circumstances regarding how

24   this was all set up.  And what the purpose of it was and

25   what the policy reasons were.  And he concluded on the

                                                          8


                                                          8

1    basis of all those that the bank should be deemed to have

2    entered into this contract.

3         THE COURT:  And how do you get around this

4    regulation?  You just say that you weren't repudiating at

5    this time, you are enforcing?

6         MR. DAVIDSON:  Your Honor, if you look at

7    Section 1821(e) of the statute, it is entitled Authority

8    to Repudiate Contracts.  And it says that the receiver,

9    quote, "may disaffirm or repudiate any contract."  So the

10   regulation which Judge Jackson noted and wondered why

11   nobody had talked about was not talked about because that

12   only applies to the power under E-1, which is the power

13   to disaffirm or repudiate a contract.  We're under E-12

14   which is the power to enforce a contract to which that

15   regulation has no application.

16        THE COURT:  All right.  I'm happy to hear from

17   Mr. Harris.

18        MR. HARRIS:  Good afternoon, Your Honor.  May

19   it please the Court, my name is Steve Harris.  I

20   represent the Bank of New York.  You will not be

21   surprised to hear that we disagree a bit with some of the

22   things my esteemed colleague, Mr. Davidson, just said.

23   As to Count VI, Your Honor, the judge, Judge Jackson held

24   that they were technically apart.  "The FDIC was

25   technically a party by accession to the master

9

1    indenture," that is a quote from his memorandum and order

2    at page eight.

3          THE COURT:  Let's go back to the argument he

4    just made.  I think that maybe we're setting up too high

5    a standard for yourselves to determine whether or not

6    they were quote "a party" for purposes of the New York

7    state law.  I agree that maybe you could have some

8    ambiguities about that.  But that is not -- apparently

9    Mr. Davidson was kind enough to refocus me that the

10   statute says "entered into."  Now, there is no question

11   that they said we are bound by.  How do you distinguish

12   that?  Why do I have to say that they have to be a quote

13   "party" in the traditional sense to get past this issue.

14         MR. HARRIS:  Well, under New York law, and I'm

15   sorry, I don't have that case with me.  We did brief it

16   in our original round of briefing.  But the "entered

17   into" is in New York case law defined as being a party to

18   an instrument.

19         THE COURT:  I'm sorry, say that again.

20         MR. HARRIS:  "Entered into," there is New York

21   case law that says that the term, quote, "entered into,"

22   unquote, is synonymous or means being a party to.

23         THE COURT:  Well, but the federal statute is

24   not going to be interpreted by New York law.  I can

25   understand the contract could be interpreted by New York

                                                        10

1    law but I can't import New York law to interpret 1821,

2    sub part E.

3          MR. HARRIS:  Well, to me, "entered into" is

4    synonymous as a matter of, I guess, federal common law.

5    It is commonly used to mean that if you enter into a

6    contract you become a party to a contract.  You sign with

7    an intent to be a formal party.

8          But Your Honor, the point here today, I think,

9    is that even, if the argument as I understand the FDIC's

10   argument on its motion for reconsideration where it has a

11   higher burden than it did last time, it has to prove that

12   there is a clear error that necessitates a different

13   result.  Not that there was an error in some regard.

14         They say it was an error for Judge Jackson to

15   have first found, this is not an error, that they say he

16   properly found that the FDIC is a party to the master

17   indenture.  They didn't say that it was a clear error for

18   Judge Jackson not to have taken that finding and do what

19   they see as the next logical and necessary step, rule

20   that their motion to dismiss Count VI was required under

21   the wording of that statute, 1821 E-1.

22         There are several problems with that because,

23   principally because there are separate and independent

24   grounds on which Judge Jackson's denial of the motion to

25   dismiss stand as proper whether or not his finding that

                                                        11

1    the FDIC is a party to that contract is right or wrong.

2              THE COURT:  Such as?

3              MR. HARRIS:  Such as, there are two.  The first

4    is, that the rights and obligations that were effected by

5    the FDIC's actions are not the rights and obligations of

6    Next Bank.  When the FDIC becomes a receiver just as a

7    bankruptcy receiver or a common law receiver, it is

8    entitled to step into the shoes of the received

9    institution, the failed depository institution in the

10   language of FIERI.  That is Next Bank.

11             The purpose and intent as it is expressed in a

12   number of documents, some of which we handed up last time

13   including opinions of counsel.  I would like to hand up

14   the FAS 140 accounting statement and an interpretive

15   letter by the general counsel of the FDIC.  Her Honor

16   asked earlier whether there are other materials that help

17   interpret the meaning of that statute.  I believe that

18   these do.

19             And while the FDIC wants to say that one is

20   limited to enforcement and the other is to repudiation,

21   we would say that Judge Jackson got it just right when he

22   said in essence what they were doing was rejecting the

23   acceleration clause, not of Next Bank.  This was not an

24   acceleration clause that accelerated an obligation of

25   Next Bank or that accelerated an obligation to Next Bank.

                                                      12

1    We have to remember --

2              THE COURT:  Why?  If they were to accelerate,

3    who is paying whom?

4              MR. HARRIS:  Let me go to this table.  If I can

5    hand that up as well, Your Honor.  We use this in the

6    earlier hearing and it is referred to in the transcript.

7              This is a typical structure.  In fact, it is a

8    structure that is in essence mandated by the bank or

9    accounting standard 140.  And by the regulation 360.6

10   that was put in place by FDIC to reassure the

11   securitization markets that there would be legal

12   isolation.  That is a term that, if you follow the rules,

13   if you have a true sale of receivable which we do, there

14   is no dispute that we do here.  If you set up this entity

15   which Mr. Davidson said is fictional for tax purposes, it

16   is very real for securitization purposes.  It is not a

17   taxpayer institution so there is a tax rule, that

18   allocates the tax liability between the bank and the note

19   holders, which one would do for example with a

20   partnership that is just a pass through entity.

21             Even though it is a tax rule that says you

22   don't tax this entity, it is recognized in the materials

23   I've given Your Honor in the regulation adopted by the

24   FDIC for the very purpose of preventing what the  FDIC is

25   trying to do here, which is, to reach back and affect a

13

1    transaction that is legally isolated.  It is  separated

2    from the sale.

3           Here is what we have.  We have Next Bank which

4    wants to issue credit cards.  It needs to have a certain

5    capital ratio under the banking laws.  That ties up quite

6    a bit of the capital.  It has more capital to fund the

7    issuance of now cards and more operations if it is able

8    to sell its receivables.

9           These are the receivables.  I go out and charge

10   money on a Next Bank credit card.  Before I pay that,

11   that is an account receivable owned  by Next Bank.  Just

12   as you can sell receivables to a factor in the

13   securitization industry in accordance with these rules

14   laid down by the FDIC.  And they were sold to a trust.

15   The trust is a legally separate entity.

16          They're not shoed into what the FDIC can step

17   the whole receivership because those shoes are full.

18   They are full with Wilmington trust fees.  A separate

19   entity that is very real and acts as the owner-trustee

20   and has real legal obligations as the owner-trustee of

21   that trust at issue.

22          We have now crossed the line what is called

23   legal isolation in the regular and the financial

24   accounting standard 140 and in the general counsel.

25          At this point, the bank, this is the failed

                                                              14

1    institution.  This is the institution into which the new

2    shoes of the FDIC steps, and it is entitled to step, has

3    sold in a true sale the receivable to the trust.

4         The trust then collateralizes issued notes,

5    loans money to the note holders or investors and they

6    give back, they get back a collateral interest in those

7    receivables.  What they are trying to do is reach beyond

8    the line of legal isolation which is impermissible and

9    effect the rights between these two parties.

10        The acceleration clause dictates when and how

11   fast and what kinds of money, principal versus interest,

12   that the trust pays to the note holders.  This is not an

13   acceleration clause which is the typical setting where a

14   bank has an acceleration clause in a contract.  But it is

15   a party or not effecting its rights and obligations being

16   technically a party.

17        And I think this is why Judge Jackson was

18   careful to use the word technically, but said this does

19   not help him on the rights and obligations between Next

20   Bank and the note holders or Bank of New York as the

21   indentured trustee for the note holder.  Bank of New York

22   is simply a representative of the note holders under an

23   indentured trustee agreement.

24        THE COURT:  But, would your argument be

25   different if one were to find, I take it would not, I now

                                                          15

1    understand, if you were to find that Next Bank was a

2    party to, or have entered into the master indenture, you

3    still would argue that they could not do that?

4          MR. HARRIS:  Absolutely, Your Honor.  That

5    would be contrary to the policy, purposes and the

6    regulation itself and FAS 140.  It would undermined the

7    securitization industry, which is trillions of dollars in

8    this economy.

9          THE COURT:  Well, I thought there was some

10   warning about that in the contracts.  Why is everybody so

11   alarmed?  That the FDIC could come in as receiver and --

12         MR. HARRIS:  The warning in the contract first

13   is in vague language.  It doesn't say that they are going

14   to interfere with the rights and obligations of third

15   parties.

16         THE COURT:  Who wrote it?

17         MR. HARRIS:  Pardon?

18         THE COURT:  Who wrote it?

19         MR. HARRIS:  I'm not sure who wrote it.  Mr.

20   Davidson, I assume it is the FDIC or --.

21         MR. DAVIDSON:  This language was written by the

22   parties to the contract.  FDIC had nothing to do with it.

23         THE COURT:  I would assume so.  Right.  Why

24   would the FDIC write the parts for these contracts?

25         MR. HARRIS:  I don't know.  I was thinking you

                                                           16

1    were speaking of something else.  But that, if it is the

2    offering memorandum that we're speaking of, that was

3    written presumably by one of the parties.

4              THE COURT:  What is the general counsel's

5    wisdom here?

6              MR. HARRIS:  The general counsel's thing which

7    is called FDIC interpretive letter, but I'm told by

8    someone who does a lot of this that it is better known as

9    a general counsel's opinion.  It in essence restates the

10   reasons why 12 CFR 360.6 was adopted by the FDIC to

11   reassure the securitization market that the separation

12   would be recognized and that the FDIC would not come back

13   and try to reach beyond the line of legal isolation and

14   interfere with the relationships of the parties to the

15   securitization as opposed to the parties to the initial

16   sale.

17             THE COURT:  How come you don't have a motion to

18   dismiss?  I mean for summary judgment on this?

19             MR. HARRIS:  Well, we had told Judge Jackson

20   that we believe we can probably stipulate to facts.  We

21   have not done that yet, but we believe we can stipulate

22   to facts and present this on cross motions for summary

23   judgment expeditiously.

24             THE COURT:  How do you allow for them to be

25   repudiating in the agreement and not a party to?  Since

                                                        17

1    your argument on the other counts say repudiated, I take

2    it, the master indenture.

3              MR. HARRIS:  The argument on the other

4    counts?  I'm sorry, I don't follow, Your Honor.

5              THE COURT:  I assume that you are arguing that

6    they are not, you are arguing on Count VI, that they're

7    not a party, the FDIC or Next Bank to the master

8    indenture.  How is it that they can repudiate it?  Which

9    is what you are arguing on Count II?

10             MR. HARRIS:  On Count II, they repudiated, the

11    rights and obligations that were repudiated on Count II

12   did affect, were rights and obligations of Next Bank, the

13   failed institution.  That is the important distinction,

14   Your Honor.  They can.

15             And we're not arguing they cannot  repudiate on

16   July 12 as to Count II, because what they repudiated

17   there was indeed a set of rights and obligations.  We

18   don't quibble with that right or that power.  But when

19   you repudiate the obligations you lose the rights.

20             THE COURT:  Where do they get that?

21             MR. HARRIS:  Where do they get the right to

22   repudiate?

23             THE COURT:  No, where are their rights and

24   obligations set forth?

25             MR. HARRIS:  The rights and obligations for the

                                                        18

1    transfer or interest, Mr. Davidson is right, the

2    collateral verses the transfer or interest is defined in

3    the granting clauses of the master indenture.  There are

4    two species of property in the trust, if you would, Your

5    Honor.  One is transfer or interest and one is

6    collateral.

7         THE COURT:  So you are trying to say that they

8     have rights and obligations under the master indenture

9    but they didn't enter into it.

10         MR. HARRIS:  The rights and obligations --

11    actually not, Your Honor.   Our position, although I

12    think we still prevail because it is not necessary for

13    the judge's conclusion.

14         We think the judge was wrong to find that they

15    were a party, technically or otherwise.  But even if they

16    are a party, the rights and obligations that they have

17    which we think are just recited in the master indenture

18    and actually are created in the transfer and servicing

19    agreement, a different document.

20         If one argues that those rights are given rise

21    to by the master  indenture, those rights and obligations

22    have nothing to do with, they are not the rights and

23    obligations that were purportedly meddled with in

24    connection with Count VI.

25         When they ignored the acceleration provision

19

1    that was not an acceleration of a right or obligation of

2    Next Bank, but was a right between the note holders and

3    the trust, that was impermissible.

4              THE COURT:  Who dreams up these kinds of

5    transactions?

6              MR. HARRIS:  Ms. Soukup is one.  We have an

7    exhibit.

8              THE COURT:  Are they designed to get around

9    this problem or are they designed to in some other

10   fashion, are they designed to protect your investors?

11             MR. HARRIS:  Well, yes.  The structure.  And

12   again, this is a structure that was in essence blessed by

13   the FDIC and FAS said this is how you do it if you don't

14   want us to reach beyond the line of legal isolation.

15   This is how -- it's called a two-tiered securitization.

16             Years ago they were done as one tier  without

17   this separate entity in the middle.  And they said you

18   have to have a separate entity.  And we have a separate

19   entity.  Everybody in the industry does it this way now.

20    Everybody in the industry does it this way now as a

21   result.

22             THE COURT:  The purpose being in order to worry

23   about the FDIC coming in as a receiver?

24             MR. HARRIS:  That's one -- well, that's the

25   regulatory purpose to reassure the note holders to make

                                                      20

1    sure that they are willing to actually invest in it.

2              THE COURT:  Who are the ultimate quote

3    "victims" here?

4              MR. HARRIS:  The note holders are everything

5    from individuals who buy notes on the public market all

6    the way to pension funds, institutions, banks.

7              THE COURT:  And they didn't sue?

8              MR. HARRIS:  They don't have the right to sue,

9    Your Honor.  The only party that has standing to sue is

10   the indentured trustee, who we represent.  The Bank of

11   New York gets no money out of this.  It is the party that

12   has legal standing and has to sue on behalf of the

13   parties whose money is at risk who are the note holders

14   that it represents.

15             THE COURT:  What do you say to the argument --

16    and I realize this is not the legal dispositive issue,

17   but if they're getting paid, what is your standing?

18             MR. HARRIS:  They get a servicing fee, Your

19   Honor.  But they are not the --

20             THE COURT:  Not you, I mean, he said they're

21   getting paid now.

22             MR. HARRIS:  That was a little misleading if I

23   might say that, Your Honor.  He said that the interest is

24   paid up to date, I believe.

25             THE COURT:  He said that.  And he said that

                                                        21


                                                        21

1    they did start --

2          MR. HARRIS:  Well, let's remember that if this

3    acceleration clause between these two parties, not with

4    Next Bank, had been given effect, as we say it should

5    have been, on February 7 or February 12 when the bank was

6    placed into receivership, not on July 12, the principal

7    and interest would have been, begun to be paid fully.

8    And no transfer or interest deducted to the note holders

9    at that time.

10          As a result of the principal and interest not

11    being paid because they refused to give effect to that

12    acceleration clause, the note holders in fact are well in

13    arrears of where they are supposed to be under the law.

14          THE COURT:  You are the one that raised the

15    question that I asked the other counsel about if you

16    can't say that it is unambiguous, then you have to have

17    discovery.

18          MR. HARRIS:  That is correct, Your Honor.

19          THE COURT:  On the contract.  And what was

20    going on here and what was the industry practice and what

21    was the FDIC's, I suppose, various rules and regulations.

22          MR. HARRIS:  We do think that is necessary if

23    they take this position.

24          THE COURT:  Right.  So you can't resolve that

25    either by some summary judgment at this point?

                                                        22

1          MR. HARRIS:  Well, if we can stipulate to the

2     facts, we could.  I'm not sure if we can stipulate to the

3     facts of the FDIC practice.  I have not discussed that

4     specific issue, but I think they're fairly clear from

5     having looked at what is public as to how the FDIC has

6     handled these matters.

7          We're not aware of any instance in which the

8     FDIC has tried to do any, something analogous to this

9     which is use these powers to interfere with strangers

10    rights between each other.

11         THE COURT:  Well, strangers is a little bit of

12    a stretch if you ask me.

13         MR. HARRIS:  Well, between parties neither of

14    which is the failed depository institution.

15         THE COURT:  You are pretty cozy if you ask me.

16     Strangers.

17         You keep talking about a lien.  I don't

18    understand your lien argument frankly on the other count.

19         MR. HARRIS:  On Count II.

20         THE COURT:  Yes.  We all agree, and so did

21    Judge Jackson, that the transfer or interest excludes

22    the collateral.  The collateral belongs to the note

23    holders.  I think I've stated that correctly.  So where

24    is your right?

25         Where is, even assuming they can't do what they

                                                              23

1    did, and that some way or another the repudiation puts

2    everybody -- I don't know whether you are arguing

3    recision under the contract or everybody goes back to go.

4    But why should it lapse to you?  I mean, here is a pot

5    of money I suppose, or a dwindling pot, why does it go to

6    your client?

7              MR. HARRIS:  Because the granting clause says

8    that the note holders have an interest in all the assets

9    of the trust except the transfer or interest.  In

10   mathematical terms, it is defined as Y. equals one minus

11   X.  X. meaning the transfer or interest.  X. is zero.

12             When they repudiated on July 12, when they

13   repudiated the transfer and servicing agreement of the

14   other agreement and a master indenture, which sets out

15   the right to the cash payments of the transfer or

16   interest.  They stopped performing the services that are

17   the other side of the coin of the transfer or interest.

18   They earned the transfer or interest by performing the

19   transfer of services.

20             Once they stopped performing the transfer of

21   services as with any repudiation, you cannot repudiate

22   the obligation and retain the benefit.

23             THE COURT:  What benefit?

24             MR. HARRIS:  I refer Your Honor to the Ernst

25   and Young decision of Judge Easterbrook in the 7th

                                                          24

1    Circuit that we submitted.

2            THE COURT:  I understand your argument.  But

3    I'm trying to understand how you apply it here.  If in

4    fact, on day, what are you saying -- July, they

5    repudiate?

6            MR. HARRIS:  Correct.

7            THE COURT:  You are saying there is nothing

8    there?

9            MR. HARRIS:  No, no, no.  The transfer or

10   interest is defined as what is, what is not collateral

11   and what is not collateral are the monies defined in the

12   master agreement that they were entitled, the cash flow

13   they were entitled to as a transfer or interest as long

14   as they were performing the transfer of  services. When

15   they stopped performing the transfer of services, we

16   submit that it is in the meaning of repudiation that you

17   cannot repudiate the burden --

18           THE COURT:  -- your argument that you get

19   damages.  That's the way it goes.

20           MR. HARRIS:  No, because what they have done,

21   the money was there and they did not, they diverted it to

22   their own uses.

23           THE COURT:  Well --

24           MR. HARRIS:  We have a superior possessory

25   right.  That's what the lien gives us.

                                                        25

1          THE COURT:  What lien?  I don't understand

2     this.  I don't see the lien being defined to include the

3      transfer in interest.  You have a lien on collateral.  I

4     agree.  But I still don't understand how you get a

5     possessory interest in something because they repudiated.

6     Some way or another you are taking the position that when

7     they repudiated that put you in a superior position, I

8     guess.  I don't see where you get it from the contract.

9          MR. HARRIS:  When they repudiated, Your Honor,

10    they repudiated the transferor obligations.  Those are

11    the obligations that are related to the transferor

12    interest.  They repudiated the master indenture which is

13    the document that gave the transfer interest rights, the

14    transferor, the rights to receive money.

15          THE COURT:  I thought you told me a minute ago

16    they didn't repudiate the master.

17          MR. HARRIS:  No, they repudiated the master

18    indenture.

19          THE COURT:  But that's okay, you say, that's

20    all right, although they're not a party to it.

21          MR. HARRIS:  In Count II, they are repudiating

22    rights and obligations.  The rights and obligations of

23    the parties are entitled to repudiate the rights and

24    obligations.   In Count VI, they're trying impermissibly

25    to  repudiate rights and obligations between two other

                                                          26


                                                          26

1    parties.  That's the difference in our view, Your Honor.

2              THE COURT:  Let's go back to the top again.

3    Count II, they're repudiating rights and obligations of

4    Next Bank.

5              MR. HARRIS:  That is correct.  Next Bank was

6    entitled to transferor interest under a document that

7    they repudiated.  Now, they got that, it was performing

8    transferor services.  It was transferring monies to the

9    trust.

10             THE COURT:  All right.  But I don't --

11             MR. HARRIS:  It stopped performing those

12   services when it repudiated.

13             THE COURT:  I know, but why do you then get a

14   claim for conversion as opposed to a claim for damages?

15             MR. HARRIS:  Because our claim is for the --

16   our entitlement is for the trust assets that we have a

17   property interest in under the granting clause.  That is

18   the collateral.  The collateral initially, it's defined

19   as whatever the collateral is less the transferor

20   interest.  When the transferor interest becomes zero, all

21   of the money in the trust is collateral.

22             THE COURT:  That's what I'm asking.  When does

23   it all become zero?

24             MR. HARRIS:  At the time of repudiation when

25   they stop performing their services.

                                                      27

1            THE COURT:  What could there possibly be to

2    fight about?

3            MR. HARRIS:  I don't know, Your Honor.  We put

4    in a claim and they should have granted it.

5            THE COURT:  That's not my point.  If it is

6    zero, how did your collateral grow beyond A. through H.

7    minus T. I.?

8            MR. HARRIS:  Because it is defined to be

9    everything in there except for whatever transferor

10   interest is.  When the transferor interest is zero, it's

11   everything that's in there, because everything that's in

12   there minus zero is everything that is in there.

13           THE COURT:  Maybe this is more metaphysical

14   than I'm prepared to --

15           MR. HARRIS:  The trust asset is -- there is

16   nothing else that gives them, if they have lost their

17   transfer interest.  If we're correct and the transfer

18   interest goes to zero by virtue of their repudiating the

19   related obligation.

20           I'm sorry, if the transfer interest becomes

21   zero at the point of repudiation, just like any other

22   right becomes zero when you repudiate the correlating

23   obligation, if that becomes zero on July 12, and if we

24   are right, then when you do that equation, that simple

25   equation of collateral minus transfer interest, you get

                                                         28

1   collateral, A. through H.

2            THE COURT:  Okay, say that once more -- when

3   you what?

4            MR. HARRIS:  When you do the equation, the

5   definition of what collateral is, which is essentially

6   everything in the trust unless there is transfer

7   interest, except to the extent there is transfer

8   interest.

9            THE COURT:  Right.  And if you say T. I. equals

10   zero then that means everything is trust.  What I want

11   to understand --

12            MR. HARRIS:  Everything is collateral.

13            THE COURT:  All right, collateral.  What is the

14   deal the day before the repudiation?  Is there some

15   figure that one attaches?

16            MR. HARRIS:  Yes.  Under the master indenture

17   it defines what they are entitled to earn.  May I defer

18   to Ms. Soukup?

19            THE COURT:  You can answer this.  What are you

20   saying they converted on?  I guess you said July

21   something.

22            MR. HARRIS:  They repudiated on July 12.

23            THE COURT:  I know, but you are making a claim

24   of conversion.  So I assume it is as of that time.

25            MR. HARRIS:  As of that time, they kept that

                                                        29

1    money which was ours.

2              THE COURT:  And what amount is that?

3              MR. HARRIS:  That amount is approximately $13

4    million.

5              THE COURT:  That is an amount, not interest et

6    cetera.  So where is that money the day before their

7    quote "repudiation?"  Is it in the collateral or the

8    trust?

9              MR. HARRIS:  The day before the repudiation --

10             THE COURT:  The transfer of interest, I'm

11   sorry, is it in the collateral or is it part of the

12   transferor interest.

13             MR. HARRIS:  I'm not sure I know the answer to

14   that, Your Honor.

15             MS. SOUKUP:  It would be part of the transfer

16   of interest --

17             MR. HARRIS:  It would be part of the transfer

18   of interest the day before.

19             THE COURT:  Okay.  So under what theory does 24

20   hours later does it move?  Just by virtue of what you

21   call repudiation?  That has to be it unless I'm missing

22   something.

23             MR. HARRIS:  Well, let's remember that they

24   would have continued and did continue to keep the

25   transfer interest beyond July 12 when they didn't earn

30

1    it.  The transfer interest is continually being paid if

2    there is no repudiation.

3          THE COURT:  Well then, where does the zero come

4    from if it is still accumulating money here?

5          MR. HARRIS:  No, the zero is what its value is

6    if we are correct that the repudiation deprives them of

7    any transferor interest.  The master indenture defines

8    the transferor interest and --

9          THE COURT:  Right.  And where would I find

10   something in the contract that says repudiation deprives

11   them of the transfer of interest.  It is not as if the

12   transfer of interest is in fact zero.  But you are

13   saying, I think if I follow you, that somewhere or

14   another they have lost the right in it because they

15   repudiated.

16         MR. HARRIS:  Correct.

17         THE COURT:  Okay.  It is not zero.

18         MR. HARRIS:  It is not zero the day before.

19   And it will continue to grow and did continue to grow and

20   be diverted improperly.

21         THE COURT:  Okay.

22         Mr. Davidson, do you want to respond in any way

23   to this?

24         MR. DAVIDSON:  Your Honor, just as repudiation

25   under bankruptcy law by a trustee in bankruptcy is simply

1    a breach of contract.  That's all that repudiation by the

2    FDIC as receiver is.  It is a breach of contract which

3    does not mean that you lose your transferor interest.

4    Indeed the transferor interest is transferable.  Somebody

5    else could own it.  So they're sitting there with a $12

6    million thing, which the next day turns out to be zero

7    because of something --

8              THE COURT:  I just figured that out, I think

9    maybe.  I don't know.  But it is often easier to

10   understand things if you can explain why you say -- why

11   are they suing you for conversion as opposed to a simple

12   breach of contract?  Why is this becoming such an

13   unbelievably complicated, unnecessary, intentional tort.

14             MR. DAVIDSON:  I really am having less and less

15   ability to follow that argument.  As far as I can see, I

16   could reach into my pocket pull out nothing and give it

17   to Mr. Harris and he would be satisfied on that account,

18   because on his argument we converted nothing.

19             THE COURT:  He's already -- in Count III claims

20   conversion of the transferor interest.  How many times do

21   we have to address it?  I take it that you've got another

22   claim, which is not the subject of the motion to dismiss.

23    Is this you alternative pleadings for lack of a better

24   word, some kind of overkill?  And the punitives can fall

25   from an intentional tort?

                                                          32

1        You can answer in a minute.  I don't mean to

2    slander you, sir.  You don't have any insight?

3        MR. DAVIDSON:  I don't know.

4        THE COURT:  I don't know the world of

5    securitization.  I was a white collar defense lawyer.

6    Any way this kind of transaction can send you to jail, I

7    know that much.

8        MR. DAVIDSON:  Moving over to Count VI for just

9    a moment.  In exhibit four to our motion for

10   reconsideration, we find that the initial purchasers of

11   these notes were the following widows and orphans.

12   Credit Suisse First Boston, Barkley, Goldman Sachs, and

13   J. P. Morgan.

14       THE COURT:  I understand.  I don't know who

15   they are, but I know they were not poor people.  I

16   understand that.

17       MR. DAVIDSON:  Now I'm reading from page nine

18   of that same document.  And I'm leaving out some words

19   but all the words I'm reading are in there.  They were

20   given the following reassurance.

21       In addition, regardless of the terms of the

22   transfer of servicing agreement, the indenture or the

23   instructions of those authorized to direct the indentured

24   trustees actions, the FDIC may have power to prevent the

25   commencement of an early amortization period, which is

33

1    exactly what they did.

2            THE COURT:  Right.  No, I recall.  You gave

3    people fair warning.  The difficulty I have, which is not

4    the difficult Judge Jackson had, is that I have a

5    difficult time interpreting to my satisfaction some of

6    the words.  Both the federal statutes as well as the

7    motion of accepted and -- obviously, they're bound, we

8    know they're bound.  They say they're bound by the terms

9    of the master indenture.

10           I can't find anything that satisfies me that

11   entering into a contract, being bound by it,

12   acknowledging receipt, unfortunately, in a lot of ways, I

13   have no doubt that this was set up with a lot of special

14   considerations for a lack of better words.  And that

15   often frustrates the role of the receiver.

16           But I don't know that you can just take the

17   formalities and say well we'll get down to, at least at

18   the motion to dismiss stage, we'll get to the substance.

19           MR. DAVIDSON:  Let's look just for a moment at

20   the so called separate and independent trust.  It was

21   created by Next Bank for this sole purpose.  It is only

22   allowed to engage in this business.  The sole beneficiary

23   of the Trust is Next Bank.

24           Next Bank in the administrative agreement

25   agreed to do all the work of the trustee under the

                                                          34

1   agreement.  So these shoes filled with Wilmington Trust,

2   they're sitting there in Wilmington collecting a fee.

3   All of the work of the trust is being done by the Next

4   Bank.

5           THE COURT:  Mr. Harris seems to imply that this

6   is a traditional transaction in the world of high

7   finance.  Where is the FDIC on all this?  Haven't they

8   encountered this before?  Banks go belly up and you walk

9   in their shoes all the time.  Where are these --

10          MR. DAVIDSON:  This structure is to delete the

11  credit card bank.  If I might draw a couple of pictures

12  which I drew for Judge Jackson.  Essentially, these like

13  in any business, try to apply chief.

14          So you have the credit card holders.  The Next

15  Bank issuing credit cards at the usual high interest

16  rates to credit card holders.  And in a traditional

17  financing arrangement you have a lender down here.  And

18  that lender would probably have an ipso facto clause in

19  his contract saying if a receiver comes in, I don't have

20  to keep performing.

21          Clearly, the statute says nobody will dispute

22  that if the FDIC came into this kind of situation, they

23  could force the lender to keep going.

24          THE COURT:  I'm sorry, the lender being whom

25  again?

35

1          MR. DAVIDSON:  Some other institution, some

2     bank, whatever.

3          THE COURT:  Right.

4          MR. DAVIDSON:  Here Next Bank is getting its

5     money from the note.  Okay.  But for good and sufficient

6     reasons, which are recognized for some purchases, it sets

7     up this little trust which only does this one thing.  It

8     funds the trust.  It does all the work of the trust.  It

9     is the sole beneficiary of the trust.  It is the creator

10    of the trust.  It is really the little red hen of this

11    trust.  And through this trust, the financing works.

12         Under their theory, even though Next Bank is

13    party to three of the four contracts, when the FDIC came

14    in, they would be obliged to stop the business, have over

15    a million card holders not be able to pay for their gas,

16    or their weekend groceries, or be embarrassed at

17    restaurants, that the business would stop on a dime.

18    That Congress' purpose of permitting the FDIC to keep

19    going with the business would be frustrated.

20         So, the fact that they come up with this

21    financing vehicle which the IRS, in fact the parties

22    agreed contractually to do nothing that would cause the

23    IRS to take any other position and that this did not

24    exist.  That's part of the agreement.

25         THE COURT:  Well, what are you doing in this

                                                    36

1    legal opinion here?  I know it is not binding on anybody

2    and it has no particular effect on the Chevron.  But what

3    are they doing here, other than sanctioning in some way

4    this complicated transaction.

5         Financial assets are deemed to be legally

6    isolated when they've been placed beyond the reach of the

7    transfer and its creditors.  Is that where we are as a

8    factual matter, are we really trying to figure out

9    whether or not they violated this by not making it proper

10   in terms of isolation?

11        MR. DAVIDSON:  Your Honor, they're calling back

12   nothing.  The statute clearly says that the FDIC when it

13   comes in can't take money back from them that has gone to

14   somebody else using it power to disaffirm contracts.

15   FDIC is not allowed to do that and it didn't.  The FDIC

16   is just coming in here and taking what Next Bank itself

17   owns, which is the transfer of interest.

18        THE COURT:  That hops to the other counts.  I'm

19   sorry, let's get back to -- they're making some other

20   claim in Count VI, right?  I understand about the

21   transfer of interest, I think.  But go back to VI.

22        MR. DAVIDSON:  On Count VI, all they did was to

23   keep the business going for a few months.  That's it.

24   They gave the credit card holders a little softer lender

25   than they would have otherwise had they not been able to

37

1    do that.

2              THE COURT:  And their argument comes down to

3    whether under the statute, not under the contract

4    necessarily, you've got the power to do that given the

5    contracts.  That's the problem.  Right?

6              MR. DAVIDSON:  That is correct.  Next Bank is

7    party to three of the four agreements.  The fourth one,

8    it's breacher set up only for the purposes of this

9    transaction, it is the formal party with Bank of New

10   York.  But Next Bank signs the agreement.  Agrees to do

11   all the work required under the agreement.

12             THE COURT:  The hypothetical though, is the

13   question really instead of who is the party to the

14   contract maybe is an unnecessary diversion.  Is it

15   whether they properly isolated that level so that, you

16   can have securitization agreements in which you are not

17   able to go and do certain things, right?

18             MR. DAVIDSON:  Your Honor, we're not saying

19   that the FDIC could go into this trust and take something

20   out of it.  That it did not -- by using a call back power

21   or ability to disaffirm contracts.  No receivable that

22   went into this trust are coming out of it at all.  All

23   they did was keep the business going for a few months.

24   Paying people what they were supposed to be paid out when

25   the business was running.

                                                          38

1           THE COURT:   Why do you say that you agree you
2     repudiated, I think?   You don't disagree about that in
3     July?

4           MR. DAVIDSON:   Right.

5           THE COURT:   What is the measure of damages?
6           MR. DAVIDSON:   The $800 million number which
7     appears in the complaint is completely weird.   This thing
8     is going to pay out to, with a total loss of bond holders
9     of well under probably $50 million.   So all we're talking
10    about is how much better they would have done if the
11    liquidation was three or four months earlier.   That's all
12    it is.

13          THE COURT:   I'm sorry, why is that a level of
14    damages?   If it were three or four months earlier?   I'm
15    just trying to understand what you would agree is owing
16    here.

17          MR. DAVIDSON:   Our client has done some
18    modeling to try to figure out what the difference would
19    be between liquidating at point A. rather than at point
20    B.

21          THE COURT:   What required you to liquidate --
22    why are you liable in anyway for not liquidating at one
23    point versus another?   That's what I --

24          THE WITNESS:   That's their whole point.   They
25    said we had to do it in February, instead of waiting
                                                          39

1    until July.  That's what their Count VI is about, we

2    waited until July.

3          THE COURT:  I'm sorry, no, no.  You have

4    acknowledged I think that there has been a repudiation in

5    July, a breach of contract.  And if anything, they're

6    liable for damages.

7          MR. DAVIDSON:  Right.

8          THE COURT:  I'm just understanding, what would

9    be the measure of damages at that point?  There are

10   counts that are still out there, and I take it they're

11   not subject to motions, and that there is some liability

12   here, but I just don't understand what it is.

13         MR. DAVIDSON:  For that particular breach of

14   contract, I'm not sure there were any damages because the

15   conclusion at that time was that it was a bad idea to

16   continue this business.  And everybody would be better

17   off if it stopped and not let any further losses accrue

18    and just try to collect the debts that were owed by the

19   card holders out there.  Which is what's been happening

20   the last couple of years.

21         THE COURT:  What happens to the -- the fight

22   over this transferor interest, right, I now establish

23   that there was $13 million.  What happens to that money?

24         MR. DAVIDSON:  You know, the transfer of

25   interest is still going on.  As new collections come in,

                                                      40

1    part of it is allocated to the transferor, which is what

2    the documents require.  The documents put the transferor

3    interest and the collateral beside each other.  They both

4    continue to attract money as the accounts are paid down.

5     It is tiny compared to the collateral but they both keep

6    getting bigger.

7              THE COURT:  So things are still operating at

8    the credit card company somewhere?

9              MR. HARRISON:  No, no.  The credit cards are

10    all canceled.  It is just a bunch of people that owe

11    money that are being collected from.

12              THE COURT:  You are still operating, you are

13    still getting receivables, in other words?

14              MR. DAVIDSON:  Right, there is several hundred

15    million at least of receivables out there which are being

16    collected every month.

17              THE COURT:  So, if they don't get the

18    receivables that's put it in the column of the transfer

19    of interest, who does?

20              MR. DAVIDSON:  The owner of the transfer of

21    interest.

22              THE COURT:  Which is who?

23              MR. DAVIDSON:  In this particular case, at this

24    point, it's the FDIC as receiver.  But it can be sold to

25    anybody else along the way.

                                                      41

1              THE COURT:  What does the FDIC as the receiver

2    do?

3              MR. DAVIDSON:  It does not have it yet.  But it

4    will get it at a point.

5              THE COURT:  I know, but do you have any

6    obligations vis a vis it when you do get it?  I mean, you

7    don't just put it in the pocket of a chairman of a --

8              MR. DAVIDSON:  It is an asset of the failed

9    bank to be distributed as the assets of the failed bank

10   that distributed it.

11             THE COURT:  So that, is it true that there

12   would be no,  would the creditors include the bond

13   holders or not?

14             MR. DAVIDSON:  I'm not sure the bond holders

15   are creditors of the bank.  That's a question I have not

16   ever focused on.  And I probably should have but I don't

17   know --

18             THE COURT:  Next Bank has creditors.

19             MR. DAVIDSON:  Oh yeah.  I'm sure those people

20   that don't pay, yeah.

21             THE COURT:  Did they go into bankruptcy?

22             MR. DAVIDSON:  Well, it is in receivership.

23   Effectively, a bankruptcy.

24             THE COURT:  And so, the people they borrowed

25   money from get paid, but due the investors, so to speak,

                                                      42

1    this separate group down there, did they have any claims

2    on that money?  Or are they like general creditors of

3    some sort?

4            MR. DAVIDSON:  One of my colleagues from the

5    agency is in the courtroom.  I can ask him but I don't

6    know off the top of my head.

7            THE COURT:  All right, I'm just curious.

8    Okay.  And then, I'll hear from Mr. Harris, and we'll

9    take a break.

10           MR. DAVIDSON:  My understanding is that the

11   note holders are not creditors of the bank.  I would just

12   in closing I would invite the Court's attention to the

13   complaint of Bank of New York, which defines the

14   transferor interest in a way which we would, essentially

15   in the way we would define it.  And that would be

16   attachment A. to the proof of claim, attached as exhibit

17   B. to the complaint, on page five.

18           MR. HARRIS:  Your Honor, there were several

19   things that I think are a bit misleading that were just

20   said.  This is a standard structure.  And I don't think

21   anything Mr. Davidson quite said especially in the press

22   conference was also typical of many other industries.

23   And is in fact the precise structure that the FDIC, the

24   National Accounting Standards Board, and the

25   securitization industry decided needs to be in place

                                                    43


                                                    43

1    including this trust that he makes sound somehow

2    dishonest or surreptitious.

3        That is exactly the kind of separate entity,

4    legally separate entity that the law and the regulations

5    and the financial accounting standards requires to be

6    created for this purpose to legally isolate these assets.

7        Again, remember what we're talking about.  It

8    may be simple if we think  outside this complex

9    securitization issue and think about a bank selling a car

10   to me.  I take the title to the car.  My transferor

11   certificate.  I go collateralize the car, I borrow money

12   on the car and the car becomes, I give a lien to another

13   lender.  I borrow money on the car.

14       THE COURT:  Can I interrupt a minute because

15   he is saying that your leg so to stand on to argue

16   against Judge Jackson is that the bank can't, you are

17   arguing under the regulations, but can't recharacterize

18   something.  How have they done that?

19       MR. HARRIS:  They have recharacterized, they

20   have recaptured the monies.  Again --

21       THE COURT:  Are we on Count II or VI then?

22       MR. HARRIS:  On Count VI, in February, and the

23   difference in the receivables performance between

24   February and July is a significant amount of money.

25       THE COURT:  Sure.

                                                        44

1          MR. HARRIS:  Getting the principal paid earlier

2     would have reduced the amount of the arrearages, the

3     losses to the note holders.

4          THE COURT:  They're not recharacterizing, are

5     they?  That's what they can't do consistent with

6     securitization.  How are they doing that?  They're just

7     not accelerating or  --

8          MR. HARRIS:  Well, I believe they are

9     recharacterizing what is principal that should have been

10    paid to the note holders as money that is not paid to the

11    note holders as a part of the trust that is not due to

12    the note holders which would have been due if they had

13    given effect to, had not disregarded, had not refused to

14    give effect to the acceleration clause between these two

15    other parties.

16         THE COURT:  Is that what it means in the

17    regulations to, in some fashion recharacterize?

18    Basically, you are arguing that they didn't do it fast

19    enough so your ultimate clients of the bank didn't get

20    enough principal and interest.

21         MR. HARRIS:  They didn't allow a contractual

22    right of another party with yet another third party to be

23    given effect.  By doing that, they have diverted funds,

24    they have kept funds in the trust for the FDIC receiver's

25    own uses.  And again, the note holders claims are the

                                                        45

1    only claims in this litigation.

2          If there are other bank creditors we don't know

3    that.  And that's irrelevant to whether or not these

4    monies should have been paid under FIERI to the note

5    holders in February, beginning in February the principal

6    and interest in full and not waiting until July, which is

7    what the documents call for.

8          THE COURT:  Is it your position that, yes, we

9    have a statute that allows them to specifically, if we go

10   beyond the issue of whether they entered into, any

11   statute that allows the FDIC to pursue it to its powers

12   to not require acceleration.  Let's just assume that we

13   didn't have all this for a moment, that this didn't

14   involve securitization.  You would agree that they could

15   do what they did?

16         MR. HARRIS:  If the acceleration clause had to

17   do with the rights and obligations of Next Bank, not if

18   it had to do with the rights and obligations of the guy

19   who bought the car and the separate lender down the road.

20         THE COURT:  Rights and obligations and they --

21   in other words, you are saying Next Bank prevented the

22   trust.

23         MR. HARRIS:  Under the agreement, under the

24   master indenture, upon a receiver being appointed, at a

25   trigger instrument, like a date, anything else happened.

                                              46

1    The master indenture, the rights and obligations between

2    these parties in the master indenture.  And other parties

3    do that, these clauses are for the rights and obligations

4    of these two parties, not Next Bank.

5           Upon repudiation, the document says that the

6    revolving only period, which means the interest only

7    period ends immediately.  And all principal and interest

8    of the receivables goes to the note holders to ensure

9    that they get paid.  And that is part of the benefit of

10   the bargain when they bought their notes.

11          They depended on that.  The rate at which the

12   notes were priced depends on that.  And the right and

13   ability of banks and in other instances, people getting

14   mortgages and people getting student loans to get

15   reasonable credit terms relies in part on the note

16   holders who provide the credit for those securitized

17   loans to be assured that this won't happen.

18          Again, the structure is not just for credit

19   cards.  It is for many types of receivables and is the

20   standard practice in the securitization industry.

21          THE COURT:  But this has not come up ever

22   before?

23          MR. HARRIS:  To our knowledge, as I said

24   earlier, we are never aware of them trying to use these

25   powers in this way.  They have always used the

47

1    repudiation and enforcement powers only with regard to

2    rights and obligations involving the failed depository

3    institution.

4            That's why a contract entered into by the

5    failed depository institution, which is the language in

6    the statute, we believe Judge Jackson recognized that

7    whether they're technically a party does not get to the

8    intent of the statute which is the contractual rights

9    that involve the failed depository institution.  If there

10   is a contract with 100 parties, they are not entitled to

11   meddle with the rights and obligations between and among

12   the other 99.

13           If it is a right or obligation to which the

14   bank has one of their rights or obligations, okay.  You

15   can enforce, despite an acceleration clause, that

16   accelerates some obligation of the bank, but not that

17   accelerates some obligation of a trust, a separate

18   entity.  That's not the purpose of a receiver in

19   bankruptcy or common law.

20           It is not within the power of a receiver at

21   common law to do anything but step into the shoes of the

22   failed institution, the bankrupt party, and act on its

23   behalf.  And deal with its rights and obligations under a

24   contract not somebody else's rights and obligations under

25   a contract.

                                                    48

```
1              The two counts, Your Honor, are for different

2    amounts.  They result in different accounts because one

3    is for both principal and interest and one is only for

4    principal.  You asked about Count II and Count III of the

5    complaint.  Count III, I believe, is for principal and

6    interest; and Count II is for principal only.  So the

7    amounts claimed are different.  That's why we pled them

8    separately.

9              THE COURT:  What is your name?

10             MR. HARRIS:  Ms. Soukup.

11             MS. SOUKUP:  It is the other way.

12             THE COURT:  You can say it the other way

13   around.  Count II is for principal and interest?

14             MR. HARRIS:  Then, Count III is for principal,

15   I'm sorry, Your Honor.

16             This offering memorandum, Your Honor, that Mr.

17   Davidson places a lot of weight on that says:  "The FDIC

18   may have the power to stop early amortization."  It does

19   not say may have the power to stop early amortization as

20   to contracts between other parties.  That is true in the

21   abstract in general terms, it may go in and effect

22   contracts with early amortization clauses where Next Bank

23   is involved in the rights or obligations that are

24   involved in the early amortization rights.

25             It does not say it is able to reach beyond that
                                                         49
```

1    because it can't.  It can't alter the, the offering

2    memorandum can't alter the law.  It can't alter this

3    regulation that the FDIC and the F.A.S.B. came up with to

4    give assurance to the  securities.

5              THE COURT:  When was the regulation enacted?

6              MR. HARRIS:  2000, Your Honor.

7              THE COURT:  And when was this enacted?  When

8    were the contracts signed?

9              MR. HARRIS:  In 2000 as well.

10             THE COURT:  So does this cottage industry, for

11   lack of a better word, grow up around this regulation?

12             MR. HARRIS:  It already existed but there was

13   concern about this issue.  And there was uncertainty

14   about the issue.

15             THE COURT:  So the banks went to the FDIC and

16   got this?

17             MR. HARRIS:  Said, we need some assurance,

18   exactly, Your Honor.

19             THE COURT:  Okay.

20             MR. HARRIS:  And on the buyers of the notes,

21   there are individual holders of the notes.  Obviously,

22   large institutions are the first purchasers.  And then,

23   they resell them in the secondary market which is how

24   these notes are ultimately purchased.

25             THE COURT:  If this goes to a jury you can tell

                                              50

1    them about the victims.

2              MR. HARRIS:  We'll have one in the courtroom.

3              THE COURT:  Sure, one more word.

4              MR. DAVIDSON:  I just wanted to advise the

5    Court that this is the only credit card bank to have gone

6    into FDIC receivership so this particular arrangement has

7    not come up before.

8              THE COURT:  Right, I know.

9              MR. HARRIS:  There are other credit card

10   issuers who have gone into FDIC -- in fact, I've handled

11   several cases.  This may be the only bank that did only

12   credit cards.  But I have dealt with credit card

13   securitization receiverships of the Bank of New England

14   and the CitiBank and Fleet.

15             THE COURT:  Right.  No, but I think it is this

16   complicated transaction.

17             Counsel, the Court grapples with this, as I can

18   see that Judge Jackson did.  And it is so not surprising,

19   it is complicated.  And on the surface, whatever seems

20   like it is reasonable it does not necessarily seem so

21   reasonable when you sit and scratch.  The lawyers have

22   done an excellent job on their positions to say the

23   least.

24             If there is a clear error of law, I certainly

25   have the right to review what has gone on and change the

                                                        51

1    decision as Judge Jackson would have.  And I can't speak

2    for him obviously because he has now moved on back to the

3    private practice of law.

4            I am unwilling to change his opinion on the

5    Count VI, on the grounds that I think there are some

6    ambiguities with respect to the contract, the statute is

7    somewhat confusing.  I know he said that they entered

8    into it.

9            But whether they could then do what they have

10   done here given the differences, for lack of better word,

11   of what is above the legal isolation versus below the

12   legal isolation, given both the FDIC regulatory

13   framework, I'm not so sure it is so easy just to say that

14   that regulation has no applicability here.

15           The difficulty is that one would have to start

16   to do almost an administrative review analysis.  And I'm

17   not sure we're there, nor do we have the necessary facts

18   to understand all that has gone on.  Especially now that

19   I understand that the regulations in these kinds of

20   transactions, somewhat perhaps grew up together.

21           So that I'm not inclined to change his bottom

22   line on Count VI although that does not mean that one

23   would find the same thing after either discovery or

24   summary judgment or an argument.  I am concerned about

25   what the FDIC was doing not at the time they became the

                                                      52

1   receiver but before that.

2           As the flip side though, I feel that there is a

3   clear error on this conversion claim, absolutely clear

4   error.  I do not see anything in the contracts that gives

5   the right to the transfer interest to the bank.  They

6   never had the right, the fact they repudiated, didn't

7   give you the right, you didn't step in under the contract

8   into some shoes you didn't have before.

9           The transfer interest is always excluded the

10  collateral.  Your rights are in the collateral.  Their

11  rights are in there meaning Next Bank, who then became

12  the FDIC.  To say they repudiated the contract does not

13  mean that this intangible then crosses the line and

14  becomes the lien of the note holders.  I find that

15  perhaps naively so far simpler.  I do feel that is an

16  error of law.

17          So after much reconsideration, I've read the

18  cases, I've considered the arguments, I read everything

19  that was before Judge Jackson.  I do find that there was

20  an error of law as to the Count II conversion.

21          The other count in conversion makes much more

22  sense than this one.  And I don't know where that puts

23  us.  Whether or not we should go back to your initial

24  scheduling or whether the parties want to get together

25  and -- you did file 16-03 --

53

1          MR. HARRIS:  Your Honor, the parties have had

2     some discussions.  I think there was an intention that we

3     would probably talk after this hearing or after Your

4     Honor's ruling.  I can't speak for Mr. Davidson but

5     certainly we're willing and happy to sit down and talk

6     with him, too.

7          THE COURT:  I'm sure Mr. Davidson would prefer

8     a cleaner ruling from the Court.  I wasn't splitting the

9     baby.  I really did grapple with these counts

10    independently and did the best I could as did Judge

11    Jackson obviously.  But when you get into these kinds of

12    transactions, there's all kinds of things going on that

13    are hard to understand.

14          So, how would you like to proceed, sir?

15          MR. DAVIDSON:  Your Honor, we actually did come

16    to court today with a jointly-proposed schedule.  But if

17    Your Honor would have patience with us, I think it would

18    be better if we withdrew and thought about how we wanted

19    to proceed and then come to the Court with a new --

20          THE COURT:  Can you just give me a call and

21    we'll do a conference call by phone some time?  This week

22    obviously is not a good week because of the holidays.  If

23    you need a professional mediator, I don't think you do, I

24    think it would take somebody too long to understand this

25    stuff.  There are people, I'm sure, in the commercial

                                                        54

1    world out there.

2              Perhaps you can get Jerry Hawk to do it.  Maybe

3    you could come back by phone on a conference call to give

4    me your proposals.  I suggest the week of the 6th.  I'll

5    issue an order.  I will incorporate by reference my

6    reasoning as stated here in open court.  But I think

7    we've wasted enough paper on this transaction already.

8              Can you set up a conference call do you think?

9              MR. DAVIDSON:  Certainly, Your Honor.

10             MR. HARRIS:  I'm in court on October 8.  Other

11   than that I --

12             MR. DAVIDSON:  The 7th is not good for me.

13   Otherwise, the week is fine -- six, nine or 10 would all

14   be good.

15             THE COURT:  The 6th is fine.  I think we should

16   just do it at 12:00.  You can call chambers and we will

17   figure out where we are going at that time.

18             All right.

19             MR. HARRIS:  Yes, Your Honor.

20             (Whereupon, at 3:50 p.m., the hearing

21   adjourned.)

**CERTIFICATE OF REPORTER**


I, Lisa Walker Griffith, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.




_____        _____
Lisa Walker Griffith, RPR            Date

56

We hereby agree, as of 27 July 2005, on a settlement of Counts 1, 3, 4, and 5 and all Counterclaims in Bank of New York v. FDIC, # 03-CV-01221-ESH, on the attached terms, as modified by the following:

1. After taking into account and paying the amounts set forth in Exhibit A, (i) the balance of the retained collections representing the Transferor Interest and the overfunding of the Collection Account at issue in Counterclaims 5 and 6 shall be released to the FDIC Receiver, and (ii) the funds held in the Reserve Accounts at issue in Counterclaims 7 and 8 shall be released to the FDIC Receiver.

2. Interest earned through June 30, 2005 on the Transferor Interest shall be allocated among the FDIC Receiver, Indenture Trustee, and Noteholders in proportion to the amounts payable to them under this settlement. Interest paid to the Indenture Trustee and Noteholders shall not reduce the Invested Amount.

All payments referred to above shall be made within five business days of this agreement's ratification by the requisite majority Noteholders. The Noteholders signing below agree, as representative of the Noteholders, to strongly and promptly recommend this settlement to the Noteholders in order for the Indenture Trustee to obtain approval by the requisite majority Noteholders on or prior to 1 August 2005. The Indenture Trustee will then promptly notify Nancy Stanley, Esq., Director of Dispute Resolution, United States District Court for the District of Columbia, of such approval. Upon such approval, all Claims in the Complaint, other than Count 6, and all Counterclaims are hereby fully released, and the parties agree to take all necessary actions to dismiss such Claims (other than Count 6) and Counterclaims with prejudice.

Federal Deposit Insurance Corporation, as Receiver for NextBank, N.A.

By: _____   Tom M. Reeves

The Bank of New York, as Indenture Trustee

By: _____   Loretta A. Lindberg

CS First Boston LLC

By: _____   MICHAEL MITTLEMAN

Millennium Partners LLP

By: _____   Philip Schockling

EXHIBIT A (p. 1)

Settlement Amts

| Count | 1 | 789,704 |
|---|---|---|
| | 3 | 6,074,776 |
| | 4 | 653,005 |
| | 5 | 2,449,499 |
| Total | | 9,966,983 |

| | |
|---|---|
| Payment of Trustee Expenses - Litigation | 1,936,423 |
| Payment of Trustee Exp - Cnt 4 | 653,005 |
| Total Exp to Trustee | 2,589,428 |

| | |
|---|---|
| Total Settlement Payment | 9,966,983 |
| Exp to Trustee | 2,589,428 |
| To Noteholders | 7,377,555 |

Noteholders Payment Applied as follows:

| Count | 1 | 789,704 | } | Applied retro to |
|---|---|---|---|---|
| | 5 | 2,449,499 | | Sept - 02 with |
| Total applied Sept-02 | | 3,239,203 | | the effect shown on Exhibit B |

| Count 3 | 6,074,776 | (July 02) |
|---|---|---|
| Less Trust Exp | ⟨1,936,423⟩ | |
| Net Count 3 | 4,138,353 | - applied retro to ~~...~~ with the effect shown on Exhibit B |

| Total - Counts 1 + 5 | 3,239,203 |
|---|---|
| " " 3 | 4,138,353 |
| Total to Noteholders | 7,377,556 |

EXHIBIT A (p. 2)

~~after~~

1) Cash settlement amounts are paid as follows:

To Trustee for expenses         2,589,428
To noteholders                  7,377,555 ←
Total settlement from FDIC      9,966,983

2) Payment to noteholders is applied as follows the waterfall

Sept-02      3,239,203        for purpose of
Jan-04       4,138,352        adjusting current
             7,377,555        Invested Amounts
                              outstanding:

By

**NEXTBANK**
**PROPOSED SETTLEMENT - COUNTS 1 THROUGH 5**

| | Principal Balance on Notes | | | Invested Amounts | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Series 2000-1 | Series 2001-1 | Total | Series 2000-1 | Series 2001-1 | Total |
| Actual balance as of 7/15/05 | 72,260,708 | 80,540,713 | 152,801,421 | 15,229,412 | 21,694,447 | 36,923,859 |
| % of Total O/S Principal by Series | 47.29% | 52.71% | 100.00% | | | |
| Fixed Allocation % | 41.66% | 58.34% | 100.00% | | | |
| | | | | | | |
| Settlement Amount to Noteholders | | | 7,377,555 | | | |
| Allocated based on Current Note Principal | 3,488,890 | 3,888,665 | 7,377,555 | | | |
| Allocated based on Fixed Alloc % | 3,073,443 | 4,304,112 | 7,377,555 | | | |
| | | | | | | |
| Adjusted 7/15/05 Invested Amounts after Settlement | | | | 14,552,114 | 20,723,815 | 35,275,929 |
| Change in Invested Amounts as a Result of Settlement | | | | 677,298 | 970,632 | 1,647,930 |
| | | | | | | |
| Reduction in Note Principal due to Settlement | | | 7,377,555 | | | |
| Reduction in Invested Amount due to Settlement | | | (1,647,930) | | | |
| Net Investor Pick-Up | | | 5,729,625 | | | |

|                                                  | Jul-02        | Sep-02        | Total     |
|--------------------------------------------------|---------------|---------------|-----------|
| Additional Principal Collections to Noteholders  | 4,138,353     | 3,239,203     | 7,377,556 |
|                                                  |               |               |           |
| **Invested Amounts, End of Revolving Period**    |               |               |           |
| Series 2000-99-1                                 | 49,066,011    | 49,066,011    |           |
| Series 2000-1                                    | 499,849,886   | 499,849,886   |           |
| Series 2001-1                                    | 700,000,000   | 700,000,000   |           |
|                                                  | 1,248,915,897 | 1,248,915,897 |           |
|                                                  |               |               |           |
| **Allocation Percentage - Settlement Funds**     |               |               |           |
| Series 2000-99-1                                 | 3.93%         | 3.93%         |           |
| Series 2000-1                                    | 40.02%        | 40.02%        |           |
| Series 2001-1                                    | 56.05%        | 56.05%        |           |
|                                                  | 100.00%       | 100.00%       |           |
|                                                  |               |               |           |
| **Additional Principal Payment to Noteholders**  |               |               |           |
| Series 2000-99-1                                 | 162,583       | 127,258       | 289,841   |
| Series 2000-1                                    | 1,656,281     | 1,296,417     | 2,952,697 |
| Series 2001-1                                    | 2,319,489     | 1,815,528     | 4,135,018 |
|                                                  | 4,138,353     | 3,239,203     | 7,377,556 |
|                                                  |               |               |           |
| **Allocable Principal Collections before Settlement** |          |               |           |
| Series 2000-99-1                                 | 4,780,221     | 2,207,131     |           |
| Series 2000-1                                    | 49,080,305    | 22,484,695    |           |
| S     2001-1                                     | 68,196,996    | 31,488,027    |           |
|                                                  | 122,057,522   | 56,179,853    |           |
|                                                  |               |               |           |
| **Allocable Principal Collections - Adjusted for Settlement** |     |               |           |
| Series 2000-99-1                                 | 4,942,804     | 2,334,389     |           |
| Series 2000-1                                    | 50,736,586    | 23,781,112    |           |
| Series 2001-1                                    | 70,516,485    | 33,303,555    |           |
|                                                  | 126,195,875   | 59,419,056    |           |

**Christensen, Scott**

| | |
|---|---|
| **From:** | Harris, Steve [SHarris@alston.com] |
| **Sent:** | Tuesday, August 02, 2005 3:43 PM |
| **To:** | christen@hugheshubbard.com; Harris, Steve |
| **Subject:** | Re: BNY v. FDIC (NextBank) |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Blue |

I reported to Ms. Stanley just before I sent you the email.  She will inform the Court informally but does want us to file a formal notice.
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Christensen, Scott <christen@HughesHubbard.COM>
To: Harris, Steve <SHarris@alston.com>
Sent: Tue Aug 02 15:33:41 2005
Subject: RE: BNY v. FDIC (NextBank)

Steve,

Thank you for letting me know.  Have you told Nancy Stanley?  I will talk with my client and will let you know, but I imagine we would be happy to draft the paperwork.

Best regards,

Scott

Scott H. Christensen
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C.  20006-2401
Telephone:  (202) 721-4644
Facsimile:  (202) 721-4646
Mobile:  (202) 557-0365
E-mail:  christen@hugheshubbard.com

_____

From: Harris, Steve [mailto:SHarris@alston.com]
Sent: Tuesday, August 02, 2005 3:31 PM
To: Christensen, Scott
Subject: BNY v. FDIC (NextBank)


Scott,

We have all the approvals needed for the settlement.  Do you want to draft a notice to the Court?

Best regards,
Steve

H. Stephen Harris, Jr.
ALSTON&BIRDLLP
Email:       sharris@alston.com
Website:     www.alston.com <file://www.alston.com>

```
Atlanta Office:
1201 West Peachtree St.
Atlanta, GA  30309-3424
USA
Direct Dial: 404.881.7197
Mobile:      404.966.7197
Switchboard: 404.881.7000
Fax:         404.881.7777

Washington, DC Office:
601 Pennsylvania Avenue, N.W.
Washington, DC  20004-2601
USA
Direct Dial: 202.756.3059
Mobile:      404.966.7197
Switchboard: 202.756.3300
Fax:         202.756.3333

Admitted in:
The District of Columbia, Georgia and New York
```

```
*********************************************************
IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we
inform you that any U.S. federal tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.
```
────────────────────────────────────────────

```
NOTICE: This e-mail message and all attachments transmitted with it
may contain legally privileged and confidential information intended
solely for the use of the addressee. If the reader of this message is not
the intended recipient, you are hereby notified that any reading,
dissemination, distribution, copying, or other use of this message or its
attachments is strictly prohibited. If you have received this message in
error, please notify the sender immediately by telephone
(404-881-7000) or by electronic mail (postmaster@alston.com), and
delete this message and all copies and backups thereof. Thank you.
```
────────────────────────────────────────────

```
***************************************************************************
****
This email and any files transmitted with it may contain privileged or confidential
information. Use, disclosure, copying or distribution of this message by anyone
other than the intended recipient is strictly prohibited. If you have received
this email in error please notify the sender by reply email and destroy all copies
of this message in your possession, custody or control.

***************************************************************************
*****

*********************************************************
IRS Circular 230 disclosure:  To ensure compliance with requirements imposed by the IRS,
we inform you that any U.S. federal tax advice contained in this communication (including
any attachments) is not intended or written to be used, and cannot be used, for the
purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.
```

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month. The information which is required to be prepared with respect to the Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 223,605.59 |
| | (2) | Principal | | 2,164,504.06 |
| | (3) | Total Distribution for Class C Notes | | 2,388,109.65 |
| | | | | |
| D | (1) | Interest | | 151,768.14 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 151,768.14 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 134,541,055.27 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 6,724,531.93 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 141,265,587.20 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 127,417,079.02 |
| | M | End of the Month Finance Charge Receivables: | | 6,375,124.95 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 133,792,203.97 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

P (a) Transferor Interest

| | | |
|---|---|---|
| + Principal Receivables | 127,417,079.02 | |
| + Special Funding Account (SFA) | - | |
| - Aggregate Invested Amounts in the trust | 30,133,160.81 | |
| Ending Transferor Interest | 97,283,918.21 | |

(b) Required Transferor Interest (9% x Principal Receivables)  11,467,537.11

(c) (Shortfall) if applicable in Transferor Interest  N/A
    - principal collections will be trapped in the SFA until shortfall eliminated

(d) Transferor Percentage (for information only)  76.4%

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 7,032,488.55 |
| (2) | Total Principal Collections | | 4,994,562.05 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 2,037,926.50 |
| | | | |
| (4) | Principal Payment Rate | | 3.7% |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 307,987 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,072 | 0.3% |
| | 60-89 Days | 770 | 0.2% |
| | 90-119 Days | 666 | 0.2% |
| | 120-149 Days | 629 | 0.2% |
| | 150-179 Days | 619 | 0.2% |
| | 180-209 Days | 5 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,761 | 1.2% |
| (3) | Total Accounts | 311,748 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---|---|
| (1) | Current Balances | $ | 120,794,102.56 | 90.3% |
| (2) | End of month delinquencies: | | | |
| | 30-59 Days | | 3,377,541.94 | 2.5% |
| | 60-89 Days | | 2,654,701.67 | 2.0% |
| | 90-119 Days | | 2,392,711.35 | 1.8% |
| | 120-149 Days | | 2,276,555.06 | 1.7% |
| | 150-179 Days | | 2,279,589.79 | 1.7% |
| | 180-209 Days | | 17,001.60 | 0.0% |
| | Over 209 Days | | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | | 12,998,101.41 | 9.7% |
| (3) | Total Balances | $ | 133,792,203.97 | 100.0% |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| **IV** | **SERIES 2000-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 15,229,412.18 | (0.00) | 0.00 | 15,229,412.18 | 0.00 |
| D | Month End Invested Amount | 12,411,984.03 | (0.00) | 0.00 | 12,411,984.03 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 10,100,959.03 | (0.00) | 0.00 | 10,100,959.03 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 3.77125% | 4.37125% | 5.22125% | 10.07125% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 11.32% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)    Allocable Finance Charge Collections for such Distribution Date | 328,093.28 | | | | |
| | (2)    Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)    Total Series 2000-1 Finance Charge Collections for such Distribution Date | 328,093.28 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)    Allocable Principal Collections for such Distribution Date | 2,080,703.01 | | | | |
| | (2)    Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)    Total Series 2000-1 Principal Collections for such Distribution Date | 2,080,703.01 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | 230,321.99 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 20,686.64 | | | | |
| **V** | **SPREAD ACCOUNT** | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 21,074,800.98 | | | | |
| D | Spread Account Shortfall | 13,925,199.02 | | | | |
| E | Interest earnings on the Spread Account | 47,920.95 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (151,768.14) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 20,970,953.79 | | | | |

Note: the Spread Account Percentage is:
   4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date — 328,093.28

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account) — (20,686.64)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date — 0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date — (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn. — (223,605.59)

(vi)  **Investor Default Amount,** if any, shall be treated as a portion of Available
Principal Collections — (230,321.99) see (x) below

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections — -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn. — (151,768.14)

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections — -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

| | | |
|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (298,289.09) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 151,768.14 |
| (xv) | Investor Default Amount to be released on distribution | 83,801.05 |

**Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture**    N/A

**C**  **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 2,164,504.06 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 2,164,504.06 |
| B | Series 2000-1 Principal Shortfall | $ | 12,411,984.03 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

C   Shared Principal Collections allocable from other principal sharing series          $                -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 62,588,015.97 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **7.70%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 5.27% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 4.87% | |
| (iv) | 3 Month Average | 5.95% | |

B  Base Rate for the current Monthly Period
| | | |
|---|---|---|
| (i) | Current Base Rate | **31.21%** |
| (ii) | Base Rate (prior month) | 28.08% |
| (iii) | Base Rate (2 months prior) | 24.05% |
| (iv) | 3 Month Average | 27.78% |

C  Excess Spread
| | | |
|---|---|---|
| (i) | Current Excess Spread | **-23.50%** |
| (ii) | Excess Spread (prior month) | -22.81% |
| (iii) | Excess Spread (2 months prior) | -19.18% |
| (iv) | 3 Month Average | -21.83% |

_____
Karlyn M. Knieriem
Finance Officer

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 223,605.59 |
| | (2) | Principal | | 2,164,504.06 |
| | (3) | Total Distribution for Class C Notes | | 2,388,109.65 |
| | | | | |
| D | (1) | Interest | | 151,768.14 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 151,768.14 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 134,541,055.27 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 6,724,531.93 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 141,265,587.20 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 127,417,079.02 |
| | M | End of the Month Finance Charge Receivables: | | 6,375,124.95 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 133,792,203.97 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

P (a) Transferor Interest

| | | |
|---|---|---:|
| | + Principal Receivables | 127,417,079.02 |
| | + Special Funding Account (SFA) | - |
| | - Aggregate Invested Amounts in the trust | 30,133,160.81 |
| | Ending Transferor Interest | 97,283,918.21 |
| (b) | Required Transferor Interest (9% x Principal Receivables) | 11,467,537.11 |
| (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | - principal collections will be trapped in the SFA until shortfall eliminated | |
| (d) | Transferor Percentage (for information only) | 76.4% |

**III PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | |
|---|---|---|---:|
| (1) | Total Collections | $ | 7,032,488.55 |
| (2) | Total Principal Collections | | 4,994,562.05 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 2,037,926.50 |
| (4) | Principal Payment Rate | | 3.7% |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---:|---:|
| (1) | Current Accounts | 307,987 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,072 | 0.3% |
| | 60-89 Days | 770 | 0.2% |
| | 90-119 Days | 666 | 0.2% |
| | 120-149 Days | 629 | 0.2% |
| | 150-179 Days | 619 | 0.2% |
| | 180-209 Days | 5 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,761 | 1.2% |
| (3) | Total Accounts | 311,748 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---:|---:|
| (1) | Current Balances | $ | 120,794,102.56 | 90.3% |
| (2) | End of month delinquencies: | | | |
| | 30-59 Days | | 3,377,541.94 | 2.5% |
| | 60-89 Days | | 2,654,701.67 | 2.0% |
| | 90-119 Days | | 2,392,711.35 | 1.8% |
| | 120-149 Days | | 2,276,555.06 | 1.7% |
| | 150-179 Days | | 2,279,589.79 | 1.7% |
| | 180-209 Days | | 17,001.60 | 0.0% |
| | Over 209 Days | | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | | 12,998,101.41 | 9.7% |
| (3) | Total Balances | $ | 133,792,203.97 | 100.0% |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | | Distribution Date: | September 15, 2005 |
| | | LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| **IV** | **SERIES 2000-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 15,229,412.18 | (0.00) | 0.00 | 15,229,412.18 | 0.00 |
| D | Month End Invested Amount | 12,411,984.03 | (0.00) | 0.00 | 12,411,984.03 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 10,100,959.03 | (0.00) | 0.00 | 10,100,959.03 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 3.77125% | 4.37125% | 5.22125% | 10.07125% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 11.32% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)  Allocable Finance Charge Collections for such Distribution Date | 328,093.28 | | | | |
| | (2)  Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)  Total Series 2000-1 Finance Charge Collections for such Distribution Date | 328,093.28 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)  Allocable Principal Collections for such Distribution Date | 2,080,703.01 | | | | |
| | (2)  Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)  Total Series 2000-1 Principal Collections for such Distribution Date | 2,080,703.01 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | 230,321.99 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 20,686.64 | | | | |
| **V** | **SPREAD ACCOUNT** | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 21,074,800.98 | | | | |
| D | Spread Account Shortfall | 13,925,199.02 | | | | |
| E | Interest earnings on the Spread Account | 47,920.95 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (151,768.14) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 20,970,953.79 | | | | |

Note: the Spread Account Percentage is:
   4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

7.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

VI  **APPLICATION OF FUNDS**

A  **Distribution of Available Finance Charge Collections:**

(i)  Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                  328,093.28

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                      (20,686.64)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                          0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                         (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                            (223,605.59)

(vi)  **Investor Default Amount,** if any, shall be treated as a portion of Available
Principal Collections                                                                            (230,321.99)  see (x) below

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                                          -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                                            (151,768.14)

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                          -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| | |
|---|---|
| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

(x)     after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (298,289.09) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 151,768.14 |
| (xv) | Investor Default Amount to be released on distribution | 83,801.05 |

| | | |
|---|---|---:|
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | N/A |

| | | | |
|---|---|---|---:|
| **C** | **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:** | | |
| | (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | N/A |
| | (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $    - |
| | | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $    - |
| | (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $    - |
| | | Class B Special Funding Principal Balance Allocation | $    - |
| | (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $    2,164,504.06 |
| | | Class C Special Funding Principal Balance Allocation | $    - |
| | (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $    - |
| | | Class D Special Funding Principal Balance Allocation | $    - |
| | (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $    - |

**VII PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | 2,164,504.06 |
| B | Series 2000-1 Principal Shortfall | $ | 12,411,984.03 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

C   Shared Principal Collections allocable from other principal sharing series          $                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2005**

| Distribution Date: | September 15, 2005 |
|---|---|
| LIBOR Determination Date: | August 13, 2005 |

**AS REVISED 11/14/05**

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 62,588,015.97 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
|  |  |  |
|---|---|---|
| (i) | Current Portfolio Yield | **7.70%** |
| (ii) | Portfolio Yield (prior month) | 5.27% |
| (iii) | Portfolio Yield (2 months prior) | 4.87% |
| (iv) | 3 Month Average | 5.95% |

Includes draw from Reserve Account;
should also include investment earnings

B  Base Rate for the current Monthly Period
|  |  |  |
|---|---|---|
| (i) | Current Base Rate | **31.21%** |
| (ii) | Base Rate (prior month) | 28.08% |
| (iii) | Base Rate (2 months prior) | 24.05% |
| (iv) | 3 Month Average | 27.78% |

C  Excess Spread
|  |  |  |
|---|---|---|
| (i) | Current Excess Spread | **-23.50%** |
| (ii) | Excess Spread (prior month) | -22.81% |
| (iii) | Excess Spread (2 months prior) | -19.18% |
| (iv) | 3 Month Average | -21.83% |

_____
Karlyn M. Knieriem
Finance Officer

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| Distribution Date: | October 17, 2005 |
|---|---|
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | (0.00) |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | (0.00) |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 229,097.76 |
| | (2) | Principal | 1,789,311.97 |
| | (3) | Total Distribution for Class C Notes | 2,018,409.73 |
| | | | |
| D | (1) | Interest | 159,726.47 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 159,726.47 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $    127,417,079.02 |
| | B | Beginning of the Period Finance Charge Receivables: | $    6,375,124.95 |
| | C | Beginning of the Period Discounted Receivables: | N/A |
| | D | Beginning of the Period Total Receivables: | 133,792,203.97 |
| | | | |
| | E | Removed Principal Receivables: | - |
| | F | Removed Finance Charge Receivables: | - |
| | G | Removed Total Receivables: | - |
| | | | |
| | H | Additional Principal Receivables: | - |
| | I | Additional Finance Charge Receivables: | - |
| | J | Additional Total Receivables: | - |
| | | | |
| | K | Discounted Receivables Generated this Period: | N/A |
| | L | End of the Month Principal Receivables: | 121,269,485.61 |
| | M | End of the Month Finance Charge Receivables: | 6,197,658.55 |
| | N | End of the Month Discounted Receivables: | N/A |
| | O | End of the Month Total Receivables: | 127,467,144.16 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

| | | | | |
|---|---|---|---|---|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | 121,269,485.61 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | 24,580,180.84 | |
| | | Ending Transferor Interest | 96,689,304.77 | |
| | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 10,914,253.70 | |
| | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | | | | |
| | (d) | Transferor Percentage (for information only) | 79.7% | |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 6,115,264.04 | |
| (2) | Total Principal Collections | | 4,252,818.50 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,862,445.54 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.3% | |

**B.  DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 301,887 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,079 | 0.4% |
| | 60-89 Days | 759 | 0.2% |
| | 90-119 Days | 665 | 0.2% |
| | 120-149 Days | 607 | 0.2% |
| | 150-179 Days | 592 | 0.2% |
| | 180-209 Days | 3 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,705 | 1.2% |
| (3) | Total Accounts | 305,592 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 114,444,636.24 | 89.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 3,727,926.73 | 2.9% |
| | 60-89 Days | 2,431,120.96 | 1.9% |
| | 90-119 Days | 2,394,521.09 | 1.9% |
| | 120-149 Days | 2,228,347.54 | 1.7% |
| | 150-179 Days | 2,222,605.10 | 1.7% |
| | 180-209 Days | 17,986.50 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 13,022,507.92 | 10.2% |
| (3) | Total Balances | $ 127,467,144.16 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

| IV | SERIES 2000-1 INFORMATION | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 12,411,984.03 | (0.00) | 0.00 | 12,411,984.03 | 0.00 |
| D | Month End Invested Amount | 10,100,959.03 | (0.00) | 0.00 | 10,100,959.03 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 8,162,699.79 | (0.00) | 0.00 | 8,162,699.78 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 3.96813% | 4.56813% | 5.41813% | 10.26813% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 9.74% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| (1) | Allocable Finance Charge Collections for such Distribution Date | 263,547.33 | | | | |
| (2) | Shared Finance Charge Collections for such Distribution Date | - | | | | |
| (3) | Total Series 2000-1 Finance Charge Collections for such Distribution Date | 263,547.33 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| (1) | Allocable Principal Collections for such Distribution Date | 1,771,697.33 | | | | |
| (2) | Shared Principal Collections for such Distribution Date | - | | | | |
| (3) | Total Series 2000-1 Principal Collections for such Distribution Date | 1,771,697.33 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | 166,561.92 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 16,834.93 | | | | |
| V | SPREAD ACCOUNT | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 20,970,953.79 | | | | |
| D | Spread Account Shortfall | 14,029,046.21 | | | | |
| E | Interest earnings on the Spread Account | 48,010.40 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (159,726.47) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 20,859,237.72 | | | | |

Note: the Spread Account Percentage is:
    4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
    5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
    6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

AS REVISED 11/14/05

> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI    APPLICATION OF FUNDS**

**A    Distribution of Available Finance Charge Collections:**

(i)   Series 2000-1 Allocable Finance Charge Collections for such            263,547.33
        Distribution Date

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
        not distributed to the Servicer on a prior Distribution Date (unless such amount
        has been netted against deposits to the Collection Account)                    (16,834.93)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
        Class A Additional Interest previously due but not distributed on a prior
        Distribution Date                                                                                    0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date                                                                                   (0.00)

(v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a
        Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
        Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
        Account will be drawn.                                                                        (229,097.76)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
        Principal Collections                                                             (166,561.92)  see (x) below

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
        Principal Collections** not previously reimbursed shall be treated as a portion of
        Available Principal Collections                                                           -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
        Class D Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
        Available Finance Charge Collections available after (i) through (vi), then the Spread
        Account will be drawn.                                                                       (159,726.47)

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
        the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
        Balance shall be treated as a portion of Available Principal Collections                     -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
        terminates, an amount up to the excess, if any, of the Required Reserve Account

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

Distribution Date:                October 17, 2005
LIBOR Determination Date:         September 13, 2005

**AS REVISED 11/14/05**

over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| Distribution Date: | October 17, 2005 |
|---|---|
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

AS REVISED 11/14/05

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (308,673.74) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 159,726.47 |
| (xv) | Investor Default Amount to be released on distribution | 17,614.64 |
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | N/A |
| **C** | **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:** | |
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ - |
| | Class B Special Funding Principal Balance Allocation | $ - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ 1,789,311.97 |
| | Class C Special Funding Principal Balance Allocation | $ - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ - |
| | Class D Special Funding Principal Balance Allocation | $ - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ - |

**VII PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,789,311.97 |
| B | Series 2000-1 Principal Shortfall | $ | 10,100,959.03 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 54,968,031.63 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | |
|---|---|---|
| A | Portfolio Yield for the current Monthly Period | |
| | (i)    Current Portfolio Yield | **9.38%** |
| | (ii)   Portfolio Yield (prior month) | 7.70% |
| | (iii)  Portfolio Yield (2 months prior) | 5.27% |
| | (iv)  3 Month Average | 7.45% |

Includes draw from Reserve Account;
should also include investment earnings

| | | |
|---|---|---|
| B | Base Rate for the current Monthly Period | |
| | (i)    Current Base Rate | **39.22%** |
| | (ii)   Base Rate (prior month) | 33.55% |
| | (iii)  Base Rate (2 months prior) | 28.08% |
| | (iv)  3 Month Average | 33.62% |

| | | |
|---|---|---|
| C | Excess Spread | |
| | (i)    Current Excess Spread | **-29.84%** |
| | (ii)   Excess Spread (prior month) | -25.84% |
| | (iii)  Excess Spread (2 months prior) | -22.81% |
| | (iv)  3 Month Average | -26.16% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |
| **AS REVISED 11/14/05** | |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 218,389.82 |
| | (2) | Principal | 2,614,878.30 |
| | (3) | Total Distribution for Class C Notes | 2,833,268.12 |
| | | | |
| D | (1) | Interest | 220,350.39 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 220,350.39 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 127,417,079.02 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 6,375,124.95 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 133,792,203.97 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 121,269,485.61 |
| M | End of the Month Finance Charge Receivables: | | 6,197,658.55 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 127,467,144.16 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |
| **AS REVISED 11/14/05** | |

P  (a)  Transferor Interest

| | |
|---|---|
| + Principal Receivables | 121,269,485.61 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | 24,580,180.84 |
| Ending Transferor Interest | 96,689,304.77 |

(b)  Required Transferor Interest (9% x Principal Receivables)  10,914,253.70

(c)  (Shortfall) if applicable in Transferor Interest  N/A
     - principal collections will be trapped in the SFA until shortfall eliminated

(d)  Transferor Percentage (for information only)  79.7%

(e)  Transferor Allocations/Distributions
| | |
|---|---|
| Transferor share of Finance Charge Collections | 2,065,657.93 |
| Interest earned on the Collections Account | 159,518.34 |
| Transferor share of Principal Collections | - |
| Transferor allocated Servicing Fees | (171,394.81) |
| Net cash distributable to the Transferor on the Distribution Date | 2,053,781.46 |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 6,115,264.04 |
| (2) | Total Principal Collections | | 4,252,818.50 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,862,445.54 |
| (4) | Principal Payment Rate | | 3.3% |

**B.  DELINQUENCIES AND LOSSES**

| **NUMBER OF ACCOUNTS** | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 301,887 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,079 | 0.4% |
| | 60-89 Days | 759 | 0.2% |
| | 90-119 Days | 665 | 0.2% |
| | 120-149 Days | 607 | 0.2% |
| | 150-179 Days | 592 | 0.2% |
| | 180-209 Days | 3 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,705 | 1.2% |
| (3) | Total Accounts | 305,592 | 100.0% |

| **OUTSTANDING BALANCES** | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $  114,444,636.24 | 89.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 3,727,926.73 | 2.9% |
| | 60-89 Days | 2,431,120.96 | 1.9% |
| | 90-119 Days | 2,394,521.09 | 1.9% |
| | 120-149 Days | 2,228,347.54 | 1.7% |
| | 150-179 Days | 2,222,605.10 | 1.7% |
| | 180-209 Days | 17,986.50 | 0.0% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

| | | | |
|---|---|---|---|
| | SubTotal -- 30+ Days Delinquent | 13,022,507.92 | 10.2% |
| (3) | Total Balances | $ 127,467,144.16 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended September 30, 2005

| Distribution Date: | October 17, 2005 |
|---|---|
| LIBOR Determination Date: | September 13, 2005 |
| **AS REVISED 11/14/05** | |

| IV | SERIES 2001-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 17,721,176.77 | $ 0.00 | $ 0.00 | $ 17,721,176.77 | $ 0.00 |
| D | Month End Invested Amount | | 14,479,221.80 | $ 0.00 | $ 0.00 | $ 14,479,221.80 | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 11,760,292.31 | $ 0.00 | $ 0.00 | $ 11,760,292.30 | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.06813% | 4.64813% | 5.36813% | 10.11813% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 13.91% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 58.34% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)  Allocable Finance Charge Collections for such Distribution Date | | 376,278.99 | | | | |
| | (2)  Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)  Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 376,278.99 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)  Allocable Principal Collections for such Distribution Date | | 2,481,121.17 | | | | |
| | (2)  Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)  Total Series 2000-1 Principal Collections for such Distribution Date | | 2,481,121.17 | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | 237,808.33 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 24,132.04 | | | | |

| V | SPREAD ACCOUNT | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 9,133,078.99 | 9,133,078.99 |
| D | Spread Account Shortfall | 21,000,000.00 | 18,866,921.01 | 39,866,921.01 |
| E | Interest earnings on the Spread Account | - | 21,058.17 | 21,058.17 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (220,350.39) | (220,350.39) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 8,933,786.77 | 8,933,786.77 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |
| **AS REVISED 11/14/05** | |

**Note: the Junior Note Spread Account Percentage is:**
    1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
    2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
    3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
    4.0% if the Quarterly Excess Spread Percentage is <2.0%
    provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
    the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

    **A  Distribution of Available Finance Charge Collections:**

      (i)  Series 2001-1 Allocable Finance Charge Collections for such        376,278.99
            Distribution Date

      (ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
            not distributed to the Servicer on a prior Distribution Date (unless such amount
            has been netted against deposits to the Collection Account)        (24,132.04)

      (iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
            Class A Additional Interest previously due but not distributed on a prior
            Distribution Date        (0.00)

      (iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
            Class B Additional Interest previously due but not distributed on a prior
            Distribution Date        (0.00)

      (v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
            Class B Additional Interest previously due but not distributed on a prior
            Distribution Date, *provided, however* , that if the Class C Monthly Interest exceeds
            Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
            Account will be drawn.        (218,389.82)

      (vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
            Principal Collections        (237,808.33)

      (vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
            **Principal Collections** not previously reimbursed shall be treated as a portion of
            Available Principal Collections        -

      (viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
            Class D Additional Interest previously due but not distributed on a prior
            Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                                    (220,350.39)

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended September 30, 2005

Distribution Date:                    October 17, 2005
LIBOR Determination Date:      September 13, 2005
AS REVISED 11/14/05

(ix)    upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
        the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
        Balance shall be treated as a portion of Available Principal Collections                    -

(x)     after the Reserve Account Funding Date, but prior to the date the Reserve Account
        terminates, an amount up to the excess, if any, of the Required Reserve Account
        over the Available Reserve Account shall be deposited in the Reserve Account              -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| | |
|---|---|
| Distribution Date: | October 17, 2005 |
| LIBOR Determination Date: | September 13, 2005 |
| **AS REVISED 11/14/05** | |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (324,401.59) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 220,350.39 |
| (xv) | Investor Default Amount to be released on distribution | | 133,757.13 |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B**   **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 2,614,878.30 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII   PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 2,614,878.30 |
| B | Series 2001-1 Principal Shortfall | $ | 14,479,221.80 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| Distribution Date: | October 17, 2005 |
|---|---|
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2005**

| Distribution Date: | October 17, 2005 |
|---|---|
| LIBOR Determination Date: | September 13, 2005 |

**AS REVISED 11/14/05**

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,788,774.02 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A   Portfolio Yield for the current Monthly Period
|  | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **9.38%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 7.70% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 5.27% | |
| (iv) | 3 Month Average | 7.45% | |

B   Base Rate for the current Monthly Period
|  | | |
|---|---|---|
| (i) | Current Base Rate | **31.34%** |
| (ii) | Base Rate (prior month) | 27.30% |
| (iii) | Base Rate (2 months prior) | 23.08% |
| (iv) | 3 Month Average | 27.24% |

C   Excess Spread
|  | | |
|---|---|---|
| (i) | Current Excess Spread | **-21.97%** |
| (ii) | Modified Excess Spread (prior month) | -19.59% |
| (iii) | Excess Spread (2 months prior) | -17.80% |
| (iv) | 3 Month Average | -19.79% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | (0.00) |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | (0.00) |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 207,254.78 |
| | (2) | Principal | 1,559,036.32 |
| | (3) | Total Distribution for Class C Notes | 1,766,291.10 |
| | | | |
| D | (1) | Interest | 147,597.92 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 147,597.92 |

**II   RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $   121,269,485.61 |
| | B | Beginning of the Period Finance Charge Receivables: | $   6,197,658.55 |
| | C | Beginning of the Period Discounted Receivables: | N/A |
| | D | Beginning of the Period Total Receivables: | 127,467,144.16 |
| | | | |
| | E | Removed Principal Receivables: | - |
| | F | Removed Finance Charge Receivables: | - |
| | G | Removed Total Receivables: | - |
| | | | |
| | H | Additional Principal Receivables: | - |
| | I | Additional Finance Charge Receivables: | - |
| | J | Additional Total Receivables: | - |
| | | | |
| | K | Discounted Receivables Generated this Period: | N/A |
| | L | End of the Month Principal Receivables: | 115,592,374.69 |
| | M | End of the Month Finance Charge Receivables: | 5,872,496.06 |
| | N | End of the Month Discounted Receivables: | N/A |
| | O | End of the Month Total Receivables: | 121,464,870.75 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

| | | | |
|---|---|---|---|
| P | (a) | Transferor Interest | |
| | | + Principal Receivables | 115,592,374.69 |
| | | + Special Funding Account (SFA) | - |
| | | - Aggregate Invested Amounts in the trust | 19,922,992.09 |
| | | Ending Transferor Interest | 95,669,382.60 |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 10,403,313.72 |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | |
| | (d) | Transferor Percentage (for information only) | 82.8% |

**III  PERFORMANCE SUMMARY**

**A  COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 5,591,045.85 |
| (2) | Total Principal Collections | | 3,742,342.65 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,848,703.20 |
| (4) | Principal Payment Rate | | 3.1% |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 301,288 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,100 | 0.4% |
| | 60-89 Days | 821 | 0.3% |
| | 90-119 Days | 638 | 0.2% |
| | 120-149 Days | 602 | 0.2% |
| | 150-179 Days | 577 | 0.2% |
| | 180-209 Days | 21 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,759 | 1.2% |
| (3) | Total Accounts | 305,047 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $  108,487,264.18 | 89.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 3,392,063.28 | 2.8% |
| | 60-89 Days | 2,947,106.52 | 2.4% |
| | 90-119 Days | 2,123,493.30 | 1.7% |
| | 120-149 Days | 2,260,715.53 | 1.9% |
| | 150-179 Days | 2,163,386.84 | 1.8% |
| | 180-209 Days | 90,841.10 | 0.1% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 12,977,606.57 | 10.7% |
| (3) | Total Balances | $  121,464,870.75 | 100.0% |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2000-1
Monthly Noteholders Statement
Monthly Period Ended October 31, 2005

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

| IV | SERIES 2000-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | | 10,100,959.03 | (0.00) | 0.00 | 10,100,959.03 | 0.00 |
| D | Month End Invested Amount | | 8,162,699.78 | (0.00) | 0.00 | 8,162,699.78 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 6,465,991.22 | (0.00) | 0.00 | 6,465,991.22 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.17000% | 4.77000% | 5.62000% | 10.47000% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 8.33% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)    Allocable Finance Charge Collections for such Distribution Date | | 213,112.74 | | | | |
| | (2)    Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)    Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 213,112.74 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)    Allocable Principal Collections for such Distribution Date | | 1,559,036.32 | | | | |
| | (2)    Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)    Total Series 2000-1 Principal Collections for such Distribution Date | | 1,559,036.32 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | | 137,672.24 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 13,604.50 | | | | |
| V | SPREAD ACCOUNT | | | | | | |
| A | Required Spread Account Percentage (see Note: below) | | 7% | | | | |
| B | Required Spread Account Amount | | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | | 20,859,237.72 | | | | |
| D | Spread Account Shortfall | | 14,140,762.28 | | | | |
| E | Interest earnings on the Spread Account | | 52,165.70 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | | (155,344.46) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | 20,756,058.96 | | | | |

Note: the Spread Account Percentage is:
   4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

7.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

   **A   Distribution of Available Finance Charge Collections:**

    (i)   Series 2000-1 Allocable Finance Charge Collections for such
        Distribution Date        213,112.74

    (ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
        not distributed to the Servicer on a prior Distribution Date (unless such amount
        has been netted against deposits to the Collection Account)        (13,604.50)

    (iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
        Class A Additional Interest previously due but not distributed on a prior
        Distribution Date        0.00

    (iv) **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date        (0.00)

    (v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
        Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
        Account will be drawn.        (207,254.78)

    (vi) **Investor Default Amount**, if any, shall be treated as a portion of Available
        Principal Collections        (137,672.24) see (x) below

    (vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
        **Principal Collections** not previously reimbursed shall be treated as a portion of
        Available Principal Collections        -

    (viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
        Class D Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
        Available Finance Charge Collections available after (i) through (vi), then the Spread
        Account will be drawn.        (147,597.92)

    (ix) upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
        the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
        Balance shall be treated as a portion of Available Principal Collections        -

    (x)  after the Reserve Account Funding Date, but prior to the date the Reserve Account
        terminates, an amount up to the excess, if any, of the Required Reserve Account

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

over the Available Reserve Account shall be deposited in the Reserve Account          -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (293,016.70) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 155,344.46 |
| (xv) | Investor Default Amount to be released on distribution | 0.00 |
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | N/A |

**C   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,559,036.32 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,559,036.32 |
| B | Series 2000-1 Principal Shortfall | $ | 8,162,699.78 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| Distribution Date: | November 15, 2005 |
|---|---|
| LIBOR Determination Date: | October 13, 2005 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,116,978.91 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i) Current Portfolio Yield | **8.96%** | Includes draw from Reserve Account; |
| | (ii) Portfolio Yield (prior month) | 9.38% | should also include investment earnings |
| | (iii) Portfolio Yield (2 months prior) | 7.70% | |
| | (iv) 3 Month Average | 8.68% | |
| | | | |
| B | Base Rate for the current Monthly Period | | |
| | (i) Current Base Rate | **43.77%** | |
| | (ii) Base Rate (prior month) | 39.23% | |
| | (iii) Base Rate (2 months prior) | 33.55% | |
| | (iv) 3 Month Average | 38.85% | |
| | | | |
| C | Excess Spread | | |
| | (i) Current Excess Spread | **-34.81%** | |
| | (ii) Excess Spread (prior month) | -29.85% | |
| | (iii) Excess Spread (2 months prior) | -25.84% | |
| | (iv) 3 Month Average | -30.17% | |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 193,625.64 |
| | (2) | Principal | 2,275,566.71 |
| | (3) | Total Distribution for Class C Notes | 2,469,192.35 |
| | | | |
| D | (1) | Interest | 203,676.67 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 203,676.67 |

**II   RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 121,269,485.61 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 6,197,658.55 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 127,467,144.16 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 115,592,374.69 |
| M | End of the Month Finance Charge Receivables: | | 5,872,496.06 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 121,464,870.75 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

P (a) Transferor Interest

| | |
|---|---|
| + Principal Receivables | 115,592,374.69 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | 19,922,992.09 |
| Ending Transferor Interest | 95,669,382.60 |

(b) Required Transferor Interest (9% x Principal Receivables)  10,403,313.72

(c) (Shortfall) if applicable in Transferor Interest   N/A
    - principal collections will be trapped in the SFA until shortfall eliminated

(d) Transferor Percentage (for information only)   82.8%

(e) Transferor Allocations/Distributions

| | |
|---|---|
| Transferor share of Finance Charge Collections | 2,039,976.60 |
| Interest earned on the Collections Account | 14,846.96 |
| Transferor share of Principal Collections | - |
| Transferor allocated Servicing Fees | (168,910.80) |
| Net cash distributable to the Transferor on the Distribution Date | 1,885,912.76 |

III  **PERFORMANCE SUMMARY**

**A  COLLECTIONS**

| | | |
|---|---|---|
| (1) | Total Collections | $  5,591,045.85 |
| (2) | Total Principal Collections | 3,742,342.65 |
| (3) | Total Finance Charge Collections (including interchange) | $  1,848,703.20 |
| (4) | Principal Payment Rate | 3.1% |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 301,288 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,100 | 0.4% |
| | 60-89 Days | 821 | 0.3% |
| | 90-119 Days | 638 | 0.2% |
| | 120-149 Days | 602 | 0.2% |
| | 150-179 Days | 577 | 0.2% |
| | 180-209 Days | 21 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,759 | 1.2% |
| (3) | Total Accounts | 305,047 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $  108,487,264.18 | 89.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 3,392,063.28 | 2.8% |
| | 60-89 Days | 2,947,106.52 | 2.4% |
| | 90-119 Days | 2,123,493.30 | 1.7% |
| | 120-149 Days | 2,260,715.53 | 1.9% |
| | 150-179 Days | 2,163,386.84 | 1.8% |
| | 180-209 Days | 90,841.10 | 0.1% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | | | |
|---|---|---|---|
| Distribution Date: | | November 15, 2005 |
| LIBOR Determination Date: | | October 13, 2005 |

| | | | |
|---|---|---|---|
| | SubTotal -- 30+ Days Delinquent | 12,977,606.57 | 10.7% |
| (3) | Total Balances | $ 121,464,870.75 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

| IV | SERIES 2001-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 14,479,221.81 | $ 0.00 | $ 0.00 | $ 14,479,221.80 | $ 0.00 |
| D | Month End Invested Amount | | 11,760,292.31 | $ 0.00 | $ 0.00 | $ 11,760,292.30 | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 9,379,639.67 | $ 0.00 | $ 0.00 | $ 9,379,639.66 | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.27000% | 4.85000% | 5.57000% | 10.32000% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 11.94% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 58.34% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)    Allocable Finance Charge Collections for such Distribution Date | | 305,486.50 | | | | |
| | (2)    Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)    Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 305,486.50 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)    Allocable Principal Collections for such Distribution Date | | 2,183,306.33 | | | | |
| | (2)    Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)    Total Series 2000-1 Principal Collections for such Distribution Date | | 2,183,306.33 | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | 197,346.31 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 19,600.49 | | | | |

| V | SPREAD ACCOUNT | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 8,933,786.77 | 8,933,786.77 |
| D | Spread Account Shortfall | 21,000,000.00 | 19,066,213.23 | 40,066,213.23 |
| E | Interest earnings on the Spread Account | - | 22,497.93 | 22,497.93 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (203,676.67) | (203,676.67) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 8,752,608.03 | 8,752,608.03 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| Distribution Date: | November 15, 2005 |
|---|---|
| LIBOR Determination Date: | October 13, 2005 |

<div style="border:1px solid black; background-color:#d9f2d9;">

**Note: the Junior Note Spread Account Percentage is:**
  1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
  1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
  2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
  2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
  3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
  4.0% if the Quarterly Excess Spread Percentage is <2.0%
  provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
  the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

</div>

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)   Series 2001-1 Allocable Finance Charge Collections for such          305,486.50
      Distribution Date

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
      not distributed to the Servicer on a prior Distribution Date (unless such amount
      has been netted against deposits to the Collection Account)                (19,600.49)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
      not distributed on a prior Distribution Date,  *plus* Class A Additional Interest, *plus*
      Class A Additional Interest previously due but not distributed on a prior
      Distribution Date                                                          (0.00)

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
      not distributed on a prior Distribution Date,  *plus* Class B Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date                                                          (0.00)

(v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
      not distributed on a prior Distribution Date,  *plus* Class C Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date, *provided, however* , that if the Class C Monthly Interest exceeds
      Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
      Account will be drawn.                                                     (193,625.64)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
      Principal Collections                                                      (197,346.31)

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
      Principal Collections** not previously reimbursed shall be treated as a portion of
      Available Principal Collections                                            -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
       not distributed on a prior Distribution Date,  *plus* Class D Additional Interest, *plus*
       Class D Additional Interest previously due but not distributed on a prior
       Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
       Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

Account will be drawn.                                      (203,676.67)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| Distribution Date: | November 15, 2005 |
|---|---|
| LIBOR Determination Date: | October 13, 2005 |

(ix)  upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                    -

(x)  after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account            -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| Distribution Date: | November 15, 2005 |
|---|---|
| LIBOR Determination Date: | October 13, 2005 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (308,762.60) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 203,676.67 |
| (xv) | Investor Default Amount to be released on distribution | | 92,260.38 |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 2,275,566.71 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII   PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 2,275,566.71 |
| B | Series 2001-1 Principal Shortfall | $ | 11,760,292.31 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| Distribution Date: | November 15, 2005 |
|---|---|
| LIBOR Determination Date: | October 13, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2005**

| | |
|---|---|
| Distribution Date: | November 15, 2005 |
| LIBOR Determination Date: | October 13, 2005 |

**VIII  INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,892,825.22 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period

| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **8.96%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 9.38% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 7.70% | |
| (iv) | 3 Month Average | 8.68% | |

B  Base Rate for the current Monthly Period

| | | |
|---|---|---|
| (i) | Current Base Rate | **34.55%** |
| (ii) | Base Rate (prior month) | 31.35% |
| (iii) | Base Rate (2 months prior) | 27.30% |
| (iv) | 3 Month Average | 31.07% |

C  Excess Spread

| | | |
|---|---|---|
| (i) | Current Excess Spread | **-25.59%** |
| (ii) | Modified Excess Spread (prior month) | -21.97% |
| (iii) | Excess Spread (2 months prior) | -19.59% |
| (iv) | 3 Month Average | -22.38% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | | Interest | (0.00) |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class A Notes | (0.00) |
| | | | | |
| B | (1) | | Interest | 0.00 |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class B Notes | 0.00 |
| | | | | |
| C | (1) | | Interest | 212,443.34 |
| | (2) | | Principal | 1,503,299.31 |
| | (3) | | Total Distribution for Class C Notes | 1,715,742.65 |
| | | | | |
| D | (1) | | Interest | 154,802.08 |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class D Notes | 154,802.08 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 115,592,374.69 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 5,872,496.06 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 121,464,870.75 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 109,955,099.06 |
| | M | End of the Month Finance Charge Receivables: | | 5,545,495.79 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 115,500,594.85 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

| | | | | |
|---|---|---|---|---:|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | | 109,955,099.06 |
| | | + Special Funding Account (SFA) | | - |
| | | - Aggregate Invested Amounts in the trust | | 15,845,630.89 |
| | | Ending Transferor Interest | | 94,109,468.17 |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | | 9,895,958.92 |
| | (c) | (Shortfall) if applicable in Transferor Interest | | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | (d) | Transferor Percentage (for information only) | | 85.6% |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---:|
| | (1) | Total Collections | $ | 5,265,290.12 |
| | (2) | Total Principal Collections | | 3,608,550.41 |
| | (3) | Total Finance Charge Collections (including interchange) | $ | 1,656,739.71 |
| | (4) | Principal Payment Rate | | 3.1% |

**B.  DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | | Number | % of Total |
|---|---|---|---:|---:|
| | (1) | Current Accounts | 295,287 | 98.8% |
| | (2) | End of month delinquencies: | | |
| | | 30-59 Days | 1,015 | 0.3% |
| | | 60-89 Days | 766 | 0.3% |
| | | 90-119 Days | 659 | 0.2% |
| | | 120-149 Days | 569 | 0.2% |
| | | 150-179 Days | 585 | 0.2% |
| | | 180-209 Days | 3 | 0.0% |
| | | Over 209 Days | - | 0.0% |
| | | SubTotal -- 30+ Days Delinquent | 3,597 | 1.2% |
| | (3) | Total Accounts | 298,884 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---:|---:|
| | (1) | Current Balances | $ 103,282,870.91 | 89.4% |
| | (2) | End of month delinquencies: | | |
| | | 30-59 Days | 3,174,952.44 | 2.7% |
| | | 60-89 Days | 2,574,437.68 | 2.2% |
| | | 90-119 Days | 2,278,224.33 | 2.0% |
| | | 120-149 Days | 1,920,552.26 | 1.7% |
| | | 150-179 Days | 2,257,787.50 | 2.0% |
| | | 180-209 Days | 11,769.73 | 0.0% |
| | | Over 209 Days | - | 0.0% |
| | | SubTotal -- 30+ Days Delinquent | 12,217,723.94 | 10.6% |
| | (3) | Total Balances | $ 115,500,594.85 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| IV | SERIES 2000-1 INFORMATION | | | | | |
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 8,162,699.78 | (0.00) | 0.00 | 8,162,699.78 | 0.00 |
| D | Month End Invested Amount | 6,465,991.22 | (0.00) | 0.00 | 6,465,991.22 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 4,826,598.82 | (0.00) | 0.00 | 4,826,598.81 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 4.31500% | 4.91500% | 5.76500% | 10.61500% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 7.06% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | 166,727.52 | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | 166,727.52 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | 1,503,299.31 | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | 1,503,299.31 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | 136,093.09 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 10,776.65 | | | | |
| V | SPREAD ACCOUNT | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 20,756,058.96 | | | | |
| D | Spread Account Shortfall | 14,243,941.04 | | | | |
| E | Interest earnings on the Spread Account | 54,618.02 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (211,294.55) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 20,599,382.42 | | | | |

Note: the Spread Account Percentage is:
    4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
    5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
    6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

7.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i) Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                                 166,727.52

(ii) **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)              (10,776.65)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                     0.00

(iv) **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                   (0.00)

(v) **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                            (212,443.34)

(vi) **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                             (136,093.09)  see (x) below

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                         -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                            (154,802.08)

(ix) upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                -

(x) after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (347,387.65) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | | 211,294.55 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | | N/A |
| **C** | **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:** | | |
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,503,299.31 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,503,299.31 |
| B | Series 2000-1 Principal Shortfall | $ | 6,465,991.22 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

|   | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,254,651.15 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i)   Current Portfolio Yield | **4.50%** | Includes draw from Reserve Account; |
| | (ii)  Portfolio Yield (prior month) | 8.96% | should also include investment earnings |
| | (iii) Portfolio Yield (2 months prior) | 9.38% | |
| | (iv)  3 Month Average | 7.61% | |
| | | | |
| B | Base Rate for the current Monthly Period | | |
| | (i)   Current Base Rate | **55.57%** | |
| | (ii)  Base Rate (prior month) | 43.77% | |
| | (iii) Base Rate (2 months prior) | 39.23% | |
| | (iv)  3 Month Average | 46.19% | |
| | | | |
| C | Excess Spread | | |
| | (i)   Current Excess Spread | **-51.07%** | |
| | (ii)  Excess Spread (prior month) | -43.77% | |
| | (iii) Excess Spread (2 months prior) | -39.23% | |
| | (iv)  3 Month Average | -44.69% | |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month. The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 194,679.34 |
| | (2) | Principal | 2,135,149.30 |
| | (3) | Total Distribution for Class C Notes | 2,329,828.63 |
| | | | |
| D | (1) | Interest | 213,660.42 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 213,660.42 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---|
| A | Beginning of the Period Principal Receivables: | $ | 115,592,374.69 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 5,872,496.06 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 121,464,870.75 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 109,955,099.06 |
| M | End of the Month Finance Charge Receivables: | | 5,545,495.79 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 115,500,594.85 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended November 30, 2005

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

P  (a)  Transferor Interest

| | | |
|---|---|---|
| + Principal Receivables | 109,955,099.06 | |
| + Special Funding Account (SFA) | - | |
| - Aggregate Invested Amounts in the trust | 15,845,630.89 | |
| Ending Transferor Interest | 94,109,468.17 | |

(b)  Required Transferor Interest (9% x Principal Receivables)     9,895,958.92

(c)  (Shortfall) if applicable in Transferor Interest     N/A
      - principal collections will be trapped in the SFA until shortfall eliminated

(d)  Transferor Percentage (for information only)     85.6%

(e)  Transferor Allocations/Distributions

| | |
|---|---|
| Transferor share of Finance Charge Collections | 1,954,098.12 |
| Interest earned on the Collections Account | 14,309.82 |
| Transferor share of Principal Collections | - |
| Transferor allocated Servicing Fees | (166,244.55) |
| Net cash distributable to the Transferor on the Distribution Date | 1,802,163.39 |

## III  PERFORMANCE SUMMARY
### A  COLLECTIONS

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 5,265,290.12 |
| (2) | Total Principal Collections | | 3,608,550.41 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,656,739.71 |
| (4) | Principal Payment Rate | | 3.1% |

### B. DELINQUENCIES AND LOSSES
NUMBER OF ACCOUNTS

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 295,287 | 98.8% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,015 | 0.3% |
| | 60-89 Days | 766 | 0.3% |
| | 90-119 Days | 659 | 0.2% |
| | 120-149 Days | 569 | 0.2% |
| | 150-179 Days | 585 | 0.2% |
| | 180-209 Days | 3 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,597 | 1.2% |
| (3) | Total Accounts | 298,884 | 100.0% |

OUTSTANDING BALANCES

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $   103,282,870.91 | 89.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 3,174,952.44 | 2.7% |
| | 60-89 Days | 2,574,437.68 | 2.2% |
| | 90-119 Days | 2,278,224.33 | 2.0% |
| | 120-149 Days | 1,920,552.26 | 1.7% |
| | 150-179 Days | 2,257,787.50 | 2.0% |
| | 180-209 Days | 11,769.73 | 0.0% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

|  |  |  |  |
|---|---|---|---|
|  | SubTotal -- 30+ Days Delinquent | 12,217,723.94 | 10.6% |
| (3) | Total Balances | $ 115,500,594.85 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

| IV | SERIES 2001-1 INFORMATION | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | 521,500,000.00 | 87,500,000.00 | 66,500,000.00 | 24,500,000.00 |
| C | Beginning of Month Invested Amount | 11,760,292.31 | $ 0.00 | $ 0.00 | $ 11,760,292.30 | $ 0.00 |
| D | Month End Invested Amount | 9,379,639.67 | $ 0.00 | $ 0.00 | $ 9,379,639.66 | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 7,078,314.41 | $ 0.00 | $ 0.00 | $ 7,078,314.40 | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 4.41500% | 4.99500% | 5.71500% | 10.46500% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 10.17% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 58.34% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | 240,210.27 | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | 240,210.27 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | 2,105,251.10 | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | 2,105,251.10 | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | 196,074.16 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 15,632.73 | | | | |

| V | SPREAD ACCOUNT | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 8,752,608.03 | 8,752,608.03 |
| D | Spread Account Shortfall | 21,000,000.00 | 19,247,391.97 | 40,247,391.97 |
| E | Interest earnings on the Spread Account | - | 23,199.87 | 23,199.87 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (213,660.42) | (213,660.42) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 8,562,147.48 | 8,562,147.48 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

> **Note: the Junior Note Spread Account Percentage is:**
>   1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
>   1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
>   2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
>   2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
>   3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
>   4.0% if the Quarterly Excess Spread Percentage is <2.0%
>   provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
>   the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)    Series 2001-1 Allocable Finance Charge Collections for such                    240,210.27
         Distribution Date

(ii)   **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
         not distributed to the Servicer on a prior Distribution Date (unless such amount
         has been netted against deposits to the Collection Account)                     (15,632.73)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
         not distributed on a prior Distribution Date,  *plus* Class A Additional Interest, *plus*
         Class A Additional Interest previously due but not distributed on a prior
         Distribution Date                                                                          (0.00)

(iv)   **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
         not distributed on a prior Distribution Date,  *plus* Class B Additional Interest, *plus*
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date                                                                          (0.00)

(v)    **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
         not distributed on a prior Distribution Date,  *plus* Class C Additional Interest, *plus*
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
         Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
         Account will be drawn.                                                              (194,679.34)

(vi)   **Investor Default Amount**, if any, shall be treated as a portion of Available
         Principal Collections                                                               (196,074.16)

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
         **Principal Collections** not previously reimbursed shall be treated as a portion of
         Available Principal Collections                                                              -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
         not distributed on a prior Distribution Date,  *plus* Class D Additional Interest, *plus*
         Class D Additional Interest previously due but not distributed on a prior
         Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
         Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

Account will be drawn.                                    (213,660.42)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

(ix)    upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                    -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account              -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| | |
|---|---|
| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (379,836.38) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 213,660.42 |
| (xv) | Investor Default Amount to be released on distribution | | 29,898.20 |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B    Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 2,135,149.30 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 2,135,149.30 |
| B | Series 2001-1 Principal Shortfall | $ | 9,379,639.67 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
| LIBOR Determination Date: | November 10, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended November 30, 2005**

| Distribution Date: | December 15, 2005 |
|---|---|
| LIBOR Determination Date: | November 10, 2005 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

A  Investor Charge-Offs    $    55,997,911.15
B  Reductions in Invested Amount (other than by principal payments)    -
C  Previous reductions in Invested Amount reimbursed    $    -

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
   (i)    Current Portfolio Yield    **4.50%**    Includes draw from Reserve Account;
   (ii)   Portfolio Yield (prior month)    8.96%    should also include investment earnings
   (iii)  Portfolio Yield (2 months prior)    9.38%
   (iv)   3 Month Average    7.61%

B  Base Rate for the current Monthly Period
   (i)    Current Base Rate    **43.26%**
   (ii)   Base Rate (prior month)    34.55%
   (iii)  Base Rate (2 months prior)    31.35%
   (iv)   3 Month Average    36.39%

C  Excess Spread
   (i)    Current Excess Spread    **-38.76%**
   (ii)   Modified Excess Spread (prior month)    -25.59%
   (iii)  Excess Spread (2 months prior)    -21.97%
   (iv)   3 Month Average    -28.77%

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 235,704.26 |
| | (2) | Principal | | 1,511,764.21 |
| | (3) | Total Distribution for Class C Notes | | 1,747,468.47 |
| | | | | |
| D | (1) | Interest | | 174,362.97 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 174,362.97 |

**II   RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 109,955,099.06 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 5,545,495.79 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 115,500,594.85 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 104,651,856.11 |
| | M | End of the Month Finance Charge Receivables: | | 5,399,787.96 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 110,051,644.07 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2000-1
Monthly Noteholders Statement
Monthly Period Ended December 31, 2005

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

P  (a)  Transferor Interest

| | |
|---|---|
| + Principal Receivables | 104,651,856.11 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | 11,904,913.23 |
| Ending Transferor Interest | 92,746,942.88 |

(b)  Required Transferor Interest (9% x Principal Receivables)     9,418,667.05

(c)  (Shortfall) if applicable in Transferor Interest     N/A
     - principal collections will be trapped in the SFA until shortfall eliminated

(d)  Transferor Percentage (for information only)     88.6%

III  PERFORMANCE SUMMARY
A  COLLECTIONS

| | | |
|---|---|---|
| (1) | Total Collections | $    5,210,361.76 |
| (2) | Total Principal Collections | 3,628,869.73 |
| (3) | Total Finance Charge Collections (including interchange) | $    1,581,492.03 |
| (4) | Principal Payment Rate | 3.3% |

B.  DELINQUENCIES AND LOSSES

NUMBER OF ACCOUNTS

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 295,044 | 98.9% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 766 | 0.3% |
| | 60-89 Days | 713 | 0.2% |
| | 90-119 Days | 666 | 0.2% |
| | 120-149 Days | 609 | 0.2% |
| | 150-179 Days | 522 | 0.2% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,276 | 1.1% |
| (3) | Total Accounts | 298,320 | 100.0% |

OUTSTANDING BALANCES

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $    98,978,771.89 | 89.9% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,414,210.96 | 2.2% |
| | 60-89 Days | 2,350,916.94 | 2.1% |
| | 90-119 Days | 2,281,054.86 | 2.1% |
| | 120-149 Days | 2,201,101.52 | 2.0% |
| | 150-179 Days | 1,825,587.90 | 1.7% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 11,072,872.18 | 10.1% |
| (3) | Total Balances | $    110,051,644.07 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

| IV | SERIES 2000-1 INFORMATION | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 6,465,991.22 | (0.00) | 0.00 | 6,465,991.22 | 0.00 |
| D | Month End Invested Amount | 4,826,598.82 | (0.00) | 0.00 | 4,826,598.81 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 3,213,296.10 | (0.00) | 0.00 | 3,213,296.09 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 4.56938% | 5.16938% | 6.01938% | 10.86938% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 5.88% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | 129,272.35 | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | 129,272.35 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | 1,511,764.21 | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | 1,511,764.21 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | 101,538.51 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 8,044.33 | | | | |
| **V** | **SPREAD ACCOUNT** | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 20,599,382.43 | | | | |
| D | Spread Account Shortfall | 14,400,617.57 | | | | |
| E | Interest earnings on the Spread Account | 58,296.82 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (288,839.21) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 20,365,161.24 | | | | |

Note: the Spread Account Percentage is:
   4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

   **A   Distribution of Available Finance Charge Collections:**

(i)     Series 2000-1 Allocable Finance Charge Collections for such          129,272.35
      Distribution Date

(ii)    **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
      not distributed to the Servicer on a prior Distribution Date (unless such amount
      has been netted against deposits to the Collection Account)          (8,044.33)

(iii)   **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
      Class A Additional Interest previously due but not distributed on a prior
      Distribution Date          0.00

(iv)   **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date          (0.00)

(v)    **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
      Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
      Account will be drawn.          (235,704.26)

(vi)   **Investor Default Amount**, if any, shall be treated as a portion of Available
      Principal Collections          (101,538.51) see (x) below

(vii)   Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
      **Principal Collections** not previously reimbursed shall be treated as a portion of
      Available Principal Collections          -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
      Class D Additional Interest previously due but not distributed on a prior
      Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
      Available Finance Charge Collections available after (i) through (vi), then the Spread
      Account will be drawn.          (174,362.97)

(ix)   upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
      the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
      Balance shall be treated as a portion of Available Principal Collections          -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
      terminates, an amount up to the excess, if any, of the Required Reserve Account

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

over the Available Reserve Account shall be deposited in the Reserve Account                     -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2000-1
Monthly Noteholders Statement
Monthly Period Ended December 31, 2005

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (390,377.72) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | | 288,839.21 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | | N/A |
| **C** | **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:** | | |
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,511,764.21 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,511,764.21 |
| B | Series 2000-1 Principal Shortfall | $ | 4,826,598.82 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,390,744.24 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX   Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i)    Current Portfolio Yield | **5.15%** | Includes draw from Reserve Account; |
| | (ii)   Portfolio Yield (prior month) | 4.50% | should also include investment earnings |
| | (iii)  Portfolio Yield (2 months prior) | 8.96% | |
| | (iv)  3 Month Average | 6.20% | |
| | | | |
| B | Base Rate for the current Monthly Period | | |
| | (i)    Current Base Rate | **77.60%** | |
| | (ii)   Base Rate (prior month) | 55.57% | |
| | (iii)  Base Rate (2 months prior) | 43.77% | |
| | (iv)  3 Month Average | 58.98% | |
| | | | |
| C | Excess Spread | | |
| | (i)    Current Excess Spread | **-72.45%** | |
| | (ii)   Excess Spread (prior month) | -51.07% | |
| | (iii)  Excess Spread (2 months prior) | -43.77% | |
| | (iv)  3 Month Average | -55.76% | |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 211,995.77 |
| | (2) | Principal | 2,117,105.52 |
| | (3) | Total Distribution for Class C Notes | 2,329,101.29 |
| | | | |
| D | (1) | Interest | 240,739.41 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 240,739.41 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 109,955,099.06 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 5,545,495.79 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 115,500,594.85 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 104,651,856.11 |
| M | End of the Month Finance Charge Receivables: | | 5,399,787.96 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 110,051,644.07 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended December 31, 2005

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

| P | (a) | Transferor Interest | | |
|---|---|---|---|---|
| | | + Principal Receivables | 104,651,856.11 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | 11,904,913.23 | |
| | | Ending Transferor Interest | 92,746,942.88 | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 9,418,667.05 | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | (d) | Transferor Percentage (for information only) | 88.6% | |
| | (e) | Transferor Allocations/Distributions | | |
| | | Transferor share of Finance Charge Collections | 1,881,498.13 | |
| | | Interest earned on the Collections Account | 14,086.69 | |
| | | Transferor share of Principal Collections | - | |
| | | Transferor allocated Servicing Fees | (163,416.95) | |
| | | Net cash distributable to the Transferor on the Distribution Date | 1,732,167.87 | |

**III  PERFORMANCE SUMMARY**

**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 5,210,361.76 | |
| (2) | Total Principal Collections | | 3,628,869.73 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,581,492.03 | |
| (4) | Principal Payment Rate | | 3.3% | |

**B. DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 295,044 | 98.9% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 766 | 0.3% |
| | 60-89 Days | 713 | 0.2% |
| | 90-119 Days | 666 | 0.2% |
| | 120-149 Days | 609 | 0.2% |
| | 150-179 Days | 522 | 0.2% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,276 | 1.1% |
| (3) | Total Accounts | 298,320 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $  98,978,771.89 | 89.9% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,414,210.96 | 2.2% |
| | 60-89 Days | 2,350,916.94 | 2.1% |
| | 90-119 Days | 2,281,054.86 | 2.1% |
| | 120-149 Days | 2,201,101.52 | 2.0% |
| | 150-179 Days | 1,825,587.90 | 1.7% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

|  |  |  |  |
|---|---|---|---|
|  | SubTotal -- 30+ Days Delinquent |  | 11,072,872.18 | 10.1% |
| (3) | Total Balances | $ | 110,051,644.07 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

| IV | SERIES 2001-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 9,379,639.67 | $ 0.00 | $ 0.00 | $ 9,379,639.66 | $ 0.00 |
| D | Month End Invested Amount | | 7,078,314.41 | $ 0.00 | $ 0.00 | $ 7,078,314.40 | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 4,813,915.99 | $ 0.00 | $ 0.00 | $ 4,813,915.98 | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.66938% | 5.24938% | 5.96938% | 10.71938% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 8.53% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 58.34% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | | 187,523.93 | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 187,523.93 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | | 2,117,105.52 | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | | 2,117,105.52 | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | 147,292.91 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 11,797.19 | | | | |

| V | SPREAD ACCOUNT | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 8,562,147.48 | 8,562,147.48 |
| D | Spread Account Shortfall | 21,000,000.00 | 19,437,852.52 | 40,437,852.52 |
| E | Interest earnings on the Spread Account | - | 24,390.69 | 24,390.69 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (277,008.45) | (277,008.45) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 8,309,529.72 | 8,309,529.72 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

**Note: the Junior Note Spread Account Percentage is:**
  1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
  1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
  2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
  2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
  3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
  4.0% if the Quarterly Excess Spread Percentage is <2.0%
  provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
  the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

   **A   Distribution of Available Finance Charge Collections:**

   (i)   Series 2001-1 Allocable Finance Charge Collections for such
         Distribution Date                                                            187,523.93

   (ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
         not distributed to the Servicer on a prior Distribution Date (unless such amount
         has been netted against deposits to the Collection Account)                   (11,797.19)

   (iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
         Class A Additional Interest previously due but not distributed on a prior
         Distribution Date                                                            (0.00)

   (iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date                                                            (0.00)

   (v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
         Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
         Account will be drawn.                                                       (211,995.77)

   (vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
         Principal Collections                                                        (147,292.91)

   (vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
         Principal Collections** not previously reimbursed shall be treated as a portion of
         Available Principal Collections                                              -

   (viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
         Class D Additional Interest previously due but not distributed on a prior
         Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
         Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

Account will be drawn.                                                      (240,739.41)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                     -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account            -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

| | | |
|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (424,301.35) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | 277,008.45 |
| (xv) | Investor Default Amount to be released on distribution | 0.00 |
| (xvi) | Net Excess Spread due back to Nextbank | - |

**B   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 2,117,105.52 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 2,117,105.52 |
| B | Series 2001-1 Principal Shortfall | $ | 7,078,314.41 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| Distribution Date: | January 17, 2006 |
|---|---|
| LIBOR Determination Date: | December 13, 2005 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended December 31, 2005**

| | |
|---|---|
| Distribution Date: | January 17, 2006 |
| LIBOR Determination Date: | December 13, 2005 |

**VIII  INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,164,087.11 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | | | |
|---|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | | |
| | (i) | Current Portfolio Yield | **5.15%** | Includes draw from Reserve Account; |
| | (ii) | Portfolio Yield (prior month) | 4.50% | should also include investment earnings |
| | (iii) | Portfolio Yield (2 months prior) | 8.96% | |
| | (iv) | 3 Month Average | 6.20% | |
| | | | | |
| B | Base Rate for the current Monthly Period | | | |
| | (i) | Current Base Rate | **59.43%** | |
| | (ii) | Base Rate (prior month) | 43.26% | |
| | (iii) | Base Rate (2 months prior) | 34.55% | |
| | (iv) | 3 Month Average | 45.75% | |
| | | | | |
| C | Excess Spread | | | |
| | (i) | Current Excess Spread | **-54.28%** | |
| | (ii) | Modified Excess Spread (prior month) | -38.76% | |
| | (iii) | Excess Spread (2 months prior) | -25.59% | |
| | (iv) | 3 Month Average | -39.54% | |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | | Interest | (0.00) |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class A Notes | (0.00) |
| | | | | |
| B | (1) | | Interest | 0.00 |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class B Notes | 0.00 |
| | | | | |
| C | (1) | | Interest | 203,143.50 |
| | (2) | | Principal | 1,392,532.99 |
| | (3) | | Total Distribution for Class C Notes | 1,595,676.49 |
| | | | | |
| D | (1) | | Interest | 154,646.53 |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class D Notes | 154,646.53 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 104,651,856.11 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 5,399,787.96 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 110,051,644.07 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 99,821,037.11 |
| | M | End of the Month Finance Charge Receivables: | | 5,214,186.63 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 105,035,223.74 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | | |
|---|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

| | | | | |
|---|---|---|---|---|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | 99,821,037.11 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | 8,027,212.08 | |
| | | Ending Transferor Interest | 91,793,825.03 | |
| | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 8,983,893.34 | |
| | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | | | | |
| | (d) | Transferor Percentage (for information only) | 92.0% | |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 4,976,679.46 | |
| (2) | Total Principal Collections | | 3,342,664.66 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,634,014.80 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.2% | |

**B.  DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 294,837 | 99.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 717 | 0.2% |
| | 60-89 Days | 510 | 0.2% |
| | 90-119 Days | 589 | 0.2% |
| | 120-149 Days | 602 | 0.2% |
| | 150-179 Days | 565 | 0.2% |
| | 180-209 Days | 2 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 2,985 | 1.0% |
| (3) | Total Accounts | 297,822 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---|---|
| (1) | Current Balances | $ | 94,977,634.86 | 90.4% |
| (2) | End of month delinquencies: | | | |
| | 30-59 Days | | 2,194,073.19 | 2.1% |
| | 60-89 Days | | 1,703,418.16 | 1.6% |
| | 90-119 Days | | 1,949,007.31 | 1.9% |
| | 120-149 Days | | 2,144,052.89 | 2.0% |
| | 150-179 Days | | 2,061,982.99 | 2.0% |
| | 180-209 Days | | 5,054.34 | 0.0% |
| | Over 209 Days | | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | | 10,057,588.88 | 9.6% |
| (3) | Total Balances | $ | 105,035,223.74 | 100.0% |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

| IV | SERIES 2000-1 INFORMATION | | Series Total | | Class A | | Class B | | Class C | | Class D |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 500,000,000.00 | $ | 357,500,000.00 | $ | 67,500,000.00 | $ | 57,500,000.00 | $ | 17,500,000.00 |
| B | Initial Invested Amount | | 500,000,000.00 | | 357,500,000.00 | | 67,500,000.00 | | 57,500,000.00 | | 17,500,000.00 |
| C | Beginning of Month Invested Amount | | 4,826,598.82 | | (0.00) | | 0.00 | | 4,826,598.81 | | 0.00 |
| D | Month End Invested Amount | | 3,213,296.10 | | (0.00) | | 0.00 | | 3,213,296.09 | | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 1,756,670.85 | | (0.00) | | 0.00 | | 1,756,670.84 | | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | | 4.67000% | | 5.27000% | | 6.12000% | | 10.97000% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (Average Investor %) | | 4.61% | | | | | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 41.66% | | | | | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | | 103,334.24 | | | | | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 103,334.24 | | | | | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | | 1,392,532.99 | | | | | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | | - | | | | | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | | 1,392,532.99 | | | | | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | | 64,092.26 | | | | | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 5,355.49 | | | | | | | | |
| V | SPREAD ACCOUNT | | | | | | | | | | |
| A | Required Spread Account Percentage (see Note: below) | | 7% | | | | | | | | |
| B | Required Spread Account Amount | | 35,000,000.00 | | | | | | | | |
| C | Amount on Deposit in the Spread Account | | 20,426,823.81 | | | | | | | | |
| D | Spread Account Shortfall | | 14,573,176.19 | | | | | | | | |
| E | Interest earnings on the Spread Account | | 59,470.53 | | | | | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | | (259,811.28) | | | | | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | 20,226,483.06 | | | | | | | | |

Note: the Spread Account Percentage is:
4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)   Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                               103,334.24

(ii)   **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                     (5,355.49)

(iii)   **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                               0.00

(iv)   **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                               (0.00)

(v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however* , that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                          (203,143.50)

(vi)   **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                          (64,092.26)  see (x) below

(vii)   Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                 -

(viii)   **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                          (154,646.53)

(ix)   upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections        -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (323,903.54) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | | 259,811.28 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | | N/A |
| **C** | **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:** | | |
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,392,532.99 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,392,532.99 |
| B | Series 2000-1 Principal Shortfall | $ | 3,213,296.10 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | Distribution Date: | February 15, 2006 |
|---|---|---|
| | LIBOR Determination Date: | January 13, 2006 |

C   Shared Principal Collections allocable from other principal sharing series                                                    $                          -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,492,282.75 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period

| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **9.76%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 5.15% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 4.50% | |
| (iv) | 3 Month Average | 6.47% | |

B  Base Rate for the current Monthly Period

| | | |
|---|---|---|
| (i) | Current Base Rate | **90.29%** |
| (ii) | Base Rate (prior month) | 77.60% |
| (iii) | Base Rate (2 months prior) | 55.57% |
| (iv) | 3 Month Average | 74.49% |

C  Excess Spread

| | | |
|---|---|---|
| (i) | Current Excess Spread | **-80.53%** |
| (ii) | Excess Spread (prior month) | -72.45% |
| (iii) | Excess Spread (2 months prior) | -51.07% |
| (iv) | 3 Month Average | -68.02% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| C | (1) | Interest | 179,087.52 |
| | (2) | Principal | 1,950,131.67 |
| | (3) | Total Distribution for Class C Notes | 2,129,219.19 |
| D | (1) | Interest | 213,544.72 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 213,544.72 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 104,651,856.11 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 5,399,787.96 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 110,051,644.07 |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 99,821,037.11 |
| M | End of the Month Finance Charge Receivables: | | 5,214,186.63 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 105,035,223.74 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | | |
|---|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

| | | | |
|---|---|---|---|
| P | (a) | Transferor Interest | |
| | | + Principal Receivables | 99,821,037.11 |
| | | + Special Funding Account (SFA) | - |
| | | - Aggregate Invested Amounts in the trust | 8,027,212.08 |
| | | Ending Transferor Interest | 91,793,825.03 |
| | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 8,983,893.34 |
| | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | |
| | | | |
| | (d) | Transferor Percentage (for information only) | 92.0% |
| | | | |
| | (e) | Transferor Allocations/Distributions | |
| | | Transferor share of Finance Charge Collections | 1,985,649.56 |
| | | Interest earned on the Collections Account | 14,343.71 |
| | | Transferor share of Principal Collections | - |
| | | Transferor allocated Servicing Fees | (161,041.05) |
| | | Net cash distributable to the Transferor on the Distribution Date | 1,838,952.22 |

**III PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 4,976,679.46 | |
| (2) | Total Principal Collections | | 3,342,664.66 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,634,014.80 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.2% | |

**B. DELINQUENCIES AND LOSSES**

| | NUMBER OF ACCOUNTS | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 294,837 | 99.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 717 | 0.2% |
| | 60-89 Days | 510 | 0.2% |
| | 90-119 Days | 589 | 0.2% |
| | 120-149 Days | 602 | 0.2% |
| | 150-179 Days | 565 | 0.2% |
| | 180-209 Days | 2 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 2,985 | 1.0% |
| (3) | Total Accounts | 297,822 | 100.0% |

| | OUTSTANDING BALANCES | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $    94,977,634.86 | 90.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,194,073.19 | 2.1% |
| | 60-89 Days | 1,703,418.16 | 1.6% |
| | 90-119 Days | 1,949,007.31 | 1.9% |
| | 120-149 Days | 2,144,052.89 | 2.0% |
| | 150-179 Days | 2,061,982.99 | 2.0% |
| | 180-209 Days | 5,054.34 | 0.0% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

| | | | |
|---|---|---|---|
| | SubTotal -- 30+ Days Delinquent | 10,057,588.88 | 9.6% |
| (3) | Total Balances | $ 105,035,223.74 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | Distribution Date: | February 15, 2006 |
|---|---|---|
| | LIBOR Determination Date: | January 13, 2006 |

**IV  SERIES 2001-1 INFORMATION**

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | 24,500,000.00 |
| C | Beginning of Month Invested Amount | 7,078,314.41 | $ 0.00 | $ 0.00 | $ 7,078,314.40 | $ 0.00 |
| D | Month End Invested Amount | 4,813,915.99 | $ 0.00 | $ 0.00 | $ 4,813,915.98 | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 2,769,791.60 | $ 0.00 | $ 0.00 | $ 2,769,791.59 | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 4.77000% | 5.35000% | 6.07000% | 10.82000% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 6.76% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 58.34% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| (1) | Allocable Finance Charge Collections for such Distribution Date | 151,541.96 | | | | |
| (2) | Shared Finance Charge Collections for such Distribution Date | - | | | | |
| (3) | Total Series 2000-1 Finance Charge Collections for such Distribution Date | 151,541.96 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| (1) | Allocable Principal Collections for such Distribution Date | 1,950,131.67 | | | | |
| (2) | Shared Principal Collections for such Distribution Date | - | | | | |
| (3) | Total Series 2000-1 Principal Collections for such Distribution Date | 1,950,131.67 | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | 93,992.72 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 8,023.19 | | | | |

**V  SPREAD ACCOUNT**

| | | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 8,345,798.76 | 8,345,798.76 |
| D | Spread Account Shortfall | 21,000,000.00 | 19,654,201.24 | 40,654,201.24 |
| E | Interest earnings on the Spread Account | - | 24,512.20 | 24,512.20 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (249,113.47) | (249,113.47) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 8,121,197.49 | 8,121,197.48 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

| Note: the Junior Note Spread Account Percentage is: |
|---|
| 1.0% if the Quarterly Excess Spread Percentage is >= 4.0% |
| 1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5% |
| 2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0% |
| 2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5% |
| 3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0% |
| 4.0% if the Quarterly Excess Spread Percentage is <2.0% |
| provided, that if a Redemption Event with respect to Series 2001-1 has occurred, |
| the Spread Account Percentage shall be 4.0% and shall not be subject to reduction. |

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)     Series 2001-1 Allocable Finance Charge Collections for such                           151,541.96
        Distribution Date

(ii)    **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
        not distributed to the Servicer on a prior Distribution Date (unless such amount
        has been netted against deposits to the Collection Account)                            (8,023.19)

(iii)   **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
        Class A Additional Interest previously due but not distributed on a prior
        Distribution Date                                                                      (0.00)

(iv)    **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date                                                                      (0.00)

(v)     **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however* , that if the Class C Monthly Interest exceeds
        Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
        Account will be drawn.                                                                 (179,087.52)

(vi)    **Investor Default Amount,** if any, shall be treated as a portion of Available
        Principal Collections                                                                 (93,992.72)

(vii)   Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
        **Principal Collections** not previously reimbursed shall be treated as a portion of
        Available Principal Collections                                                        -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
        Class D Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

Distribution Date:                    February 15, 2006
LIBOR Determination Date:        January 13, 2006

Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                        (213,544.72)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| | |
|---|---|
| Distribution Date: | February 15, 2006 |
| LIBOR Determination Date: | January 13, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections    -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (343,106.19) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 249,113.47 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B**   **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,950,131.67 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,950,131.67 |
| B | Series 2001-1 Principal Shortfall | $ | 4,813,915.99 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended January 31, 2006**
**REVISED 3/06/06**

| Distribution Date: | February 15, 2006 |
|---|---|
| LIBOR Determination Date: | January 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,311,380.01 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
   (i)  Current Portfolio Yield    **9.76%**    Includes draw from Reserve Account;
   (ii)  Portfolio Yield (prior month)    5.15%      should also include investment earnings
   (iii)  Portfolio Yield (2 months prior)    4.50%
   (iv)  3 Month Average    6.47%

B  Base Rate for the current Monthly Period
   (i)  Current Base Rate    **67.92%**
   (ii)  Base Rate (prior month)    77.60%
   (iii)  Base Rate (2 months prior)    55.57%
   (iv)  3 Month Average    67.03%

C  Excess Spread
   (i)  Current Excess Spread    **-58.17%**
   (ii)  Modified Excess Spread (prior month)    -72.45%
   (iii)  Excess Spread (2 months prior)    -51.07%
   (iv)  3 Month Average    -60.56%

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | (0.00) |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | (0.00) |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 192,606.67 |
| | (2) | Principal | 1,353,083.90 |
| | (3) | Total Distribution for Class C Notes | 1,545,690.57 |
| | | | |
| D | (1) | Interest | 150,675.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 150,675.00 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $    99,821,037.11 |
| | B | Beginning of the Period Finance Charge Receivables: | $    5,214,186.63 |
| | C | Beginning of the Period Discounted Receivables: | N/A |
| | D | Beginning of the Period Total Receivables: | 105,035,223.74 |
| | | | |
| | E | Removed Principal Receivables: | - |
| | F | Removed Finance Charge Receivables: | - |
| | G | Removed Total Receivables: | - |
| | | | |
| | H | Additional Principal Receivables: | - |
| | I | Additional Finance Charge Receivables: | - |
| | J | Additional Total Receivables: | - |
| | | | |
| | K | Discounted Receivables Generated this Period: | N/A |
| | L | End of the Month Principal Receivables: | 95,630,574.18 |
| | M | End of the Month Finance Charge Receivables: | 5,017,527.65 |
| | N | End of the Month Discounted Receivables: | N/A |
| | O | End of the Month Total Receivables: | 100,648,101.83 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | | |
|---|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

| | | | | |
|---|---|---|---|---|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | 95,630,574.18 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | 4,526,462.44 | |
| | | Ending Transferor Interest | 91,104,111.74 | |
| | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 8,606,751.68 | |
| | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | | | | |
| | (d) | Transferor Percentage (for information only) | 95.3% | |

**III PERFORMANCE SUMMARY**
**A COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 4,767,754.59 | |
| (2) | Total Principal Collections | | 3,247,970.27 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,519,784.32 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.3% | |

**B. DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 288,053 | 99.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 826 | 0.3% |
| | 60-89 Days | 448 | 0.2% |
| | 90-119 Days | 411 | 0.1% |
| | 120-149 Days | 542 | 0.2% |
| | 150-179 Days | 566 | 0.2% |
| | 180-209 Days | 236 | 0.1% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,029 | 1.0% |
| (3) | Total Accounts | 291,082 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $   90,550,100.53 | 90.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,519,170.54 | 2.5% |
| | 60-89 Days | 1,450,228.84 | 1.4% |
| | 90-119 Days | 1,393,242.75 | 1.4% |
| | 120-149 Days | 1,849,834.62 | 1.8% |
| | 150-179 Days | 2,107,444.48 | 2.1% |
| | 180-209 Days | 778,080.07 | 0.8% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 10,098,001.30 | 10.0% |
| (3) | Total Balances | $  100,648,101.83 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| Distribution Date: | March 15, 2006 |
|---|---|
| LIBOR Determination Date: | February 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

| | | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| **IV** | **SERIES 2000-1 INFORMATION** | | | | | | |
| A | Note Principal Balance | $ | 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | | 3,213,296.10 | (0.00) | 0.00 | 3,213,296.09 | 0.00 |
| D | Month End Invested Amount | | 1,756,670.85 | (0.00) | 0.00 | 1,756,670.84 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 377,288.45 | (0.00) | 0.00 | 377,288.45 | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.77000% | 5.37000% | 6.22000% | 11.07000% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 3.22% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | | 73,057.12 | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 73,057.12 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | | 1,353,083.90 | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | | 1,353,083.90 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | | 26,298.49 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 2,927.78 | | | | |
| **V** | **SPREAD ACCOUNT** | | | | | | |
| A | Required Spread Account Percentage (see Note: below) | | 7% | | | | |
| B | Required Spread Account Amount | | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | | 20,165,810.45 | | | | |
| D | Spread Account Shortfall | | 14,834,189.55 | | | | |
| E | Interest earnings on the Spread Account | | 57,108.52 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | | (273,152.33) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | 19,949,766.64 | | | | |

Note: the Spread Account Percentage is:
    4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

> 5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
> 6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

   **A  Distribution of Available Finance Charge Collections:**

   (i)    Series 2000-1 Allocable Finance Charge Collections for such        73,057.12
          Distribution Date

   (ii)   **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
          not distributed to the Servicer on a prior Distribution Date (unless such amount
          has been netted against deposits to the Collection Account)        (2,927.78)

   (iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
          not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
          Class A Additional Interest previously due but not distributed on a prior
          Distribution Date                                                  0.00

   (iv)   **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
          not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
          Class B Additional Interest previously due but not distributed on a prior
          Distribution Date                                                  (0.00)

   (v)    **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
          not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
          Class B Additional Interest previously due but not distributed on a prior
          Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
          Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
          Account will be drawn.                                             (192,606.67)

   (vi)   **Investor Default Amount,** if any, shall be treated as a portion of Available
          Principal Collections                                             (26,298.49)  see (x) below

   (vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
          **Principal Collections** not previously reimbursed shall be treated as a portion of
          Available Principal Collections                                    -

   (viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
          not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
          Class D Additional Interest previously due but not distributed on a prior
          Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
          Available Finance Charge Collections available after (i) through (vi), then the Spread
          Account will be drawn.                                             (150,675.00)

   (ix)   upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections          -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account          -

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

| | | |
|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (299,450.83) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 273,152.33 |
| (xv) | Investor Default Amount to be released on distribution | (0.00) |

**Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture**          N/A

**C**  **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,353,083.90 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| Distribution Date: | March 15, 2006 |
|---|---|
| LIBOR Determination Date: | February 13, 2006 |

| | | | | |
|---|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,353,083.90 | |
| B | Series 2000-1 Principal Shortfall | $ | 1,756,670.85 | |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - | |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | | |
|---|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,556,375.01 | |
| B | Reductions in Invested Amount (other than by principal payments) | | - | |
| C | Previous reductions in Invested Amount reimbursed | $ | - | |

**IX  Portfolio Yield**

| | | | | |
|---|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | | |
| | (i) | Current Portfolio Yield | **17.46%** | Includes draw from Reserve Account; |
| | (ii) | Portfolio Yield (prior month) | 9.76% | should also include investment earnings |
| | (iii) | Portfolio Yield (2 months prior) | 5.15% | |
| | (iv) | 3 Month Average | 10.79% | |
| B | Base Rate for the current Monthly Period | | | |
| | (i) | Current Base Rate | **129.29%** | |
| | (ii) | Base Rate (prior month) | 90.29% | |
| | (iii) | Base Rate (2 months prior) | 77.60% | |
| | (iv) | 3 Month Average | 99.06% | |
| C | Excess Spread | | | |
| | (i) | Current Excess Spread | **-111.83%** | |
| | (ii) | Excess Spread (prior month) | -80.53% | |
| | (iii) | Excess Spread (2 months prior) | -72.45% | |
| | (iv) | 3 Month Average | -88.27% | |

_____

Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 166,402.26 |
| | (2) | Principal | 1,894,886.37 |
| | (3) | Total Distribution for Class C Notes | 2,061,288.63 |
| | | | |
| D | (1) | Interest | 208,086.67 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 208,086.67 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 99,821,037.11 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 5,214,186.63 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 105,035,223.74 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 95,630,574.18 |
| M | End of the Month Finance Charge Receivables: | | 5,017,527.65 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 100,648,101.83 |
| | | | |
| P | (a)    Transferor Interest | | |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

|  |  |  |
|---|---|---:|
|  | + Principal Receivables | 95,630,574.18 |
|  | + Special Funding Account (SFA) | - |
|  | - Aggregate Invested Amounts in the trust | 4,526,462.44 |
|  | Ending Transferor Interest | 91,104,111.74 |
| (b) | Required Transferor Interest (9% x Principal Receivables) | 8,606,751.68 |
| (c) | (Shortfall) if applicable in Transferor Interest | N/A |
|  | - principal collections will be trapped in the SFA until shortfall eliminated | |
| (d) | Transferor Percentage (for information only) | 95.3% |

<table>
<tr><td>(e)</td><td>Transferor Allocations/Distributions</td><td></td></tr>
<tr><td></td><td>Transferor share of Finance Charge Collections</td><td>2,087,013.22</td></tr>
<tr><td></td><td>Interest earned on the Collections Account</td><td>14,343.71</td></tr>
<tr><td></td><td>Transferor share of Principal Collections</td><td>-</td></tr>
<tr><td></td><td>Transferor allocated Servicing Fees</td><td>(158,824.27)</td></tr>
<tr><td></td><td>Net cash distributable to the Transferor on the Distribution Date</td><td>1,942,532.66</td></tr>
</table>

**III  PERFORMANCE SUMMARY**

**A  COLLECTIONS**

| | | | |
|---|---|---|---:|
| (1) | Total Collections | $ | 4,767,754.59 |
| (2) | Total Principal Collections | | 3,247,970.27 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,519,784.32 |
| (4) | Principal Payment Rate | | 3.3% |

**B. DELINQUENCIES AND LOSSES**

| | NUMBER OF ACCOUNTS | Number | % of Total |
|---|---|---:|---:|
| (1) | Current Accounts | 288,053 | 99.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 826 | 0.3% |
| | 60-89 Days | 448 | 0.2% |
| | 90-119 Days | 411 | 0.1% |
| | 120-149 Days | 542 | 0.2% |
| | 150-179 Days | 566 | 0.2% |
| | 180-209 Days | 236 | 0.1% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 3,029 | 1.0% |
| (3) | Total Accounts | 291,082 | 100.0% |

| | OUTSTANDING BALANCES | Amount | % of Total |
|---|---|---:|---:|
| (1) | Current Balances | $        90,550,100.53 | 90.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,519,170.54 | 2.5% |
| | 60-89 Days | 1,450,228.84 | 1.4% |
| | 90-119 Days | 1,393,242.75 | 1.4% |
| | 120-149 Days | 1,849,834.62 | 1.8% |
| | 150-179 Days | 2,107,444.48 | 2.1% |
| | 180-209 Days | 778,080.07 | 0.8% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | Distribution Date: | March 15, 2006 |
|---|---|---|
| | LIBOR Determination Date: | February 13, 2006 |

|   | | | |
|---|---|---|---|
| | SubTotal -- 30+ Days Delinquent | 10,098,001.30 | 10.0% |
| (3) | Total Balances | $  100,648,101.83 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| Distribution Date: | March 15, 2006 |
|---|---|
| LIBOR Determination Date: | February 13, 2006 |

| | | Series Total | | Class A | | Class B | | Class C | | Class D |
|---|---|---|---|---|---|---|---|---|---|---|
| **IV** | **SERIES 2001-1 INFORMATION** | | | | | | | | | |
| A | Note Principal Balance | $ 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| C | Beginning of Month Invested Amount | 4,813,915.99 | $ | 0.00 | $ | 0.00 | $ | 4,813,915.98 | $ | 0.00 |
| D | Month End Invested Amount | 2,769,791.60 | $ | 0.00 | $ | 0.00 | $ | 2,769,791.59 | $ | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 835,506.83 | $ | 0.00 | $ | 0.00 | $ | 835,506.82 | $ | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.87000% | | 5.45000% | | 6.17000% | | 10.92000% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 4.82% | | | | | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 58.34% | | | | | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | 109,448.62 | | | | | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | 109,448.62 | | | | | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | 1,894,886.37 | | | | | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | - | | | | | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | 1,894,886.37 | | | | | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | 39,398.40 | | | | | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 4,616.32 | | | | | | | | |

| | | Senior | Junior | Total |
|---|---|---|---|---|
| **V** | **SPREAD ACCOUNT** | | | |
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 8,081,154.45 | 8,081,154.45 |
| D | Spread Account Shortfall | 21,000,000.00 | 19,918,845.55 | 40,918,845.55 |
| E | Interest earnings on the Spread Account | - | 23,108.11 | 23,108.11 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (269,656.63) | (269,656.63) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 7,834,605.93 | 7,834,605.93 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
4.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2001-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                      109,448.62

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                          (4,616.32)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                       (0.00)

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                       (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                               (166,402.26)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                                                 (39,398.40)

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                                    -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

Account will be drawn.                    (208,086.67)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| | |
|---|---|
| Distribution Date: | March 15, 2006 |
| LIBOR Determination Date: | February 13, 2006 |

 

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections    -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| Distribution Date: | March 15, 2006 |
|---|---|
| LIBOR Determination Date: | February 13, 2006 |

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (309,055.02) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | 269,656.63 |
| (xv) | Investor Default Amount to be released on distribution | 0.00 |
| (xvi) | Net Excess Spread due back to Nextbank | - |

**B  Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 1,894,886.37 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended February 28, 2006**

| Distribution Date: | March 15, 2006 |
|---|---|
| LIBOR Determination Date: | February 13, 2006 |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 1,894,886.37 |
| B | Series 2001-1 Principal Shortfall | $ | 2,769,791.60 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**VIII  INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,405,372.74 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
    (i)   Current Portfolio Yield    **17.46%**    Includes draw from Reserve Account;
    (ii)  Portfolio Yield (prior month)    9.76%    should also include investment earnings
    (iii) Portfolio Yield (2 months prior)    5.15%
    (iv) 3 Month Average    10.79%

B  Base Rate for the current Monthly Period
    (i)   Current Base Rate    **94.50%**
    (ii)  Base Rate (prior month)    67.92%
    (iii) Base Rate (2 months prior)    77.60%
    (iv) 3 Month Average    80.01%

C  Excess Spread
    (i)   Current Excess Spread    **-77.04%**
    (ii)  Modified Excess Spread (prior month)    -58.17%
    (iii) Excess Spread (2 months prior)    -72.45%
    (iv) 3 Month Average    -69.22%

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I     SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | (0.00) |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | (0.00) |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 225,587.71 |
| | (2) | Principal | 335,277.77 |
| | (3) | Total Distribution for Class C Notes | 560,865.48 |
| | | | |
| D | (1) | Interest | 180,448.70 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 180,448.70 |

**II     RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 95,630,574.18 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 5,017,527.65 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 100,648,101.83 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 89,627,335.56 |
| | M | End of the Month Finance Charge Receivables: | | 4,642,165.12 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 94,269,500.68 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2000-1
Monthly Noteholders Statement
Monthly Period Ended March 31, 2006

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| | | | | |
|---|---|---|---|---|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | 89,627,335.56 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | 1,212,795.28 | |
| | | Ending Transferor Interest | 88,414,540.28 | |
| | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 8,066,460.20 | |
| | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | | | | |
| | (d) | Transferor Percentage (for information only) | 98.6% | |

**III  PERFORMANCE SUMMARY**

**A  COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 5,147,648.25 |
| (2) | Total Principal Collections | | 3,586,269.57 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,561,378.68 |
| | | | |
| (4) | Principal Payment Rate | | 3.8% |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 288,007 | 99.2% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 636 | 0.2% |
| | 60-89 Days | 485 | 0.2% |
| | 90-119 Days | 350 | 0.1% |
| | 120-149 Days | 349 | 0.1% |
| | 150-179 Days | 489 | 0.2% |
| | 180-209 Days | 8 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 2,317 | 0.8% |
| (3) | Total Accounts | 290,324 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 86,618,983.11 | 91.9% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,979,131.55 | 2.1% |
| | 60-89 Days | 1,534,412.78 | 1.6% |
| | 90-119 Days | 1,194,024.78 | 1.3% |
| | 120-149 Days | 1,235,532.59 | 1.3% |
| | 150-179 Days | 1,683,471.55 | 1.8% |
| | 180-209 Days | 23,944.32 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 7,650,517.57 | 8.1% |
| (3) | Total Balances | $ 94,269,500.68 | 100.0% |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| IV | SERIES 2000-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | | 1,756,670.85 | (0.00) | 0.00 | 1,756,670.84 | 0.00 |
| D | Month End Invested Amount | | 377,288.45 | (0.00) | 0.00 | 377,288.45 | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 4.94875% | 5.54875% | 6.39875% | 11.24875% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 1.84% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)  Allocable Finance Charge Collections for such Distribution Date | | 44,593.36 | | | | |
| | (2)  Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)  Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 44,593.36 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)  Allocable Principal Collections for such Distribution Date | | 1,494,017.26 | | | | |
| | (2)  Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)  Total Series 2000-1 Principal Collections for such Distribution Date | | 1,494,017.26 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | | 42,010.68 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 628.81 | | | | |
| V | SPREAD ACCOUNT | | | | | | |
| A | Required Spread Account Percentage (see Note: below) | | 7% | | | | |
| B | Required Spread Account Amount | | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | | 19,952,455.48 | | | | |
| D | Spread Account Shortfall | | 15,047,544.52 | | | | |
| E | Interest earnings on the Spread Account | | 64,371.33 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | | (362,071.86) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | 19,654,754.95 | | | | |

Note: the Spread Account Percentage is:
    4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

> 5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
> 6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)   Series 2000-1 Allocable Finance Charge Collections for such
      Distribution Date                                                          44,593.36

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
      not distributed to the Servicer on a prior Distribution Date (unless such amount
      has been netted against deposits to the Collection Account)                  (628.81)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
      Class A Additional Interest previously due but not distributed on a prior
      Distribution Date                                                              0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date                                                            (0.00)

(v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
      Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
      Account will be drawn.                                                   (225,587.71)

(vi)  **Investor Default Amount,** if any, shall be treated as a portion of Available
      Principal Collections                                          (42,010.68)  see (x) below

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
      **Principal Collections** not previously reimbursed shall be treated as a portion of
      Available Principal Collections                                                 -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
      Class D Additional Interest previously due but not distributed on a prior
      Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
      Available Finance Charge Collections available after (i) through (vi), then the Spread
      Account will be drawn.                                                   (180,448.70)

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                               -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account                           -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

(xi)   amounts required to be deposited in the **Spread Account**                                                -

(xii)  any other amounts the Trust may be liable for not referred to above                                      -

(xiii) any balance will be Excess Finance Charge Collections and will be available for
       allocation to other Series in Group One or to the Holders of Transferor
       Certificates                                                                                             (404,082.53)

(xiv)  Withdrawal from Spread Account to cover Class D Monthly Interest                                          362,071.86
(xv)   Investor Default Amount to be released on distribution                                                   0.00


**Available Principal Collections shall be treated as Shared Principal Collections**
**and applied in accordance with Section 8.05 of the Indenture**                                                N/A

C   **Distribution of Available Principal Collections - during the Controlled**
    **Accumulation Period or the Early Amortization Period:**

(i)    during the **Controlled Accumulation Period**, Monthly Principal shall be deposited
       in the **Principal Funding Account**                                                                     N/A

(ii)   during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders**
       until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults)     $         -

       Funds in the Special Funding Account to be used to pay Class A Note Principal Balance           $         -

(iii)  after (ii) during the **Early Amortization Period**, any remaining Monthly Principal
       shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has
       been paid in full                                                                              $         -

       Class B Special Funding Principal Balance Allocation                                           $         -

(iv)   after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly
       Principal shall be paid to **Class C Noteholders** until the Class C Note Principal
       Balance has been paid in full                                                                  $    335,277.77

       Class C Special Funding Principal Balance Allocation                                           $         -

(v)    after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly
       Principal shall be paid to **Class D Noteholders** until the Class D Note
       Principal Balance has been paid in full                                                        $         -

       Class D Special Funding Principal Balance Allocation                                           $         -

(vi)   for either period, after (i) through (v), the balance of Available Principal Collections
       remaining shall be treated as Shared Principal Collections and applied in accordance
       with Section 8.05 of the Indenture                                                             $         -

**VII  PRINCIPAL COLLECTIONS**

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| | | | | |
|---|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 335,277.77 | |
| B | Series 2000-1 Principal Shortfall | $ | 377,288.45 | |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - | |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | | |
|---|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,582,673.51 | |
| B | Reductions in Invested Amount (other than by principal payments) | | - | |
| C | Previous reductions in Invested Amount reimbursed | $ | - | |

**IX Portfolio Yield**

| | | | | |
|---|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | | |
| | (i) | Current Portfolio Yield | **1.76%** | Includes draw from Reserve Account; |
| | (ii) | Portfolio Yield (prior month) | 17.46% | should also include investment earnings |
| | (iii) | Portfolio Yield (2 months prior) | 9.76% | |
| | (iv) | 3 Month Average | 5.56% | |
| B | Base Rate for the current Monthly Period | | | |
| | (i) | Current Base Rate | **277.80%** | |
| | (ii) | Base Rate (prior month) | 129.29% | |
| | (iii) | Base Rate (2 months prior) | 90.29% | |
| | (iv) | 3 Month Average | 148.56% | |
| C | Excess Spread | | | |
| | (i) | Current Excess Spread | **-276.03%** | |
| | (ii) | Excess Spread (prior month) | -111.83% | |
| | (iii) | Excess Spread (2 months prior) | -80.53% | |
| | (iv) | 3 Month Average | -143.00% | |

_____

Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 190,770.97 |
| | (2) | Principal | 769,267.42 |
| | (3) | Total Distribution for Class C Notes | 960,038.40 |
| | | | |
| D | (1) | Interest | 249,259.43 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 249,259.43 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 95,630,574.18 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 5,017,527.65 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 100,648,101.83 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 89,627,335.56 |
| M | End of the Month Finance Charge Receivables: | | 4,642,165.12 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 94,269,500.68 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| | | | |
|---|---|---|---|
| P | (a) | Transferor Interest | |
| | | + Principal Receivables | 89,627,335.56 |
| | | + Special Funding Account (SFA) | - |
| | | - Aggregate Invested Amounts in the trust | 1,212,795.28 |
| | | Ending Transferor Interest | 88,414,540.28 |
| | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 8,066,460.20 |
| | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | |
| | | | |
| | (d) | Transferor Percentage (for information only) | 98.6% |
| | | | |
| | (e) | Transferor Allocations/Distributions | |
| | | Transferor share of Finance Charge Collections | 2,312,691.83 |
| | | Interest earned on the Collections Account | 12,931.56 |
| | | Transferor share of Principal Collections | 2,481,724.38 |
| | | Transferor allocated Servicing Fees | (157,362.94) |
| | | Net cash distributable to the Transferor on the Distribution Date | 4,649,984.83 |

**III    PERFORMANCE SUMMARY**
**A    COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 5,147,648.25 | |
| (2) | Total Principal Collections | | 3,586,269.57 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,561,378.68 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.8% | |

**B. DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 288,007 | 99.2% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 636 | 0.2% |
| | 60-89 Days | 485 | 0.2% |
| | 90-119 Days | 350 | 0.1% |
| | 120-149 Days | 349 | 0.1% |
| | 150-179 Days | 489 | 0.2% |
| | 180-209 Days | 8 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 2,317 | 0.8% |
| (3) | Total Accounts | 290,324 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $    86,618,983.11 | 91.9% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,979,131.55 | 2.1% |
| | 60-89 Days | 1,534,412.78 | 1.6% |
| | 90-119 Days | 1,194,024.78 | 1.3% |
| | 120-149 Days | 1,235,532.59 | 1.3% |
| | 150-179 Days | 1,683,471.55 | 1.8% |
| | 180-209 Days | 23,944.32 | 0.0% |
| | Over 209 Days | - | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | | |
|---|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| | | | |
|---|---|---|---|
| | SubTotal -- 30+ Days Delinquent | 7,650,517.57 | 8.1% |
| (3) | Total Balances | $ 94,269,500.68 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| Distribution Date: | April 17, 2006 |
|---|---|
| LIBOR Determination Date: | March 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| IV | SERIES 2001-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 2,769,791.60 | $ 0.00 | $ 0.00 | $ 2,769,791.59 | $ 0.00 |
| D | Month End Invested Amount | | 835,506.83 | $ 0.00 | $ 0.00 | $ 835,506.82 | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 5.04875% | 5.62875% | 6.34875% | 11.09875% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 2.90% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 58.34% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)    Allocable Finance Charge Collections for such Distribution Date | | 70,311.59 | | | | |
| | (2)    Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)    Total Series 2000-1 Finance Charge Collections for such Distribution Date | | 70,311.59 | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)    Allocable Principal Collections for such Distribution Date | | 2,092,252.31 | | | | |
| | (2)    Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)    Total Series 2000-1 Principal Collections for such Distribution Date | | 2,092,252.31 | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | 66,239.40 | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 1,392.51 | | | | |

| V | SPREAD ACCOUNT | | Senior | Junior | Total |
|---|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | | 3% | 4% | 7% |
| B | Required Spread Account Amount | | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | | (0.00) | 7,838,379.93 | 7,838,379.93 |
| D | Spread Account Shortfall | | 21,000,000.00 | 20,161,620.07 | 41,161,620.07 |
| E | Interest earnings on the Spread Account | | - | 25,514.55 | 25,514.55 |
| F | Withdrawals from Spread Account on this Distribution Date | | - | (371,111.32) | (371,111.32) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | (0.00) | 7,492,783.16 | 7,492,783.16 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
  1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
  1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
  2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
  2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
  3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
  4.0% if the Quarterly Excess Spread Percentage is <2.0%
  provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
  the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2001-1 Allocable Finance Charge Collections for such
     Distribution Date                                                          70,311.59

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
     not distributed to the Servicer on a prior Distribution Date (unless such amount
     has been netted against deposits to the Collection Account)                (1,392.51)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
     not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
     Class A Additional Interest previously due but not distributed on a prior
     Distribution Date                                                          (0.00)

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
     not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
     Class B Additional Interest previously due but not distributed on a
     Distribution Date                                                          (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
     not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
     Class B Additional Interest previously due but not distributed on a prior
     Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
     Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
     Account will be drawn.                                                     (190,770.97)

(vi)  **Investor Default Amount,** if any, shall be treated as a portion of Available
     Principal Collections                                                      (66,239.40)

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
     **Principal Collections** not previously reimbursed shall be treated as a portion of
     Available Principal Collections                                            -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
     not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
     Class D Additional Interest previously due but not distributed on a prior
     Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
     Available Finance Charge Collections available after (i) through (vi), then the Spread
     Account will be drawn.                                                     (249,259.43)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| Distribution Date: | April 17, 2006 |
|---|---|
| LIBOR Determination Date: | March 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                    -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account              -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| | |
|---|---|
| Distribution Date: | April 17, 2006 |
| LIBOR Determination Date: | March 13, 2006 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (437,350.72) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 371,111.32 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B    Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 769,267.42 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 769,267.42 |
| B | Series 2001-1 Principal Shortfall | $ | 835,506.83 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended March 31, 2006**

| Distribution Date: | April 17, 2006 |
|---|---|
| LIBOR Determination Date: | March 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,444,771.13 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX Portfolio Yield**

A   Portfolio Yield for the current Monthly Period
    (i)   Current Portfolio Yield      **1.76%**     Includes draw from Reserve Account;
    (ii)  Portfolio Yield (prior month)    17.46%       should also include investment earnings
    (iii) Portfolio Yield (2 months prior)   9.76%
    (iv) 3 Month Average         5.56%

B   Base Rate for the current Monthly Period
    (i)   Current Base Rate        **191.24%**
    (ii)  Base Rate (prior month)      94.50%
    (iii) Base Rate (2 months prior)    67.92%
    (iv) 3 Month Average         112.25%

C   Excess Spread
    (i)   Current Excess Spread      **-189.48%**
    (ii)  Modified Excess Spread (prior month)  -77.04%
    (iii) Excess Spread (2 months prior)  -58.17%
    (iv) 3 Month Average         -106.70%

_____

Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 194,261.15 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 194,261.15 |
| | | | | |
| D | (1) | Interest | | 155,183.68 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 155,183.68 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 89,627,335.56 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 4,642,165.12 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 94,269,500.68 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 85,277,037.22 |
| | M | End of the Month Finance Charge Receivables: | | 4,422,918.23 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 89,699,955.45 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | | |
|---|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

| | | | | |
|---|---|---|---|---|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | 85,277,037.22 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | (0.00) | |
| | | Ending Transferor Interest | 85,277,037.21 | |
| | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 7,674,933.35 | |
| | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | | | | |
| | (d) | Transferor Percentage (for information only) | 100.0% | |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 4,289,756.58 | |
| (2) | Total Principal Collections | | 2,910,220.70 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,379,535.88 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.2% | |

**B. DELINQUENCIES AND LOSSES**
**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 287,792 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 629 | 0.2% |
| | 60-89 Days | 419 | 0.1% |
| | 90-119 Days | 384 | 0.1% |
| | 120-149 Days | 301 | 0.1% |
| | 150-179 Days | 315 | 0.1% |
| | 180-209 Days | 1 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 2,049 | 0.7% |
| (3) | Total Accounts | 289,841 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---|---|
| (1) | Current Balances | $ | 82,920,717.63 | 92.4% |
| (2) | End of month delinquencies: | | | |
| | 30-59 Days | | 1,897,500.62 | 2.1% |
| | 60-89 Days | | 1,391,780.43 | 1.6% |
| | 90-119 Days | | 1,280,287.50 | 1.4% |
| | 120-149 Days | | 1,075,979.45 | 1.2% |
| | 150-179 Days | | 1,129,443.89 | 1.3% |
| | 180-209 Days | | 4,245.93 | 0.0% |
| | Over 209 Days | | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | | 6,779,237.82 | 7.6% |
| (3) | Total Balances | $ | 89,699,955.45 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

| IV | SERIES 2000-1 INFORMATION | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | | 377,288.45 | (0.00) | 0.00 | 377,288.45 | 0.00 |
| D | Month End Invested Amount | | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 5.10125% | 5.70125% | 6.55125% | 11.40125% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (Average Investor %) | | 0.00% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 41.66% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1) Allocable Finance Charge Collections for such Distribution Date | | - | | | | |
| | (2) Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3) Total Series 2000-1 Finance Charge Collections for such Distribution Date | | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1) Allocable Principal Collections for such Distribution Date | | 1,212,379.57 | | | | |
| | (2) Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3) Total Series 2000-1 Principal Collections for such Distribution Date | | 1,212,379.57 | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 0.00 | | | | |
| V | SPREAD ACCOUNT | | | | | | |
| A | Required Spread Account Percentage (see Note: below) | | 7% | | | | |
| B | Required Spread Account Amount | | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | | 19,654,754.95 | | | | |
| D | Spread Account Shortfall | | 15,345,245.05 | | | | |
| E | Interest earnings on the Spread Account | | 64,409.95 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | | (349,444.83) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | 19,369,720.07 | | | | |

Note: the Spread Account Percentage is:
4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
7.0% if the Quarterly Excess Spread Percentage is <2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                          -

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                            (0.00)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                      0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                    (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                          (194,261.15)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                                                -          see (x) below

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                                  -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                                          (155,183.68)

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                  -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

(xi)   amounts required to be deposited in the **Spread Account**                                            -

(xii)   any other amounts the Trust may be liable for not referred to above                              -

(xiii)  any balance will be Excess Finance Charge Collections and will be available for
        allocation to other Series in Group One or to the Holders of Transferor
        Certificates                                                                                         (349,444.83)

(xiv)  Withdrawal from Spread Account to cover Class D Monthly Interest                     349,444.83
(xv)   Investor Default Amount to be released on distribution                                         (0.00)


**Available Principal Collections shall be treated as Shared Principal Collections**
**and applied in accordance with Section 8.05 of the Indenture**                          N/A

**C   Distribution of Available Principal Collections - during the Controlled**
**Accumulation Period or the Early Amortization Period:**

(i)    during the **Controlled Accumulation Period**, Monthly Principal shall be deposited
       in the **Principal Funding Account**                                                            N/A

(ii)   during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders**
       until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults)    $             -

       Funds in the Special Funding Account to be used to pay Class A Note Principal Balance          $             -

(iii)  after (ii) during the **Early Amortization Period**, any remaining Monthly Principal
       shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has
       been paid in full                                                                             $             -

       Class B Special Funding Principal Balance Allocation                                          $             -

(iv)   after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly
       Principal shall be paid to **Class C Noteholders** until the Class C Note Principal
       Balance has been paid in full                                                                 $         (0.00)

       Class C Special Funding Principal Balance Allocation                                          $             -

(v)    after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly
       Principal shall be paid to **Class D Noteholders** until the Class D Note
       Principal Balance has been paid in full                                                       $             -

       Class D Special Funding Principal Balance Allocation                                          $             -

(vi)   for either period, after (i) through (v), the balance of Available Principal Collections
       remaining shall be treated as Shared Principal Collections and applied in accordance
       with Section 8.05 of the Indenture                                                            $             -

**VII  PRINCIPAL COLLECTIONS**

A   Monthly Principal (Includes Investor Defaults)                                                    $         (0.00)
B   Series 2000-1 Principal Shortfall                                                                 $          0.00

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

C   Shared Principal Collections allocable from other principal sharing series            $                -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
|---|---|
| LIBOR Determination Date: | April 12, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

|   |   |   |   |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) |   | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 1.76% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 17.46% | |
| (iv) | 3 Month Average | 6.41% | |

B  Base Rate for the current Monthly Period
| | | |
|---|---|---|
| (i) | Current Base Rate | **1111.44%** |
| (ii) | Base Rate (prior month) | 277.80% |
| (iii) | Base Rate (2 months prior) | 129.29% |
| (iv) | 3 Month Average | 506.18% |

C  Excess Spread
| | | |
|---|---|---|
| (i) | Current Excess Spread | **-1111.44%** |
| (ii) | Excess Spread (prior month) | -276.03% |
| (iii) | Excess Spread (2 months prior) | -111.83% |
| (iv) | 3 Month Average | -499.77% |

---

Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I   SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | 0.00 |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 161,864.56 |
| | (2) | Principal | | 0.00 |
| | (3) | Total Distribution for Class C Notes | | 161,864.57 |
| | | | | |
| D | (1) | Interest | | 214,398.82 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 214,398.82 |

**II   RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 89,627,335.56 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 4,642,165.12 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 94,269,500.68 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 85,277,037.22 |
| M | End of the Month Finance Charge Receivables: | | 4,422,918.23 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 89,699,955.45 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

P (a) Transferor Interest

| | |
|---|---|
| + Principal Receivables | 85,277,037.22 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | 0.01 |
| Ending Transferor Interest | 85,277,037.21 |

(b) Required Transferor Interest (9% x Principal Receivables)    7,674,933.35

(c) (Shortfall) if applicable in Transferor Interest    N/A
   - principal collections will be trapped in the SFA until shortfall eliminated

(d) Transferor Percentage (for information only)    100.0%

(e) Transferor Allocations/Distributions

| | |
|---|---|
| Transferor share of Finance Charge Collections | 1,943,180.73 |
| Interest earned on the Collections Account | 15,273.44 |
| Transferor share of Principal Collections | 2,910,220.71 |
| Transferor allocated Servicing Fees | (149,378.87) |
| Net cash distributable to the Transferor on the Distribution Date | 4,719,296.01 |

**III PERFORMANCE SUMMARY**

**A COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 4,289,756.58 |
| (2) | Total Principal Collections | | 2,910,220.70 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,379,535.88 |
| (4) | Principal Payment Rate | | 3.2% |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 287,792 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 629 | 0.2% |
| | 60-89 Days | 419 | 0.1% |
| | 90-119 Days | 384 | 0.1% |
| | 120-149 Days | 301 | 0.1% |
| | 150-179 Days | 315 | 0.1% |
| | 180-209 Days | 1 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 2,049 | 0.7% |
| (3) | Total Accounts | 289,841 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 82,920,717.63 | 92.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,897,500.62 | 2.1% |
| | 60-89 Days | 1,391,780.43 | 1.6% |
| | 90-119 Days | 1,280,287.50 | 1.4% |
| | 120-149 Days | 1,075,979.45 | 1.2% |
| | 150-179 Days | 1,129,443.89 | 1.3% |
| | 180-209 Days | 4,245.93 | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
| --- | --- |
| LIBOR Determination Date: | April 12, 2006 |

|  | | | |
| --- | --- | --- | --- |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,779,237.82 | 7.6% |
| (3) | Total Balances | $ 89,699,955.45 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

**IV   SERIES 2001-1 INFORMATION**

| | | Series Total | | Class A | | Class B | | Class C | | Class D |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 835,506.83 | $ | 0.00 | $ | 0.00 | $ | 835,506.82 | $ | 0.00 |
| D | Month End Invested Amount | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | | 5.20125% | | 5.78125% | | 6.50125% | | 11.25125% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 0.00% | | | | | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 58.34% | | | | | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | | 1,697,841.13 | | | | | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | | - | | | | | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | | 1,697,841.13 | | | | | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | - | | | | | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 0.00 | | | | | | | | |

**V   SPREAD ACCOUNT**

| | | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 7,492,783.16 | 7,492,783.16 |
| D | Spread Account Shortfall | 21,000,000.00 | 20,507,216.84 | 41,507,216.84 |
| E | Interest earnings on the Spread Account | - | 24,958.78 | 24,958.78 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (376,263.38) | (376,263.38) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 7,141,478.56 | 7,141,478.56 |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
|---|---|
| LIBOR Determination Date: | April 12, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
4.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

    **A  Distribution of Available Finance Charge Collections:**

      (i)   Series 2001-1 Allocable Finance Charge Collections for such         -
            Distribution Date

      (ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
            not distributed to the Servicer on a prior Distribution Date (unless such amount
            has been netted against deposits to the Collection Account)         (0.00)

      (iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
            Class A Additional Interest previously due but not distributed on a prior
            Distribution Date         (0.00)

      (iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
            Class B Additional Interest previously due but not distributed on a prior
            Distribution Date         (0.00)

      (v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
            Class B Additional Interest previously due but not distributed on a prior
            Distribution Date, *provided, however* , that if the Class C Monthly Interest exceeds
            Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
            Account will be drawn.         (161,864.56)

      (vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
            Principal Collections         -

      (vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
            **Principal Collections** not previously reimbursed shall be treated as a portion of
            Available Principal Collections         -

      (viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
            not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
            Class D Additional Interest previously due but not distributed on a prior
            Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
            Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

Account will be drawn.                                    (214,398.82)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                    -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account            -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| Distribution Date: | May 15, 2006 |
|---|---|
| LIBOR Determination Date: | April 12, 2006 |

| | | |
|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (376,263.38) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | 376,263.38 |
| (xv) | Investor Default Amount to be released on distribution | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | - |

**B  Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | N/A | |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 0.00 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | 0.00 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended April 30, 2006**

| | |
|---|---|
| Distribution Date: | May 15, 2006 |
| LIBOR Determination Date: | April 12, 2006 |

| | | | |
|---|---|---|---|
| B | Series 2001-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
|  |  |  |  |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 1.76% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 17.46% | |
| (iv) | 3 Month Average | 6.41% | |

B  Base Rate for the current Monthly Period
|  |  |  |
|---|---|---|
| (i) | Current Base Rate | **540.41%** |
| (ii) | Base Rate (prior month) | 191.24% |
| (iii) | Base Rate (2 months prior) | 94.50% |
| (iv) | 3 Month Average | 275.38% |

C  Excess Spread
|  |  |  |
|---|---|---|
| (i) | Current Excess Spread | **-540.41%** |
| (ii) | Modified Excess Spread (prior month) | -189.48% |
| (iii) | Excess Spread (2 months prior) | -77.04% |
| (iv) | 3 Month Average | -268.98% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| Distribution Date: | June 15, 2006 |
|---|---|
| LIBOR Determination Date: | May 11, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 220,963.82 |
| | (2) | Principal | | 0.00 |
| | (3) | Total Distribution for Class C Notes | | 220,963.82 |
| | | | | |
| D | (1) | Interest | | 174,513.66 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 174,513.66 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 85,277,037.22 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 4,422,918.23 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 89,699,955.45 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 81,253,231.02 |
| | M | End of the Month Finance Charge Receivables: | | 4,213,859.67 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 85,467,090.69 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

| | | | |
|---|---|---|---|
| P | (a) | Transferor Interest | |
| | | + Principal Receivables | 81,253,231.02 |
| | | + Special Funding Account (SFA) | - |
| | | - Aggregate Invested Amounts in the trust | (0.00) |
| | | Ending Transferor Interest | 81,253,231.01 |
| | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 7,312,790.79 |
| | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | |
| | | | |
| | (d) | Transferor Percentage (for information only) | 100.0% |

**III PERFORMANCE SUMMARY**
**A COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 4,767,254.91 |
| (2) | Total Principal Collections | | 3,398,239.19 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,369,015.72 |
| | | | |
| (4) | Principal Payment Rate | | 4.0% |

**B. DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 281,316 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 663 | 0.2% |
| | 60-89 Days | 399 | 0.1% |
| | 90-119 Days | 326 | 0.1% |
| | 120-149 Days | 333 | 0.1% |
| | 150-179 Days | 265 | 0.1% |
| | 180-209 Days | 1 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,987 | 0.7% |
| (3) | Total Accounts | 283,303 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 78,871,061.01 | 92.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,043,577.46 | 2.4% |
| | 60-89 Days | 1,269,529.62 | 1.5% |
| | 90-119 Days | 1,168,664.33 | 1.4% |
| | 120-149 Days | 1,142,642.64 | 1.3% |
| | 150-179 Days | 964,664.55 | 1.1% |
| | 180-209 Days | 6,951.08 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,596,029.68 | 7.7% |
| (3) | Total Balances | $ 85,467,090.69 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

**IV SERIES 2000-1 INFORMATION**

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| D | Month End Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.28063% | 5.88063% | 6.73063% | 11.58063% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (Average Investor %) | 0.00% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1) Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| | (2) Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3) Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1) Allocable Principal Collections for such Distribution Date | - | | | | |
| | (2) Shared Principal Collections for such Distribution Date | - | | | | |
| | (3) Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | |

**V SPREAD ACCOUNT**

| | | |
|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 7% |
| B | Required Spread Account Amount | 35,000,000.00 |
| C | Amount on Deposit in the Spread Account | 19,369,720.07 |
| D | Spread Account Shortfall | 15,630,279.93 |
| E | Interest earnings on the Spread Account | 67,506.83 |
| F | Withdrawals from Spread Account on this Distribution Date | (387,297.61) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 19,049,929.29 |

Note: the Spread Account Percentage is:
4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
7.0% if the Quarterly Excess Spread Percentage is <2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                           -

(ia)  Series 2000-1 Allocable Finance Charge Collections for prior
Distribution Date                                                                                    8,179.87

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                          (0.00)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                    0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                    (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however* , that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                          (220,963.82)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                                                    -        see (x) below

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                                     -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                                          (174,513.66)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
        the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
        Balance shall be treated as a portion of Available Principal Collections                          -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
        terminates, an amount up to the excess, if any, of the Required Reserve Account
        over the Available Reserve Account shall be deposited in the Reserve Account                   -

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (387,297.61) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 387,297.61 |
| (xv) | Investor Default Amount to be released on distribution | 0.00 |

**Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture**          N/A

**C   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | 0.00 |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII   PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | 0.00 |
| B | Series 2000-1 Principal Shortfall | $ | 0.00 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

C   Shared Principal Collections allocable from other principal sharing series          $                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

**VIII  INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period

| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 1.76% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 17.46% | |
| (iv) | 3 Month Average | 6.41% | |

B  Base Rate for the current Monthly Period

| | | |
|---|---|---|
| (i) | Current Base Rate | **113399603434.42%** |
| (ii) | Base Rate (prior month) | 277.80% |
| (iii) | Base Rate (2 months prior) | 129.29% |
| (iv) | 3 Month Average | 37799867947.17% |

C  Excess Spread

| | | |
|---|---|---|
| (i) | Current Excess Spread | **-113399603434.42%** |
| (ii) | Excess Spread (prior month) | -276.03% |
| (iii) | Excess Spread (2 months prior) | -111.83% |
| (iv) | 3 Month Average | -37799867940.76% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| Distribution Date: | June 15, 2006 |
|---|---|
| LIBOR Determination Date: | May 11, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---|
| A | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | 0.00 |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 184,151.81 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 184,151.81 |
| | | | | |
| D | (1) | Interest | | 241,154.54 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 241,154.54 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---|
| A | Beginning of the Period Principal Receivables: | $ | 85,277,037.22 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 4,422,918.23 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 89,699,955.45 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 81,253,231.02 |
| M | End of the Month Finance Charge Receivables: | | 4,213,859.67 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 85,467,090.69 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

P  (a)  Transferor Interest

| | | |
|---|---|---:|
| | + Principal Receivables | 81,253,231.02 |
| | + Special Funding Account (SFA) | - |
| | - Aggregate Invested Amounts in the trust | 0.01 |
| | Ending Transferor Interest | 81,253,231.01 |

(b)  Required Transferor Interest (9% x Principal Receivables)     7,312,790.79

(c)  (Shortfall) if applicable in Transferor Interest     N/A
     - principal collections will be trapped in the SFA until shortfall eliminated

(d)  Transferor Percentage (for information only)     100.0%

(e)  Transferor Allocations/Distributions

| | |
|---|---:|
| Transferor share of Finance Charge Collections | 1,949,144.33 |
| Interest earned on the Collections Account | 16,454.59 |
| Transferor share of Principal Collections | 3,398,239.20 |
| Transferor allocated Servicing Fees | (142,128.37) |
| Net cash distributable to the Transferor on the Distribution Date | 5,221,709.75 |

III  **PERFORMANCE SUMMARY**
A  **COLLECTIONS**

| | | | |
|---|---|---|---:|
| (1) | Total Collections | $ | 4,767,254.91 |
| (2) | Total Principal Collections | | 3,398,239.19 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,369,015.72 |
| (4) | Principal Payment Rate | | 4.0% |

B.  **DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---:|---:|
| (1) | Current Accounts | 281,316 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 663 | 0.2% |
| | 60-89 Days | 399 | 0.1% |
| | 90-119 Days | 326 | 0.1% |
| | 120-149 Days | 333 | 0.1% |
| | 150-179 Days | 265 | 0.1% |
| | 180-209 Days | 1 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,987 | 0.7% |
| (3) | Total Accounts | 283,303 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---:|---:|
| (1) | Current Balances | $ 78,871,061.01 | 92.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 2,043,577.46 | 2.4% |
| | 60-89 Days | 1,269,529.62 | 1.5% |
| | 90-119 Days | 1,168,664.33 | 1.4% |
| | 120-149 Days | 1,142,642.64 | 1.3% |
| | 150-179 Days | 964,664.55 | 1.1% |
| | 180-209 Days | 6,951.08 | 0.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

| | | | |
|---|---|---|---|
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,596,029.68 | 7.7% |
| (3) | Total Balances | $ 85,467,090.69 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | | |
|---|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

### IV  SERIES 2001-1 INFORMATION

| | | Series Total | | Class A | | Class B | | Class C | | Class D |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| D | Month End Invested Amount | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 5.38063% | | 5.96063% | | 6.68063% | | 11.43063% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (Average Investor %) | 0.00% | | | | | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | | | | |
| | (1)  Allocable Finance Charge Collections for such Distribution Date | - | | | | | | | | |
| | (2)  Shared Finance Charge Collections for such Distribution Date | - | | | | | | | | |
| | (3)  Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | | | | |
| | (1)  Allocable Principal Collections for such Distribution Date | - | | | | | | | | |
| | (2)  Shared Principal Collections for such Distribution Date | - | | | | | | | | |
| | (3)  Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | - | | | | | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | | | | | |

### V  SPREAD ACCOUNT

| | | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 7,141,478.56 | 7,141,478.56 |
| D | Spread Account Shortfall | 21,000,000.00 | 20,858,521.44 | 41,858,521.44 |
| E | Interest earnings on the Spread Account | - | 25,297.99 | 25,297.99 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (407,192.00) | (407,192.00) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 6,759,584.55 | 6,759,584.54 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
  1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
  1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
  2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
  2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
  3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
  4.0% if the Quarterly Excess Spread Percentage is <2.0%
  provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
  the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)   Series 2001-1 Allocable Finance Charge Collections for such                -
      Distribution Date

(ia)  Series 2001-1 Allocable Finance Charge Collections for prior          18,114.35
      Distribution Date

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
      not distributed to the Servicer on a prior Distribution Date (unless such amount
      has been netted against deposits to the Collection Account)              (0.00)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
      Class A Additional Interest previously due but not distributed on a prior
      Distribution Date                                                       (0.00)

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date                                                       (0.00)

(v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
      Class B Additional Interest previously due but not distributed on a prior
      Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
      Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
      Account will be drawn.                                              (184,151.81)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available       -
      Principal Collections

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
      **Principal Collections** not previously reimbursed shall be treated as a portion of
      Available Principal Collections                                             -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus* Class D Additional Interest previously due but not distributed on a prior Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds Available Finance Charge Collections available after (i) through (vi), then the Spread Account will be drawn.                                                                 (241,154.54)

(ix) upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections                    -

(x) after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

(xi)   amounts required to be deposited in the **Spread Account**        -

(xii)  any other amounts the Trust may be liable for not referred to above        -

(xiii) any balance will be Excess Finance Charge Collections and will be available for
allocation to other Series in Group One or to the Holders of Transferor
Certificates        (407,192.00)

(xiv) Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii)        -
       Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii)        407,192.00
(xv)  Investor Default Amount to be released on distribution        (0.00)
(xvi) Net Excess Spread due back to Nextbank        -

**B   Distribution of Available Principal Collections - during the Controlled**
**Accumulation Period or the Early Amortization Period:**

(i)    during the **Controlled Accumulation Period**, Monthly Principal shall be deposited
in the **Principal Funding Account**        N/A

(ii)   during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders**
until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults)        $        -

       Funds in the Special Funding Account to be used to pay Class A Note Principal Balance        $        -

(iii)  after (ii) during the **Early Amortization Period**, any remaining Monthly Principal
shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has
been paid in full        $        -

       Class B Special Funding Principal Balance Allocation        $        -

(iv)   after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly
Principal shall be paid to **Class C Noteholders** until the Class C Note Principal
Balance has been paid in full        $        (0.00)

       Class C Special Funding Principal Balance Allocation        $        -

(v)    after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly
Principal shall be paid to **Class D Noteholders** until the Class D Note
Principal Balance has been paid in full        $        -

       Class D Special Funding Principal Balance Allocation        $        -

(vi)   for either period, after (i) through (v), the balance of Available Principal Collections
remaining shall be treated as Shared Principal Collections and applied in accordance
with Section 8.05 of the Indenture        $        -

**VII  PRINCIPAL COLLECTIONS**

A   Monthly Principal (Includes Investor Defaults)        $        (0.00)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | | |
|---|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

| | | | |
|---|---|---|---|
| B | Series 2001-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended May 31, 2006**

| | |
|---|---|
| Distribution Date: | June 15, 2006 |
| LIBOR Determination Date: | May 11, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 1.76% | |
| (iv) | 3 Month Average | 0.59% | |

B  Base Rate for the current Monthly Period
| | | |
|---|---|---|
| (i) | Current Base Rate | **137058758887.84%** |
| (ii) | Base Rate (prior month) | 1111.44% |
| (iii) | Base Rate (2 months prior) | 277.80% |
| (iv) | 3 Month Average | 45686253425.69% |

C  Excess Spread
| | | |
|---|---|---|
| (i) | Current Excess Spread | **-137058758887.84%** |
| (ii) | Modified Excess Spread (prior month) | -1111.44% |
| (iii) | Excess Spread (2 months prior) | -276.03% |
| (iv) | 3 Month Average | -45686253425.10% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 232,094.61 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 232,094.61 |
| | | | | |
| D | (1) | Interest | | 181,980.56 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 181,980.56 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 81,253,231.02 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 4,213,859.67 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 85,467,090.69 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 77,717,443.87 |
| | M | End of the Month Finance Charge Receivables: | | 4,172,029.95 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 81,889,473.82 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| Distribution Date: | July 17, 2006 |
|---|---|
| LIBOR Determination Date: | June 13, 2006 |

| | | | | |
|---|---|---|---|---|
| P | (a) | Transferor Interest | | |
| | | + Principal Receivables | 77,717,443.87 | |
| | | + Special Funding Account (SFA) | - | |
| | | - Aggregate Invested Amounts in the trust | (0.00) | |
| | | Ending Transferor Interest | 77,717,443.87 | |
| | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 6,994,569.95 | |
| | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | |
| | | | | |
| | (d) | Transferor Percentage (for information only) | 100.0% | |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 4,155,051.42 | |
| (2) | Total Principal Collections | | 2,872,760.66 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,282,290.76 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.5% | |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 281,151 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 585 | 0.2% |
| | 60-89 Days | 408 | 0.1% |
| | 90-119 Days | 315 | 0.1% |
| | 120-149 Days | 292 | 0.1% |
| | 150-179 Days | 304 | 0.1% |
| | 180-209 Days | 1 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,905 | 0.7% |
| (3) | Total Accounts | 283,056 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 75,613,995.29 | 92.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,751,686.55 | 2.1% |
| | 60-89 Days | 1,308,009.67 | 1.6% |
| | 90-119 Days | 1,085,550.49 | 1.3% |
| | 120-149 Days | 1,059,875.18 | 1.3% |
| | 150-179 Days | 1,067,419.07 | 1.3% |
| | 180-209 Days | 2,937.57 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,275,478.53 | 7.7% |
| (3) | Total Balances | $ 81,889,473.82 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| Distribution Date: | July 17, 2006 |
|---|---|
| LIBOR Determination Date: | June 13, 2006 |

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| **IV** | **SERIES 2000-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| D | Month End Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.39875% | 5.99875% | 6.84875% | 11.69875% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 0.00% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)    Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| | (2)    Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)    Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)    Allocable Principal Collections for such Distribution Date | - | | | | |
| | (2)    Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)    Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | |
| **V** | **SPREAD ACCOUNT** | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 19,049,929.29 | | | | |
| D | Spread Account Shortfall | 15,950,070.71 | | | | |
| E | Interest earnings on the Spread Account | 65,994.35 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (414,075.16) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 18,701,848.48 | | | | |

Note: the Spread Account Percentage is:
    4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
    5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
    6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
    7.0% if the Quarterly Excess Spread Percentage is <2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)   Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                               -

(ia)  Series 2000-1 Allocable Finance Charge Collections for prior
Distribution Date                                                                                               -

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                       (0.00)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                        0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                        (0.00)

(v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a
Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                             (232,094.61)

(vi)  **Investor Default Amount,** if any, shall be treated as a portion of Available
Principal Collections                                                                                   -        see (x) below

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                                   -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                                            (181,980.56)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                      -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account          -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (414,075.16) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 414,075.16 |
| (xv) | Investor Default Amount to be released on distribution | (0.00) |

|  | | |
|---|---|---|
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | N/A |

**C   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2000-1 Principal Shortfall | $ | 0.00 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

C   Shared Principal Collections allocable from other principal sharing series                     $                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i)   Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| | (ii)  Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| | (iii) Portfolio Yield (2 months prior) | 0.00% | |
| | (iv)  3 Month Average | 0.00% | |
| | | | |
| B | Base Rate for the current Monthly Period | | |
| | (i)   Current Base Rate | **118732321353.59%** | |
| | (ii)  Base Rate (prior month) | 113399603434.42% | |
| | (iii) Base Rate (2 months prior) | 1111.44% | |
| | (iv)  3 Month Average | 77377308633.15% | |
| | | | |
| C | Excess Spread | | |
| | (i)   Current Excess Spread | **-118732321353.59%** | |
| | (ii)  Excess Spread (prior month) | -113399603434.42% | |
| | (iii) Excess Spread (2 months prior) | -1111.44% | |
| | (iv)  3 Month Average | -77377308633.15% | |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextBank Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month. The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 193,453.21 |
| | (2) | Principal | (0.00) |
| | (3) | Total Distribution for Class C Notes | 193,453.21 |
| | | | |
| D | (1) | Interest | 251,506.11 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 251,506.11 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 81,253,231.02 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 4,213,859.67 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 85,467,090.69 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 77,717,443.87 |
| M | End of the Month Finance Charge Receivables: | | 4,172,029.95 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 81,889,473.82 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| Distribution Date: | July 17, 2006 |
|---|---|
| LIBOR Determination Date: | June 13, 2006 |

P (a) Transferor Interest

| | |
|---|---|
| + Principal Receivables | 77,717,443.87 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | (0.00) |
| Ending Transferor Interest | 77,717,443.87 |

(b) Required Transferor Interest (9% x Principal Receivables)    6,994,569.95

(c) (Shortfall) if applicable in Transferor Interest    N/A
    - principal collections will be trapped in the SFA until shortfall eliminated

(d) Transferor Percentage (for information only)    100.0%

(e) Transferor Allocations/Distributions

| | |
|---|---|
| Transferor share of Finance Charge Collections | 1,831,780.75 |
| Interest earned on the Collections Account | 15,192.77 |
| Transferor share of Principal Collections | 2,872,760.67 |
| Transferor allocated Servicing Fees | (135,422.03) |
| Net cash distributable to the Transferor on the Distribution Date | 4,584,312.16 |

**III  PERFORMANCE SUMMARY**

**A  COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 4,155,051.42 |
| (2) | Total Principal Collections | | 2,872,760.66 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,282,290.76 |
| (4) | Principal Payment Rate | | 3.5% |

**B.  DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 281,151 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 585 | 0.2% |
| | 60-89 Days | 408 | 0.1% |
| | 90-119 Days | 315 | 0.1% |
| | 120-149 Days | 292 | 0.1% |
| | 150-179 Days | 304 | 0.1% |
| | 180-209 Days | 1 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,905 | 0.7% |
| (3) | Total Accounts | 283,056 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 75,613,995.29 | 92.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,751,686.55 | 2.1% |
| | 60-89 Days | 1,308,009.67 | 1.6% |
| | 90-119 Days | 1,085,550.49 | 1.3% |
| | 120-149 Days | 1,059,875.18 | 1.3% |
| | 150-179 Days | 1,067,419.07 | 1.3% |
| | 180-209 Days | 2,937.57 | 0.0% |
| | Over 209 Days | | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,275,478.53 | 7.7% |
| (3) | Total Balances | $ 81,889,473.82 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| Distribution Date: | July 17, 2006 |
|---|---|
| LIBOR Determination Date: | June 13, 2006 |

| IV | SERIES 2001-1 INFORMATION | | Series Total | | Class A | | Class B | | Class C | | Class D |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Note Principal Balance | $ | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| D | Month End Invested Amount | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | | 5.49875% | | 6.07875% | | 6.79875% | | 11.54875% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 0.00% | | | | | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 0.00% | | | | | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | | | | | |
| | (1)  Allocable Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (2)  Shared Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (3)  Total Series 2000-1 Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | | | | | |
| | (1)  Allocable Principal Collections for such Distribution Date | | - | | | | | | | | |
| | (2)  Shared Principal Collections for such Distribution Date | | - | | | | | | | | |
| | (3)  Total Series 2000-1 Principal Collections for such Distribution Date | | - | | | | | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | - | | | | | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 0.00 | | | | | | | | |

| V | SPREAD ACCOUNT | Senior | Junior | Total |
|---|---|---|---|---|
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 6,759,584.55 | 6,759,584.55 |
| D | Spread Account Shortfall | 21,000,000.00 | 21,240,415.45 | 42,240,415.45 |
| E | Interest earnings on the Spread Account | - | 23,850.31 | 23,850.31 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (444,959.32) | (444,959.32) |
| G | Amount on Deposit in the Spread Account after Withdrawals on this Distribution Date | (0.00) | 6,338,475.54 | 6,338,475.54 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
  1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
  1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
  2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
  2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
  3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
  4.0% if the Quarterly Excess Spread Percentage is <2.0%
  provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
  the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2001-1 Allocable Finance Charge Collections for such
     Distribution Date                                                                              -

(ia) Series 2001-1 Allocable Finance Charge Collections for prior
     Distribution Date                                                                              -

(ii) **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
     not distributed to the Servicer on a prior Distribution Date (unless such amount
     has been netted against deposits to the Collection Account)                          (0.00)

(iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
      not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
      Class A Additional Interest previously due but not distributed on a prior
      Distribution Date                                                                            (0.00)

(iv) **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
     not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
     Class B Additional Interest previously due but not distributed on a prior
     Distribution Date                                                                             (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
     not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
     Class B Additional Interest previously due but not distributed on a prior
     Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
     Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
     Account will be drawn.                                                                  (193,453.21)

(vi) **Investor Default Amount**, if any, shall be treated as a portion of Available
     Principal Collections                                                                          -

(vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
      **Principal Collections** not previously reimbursed shall be treated as a portion of
      Available Principal Collections                                                              -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
       not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
       Class D Additional Interest previously due but not distributed on a prior
       Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
       Available Finance Charge Collections available after (i) through (vi), then the Spread
       Account will be drawn.                                                               (251,506.11)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| | |
|---|---|
| Distribution Date: | July 17, 2006 |
| LIBOR Determination Date: | June 13, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                    -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account          -

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended June 30, 2006

| | | |
|---|---|---|
| Distribution Date: | | July 17, 2006 |
| LIBOR Determination Date: | | June 13, 2006 |

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (444,959.32) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | 444,959.32 |
| (xv) | Investor Default Amount to be released on distribution | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | - |

**B   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | N/A | |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2001-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---:|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended June 30, 2006**

| Distribution Date: | July 17, 2006 |
|---|---|
| LIBOR Determination Date: | June 13, 2006 |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
   (i)   Current Portfolio Yield           **0.00%**        Includes draw from Reserve Account;
   (ii)  Portfolio Yield (prior month)       0.00%          should also include investment earnings
   (iii) Portfolio Yield (2 months prior)   0.00%
   (iv) 3 Month Average              0.00%

B  Base Rate for the current Monthly Period
   (i)   Current Base Rate          **143392101743.62%**
   (ii)  Base Rate (prior month)     137058758887.84%
   (iii) Base Rate (2 months prior)   540.41%
   (iv) 3 Month Average            93483620390.62%

C  Excess Spread
   (i)   Current Excess Spread      **-143392101743.62%**
   (ii)  Modified Excess Spread (prior month)   -137058758887.84%
   (iii) Excess Spread (2 months prior)   -540.41%
   (iv) 3 Month Average            -93483620390.62%

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 215,556.70 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 215,556.70 |
| | | | | |
| D | (1) | Interest | | 167,316.41 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 167,316.41 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---|
| * | A | Beginning of the Period Principal Receivables: | $ | 77,717,443.87 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 4,172,029.95 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 81,889,473.82 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 74,484,524.84 |
| | M | End of the Month Finance Charge Receivables: | | 4,091,986.97 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 78,576,511.81 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

| | | | |
|---|---|---|---|
| P | (a) | Transferor Interest | |
| | | + Principal Receivables | 74,484,524.84 |
| | | + Special Funding Account (SFA) | - |
| | | - Aggregate Invested Amounts in the trust | (0.00) |
| | | Ending Transferor Interest | 74,484,524.84 |
| | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 6,703,607.24 |
| | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | |
| | | | |
| | (d) | Transferor Percentage (for information only) | 100.0% |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 3,579,054.16 |
| (2) | Total Principal Collections | | 2,329,114.73 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,249,939.43 |
| | | | |
| (4) | Principal Payment Rate | | 3.0% |

**B. DELINQUENCIES AND LOSSES**
**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 280,936 | 99.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 601 | 0.2% |
| | 60-89 Days | 361 | 0.1% |
| | 90-119 Days | 331 | 0.1% |
| | 120-149 Days | 287 | 0.1% |
| | 150-179 Days | 256 | 0.1% |
| | 180-209 Days | 2 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,838 | 0.6% |
| (3) | Total Accounts | 282,774 | 100.0% |

**OUTSTANDING BALANCES**

| | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 72,482,855.36 | 92.2% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,845,654.94 | 2.3% |
| | 60-89 Days | 1,174,246.68 | 1.5% |
| | 90-119 Days | 1,067,676.88 | 1.4% |
| | 120-149 Days | 1,013,358.35 | 1.3% |
| | 150-179 Days | 987,982.52 | 1.3% |
| | 180-209 Days | 4,737.08 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,093,656.45 | 7.8% |
| (3) | Total Balances | $ 78,576,511.81 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| IV | **SERIES 2000-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| D | Month End Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.56875% | 6.16875% | 7.01875% | 11.86875% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 0.00% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | - | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | |
| V | **SPREAD ACCOUNT** | | | | | |
| A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| B | Required Spread Account Amount | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | 18,701,848.48 | | | | |
| D | Spread Account Shortfall | 16,298,151.52 | | | | |
| E | Interest earnings on the Spread Account | 70,562.40 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | (382,873.11) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 18,389,537.77 | | | | |

Note: the Spread Account Percentage is:
4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
7.0% if the Quarterly Excess Spread Percentage is <2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)  Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                                   -

(ia)  Series 2000-1 Allocable Finance Charge Collections for prior
Distribution Date                                                                                                   -

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                                   (0.00)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                                   0.00

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                                   (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                                        (215,556.70)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                                                          -        see (x) below

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                                          -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.                                                                                        (167,316.41)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections     -

(x)  after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account     -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| Distribution Date: | August 15, 2006 |
|---|---|
| LIBOR Determination Date: | July 13, 2006 |

| | | | |
|---|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (382,873.11) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | | 382,873.11 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |

**Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture**    N/A

**C** **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2000-1 Principal Shortfall | $ | 0.00 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | Distribution Date: | August 15, 2006 |
| --- | --- | --- |
| | LIBOR Determination Date: | July 13, 2006 |

C   Shared Principal Collections allocable from other principal sharing series          $                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| Distribution Date: | August 15, 2006 |
|---|---|
| LIBOR Determination Date: | July 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i)   Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| | (ii)  Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| | (iii) Portfolio Yield (2 months prior) | 0.00% | |
| | (iv) 3 Month Average | 0.00% | |

| | | |
|---|---|---|
| B | Base Rate for the current Monthly Period | |
| | (i)   Current Base Rate | **109785413270.15%** |
| | (ii)  Base Rate (prior month) | 118732321353.59% |
| | (iii) Base Rate (2 months prior) | 113399603434.42% |
| | (iv) 3 Month Average | 113972446019.39% |

| | | |
|---|---|---|
| C | Excess Spread | |
| | (i)   Current Excess Spread | **-109785413270.15%** |
| | (ii)  Excess Spread (prior month) | -118732321353.59% |
| | (iii) Excess Spread (2 months prior) | -113399603434.42% |
| | (iv) 3 Month Average | -113972446019.39% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I     SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---|
| A | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | 0.00 |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 179,700.70 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 179,700.70 |
| | | | | |
| D | (1) | Interest | | 231,282.55 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 231,282.55 |

**II     RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---|
| A | Beginning of the Period Principal Receivables: | $ | 77,717,443.87 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 4,172,029.95 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 81,889,473.82 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 74,484,524.84 |
| M | End of the Month Finance Charge Receivables: | | 4,091,986.97 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 78,576,511.81 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended July 31, 2006

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

P  (a)  Transferor Interest

| | | |
|---|---|---:|
| | + Principal Receivables | 74,484,524.84 |
| | + Special Funding Account (SFA) | - |
| | - Aggregate Invested Amounts in the trust | (0.00) |
| | Ending Transferor Interest | 74,484,524.84 |
| (b) | Required Transferor Interest (9% x Principal Receivables) | 6,703,607.24 |
| (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | - principal collections will be trapped in the SFA until shortfall eliminated | |
| (d) | Transferor Percentage (for information only) | 100.0% |
| (e) | Transferor Allocations/Distributions | |
| | Transferor share of Finance Charge Collections | 1,833,555.94 |
| | Interest earned on the Collections Account | 14,721.56 |
| | Transferor share of Principal Collections | 2,329,114.73 |
| | Transferor allocated Servicing Fees | (129,529.05) |
| | Net cash distributable to the Transferor on the Distribution Date | 4,047,863.18 |

III  PERFORMANCE SUMMARY
  A  COLLECTIONS

| | | | |
|---|---|---|---:|
| (1) | Total Collections | $ | 3,579,054.16 |
| (2) | Total Principal Collections | | 2,329,114.73 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,249,939.43 |
| (4) | Principal Payment Rate | | 3.0% |

  B. DELINQUENCIES AND LOSSES

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---:|---:|
| (1) | Current Accounts | 280,936 | 99.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 601 | 0.2% |
| | 60-89 Days | 361 | 0.1% |
| | 90-119 Days | 331 | 0.1% |
| | 120-149 Days | 287 | 0.1% |
| | 150-179 Days | 256 | 0.1% |
| | 180-209 Days | 2 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,838 | 0.6% |
| (3) | Total Accounts | 282,774 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---:|---:|
| (1) | Current Balances | $ 72,482,855.36 | 92.2% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,845,654.94 | 2.3% |
| | 60-89 Days | 1,174,246.68 | 1.5% |
| | 90-119 Days | 1,067,676.88 | 1.4% |
| | 120-149 Days | 1,013,358.35 | 1.3% |
| | 150-179 Days | 987,982.52 | 1.3% |
| | 180-209 Days | 4,737.08 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,093,656.45 | 7.8% |
| (3) | Total Balances | $ 78,576,511.81 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| **IV** | **SERIES 2001-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| D | Month End Invested Amount | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.66875% | 6.24875% | 6.96875% | 11.71875% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (Average Investor %) | 0.00% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1) Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| | (2) Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3) Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1) Allocable Principal Collections for such Distribution Date | - | | | | |
| | (2) Shared Principal Collections for such Distribution Date | - | | | | |
| | (3) Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | |

| | | Senior | Junior | Total |
|---|---|---|---|---|
| **V** | **SPREAD ACCOUNT** | | | |
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 6,338,475.54 | 6,338,475.54 |
| D | Spread Account Shortfall | 21,000,000.00 | 21,661,524.46 | 42,661,524.46 |
| E | Interest earnings on the Spread Account | - | 24,494.04 | 24,494.04 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (410,983.25) | (410,983.25) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 5,951,986.33 | 5,951,986.33 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
   1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
   4.0% if the Quarterly Excess Spread Percentage is <2.0%
   provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
   the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

VI  **APPLICATION OF FUNDS**

   A  **Distribution of Available Finance Charge Collections:**

   (i)   Series 2001-1 Allocable Finance Charge Collections for such          -
         Distribution Date

   (ia)  Series 2001-1 Allocable Finance Charge Collections for prior         -
         Distribution Date

   (ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
         not distributed to the Servicer on a prior Distribution Date (unless such amount
         has been netted against deposits to the Collection Account)              (0.00)

   (iii) **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
         Class A Additional Interest previously due but not distributed on a prior
         Distribution Date                                                       (0.00)

   (iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date                                                       (0.00)

   (v)   **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
         Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
         Account will be drawn.                                               (179,700.70)

   (vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
         Principal Collections                                                     -

   (vii) Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
         **Principal Collections** not previously reimbursed shall be treated as a portion of
         Available Principal Collections                                           -

   (viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
         not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
         Class D Additional Interest previously due but not distributed on a prior
         Distribution Date, *provided, however*, that if the Class D Monthly Interest exceeds
         Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| Distribution Date: | August 15, 2006 |
|---|---|
| LIBOR Determination Date: | July 13, 2006 |

Account will be drawn.                                      (231,282.55)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

(ix) upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections                 -

(x) after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account                 -

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

(xi)    amounts required to be deposited in the **Spread Account**                                      -

(xii)   any other amounts the Trust may be liable for not referred to above                             -

(xiii)  any balance will be Excess Finance Charge Collections and will be available for
        allocation to other Series in Group One or to the Holders of Transferor
        Certificates                                                                        (410,983.25)

(xiv)   Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii)                                  -
        Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii)                          410,983.25
(xv)    Investor Default Amount to be released on distribution                                     (0.00)
(xvi)   Net Excess Spread due back to Nextbank                                                         -

**B**   **Distribution of Available Principal Collections - during the Controlled**
        **Accumulation Period or the Early Amortization Period:**

(i)     during the **Controlled Accumulation Period**, Monthly Principal shall be deposited
        in the **Principal Funding Account**                                              N/A

(ii)    during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders**
        until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults)     $          -

        Funds in the Special Funding Account to be used to pay Class A Note Principal Balance           $          -

(iii)   after (ii) during the **Early Amortization Period**, any remaining Monthly Principal
        shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has
        been paid in full                                                                              $          -

        Class B Special Funding Principal Balance Allocation                                           $          -

(iv)    after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly
        Principal shall be paid to **Class C Noteholders** until the Class C Note Principal
        Balance has been paid in full                                                                  $      (0.00)

        Class C Special Funding Principal Balance Allocation                                           $          -

(v)     after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly
        Principal shall be paid to **Class D Noteholders** until the Class D Note
        Principal Balance has been paid in full                                                        $          -

        Class D Special Funding Principal Balance Allocation                                           $          -

(vi)    for either period, after (i) through (v), the balance of Available Principal Collections
        remaining shall be treated as Shared Principal Collections and applied in accordance
        with Section 8.05 of the Indenture                                                             $          -

**VII  PRINCIPAL COLLECTIONS**

A   Monthly Principal (Includes Investor Defaults)                                          $       (0.00)
B   Series 2001-1 Principal Shortfall                                                       $        0.00
C   Shared Principal Collections allocable from other principal sharing series             $          -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended July 31, 2006**

| | |
|---|---|
| Distribution Date: | August 15, 2006 |
| LIBOR Determination Date: | July 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i) Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| | (ii) Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| | (iii) Portfolio Yield (2 months prior) | 0.00% | |
| | (iv) 3 Month Average | 0.00% | |
| B | Base Rate for the current Monthly Period | | |
| | (i) Current Base Rate | **132443011621.48%** | |
| | (ii) Base Rate (prior month) | 143392101743.62% | |
| | (iii) Base Rate (2 months prior) | 137058758887.84% | |
| | (iv) 3 Month Average | 137631290750.98% | |
| C | Excess Spread | | |
| | (i) Current Excess Spread | **-132443011621.48%** | |
| | (ii) Modified Excess Spread (prior month) | -143392101743.62% | |
| | (iii) Excess Spread (2 months prior) | -137058758887.84% | |
| | (iv) 3 Month Average | -137631290750.98% | |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 229,150.53 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 229,150.53 |
| | | | | |
| D | (1) | Interest | | 178,271.53 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 178,271.53 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 74,484,524.84 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 4,091,986.97 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 78,576,511.81 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 71,104,510.11 |
| | M | End of the Month Finance Charge Receivables: | | 3,961,805.26 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 75,066,315.37 |

NextBank, N. A.
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | | |
|---|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

| | | | |
|---|---|---|---:|
| P | (a) | Transferor Interest | |
| | | + Principal Receivables | 71,104,510.11 |
| | | + Special Funding Account (SFA) | - |
| | | - Aggregate Invested Amounts in the trust | (0.00) |
| | | Ending Transferor Interest | 71,104,510.11 |
| | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 6,399,405.91 |
| | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | |
| | | | |
| | (d) | Transferor Percentage (for information only) | 100.0% |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---:|
| | (1) | Total Collections | $ | 3,911,317.46 |
| | (2) | Total Principal Collections | | 2,684,768.67 |
| | (3) | Total Finance Charge Collections (including interchange) | $ | 1,226,548.79 |
| | | | | |
| | (4) | Principal Payment Rate | | 3.6% |

**B. DELINQUENCIES AND LOSSES**
**NUMBER OF ACCOUNTS**

| | | | Number | % of Total |
|---|---|---|---:|---:|
| | (1) | Current Accounts | 280,712 | 99.4% |
| | (2) | End of month delinquencies: | | |
| | | 30-59 Days | 591 | 0.2% |
| | | 60-89 Days | 405 | 0.1% |
| | | 90-119 Days | 274 | 0.1% |
| | | 120-149 Days | 293 | 0.1% |
| | | 150-179 Days | 258 | 0.1% |
| | | 180-209 Days | - | 0.0% |
| | | Over 209 Days | - | 0.0% |
| | | SubTotal -- 30+ Days Delinquent | 1,821 | 0.6% |
| | (3) | Total Accounts | 282,533 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---:|---:|
| | (1) | Current Balances | $      69,071,248.72 | 92.0% |
| | (2) | End of month delinquencies: | | |
| | | 30-59 Days | 1,786,804.70 | 2.4% |
| | | 60-89 Days | 1,321,210.37 | 1.8% |
| | | 90-119 Days | 950,885.76 | 1.3% |
| | | 120-149 Days | 1,037,552.42 | 1.4% |
| | | 150-179 Days | 898,613.40 | 1.2% |
| | | 180-209 Days | - | 0.0% |
| | | Over 209 Days | - | 0.0% |
| | | SubTotal -- 30+ Days Delinquent | 5,995,066.65 | 8.0% |
| | (3) | Total Balances | $      75,066,315.37 | 100.0% |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | | |
|---|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

| | | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| IV | **SERIES 2000-1 INFORMATION** | | | | | | |
| A | Note Principal Balance | $ | 500,000,000.00 $ | 357,500,000.00 $ | 67,500,000.00 $ | 57,500,000.00 $ | 17,500,000.00 |
| B | Initial Invested Amount | | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| C | Beginning of Month Invested Amount | | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| D | Month End Invested Amount | | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 5.53000% | 6.13000% | 6.98000% | 11.83000% |
| G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 0.00% | | | | |
| H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | | - | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | | - | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | | - | | | | |
| K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 0.00 | | | | |
| V | **SPREAD ACCOUNT** | | | | | | |
| A | Required Spread Account Percentage (see Note: below) | | 7% | | | | |
| B | Required Spread Account Amount | | 35,000,000.00 | | | | |
| C | Amount on Deposit in the Spread Account | | 18,389,537.77 | | | | |
| D | Spread Account Shortfall | | 16,610,462.23 | | | | |
| E | Interest earnings on the Spread Account | | 70,688.09 | | | | |
| F | Withdrawals from Spread Account on this Distribution Date | | (407,422.06) | | | | |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | | 18,052,803.80 | | | | |

Note: the Spread Account Percentage is:
   4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust – Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

7.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)    Series 2000-1 Allocable Finance Charge Collections for such
Distribution Date      -

(ia)    Series 2000-1 Allocable Finance Charge Collections for prior
Distribution Date      -

(ii)    **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)      (0.00)

(iii)    **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date      0.00

(iv)    **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date      (0.00)

(v)    **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.      (229,150.53)

(vi)    **Investor Default Amount,** if any, shall be treated as a portion of Available
Principal Collections      -    see (x) below

(vii)    Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections      -

(viii)    **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread
Account will be drawn.      (178,271.53)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

(ix)  upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections — 

(x)  after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account —

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2000-1
Monthly Noteholders Statement
Monthly Period Ended August 31, 2006

Distribution Date:                September 15, 2006
LIBOR Determination Date:         August 11, 2006

(xi)   amounts required to be deposited in the **Spread Account**                                                   -

(xii)  any other amounts the Trust may be liable for not referred to above                                          -

(xiii) any balance will be Excess Finance Charge Collections and will be available for
       allocation to other Series in Group One or to the Holders of Transferor
       Certificates                                                                                    (407,422.06)

(xiv)  Withdrawal from Spread Account to cover Class D Monthly Interest                                  407,422.06
(xv)   Investor Default Amount to be released on distribution                                               (0.00)

       **Available Principal Collections shall be treated as Shared Principal Collections
       and applied in accordance with Section 8.05 of the Indenture**                          N/A

C   **Distribution of Available Principal Collections - during the Controlled
    Accumulation Period or the Early Amortization Period:**

    (i)    during the **Controlled Accumulation Period**, Monthly Principal shall be deposited
           in the **Principal Funding Account**                                                N/A

    (ii)   during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders**
           until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults)    $            -

           Funds in the Special Funding Account to be used to pay Class A Note Principal Balance           $            -

    (iii)  after (ii) during the **Early Amortization Period**, any remaining Monthly Principal
           shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has
           been paid in full                                                                              $            -

           Class B Special Funding Principal Balance Allocation                                           $            -

    (iv)   after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly
           Principal shall be paid to **Class C Noteholders** until the Class C Note Principal
           Balance has been paid in full                                                                  $        (0.00)

           Class C Special Funding Principal Balance Allocation                                           $            -

    (v)    after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly
           Principal shall be paid to **Class D Noteholders** until the Class D Note
           Principal Balance has been paid in full                                                        $            -

           Class D Special Funding Principal Balance Allocation                                           $            -

    (vi)   for either period, after (i) through (v), the balance of Available Principal Collections
           remaining shall be treated as Shared Principal Collections and applied in accordance
           with Section 8.05 of the Indenture                                                             $            -

VII  **PRINCIPAL COLLECTIONS**

A   Monthly Principal (Includes Investor Defaults)                                                         $        (0.00)
B   Series 2000-1 Principal Shortfall                                                                      $         0.00

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

C   Shared Principal Collections allocable from other principal sharing series          $                    -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| Distribution Date: | September 15, 2006 |
|---|---|
| LIBOR Determination Date: | August 11, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i)    Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| | (ii)   Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| | (iii)  Portfolio Yield (2 months prior) | 0.00% | |
| | (iv)  3 Month Average | 0.00% | |
| | | | |
| B | Base Rate for the current Monthly Period | | |
| | (i)    Current Base Rate | **116824604700.26%** | |
| | (ii)   Base Rate (prior month) | 109785413270.15% | |
| | (iii)  Base Rate (2 months prior) | 118732321353.59% | |
| | (iv)  3 Month Average | 115114113108.00% | |
| | | | |
| C | Excess Spread | | |
| | (i)    Current Excess Spread | **-116824604700.26%** | |
| | (ii)   Excess Spread (prior month) | -109785413270.15% | |
| | (iii)  Excess Spread (2 months prior) | -118732321353.59% | |
| | (iv)  3 Month Average | -115114113108.00% | |

_____

Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 191,025.71 |
| | (2) | Principal | (0.00) |
| | (3) | Total Distribution for Class C Notes | 191,025.71 |
| | | | |
| D | (1) | Interest | 246,415.56 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 246,415.56 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 74,484,524.84 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 4,091,986.97 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 78,576,511.81 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 71,104,510.11 |
| M | End of the Month Finance Charge Receivables: | | 3,961,805.26 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 75,066,315.37 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended August 31, 2006

| | | |
|---|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

**P** **(a)** Transferor Interest

| | | |
|---|---|---|
| + Principal Receivables | 71,104,510.11 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | (0.00) |
| Ending Transferor Interest | 71,104,510.11 |

**(b)** Required Transferor Interest (9% x Principal Receivables)  6,399,405.91

**(c)** (Shortfall) if applicable in Transferor Interest  N/A
   - principal collections will be trapped in the SFA until shortfall eliminated

**(d)** Transferor Percentage (for information only)  100.0%

**(e)** Transferor Allocations/Distributions
   Transferor share of Finance Charge Collections  1,837,620.27
   Interest earned on the Collections Account  14,326.19
   Transferor share of Principal Collections  2,684,768.67
   Transferor allocated Servicing Fees  (124,140.85)
     Net cash distributable to the Transferor on the Distribution Date  4,412,574.28

**III PERFORMANCE SUMMARY**
**A COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 3,911,317.46 |
| (2) | Total Principal Collections | | 2,684,768.67 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,226,548.79 |
| (4) | Principal Payment Rate | | 3.6% |

**B. DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 280,712 | 99.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 591 | 0.2% |
| | 60-89 Days | 405 | 0.1% |
| | 90-119 Days | 274 | 0.1% |
| | 120-149 Days | 293 | 0.1% |
| | 150-179 Days | 258 | 0.1% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,821 | 0.6% |
| (3) | Total Accounts | 282,533 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 69,071,248.72 | 92.0% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,786,804.70 | 2.4% |
| | 60-89 Days | 1,321,210.37 | 1.8% |
| | 90-119 Days | 950,885.76 | 1.3% |
| | 120-149 Days | 1,037,552.42 | 1.4% |
| | 150-179 Days | 898,613.40 | 1.2% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 5,995,066.65 | 8.0% |
| (3) | Total Balances | $ 75,066,315.37 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| Distribution Date: | September 15, 2006 |
|---|---|
| LIBOR Determination Date: | August 11, 2006 |

NextBank, N. A.
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

| | | | Series Total | | Class A | | Class B | | Class C | | Class D |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV** | **SERIES 2001-1 INFORMATION** | | | | | | | | | | |
| A | Note Principal Balance | $ | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| B | Initial Invested Amount | | 700,000,000.00 | $ | 521,500,000.00 | $ | 87,500,000.00 | $ | 66,500,000.00 | $ | 24,500,000.00 |
| C | Beginning of Month Invested Amount | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| D | Month End Invested Amount | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | | 0.00 | $ | 0.00 | $ | 0.00 | $ | (0.00) | $ | 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | | 5.63000% | | 6.21000% | | 6.93000% | | 11.68000% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | | 0.00% | | | | | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | | 0.00% | | | | | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | | - | | | | | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | | - | | | | | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | | - | | | | | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | | - | | | | | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | | - | | | | | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | | 0.00 | | | | | | | | |

| | | Senior | Junior | Total |
|---|---|---|---|---|
| **V** | **SPREAD ACCOUNT** | | | |
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 5,951,986.33 | 5,951,986.33 |
| D | Spread Account Shortfall | 21,000,000.00 | 22,048,013.67 | 43,048,013.67 |
| E | Interest earnings on the Spread Account | - | 23,371.39 | 23,371.39 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (437,441.26) | (437,441.26) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 5,537,916.46 | 5,537,916.46 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

> **Note: the Junior Note Spread Account Percentage is:**
> 1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
> 1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
> 2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
> 2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
> 3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
> 4.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
> the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

   **A  Distribution of Available Finance Charge Collections:**

    (i)   Series 2001-1 Allocable Finance Charge Collections for such        -
        Distribution Date

    (ia)  Series 2001-1 Allocable Finance Charge Collections for prior      -
        Distribution Date

    (ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
        not distributed to the Servicer on a prior Distribution Date (unless such amount
        has been netted against deposits to the Collection Account)        (0.00)

    (iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
        Class A Additional Interest previously due but not distributed on a prior
        Distribution Date        (0.00)

    (iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date        (0.00)

    (v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
        Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
        Account will be drawn.      (191,025.71)

    (vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
        Principal Collections        -

    (vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
        **Principal Collections** not previously reimbursed shall be treated as a portion of
        Available Principal Collections        -

    (viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
        Class D Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
        Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

Account will be drawn.                    (246,415.56)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| Distribution Date: | September 15, 2006 |
|---|---|
| LIBOR Determination Date: | August 11, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal Balance shall be treated as a portion of Available Principal Collections                -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account terminates, an amount up to the excess, if any, of the Required Reserve Account over the Available Reserve Account shall be deposited in the Reserve Account                -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (437,441.26) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 437,441.26 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B  Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | | |
|---|---|---|---|---|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | | N/A | |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | | - |
| | Class B Special Funding Principal Balance Allocation | $ | | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | | - |
| | Class D Special Funding Principal Balance Allocation | $ | | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2001-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended August 31, 2006**

| | |
|---|---|
| Distribution Date: | September 15, 2006 |
| LIBOR Determination Date: | August 11, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period
| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 0.00% | |
| (iv) | 3 Month Average | 0.00% | |

B  Base Rate for the current Monthly Period
| | | |
|---|---|---|
| (i) | Current Base Rate | **140969340881.52%** |
| (ii) | Base Rate (prior month) | 132443011621.48% |
| (iii) | Base Rate (2 months prior) | 143392101743.62% |
| (iv) | 3 Month Average | 138934818082.21% |

C  Excess Spread
| | | |
|---|---|---|
| (i) | Current Excess Spread | **-140969340881.52%** |
| (ii) | Modified Excess Spread (prior month) | -132443011621.48% |
| (iii) | Excess Spread (2 months prior) | -143392101743.62% |
| (iv) | 3 Month Average | -138934818082.21% |

---
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | | Interest | (0.00) |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class A Notes | (0.00) |
| | | | | |
| B | (1) | | Interest | 0.00 |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class B Notes | 0.00 |
| | | | | |
| C | (1) | | Interest | 229,150.53 |
| | (2) | | Principal | (0.00) |
| | (3) | | Total Distribution for Class C Notes | 229,150.53 |
| | | | | |
| D | (1) | | Interest | 178,271.53 |
| | (2) | | Principal | - |
| | (3) | | Total Distribution for Class D Notes | 178,271.53 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 71,104,510.11 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 3,961,805.26 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 75,066,315.37 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 68,107,995.19 |
| | M | End of the Month Finance Charge Receivables: | | 3,892,789.48 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 72,000,784.67 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| Distribution Date: | October 16, 2006 |
|---|---|
| LIBOR Determination Date: | September 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

P (a) Transferor Interest

| | | |
|---|---|---|
| + Principal Receivables | 68,107,995.19 | |
| + Special Funding Account (SFA) | - | |
| - Aggregate Invested Amounts in the trust | (0.00) | |
| Ending Transferor Interest | 68,107,995.19 | |

(b) Required Transferor Interest (9% x Principal Receivables) — 6,129,719.57

(c) (Shortfall) if applicable in Transferor Interest — N/A
    - principal collections will be trapped in the SFA until shortfall eliminated

(d) Transferor Percentage (for information only) — 100.0%

**III PERFORMANCE SUMMARY**
**A COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 3,353,628.16 |
| (2) | Total Principal Collections | | 2,248,834.92 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,104,793.24 |
| (4) | Principal Payment Rate | | 3.2% |

**B. DELINQUENCIES AND LOSSES**

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 281,044 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 599 | 0.2% |
| | 60-89 Days | 403 | 0.1% |
| | 90-119 Days | 340 | 0.1% |
| | 120-149 Days | 248 | 0.1% |
| | 150-179 Days | 264 | 0.1% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,854 | 0.7% |
| (3) | Total Accounts | 282,898 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 65,901,169.66 | 91.5% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,763,168.25 | 2.4% |
| | 60-89 Days | 1,304,533.90 | 1.8% |
| | 90-119 Days | 1,229,193.33 | 1.7% |
| | 120-149 Days | 856,215.58 | 1.2% |
| | 150-179 Days | 946,503.95 | 1.3% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 6,099,615.01 | 8.5% |
| (3) | Total Balances | $ 72,000,784.67 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

| | | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|---|
| **IV** | **SERIES 2000-1 INFORMATION** | | | | | | |
| | A | Note Principal Balance | $ 500,000,000.00 | $ 357,500,000.00 | $ 67,500,000.00 | $ 57,500,000.00 | $ 17,500,000.00 |
| | B | Initial Invested Amount | 500,000,000.00 | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| | C | Beginning of Month Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| | D | Month End Invested Amount | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| | E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | (0.00) | 0.00 | (0.00) | 0.00 |
| | F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.53000% | 6.13000% | 6.98000% | 11.83000% |
| | G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 0.00% | | | | |
| | H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| | I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | | (1)   Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| | | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| | J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | | (1)   Allocable Principal Collections for such Distribution Date | - | | | | |
| | | (2)   Shared Principal Collections for such Distribution Date | - | | | | |
| | | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| | K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| | L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | |
| **V** | **SPREAD ACCOUNT** | | | | | | |
| | A | Required Spread Account Percentage (see Note: below) | 7% | | | | |
| | B | Required Spread Account Amount | 35,000,000.00 | | | | |
| | C | Amount on Deposit in the Spread Account | 18,052,803.80 | | | | |
| | D | Spread Account Shortfall | 16,947,196.20 | | | | |
| | E | Interest earnings on the Spread Account | 67,076.92 | | | | |
| | F | Withdrawals from Spread Account on this Distribution Date | (407,422.06) | | | | |
| | G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | 17,712,458.66 | | | | |

Note: the Spread Account Percentage is:
    4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
    4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
    5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
7.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

**A   Distribution of Available Finance Charge Collections:**

(i)    Series 2000-1 Allocable Finance Charge Collections for such                                                     -
        Distribution Date

(ia)   Series 2000-1 Allocable Finance Charge Collections for prior                                                    -
        Distribution Date

(ii)   **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
        not distributed to the Servicer on a prior Distribution Date (unless such amount
        has been netted against deposits to the Collection Account)                                              (0.00)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
        Class A Additional Interest previously due but not distributed on a prior
        Distribution Date                                                                                          0.00

(iv)   **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date                                                                                         (0.00)

(v)    **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
        Class B Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however,* that if the Class C Monthly Interest exceeds
        Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
        Account will be drawn.                                                                              (229,150.53)

(vi)   **Investor Default Amount,** if any, shall be treated as a portion of Available
        Principal Collections                                                                -        see (x) below

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated**
        **Principal Collections** not previously reimbursed shall be treated as a portion of
        Available Principal Collections                                                                           -

(viii) **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
        not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
        Class D Additional Interest previously due but not distributed on a prior
        Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
        Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

Account will be drawn.                                    (178,271.53)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                                -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account                        -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

| | | | |
|---|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (407,422.06) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | | 407,422.06 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |

| | | |
|---|---|---|
| **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | N/A | |

**C   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | N/A | |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2000-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**VIII  INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A   Portfolio Yield for the current Monthly Period

| | | | | |
|---|---|---|---|---|
| | (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| | (ii) | Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| | (iii) | Portfolio Yield (2 months prior) | 0.00% | |
| | (iv) | 3 Month Average | 0.00% | |

B   Base Rate for the current Monthly Period

| | | | |
|---|---|---|---|
| | (i) | Current Base Rate | **116824604700.26%** |
| | (ii) | Base Rate (prior month) | 116824604700.26% |
| | (iii) | Base Rate (2 months prior) | 109785413270.15% |
| | (iv) | 3 Month Average | 114478207556.89% |

C   Excess Spread

| | | | |
|---|---|---|---|
| | (i) | Current Excess Spread | **-116824604700.26%** |
| | (ii) | Excess Spread (prior month) | -116824604700.26% |
| | (iii) | Excess Spread (2 months prior) | -109785413270.15% |
| | (iv) | 3 Month Average | -114478207556.89% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 191,025.71 |
| | (2) | Principal | (0.00) |
| | (3) | Total Distribution for Class C Notes | 191,025.71 |
| | | | |
| D | (1) | Interest | 246,415.56 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 246,415.56 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 71,104,510.11 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 3,961,805.26 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 75,066,315.37 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 68,107,995.19 |
| M | End of the Month Finance Charge Receivables: | | 3,892,789.48 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 72,000,784.67 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended September 30, 2006

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

P  (a)   Transferor Interest

| | | |
|---|---|---|
| | + Principal Receivables | 68,107,995.19 |
| | + Special Funding Account (SFA) | - |
| | - Aggregate Invested Amounts in the trust | (0.00) |
| | Ending Transferor Interest | 68,107,995.19 |

| | | |
|---|---|---|
| (b) | Required Transferor Interest (9% x Principal Receivables) | 6,129,719.57 |

| | | |
|---|---|---|
| (c) | (Shortfall) if applicable in Transferor Interest | N/A |
| | - principal collections will be trapped in the SFA until shortfall eliminated | |

| | | |
|---|---|---|
| (d) | Transferor Percentage (for information only) | 100.0% |

| | | |
|---|---|---|
| (e) | **Transferor Allocations/Distributions** | |
| | Transferor share of Finance Charge Collections | 1,659,032.62 |
| | Interest earned on the Collections Account | 13,682.55 |
| | Transferor share of Principal Collections | 2,248,834.92 |
| | Transferor allocated Servicing Fees | (118,507.49) |
| | Net cash distributable to the Transferor on the Distribution Date | 3,803,042.60 |

III   **PERFORMANCE SUMMARY**

A   **COLLECTIONS**

| | | | |
|---|---|---|---|
| (1) | Total Collections | $ | 3,353,628.16 |
| (2) | Total Principal Collections | | 2,248,834.92 |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,104,793.24 |
| (4) | Principal Payment Rate | | 3.2% |

B.   **DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 281,044 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 599 | 0.2% |
| | 60-89 Days | 403 | 0.1% |
| | 90-119 Days | 340 | 0.1% |
| | 120-149 Days | 248 | 0.1% |
| | 150-179 Days | 264 | 0.1% |
| | 180-209 Days | - | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,854 | 0.7% |
| (3) | Total Accounts | 282,898 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---|---|
| (1) | Current Balances | $ | 65,901,169.66 | 91.5% |
| (2) | End of month delinquencies: | | | |
| | 30-59 Days | | 1,763,168.25 | 2.4% |
| | 60-89 Days | | 1,304,533.90 | 1.8% |
| | 90-119 Days | | 1,229,193.33 | 1.7% |
| | 120-149 Days | | 856,215.58 | 1.2% |
| | 150-179 Days | | 946,503.95 | 1.3% |
| | 180-209 Days | | - | 0.0% |
| | Over 209 Days | | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | | 6,099,615.01 | 8.5% |
| (3) | Total Balances | $ | 72,000,784.67 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| Distribution Date: | October 16, 2006 |
|---|---|
| LIBOR Determination Date: | September 13, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| **IV** | **SERIES 2001-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| D | Month End Invested Amount | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.63000% | 6.21000% | 6.93000% | 11.68000% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 0.00% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| | (1)   Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| | (1)   Allocable Principal Collections for such Distribution Date | - | | | | |
| | (2)   Shared Principal Collections for such Distribution Date | - | | | | |
| | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | 0.00 | | | | |

| | | Senior | Junior | Total |
|---|---|---|---|---|
| **V** | **SPREAD ACCOUNT** | | | |
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 5,537,916.46 | 5,537,916.46 |
| D | Spread Account Shortfall | 21,000,000.00 | 22,462,083.54 | 43,462,083.54 |
| E | Interest earnings on the Spread Account | - | 20,960.58 | 20,960.58 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (437,441.26) | (437,441.26) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 5,121,435.78 | 5,121,435.78 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
4.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

VI  **APPLICATION OF FUNDS**

A  **Distribution of Available Finance Charge Collections:**

(i)  Series 2001-1 Allocable Finance Charge Collections for such
Distribution Date                                                                                     -

(ia)  Series 2001-1 Allocable Finance Charge Collections for prior
Distribution Date                                                                                    -

(ii)  **Monthly Servicing Fee,** *plus* any Monthly Servicing Fee previously due but
not distributed to the Servicer on a prior Distribution Date (unless such amount
has been netted against deposits to the Collection Account)                          (0.00)

(iii)  **Class A Monthly Interest,** *plus* Class A Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class A Additional Interest, *plus*
Class A Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                    (0.00)

(iv)  **Class B Monthly Interest,** *plus* Class B Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class B Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date                                                                                    (0.00)

(v)  **Class C Monthly Interest,** *plus* Class C Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class C Additional Interest, *plus*
Class B Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however*, that if the Class C Monthly Interest exceeds
Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
Account will be drawn.                                                                         (191,025.71)

(vi)  **Investor Default Amount**, if any, shall be treated as a portion of Available
Principal Collections                                                                              -

(vii)  Aggregate amount of **Investor Charge-Offs** and the amount of **Reallocated
Principal Collections** not previously reimbursed shall be treated as a portion of
Available Principal Collections                                                               -

(viii)  **Class D Monthly Interest,** *plus* Class D Monthly Interest previously due but
not distributed on a prior Distribution Date, *plus* Class D Additional Interest, *plus*
Class D Additional Interest previously due but not distributed on a prior
Distribution Date, *provided, however,* that if the Class D Monthly Interest exceeds
Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| Distribution Date: | October 16, 2006 |
|---|---|
| LIBOR Determination Date: | September 13, 2006 |

Account will be drawn.                                                          (246,415.56)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| Distribution Date: | October 16, 2006 |
|---|---|
| LIBOR Determination Date: | September 13, 2006 |

(ix)   upon an **Event of Default** w/r/t Series 2001-1 and acceleration of the maturity of
       the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
       Balance shall be treated as a portion of Available Principal Collections                          -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
       terminates, an amount up to the excess, if any, of the Required Reserve Account
       over the Available Reserve Account shall be deposited in the Reserve Account                       -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

| | | |
|---|---|---:|
| (xi) | amounts required to be deposited in the **Spread Account** | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (437,441.26) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | 437,441.26 |
| (xv) | Investor Default Amount to be released on distribution | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | - |

**B   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---:|
| (i) | during the **Controlled Accumulation Period**, Monthly Principal shall be deposited in the **Principal Funding Account** | N/A | |
| (ii) | during the **Early Amortization Period**, Montly Principal shall be paid to **Class A Noteholders** until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class B Noteholders** until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class C Noteholders** until the Class C Note Principal Balance has been paid in full | $ | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the **Early Amortization Period**, any remaining Monthly Principal shall be paid to **Class D Noteholders** until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---:|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2001-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended September 30, 2006**

| | |
|---|---|
| Distribution Date: | October 16, 2006 |
| LIBOR Determination Date: | September 13, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period

| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 0.00% | |
| (iv) | 3 Month Average | 0.00% | |

B  Base Rate for the current Monthly Period

| | | |
|---|---|---|
| (i) | Current Base Rate | **140969340881.52%** |
| (ii) | Base Rate (prior month) | 140969340881.52% |
| (iii) | Base Rate (2 months prior) | 132443011621.48% |
| (iv) | 3 Month Average | 138127231128.17% |

C  Excess Spread

| | | |
|---|---|---|
| (i) | Current Excess Spread | **-140969340881.52%** |
| (ii) | Modified Excess Spread (prior month) | -140969340881.52% |
| (iii) | Excess Spread (2 months prior) | -132443011621.48% |
| (iv) | 3 Month Average | -138127231128.17% |

_____
Karlyn M. Knieriem
Finance Officer

# VEDDER PRICE

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

805 THIRD AVENUE

NEW YORK, NEW YORK 10022

212-407-7700

FACSIMILE: 212-407-7799

OFFICES IN CHICAGO, NEW YORK CITY, AND ROSELAND, NEW JERSEY

MICHAEL J. EDELMAN
212-407-6970
mjedelman@vedderprice.com

November 13, 2006

**VIA E-MAIL AND FIRST CLASS MAIL**

Gary D. Roth, Esq.
Alston & Bird LLP
90 Park Avenue
New York, New York 10016
e-mail: gary.roth@alston.com

Re:    NextCard Credit Card Master Note Trust – Indenture Trustee's Refusal to Follow
the Directions is Unreasonable and Will Cause the Noteholders Irreparable Harm

Dear Gary:

As you know, we represent Millennium Partners, L.P. and First Millennium, Inc. (together, "Millennium"), which is the largest holder of Notes under that certain Master Indenture, dated as of December 11, 2000 (the "Master Indenture", and as amended and supplemented from time to time, the "Indenture"), between NextCard Credit Card Master Note Trust (the "SPV Issuer") and The Bank of New York, in its capacity as indenture trustee (the "Indenture Trustee"). As you know, Millennium and RMK Advantage Income Fund (together, the "Directing Noteholders") hold a majority of the outstanding Notes under each of the 2000-1 and 2001-1 Series of Notes issued under the Indenture. As you also know, the Directing Noteholders directed the Indenture Trustee to take certain actions to enforce the rights of the Noteholders pursuant to an instruction letter dated November 9, 2006 (the "Instruction Letter" and the directions therein, the "Directions").[1]

We write in response to your letter, dated November 10, 2006 (the "Refusal Letter"), wherein you state that Indenture Trustee "declines to accept the Instruction Letter or to accept the actions specified in the Directions . . . ." In sum, the Indenture Trustee's refusal to follow the express terms of the Instruction Letter violates the terms of the Indenture and constitutes an egregious breach of duty owed to the Noteholders, which will result in serious and significant damages to the Noteholders.

Although we have repeatedly asked you to provide the specific reasons why the Indenture Trustee is unwilling to act, you have refused to provide anything but a conclusory response.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Indenture.

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 2

Once again, in the Refusal Letter, you have given the following generalized platitudes to explain away the Indenture Trustee's refusal to accept the Instruction Letter:

(a) <u>Conflicts with Rule of Law from D.C. Opinion</u>. The Directions "conflict with the rule of law as evidenced by the [September 28, 2006] decision of the court in the action entitled *The Bank of New York v. Federal Deposit Insurance Company* in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH) (the "FDIC Suit", and such September 28[th] decision, the (the "D.C. Opinion").

(b) <u>Conflicts with Terms of Master Indenture</u>. The "actions [specified in the Directions] conflict with the Master Indenture as they are not authorized or within the discretion or rights conferred upon the Indenture Trustee by the Master Indenture."

(c) <u>Indemnification is Not Satisfactory</u>. The indemnification provided in the Instruction Letter was not satisfactory.

Your refusal to provide concrete bases for why the Indenture Trustee is unwilling to act places an unfair burden upon the Noteholders – forcing Millennium to waste substantial resources to demonstrate how each and every request in the Instruction Letter is appropriate. In contrast to the generalized and unsupported rationales posited in your refusal letter, the Instruction Letter and the Directions comply with the terms of the Indenture and do not contravene any rule of law.

## A.    **General Provisions Regarding Directions**

The right to direct the Indenture Trustee is governed by Sections 5.12, 6.01 and 6.03(d) of the Master Indenture. Section 5.12 provides that a majority of the Outstanding Amount of the Notes of any affected Series "shall have the right to direct" the exercise of remedies by the Indenture Trustee unless the directions "conflict with the rule of law or with this Indenture", is "illegal" or will expose the Indenture Trustee to "personal liability". Section 6.03(d) further provides that the Indenture Trustee "shall be under no obligation to . . . honor the . . . direction of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Indenture Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such . . . direction;" once such an indemnification is provided, however, the Indenture Trustee has a duty to perform the directions of the Noteholders. Section 6.01, however, provides that the Indenture Trustee is responsible for "its own negligent failure to act" – such as the refusal to follow a valid direction of the majority of the Noteholders. *See* Master Indenture, § 6.01(d). In contrast, the Indenture Trustee is relieved of liability "with respect to any action taken . . . by it in good faith in accordance with this Indenture and/or the direction of the majority of the Outstanding Amount of the Notes of each outstanding Series of Notes" relating to any remedy available under the Indenture. *See* Master Indenture, § 6.01(d)(iii).

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 3

As you know, the Instruction Letter was issued by a majority of the Outstanding Amount for each Series of Notes. Further, as this letter will detail, (a) the Directions do not contravene, the D.C. Opinion (or any rule of law for that matter), (b) the Directions do not contravene any provision in the Indenture, (c) the Directions do not involve any illegalities, and (d) in light of the full indemnification provided by the Directing Noteholders, the Directions do not expose the Indenture Trustee to any personal liability. As such, the Indenture Trustee is duty-bound to comply with the terms of the Instruction Letter. In addition, the proper Instruction Letter shields the Indenture Trustee from any potential liability relating to the Indenture Trustee following the terms of the Instruction Letter pursuant to the express terms of Section 6.01 of the Master Indenture (which is binding upon NextBank and the FDIC).

**B.    Nothing in the Directions or the Instruction Letter Violates**
**Any "Rule of Law" Promulgated in the D.C. Opinion**

Contrary to the general unsubstantiated statement in the Refusal Letter, the Instruction Letter does not contravene any "rule of law" established in the D.C. Opinion. In the FDIC Suit, the SPV Issuer is neither the defendant nor even a named party – rather, the sole defendant is the FDIC. The primary theory pursued in the FDIC Suit was that FDIC did not have power to revoke the "*ipso facto*" clause in the Indenture because it was not a "party" to the Indenture. Accordingly, because (under this theory) the FDIC acted beyond its powers, causing it to receive Receivables distributions to which it was not entitled, the Indenture Trustee sued the FDIC for conversion and damages relating to such conversion.

Other than the direction regarding the appeal of the D.C. Opinion,[2] nothing in the Instruction Letter relates to the FDIC, NextBank, N.A. ("NextBank") or the FDIC Suit. Rather, the Instruction Letter and the Directions solely concern enforcement actions and rights against the SPV Issuer. In evaluating the unsubstantiated contention that the D.C. Opinion created a "rule of law" that the Instruction Letter violates, the following facts must be noted:

- The SPV Issuer is not a party to the FDIC Suit;
- The FDIC Suit does not address the liability of the SPV Issuer in any way;
- In the D.C. Opinion, the court neither ruled that the SPV Issuer was not a separate legal entity, nor ruled that the separate existence of the SPV Issuer should be disregarded with respect to its obligations under the Indenture;
- Neither did the court hold that an Early Amortization Event did not occur in February 2002;
- Nowhere in the D.C. Opinion did the court rule that the Early Amortization Event in February 2002 was not enforceable against the SPV Issuer;

---

[2]    It should be self-evident that the Indenture Trustee has the right to pursue an appeal of the D.C. Opinion, and that such appeal does not violate any "rule of law."

NEWYORK/#170516.1

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 4

- Nowhere in the D.C. Opinion did the court rule that any of the provisions of the Indenture could not be enforced against the SPV Issuer;
- At no point in the D.C. Opinion did the court rule that remedies could not be taken against the Collateral;
- Nothing in the D.C. Opinion excused the SPV Issuer from making principal repayments under the Early Amortization waterfall starting in February 2002; and
- Nothing in the D.C. Opinion excuses the SPV Issuer from the Event of Default arising from the non-payment of principal caused by the delay in honoring the Early Amortization Period in February 2002.

Nothing in the D.C. Opinion affects in any way the liability of the SPV Issuer or the remedies that can be taken against the SPV Issuer. The D.C. Opinion stands only for the proposition that the Early Amortization Period clause was unenforceable against the FDIC (standing in the shoes of NextBank) and that the FDIC is not liable for conversion. Accordingly, the statement in the Refusal Letter that the D.C. Opinion created a "rule of law" that is violated by the Instruction Letter lacks any foundation. Indeed, in several conference calls and e-mails, Alston & Bird admitted that pursuing remedies against the SPV Issuer was not precluded by the D.C. Opinion or the FDIC Suit.

**C.     Nothing in the Directions or the Instruction Letter Violates the Indenture**

In the Refusal Letter, you next contend that the Directions contradict the terms of the Master Indenture. Once again, you have failed to explain how any of the Directions contravene the terms of the Master Indenture. In the Instruction Letter, the Directing Noteholders direct the Indenture Trustee to take the following Directions:

(i)      to Declare an Event of Default and accelerate the Notes;

(ii)     to Exercise Control over the Collateral and continue to hold the Collateral until the Notes are fully repaid

(iii)    to the extent necessary to carry-out the Directions, to revoke the power of the Servicer to make distributions other than as provided in the Instruction Letter

(iv)    to cause all moneys and proceeds from the SPV Issuer and from the Collateral to be applied in accordance with the Section 5.05(b) waterfall, including the payment of Indenture Trustee's fees and expenses;

(v)     after payment of the Indenture Trustee's fees and expenses, to hold all other collections in escrow pending certain events after which such collections shall be distributed under Section 5.05(b) of the Mater Indenture;

(vi)    to initiate suit against the SPV Issuer;

(vii)   to pursue the appeal of the D.C. Opinion;

(viii)  to distribute the Spread Accounts in accordance with the terms of the Indenture;

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 5

      (ix)     to pursue the Issuer Suit and the Appeal of the D.C. Opinion in accordance with Directions from the Directing Noteholders;

      (x)     to retain co-counsel to carry out the Directions;

      (xi)     to send out a notice of election of remedies; and

      (xii)     to organize a Noteholders' conference call.

Contrary to the unsubstantiated allegation in the Refusal Letter, and as specifically addressed below, each of these Directions is supported by the terms of the Indenture.

      (i)     **To Declare Event of Default and Accelerate the Notes**.  The Direction to declare an Event of Default and to accelerate the Notes fully comports with the terms of the Indenture.  Pursuant to Section 5.01(a) of the Master Indenture, NextBank's entry into a receivership would constitute a Trust Redemption Event, which in turn would trigger the commencement of the Early Amortization Period.  *See* Master Indenture, § 5.01(a).  During an Early Amortization Period, the SPV Issuer is required to commence making payments of principal on the Notes.  *See* Indenture Supplement, § 4.04(c).  The SPV Issuer's failure to pay the principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture.  Under the Master Indenture, after an Event of Default under Section 5.02, the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes may declare an immediate acceleration of maturity on the Notes, as set forth in Section 5.03 of the Master Indenture.  Once accelerated, all "unpaid principal of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall automatically become . . . due and payable."  *See* Master Indenture, § 5.03.  In addition, Section 5.04 provides that the Indenture Trustee can demand immediate full payment of any defaulted principal payment.

      In the instant case, all of the requirements necessary for declaring an Event of Default and accelerating the Notes of each Series have occurred:

      •     NextBank entered into receivership on February 7, 2002, which constituted a Trust Redemption Event and triggered the commencement of the Early Amortization Period.

      •     Contrary to the express terms of the Indenture, the SPV Issuer failed to pay the principal that came due commencing in February 2002, which failure has caused certain principal not be repaid.

      •     The SPV Issuer's failure to pay any principal on the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture.

      •     The Directing Noteholders, as the holders of a majority of the outstanding Notes under each Series, are entitled to accelerate the Notes and so instructed the Indenture Trustee.

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 6

- The acceleration of the Notes causes the full unpaid principal amount of $55,622,500 on the 2000-1 Series Notes and $56,486,500 on the 2001-1 Series Notes to become immediately due and payable.

Accordingly, the Directing Noteholders' direction to declare an Event of Default and acceleration of the Notes is in compliance with the express terms of the Master Indenture. As an express result of this Direction, and in accordance with the terms of Section 5.03 of the Master Indenture (and the corresponding provisions in each of the Notes), the "unpaid principal of the Notes" – which is now in excess of $112 million in the aggregate – together with accrued interest thereon is now due and payable.

(ii)      **To Exercise Control over the Collateral and Continue to Hold the Collateral until the Notes are Fully Repaid.**  In the Instruction Letter, the Directing Noteholders directed that the Indenture Trustee exercise control over the Collateral (the Receivables) and continue to hold the Collateral until the Notes are fully repaid.  This action is expressly countenanced and authorized under Sections 5.02(a)(ii), 5.06, 5.12 and 8.01 of the Master Indenture.  Section 5.06 expressly contemplates that the Indenture Trustee may take action to maintain possession and control of the Collateral after an Event of Default, regardless of the occurrence of the final maturity date, in an amount sufficient to pay the principal and interest on the Notes.  Further, Section 8.01 provides that the "Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture."  In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control over the receipt of the proceeds of the Receivables.  *See* Master Indenture, § 8.01.  In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an Event of Default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series."  Finally, as set forth above, Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise remedies against the SPV Issuer and the Collateral.  In addition, the exercise of control over the Collateral after an Event of Default and acceleration is consistent with the granting clause and Section 8.02 of the Master Indenture, which contemplate that the Collateral will be used to protect the payment of principal of and interest due on the Notes.

With respect to the direction to continue to hold and collect proceeds from the Collateral until the all principal and interest on the Notes have been repaid in full, such direction comports with numerous provisions in the Indenture.  *See, e.g.,* Master Indenture § 5.03 (after acceleration, all unpaid principal and interest on the Notes becomes due), § 5.05(b) (distribution waterfall after acceleration requires all interest and principal due to be repaid), § 5.06 (Indenture Trustee should retain Collateral sufficient for payment in full of principal and interest on the Notes), § 5.08 (Noteholders have unconditional right to receive full payment of principal and interest due on the

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 7

Notes). As you will note, we expressly made the Indenture Trustee's ability to continue to hold and collect the Receivables in escrow subject to further order from a court of competent jurisdiction. This clause was inserted at the request of Indenture Trustee itself, so that the Indenture Trustee would not be faced with a conflict between a Direction and a court order.

Based upon the foregoing, the Indenture Trustee has authority to exercise control over the Collateral until all principal and interest due on the Notes have been repaid in full. Accordingly, this Direction fully comports with the terms of the Indenture.

(iii)    **To the Extent Necessary to Carry Out the Directions, to Revoke the Power of Servicer to Make Distributions Other Than as Provided in the Instruction Letter**. To ensure that the Servicer would respect the Indenture Trustee's exercise of control over the Collateral and to make distributions as required pursuant to Section 5.05(b) of the Master Indenture, the Directing Noteholders instructed the Indenture Trustee to revoke the power of the Servicer to make distributions not in compliance with the Instruction Letter (which in turn provides that distributions be made in accordance with Section 5.05(b) of the Master Indenture), which distribution scheme (as discussed below) is required by the terms of the Indenture). Pursuant to Sections 8.01 and 8.03 of the Master Indenture, the Indenture Trustee has the power to revoke the Servicer's authority to receive and distribute the proceeds of the Receivables and other Collateral. Accordingly, this Direction fully comports with the terms of the Indenture.

(iv)    **To Cause All Moneys and Proceeds from the SPV Issuer and from the Collateral to Be Applied in Accordance with the Section 5.05(b) Waterfall, including the Payment of Indenture Trustee's Fees and Expenses**. Pursuant to the Instruction Letter, the Directing Noteholders have directed that the Indenture Trustee make all future distributions from collections on the Receivables, whether through the proceeds of Receivables taken into control by the Indenture Trustee or as a result of Proceedings initiated by the Indenture Trustee, in accordance with Section 5.05(b) of the Master Indenture. Section 5.05(b) of the Master Indenture provides the waterfall for collections received by the Indenture Trustee after an acceleration of the Notes. The Section 5.05(b) waterfall basically provides for payments in the following order: first, payment of the Indenture Trustee's fees and expenses;[3] second, to the various classes of Notes, in order of priority; and finally, the remainder (if any) is turned over to the transferor (NextBank/the FDIC receiver).

In a recent telephone call, you asked whether the distribution scheme under Section 5.05(b) only applies to collections from law suits. It clearly does not. The distribution waterfall applies to all collections pursuant to Article V of the Indenture. Section 5.05(b) provides:

---

[3]    This first distribution level would provide the basis for paying the $600,000 of fees and expenses of the Indenture Trustee's counsel discussed below.

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 8

> If the Indenture Trustee **collects any money or property pursuant to this Article V** following the acceleration of maturities of the Notes . . ., it shall pay the money or property in the following order: . . . .

*See* Master Indenture, § 5.05(b)   Accordingly, distribution pursuant to the waterfall provision of Section 5.05(b) is proper when collections of interest and principal from Receivables is the collection of "money or property pursuant to [ ] Article V".

If distributions under 5.05(b) were meant to apply solely to collections from law suits, the phrase in Section 5.05(b) would not have been "pursuant to Article V", but would have been limited to "Proceedings" or "Sections 5.04 or 5.05(a)(i)".   Article V of the Master Indenture deals not only with the commencement of Proceedings (§§ 5.04 and 5.05(a)(i)), but many other types of rights and remedies, including the initiation of any remedy (§5.05(a)), actions to take control of the Collateral (§5.06), the acceleration of the Notes (§5.03), and Noteholders' directions regarding remedies and powers of the Indenture Trustee (§5.12).   At a minimum, collections are not limited to proceeds from a suit, but for collections arising from any right or remedy directed by the Noteholders.   One of the remedies available to the Noteholders is to exercise control over the Collateral, which control over Collateral can be invoked through Sections 5.05(a)(ii), 5.06 and 5.12 of the Master Indenture.   After the Indenture Trustee takes control of the Receivables (as has been directed by the Noteholders), proceeds from the Receivables will be subject to the distribution waterfall of Section 5.05(b) – indeed, such proceeds will be "money or property [collected by the Indenture Trustee] pursuant to this Article V" of the Master Indenture.   Accordingly, the Directing Noteholders' Direction to make future distributions from the moneys and proceeds of the Receivables collected by the Indenture Trustee is not only a reasonable interpretation of the Master Indenture, but such distribution is required by the express mandate of Section 5.05(b) thereof.   Accordingly, this Direction fully comports with the terms of the Indenture.

     (v)   **After Payment of the Indenture Trustee's Fees and Expenses, To Hold All Other Collections in an Escrow Account Pending Certain Events, after Which Collections to Be Distributed under Section 5.05(b).**   The Directing Noteholders also directed that after the fees and expenses (including attorneys' fees) of the Indenture Trustees are paid (including the $600,000 discussed below), that all further proceeds from the Receivables should be held in an Escrow Account pending (a) further order of a court of competent jurisdiction, (b) receipt of further directions from the Directing Noteholders (which directions of course would have to be in compliance with the terms of the Master Indenture and applicable law), or (c) collection of amounts sufficient to satisfy in full all of the Notes.   This Direction does not change who is entitled to receive distributions or how much such parties receive, but just the timing of when the Indenture Trustee makes distributions under the Section 5.05(b) waterfall to the "SECOND" and lower distribution levels.   The Directing Noteholders inserted this Direction at the request of the Indenture Trustee's counsel, who asked that proceeds from the Receivables not be distributed

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 9

immediately to the Noteholders – which delay would give a court of competent jurisdiction an opportunity to review the Noteholders' entitlement to such funds if so requested by an interested party.[4]  The Directing Noteholders also believe that this Direction fully comports with the requirements of Master Indenture Sections 5.05(a)(ii) (remedies power), 5.06 (collateral preservation power) and 8.01 of the Master Indenture (right to hold collections by the Indenture Trustee in trust for the Noteholders, for application as provided in the Indenture).  Accordingly, this Direction fully comports with the terms of the Indenture.

      (vi)    **To Initiate Suit against the SPV Issuer**.  In the Instruction Letter, the Directing Noterholders directed that the Indenture Trustee commence a suit against the SPV Issuer (the "Issuer Suit").  The Directing Noteholders also requested that the Indenture Trustee seek such declaratory and other injunctive relief in such suit as deemed necessary or advisable in the collection of the sums due and owing to the Noteholders.

      Under the terms of the Indenture, the acceleration notice causes all "unpaid principal" and "unpaid interest" on the Notes to become immediately due and payable.  *See* Master Indenture, § 5.03.  Upon the failure of the SPV Issuer to repay the demanded amount, Section 5.04(b) provides that the Indenture Trustee may institute and prosecute a suit, and seek enforcement and collection of a judgment, against the SPV Issuer for such sums so due and unpaid.  In addition, Section 5.04(c) provides that the Indenture Trustee may seek specific performance or other relief in the suit against the SPV Issuer to assist in the enforcement of rights by the Indenture Trustee and the Noteholders under the Indenture.  Section 5.05(a)(i) also authorizes the Indenture Trustee to initiate a suit against the SPV Issuer for collection of amounts due and payable on the Notes.

      Here, pursuant to the Instruction Letter, all of the unpaid principal and interest on the Notes is accelerated and is due and payable.  Initiation of a suit against the SPV Issuer is expressly contemplated under the terms of the Master Indenture to seek collection of amounts due on the Notes.  Accordingly, this Direction fully comports with the terms of the Indenture.

      (vii)    **To Pursue the Appeal of the D.C. Opinion**.  The Directing Noteholders have requested that the Indenture Trustee pursue the appeal of the D.C. Opinion (the "Appeal").  Having brought the FDIC Suit, and having expressly recognized the propriety of pursuing such Appeal in numerous correspondences and in several direction letters accepted (and drafted and/or revised) by the Indenture Trustee, the Indenture Trustee cannot now argue that pursuit of the Appeal is improper under the terms of the Indenture.

      In the Refusal Letter, you also state that in the instruction letter dated October 27, 2006, Millennium agreed that the Indenture Trustee can dismiss the Appeal unless the Indenture

---

[4]      To the extent that the Indenture Trustee wishes to rescind this suggestion, the Instruction Letter can be so modified.

NEWYORK/#170516.1

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 10

Trustee receives confirmation of arrangements satisfactory to the Indenture Trustee regarding the payment of the $600,000 over-spending by the Indenture Trustee.[5] This assertion is wholly unsupported. As set forth below, the $600,000 deficit spending was unauthorized and, as such, if the Indenture Trustee dismisses the Appeal based upon fees and expenses incurred beyond the authority conferred under the August 2005 Instruction Letter (as defined below), such dismissal would constitute a direct breach of its duties to the Noteholders. Furthermore, as set forth above, the Directing Noteholders have provided arrangements for the full payment of such expenses, and the Indenture Trustee's refusal to accept such payment mechanisms is patently unreasonable.

(viii)     **To Distribute the Spread Accounts in Accordance with the Terms of the Indenture**. The Directing Noteholders also directed that the Indenture Trustee "distribute the amounts held in the Spread Accounts in accordance with the terms of the Indenture." Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Accounts and the proceeds thereof. *See* Indenture Supplement, § 4.11(a). Following the occurrence of an Event of Default and acceleration of the Notes, the Spread Accounts are required to be liquidated, with the funds distributed first to Class C Noteholders to fund any shortfall of amounts due to such Noteholders under Section 5.02 of the Indenture Supplement. This Direction does nothing more than direct the Indenture Trustee to implement the mandatory terms of the Indenture relating to the distribution of the funds in the Spread Accounts after an Event of Default and acceleration of the Notes. Accordingly, this Direction fully comports with the terms of the Indenture.

(ix)     **To Pursue the Issuer Suit and the Appeal of the D.C. Opinion in Accordance with Directions from Directing Noteholders**. The Instruction Letter includes a provision in which the Directing Noteholders, as the parties who are responsible for the indemnification provided to the Indenture Trustee under the Instruction Letter, are granted the right to direct the prosecution of the Appeal and the Issuer Suit or, if no such direction is given, that such suits may be pursued as determined in the reasonable discretion of the Indenture Trustee. This type of direction has been accepted in the past by the Indenture Trustee with respect to the FDIC Suit and is common for litigations that are authorized by directing noteholders under indentures. Accordingly, this Direction fully comports with the terms of the Indenture.

(x)     **To Retain Co-Counsel for Carrying Out Directions**.     Pursuant to the Instruction Letter, the Directing Noteholders have directed that the Indenture Trustee retain Vedder, Price as co-counsel for the Indenture Trustee in effecting the Directions. Under the terms of the Master Indenture, the Directing Noteholders have a right "to direct the time, manner

---

[5]     Millennium only accepted this provision in the October 27th Instruction Letter when the Indenture Trustee – in complete dereliction of its duties – informed Millennium that it would not file the notice of appeal without such provision, which demand was made literally two hours before the deadline for such filing. To prevent irreparable harm to all Noteholders that would have occurred if the notice of appeal had not been filed, Millennium agreed to this last minute ultimatum by the Indenture Trustee.

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 11

and place of any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any power conferred on the Indenture Trustee with respect to the Notes . . . " *See* Master Indenture § 5.12. Requiring an indenture trustee to retain an additional co-counsel selected by directing noteholders is a common direction that is put into place for litigations that are authorized by directing noteholders under indentures. Such a Direction is not only reasonable and within the rights granted to the Directing Noteholders under the Indenture, but is a practical necessity to ensure the successful pursuit of the remedies directed by the Directing Noteholders. Accordingly, this Direction fully comports with the terms of the Indenture.

     (xi)    **To Send Out a Notice of Election of Remedies and To Organize a Noteholders' Conference Call**. Pursuant to the Instruction Letter, the Directing Noteholders have requested that the Indenture Trustee send out a notice of the election of remedies and schedule a Noteholders' conference call. These actions are fully within rights of the Indenture Trustee under the Indenture. In addition, the Directing Noteholders included these provisions at the express request of the Indenture Trustee. Accordingly, these Directions fully comport with the terms of the Indenture.

**D.**    **In Accordance with Past Practices, the Indemnification Provided is Appropriate**

     In the Refusal Letter, you have also stated that the indemnification provided by the Directing Noteholders is not reasonably satisfactory to the Indenture Trustee. Such contention lacks credibility. As you know, Millennium has a net worth of billions of dollars – a fact which Millennium has confirmed to you through requested disclosures of financial information – which fully protects the Indenture Trustee from any risk of personal liability. Further, the Indenture Trustee has accepted the same form of Indemnification repeatedly in the past. Accordingly, your contention that the indemnification is not satisfactory lacks credibility.

**E.**    **Holding the Directions Hostage to the Repayment of Unauthorized Legal Fees and Expenses Amounts to a Breach of the Trustee's Duties to the Noteholders**

     In your e-mail of November 2, 2006, referenced in the Refusal Letter, you also demand that as part of the indemnification Millennium fully indemnify the $600,000 of legal fees incurred primarily by Alston & Bird in pursuing the FDIC Suit. As we have repeatedly informed you, this "demand" is patently unreasonable. Indeed, this demand appears to be the true reason why you have "decline[d] to accept the Instruction Letter".

     Apparently, Alston & Bird spent in excess of $600,000 above the fund established to finance prosecution of the FDIC Suit in the instruction letter delivered in August 2005 (the "August 2005 Instruction Letter"). In the August 2005 Instruction Letter, a majority of the Noteholders directed the Indenture Trustee to:

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 12

> "proceed to litigate/and or settle [the FDIC Suit], as currently pled in the
> Count 6 [of the FDIC Suit], and any possible appeal thereof to the United
> States Court of Appeals for the District of Columbia Circuit, including
> taking discovery, preparing the record, briefing and arguing related
> motions and the submission of Count 6 to these Courts in due course, and
> all other actions necessary to the litigation or settlement of Count 6 in the
> ordinary course."

As part of the process of establishing the fund under the August 2005 Instruction Letter,
Millennium requested that Alston & Bird estimate the total amount of fees needed to fund the
litigation of the FDIC Suit and the appeal thereof. We received an estimate that the total cost of
the litigation (including the appeal) would be less than $700,000. Being responsible, Millennium
built in a reserve of approximately160% of the stated amount – amounting to in excess of $1.1
million – which funds were set aside in an expense account (the "Expense Account") by the
Indenture Trustee to fund the FDIC Suit and any appeal thereof. The August 2005 Instruction
Letter further states, as was accepted by the Indenture Trustee and Alston & Bird, that:

> It is anticipated that the Expense Account will be sufficient to cover the
> fees and expenses associated with pursuing Count 6 (including the costs
> and expenses of any appeal). If inadequate, the Indenture Trustee agrees
> that it shall seek further direction from the August 2005 Directing
> Noteholders before incurring fees and expenses related to Count 6 in
> excess of the amounts deposited in the Expense Account.

As you know, the Indenture Trustee exceeded its fee and expense estimate for pursuing Count 6
by not just a little, but by well over double over its original estimate. In fact, the August 2005
Directing Noteholders were not even approached for further instructions until the fees and costs
had exceeded the Expense Account by over $400,000. As such, the $600,000 in fees is not only
in excess of the Expense Account, but is an unauthorized expense pursuant to the express terms
of the August 2005 Instruction Letter. Further, the egregiousness of the expense overrun is
highlighted by the fact that the cap was exceeded after only a portion of the litigation had been
completed – only the liability stage of the FDIC Suit has concluded, and no Expense Account
amounts were spent in the damage stage or the Appeal.

As expenses unauthorized by the August 2005 Instruction Letter, the August 2005
Directing Noteholders have no responsibility to fund such *ultra vires* fees and expenses. Indeed,
the demand by the Indenture Trustee to include such overrun fees and expenses in the Instruction
Letter is egregious. The current Instruction Letter primarily relates to matters unrelated to the
FDIC Suit – and compelling the Directing Noteholders to condition taking such actions against
the SPV Issuer and the Collateral has no justification. Nowhere in the Indenture are Noteholders
required to include in an indemnification in a new instruction letter for obligations unrelated to

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 13

such instructions – especially, as in the instant case, for overrun expenses that were not authorized.

Accordingly, the refusal by the Indenture Trustee to honor the Directions and the Instruction Letter based upon concerns regarding the unauthorized $600,000 of expenses amounts to a patent breach of duties to the Noteholders. This refusal is also unreasonable in that the Instruction Letter provides both a definitive means for the payment of such $600,000 of fees and an express authorization to make such payments from the proceeds of the Receivables. Why is the Indenture Trustee threatening the Noteholders for solving a problem that the Noteholders had no part in creating?

**F.    Requirement to Deliver Unqualified Opinion is Patently Unreasonable**

The requirement that the Directing Noteholders provide an "unqualified opinion" is patently unreasonable – such an opinion is not a requirement for Noteholders to give directions under the Indenture and cannot be given in accordance with accepted opinion practice regarding the exercise of remedies. The sole requirements placed upon Noteholders in directing the Indenture Trustee is to provide the Indenture Trustee with "reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such . . . direction." *See* Master Indenture, §6.03(d). As set forth above, the Directing Noteholders have provided sufficient indemnification to the Indenture Trustee. The requirement that the Noteholders be compelled to deliver an "unqualified opinion" directly contravenes the express provisions of the Indenture.

Further, as we have also mentioned to you, it is beyond accepted opinion practice to give an unqualified opinion – as you requested – with respect to remedies. Such a request asks for an opinion in contravention to accepted practices as enunciated by the Tribar Opinion Committee on Third-Party Legal Opinions. No law firm could give such an opinion – and your insistence upon delivery of such an "unqualified opinion" demonstrates the patent unreasonableness of the Indenture Trustee's position.

In sum, not only is the giving of an "unqualified opinion (or for that matter, any opinion) beyond the requirements of the Indenture, such an opinion cannot reasonably be requested. As such, the Indenture Trustee's requirement for an "unqualified opinion" amounts to a breach of duty by the Indenture Trustee and contravenes the duties imposed upon the Indenture Trustee under the Indenture.

Although not required by the Indenture, but to move matters forward, Millennium has authorized us to make the following statement. Although this letter does not constitute a legal opinion as to any of the issues addressed herein, the Indenture Trustee can consider this letter as "advice from counsel" within the meaning of Section 5.12(a) of the Master Indenture.

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 14

**G.    Importance of Directions and Irreparable Material Harm
that the Trustee's Actions Will Inflict upon the Noteholders**

The failure by the Indenture Trustee to follow the Directions set forth in the Instruction Letter will cause severe and irreparable harm to the Noteholders. As you know, there are only three sources of recovery for the Noteholders to receive payment on the unpaid principal and interest due on Notes – which obligations now exceeds $112 million in face principal amount:

(i)     the approximately $22.8 million held in the Spread Accounts;
(ii)    collection on the Collateral (comprised of the Receivables) – which has a value in excess of $70 million; and
(iii)   the FDIC Suit, which is subject to the Appeal.

The failure by the Trustee to implement the Directions will irreparably harm the value of the Collateral and the prosecution of the Appeal. As you know, with the final maturity date for the Notes rapidly approaching – next month (December 15, 2001) for the 2000-1 Series and on April 15, 2007 for the 2001-1 Series – the failure by the Indenture Trustee to undertake the Directions may result in the Collateral being released to the Transferor – thereby by itself causing over $70 million of damages to the Noteholders. Further, the Collateral is dissipating each month. As set forth in the Instruction Letter, the Notes should be accelerated and the value of the Collateral must be held for the benefit of the Noteholders to satisfy the outstanding amounts due on the Notes. If the Indenture Trustee fails to accelerate the Notes, take immediate control of the Collateral and use the proceeds to repay the Notes, the Indenture Trustee will be breaching its duties to the Noteholders and be causing the Noteholders damages in excess of $70 million.

With respect to obtaining a recovery against the FDIC for conversion of Collateral, the Appeal must be pursued. The failure by the Indenture Trustee to pursue the Appeal will cause the irreparable loss of any rights to seek recovery against the FDIC.

In sum, Millennium believes that it (and all of the Noteholders) will receive full or close to full recovery on the Notes if the Indenture Trustee takes the Directions. Millennium believes that the Indenture Trustee should be responsible for any unpaid principal and interest on the Notes if the Indenture Trustee fails to follow the Instruction Letter -- and Millennium may pursue remedies against the Indenture Trustee for such failure.

**H.    Summary**

We have carefully reviewed each of the provisions of the Indenture, the pleadings in the FDIC Suit, and the D.C. Opinion. We strongly believe that the Directions described above are, at the very least, reasonable interpretations of the documents. In addition to the reasonableness of the positions stated, the Indenture Trustee is fully protected by the Indemnification provided in the Instruction Letter. Accordingly, we strongly believe that, and in accordance with Section

VEDDERPRICE

Gary Roth, Esq.
November 13, 2006
Page 15

5.12(a) of the Indenture, the Instruction Letter and the Directions therein (a) fully comport with, and do not contravene, the Indenture, (b) are in compliance with the "rule of law", including with respect to the D.C. Opinion and FDIC Suit, and (c) do not constitute any illegal action. Further, given the broad indemnifications provided to the Indenture Trustee in the Instruction Letter, the indemnification provided to the Indenture Trustee is reasonable and proper. In this regard, even if any of the reasons posited herein are incorrect – which we believe is not the case -- the Directing Noteholders have provided indemnity against the "costs, expenses and liabilities which might be incurred" by the Indenture Trustee as a result of its actions taken under the terms of the Instruction Letter, as is required pursuant to Section 6.03(d) of the Master Indenture. Accordingly, the Indenture Trustee is protected against risk of personal liability. Further, the Instruction Letter and the Directions therein will protect all Noteholders from suffering imminent, irreparable injury through the loss of their Collateral and the rights to pursue the FDIC.

In sum, contrary to the unsupported allegations in the Refusal Letter, there is no basis for the Indenture Trustee to refuse to honor the Instruction Letter or to immediately undertake the Directions. Indeed, given the proximity to the November 15th distribution date, we urge the Indenture Trustee to act immediately. Failure by the Indenture Trustee to so act will be in direct contravention of its duties to the Noteholders and expose the Noteholders to approximately $90 million of irreparable injury. Once again, it is imperative for the Indenture Trustee to take immediate action to prevent irreparable harm to the Noteholders caused by an unreasonable breach of duty by the Indenture Trustee.

We hope that this letter clarifies matters for the Indenture Trustee and prevents any further misunderstandings. We look forward to working with you in implementing the Directions in a consensual manner – after all, our interests should be aligned here.

Very truly yours,

Michael J. Edelman

cc:    The Directing Noteholders
       H. Stephen Harris, Esq.
       John Douglas, Esq.
       Ms. Loretta Lundberg
       Robert E. Bailey, Esq.
       Douglas Lipke, Esq.

NextCard Credit Card Master Note Trust

Series 2000-1 and Series 2001-1 Asset Backed Notes

**DIRECTIONS TO INDENTURE TRUSTEE AND INDEMNIFICATION REGARDING (A) NOTICE OF EVENT OF DEFAULT AND ACCELERATION AND (B) EXERCISE OF REMEDIES UNDER MASTER INDENTURE SECTION 5.05**
November 9, 2006
(this letter of instruction, the "Instruction Letter")

Reference is hereby made to the Master Indenture, as amended and supplemented (the "**Master Indenture**"), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the "**Issuer**") and The Bank of New York, as indenture trustee (the "**Indenture Trustee**"), and to the Transfer and Servicing Agreement, as amended (together with the Master Indenture, the "**Agreements**"), dated as of December 11, 2000, between NextBank, N.A. ("**NextBank**"), as transferor and servicer, and the Issuer, and acknowledged and accepted by the Indenture Trustee. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Agreements.

The parties identified in Schedule 1 to this Instruction Letter (the "**Directing Holders**") are the beneficial owner of the Notes designated on the signature and certification page provided by or on behalf of such owners. Each Directing Holder represents and warrants to the Indenture Trustee that it is either (i) the legal and beneficial owner of such Notes or (ii) the nominee or advisor for the legal and beneficial owner of such Notes, authorized by such beneficial owner to execute and deliver this Instruction Letter to the Indenture Trustee on behalf of such legal and beneficial owner.

Pursuant to the applicable terms of the Agreements:

(i)    the Directing Holders hereby irrevocably direct the Indenture Trustee to execute the Notice of Event Default and Acceleration under Master Indenture in substantially the form annexed hereto as Exhibit A (updated to reflect the addressees in the carbon copies in accordance with the Indenture Trustee's records) and to deliver such notice in accordance with the terms thereof on or prior to November 14, 2006;

(ii)    from and after the delivery of the Notice of Event of Default and Acceleration, in accordance with Section 5.05(a)(ii) of the Master Indenture, the Directing Holders hereby irrevocably direct that the Indenture Trustee (a) to exercise control over the Collateral in accordance with section 8.01 of the Master Indenture, (b) to continue to hold the Collateral and collection of proceeds therefrom through (unless otherwise ordered by a court of competent jurisdiction) the date that all Notes are fully repaid in accordance with the provisions hereof without regard to the occurrence of any Final Maturity Date with respect to any Series, (c) to the extent necessary to carry out these instructions, pursuant to Section 8.03 of the Indenture, to revoke the power of the Servicer to make distributions other than as specifically authorized in this

Instruction Letter, and (d) subject to the following provisions, cause all moneys and proceeds received from the Issuer or from the Collateral to be applied in accordance with the distribution waterfall set forth in Section 5.05(b) of the Master Indenture, _provided_ that (A) such distributions in accordance with this provision shall continue through (unless otherwise ordered by a court of competent jurisdiction) the full repayment of the Notes, in each case regardless of the occurrence of any Final Maturity Date with respect to any Series, and (B) the Indenture Trustee shall only make distributions the "FIRST" subclause in Section 5.05(b) pending the first to occur of the following (a **"Release Event"**): (1) upon receipt of authorization to distribute proceeds from the court in the New York Suit in accordance with the instructions of such court or from such other court of competent jurisdiction, (2) upon receipt of directions from the Directing Holders to distribute such proceeds in accordance with Section 5.05(b) of the Master Indenture, or (3) upon receipt of collection of the amounts needed to fully satisfy all outstanding Notes, to distribute such proceeds in accordance with Section 5.05(b) of the Indenture; _provided further_ that, from and after the date hereof, pending the occurrence of the Release Event, that the Indenture Trustee shall hold (unless otherwise ordered by a court of competent jurisdiction), all proceeds from the Collateral in an escrow account (or if such is not practicable as reasonably determined by the Indenture Trustee, held in the Collections Account) for the benefit of the Noteholders; _provided further_ that amounts paid to the Indenture Trustee under the "FIRST" clause of such Section 5.05(b) of the Master Indenture shall be limited as follows: (x) the current fees and expenses of the Indenture Trustee shall not exceed $600,000 (the **"Past Amounts"**) with respect to pending out-of-pocket expenses relating to the action entitled The Bank of New York v. Federal Deposit Insurance Company in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH) (the **"FDIC Suit"**), (y) the reasonable fees and expenses in connection with (i) the Issuer Suit (as defined herein), (ii) the fees and expenses relating to the appeal (the **"Appeal"**) of that certain Memorandum Opinion issued in the FDIC Suit on or about September 28, 2006, (iii) any expenses and costs incurred by the Indenture Trustee and its agents and professionals in defending against any Proceedings or efforts in which parties seek the disgorgement of any amounts distributed pursuant to the Directions; and (iv) other matters related to this Instruction Letter, which fees and expenses shall be subject to review as to reasonableness by the Directing Holders, and (z) to reimburse Vedder, Price, Kaufman & Kammholz, P.C. (**"Vedder Price"**), as co-counsel for the Indenture Trustee as provided herein;

      (iii)     the Directing Holders hereby irrevocably direct the Indenture Trustee to take appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes in accordance with section 5.05(a)(i) and (ii) of the Master Indenture, and specifically including, but not limited to:

      (a)     promptly after the delivery of the Notice of Event Default and Acceleration, but in any event on or prior to November 17, 2006, execute the Notice of Exercise of Remedies under Section 5.05(a) of the Master Indenture in substantially the form annexed hereto as Exhibit B

(updated to reflect the addressees in the carbon copies in accordance with the Indenture Trustee's records) and to deliver such notice in accordance with the terms thereof as soon as reasonably practicable after the delivery of the Notice of Default under Indenture and Notice of Acceleration; and

(b)    in accordance with sections 5.03 and 5.05(a)(i). promptly after the delivery of the Notice of Event Default and Acceleration, but in any event on or prior to November 17, 2006, commence an action in the Supreme Court of the State of New York sitting in New York County (the "**Issuer Suit**"), which action will seek (i) to obtain a judgment against the Issuer for the full unpaid principal and interest due on the accelerated Notes, (ii) to the extent deemed necessary or advisable by the Directing Holders, to obtain a declaratory judgment authorizing the payment of all amounts due to the Series C and Series D Noteholders in accordance with Indenture Section 5.05(b); and (iii) to obtain any other injunctive relief to the extent required or deemed advisable by the Directing Holders for the continuation of the existence of Issuer and the Collateral and the continuation of the distributions of Available Finance Charge Collections, Available Principal Amount Collections and other distributions from the Collateral in accordance with the Section 5.05(b) of the Master Indenture until all unpaid principal and interest have on the Notes under all Series have been repaid in full, all to be effected in accordance with the terms of the Master Indenture without regard to the occurrence of any Final Maturity Date with respect to any Series, which injunctive or declaratory actions may include, without limitation, the authority to calculate Available Principal Collections with respect to each Series using the Invested Amount for each Series as of January 31, 2002 (less any principal amounts actually repaid to the Noteholders); and

(c)    the Directing Holder hereby irrevocably direct that any amounts recovered in the Issuer Suit be distributed in accordance with the provisions of Section 5.05(b) of the Master Indenture;

(iv)    the Directing Holders hereby irrevocably direct the Indenture Trustee to pursue the appeal (the "**Appeal**") to the United States Court of Appeals for the District of Columbia of the decision of the court in the action entitled The Bank of New York v. Federal Deposit Insurance Company in the United States District Court for the District of Columbia, Civil Action No. 03-1221 (ESH);

(v)    the Directing Holders hereby irrevocably direct the Indenture Trustee to distribute the amounts held in the Spread Accounts in accordance with the terms of the Indenture;

(vi)    the Directing Holders hereby irrevocably direct the Indenture Trustee (a) to prosecute, pursue, settle, withdraw, dismiss and/or abandon each of the Appeal and the Issuer Suit in accordance with the directions from the Directing Holders (or, as the case may be, a purchaser or transferee from any undersigned Directing Holder, to the extent of the interest so sold or transferred in

3

accordance with the terms of this Instruction Letter) or, if no such directions are given promptly after a request is made by the Indenture Trustee, in accordance with the reasonable discretion of the Indenture Trustee, and (b) with respect to any other Direction, if the Directing Holders (or, as the case may be, a purchaser or transferee from any undersigned Directing Holder, to the extent of the interest so sold or transferred in accordance with the terms of this Instruction Letter) so instruct the Indenture Trustee in writing, to cease continuation of any such Direction provided that such instruction is in conformance with the terms of the Indenture and applicable law;

(vii) the Directing Holders hereby irrevocably direct the Indenture Trustee to retain Vedder Price, at such firm's standard hourly rates, to serve as co-counsel with Alston & Bird LLP ("**Alston & Bird**") for the above actions and Directions, provided, however, that such fees and expenses of Vedder Price shall be payable from distributions under Master Indenture Section 5.05(b) and shall be non recourse to the Indenture Trustee. As Co-Counsel, Vedder Price shall provide Alston in a timely and reasonable manner Vedder Price's analysis and recommended course of action on strategic decisions in the course of the actions and Directions and input on pleadings in the Appeal and the Issuer Suit; and Alston & Bird LLP shall provide Vedder Price with reasonable advance notice (to the extent practicable) with respect to the foregoing. Vedder Price shall not serve as counsel of record in any litigation, and Alston & Bird shall remain lead counsel to the Indenture Trustee in all litigation and in connection with all other legal aspects of issues related to the Indenture Trustee's duties as Indenture Trustee;

(viii) the Directing Holders hereby irrevocably direct the Indenture Trustee to organize a conference call with the Noteholders to review these matters with any Noteholders who wish to attend such a conference call.

The foregoing directions are referred to herein as the "**Directions.**"

Pursuant to Section 6.03(d) of the Master Indenture, each of the undersigned Directing Holders, subject to the provisions of this Instruction Letter, hereby agrees to, and shall, pay and reimburse any and all (and with respect to each of the undersigned other than RMK Advantage Income Fund, which obligations shall be on a joint and several basis, but, with respect to RMK Advantage Income Fund, it shall only be liable for its pro rata share of such obligations (based upon outstanding Notes)), the Indenture Trustee and each director, officer, employee and agent of the Indenture Trustee (the Indenture Trustee and each such other person being an "**Indemnified Person**") on demand for, and to indemnify, defend and hold harmless each such Indemnified Person from and against, any and all of the following losses, liabilities, judgments, claims, causes of action, reasonable out-of-pocket costs and expenses (including reasonable fees and disbursements of counsel, employees, agents and persons not regularly in the Indenture Trustee's employ) (collectively referred to herein as "**Losses**") incurred or suffered by an Indemnified Person in any way, directly or indirectly, arising out of, related to, or connected with, the compliance by any Indemnified Person with the terms of this Instruction Letter and the Directions set forth herein or the taking or not taking of action in accordance with this Instruction Letter and the Directions set forth herein:

4

(i)    all costs and expenses associated with the Directions;

(ii)    all costs and expenses incurred by the Indenture Trustee and its agents and professionals in defending against any Proceedings or efforts in which parties seek the disgorgement of any amounts distributed pursuant to the Directions;

(iii)    any claim, cause of action, litigation, proceeding, action or investigation (whether civil or administrative, but excluding criminal, and whether sounding in tort, contract or otherwise and whether or not such Indemnified Person is a party to such litigation, proceeding, action or investigation) in any way, directly or indirectly, arising out of, related to, or connected with, the compliance by any Indemnified Person with the terms of this Instruction Letter and the Directions set forth herein or the taking or not taking of action by any Indemnified Person in accordance with this Instruction Letter and the Directions set forth herein; and

(iv)    Losses resulting from, arising out of, or in any manner connected with, directly or indirectly, (a) a determination that any Indemnified Person breached any duty as a result of relying upon and complying with, and taking or not taking of any action in accordance with, this Instruction Letter and the Directions set forth herein, and (b) the enforcement of this Instruction Letter;

provided, however, that the foregoing indemnity (the **"Indemnity"**) shall not be applicable to any Losses suffered or incurred by an Indemnified Person as a result of such Indemnified Person's gross negligence or willful misconduct as determined by a judgment of a court that is binding on such Indemnified Person, is final and is not subject to review on appeal. Amounts payable by the Directing Holder with respect to the Indemnity shall be invoiced (with supporting detail) to the Directing Holder on a monthly basis, and shall be payable by the Directing Holder within thirty (30) days of such Directing Holder's receipt of such invoice. Amounts not paid by the Directing Holder when due shall accrue interest at the prime rate and such interest shall be payable on demand to the Indenture Trustee.

The Directing Holders hereby acknowledge and agree that, notwithstanding the Directions, the Indenture Trustee may discontinue pursuing the exercise of remedies under Section 5.05 of the Master Indenture or taking any other actions to carry out the Directions upon 30 days notice to the Directing Holder if it is anticipated that the distributions to the Indenture Trustee under Section 5.05(b) will not be sufficient to cover the fees and expenses (including the internal costs and expenses of the Indenture Trustee) associated with these Instructions and the Indenture Trustee has not received reasonable assurances that additional funds will be made available to cover such fees and expenses. It is further understood and agreed that (a) the Indenture Trustee's professionals shall render invoices for their services at least once every 60 days; (b) the reasonable fees and expenses of the Indenture Trustee's professionals shall be paid within thirty (30) days after the presentation of an invoice for such reasonable fees and expenses to the Indenture Trustee and the Directing Holders; and (c) the Indenture Trustee shall have the right to discontinue pursuing any of the Appeal, the Issuer Suit or any of the other Directions if any such fees and expenses have not been

paid within such (30) days. The Indenture Trustee shall have no obligation to advance any funds to pay any such expenses. Notwithstanding any other provision of this Instruction Letter, the rights and obligations of the Indenture Trustee under this Instruction Letter shall be subject to the standards and provisions set forth in Section 6.03 of the Master Indenture as though such Section were set forth in and referred to this Instruction Letter.

The Indenture Trustee and any legal counsel engaged to carry out these Instructions ("**Legal Counsel**") shall cooperate and coordinate with the Directing Holders in connection with such action and all related matters. The Directing Holder shall have full, complete and timely access to all information developed or discovered in connection with any of the actions taken pursuant to this Instruction Letter and the Directions set forth herein, including, without limitation, the authority to communicate and discuss with any Legal Counsel any issues or matters relating to such actions or proceedings it may so desire from time to time. The Indenture Trustee agrees to direct each Legal Counsel to fully disclose and discuss, provide information with respect to and answer any questions regarding such issues and matters as the Directing Holder may request from time to time, and such parties shall be deemed covered by a joint prosecution and defense privilege with respect to any suits, actions or appeals commenced or relating to these Instructions.

This Instruction Letter and the representations and warranties contained herein shall be binding upon the Indenture Trustee, the Directing Holders and their successors and assigns. This Instruction Letter shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. In addition, the Directing Holders hereby agree that it shall not sell, transfer, convey, assign or exchange its Notes, unless such purchaser or transferee agrees, in writing, to be bound by this Instruction Letter (including the indemnification provisions hereunder). Unless consented to in writing by the Indenture Trustee, which consent may not be unreasonably withheld, no such transfer will release the Directing Holders from its obligation to provide the Indemnity provided hereunder.

Except as otherwise provided herein, no termination, amendment, modification or waiver of this Instruction Letter (including without limitation the Indemnity provided hereunder) shall be given effect without the prior written consent of the Directing Holders and the Indenture Trustee.

The Directing Holders hereby represent and warrant that this Instruction Letter (including without limitation the Indemnity provided hereunder) has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency or other similar laws affecting creditors' rights generally and (ii) general principles of equity; and hereby waives any defenses based upon the invalidity of such representations and warranties.

The Indemnity provided herein shall be in addition to any other remedies, relief or indemnification available to any Indemnified Person. The rights and remedies conferred hereunder shall be cumulative and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies or the subsequent exercise of such right or remedy.

6

The terms of this Instruction Letter (including without limitation the Indemnity provided hereunder) will be governed by and construed in accordance with the laws of the State of New York (without giving effect to any law that would result in the application of the laws of any other jurisdiction). All actions and proceedings relating to or arising from, directly or indirectly, this Instruction Letter (including without limitation the Indemnity provided hereunder) may be brought by any Indemnified Person in courts located within the State of New York and the Directing Holders and the Indenture Trustee hereby submit to personal jurisdiction of such courts for such actions or proceedings.

Notwithstanding anything to the contrary in this Instruction Letter or the Directions, the Directing Holders' indemnification provided hereunder shall not be responsible for or cover the Past Amounts. Further, notwithstanding anything to the contrary in this Instruction Letter or the Directions, nothing herein affects the rights (if any) or obligations (if any) of any person or entity with respect to the payment or entitlement to payment for the Past Amounts.

The certification attached hereto and the signature pages to this Instruction Letter may be executed by the Indenture Trustee and the Directing Holders, as the case may be, in separate counterparts and the Indenture Trustee is hereby instructed to accept the signature pages as such counterparts. Facsimile signatures and signature pages provided in the form of a "pdf" or similar imaged document transmitted by electronic mail shall be deemed original signatures for all purposes hereunder.

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:   Millennium Partners, L.P.
(Print Name of Authorized Signature):  Fred Stone
Title:  Secretary |  Senior Managing Director
Signature:  _____
Address:  666 5th Avenue, 8th Floor, New York, New York 10103
Phone:  (212) 841-4100
FAX:  (212) 841-4141
E-mail:  fstone@mlp.com
Class of Securities:  NextCard 2001-1A C
CUSIP No.:  65334UAG8
Total Current Principal Amount of Securities Owned as of the Date Hereof:  $19,240,000
Total Original Principal Amount of Securities Owned as of the Date Hereof:  $40,000,000
DTC Participant Name:  _____
DTC Participant No.:  2474
Date:  November 9, 2006

14

## SCHEDULE 1
## SIGNATURE AND CERTIFICATION PAGE

### Complete Section A or B as appropriate:

### A. EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  Millennium Partners, L.P.

(Print Name of Authorized Signature): Fred Stone

Title: ~~Secretary~~ Senior Managing Director

Signature: _Fred Stone_

Address: 666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2000-1A C

CUSIP No.:  65334UAC7

Total Current Principal Amount of Securities Owned as of the Date Hereof: $16,243,500

Total Original Principal Amount of Securities Owned as of the Date Hereof: $24,500,000

DTC Participant Name:

DTC Participant No.:  2474

Date:  November 9, 2006

14

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner: __First Millennium, Inc.__

(Print Name of Authorized Signature): _Fred Stone_

Title: ~~Secretary~~ _Senior Managing Director_

Signature: _____

Address: _666 5th Avenue, 8th Floor, New York, New York 10103_

Phone: _(212) 841-4100_

FAX: _(212) 841-4141_

E-mail: _fstone@mlp.com_

Class of Securities: _NextCard 2000-1A D_

CUSIP No.: _65334UAD5_

Total Current Principal Amount of Securities Owned as of the Date Hereof: _$6,000,000_

Total Original Principal Amount of Securities Owned as of the Date Hereof: _$6,000,000_

DTC Participant Name: _N/A_

DTC Participant No.: _N/A_

Date: _November 9, 2006_

14

**SCHEDULE 1**
**SIGNATURE AND CERTIFICATION PAGE**

**Complete Section A or B as appropriate:**

**A. EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  First Millennium, Inc.

(Print Name of Authorized Signature):  Fred Stone

Title:  ~~Secretary~~  Senior Managing Director

Signature:

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2001-1A D

CUSIP No.:  65334UAH6

Total Current Principal Amount of Securities Owned as of the Date Hereof: $13,000,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $13,000,000

DTC Participant Name:  N/A

DTC Participant No.:  N/A

Date:  November 9, 2006

**SCHEDULE 1 (CONTINUED)**

## B. EXECUTION BY NOMINEE OR ADVISOR

The undersigned hereby represents and warrants that it is the nominee or advisor for the beneficial owner indicated below of NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes, and that the beneficial owner has granted to the undersigned the power and authority to deliver this Certification to the Indenture Trustee on behalf of such beneficial owner.

Name of Beneficial Owner: RMK Advantage Income Fund

Name of Nominee or Advisor: Daymaster & Co.

(Print Name of Authorized Signature): Jim Kelsoe

Title: Managing Director

Signature:

Address: 1100 Ridgeway Loop Road, Suite 510, Memphis, TN 38120

Phone: 901-374-7814

FAX: 901-374-7827

E-mail: jim.kelsoe@morgankeegan.com

Class of Securities: Series 2000-1A / Class C

CUSIP No.: 65334UC7

Total Current Principal Amount of Securities with Respect to Which Certification is Made as of the Date Hereof: $6,640,464.00

Total Original Principal Amount of Securities with Respect to Which Certification is Made as of the Date Hereof: $10,000,000.00

DTC Participant Name: State Street Bank & Trust

DTC Participant No.: 997

Date: November 4, 2006

# EXHIBIT A

**Notice of Event Default and Acceleration under Master Indenture**

November __, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

Re:    NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1
       Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER
       INDENTURE AND NOTICE OF ACCELERATION FOR BOTH
       SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (the **"Noteholders"**) arising from the secured loans made to the Issuer under the Master Indenture, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes.

The Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to any Series, the Indenture Trustee may pursuant to section 5.03 of the Master Indenture, by delivery of written notice to the Issuer, declare all of the Notes with respect to such Series to be immediately due and payable, whereupon the unpaid principal amount of such Notes, together with accrued but unpaid interest thereon through the date of acceleration and all other amounts due under the Master Indenture and the Notes shall immediately become due and payable.

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes. NextBank, N.A.'s entry into receivership on February 7, 2002 constituted a Trust Redemption Event which triggered the commencement of the Early Amortization Period, whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1

Notes and Series 2001-1 Notes. Contrary to its obligations under the Master Indenture and the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes, Issuer failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. The Issuer's failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: · | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $56,486,500.00 |
| | |
| TOTAL NOTES: | $112,109,000.00 |

The Indenture Trustee, pursuant to a directive of the Noteholders, hereby declares all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable. The Indenture Trustee hereby demands that the Issuer immediately pay in full the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholder expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture
    Trustee

By _____
    Name:
    Title:

cc:     The Administrator
            [Does trustee have this address?]
        The Servicer
            [Does trustee have this address?]
        FDIC
        [Does trustee have this address?]
        Scott H. Christensen, Esq.
        H. Stephen Harris, Esq.
        Michael J. Edelman, Esq.

# EXHIBIT B

**Notice of Exercise of Remedies**

November __, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

Re:    NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset
       Backed Notes - **NOTIFICATION OF EXERCISE OF REMEDIES UNDER
       MASTER INDENTURE SECTIONS 5.04 AND 5.05(a)**

TO THE ABOVE REFERENCED PARTIES:

   Reference is hereby made to the Master Indenture, as amended and supplemented (the "**Master Indenture**"), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the "**Issuer**") and The Bank of New York, as indenture trustee (the "**Indenture Trustee**"), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

   The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (collectively, the "**Noteholders**") arising from the secured loans made to the Issuer under the Master Indenture and the Indenture Supplements, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes. Pursuant to that certain Notice of Default under Master Indenture and Notice of Acceleration, dated November 14, 2006, the Indenture Trustee has accelerated all obligations due under the Series 2000-1 Notes and Series 2001-1 Notes, whereupon the following principal amounts of Notes became due and payable:

| | |
|---|---:|
| Series 2000-1 Notes: | |
|  Class C Notes: | $38,122,500.00 |
|  Class D Notes: | <u>$17,500,000.00</u> |
|  Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
|  Class C Notes: | $31,986,500.00 |
|  Class D Notes: | <u>$24,500,000.00</u> |
|  Total Outstanding Principal Amount of Series 2001-1 Notes: | <u>$56,486,500.00</u> |
| | |
| TOTAL OUTSTANDING PRINCIPAL AMOUNT OF NOTES: | **<u>$112,109,000.00</u>** |

NY#159812
NEWYORK/#159812.4

Sections 5.04 and 5.05(a) of the Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to the Notes, and the Notes have been accelerated pursuant to Section 5.03 of the Master Indenture, the Indenture Trustee may take any appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Noteholders.

Notice is hereby given that the Indenture Trustee (a) is commencing a Proceeding against the Issuer before the Supreme Court of the State of New York sitting in New York County for with respect to the Series 2000-1 Notes and Series 2001-1 Notes seeking to obtain a judgment against the issuer for the unpaid principal and interest on such Notes issued by the Issuer and for related relief and (b) is seeking to enforce remedies against the Collateral.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture Trustee

By _____
      Name:
      Title:

cc:    The Administrator
            [Does trustee have this address?]
       The Servicer
            [Does trustee have this address?]
       FDIC
            [Does trustee have this address if different from the Administrator?]
       Scott H. Christensen, Esq.
       H. Stephen Harris, Esq.
       Michael J. Edelman, Esq.

NEWYORK/#159812.4                              2

Michael G. Davies (MD 6045)
Michael J. Edelman (ME 6476)
Ariel Levy (AL 2967)
VEDDER, PRICE, KAUFMAN
& KAMMHOLZ, P.C.
805 Third Avenue, 23rd Floor
New York, New York  10022-2203
Telephone:   (212) 407-7700
E-mail:      MJEdelman@VedderPrice.com
             MDavies@VedderPrice.com


*Attorneys for Interpleader Defendants First Millennium, Inc.*
*and Millennium Partners, L.P.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                    Interpleader Plaintiff,                    Index No. 06-Civ-13388-CSH

                  -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                    Interpleader Defendants.


**MEMORANDUM OF LAW OF INTERPLEADER DEFENDANTS FIRST**
**MILLENNIUM, INC. AND MILLENNIUM PARTNERS, L.P. IN OPPOSITION**
**TO MOTION OF INTERPLEADER DEFENDANT FEDERAL DEPOSIT**
**INSURANCE CORPORATION FOR A STAY OF THIS INTERPLEADER CASE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 2

A.    Underlying Securitization Transaction and Absolute Sale of Receivables by NextBank to a Special Purpose Entity ................................................................. 2

B.    The Issuer Obtains Financing to Purchase Receivables by Obtaining Loans Secured by the Receivables ................................................................................ 2

C.    Material Terms of Note Obligations ................................................................... 4

    1. Early Amortization Period and Remedies Distribution Scheme ...................... 4

    2. Rights of NextBank to the Transferor Interest under the Indenture ............... 4

    3. The Spread Account ....................................................................................... 5

    4. Notes Become Fully Due on Earlier of Final Maturity Date and Redemption Date ............................................................................................................... 6

    5. Right to Declare an Event of Default and Acceleration of the Notes ............. 6

    6. Right to Take Enforcement Action under the Indenture ................................. 7

D.    Commencement of NextBank Receivership, Resulting in Notes Becoming Due and Accelerated Amortization ............................................................................ 8

F.    Commencement of Conversion Lawsuit against FDIC in The D.C. Court ............ 10

    1.    The 2003 Complaint and the FDIC's Counterclaims ........................... 11

    2.    Settlement of All Counts and Counterclaims Other than Count Six ...... 12

    3.    D.C. Court's Decision on Count Six ..................................................... 13

    4.    The 2003 FDIC Conversion Suit Did Not Involve the Obligations of the Issuer ................................................................................................... 14

H.    Status of Notes and Collateral ........................................................................... 15

I.    Noteholders Declare Event of Default and Acceleration and Direct Commencement of Lawsuit against Issuer .......................................................... 16

J.    Indenture Trustee  Starts Interpleader after Becoming Subjected to Competing Threats Regarding Rights to Issuer's Collateral .................................................. 17

NEWYORK/#171906.5

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

K.     FDIC Commences Second-Filed Lawsuit in Effort to Avoid INTERPLEADER ........... 19

ARGUMENT ........................................................................................................................ 20

I.     FIRST TO FILE RULE COMPELS DENIAL OF FDIC'S STAY MOTION ............... 20

II.    THE FDIC HAS FAILED TO MEET THE STANDARDS REQUIRED TO
STAY THIS INTERPLEADER ACTION IN FAVOR OF THE SECOND FILED
SUIT IN THE D.C. COURT ......................................................................................... 26

       A.    THE 2003 FDIC CONVERSION SUIT DOES NOT CONTROL THE
ISSUES APPLICABLE TO THIS INTERPLEADER ACTION ....................... 27

       B.    OTHER FACTORS ........................................................................................ 33

              1.    Stay Will Unduly Burden the Interpleader Plaintiff Indenture
Trustee ................................................................................................. 33

              2.    Stay Will Unduly Burden the Interpleader Defendant Noteholders ........ 33

              3.    Denial of Stay Will Not Burden Movant and Interpleader
Defendant FDIC ................................................................................... 37

              4.    The Interests Of The Courts Favors Denial Of The Stay ........................ 38

              5.    The Interests of Non-Parties and the Public Interest Mandate
Denial of the Stay ................................................................................ 38

CONCLUSION .................................................................................................................... 42

NEWYORK/#171906.5

## TABLE of AUTHORITIES

### CASES

*800-Flowers, Inc. v. Intercont'l Florist, Inc.*,
  860 F.Supp. 128 (S.D.N.Y.1994)..................................................................... 21

*Citigroup Inc. v. City Holding Co.*,
  97 F.Supp.2d 549 (S.D.N.Y. 2000)............................................................. 24, 25

*Clinton v. Jones*,
  520 U.S. 681 (1997)........................................................................................ 26

*Crouse-Hinds Co. v. InterNorth, Inc.*,
  634 F.2d 690 (2d Cir. 1980)............................................................................ 35

*Day v. Moscow*,
  955 F.2d 807 (2d Cir. 1992), *cert. denied* 506 U.S. 821 ............................... 23

*Donaldson, Lufkin, & Jenrette, Inc. v. Los Angeles County*,
  542 F.Supp. 1317 (S.D.N.Y.1982).................................................................. 20

*First City Nat'l Bank & Trust Co. v. Simmons*,
  878 F.2d 76 (2d Cir. 1989)........................................................................ 20, 21

*First Fidelity Bank, N.A., v. Prime Motor Inns, Inc. (In re Prime Motor Inns, Inc.)*,
  130 B.R. 610 (S.D. Fla. 1991) ....................................................................... 32

*Fluent v. Salamanca Indian Lease Auth.*,
  928 F.2d 542 (2d Cir. 1991)............................................................................ 35

*Gulf Oil v. Gilbert*,
  330 U.S. 501 (1947)........................................................................................ 23

*Hanson PLC v. Metro-Goldwyn-Mayer Inc.*,
  932 F.Supp. 104 (S.D.N.Y. 1996).................................................................. 25

*In re Geopharma, Inc. Securities Litig.*,
  No. 06 Civ. 9463(SAS), 2005 WL 1123883  (S.D.N.Y. 2005) ............................... 23

*In re Zenith Laboratories, Inc. v. Security Pacific Nat. Trust (In re Zenith Laboratories, Inc.)*,
  104 B.R. 667 (Bankr. D.N.J. 1989) ................................................................. 32

*J. Lyons & Co. Ltd. v. Republic of Tea, Inc.*,
  892 F.Supp. 486 (S.D.N.Y. 1995)................................................................... 21

*Kappel v. Comfort*,
  914 F.Supp. 1056 (S.D.N.Y. 1996)................................................................. 26

*Katz v. Feinberg*,
  No. 99 Civ. 11705, 2001 WL 1132018 (S.D.N.Y. Sept. 24, 2001) ...................... 27

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*,
  342 U.S. 180 (1952)........................................................................................ 20

*Landis v. North American Co.*,
  299 U.S. 248 (1936)........................................................................................ 26

*Lasala v. Needham & Co., Inc.*,
  399 F.Supp.2d 421 (S.D.N.Y. 2005)............................................................... 27

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*,
  417 F.3d 193 (1ˢᵗ Cir. 2005)............................................................................ 31

*Liman v. Midland Bank Ltd.*,
  309 F.Supp. 163 (S.D.N.Y. 1970).................................................................... 35

NEWYORK/#171906.5

*Mattel, Inc. v. Procount Bus. Servs.*,
   No. 03 Civ. 7234 (RWS), 2004 WL 502190, at *4 (S.D.N.Y. Mar.10, 2004) ........................ 22
*McAndrews v. Fleet Bank of Massachusetts*,
   989 F.2d 13 (1st Cir. 1993)...................................................................................................... 31
*Micromuse, Inc. v. Aprisma Management Technologies, Inc.*,
   No. 05 Civ. 0894(SAS), 2005 WL 1241924, at *2 (S.D.N.Y. 2005) ...................................... 23
*MK Systems, Inc. v. Schmidt*,
   No. 04 Civ. 8106 (RWS), 2005 WL 590665 at *5 (S.D.N.Y., March 10, 2005) ................... 22
*Motion Picture Lab. Technicians Local 780 v. McGregor & Werner, Inc.*,
   804 F.2d 16 (2d Cir. 1986)....................................................................................................... 25
*NLRB v. Thalbo Corp.*,
   171 F.3d 102 (2d Cir. 1999)...................................................................................................... 29
*Ontel Prod., Inc. v. Project Strategies Corp.*,
   899 F.Supp. 1144 (S.D.N.Y.1995)............................................................................................ 25
*Pilates, Inc. v. Pilates Institute, Inc.*,
   891 F.Supp. 175 (S.D.N.Y. 1995) ............................................................................................ 22
*Provident Tradesmens Bank & Trust Co. v. Patterson*,
   390 U.S. 102 (1968)................................................................................................................... 35
*Purcell v. FDIC (In re Purcell)*,
   141 B.R. 480 (Bankr. D. Vt. 1992)........................................................................................... 39
*Regions Bank v. Wieder & Mastroianni, P.C.*,
   170 F.Supp.2d 436 (S.D.N.Y., Nov 07, 2001) (NO. 01 CIV. 0016 (WCC).......................... 21
*See, e.g., Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*,
   11 F.3d 399 (3d Cir. 1993)........................................................................................................ 34
*Stone v. Williams*,
   970 F.2d 1043 (2d Cir. 1992).................................................................................................... 29
*The Bank of New York v. Federal Deposit Insurance Company*,
   Civil Action No. 03-1221 (ESH) ............................................................................................. 11
*Toy Biz, Inc. v. Centuri Corp.*,
   990 F.Supp. 328 (S.D.N.Y.1998).............................................................................................. 25
*Transatlantic Reinsurance Co. v. Continental Ins. Co.*,
   No. 03 Civ. 3227, 2003 WL 22743829, at *3 (S.D.N.Y. Nov. 20, 2003) .............................. 22
*William Gluckin & Co. v. Int'l. Playtex Corp.*,
   407 F.2d 177 (2d Cir. 1969)...................................................................................................... 21
*ZPC 2000, Inc. v. SCA Group, Inc.*,
   86 F.Supp.2d 274 (S.D.N.Y. 2000)........................................................................................... 22

## STATUTES

11 U.S.C. § 365............................................................................................................................... 31
12 U.S.C. § 1821........................................................................................................................ 11, 31
28 U.S.C. § 1404(a) ........................................................................................................................ 21

## RULES

Fed.R.Civ.P. 19.......................................................................................................................... 34, 35
Fed.R.Civ.P. 8(c) ............................................................................................................................ 23

ii

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. (together, "Millennium") by their attorneys, Vedder, Price, Kaufman & Kammholz, P.C., respectfully submit this memorandum of law in opposition to the Motion for Stay of Interpleader Defendant the Federal Deposit Insurance Corporation ("FDIC"), in its Capacity as Receiver (the "NextBank Receiver") of NextBank, N.A. ("NextBank"),[1] pursuant to which the NextBank Receiver is seeking to permanently stay this interpleader action commenced by The Bank of New York ("BoNY"), in its capacity as indenture trustee (the "Indenture Trustee").

## PRELIMINARY STATEMENT[2]

The FDIC's motion to stay this interpleader action in favor of a second-filed action in the District of Columbia is based on the notion that this action is an "end -run" around a prior decision of the D.C. Court. That claim is patently untrue. The interpleader action before this court- -where all necessary parties are subject to the court's jurisdiction - - is the proper forum to decide the parties' entitlement under New York law to millions of dollars of collateral held in connection with a New York based asset securitization transaction. A suit for conversion against the FDIC (the subject of the prior litigation) is not the same as an *in rem* action involving the collateral granted by an independent special purpose entity. In fact, the core parties involved in this action are not even subject to the jurisdiction of the D.C. Court. The D. C. Court has never ruled on or addressed the core matters at issue in this case.

The stay motion is nothing but an attempt by the FDIC to justify its own blatant attempt at forum shopping. The motion should be denied.

---

[1] The FDIC's Memorandum in Support of the NextBank Receiver's Motion for Stay, dated December 4, 2006 and the Declaration of Scott H. Christensen in Support of the Receiver's Motion for Stay are referred to herein as, respectively, the "FDIC Stay Memorandum" and the "FDIC Stay Declaration."

[2] Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms in this Memorandum.

# BACKGROUND[3]

### A.    Underlying Securitization Transaction and Absolute Sale of Receivables by NextBank to a Special Purpose Entity

The secured financing obligations that constitute the subject of this action are part of a typical asset-backed securitization transaction.  In this case, a special purpose entity was formed to own credit card receivables (the "Receivables").  The special purpose entity in turn borrowed money from noteholders (the "Noteholders") pursuant to the terms of an indenture and notes that were collateralized by such Receivables (the "Collateral").  The special purpose entity, NextCard Credit Card Master Note Trust (the "Issuer"), was established as a Delaware business trust pursuant to a Trust Agreement, dated as of December 1, 2000, between NextBank, as transferor, and Wilmington Trust Company, as owner trustee.

As a typical securitization transaction, NextBank sold the Receivables to the Issuer, who purchased the Receivables using money borrowed by the Issuer from the Noteholders.  After the sale of the Receivables, NextBank continued to service, and received compensation for servicing, the Receivables.  NextBank also holds ownership interests in the Issuer, which remains a separate and independent special purpose entity.

### B.    The Issuer Obtains Financing to Purchase Receivables by Obtaining Loans Secured by the Receivables

As part of the asset-backed securitization, the Issuer borrowed the money needed to purchase the Receivables from the proceeds of the loans extended by the Indenture Trustee and the Noteholders under a Master Indenture, dated as of December 11, 2000 (the "Master

---

[3]  Millennium respectfully refers the Court to the Declaration of Michael J. Edelman, sworn December 14, 2006 (the "Edelman Dec."), and to the exhibits attached thereto for a full recitation of the relevant facts and circumstances underlying this case.  References to Exhibits ("Ex. __") refer to the exhibits annexed to the Edelman Declaration.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Edelman Declaration.

Indenture"), as supplemented.[4]    To evidence its obligations under the Indenture, the Issuer delivered certain asset-backed notes (the "Notes") to the Noteholders that were secured by the Receivables now owned by the Issuer.

Each of the Notes was executed solely by the Issuer, certified as authentic by the Indenture Trustee and delivered to the respective Noteholders.  The Notes were not signed or executed in any manner by NextBank.

The Indenture was executed as an agreement between the Issuer and the Indenture Trustee, which agreement was acknowledged and accepted by NextBank.  Under the terms of the Master Indenture, the Issuer was required to maintain an office or agency within the County of New York, New York.  (Ex. A, at § 3.02.)

Pursuant to the express terms of the Indenture and the Notes, the obligations of the Issuer to make payments of principal, interest and other amounts with respect to the Notes is secured by the Collateral.  The Issuer's obligation to repay the principal and interest on the Notes is a limited recourse obligation to the extent of the Collateral.  (Ex. A, at 1-2 (Master Indenture Granting Clause, Limited Recourse).)

---

[4]  The Master Indenture is supplemented by the Series 99-1 Indenture Supplement, dated as of December 11, 2000; the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "2000-1 Indenture Supplement"); and the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "2001-1 Indenture Supplement"; the three Indenture Supplements together are referred to hereinafter as the "Indenture Supplements," and the Master Indenture as amended, together with the Indenture Supplements, are referred to hereinafter as the "Indenture").  Copies of the Master Indenture and the 2000-1 Indenture Supplement are annexed to the Edelman Dec. as Exhibits A and B.  For purposes of this litigation, the 2000-1 Indenture Supplement and the 2001-1 Indenture Supplement are substantially identical.

3

C.      **Material Terms of Note Obligations**

    1.      **Early Amortization Period and Remedies Distribution Scheme**

        Under the Indenture, extraordinary events, such as, *inter alia*, NextBank entering into receivership, or the Issuer entering into bankruptcy, trigger the so-called "Early Amortization Period," which also constitute "Redemption Events." (Ex. A, § 5.01.) In an Early Amortization Period, all collections on the Receivables are utilized to repay the principal and interest due on the Notes.

        Upon the occurrence of an event of default and acceleration of the Notes, all of the Indenture Trustee's collections from the Receivables are distributed in accordance with the remedies provision of Section 5.05(b) of the Master Indenture. Under the Section 5.05(b) remedies distribution scheme, all principal and interest on the Notes must be fully repaid to the Noteholders before the proceeds of any collections are returned to the Issuer; NextBank has no right to receive any distributions under the Section 5.05(b) remedies distribution waterfall. After the acceleration of the Notes, the distribution scheme for finance charge collections on the Receivables also changes through a requirement that the full amount of the Notes becomes payable before payments are made to the Transferor. (Ex. B, § 4.04(a)(viii) & (xii).)

        All payments required to be made to the Noteholders under the foregoing distribution schemes and under the Notes are secured by the security interests held by the Indenture Trustee in the Receivables. (Ex. A (Master Indenture), § 8.02.)

    2.      **Rights of NextBank to the Transferor Interest under the Indenture**

        In contrast to the secured obligations owed to the Noteholders, NextBank possessed a limited right to receive a so-called "Transferor Interest" ("Transferor Interest") under the Indenture. The Transferor Interest is an unsecured obligation of the Issuer to pay certain

amounts deposited into a "Collections Account" (as defined in the Indenture) to NextCard prior to the occurrence of an event of default and acceleration. The Transferor Interest is calculated prior to distribution dates and, in effect, the FDIC's entitlement thereto is determined immediately prior to a distribution under the Indenture. (*See, e.g.,* Ex. A (Master Indenture), §§ 8.04, 8.08; Ex. B (Indenture Supplement), § 4.01(b).)

The right of NextBank to receive distributions after an event of default and acceleration is either cut off or subordinated to the payment to the Noteholders of the full principal balance of the Notes. (*See, e.g.,* Ex. A (Master Indenture), § 5.05(b); Ex. B, §§ 4.04(a)(viii) & (xii).)

**3.    The Spread Account**

Several classes of Notes were Issued by the Issuer under the Indenture. To provide additional protection to the holders of Class C Notes and Class D Notes, the Indenture Trustee established a so-called "Spread Account," which was funded by the Issuer. Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Account and the proceeds thereof. (Ex. B (Indenture Supplement), § 4.11(a).)

Prior to an acceleration of the Notes, the Spread Account provides a source for interest payments to the holders of the Class C Notes and Class D Notes. (Ex. B, § 4.11(a).) Following the occurrence of an event of default and acceleration of the Notes, the Spread Account must be liquidated, with the funds distributed in accordance with the distribution scheme established under Section 5.02 of the Indenture Supplements, for priority payment to the Class C Noteholders:

> [A]n amount equal to the balance on deposit [in the Spread Account shall be deposited] into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section

5

5.02 [of the Indenture Supplements], to fund any shortfalls in amounts
owed to such Noteholders.

(Ex. B (Indenture Supplement), § 4.11(e).)   Section 5.02 of the Indenture Supplements, in

relevant part, directs that distributions of the Spread Account be payable for interest and

principal due to the Class C Noteholders of each Series.   Where the amounts in the Spread

Account are insufficient to pay in full the outstanding amounts due on the Class C Notes, no

other parties retain an interest in the Spread Account.  (Ex. B, § 4.11(e).)

4.    **Notes Become Fully Due on Earlier of Final
Maturity Date and Redemption Date**

Pursuant to the express terms of the Notes,[5] the Issuer agreed to repay the "entire

unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the

Redemption Date, if any" (as such terms are defined in the Indenture) and to pay interest due

thereon pursuant to the terms thereof.  *(*Ex. C (the Notes), at 3 for each of the Notes.)

The Indenture provides that a receivership of NextBank constitutes a "Trust

Redemption Event" and a "Redemption Event with respect to all Series of Notes shall occur

without any notice or other action on the part of the Indenture Trustee or the Noteholders

immediately upon the occurrence of such event," which date, by definition, would constitute a

"Redemption Date."  (Ex. A (Master Indenture), § 5.01.)

5.    **Right to Declare an Event of Default and Acceleration of the Notes**

The Issuer's failure to pay principal amounts when due on the Notes constitutes

an  event of default under the Indenture.  (Ex. A (Master Indenture), § 5.02(a).)  Section 5.03 of

---

[5] The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2000-1 Notes."
The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2001-1 Notes."
Representative copies of the outstanding Series 2000-1 Notes and Series 2001-1 Notes are annexed as Ex.
C to the Edelman Dec.

the Master Indenture, in turn, provides that if any of several listed Events of Default were to

occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all of the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer . . . , and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

(Ex. A, § 5.03.)

### 6.    Right to Take Enforcement Action under the Indenture

The Indenture sets forth numerous rights and remedies that may be taken by the

Indenture Trustee and/or the Noteholders after the occurrence of an event of default and

acceleration.[6]  As described in the offering memorandum for the Notes, "[a]fter an event of

default and acceleration of a series of notes, funds on deposit in the collections account and any

trust accounts with respect to that series will be applied to pay principal and interest on those

notes to the extent permitted by law."  (Ex. D (Offering Memorandum), at 7 & S-11.)  This right

to apply the Collateral to repay principal and interest on the Notes is recognized throughout the

Indenture.   The Collateral is expressly held by the Indenture Trustee for the benefit of the

Noteholders to secure all principal and interest due on the Notes.  (Ex. A (Master Indenture), at

1-2, 52.)  Master Indenture Section 5.06 provides that the Indenture Trustee may take action to

maintain possession and control of the Collateral after an event of default in an amount sufficient

to pay the principal and interest on the Notes.  (*Id.*, at § 5.06.)  Further, Section 8.01 provides

that the "Indenture Trustee may demand payment or delivery of, and shall receive and collect,

---

[6]    *See, e.g.,* Ex. A (Master Indenture), §§ 5.03 (right to accelerate, exercisable by each of the Indenture Trustee and the Noteholders); 5.04 (collection and enforcement actions), 5.05(a) (remedies), 5.06 (preservation of collateral), 5.07 (limitations on suits), 5.08 (unconditional rights of Noteholders to bring enforcement action to collect on Notes), 5.09 (sale of receivables), & 8.01 (collection of money).

7

directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture." (Ex. A, § 8.01.)  In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control over the receipt of the proceeds of the Receivables.  (Ex. A, § 8.01.)  In turn, Section 5.05(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series."  (Ex. A, § 5.05(a)(ii).)  Section 5.12 of the Master Indenture gives the Noteholders the right to direct the Indenture Trustee as to how to exercise remedies against the Issuer and the Collateral.

Although the Indenture places limitations upon Noteholders taking actions on behalf of other Noteholders (*see* Section 5.07 of the Indenture), the NextBank Receiver is incorrect in its repeated assertion that the Noteholders "have no right under the contracts to file a suit in their own name." *See* FDIC Memorandum, at 9; *see also id.,* at 3.  The Indenture specifically provides that each Noteholder has the unfettered right to bring suit against the Issuer to enforce the payment of its Notes:

> Notwithstanding any other provision of this Indenture, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal and interest in respect of such Note as such principal and interest becomes due and payable *and to institute suit for the enforcement of any such payment,* and such right shall not be impaired without the consent of such Noteholder.

(Ex. A, § 5.08 (emphasis added).)

### D.    Commencement of NextBank Receivership, Resulting in Notes Becoming Due and Accelerated Amortization

NextBank entered into receivership on February 7, 2002.  As a result of the receivership, the FDIC, acting as receiver, took over NextBank.  The Indenture provides that a

8

receivership of NextBank constitutes a "Trust Redemption Event" and a "Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders immediately upon the occurrence of such event," which date, by definition, would constitute a "Redemption Date."  (Ex. A, § 5.01.)

NextBank's entry into receivership constituted a Redemption Event, which triggered the Notes to become due by their own terms.  (Ex. C, at p. 3 for each of the Notes.)

As a Redemption Event, NextBank's entry into receivership also caused the commencement of the Early Amortization Period, whereupon the Issuer was required to commence making payments of principal on the Notes to the Noteholders in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes.  (Ex. B (Indenture Supplement, § 4.04(c).)

Notwithstanding the fact that the Notes became due under their own terms on February 7, 2002, and that the Issuer was required to repay the Notes in full in accordance with the Early Amortization Period's distribution scheme, the Issuer failed to repay the principal due on the Notes.

Following the commencement of the Receivership, and contrary to its obligations under both the Notes and the Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes.  This breach caused the Issuer to fail to make certain payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof.  Such failure to pay principal of the Notes when due and payable constitutes an event of default under Section 5.02 of the Master

9

Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default").

The Issuer's failure to repay principal when due caused the Noteholders to be subjected to an improper and substantial write-down of their basis in the Notes.

**F.    Commencement of Conversion Lawsuit against FDIC in The D.C. Court**

The Issuer failed to repay the Notes because the FDIC, using its newfound status as the NextBank Receiver, and having stepped into the role of Servicer of the Receivables, refused to make accelerated repayments on the Notes. The FDIC reasoned that because the accelerated repayment required under the Indenture's Early Amortization Period was triggered by the receivership of NextBank, the Early Amortization Period provision constituted an "*ipso facto* clause," which could not be enforced against the FDIC.

The FDIC's stated reason for delaying the amortization of the Notes was that it wanted to sell NextBank's interests in the Receivables (through its beneficial ownership of the Issuer) to maximize the value of NextBank's assets. In July 2002, the FDIC decided to cease its efforts to sell its stake in the Issuer. Accordingly, in July 2002, after a four month delay in complying with the provisions of the Indenture, the FDIC recognized the Early Amortization Period and exercised its right to repudiate the Indenture (only to the extent of the NextBank Receiver's obligations thereunder). Because the Issuer was not in FDIC receivership (nor could it be – it is not a depository institution), the FDIC's repudiation of the Indenture in its capacity as receiver for NextBank had no effect upon the Issuer's obligations under the Indenture.

The FDIC's refusal, in its capacity as the Servicer of the Receivables (the "Servicer"), to repay the Notes in February 2002 in accordance with the Early Amortization Period caused the Noteholders' collateral to lose substantial value, while the FDIC, in its capacity as Servicer, was still making large distributions of the Transferor Interest to itself as

10

the NextBank Receiver.  This prompted certain non-party Noteholders to direct the Indenture

Trustee to bring a suit against the FDIC for the tort of conversion arising from the FDIC using its

capacity as the Servicer of the Receivables to improperly divert payments to the FDIC.

1.    **The 2003 Complaint and the FDIC's Counterclaims**

The Indenture Trustee brought the lawsuit against the NextBank Receiver in the

United States District Court for the District of Columbia (the "D.C. Court") captioned *The Bank

of New York v. Federal Deposit Insurance Company*, Civil Action No. 03-1221 (ESH)" (the

"2003 FDIC Conversion Suit").  Suit was brought in the D.C. Court because, by statute, the

NextBank Receiver was subject to suit only in two jurisdictions – Arizona (where NextBank, as

the depository institution under receivership, had its principal place of business) and the D.C.

Court.  *See* 12 U.S.C. § 1821(d)(6).

Although the FDIC would like this Court to think otherwise, the issues involved

in the 2003 FDIC Conversion Suit have nothing to do with this interpleader action involving the

Issuer's assets.[7]   In the 2003 FDIC Conversion Suit, the Issuer is neither the defendant nor even

a named party – rather, the sole defendant is the FDIC.  The only claims raised by the Indenture

Trustee were for conversion of assets.  The primary theory pursued in the 2003 FDIC Conversion

Suit was that FDIC breached its duties as the Servicer and converted assets that belonged to the

Noteholders.  Specifically, the only claims asserted against the FDIC were as follows:

---

[7]  A copy of the Indenture Trustee's complaint in the 2003 FDIC Conversion Suit (the "2003 Complaint")
is annexed to the Edelman Dec. as Exhibit D.

| | Summary of Claim | Details of Claim |
|---|---|---|
| **Count One** | Conversion of Servicing Fees | FDIC improperly paid itself for servicing fees under its servicing agreement after a new Servicer replaced the NextBank Receiver as Servicer. |
| **Count Two** | Conversion of Transferor Interest Following the FDIC's Repudiation of the Indenture | Because the FDIC repudiated the Indenture, it breached its duties as the Servicer by paying itself the Transferor Interest otherwise due to it under the Indenture (which distribution occurred prior to the declaration of an event of default by the Noteholders). |
| **Count Three** | Conversion of Transferor Interest | Even if FDIC did not repudiate right to Transferor Interest, the FDIC as Servicer paid itself too much Transferor Interest. |
| **Count Four** | Conversion of Monies Owed to Indenture Trustee for Trust Expenses | Under the servicing agreement, the Servicer is required to pay the fees and expenses of the Indenture Trustee. While acting as Servicer, the FDIC failed to pay the fees and expenses of the Indenture Trustee and, instead, paid itself too much Transferor Interest. |
| **Count Five** | Conversion of Excess Refunds by the Servicer | Under the transfer and servicing agreement, NextBank is entitled to recover from the Issuer for certain refunds. The FDIC, however, admitted that it effected a offset of excessive refunds to which it was not entitled. |
| **Count Six** | Conversion of Issuer's Assets for Failure to Begin Early Amortization Period | As Servicer, the FDIC refused to honor the Early Amortization Period triggered by the receivership of NextBank due to the alleged impact of the *ipso facto* clause upon the FDIC. |

The FDIC asserted counterclaims (the "FDIC Counterclaims") against the Indenture Trustee for conversion, breach of contract and unjust enrichment based upon the alleged failure of the Indenture Trustee to distribute certain amounts then held by the Indenture Trustee. The FDIC also asked for an accounting in respect of properties in which the NextBank Receiver possessed an interest.

### 2.    Settlement of All Counts and Counterclaims Other than Count Six

On November 23, 2004, the D.C. Court dismissed Count Two of the Complaint, determining that the FDIC did not disclaim its Transferor Interest by exercising its repudiation power under Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). (FDIC Stay Declaration, Ex. 2 (Docket for 2003 FDIC Conversion Suit), at 6-7.)

Thereafter, the parties entered into mediation and settlement discussions.   Pursuant to these settlement discussions, in July 2005 the parties consensually resolved all counts of the 2003 Complaint other than Count Six (Conversion of Issuer's Assets for Failure to Begin Early Amortization Period).   The result of the discussions was a consensual settlement of the conversion claims against the FDIC on Counts One, Three, Four and Five and a resulting agreed disposition of the funds then held by the Indenture Trustee in the Collections Account.  (Ex. F (July 27, 2005 Settlement Agreement).)

The July 2005 settlement did not address in any way (a) any future disposition of Collateral held by the Indenture Trustee, (b) any future entitlement of the FDIC to, or the amount of, the Transferor Interest after the exercise of remedies by the Noteholders against the Issuer and/or their Collateral under the Indenture, or (c) obligations of the Issuer.  As a result of the consensual settlement of these counts, the parties asked the D.C. Court to dismiss Counts One, Three, Four and Five in the 2003 Complaint and all of the FDIC's Counterclaims against the Indenture Trustee.    The D.C. Court entered a consent order dismissing all claims and counterclaims other than Count Six, without reviewing the settlement terms or entering any findings of facts or conclusions of law.  (Ex. G.)

### 3.     D.C. Court's Decision on Count Six

The remaining issue, which the D.C. Court determined on the merits, was whether the FDIC was liable for conversion for failing to honor the Early Amortization Period triggered by the receivership of NextBank when it was acting as Servicer.  In determining this issue, the D.C. Court examined whether NextBank was a party to the Master Indenture that contained the Early Amortization Provision, which the D.C. Court characterized as an *ipso facto* clause.  In a

NEWYORK/#171906.5

decision entered on September 28, 2006 (the "D.C. Opinion")[8], the D.C. Court held "that the early amortization clause is unenforceable against the FDIC." In reaching this holding, the D.C. Court determined that (a) NextBank, which had "acknowledged and accepted" the Indenture, had "entered into" the Indenture as a matter of law under FIRREA and under New York contract law, and (b) because the Indenture was "entered into" by NextBank, the Early Amortization Event Period, as an *ipso facto* clause, could not be enforced against the FDIC in its capacity as NextBank's receiver. *See* D.C. Opinion.

On October 27, 2006, the Indenture Trustee appealed the ruling of the D.C. Court. That appeal is currently pending in the United States Court of Appeals for the District of Columbia Circuit.

### 4. The 2003 FDIC Conversion Suit Did Not Involve the Obligations of the Issuer

In the 2003 FDIC Conversion Suit, the Indenture Trustee did not sue the Issuer – in fact, it could not bring an action against the Issuer while suing the FDIC. The Issuer is a special purpose entity, organized under Delaware law, operated by an owner trustee who is domiciled in Delaware, and, as is required under the Indenture, maintains an office in New York. (*See, e.g.*, Ex. A (Master Indenture), at 1, 9, 24.) The only locations in which the Issuer could be sued are New York and Delaware. (*See* FDIC Stay Memorandum, at 3-4.)

The sole issues decided in the 2003 FDIC Conversion Suit concerned the NextBank Receiver's liability for conversion while acting as Servicer of the Receivables, and the FDIC's rights under FIRREA. The suit did not in any way address (a) the obligations of the Issuer under the Indenture, (b) the rights and remedies of the Indenture Trustee and the

---

[8] A copy of the D.C. Opinion is annexed to the FDIC Stay Declaration as Exhibit 1.

Noteholders against the Issuer, or (c) the entitlement of the Noteholders to the Collateral granted by the Issuer solely for the benefit of the Noteholders.

Although the D.C. Court did not rule on any matters regarding the obligations of the Issuer, the D.C. Court expressly recognized that in securitizations, (a) the assets sold from a transferor to an issuer are insulated from the transferor's business and credit risks, and (b) the assets are legally isolated from the transferor pursuant to which the sold assets are "'presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.'"  *See* D.C. Opinion, at 4-5 (citations omitted).

## H.    Status of Notes and Collateral

As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C  Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C  Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| | |
| **TOTAL NOTES:** | **$112,109,000.00** |

(*See* Ex. H.)  Millennium currently holds unpaid principal in the following Notes:

(a) Series 2000-1 Class C Notes:  $16,243,500.00; (b) Series 2000-1 Class D Notes: $6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes:  $13,000,000.00.  Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes.

The Indenture Trustee currently holds approximately $22 million in the Spread Account.  The amounts currently owed to the Class C Noteholders substantially exceed the

15

amounts in the Spread Account.  In addition to the Spread Account, the Collateral granted to the

Indenture Trustee by the Issuer (the Receivables) is worth approximately $72 million.

Accordingly, the value of the Collateral and cash securing payment of the Notes is less than $100

million and is insufficient to repay the Notes in full.

**I.      Noteholders Declare Event of Default and Acceleration
         and Direct Commencement of Lawsuit against Issuer**

        The Noteholders are undersecured.  In addition, each month that passes without

the Noteholders exercising contractual remedies results in a decline in the value of the

Noteholder's Collateral declining by millions of dollars.  Accordingly, on November 9, 2006

Millennium and RMK Advantage Income Fund, who together constitute the holders of a

majority of the outstanding Notes (the "Majority Noteholders"), directed the Indenture Trustee to

(a) declare an event of default and accelerate all obligations on the Notes, and (b) exercise

remedies against the Receivables Collateral.  In accordance with such instruction, by letter dated

November 14, 2006, the Indenture Trustee notified the Issuer of the occurrence and continuation

of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and

Series 2001-1 Notes to be due and payable" and demanded that "all the unpaid principal of all

Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due

thereunder, [be] immediately due and payable."  (Ex. H.)

        In addition, on November 16, 2006 the Majority Noteholders also notified the

Issuer of the occurrence and continuation of the Principal Payment Event of Default and

"declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable."  (Ex.

I).  The Majority Noteholders also "demand[ed] that the Issuer immediately pay in full to the

Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued

and unpaid interest thereon, plus (c) all other amounts due thereon."  (Ex. I.)

Despite these demands, the Issuer has failed to repay in full the Notes.

The Majority Noteholders also instructed the Indenture Trustee to exercise remedies against the Receivables and Collateral pursuant to the terms of the Indenture.  On November 14, 2006, the Indenture Trustee immediately took control of, and started the process of exercising remedies over, the Collateral.

In addition, the Majority Noteholders instructed the Indenture Trustee to commence a suit against the Issuer in New York – one of the two states (the other being Delaware) where the Issuer was subject to personal jurisdiction.  The choice of New York was obvious for numerous reasons:

- The Issuer is subject to jurisdiction in New York;
- Two of the three Majority Noteholders are subject to jurisdiction in New York (but not in the D.C. Court or Delaware);
- The Indenture Trustee has its primary office in New York;
- The Indenture Trustee holds the Collateral in its possession in New York;
- The FDIC is subject to jurisdiction in New York and has an office in New York;
- The Notes are governed by New York law; and
- The Indenture and other operative documents are governed by New York law.

Based upon these factors, the Noteholders directed the Indenture Trustee to bring suit against the Issuer in New York.

- 

## J.    Indenture Trustee  Starts Interpleader after Becoming Subjected to Competing Threats Regarding Rights to Issuer's Collateral

After issuing the notice of default and acceleration, on November 16, 2006 counsel for the FDIC contacted counsel for the Indenture Trustee and demanded that the Indenture Trustee immediately retract its notice of default and acceleration and turn over alleged Transferor Interest of almost $4 million that would have been payable to the NextBank Receiver had the Indenture Trustee not started enforcement actions against the Collateral prior to the

November distribution date.  The FDIC threatened the Indenture Trustee with sanctions unless the Indenture Trustee retracted all of its enforcement actions "by the close of business" on November 16, 2006, positing that the actions taken by BoNY violated the "essence" of the D.C. Opinion.

As a result of these threats, BoNY informed counsel for Millennium that the Indenture Trustee was contemplating withdrawing the notices of default, releasing the Collateral, and turning over assets to the FDIC representing the amount of the Transferor Interests that would have arisen and been transferred to the FDIC in the absence of the enforcement of rights against the Collateral taken by the Indenture Trustee.  Millennium immediately responded that if the Bank of New York failed to bring a law suit in New York against the Issuer (as required in the Instruction Letter) and/or decided to release any of the collateral that it is required to hold pursuant to the express directions of the majority of the Noteholders, Millennium would hold The Bank of New York liable for such breaches of duties.

As a result of the competing threats against the FDIC, BoNY instituted this interpleader action on November 16, 2006.[9]  By instituting this interpleader, the Indenture Trustee has subjected the Collateral to the jurisdiction of this Court.

---

[9]  Although an instruction letter delivered to the Indenture Trustee by the Majority Noteholders originally contemplated that the Indenture Trustee would retain Vedder Price as co-counsel in a suit against the Issuer, Vedder Price declined that offer on November 17, 2006 after learning of the interpleader commenced by the Indenture Trustee on November 16, 2006 and the Indenture Trustee's refusal to bring an action solely against the Issuer.

NEWYORK/#171906.5

**K**.    **FDIC Commences Second-Filed Lawsuit in Effort to Avoid Interpleader**

After learning of the commencement of this interpleader action, the FDIC filed a new action in the D.C. Court on the afternoon of November 17, 2006 (the "Second Filed Suit"). Even though the issues and parties in the 2003 FDIC Conversion Suit and this Interpleader regarding the Issuer's Collateral are distinct, the FDIC filed its Second Filed Suit in an attempt to undermine the jurisdiction of this Court.  The relief sought by the FDIC in the Second Filed Suit is to enjoin the Indenture Trustee from prosecuting this interpleader action and to force the Indenture Trustee to turn over to the FDIC the Collateral granted by the Issuer for the sole benefit of the Noteholders.

Although the FDIC is seeking to compel the Indenture Trustee in the D.C. Court to turn over the Collateral granted by the Issuer for the sole benefit of the Noteholders, the FDIC has repeatedly informed the D.C. Court that the D.C. Court can proceed without the Noteholders and that the Noteholders are not necessary to such action.  In so doing, the FDIC is seeking to ignore the jurisdictional limitations of a suit in the D.C. Court (as the Noteholders are not subject to the jurisdiction of the D.C. Court), while still seeking to deprive the Noteholders of their collateral property rights.

The FDIC claims that this interpleader action is:

> [A] collusive attempt to end run the orders and judgment of the [D.C. Court].  Pending their appeal to the United States Court of Appeals for the D.C. Circuit, they want to convince a different court in a different jurisdiction to reach a different result. . . .  In response to the efforts of [the Indenture Trustee] and Millennium, the NextBank Receiver brought suit for injunction before Judge Huvelle.

(FDIC Stay Memorandum, at 1.*)*  This Interpleader, however, is not a relitigation in any sense of the limited issues decided and dealt with in the 2003 FDIC Conversion Suit.  Rather, it involves the enforcement of rights against the Issuer – the primary obligor – by seeking a determination

that the Collateral granted by the Issuer for the benefit of the Noteholders should be turned over

to the Noteholders to satisfy outstanding principal and interest due on the Issuer's Notes that

greatly exceed the value of the Collateral.  Unlike the FDIC, in its defense against the conversion

claims, the Issuer has no defense to the repayment of amounts that it actually borrowed from the

Noteholders and which are now due and payable.

## ARGUMENT

## I.    FIRST TO FILE RULE COMPELS DENIAL OF FDIC'S STAY MOTION

This interpleader action was the first action filed concerning adjudication of the

claims of the Noteholders against the Issuer.  Accordingly, under the well-settled "first-filed

rule," there is a presumption that this action should go forward absent the existence of "special

circumstances" favoring a stay or transfer.  Under the facts of this case, the FDIC could not

obtain a transfer of this interpleader action, nor could it show any "special circumstance" giving

rise to the need to stay the interpleader action in favor of the D.C. Action.  Thus, this interpleader

action must not be stayed.

The first-filed rule is a principle of judicial administration, which provides that

"[w]here there are two competing lawsuits, the first suit should have priority, absent the showing

of a balance of convenience ... or ... special circumstances ... giving priority to the second." *First

City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989).  The first-filed rule

"embodies considerations of judicial administration and conservation of resources," *id*. at 80

(citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)), and will

generally be applied where the two actions embrace the same issues. *Donaldson, Lufkin, &

Jenrette, Inc. v. Los Angeles County*, 542 F.Supp. 1317, 1320 (S.D.N.Y.1982) (applying the first-

filed rule where a second action arose from the same facts giving rise to the first action); *see also*

*Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F.Supp.2d 436 (S.D.N.Y., Nov. 7, 2001) (NO. 01 CIV. 0016 (WCC)) (noting that "the first-filed rule may apply even if the two actions at issue involve different parties" (citing *Marshak v. Reed*, 13 Fed. Appx. 19, 2001 WL 668656, *3 (2d Cir. 2001)).

Thus, the FDIC, as the party that seeks to overcome the first-filed rule, has the burden of demonstrating either that the "balance of convenience" favors deference to the 2003 FDIC Conversion Suit, or that "special circumstances" exist justifying an exception. *See, e.g., William Gluckin & Co. v. Int'l. Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969). Based on the facts and circumstances underlying this dispute, neither of these exceptions is available to the FDIC.

"Balancing factors of convenience is essentially an equitable task." *First City Nat'l Bank*, 878 F.2d at 80. In their determination of balance of convenience, courts give consideration to the same factors that apply to a 28 U.S.C. § 1404(a) motion to transfer venue. *See, e.g., J. Lyons & Co. Ltd. v. Republic of Tea, Inc.*, 892 F.Supp. 486 (S.D.N.Y. 1995). These factors include: (1) the locus of the operative facts; (2) a forum's familiarity with the governing law; (3) the weight accorded a plaintiff's choice of forum; (4) trial efficiency and the interests of justice based on the totality of the circumstances; (5) the convenience of the parties; (6) the availability of process to compel attendance of unwilling witness; (7) the convenience of witnesses; and (8) the relative means of the parties; and (9) the location of relevant documents and the relative ease of access to sources of proof. *800-Flowers, Inc. v. Intercont'l Florist, Inc.*, 860 F.Supp. 128, 131 (S.D.N.Y.1994); *Transatlantic Reinsurance Co. v. Continental Ins. Co.*,

21

No. 03 Civ. 3227, 2003 WL 22743829, at *3 (S.D.N.Y. Nov. 20, 2003).[10]  Each of these factors

militate in favor of maintaining the interpleader action in New York.

       First, and most importantly, the locus of operative facts weighs heavily in favor of

adjudication in New York.  *See, e.g., MK Systems, Inc. v. Schmidt*, No. 04 Civ. 8106 (RWS),

2005 WL 590665 at *5 (S.D.N.Y., March 10, 2005) ("the locus of the operative facts is a

'primary factor' in determining whether to transfer venue") (citing *Mattel, Inc. v. Procount Bus.*

*Servs.,* No. 03 Civ. 7234 (RWS), 2004 WL 502190, at *4 (S.D.N.Y. Mar.10, 2004) (*quoting ZPC*

*2000, Inc. v. SCA Group, Inc.*, 86 F.Supp.2d 274, 279 (S.D.N.Y. 2000)).  As is set forth above,

all of the operative facts giving rise to the dispute among the parties occurred in New York,

while the District of Columbia has no connection whatsoever to the Notes, the Issuer, or the

Collateral.  In addition, the funds at issue in this interpleader action are held by the Indenture

Trustee in New York.  The securitization transaction was negotiated and implemented in New

York, and each of the parties to the transaction is subject to New York's jurisdiction.  *See, e.g.,*

Master Indenture, § 3.02 (Issuer compelled to maintain an office in the "Borough of Manhattan,

City of New York  . . . .).

       Second, interpretation of the Notes and the Indenture is governed by New York

Law.  (Ex. A, §12.13 ("THE INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN

ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW

YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN")

(emphasis in original).)

---

[10]  These factors are also generally used to determine whether venue is proper.  *See Pilates, Inc. v. Pilates Institute, Inc.*, 891 F.Supp. 175, 183 (S.D.N.Y. 1995) (listing nine factors).  For the same reasons set forth here, the New York Court is the only appropriate venue for adjudication of the claims between the parties.

Third, courts will generally give deference to the plaintiff's choice of forum. *See, e.g., Micromuse, Inc. v. Aprisma Management Technologies, Inc.*, No. 05 Civ. 0894(SAS), 2005 WL 1241924, at *2 (S.D.N.Y. 2005) (plaintiff choice of its home, for forum of suit, is entitled to "significant deference"); *In re Geopharma, Inc. Securities Litig.*, No. 06 Civ. 9463(SAS), 2005 WL 1123883, at *1 (S.D.N.Y. 2005) ("Unless the balance is strongly in favor of the defendant, the plaintiffs choice of forum should rarely be disturbed" (citing *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947)). The choice of New York for the filing of this interpleader action was eminently reasonable, given that the Indenture Trustee is a New York banking corporation and the *res* is, and always has been, situated in New York.

Fourth, trial efficiency and the interests of justice favor adjudication in this Court. As is set forth more fully below, the D.C. Court does not have jurisdiction over the Noteholders, who are indispensable parties, and any decision rendered by the D.C. Court would be piecemeal *ab initio* – and an inefficient use of the court's resources. Also as is set forth more fully below, the D.C. Court does not have any superior knowledge of the facts or issues relevant to this interpleader action. Finally, based solely on the equities, the FDIC's stay request should be denied. The D.C. Action, if allowed to take precedence over this interpleader action by way of a stay, will do nothing more than adjudicate an affirmative defense of *res judicata* that was more properly brought before this Court in the first instance. *Cf Day v. Moscow*, 955 F.2d 807 (2d Cir. 1992), *cert. denied* 506 U.S. 821 (Court determined that an injunction action sought in the second filed case seeking to enjoin the first filed cases was improper; "[g]enerally *res judicata* is an affirmative defense to be pleaded in the defendant's answer." (citing Fed.R.Civ.P. 8(c)).

The fifth, sixth and seventh factors also favor this Court. As the courts in New York are the only courts that have jurisdiction over all parties, the "convenience of the parties", the "availability of process" and the "convenience of witnesses" strongly favor New York.

Eighth, the relative means of the parties also favor New York. No party here lacks means – the FDIC least of all - and the FDIC could not complain that its travel expenses would be overwhelming, especially given the fact that it maintains an office only blocks from this Court's chambers.

Finally, "most of the relevant documents and sources of proof" are located in New York. This is a securitization that took place in New York and involves parties either located primarily in New York or who have offices in New York. The facts support New York as the location where most of the relevant documents and sources of proof are maintained. Indeed, the only documents housed in Washington, D.C. are the FDIC's documents relating to the propriety of the NextBank receivership. Those documents have no bearing upon the contractual entitlement of the Noteholders to the Collateral granted by the Issuer for the Noteholders' benefit, which Collateral is the subject matter of this interpleader action.

The balancing factors thus each demonstrate that New York is the only appropriate jurisdiction for an action to determine the Issuer's obligations under the Notes and the Indenture.

The FDIC also cannot show that "special circumstances" exist to justify applying an exception to the first-filed rule. Courts in this district have generally held that "special circumstances" are present when the first-filed suit constitutes an "improper anticipatory filing" or was motivated solely by forum shopping. *See, e.g., Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 555 (S.D.N.Y. 2000); *Hanson PLC v. Metro-Goldwyn-Mayer Inc.*, 932 F.Supp.

24

104, 106 (S.D.N.Y. 1996).  *Toy Biz, Inc. v. Centuri Corp.*, 990 F.Supp. 328, 332 (S.D.N.Y. 1998); *Ontel Prod., Inc. v. Project Strategies Corp.*, 899 F.Supp. 1144, 1150 (S.D.N.Y. 1995); *see also Motion Picture Lab. Technicians Local 780 v. McGregor & Werner, Inc.*, 804 F.2d 16, 19 (2d Cir. 1986) ("the chief 'special circumstance' ... is our interest in discouraging forum shopping").

As is set forth herein, the interpleader action was not filed in a "race to the courthouse", nor was it motivated by forum shopping.  Rather, this interpleader action was both properly filed in a forum that, unlike the D.C. Court, was available for a suit involving the Issuer (or, in this case, the Issuer's property granted as Collateral) and was filed to redress imminent harm threatened against the Noteholders' Collateral.  Indeed, a suit in New York is the *only* action that can serve to adjudicate the claims among the Indenture Trustee, the Noteholders, the Issuer and the FDIC.  Accordingly, the FDIC cannot prove any "special circumstance" that would overcome the presumption that the first-filed suit should proceed.  *See Citigroup*, 97 F.Supp.2d at 560 (forum shopping may be found only where the first-filed suit bears a "slight connection" to the forum (citations omitted)).  Rather, the FDIC is the party guilty of forum shopping by trying to invoke the jurisdiction of a forum that has only a slight connection to the matters at issue in this case.

Accordingly, the first-filed rule's presumption demonstrates the propriety of this interpleader action, and the interpleader action is the proper action to determine the entitlement to ownership of the Collateral.

NEWYORK/#171906.5

## II.    THE FDIC HAS FAILED TO MEET THE STANDARDS REQUIRED TO STAY THIS INTERPLEADER ACTION IN FAVOR OF THE SECOND FILED SUIT IN THE D.C. COURT

The FDIC ignores the first-filed rule in favor of a stay of case standard enunciated by *Kappel v. Comfort*, 914 F.Supp. 1056, 1058 (S.D.N.Y. 1996). The apparent rationale for ignoring the first-filed rule is that the FDIC wants to avoid the presumption of propriety it grants to this interpleader action, as the first filed action. Indeed, the FDIC's failure to even address the first filed rule is telling. Notwithstanding the FDIC's machinations, no matter which standard is applied, the propriety of this interpleader action is apparent.[11] Under the *Kappell* standard, courts consider the following factors.

> (a)    the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed;
> (b)    the private interests of and burden on the defendants;
> (c)    the interests of the Courts;
> (d)    the interests of persons not party to the litigation; and
> (e)    the public interest.

*Id.,* at 1058.

The movant "bears the burden of establishing its need" for a stay. *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (citing *Landis v. North American Co.*, 299 U.S. 248, 256 (1936)). In applying these standards, courts are very hesitant to grant a stay of a case where such a stay will harm the parties' interests. "If there is even a fair possibility that the stay for which [the movant] prays will work damage to someone else, [such movant] must make out a clear case

---

[11]    Because the relief being sought by the FDIC is akin to a permanent injunction that seeks to bar the Noteholders from pursuing their Collateral, a more appropriate standard would seem to be the standard for a permanent injunction. To obtain a permanent injunction, the FDIC would need to meet the following standard: (a) success on the merits (which the FDIC cannot show as it cannot demonstrate that the 2003 FDIC Conversion Suit is entitled to res judicata deference or that the FDIC's rights to the Collateral is senior to the Noteholders' rights), (b) that it has suffered irreparable harm (which, because its remedies at law are adequate, it cannot demonstrate), (c) that the balance of hardship favors the FDIC (which the FDIC also cannot demonstrate given the extreme prejudice that will be inflicted upon the Noteholders), and (d) the public interest (which also favors the Noteholders).

26

of hardship or inequity in being required to go forward." *Lasala v. Needham & Co., Inc.,* 399

F.Supp.2d 421, 427 (S.D.N.Y. 2005) (*quoting Katz v. Feinberg*, No. 99 Civ. 11705, 2001 WL

1132018 (S.D.N.Y. Sept. 24, 2001).

**A.    THE 2003 FDIC CONVERSION SUIT DOES NOT CONTROL THE ISSUES APPLICABLE TO THIS INTERPLEADER ACTION**

Notwithstanding the above stated factors, the essence of the FDIC's Stay Motion

is that this interpleader action is an "end run around the orders and judgment entered in [the 2003

FDIC Conversion Suit] (D.D.C. Sept. 27, 2006)." *See* FDIC Stay Memorandum, at 11.

In its submissions to both this Court and the D.C. Court regarding the inter-

relationship of this interpleader action and the 2003 FDIC Conversion Suit, the FDIC plays fast

and loose with the facts – hoping that its generalized and ambiguous statements about the issues

involved in the 2003 FDIC Conversion Suit (which are very different), the parties involved (who

are different), and the decisions of the D.C. Court (decisions centered upon the rights of the

FDIC standing in the shoes of NextBank, not the obligations of the Issuer to the Noteholders or

the entitlement of retaining the Collateral granted to the Noteholders for defaulted, undersecured

obligations of the Issuer) – will convince this Court that the 2003 FDIC Conversion Suit against

the FDIC is the same as this interpleader action involving the Collateral granted by the Issuer.  In

evaluating the unsubstantiated contention by the FDIC that this interpleader action is a "collusive

attempt to end run the orders and judgment of the [D.C. Court]", the following summary

highlights the profound differences between the parties, claims and issues involved in the 2003

FDIC Conversion Suit and this interpleader action.

NEWYORK/#171906.5

| ISSUE | 2003 FDIC CONVERSION SUIT | 2006 INTERPLEADER ACTION |
|---|---|---|
| Involvement of Issuer in Suit | Neither the Issuer, nor the Issuer's Collateral, were involved in the 2003 FDIC Conversion Suit | This is an *in rem* action solely involving Collateral granted by the Issuer for benefit of Noteholders |
| Does Suit involve Liability/Obligations of Issuer | No | Yes |
| Does Suit Involve Effect of Early Amortization Period/*Ipso Facto* Clause upon NextBank Receiver | **Yes** | **No** |
| Does Suit Involve Effect of Early Amortization Period/*Ipso Facto* Clause upon Issuer (Who is Not in Receivership or bankruptcy) | **No** | **Yes** |
| Did Court rule that NextCard Receivership was not an Early Amortization Event | Occurrence of Early Amortization Event not an issue; effect of such Event upon NextBank Receiver is issue | Occurrence of Early Amortization Event not an issue; effect of such Event upon Issuer is issue |
| Does Suit Involve Remedies that Are Available Against Issuer or its Collateral | **No** | **Yes** |
| Does Suit Involve Conversion Claims against NextBank Receiver | **Yes** | **No** |
| Does Suit Involve Entitlement of NextBank Receiver to Past Transferor Interest that Accrued Before Event of Default & Acceleration | **Yes** | **No** |
| Does Suit Involve the Effect of NextBank Receiver's Repudiation of a Contract upon Entitlements Granted to NextBank Receiver under Such Contract | **Yes** | **No** |
| Does Suit Involve Entitlement of NextBank Receiver to Transferor Interest that Would Have Accrued in Future But For Event of Default & Acceleration and Enforcement of Remedies Against Collateral | **No** | **Yes** |
| Does Suit Involve What Remedies Are Available Against Issuer | **No** | **Yes** |
| Are the Noteholders Indispensable Parties to Such Suit | **No** | **Yes** |
| Could the Suit Have Been Brought in New York | **No** | **Yes** |
| Could the Suit Have Been Brought in the D.C. Court | **Yes** | **No (Neither Noteholders nor Issuer are Subject to Jurisdiction in D.C.)** |

28

In sum, nothing in the D.C. Opinion affects in any way the liability of the Issuer or the remedies that can be taken against the Issuer – which is the crux of the interpleader action. Rather, the D.C. Opinion deals with the rights and privileges granted to the NextBank Receiver under FIRREA to either claim rights under a contract that it repudiated or to defend against liabilities asserted against the NextBank Receiver based upon the effect of an *ipso facto* clause.

In essence, the FDIC alleges that notions of *res judicata* should preclude this Court from considering the merits of the interpleader. *Res judicata* (or claims preclusion) is not applicable where, as here, the claims and issues involved in the instant case are so distinct and, in fact, could not have been raised in the 2003 FDIC Conversion Suit and where the indispensable parties in the instant case could not have been joined to the prior case. *See Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir. 1992) ("Generally, *res judicata* (claim preclusion) operates to prevent the parties or their privies to a prior action from litigating any matter that was or could have been decided in a previous suit."). Also, due to the dissimilarity of the issues involved in the two cases, the doctrine of collateral estoppel or issue preclusion is likewise inapplicable. *See NLRB v. Thalbo Corp.,* 171 F.3d 102, 109 (2d Cir. 1999) (Collateral estoppel, or issue preclusion, bars a party and its privies from relitigating a claim it previously litigated and lost. "[Such estoppel requires that]: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.")

In the instant case, the D.C. Court's consideration of the conversion causes of action and the NextBank Receiver's FIRREA defenses do not raise the same operative facts as the entitlement of the Noteholders to collect upon the Notes where the Noteholders are taking

29

enforcement actions after declaring an event of default. Indeed, the D.C. Court was not even asked to review the Notes or the entitlement of the Noteholders to the Collateral granted by the issuer, and the Notes and Collateral are the wellspring of the Noteholders' rights. This interpleader action is an action based upon the contractual rights between the Noteholders and the Issuer (as the special purpose entity that issued the Notes and granted the collateral rights to the Noteholders). In contrast, in the 2003 FDIC Conversion Suit, the D.C. Court addressed the statutory framework of FIRREA and its effect on purportedly tortious FDIC action.

The FDIC also claims that the D.C. Court is very familiar with the underlying transaction having been involved in the 2003 FDIC Conversion Suit for three years. That assertion is belied by a review of the D.C. Opinion and the issues implicated in the 2003 FDIC Conversion Suit. Other than (a) the fact that there is an accelerated payment distribution scheme triggered by the receivership of NextBank and (b) a generalized understanding of securitizations, the underlying 2003 FDIC Conversion Suit did not deal with the substantive provisions of the transaction documents, especially with respect to the dispositive issues before this Court.

Rather than reviewing the contract issues that are at the core of this interpleader action, the 2003 FDIC Conversion Suit reviewed the rights and privileges granted to the NextBank Receiver under FIRREA to determine that the FDIC was not liable for conversion of assets. For example, the primary issue addressed by the D.C. Court in the 2003 FDIC Conversion Suit was whether the *ipso facto* clause could be invoked as a defense by the NextBank Receiver in defending against the Indenture Trustee's conversion claim against it. The *ipso facto* defense, however, may only be asserted as a defense by the NextBank Receiver. It is a "personal defense" belonging only to the receiver. It may not be asserted by the Issuer, who is not the entity that is the subject of the receivership (nor is it a debtor under a chapter 11

30

case).  In determining the scope of the *ipso facto* defense under FIRREA,[12] courts have viewed

the case-law construing the *ipso facto* defense under the Bankruptcy Code (under Section 11

U.S.C. § 365(e)(1)[13]) as instructive.  *See McAndrews v. Fleet Bank of Massachusetts*, 989 F.2d

13, 17 (1st Cir. 1993).  Under the Bankruptcy Code, the Bankruptcy Courts construe the *ipso*

*facto* defense as belonging solely to the Debtor.  *See Liberty Mut. Ins. Co. v. Greenwich Ins. Co.,*

417 F.3d 193, 198 (1st Cir. 2005) (Circuit court affirmed ruling of district court that held that *ipso*

*facto* clause is intended to protect a bankruptcy debtor, not a non-debtor third party).  In *Liberty*

*Mutual*, the First Circuit went on to state that "if two persons are jointly and severally liable on a

contract, the fact that one has a defense . . . does not automatically protect the other against suit

for nonperformance."  Accordingly, the *Liberty Mutual* Court held that just because one obligor

under a contract may have an *ipso facto* defense, it does not excuse a non-debtor third party from

the obligations under such contract. *Id.* (debtor and non-debtor were co-guarantors under a bond;

Court ruled that *ipso facto* clause did not provide defense to non-debtor).

Similarly, courts have held that the *ipso facto* defense is inapplicable where there

exists a separate independent obligation between the non-debtors.  *First Fidelity Bank, N.A., v.*

*Prime Motor Inns, Inc. (In re Prime Motor Inns, Inc.),* 130 B.R. 610, 613-614 (S.D. Fla. 1991)

---

[12]  12 U.S.C. § 1821(e)(12)(A) provides that "[t]he conservator or receiver may enforce any contract, other than a director's or officer's liability insurance contract or a depository institution bond, entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver."

[13] 11 U.S.C. § 365(e)(1) provides that: [N]otwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
    **(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;
    **(B)** the commencement of a case under this title; or
    **(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

("[T]he court holds that even if the Debtors were correct in their assertion that they should be considered parties to the indentures, they have not asserted and cannot assert that they are parties to the letters of credit"); *In re Zenith Laboratories, Inc. v. Security Pacific Nat. Trust (In re Zenith Laboratories, Inc.),* 104 B.R. 667, 672 (Bankr. D.N.J. 1989) (non-debtor cannot assert *ipso facto* defense where separate agreement existed between non-debtors).  In the instant case, the Notes establish an independent obligation owed by the Issuer directly to the Noteholders, and the Notes were only signed by the Issuer (and not by NextBank).  Both because the non-debtor Issuer has no rights to assert the *ipso facto* defense and because the Notes are separate obligations owed by the Issuer to the Noteholders, the *ipso facto* defense is not relevant to this interpleader action.

In sum, the D.C. Court does not have any special expertise with respect to the issues at hand.

Finally, the FDIC asserts, without any basis, that the D.C. Court made a determination that the FDIC has a superior interest in the Collateral.  This is untrue.  In fact, the D.C. Court made no determination that the FDIC has a superior interest to any portion of the Collateral – nor could it.  Under the Notes and the Indenture, the following facts cannot be disputed:

- The Noteholders lent in excess of $112 million to the Issuer that remain outstanding an unpaid.  *See supra* at 15.

- Express terms of the each of the Notes and the Indenture provide that the full principal amount is now due and owing to the Noteholders.  *See supra* at 9.

- The Notes have been properly accelerated after an event of default.  *See supra* at 16.

- The Noteholders and the Indenture Trustee have commenced enforcement rights against the Collateral.  *See supra* at 16-17.

32

- The Collateral solely secures the payment of all unpaid interest and principal due on the Notes. *See supra* at 4.

- Let alone possessing a superior interest in the Collateral, the NextBank Receiver possesses no interest in the Collateral. *See* supra at 4. Indeed, it appears that the only reason that the NextBank Receiver is named in this interpleader action is that they threatened the Indenture Trustee. *See supra* at 17-18.

Based upon these facts, the Noteholders are the only parties that have an interest in the Collateral.

**B.    OTHER FACTORS**

**1.    Stay Will Unduly Burden the Interpleader
Plaintiff Indenture Trustee**

If this Court grants the stay, the Indenture Trustee will be stuck mired in a stayed interpleader action, while also being the only party subject to the jurisdiction of the D.C. Court to defend against the FDIC's Second Filed Suit. This will place the Indenture Trustee in the untenable position of being forced to defend the Second Filed Suit in the D.C. Court even though it does not have a true economic stake in the outcome. Frankly, this appears to be the FDIC's litigation goal – to litigate in a forum without the true economically interested parties, Noteholders, present. Forcing the Indenture Trustee to be subjected to the Second Filed Action in the D.C. Court may also subject the Indenture Trustee to conflicting judgments obtained by entities who are not subject to the D.C. Court's jurisdiction – which is the exact outcome that the Indenture Trustee sought to avoid by commencing this interpleader action.

**2.    Stay Will Unduly Burden the
Interpleader Defendant Noteholders**

Granting the stay would also subject Millennium and the other Noteholders to a grave risk of harm. This interpleader is an action that will, at its completion, determine the

contractual rights of the Noteholders under the Notes. Specifically, the contractual entitlement of the Noteholders to retain the Collateral granted for their benefit by the Issuer will be determined. By its filing in the D.C. Court and its Stay Motion in this Court, the FDIC is attempting to have the determination of the Noteholders' contractual rights determined in a foreign venue in the absence of the Noteholders. The FDIC's Second Filed Suit in the D.C. Court is inappropriate, as the Noteholders are indispensable parties to the interpleader action and face the risk of being irreparably harmed, without adequate representation of their interests, if a decision concerning the Collateral is rendered in the Second Filed Suit.

Rule 19(a) of the Federal Rules of Civil Procedure requires that a party on whom service of process may be made should be joined, where (i) complete relief cannot be accorded in its absence; (ii) the action's disposition may impair the absentee's ability to protect its interests; or (iii) the non-absentee parties will be subject to a substantial risk of incurring inconsistent obligations because of the absence. Only one of these three factors must be shown to render Rule 19(a) applicable. *See, e.g., Janney Montgomery Scott, Inc. v. Shepard Niles, Inc*., 11 F.3d 399 (3d Cir. 1993) (Clauses in rule defining "necessary" parties are phrased in disjunctive, and should be so treated). If such party cannot be joined, a court is required to determine whether that party is "indispensable" pursuant to Rule 19(b).

Service of process may not be made on the Noteholders in the Second Filed Suit because the D.C. Court does not have personal jurisdiction over the Noteholders. Adjudication of the Second Filed Suit in the D.C. Court would seriously impair the Noteholders' ability to protect their interests in the Collateral, in violation of Rule 19(a). Thus, reference must be made to Rule 19(b), which sets forth the standards for showing that a party that cannot otherwise be joined pursuant to Rule 19(a) is "indispensable."

Under Rule 19(b), the following factors contribute to a showing that a party is indispensable:

(i)    the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already parties;

(ii)   the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

(iii)  whether a judgment rendered in the person's absence will be adequate;

(iv)   whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). *See also Liman v. Midland Bank Ltd*., 309 F.Supp. 163, 172-3 (S.D.N.Y. 1970) (applying Rule 19(b) in corporate derivative suit). The determination of whether an entity is an indispensable party depends on the facts and circumstances of each case. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 108 (1968).

First, the Noteholders will be greatly prejudiced if the Second Filed Suit is allowed to continue without their presence. The Second Filed Suit, if decided in favor of the FDIC, will foreclose the rights of the Noteholders to receive payment on their Notes for moneys actually loaned to the Issuer. Further, the Noteholders will be deprived of their right – which is absolutely protected under the Indenture – to sue the Issuer to enforce payment on their Notes. (Ex. A. (Master Indenture), § 5.08.) As the Second Circuit Court of Appeals has noted, "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542 (2d Cir. 1991), (citing *Crouse-Hinds Co. v. InterNorth, Inc*., 634 F.2d 690, 701 (2d Cir. 1980)). The FDIC is seeking a determination of the Noteholders' right to repayment on their Notes in an action that does not involve either the Noteholders or the Issuer.

35

Further, the Indenture Trustee is not a party that has the same interest as the Noteholders. The Indenture Trustee has already, in effect, stated that it does not have the same interests as the Noteholders – it has thrown up its hands and sought the protection of this Court by filing this interpleader action. As the stakeholder who has filed this interpleader, it will be constrained from taking a strong advocacy position that the Noteholders are entitled to the Collateral. The real economic interests of the Noteholders cannot be adequately represented by the presence of a stakeholder who does not share the same economic interests as the Noteholders. These circumstances demonstrate that the Noteholders will suffer severe prejudice if this interpleader action is stayed so that the Second Filed Suit can proceed.

In the same vein, as to the second factor, there is no avenue by which the D.C. Court, in making its determination, could lessen the prejudice against the Noteholders, where the Noteholders' interests are not being zealously represented in the Second Filed Action in the D.C. Court.

Third, because the Noteholders are not subject to the jurisdiction of the D.C. Court, and possess the unfettered right to proceed against the Issuer in the New York courts, a judgment rendered in the D.C. Court without the participation of the Noteholders cannot provide an adequate remedy. Indeed, all parties could face conflicting judgments rendered by the Court in New York, which has jurisdiction over all parties, and the D.C. Court, which only has jurisdiction over the FDIC and the Indenture Trustee.

Finally, it is clear that all of the parties will have an adequate remedy – the only adequate remedy - if the D.C. Action is dismissed or stayed for nonjoinder. The only proper court to determine the distribution of the Collateral and the obligations of the Issuer on the Notes is this Court. These facts demonstrate that this Court should retain its rightful jurisdiction to hear

and determine this interpleader action. Accordingly, the Noteholders are indispensable to any action concerning entitlement to the Collateral and the Issuer's obligations under the Notes and the Indenture, and this interpleader action must be allowed to proceed notwithstanding the FDIC's filing of the Second Filed Suit in the D.C. Court.

In sum, if this Court grants the FDIC's request for a stay, the Noteholders will face the threat of real and irreparable harm of being denied the right to seek recovery from the Issuer on the Notes and the Collateral granted by the Issuer for the sole benefit of the Noteholders. Given that the Noteholders are already undersecured on their Notes, any action that prevents or hinders the Noteholders from enforcing their rights under the Notes and in the Collateral will subject the Noteholders to irreparable harm. This risk is all the greater given the non-recourse nature of the obligations. Such risk of irreparable harm mandates the denial of the stay sought by the FDIC

### 3. Denial of Stay Will Not Burden Movant and Interpleader Defendant FDIC

In contrast to the severe risks and harm that are threatened against both the Indenture Trustee and the Noteholders, the FDIC is exposed to no risk or prejudice if the stay is denied – the only risk that they will "suffer" is that this Court will adjudicate the respective rights of all parties in a court that (a) has jurisdiction over all parties in interest, (b) that has the most connections to the transaction and matters at issue, (c) can most efficiently New York law, which is the controlling law under the Notes and the Indenture, and (d) has jurisdiction over the assets in question.

Nor has the FDIC demonstrated any need for the stay. As set forth above, the 2003 FDIC Conversion Suit does not raise any of the same issues as the interpleader action. The

2003 FDIC Conversion Suit was a tort suit for conversion pursuant to which the FDIC utilized

the provisions of FIRREA as affirmative defenses for its actions as the receiver of NextBank.  In

contrast, this interpleader action is a contract action against the Issuer seeking recovery of the

Collateral granted to the Noteholders by that same Issuer.  Apparently, having rushed to file the

Second Filed Suit in the D.C. Court on the day after the commencement of this action, the FDIC

claims that "it should not be put to the burden of defending itself against duplicative lawsuits

seeking conflicting results."  *See* FDIC Stay Memorandum, at 10.  Extraordinary relief, such as

seeking the stay of a first filed suit, cannot be justified through such artificial machinations.

Finally, the FDIC fails to explain how the commencement of an interpleader action – which, by

its express nature, is an inherently fair process – is somehow prejudicial to the FDIC.

Accordingly, because the FDIC will suffer no prejudice or harm, this Court should deny the

FDIC's stay application.

### 4.      The Interests Of The Courts Favors Denial Of The Stay

The interests of the courts favor denial of the stay.  This is the only Court that can

administer full and fair justice in a forum in which all indispensable parties are present.  The

FDIC's actions amount to a thinly disguised effort at forum shopping.  As set forth above, there

is no basis for the FDIC's unsupported allegations that this interpleader action "is an end run

around the orders and judgment entered in [the 2003 FDIC Conversion Suit on September 27,

2006]."

### 5.      The Interests of Non-Parties and the Public Interest Mandate Denial of the Stay

Granting a stay will have a broad and negative impact upon the interest of others

and the general public.

**(a)    This Court Should Not Countenance FDIC's Utilization of FIRREA Powers as a Sword to Attack the Noteholders' Collateral Rights**

First, unlike the Indenture Trustee's 2003 FDIC Conversion Suit in which the Indenture Trustee brought suit against the FDIC asserting claims against the FDIC, the instant interpleader action involves the exact opposite – the FDIC asserting claims against the Noteholders' Collateral.  In the original case, the FDIC utilized its rights under FIRREA to *shield* itself from liability; now, the FDIC is seeking to use the provisions of FIRREA as a sword to cut down the claims and collateral property rights of the Noteholders.  Congress, however, did not intend for FIRREA to be used in such an offensive manner.

In *Purcell v. FDIC (In re Purcell)*, the FDIC, acting in its capacity as receiver for a failed bank, asserted an unperfected lien against the debtor.  141 B.R. 480, 481 (Bankr. D. Vt. 1992), *aff'd*, 150 B.R. 111 (D. Vt. 1993).  Pursuant to his rights under the Bankruptcy Code, the debtor moved to set aside the FDIC's unperfected lien.  *Id.*  The FDIC countered by seeking dismissal of the debtor's avoidance action, asserting that FIRREA divested the bankruptcy court of jurisdiction.  *Id.*  By seeking to divest the Bankruptcy Court of jurisdiction, the FDIC was attempting to retain its unperfected lien against the debtor.  *Id.* at 483.  The *Purcell* Court rejected the FDIC's efforts.  As the court succinctly stated:

> We will deny FDIC's motion to dismiss because we hold that FDIC is attempting to use FIRREA as a sword when Congress intended it only as a shield.

*Id.* at 481.  The Bankruptcy Court determined that it possessed subject matter jurisdiction over the FDIC's efforts to assert property rights against the debtor and denied the FDIC's dismissal motion.  *Id.*

Similar to *Purcell*, the FDIC is seeking to use its powers under FIRREA as a sword against the outstanding and unpaid claims held by the Noteholders. There is no issue that at the time that the FDIC placed NextBank into receivership, the Notes were fully secured and the Noteholders would not have suffered any losses. The FDIC sought to delay the early amortization of the Notes because it wanted to sell the NextBank Receiver's interest in the Receivables (in the form of its Transferor Interest and through its ownership of the Issuer) to maximize the assets of the NextBank receivership estate. Accordingly, it used its FIRREA powers as a means to maximize the potential sale value of such interests. (It also used its FIRREA powers as a defense against the conversion claims asserted against it in the 2003 FDIC Conversion Suit.) Now, however, the FDIC is seeking to go one step further – to utilize FIRREA powers to take away the property rights that the Noteholders hold in the Receivables and other Collateral. In this regard, the FDIC is seeking to expand the holding from the 2003 FDIC Conversion Suit to cover the Noteholders' claims against the Issuer. Such an offensive use of FIRREA is against public policy and should not be countenanced by this Court. Accordingly, on this basis alone, this Court should deny the FDIC's request to stay this action.

       **(b)**      **The FDIC's Efforts to Expand the Decision from the D.C. Court to Cover the Issuer Will Have a <u>Devastating Impact upon the</u> <u>Securitization Industry</u>**

In seeking to stay this action, the FDIC is seeking to pull an enforcement action brought in the New York Courts involving the Collateral granted by the Issuer into a litigation focused upon the original transferor – in this case, the NextBank Receiver in the D.C. Court. By seeking to stay enforcement against the Issuer – as is the absolute right of the Noteholders under the Indenture and the Notes – the FDIC is seeking to eliminate two of the primary hallmarks of

securitizations:  (a) the insulation of the assets sold to a special purpose entity from the transferor's business and credit risks and (b) the legal isolation and separation of the assets from the transferor so as to put the assets beyond the reach of the transferor and its creditors, even in bankruptcy or receiverships.  If the FDIC succeeds in its efforts, other transferors may utilize the same tactics to re-take assets that had previously been fully transferred to a special purpose securitization vehicle.  In this manner, after having obtained the benefits of low cost securitized liquidity, a transferor may utilize receivership or chapter 11 cases to re-claim assets that were previously fully divested.  Such a precedent could (and probably would) have a devastating impact upon the securitization industry in this country.  Given the magnitude of this industry,[14] such an attack on the fundamental precepts in the securitization industry should not be taken lightly.  This Court can, and should, exercise jurisdiction over this matter.  No reason has been given to depart from the expectations of the parties and the markets that expect the Noteholders and the Indenture Trustee to have redress against their Issuer without being dragged into the business and credit risks of the transferor.  Accordingly, the interests of non-parties in the securitization industry and public policy further mandate the denial of the NextBank Receivership's litigation machinations.

---

[14]  In 2005, the amount of new issuances of securitized loans aggregated to trillions of dollars in the United States markets alone.  *See, e.g., www.financialservicesfacts.org/financial2/securities/assetbacked/ (website for Insurance Information Institute)* (valuing asset backed securitizations at approximately $2 trillion in 2005); *http://en.wikipedia.org/wiki/Securitization* (from wikipedia, an internet enclopdeia) (valuing new issueances in all securitizations in the Unbited States alone in 2005 as exceeding $3 trillion).

41

## CONCLUSION

WHEREFORE, for the foregoing reasons, Millennium respectfully requests that this

Court enter an order: (a) denying the FDIC's motion for a stay, and (b) granting such other relief

as is just and equitable under the circumstances.

Dated: New York, New York
          December 14, 2006

                                   **VEDDER PRICE KAUFMAN & KAMMHOLZ, P.C.**

                                   By:    /s/  Michael J. Edelman
                                          Michael G. Davies (MD 6045)
                                          Michael J. Edelman (ME 6476)
                                          Ariel Levy (AL 2967)
                                          805 Third Avenue
                                          New York, New York  10022
                                          Tel:    212-407-7700
                                          E-mail: MJEdelman@VedderPrice.com
                                                  MDavies@VedderPrice.com

                                   *Counsel for Interpleader Defendants First Millennium, Inc.
                                   and Millennium Partners, L.P.*



November 14, 2006

BY FACSIMILE AND BY OVERNIGHT MAIL

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

     Re:    NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1
             Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER
             INDENTURE AND NOTICE OF ACCELERATION FOR BOTH
             SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

        Reference is hereby made to the Master Indenture, as amended and supplemented
(the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card
Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the
**"Indenture Trustee"**), as supplemented by the Indenture Supplements. Capitalized terms used
herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

        The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the
Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and
Series 2001-1 Notes (collectively, the **"Noteholders"**) arising from the secured loans made to the
Issuer under the Master Indenture and the Indenture Supplements, which Notes are secured by
the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the
Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid
principal balance of the Notes for the period such balance is outstanding at the rate set forth in
such Master Indenture and the Notes.

        The Master Indenture provides, among other things, that if any Event of Default
shall occur and be continuing with respect to any Series, the Indenture Trustee may pursuant to
section 5.03 of the Master Indenture, by delivery of written notice to the Issuer, declare all of the
Notes with respect to such Series to be immediately due and payable, whereupon the unpaid
principal amount of such Notes, together with accrued but unpaid interest thereon through the
date of acceleration and all other amounts due under the Master Indenture and the Notes shall
immediately become due and payable.

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes. NextBank, N.A.'s entry into receivership on February 7, 2002 constituted a Trust Redemption Event which triggered the commencement of the Early Amortization Period, whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes. Contrary to its obligations under the Master Indenture and the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes, Issuer failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. The Issuers failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| | |
| TOTAL OUTSTANDING PRINCIPAL AMOUNT OF NOTES: | **$112,109,000.00** |

The Indenture Trustee, pursuant to a directive of the Noteholders, hereby declares all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the

2

Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

The Bank of New York, as the Indenture
    Trustee

By
    Name: Loretta A Lindberg
    Title: Managing Director

3

cc:  **Owner Trustee**
Mr. Erwin Soriano
Wilmington Trust Co.
Rodney Square North
1100 North Market St.
Wilmington, DE  19890
(via registered mail and email)

**Servicer**
Ms. Karlyn Knieriem
Finance Officer
The First National Bank of Omaha
1620 Dodge Street
Stop 3396
Omaha, Nebraska, 68197
(via registered mail and email)

Mr. Matt Tunink
The First National Bank of Omaha
Servicer of the NextCard Master Note Trust
1620 Dodge Street
Stop 3395
Omaha, Nebraska  68197
(via registered mail and email)

**Administrator**
NextBank, N.A.
NextCard Credit Card Master Note Trust
595 Market Street, Suite 1800
San Francisco, California 94105
(via registered mail)

**Counsel to the FDIC**

Scott H. Christensen, Esq.
Hughes,Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC  20006-2401
(via registered mail and email)

**<u>Federal Deposit Insurance Corporation</u>**

c/o Tom M. Reeves, Esq.
Counsel, Legal Division
550 17th Street, NW
Room H-10710
Washington, DC 20429
(via registered mail and email)


**<u>Counsel to the Indenture Trustee,</u>**
**<u>The Bank of New York</u>**

John L. Douglas, Esq.
H. Stephen Harris, Jr. Esq.
Alston & Bird LLP

Michael J. Edelman, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.

# Hughes Hubbard & Reed LLP

1775 I Street, N.W.
Washington, D.C. 20006-2401
Telephone: 202-721-4600
Fax: 202-721-4646

November 15, 2006

<u>VIA FACSIMILE</u>

H. Stephen Harris, Jr.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

> Re:    *Bank of New York v. Federal Deposit Insurance Corporation*, No. 03-1221 (D.D.C.)

Dear Steve:

I am writing in response to the "Notice of Default under Master Indenture and Notice of Acceleration for Both Series 2000-1 Notes and Series 2001-1 Notes" sent by the Bank of New York ("BONY") on November 14, 2006.

As BONY and the Noteholders are well aware, that Notice has no effect for reasons explained by the federal court in its recent decision and judgment against BONY. *See Bank of New York v. FDIC*, ___ F. Supp. 2d ___, No. 03-1221, 2006 WL 2772860 (D.D.C. Sept. 27, 2006). The Federal Deposit Insurance Corporation, as Receiver for NextBank, N.A. (the "FDIC Receiver"), may enforce the Master Indenture "notwithstanding <u>any provision of the contract</u> providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of or the exercise of rights or powers by a conservator or receiver." 12 U.S.C. § 1821(e)(13)(A) (2006) (emphasis added).

If BONY or the Noteholders attempt to take further action on the Notice of Default or otherwise take funds not due to them, the FDIC Receiver will seek judicial intervention, as well as attorneys' fees and costs for having to take such action.

Sincerely,

Scott H. Christensen

cc:    Steven M. Cimalore, Wilmington Trust Co.
Michael J. Edelman, Vedder Price, Kaufman & Kammholz, P.C.
Karlyn Knieriem, The First National Bank of Omaha
Matt Tunink, The First National Bank of Omaha

| One Battery Park Plaza | 47, Avenue Georges Mandel | 350 South Grand Avenue | 201 South Biscayne Boulevard | Shiroyama JT Trust Tower, 16F | 101 Hudson Street |
| New York, New York | 75116 Paris, France | Los Angeles, California | Miami, Florida | 4-3-1 Toranomon, Minato-ku | Jersey City, New Jersey |
| 10004-1482 | (33) (1) 44.05.80.00 | 90071-1442 | 33131-4332 | Tokyo 105-6016 Japan | 07302-3918 |
| 212-837-6000 | | 213-613-2800 | 305-358-1666 | (81)(3) 5403-4649 | 201-536-9220 |

November 16, 2006

BY FACSIMILE AND BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NextCard Credit Card Master Note Trust
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001
Attention: Corporate Trust Department

> Re: NextCard Credit Card Master Note Trust, Series 2000-1 and Series 2001-1 Asset Backed Notes – **NOTICE OF DEFAULT UNDER MASTER INDENTURE AND NOTICE OF ACCELERATION FOR BOTH SERIES 2000-1 NOTES AND SERIES 2001-1 NOTES**

TO THE ABOVE REFERENCED PARTIES:

Reference is hereby made to the Master Indenture, as amended and supplemented (the **"Master Indenture"**), dated as of December 11, 2000, between NextCard Credit Card Master Note Trust (the **"Issuer"**) and The Bank of New York, as indenture trustee (the **"Indenture Trustee"**), as supplemented by the Indenture Supplements. Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Master Indenture.

The Issuer issued Series 2000-1 Notes and Series 2001-1 Notes as evidence of the Issuer's indebtedness to the Indenture Trustee and the Holders of the Series 2000-1 Notes and Series 2001-1 Notes (the **"Noteholders"**) arising from the secured loans made to the Issuer under the Master Indenture, which Notes are secured by the security interests created by the Issuer in favor of the Indenture Trustee. Pursuant to the Master Indenture and the Notes, the Issuer agreed to pay principal of and interest on the unpaid principal balance of the Notes for the period such balance is outstanding at the rate set forth in such Master Indenture and the Notes. The undersigned Noteholders hold a majority of the Outstanding Amount of each of the Series 2000-1 Notes and the Series 2001-1 Notes.

The Master Indenture provides, among other things, that if any Event of Default shall occur and be continuing with respect to any Series, Noteholders holding a majority of the Outstanding Amount of each Series may pursuant to section 5.03 of the Master Indenture, by delivery of written notice to the Issuer and the Indenture Trustee, declare all of the Notes with respect to such Series to be immediately due and payable, whereupon the unpaid principal amount of such Notes, together with accrued but unpaid interest thereon through the date of acceleration and all other amounts due under the Master Indenture and the Notes shall immediately become due and payable.

As of the date of this letter, one or more Events of Default under the Master Indenture have occurred and are continuing with respect to the Series 2000-1 Notes and Series 2001-1 Notes. Pursuant to the express terms of each of the Notes, "the entire principal amount of this Note shall be due and payable on the earlier of the [Final] Maturity Date and the Redemption Date, if any." NextBank N.A.'s entry into receivership on February 7, 2002 is a Redemption Date under the terms of the Notes. Accordingly, the Issuer is liable under the Notes for the full outstanding unpaid principal on the Notes, which the Issuer has failed to repay. The Issuer's failure to honor its contractual repayment obligations has caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. Such failure to pay the principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes. The current outstanding principal amounts due under these Notes are as follows:

| | |
|---|---:|
| Series 2000-1 Notes: | |
|     Class C Notes: | $38,122,500.00 |
|     Class D Notes: | $17,500,000.00 |
|     Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
|     Class C Notes: | $31,986,500.00 |
|     Class D Notes: | $24,500,000.00 |
|     Total Outstanding Principal Amount of Series 2000-1 Notes: | $56,486,500.00 |
| | |
| **TOTAL NOTES:** | **$112,109,000.00** |

The Undersigned Noteholders hereby declare all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable, whereupon all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, are immediately due and payable. The Undersigned Noteholders hereby demand that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon.

This notice is without prejudice to any rights or remedies of the Indenture Trustee or the Noteholders under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The Indenture Trustee and the Noteholders expressly reserve any and all of their rights and remedies, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law, waiving none of their rights by the presentment of this notice. This notice is also without prejudice to the Indenture Trustee's or Noteholders' rights and remedies with respect to any other Event of Default which may have occurred and which may be continuing, and the Indenture Trustee and Noteholders expressly reserve any and all rights and remedies with respect thereto, including under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law. The failure by the Indenture Trustee or the

Noteholders to exercise any right under the Master Indenture, the Indenture Supplements, the Notes, the other transaction documents or under applicable law shall not operate as a waiver thereof or preclude any other or further exercise thereof.

Very truly yours,

BY THE NOTEHOLDERS ON THE
ATTACHED SIGNATURE PAGES

cc:   **Owner Trustee**
Mr. Erwin Soriano
Wilmington Trust Co.
Rodney Square North
1100 North Market St.
Wilmington, DE  19890
(via registered mail and email)

**Servicer**
Ms. Karlyn Knieriem
Finance Officer
The First National Bank of Omaha
1620 Dodge Street
Stop 3396
Omaha, Nebraska, 68197
(via registered mail and email)

Mr. Matt Tunink
The First National Bank of Omaha
Servicer of the NextCard Master Note Trust
1620 Dodge Street
Stop 3395
Omaha, Nebraska  68197
(via registered mail and email)

**Administrator**
NextBank, N.A.
NextCard Credit Card Master Note Trust
595 Market Street, Suite 1800
San Francisco, California 94105
(via registered mail)

3

**Counsel to the FDIC**
Scott H. Christensen, Esq.
Hughes,Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC  20006-2401
(via registered mail and email)

**Federal Deposit Insurance Corporation**
Federal Deposit Insurance Corporation
c/o Tom M. Reeves, Esq.
Counsel, Legal Division
550 17th Street, NW
Room H-10710
Washington, DC 20429
(via registered mail and email)

**The Indenture Trustee**
Ms. Loretta Lundberg
Vice President-Default Group, Corporate Trust Administration
The Bank of New York
21W, Corporate Trust Administration
101 Barclay Street
New York, NY 10007-2119
(via registered mail and email)

**Counsel to the Indenture Trustee,**
**The Bank of New York**
John L. Douglas, Esq.
H. Stephen Harris, Jr. Esq.
Alston & Bird LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3449

**Counsel for Millennium Partners LLP**
Michael J. Edelman, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  Millennium Partners, L.P.
(Print Name of Authorized Signature):  Fred Stone
Title:  Senior Managing Director
Signature:
Address:  666 5th Avenue, 8th Floor, New York, New York 10103
Phone:  (212) 841-4100
FAX:  (212) 841-4141
E-mail:  fstone@mlp.com
Class of Securities:  NextCard 2001-1A C
CUSIP No.:  65334UAG8
Total Current Principal Amount of Securities Owned as of the Date Hereof: $19,240,000
Total Original Principal Amount of Securities Owned as of the Date Hereof: $40,000,000
DTC Participant Name:
DTC Participant No.:  2474
Date:  November 9, 2006

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:   Millennium Partners, L.P.
(Print Name of Authorized Signature):   Fred Stone
Title:                                    Senior Managing Director
Signature:
Address:  666 5th Avenue, 8th Floor, New York, New York 10103
Phone:  (212) 841-4100
FAX:  (212) 841-4141
E-mail:  fstone@mlp.com
Class of Securities:  NextCard 2000-1A C
CUSIP No.:  65334UAC7
Total Current Principal Amount of Securities Owned as of the Date Hereof: $16,243,500
Total Original Principal Amount of Securities Owned as of the Date Hereof: $24,500,000
DTC Participant Name:
DTC Participant No.:  2474
Date:  November 9, 2006

16

## EXECUTION BY BENEFICIAL OWNER

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  First Millennium, Inc.
(Print Name of Authorized Signature):  Fred Stone
Title:  Secretary
Signature:
Address:  666 5th Avenue, 8th Floor, New York, New York 10103
Phone:  (212) 841-4100
FAX:  (212) 841-4141
E-mail:  fstone@mlp.com
Class of Securities:  NextCard 2000-1A D
CUSIP No.:  65334UAD5
Total Current Principal Amount of Securities Owned as of the Date Hereof:  $6,000,000
Total Original Principal Amount of Securities Owned as of the Date Hereof:  $6,000,000
DTC Participant Name:  N/A
DTC Participant No.:  N/A
Date:  November 9, 2006

**SIGNATURE PAGES FOR NOTEHOLDERS FOR THIS NOTICE OF DEFAULT AND ACCELERATION OF THE NOTES:**

**EXECUTION BY BENEFICIAL OWNER**

The undersigned beneficial owner of the NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes hereby represents and warrants that it is the beneficial owner of the securities described below and is duly authorized to deliver this Certification to the Indenture Trustee, and that such power has not been granted or assigned to any other person.

Name of Beneficial Owner:  First Millennium, Inc.

(Print Name of Authorized Signature):  Fred Stone

Title:  Secretary

Signature:

Address:  666 5th Avenue, 8th Floor, New York, New York 10103

Phone:  (212) 841-4100

FAX:  (212) 841-4141

E-mail:  fstone@mlp.com

Class of Securities:  NextCard 2001-1A D

CUSIP No.:  65334UAH6

Total Current Principal Amount of Securities Owned as of the Date Hereof: $13,000,000

Total Original Principal Amount of Securities Owned as of the Date Hereof: $13,000,000

DTC Participant Name:  N/A

DTC Participant No.:  N/A

Date:  November 8, 2006

## EXECUTION BY NOMINEE OR ADVISOR

The undersigned hereby represents and warrants that it is the nominee or advisor for the beneficial owner indicated below of NextCard Credit Card Master Note Trust, Series 2000-1 and/or Series 2001-1 Asset Backed Notes, and that the beneficial owner has granted to the undersigned the power and authority to deliver this Certification to the Indenture Trustee on behalf of such beneficial owner.

Name of Beneficial Owner:  RMK Advantage Income Fund

Name of Nominee or Advisor:  Daymaster & Co.

(Print Name of Authorized Signature):  Jim Kelsoe

Title:  Managing Director

Signature:

Class of Securities:  Series 2000-1A / Class C

CUSIP No.:  65334UC7

Total Current Principal Amount of Securities with Respect to Which Certification is
    Made as of the Date Hereof:  $6,640,464.00

Total Original Principal Amount of Securities with Respect to Which Certification is
    Made as of the Date Hereof:  $10,000,000

DTC Participant Name:

DTC Participant No.:

Date:

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its Capacity as
Receiver for NextBank, N.A.,

                                          Plaintiff,

          v.

THE BANK OF NEW YORK, as Indenture
Trustee of the NextCard Credit Card Master
Note Trust,

                                          Defendant.

Case No. 06-CV-01975-ESH

Hon. Ellen Segal Huvelle

## STIPULATION

THIS MATTER having come before the Court on the stipulation of Plaintiff

Federal Deposit Insurance Corporation, in its Capacity as Receiver for NextBank, N.A. (the

"FDIC Receiver"), and Defendant The Bank of New York ("BNY"), as Indenture Trustee of the

NextCard Credit Card Master Note Trust (the "Trust"); and BNY having assured the Court and

the FDIC Receiver that funds in the possession, custody, or control of BNY as Indenture Trustee

of the Trust will not be transferred or distributed in any way (other than payment of the fees and

expenses of The First National Bank of Omaha as Servicer) pending an order from this Court

regarding the distribution or transfer of such funds; and based on the assurance above, the parties

have agreed to the briefing schedule set forth below rather than a hearing on these matters on

Wednesday, November 22, 2006,

          IT IS HEREBY ORDERED that funds that are or will be in the possession,

custody, or control of BNY as Indenture Trustee of the Trust shall not be transferred or

distributed in any way (other than payment of the fees and expenses of The First National Bank of Omaha as Servicer) pending an order from this Court regarding the distribution or transfer of such funds.

IT IS FURTHER ORDERED that the FDIC Receiver shall file a combined opposition to BNY's motion to dismiss and reply in support of the FDIC Receiver's motion for preliminary and permanent injunction on or before December 6, 2006.

IT IS FURTHER ORDERED that BNY shall file a reply in support of its motion to dismiss on or before December 15, 2006.

SO ORDERED.

Date: _____        _____

                                       HON. ELLEN SEGAL HUVELLE

The parties consent to the entry of an order in the foregoing form.

_____       H. Stephen Harris, Jr. /with permission SHC

Dennis S. Klein, D.C. Bar No. 361457    H. Stephen Harris, Jr.
Scott H. Christensen, D.C. Bar No. 476439   ALSTON & BIRD LLP
HUGHES HUBBARD & REED LLP                One Atlantic Center
1775 I Street, N.W.                      1201 West Peachtree Street
Washington, D.C. 20006-2401              Atlanta, Georgia 30309-3424
Telephone:  202-721-4600                 Telephone:  404-881-7000

Counsel for Plaintiff Federal Deposit Insurance   Counsel for Defendant Bank of New York, as
Corporation, in its Capacity as Receiver for      Indenture Trustee of the NextCard Credit Card
NextBank, N.A.                                    Master Note Trust

DC 561643_1.DOC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK, in its capacity as Indenture Trustee of the NextCard Credit Card Master Note Trust, : | Index No. |
| Interpleader Plaintiff, : | |
| - against - : | Summons |
| FIRST MILLENNIUM, INC., MILLENNIUM PARTNERS, L.P., RMK ADVANTAGE FUND, and FEDERAL DEPOSIT INSURANCE CORPORATION, : | Date Index No. Purchased: 11/16/06 |
| Interpleader Defendants. : | |

To the above named Defendant(s)

First Millennium, Inc., 666 5th Avenue, 8th Floor, New York, NY 10103

Millennium Partners, L.P., 666 5th Avenue, 8th Floor, New York, NY 10103

RMK Advantage Fund, 1100 Ridgeway Loop Road, Suite 510, Memphis, TN 38120

Federal Deposit Insurance Corporation, Regional Counsel, 20 Exchange Place, 4th Floor, New York, NY 10005,

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is the residence of plaintiff, which is 101 Barclay Street, New York, NY 10007-2119.

Dated:  New York, New York
        November 16, 2006

                                  ALSTON & BIRD LLP

                                  Michael E. Johnson
                                  Birgit Kurtz
                                  90 Park Avenue
                                  New York, New York
                                  (212) 210-9400

                                  *Attorneys for Interpleader Plaintiff*
                                  *The Bank of New York, in its capacity as*
                                  *Indenture Trustee of the NextCard Credit*
                                  *Card Master Note Trust*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                       Interpleader Plaintiff,

                 - against -

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                     Interpleader Defendants.

**INTERPLEADER
COMPLAINT**

Index No._____

Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the NextCard

Credit Card Master Note Trust, by its attorneys, Alston & Bird LLP, as and for its Interpleader

Complaint, alleges:

## INTRODUCTION

1.      This is an interpleader action brought in accordance with CPLR 1006 for the

purpose of obtaining adjudication of the respective rights of the Interpleader Defendants with

respect to certain assets held by the Interpleader Plaintiff.  Interpleader Plaintiff, which serves as

indenture trustee, faces competing claims to the assets by the Interpleader Defendants and cannot

determine, without hazard to itself, how to proceed.

## PARTIES

2.      Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee

of the NextCard Credit Card Master Note Trust, ("BNY") is a New York banking corporation

with its principal place of business in New York, New York.  BNY is the indenture trustee under the Indenture, as defined below.

3.      Interpleader Defendant First Millennium, Inc. is, upon information and belief, a New York corporation with its principal place of business in New York, New York.

4.      Interpleader Defendant Millennium Partners, L.P. is, upon information and belief, a limited partnership organized under the laws of the State of New York, with its principal place of business in New York, New York.

5.      Interpleader Defendant RMK Advantage Fund is, upon information and belief, a limited partnership organized under the laws of the State of Tennessee, with its principal place of business in Memphis, Tennessee.

6.      Interpleader Defendants First Millennium, Inc., Millennium Partners, L.P. and RMK Advantage Fund (collectively, the "Noteholders") hold a majority of the outstanding Notes that are the subject of the Indenture, as defined below.

7.      Interpleader Defendant Federal Deposit Insurance Corporation ("FDIC") is a federal regulatory agency with an office located in New York, New York, which serves as the receiver for non-party NextBank, N.A ("NextBank").

## BACKGROUND

8.      Interpleader Plaintiff BNY is a party to a master indenture agreement, dated as of December 11, 2000, as supplemented by indenture supplements (the "Indenture").  Pursuant to the Indenture, certain asset-backed notes (the "Notes") were issued that are secured by a portfolio of credit card receivables.  The credit cards were issued by non-party NextBank.

9.      Pursuant to the terms of the Indenture, BNY holds certain collateral that is the subject of the instant dispute (the "Collateral").  The Collateral consists of credit card

2

receivables, proceeds received from credit card receivables, funds in accounts referred to as the "Spread Accounts," and certain other assets.

10.     The Noteholders have notified BNY that, as a result of NextBank's entry into receivership and certain subsequent events, BNY is now obligated, pursuant to the terms of the Indenture, to turn over to them (and other holders of Notes) certain Collateral and take certain other actions with respect to the Collateral for their benefit (the "Instructions").

11.     The Noteholders have taken the position that BNY's failure to turn Collateral over to them or follow the Instructions will constitute a breach of BNY's obligations pursuant to the Indenture.  The Noteholders have further notified BNY that they will consider instituting legal proceedings against BNY if it does not follow the Instructions concerning the Collateral.

12.     The FDIC has disputed the Noteholders' claims to the Collateral and the Noteholders' Instructions.  The FDIC has further informed BNY that, in accordance with the terms of the Indenture and a decision rendered by the United States District Court for the District of Columbia, in an action entitled *Bank of New York v. FDIC*, ___ F. Supp. 2d ___, No. 03-1221, 2006 WL 2772860 (D.D.C. Sept. 27, 2006) (the "District Court Decision"), BNY must turn certain Collateral over to the FDIC and cannot take actions with respect to the Collateral pursuant to the Noteholders' Instructions.  The FDIC has taken the position that, if BNY turns Collateral over to the Noteholders and follows the Instructions with respect to the Collateral, BNY might be acting in contempt of the District Court Decision, and the FDIC has indicated that it is considering legal action.

13.     The Noteholders have disputed the FDIC's claims to the Collateral and the FDIC's efforts to cause BNY not to follow their Instructions concerning the Collateral.

14.     Interpleader Plaintiff BNY faces competing claims to the Collateral and cannot determine, without hazard to itself, how it should proceed with respect to the Collateral it holds.

15.     Interpleader Plaintiff BNY is ready and willing to deliver the Collateral to such person or persons as the Court shall direct.

16.     The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

## PLEA FOR RELIEF

**WHEREFORE,** Interpleader Plaintiff BNY demands judgment:

1.     That Interpleader Defendants and each of them be restrained by injunction from commencing or prosecuting any action or proceeding against Interpleader Plaintiff in relation to the Collateral.

2.     That Interpleader Defendants be required to interplead together concerning their respective claims to the Collateral.

3.     That Interpleader Plaintiff's costs and disbursements, including legal fees and expenses, be paid out of the Collateral.

4.     That Interpleader Plaintiff have such other and further relief as the court may deem just, proper and equitable, including reasonable attorneys' fees.

Dated: New York, New York
      November 16, 2006

                                    ALSTON & BIRD LLP

                                    Michael E. Johnson
                                    Birgit Kurtz
                                    90 Park Avenue
                                    New York, New York
                                    (212) 210-9400

                                    *Attorneys for Interpleader Plaintiff*
                                    *The Bank of New York, in its capacity as*
                                    *Indenture Trustee of the NextCard Credit*
                                    *Card Master Note Trust*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                             **Interpleader Plaintiff,**

                    -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                          **Interpleader Defendants.**

---------------------------------------------------------

Index No. 650234/06

**NOTICE OF MOTION
FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT
REQUESTED**

SIRS:

      PLEASE TAKE NOTICE that upon the affidavit of Philip Schockling sworn to

November 20, 2006, the exhibits annexed thereto, the accompanying memorandum of law, and

all pleadings and prior proceedings heretofore had herein, Interpleader Defendants First

Millennium, Inc. and Millennium Partners, L.P. will move this Court in Room 130 of the New

York County Courthouse, 60 Centre Street, New York, New York, on December 6, 2006, at 9:30

a.m. or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3212 granting

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. summary

judgment in their favor and against all adverse interpleader defendants and ordering inerpleader

plaintiff to distribute all interpleader assets to said interpleader defendants and other Noteholders

in accordance with the terms of the Indenture.

      Pursuant to CPLR 2214, answering affidavits, if any, are required to be served upon the

undersigned by November 29, 2006.

Dated: New York, New York
      November 20, 2006

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____
    Michael J. Edelman
    Michael G. Davies
    805 Third Avenue
    New York, New York  10022-2203
    Tel:  (212) 407-7700

*Attorneys for Interpleader Defendants*
*FIRST MILLENNIUM, INC. AND*
*MILLENNIUM PARTNERS, L.P.*

To:

Alston & Bird LLP
Attorneys for Interpleader Plaintiff The Bank of New York

Defendant RMK Advantage Fund

Defendant Federal Deposit Insurance Corporation

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------



THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                Interpleader Plaintiff,

            -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

               Interpleader Defendants.
------------------------------------------------------------

Index No. 650234/06

## MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO CPLR 3212 FOR SUMMARY JUDGMENT OF INTERPLEADER DEFENDANTS FIRST MILLENNIUM, INC. AND MILLENNIUM PARTNERS, L.P.

VEDDER, PRICE, KAUFMAN
 & KAMMHOLZ, P.C.
805 Third Avenue
New York, New York  10022
Tel:  (212) 407-7700
Fax: (212) 407-7799

*Attorneys for Interpleader Defendants First*
*Millennium, Inc. and Millennium Partners, L.P.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF THE CASE .....................................................................................1

ARGUMENT:  MILLENNIUM IS ENTITLED TO SUMMARY JUDGMENT ON ITS
      CLAIMS .................................................................................................................9

          1.  Standard for Summary Judgment ......................................................................9

          2.  Promissory Notes Issued by Issuer are Due to Millennium and Other
              Noteholders.....................................................................................................9

          3.  Millennium and Other Noteholders are Entitled to the Interpleader
              Assets............................................................................................................10

CONCLUSION .........................................................................................................12

## TABLE OF AUTHORITIES

### CASES

<u>Di Sabato v. Soffes</u>, 9 A.D.2d 297, 193 N.Y.S.2d 184 (1st Dept. 1959) ........................................9

<u>Drug Guild Distributors v. 3-9 Drugs Inc.</u>, 277 A.D.2d 197, 715 N.Y.S.2d 442
    (2nd Dept. 2000)...........................................................................................................9

<u>Marine Midland Bank v. Scallen</u>, 161 A.D.2d 103, 554 N.Y. 541 (1st Dept. 1990) ...................10

<u>Moezinia v. Baroukhian</u>, 247 A.D.2d 452 (2nd Dept. 1998) .........................................................10

<u>Neuhaus v. McGovern</u>, 293 A.D.2d 727, 741 N.Y.S.2d 436 (2nd Dept. 2002)...........................10

<u>Thomson v. Rubenstein</u>, 31 A.D.3d 434, 818 N.Y.S.2d 516 (2nd Dept. 2006)............................10

## PRELIMINARY STATEMENT

Interpleader Defendants First Millennium, Inc. and Millennium Partners, L.P. (together, "Millennium") by their attorneys, Vedder, Price, Kaufman & Kammholz, P.C., respectfully submit this memorandum of law in support of their Motion for Summary Judgment in favor of Millennium, filed contemporaneously herewith in the instant action.

## STATEMENT OF THE CASE

The material facts are uncontested. The dispute regarding the entitlement of the interpleader assets concerns the application of the facts to the financing documents. The relevant, undisputed facts are set out in the affidavit of Philip Schockling, sworn to November 20, 2006 (the "Affidavit"), submitted in support of the motion.[1] Millennium respectfully refers the Court to the Affidavit and to the exhibits attached thereto for a full recitation of the relevant facts and circumstances.

### The Securitization

The subject matter of this action consists of a securitized secured financing in which a special purpose entity – NextCard Credit Card Master Note Trust (the "Issuer") – was established to own credit card receivables (the "Receivables"). This special purpose entity in turn borrowed money from noteholders ("Noteholders") pursuant to the terms of a Master Indenture, dated as of December 11, 2000 (the "Master Indenture"), between Issuer and the Indenture Trustee, as supplemented from time to time (as supplemented, the "Indenture"), and as evidenced by notes issued by the Issuer (the "Notes"). Copies of the Master Indenture, the form of indenture supplement and the Notes are annexed to the Affidavit, respectively, as Exhibits A, B and C. The obligations owed by Issuer under the Notes and the Indenture were collateralized

---

[1]    References to Exhibits refer to the Exhibits annexed to the Affidavit. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Affidavit.

by such Receivables (the "Collateral"). The interpleader plaintiff holds the Receivables and the Collateral as security for the Noteholders in accordance with the terms of the Indenture.

All of the relevant agreements are governed by New York law and the Notes were made expressly subject to Section 5-1401 of the General Obligations Law.[2]

## The Outstanding Obligations under the Notes and the Indenture

Pursuant to the express terms of the Notes, the Issuer agreed to repay the "entire unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the Redemption Date, if any" (as such terms are defined in the Master Indenture) and to pay interest due thereon pursuant to the terms thereof. *See* Exhibit C p. 3. The Notes became due by their own terms upon the entry into receivership of NextBank, N.A. on February 7, 2002. *See* Affidavit, at ¶ 12-13. (As a separate, independent entity, the Issuer is not the subject of the FDIC NextBank receivership. *See* Affidavit, at ¶ 15.)

As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

Series 2000-1 Notes:
    Class C Notes:    $38,122,500.00
    Class D Notes:    $17,500,000.00
    Total Outstanding Principal Amount of Series 2000-1 Notes:    $55,622,500.00

Series 2001-1 Notes:
    Class C Notes:    $31,986,500.00
    Class D Notes:    $24,500,000.00
    Total Outstanding Principal Amount of Series 2001-1 Notes:    $56,486,500.00

**TOTAL NOTES:**    **$112,109,000.00**

*See* Affidavit at ¶ 8 Millennium currently holds unpaid principal in the following Notes:

(a) Series 2000-1 Class C Notes: $16,243,500.00; (b) Series 2000-1 Class D Notes:

---

[2] *See, e.g.*, Exhibit A at 68 (Master Indenture); Exhibit B at 40 (Indenture Supplement); Exhibit C at 8-9 of each of the Notes.

$6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes: $13,000,000.00. Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes. *See* Affidavit at ¶ 9.

As a Redemption Event, NextBank's entry into receivership also caused the commencement of the Early Amortization Period (as defined in the Indenture), whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes. *See* Affidavit at ¶ 16.

## The Issuer's Defaults

Contrary to its obligations under both the Notes and the Master Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. *See* Affidavit, at ¶ 17. The Issuer's failure to honor its contractual repayment obligations caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof. *Id.* Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default"). *Id.*

At the time that interpleader plaintiff commenced this action, the Issuer was in default of its obligations to Millennium, the other Noteholders and the Indenture Trustee on the Notes and the Indenture. *See* Affidavit, at ¶¶ 19-21.

3

## Acceleration of Notes and All Obligations Now Due and Payable

Section 5.03 of the Master Indenture states that if any of several listed Events of Default were to occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all of the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer . . ., and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

*See* Exhibit A, § 5.03.

Due to the Issuer's failure to repay its obligations when due, Millennium and RMK Advantage Income Fund, who together constituted a majority of the outstanding Notes (the "Majority Noteholders"), directed that the Indenture Trustee (a) declare an event of default and accelerate all obligations on the Notes and (b) exercise remedies against the Collateral and the Receivables. *See* Affidavit, at ¶ 19  In accordance with such instruction, by letter dated November 14, 2006, the Indenture Trustee issued a notice of event of default and accelerated all obligations under the Notes and the Indenture. *Id.* In addition, on November 16, 2006, prior to the initiation of this suit, the Majority Noteholders also issued a notice of event of default and accelerated all obligations under the Notes and the Indenture. notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable." *Id.* As a result of these demands, the full $112,109,000.00 of unpaid principal on all Notes, plus all accrued and unpaid interest thereon, plus all other amounts due thereon are now due. *See* Affidavit, at ¶ 20.

4

Despite these demands, the Issuer has failed to repay in full the Notes. *See* Affidavit, at ¶ 21.

## Entitlement of Noteholders to All Receivables and Collateral under the Indenture

The Indenture provides the Indenture Trustee with numerous powers to take control of the collections of the Receivables and Collateral after an event of default and acceleration. *See* Affidavit, at ¶ 34. Master Indenture Section 5.06 expressly grants the Indenture Trustee with authority to take action to "maintain possession" and control of the Collateral in an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ." *Id.* Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture.

*See* Exhibit A, § 8.01. These collections include all proceeds of the Receivables, all of which are required to be distributed in accordance with Section 5.05(b). *See* Affidavit, at ¶ 34.

In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables. *See* Exhibit A, § 8.01. In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series." Finally, Master Indenture Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture. In fact, the Majority Noteholders repeatedly specifically directed the Indenture Trustee to take all

NEWYORK/#170758.2

such actions in accordance with their rights under Section 5.12 of the Indenture. *See* Affidavit, at ¶ 35.

**The Interpleader Assets**

Prior to starting the Interpleader, the interpleader plaintiff started exercising remedies to exercise control over the Receivables and the Collateral as directed by the Majority Noteholders. Shortly thereafter, the FDIC, in its capacity as the receiver of NextBank, threatened the Indenture Trustee with damages for starting to exercise such remedies. The Indenture Trustee responded by informing Millennium that the Indenture Trustee was contemplating rescinding its enforcement actions, whereupon the Directing Noteholders demanded that the Indenture Trustee continue exercising such remedies and stated that the Indenture Trustee would be held responsible for any resulting damages to the Noteholders. Immediately thereafter, on November 16, 2006, the interpleader plaintiff commenced this interpleader action. *See* Affidavit, at ¶ 23.

The assets that are the subject of this interpleader action constitute (a) amounts held in the so-called "Spread Accounts" (as defined in the Indenture) and (b) the Receivables and proceeds of the Receivables. *See* Affidavit, at ¶ 24.

The Indenture Trustee currently holds approximately $22 million in the Spread Accounts. *See* Affidavit, at ¶ 26. Under the Indenture, the Indenture Trustee possesses "all right, title and interest" in the funds held in the Spread Accounts and the proceeds thereof. *See* Exhibit B, § 4.11(a) (Indenture Supplement). Following the occurrence of an event of default and acceleration of the Notes, the Spread Accounts are required to be liquidated, with the funds distributed in accordance with the distribution scheme established under Section 5.02 of the Indenture Supplements for payment to the C Holders:

6

> [A]n amount equal to the balance on deposit [in the Spread Accounts shall be deposited] into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02 [of the Indenture Supplements], to fund any shortfalls in amounts owed to such Noteholders.

*See* Exhibit B, § 4.11(e).

Section 5.02 of the Indenture Supplements, in turn, in relevant part, directs that distributions of the Spread Accounts be payable for interest and principal due to the Class C Noteholders of each Series.

As the principal and interest amounts owed to Class C Noteholders under each series of Notes is substantially in excess of the amounts on deposit in the Spread Accounts for each series of Notes, the Class C Noteholders, including Millennium, are entitled to the full amounts now held by the Indenture Trustee in the Spread Accounts. *See* Affidavit, at 31.

With respect to the Receivables, the Indenture provides the Indenture Trustee with numerous powers to take control of the collections of the Receivables and Collateral after an event of default and acceleration. Master Indenture Section 5.06 expressly grants the Indenture Trustee with authority may take action to "maintain possession" and control of the Collateral in an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ." Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture. The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture.

*See* Exhibit A, § 8.01. These collections include all proceeds of the Receivables. *See* Affidavit, at ¶ 34. In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables. *See* Exhibit A, § 8.01.

In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series." Finally, as set forth above, Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture. In fact, the Majority Noteholders repeatedly specifically directed the Indenture Trustee to take all such actions in accordance with their rights under Section 5.12 of the Indenture. *See* Affidavit, at ¶ 35.

Under the express terms of the Master Indenture, "all money and property [collected by the Indenture Trustee] pursuant to [] Article V[3] following acceleration of the maturities of the Notes . . . shall [be paid] in the following order": (a) first, to the Indenture Trustee for fees and expenses, (b) second, to holders of Notes (in order of priority) "for amounts due and unpaid [on such] Notes for interest and principal, ratably, and (c) last, to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement." *See* Exhibit A, § 5.05(b).

Accordingly, pursuant to the express provisions of the Indenture, after payment of the Indenture Trustee's fees, the Indenture requires that all proceeds of Receivables collections be made to the Noteholders prior to such amounts being distributed to any other party. *See* Affidavit, at ¶ 36.

---

[3]  Article V of the Master Indenture includes (a) Redemption Events (§ 5.01), Events of Default (§ 5.02), acceleration (§ 5.03), enforcement actions (§ 5.04), remedies (§ 5.05), preservation of collateral (§ 5.06), unconditional rights of Noteholders to receive principal and interest, § 5.12 (Noteholders' right to direct Indenture Trustee to take remedies, rights and powers under Indenture).

In accordance with these rights under the Indenture, after the event of default and acceleration issued by both the Indenture Trustee and the Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the distribution scheme provided in Section 5.05(b) of the Master Indenture. Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes. *Id.*

## ARGUMENT

## MILLENNIUM IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS

1.    Standard for Summary Judgment

CPLR 3212 provides that where there exists no genuine issue of material fact, the court shall grant summary judgment for the moving party. CPLR 3212(b). To defeat a summary judgment motion, a defendant must "establish by affidavits or other evidence [that it] has a *bona fide* defense to the action." *Di Sabato v. Soffes*, 9 A.D.2d 297, 300, 193 N.Y.S.2d 184 (1st Dept. 1959); *Drug Guild Distributors v. 3-9 Drugs Inc.*, 277 A.D.2d 197, 715 N.Y.S.2d 442 (2nd Dept. 2000) (where movant shows *prima facie* entitlement to summary judgment, burden shifts to opposing party to produce evidence in admissible form to establish existence of a material issue of fact).

2.    Promissory Notes Issued by Issuer are Due to Millennium and Other Noteholders

Under New York law, proof of execution of a promissory note and subsequent failure to make required payment thereon establish a *prima facie* case for recovery on the note. *See*

9

*Thomson v. Rubenstein*, 31 A.D.3d 434, 818 N.Y.S.2d 516 (2nd Dept. 2006) (*citing to Neuhaus v. McGovern*, 293 A.D.2d 727, 728, 741 N.Y.S.2d 436 (2nd Dept. 2002); *Moezinia v. Baroukhian*, 247 A.D.2d 452, 453 (2nd Dept. 1998)); *Marine Midland Bank v. Scallen*, 161 A.D.2d 103, 554 N.Y. 541 (1st Dept. 1990) (same).

As is set forth in the accompanying affidavit, Millennium and the other Noteholders are the holders of valid and binding promissory notes pursuant to whose terms the Issuer has been, and continues to be, in default. Issuer owes all amounts due under the Notes and the Indenture. Accordingly, Millennium has established a *prima facie* case for recovery on the Notes. Pursuant to the express terms of the Indenture, the Noteholders are owed in excess of $112 million. Millennium itself is owed a face principal amount of $54,483,500.00, along with additional amounts for interest and other obligations under the Notes and the Indenture. *See* Affidavit, at ¶ 9.

   3.    <u>Millennium and Other Noteholders are Entitled to the Interpleader Assets</u>

Entitlement to the interpleader assets is governed by the terms of the Indenture and the Notes. In accordance with their express rights, the Noteholders directed that (a) the Notes and obligations under the Indenture be accelerated, (b) the Indenture Trustee disburse the proceeds of the Spread Accounts to the Noteholders holding Class C notes, and (c) the Indenture Trustee take control over and collect all Receivables and the proceeds of such Receivables. *See* Affidavit at ¶ 19. These are the assets that are the subject to this interpleader action. *See* Affidavit, at ¶ 24.

Pursuant to the express terms of the Indenture, the Indenture Trustee is entitled to take control over the Receivables and all collections of the proceeds of the Receivables. *See* Affidavit at ¶ 34. Further, the Noteholders specifically directed the Indenture Trustee to exercise its rights and powers under the Indenture pursuant to Section 5.12 of the Master Indenture. Affidavit at ¶ 35. After the event of default and acceleration issued by both the Indenture Trustee and the

10

Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the distribution scheme provided in Section 5.05(b) of the Master Indenture, which sums are required to be distributed to the Noteholders under the terms of Section 5.05(b) of the Indenture.

In sum, it is undisputed that Millennium and the other Noteholders lent moneys to the Issuer and the Issuer has failed to repay in excess of $112 million in face principal amount of such loans. It is also undisputed that the Noteholders have the right to direct that the Indenture Trustee take control over all Receivables and Collateral as an exercise of remedies under the Indenture. It is further undisputed that any property and moneys so collected by the Indenture Trustee are required to be distributed under the distribution scheme established under Section 5.05(b) of the Indenture. Under this distribution scheme, after payment of the Indenture Trustee's fees and expenses, the Noteholders hold senior rights to the Receivables, proceeds and other moneys and property collected by the Indenture Trustee. Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables and other interpleader assets are required to be distributed under the terms of the Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

Further, pursuant to the express terms of the Indenture, the Noteholders holding Class C Notes have priority entitlement to receive all of the amounts held in the Spread Accounts. Accordingly, the Spread Account interpleader assets are required to be distributed to holders of the Class C Notes (including Millennium).

11

**CONCLUSION**

By reason of the foregoing, interpleader defendants First Millennium, Inc. and Millennium Partners, L.P. respectfully request that an order be entered granting summary judgment in their favor and against all adverse interpleader defendants and requiring the interpleader plaintiff Indenture Trustee to distribute all interpleader assets to the Noteholders (a) with respect to the Spread Accounts, to the Noteholders holding Class C Notes, in accordance with the terms of the Indenture, and (b) for all other interpleader assets, in accordance with Section 5.05(b) of the Indenture (after payment of the Indenture Trustee's fees and expenses).

Dated: New York, New York
        November 20, 2006

                        Respectfully submitted,

                        VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

                        By: _____
                            Michael G. Davies
                            Michael J. Edelman
                            805 Third Avenue
                            New York, New York  10022-2203
                            Tel:  (212) 407-7700
                            Fax:  (212) 407-7799

                        *Attorneys for Interpleader Defendants*
                        *FIRST MILLENNIUM, INC. AND MILLENNIUM*
                        *PARTNERS, L.P.*

12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                 Interpleader Plaintiff,

                -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                Interpleader Defendants.

Index No. 650234/06

## AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF INTERPLEADER DEFENDANTS FIRST MILLENNIUM, INC. AND MILLENNIUM PARTNERS, L.P.

STATE OF NEW YORK   )
                       ) ss.:
COUNTY OF NEW YORK  )

       PHILIP SCHOCKLING, being duly sworn, deposes and says:

       1.      I am a portfolio manager for each of First Millennium, Inc. and of Millennium Partners, L.P. (along with First Millennium, Inc., "Millennium"), two of the interpleader defendants in the above-captioned action. I make this affidavit in support of Millennium's motion, pursuant to CPLR § 3212, for summary judgment on the Interpleader Complaint of Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the NextCard Credit Card Master Note Trust (the "Indenture Trustee").

       2.      I have personal knowledge of the facts set forth in this affidavit.

**The Underlying Transaction**

3.     The material facts of this action are not in dispute.   The secured financing

obligations that constitute the subject of this action are part of a securitization in which a special

purpose entity was established to own credit card receivables (the "Receivables"), which special

purpose entity in turn borrowed money from noteholders ("Noteholders") pursuant to the terms

of an Indenture and Notes and that were collateralized by such Receivables (the "Collateral").

4.     The special purpose entity, NextCard Credit Card Master Note Trust (the

"Issuer"), was established as a Delaware business trust pursuant to a Trust Agreement, dated as

of December 1, 2000 (the "Trust Agreement"), between NextBank, N.A. (NextBank"), as

transferor, and Wilmington Trust Company, as owner trustee (the "Owner Trustee").

5.     The Issuer and the Indenture Trustee entered into that certain Master Indenture,

dated as of December 11, 2000 (the "Master Indenture"), which was supplemented by:   the

Series 99-1 Indenture Supplement dated as of December 11, 2000; the Series 2000-1 Indenture

Supplement dated as of December 13, 2000 (the "2000-1 Indenture Supplement"); and the Series

2001-1 Indenture Supplement dated as of May 8, 2001 (the "2001-1 Indenture Supplement"; the

three Indenture Supplements together are referred to hereinafter as the "Indenture Supplements,"

and the Master Indenture as amended together with the Indenture Supplements are referred to

hereinafter as the "Indenture").   Copies of the Master Indenture and the 2000-1 Indenture

Supplement are annexed hereto, respectively, as Exhibits A and B.   (For purposes of this

litigation, the 2000-1 Indenture Supplement and the 2001-1 Indenture Supplement are

substantially identical.)

6.     Under the terms of the Master Indenture, the Issuer was required to maintain an

office or agency within the County of New York, New York. *See* Exhibit A, at § 3.02.

2

7.    To evidence its obligations under the Indenture, the Issuer delivered certain asset-backed notes (the "Notes") that were secured by a portfolio of credit card receivables owned by the Issuer.

8.    Under the terms of the Notes and the Indenture, the Indenture Trustee agreed to make loans to the Issuer under the terms of the Indenture and the Notes.  As of the date hereof, the principal amount of the Notes outstanding (excluding accrued interest and other amounts due thereon) are as follows:

| | |
|---|---|
| Series 2000-1 Notes: | |
| Class C Notes: | $38,122,500.00 |
| Class D Notes: | $17,500,000.00 |
| Total Outstanding Principal Amount of Series 2000-1 Notes: | $55,622,500.00 |
| | |
| Series 2001-1 Notes: | |
| Class C Notes: | $31,986,500.00 |
| Class D Notes: | $24,500,000.00 |
| Total Outstanding Principal Amount of Series 2001-1 Notes: | $56,486,500.00 |
| **TOTAL NOTES:** | **$112,109,000.00** |

The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2000-1 Notes." The Notes issued under the 2000-1 Indenture Supplement are referred to as the "Series 2001-1 Notes." Representative copies of the outstanding Series 2000-1 Notes and Series 2001-1 Notes are annexed hereto as Exhibit C.

9.    Millennium currently holds unpaid principal in the following Notes: (a) Series 2000-1 Class C Notes: $16,243,500.00; (b) Series 2000-1 Class D Notes: $6,000,000.00; (c) Series 2001-1 Class C Notes: $19,240,000.00; and (d) Series 2001-1 Class D Notes: $13,000,000.00. Accordingly, Millennium holds $54,483,500.00 of the outstanding face principal amount on the Notes.

3

**The Obligations of the Issuer under the Notes Became Due and**
**Payable on the Redemption Event that Occurred on February 7, 2002**

      10.    Pursuant to the express terms of the Notes, the Issuer agreed to repay the "entire unpaid principal amount of the Notes . . . on the earlier of the Final Maturity Date and the Redemption Date, if any" (as such terms are defined in the Indenture) and to pay interest due thereon pursuant to the terms thereof. *See* Exhibit C, at p. 3 for each of the Notes.

      11.    The Indenture provides that a receivership of NextBank constitutes a "Trust Redemption Event" and a "Redemption Event with respect to all Series of Notes shall occur without any notice or other action on the part of the Indenture Trustee or the Noteholders immediately upon the occurrence of such event," which date, by definition, would constitute a "Redemption Date." *See* Exhibit A, § 5.01.

      12.    NextBank entered into receivership on February 7, 2002.

      13.    NextBank's entry into receivership constituted a Redemption Event which triggered the Notes to become due by their own terms. *See* Exhibit C, at p. 3 for each of the Notes.

      14.    To the extent (if any) that Nextbank was a party to, or signatory of, the Indenture, in accordance with its rights in the NextBank receivership, the Federal Deposit Insurance Corporation (the "FDIC") repudiated NextBank's obligations under such contracts in July 2002.

      15.    As a separate, independent entity, the Issuer is not the subject of the FDIC NextBank receivership.

      16.    As a Redemption Event, NextBank's entry into receivership also caused the commencement of the Early Amortization Period (as defined in the Indenture), whereupon the Issuer was required to commence making payments of principal on the Notes in accordance with

4

Section 4.04(c) of the Indenture Supplements for each of the Series 2000-1 Notes and Series 2001-1 Notes.

**The Issuer's Failure to Repay Principal When Due Constituted an Event of Default**

17.    Contrary to its obligations under both the Notes and the Master Indenture, the Issuer (a) failed to repay the Notes in accordance with their terms and (b) failed to make distributions in accordance with Section 4.04(c) of the Indenture Supplements following the commencement of the February 7, 2002 receivership for the four monthly distributions commencing on February 15, 2002 for each of the Series 2000-1 Notes and Series 2001-1 Notes. The Issuer's failure to honor its contractual repayment obligations caused it to fail to make payments of principal due to the Noteholders of the Series 2000-1 Notes and Series 2001-1 Notes, which failure continues through the date hereof.  Such failure to pay principal of the Notes when due and payable constitutes an Event of Default under Section 5.02 of the Master Indenture for each of the Series 2000-1 Notes and Series 2001-1 Notes (the "Principal Payment Event of Default").

18.    Section 5.03 of the Master Indenture states that if any of several listed Events of Default were to occur and be continuing,

> the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of such Series may declare all of the Notes of such Series to be immediately due and payable, by a notice in writing to the Issuer . . ., and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

*See* Exhibit A, § 5.03.

19.    Due to the Issuer's failure to repay its obligations when due, Millennium and RMK Advantage Income Fund, who together constituted a majority of the outstanding Notes (the

5

NEWYORK/#170756.3

"Majority Noteholders"), directed that the Indenture Trustee (a) declare an event of default and accelerate all obligations on the Notes and (b) exercise remedies against the Collateral and the Receivables. In accordance with such instruction, by letter dated November 14, 2006 (the "Indenture Trustee's Acceleration Letter"), a copy of which is annexed hereto as Exhibit D, the Indenture Trustee notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable" and demanded that "all the unpaid principal of all Notes now outstanding, together with accrued but unpaid interest thereon and other amounts due thereunder, [be] immediately due and payable." *See* Exhibit D.

20.    In addition, on November 16, 2006 the Majority Noteholders also notified the Issuer of the occurrence and continuation of the Principal Payment Event of Default and "declare[d] all of the Series 2000-1 Notes and Series 2001-1 Notes to be due and payable." A copy of the Majority Noteholders' notice of event of default and acceleration is attached hereto as Exhibit E. The Majority Noteholders also "demand[ed] that the Issuer immediately pay in full to the Indenture Trustee (a) the $112,109,000.00 of unpaid principal on all Notes, plus (b) all accrued and unpaid interest thereon, plus (c) all other amounts due thereon." *See* Exhibit E.

21.    Despite these demands, the Issuer has failed to repay in full the Notes.

22.    In addition to declaring a notice of event of default and the acceleration, the Majority Noteholders instructed the Indenture Trustee to exercise remedies against the Receivables and Collateral pursuant to the terms of the Indenture.

**The Noteholders' Right to the Interpleader Assets Is**
**Mandated Under the Express Terms of the Master Indenture**

23.    Prior to filing this interpleader action, the interpleader plaintiff started exercising remedies to exercise control over the Receivables and the Collateral as directed by the Majority

6

Noteholders.   Shortly thereafter, the FDIC, in its capacity as the receiver of NextBank,
threatened the Indenture Trustee with contempt and damages for starting to exercise such
remedies.  The Indenture Trustee responded by informing Millennium that the Indenture Trustee
was going to rescind its enforcement actions, whereupon the Directing Noteholders demanded
that the Indenture Trustee continue exercising such remedies and stated that the Indenture
Trustee would be held responsible for any resulting damages to the Noteholders.   Immediately
thereafter, on November 16, 2006, the interpleader plaintiff commenced this interpleader action.

24.     The assets that are the subject of this interpleader action constitute (a) amounts
held in the so-called "Spread Accounts" (as defined in the Indenture) and (b) the Receivables and
proceeds of the Receivables.

25.     Most of the assets that are the subject of this interpleader action constitute
Receivables.  The remainder constitute moneys held by the Indenture Trustee in the Spread
Accounts.

## A.     The Spread Accounts

26.     The Indenture Trustee currently holds approximately $22 million in the Spread
Accounts.

27.     The amounts currently owed to the C Noteholders substantially exceed the
amounts in the Spread Accounts for each series of Notes.

28.     Under the Indenture, the Indenture Trustee possesses "all right, title and interest"
in the funds held in the Spread Accounts and the proceeds thereof.  *See* Exhibit B, § 4.11(a)
(Indenture Supplement).

29.     Following the occurrence of an event of default and acceleration of the Notes, the
Spread Accounts are required to be liquidated, with the funds distributed in accordance with the

7

distribution scheme established under Section 5.02 of the Indenture Supplements for payment to the C Holders:

> [A]n amount equal to the balance on deposit [in the Spread Accounts shall be deposited] into the Collection Account for distribution to the Class C Noteholders, the Class D Noteholders, the Class A Noteholders and the Class B Noteholders, in that order of priority, in accordance with Section 5.02 [of the Indenture Supplements], to fund any shortfalls in amounts owed to such Noteholders.

*See* Exhibit B, § 4.11(e).

30.    Section 5.02 of the Indenture Supplements, in turn, in relevant part, directs that distributions of the Spread Accounts be payable for interest and principal due to the Class C Noteholders of each Series.

31.    As the principal and interest amounts owed to Class C Noteholders under each series of Notes is substantially in excess of the amounts on deposit in the Spread Accounts for each series of Notes, the Class C Noteholders, including Millennium, are entitled to the full amounts now held by the Indenture Trustee in the Spread Accounts.

**B.    The Receivables**

32.    The Indenture Trustee currently holds approximately $72 million worth of Receivables and proceeds of Receivables.

33.    Under the express terms of the Master Indenture, "all money and property [collected by the Indenture Trustee] pursuant to [] Article V[1] following acceleration of the maturities of the Notes . . . shall [be paid] in the following order":  (a) first, to the Indenture Trustee for fees and expenses, (b) second, to holders of Notes (in order of priority) "for amounts

---

[1]  Article V of the Master Indenture includes (a) Redemption Events (§ 5.01), Events of Default (§ 5.02), acceleration (§ 5.03), enforcement actions (§ 5.04), remedies (§ 5.05), preservation of collateral (§ 5.06), unconditional rights of Noteholders to receive principal and interest, § 5.12 (Noteholders' right to direct Indenture Trustee to take remedies, rights and powers under Indenture).

due and unpaid [on such] Notes for interest and principal, ratably, and (c) last, to the Issuer for distribution pursuant to Article IV of the related Indenture Supplement." *See* Exhibit A, § 5.05(b).

34.    The Indenture provides the Indenture Trustee with numerous powers to take control of the collections of the Receivables and Collateral after an event of default and acceleration.    Master Indenture Section 5.06 expressly grants the Indenture Trustee with authority may take action to "maintain possession" and control of the Collateral in an amount "sufficient . . . for the payment of principal of and interest on the Notes . . . ." Further, Section 8.01 provides that:

> [T]he Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any . . . intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to [the] Indenture.  The Indenture Trustee shall hold all such money and property received by it in trust for the Noteholders and shall apply it as provided in this Indenture.

*See* Exhibit A, § 8.01.  These collections include all proceeds of the Receivables, all of which are required to be distributed in accordance with Section 5.05(b).

35.    In addition, a majority of Noteholders can direct that the Indenture Trustee take such actions to take control of the receipt of the proceeds of the Receivables.  *See* Exhibit A, § 8.01.  In turn, Section 5.02(a)(ii) of the Master Indenture specifically authorizes that after an event of default and acceleration, the Indenture Trustee may take any "appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes of the affected Series."  Finally, as set forth above, Section 5.12 gives the Noteholders the right to direct the Indenture Trustee as to how to exercise all rights, remedies and powers under the Indenture.  In fact, the Majority Noteholders repeatedly specifically directed the Indenture

9

Trustee to take all such actions in accordance with their rights under Section 5.12 of the Indenture.

36.    In accordance with these rights under the Indenture, after the event of default and acceleration issued by both the Indenture Trustee and the Majority Noteholders described above, all proceeds of the Receivables are "moneys and property [collected by the Indenture Trustee ] pursuant to Article V of [the] Indenture" and are required to be distributed in accordance with the distribution scheme provided in Section 5.05(b) of the Master Indenture.  Because the amount of the interpleader assets are insufficient to repay the principal amount of the outstanding Notes (even after the distribution of the Spread Accounts), all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

**The Pleadings**

37.    Annexed hereto as Exhibit F is a copy of the Interpleader Complaint.

38.    Annexed hereto as Exhibit G is a copy of the Answer of First Millennium, Inc. and Millennium Partners, L.P. to the Interpleader Complaint, without exhibits.

**Conclusion**

39.    I know of no defense of any other party that would entitle such party to superior rights to the Noteholders in the assets that are the subject to this interpleader.  Accordingly, the Noteholders, including Millennium, are entitled to receive in full the assets that are the subject of this interpleader.

10

**WHEREFORE,** by reason of the foregoing, interpleader defendants First Millennium, Inc. and of Millennium Partners, L.P. respectfully request that an order be entered granting summary judgment in their favor and against all adverse interpleading defendants and requiring the interpleader plaintiff Indenture Trustee to distribute all interpleader assets to the Noteholders (a) with respect to the Spread Accounts, to the Noteholders holding Class C Notes in accordance with the terms of the Indenture, and (b) for all other interpleader assets, in accordance with Section 5.05(b) of the Indenture (after payment of the Indenture Trustee's fees and expenses).

_____
PHILIP SCHOCKLING

Sworn to and subscribed before me
this 20th day of November, 2006

_____
Notary Public

**Danielle Scotto**
**Notary Public, State of New York**
**No. 01SC6119482**
**Qualified in Kings County**
**Commission Expires Nov 29, 200 8**

11

George A. Davidson (GD3422)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

Attorneys for Defendant Federal Deposit Insurance
Corporation, in its Capacity as Receiver for NextBank, N.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -x



THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card
Master Note Trust,

                        Interpleader Plaintiff,

             -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND,
and FEDERAL DEPOSIT INSURANCE
CORPORATION,

                      Interpleader Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -X

**06 CV 13388**

**<u>NOTICE OF REMOVAL OF
DEFENDANT FEDERAL
DEPOSIT INSURANCE
CORPORATION</u>**

RECEIVED
NOV 21 2006
U.S.D.C. S.D. N.Y.
CASHIERS

         PLEASE TAKE NOTICE that the Federal Deposit Insurance Corporation, in its

Capacity as Receiver for NextBank, N.A. (the "FDIC Receiver"), hereby removes this action

pursuant to 12 U.S.C. § 1819(b)(2)(B) from the Supreme Court of the State of New York,

County of New York to the United States District Court for the Southern District of New York

and respectfully states as follows:

         1.       On November 16, 2006, the Bank of New York, in its capacity as Indenture

Trustee of the NextCard Credit Card Master Note Trust ("BONY"), filed an action against the

FDIC Receiver in the Supreme Court of the State of New York. *Bank of New York v. First*

*Millennium, Inc.*, No. 650234/2006 (N.Y. Sup. Ct.).  True and correct copies of all papers served

FDIC Receiver are attached hereto as Exhibit A.

     2.    This action is removable pursuant to 12 U.S.C § 1819 (b)(2)(B) which provides that the FDIC Receiver "may, without bond or security, remove any action, suit or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party."

     3.    Venue is proper in this Court because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

     4.    No previous application has been made for the relief requested herein.

     5.    This Notice of Removal has been served on all named parties to the removed case.

     6.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Court for the Supreme Court of the State of New York, County of New York.

     WHEREFORE, Defendant the FDIC Receiver respectfully removes this action from the Supreme Court of the State of New York, County of New York, pursuant to 12 U.S.C. § 1819(b)(2)(B).

DATED:   November *21*, 2006        Respectfully submitted,
           New York, New York

                          HUGHES HUBBARD & REED LLP

                          By: _____
                          George A. Davidson (GD3422)

                          One Battery Park Plaza
                          New York, New York 10004-1482
                          (212) 837-6000

                          *Attorneys for Defendant Federal Deposit Insurance Corporation, in its Capacity as Receiver for NextBank, N.A.*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____

THE BANK OF NEW YORK, in its capacity as     :
Indenture Trustee of the NextCard Credit Card    :    Index No.
Master Note Trust,                                  :

                 Interpleader Plaintiff,        :

                  - against -           :     **Summons**

FIRST MILLENNIUM, INC., MILLENNIUM       :
PARTNERS, L.P., RMK ADVANTAGE FUND,    :    Date Index No. Purchased:
and FEDERAL DEPOSIT INSURANCE         :    11/16/06
CORPORATION,                               :

                 Interpleader Defendants.     :
_____ :

To the above named Defendant(s)

First Millennium, Inc., 666 5th Avenue, 8th Floor, New York, NY 10103

Millennium Partners, L.P., 666 5th Avenue, 8th Floor, New York, NY 10103

RMK Advantage Fund, 1100 Ridgeway Loop Road, Suite 510, Memphis, TN 38120

Federal Deposit Insurance Corporation, Regional Counsel, 20 Exchange Place, 4th
Floor, New York, NY 10005,

      You are hereby summoned to answer the complaint in this action and to serve a copy
of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiffs' attorney within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of
your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

The basis of venue is the residence of plaintiff, which is 101 Barclay Street, New York, NY 10007-2119.

Dated:  New York, New York
        November 16, 2006


                                    ALSTON & BIRD LLP


                                    Michael E. Johnson
                                    Birgit Kurtz
                                    90 Park Avenue
                                    New York, New York
                                    (212) 210-9400

                                    *Attorneys for Interpleader Plaintiff*
                                    *The Bank of New York, in its capacity as*
                                    *Indenture Trustee of the NextCard Credit*
                                    *Card Master Note Trust*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| THE BANK OF NEW YORK, in its capacity as Indenture Trustee of the NextCard Credit Card Master Note Trust, | : : : : : | INTERPLEADER COMPLAINT |
| Interpleader Plaintiff, | : : : | |
| - against - | : : : | Index No._____ |
| FIRST MILLENNIUM, INC., MILLENNIUM PARTNERS, L.P., RMK ADVANTAGE FUND, and FEDERAL DEPOSIT INSURANCE CORPORATION, | : : : : : : | |
| Interpleader Defendants. | : : : : | |

Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the NextCard Credit Card Master Note Trust, by its attorneys, Alston & Bird LLP, as and for its Interpleader Complaint, alleges:

## INTRODUCTION

1.      This is an interpleader action brought in accordance with CPLR 1006 for the purpose of obtaining adjudication of the respective rights of the Interpleader Defendants with respect to certain assets held by the Interpleader Plaintiff. Interpleader Plaintiff, which serves as indenture trustee, faces competing claims to the assets by the Interpleader Defendants and cannot determine, without hazard to itself, how to proceed.

## PARTIES

2.      Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the NextCard Credit Card Master Note Trust, ("BNY") is a New York banking corporation

1

with its principal place of business in New York, New York.  BNY is the indenture trustee under the Indenture, as defined below.

      3.      Interpleader Defendant First Millennium, Inc. is, upon information and belief, a New York corporation with its principal place of business in New York, New York.

      4.      Interpleader Defendant Millennium Partners, L.P. is, upon information and belief, a limited partnership organized under the laws of the State of New York, with its principal place of business in New York, New York.

      5.      Interpleader Defendant RMK Advantage Fund is, upon information and belief, a limited partnership organized under the laws of the State of Tennessee, with its principal place of business in Memphis, Tennessee.

      6.      Interpleader Defendants First Millennium, Inc., Millennium Partners, L.P. and RMK Advantage Fund (collectively, the "Noteholders") hold a majority of the outstanding Notes that are the subject of the Indenture, as defined below.

      7.      Interpleader Defendant Federal Deposit Insurance Corporation ("FDIC") is a federal regulatory agency with an office located in New York, New York, which serves as the receiver for non-party NextBank, N.A ("NextBank").

## BACKGROUND

      8.      Interpleader Plaintiff BNY is a party to a master indenture agreement, dated as of December 11, 2000, as supplemented by indenture supplements (the "Indenture").  Pursuant to the Indenture, certain asset-backed notes (the "Notes") were issued that are secured by a portfolio of credit card receivables.  The credit cards were issued by non-party NextBank.

      9.      Pursuant to the terms of the Indenture, BNY holds certain collateral that is the subject of the instant dispute (the "Collateral").  The Collateral consists of credit card

receivables, proceeds received from credit card receivables, funds in accounts referred to as the "Spread Accounts," and certain other assets.

10.     The Noteholders have notified BNY that, as a result of NextBank's entry into receivership and certain subsequent events, BNY is now obligated, pursuant to the terms of the Indenture, to turn over to them (and other holders of Notes) certain Collateral and take certain other actions with respect to the Collateral for their benefit (the "Instructions").

11.     The Noteholders have taken the position that BNY's failure to turn Collateral over to them or follow the Instructions will constitute a breach of BNY's obligations pursuant to the Indenture. The Noteholders have further notified BNY that they will consider instituting legal proceedings against BNY if it does not follow the Instructions concerning the Collateral.

12.     The FDIC has disputed the Noteholders' claims to the Collateral and the Noteholders' Instructions. The FDIC has further informed BNY that, in accordance with the terms of the Indenture and a decision rendered by the United States District Court for the District of Columbia, in an action entitled *Bank of New York v. FDIC*, ___ F. Supp. 2d ___, No. 03-1221, 2006 WL 2772860 (D.D.C. Sept. 27, 2006) (the "District Court Decision"), BNY must turn certain Collateral over to the FDIC and cannot take actions with respect to the Collateral pursuant to the Noteholders' Instructions. The FDIC has taken the position that, if BNY turns Collateral over to the Noteholders and follows the Instructions with respect to the Collateral, BNY might be acting in contempt of the District Court Decision, and the FDIC has indicated that it is considering legal action.

13.     The Noteholders have disputed the FDIC's claims to the Collateral and the FDIC's efforts to cause BNY not to follow their Instructions concerning the Collateral.

14.    Interpleader Plaintiff BNY faces competing claims to the Collateral and cannot determine, without hazard to itself, how it should proceed with respect to the Collateral it holds.

15.    Interpleader Plaintiff BNY is ready and willing to deliver the Collateral to such person or persons as the Court shall direct.

16.    The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

## PLEA FOR RELIEF

**WHEREFORE,** Interpleader Plaintiff BNY demands judgment:

1.    That Interpleader Defendants and each of them be restrained by injunction from commencing or prosecuting any action or proceeding against Interpleader Plaintiff in relation to the Collateral.

2.    That Interpleader Defendants be required to interplead together concerning their respective claims to the Collateral.

3.    That Interpleader Plaintiff's costs and disbursements, including legal fees and expenses, be paid out of the Collateral.

4.    That Interpleader Plaintiff have such other and further relief as the court may deem just, proper and equitable, including reasonable attorneys' fees.

Dated: New York, New York
       November 16, 2006

ALSTON & BIRD LLP

Michael E. Johnson
Birgit Kurtz
90 Park Avenue
New York, New York
(212) 210-9400

*Attorneys for Interpleader Plaintiff*
*The Bank of New York, in its capacity as*
*Indenture Trustee of the NextCard Credit*
*Card Master Note Trust*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card Master
Note Trust,

                Interpleader Plaintiff,

                - against -

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND, and
FEDERAL DEPOSIT INSURANCE
CORPORATION,

                Interpleader Defendants.

Index No.  650234-06

**AFFIDAVIT OF
SERVICE**

STATE OF NEW YORK  )
                S.S.:
COUNTY OF NEW YORK)

        KIM FITZGERALD, being duly sworn, deposes and says:
        I am not a party to the action, am over 18 years of age, and am employed by
Alston & Bird LLP, attorneys for Interpleader Plaintiff.
        That on the 20th day of November 2006, at approximately 8:50 a.m., I served true
copies of the annexed Summons and Complaint and Notice Regarding Availability of
Electronic Filing upon the Federal Deposit Insurance Corporation at 20 Exchange Place,
4th Floor, New York, NY 10005, by personally delivering and leaving the same with
Barbara A. Monheit, Regional Counsel and Agent for Service of Process for the Federal
Deposit Insurance Corporation.
        Barbara A. Monheit is a white female, approximately 50 years of age, stands
approximately 5' 1" and weighs approximately 120 pounds with brown eyes and blond
hair.

*Kim Fitzgerald*
Kim Fitzgerald

Sworn to before me this 20th
Day of November, 2006

*Pamela L. Lewis*
Notary Public

PAMELA L. LEWIS
Notary Public, State of New York
No. 31-4610141
Qualified in New York County
Commission Expires March 30, April 30, 2007

ADMIN/20048156v1

Barbara A. Monheit
Regional Counsel
Legal

**FDIC** Federal Deposit Insurance Corporation
20 Exchange Place
New York, NY 10005
Tel: 917.320.2800
Fax: 917.320.2844
bmonheit@fdic.gov

George A. Davidson (GD3422)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York  10004-1482
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Tom M. Reeves (KS Sup. Ct. No. 7259)
Federal Deposit Insurance Corporation
550 17th Street, N.W., Room VS-D-7068
Washington, D.C.  20429
Telephone:  (703) 562-2433
Facsimile:  (703) 562-2475



Attorneys for Interpleader Defendant Federal Deposit Insurance
Corporation, in its Capacity as Receiver for NextBank, N.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card
Master Note Trust,

                         Interpleader Plaintiff,

                    -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND,
and FEDERAL DEPOSIT INSURANCE
CORPORATION,

                     Interpleader Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -x

No.: 06-CIV-13388-CSH

**ORDER TO SHOW CAUSE IN
SUPPORT OF THE FDIC
RECEIVER'S MOTION FOR A
STAY**

        Upon the Motion for a Stay of Interpleader Defendant the Federal Deposit

Insurance Corporation, in its Capacity as Receiver of NextBank, N.A. (the "FDIC Receiver"),

the Declaration of Scott H. Christensen executed on December 4, 2006, together with the

exhibits attached thereto, and the accompanying Memorandum of Law, and sufficient cause

appearing therefore,

IT IS HEREBY ORDERED, that the other Interpleader Defendants First

Millennium, Inc. and Millennium Partners, L.P., show cause before the Honorable Judge Charles

S. Haight, Jr. of this Court in Room 17C United States Courthouse, 500 Pearl Street, in the City,

County and State of New York, on December 21, 2006, at ___ o'clock A .m., or as soon

thereafter as counsel can be heard, why an order should not be issued granting the FDIC

Receiver's motion for a stay.

IT IS FURTHER ORDERED that personal service of this Order to Show Cause,

together with the papers submitted in support hereof, be deemed good and sufficient service if

delivered to Michael E. Johnson, Birgit Kurtz, Alston & Bird LLP, 90 Park Avenue, New York,

NY 10016-1387 and Michael J. Edelman, Michael G. Davies, Vedder Price, Kaufman &

Kammholz, P.C., 805 Third Avenue, New York, New York 10022-2203 at or before 5:00 o'clock

P .m., at or before December 8, 2006.                     and Interpleader Plaintiff's

IT IS FURTHER ORDERED, that Interpleader Defendants' papers in opposition,

if any, be delivered to Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New

York 10004, Attn: George A. Davidson, Esq., on or before ___ o'clock ___m., on December

12:00 noon

14, 2006; and it is *

DATED: December 7, New York, New York
ISSUED 10:10 o'clock a m.

_United States District Judge_

* FURTHER ORDERED, that Interpleader Defendant
FDIC, if so advised, may file and serve reply
papers on or before December 19, 2006, by 12:00 noon.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

THE BANK OF NEW YORK, in its capacity as                  :
Indenture Trustee of the NextCard Credit Card             :
Master Note Trust,                                        :
                                                          :
                    Interpleader Plaintiff,               :        06 Civ. 13388 (CSH)
                                                          :
          -against-                                       :
                                                          :
FIRST MILLENNIUM, INC., MILLENNIUM                        :        ORDER
PARTNERS, L.P., RMK ADVANTAGE FUND,                       :
and FEDERAL DEPOSIT INSURANCE                             :
CORPORATION,                                              :
                                                          :
                    Interpleader Defendants.              :
                                                          :
-----------------------------------------------------------x

HAIGHT, Senior District Judge:

    Interpleader Defendant Federal Deposit Insurance Corporation ("FDIC") moved by Order

to Show Cause dated December 4, 2006 for an Order extending to and including December 20, 2006

its time to file (1) papers in opposition to the motion of Interpleader Defendants First Millennium,

Inc. and Millennium Partners, L.P. (collectively "Millennium") for summary judgment filed in the

New York State court before its removal to this Court, and (2) either a motion to dismiss or an

answer to the complaint of Interpleader Plaintiff The Bank of New York ("BNY").

    The FDIC accompanied this motion for an extension of time with a second motion, also by

Order to Show Cause and dated December 4, 2006, for an Order staying the captioned action in this

Court until the Honorable Ellen S. Huvelle, a United States District Judge for the District of the

District of Columbia, had ruled on a pending application by the FDIC in a case seemingly arising

out of the same nexus of facts and bearing docket number Civil Action No. 06-1975-ESH (D.D.C.).

    At 5:30 p.m. on December 6, 2006, I convened by telephone conference call a preliminary

hearing on both of the FDIC's motions. Counsel for the FDIC, Millennium, and BNY participated in the hearing. At its conclusion, I ruled that I would hear oral argument on the FDIC's motion for a stay at 10:30 a.m. on December 21, 2006. A pre-hearing briefing schedule was also laid down. Those dates appear in the Order to Show Cause on the FDIC's motion for a stay, which is being filed concurrently with this Memorandum and Order.

If the FDIC's motion for a stay is granted (a question on which I intimate no present view), the parties and this Court will await Judge Huvelle's decision in the case pending before her. In that circumstance, there is no present need for the FDIC to devote the time and resources necessary to prepare the papers contemplated by the first of its two motions before me. Accordingly, I decline to sign the first of these Orders to Show Cause, and direct instead that the FDIC's time within which to file papers in opposition to Millennium's motion for summary judgment and to move to dismiss or answer BNY's interpleader complaint is extended *sine die*, subject to this Court's further Order.

It is SO ORDERED.

Dated: New York, New York
     December 7, 2006

                                     CHARLES S. HAIGHT, JR.
                         UNITED STATES SENIOR DISTRICT JUDGE

Michael E. Johnson (MJ 0299)
H. Stephen Harris, Jr. (HH 0584)
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 210-9400
Fax: (212) 210-9444

Attorneys for Interpleader Plaintiff
The Bank of New York, in its capacity as Indenture
Trustee of the NextCard Credit Card Master Note Trust

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

THE BANK OF NEW YORK, in its capacity as
Indenture Trustee of the NextCard Credit Card
Master Note Trust,

                          Interpleader Plaintiff,               No.: 06-CIV-13388-CSH

        -against-

FIRST MILLENNIUM, INC., MILLENNIUM
PARTNERS, L.P., RMK ADVANTAGE FUND,
and FEDERAL DEPOSIT INSURANCE
CORPORATION,

                          Interpleader Defendants.

-------------------------------------------------------------X

## THE BANK OF NEW YORK'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE FDIC RECEIVER'S MOTION FOR A STAY

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

    A Dispute Over the Collateral Held by BNY Arises, and BNY Commences the
    Interpleader Action in New York ...........................................................................................2

    The FDIC Subsequently Commences the DC Action and Takes Steps To Have the DC
    Court Reach the Merits First .................................................................................................5

ARGUMENT................................................................................................................................7

    THE FDIC'S MOTION FOR A STAY MUST BE DENIED....................................................7

        A.    The FDIC's Motion Must Be Denied Because this Action Was Filed First ...........7

        B.    A Stay Should Be Denied Because This Action Is an Interpleader and the
              DC Action is Not, and Because All Interested Persons Are Subject to This
              Court's Jurisdiciton................................................................................................8

        C.    Application of the *Kappel* Factors Does Not Support the Granting of a
              Stay ......................................................................................................................10

CONCLUSION ..........................................................................................................................14

Interpleader Plaintiff The Bank of New York, in its capacity as Indenture Trustee of the

NextCard Credit Card Master Note Trust ("BNY"), respectfully submits this Memorandum of

Law in Opposition to the FDIC Receiver's ("FDIC") Motion for a Stay (the "Motion").

## PRELIMINARY STATEMENT

The FDIC's accusation of forum-shopping is an egregious example of the pot calling the

kettle black. As set forth below, BNY, as an interpleading stakeholder, commenced this

litigation only when it became clear that it could not resolve the Directing Noteholders'[1] and the

FDIC's competing claims to certain assets held by BNY without unfairly subjecting itself to the

threat of litigation. BNY had little choice but to commence its interpleader action in this Court,

as this district appeared to be the only one where all of the interpleader defendants were subject

to jurisdiction. In addition, venue is proper in this district because a substantial part of the events

or omissions giving rise to the claim occurred in New York and the property (the *res* itself) that

is the subject of the action is situated in New York. Finally, New York is plainly the most

appropriate and convenient forum, in that New York is the principal place of business of BNY

and two of the interpleader defendants, the FDIC maintains a permanent office in New York, and

the documents (including the files of BNY and two of the three Directing Noteholders) and

witnesses with knowledge of the events giving rise to this claim are located in New York.

In response to the commencement of this action, the FDIC commenced its own action in

its preferred jurisdiction (the "DC Action"), naming BNY as a defendant but omitting the

Directing Noteholders, because the interpleader defendant noteholders do not appear to be

subject to jurisdiction in the District of Columbia. Presumably believing this Court incapable of

resolving this matter fully and fairly, the FDIC promptly manufactured an excuse to file an

---

[1]    First Millennium, Inc., Millennium Partners, L.P. and RMK Advantage Fund (the "Directing Noteholders")
are the noteholders that, pursuant to the Master Indenture (as defined herein), directed BNY to take actions that gave
rise to the claims in this action.

"emergency" motion in the DC Action, hoping to win an order staying further proceedings in this Court under the All Writs Act, 28 U.S.C. § 1651 (2000). The court in the DC Action (the "DC Court") saw through the FDIC's ploy and directed it to seek relief here, prompting the FDIC to move this Court for a stay of proceedings here.

The FDIC's Motion should be denied. The FDIC has failed to identify any basis for deviating from the first-filed rule, which prescribes that the case that is filed first should ordinarily be allowed to take priority over later-filed actions. This case presents a particularly compelling application of the first-filed rule because it is an interpleader action, where all parties' claims can be heard, whereas the DC Action is not an interpleader and the Directing Noteholders – indisputably real parties in interest – are absent. Complete relief cannot be afforded in the DC Action, and venue does not properly lie there. Moreover, the FDIC will not be prejudiced if this case is permitted to proceed, whereas BNY and the Directing Noteholders could both be harmed if this litigation is stayed in favor of the DC Action.

## BACKGROUND

### A Dispute Over the Collateral Held by BNY Arises, and BNY Commences the Interpleader Action in New York

BNY serves as the Indenture Trustee of the NextCard Credit Card Master Note Trust (the "Trust"). *See* Interpleader Complaint ¶¶ 2, 8 (Declaration of H. Stephen Harris, Jr., dated December 14, 2006 (the "Harris Decl."), Ex. 1). The master indenture between the Trust and BNY (the "Master Indenture") sets forth certain obligations of BNY as Indenture Trustee and creates certain duties owed by BNY to the noteholders (the "Noteholders") who acquired debt instruments (the "Notes") issued by the Trust.

On or about November 9, 2006, the Directing Noteholders sent a letter to BNY (the "November 9 Instruction Letter"), instructing it – under the terms of the Master Indenture – to

deliver a notice of default to the Trust. *See* Directions to Indenture Trustee and Indemnification Regarding (a) Notice of Event of Default and Acceleration and (b) Exercise of Remedies Under Master Indenture Section 5.05, dated November 9, 2006 (Harris Decl., Ex. 2). The Directing Noteholders also directed BNY to hold certain Trust assets, including credit card receivables and proceeds thereof (the "Collateral"), which required that BNY cease making payments of proceeds of the Collateral to the FDIC. *Id.* Finally, the Directing Noteholders also instructed BNY to commence litigation against the Trust seeking a judgment in the amount of the full, unpaid principal and interest due on the Notes. *Id.*

Concerned that the instructions could be construed to contravene a prior decision and judgment of the United States District Court of the District of Columbia (the "Prior DC Action"),[2] BNY initially declined to accept the instructions. On or about November 13, 2006, counsel for Millennium sent counsel for BNY a detailed letter (the "November 13 Letter"), providing legal advice that the instructions contained in the November 9 Instruction Letter did not run afoul of the decision and judgment in the Prior DC Action. *See* Letter from Michael J. Edelman to Gary D. Roth, dated November 13, 2006 (Harris Decl., Ex. 3). In the November 13 Letter, counsel for Millennium asserted that "[n]othing in [the prior decision] affects in any way the liability of the [Trust] or the remedies that can be taken against the [Trust.] [That decision] stands only for the proposition that the Early Amortization Period clause was unenforceable against the FDIC (standing in the shoes of NextBank) and that the FDIC is not liable for conversion." *Id.*

After carefully considering the decision and judgment in the Prior DC Action, the contents of the November 13 Letter and the obligations of BNY under the Master Indenture, BNY concluded that it was obligated by virtue of its fiduciary duties to the Directing

---

[2] *The Bank of New York v. Federal Deposit Insurance Corp.*, No. 1:03-cv-01221-ESH (U.S.D.C., D.D.C.).

Noteholders to heed their instructions with respect to the delivery of the notice of default and the taking control of the Collateral. Accordingly, on November 14, 2006, BNY delivered a notice of default (the "Notice of Default") to all interested persons, including the FDIC. *See* Letter from The Bank of New York to NextCard Credit Card Master Note Trust, dated November 14, 2006 (Harris Decl., Ex. 4).

The FDIC immediately responded on November 15 by threatening legal action against BNY if it took any action on the Notice of Default. *See* Letter from Scott H. Christensen to H. Stephen Harris, Jr., dated November 15, 2006 (Harris Decl., Ex. 5). The FDIC also demanded that BNY turn over approximately $3.6 million in proceeds from credit card receivables that it held, in contravention of the Directing Noteholders' instruction that all Collateral be held for their benefit. *See* Interpleader Compl. ¶ 12 (Harris Decl., Ex. 1). On November 16, counsel for Millennium informed counsel for BNY that Millennium intended to take legal action against BNY if it rescinded the Default Notice or otherwise failed to carry out the instructions contained in the November 9 Instruction Letter. *See id.*. ¶ 11.

In the course of communications BNY subsequently had with representatives of the FDIC and the Directing Shareholders, BNY was unable to achieve any resolution of the conflicting instructions (and threats of imminent litigation) it was receiving. BNY thus was unable to determine what to do with the Collateral it was holding, including the $3.6 million in credit card receivable proceeds demanded by the FDIC. *See id.* ¶ 14. Accordingly, late in the day on November 16, 2006, immediately after a "close of business" deadline unilaterally imposed by the FDIC for BNY to capitulate to the FDIC's demands to retract the Notice of Default and pay proceeds of the Collateral to the FDIC, BNY filed an interpleader complaint in the Supreme Court for the State of New York (New York County), naming the FDIC and the Directing

- 4 -

Noteholders as defendants. Counsel for BNY promptly delivered a courtesy copy of the summons and complaint to counsel for the FDIC that evening, and the pleadings were formally served on the FDIC on November 20. *See* E-mail from Gary Roth to Scott Christensen, dated November 16, 2006 (Harris Decl., Ex. 6) and Affidavit of Service, executed on November 20, 2006 (Harris Decl., Ex. 7). Removed by the FDIC on November 21, this action is now pending before this Court. *See* Notice of Removal of Defendant Federal Deposit Insurance Corporation, filed November 21, 2006 (Harris Decl., Ex. 8).

<div align="center">The FDIC Subsequently Commences the DC Action<br>and Takes Steps To Have the DC Court Reach the Merits First</div>

After receiving a copy of the summons and complaint in this action, the FDIC filed a summons and complaint, naming only BNY as a defendant, in the United States District Court for the District of Columbia, on Friday, November 17, 2006. *See* Complaint in *Federal Deposit Insurance Corporation v. The Bank of New York* (No. 06-1975, U.S.D.C., D.D.C.) (the "DC Action"), dated November 17, 2006 (Harris Decl., Ex. 9). At the same time, the FDIC also filed in that court motions for a preliminary injunction and temporary restraining order. *See* Declaration of Scott H. Christensen in Support of the FDIC Receiver's Motion for a Stay, dated December 4, 2006 ("Christensen Decl."), Ex. 3. The following business day, November 20, 2006, BNY filed papers in opposition to the FDIC's motions and in support of its own motion to dismiss. *See id.* In its motion, BNY sought dismissal of the DC Action on the bases that this Court has proper and exclusive jurisdiction and the Directing Noteholders are indispensable parties who are not included in the DC Action.

Following a telephonic conference with the DC Court, BNY entered into a stipulation obviating the need for a temporary restraining order (the "DC Stipulation"). *See id.*, Ex. 4. Contrary to the FDIC's mischaracterization of that document, in the Stipulation BNY did *not*

<div align="center">- 5 -</div>

concede that the DC Court has "jurisdiction over the funds in question." *See* Memorandum in Support of the FDIC Receiver's Motion for a Stay ("FDIC Mem."), ¶ 18. Instead, at the suggestion of the DC Court, in order to avoid the need for the DC Court to hear arguments and rule on the application for a temporary restraining order, BNY agreed not to transfer or distribute funds associated with the Collateral pending further order from the DC Court. In entering into the DC Stipulation, BNY contemplated that (and still contemplates that), once this Court (which has had jurisdiction over the funds as a matter of law since the commencement of this interpleader case, and hence prior to the execution of the Stipulation) decided the dispute between the Directing Noteholders and FDIC, the DC Court would simply order that the funds be distributed in a manner that comported with this Court's ruling.

With respect to the FDIC's preliminary injunction motion, the DC Court has ordered that it intends to collapse consideration of that motion with its hearing of the trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2), which it has scheduled for January 11, 2007. *See* Christensen Decl., Ex. 3, November 28, 2006 Minute Order. The DC Court has also set a briefing schedule, pursuant to which BNY has already filed a supplemental brief in further support of its motion to dismiss. Even though there has been no development of the dispute between the FDIC and the Directing Noteholders in either litigation and the Directing Noteholders, as nonparties, will have no opportunity to fully or fairly litigate their position in the DC Action, the DC Court's briefing schedule contemplates that the FDIC will file a motion for summary judgment on December 15, 2006, and that briefing will be completed by the trial date. *See* Scheduling Order, dated December 5, 2006, in DC Action (Harris Decl., Ex. 10).

In addition to pressing for extremely accelerated consideration of the merits in the DC Action, the FDIC has undertaken a campaign to prevent the parties from litigating in this forum.

- 6 -

On November 30, 2006, the FDIC served an "Emergency Motion," seeking an order from the

DC Court pursuant to the All Writs Act, staying this action from proceeding. *See* The FDIC

Receiver's Emergency Motion to Stay Related Cases [*sic*], dated November 30, 2006 (Harris

Decl., Ex. 11). The FDIC outrageously claimed that it was entitled to an "emergency" stay of

proceedings in this Court, because it calculated that its brief in opposition to Millennium's

summary judgment motion was due the following week, on December 5, 2006. *Id.* In its motion

papers, the FDIC neglected to inform the DC Court that it had not requested an extension or

adjournment of that deadline from any of the other parties to this action. *Id.*

The next day, the DC Court convened a conference call with counsel for the FDIC and

BNY. *See* Harris Decl. ¶ 13. On the call, the DC Court instructed the FDIC to seek a consensual

extension or adjournment of the summary judgment opposition deadline and suggested that a

motion to stay this litigation would be more appropriately sought from this Court. *See id.* ¶ 14.

The DC Court also instructed counsel for the FDIC not to file any other motions without first

consulting with counsel for BNY and counsel for the Directing Noteholders. *See id.* Having

received a chilly reception to its "Emergency Motion" for a stay order from its favored court, the

FDIC resorted to filing its Motion for a stay in this Court on December 4, 2006.

## ARGUMENT

### THE FDIC'S MOTION FOR A STAY MUST BE DENIED

#### A.    *The FDIC's Motion Must Be Denied Because this Action Was Filed First*

It is well-settled law in the Second Circuit that where, as here, two suits involving the

same controversy are filed in different district courts, "the first suit should have priority," and it

is the second-filed action that generally should be stayed. *Mattel, Inc. v. Louis Marx & Co.*, 353

F.2d 421, 422-24 (2d Cir. 1965); *see also Fort Howard Paper Co. v. William D. Witter, Inc.*, 787

F.2d 784, 790 (2d Cir. 1986) ("[W]here there are two competing lawsuits, the first should have

priority, absent a showing of balance of convenience in favor of the second action or unless there are special circumstances which justify giving priority to the second.") (internal quotations and citation omitted); *Adams v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) (same). As this Court observed in *Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F. Supp. 2d 436, 440 (S.D.N.Y. 2001), "the Second Circuit has long followed the 'first-filed rule' in deciding whether a case should be stayed or dismissed in favor of a case pending in another federal court . . . . Under this rule, where two actions involve substantially the same issues, the first suit should have priority, absent the showing of a balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second" (internal quotations and citations omitted).

There is no reason to depart from the first-filed rule here. This case was filed first, and all necessary parties are subject to the Court's jurisdiction but not to the jurisdiction of the DC Court. This forum is more convenient than Washington, DC because BNY and two of the Directing Noteholders are based in New York, and the FDIC has a large office here. Moreover, the funds at issue are held by BNY in New York.

### B.    *A Stay Should Be Denied Because This Action Is an Interpleader and the DC Action Is Not, and Because All Interested Persons Are Subject to This Court's Jurisdiction*

Because this action has been styled as an interpleader with all interested parties named as defendants, and the DC Action is not an interpleader and does not include one set of parties laying claim to the *res* at issue (proceeds from the Collateral held by BNY), the first-filed action before this Court should be allowed to proceed. *See Sotheby's Inc. v. Garcia*, 802 F. Supp. 1058, 1066 (S.D.N.Y. 1992) (denying stay of interpleader action and staying proceedings in another district that did not include all claimants). In *Sotheby's*, a client of the auction house, Sandra Garcia, delivered a set of paintings to Sotheby's, which paintings had apparently been delivered

to her as collateral for a loan made by Imelda Marcos. *Id.* at 1061. Shortly after it took

possession of the paintings, Sotheby's received a letter from the Republic of Philippines, in

which the Philippines claimed to be the owner of some or all of the paintings. *Id.* When

Sotheby's refused to return the paintings to Garcia, Garcia commenced a conversion action

against Sotheby's in the United States District Court for the Eastern District of Virginia. *Id.* at

1062. Garcia declined to name the Philippines as a defendant in the Virginia litigation. *Id.*

Sotheby's then commenced an interpleader action in this Court, naming both claimants as

interpleader defendants. *Id.* at 1061.

      In its decision denying Garcia's motion to stay the New York action, this Court explained

that "[i]t is only in this interpleader action that the competing claims to the ownership of the

Paintings can be resolved and effective relief granted." *Id.* at 1066. The Court observed that the

Philippines was not a party to the Virginia action, and the Virginia action therefore did not

include that party's claim to the paintings. As a result, "[i]f Garcia were to succeed in the

Virginia Action and procure return of the Paintings, the Philippines may be left without a means

to satisfy an ultimate judgment in its favor." *Id.* at 1065. The *Sotheby's* court further observed

that allowing the Virginia litigation to take priority over the New York interpleader action could

result in injustice to Sotheby's, as the stakeholder, because Sotheby's could be left exposed to

"an action that may be later commenced by the Philippines charging it with improperly returning

the paintings to Garcia." *Id.* at 1065-66.[3] The *Sotheby's* court not only denied Garcia's motion

for a stay but granted the motion of the Philippines and Sotheby's, pursuant to 28 U.S.C. § 2361,

enjoining further proceedings in the Virginia litigation. *Id.* at 1066.

---

[3] The FDIC has claimed that BNY has "colluded" with the Directing Noteholders and tried to suggest that BNY can adequately protect the Directing Noteholders interests in the DC Action. Prior to the commencement of this action, however, the Directing Noteholders threatened litigation against BNY in the event BNY turned Collateral proceeds over to the FDIC.

Interestingly, *Sotheby's* presented one of the rare cases in which a court in this Circuit declined to follow the first-filed rule. The circumstances that overbore the first-filed rule were apparently that the New York case was an interpleader action and all interested persons were named in that action. *A fortiori*, here, where both those factors *and* the first-filed rule support the New York forum, the Court's decision in *Sotheby's* requires that the FDIC's Motion be denied. As in *Sotheby's*, all parties are present in this litigation, but one set of claimants, the Directing Noteholders, are absent from the DC Action. Were a stay granted, the FDIC would be allowed to proceed to obtain a judgment concerning the *res* (the proceeds from the Collateral held by the FDIC) in the absence of the Directing Noteholders. Such an outcome would be manifestly unfair to the Directing Noteholders, and it exposes BNY, as the stakeholder, to an unnecessary risk of liability. The inappropriateness of a stay in this case is even clearer than it was in *Sotheby's* because, unlike *Sotheby's*, denial of the stay is consistent with the first-filed rule.

    **C.    Application of the _Kappel_ Factors Does Not Support the Granting of a Stay**

To avoid the well-settled first-filed rule (which the FDIC carefully avoids even mentioning), the FDIC argues that a stay should be granted because "BONY will suffer no prejudice by staying this case," FDIC Mem. at 9, and "the private interest of and burdens on Interpleader Defendants supports granting the stay," *id.* at 10. In support of its argument, the FDIC relies on the Court's decision in *Kappel v. Comfort,* 914 F. Supp. 1056 (S.D.N.Y. 1996). The *Kappel* court identified five factors to consider on a motion to stay,[4] observing that "the basic goal [is] to avoid prejudice." *Id.* at 1058.

---

[4] These five factors are: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) (quoting *Volmar Distributors v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993)).

LEGAL01/13028970v4

What the FDIC ignores is that the prejudice inquiry must focus primarily on the prejudice that the *movant* will suffer in the absence of a stay, not the prejudice that might result to the non-movants if a stay is granted. As the Supreme Court explained (and as the *Kappel* court alluded to), the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward, if there is . . . a fair possibility that the stay for which [it] prays will work damage to someone else." *Landis v. North American Co.*, 299 U.S. 248, 255 (1936). Moreover, "the burden of making out the justice and wisdom of a departure from the beaten track [lies] heavily on" the party seeking the stay. *Id.* at 256; *see also Clinton v. Jones*, 520 U.S. 681, 707 (1997) ("The proponent of a stay bears the burden of establishing its need.").

The FDIC has failed to show that it will suffer any "prejudice," "hardship or inequity" from being required to proceed before this Court. *See Landis*, 299 U.S. at 255. The FDIC asserts only that it "would suffer the burden of relitigating what has already been decided after three years of litigation," and that it "should not be put to the burden of defending itself against duplicative lawsuits seeking conflicting results." *See* FDIC Mem. at 10. While the FDIC might believe that litigation of its dispute with the Directing Noteholders over the proceeds of the Collateral constitutes an unfair burden, a stay of this action would not relieve the FDIC from having to "relitigate" the dispute. To the contrary, the FDIC would still be required to proceed with its lawsuit in the DC Court even if a stay here is granted. To the extent the FDIC believes the instant dispute is controlled by the decision in the Prior DC Action, its remedy is not a stay but rather invocation of principles of *res judicata* and collateral estoppel. Those doctrines are properly invoked in this district, where the parties characterized by the FDIC as seeking relitigation are present, not in the Court where the FDIC originally won the judgment in its

- 11 -

favor.[5]  Further, the FDIC simply assumes the ground of the controversy.  The Directing

Noteholders vigorously assert that this dispute is *not* controlled by the decision in the Prior DC

Action.  *See* November 13 Letter (Harris Decl., Ex. 13).  It is perfectly normal and proper for a

second court to decide such claims of collateral estoppel.  *See, e.g., Commissioner v. Sunnen,*

333 U.S. 591, 601-02 (1948).

      Even if the FDIC could meet its burden of demonstrating some need for a stay, the other

*Kappel* considerations do not support the granting of a stay.  As indicated in the preceding

section and as this Court held in *Sotheby's,* BNY, as the interpleading stakeholder in this

litigation, has a strong interest in the litigation proceeding in this forum where all of the parties

are present and all claims to the *res* can be heard.  If a stay were granted, BNY could be

prejudiced if the FDIC prevails in the DC Action, where the Directing Noteholders are not

parties.  BNY could still be subjected to continuing inconsistent claims concerning the Collateral

brought by the Directing Noteholders, and additional litigation is virtually certain.  Notably,

federal interpleader practice affords BNY the opportunity to interplead the Collateral proceeds in

this Court and seek dismissal from the action, a procedural remedy that offers full and fair

litigation of the issues and complete and final resolution of the dispute, that is unavailable to

BNY in the DC Action as that case is configured.[6]

      As for the second *Kappel* consideration, the FDIC disingenuously argues that the

Directing Noteholders will not be prejudiced if this action is stayed.  The Directing Noteholders

are not parties to the DC Action, and their claim to the Collateral proceeds thus cannot be heard

---

[5] The FDIC's transparent attempt to forum-shop its *res judicata* or collateral estoppel argument to its favored, "home" court is yet another reason to deny its stay motion.  It would be ironic indeed were the FDIC to prevail on its argument that it is burdened by "duplicative litigation" and win a stay of this action in favor of the DC Action, when it is the FDIC itself that needlessly commenced that litigation.

[6] As explained in the Background section above, notwithstanding the FDIC's argument to the contrary, BNY has not turned the *res* at issue in this interpleader action over to the jurisdiction of the DC Court.

by the DC Court.  Moreover, BNY has made clear in its filings in this Court and in the DC Court

that it does not know which of the substantive positions taken by the Directing Noteholders and

the FDIC is correct.  As such, BNY cannot fairly be expected to litigate the Directing

Noteholders' claims.  The Directing Noteholders are in the best position to articulate their

arguments, and they are present only in this case, not in the DC Action.  There is thus more than

"a fair possibility" that a stay "will work damage to" the Directing Noteholders.  *Landis*, 299

U.S. at 57.

In addition, since a final judgment in the DC Court might not be binding upon the

Directing Noteholders, a stay of this case also does not further the "interests of the courts."

*Kappel*, 914 F. Supp. at 1058.  The Second Circuit has made clear that the DC Court can have

"no interest . . . in being the first court to hold a trial on the merits."  *Retirement Sys. v. J.P.*

*Morgan Case & Co.*, 386 F.3d 419, 429 (2d Cir. 2004).  The FDIC inexplicably quotes *Kappel*

for the proposition that a court has an "obligation to assure that [its] exercise of its jurisdiction

does not have an avoidably harmful impact on cases *already pending* before another court."

FDIC Mem. at 11, *quoting Kappel,* 914 F. Supp. at 1058 (emphasis added).  Obviously, this

authority supports this Court's jurisdiction, and confirms the impropriety of the DC Court's

jurisdiction over the current dispute.  The *Kappel* court's allusion to the first-filed rule makes

clear that the courts do not have an interest in encouraging parties to commence duplicative

litigations by granting the stay motions of forum-shopping defendants such as the FDIC.

As for the final *Kappel* considerations, the interests of non-parties and the public interest

do not support the granting of a stay.  The FDIC suggests that the public interest is best served by

having the DC Court hear the dispute.  *See* FDIC Mem. at 11.  The public has no interest,

however, in the FDIC forum-shopping a *res judicata* or collateral estoppel determination to its

- 13 -

favored, "home" where it gains a tactical advantage by excluding the Directing Noteholders. To the contrary, the public's interest is in full and fair litigation of all the issues by all the interested persons in a forum that can afford complete and final relief.[7]

## CONCLUSION

For the foregoing reasons, the FDIC Receiver's Motion for a Stay should be denied.

Dated: New York, New York
       December 14, 2006

Michael E. Johnson (MJ 0299)
H. Stephen Harris, Jr. (HH 0584)
ALSTON & BIRD LLP
90 Park Avenue
New York, New York  10016
Tel: (212) 210-9400
Fax: (212) 210-9444

*Attorneys for Interpleader Plaintiff*
*The Bank of New York, in its capacity*
*as Indenture Trustee of the NextCard Credit Card*
*Master Note Trust*

---

[7] The FDIC has suggested that full and fair litigation can be achieved in the DC Action if the Directing Noteholders Intervene there. However, BNY has no way to compel the Directing Noteholders to waive personal jurisdiction and travel to the DC Court to litigate this matter.

LEGAL01/13028970v4

## CERTIFICATE OF SERVICE

I certify that on December 14, 2006 I caused a copy of The Bank of New York's Memorandum of Law in Opposition for a Stay and the Declaration of H. Steven Harris, dated December 14, 2006, to be served via the Electronic Court Filing system and by first-class, postage prepaid mail on:

| | |
|---|---|
| Dennis S. Klein | Michael G. Davies |
| Scott H. Christiensen | Michael J. Edelman |
| Hughes Hubbard & Reed LLP | Vedder, Price, Kaufman & Kammholz, P.C. |
| 1775 I Street, N.W. | 805 Third Avenue |
| Washington, D.C. 20006-2401 | New York, NY 10022-2203 |
| | |
| *Attorneys for Interpleader Defendant* | *Attorneys for Interpleader Defendants* |
| *Federal Deposit Insurance Corporation* | *First Millennium, Inc. and* |
| | *Millennium Partners, L.P.* |

Michael E. Johnson

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

Pursuant to the Master Indenture, dated as of December 11, 2000 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2000-1 Indenture Supplement, dated as of December 13, 2000 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of December 11, 2000 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2000-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | | |
|---|---|---|---|---:|
| A | (1) | Interest | | (0.00) |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class A Notes | | (0.00) |
| | | | | |
| B | (1) | Interest | | 0.00 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class B Notes | | 0.00 |
| | | | | |
| C | (1) | Interest | | 228,822.24 |
| | (2) | Principal | | (0.00) |
| | (3) | Total Distribution for Class C Notes | | 228,822.24 |
| | | | | |
| D | (1) | Interest | | 178,120.83 |
| | (2) | Principal | | - |
| | (3) | Total Distribution for Class D Notes | | 178,120.83 |

**II    RECEIVABLES IN THE TRUST**

| | | | | |
|---|---|---|---|---:|
| * | A | Beginning of the Period Principal Receivables: | $ | 68,107,995.19 |
| | B | Beginning of the Period Finance Charge Receivables: | $ | 3,892,789.48 |
| | C | Beginning of the Period Discounted Receivables: | | N/A |
| | D | Beginning of the Period Total Receivables: | | 72,000,784.67 |
| | | | | |
| | E | Removed Principal Receivables: | | - |
| | F | Removed Finance Charge Receivables: | | - |
| | G | Removed Total Receivables: | | - |
| | | | | |
| | H | Additional Principal Receivables: | | - |
| | I | Additional Finance Charge Receivables: | | - |
| | J | Additional Total Receivables: | | - |
| | | | | |
| | K | Discounted Receivables Generated this Period: | | N/A |
| | L | End of the Month Principal Receivables: | | 65,259,884.79 |
| | M | End of the Month Finance Charge Receivables: | | 3,735,321.12 |
| | N | End of the Month Discounted Receivables: | | N/A |
| | O | End of the Month Total Receivables: | | 68,995,205.91 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| Distribution Date: | November 15, 2006 |
|---|---|
| LIBOR Determination Date: | October 12, 2006 |

| | | | | | |
|---|---|---|---|---|---|
| P | (a) | Transferor Interest | | | |
| | | + Principal Receivables | 65,259,884.79 | | |
| | | + Special Funding Account (SFA) | - | | |
| | | - Aggregate Invested Amounts in the trust | (0.00) | | |
| | | Ending Transferor Interest | 65,259,884.79 | | |
| | | | | | |
| | (b) | Required Transferor Interest (9% x Principal Receivables) | 5,873,389.63 | | |
| | | | | | |
| | (c) | (Shortfall) if applicable in Transferor Interest | N/A | | |
| | | - principal collections will be trapped in the SFA until shortfall eliminated | | | |
| | | | | | |
| | (d) | Transferor Percentage (for information only) | 100.0% | | |

**III  PERFORMANCE SUMMARY**
**A  COLLECTIONS**

| | | | | |
|---|---|---|---|---|
| (1) | Total Collections | $ | 3,268,976.26 | |
| (2) | Total Principal Collections | | 2,141,172.11 | |
| (3) | Total Finance Charge Collections (including interchange) | $ | 1,127,804.15 | |
| | | | | |
| (4) | Principal Payment Rate | | 3.1% | |

**B. DELINQUENCIES AND LOSSES**

**NUMBER OF ACCOUNTS**

| | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 272,469 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 560 | 0.2% |
| | 60-89 Days | 400 | 0.1% |
| | 90-119 Days | 312 | 0.1% |
| | 120-149 Days | 313 | 0.1% |
| | 150-179 Days | 218 | 0.1% |
| | 180-209 Days | 4 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,807 | 0.7% |
| (3) | Total Accounts | 274,276 | 100.0% |

**OUTSTANDING BALANCES**

| | | | Amount | % of Total |
|---|---|---|---|---|
| (1) | Current Balances | $ | 63,033,004.48 | 91.4% |
| (2) | End of month delinquencies: | | | |
| | 30-59 Days | | 1,656,973.51 | 2.4% |
| | 60-89 Days | | 1,282,492.91 | 1.9% |
| | 90-119 Days | | 1,068,143.68 | 1.5% |
| | 120-149 Days | | 1,146,815.23 | 1.7% |
| | 150-179 Days | | 801,851.16 | 1.2% |
| | 180-209 Days | | 5,924.94 | 0.0% |
| | Over 209 Days | | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | | 5,962,201.43 | 8.6% |
| (3) | Total Balances | $ | 68,995,205.91 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

| | | | Series Total | | Class A | Class B | Class C | Class D |
|---|---|---|--:|---|--:|--:|--:|--:|
| IV | **SERIES 2000-1 INFORMATION** | | | | | | | |
| | A | Note Principal Balance | $    500,000,000.00 | $ | 357,500,000.00  $ | 67,500,000.00  $ | 57,500,000.00  $ | 17,500,000.00 |
| | B | Initial Invested Amount | 500,000,000.00 | | 357,500,000.00 | 67,500,000.00 | 57,500,000.00 | 17,500,000.00 |
| | C | Beginning of Month Invested Amount | 0.00 | | (0.00) | 0.00 | (0.00) | 0.00 |
| | D | Month End Invested Amount | 0.00 | | (0.00) | 0.00 | (0.00) | 0.00 |
| | E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | | (0.00) | 0.00 | (0.00) | 0.00 |
| | F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | | 5.52000% | 6.12000% | 6.97000% | 11.82000% |
| | G | The Series 2000-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to  (Average Investor %) | 0.00% | | | | | |
| | H | The Series 2000-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | | |
| | I | Series 2000-1 Allocable Finance Charge Collections: | | | | | | |
| | | (1)   Allocable Finance Charge Collections for such Distribution Date | - | | | | | |
| | | (2)   Shared Finance Charge Collections for such Distribution Date | - | | | | | |
| | | (3)   Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | | |
| | J | Series 2000-1 Allocable Principal Collections: | | | | | | |
| | | (1)   Allocable Principal Collections for such Distribution Date | - | | | | | |
| | | (2)   Shared Principal Collections for such Distribution Date | - | | | | | |
| | | (3)   Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | | |
| | K | Series 2000-1 Allocable Principal Defaults for such Distribution Date | - | | | | | |
| | L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | - | | | | | |
| V | **SPREAD ACCOUNT** | | | | | | | |
| | A | Required Spread Account Percentage (see Note: below) | 7% | | | | | |
| | B | Required Spread Account Amount | 35,000,000.00 | | | | | |
| | C | Amount on Deposit in the Spread Account | 17,712,458.66 | | | | | |
| | D | Spread Account Shortfall | 17,287,541.34 | | | | | |
| | E | Interest earnings on the Spread Account | 73,946.89 | | | | | |
| | F | Withdrawals from Spread Account on this Distribution Date | (406,943.07) | | | | | |
| | G | Amount on Deposit in the Spread Account after Withdrawals on this Distribution Date | 17,379,462.48 | | | | | |

Note: the Spread Account Percentage is:
   4.0% if the Quarterly Excess Spread Percentage is >= 4.0%
   4.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
   5.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
   5.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
   6.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

> 7.0% if the Quarterly Excess Spread Percentage is <2.0%
> provided, that if a Redemption Event with respect to Series 2000-1 has occurred,
> the Spread Account Percentage shall be 7.0% and shall not be subject to reduction.

**VI   APPLICATION OF FUNDS**

    **A   Distribution of Available Finance Charge Collections:**

       (i)    Series 2000-1 Allocable Finance Charge Collections for such
            Distribution Date        -

      (ia)  Series 2000-1 Allocable Finance Charge Collections for prior
            Distribution Date        -

      (ii)  **Monthly Servicing Fee, plus any Monthly Servicing Fee previously due but**
            not distributed to the Servicer on a prior Distribution Date (unless such amount
            has been netted against deposits to the Collection Account)    -

     (iii)  **Class A Monthly Interest, plus Class A Monthly Interest previously due but**
           not distributed on a prior Distribution Date, plus Class A Additional Interest, plus
           Class A Additional Interest previously due but not distributed on a prior
           Distribution Date        0.00

     (iv)  **Class B Monthly Interest, plus Class B Monthly Interest previously due but**
           not distributed on a prior Distribution Date, plus Class B Additional Interest, plus
           Class B Additional Interest previously due but not distributed on a prior
           Distribution Date        (0.00)

     (v)   **Class C Monthly Interest, plus Class C Monthly Interest previously due but**
           not distributed on a prior Distribution Date, plus Class C Additional Interest, plus
           Class B Additional Interest previously due but not distributed on a prior
           Distribution Date, provided, however, that if the Class C Monthly Interest exceeds
           Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
           Account will be drawn.        (228,822.24)

     (vi)  **Investor Default Amount, if any, shall be treated as a portion of Available**
            Principal Collections        -    see (x) below

     (vii)  Aggregate amount of Investor Charge-Offs and the amount of Reallocated
           **Principal Collections not previously reimbursed shall be treated as a portion of**
           Available Principal Collections        -

    (viii)  **Class D Monthly Interest, plus Class D Monthly Interest previously due but**
           not distributed on a prior Distribution Date, plus Class D Additional Interest, plus
           Class D Additional Interest previously due but not distributed on a prior
           Distribution Date, provided, however, that if the Class D Monthly Interest exceeds
           Available Finance Charge Collections available after (i) through (vi), then the Spread
           Account will be drawn.        (178,120.83)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

(ix)   upon an Event of Default w/r/t Series 2000-1 and acceleration of the maturity of
the Series 2000-1 Notes, the balance, if any, up to the outstanding Note Principal
Balance shall be treated as a portion of Available Principal Collections                    -

(x)    after the Reserve Account Funding Date, but prior to the date the Reserve Account
terminates, an amount up to the excess, if any, of the Required Reserve Account
over the Available Reserve Account shall be deposited in the Reserve Account            -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

| | | |
|---|---|--:|
| (xi) | amounts required to be deposited in the Spread Account | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | (406,943.07) |
| (xiv) | Withdrawal from Spread Account to cover Class D Monthly Interest | 406,943.07 |
| (xv) | Investor Default Amount to be released on distribution | (0.00) |
| | **Available Principal Collections shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture** | N/A |
| **C** | **Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:** | |
| (i) | during the Controlled Accumulation Period, Monthly Principal shall be deposited in the Principal Funding Account | N/A |
| (ii) | during the Early Amortization Period, Montly Principal shall be paid to Class A Noteholders until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ - |
| (iii) | after (ii) during the Early Amortization Period, any remaining Monthly Principal shall be paid to Class B Noteholders until the Class B Note Principal Balance has been paid in full | $ - |
| | Class B Special Funding Principal Balance Allocation | $ - |
| (iv) | after (ii) and (iii) during the Early Amortization Period, any remaining Monthly Principal shall be paid to Class C Noteholders until the Class C Note Principal Balance has been paid in full | $ (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ - |
| (v) | after (ii), (iii) and (iv) during the Early Amortization Period, any remaining Monthly Principal shall be paid to Class D Noteholders until the Class D Note Principal Balance has been paid in full | $ - |
| | Class D Special Funding Principal Balance Allocation | $ - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ - |

**VII  PRINCIPAL COLLECTIONS**

| | | |
|---|---|--:|
| A | Monthly Principal (Includes Investor Defaults) | $ (0.00) |
| B | Series 2000-1 Principal Shortfall | $ 0.00 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| Distribution Date: | November 15, 2006 |
|---|---|
| LIBOR Determination Date: | October 12, 2006 |

C   Shared Principal Collections allocable from other principal sharing series          $          -

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2000-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 55,624,684.19 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

A  Portfolio Yield for the current Monthly Period

| | | | |
|---|---|---|---|
| (i) | Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| (ii) | Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| (iii) | Portfolio Yield (2 months prior) | 0.00% | |
| (iv) | 3 Month Average | 0.00% | |

B  Base Rate for the current Monthly Period

| | | |
|---|---|---|
| (i) | Current Base Rate | **116687258535.29%** |
| (ii) | Base Rate (prior month) | 116824604700.26% |
| (iii) | Base Rate (2 months prior) | 116824604700.26% |
| (iv) | 3 Month Average | 116778822645.27% |

C  Excess Spread

| | | |
|---|---|---|
| (i) | Current Excess Spread | **-116687258535.29%** |
| (ii) | Excess Spread (prior month) | -116824604700.26% |
| (iii) | Excess Spread (2 months prior) | -116824604700.26% |
| (iv) | 3 Month Average | -116778822645.27% |

_____
Karlyn M. Knieriem
Finance Officer

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

Pursuant to the Master Indenture, dated as of April 20, 2001 (as amended and supplemented, the "Master Indenture"), between NextCard Credit Card Master Note Trust (the "Trust") and The Bank of New York, as indenture trustee (the "Indenture Trustee"), as supplemented by the Series 2001-1 Indenture Supplement, dated as of May 8, 2001 (the "Indenture Supplement"), between the Trust and the Indenture Trustee, NextBank, N.A., as Servicer (the "Servicer") under the Transfer and Servicing Agreement, dated as of April 20, 2001 (the "Transfer and Servicing Agreement") among NextBank, N.A., as Transferor and Servicer, and the Trust, is required to prepare certain information each month regarding current distributions to the Series 2001-1 Noteholders and the performance of the Trust during the previous month.  The information which is required to be prepared with respect to the above Distribution Date, and with respect to the performance of the Trust during the above month is set forth below. Capitalized terms used in this Monthly Statement have their respective meanings set forth in the Master Indenture and the Indenture Supplement.

**I    SUMMARY DISTRIBUTION INFORMATION**

| | | | |
|---|---|---|---:|
| A | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class A Notes | 0.00 |
| | | | |
| B | (1) | Interest | 0.00 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class B Notes | 0.00 |
| | | | |
| C | (1) | Interest | 190,750.06 |
| | (2) | Principal | (0.00) |
| | (3) | Total Distribution for Class C Notes | 190,750.05 |
| | | | |
| D | (1) | Interest | 246,204.48 |
| | (2) | Principal | - |
| | (3) | Total Distribution for Class D Notes | 246,204.48 |

**II    RECEIVABLES IN THE TRUST**

| | | | |
|---|---|---|---:|
| A | Beginning of the Period Principal Receivables: | $ | 68,107,995.19 |
| B | Beginning of the Period Finance Charge Receivables: | $ | 3,892,789.48 |
| C | Beginning of the Period Discounted Receivables: | | N/A |
| D | Beginning of the Period Total Receivables: | | 72,000,784.67 |
| | | | |
| E | Removed Principal Receivables: | | - |
| F | Removed Finance Charge Receivables: | | - |
| G | Removed Total Receivables: | | - |
| | | | |
| H | Additional Principal Receivables: | | - |
| I | Additional Finance Charge Receivables: | | - |
| J | Additional Total Receivables: | | - |
| | | | |
| K | Discounted Receivables Generated this Period: | | N/A |
| L | End of the Month Principal Receivables: | | 65,259,884.79 |
| M | End of the Month Finance Charge Receivables: | | 3,735,321.12 |
| N | End of the Month Discounted Receivables: | | N/A |
| O | End of the Month Total Receivables: | | 68,995,205.91 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended October 31, 2006

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

P  (a)  Transferor Interest

| | |
|---|---|
| + Principal Receivables | 65,259,884.79 |
| + Special Funding Account (SFA) | - |
| - Aggregate Invested Amounts in the trust | (0.00) |
| Ending Transferor Interest | 65,259,884.79 |

(b)  Required Transferor Interest (9% x Principal Receivables)  5,873,389.63

(c)  (Shortfall) if applicable in Transferor Interest  N/A
     - principal collections will be trapped in the SFA until shortfall eliminated

(d)  Transferor Percentage (for information only)  100.0%

(e)  Transferor Allocations/Distributions

| | |
|---|---|
| Transferor share of Finance Charge Collections | 1,586,732.87 |
| Interest earned on the Collections Account | 12,142.71 |
| Transferor share of Principal Collections | 2,141,172.11 |
| Transferor allocated Servicing Fees | (113,513.30) |
| Net cash distributable to the Transferor on the Distribution Date | 3,626,534.39 |

III  PERFORMANCE SUMMARY
  A  COLLECTIONS

| | | |
|---|---|---|
| (1) | Total Collections | $ 3,268,976.26 |
| (2) | Total Principal Collections | 2,141,172.11 |
| (3) | Total Finance Charge Collections (including interchange) | $ 1,127,804.15 |
| (4) | Principal Payment Rate | 3.1% |

  B.  DELINQUENCIES AND LOSSES

| NUMBER OF ACCOUNTS | | Number | % of Total |
|---|---|---|---|
| (1) | Current Accounts | 272,469 | 99.3% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 560 | 0.2% |
| | 60-89 Days | 400 | 0.1% |
| | 90-119 Days | 312 | 0.1% |
| | 120-149 Days | 313 | 0.1% |
| | 150-179 Days | 218 | 0.1% |
| | 180-209 Days | 4 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 1,807 | 0.7% |
| (3) | Total Accounts | 274,276 | 100.0% |

| OUTSTANDING BALANCES | | Amount | % of Total |
|---|---|---|---|
| (1) | Current Balances | $ 63,033,004.48 | 91.4% |
| (2) | End of month delinquencies: | | |
| | 30-59 Days | 1,656,973.51 | 2.4% |
| | 60-89 Days | 1,282,492.91 | 1.9% |
| | 90-119 Days | 1,068,143.68 | 1.5% |
| | 120-149 Days | 1,146,815.23 | 1.7% |
| | 150-179 Days | 801,851.16 | 1.2% |
| | 180-209 Days | 5,924.94 | 0.0% |
| | Over 209 Days | - | 0.0% |
| | SubTotal -- 30+ Days Delinquent | 5,962,201.43 | 8.6% |
| (3) | Total Balances | $ 68,995,205.91 | 100.0% |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| Distribution Date: | November 15, 2006 |
|---|---|
| LIBOR Determination Date: | October 12, 2006 |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

| | | Series Total | Class A | Class B | Class C | Class D |
|---|---|---|---|---|---|---|
| **IV** | **SERIES 2001-1 INFORMATION** | | | | | |
| A | Note Principal Balance | $ 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| B | Initial Invested Amount | 700,000,000.00 | $ 521,500,000.00 | $ 87,500,000.00 | $ 66,500,000.00 | $ 24,500,000.00 |
| C | Beginning of Month Invested Amount | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| D | Month End Invested Amount | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| E | Invested Amount after giving effect to Distributions on this Distribution Date | 0.00 | $ 0.00 | $ 0.00 | $ (0.00) | $ 0.00 |
| F | The Note Rate with respect to the Interest Period preceeding such Distribution Date | | 5.62000% | 6.20000% | 6.92000% | 11.67000% |
| G | The Series 2001-1 Floating Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (Average Investor %) | 0.00% | | | | |
| H | The Series 2001-1 Fixed Allocation Percentage with respect to the Monthly Period preceding such Distribution Date was equal to (If Applicable) | 0.00% | | | | |
| I | Series 2000-1 Allocable Finance Charge Collections: | | | | | |
| (1) | Allocable Finance Charge Collections for such Distribution Date | - | | | | |
| (2) | Shared Finance Charge Collections for such Distribution Date | - | | | | |
| (3) | Total Series 2000-1 Finance Charge Collections for such Distribution Date | - | | | | |
| J | Series 2000-1 Allocable Principal Collections: | | | | | |
| (1) | Allocable Principal Collections for such Distribution Date | - | | | | |
| (2) | Shared Principal Collections for such Distribution Date | - | | | | |
| (3) | Total Series 2000-1 Principal Collections for such Distribution Date | - | | | | |
| K | Series 2001-1 Allocable Principal Defaults for such Distribution Date | - | | | | |
| L | The Monthly Servicing Fee allocable to Series 2000-1 Notes | - | | | | |

| | | Senior | Junior | Total |
|---|---|---|---|---|
| **V** | **SPREAD ACCOUNT** | | | |
| A | Required Spread Account Percentage (see Note: below) | 3% | 4% | 7% |
| B | Required Spread Account Amount | 21,000,000.00 | 28,000,000.00 | 49,000,000.00 |
| C | Amount on Deposit in the Spread Account at month-end | (0.00) | 5,121,435.78 | 5,121,435.78 |
| D | Spread Account Shortfall | 21,000,000.00 | 22,878,564.22 | 43,878,564.22 |
| E | Interest earnings on the Spread Account | - | 21,848.78 | 21,848.78 |
| F | Withdrawals from Spread Account on this Distribution Date | - | (436,954.54) | (436,954.54) |
| G | Amount on Deposit in the Spread Account after Witdrawals on this Distribution Date | (0.00) | 4,706,330.02 | 4,706,330.02 |

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended October 31, 2006

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

**Note: the Junior Note Spread Account Percentage is:**
1.0% if the Quarterly Excess Spread Percentage is >= 4.0%
1.5% if the Quarterly Excess Spread Percentage is <4.0% and >=3.5%
2.0% if the Quarterly Excess Spread Percentage is <3.5% and >=3.0%
2.5% if the Quarterly Excess Spread Percentage is <3.0% and >=2.5%
3.0% if the Quarterly Excess Spread Percentage is <2.5% and >=2.0%
4.0% if the Quarterly Excess Spread Percentage is <2.0%
provided, that if a Redemption Event with respect to Series 2001-1 has occurred,
the Spread Account Percentage shall be 4.0% and shall not be subject to reduction.

**VI  APPLICATION OF FUNDS**

**A  Distribution of Available Finance Charge Collections:**

(i)    Series 2001-1 Allocable Finance Charge Collections for such                                     -
         Distribution Date

(ia)   Series 2001-1 Allocable Finance Charge Collections for prior                                   -
         Distribution Date

(ii)   **Monthly Servicing Fee, plus any Monthly Servicing Fee previously due but**
         not distributed to the Servicer on a prior Distribution Date (unless such amount
         has been netted against deposits to the Collection Account)                                     -

(iii)  **Class A Monthly Interest, plus Class A Monthly Interest previously due but**
         not distributed on a prior Distribution Date, plus Class A Additional Interest, plus
         Class A Additional Interest previously due but not distributed on a prior
         Distribution Date                                                                                          (0.00)

(iv)   **Class B Monthly Interest, plus Class B Monthly Interest previously due but**
         not distributed on a prior Distribution Date, plus Class B Additional Interest, plus
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date                                                                                          (0.00)

(v)    **Class C Monthly Interest, plus Class C Monthly Interest previously due but**
         not distributed on a prior Distribution Date, plus Class C Additional Interest, plus
         Class B Additional Interest previously due but not distributed on a prior
         Distribution Date, provided, however, that if the Class C Monthly Interest exceeds
         Available Finance Charge Collections available after (i), (ii) and (iii), then the Spread
         Account will be drawn.                                                                           (190,750.06)

(vi)   **Investor Default Amount, if any, shall be treated as a portion of Available**
         Principal Collections                                                                                    -

(vii)  Aggregate amount of Investor Charge-Offs and the amount of Reallocated
         **Principal Collections not previously reimbursed shall be treated as a portion of**
         Available Principal Collections                                                                         -

(viii) **Class D Monthly Interest, plus Class D Monthly Interest previously due but**
         not distributed on a prior Distribution Date, plus Class D Additional Interest, plus
         Class D Additional Interest previously due but not distributed on a prior
         Distribution Date, provided, however, that if the Class D Monthly Interest exceeds
         Available Finance Charge Collections available after (i) through (vi), then the Spread

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

Account will be drawn.                                    (246,204.48)

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

(ix)  upon an Event of Default w/r/t Series 2001-1 and acceleration of the maturity of
     the Series 2001-1 Notes, the balance, if any, up to the outstanding Note Principal
     Balance shall be treated as a portion of Available Principal Collections                     -

(x)   after the Reserve Account Funding Date, but prior to the date the Reserve Account
     terminates, an amount up to the excess, if any, of the Required Reserve Account
     over the Available Reserve Account shall be deposited in the Reserve Account             -

NextBank, N. A.
NextCard Credit Card Master Note Trust - Series 2001-1
Monthly Noteholders Statement
Monthly Period Ended October 31, 2006

| Distribution Date: | November 15, 2006 |
|---|---|
| LIBOR Determination Date: | October 12, 2006 |

| | | | |
|---|---|---|---|
| (xi) | amounts required to be deposited in the Spread Account | | - |
| (xii) | any other amounts the Trust may be liable for not referred to above | | - |
| (xiii) | any balance will be Excess Finance Charge Collections and will be available for allocation to other Series in Group One or to the Holders of Transferor Certificates | | (436,954.54) |
| (xiv) | Withdrawal from Spread Account to cover 4.04a(ii) - 4.04a(vii) | | - |
| | Withdrawal from Spread Account to cover 4.04a(iv), 4.04a(vii) | | 436,954.54 |
| (xv) | Investor Default Amount to be released on distribution | | (0.00) |
| (xvi) | Net Excess Spread due back to Nextbank | | - |

**B   Distribution of Available Principal Collections - during the Controlled Accumulation Period or the Early Amortization Period:**

| | | | |
|---|---|---|---|
| (i) | during the Controlled Accumulation Period, Monthly Principal shall be deposited in the Principal Funding Account | N/A | |
| (ii) | during the Early Amortization Period, Montly Principal shall be paid to Class A Noteholders until the Class A Note Principal Balance has been paid in full (Includes Investor Defaults) | $ | - |
| | Funds in the Special Funding Account to be used to pay Class A Note Principal Balance | $ | - |
| (iii) | after (ii) during the Early Amortization Period, any remaining Monthly Principal shall be paid to Class B Noteholders until the Class B Note Principal Balance has been paid in full | $ | - |
| | Class B Special Funding Principal Balance Allocation | $ | - |
| (iv) | after (ii) and (iii) during the Early Amortization Period, any remaining Monthly Principal shall be paid to Class C Noteholders until the Class C Note Principal Balance has been paid in full | $ | (0.00) |
| | Class C Special Funding Principal Balance Allocation | $ | - |
| (v) | after (ii), (iii) and (iv) during the Early Amortization Period, any remaining Monthly Principal shall be paid to Class D Noteholders until the Class D Note Principal Balance has been paid in full | $ | - |
| | Class D Special Funding Principal Balance Allocation | $ | - |
| (vi) | for either period, after (i) through (v), the balance of Available Principal Collections remaining shall be treated as Shared Principal Collections and applied in accordance with Section 8.05 of the Indenture | $ | - |

**VII  PRINCIPAL COLLECTIONS**

| | | | |
|---|---|---|---|
| A | Monthly Principal (Includes Investor Defaults) | $ | (0.00) |
| B | Series 2001-1 Principal Shortfall | $ | 0.00 |
| C | Shared Principal Collections allocable from other principal sharing series | $ | - |

**NextBank, N. A.**
**NextCard Credit Card Master Note Trust - Series 2001-1**
**Monthly Noteholders Statement**
**Monthly Period Ended October 31, 2006**

| | |
|---|---|
| Distribution Date: | November 15, 2006 |
| LIBOR Determination Date: | October 12, 2006 |

**VIII INVESTOR CHARGE-OFFS AND REDUCTIONS**

| | | | |
|---|---|---|---|
| A | Investor Charge-Offs | $ | 56,511,010.54 |
| B | Reductions in Invested Amount (other than by principal payments) | | - |
| C | Previous reductions in Invested Amount reimbursed | $ | - |

**IX  Portfolio Yield**

| | | | |
|---|---|---|---|
| A | Portfolio Yield for the current Monthly Period | | |
| | (i)    Current Portfolio Yield | **0.00%** | Includes draw from Reserve Account; |
| | (ii)   Portfolio Yield (prior month) | 0.00% | should also include investment earnings |
| | (iii)  Portfolio Yield (2 months prior) | 0.00% | |
| | (iv)  3 Month Average | 0.00% | |
| B | Base Rate for the current Monthly Period | | |
| | (i)    Current Base Rate | **140812490032.91%** | |
| | (ii)   Base Rate (prior month) | 140969340881.52% | |
| | (iii)  Base Rate (2 months prior) | 140969340881.52% | |
| | (iv)  3 Month Average | 140917057265.32% | |
| C | Excess Spread | | |
| | (i)    Current Excess Spread | **-140812490032.91%** | |
| | (ii)   Modified Excess Spread (prior month) | -140969340881.52% | |
| | (iii)  Excess Spread (2 months prior) | -140969340881.52% | |
| | (iv)  3 Month Average | -140917057265.32% | |

_____
Karlyn M. Knieriem
Finance Officer