UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its Capacity as
Receiver for NextBank, N.A.,

Plaintiff,

v.

THE BANK OF NEW YORK, as Indenture
Trustee of the NextCard Credit Card Master
Note Trust,

Defendant.

Case No. 06-CV-1975-ESH

Hon. Ellen Segal Huvelle

## NOTICE OF FILING HEARING TRANSCRIPT

Plaintiff Federal Deposit Insurance Corporation, in its Capacity as Receiver for

NextBank, N.A., hereby serves notice of its filing of the transcript of the December 21, 2006

hearing before the Honorable Charles S. Haight, Jr. in *Bank of New York v. First Millennium,*

*Inc.*, No. 06-13388 (S.D.N.Y), attached hereto as Attachment A.

Dated:  January 8, 2007

Respectfully submitted,

Dennis S. Klein, D.C. Bar No. 361457
Scott H. Christensen, D.C. Bar No. 476439
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C. 20006-2401
Telephone:  (202) 721-4600
Facsimile:  (202) 721-4646

Of Counsel:

Tom M. Reeves (KS Sup. Ct. No. 7259)
  Counsel
Federal Deposit Insurance Corporation
550 17th Street, N.W., Room VS-D-7068
Washington, D.C. 20429
Telephone:  (703) 562-2433
Facsimile:  (703) 562-2475
E-mail:  TReeves@FDIC.gov

Attorneys for Plaintiff Federal Deposit
Insurance Corporation, in its Capacity as
Receiver for NextBank, N.A.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 8, 2007, true and accurate copies of foregoing Notice of Filing Hearing Transcript and Attachment A were served by mail upon:

John L. Douglas
H. Stephen Harris, Jr.
Jack P. Smith, III
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

Paul F. Brinkman
Alston & Bird LLP
601 Pennsylvania Avenue, N.W.
North Building, 10th Floor
Washington, D.C.  20004-2601

Scott H. Christensen

**ATTACHMENT  A**

# In The Matter Of:

*BANK OF NEW VYORK v.*
*FIRST MILLENMIUM*

---

*December  21, 2006*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 6CLVBANA.txt, Pages 1-85

**Word Index included with this Min-U-Script®**

BANK OF NEW VYORK v.
FIRST MILLENNIUM

December 21, 2006

Page 1

[1]      *CLYHANA                    Arguments
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

[2]    ---------------------------------x

[3]    THE BANK OF NEW YORK, in its
Capacity as Indenture Trustee
[4]    of the NextCard Credit Card
Master Note Trust

[5]                   Plaintiff,

[6]

[7]          v.                      06 CV 1975 (CSH)

[8]    FIRST MILLENNIUM, INC.,
MILLENNIUM PARTNERS, L.P., RMK
[9]    ADVANTAGE FUND and FEDERAL
DEPOSIT INSURANCE CORPORATION,

[10]                  Defendants.

[11]   ---------------------------------x

[12]                                 New York, N.Y.
December 21, 2006
10:30 a.m.

[13]

[14]   Before:

[15]              HON. CHARLES S. HAIGHT,

[16]                             District Judge

[17]                 APPEARANCES

[18]   ALSTON & BIRD
Attorneys for Plaintiff
[19]   H. STEPHEN HARRIS, JR.
JUDY AMOROSA

[20]   VEDDER PRICE KAUFMAN & KAMMHOLZ
Attorneys for Defendant FIRST MILLENNIUM, ET AL
[21]   MICHAEL J. EDELMAN
ARIEL LEVY
[22]   MICHAEL DAVIES

[23]
[24]
[25]

Page 2

[1]                 APPEARANCES (cont'd.)

[2]    HUGHES HUBBARD & REED
Attorneys for Defendant FDIC

[3]    GEORGE A. DAVIDSON
SCOTT H. CHRISTENSEN

[4]

[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]              (In open court)

[2]              (Case called)

[3]         THE DEPUTY CLERK:  Bank of New York, etc. v. First

[4]    Millennium, Millennium Partners, RMK Advantage, and Federal

[5]    Deposit Insurance Corporation.

[6]              Is the plaintiff ready?

[7]         MR. HARRIS:  Plaintiff is ready.

[8]         THE DEPUTY CLERK:  Defendant ready?  Or defendants

[9]    ready?

[10]        MR. CHRISTENSEN:  Defendants are ready, your Honor.

[11]        MR. EDELMAN:  We are.

[12]        THE COURT:  Good morning, everyone.  Those of you who

[13]   have come to this place from far off places are welcome here.

[14]             One or two preliminary remarks which may be of

[15]   assistance to counsel before I hear arguments.

[16]             First of all, I have given you a somewhat revised

[17]   timetable which provides that counsel for the moving party,

[18]   which in this case is the FDIC, moving for a stay of the

[19]   interpleader proceedings here, will have 30 minutes to present

[20]   their argument in chief; then I thought it right to give the

[21]   bank and one of the two interpleader defendants, Millennium,

[22]   also known as the noteholders, 20 minutes each; and then the

[23]   FDIC is the moving party upon whom the burden of persuasion

[24]   falls, will have 10 minutes to reply.

[25]             I make those times available to counsel.  You don't

Page 4

[1]    need to take all that time, although by my experience, counsel
[2]    usually do.

[3]         But I want to put this to you, and I really am
[4]    addressing my remarks to counsel for the bank and for the
[5]    noteholders:  If you hear counsel for the FDIC say something in
[6]    the reply to which, under the present rules of engagement, you
[7]    could not reply, that you simply cannot stand, you just cannot
[8]    stand it, and if you're required to leave the courtroom without
[9]    having an opportunity to say something about this comment you
[10]   just can't stand, with the risk of mental and gastric health, I
[11]   will let you vent very briefly, if you hear something that you
[12]   just can't stand.

[13]        I do that for two reasons:

[14]        One is humanity, humane considerations.  Being a trial
[15]   lawyer is a stressful profession, and I like to reduce stress
[16]   in my courtroom to the extent that I can, while maintaining
[17]   some vestige of discipline.

[18]        Secondly, it has been my experience that if I allow
[19]   this, some additional points are made through the presentations
[20]   of counsel which help us in arriving at what we hope will be
[21]   the right decision.

[22]        This additional opportunity to preserve mental and
[23]   physical health need not be taken advantage of by counsel; you
[24]   don't need to.  If you do, the proviso, of course, is that the
[25]   FDIC, as the moving party, will always have the last word.  And

December 21, 2006

---

Page 5

[1] the time will come when the last word has been spoken, and that
[2] the case will be regarded as admitted.

[3]     I direct counsel to order the transcripts of what I'm
[4] confident will be excellent arguments from the court reporter
[5] on an expedited basis, that being so that I do not require
[6] daily copy, but I do require an expedited transcript, which I
[7] think should be about a week; and that the cost of that
[8] expedited transcript will be borne in equal thirds by the three
[9] parties.

[10]     But since I order that transcript for the assistance
[11] of the Court, it will be a taxable item of costs, with costs to
[12] abide the events.

[13]     Connected with that last instruction, I will say this:
[14] It is my hope that I will be able to rule on this case, the
[15] motion for a stay, from the bench. And my hope is that I will
[16] be able to do that this afternoon after hearing your arguments
[17] and then considering them during the lunch break, which you and
[18] I and my law clerk will all take.

[19]     If I do that, if I'm able to fulfill that hope, why
[20] then do I need a transcript?

[21]     I need a transcript because I wish that there be a
[22] clear record, and our reporters always produce clear records,
[23] of what I said for the benefit, if that's the proper word, of
[24] the Court of Appeals.

[25]     Also, in circumstances such as these, I edit or review

---

Page 6

[1] the transcript, not for the purpose of changing anything
[2] material or significant, but for the purpose of correcting any
[3] errors of my own grammatically or typographical which may creep
[4] in; and also to add citations to cases which I may refer to in
[5] the oral opinion.

[6]     As I say, I hope to resolve the case that way.
[7] Whether I can or not, I will let you know after you come back
[8] from the lunch break. And, actually, if at the end of the
[9] arguments it becomes apparent to me that I simply cannot do
[10] that, I will release the out-of-towners and they can go away.
[11] But my hope, and it borders on expectation, is that I will be
[12] able to rule orally on this application. And if I am still of
[13] that view when you've finished your arguments, then I will
[14] require you to come back after lunch and hear what it is that I
[15] have to say. I flatter myself that you will be interested to
[16] do that anyway, without requiring a command.

[17]     The last preliminary remark I will make is this:
[18] There are a number of arguments put forward by the FDIC
[19] principally in their reply brief which seem to me to go more to
[20] the underlying merits rather than to whether or not a stay
[21] should be issued.

[22]     For instance, it is argued that the bank's
[23] interpleader complaint is both filed prematurely and is barred
[24] by the statute of limitations. It's rather striking to be told
[25] that the same pleading is both too early and too late in the

---

Page 7

[1] same breath.

[2]     However one may sort that out, and the FDIC's
[3] additional argument that the venue is wrong here in the
[4] Southern District, I'm not going to get into those arguments or
[5] those contentions during this argument. Counsel for the other
[6] parties need not feel that they respond to them and.

[7]     I say that because it seems to me that those
[8] particular arguments, if they are sound, as to which I express
[9] no view one way or the other, would constitute bars to the
[10] action in its entirety to the interpleader action here. And
[11] that seems to me to take those considerations outside the scope
[12] of analysis as to whether or not a stay should issue.

[13]     In my view, a stay analysis, the foreign court is
[14] asked to stay proceedings there in deference to and so that
[15] another action can go forward in a different forum. I think
[16] that a stay analysis as it's prone up from the Supreme Court's
[17] decision in Landis through the cases that follow it assume the
[18] legal viability of the claims in both forums, and then applying
[19] well-recognized factors decide whether or not there should be a
[20] stay, you see.

[21]     So I am not going to take into consideration the
[22] FDIC's arguments based upon time bar, prematurity or proper or
[23] improper venue. It's not that I'm rejecting those contentions
[24] on the merits, it is simply that I don't think they play a
[25] proper part in the calculus of whether or not a stay should

---

Page 8

[1] issue. And consequently, I don't want to hear about them from
[2] counsel for the FDIC and counsel for the bank and for the
[3] noteholders need not respond to sufficient upon the day.

[4]     All right. I hope that will be of some assistance to
[5] you. Now I will hear first from counsel for the FDIC, the
[6] moving party. Counsel's 30 minutes begins to run now. And
[7] when there are five minutes left, my law clerk, Mr. Lee, will
[8] stand up and look at you, and then he'll sit down again. That
[9] will be a sign unto you that you have five more minutes to go.

[10]     Okay. All right. I'll hear counsel.

[11]     **MR. CHRISTENSEN:** Thank you. Good morning, your
[12] Honor. Scott Christensen on behalf of the Federal Deposit
[13] Insurance Corporation as receiver for NextBank, the FDIC
[14] receiver.

[15]     The central question in deciding a stay is prejudice.
[16] A stay here will not prejudice the Bank of New York or the
[17] noteholders. The Bank of New York has stipulated to Judge
[18] Huvelle in the District of Columbia that the D.C. court will
[19] hold them -- that Bank of New York will hold the money at issue
[20] here pending an order from Judge Huvelle regarding a
[21] distribution or transfer of such funds. There's nothing to
[22] litigate here until then.

[23]     The Bank of New York and the FDIC receiver litigated
[24] for over three years in the District of Columbia. Judge
[25] Huvelle has before her now the question of whether the Bank of

---

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December  21, 2006

---

Page 9

[1] New York is violating her orders and the parties' settlement
[2] agreement in that case.
[3]        Judge Huvelle is proceeding expeditiously, and she has
[4] said that she'll rule on the merits by the end of January 2007,
[5] a little more than a month from now.
[6]        In the meantime, denying a stay here would prejudice
[7] everyone. Litigating here over money that another court
[8] controls is a waste of everyone's time and money, especially
[9] the taxpayers' money. Relitigating anything here after three
[10] years of litigation and a final judgment is also a waste of
[11] everyone's time and point.
[12]        THE COURT: I would ask you to expand on that,
[13] Mr. Christensen. In the Landis case, Justice Cardoza said
[14] "True, the suppliant for a stay," that's you, "must make out a
[15] clear case of hardship or inequity in being required to go
[16] forward."
[17]        Where is that showing as far as the FDIC is concerned?
[18]        MR. CHRISTENSEN: All right. The very premise, the
[19] theory, on which the noteholders in the Bank of New York have
[20] acted since Judge Huvelle's judgment, is the same theory and
[21] the same funds that were the subject of claims in October 2002
[22] that were filed in litigation in June 2003 in the District of
[23] Columbia and litigated there for three and-a-half years.
[24] There's now a final judgment on those issues, and the Bank of
[25] New York is representing the noteholders on the appeal of those

---

Page 11

[1]        The effort here is to get your Honor to rule, the
[2] effort by the Bank of New York and the noteholders, is to get
[3] your Honor to issue an order that would conflict with orders
[4] already issued by another federal court in the District of
[5] Columbia, and orders that she will likely be issuing in a
[6] matter of weeks, so that subjecting the FDIC to conflicting
[7] orders from different federal courts is also prejudiced. And
[8] as we've cited in our brief, this Court has held that having to
[9] relitigate constitutes irreparable injury even, which is a
[10] prejudice in addition to those we have discussed already.
[11]        Your Honor, the only party allowed to sue in the
[12] noteholders' name is already representing the noteholders in
[13] litigation in the District of Columbia. The Bank of New York
[14] filed the first lawsuit on the noteholders' behalf against the
[15] FDIC receiver in June 2003. The Bank of New York is
[16] representing the noteholders in the appeal of that case pending
[17] in the same courthouse in the District of Columbia. The Bank
[18] of New York presently represents the noteholders in the case
[19] pending before Judge Huvelle. As a result, all of the
[20] necessary parties are present in the District of Columbia.
[21]        THE COURT: Well, the noteholders are there because
[22] the Bank of New York is obligated to represent them in
[23] litigation. What do you think about this: If the noteholders
[24] were so advised, do you think they could intervene in the
[25] action before Judge Huvelle and represent their interest

---

Page 10

[1] issues.
[2]        To have to now come to another court and start over
[3] with the same parties, arguing over the same pot of money,
[4] taken out of the same pocket, on the same theory, wastes the
[5] taxpayers' money.
[6]        THE COURT: And by wasting the taxpayers' money, I
[7] suppose you mean that the FDIC would be required to pay even
[8] higher and greater and more fees to your excellent firm, is
[9] that what it comes down to?
[10]        MR. CHRISTENSEN: Yes, your Honor.
[11]        THE COURT: I think it is noble of you to take that
[12] position in this litigation, because really that's all that
[13] we're talking about, isn't it? If I don't grant a stay, it
[14] just means that the FDIC will incur legal expenses, both in the
[15] Southern District of New York and the District of Columbia,
[16] just incurring them perhaps sooner, and perhaps to a greater
[17] degree than if the stay issued.
[18]        There's going to be litigation in New York one way or
[19] another; so really the prejudice that the FDIC can point to is
[20] the likelihood that their legal expenses, their legal fees,
[21] would be somewhat greater if the stay does not issue. Is that
[22] a fair summation?
[23]        MR. CHRISTENSEN: Yes. I would add unnecessarily
[24] greater. And I would add the additional prejudice of the
[25] possibility of conflicting court orders on the FDIC.

---

Page 12

[1] directly if they felt like it?
[2]        MR. CHRISTENSEN: No, your Honor. The documents, the
[3] transaction documents, specify the conditions under which the
[4] noteholders may sue in their own name, which would be the
[5] result of intervening. Those conditions are not satisfied
[6] here.
[7]        THE COURT: I see. So as far as the noteholders are
[8] concerned before Judge Huvelle, their champion in the lists
[9] must be the bank, and there can be no other, correct?
[10]        MR. CHRISTENSEN: Their trustee; that's correct, your
[11] Honor.
[12]        THE COURT: All right. Well, does that work any
[13] hardship on the bank? Because the bank says in its
[14] interpleader action here that they really can't tell who's
[15] right and who's wrong; whether the FDIC is right with respect
[16] to the acceleration clause, or whether the noteholders are
[17] right. That's why they started an interpleader.
[18]        Does that prejudice the bank at all with respect to
[19] discharging their fiduciary responsibility to protect the
[20] noteholders' interests in the action in the District of
[21] Columbia.
[22]        MR. CHRISTENSEN: To the extent that is any hardship,
[23] that's the trustee's job description as trustee and under the
[24] documents.
[25]        THE COURT: I suppose that some corporate officers at

---

December 21, 2006

---

[1] the bank may be wishing now that they let this piece of
[2] business go by. But your answer to my question is that they
[3] had it and they've got to act in accordance with their
[4] fiduciary obligations under the trust indenture; or, as Lilly
[5] Aldman would say, it comes with the territory.

[6] **MR. CHRISTENSEN:** That's correct, your Honor. And
[7] that principle is almost as old as the Bank of New York itself.
[8] As a result, your Honor, the Bank of New York and the
[9] noteholders suffer no prejudice by having to litigate in the
[10] District of Columbia.

[11] Judge Huvelle has spent countless hours studying the
[12] facts of the case and preparing a published opinion that we've
[13] offered to this Court.

[14] **THE COURT:** Did she consider at all, as the
[15] interpleader action requires a court somewhere to consider,
[16] what the obligations of the issuer were and are to the
[17] noteholders?

[18] The conversion action before Judge Huvelle dealt with
[19] whether or not the FDIC or the acts to the receiver had
[20] wrongfully converted funds. There was no claim against the
[21] issuer in the case with Judge Huvelle, as far as I am aware;
[22] there is no claim against the issuer in the revived action
[23] before Judge Huvelle, although I'm not sure if that's so or
[24] not. But certainly there was no claim with respect to the
[25] conduct of the issuer in Judge Huvelle's September opinion;

---

[1] whereas in the interpleader action, the issuer's obligations to
[2] the noteholders under the indentured lie at the heart of the
[3] case. Does that make a difference in the claims or issues
[4] between the two cases?

[5] **MR. CHRISTENSEN:** I think I beg to differ slightly on
[6] the construction of the case that was litigated before Judge
[7] Huvelle.

[8] Paragraph 75 of the complaint was filed in June 2003.
[9] The Bank of New York alleges that the FDIC prevented paying
[10] principal to the trust; that it should have then been paid to
[11] the noteholders. The defense of the bank was in Count 6, which
[12] was litigated and decided by Judge Huvelle in September of this
[13] year. The FDIC's defense to having to pay the trust, the
[14] principal in question, was a statutory defense that she decided
[15] under 12 U.S.C., 1821(e)(13)(A).

[16] So, your Honor, the question of whether the trust then
[17] has to pay money to the noteholders was necessarily decided as
[18] part of the litigation that the Bank of New York filed in the
[19] District of Columbia. In other words, not only was it
[20] mentioned in the complaint itself that the FDIC was to pay the
[21] trust, the trust was then to pay the noteholders; but the trust
[22] cannot pay money that the FDIC legally does not have to render
[23] to them, not to mention that the trust is not owned by the bank
[24] for which the FDIC is receiver, and that's also spelled out in
[25] the judge's order.

---

[1] **THE COURT:** And I wonder if that's another way of
[2] saying that it is the FDIC's conduct, it is its acts as
[3] receiver, which fully as much as was involved in the District
[4] of Columbia, prevent the noteholders from receiving any funds
[5] from the issuer. Is that your world view?

[6] **MR. CHRISTENSEN:** That's correct, your Honor. The
[7] allegation in the notice of default that was sent to the FDIC
[8] on November 14, 2006 says that the FDIC's failure to honor
[9] their early amortization clause in February 2002 is what has
[10] now caused the noteholders to fail to receive 112 million
[11] dollars in principal. That's the same claim that was litigated
[12] in Count 6. Whether or not the issuer was named as a formal
[13] party in any case is beside the point.

[14] **THE COURT:** Let me put this to you: One of the more
[15] entertaining aspects of the case, from my point of view, is
[16] that in the brief for the noteholders, at page 28, there is
[17] this chart comparing two cases. And the purpose of that chart
[18] is to demonstrate that the 2003 conversion suit has absolutely
[19] nothing or very little to do with the interpleader action.

[20] The FDIC replies in its brief at page 2 with a chart
[21] which is intended to show that the FDIC conversion suit has
[22] everything or at least a great deal to do with the interpleader
[23] action as far as claims and issues are concerned. Now, you
[24] both can't be right.

[25] And the question I would put to you, and this is also

---

[1] a question I want to hear about from the bank and from the
[2] noteholders, is, if, as would appear from comparing these two
[3] charts, there is a fundamental dispute between what claims and
[4] issues were resolved by Judge Huvelle and which were not, is it
[5] not a sensible thing for this Court to give Judge Huvelle a
[6] chance to explain herself and wait and see what the answer is?
[7] Does that approach have any appeal to you, Mr. Christensen?

[8] **MR. CHRISTENSEN:** Your Honor, in effect, I think that
[9] that's already underfoot. Judge Huvelle will have a merits
[10] hearing on January 11th and will decide approximately a month
[11] from now on issues relating to whether this is the same case or
[12] not.

[13] I think this goes back to the whole prejudice
[14] question. If Judge Huvelle's ruling resolves the issues in
[15] both cases, then this Court will not have to spend any time and
[16] effort learning the complicated details of the underlying
[17] transaction. If Judge Huvelle's ruling doesn't resolve all the
[18] issues, there's really no prejudice to the parties waiting
[19] another month.

[20] To the contrary, at a minimum, Judge Huvelle's ruling
[21] might narrow the issues or further clarify the issues to be
[22] addressed by this Court.

[23] **THE COURT:** Well, you say resolve all the issues. As
[24] to all the parties in the interpleader, is it your view that if
[25] Judge Huvelle comes down with an opinion which favors the FDIC

---

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December 21, 2006

[1] foursquare and hands down an opinion which is bitterly
[2] disappointing to the noteholders appearing through their
[3] representative, the Bank of New York, are the noteholders bound
[4] by Judge Huvelle's decision, do you think, even though they are
[5] not named parties and, in accordance with your argument, could
[6] not be?

[7] **MR. CHRISTENSEN:** Absolutely, your Honor.

[8] **THE COURT:** They would be bound.

[9] **MR. CHRISTENSEN:** Absolutely. The notion that a
[10] trustee binds the bondholders that it represents is almost as
[11] old as the Bank of New York itself from the Supreme Court
[12] itself.

[13] **THE COURT:** I thought you were going to say almost as
[14] old as I am, although I've read some of the cases you put in
[15] your brief. No, I'm familiar with that principle. I just
[16] wanted to see if you felt it should be applied here, as indeed
[17] you say in your brief it should be.

[18] **MR. CHRISTENSEN:** And furthermore, your Honor, the
[19] issue before Judge Huvelle is, in part, injunctive relief. And
[20] Rule 65 allows a judge to enjoin anyone acting in concert with
[21] a party before her, which would also allow her to enjoin the
[22] noteholders by name.

[23] **THE COURT:** Tell me this: My understanding of what's
[24] been going on before Judge Huvelle is that the FDIC asked her
[25] to issue an injunction under the All Writs Act in aid of her

[1] own jurisdiction, which would enjoin the parties here in the
[2] interpleader action in the Southern District from proceeding
[3] with that action. To all practical sense, Judge Huvelle would
[4] be enjoining me. She wouldn't put it that way, but that would
[5] be the practical effect of it. She'd be enjoining this action.

[6] What she says, I understand it, when you made that
[7] application to her, she was going to wait and see. She was
[8] going to wait and see whether I stayed the interpleader action.
[9] Suppose I don't, what do you think she'll do?

[10] **MR. CHRISTENSEN:** I don't think I have enough hutzpah
[11] to guess what another federal judge would do.

[12] **THE COURT:** What would you ask her to do?

[13] **MR. CHRISTENSEN:** We would certainly ask her to enjoin
[14] the suit from going forward based on the same prejudice
[15] arguments we made to your Honor.

[16] **THE COURT:** Okay. I put these questions as they occur
[17] to me, Mr. Christensen. I don't mean to interrupt your
[18] argument. You may now resume it, if you'd like to.

[19] **MR. CHRISTENSEN:** Your Honor, asking Judge Huvelle to
[20] enforce her own orders is not forum shopping. As I say, she's
[21] now poised to decide whether the Bank of New York violated her
[22] own orders. As I mentioned, I think stay would also spare this
[23] Court from having to relitigate issues that were fully and
[24] fairly litigated before her.

[25] So the FDIC receiver, your Honor, requests that this

[1] Court stay the litigation here to avoid prejudice to the FDIC
[2] receiver, to conserve the parties' resources and the Court's
[3] resources, and to prevent rulings that conflict with the orders
[4] from Judge Huvelle.

[5] **THE COURT:** Well, the interpleader action was filed on
[6] November 16. And on November 17, the FDIC appeared before
[7] Judge Huvelle, asking for the relief which we have just been
[8] referring to, you and I. Isn't it a faint whiff of forum
[9] shopping there as far as the FDIC is concerned? Because after
[10] all, if your interpretation of the effect of Judge Huvelle's
[11] opinion is well-founded, that could have been pleaded here in
[12] the interpleader action as res judicata or collateral estoppel,
[13] could it not?

[14] **MR. CHRISTENSEN:** If there's a whiff, your Honor, it's
[15] because we're close to the source of the smell here in New
[16] York. The forum shopping was by the Bank of New York and the
[17] noteholders at the noteholders' suggestion of filing an
[18] interpleader action in New York, and only in New York.

[19] The FDIC receiver has returned to the Court who issued
[20] orders that we contend are now being violated to ask her to
[21] enforce those. That's not forum shopping. And I, because your
[22] Honor requested, won't get into the questions of which courts
[23] could be gone to anyway.

[24] **THE COURT:** All right. Your response to the forum
[25] shopping charge made by your adversaries falls under the Latin

[1] phrase et tu quoque: "Yeah, you're another one." And you say
[2] they're the real ones, is that so?

[3] Is that fair? Is that fair to the noteholders? On
[4] your own argument, they could not appear as parties before
[5] Judge Huvelle. It's true that the bank represents them as a
[6] fiduciary, but they cannot appear themselves, and they're
[7] asserting claims against the issuer, who wasn't before Judge
[8] Huvelle.

[9] I realize we're replowing some ground we've covered,
[10] but in the concept of forum shopping, does not their inability
[11] to assert their claims directly in Judge Huvelle's court and
[12] the fact that the claims are asserted against a different
[13] party, the issuers, relieve them of some of the taint or the
[14] odor of forum shopping?

[15] **MR. CHRISTENSEN:** If by "directly" your Honor means
[16] that they must go through the Bank of New York to litigate
[17] them, then I would agree, but they can't assert them directly.

[18] But the fact is they can and are and have asserted
[19] them.

[20] If you have no further questions, your Honor, I turn
[21] the mike over.

[22] **THE COURT:** Well, hold on just a minute.

[23] (Pause)

[24] **THE COURT:** Not at the present time, Mr. Christensen,
[25] thank you.

---

[1] I will hear from the bank and the noteholders. Each
[2] have 20 minutes, and counsel may address me in whichever order
[3] they prefer.

[4] **MR. HARRIS:** Your Honor, Steve Harris for the Bank of
[5] New York. I'm here with my distinguished colleague Judy
[6] Amorosa from our New York office.

[7] I intend to address primarily the procedural and
[8] prejudice issues that make this the proper court, in the bank's
[9] view, for the full and final resolution of this case, which, in
[10] the bank's view, cannot occur in the D.C. district.

[11] Your Honor, the bank is no longer an adequate
[12] representative of the noteholders. The bank is adverse to the
[13] noteholders. The bank does not know whether the noteholders'
[14] position is correct or the FDIC's position is correct, and does
[15] not take a position. It is a neutral stakeholder that was
[16] threatened with imminent litigation, and within one day filed
[17] an interpleader which the bank submits is the proper,
[18] long-standing, and only procedural device open or available to
[19] a trustee that is between a rock and a hard place, as is the
[20] bank.

[21] Your Honor, there's a case called Green v. Brophy that
[22] was decided by the D.C. Circuit Court in 1940, page 542 of 110
[23] F.2d. That court said, "Where the trustee may not fairly be
[24] said to represent the interests of the sesqui-equate trusts,
[25] the latter are indispensable parties to litigation involving

[1] the trust."

[2] Indispensable parties, your Honor, not just necessary
[3] parties.

[4] **THE COURT:** Is that case in your brief?

[5] **MR. HARRIS:** It is not, your Honor. We briefed this
[6] to the D.C. court today. I'm sorry, it is not in.

[7] **THE COURT:** Give me the citation.

[8] **MR. HARRIS:** It is 110 F.2d 539, at 542, Green v.
[9] Brophy. And there are a number of other cases from other
[10] districts and other state courts that follow that rule that
[11] recognize the simple reality that to get full and fair
[12] resolution of issues where the representative party is now
[13] adverse to the party that it has been charged with
[14] representing, one cannot have full and fair litigation or final
[15] and conclusive litigation if that party that is not properly
[16] represented is absent.

[17] We will have additional duplicative litigation if this
[18] Court does not take jurisdiction and decide this issue, and if
[19] the issue is decided instead in the absence of the noteholders
[20] as a party.

[21] **THE COURT:** But there's nothing this Court can do to
[22] relieve the bank from having to represent the noteholders
[23] before Judge Huvelle, is there?

[24] **MR. HARRIS:** I believe there is, your Honor. First of
[25] all, the federal interpleader statute empowers this Court to

[1] enjoin other proceedings, other court proceedings, that may
[2] interfere with the interpleader action. That's in the statute.
[3] I believe it's 28 U.S.C. 1631, but I'm working from memory
[4] there. But it's the federal interpleader statute. And that is
[5] the proper approach in the bank's view to protect the bank from
[6] that duplicative litigation and the prejudicial litigation of
[7] having to litigate in a forum where the issues will not be
[8] fully and fairly resolved, and will not be finally resolved.

[9] **THE COURT:** Well, if you follow that procedural
[10] machinery, there could be this immense traffic jam or collision
[11] of trains between Washington and New York, similar in Baltimore
[12] and Philadelphia; because if I don't issue a stay, Judge
[13] Huvelle may very well enjoin me. But you're telling me that in
[14] aid of the interpleader, I should enjoin her. Suppose we both
[15] do that, then what happens?

[16] **MR. HARRIS:** Well, your Honor, I believe we're in an
[17] appellate court or two appellate courts. But I don't think
[18] that will happen.

[19] **THE COURT:** That's for sure.

[20] **MR. HARRIS:** I do not think that will happen, because
[21] Judge Huvelle suggested that this was the proper place. After
[22] she denied the all writs motion, she suggested to the FDIC's
[23] counsel that this Court is the proper forum in which the
[24] question of this Court's jurisdiction for a stay of this
[25] Court's jurisdiction should be decided.

[1] **THE COURT:** Did she really say that?

[2] **MR. HARRIS:** She said that isn't it common sense to
[3] seek a stay in New York. And she said, I think it would be
[4] stupid not to do that. She used the word "stupid."

[5] **THE COURT:** Did she say that on the record?

[6] **MR. HARRIS:** There is no record; I checked, your
[7] Honor. She said it on the telephone.

[8] **THE COURT:** I bet you looked for it.

[9] **MR. HARRIS:** I called the clerk. They did not take
[10] that down, that telephonic hearing.

[11] **THE COURT:** She didn't say it in an opinion or
[12] memorandum or anything?

[13] **MR. HARRIS:** No, your Honor.

[14] **THE COURT:** Okay.

[15] **MR. HARRIS:** Your Honor, as we say in our papers, I
[16] won't belabor this, it's covered pretty clearly in the paper,
[17] that in the bank's view, an interpleader action is the only
[18] procedural mechanism that can resolve these claims; and the
[19] noteholders are a necessary and indispensable party; and it is
[20] only in New York that they can be joined.

[21] Two of the three noteholders have their principal
[22] places of business in New York. The Bank of New York, not
[23] surprisingly, has its principal place of business in New York,
[24] and the res that is the subject of this interpleader is sitting
[25] in an account here in the Southern District.

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December 21, 2006

[1]    **THE COURT:** Does the bank have in mind, based upon the
[2] argument you just made to me, that the bank is now in an
[3] impossible position and is now adverse to the noteholders and
[4] cannot fairly represent them, is the bank considering making
[5] that argument to Judge Huvelle, to making an application to
[6] Judge Huvelle to be relieved of its responsibilities under the
[7] indenture of trust to represent the noteholders' interests in
[8] the litigation before her?

[9]    **MR. HARRIS:** I do not know if we will do that. We've
[10] considered it, we've talked about it a bit, your Honor. At
[11] present, what we've done is moved to dismiss the case in D.C.
[12] because the absence of an indispensable party in accordance
[13] with Federal Rule 19.

[14]    **THE COURT:** That essential party is the noteholders.

[15]    **MR. HARRIS:** Correct.

[16]    **THE COURT:** And that argument, that an essential party
[17] is missing before Judge Huvelle, within the context of Rule 19,
[18] is based, I suppose, upon the premise that the bank can no
[19] longer fairly represent them.

[20]    **MR. HARRIS:** Yes.

[21]    **THE COURT:** Is that what it comes down to?

[22]    **MR. HARRIS:** It is, your Honor. It is also true that
[23] the noteholders simply have a different view than the bank; and
[24] the bank has a different view from either the noteholders or
[25] the FDIC. But our view is fairly unimportant. We do not have

[1] a dog in this fight, as we say where I come from. The bank
[2] makes $5,000 a year for a series of notes for serving in this
[3] capacity as indenture trustee. That's a grand total of
[4] $10,000 a year, now that there are two remaining series of
[5] notes.

[6]    The 100 million dollars that the noteholders claim is
[7] theirs and that the FDIC claim is theirs tends to overshadow
[8] and underscore the fact that the bank is not a particularly
[9] motivated -- is not motivated in the same way or to the same
[10] quantum that the noteholders are motivated.

[11]    **THE COURT:** Surely you are not suggesting that this
[12] wonderful historic institution would default or go easy on its
[13] fiduciary responsibilities because its fees weren't high
[14] enough.

[15]    **MR. HARRIS:** It will discharge its fiduciary
[16] responsibilities, your Honor. I think we can be confident,
[17] however, that the party that has a direct claim to 100 million
[18] dollars is going to turn over every rock and do absolutely
[19] everything it can do above and beyond what is required by the
[20] fiduciary duties of the Institution at Alexander Hamilton Bell
[21] (sic).

[22]    **THE COURT:** It's hard to see how they can make a
[23] better presentation than you are right now, if I may say so.

[24]    **MR. HARRIS:** You're very kind, your Honor. I'm just a
[25] poor southern lawyer in a big city.

[1]    Your Honor, in addition, the prejudice, we would say,
[2] falls on all parties, including the FDIC, though obviously they
[3] disagree, if this Court declines to take jurisdiction; because
[4] what they don't recognize or at least admit, I think they must
[5] know it.

[6]    But if it plays out the way they want it to play out,
[7] and we have a decision from her Honor on or about January 11th
[8] or shortly after the trial on the merits on January 11th in the
[9] D.C. district, that decision, the noteholders will certainly
[10] not agree that they are bound by that decision.

[11]    The Bank of New York does not believe they would be
[12] bound by that decision for the reasons I just expressed, that
[13] they are not properly or adequately represented, and cannot be
[14] under these terms, and that D.C. circuit case says they would
[15] not bound. They are an indispensable party; they were absent.

[16]    Only this Court has all the parties before it. This
[17] is a quintessential interpleader, but the FDIC has assiduously
[18] avoided proceeding in the D.C. district as an interpleader.
[19] Why? Because it doesn't want to have to litigate against the
[20] noteholders directly, I submit, your Honor. It wants to have
[21] its cake and eat it, too. And that, in my book, is forum
[22] shopping.

[23]    **THE COURT:** I want to see just how far your argument,
[24] based on the case you've cited to me and the position that the
[25] bank now finds it itself in, goes.

[1]    There's certainly no question but that under the
[2] indenture trust, which installed the Bank of New York as the
[3] indenture trustee for the benefit of the noteholders, the bank
[4] owed under that instrument and gladly and willingly, or at
[5] least willingly, took upon itself the fiduciary
[6] responsibilities explicit and implicit in that trust agreement.

[7]    Do you say that as the result of the conflicting
[8] claims asserted by the FDIC and the noteholders, with respect
[9] to the present corpus or funds or res, do you say as the result
[10] of that conflict, the bank is ipso facto automatically per se
[11] relieved of any fiduciary responsibilities devolving upon it
[12] under the indenture of trust? Is that the bottom line of your
[13] position?

[14]    **MR. HARRIS:** No, your Honor.

[15]    **THE COURT:** Then what is your position?

[16]    **MR. HARRIS:** Well, we have fiduciary responsibilities
[17] in which we do not have a conflict with the noteholders. One
[18] of them, which we put in our papers, was that -- and the FDIC
[19] sees excellent counsel appointed to, is the fact that the
[20] noteholders themselves said, We want you to sue the trust.

[21]    We declined and refused to do that. That was a point
[22] along which we were in conflict and are still in conflict. We
[23] told them we're thinking about an interpleader; that this
[24] smells like an interpleader to us.

[25]    And they said, We don't want you to do that. But if

---

Page 29

[1] you do that, do it in New York.

[2] We then looked at the various forum available. We
[3] concluded independently that this is the only forum where all
[4] the parties can be enjoined; and for that separate and
[5] independent reason, filed in New York.

[6] But we also found that to be a lawful direction under
[7] the indenture, the master indenture, which states that the
[8] noteholders can direct the time and place of litigation that
[9] they direct the trustee to undertake.

[10] So we have tried to navigate a course between what we
[11] feel is something we cannot do that is contrary to either law
[12] or is contrary to the interests of the bank being subjected to
[13] litigation by the FDIC or the noteholders.

[14] And the case law is clear that in that situation, the
[15] merits not matter, it does not matter whether the threats of
[16] litigation have merit on either side. It's the fact of the
[17] threats. Was the stakeholder, in this case the trustee,
[18] threatened with imminent litigation? Yes, there's no doubt.
[19] There's no dispute about that. That's all that needs to happen
[20] for an interpleader to be brought. And that is the remedy that
[21] the trustee has in law; and this is the only court where that
[22] remedy is available.

[23] THE COURT: Well, yes. Suppose one accepts all of
[24] that for the sake of the analysis. I don't understand the FDIC
[25] to be suggesting that the interpleader action is entirely

---

Page 30

[1] improper. Well, they do in a way, but I'm not talking about
[2] venue or statute of limitations now.

[3] Within the context of the stay analysis, what they're
[4] saying is that interpleader may be okay, but in the rather
[5] special circumstances of this case, it just makes sense to stay
[6] the proceedings until Judge Huvelle interprets her own order
[7] and opinion.

[8] Why is that not an appealing position to take? And
[9] before you answer that, I'm going to put to you the rather
[10] entertaining distinctions or differences that appear between
[11] the two charts in the briefs, I'm sure you've looked at them.

[12] MR. HARRIS: Yes, your Honor.

[13] THE COURT: And so it's perfectly apparent to me that
[14] if this interpleader action goes forward, if it's not
[15] time-barred or premature or it's in the right venue, if all of
[16] those things are swept aside, then a time is certainly going to
[17] come, it seems to me, when I'm going to have to look at those
[18] two charts and try to figure out just what Judge Huvelle did in
[19] September of this year, and what she didn't do.

[20] Now, if I'm going to have to do that, if it's
[21] inevitable that I'm going to have to do that when the FDIC here
[22] in the interpleader action pleads that very opinion as res
[23] judicata or collateral estoppel, as it inevitably will, if I'm
[24] going to have to do that sometime, why isn't it an exercise of
[25] proper judicial administration, which is an important factor in

---

Page 31

[1] stay analysis, to let Judge Huvelle tell us all what she meant?

[2] MR. HARRIS: Your Honor, I would submit it is not
[3] proper, because she does not have the parties before her that
[4] are needed in order to fully and fairly litigate that issue.

[5] The bank is not going to be able to fully and fairly
[6] and properly put forward those arguments. That one of those
[7] charts will be deficient in a sense, because the party who has
[8] the interest and who must be free under the case law to present
[9] its issues and the reason why it is an indispensable party
[10] under the case I cited to your Honor is just that. It is not
[11] fair to allow that issue to be decided, and it will be a
[12] meaningless decision to the noteholders. They certainly won't
[13] regard themselves as bound by it. And they will, I'm sure,
[14] although they can speak for themselves and will do so, inform
[15] your Honor that when you review that, you will have to take
[16] into account the fact that it was not fully and fairly
[17] litigated when Judge Huvelle decided that issue today.

[18] Now, what she said in her order is in writing. Almost
[19] all instances of collateral estoppel and res judicata are in
[20] courts that did not issue the opinion that is the subject of
[21] the claim of issue preclusion or claim preclusion.

[22] In the normal course of judicial administration, it is
[23] a different judge reading the written order and applying the
[24] English language to the current set of facts. And that is an
[25] obligation on Judge Huvelle to have stated what she ruled last

---

Page 32

[1] year in a way that can be understood.

[2] THE COURT: I don't know if you saw Mr. Lee stand up.

[3] MR. HARRIS: I did. I was trying to respond to your
[4] Honor's question.

[5] THE COURT: That's fine. I didn't mean to suggest you
[6] shouldn't. Anything further? You have a couple more minutes.

[7] MR. HARRIS: No, your Honor, that's fine.

[8] THE COURT: All right. Good. We'll take a ten-minute
[9] recess, and then I will hear from the noteholders and then the
[10] FDIC in reply. A ten-minute recess.

[11] (Recess)

[12] THE COURT: I will hear now from counsel for the
[13] noteholders.

[14] MR. HARRIS: Your Honor, pardon me, but may I correct
[15] the citation to the statute that I tried to remember?

[16] THE COURT: By all means.

[17] MR. HARRIS: Which I should not have tried to do from
[18] memory, as I said. It's 28 U.S.C., 2361, the statute that
[19] provides the district court with the authority to restrain
[20] prosecution of any other proceeding.

[21] THE COURT: All right. Thank you. Your citation in
[22] the Green case was correct, because we found it.

[23] MR. HARRIS: Thank you, your Honor.

[24] THE COURT: Not only we found it, we printed it out.
[25] All right. I'll hear from counsel for the

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December 21, 2006

Page 33

[1] noteholders.

[2]     **MR. EDELMAN:** Good morning, your Honor. My name is
[3] Michael Edelman. I'm from Vedder, Price, Kaufman & Kammholz,
[4] and I'm counsel for First Millennium, Incorporated and
[5] Millennium Partners, L.P., two noteholders in this case.

[6]     In contrast to the FDIC statements, the FDIC is the
[7] party here seeking the extraordinary remedy seeking to stay a
[8] first-filed suit, in favor of a second-filed suit.

[9]     Also in contrast to the FDIC statement is the
[10] noteholder trying to do an end run around the jurisdiction of
[11] this Court and rush to a court that they deem more favorable.

[12]     Their action in D.C. was a blatant attempt at forum
[13] shopping, and it's an effort to disenfranchise the noteholders
[14] from taking enforcement action before this Court. They justify
[15] this by stating that the 2003 action against the FDIC alleging
[16] the conversion is really the same as the issues and facts and
[17] matters before this Court in this interpleader. We believe
[18] that a simple review of the underlying cause of action and the
[19] decision dispel that that is blatantly not true.

[20]     **THE COURT:** Hence, your chart.

[21]     **MR. EDELMAN:** Hence, my chart. And I guess you're
[22] going to say, Why not, since you asked each of the others, I
[23] can go to that point right now. Why should we ask the D.C.
[24] court to expound upon the differences?

[25]     **THE COURT:** That was perceptive of you, Mr. Edelman.

Page 35

[1] is whether the conflicting claims of the FDIC and the
[2] noteholders to the res or the collateral is sufficient to
[3] relieve the Bank of New York of its fiduciary duties, at least
[4] to the extent of requiring them to advance and argue for the
[5] interests of the noteholders in the case before Judge Huvelle,
[6] which is going to go forward whatever I say, seems to me.

[7]     Now, let me approach that question from your point of
[8] view this way: Whether I issue a stay or not, Judge Huvelle is
[9] going to go forward. And the bank will have to discharge
[10] whatever responsibilities it may have in that litigation in the
[11] District of Columbia.

[12]     Suppose that your fine law firm representing the
[13] noteholders had some arguments you really wanted the Bank of
[14] New York to put forward before Judge Huvelle on behalf of the
[15] noteholders, and you politely drafted a memorandum and sent it
[16] on to Mr. Harris's equally excellent firm and said, Would you
[17] please make these arguments on our behalf, Mr. Fiduciary.
[18] Don't you think that the bank's lawyers might agree and put
[19] that argument forward which you had placed in their hands?

[20]     **MR. EDELMAN:** Your Honor, we have forcefully asked the
[21] Bank of New York to pursue the rights of the noteholders
[22] against the issuer; and they have forcefully said to us that
[23] they have refused to do that; and that in light of the
[24] competing claims against the Bank of New York with respect to
[25] the collateral, that the Bank of New York is not going to take

Page 34

[1] The thought had crossed my mind.

[2]     **MR. EDELMAN:** I thought that your consistency was --I
[3] could make an end run and answer the question.

[4]     We actually think it would be very unfair. The D.C.
[5] court does not have jurisdiction over the noteholders. The
[6] noteholders would be not a party to that suit, and the D.C.
[7] court would not have the benefits of an indispensable party who
[8] is required to be present for full and fair adjudication of
[9] that lawsuit. And the issues that are being decided in no way
[10] relate to the 2003 lawsuit. The issues really are entitlement
[11] to collateral that the Bank of New York holds solely for the
[12] benefit of the noteholders.

[13]     So the issues that the D.C. court would be deciding
[14] would be matters that only affect the noteholders, since it's
[15] our collateral.

[16]     The party before the D.C. court who ostensibly would
[17] be standing to represent us has already stated quite forcefully
[18] before you this morning and by filing the interpleader that
[19] they are incapable of adequately representing the noteholders'
[20] interest. They are a stakeholder. The true economic parties
[21] in interest are the noteholders.

[22]     **THE COURT:** Well, they are a stakeholder who owe a
[23] fiduciary duty to one of the claims of the stake, but not to
[24] the other. And the question which I have, and I put it to
[25] Mr. Harris and I'll put it in somewhat different form to you,

Page 36

[1] sides and will not go to the substance of who is entitled to
[2] the property in question.

[3]     **THE COURT:** But those are claims against the issuer.
[4] What Judge Huvelle has before her is a lawsuit which in 2003
[5] was commenced by the Bank of New York on behalf of the
[6] noteholders. And now the issue both before her and ultimately,
[7] I suppose, before me, is going to be the effect of her judgment
[8] in that action commenced by the Bank of New York, and as which
[9] the Bank of New York still stands as party plaintiff.

[10]     **MR. EDELMAN:** I think your honor highlights the point
[11] by saying but those are claims against the issuer. The claims
[12] against the issuer are not before the judge in D.C., and the
[13] claims against the issuer are properly before the Court. And
[14] this is the only Court that can adjudicate the claims against
[15] the issuer and the property of the issuer. Those were not
[16] decided in D.C., and we posit that is not a proper subject
[17] matter for the D.C. court to consider without the noteholders;
[18] and that this is the only Court that can adjudicate this; and
[19] it makes logical sense for this Court to adjudicate issues
[20] against the issuer.

[21]     **THE COURT:** Isn't it the fact that the only reason the
[22] issuer is not paying the collateral to the noteholders is
[23] because of the action taken by the FDIC as receiver? Isn't
[24] that the practical reality of it?

[25]     **MR. EDELMAN:** The assets in question are the

Page 37

[1] collateral that is being held by the Bank of New York.

[2] **THE COURT:** Yes.

[3] **MR. EDELMAN:** That collateral is in the control of the

[4] Bank of New York.

[5] **THE COURT:** Quite right.

[6] **MR. EDELMAN:** This is an interim action. And we're

[7] owed about 112 million, and collateral is only worth 72 million

[8] of receivables collateral, and another 20 million of the spread

[9] count.

[10] Without the FDIC making unsubstantiated threats

[11] against the Bank of New York, the Bank of New York would, we

[12] think in its fiduciary duties, turn over that collateral. But

[13] the Bank of New York has said that since they have been

[14] threatened with contempt and sanctions, they are not going to

[15] honor the instructions of the noteholders.

[16] Once again, the noteholders are not subject to the

[17] jurisdiction of the D.C. court. This is the only Court that

[18] can issue a decision regarding the issuer, the property issuer,

[19] the collateral that is held by the Bank of New York.

[20] One of the points about the collateral is I heard

[21] these statements from the FDIC that we're seeking a

[22] disgorgement of assets from the FDIC receiver. That is not

[23] correct. The assets involved here are the collateral that's

[24] being held by the Bank of New York. These were the assets that

[25] were transferred at the start of the securitization when the

Page 38

[1] depository institution sold these assets to the issuer.

[2] Under controlling law, which is from several sources,

[3] the depository institution doesn't have any rights to those

[4] individual assets anymore, and those are the assets that have

[5] been deposited with the Bank of New York or in control of the

[6] Bank of New York, and that is our collateral.

[7] **THE COURT:** And what would the noteholders, in a

[8] perfect world, expect the Bank of New York to do with that

[9] collateral?

[10] **MR. EDELMAN:** They would liquidate that collateral or

[11] administer the collateral to pay down the notes that are due

[12] and owing.

[13] **THE COURT:** And they would be doing so in conformity

[14] with the acceleration clause, would they not, or the ipso facto

[15] clause?

[16] **MR. EDELMAN:** That's an issue in question. There are

[17] two notes at issue here. This is an obligation that's governed

[18] by the notes which the FDIC receiver or NextBank, the depositor

[19] institution, was not a party to the notes. The money was lent

[20] to the issuer. And the notes provide that the full amount of

[21] both issuance of notes are due upon the final maturity date and

[22] upon a redemption event.

[23] We posit that actually that as an obligation of the

[24] issuer, the fact that FIRREA has a defense before the FDIC, the

[25] institution and receivership has no effect upon the obligation

Page 39

[1] of the issuer. And none of that was decided in a D.C. court.

[2] But if you look at the notes themselves, the 2000-1

[3] issuance was actually due and payable -- the final maturity

[4] days was last week. So the notes by its own terms are due and

[5] payable now. And the collateral secures the full and front

[6] payment of 100 percent of the principal and interest that was

[7] lent.

[8] There's no issue here that we want lent the money.

[9] The noteholders lent the money to issuer. They have not been

[10] repaid. 112 million hasn't been repaid. And what the FDIC is

[11] doing, they're trying to go under the umbrella of the FIRREA to

[12] say that they now have rights to this collateral, which under

[13] governing authority we don't have.

[14] Let me just pause there and go on another tangent for

[15] a second, which is why they have no rights to that collateral,

[16] from a few sources.

[17] First of all, this is a Delaware statutory trust. As

[18] a statutory creation, you look to the rights of the parties who

[19] create that statutory trust, namely to Delaware law to see what

[20] rights the beneficial owner, in this case the FDIC, has to

[21] specific assets.

[22] The Delaware code specifically provides under Delaware

[23] Code Section 3805 that a beneficial owner has no interest in

[24] the specific statutory trust property. So by the Delaware

[25] statute itself, they have no interest in the collateral that

Page 40

[1] was sold to the trust. And if you want, I can hand it up and

[2] hand around a cite to that section, if it would please the

[3] Court.

[4] **THE COURT:** Yes, come up. Just make sure that

[5] everybody in the room has a copy.

[6] **MR. EDELMAN:** There's also, under the final rule

[7] issued under CFR, Code of Federal Regulations, Section 360.6,

[8] there's a provision of the federal regulations that provides

[9] that the FDIC agreed that they would not try to reclaim,

[10] recover, or recharacterize assets that were transferred to a

[11] special-purpose entity as part of a securitization.

[12] So under their own final rules, they don't have any

[13] rights to this collateral. This collateral is held solely by

[14] the Bank of New York, and these are all issues that are now

[15] before the D.C. court.

[16] All the D.C. court has been asked to do is to enjoin

[17] this action. Well, this is the only action that is properly

[18] addressing the obligations of the issuer and the rights of the

[19] noteholders to the collateral.

[20] **THE COURT:** Could not the arguments you've just made

[21] to me be made to Judge Huvelle when she comes to decide the

[22] second action before her, the 2006 injunction action, as

[23] opposed to the 2003 conversion action? Could not those issues

[24] be put before her in the overall context of the effect and the

[25] fallout, if you will, from her September decision?

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December 21, 2006

Page 41

[1] **MR. EDELMAN:** There's no one who would make those
[2] arguments. We've been told by Bank of New York that because
[3] having started this interpleader action, that they now consider
[4] us now as a stakeholder, and they will not take sides --
[5] **THE COURT:** Well, yes. But Judge Huvelle will not
[6] allow her to take that position. If I were she, I'd think
[7] about that.
[8] **MR. EDELMAN:** She also doesn't have the true parties
[9] in interest to the collateral, which brings me to another
[10] point.
[11] We've heard all morning from the FDIC that the
[12] noteholders have no rights to sue; that we have to rely upon a
[13] suit by the indenture trustee. That is categorically not
[14] correct.
[15] Under the terms of the indenture, Section 5.08,
[16] there's a provision that says that the noteholders have an
[17] absolute and unconditional right to initiate a lawsuit for the
[18] enforcement of payments under the note; and that rights will
[19] not be impaired without the consent of the noteholders. So we
[20] have an absolute right to sue on the notes against the issuer.
[21] **THE COURT:** Could you intervene using that language in
[22] the action in the District of Columbia?
[23] **MR. EDELMAN:** We are not before that court, and we
[24] think that court --
[25] **THE COURT:** No, I know. Could you be? Could you

Page 42

[1] intervene to protect your interest directly?
[2] **MR. EDELMAN:** You're asking for a party to subject
[3] themselves to a jurisdiction where it is not subject to. And
[4] we are not subject to that jurisdiction, and --
[5] **THE COURT:** Either I'm not stating the question
[6] clearly or I don't understand your answer. My question is
[7] based upon what you've just read from the note, would the
[8] noteholders have standing to intervene directly in the action
[9] before Judge Huvelle if they felt the Bank of New York was not
[10] fighting hard enough for them?
[11] **MR. EDELMAN:** Your Honor, there's no reason why the
[12] noteholders would intervene, because that Court doesn't have
[13] jurisdiction over the issuer or the property at hand, and all
[14] the matters are before this Court and under New York law. So
[15] you're asking the noteholders to subject themselves to a
[16] jurisdiction in another court.
[17] Theoretically, it's possible that that would be a
[18] great prejudice to the noteholders. And the noteholders have a
[19] right to submit themselves to the Court that is contemplated
[20] under the documents, which these are governed by New York law;
[21] all the actions occurred in New York; the property is in New
[22] York; and all the parties involved here are all subject to the
[23] jurisdiction of this Court. And this Court is the only Court
[24] who could give full and effective relief.
[25] **THE COURT:** I'm not questioning, for the sake of the

Page 43

[1] stay analysis, your fundamental right to participate in the
[2] interpleader action which the Bank of New York had, I will also
[3] accept, the fundamental right to initiate.
[4] The only question before me is whether or not in the
[5] totality of circumstances I should exercise the discretion I
[6] have to stay these proceedings until Judge Huvelle decides the
[7] case before her. That's the question before me. How would the
[8] noteholders be prejudiced if I did that?
[9] **MR. EDELMAN:** They would be prejudiced because you
[10] would be allowing another foreign court who doesn't have full
[11] jurisdiction over the parties or the subject matter at hand to
[12] rule on this matter. And that's a court that doesn't have the
[13] issues regarding the issuer before it, the obligations of the
[14] issuer on the collateral before it; and we think that it would
[15] be inherently unfair to subject the noteholders to the decision
[16] of that foreign court when all the documents and rights can
[17] also fully and fairly be adjudicated before this Court.
[18] **THE COURT:** On that point, there's one question I
[19] wanted to put to you, Mr. Edelman. If I carry you over your
[20] time, that's fine.
[21] You say in your brief at page 16, "Each month that
[22] passes without noteholders exercising contractual remedies
[23] results in a decline in the value of the noteholders'
[24] collateral declining by millions of dollars." Each month that
[25] there's a delay of the resolution of the interpleader.

Page 44

[1] Explain that to me. How? Why? Where does the money
[2] go during that intervening month?
[3] **MR. EDELMAN:** It has to do with the workings of the
[4] underlying securitization.
[5] Until we've taken enforcement action and take action
[6] with respect to the collateral, every month receivables are
[7] generated by that collateral, and every month there's an
[8] allocation of who gets the amounts from that collateral.
[9] So once the collateral was liquidated from the
[10] proceeds, principal has been paid off or interest is paid off
[11] on the credit card receivables, every month at payment date
[12] there's a determination made as to who's entitled to how that
[13] money gets split up.
[14] And every month recently, as of that date's
[15] termination, a slug of that goes out to pay to the so-called
[16] transferor interest. That transferor interest would not exist
[17] if we exercise control over the collateral. So every month
[18] that we delay, millions of dollars go out to the FDIC sitting
[19] as the beneficiary of transferor interest. And that payment
[20] stops under the -- and has stopped, because we've taken
[21] enforcement action, under the waterfall -- under the indenture,
[22] which is 505(b). And that says once you've declared a defense
[23] called an accelerated and exercise rights against the
[24] collateral, the payments get first paid out to the -- pay the
[25] fees of the indenture trustee, and then you pay all the

[1] principal and interest due to the noteholders. And at the very
[2] end of that waterfall, it reverts back to the issuer. And
[3] there is no right of transferor interest once we've exercised
[4] our remedies.
[5]     So by exercising our remedies, we have acted to
[6] maximize the collateral. And if we hadn't done that, then
[7] every month that preceded, our collateral would have been
[8] diminished by several million dollars.
[9]     **THE COURT:** What if it takes me a year, I hope it
[10] wouldn't, but suppose it takes me a year to decide whether or
[11] not the noteholders are the winning claimant in the
[12] interpleader action, and then it takes the Court of Appeals
[13] another year to decide whether or not I have it right. Would
[14] all this capital be draining away in the manner you described
[15] during that period of time?
[16]     **MR. EDELMAN:** Because all of this collateral has been
[17] offered by the Bank of New York to be subject to this
[18] interpleader action, that collateral --
[19]     **THE COURT:** Stays there.
[20]     **MR. EDELMAN:** It just stays there.
[21]     **THE COURT:** All right. Last question for you. In the
[22] first paragraph of your brief, you say that by this motion, the
[23] FDIC, "Is seeking to permanently stay this interpleader action
[24] commenced by the Bank of New York." It's not entirely clear to
[25] me that that's what the FDIC is asking for, a permanent stay

[1] forever and a day. They'd have trouble with Justice Cardozo in
[2] the Landis case if they did that.
[3]     I read the FDIC's papers, and Mr. Chirstensen is about
[4] to speak for himself on the point, that they are simply asking
[5] me to stay the proceeding here until District Judge Huvelle has
[6] decided the case. If that is, indeed, the FDIC's position,
[7] does that reduce your concern a bit?
[8]     **MR. EDELMAN:** No, it doesn't because, once again, the
[9] district court in D.C. is not the Court that has before it the
[10] issues regarding the obligations and the rights of the
[11] noteholders against the issuer for our collateral.
[12]     So we're being forced to not pursue our rights by a
[13] court that doesn't have jurisdiction over us. And, frankly, it
[14] would be an incredible action by that court to expand its
[15] jurisdiction over parties that are not before it over matters
[16] that are not before it, over collateral that's not before it,
[17] based upon a conversion suit that was brought in 2003.
[18]     There is a conversion suit against the FDIC in its
[19] capacity as receiver. That has nothing to do with the
[20] noteholders' rights to go after their collateral. And we think
[21] that the FDIC's actions in D.C. to enjoin us for any period is
[22] not right; but we read their injunction to push the enforcement
[23] action past the due dates of these notes. And that could cause
[24] severe harm to the noteholders' interest.
[25]     So unless there is an interpleader action that

[1] protects the rights to the collateral, and we submit that
[2] that's this Court, an injunction that doesn't allow the Bank of
[3] New York to exercise control over the collateral would severely
[4] prejudice the noteholders' rights.
[5]     Once again, the D.C. court is seeking to enjoin the
[6] Bank of New York from taking any control over the collateral.
[7] And they hold the collateral, but it's solely for the
[8] noteholders' benefit. So we think that that by its very nature
[9] would cause injury to the noteholders.
[10]     **THE COURT:** Well, the Bank of New York entered into a
[11] stipulation before Judge Huvelle, did it not, that it would
[12] keep the res in its own custody and control pending further
[13] orders from Judge Huvelle's court. Did not the Bank of New
[14] York agree to that?
[15]     **MR. EDELMAN:** I think the Bank of New York can speak
[16] to that. We did not have any involvement in that agreement.
[17]     **THE COURT:** Your answer to my question is yes, the
[18] Bank of New York did that.
[19]     **MR. EDELMAN:** I understand they did it with the
[20] understanding, I was told afterwards, that it would be subject
[21] to both Courts' review. And that collateral is now subject to
[22] this Court's jurisdiction, which gives us protection to enforce
[23] our rights before a court that has jurisdiction over us.
[24]     **THE COURT:** I think you're saying yes, the Bank of New
[25] York did agree to that. My question is are you angry at the

[1] Bank of New York for doing that?
[2]     **MR. EDELMAN:** I believe that they shouldn't have done
[3] that without an express -- something that makes this Court's
[4] determination on interpleader supreme.
[5]     **THE COURT:** Okay. That's a good answer. All right,
[6] Mr. Edelman. Any further point you feel badly if you didn't
[7] say before you sat down, your time having elapsed? I don't
[8] want you to be uncomfortable.
[9]     **MR. EDELMAN:** One last point is just the FDIC makes
[10] much that the decision in D.C. and the cause of action in the
[11] 2003 decision are directly related to and the same as this
[12] action. And we think that even a superficial reading of the
[13] decision and the matter before the Court, leads to the
[14] inescapable conclusion that these are very separate actions.
[15]     And we think it's grossly unjust for the FDIC to
[16] basically seek to use FIRREA power as a sword to cut down valid
[17] claims. The banking laws and the receivership laws were not
[18] meant to turn to parties who have valid claims and use that to
[19] say, We don't owe you claims, we don't owe you anymore.
[20]     Here we lent over 100 million of notes that have not
[21] been paid. There's no question that this is our collateral
[22] that's being held by the Bank of New York. And they are now
[23] trying to turn upside down the provisions of FIRREA as a sword,
[24] not a shield. And we think that's improper, especially when
[25] their basis for doing so is a 2003 lawsuit, where there has

**BANK OF NEW VYORK v.**
**FIRST MILLENMIUM**

December 21, 2006

Page 49

[1] been no determination in any regard as to the obligations and
[2] rights of the issuer.
[3]     THE COURT: But, Mr. Edelman, in asking to be paid in
[4] the manner you just summarize, the noteholders are relying upon
[5] and invoking, are they not, the acceleration clause?
[6]     MR. EDELMAN: Actually, with respect to the 2000-1
[7] notes, no, those are due and payable as of December 15th, a few
[8] days ago. Those are fully due now.
[9]     THE COURT: I see.
[10]     MR. EDELMAN: And the other notes are fully due and
[11] payable in the next couple of months. I think they are due in
[12] March.
[13]     But, once again, we don't think that the ipso facto
[14] clauses is a defense that can be used by the issuer. But that
[15] is only an issue with respect to one of the notes right now.
[16] The 2000-1 is fully due and payable by its own terms on the
[17] maturity occurring December 15th.
[18]     THE COURT: All right. Thank you.
[19]     MR. EDELMAN: Thank you.
[20]     THE COURT: All right. I'll hear from the FDIC in
[21] reply.
[22]     MR. CHRISTENSEN: Your Honor, I would also invite even
[23] a superficial read of Judge Huvelle's order, because the
[24] arguments that we've just heard sound like they're months or
[25] even years too late and in the wrong court, because they were

Page 50

[1] all made to Judge Huvelle and decided in various orders.
[2]     On November 23rd, 2004, Judge Huvelle decided what was
[3] collateral and what was transferor interest under very
[4] complicated sections of the master indenture.
[5]     The FDIC receiver strongly disagrees with the
[6] characterization that the noteholders and the Bank of New York
[7] have given to the description of the collateral that we've
[8] heard much of today.
[9]     The noteholders assert that they've had this claim
[10] since the receivership of NextBank in February 2002. The
[11] noteholders waited to res the claim until just last month,
[12] because Judge Huvelle ruled against them in the end of
[13] September. Even if this were a new claim, which we contend
[14] it's not, since they've waited four years to bring it, there's
[15] no reason why waiting for Judge Huvelle to rule in a month is
[16] going to prejudice them.
[17]     Your Honor, the superficial read of Judge Huvelle's
[18] order will show that even the documents we've just been handed
[19] now from Code of Federal Regulations were discussed at great
[20] length by Judge Huvelle at 453 F. Supp. 2d at 98 to 99, where
[21] she devotes an entire paragraph or more to the argument about
[22] 12 CFR 360.6, subparagraph B and the powers referred to
[23] therein.
[24]     Your Honor, I think it would come as a shock to the
[25] Court in the District of Columbia, both the district court and

Page 51

[1] the District of Columbia Circuit, that the noteholders are not
[2] bound by the litigation that they instructed the Bank of New
[3] York to bring and then to appeal to the D.C. Circuit.
[4]     They would also be surprised, I think, that the
[5] fiduciary duty of the Bank of New York doesn't transfer from
[6] one floor of the courthouse to another, because the Bank of New
[7] York is presently representing the noteholders in an appeal in
[8] the federal courthouse in the District of Columbia pursuant
[9] that their fiduciary duties that they are now saying prevent
[10] them from litigating in Judge Huvelle's chambers a few floors
[11] apart.
[12]     THE COURT: Well, they say the world changed when the
[13] FDIC's notice letter was received which clashed with what the
[14] noteholders were saying they should do, and they promptly
[15] launched an interpleader. That's what they say is the defining
[16] event which changed the world from their point of view, changed
[17] the position they held in the world, changed the role they
[18] played in the drama. What do you say about that?
[19]     It's that event immediately triggering the
[20] interpleader which counsel argues makes the fiduciary, the Bank
[21] of New York, no longer in a position to being able to fully and
[22] adequately represent the beneficiaries of the trust.
[23]     MR. CHRISTENSEN: They certainly haven't notified the
[24] D.C. Circuit of these world changes, and are continuing to
[25] litigate on the noteholders' behalf before that appellate

Page 52

[1] court; case, again, that they filed under the noteholders'
[2] behalf three years prior.
[3]     They are arguing presently to Judge Huvelle that their
[4] fiduciary duties are somehow compromised in the case before
[5] her. She will decide that within the next month.
[6]     THE COURT: They are making that argument to her?
[7]     MR. CHRISTENSEN: Absolutely. Now, Judge Huvelle can
[8] nullify the argument about the noteholders not being bound by
[9] her decisions, as I discussed in my opening. If she does not,
[10] then we can always come back here and resume litigating. But
[11] there's no benefit to litigating here in the meantime. And
[12] that's why the FDIC has asked for a stay.
[13]     I note one minor correction in Mr. Harris's statement.
[14] Judge Huvelle did not deny the all writs motion; she merely has
[15] not decided it.
[16]     THE COURT: She's waiting for me, as I understand it.
[17] She's waiting to see whether or not I grant your motion for a
[18] stay, is that the state of the game?
[19]     MR. CHRISTENSEN: That may very well be, your Honor.
[20]     THE COURT: I didn't intend to be making that up. I
[21] had thought that somebody or other had indicated in a brief
[22] that that was the present state of the art. Maybe I'm wrong.
[23]     MR. CHRISTENSEN: We filed the all writs motion.
[24] Judge Huvelle, instead of ruling on it, asked that we first ask
[25] the noteholders in the Bank of New York to stay the matter

December 21, 2006

Page 53

[1] before your Honor.

[2]     THE COURT: And you did not get full consent.

[3]     MR. CHRISTENSEN: No, we did not. The Bank of New
[4] York did not oppose; the noteholders would not oppose only with
[5] conditions that were unacceptable to the FDIC.

[6]     And Judge Huvelle asked that we then file the motion
[7] that we had filed in front of your Honor to allow you to rule
[8] on the question of a stay before she rules on the question
[9] of --

[10]     THE COURT: Yes, so I understood it correctly, then, I
[11] think. She's waiting to see what I do.

[12]     MR. CHRISTENSEN: Yes.

[13]     THE COURT: Fine. The question is whether I should
[14] wait to see what she does, and you say I should.

[15]     MR. CHRISTENSEN: Yes, for all the reasons we've laid
[16] out earlier.

[17]     THE COURT: All right. Anything else?

[18]     MR. CHRISTENSEN: That's all, your Honor.

[19]     THE COURT: All right. Gentlemen from the back and
[20] the noteholders, have you heard something in what counsel has
[21] just said that you simply can't stand, that you must respond
[22] to?

[23]     MR. HARRIS: Your Honor, I believe I heard, with all
[24] due respect, the Court misspeak.

[25]     THE COURT: I can't let you leave having committed

Page 54

[1] that sin. Put me straight.

[2]     MR. HARRIS: I'm confident you are clear on this, but
[3] I believe the record will reflect it, you indicated that Judge
[4] Huvelle currently has before her a case filed by the Bank of
[5] New York in 2003. That case is docketed with the U.S. Court of
[6] Appeals for the District of Columbia. She does not have that
[7] before her.

[8]     THE COURT: Jurisdiction would be ousted.

[9]     MR. HARRIS: In fact, her jurisdiction is ousted, your
[10] Honor, which is an important point. Because essentially in the
[11] second filed action, the 2006 action that was filed by the FDIC
[12] after this interpleader action was filed, that case is
[13] improperly asking her to go back and reconstrue that order that
[14] is on appeal. I think that order stands. That is the current
[15] state of the law in that case. And that should be considered,
[16] assuming that there's going to be a res judicata motion or
[17] collateral estoppel motion, when the FDIC urges it here in an
[18] interpleader action. And you've just heard Mr. Edelman, who
[19] plainly knows the deal documents a lot better than I do and
[20] better than I ever will, and let the noteholders and the FDIC
[21] fight it out in a good fair fight, and let the bank out in the
[22] middle.

[23]     THE COURT: That's a very powerful argument you make,
[24] Mr. Harris, on behalf of the bank, on behalf of the
[25] noteholders, in fulfillment of your fiduciary duty. And if

Page 55

[1] I've done something wrong, I'm glad you put me straight on it.

[2]     Anybody else? All right. Thank you for these
[3] excellent arguments. I want you to come back at 2 o'clock, and
[4] I will either rule on the case or explain why I'm not doing so.
[5] The case is adjourned until 2 p.m.

[6]     MR. HARRIS: Your Honor, may we leave our --

[7]     THE COURT: Oh, yes. You can leave everything here.

[8]     (Luncheon recess)

[9] A F T E R N O O N   S E S S I O N

    2:15 P.M.

[11]     THE COURT: I have concluded that it is proper for me
[12] to rule on this motion this afternoon from the bench; and in a
[13] moment, I will endeavor to do so. I do so because with the
[14] exigencies of the case, I think it important that this issue be
[15] resolved as quickly as possible, both with a view towards
[16] proceedings here, and also with a view towards proceedings in
[17] the District of Columbia.

[18]     Consequently, what is about to be placed on the record
[19] will lack the polish and the proper structure of what I like to
[20] think may be found in my written opinions. But, as I say, I
[21] think it important I proceed in this fashion. And so whatever
[22] product emerges, how rough it may turn out to be, will be the
[23] opinion of the Court on this motion.

[24]     The transcript will be made and will be reviewed by
[25] me, and will be corrected only for typographical or grammatical

Page 56

[1] errors; no changes of substance will be made. Some citations
[2] of the cases may be included in the text.

[3]     I propose to send to Judge Huvelle a copy of my
[4] opinion as soon as it has been transcribed and edited in the
[5] manner to which I refer. I will not send her copies of
[6] counsel's arguments, excellent as they were; I will leave it to
[7] counsel, who will be appearing before Judge Huvelle, to make
[8] whatever use of their own or adversary's remarks that they
[9] think best.

[10]     This case is before the Court on the motion of one of
[11] two interpleaded defendants for a stay of proceedings while
[12] litigation goes forward in another forum. The interpleader
[13] plaintiff and the other interpleader defendant oppose that
[14] motion.

[15]     The underlying action is an interpleader brought in
[16] this Court by interpleader plaintiff, the Bank of New York,
[17] which currently holds funds as the indenture trustee of a trust
[18] which came about in the following fashion:

[19]     NextBank, a national banking association that issued
[20] consumer credit cards, created a trust, transferred its
[21] receivables to this trust, ordered the trust to sell notes to
[22] investors, and used the proceeds to pay merchants for charges
[23] by credit cardholders. This securitization transaction was
[24] executed through a set of indenture contracts known as the
[25] indentures.

Page 57

The indentures established a trust called the NextCard Credit Card Master Note Trust, also known as the issuer. The issuer trust sold asset back to notes to investors, also known as the noteholders.

The Bank of New York acts as indenture trustee of the trust, and represents the interests of the noteholders. The indenture allows the bank to take control of collateral funds under certain circumstances.

The bank imposed an interpleader because it alleges it is confronted with two opposing claims to funds it holds presently, opposing claims by the interpleaded defendant noteholders who claim that the issuer is obligated to pay them funds under the terms of the notes and the bank is obligated to act in furtherance of that obligation, and by the Federal Deposit Insurance Company, or FDIC, which, in 2002, became the receiver of NextBank when NextBank failed.

The FDIC now claims that the bank must turn over the funds held by the bank to the FDIC, in accordance with the terms of the indenture and, more particularly, perhaps, in accordance with a decision dated September 27, 2006, by District Judge Ellen S. Huvelle of the United States District Court for the District of Columbia.

The action before Judge Huvelle came about in this fashion:

In 2003, the Bank of New York, on behalf of the

Page 59

The noteholders had notified the bank that as a result of NextBank's entry into receivership and subsequent events, the bank was obligated to turn the collateral funds over to the noteholders; and that failure to do so would constitute a breach of the bank's obligations under the indenture.

The FDIC, on the other hand, had informed the bank that the bank needed to turn over the collateral funds to the FDIC, in accordance with the terms of the indenture; and, more particularly, in obedience to Judge Huvelle's opinion in the District Court for the District of Columbia, dated September 27, 2006, and reported at 2006 Westlaw 2772860.

So this is the interpleader action which on November 16 was filed in the New York State court by the bank, and thereafter removed to this Court, properly removed.

On November 17, 2006, the next day, the FDIC filed a lawsuit seeking to prevent, and alleged and perceived and threatened improper distribution of funds subject to the orders and the judgment in the 2003 District of Columbia litigation.

The FDIC filed that action in the District of Columbia, alleging a theme which is repeated in the arguments here today, that the interpleader action commenced by the bank constitutes, in effect, a wholly improper attempt at an end run around Judge Huvelle's September 27 opinion, which contained resolutions of issues and claims which fell ungratefully upon the ears of the noteholders.

Page 58

noteholders, sued the FDIC for conversion based on actions the agency took as NextBank's receiver. Five of the bank's six counts were dismissed and settled. I should say, I suppose, dismissed or settled. The sixth count, based on an early amortization clause in the indenture, was addressed by Judge Huvelle in her September 27, 2006 opinion.

Judge Huvelle found that the FDIC was not liable to the bank for conversion because the Financial Institution's Reform Recovery and Enforcement Act, also known as FIRREA, allowed the FDIC as receiver of NextBank to disregard an early amortization clause relied upon by the noteholders, whose interests were avast in that litigation by the bank, a disallowance or disregard, which, in Judge Huvelle's view, was based upon the appointment of a receiver and the operation of the statutory scheme.

The district court's decision, that is to say, Judge Huvelle's decision, has been appealed to the Circuit Court of Appeals for the District of Columbia Circuit, and that appeal is pending.

I have said a moment ago that the bank files this interpleader because it says it is confronted by competing claims. Specifically, on November 16, 2006, the Bank of New York filed this interpleader action to resolve competing claims from the noteholders and the FDIC against collateral funds held by the bank.

Page 60

The case was assigned, this new case, commenced in the district on November 17, 2006 to Judge Huvelle as a related case.

The bank has stipulated in the district court action that the collateral funds it currently holds will not be transferred or distributed pending an order from the District of Columbia court. The FDIC has filed before Judge Huvelle a motion for a stay of all other actions pursuant to the All Writs Act. And the phrase "all other actions" includes, of course, and one supposes is primarily intended to include, the interpleader action which was commenced on November 16 in this Court.

The All Writs Act empowers a district court to issue injunctions, even enjoining actions elsewhere in aid of its own jurisdiction. The point has been made in argument here that in view of the fact that a notice of appeal from Judge Huvelle's opinion has been filed, she has ousted jurisdiction and, consequently, there is no jurisdiction to issue a writ in aid of. It's an interesting argument. I don't undertake to decide it, because that is certainly an argument which must in the first instance be addressed to Judge Huvelle.

I am told that Judge Huvelle has consolidated the preliminary injunction hearing on the injunction prayed for by the FDIC, and trial on the merits, and intends to schedule oral argument around January 8, 2007. I am told that she expects to

Page 61

[1] reach a decision on or around the end of January 2007. And it
[2] is that expedited track that Judge Huvelle has placed the
[3] parties upon which lead me to the conclusion that I should
[4] decide this motion as quickly as I can, and so I attempt to do
[5] that this afternoon.

[6] So in these particular circumstances, the FDIC asks
[7] this Court for "An order staying this action pending further
[8] order of this Court, following resolution of the issues before
[9] Judge Huvelle." I have quoted from the last sentence of the
[10] FDIC's main brief in support of this motion for a stay.

[11] The brief for the noteholders opposing the stay prayed
[12] for by the FDIC says that the FDIC is seeking to quote
[13] "permanently stay this interpleader action." I'm not at all
[14] sure that that is an accurate paraphrase of the relief prayed
[15] for by the FDIC.

[16] In my view, the FDIC is asking for a significantly
[17] more limited stay. And if they were asking for as broad, which
[18] is to say as permanent, a stay as the brief or the noteholders
[19] suggest, I would not grant it. I would grant the more limited
[20] stay, if one has to be granted at all, for reasons that I will
[21] come to.

[22] A stay of proceedings in another forum rests within
[23] the sound discretion of the trial judge to whom the application
[24] is made, and is reviewable by the Court of Appeals for abuse of
[25] that discretion. There are many cases which discuss and

Page 62

[1] describe the circumstances and the criteria which should inform
[2] the trial judge's exercise of that discretion, but any analysis
[3] must begin with Justice Cardozo's opinion in 1936 for the
[4] Supreme Court in Landis v. North American Company. And because
[5] I find so much guidance in that case, and because so many
[6] lesser courts in subsequent years have found so much guidance
[7] in the Landis case, which is still cited and remains the lead
[8] case in the field, I will be quoting from it at some length
[9] this afternoon. It paints with a very broad brush.

[10] In Landis, the Supreme Court undertook to bring order
[11] out of a certain degree of confusion among the circuits as to
[12] when a stay should be granted and what conditions apply to it.
[13] Justice Cardozo began his opinion with this paragraph:

[14] "The controversy hinges upon the power of a court to
[15] stay proceedings in one suit until the decision of another, and
[16] upon the propriety of using such a power in a given situation."

[18] Well, that sums it up, doesn't it? That sums up what
[19] I am about this afternoon. That sums up what all of us are
[20] about this afternoon as counsel try to educate me as to the
[21] nature of the case and the criteria that I should apply.

[22] What was involved in the Landis case was the question
[23] of whether or not the Public Utility Holding Company Act of
[24] 1935 was unconstitutional and void. Electrical companies
[25] didn't like the act very much, and thought it should be

Page 63

[1] declared to be unconstitutional.

[2] The United States, represented by the attorney general
[3] and the solicitor general, felt that the act was proper and
[4] constitutional and should be upheld in all respects; and,
[5] furthermore, that proceedings seeking sanctions against
[6] electrical companies and holding companies should go forward in
[7] order to enforce the turns of the Public Utility Holding
[8] Company Act.

[9] Litigation broke out initially in this fashion: Two
[10] electrical companies filed actions in the United States
[11] District Court for the District of Columbia seeking to hold the
[12] act unconstitutional and void. The Supreme Court decision does
[13] not give the date when that action was commenced, but it does
[14] go on to say that on November 26, 1935, the commission, the
[15] government, that is, filed another complaint in the Southern
[16] District of New York to compel holding companies and utility
[17] systems to register with the commission in accordance with the
[18] act and, in other words, bring themselves within the power and
[19] the effect and the sanctions of the act.

[20] We know or can educe from the opinion in the Court of
[21] Appeals in the Landis case that the actions in the District of
[22] Columbia by the electric companies and the action by the
[23] government in the Southern District were filed simultaneously.
[24] Whether that's just a coincidence or something was going on
[25] behind the scenes, one cannot tell from the opinions. What it

Page 64

[1] does do is to eliminate from this case any appeal that anybody
[2] made to the so-called first filed rule, a judge-made rule which
[3] is referred to in the briefs and arguments in this case, and to
[4] which I will come later on.

[5] But what justice Cardoza's opinion in Landis does is
[6] to instruct us on the power a district judge has to grant a
[7] stay, and the circumstances under which he should do so or
[8] should not do so.

[9] Here is some of the language that I find very helpful
[10] and pertinent:

[11] The Supreme Court said in Landis, "Viewing the problem
[12] as one of power, and of power only, we find ourselves unable to
[13] assent to the suggestion that before proceedings in one suit
[14] may be stayed to abide the proceedings in another, the parties
[15] to the two cases must be shown to be the same, and the issues
[16] identical."

[17] I pause here to reflect that such differences as may
[18] exist between the issues and claims and parties in the District
[19] of Columbia action, in our case, and the issues, claims, and
[20] parties in the case here, the interpleader action, to the
[21] extent that such differences exist, they are not per se
[22] determinative or, to state it more precisely, fatal to the
[23] issuance of a stay by this Court of the proceedings in the
[24] District of Columbia.

[25] To return to the Landis case, the Court said, "The

**BANK OF NEW VYORK v.**
**FIRST MILLENMIUM**

**December 21, 2006**

---

Page 65

[1] power to stay proceedings is incidental to the power inherent
[2] to every court to control the disposition of the causes on its
[3] docket with economy of time and effort for itself, for counsel,
[4] and for litigants.  How this can best be done calls for the
[5] exercise of judgment which must weigh competing interests and
[6] maintain an even balance."
[7]          And then expanding further on that general concept,
[8] the Landis court says this: "True, the suppliant for a stay
[9] must make out a clear case of hardship or inequity in being
[10] required to go forward if there is even a fair possibility that
[11] the stay for which he prays will work damage to someone else.
[12] Only in rare circumstances will a litigant in one cause be
[13] compelled to stand aside, while a litigant in another settles
[14] the rule of law that will define the rights of both.
[15] Considerations such as these, however, are counsels of
[16] moderation rather than limitations upon power."
[17]          And then the Court in Landis turned to the important
[18] public issues that arose out of the constitutionality well
[19] known of the statute in question.  And it is worth reflecting
[20] on the words that were used in that regard:
[21]          "We must be on our guard against depriving the
[22] processes of justice of their suppleness of adaptation to
[23] varying conditions.  Especially in cases of extraordinary
[24] public moment, the individual may be required to submit to
[25] delay, not immoderate in extent, and not oppressive in its

---

Page 66

[1] consequences, if the public welfare or convenience will thereby
[2] be promoted.  In these holding company act cases, great issues
[3] are involved, great in their complexity, great in their
[4] significance.  On the facts, there will be a need for the
[5] minute investigation of intercorporate relations linked in a
[6] web of baffling intricacy.  On the law, there will be novel
[7] problems of far-reaching importance to the parties and the
[8] public that application for a stay in suits so weighty and
[9] unusual will not always fit within the mold appropriate to an
[10] application for such relief in a suit upon a bill of goods.
[11] True, a decision in the cause then pending in New York may not
[12] settle every question, fact, and law in suits by other
[13] companies; but, in all likelihood, it will settle many and
[14] simply them all.  Even so, the burden of making out the justice
[15] and wisdom of a departure from the beaten drive lay heavily on
[16] the petitioner's suppliance for relief and discretion was
[17] abused if the stay was not kept within the bounds of
[18] moderation."
[19]          If the stay was not kept within the bounds of
[20] moderation.
[21]          It is because the Court used that phrase and then said
[22] what it said next, what I will read in a moment, that any stay
[23] which the Court would consider in this case would necessarily
[24] be of limited in duration.  Having used that phrase, within the
[25] bounds of moderation, the Court in Landis then went on to say:

---

Page 67

[1]          "We are satisfied that the limits of a fair discretion
[2] are exceeded insofar as the stay is to continue in effect after
[3] the decision by the district court in the suit against the bond
[4] and share company and until the determination by this Court of
[5] any appeal therefrom."
[6]          Now, the Supreme Court was speaking of the action in
[7] the Southern District of New York.  And what Landis holds, and
[8] the reason it gives for that holding, is stated a little later
[9] on in the opinion:
[10]          "The stay is immoderate."  And I will interrupt the
[11] reading to say that the district court gave a stay which he
[12] sent it right through any appeals to the Court of Appeals or
[13] the Supreme Court.
[14]          Such a stay, the Landis court holds, "is immoderate
[15] and, hence, unlawful, unless so framed in its inception that
[16] its force will be spent within reasonable notice so far, at
[17] least, as they are susceptible of provision and description.
[18] When once those limits have been reached, the fetters should
[19] fall off."
[20]          And it concludes, "If a second stay is necessary
[21] during the course of an appeal, the petitioners must bear the
[22] burden when that stage shall have arrived of making obvious the
[23] need."
[24]          Now, to revert for a moment to my own background in
[25] the admiralty law, it seems to me that the Landis case charts

---

Page 68

[1] the course which I must follow in navigating the question of
[2] whether or not a stay should issue in this case; and, if so, of
[3] what duration.
[4]          There have been, as I have said, a number of cases
[5] that have followed and applied in Landis.  Their general
[6] holdings over the rules that they articulate may be summarized.
[7] It is generally held that in determining whether an action
[8] should be stayed, courts in this circuit generally consider,
[9] one, the private interests of the plaintiffs in proceeding
[10] expeditiously with a civil litigation as balanced against the
[11] prejudice of the plaintiffs as conveyed; two, the private
[12] interests of and burden on the defendants; three, the interests
[13] of the courts; four, the interests of persons not parties to
[14] the civil litigation; and, five, the public interest.
[15]          These factors are to be balanced with a principal
[16] purpose being the avoidance of unfair prejudice to any one or
[17] more of the specifically identified interests to which I've
[18] just referred.
[19]          Now, I want to deal, as I begin my analysis of these
[20] factors and criteria, with certain arguments that have been
[21] made in the briefs and repeated in the able arguments this
[22] morning.
[23]          And the first is that the FDIC accuses the noteholders
[24] primarily, I think it's fair to say, and that the bank is sort
[25] of their having, of the most outrageous sort of forum shopping.

---

Page 69

[1] And the noteholders and the bank return that compliment by
[2] accusing the FDIC of the most outrageous form of forum
[3] shopping. Forum shopping is a, properly condemned in certain
[4] circumstances, litigation tactic followed by counsel.

[5] And there are certain definitions of forum shopping.
[6] One case in our court has said, "Forum shopping occurs when a
[7] litigant selects a forum with only a slight connection to the
[8] factual circumstances of his action or where forum shopping
[9] alone motivated the choice."

[10] And another court has said, "The second example is
[11] where forum shopping alone motivated the choice of the situs
[12] for the first suit."

[13] And then going on to explain the result in that case,
[14] the Second Circuit said, "This, however, is not applicable to
[15] the present case, because Judge Motley made no specific finding
[16] of forum shopping, nor is one inferable, and because the
[17] reasons Playtex asserts justifying the choice of the Georgia
[18] forum are not wholly frivolous."

[19] Now, when I apply those standards, that rather narrow
[20] definition of the approprium which is attached to the concept
[21] of forum shopping, I conclude that neither the FDIC nor the
[22] bank and/or noteholders can be fairly indicted, even less,
[23] convicted, of forum shopping.

[24] There are perfectly apparent non-frivolous reasons why
[25] the bank, holding funds in New York with noteholders and the

Page 70

[1] FDIC, both available in New York, dealing with underlying
[2] documents which provide for the application of New York law,
[3] it's not hard to think of perfectly sound reasons why the
[4] interpleading plaintiff, the bank, came to New York.

[5] Similarly, when one considers the expertise and the
[6] knowledge that Judge Huvelle has obtained and developed in this
[7] case, and has demonstrated, in my view, a finely-wrought and
[8] well-reasoned opinion in September 2006, that gives every
[9] logical reason for the FDIC feeling aggrieved within the
[10] context of Judge Huvelle's decision by the filing of the
[11] interpleader action here to go before Judge Huvelle and seek
[12] regress, as they are doing. There are, in other words, legal,
[13] economic, demographic, jurisdictional, societal, professional
[14] reasons for one side invoking one forum, and the other side
[15] invoking another. And so I don't think this is a forum
[16] shopping case at all.

[17] Another principle that is relied upon, I think
[18] primarily by the noteholders, is what has come to be known as
[19] the first-filed rule. This is a judge-made rule. You won't
[20] find it in the statute or the rules of civil procedure. It
[21] doesn't appear at all in the Landis case for the reasons
[22] stated. The filings were simultaneous. I don't know if
[23] this ever happened before or if it ever happened again, but it
[24] was in that case, so that's why there's no analysis of the
[25] first-filed rule.

Page 71

[1] The first-filed rule is, as I have said, judge-made.
[2] And if one speaks again in general terms, the reported cases
[3] stand for these propositions where two courts have concurrent
[4] jurisdiction over an action involving the same parties and
[5] issues. Courts will follow a first-filed rule whereby the
[6] Court which first has possession of the action decides it. It
[7] is applicable only where, in fact, the suits are duplicative;
[8] thus, the principle requires a substantial overlap between the
[9] cases in that they have identical or substantially similar
[10] parties and claims.

[11] However, the rule need not be applied where there is a
[12] showing of balance or convenience or special circumstances,
[13] giving priority to the second case. Special circumstances
[14] include situations where there is only a short span of time
[15] between the filing of the two actions, or where there is a lack
[16] of progress in either litigation, or where the interest of
[17] justice favors the second action. The determination as to
[18] whether there are circumstances warranting departure from the
[19] first-file rule is committed to sound discretion of the
[20] district court.

[21] Now, how about this case? Certainly the observation
[22] in case law that a special circumstance arguing against the
[23] application of the first-filed rule arises where there is only
[24] a short span of time between the filing of the two actions is
[25] present here. And that is so even if I reject the FDIC's

Page 72

[1] argument that the first-filed action was the conversion action
[2] back in 2003. Well, if one accepts that, then that's the first
[3] filed action, and the interpleader is number two, I suppose,
[4] and the return to Judge Huvelle is number three.

[5] The bank and the noteholders say that because of the
[6] differences between the actions, the 2003 conversion action
[7] against the FDIC should not be regarded as the first-filed
[8] action. And that brings us, of course, into a consideration of
[9] what the similarities and differences are between the two
[10] actions. That is a question which sort of runs like a theme
[11] throughout a number of the issues that arise on this motion.

[12] But even if one accepts the contention of the
[13] noteholders and the bank that the 2003 action should be
[14] disregarded for first-filing analysis, it's something like 12
[15] hours' difference, I think the interpleader was filed in the
[16] nighttime on November 16th, and the FDIC was before Judge
[17] Huvelle on the morning of November 17th. And this is just not
[18] a span of time which argues is for a strict application or,
[19] indeed, any application at all of the first-file rule.

[20] And another special circumstance is where the
[21] interests of justice favors the second action. And it is
[22] there, I think, that the core of the case really lies. But
[23] before I come to that core or, rather, on my way to reaching
[24] it, I must deal with some of the other contentions that are
[25] made by the parties.

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December 21, 2006

---

Page 73

[1]   I have to say that I am not persuaded by the bank's
[2] contention that it cannot adequately represent the noteholders
[3] before Judge Huvelle. That particular contention was very ably
[4] made by Mr. Harris. He gave me an interesting court case to
[5] read coming out of the District of Columbia Circuit, but I
[6] don't think the facts of that case bear any meaningful
[7] resemblance to our case.
[8]   The Court of Appeals stated the general proposition to
[9] which Mr. Harris referred. But the facts were that the trustee
[10] was trustee for the members of a labor union. The trustee had
[11] entered into that fiduciary relationship when everybody in the
[12] labor union got on well with each other. But then the time
[13] came when the union split into two warring camps, and the
[14] trustee, understandably enough, felt that it could no longer
[15] adequately represent one or the other.
[16]   I think that that is a very significant difference in
[17] the facts of that case and this one, because here, the Bank of
[18] New York acts as trustee for the noteholders, and there is no
[19] division, no differences, no disagreements, no quarrels between
[20] the noteholders in this case. On the contrary, they say with
[21] one voice that they are owed monies which are not being paid to
[22] them, and they are aggrieved by that.
[23]   And so what one must ask oneself is whether the
[24] fiduciary responsibilities, very brave and serious
[25] responsibilities, which I know the bank recognizes that it owes

Page 74

[1] to the noteholders, have been reduced, minimized, changed,
[2] shrunken in any way, by anything that has happened since the
[3] bank first saw fit to take upon itself those fiduciary duties.
[4]   I am not persuaded that that has occurred.
[5]   Surely the bank was not of the view that it had
[6] occurred, when in 2003, it commenced on behalf of the
[7] noteholders the conversion action for the noteholders' benefit,
[8] not for the bank's benefit, against the FDIC. And that was the
[9] case that came on before Judge Huvelle and was decided by her.
[10]   The 2006 injunction action commenced on November 17 by
[11] the FDIC against the other parties is a return to Judge
[12] Huvelle's court, the parties coming before her again not in the
[13] context of what they hope she will do in the initial action,
[14] but in consequence of what the parties say or deny has occurred
[15] or should not be allowed to occur in consequence of what she
[16] has done.
[17]   Why is it that the bank, uninhibited in any way from
[18] representing the noteholders in 2003, is now not able to do so,
[19] is not able to adequately represent the noteholders? Why is it
[20] that the noteholders are unrepresented indispensable parties,
[21] the phrase that counsel used today? It can be only because,
[22] and this is the reason given, the bank now finds itself
[23] confronted as of November 16, and a few days before, with
[24] conflicting claims to funds which it holds. Does that create
[25] an impossibility for the bank to adequately represent the

Page 75

[1] noteholders before Judge Huvelle? I am not persuaded that it
[2] does. And even if it did, I am not persuaded that that is a
[3] reason for withholding a stay of this action.
[4]   Mr. Christensen says that the noteholders would have
[5] absolutely no standing to take part in the renewed battle
[6] before Judge Huvelle. I'm not at all sure he's right. I'm not
[7] sure that an application for intervention as of rite under Rule
[8] 24(a) might not lie in favor of the noteholders, if, in fact,
[9] they are not adequately represented by the bank.
[10]   But I am not persuaded that the bank cannot continue
[11] to act as an adequate representative of the noteholders,
[12] perhaps with an informal under-the-table assist from able
[13] counsel for the noteholders as to what sort of arguments should
[14] be made before Judge Huvelle. I want to be very careful about
[15] this. I am giving you my own personal views as to whether the
[16] bank can be a sufficiently independent and energetic and
[17] professional protector of the noteholders' interests before
[18] Judge Huvelle.
[19]   But really, it seems to me, that's a question in the
[20] first instance to be considered by Judge Huvelle. She has an
[21] interest in making sure that everyone whose interests may be
[22] affected by her judgments are adequately represented. If the
[23] bank feels that it can no longer adequately represent the
[24] noteholders, there is nothing to stop counsel for the bank from
[25] saying that to Judge Huvelle. And they can cite that D.C.

Page 76

[1] Circuit case that Mr. Harris cited me, which didn't carry the
[2] day with me, but it might with her.
[3]   But I do say this much, and I think it falls to me to
[4] say this: That to the extent that prejudice to the bank is
[5] urged as a ground for denying the stay that the FDIC seeks, I
[6] am not persuaded by it; nor am I persuaded by the bank's
[7] argument that it would be prejudiced if they cannot go full
[8] speed ahead with the interpleader here by being caught in a
[9] crossfire of competing claims or judgments of contempt or
[10] judges angry at them or money being spent out to the wrong
[11] horse if they back the wrong horse. I simply don't think that
[12] those risks arise to a sufficient degree to inform my decision.
[13]   It seems to me that the bank is adequately protected
[14] from claims that they were the cause of financial harm to
[15] either of the interpleaded defendants by adhering to and
[16] following and obeying whatever orders may be made by any court
[17] of competent jurisdiction after appeals, if any. It's simply a
[18] question of doing what the law tells you to do. And the law in
[19] this case will be declared by judges.
[20]   Now, how about the noteholders? I've already said
[21] that I think that they will be adequately protected by the
[22] bank; but, if not, they have remedies available to them which
[23] they can ask Judge Huvelle to extend to them.
[24]   It is said that if interpleader is delayed or
[25] postponed by a month, a week, a day, an hour, a minute, the

---

December  21, 2006

Page 77

[1] collateral will drain away and disappear.  I have a little
[2] trouble understanding that because the bank, again, on behalf
[3] of the noteholders, entered into a stipulation before Judge
[4] Huvelle after the most recent action was commenced by the FDIC,
[5] in which the bank stipulated that the funds which it held would
[6] remain on hand and not be transferred or distributed to anybody
[7] pending the further orders of Judge Huvelle, which, it seems to
[8] me, inures not only the benefit of the bank, but it also inures
[9] to the benefit of the noteholders and furnishes a significant
[10] degree of protection to them.
[11]      How great prejudice to the FDIC if the stay is not
[12] granted?  Justice Cardozo made it quite plain that the
[13] suppliant, the applicant for a stay, in most cases, must show a
[14] significant degree of prejudice if the stay prayed for is not
[15] granted.  I think that on that aspect of the case,
[16] Mr. Christensen does not make a particularly strong showing.
[17] We went around that a bit, he and I, and I think at the end of
[18] the day, the main thrust of the prejudice he saw to the FDIC
[19] was requiring the taxpayers to pay perhaps more money than they
[20] otherwise would have to Mr. Christensen's fine law firm.  It's
[21] hard to see any other specific degree of prejudice.
[22]      If the stay is granted, and certain things happen in
[23] Judge Huvelle's courtroom, then the boundaries of litigation
[24] may be narrowed or reduced here with some saving in legal fees.
[25] I don't think that's a very strong showing of prejudice to the

Page 78

[1] party applying for the stay.
[2]      But I want to go back, sort of, to where I began with
[3] the Landis case, because I don't read justice Cardozo balancing
[4] the amount of prejudice to the holding companies as against the
[5] amount of prejudice to the government if the stay was granted
[6] or withheld.
[7]      In the passage which I wrote, which I read towards the
[8] end of my quotations from Landis, it seems to me that what the
[9] Court really focused on was the complexity of the case, and the
[10] importance of the public issues involved, and the necessity
[11] within the context of the proper and efficient and prompt
[12] administration of justice to stay one proceeding in deference
[13] to the other.
[14]      And so what the Supreme Court did in Landis was to
[15] allow the Southern District of New York case to go forward and
[16] staying the simultaneously begun actions brought by the holding
[17] company plaintiffs in the District of Columbia.
[18]      Here we have, again, the Southern District of New York
[19] and the District of Columbia staring at each other.  There is a
[20] certain ironic symmetry to that, I suppose.  But what the Court
[21] also did was to limit the duration of the stay.  The district
[22] court in Landis granted the stay pending -- and this is the
[23] district court in the District of Columbia, granted a stay so
[24] the Southern District action should go forward.  And the
[25] district judge in the District of Columbia said that that stay

Page 79

[1] would stay in effect until the district judge in the Southern
[2] District of New York spoke, and the Second Circuit spoke, and
[3] the Supreme Court decided the case.
[4]      That opinion granting the stay by the district judge
[5] in the District of Columbia was appealed to the D.C. Circuit
[6] where four judges issued three opinions, none of them majority
[7] opinions, and then remanded the case to the district court with
[8] instructions to proceed in conformity with this opinion.  And
[9] so the Supreme Court took it up quickly enough and said that
[10] the stay was properly granted, but it was excessive in length.
[11]      And so the holding was that the proceedings in the
[12] District of Columbia would be stayed until the district judge
[13] in the Southern District had decided the action commenced by
[14] the government testing the constitutionality of the statute.
[15] And after the district judge had done that, the fetters, in
[16] Justice Cardozo's phrase, would fall off.  And if anybody
[17] wanted to vacate a stay or, to state more accurately, the party
[18] obtaining the original stay wished to renew it, it would have
[19] to come back to the district judge.
[20]      I follow that template in this case.
[21]      I stay the proceedings in the interpleader action in
[22] the Southern District of New York until Judge Huvelle has heard
[23] counsel and issued her decision on the claims for relief
[24] asserted by the parties in the action which was commenced in
[25] 2006 by the FDIC, and referred to Judge Huvelle as a related

Page 80

[1] case.  When that decision comes down, the stay which I impose
[2] this afternoon is dissipated.  And if the FDIC wishes it to be
[3] reimposed, it must come and show me why it should be.
[4]      In reaching that conclusion, I have done the best I
[5] can to consider and balance the factors which inform my
[6] decision as to whether or not to issue a stay.
[7]      And the transcript will be prepared on an expedited
[8] basis, and edited in nonsubstantive ways only by me.  And then
[9] I will send a copy with the compliments of the season to my
[10] judicial colleague, Judge Huvelle.  And counsel for the parties
[11] very ably represented today, and I commend you all, may make of
[12] that what they will.
[13]      That is the Court's decision.
[14]      Any questions?  Any comments?  Well, I'm not asking
[15] your comments, but are there any questions you want to ask to
[16] make sure that the resolution by this Court is understood and
[17] counsel receive sufficient enlightenment from it?  Mr. Edelman.
[18]      **MR. EDELMAN:**  Your Honor, I do have one question about
[19] your order.  In order to avoid prejudice to the noteholders,
[20] pending this action reconvening after the stay ends when
[21] there's a decision in the D.C. court, I would ask this Court to
[22] also ensure that the collateral at issue not be dissipated
[23] until this Court decides what to do with it after this case
[24] reconvenes.  Otherwise, we're at risk that our collateral --
[25]      **THE COURT:**  That the collateral not be dissipated.

**BANK OF NEW VYORK v.**
**FIRST MILLENMIUM**

**December 21, 2006**

Page 81

[1] What about the effect of the stipulation entered into by the
[2] bank, which is, after all, a party that's holding this money in
[3] the proceedings before Judge Huvelle? I gather that you,
[4] speaking on behalf of the noteholders, do not feel sufficiently
[5] protected by that, is that so?
[6]     **MR. EDELMAN:** That is emphatically we do not feel
[7] protected at all.
[8]     **THE COURT:** At all. Well, you and I may quarrel with
[9] each other; well, not quarrel, disagree. But tell me, while I
[10] have the benefit of your guidance, draft in your mind or you
[11] can send it to me tomorrow with copies to counsel, if you've
[12] got a proposed order you'd like me to enter along those lines,
[13] what would you like me to say.
[14]     **MR. EDELMAN:** I would say that the collateral should
[15] not be transferred to any parties from the Bank of New York
[16] pending this Court's further ruling.
[17]     **THE COURT:** Pending my further ruling.
[18]     **MR. EDELMAN:** Yes.
[19]     **THE COURT:** If I want a form for that, I can look and
[20] see what Judge Huvelle says. I suppose that sounds very much
[21] like the stipulation before her.
[22]     **MR. EDELMAN:** The collateral is our collateral, and
[23] we're not a party to the D.C. --
[24]     **THE COURT:** I understand. But you are represented
[25] there. But we won't go around that again.

Page 82

[1]     All right. You want an order from this Court that
[2] directs that the collateral funds presently held by the Bank of
[3] New York shall not be distributed, transferred, paid to anybody
[4] pending a further order of this Court. Is that what you're
[5] after?
[6]     **MR. EDELMAN:** Yes, your Honor, because you can then
[7] look at what the D.C. court does, and you can decide whether it
[8] has fully answered the questions that this Court needs
[9] direction for to deal with the issues before it, and then this
[10] Court can make an informed decision on what --
[11]     **THE COURT:** It's an order which should be directed to
[12] your client. Mr. Harris, do you object to that in principle?
[13]     **MR. HARRIS:** No objection.
[14]     **THE COURT:** Does the FDIC object to it in principle?
[15]     **MR. CHRISTENSEN:** I would have to consult with my
[16] client, your Honor. And I'd like to see the text of the order
[17] before agreeing to it. If counsel wants to prepare a draft,
[18] could circulate it --
[19]     **THE COURT:** I'll give you an order. I'll give you an
[20] order right now. I'll go slowly so you can write it down. Are
[21] you ready?
[22]     This Court, having read the briefs of counsel, and
[23] having heard the oral arguments of counsel, and being fully
[24] advised in the premises, hereby orders;
[25]     1. Proceedings in the above-captioned action are

Page 83

[1] stayed pending the further decision of the United States
[2] District Court, for the District of Columbia, (Honorable Ellen
[3] S. Huvelle, Judge) in that case bearing docket number
[4] C 06-1975; provided, however, that the interpleader plaintiff,
[5] Bank of New York, shall, with respect to the collateral funds
[6] currently in its possession as indenture trustee, make no
[7] distribution, payment, transfer, or any other disposition to
[8] any party or interest without a further order permitting such
[9] conduct and entered by this Court.
[10]     Does that meet your approval, Mr. Edelman?
[11]     **MR. EDELMAN:** I believe it does.
[12]     **THE COURT:** All right.
[13]     **MR. HARRIS:** I don't want to speak to Mr. Edelman, but
[14] it leaves the bank a little bit uncertain with funds that come
[15] in. As you know, there are payments the 15th of each month.
[16] And the funds currently in that bank account, we will expect
[17] the next traunch of funds January 15, and I don't know whether
[18] Judge Huvelle will have ruled back then.
[19]     **THE COURT:** Now you have carried me into waters beyond
[20] my depth. I think I made what I wanted to do sufficiently
[21] clear in principle. I invite counsel to work together and
[22] agree on the language of an order, if you can.
[23]     **MR. HARRIS:** Your Honor, the bank has no objection and
[24] thinks it's quite appropriate that your order cover all funds
[25] that are or will become part of the res in this interpleader

Page 84

[1] action, that we continue to hold those until the further order
[2] of this Court.
[3]     **MR. EDELMAN:** Thank you.
[4]     **THE COURT:** You heard what counsel said.
[5]     **MR. EDELMAN:** I did. And I assume we'll look at the
[6] language and make sure everyone is comfortable. But I agree
[7] with the concept.
[8]     **THE COURT:** Okay. But following up on what Mr. Harris
[9] said, I endorse it by saying "so ordered." So now you've got a
[10] record containing the order. And if it needs to be refined or
[11] if Mr. Christensen wants to consult with his colleagues, then
[12] you will have to apply to me.
[13]     But what I'm trying to do is to grant the application
[14] which Mr. Edelman made to me so that the noteholders may be
[15] protected in this Court, as I think they are before Judge
[16] Huvelle.
[17]     I'm trying to grant you the limited relief you asked
[18] for, Mr. Edelman. I think I've done it. But if when you think
[19] all this over and feel I haven't, come back to me and we'll
[20] work on it some more.
[21]     **MR. EDELMAN:** I think you have also. I would like to
[22] just look at the language. But I think this does it, and I
[23] agree.
[24]     **THE COURT:** Sure. All right. Fine.
[25]     **MR. EDELMAN:** Thank you.

December 21, 2006

BANK OF NEW VYORK v.
FIRST MILLENMIUM

Page 85

[1]     **THE COURT:** For the present, Mr. Christensen, I'm
[2] assuming that the FDIC is not going to object to this fair,
[3] even-handed and beautifully expressed direction that I have
[4] made. But if you don't see it that way, you know where I am.
[5]     **MR. CHRISTENSEN:** Yes, your Honor.
[6]     **THE COURT:** All right. Thank you. I'm obliged to
[7] counsel.
[8]     **MR. HARRIS:** Thank you, your Honor.
[9]     **MR. EDELMAN:** Thank you, your Honor.
[10]              * * *
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Min-U-Script®          CONFERENCE

**$**

$10,000 26:4
$5,000 26:2

**0**

06-1975 83:4

**1**

1 82:25
100 26:6,17;39:6;48:20
110 21:22;22:8
112 15:10;37:7;39:10
11th 16:10;27:7,8
12 14:15;50:22;72:14
14 15:8
15 83:17
15th 49:7,17;83:15
16 19:6;43:21;58:22;
59:13;60:11;74:23
1631 23:3
16th 72:16
17 19:6;59:15;60:2;74:10
17th 72:17
1821e13A 14:15
19 25:13,17
1935 62:24;63:14
1936 62:3
1940 21:22

**2**

2 15:20;55:3,5
2:15 55:10
20 21:2;37:8
2000-1 39:2;49:6,16
2002 9:21;15:9;50:10;
57:15
2003 9:22;11:15;14:8;
15:18;33:15;34:10;36:4;
40:23;46:17;48:11,25;54:5;
57:25;59:18;72:2,6,13;
74:6,18
2004 50:2
2006 15:8;40:22;54:11;
57:20;58:6,22;59:11,11,15;
60:2;70:8;74:10;79:25
2007 9:4;60:25;61:1
2361 32:18
23rd 50:2
24a 75:8
26 63:14
27 57:20;58:6;59:11,23
2772860 59:11
28 15:16;23:3;32:18
2d 50:20

**3**

30 8:6

**360.6** 40:7;50:22
**3805** 39:23

**4**

**453** 50:20

**5**

**5.08** 41:15 ·
**505b** 44:22
**539** 22:8
**542** 21:22;22:8

**6**

**6** 14:11;15:12
**65** 17:20

**7**

**72** 37:7
**75** 14:8

**8**

**8** 60:25

**9**

**98** 50:20
**99** 50:20

**A**

abide 5:12;64:14
able 5:14,16,19;6:12;31:5;
51:21;68:21;74:18,19;
75:12
ably 73:3;80:11
above 26:19
above-captioned 82:25
absence 22:19;25:12
absent 22:16;27:15
absolute 41:17,20
absolutely 15:18;26:18;
75:5
Absolutely 17:7,9;52:7
abuse 61:24
abused 66:17
accelerated 44:23
acceleration 12:16;
38:14;49:5
accept 43:3
accepts 29:23;72:2,12
accordance 13:3;17:5;
25:12;57:18,20;59:8;63:17
account 24:25;31:16;
83:16
accurate 61:14
accurately 79:17
accuses 68:23
accusing 69:2

act 13:3;57:14;62:25;63:3,
12,18,19;66:2;75:11
Act 17:25;58:9;60:9,13;
62:23;63:8
acted 9:20;45:5
acting 17:20
action 7:10,10,15;11:25;
12:14,20;13:15,18,22;14:1;
15:19,23;18:2,3,5,8;19:5,
12,18;23:2;24:17;29:25;
30:14,22;33:12,14,15,18;
36:8,23;37:6;40:17,17,22,
22,23;41:3,22;42:8;43:2;
44:5,5,21;45:12,18,23;
46:14,23,25;48:10,12;
54:11,11,12,18;56:15;
57:23;58:23;59:12,19,21;
60:4,11;61:7,13;63:13,22;
64:19,20;67:6;68:7;69:8;
70:11;71:4,6,17;72:1,1,3,6,
8,13,21;74:7,10,13;75:3;
77:4;78:24;79:13,21,24;
80:20;82:25;84:1
actions 42:21;46:21;
48:14;58:1;60:8,9,14;
63:10,21;71:15,24;72:6,10;
78:16
acts 13:19;15:2;57:5;
73:18
actually 6:8;34:4;38:23;
39:3
Actually 49:6
adaptation 65:22
add 6:4;10:23,24
addition 11:10;27:1
additional 4:19,22;7:3;
10:24;22:17
address 21:2,7
addressed 16:22;58:5;
60:21
addressing 4:4;40:18
adequate 21:11;75:11
adequately 27:13;34:19;
51:22;73:2,15;74:19,25;
75:9,22,23;76:13,21
adhering 76:15
adjourned 55:5
adjudicate 36:14,18,19
adjudicated 43:17
adjudication 34:8
administer 38:11
administration 30:25;
31:22;78:12
admiralty 67:25
admit 27:4
admitted 5:2
advance 35:4
advantage 4:23
adversaries 19:25
adversary's 56:8
adverse 21:12;22:13;25:3
advised 11:24;82:24
affect 34:14

affected 75:22
afternoon 5:16;55:12;
61:5;62:9,19,20;80:2
afterwards 47:20
again 8:8;37:16;46:8;
47:5;49:13;52:1;70:23;
71:2;74:12;77:2;78:18;
81:25
against 11:14;13:20,22;
20:7,12;27:19;33:15;35:22,
24;36:3,11,12,13,14,20;
37:11;41:20;44:23;46:11,
18;50:12;58:24;63:5;
65:21;67:3;68:10;71:22;
72:7;74:8,11;78:4
agency 58:2
aggrieved 70:9;73:22
ago 49:8;58:20
agree 20:17;27:10;35:18;
47:14,25;83:22;84:6,23
agreed 40:9
agreeing 82:17
agreement 9:2;28:6;
47:16
ahead 76:8
aid 17:25;23:14;60:14,18
Aldman 13:5
Alexander 26:20
allegation 15:7
alleged 59:16
alleges 14:9;57:9
alleging 33:15;59:20
allocation 44:8
allow 4:18;17:21;31:11;
41:6;47:2;53:7;78:15
allowed 11:11;58:10;
74:15
allowing 43:10
allows 17:20;57:7
almost 13:7;17:10,13
Almost 31:18
alone 69:9,11
along 28:22;81:12
although 4:1;13:23;
17:14;31:14
always 4:25;5:22;52:10;
66:9
American 62:4
among 62:11
Amorosa 21:6
amortization 15:9;58:5,
11
amount 38:20;78:4,5
amounts 44:8
analysis 7:12,13,16;
29:24;30:3;31:1;43:1;62:2;
68:19;70:24;72:14
and/or 69:22
and-a-half 9:23
angry 47:25;76:10
answered 82:8
anymore 38:4;48:19
apart 51:11

apparent 6:9;30:13;69:24
appeal 9:25;11:16;16:7;
51:3;7:54:14;58:18;60:16;
64:1;67:5,21
appealed 58:17;79:5
appealing 30:8
appeals 67:12;76:17
Appeals 5:24;45:12;54:6;
58:18;61:24;63:21;67:12;
73:8
appear 16:2;20:4,6;30:10;
70:21
appeared 19:6
appearing 17:2;56:7
appellate 23:17,17;51:25
applicable 69:14;71:7
applicant 77:13
application 6:12;18:7;
25:5;61:23;66:8,10;70:2;
71:23;72:18,19;75:7;84:13
applied 17:16;68:5;71:11
apply 62:12,21;69:19;
84:12
applying 7:18;31:23;78:1
appointed 28:19
appointment 58:14
approach 16:7;23:5;35:7
appropriate 66:9;83:24
approprium 69:20
approval 83:10
approximately 16:10
argue 35:4
argued 6:22
argues 51:20;72:18
arguing 10:3;52:3;71:22
argument 7:3,5;17:5;
18:18;20:4;25:2,5,16;
27:23;35:19;50:21;52:6,8;
54:23;60:15,19,20,25;72:1;
76:7
arguments 15:4,16;6:9,13,
18;7:4,8,22;18:15;31:6;
35:13,17;40:20;41:2;49:24;
55:3;56:6;59:20;64:3;
68:20,21;75:13;82:23
arise 72:11;76:12
arises 71:23
arose 65:18
around 33:10;40:2;59:23;
60:25;61:1;77:17;81:25
arrived 67:22
arriving 4:20
art 52:22
articulate 68:6
aside 30:16;65:13
aspect 77:15
aspects 15:15
assent 64:13
assert 20:11,17;50:9
asserted 20:12,18;28:8;
79:24
asserting 20:7
asserts 69:17

**December 21, 2006**

asset 57:3
assets 36:25;37:22,23,24;
38:1,4,4;39:21;40:10
assiduously 27:17
assigned 60:1
assist 75:12
assistance 5:10;8:4
association 56:19
assume 7:17;84:5
assuming 54:16;85:2
attached 69:20
attempt 33:12;59:22;61:4
attorney 63:2
authority 32:19;39:13
automatically 28:10
available 21:18;29:2,22;
70:1;76:22
avast 58:12
avoid 19:1;80:19
avoidance 68:16
avoided 27:18
aware 13:21
away 6:10;45:14;77:1

**B**

back 6:7,14;16:13;45:2;
52:10;53:19;54:13;55:3;
57:3;72:2;76:11;78:2;
79:19;83:18;84:19
background 67:24
badly 48:6
baffling 66:6
balance 65:6;71:12;80:5
balanced 68:10,15
balancing 78:3
Baltimore 23:11
bank 4:4;8:2;12:9,13,13,
18;13:1;14:11,23;16:1;
20:5;21:1,11,12,13,17,20;
22:22;23:5;25:1,2,4,18,23,
24;26:1,8,27:25;28:3,10;
29:12;31:5;35:9;54:21,24;
57:7,9,13,17,18;58:8,12,
20,25;59:1,3,6,7,13,21;
60:4;68:24;69:1,22,25;
70:4;72:5,13;73:25;74:3,5,
17,22,25;75:9,10,16,23,24;
76:4,13,22;77:2,5,8;81:2;
83:14,16,23
Bank 8:16,17,19,23,25;
9:19,24;11:2,13,15,17,22;
13:7,8;14:9,18;17:3,11;
18:21;19:16;20:16;21:4;
24:22;27:11;28:2;34:11;
35:3,13,21,24,25;36:5,8,9;
37:1,4,11,11,13,19,24;
38:5,6,8;40:14;41:2;42:9;
43:2;45:17,24;47:2,6,10,
13,15,18,24;48:1,22;50:6;
51:2,5,6,20:52:25;53:3;
54:4;56:16;57:5,25;58:22;
73:17;81:15;82:2;83:5

banking 48:17;56:19
bank's 6:22;21:8,10;23:5;
24:17;35:18;58:2;59:5;
73:1;74:8;76:6
bar 7:22
barred 6:23
bars 7:9
based 7:22;18:14;25:1,
18;27:24;42:7;46:17;58:1,
4,14
basically 48:16
basis 5:5;48:25;80:8
battle 75:5
bear 67:21;73:6
bearing 83:3
beaten 66:15
beautifully 85:3
became 57:15
become 83:25
becomes 6:9
beg 14:5
began 62:13;78:2
begin 62:3;68:19
begins 8:4
begun 78:16
behalf 8:12;11:14;35:14,
17;36:5;51:25;52:2;54:24,
24;57:25;74:6;77:2;81:4
behind 63:25
belabor 24:16
Bell 26:20
bench 5:15;55:12
beneficial 39:20,23
beneficiaries 51:22
beneficiary 44:19
benefit 5:23;28:3;34:12;
47:8;52:11;74:7,8;77:8,9;
81:10
benefits 34:7
beside 15:13
best 56:9;65:4;80:4
bet 24:8
better 26:23;54:19,20
beyond 26:19;83:19
big 26:25
bill 66:10
binds 17:10
bit 25:10;46:7;77:17;83:14
bitterly 17:1
blatant 33:12
blatantly 33:19
bond 67:3
bondholders 17:10
book 27:21
borders 6:11
borne 5:8
both 6:23,25;7:18;10:14;
15:24;16:15;23:14;36:6;
38:21;47:21;50:25;55:15;
65:14;70:1
bottom 28:12
bound 17:3,8;27:10,12,
15;31:13;51:2;52:8

boundaries 77:23
bounds 66:17,19,25
brave 73:24
breach 59:5
break 5:17;6:8
breath 7:1
brief 6:19;11:8;15:16,20;
17:15,17;22:4;43:21;45:22;
52:21;61:10,11,18
briefed 22:5
briefly 4:11
briefs 30:11;64:3;68:21;
82:22
bring 50:14;51:3;62:10;
63:18
brings 41:9;72:8
broad 61:17;62:9
broke 63:9
Brophy 21:21;22:9
brought 29:20;46:17;
56:15;78:16
brush 62:9
burden 66:14;67:22;
68:12
business 13:2;24:22,23

**C**

cake 27:21
calculus 7:25
called 21:21;24:9;44:23;
57:1
calls 65:4
came 58:16;57:23;70:4;
73:13;74:9
camps 73:13
can 4:16;6:7,10;7:15;
10:19;12:9;20:18;22:21;
24:18,20;25:18;26:16,19,
22;29:4,8;31:14;32:1;
33:23;36:14,18;37:18;40:1;
43:16;47:15;49:14;52:7,10;
55:7;61:4;63:20;65:4;
69:22;74:21;75:16,23,25;
76:23;80:5;81:11,19;82:6,
7,10,20;83:22
capacity 23;46:19
capital 45:14
card 44:11
Card 57:2
cardholders 56:23
Cardoza 9:13
Cardoza's 64:5
Cardozo 46:1;62:13;
77:12;78:3
Cardozo's 62:3;79:16
cards 56:20
careful 75:14
carried 83:19
carry 43:19;76:1
case 5:2;14:6;6:9:2,13,15;
11:16,18;13:12,21;14:3,6;
13:6;14:13;15;16:11;21:9,21;

22:4;25:11;27:14,24;29:14,
17;30:5;31:8,10;32:22;
33:5;35:5;39:20;43:7;46:2,
6;52:1,4;54:4,5,12,15;55:4,
5,14;56:10;60:1,1,3,6;62:5,7,
8,21,22;63:21;64:1,3,19,
20,25;65:9;66:23;67:25;
68:2;69:6,13,15;70:7,16,
21,24;71:13,21,22;72:22;
73:4,6,7,17,20;74:9;76:1,
19;77:15;78:3,9,15;79:3,7,
20;80:1,23;83:3
cases 6:4;7:17;14:4;
15:17;16:15;17:14;22:9;
56:2;61:25;64:15;65:23;
66:2;68:4;71:2,9;77:13
categorically 41:13
caught 76:8
cause 33:18;46:23;47:9;
48:10;65:12;66:11;76:14
caused 15:10
causes 65:2
central 8:15
certain 57:8;62:11;68:20;
69:3,5;77:22;78:20
certainly 13:24;18:13;
27:9;28:1;30:16;31:12;
51:23;60:20
Certainly 71:21
CFR 40:7;50:22
chambers 51:10
champion 12:8
chance 16:6
changed 51:12,16,16,17;
74:1
changes 51:24;56:1
changing 6:1
characterization 50:6
charge 19:25
charged 22:13
charges 56:22
chart 15:17,17,20;33:20,
21
charts 16:3;30:11,18;
31:7;67:25
checked 24:6
Christensen 46:3
choice 69:9,11,17
Christensen 8:12;9:13;
16:7;18:17;20:24;75:4;
77:16;84:11;85:1
CHRISTENSEN 8:11;
9:18;10:10,23;12:2,10,22;
13:6;14:5;15:6;16:8;17:7,
9,18;18:10,13,19;19:14;
20:15;49:22;51:23;52:7,19,
23;53:3,12,15,18;82:15;
85:5
Christensen's 77:20
circuit 27:14;68:8
Circuit 21:22;51:1,3,24;
58:17;18;69:14;73:5;76:1;
79:2,5

22:4;25:11;27:14,24;29:14,
circuits 62:11
circulate 82:18
circumstance 71:22;
72:20
circumstances 5:25;
30:5;43:5;57:8;61:6;62:1;
64:7;65:12;69:4,8;71:12,
13,18
citation 22:7;32:15,21
citations 6:4;56:1
cite 40:2;75:25
cited 11:8;27:24;31:10;
62:7;76:1
city 26:25
civil 68:10,14;70:20
claim 13:20,22,24;15:11;
26:6,7,17;31:21,21;50:9,
11,13;57:12
claimant 45:11
claims 7:18;9:21;14:3;
15:23;16:3;20:7,11,12;
24:18;28:8;34:23;35:1,24;
36:3,11,11,13,14;48:17,18,
19;57:10,11,17;58:22,23;
59:24;64:18,19;71:10;
74:24;76:9,14;79:23
clarify 16:21
clashed 51:13
clause 12:16;15:9;38:14,
15;49:5;58:5,11
clauses 49:14
clear 5:22,22;9:15;29:14;
45:24;54:2;65:9;83:21
clearly 24:16;42:6
clerk 5:18;8:7;24:9
client 82:12,16
close 19:15
code 39:22
Code 39:23;40:7;50:19
coincidence 63:24
collateral 19:12;30:23;
31:19;34:11,15;35:2,2,25;
36:22;37:1,3,7,8,12,19,20,
23;38:6,9,10,11;39:5,12,
15,25;40:13,13,19;41:9;
43:14,24;44:6,7,8,9,17,24;
45:6,7,16,18;46:11,16,20;
47:1,3,6,7,21;48:21;50:3,7;
54:17;57:7;58:24;59:3,7;
60:5;77:1;80:22,24,25;
81:14,22,22;82:2;83:5
colleague 21:5;80:10
colleagues 84:11
collision 23:10
Columbia 8:18,24;9:23;
10:15;11:5,13,17,20;12:21;
13:10;14:19;15:4;35:11;
41:22;50:25;51:1,8;54:6;
55:17;57:22;58:18;59:10,
18,20;60:7;63:11,22;64:19,
24;73:5;78:17,19,23,25;
79:5,12;83:2
comfortable 84:6

coming 73:5;74:12
command 6:16
commenced 36:5,8;
45:24;59:21;60:1,11;63:13;
74:6,10;77:4;79:13,24
commend 80:11
comment 4:9
comments 80:14,15
commission 63:14,17
committed 53:25;71:19
common 24:2
companies 62:24;63:6,6,
10,16,22;66:13;78:4
company 66:2;67:4;
78:17
Company 57:15;62:4,23;
63:8
comparing 15:17;16:2
compel 63:16
compelled 65:13
competent 76:17
competing 35:24;58:21,
23;65:5;76:9
complaint 6:23;14:8,20;
63:15
complexity 66:3;78:9
complicated 16:16;50:4
compliment 69:1
compliments 80:9
compromised 52:4
concept 20:10;65:7;
59:20;84:7
concern 46:7
concerned 9:17;12:8;
15:23;19:9
concert 17:20
conclude 69:21
concluded 29:3;55:11
concludes 67:20
conclusion 48:14;61:3;
80:4
conclusive 22:15
concurrent 71:3
condemned 69:3
conditions 12:3,5;53:5;
62:12;65:23
conduct 13:25;15:2;83:9
confident 5:4;26:16;54:2
conflict 11:3;19:3;28:10,
17,22,22
conflicting 10:25;11:6;
28:7;35:1;74:24
conformity 38:13;79:8
confronted 57:10;58:21;
74:23
confusion 62:11
Connected 5:13
connection 69:7
consent 41:19;53:2
consequence 74:14,15
consequences 66:1
consequently 8:1;60:18
Consequently 55:18

conserve 19:2
consider 13:14,15;36:17;
41:3;66:23;68:8;80:5
consideration 7:21;72:8
considerations 4:14;
7:11
Considerations 65:15
considered 25:10;54:15;
75:20
considering 5:17;25:4
considers 70:5
consistency 34:2
consolidated 60:22
constitute 7:9;59:4
constitutes 11:9;59:22
constitutional 63:4
constitutionality 65:18;
79:14
construction 14:6
consult 82:15;84:11
consumer 56:20
contained 59:23
containing 84:10
contemplated 42:19
contempt 37:14;76:9
contend 19:20;50:13
contention 72:12;73:2,3
contentions 7:5,23;
72:24
context 25:17;30:3;40:24;
70:10;74:13;78:11
continue 67:2;75:10;84:1
continuing 51:24
contracts 56:24
contractual 43:22
contrary 16:20;29:11,12;
73:20
contrast 33:6,9
control 37:3;38:5;44:17;
47:3,6,12;57:7;65:2
controlling 38:2
controls 9:8
controversy 62:14
convenience 66:1;71:12
conversion 13:18;15:18,
21;33:16;40:23;46:17,18;
58:1,8;72:1,6;74:7
converted 13:20
conveyed 68:11
convicted 69:23
copies 56:5;81:11
copy 5:6;40:5;56:3;80:9
core 72:22,23
corporate 12:25
Corporation 8:13
corpus 28:9
corrected 55:25
correcting 6:2
correction 52:13
correctly 53:10
cost 5:7
costs 5:11,11
counsel 4:1,4,5,20,23;

5:3;8:2,2,5,10;21:2;23:23;
28:19;32:12,25;33:4;51:20;
53:20;56:7;62:20;65:3;
69:4;74:21;75:13,24;79:23;
80:10,17;81:11;82:17,22,
23;83:21;84:4;85:7
Counsel 7:5
counsels 65:15
counsel's 56:6
Counsel's 8:6
count 37:9;58:4
Count 14:11;15:12
countless 13:11
counts 58:3
couple 32:6;49:11
course 4:24;29:10;31:22;
60:10;67:21;68:1;72:8
court 5:4;7:13;8:18;9:7;
10:2,25;11:4;13:15;20:11;
21:8,23;22:6;23:1,17;
29:21;32:19;33:11,24;34:5,
7,13,16;36:17;37:17;39:1;
40:15,16;41:23,24;42:16;
43:10,12,16;46:9,13,14;
47:5,13,23;49:25;50:25;
52:1;59:13;60:4,7,13;
62:14;65:2;8:67:3,11,14;
69:6,10;71:20;73:4;74:12;
76:16;78:22,23;79:7;80:21;
82:7
Court 5:11,24;11:8;13:13;
16:5,15,22;17:11;18:23;
19:1,19;21:22;22:18,21,25;
23:23;27:3,16;33:11,14,17;
36:13,14,18,19;37:17;40:3;
42:12,14,19,23,23,23;
43:17;45:12;46:9;47:2;
48:13;50:25;53:24;54:5;
55:23;56:10,16;57:22;
58:17;59:10,14;60:12;61:7,
8,24;62:4,10;63:11,12,20;
64:11,23,25;65:17;66:21,
23,25;67:4,6,12,13;71:6;
73:8;78:9,14,20;79:3,9;
80:16,21,23;82:1,4,8,10,
22;83:2,9;84:2,15
COURT 9:12;10:6,11;
11:21;12:7,12,25;13:14;
15:1,14;16:23;17:8,13,23;
18:12,16;19:5,24;20:22,24;
22:4,7,21;23:9,19;24:1,5,8,
11,14;25:1,14,16,21;26:11,
22;27:23;28:15;29:23;
30:13;32:2,5,8,12,16,21,
24;33:20,25;34:22;36:3,21;
37:2,5;38:7,13;40:4,20;
41:5,21,25;42:5,25;43:18;
45:9,19,21;47:10,17,24;
48:5;49:3,9,18,20;51:12;
52:6,16,20;53:2,10,13,17,
19,25;54:8,23;55:7,11;
80:25;81:8,17,19,24;82:11,
14,19;83:12,19;84:4,8,24;

85:1,6
courthouse 11:17;51:6,8
courtroom 4:8,16;77:23
courts 11:7;19:22;22:10;
23:17;31:20;62:6;68:8,13;
71:3
court's 58:16
Courts 71:5
Court's 7:16;19:2;23:24,
25;47:22;48:3;80:13;81:16
Courts' 47:21
cover 83:24
covered 20:9;24:16
create 19:9;74:24
created 56:20
creation 39:18
credit 44:11;56:20,23
Credit 57:2
creep 6:3
criteria 62:1,21;68:20
crossed 34:1
crossfire 76:9
current 31:24;54:14
currently 54:4;56:17;
60:5;83:6,16
custody 47:12
cut 48:16

## D

daily 5:6
damage 65:11
date 38:21;44:11;63:13
dated 57:20;59:10
dates 46:23
date's 44:14
day 8:23;12:16;46:1;59:15;
76:2,25;77:18
days 39:4;49:8;74:23
DC 8:18;21:10,22;22:6;
25:11;27:9,14,18;33:12,23;
34:4,6,13,16;36:12,16,17;
37:17;39:1;40:15,16;46:9;
21;47:5;48:10;51:3,24;
75:25;79:5;80:21;81:23;
82:7
deal 15:22;54:19;68:19;
72:24;82:9
dealing 70:1
dealt 13:18
December 49:7,17
decide 7:19;16:10;18:21;
22:18;40:21;45:10,13;52:5;
60:19;61:4;82:7
decided 14:12,14,17;
21:22;22:19;23:25;31:11,
17;34:9;36:16;39:3;46:6;
50:1,2;52:15;74:9;79:3,13
decides 43:6;71:6;80:23
deciding 8:15;34:13
decision 4:21;7:17;17:4;
27:7,9,10,12;31:12;33:19;
37:18;40:25;43:15;48:10,

11,13;57:20;58:16,17;61:1;
62:15;63:12;66:11;67:3;
70:10;76:12;79:23;80:1,6,
13,21;82:10;83:1
decisions 52:9
declared 44:22;63:1;
76:19
decline 43:23
declined 28:21
declines 27:3
declining 43:24
deem 33:11
default 15:7;26:12
defendant 56:13;57:11
defendants 56:11;68:12;
76:15
defense 14:11,13,14;
38:24;44:22;49:14
deference 7:14;78:12
deficient 31:7
define 65:14
defining 51:15
definition 69:20
definitions 69:5
degree 10:17;62:11;
76:12;77:10,14,21
Delaware 39:17,19,22,22,
24
delay 43:25;44:18;65:25
delayed 76:24
demographic 70:13
demonstrate 15:18
demonstrated 70:7
denied 23:22
deny 52:14;74:14
denying 9:6;76:5
departure 16:15;71:18
Deposit 8:12;57:15
deposited 38:5
depositor 38:18
depository 38:1,3
depriving 65:21
depth 83:20
describe 62:1
described 45:14
description 12:23;50:7;
67:17
details 16:16
determination 44:12;
48:4;49:1;67:4;71:17
determinative 64:22
determining 68:7
developed 70:6
device 21:18
devolving 28:11
devotes 50:21
differ 14:5
difference 14:3;72:15;
73:16
differences 30:10;33:24;
64:17,21;72:6,9;73:19
different 7:15;11:7;20:12;
25:23,24;31:23;34:25

**December 21, 2006**

**diminished** 45:8

**direct** 5:3;26:17;29:8,9

**directed** 82:11

**direction** 29:6;82:9;85:3

**directly** 12:1;20:11,15,17;
27:20;42:1,8;48:11

**directs** 82:2

**disagree** 27:3;81:9

**disagreements** 73:19

**disagrees** 50:5

**disallowance** 58:13

**disappear** 77:1

**disappointing** 17:2

**discharge** 26:15;35:9

**discharging** 12:19

**discipline** 4:17

**discretion** 43:5;61:23,25;
62:2;66:16;67:1;71:19

**discuss** 61:25

**discussed** 11:10;50:19;
52:9

**disenfranchise** 33:13

**disgorgement** 37:22

**dismiss** 25:11

**dismissed** 58:3,4

**dispel** 33:19

**disposition** 65:2;83:7

**dispute** 16:3;29:19

**disregard** 58:10,13

**disregarded** 72:14

**dissipated** 80:2,22,25

**distinctions** 30:10

**distinguished** 21:5

**distributed** 60:6;77:6;
82:3

**distribution** 8:21;59:17;
83:7

**district** 21:10;27:9,18;
32:19;46:9;50:25;58:16;
60:2,4,13;64:6;67:3,11;
71:20;78:21,23,25;79:1,4,
7,12,15,19

**District** 7:4;8:18,24;9:22;
10:15,15;11:4,13,17,20;
12:20;13:10;14:19;15:3;
18:2;24:25;35:11;41:22;
46:5;50:25;51:1,8;54:6;
55:17;57:21,21,22;58:18;
59:10,10,18,19;60:6;63:11,
11,16,21,23;64:18,24;67:7;
73:5;78:15,17,18,19,23,24,
25;79:2,5,12,13,22;83:2,2

**districts** 22:10

**division** 73:19

**docket** 65:3;83:3

**docketed** 54:5

**documents** 12:2,3,24;
42:20;43:16;50:18;54:19;
70:2

**dog** 26:1

**dollars** 15:11;26:6,18;
43:24;44:18;45:8

**done** 25:11;45:6;48:2;

55:1;65:4;74:16;79:15;
80:4;84:18

**doubt** 29:18

**down** 8:8;10:9;16:25;
17:1;24:10;25:21;38:11;
48:7,16,23;80:1;82:20

**draft** 81:10;82:17

**drafted** 35:15

**drain** 77:1

**draining** 45:14

**drama** 51:18

**drive** 66:15

**due** 38:11,21;39:3,4;45:1;
46:23;49:7,8,10,11,16;
53:24

**duplicative** 22:17;23:6;
71:7

**duration** 66:24;68:3;
78:21

**during** 5:17;7:5;44:2;
45:15;67:21

**duties** 26:20;35:3;37:12;
51:9;52:4;74:3

**duty** 34:23;51:5;54:25

**E**

**earlier** 53:16

**early** 6:25;15:9;58:4,10

**ears** 59:25

**easy** 26:12

**eat** 27:21

**economic** 34:20;70:13

**economy** 65:3

**Edelman** 33:3,25;43:19;
48:6;49:3;54:18;80:17;
83:10,13;84:14,18

**EDELMAN** 33:2,21;34:2;
35:20;36:10,25;37:3,6;
38:10,16;40:6;41:1,8,23;
42:2,11;43:9;44:3;45:16,
20;46:8;47:15,19;48:2,9;
49:6,10,19;80:18;81:6,14,
18,22;82:6;83:11;84:3,5,
21,25;85:9

**edit** 5:25

**edited** 56:4;80:8

**educate** 62:20

**educe** 63:20

**effect** 16:8;18:5;19:10;
36:7;38:25;40:24;59:22;
63:19;67:2;79:1;81:1

**effective** 42:24

**efficient** 78:11

**effort** 11:1,2;16:16;33:13;
65:3

**either** 25:24;29:11,16;
55:4;71:16;76:15

**Either** 42:5

**elapsed** 48:7

**electric** 63:22

**electrical** 63:6,10

**Electrical** 64:1

**eliminate** 64:1

**Ellen** 57:21;83:2

**else** 53:17;55:2;65:11

**elsewhere** 60:14

**emerges** 55:22

**emphatically** 81:6

**empowers** 22:25;60:13

**end** 6:8;9:4;33:10;34:3;
45:2;50:12;59:22;61:1;
77:17;78:8

**endeavor** 55:13

**endorse** 84:9

**ends** 80:20

**energetic** 51:18

**enforce** 18:20;19:21;
47:22;63:7

**enforcement** 33:14;
41:18;44:5,21;46:22

**Enforcement** 58:9

**engagement** 4:6

**English** 31:24

**enjoin** 17:20,21;18:1,13;
23:1,13,14;40:16;46:21;
47:5

**enjoined** 29:4

**enjoining** 18:4,5;60:14

**enlightenment** 80:17

**enough** 18:10;26:14;
42:10;73:14;79:9

**ensure** 80:22

**enter** 81:12

**entered** 47:10;73:11;
77:3;81:1;83:9

**entertaining** 15:15;30:10

**entire** 50:21

**entirely** 29:25;45:24

**entirety** 7:10

**entitled** 36:1;44:12

**entitlement** 34:10

**entity** 40:11

**entry** 59:2

**equal** 5:8

**equally** 35:16

**errors** 6:3;56:1

**especially** 9:8;48:24

**Especially** 65:23

**essential** 25:14,16

**essentially** 54:10

**established** 57:1

**estoppel** 19:12;30:23;
31:19;54:17

**et** 20:1

**even** 10:7;11:9;17:4;
48:12;49:22,25;50:18;
60:14;65:6,10;69:22;71:25;
72:12;75:2

**Even** 50:13;66:14

**even-handed** 85:3

**event** 38:22;51:16,19

**events** 5:12;59:2

**everybody** 40:5;73:11

**everyone** 9:7;75:21;84:6

**everyone's** 9:8,11

**example** 69:10

**exceeded** 67:2

**excellent** 5:4;10:8;28:19;
35:16;55:3;56:6

**excessive** 79:10

**executed** 56:24

**exercise** 30:24;43:5;
44:17,23;47:3;62:2;65:5

**exercised** 45:3

**exercising** 43:22;45:5

**exigencies** 55:14

**exist** 44:16;64:18,21

**expand** 9:12;46:14

**expanding** 65:7

**expect** 38:8;83:16

**expectation** 6:11

**expects** 60:25

**expedited** 5:5,6,8;61:2;
80:7

**expeditiously** 9:3;68:10

**expenses** 10:14,20

**experience** 4:1,18

**expertise** 70:5

**explain** 16:6;55:4;69:13

**Explain** 44:1

**explicit** 28:6

**expound** 33:24

**express** 7:8;48:3

**expressed** 27:12;85:3

**extend** 76:23

**extent** 4:16;12:22;35:4;
64:21;65:25;76:4

**extraordinary** 33:7;65:23

**F**

**F2d** 21:23;22:8

**fact** 20:12,18;26:8;28:19;
29:16;31:16;36:21;38:24;
54:9;60:16;66:12;71:7;
75:8

**facto** 28:10;38:14;49:13

**factor** 30:25

**factors** 7:19;68:15,20;
80:5

**facts** 13:12;31:24;33:16;
66:4;73:6,9,17

**factual** 69:8

**fail** 15:10

**failed** 57:16

**failure** 15:8;59:4

**faint** 19:8

**fair** 10:22;20:3,3;22:11,14;
31:11;34:8;54:21;65:10;
67:1;68:24;85:2

**fairly** 18:24;21:23;23:8;
25:4,19,25;31:4,5,16;
43:17;69:22

**fall** 61:19;79:16

**fallout** 40:25

**falls** 19:25;27:2;76:3

**familiar** 17:15

**far** 9:17;12:7;13:21;15:23;

19:9;27:23;67:16

**far-reaching** 66:7

**fashion** 55:21;56:18;
57:24;63:9

**fatal** 64:22

**favor** 33:8;75:8

**favorable** 33:11

**favors** 16:25;71:17;72:21

**FDIC** 4:5,25;6:18;8:2,5,13,
23;9:17;10:7,14,19,25;
11:6,15;12:15;13:19;14:9,
20,22,24;15:7,20,21;16:25;
17:24;18:25;19:1,6,9,19;
25:25;26:7;27:2,17;28:8,
18;29:13,24;30:21;32:10;
33:6,6,9,15;35:1;36:23;
37:10,21,22;38:18,24;
39:10,20;40:9;41:11;44:18;
45:23,25;46:18;48:9,15;
49:20;50:5;52:12;53:5;
54:11,17,20;57:15,17,18;
58:1,7,10,24;59:6,8,15,19;
60:7,24;61:6,12,12,15,16;
68:23;69:2,21;70:1,9;72:7,
16;74:8,11;76:5;77:4,11,
18;79:25;80:2;82:14;85:2

**FDIC's** 7:2,22;14:13;15:2,
8;21:14;23:22;46:3,6,21;
51:13;61:10;71:25

**February** 15:9;50:10

**federal** 11:4,7;18:11;
22:25;23:4;40:8;51:8

**Federal** 8:12;25:13;40:7;
50:19;57:14

**feel** 7:6;29:11;48:6;81:4,6;
84:19

**feeling** 70:9

**feels** 75:23

**fees** 10:8,20;26:13;44:25;
77:24

**fell** 59:24

**felt** 12:1;17:16;42:9;63:3;
73:14

**fetters** 67:18;79:15

**few** 39:16;49:7;51:10;
74:23

**fiduciary** 12:19;13:4;
20:6;26:13,15,20;28:5,11,
16;34:23;35:3;37:12;51:5,
9,20;52:4;54:25;73:11,24;
74:3

**Fiduciary** 35:17

**field** 62:8

**fight** 26:1;54:21,21

**fighting** 42:10

**figure** 30:18

**file** 53:6

**filed** 6:23;9:22;11:14;
14:8,18;19:5;21:16;29:5;
52:1,23;53:7;54:4,11,11,
12;58:23;59:13,15,19;60:7,
17;63:10,15,23;64:2;72:3,
15

files 58:20
filing 19:17;34:18;70:10;
71:15,24
filings 70:22
final 9:10,24;21:9;22:14;
38:21;39:3;40:6,12
finally 23:8
financial 76:14
Financial 58:8
find 62:5;64:9,12;70:20
finding 69:15
finds 27:25;74:22
fine 32:5,7;35:12;43:20;
77:20
Fine 53:13;84:24
finely-wrought 70:7
finished 6:13
firm 10:8;35:12,16;77:20
FIRREA 38:24;39:11;
48:16,23;58:9
first 8:5;11:14;44:24;
45:22;52:24;60:21;64:2;
68:23;69:12;71:6;72:2;
74:3;75:20
First 22:24;33:4;39:17
first-file 71:19
first-filed 33:8;70:19,25;
71:1,5,23;72:1,7,19
first-filing 72:14
fit 66:9;74:3
five 8:7,9;68:14
Five 58:2
flatter 6:15
floor 51:6
floors 51:10
focused 78:9
follow 7:17;22:10;23:9;
68:1;71:5;79:20
followed 68:5;69:4
following 56:18;61:8;
76:16;84:8
force 67:16
forced 46:12
forcefully 34:17;35:20,22
foreign 7:13;43:10,16
forever 46:1
form 34:25;69:2;81:19
formal 15:12
forum 7:15;18:20;19:8,16,
21,24;20:10,14;23:7,23;
27:21;29:2,3;33:12;56:12;
61:22;68:25;69:2,5,7,8,11,
16,18,21,23;70:14,15
Forum 69:3,6
forums 7:18
forward 6:18;7:15;9:16;
18:14;30:14;31:6;35:6,9,
14,19;56:12;63:6;65:10;
78:15,24
found 29:6;32:22,24;
55:20;58:7;62:6
four 50:14;68:13;79:6
foursquare 17:1

framed 67:15
frankly 46:13
free 31:8
frivolous 69:18
front 39:5;53:7
fulfill 5:19
fulfillment 54:25
full 21:9;22:11,14;34:8;
38:20;39:5;42:24;43:10;
53:2;76:7
fully 15:3;18:23;23:8;
31:4,5,16;43:17;49:8,10,
16;51:21;82:8,23
fundamental 16:3;43:1,3
funds 8:21;9:21;13:20;
15:4;28:9;56:17;57:7,10,
13,18;58:24;59:3,7,17;
60:5;69:25;74:24;77:5;
82:2;83:5,14,16,17,24
furnishes 77:9
further 16:21;20:20;32:6;
47:12;48:6;61:7;65:7;77:7;
81:16,17;82:4;83:1,8;84:1
furtherance 57:14
furthermore 17:18;63:5

G

game 52:18
gastric 4:10
gather 81:3
gave 67:11;73:4
general 63:2,3;65:7;68:5;
71:2;73:8
generally 68:7,8
generated 44:7
Gentlemen 53:19
Georgia 69:17
gets 44:8,13
given 50:7;62:16;74:22
gives 47:22;67:8;70:8
giving 71:13;75:15
glad 55:1
gladly 28:4
goes 16:13;27:25;30:14;
44:15;56:12
good 48:5;54:21
Good 8:11;32:8;33:2
goods 66:10
governed 38:17;42:20
governing 39:13
government 63:15,23;
78:5;79:14
grammatical 55:25
grammatically 6:3
grand 26:3
grant 10:13;52:17;61:19,
19;64:6;84:13,17
granted 61:20;62:12;
77:12,15,22;78:5,22,23;
79:10
granting 79:4
great 15:22;42:18;50:19;

66:2,3,3
greater 10:8,16,21,24
Green 21:21;22:8;32:22
grossly 48:15
ground 20:9;76:5
guard 65:21
guess 18:11;33:21
guidance 62:5,6;81:10

H ·

Hamilton 26:20
hand 40:1,2;42:13;43:11;
59:6;77:6
handed 50:18
hands 17:1;35:19
happen 23:18,20;29:19;
77:22
happened 70:23,23;74:2
happens 23:11
hard 21:19;26:22;42:10;
70:3;77:21
hardship 9:15;12:13,22;
65:9
harm 46:24;76:14
Harris 21:4;34:25;54:24;
73:4,9;76:1;82:12;84:8
HARRIS 21:4;22:5,8,24;
23:16,20;24:2,6,9,13,15;
25:9,15,20,22;26:15,24;
28:14,16;30:12;31:2;32:3,
7,14,17,23;53:23;54:2,9;
55:6;82:13;83:13,23;85:8
Harris's 35:16;52:13
health 4:10,23
hear 4:5,11;6:14;8:1,5,10;
16:1;21:1;32:9,12,25;49:20
heard 37:20;41:11;49:24;
50:8;53:20,23;54:18;79:22;
82:23;84:4
hearing 5:16;16:10;
24:10;60:23
heart 14:2
heavily 66:15
held 11:8;37:1,19,24;
40:13;48:22;51:17;57:18;
58:24;68:7;77:5;82:2
Huvelle's 9:20;13:25;
16:14,17,20;17:4;19:10;
20:11;47:13;49:23;50:17;
51:10;58:13,17;59:9,23;
60:16;70:10;74:12;77:23
help 4:20
helpful 64:9
hence 67:15
Hence 33:20,21
hereby 82:24
herself 16:6
high 26:13
higher 10:8
highlights 36:10
himself 46:4
hinges 62:14
historic 26:12
hold 8:19,19;20:22;47:7;
63:11;84:1
holding 63:6,16;66:2;
67:8;69:25;78:4,16;79:11;

81:2
Holding 62:23;63:7
holdings 68:6
holds 34:16;56:17;57:10;
60:5;67:7,14;74:24
honor 15:8;36:10;37:15
Honor 12:10;10:11;1:3,
11;12:2,11;13:6,8;14:16;
15:6;16:8;17:7,18;18:15,
19,25;19:14,22;20:15,20;
21:4,11,21;22:2,5,24;
23:16;24:7,13,15;25:10,22;
26:16,24;27:1,7,20;28:14;
30:12;31:2,10,15;32:7,14,
23;33:2;35:20;42:11;
49:22;50:17,24;52:19;53:1,
7,18,23;54:10;55:6;80:18;
82:6,16;83:23;85:5,8,9
Honorable 83:2
Honor's 32:4
hope 4:20;5:14,15,19;6:6,
11;8:4;45:9;74:13
horse 76:11,11
hour 76:25
hours 13:11
hours' 72:15
humane 4:14
humanity 4:14
hutzpah 18:10
Huvelle 8:18,20,25;9:3;
11:19,25;12:8;13:11,18,21,
23;14:7,12;16:4,5,9,25;
17:19,24;18:3,19;19:4,7;
20:5,8;22:23;23:13,21;
25:5,6,17;30:6,18;31:1,17,
25;35:5,8,14;36:4;40:21;
41:5;42:9;43:6;46:5;47:11;
50:1,2,11,12,20;52:3,7,14,
24;53:6;54:4;56:3,7;57:21,
23;58:6,7;60:2,7,21,22;
61:2;9:70:6,11;72:4,17;
73:3;74:9;75:1,6,14,18,20,
25;76:23;77:4,7;79:22,25;
80:10;81:3,20;83:3,18;
84:16

I

identical 64:16;71:9
identified 68:17
immediately 51:19
immense 23:10
imminent 21:16;29:18
immoderate 65:25;
67:10,14
impaired 41:19
implicit 28:6
importance 66:7;78:10

important 30:25;54:10;
55:14,21;65:17
impose 80:1
imposed 57:9
impossibility 74:25
impossible 25:3
improper 7:23;30:1;
48:24;59:17,22
improperly 54:13
inability 20:10
incapable 34:19
inception 67:15
incidental 65:1
include 60:10;71:14
included 56:2
includes 60:9
including 27:2
Incorporated 33:4
incredible 46:14
incur 10:14
incurring 10:16
indeed 17:16;46:6;72:19
indenture 13:4;25:7;28:2,
3,12;29:7,7;41:13,15;
44:21,25;50:4;56:17,24;
57:5,7,19;58:5;59:5,8;83:6
indentured 14:2;26:3
indentures 56:25;57:1
independent 29:5;75:16
independently 29:3
indicated 52:21;54:3
indicted 69:22
indispensable 21:25;
24:19;25:12;27:15;31:9;
34:7;74:20
Indispensable 22:2
individual 38:4;65:24
inequity 9:15;65:9
inescapable 48:14
inevitable 30:21
inevitably 30:23
inferable 69:16
inform 31:14;62:1;76:12;
80:5
informal 75:12
informed 59:6;82:10
inherent 65:1
inherently 43:15
initial 74:13
initially 63:9
initiate 41:17;43:3
injunction 17:25;40:22;
46:22;47:2;60:23;74:10
injunctions 60:14
injunctive 17:19
injury 11:9;47:9
insofar 67:2
installed 28:2
instance 6:22;60:21;
75:20
instances 31:19
instead 22:19;52:24
institution 26:12;38:1,3,

19,25
**Institution** 26:20
**Institution's** 58:8
**instruct** 64:6
**instructed** 51:2
**instruction** 5:13
**instructions** 37:15;79:8
**instrument** 28:4
**Insurance** 13:15;57:15
**intend** 21:7;52:20
**intended** 15:21;60:10
**intends** 60:24
**intercorporate** 66:5
**interest** 11:25;31:8;
34:20,21;39:6,23,25;41:9;
42:1;44:10,16,16,19;45:1,
3;46:24;50:3;68:14;71:16;
75:21;83:8
**interested** 6:15
**interesting** 60:19;73:4
**interests** 12:20;21:24;
25:7;29:12;35:5;57:6;
58:12;65:5;68:9,12,12,13,
17;72:21;75:17,21
**interfere** 23:2
**interim** 37:6
**interpleaded** 56:11;
57:11;76:15
**interpleader** 6:23;7:10;
12:14,17;13:15;14:1;15:19,
22;16:24;18:2,8;19:5,12,
18;21:17;22:25;23:2,4,14;
24:17,24;27:17,18;28:23,
24;29:20,25;30:4,14,22;
33:17;34:18;41:3;43:2,25;
45:12,18,23;46:25;48:4;
51:15,20;54:12,18;56:12,
13,15,16;57:9;58:21,23;
59:12,21;60:11;61:11,13;
64:20;70:11;72:3,15;76:8,
24;79:21;83:4,25
**interpleading** 70:4
**interpretation** 19:10
**interprets** 30:6
**interrupt** 18:17;67:10
**intervene** 11:24;41:21;
42:1,8,12
**intervening** 12:5;44:2
**intervention** 75:7
**into** 7:4,21;19:22;31:16;
47:10;59:2;72:8;73:11,13;
77:3;81:1;83:19
**intricacy** 66:6
**inures** 77:8,8
**investigation** 66:5
**investors** 56:22;57:3
**invite** 49:22;83:21
**invoking** 49:5;70:14,15
**involved** 15:3;37:23;
42:22;62:22;66:3;78:10
**involvement** 47:16
**involving** 21:25;71:4
**ipso** 28:10;38:14;49:13

**ironic** 78:20
**irreparable** 11:9
**issuance** 38:21;39:3;
64:23
**issue** 7:12;8:1,19;10:21;
11:3;17:19,25;22:18,19;
23:12;31:4,11,17;32:16,21;
35:8;36:6;37:18;38:16,17;
39:8;49:15;55:14;60:13,18;
68:2;80:6,22
**issued** 6:21;10:17;11:4;
19:19;40:7;56:19;79:6,23
**issuer** 13:16,21,22,25;
15:5,12;20:7;35:22;36:3,
11,12,13,15,15,20,22;
37:18,18;38:1,20,24;39:1,
9;40:18;41:20;42:13;43:13,
14;45:2;46:11;49:2,14;
57:2,3,12
**issuers** 20:13
**issuer's** 14:1
**issues** 9:24;10:1;14:3;
15:23;16:4,11,14,18,21,21,
23;18:23;21:8;22:12;23:7;
31:9;33:16;34:9,10,13;
36:19;40:14,23;43:13;
46:10;59:24;61:8;64:15,18,
19;65:18;66:2;71:5;72:11;
78:10;82:9
**issuing** 11:5
**item** 5:11

**J**

**jam** 23:10
**January** 9:4;16:10;27:7,
8;60:25;61:1;83:17
**job** 12:23
**joined** 24:20
**judge** 17:20;18:11;31:23;
36:12;61:23;64:6;78:25;
79:1,4,12,15,19
**Judge** 8:17,20,24;9:3,20;
11:19,25;12:8;13:11,18,21,
23,25;14:6,12;16:4,5,9,14,
17,20,25;17:4,19,24;18:3,
19;19:4,7,10,20:5,7,11;
22:23;23:12,21;25:5,6,17;
30:6,18;31:1,17;25:35:5,8,
14;36:4;40:21;41:5;42:9;
43:6;46:5;47:11,13;49:23;
50:1,2,12,15,17,20;51:10;
52:3,7,14,24;53:6;54:3;
56:3,7;57:21,23;58:5,7,13,
16;59:9,23;60:2,7,16,21,
22;61:2,9;69:15;70:6,10,
11;72:4,16;73:3;74:9,11;
75:1,6,14,18,20,25;76:23;
77:3,7,23;79:22;25:80:10;
81:3,20;83:3,18;84:15
**judge-made** 64:2;70:19;
71:1
**judges** 76:10,19;79:6

**judge's** 14:25;62:2
**judgment** 9:10,20,24;
36:7;59:18;65:5
**judgments** 75:22;76:9
**judicata** 19:12;30:23;
31:19;54:16
**judicial** 30:25;31:22;
80:10
**Judy** 21:5
**June** 9:22;11:15;14:8
**jurisdiction** 18:1;22:18;
23:24,25;27:3;33:10;34:5;
37:17;42:3,4,13,16,23;
43:11;46:13,15;47:22,23;
54:9;60:15,17,18;71:4;
76:17
**Jurisdiction** 54:8
**jurisdictional** 70:13
**justice** 64:5;65:22;66:14;
71:17;72:21;78:3,12
**Justice** 9:13;46:1;62:3,
13;77:12;79:16
**justify** 33:14
**justifying** 69:17

**K**

**Kammholz** 33:3
**Kaufman** 33:3
**keep** 47:12
**kept** 66:17,19
**kind** 26:24
**knowledge** 70:6
**known** 56:24;57:2,3;58:9;
65:19;70:18
**knows** 54:19

**L**

**labor** 73:10,12
**lack** 55:19;71:15
**laid** 53:15
**Landis** 7:17;9:13;46:2;
62:4,7,10,22;63:21;64:5,
11,25;65:8,17;66:25;67:7,
14,25;68:5;70:21;78:3,8,
14,22
**language** 31:24;41:21;
64:9;83:22;84:6,22
**last** 4:25;5:1,13;6:17;
31:25;39:4;48:9;50:11;
61:9
**Last** 45:21
**late** 6:25;49:25
**later** 64:4;67:8
**Latin** 19:25
**latter** 21:25
**launched** 51:15
**law** 5:18;8:7;29:11,14,21;
31:8;35:12;38:2;39:19;
42:14,20;54:15;65:14;66:6,
12;67:25;70:2;71:22;76:18,
18;77:20

**lawful** 29:6
**laws** 48:17,17
**lawsuit** 11:14;34:9,10;
36:4;41:17;48:25;59:16
**lawyer** 4:15;26:25
**lawyers** 35:18
**lay** 66:15
**lead** 61:3;62:7
**leads** 48:13
**learning** 16:16
**least** 15:22;27:4;28:5;
35:3;67:17
**leave** 4:8;53:25;55:6,7;
56:6
**leaves** 83:14
**Lee** 8:7;32:2
**left** 8:7
**legal** 7:18;10:14,20,20;
70:12;77:24
**legally** 14:22
**length** 50:20;62:8;79:10
**lent** 38:19;39:7,8,9;48:20
**less** 69:22
**lesser** 62:6
**letter** 51:13
**liable** 58:7
**lie** 14:2;75:8
**lies** 72:22
**light** 35:23
**likelihood** 10:20;66:13
**likely** 11:5
**Lilly** 13:4
**limit** 78:21
**limitations** 6:24;30:2;
65:16
**limited** 61:17,19;66:24;
84:17
**limits** 67:1,18
**line** 28:12
**lines** 81:12
**linked** 66:5
**liquidate** 38:10
**liquidated** 44:9
**lists** 12:8
**litigant** 65:12,13;69:7
**litigants** 65:4
**litigate** 8:22;13:9;20:16;
23:7;27:19;31:4;51:25
**litigated** 8:23;9:23;14:6,
12;15:11;18:24;31:17
**Litigating** 9:7
**litigation** 9:10,22;10:12,
18;11:13,23;14:18;19:1;
21:16,25;22:14,15,17;23:6,
6;25:8;29:8,13,16,18;
35:10;51:2;56:12,18;
59:18;68:10,14;69:4;71:16;
77:23
**Litigation** 63:9
**little** 9:5;15:19;67:8;77:1;
83:14
**logical** 36:19;70:9

**longer** 21:11;25:19;51:21;
73:14;75:23
**long-standing** 21:18
**look** 8:8;30:17;39:2,18;
81:19;82:7;84:5,22
**looked** 24:8;29:2;30:11
**lot** 54:19
**LP** 33:5
**lunch** 5:17;6:8,14
**Luncheon** 55:8

**M**

**machinery** 33:4
**main** 61:10;77:18
**maintain** 65:6
**maintaining** 4:16
**majority** 79:6
**makes** 26:2;30:5;36:19;
48:3,9;51:20
**making** 25:4,5;37:10;
52:6,20;66:14;67:22;75:21
**manner** 45:14;49:4;56:5
**many** 61:25;62:5;66:13
**March** 49:12
**master** 29:7;50:4
**Master** 57:2
**material** 6:2
**matter** 11:6;29:15,15;
36:17;43:11,12;48:13;
52:25
**matters** 33:17;34:14;
42:14;46:15
**maturity** 38:21;39:3;
49:17
**maximize** 45:6
**may** 6:3,4;7:2;12:4;13:1;
18:18;21:2,23;23:1,13;
26:23;30:4;32:14;35:10;
52:19;55:6,20,22;56:2;
64:14,17;65:24;66:11;68:6;
75:21;76:16;77:24;80:11;
81:8;84:14
**Maybe** 52:22
**mean** 10:7;18:17;32:5
**meaningful** 73:6
**meaningless** 31:12
**means** 10:14;20:15;32:16
**meant** 31:1;48:18
**meantime** 9:6;52:11
**mechanism** 24:18
**meet** 83:10
**members** 73:10
**memorandum** 24:12;
35:15
**memory** 23:3;32:18
**mental** 4:10,22
**mention** 14:23
**mentioned** 14:20;18:22
**merchants** 56:22
**merely** 52:14
**merit** 29:16
**merits** 6:20;7:24;9:4;16:9;

27:8;29:15;60:24
**Michael** 33:3
**middle** 54:22
**might** 16:21;35:18;75:8;
76:2
**mike** 20:21
**Millennium** 33:4,5
**million** 15:10;26:6,17;
37:7,7,8;39:10;45:8;48:20
**millions** 43:24;44:18
**mind** 25:1;34:1;81:10
**minimized** 74:1
**minimum** 16:20
**minor** 52:13
**minute** 20:22;66:5;76:25
**minutes** 8:6,7,9;21:2;32:6
**missing** 25:17
**misspeak** 53:24
**moderation** 65:16;66:18,
20,25
**mold** 66:9
**moment** 55:13;58:20;
65:24;66:22;67:24
**money** 8:19;9:7,8,9;10:3,
5,6;14:17,22;38:19;39:8,9;
44:1,13;76:10;77:19;81:2
**monies** 73:21
**month** 9:5;16:10,19;
43:21,24;44:2,6,7,11,14,
17;45:7;50:11,15;52:5;
76:25;83:15
**months** 49:11,24
**more** 6:19;8:9;9:5;10:8;
15:14;32:6;33:11;50:21;
57:19;59:8;61:17,19;64:22;
68:17;77:19;79:17;84:20
**morning** 8:11;33:2;34:18;
41:11;68:22;72:17
**most** 68:25;69:2;77:4,13
**motion** 5:15;23:22;45:22;
52:14,17,23;53:6;54:16,17;
55:12,23;56:10,14;60:8;
61:4,10;72:11
**motivated** 26:9,9,10;
69:9,11
**Motley** 69:15
**moved** 25:11
**moving** 4:25;8:6
**much** 15:3;48:10;50:8;
62:5,6,25;76:3;81:20
**must** 9:14;12:9;20:16;
27:4;31:8;53:21;57:17;
60:20;62:3;64:15;65:5,9,
21;67:21;68:1;72:24;
73:23;77:13;80:3
**myself** 6:15

### N

**name** 11:12;12:4;17:22;
33:2
**named** 15:12;17:5
**namely** 39:19

**narrow** 16:21;69:19
**narrowed** 77:24
**national** 56:19
**nature** 47:8;62:21
**navigate** 29:10
**navigating** 68:1
**necessarily** 14:17;66:23
**necessary** 11:20;22:2;
24:19;67:20
**necessity** 78:10
**need** 4:1,23,24;5:20,21;
7:6;8:3;66:4;67:23;71:11
**needed** 31:4;59:7
**needs** 29:19;82:8;84:10
**neither** 69:21
**neutral** 21:15
**new** 50:13;60:1
**New** 8:16,17,19,23;9:1,19,
25;10:15,18;11:2,13,15,18,
22;13:7,8;14:9,18;17:3,11;
18:21;19:15,16,18,18;
20:16;21:5,6;23:11;24:3,
20,22,22,23;27:11;28:2;
29:1,5;34:11;35:3,14,21,
24,25;36:5,8,9;37:1,4,11,
11,13,19,24;38:5,6,8;
40:14;41:2;42:9,14,20,21,
21;43:2;45:17,24;47:3,6,
10,13,15,18,24;48:1,22;
50:6;51:2,5,6,21;52:25;
53:3;54:5;56:16;57:5,25;
58:22;59:13;63:16;66:11;
67:7;69:25;70:1,2,4;73:18;
78:15,18;79:2,22;81:15;
82:3;83:5
**next** 49:11;52:5;59:15;
66:22;83:17
**NextBank** 8:13;38:18;
50:10;56:19;57:16,16;
58:10
**NextBank's** 58:2;59:2
**NextCard** 57:1
**nighttime** 72:16
**noble** 10:11
**none** 39:1;79:6
**non-frivolous** 69:24
**nonsubstantive** 80:8
**nor** 69:16,21;76:6
**normal** 31:22
**North** 62:4
**note** 41:18;42:7;52:13
**Note** 57:2
**noteholder** 33:10
**noteholders** 4:5;8:3,17;
9:19,25;11:2,12,16,18,21,
23;12:4,7,16;13:9,17;14:2,
11,17,21;15:4,10,16;16:2;
17:2,3,22;19:17;20:3;21:1,
12,13;22:19,22;24:19,21;
25:3,14,23,24;26:6,10;
27:9,20;28:3,8,17,20;29:8,
13;31:12;32:9,13;33:1,5,
13;34:5,6,12,14,21;35:2,5,

13,15,21;36:6,17,22;37:15,
16;38:7;39:9;40:19;41:12,
16,19;42:8,12,15,18,18;
43:8,15,22;45:1,11;46:11;
47:9;49:4;50:6,9,11;51:1,7,
14;52:8;25:53:4,20;54:20,
25;57:4,6,12;58:1,11,24;
59:1,4,25;61:11,18;68:23;
69:1,22,25;70:18;72:5,13;
73:2,18,20;74:1,7,18,19,
20;75:1,4,8,11,13,24;
76:20;77:3,9;80:19;81:4;
84:14
**noteholders'** 11:12,14;
12:20;19:17;21:13;25:7;
34:19;43:23;46:20,24;47:4,
8;51:25;52:1;74:7;75:17
**notes** 26:2,5;38:11,17,18,
19,20,21;39:2,4;41:20;
46:23;48:20;49:7,10,15;
56:21;57:3,13
**notice** 15:7;51:13;60:16;
67:16
**notified** 51:23;59:1
**notion** 17:9
**novel** 66:6
**November** 15:8;19:6,6;
50:2;58:22;59:12,15;60:2,
11;63:14;72:16,17;74:10,
23
**nullify** 52:8
**number** 6:18;22:9;68:4;
72:3,4,11;83:3

### O

**obedience** 59:9
**obeying** 76:16
**object** 82:12,14;85:2
**objection** 82:13;83:23
**obligated** 11:22;57:12,
13;59:3
**obligation** 31:25;38:17,
23,25;57:14
**obligations** 13:4,16;14:1;
40:18;43:13;46:10;49:1;
59:5
**obliged** 85:6
**observation** 71:21
**obtained** 70:6
**obtaining** 79:18
**obvious** 67:22
**obviously** 27:2
**occur** 18:16;21:10;74:15
**occurred** 42:21;74:4,6,14
**occurring** 49:17
**occurs** 69:6
**o'clock** 55:3
**October** 9:21
**odor** 20:14
**off** 44:10,10;67:19;79:16
**offered** 13:13;45:17
**office** 21:6

**officers** 12:25
**old** 13:7;17:11,14
**once** 44:9,22;45:3;46:8;
49:13;67:18
**Once** 37:16;47:5
**one** 7:2,9;10:18;20:1;
21:16;22:14;29:23;31:6;
34:23;41:1;43:18;49:15;
51:6;52:13;56:10;60:10;
61:20;62:15;63:25;64:12,
13;65:12;68:9,16;69:16;
70:5,14,14;71:2;72:2,12;
73:15,17,21,23;78:12;
80:18
**One** 4:14;15:14;28:17;
37:20;48:9;69:6
**ones** 20:2
**oneself** 73:23
**only** 11:11;14:19;19:18;
21:18;24:17,20;29:3,21;
32:24;34:14;36:14,18,21;
37:7,17;40:17;42:23;43:4;
49:15;53:4;55:25;64:12;
69:7;71:7,14,23;74:21;
77:8;80:8
**Only** 27:16;65:12
**open** 21:18
**opening** 52:9
**operation** 58:14
**opinion** 6:5;13:12,25;
16:25;17:1;19:11;24:11;
30:7,22;31:20;55:23;56:4;
58:6;59:9,23;60:17;62:3,
13;63:20;64:5;67:9;70:8;
79:4,8
**opinions** 55:20;63:25;
79:6,7
**opportunity** 4:9,22
**oppose** 53:4,4;56:13
**opposed** 40:23
**opposing** 57:10,11;61:11
**oppressive** 65:25
**oral** 6:5;60:24;82:23
**orally** 6:12
**order** 5:3,10;8:20;11:3;
14:25;21:2;30:6;31:4,18,
23;49:23;50:18;54:13,14;
60:6;61:7,8;62:10;63:7;
80:19,19;81:12;82:1,4,11,
16,19,20;83:8,22,24;84:1,
10
**ordered** 56:21;84:9
**orders** 9:1;10:25;11:3,5,
7;18:20,22;19:3,20;47:13;
50:1;59:17;76:16;77:7;
82:24
**original** 79:18
**ostensibly** 34:16
**others** 33:22
**otherwise** 77:20
**Otherwise** 80:24
**ourselves** 64:12
**ousted** 54:8,9;60:17

**out** 7:2;9:14;10:4;14:24;
27:6,6;30:18;32:24;44:15,
18,24;53:16;54:21,21;
55:22;62:11;63:9;65:9,18;
66:14;73:5;76:10
**out-of-towners** 6:10
**outrageous** 68:25;69:2
**outside** 7:11
**over** 8:24;9:7;10:2,3;
20:21;26:18;34:5;37:12;
42:13;43:11,19;44:17;
46:13,15,15,16;47:3,6,23;
48:20;57:17;59:3,7;68:6;
71:4;84:19
**overall** 40:24
**overlap** 71:8
**overshadow** 26:7
**owe** 34:22;48:19,19
**owed** 28:4;37:7;73:21
**owes** 73:25
**owing** 38:12
**own** 6:3;12:4;18:1,20,22;
20:4;30:6;39:4;40:12;
47:12;49:16;56:8;60:14;
67:24;75:15
**owned** 14:23
**owner** 39:20,23

### P

**page** 15:16,20;21:22;
43:21
**paid** 14:10;44:10,10,24;
48:21;49:3;73:21;82:3
**paints** 62:9
**paper** 24:16
**papers** 24:15;28:18;46:3
**paragraph** 45:22;50:21;
62:13
**Paragraph** 14:8
**paraphrase** 61:14
**pardon** 32:14
**part** 7:25;14:18;17:19;
40:11;75:5;83:25
**participate** 43:1
**particular** 7:8;61:6;73:3
**particularly** 26:8;57:19;
59:9;77:16
**parties** 5:9;7:6;10:3;
11:20;16:18,24;17:5;18:1;
20:4;21:25;22:2,3;27:2,16;
29:4;31:3;34:20;39:18;
41:8;42:22;43:11;46:15;
48:18;61:3;64:14,18,20;
66:7;68:13;71:4,10;72:25;
74:11,12,14,20;79:24;
80:10;81:15
**parties'** 9:1;19:2
**Partners** 33:5
**party** 4:25;8:6;11:11;
15:13;17:21;20:13;22:12,
13,15,20;24:19;25:12,14,
16;26:17;27:15;31:7;9;

33:7;34:6,7,16;36:9;38:19;
42:2;78:1;79:17;81:2,23;
83:8
**passage** 78:7
**passes** 43:22
**past** 46:23
**pause** 39:14;64:17
**Pause** 20:23
**pay** 10:7;14:13,17,20,21,
22;38:11;44:15,24,25;
56:22;57:12;77:19
**payable** 39:3,5;49:7,11,
16
**paying** 14:9;36:22
**payment** 39:6;44:11,19;
83:7
**payments** 41:18;44:24;
83:15
**pending** 8:20;11:16,19;
47:12;58:19;60:6;61:7;
66:11;77:7;78:22;80:20;
81:16;82:4;83:1
**Pending** 81:17
**per** 28:10;64:21
**perceived** 59:16
**percent** 39:6
**perceptive** 33:25
**perfect** 38:8
**perfectly** 30:13;69:24;
70:3
**perhaps** 10:16,16;57:19;
75:12;77:19
**period** 45:15;46:21
**permanent** 45:25;61:18
**permanently** 45:23;
61:13
**permitting** 83:8
**personal** 75:15
**persons** 68:13
**persuaded** 73:1;74:4;
75:1,2,10;76:6,6
**pertinent** 64:10
**petitioners** 67:21
**petitioner's** 66:16
**Philadelphia** 23:12
**phrase** 20:1;60:9;66:21,
24;74:21;79:16
**physical** 4:23
**piece** 13:1
**place** 21:19;23:21;24:23;
29:8
**placed** 35:19;55:18;61:2
**places** 24:22
**plain** 77:12
**plainly** 54:19
**plaintiff** 36:9;56:13,16;
70:4;83:4
**plaintiffs** 68:9,11;78:17
**play** 7:24;27:6
**played** 51:18
**plays** 27:6
**Playtex** 69:17
**pleaded** 19:11

**pleading** 6:25
**pleads** 30:22
**please** 35:17;40:2
**pm** 55:5
**PM** 55:10
**pocket** 10:4
**point** 9:11;10:19;15:13,
15;28:21;33:23;35:7;
36:10;41:10;43:18;46:4;
48:6,9;51:16;54:10;60:15
**points** 4:19;37:20
**poised** 18:21
**polish** 55:19
**politely** 35:15
**poor** 26:25
**posit** 36:16;38:23
**position** 10:12;21:14,14,
15;25:3;27:24;28:13,15;
30:8;41:6;46:6;51:17,21
**possession** 71:6;83:6
**possibility** 10:25;65:10
**possible** 42:17;55:15
**postponed** 76:25
**pot** 10:3
**power** 48:16;62:14,16;
63:18;64:6,12,12;65:1,1,16
**powerful** 54:23
**powers** 50:22
**practical** 18:3,5;36:24
**prayed** 60:23;61:11,14;
77:14
**prays** 65:11
**preceded** 45:7
**precisely** 64:22
**preclusion** 31:21,21
**prefer** 21:3
**prejudice** 8:15,16;9:6;
10:19,24;11:10;12:18;13:9;
16:13,18;18:14;19:1;21:8;
27:1;42:18;47:4;50:16;
68:11,16;76:4;77:11,14,18,
21,25;78:4,5;80:19
**prejudiced** 11:7;43:8,9;
76:7
**prejudicial** 23:6
**preliminary** 6:17;60:23
**premature** 30:15
**prematurely** 6:23
**prematurity** 7:22
**premise** 9:18;25:18
**premises** 82:24
**prepare** 82:17
**prepared** 80:7
**preparing** 13:12
**present** 4:6;11:20;20:24;
25:11;28:9;31:8;34:8;
52:22;69:15;71:25;85:1
**presentation** 26:23
**presentations** 4:19
**presently** 11:18;51:7;
52:3;57:11;82:2
**preserve** 4:22
**pretty** 24:16

**prevent** 15:4;19:3;51:9;
59:16
**prevented** 14:9
**Price** 33:3
**primarily** 21:7;60:10;
68:24;70:18
**principal** 14:10,14;15:11;
24:21,23;39:6;44:10;45:1;
68:15
**principally** 6:19
**principle** 13:7;17:15;
70:17;71:8;82:12,14;83:21
**printed** 32:24
**prior** 52:2
**priority** 71:13
**private** 68:9,11
**problem** 64:11
**problems** 66:7
**procedural** 21:7,18;23:9;
24:18
**procedure** 70:20
**proceed** 55:21;79:18
**proceeding** 9:3;18:2;
27:18;32:20;46:5;68:9;
78:12
**proceedings** 7:14;23:1,
1;30:6;43:6;55:16,16;
56:11;61:22;62:15;63:5;
64:13,14,23;65:1;79:11,21;
81:3
**Proceedings** 82:25
**proceeds** 44:10;56:22
**processes** 65:22
**produce** 5:22
**product** 55:22
**profession** 4:15
**professional** 70:13;
75:17
**progress** 71:16
**promoted** 66:2
**prompt** 78:11
**promptly** 51:14
**prone** 7:16
**proper** 5:23;7:22,25;21:8,
17;23:5,21,23;30:25;31:3;
36:16;55:11,19;63:3;78:11
**properly** 22:15;27:13;
31:6;36:13;40:17;59:14;
69:3;79:10
**property** 36:2,15;37:18;
39:24;42:13,21
**propose** 56:3
**proposed** 81:12
**proposition** 73:8
**propositions** 71:3
**propriety** 62:16
**prosecution** 32:20
**protect** 12:19;23:5;42:1
**protected** 76:13,21;81:5,
7;84:15
**protection** 47:22;77:10
**protector** 75:17
**protects** 47:1

**provide** 38:20;70:2
**provided** 83:4
**provides** 32:19;39:22;
40:8
**provision** 40:8;41:16;
67:17
**provisions** 48:23
**proviso** 4:24
**public** 65:18,24;66:1,8;
68:14;78:10
**Public** 62:23;63:7
**published** 13:12
**purpose** 6:1,2;15:17;
68:16
**pursuant** 51:8;60:8
**pursue** 35:21;46:12
**push** 46:22
**put** 4:3;6:18;15:14,25;
17:14;18:4,16;28:18;30:9;
31:6;34:24,25;35:14,18;
40:24;43:19;55:1
**Put** 54:1

## Q

**quantum** 26:10
**quarrel** 81:8,9
**quarrels** 73:19
**quickly** 55:15;61:4;79:9
**quintessential** 27:17
**quite** 34:17;77:12;83:24
**Quite** 37:5
**quoque** 20:1
**quotations** 78:8
**quote** 61:12
**quoted** 61:9
**quoting** 62:8

## R

**rare** 65:12
**rather** 6:20,24;30:4,9;
65:16;69:19;72:23
**reach** 61:1
**reached** 67:18
**reaching** 72:23;80:4
**read** 17:14;42:7;46:3,22;
49:23;50:17;66:22;73:5;
78:3,7;82:22
**reading** 31:23;48:12;
67:11
**ready** 82:21
**real** 20:2
**reality** 22:11;36:24
**realize** 20:9
**really** 4:3;10:12,19;12:14;
16:18;24:1;33:16;34:10;
35:13;72:22;75:19;78:9
**reason** 29:5;31:9;36:21;
42:11;50:15;67:8;70:9;
74:22;75:3
**reasonable** 67:16
**reasons** 4:13;27:12;

53:15;61:20;69:17,24;70:3,
14,21
**receivables** 37:8;44:6,
11;56:21
**receive** 15:10;80:17
**received** 51:13
**receiver** 8:13,14,23;
11:15;13:19;14:24;15:3;
18:25;19:2,19;36:23;37:22;
38:18;46:19;50:5;57:16;  ·
58:2,10,14
**receivership** 38:25;
48:17;50:10;59:2
**receiving** 15:4
**recent** 77:4
**recently** 44:14
**recess** 32:9,10;55:8
**Recess** 32:11
**recharacterize** 40:10
**reclaim** 40:9
**recognize** 22:11;27:4
**recognizes** 73:25
**reconstrue** 54:13
**reconvenes** 80:24
**reconvening** 80:20
**record** 5:22;24:5,6;54:3;
55:18;84:10
**records** 5:22
**recover** 40:10
**Recovery** 58:9
**redemption** 38:22
**reduce** 4:15;46:7
**reduced** 74:1;77:24
**refer** 6:4;56:5
**referred** 50:22;64:3;
68:18;73:9;79:25
**referring** 19:8
**refined** 84:10
**reflect** 54:3;64:17
**reflecting** 65:19
**Reform** 58:9
**refused** 28:21;35:23
**regard** 31:13;49:1;65:20
**regarded** 5:2;72:7
**regarding** 8:20;37:18;
43:13;46:10
**register** 63:17
**regress** 70:12
**regulations** 40:8
**Regulations** 40:7;50:19
**reimposed** 80:3
**reject** 71:25
**rejecting** 7:23
**relate** 34:10
**related** 48:11;60:2;79:25
**relating** 16:11
**relations** 66:5
**relationship** 73:11
**release** 6:10
**relied** 58:11;70:17
**relief** 17:19;19:7;42:24;
61:14;66:10,16;79:23;
84:17

BANK OF NEW VYORK v.
FIRST MILLENMIUM

December  21, 2006

relieve 20:13;22:22;35:3
relieved 25:6;28:11
relitigate 11:9;18:23
Relitigating 9:9
rely 41:12
relying 49:4
remain 77:6
remaining 26:4
remains 62:7
remanded 79:7
remark 6:17
remarks 4:4;56:8
remedies 43:22;45:4,5;
76:22
remedy 29:20,22;33:7
remember 32:15
removed 59:14,14
render 14:22
renew 79:18
renewed 75:5
repaid 39:10,10
repeated 39:20;68:21
replies 15:20
replowing 20:9
reply 4:6,7;6:19;32:10;
49:21
reported 59:11;71:2
reporter 5:4
reporters 5:22
represent 11:22,25;
21:24;22:22;25:4,7,19;
34:17;51:22;73:2,15;74:19,
25;75:23
representative 17:3;
21:12;22:12;75:11
represented 22:16;
27:13;63:2;75:9,22;80:11;
81:24
representing 9:25;11:12,
16;22:14;34:19;35:12;
51:7;74:18
represents 11:18;17:10;
20:5;57:6
requested 19:22
requests 18:25
require 5:5,6;6:14
required 4:8;9:15;10:7;
26:19;34:8;65:10,24
requires 13:15;71:8
requiring 6:16;35:4;77:19
res 19:12;24:24;28:9;
30:22;31:19;35:2;47:12;
50:11;54:16;83:25
resemblance 73:7
resolution 21:9;22:12;
43:25;61:8;80:16
resolutions 59:24
resolve 6:6;16:17,23;
24:18;58:23
resolved 16:4;23:8,8;
35:15
resolves 16:14
resources 19:2,3

respect 12:15,18;13:24;
28:8;35:24;44:6;49:6,15;
53:24;83:5
respects 63:4
respond 7:6;8:3;32:3;
53:21
response 19:24
responsibilities 25:6;
26:13,16;28:6,11,16;35:10;
73:24,25
responsibility 12:19
restrain 32:19
rests 61:22
result 11:19;12:5;13:8;
28:7;9;59:1;69:13
results 43:23
resume 18:18;52:10
return 64:25;69:1;72:4;
74:11
returned 19:19
revert 67:24
reverts 45:2
review 5:25;31:15;33:18;
47:21
reviewable 61:24
reviewed 55:24
revived 13:22
right 4:21;8:4,10;9:18;
12:12,15,15,17;15:24;
19:24;26:23;30:15;32:8,21,
25;33:23;37:5;41:17,20;
42:19;43:1,3;45:3,13,21;
46:22;48:5;49:15,18,20;
53:17,19;55:2;67:12;75:6;
82:1,20;83:12;84:24;85:6
rights 35:21;38:3;39:12,
15,18,20;40:13,18;41:12,
18;43:16;44:23;46:10,12,
20;47:1,4,23;49:2;65:14
risk 4:10;80:24
risks 76:12
rite 75:7
rock 21:19;26:18
role 51:17
room 40:5
rough 55:22
rule 5:14;6:12;9:4;11:1;
22:10;40:6;43:12;50:15;
53:7;55:4,12;64:2,2;65:14;
70:19,19,25;71:1,5,11,19,
23;72:19
Rule 17:20;25:13,17;75:7
ruled 31:25;50:12;83:18
rules 4:6;40:12;53:8;68:6;
70:20
ruling 16:14,17,20;52:24;
81:16,17
rulings 19:3
run 8:6;33:10;34:3;59:22
runs 72:10
rush 33:11

S

sake 29:24;42:25
same 6:25;7:1;9:20,21;
10:3,3,4,4;11:17;15:11;
16:11;18:14;26:9,9;33:16;
48:11;64:15;71:4
sanctions 37:14;63:5,19
sat 48:7
satisfied 12:5;67:1
saving 77:24
saw 32:2;74:3;77:18
saying 15:2;30:4;36:11;
47:24;51:9,14;75:25;84:9
scenes 63:25
schedule 60:24
scheme 58:15
scope 71:11
Scott 8:12
se 28:10;64:21
season 80:9
second 39:15;40:22;
54:11;67:20;69:10;71:13,
17;72:21
Second 69:14;79:2
second-filed 33:8
Secondly 4:18
section 40:2
Section 39:23;40:7;41:15
sections 50:4
secures 39:5
securitization 37:25;
40:11;44:4;56:23
seek 24:3;48:16;70:11
seeking 33:7,7;37:21;
45:23;47:5;59:16;61:12;
63:5,11
seeks 76:5
seem 6:19
seems 7:7,11;30:17;35:6;
67:25;75:19;76:13;77:7;
78:8
sees 28:19
selects 69:7
sell 56:21
send 5:14;6:12;9:4;11:1;
sense 18:3;24:2;30:5;
31:7;36:19
sensible 16:5
sent 15:7;35:15;67:12
sentence 61:9
separate 29:4;48:14
September 13:25;14:12;
30:19;40:25;50:13;57:20;
58:6;59:10,23;70:8
series 26:2,4
serious 73:24
serving 26:2
sesqui-equate 21:24
set 31:24;56:24
settle 66:12,13
settled 58:3,4

settlement 9:1
settles 65:13
several 38:2;45:8
severe 46:24
severely 47:3
shall 67:22;82:3;83:5
share 67:4
shield 48:24
shock 50:24
shopping 18:20;19:9,16,
21,25;20:10,14;27:22;
33:13;68:25;69:3,3,5,6,8,
11,16,21,23;70:16
short 71:14,24
shortly 27:8
show 15:21;50:18;77:13;
80:3
showing 9:17;71:12;
77:16,25
shown 64:15
shrunken 74:2
sic 26:21
side 29:16;70:14,14
sides 36:1;41:4
sign 8:9
significance 66:4
significant 6:2;73:16;
77:9,14
significantly 41:6
similar 23:11;71:9
similarities 72:9
Similarly 70:5
simple 22:11;33:18
simply 4:7;6:9;7:24;
25:23;46:4;53:21;66:14;
76:11,17
simultaneous 70:22
simultaneously 63:23;
78:16
sin 54:1
sit 8:8
sitting 24:24;44:18
situation 29:14;62:16
situations 71:14
situs 69:11
six 58:2
sixth 58:4
slight 69:7
slightly 14:5
slowly 82:20
slug 44:15
smell 19:15
smells 28:24
so-called 44:15;64:2
societal 70:13
sold 38:1;40:1;57:3
solely 34:11;40:13;47:7
solicitor 63:3
somebody 52:21
somehow 52:4
someone 65:11
sometime 30:24
somewhat 10:21;34:25

somewhere 13:15
soon 56:4
sooner 10:16
sorry 22:6
sort 7:2;68:24,25;72:10;
75:13;78:2
sound 7:8;49:24;61:23;
70:3;71:19
sounds 81:20
source 19:15
sources 38:2;39:16
southern 26:25
Southern 7:4;10:15;18:2;
24:25;63:15,23;67:7;78:15,
18,24;79:1,13,22
span 71:14,24;72:18
spare 18:22
speak 31:14;46:4;47:15;
83:13
speaking 67:6;81:4
speaks 71:2
special 30:5;71:12,22;
72:20
Special 71:13
special-purpose 40:11
specific 39:21,24;69:15;
77:21
specifically 39:22;68:17
Specifically 58:22
specify 12:3
speed 76:8
spelled 14:24
spend 16:15
spent 13:11;67:16;76:10
split 44:13;73:13
spoke 79:2,2
spoken 5:1
spread 37:8
stage 67:22
stake 34:23
stakeholder 21:15;29:17;
34:20,22;41:4
stand 4:7,8,10,12;8:8;
32:2;53:21;65:13;71:3
standards 69:19
standing 34:17;42:8;75:5
stands 36:9;54:14
staring 78:19
start 10:2;37:25
started 12:17;41:3
state 22:10;52:18,22;
54:15;64:22;79:17
State 59:13
stated 31:25;34:17;67:8;
70:22;73:8
statement 33:9;52:13
statements 33:6;37:21
states 29:7
States 57:21;63:2,10;83:1
stating 33:15;42:5
statute 6:24;22:25;23:2,4;
30:2;32:15,18;39:25;65:19;
70:20;79:14

**statutory** 14:14;39:17,18,
19,24;58:15
**stay** 5:15;6:20;7:12,13,14,
16,20,25;8:15,16;9:6,14;
10:13,17,21;18:22;19:1;
23:12,24;24:3;30:3,5;31:1;
33:7;35:8;43:1,6;45:23,25;
46:5;52:12,18,25;53:8;
56:11;60:8;61:10,11,13,17,
18,20,22;62:12,15;64:7,23;
65:1,8,11;66:8,17,19,22;
67:2,10,11,14,20;68:2;
75:3;76:5;77:11,13,14,22;
78:1,5,12,21,22,23,25;
79:1,4,10,17,18,21;80:1,6,
20
**stayed** 18:8;64:14;68:8;
79:12;83:1
**staying** 61:7;78:16
**stays** 45:20
**Stays** 45:19
**Steve** 21:4
**still** 6:12;28:22;36:9;62:7
**stipulated** 8:17;60:4;77:5
**stipulation** 47:11;77:3;
81:1,21
**stop** 75:24
**stopped** 44:20
**stops** 44:20
**straight** 54:1;55:1
**stress** 4:15
**stressful** 4:15
**strict** 72:18
**striking** 6:24
**strong** 77:16,25
**strongly** 50:5
**structure** 55:19
**studying** 13:11
**stupid** 24:4,4
**subject** 9:21;24:24;31:20;
36:16;37:16;42:2,3,4,15,
22;43:11,15;45:17;47:20,
21;59:17
**subjected** 29:12
**subjecting** 11:6
**submit** 27:20;31:2;42:19;
47:1;65:24
**submits** 21:17
**subparagraph** 50:22
**subsequent** 59:2;62:6
**substance** 36:1;56:1
**substantial** 71:8
**substantially** 71:9
**sue** 11:11;12:4;28:20;
41:12,20
**sued** 58:1
**suffer** 13:9
**sufficient** 8:3;35:2;76:12;
80:17
**sufficiently** 75:16;81:4;
83:20
**suggest** 32:5;61:19
**suggested** 23:21,22

**suggesting** 26:11;29:25
**suggestion** 19:17;64:13
**suit** 15:18,21;18:14;33:8,
8;34:6;41:13;46:17,18;
62:15;64:13;66:10;67:3;
69:12
**suits** 66:8,12;71:7
**summarize** 49:4
**summarized** 68:6
**summation** 10:22
**sums** 62:18,18,19
**superficial** 48:12;49:23;
50:17
**Supp** 50:20
**suppleness** 65:22
**suppliance** 66:16
**suppliant** 9:14;65:8;
77:13
**support** 61:10
**suppose** 10:7;12:25;
25:18;36:7;45:10;58:3;
72:3;78:20;81:20
**Suppose** 18:9;23:14;
29:23;35:12
**supposes** 60:10
**supreme** 48:4
**Supreme** 7:16;17:11;
62:4,10;63:12;64:11;67:6,
13;78:14;79:3,9
**sure** 13:23;23:19;30:11;
31:13;40:4;61:14;75:6,7,
21;80:16;84:6
**Sure** 84:24
**Surely** 26:11;74:5
**surprised** 51:4
**surprisingly** 24:23
**susceptible** 67:17
**swept** 30:16
**sword** 48:16,23
**symmetry** 78:20
**systems** 63:17

**T**

**tactic** 69:4
**taint** 20:13
**talked** 25:10
**talking** 10:13;30:1
**tangent** 39:14
**taxable** 5:11
**taxpayers** 77:19
**taxpayers'** 9:9;10:5,6
**telephone** 24:7
**telephonic** 24:10
**telling** 23:13
**tells** 76:18
**template** 79:20
**tends** 26:7
**ten-minute** 32:8,10
**termination** 44:15
**terms** 27:14;39:4;41:15;
49:16;57:13,19;59:8;71:2
**territory** 13:5

**testing** 79:14
**theirs** 26:7,7
**theme** 59:20;72:10
**Theoretically** 42:17
**theory** 9:19,20;10:4
**thereafter** 59:14
**thereby** 66:1
**therefrom** 67:5
**therein** 50:23
**thinking** 28:23
**thirds** 5:8
**though** 17:4;27:2
**thought** 17:13;34:1,2;
52:21;62:25
**threatened** 21:16;29:18;
37:14;59:17
**threats** 29:15,17;37:10
**three** 5:8;8:24;9:9,23;
24:21;52:2;68:12;72:4;
79:6
**throughout** 72:11
**thrust** 77:18
**thus** 71:8
**time-barred** 30:15
**today** 22:6;31:17;50:8;
59:21;74:21;80:11
**together** 83:21
**told** 6:24;28:23;41:2;
47:20;60:22,25
**tomorrow** 81:11
**took** 28:5;58:2;79:9
**total** 26:3
**totality** 43:5
**towards** 55:15,16;78:7
**track** 61:2
**traffic** 23:10
**trains** 23:11
**transaction** 12:3;16:17;
56:23
**transcribed** 56:4
**transcript** 5:6,8,10,20,21;
6:1;55:24;80:7
**transcripts** 5:3
**transfer** 8:21;51:5;83:7
**transferor** 44:16,16,19;
45:3;50:3
**transferred** 37:25;40:10;
56:20;60:6;77:6;81:15;
82:3
**traunch** 83:17
**trial** 4:14;27:8;60:24;
61:23;62:2
**tried** 29:10;32:15,17
**triggering** 51:19
**trouble** 46:1;77:2
**true** 20:5;25:22;33:19;
34:20;41:8
**True** 9:14;65:8;66:11
**trust** 13:4;14:10,13,16,21,
21,21,23,22;1;25:7;28:2,6,
12,20;39:17,19,24;40:1;
51:22;56:17,20,21,21;57:1,
3,6

**Trust** 57:2
**trustee** 12:10,23;17:10;
21:19,23;26:3;28:3;29:9,
17,21;41:13;44:25;56:17;
57:5;73:9,10,10,14,18;83:6
**trustee's** 12:23
**trusts** 21:24
**try** 30:18;40:9;62:20
**trying** 32:3;33:10;39:11;
48:23;84:13,17
**tu** 20:1
**turn** 20:20;26:18;37:12;
48:18,23;55:22;57:17;59:3,
7
**turned** 65:17
**turns** 63:7
**two** 11:4;14:4;15:17;16:2;
23:17;26:4;30:11,18;33:5;
38:17;56:11;57:10;64:15;
68:11;71:3,15,24;72:3,9;
73:13
**Two** 24:21;63:9
**typographical** 6:3;55:25

**U**

**ultimately** 36:6
**umbrella** 39:11
**unable** 64:12
**unacceptable** 53:5
**uncertain** 83:14
**uncomfortable** 48:8
**unconditional** 41:17
**unconstitutional** 62:24;
63:1,12
**under** 4:6;12:3,23;13:4;
14:2,15;17:25;19:25;25:6;
27:14;28:1,4,12;29:6;31:8,
10;39:11,12,22;40:6,7,12;
41:18;42:14,20;44:20,21,
21;50:3;52:1;57:8,13;59:5;
64:7;75:7
**Under** 38:2;41:15
**underfoot** 16:9
**underlying** 6:20;16:16;
33:18;44:4;56:15;70:1
**underscore** 26:8
**understandably** 73:14
**understood** 32:1;53:10;
80:16
**undertake** 29:9;60:19
**under-the-table** 75:12
**undertook** 62:10
**unfair** 34:4;43:15;68:16
**ungratefully** 59:24
**unimportant** 25:25
**uninhibited** 74:17
**union** 73:10,12,13
**United** 57:21;63:2,10;
83:1
**unjust** 48:15
**unlawful** 67:15
**unless** 46:25;67:15

**unnecessarily** 10:23
**unrepresented** 74:20
**unsubstantiated** 37:10
**unto** 8:3,9
**unusual** 66:9
**up** 7:16;8:8;32:2;40:1,4;
44:13;52:20;62:18,18,19;
79:9;84:8
**upheld** 63:4
**upon** 7:22;25:1;18:28:5,
11;33:24;38:21,22,25;
41:12;42:7;46:17;49:4;
58:11,14;59:24;61:3;62:14,
16;65:16;66:10;70:17;74:3
**upside** 48:23
**urged** 76:5
**urges** 54:17
**USC** 14:15;23:3;32:18
**use** 48:16,18;56:8
**used** 24:4;49:14;56:22;
65:20;66:21,24;74:21
**using** 41:21;62:16
**usually** 4:2
**utility** 63:16
**Utility** 62:23;63:7

**V**

**vacate** 79:17
**valid** 48:16,18
**value** 43:23
**various** 29:2;50:1
**varying** 65:23
**Vedder** 33:3
**vent** 4:11
**venue** 7:3,23;30:2,15
**vestige** 4:17
**viability** 7:18
**view** 6:13;7:9,13;15:5,15;
16:24;21:9,10;23:5;24:17;
25:23,24,25;35:8;51:16;
55:15,16;58:13;60:16;
61:16;70:7;74:5
**Viewing** 64:11
**views** 75:15
**violated** 18:21;19:20
**violating** 9:1
**voice** 73:21
**void** 62:24;63:12

**W**

**wait** 16:6;18:7;8;53:14
**waited** 50:11,14
**waiting** 18:18;50:15;
52:16,17;53:11
**wants** 27:20;82:17;84:11
**warranting** 71:18
**warring** 73:13
**Washington** 23:11
**waste** 9:8,10
**wastes** 10:4
**wasting** 10:6

BANK OF NEW VYORK v.
FIRST MILLENNMIUM

December 21, 2006

**waterfall** 44:21;45:2
**waters** 83:19
**way** 6:6;7:9;10:18;15:1;
18:4;26:9;27:6;30:1;32:1;
34:9;35:8;72:23;74:2,17;
85:4
**ways** 80:8
**web** 66:6
**week** 5:7;39:4;76:25
**weeks** 11:6
**weigh** 65:5
**weighty** 66:8
**welfare** 66:1
**well-founded** 19:11
**well-reasoned** 70:8
**well-recognized** 7:19
**weren't** 26:13
**Westlaw** 59:11
**what's** 17:23
**whereas** 14:1
**whereby** 71:5
**whichever** 21:2
**whiff** 19:8,14
**whole** 16:13
**wholly** 59:22;69:18
**who's** 12:14,15;44:12
**whose** 58:11;75:21
**willingly** 28:4,5
**winning** 45:11
**wisdom** 66:15
**wish** 5:21
**wished** 79:18
**wishes** 80:2
**wishing** 13:1
**withheld** 78:6
**withholding** 75:3
**within** 21:16;25:17;52:5;
61:22;63:18;66:9,17,19,24;
67:16;70:9;78:11
**Within** 30:3
**without** 4:8;6:16;36:17;
41:19;43:22;48:3;83:8
**Without** 37:10
**wonder** 15:1
**wonderful** 26:12
**word** 4:25;5:1,23;24:4
**words** 14:19;63:18;65:20;
70:12
**work** 12:12;65:11;83:21;
84:20
**working** 23:3
**workings** 44:3
**world** 15:5;38:8;51:12,16,
17,24
**worth** 37:7;65:19
**writ** 60:18
**write** 82:20
**writing** 31:18
**writs** 23:22;52:14,23
**Writs** 17:25;60:9,13
**written** 31:23;55:20
**wrong** 7:3;12:15;49:25;
52:22;55:1;76:10,11

**wrongfully** 13:20
**wrote** 78:7

# Y

**year** 14:13;26:2,4;30:19;
32:1;45:9,10,13
**years** 8:24;9:10,23;49:25;
50:14;52:2;62:6
**York** 8:16,17,19,23;9:1,
19,25;10:15,18;11:2,13,15,
18,22;13:7,8;14:9,18;17:3,
11;18:21;19:16,16,18,18;
20:16;21:5,6;23:11;24:3,
20,22,22,23;27:11;28:2;
29:1,5;34:11;35:3,14,21,
24,25;36:5,8,9;37:1,4,11,
11,13,19,24;38:5,6,8;
40:14;41:2;42:9,14,20,21,
22;43:2;45:17,24;47:3,6,
10,14,15,18,25;48:1,22;
50:6;51:3,5,7,21;52:25;
53:4;54:5;56:16;57:5,25;
58:23;59:13;63:16;66:11;
67:7;69:25;70:1,2,4;73:18;
78:15,18;79:2,22;81:15;
82:3;83:5