## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Civil Action No. 06-1975 (ESH)** |
| **THE BANK OF NEW YORK,** ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

The Bank of New York ("BNY") is the indenture trustee for investors ("Noteholders") who purchased asset-backed securities from the NextCard Credit Card Master Note Trust ("Trust"), which the now-defunct NextBank, N.A. ("NextBank") established in December 2000 to finance its internet-based consumer credit card business. After NextBank failed in February 2002 and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver, the Noteholders commenced what has now become a four-year challenge to the FDIC's rights to the NextBank credit card receivables.

The Noteholders' dispute with the FDIC first came to this Court in 2003 when, acting on behalf of the Noteholders, BNY sued the FDIC for six counts of conversion. Over the course of more than three years of litigation, this Court dismissed Count II; the parties settled Counts I, III, IV, and V; and the Court entered judgment for the FDIC on Count VI. *See Bank of N.Y. v. FDIC* ("*NextBank I*"), 453 F. Supp. 2d 82, 91, 101 (D.D.C. 2006). BNY appealed the ruling on Count VI, which appeal is still pending.

In November 2006, BNY abruptly discontinued regular disbursements of NextBank collections, which it had been consistently paying to the FDIC as "Transferor Interest" for the prior thirteen months, and initiated an interpleader action in New York state court seeking a determination as to whether NextBank's remaining receivables belonged to the Noteholders or the FDIC.  In response, the FDIC initiated this action, arguing that BNY's conduct violated this Court's prior judgments and orders, breached a settlement agreement that the parties had reached in *NextBank I*, and converted FDIC assets.

For the reasons set forth herein, the Court concludes that BNY's conduct violated the holding of *NextBank I* that, under the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, early amortization of the NextBank notes based solely upon the FDIC's appointment as receiver is unenforceable.  BNY's violation of this Court's September 2006 judgment and order entitles the FDIC to judgment on Count I of its complaint and related remedies.[1]

## I.    Background

### A.    Facts Underlying the Dispute[2]

"NextBank was a national banking association established in 1999 to issue consumer credit cards, primarily through the internet."  *Id.* at 85.  NextBank financed its business by

---

[1]Because the FDIC has filed a motion for judgment under Federal Rule of Civil Procedure 52(a), this Memorandum Opinion will constitute the Court's "findings of fact and conclusions of law."  Fed. R. Civ. P. 52(a).  Also, because the Court will award judgment for the FDIC on Count I, the Court need not address Counts II or III, which the FDIC has argued in the alternative.  (*See* Hr'g Tr. at 54, Jan. 11, 2007.)

[2]For a more detailed recitation of the underlying facts and a description of the transaction documents, see *NextBank I*, 453 F. Supp. 2d at 86–91.

securitizing the monthly payments due from its credit card holders, selling several series of notes

to investors, and using the proceeds from the sale of notes to fund payments to merchants for

charges made by the credit card holders.  (Pl.'s Stmt. of Undisputed Facts ["Pl.'s Stmt."] ¶ 2.)

To obtain certain accounting and regulatory benefits, NextBank established the Trust to serve as

a middleman in the sale of notes and collection of receivables.  *See NextBank I*, 453 F. Supp. 2d

at 85.

The securitization of NextBank's credit card receivables was accomplished through a

series of four interrelated "transaction documents" and related supplements.  *See id.* at 86–88.

The most important of these documents, for purposes of the present dispute, is the "Master

Indenture."  The Master Indenture provided that "[n]otes issued by the [T]rust would have three

possible cash-flow periods."  *Id.* at 87.  During an initial "revolving period," Noteholders would

receive payments of interest but no principal.  *Id.*  Later, during a "controlled amortization

period," principal would be repaid "in fixed amounts at scheduled intervals."  *Id.*  Finally, upon

the occurrence of a "redemption event" - -  including the appointment of a receiver for

NextBank - - an "early amortization period" would commence, during which "Noteholders

would receive payments of principal and interest on an accelerated schedule defined in their

indenture supplements."  *Id.*

In the event that Noteholders failed to receive full repayment of their principal, the

Master Indenture provided that they would have "recourse only to the Collateral."  (*See*

Christensen Decl. of Dec. 15, 2006 ["Christensen Decl."] Ex. 3 at 141.)  The "Collateral" was the

Trust's interest in the NextBank credit card receivables, which the Trust granted to the Indenture

Trustee.  (*See id.* Ex. 3 at 140–41.)  The Collateral excluded the "Transferor Interest," a portion

of the receivables as to which NextBank retained ownership and from which NextBank was paid a monthly percentage. (*See id.* Ex. 3 at 152; *id.* Ex. 11 ["*NextBank I* Cmpl."] ¶ 13.)

On February 7, 2002, the FDIC was appointed receiver for NextBank. *See NextBank I*, 453 F. Supp. at 89. By the terms of the Master Indenture, the appointment of a receiver constituted a redemption event triggering the commencement of an early amortization period and obligating the Trust to repay the Noteholders' principal and interest at an accelerated rate. *See id.* at 87. If the Trust were to make such accelerated payments, however, the funds invested by the Noteholders would no longer be available to finance the continuing operation of NextBank's consumer credit card business. *See id.* at 90. In order to keep NextBank's business running, the FDIC decided not to honor the provision of the Master Indenture (§ 5.01) providing that the appointment of a receiver would automatically trigger the commencement of an early amortization period (the "ipso facto" clause). *See id.* at 89–90. Notwithstanding the ipso facto clause, the FDIC enforced the Master Indenture's regular repayment schedule. *See id.* at 90–91. Upon adopting this course of action, the FDIC explained to BNY that the ipso facto clause was "unenforceable under 12 U.S.C. § 1821(e)(12)(A)"[3] because early amortization under the clause was triggered "solely by reason of . . . the appointment of a receiver," which was "in direct contravention of FIRREA." *Id.* at 90 (quoting the FDIC's letter to BNY of February 14, 2002).

Although the FDIC succeeded in keeping NextBank's business running for several months, in July 2002 "the FDIC notified BNY that NextBank's securitized credit card portfolio had failed to meet a financial performance threshold, which triggered early amortization under

---

[3]This provision, renumbered in 2005, is now 12 U.S.C. § 1821(e)(13)(A). *See NextBank I*, 453 F. Supp. 2d at 85 n.2.

4

the Master Indenture independently of the ipso facto clause." *Id.* at 91.  Consequently, "the FDIC

closed NextBank's credit card accounts by prohibiting credit card holders from making new

charges." *Id.*  At the same time, the FDIC informed BNY that it was repudiating some of the

transaction documents and related supplements, including the Master Indenture.  (*See*

Christensen Decl. Ex. 8 at 3.)  Thereafter, all Noteholders of the notes now at issue (the Series

2000-1 and 2001-1 notes) continued to receive monthly interest payments.  *See NextBank I*, 453

F. Supp. 2d at 91.  The owners of the highest-priority, lowest-risk notes (Classes A and B) also

received full repayment of their principal.  *See id.*

  However, the owners of the lowest-priority, highest-risk notes (Classes C and D) did not

fully recover their principal.  *See id.*  "[T]he Class C Noteholders were repaid only half their

principal and the Class D Noteholders were not repaid any principal." *Id.*  It was on behalf of

these Noteholders that BNY sued the FDIC in *NextBank I*, and it is on their behalf that BNY

appears in the present action.  (Hr'g Tr. at 5–6, Jan. 11, 2007; *see id.* at 9–10.)

  **B.**  **Procedural History**

  The proceedings before this Court in *NextBank I* began in June 2003.  BNY alleged six

counts of conversion against the FDIC, two of which are now relevant.  In Count II, BNY alleged

that the FDIC's retention of over $13 million "in connection with the Transferor Interest"

amounted to conversion because, by repudiating the Master Indenture in July 2002, the FDIC had

thereafter forfeited any rights to the Transferor Interest.  (*NextBank I* Cmpl. ¶ 53; *see id.*

¶¶ 49–53.)  In Count VI, BNY alleged that, by ignoring the Master Indenture's ipso facto clause

and continuing to enforce the regular repayment schedule, the FDIC had converted "assets of the

Trust" that should have been repaid to the Noteholders.  (*Id.* ¶ 75; *see id.* ¶¶ 67–75.)  More

5

specifically, BNY argued that, by preventing the commencement of early amortization in

February 2002, the FDIC had acted unlawfully under FIRREA and had "interfere[d] with the

property and the economic and contractual rights of third parties," namely the Trust and the

Noteholders.  (*Id.* ¶ 74; *see* Christensen Decl. Ex. 12 ["*NextBank I* Hr'g Tr."] at 19–20, 26–27,

45–46, 48 (raising this argument during the November 2004 hearing).)

      The FDIC moved to dismiss Counts II and VI.  *See NextBank I*, 453 F. Supp. 2d at 91.

This Court granted the motion as to Count II, but denied it as to Count VI.  (*See NextBank I* Hr'g

Tr. at 53.)  The basis for dismissing Count II was that, under the Master Indenture, the Transferor

Interest belonged to NextBank (into whose shoes the FDIC had stepped).  (*See id.*)  Only the

Collateral belonged to the Noteholders and, as all parties agreed, the Collateral excluded the

Transferor Interest.  (*See id.*)  The FDIC's repudiation of the Master Indenture in July 2002 in no

way altered this arrangement or gave the Noteholders new rights to the NextBank credit card

receivables.  (*See id.*)

      Following the Court's rulings on Counts II and VI, counsel for BNY, the FDIC, and

representative Noteholders participated in extensive mediation sessions.  (*See* Pl.'s Stmt. ¶ 39.)

Mediation resulted in an agreement settling all remaining claims and counterclaims except for

Count VI.  *See id.* ¶¶ 38.  The settlement agreement was signed by counsel for BNY, the FDIC,

and two major Noteholders - - CS First Boston LLC and Millennium Partners LLP.  (*See*

Christensen Decl. Ex. 13 at 1.)  CS First Boston LLC and Millennium Partners LLP agreed "to

strongly and promptly recommend [the] settlement" to the Noteholders as a whole.  (*Id.*)  On

August 2, 2005, BNY informed the mediator that it had "all the approvals needed for settlement."

(Pl.'s P. & A. at 8; *see* Christensen Decl. Ex 14 at 1.)  Accordingly, on September 7, 2005, this

Court entered a consent order dismissing with prejudice all claims but Count VI. *NextBank I*, Minute Order (D.D.C. Sept. 7, 2005). Shortly thereafter, on September 15, 2005, BNY commenced making monthly payments of Transferor Interest to the FDIC and continued to do so through October 2006. (Pl.'s Stmt. ¶ 41.)

The parties continued to litigate Count VI. *See NextBank I*, 453 F. Supp. 2d at 91. After discovery, cross-motions for judgment were filed. *See id.* In an opinion issued on September 27, 2006, this Court held that NextBank had "entered into" the Master Indenture within the meaning of 12 U.S.C. § 1821(e)(12)(A) and that, consequently, "FIRREA sanctioned the FDIC's decision not to honor the Master Indenture's ipso facto clause." *Id.* at 101. BNY's appeal of this Court's September 2006 decision is now pending before the D.C. Circuit. *Bank of N.Y. v. FDIC*, 453 F. Supp. 2d 82 (D.D.C. 2006), *appeal docketed*, No. 06-5358 (D.C. Cir. Nov. 3, 2006).

While pursuing the D.C. Circuit appeal, Noteholders First Millennium, Inc., Millennium Partners, L.P., and RMK Advantage Fund - - who now control a majority of the relevant notes - - also initiated additional actions to recoup their lost principal, which they claim amounts to over $112 million. (*E.g.*, Christensen Decl. Ex. 21 at 2.) On November 9, 2006, they sent BNY an "instruction letter" directing BNY to (1) execute a "Notice of Event Default and Acceleration under the Master Indenture;" (2) exercise control over the "Collateral;" (3) prevent further distribution of Trust assets other than as authorized in the instruction letter; (4) "cause all moneys and proceeds received from the [Trust] or from the Collateral" to be disbursed as if an early amortization had occurred in February 2002, until there is "full repayment" of the notes; (5) "on or prior to November 17, 2006, commence an action in the Supreme Court of the State of New York sitting in New York County" seeking

7

> (i) to obtain a judgment against the [Trust] for the full unpaid principal and
> interest due on the accelerated Notes, (ii) . . . to obtain a declaratory judgment
> authorizing the payment of all amounts due to the Series C and Series D
> Noteholders . . . [,] and (iii) to obtain any other injunctive relief . . . for the
> continuation of the existence of [the Trust] and the Collateral and the
> continuation of the distributions . . . until all unpaid principal and interest have
> been paid in full;

and (6) "pursue the [D.C. Circuit] appeal." (Christensen Decl. Ex. 17 at 1–4.) The instruction

letter indemnified BNY for following the Noteholders' directions and allowed BNY to use any

funds recovered both to satisfy the substantial overruns in fees and costs from *NextBank I* and to

pay reasonable fees and expenses for pursuing the D.C. Circuit appeal and the proposed New

York litigation. (*Id.* Ex. 17 at 2, 4–5.)

Although initially BNY informed the Noteholders that it "decline[d] to accept the

Instruction Letter" because the Noteholders' directions conflicted with this Court's September

2006 decision in *NextBank I*, BNY subsequently reversed its position. (*Id.* Ex. 16 at 1 (quoting

BNY's letter to the Noteholders); *see, e.g.*, Def.'s Reply at 3 ("On the basis of the analysis in [a]

letter from [counsel for the Noteholders], BNY concluded in good faith that the actions

demanded [in the instruction letter] were not prohibited by any language in the [September 2006]

decision.").) Accordingly, on November 14, 2006, BNY sent the Trust, its "Servicer," and the

FDIC a "Notice of Default under Master Indenture and Notice of Acceleration for Both Series

2000-1 Notes and Series 2001-1 Notes." (*See* Christensen Decl. Ex. 19 at 1–5.) On November

16, 2006, the Noteholders issued a substantially similar "Notice of Default." (*See id.* Ex. 21 at

1–4.)

On November 15, 2006, after receiving BNY's notice of default but before receiving the

Noteholders' notice, the FDIC informed BNY that BNY's notice "ha[d] no effect for the reasons

8

explained" by this Court in its September 2006 Memorandum Opinion.  (*See* Christensen Decl. Ex. 20 at 1.)  The FDIC warned BNY that "if [BNY] or the Noteholders attempt[ed] to take further action on the Notice of Default or otherwise [took] funds not due to them, the FDIC Receiver [would] seek judicial intervention, as well as attorneys' fees and costs for having to take such action."  (*Id.*)  Nevertheless, that same day, BNY discontinued its monthly payments of Transferor Interest to the FDIC, and it has since failed to make the payments scheduled for December 15, 2006, and January 15, 2006.  (*See, e.g.*, Hr'g Tr. at 29 (agreeing with the Court that the payments stopped in November 2006); *see generally* Christensen Decl. of Dec. 28, 2006 ["Christensen Supp. Decl."] Ex. 1 (showing payments of $3,178,731.15 due on December 15, 2006); Christensen Decl. Ex. 28 (showing payments of $3,626,534.39 due on November 15, 2006).)

The following day, counsel for the Noteholders sent BNY an email reiterating that BNY should obey the directives set forth in the instruction letter and stating: "If you are truly concerned regarding [the FDIC's] contempt threat, then the Noteholders would understand that you may wish to bring an interpleader action in New York - - and only in New York."  (Def.'s Ex. 1 at 2.)  Hours later, at approximately 10:30 p.m. on November 16, 2006, BNY filed an interpleader complaint in New York state court naming the Noteholders and the FDIC as interpleader defendants.  (*See* Christensen Decl. Ex. 23 at 1; Pl.'s P. & A. at 14.)

One day after BNY filed the New York interpleader action, the FDIC filed this case.  The FDIC's complaint sets forth three claims: Count I requests an injunction to protect the FDIC's statutory power to disregard the Master Indenture's ipso facto clause; Count II asserts that, by discontinuing the FDIC's monthly payments of Transferor Interest, BNY breached the *NextBank*

*I* settlement agreement; and Count III alleges that BNY's retention of the disputed funds constitutes conversion of the FDIC's Transferor Interest.  (*See* Cmpl. ¶¶ 44–50 (Count I); *id.* ¶¶ 51–56 (Count II); *id.* ¶¶ 57–62 (Count III).)

In addition to its complaint, the FDIC filed a motion for a temporary restraining order ("TRO") and preliminary and permanent injunctions barring BNY from distributing Trust assets to the Noteholders in violation of this Court's September 2006 decision.  (*See* Pl.'s P. & A. in Supp. of the FDIC Receiver's Mot. for a TRO and a Preliminary and Permanent Injunction at 8.)  To eliminate the need for a TRO hearing, BNY stipulated that the disputed funds "[would] not be transferred or distributed in any way . . . pending an order from this Court regarding the distribution or transfer of such funds."  (Christensen Decl. Ex. 22 at 1.)  On the basis of BNY's stipulation, this Court issued an order denying as moot the FDIC's TRO motion.  *FDIC v. Bank of N.Y.*, No. 06-1975, Minute Order (D.D.C. Nov. 28, 2006).  At the same time, pursuant to Federal Rule of Civil Procedure 65, the Court issued a notice consolidating its merits determination with its determination of the FDIC's request for a preliminary injunction.  *See id.*

Meanwhile, on November 20, 2006, the Millennium Noteholders moved for summary judgment in the New York interpleader.  (*See* Christensen Decl. Ex. 24 ["Noteholders' Mem. in Supp. of S.J."] at 12.)  Because the Millennium Noteholders served the FDIC at its New York office, without serving either the FDIC's District of Columbia headquarters or its outside counsel's office, the FDIC was unaware of the motion for summary judgment when it removed the interpleader to the U.S. District Court for the Southern District of New York on November 21, 2006.  (*See* Pl.'s Emergency Mot. to Stay Related Cases ["Pl.'s Mot. to Stay"] at 1, 3.)

When the FDIC became aware of the Millennium Noteholders' motion for summary

judgment, it filed an "Emergency Motion to Stay Related Cases," asking this Court to stay the New York interpleader pursuant to the All Writs Act, 28 U.S.C. § 1651. (*See* Pl.'s Mot. to Stay at 1.) In support of its motion, the FDIC argued that, absent a stay, its "rights [would] be prejudiced by being forced to relitigate in New York the complicated issues already litigated before and decided by this Court." (*Id.* at 7.) BNY opposed this motion on the ground that neither the New York action nor its briefing schedule, which the FDIC could seek to extend, was an emergency warranting an All Writs Act stay. (*See* Def.'s Reply at 7–8.)

On December 4, 2006, after the Noteholders and BNY refused to consent to a voluntary stay of the interpleader, the FDIC sought a stay from the New York district court. (*See* Def.'s Ex. 2 at 12.) On December 21, 2006, the Honorable Charles S. Haight considered the FDIC's motion after hearing arguments from counsel for the FDIC, BNY, and the Millennium Noteholders. (*See* Pl.'s Ex. A ["S.D.N.Y. Hr'g Tr."] at 1.) In a decision issued from the bench, Judge Haight opined that BNY could adequately represent the Noteholders in the present action, and he rejected the argument that the "first-filed" rule should be followed so as to give precedence to the New York action. (*See id.* at 70–76.) Relying on the Supreme Court's decision in *Landis v. North American Co.*, 299 U.S. 248 (1936) - - in particular, the emphasis that *Landis* places on "the complexity of the case, and the importance of the public issues involved, and the necessity within the context of proper and efficient and prompt administration of justice to stay one proceeding in deference to the other" - - Judge Haight stayed the New York proceedings pending this Court's ruling. (*Id.* at 78–79.)

On January 11, 2007, with the New York interpleader stayed, this Court heard argument on BNY's motion to dismiss, the FDIC's motion for judgment, and the FDIC's motion for an All

11

Writs Act stay.  It is to these motions that the Court will now turn.

## II.    Motion to Dismiss

BNY advances three arguments for why this case must be dismissed.  At least two of these arguments have already been rejected in dicta by Judge Height and, for the reasons stated below, this Court finds that all three lack merit.

### A.    Rule 19

BNY's principal argument is that the Noteholders are "necessary" and "indispensable" parties within the meaning of Federal Rule of Civil Procedure 19, who cannot be joined because this Court lacks personal jurisdiction over them.  (*See, e.g.*, Def.'s Supp. P. & A. at 11–17.)

> Federal Rule of Civil Procedure 19 prescribes a three-part procedure for determining whether litigation may proceed in the absence of a particular person or entity.  First, the Court must determine if the absent party is "necessary to the litigation;" second, if so, whether the party can be joined; and third, if joinder is infeasible, whether the action can nevertheless proceed "in equity and good conscience."

*Pueblo of Sandia v. Babbit*, 47 F. Supp. 2d 49, 52 (D.D.C. 1999).

> An absent person is necessary under Rule 19
>
> if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).  Here, BNY argues that the Noteholders are necessary parties under both Rule 19(a)(2)(i) and (ii).  (*See* Def.'s Supp. P. & A. at 11–12.)

12

### 1.    Rule 19(a)(2)(i)

It is well settled that adjudicating an absent person's claim cannot "impair or impede the person's ability to protect [his] interest" if he is adequately represented by one of the existing parties. *Id.*; *see Ramah Navajo Sch. Bd., Inc. v. Babbit*, 87 F.3d 1338, 1351 (D.C. Cir. 1996). Accordingly, as a rule, "bondholders are not necessary parties to . . . litigation wherein an indenture trustee under a bond issue is a party and exercises in good faith and without neglect his contractual authority to represent and assert the lien securing the issue." *Kersh Lake Drainage Dist. v. Johnson*, 309 U.S. 485, 491 (1940); *accord Elwell v. Fosdick*, 134 U.S. 500, 512 (1890).

Only under limited and special circumstances have courts concluded that trustees do not adequately represent the interests of absent beneficiaries. For example, when a single trustee represents beneficiaries with conflicting interests, the beneficiaries will be necessary parties. *See, e.g.*, *Green v. Brophy*, 110 F.2d 539, 543–44 (D.C. Cir. 1940) (holding that members of a local union whose loyalties were split between two national labor organizations were not adequately represented by either organization, and citing with approval "the disposition of the famous controversy between two rival factions in the Presbyterian Church, where it was stated that the indispensable parties to that litigation were representatives of the two rival factions, while trustees of the property in question were characterized as merely nominal parties"); *Only Collections v. County of Cochise*, 589 P.2d 1342, 1344 (Ariz. Ct. App. 1978) ("A beneficiary must be made a party to any litigation involving his interest if the trustee or other beneficiaries are antagonistic to it. There is no doubt here that the interests of [the two beneficiaries to the trust] were antagonistic. It was to [one beneficiary's] benefit and to the [other's] detriment to have the judgment against [the first beneficiary] satisfied out of the [trust] funds. [The trustee]

13

could not . . . adequately represent these conflicting interests." (citations omitted)).  Similarly, a

trustee does not adequately represent its beneficiaries when there is evidence demonstrating that

the trustee has assumed an "antagonistic" attitude toward the beneficiaries and their legal

position.  *See, e.g.*, *Reed v. Robillo*, 376 F.2d 392, 393, 396 (6th Cir. 1967) (holding that the

executors of the plaintiff's parents' estates were properly aligned as defendants in two suits that

the plaintiff had filed against her parents' former business partners, because both executors had

refused to bring suit on the plaintiff's behalf and had affirmatively endorsed the former business

partners' legal position); *Hirsch v. Stone*, 62 F.2d 120, 122 (5th Cir. 1932) (holding that a trustee

who had failed to foreclose on a deed of trust and offer the property securing it for sale was

properly aligned as a defendant in a foreclosure suit by the owners of notes secured by the deed

of trust because the trustee had taken a position "really antagonistic to" the plaintiffs by not only

"refus[ing] to co-operate with them" but "threaten[ing] to resign, or resign[ing]"); *Hellenthal v.*

*John Hancock Mut. Life Ins. Co.*, 31 F.2d 997, 998 (W.D. Wash. 1929) ("In the instant case the

Spokane Savings & Loan Association, assignee of the policy, is trustee and refused to bring suit

or join with the beneficiary in the suit.  It is a necessary party, and was necessarily made a

defendant.  It assumes an antagonistic attitude by denying the plaintiff's claim under oath by its

manager 'authorized to make this verification for and on its behalf.' . . . Where the conduct of the

party is shown to be antagonistic to the plaintiff and makes common cause and interest with the

defendant, the court may not align the party as a plaintiff.").

    Here, as BNY concedes, there is no dispute that BNY represents the Noteholders as

indenture trustee.  (*See* Hr'g Tr. at 5–6.)  Nevertheless, BNY argues somewhat disingenuously

that it cannot adequately represent the interests of the Noteholders because, instead of heeding

the Noteholders' instruction to file suit in New York state court against the Trust, it chose - -

with the Noteholders' permission - - to file an interpleader naming the Noteholders and the

FDIC as adverse claimants.  (*See, e.g.*, Def.'s Supp. P. & A. at 15 (discussing the relevance of the

interpleader); *see* Def.'s Ex. 1 at 2 (stating that the Noteholders "would understand" BNY's

decision to file an interpleader).)  Having considered this very argument, Judge Haight rejected it

because there are "no division[s], no differences, no disagreements, no quarrels" among the

Noteholders, and, therefore, BNY's fiduciary obligations are clear.  (S.D.N.Y. Hr'g Tr. at 73.)

Moreover, there is *no* evidence to suggest that the New York interpleader will prevent BNY from

representing the Noteholders before this Court any less zealously than it has done since 2003.

(*See id.* at 74–75.)  BNY endorses the Noteholders' position that this Court's prior decisions in

*NextBank I* do not bar the New York interpleader based on principles of claim or issue

preclusion.  (*See, e.g.*, Hr'g Tr. at 6–7 ("It does not appear to us that [this Court's September

2006 Memorandum Opinion] addresses . . . all of the issues raised and all of the issues necessary

to a decision on the new issues raised."); *id.* at 74 ("We don't think Your Honor's prior order

answers [the] question [whether the notice of default transformed the Transferor Interest into

Collateral]."); Def.'s P. & A. at 21–22 (arguing that claim preclusion should not apply); Def.'s

Reply at 3 ("On the basis of the analysis in [a] letter from [counsel for the Noteholders], BNY

concluded in good faith that the actions demanded were not prohibited by any language in

[*NextBank I*] . . . ." ).)  As for the Noteholders' claim to the disputed funds, even though BNY

appears to want to portray itself as less than enthusiastic, its stance in this case is certainly not

adverse to that of the Noteholders.  (*See* Def.'s Reply at 5 (claiming to take "no position" on who

is entitled to the funds).)  Indeed, BNY's professed neutrality has a hollow ring given BNY's

15

repeated references to the disputed funds as "Collateral" in its pleadings. (*See, e.g.*, *id.* at 12 (defining "[t]he assets at issue" as "the proceeds of the Collateral").)  Furthermore, contrary to BNY's claim that it has no stake in who receives the disputed funds, the Noteholders have promised to pay BNY's attorney's fees - - now substantially in arrears - - from any funds that they recover. (*See* Hr'g Tr. at 76; Christensen Decl. Ex. 17 at 2; *see also* Def.'s Ex. C at 15 (letter from counsel for Noteholders suggesting that the Noteholders' and BNY's interests "should be aligned here").)  Finally, BNY continues to represent the Noteholders in their pending appeal before the D.C. Circuit, and the Noteholders have indemnified BNY for "any claim, cause of action, litigation, proceeding, action or investigation" that might arise from its compliance with the Noteholders' November 9, 2006, instruction letter. (*See* Christensen Decl. Ex. 17 at 4–5 (indemnifying BNY); Pl.'s Reply at 2 (emphasizing that BNY is representing the Noteholders before the D.C. Circuit).)  Such facts assure that BNY, as indenture trustee, will zealously protect the Noteholders' interests in this Court, as it has done since first filing suit here in 2003.

## 2.    Rule 19(a)(2)(ii)

BNY's alternative argument that the Noteholders are necessary parties because their absence subjects BNY "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" is equally unavailing.  Fed. R. Civ. P. 19(a)(2)(ii).  "In order to qualify as a necessary party under Rule 19(a), the possibility of being subject to multiple or inconsistent obligations must be real, and not a mere possibility."  *TRT Telecomm. Corp. v. W. Union Tel. Co.*, No. 87-2760, 1988 WL 19259, at *2 (D.D.C. 1988) (citing 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1604 at 62 (2d ed. 1986)).  The standard is not satisfied if *res judicata* or collateral estoppel bars subsequent actions involving the same parties

16

or issues.  *See, e.g.*, *Akers v. Bonifasi*, 629 F. Supp. 1212, 1215–16 (M.D. Tenn. 1984) ("The res-judicata effect of the final judgment to be entered herein negates any substantial risk that the defendants might be subjected to double liability."); *cf. Global Disc. Travel Servs., LLC v. Trans World Airlines*, 960 F. Supp. 701, 708–09 (S.D.N.Y. 1997) ("Because res judicata will not bind any subsequent court to this Court's interpretation of the contract, as Global previously argued, TWA is at risk of having another court re-decide its rights and obligations under the Agreement. This situation is precisely what Rule 19 seeks to avoid, and for this reason, as well as for the other reasons discussed, I conclude that Karabu is a necessary party under Rule 19(a)."). Here, because BNY represents the Noteholders as indenture trustee, the Noteholders will be bound by this Court's decision, as they were with respect to this Court's decisions in *NextBank I.* (*See* Hr'g Tr. at 9–10.)  In addition, any injunction against BNY will bind the Noteholders under Federal Rule of Civil Procedure 65.  *See* Fed. R. Civ. P. 65(d) ("Every order granting an injunction . . . is binding . . . upon the parties to the action . . . and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.").  Thus, neither BNY nor the Noteholders can be subject to inconsistent obligations, and the Noteholders are not necessary parties under Rule 19(a)(2)(ii).

    **B.    "First-Filed" Rule**

    BNY's second argument for dismissal is that the judge-made "first-filed" rule requires this Court to defer to the New York interpleader.  (*See, e.g.*, Def.'s Supp. P. & A. at 18–20 (presenting one statement of the first-filed argument).)  The first-filed rule provides that, "[w]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its

17

conclusion first." *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980) (alteration in original) (quoting *Speed Prods. Co. v. Tinnerman*, 171 F.2d 727, 729 (D.C. Cir. 1948)). Although this rule serves the interest of judicial efficiency, the D.C. Circuit has expressly warned against the rule's mechanical application. *See Columbia Plaza Corp. v. Security Nat'l Bank*, 525 F.2d 620, 628 (D.C. Cir. 1975). The rule should not be applied when equitable considerations favor adjudication of the later-filed case. *See id.*

Here, BNY argues that equity favors adjudication of the first-filed New York interpleader because the Noteholders are parties to that action but not to this one. *See, e.g., id.* (suggesting that, when only some parties are joined in one forum, adjudication in an alternative forum in which all parties are joined is favored). In light of this Court's conclusion that BNY adequately represents the Noteholders, BNY's argument carries little weight.[4] By contrast, the extensive and lengthy proceedings in *NextBank I* have caused this Court to become intimately familiar with the parties, their dispute, and the relevant law. As a result, the prior proceedings weigh heavily *against* the application of the first-filed rule, since they make it likely that the present dispute can be "more expeditiously determined" here than in New York. *Id.* In addition, "[t]he interests of justice . . . clearly militate against application of the [first-filed] rule" when, "as here, the time period between the filing of the two suits is only a matter of hours." *Ledyard v. United States*, No. 95-0880, 1995 WL 908244, at *3 (D.D.C. 1995). Thus, for substantially the same reasons cited by Judge Haight when he agreed to stay the New York interpleader action, this Court declines to apply the first-filed rule. (*See* S.D.N.Y. Hr'g Tr. at 70–80.)

---

[4]The FDIC also persuasively argues that the filing date of the New York action should not be compared to the filing date of this action, but rather to the 2003 filing date in *NextBank I*. (*See* Pl.'s P. & A. at 29.)

### C.    Rule 12(b)(3)

Finally, BNY argues that this case must be dismissed for improper venue under Federal Rule of Civil Procedure 12(b)(3).  (*E.g.*, Def.'s Supp. P. & A. at 20–21.)  BNY's argument fails for two reasons.

First, as BNY agreed at the January 2007 hearing (*see* Hr'g Tr. at 8), this Court has inherent jurisdiction to enforce its September 2006 judgment.  *See, e.g.*, *United States v. York*, 909 F. Supp. 4, 9–10 (D.D.C. 1995) ("Although the filing of [a] notice of appeal divests the district court of jurisdiction over any matters dealing with the merits of the appeal, the district court retains jurisdiction over any issues relating to the enforcement of the judgment . . . ." (quoting *Sheldon v. Munford, Inc.*, 128 F.R.D. 663, 665 (N.D. Ind. 1989))).  "It would be anomalous indeed for a court to be able to enter a judgment but not be able to enforce it because of improper venue."  *Americananglian Envtl. Techs., L.P. v. Doherty*, --- F. Supp. 2d --- , --- , 2006 WL 3327668, at *3 (E.D. Pa. 2006).  Here, in Count I, the FDIC seeks an injunction to enforce this Court's September 2006 judgment, arguing that BNY violated the judgment by discontinuing the FDIC's monthly payments from the Trust's collections account.  (*See* Cmpl. ¶¶ 44–50.)  Thus, this district is a proper venue for the adjudication of Count I.

Alternatively, as the FDIC has argued, venue is proper under 28 U.S.C. § 1391(b)(2). "[A] substantial part of the events or omissions giving rise to" Count I occurred in this district because it was here that the FDIC first decided to enforce the Master Indenture's regular repayment schedule notwithstanding the ipso facto clause, that it communicated its decision to

BNY, and that BNY first challenged the propriety of the FDIC's actions.[5]  28 U.S.C.

§ 1391(b)(2) (2006); *cf. Cameron v. Thornburgh*, 983 F.2d 253, 257 (D.C. Cir. 1993) (declining

to recognize venue on the basis of policy decisions purportedly reached in the District of

Columbia absent any evidence that such decisions had indeed occurred).

Because venue in this district is proper, the first-filed rule need not be applied, and the

Noteholders are not necessary parties, the defendant's motion to dismiss will be denied.

### III.    Motion for Judgment

#### A.    Judgment at This Stage of the Proceedings Is Proper

BNY argues that "summary judgment" in this case would be "premature."  (Def.'s Supp.

P. & A. at 2; *see id.* at 21, 23.)  As a threshold matter, the FDIC has moved for judgment

pursuant to Federal Rule of Civil Procedure 52(a), not for summary judgment.  (*See* Mot. for J. at

1.)  Because the Court has consolidated its merits determination with its determination of the

FDIC's request for a preliminary injunction, and because both parties have submitted

documentary evidence, consideration of the FDIC's motion for judgment is proper.  *See FDIC v.*

*Bank of N.Y.*, No. 06-1975, Minute Order (D.D.C. Nov. 28, 2006).  In any event, a motion for

summary judgment would be timely.  *See* Fed. R. Civ. P. 56(a) ("A party seeking to recover upon

a claim . . . may, at any time after the expiration of 20 days from the commencement of the

action . . . , move with or without supporting affidavits for a summary judgment . . . .").

BNY also asserts that judgment is foreclosed by genuine issues of material fact or mixed

---

[5]There also can be no difficulty as to venue with respect to Count II, since the settlement
agreement was negotiated and executed in this jurisdiction.  However, because it is not necessary
to decide the issues raised in Counts II or III, which the FDIC has pled in the alternative, the
Court need not satisfy itself as to venue for those counts.  (*See* Hr'g Tr. at 54.)

issues of law and fact. (*E.g.*, Def.'s Reply at 21–23.) Such an assertion cannot be reconciled

with the Noteholders' motion for summary judgment in the New York interpleader. (*See, e.g.*,

Noteholders' Mem. in Supp. of S.J. at 1 ("The material facts are uncontested.").) It is also

inconsistent with the pleadings in this case, which make clear that the dispute is purely legal.

Accordingly, there is no obstacle to reaching the merits of the FDIC's motion.

### B.    The FDIC Is Entitled to Judgment on Count I

Count I requires the Court to determine whether, when BNY discontinued its monthly

payments to the FDIC and initiated the New York interpleader, it relied upon a legal theory that

was foreclosed by *NextBank I*. Collateral estoppel bars the relitigation of an issue when (1) the

issue was "submitted for judicial determination in [a] prior case," (2) the issue was "actually and

necessarily determined by a court of competent jurisdiction in that prior case," and (3) preclusion

does not "work a basic unfairness to the party bound by the first determination." *Yamaha Corp.*

*of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). BNY does not, and could not,

dispute the fairness of binding the Noteholders by *NextBank I*. (*See* Hr'g Tr. at 9–10.)

Accordingly, the Court must determine whether any issue essential to the Noteholders'

interpleader claim was submitted for this Court's determination in *NextBank I* and decided in

favor of the FDIC. If so, the FDIC is entitled to judgment on Count I.[6]

The Noteholders' theory of entitlement to the NextBank receivables depends on the

---

[6]The FDIC argues that the Noteholders' claim is also barred by claim preclusion. (*See* Pl.'s P. & A. at 23–26.) Given the Court's determination that the claim is barred by collateral estoppel, the Court need not address the FDIC's claim preclusion argument. Similarly, the Court need not address the FDIC's argument that the New York interpleader is barred by FIRREA's statute of limitations and venue selection provision. (*See, e.g.*, Hr'g Tr. at 46 (arguing that, even if *res judicata* did not bar the interpleader, FIRREA's statute of limitations and venue selection provision would).)

proposition that, even if the Master Indenture's ipso facto clause is unenforceable against the

FDIC, it is enforceable against the Trust.  (*See* Hr'g Tr. at 27, 47, 49, 70, 73; S.D.N.Y. Hr'g Tr.

at 49; Christensen Decl. Ex. 18 ["Noteholders' Mem. in Opp. to Stay"] at 9; Noteholders' Mem.

in Supp. of S.J. at 2–4.)  The Noteholders' reasoning is as follows: The Master Indenture,

Indenture Supplements, and Notes created contractual obligations between the Trust and the

Noteholders with which the FDIC could not interfere.  (*See, e.g.*, Hr'g Tr. at 72 ("I believe the

noteholders said the trust has an independent obligation to pay on the notes . . . ."); Noteholders'

Mem. in Opp. to Stay at 32 ("[T]he Notes establish an independent obligation owed by the

[Trust] directly to the Noteholders . . . . and because the Notes are separate obligations owed by

the [Trust] to the Noteholders, the [FDIC's] *ipso facto* defense is not relevant to this interpleader

action."); Noteholders' Mem. in Supp. of S.J. at 1–2 (discussing the Trust's independent

obligations under the Master Indenture and the Notes).)  Then, on February 7, 2002, when

NextBank entered into receivership, a "Redemption Event" occurred under § 5.01(a) of the

Master Indenture, which triggered early amortization and the Trust's obligation to repay the

Noteholders' principal at an accelerated rate.  (*See, e.g.*, *id.* at 3 ("As a Redemption Event,

NextBank's entry into receivership also caused the commencement of the Early Amortization

Period (as defined in the Indenture), whereupon the [Trust] was required to commence making

payments of principal on the Notes in accordance with . . . the Indenture Supplements . . . .").)

Thus, under the Noteholders' reasoning, when the Trust failed to make accelerated payments,

§ 5.03 of the Master Indenture empowered the Noteholders and BNY to issue notices of default

demanding immediate repayment of all principal and interest (*see id.* at 4; Christensen Decl. Ex.

21 at 1; *id.* Ex. 19 at 1), and, under § 5.06 and § 8.01 of the Master Indenture, such notices of

22

default gave BNY the right to control all collections of the NextBank receivables. (*See* Noteholders' Mem. in Opp. to Stay at 7–8; Noteholders' Mem. in Supp. of S.J. at 5.) Furthermore, § 5.05(b) of the Master Indenture prescribed that, when early amortization is triggered, collections should be allocated first to BNY for fees and expenses, second to the Noteholders for unpaid interest and principal, and last to the Trust for uses such as paying the Transferor Interest. (*See id.* at 8.) Thus,

> [b]ecause the amount of the [collections is] insufficient to repay the principal amount of the outstanding Notes . . . , all of the proceeds of the Receivables are required to be distributed under the terms of the Master Indenture to the Noteholders (after the payment of the Indenture Trustee's fees and expenses) to repay the unpaid principal and interest due on the Notes.

(*Id.* at 9.) In other words, by the Noteholders' logic, there are simply no funds left for distribution as Transferor Interest. (*See id.*)[7]

In essence, BNY's argument relies on the premise that *NextBank I* dealt only with the liability of the FDIC and had no bearing on the liability of the Trust.[8] This premise is simply

---

[7]During the December 2006 hearing before Judge Haight, the Noteholders alluded to an alternative theory based on an argument that, once a series of notes reaches maturity, the Trust must immediately repay all principal and interest to the owners of those notes. (*See* S.D.N.Y. Hr'g Tr. at 39, 49.) The Series 2000-1 notes matured on December 15, 2006. (*E.g.*, *id.* at 49.) Accordingly, the Noteholders appear to contend that, irrespective of any early amortization requirement, all unpaid principal and interest on the Series 2000-1 notes is immediately due and payable. (*See* Hr'g Tr. at 15, 49, 75; S.D.N.Y. Hr'g Tr. at 49.)

The Noteholders' new and unexplained "maturity theory" is not before this Court. Neither BNY nor the Noteholders issued a notice of default based on the Series 2000-1 maturity date. (Hr'g Tr. at 84; *see, e.g.*, Christensen Decl. Ex. 21 at 1–3 (making no reference to the maturity date); *id.* Ex. 19 at 1–3 (same).) Moreover, it is clear from the record that, when discontinuing the FDIC's monthly payments and initiating the New York interpleader, BNY was not acting upon any maturity theory. (*See, e.g.*, *id.* Ex. 16 at 14 (referencing the Series 2000-1 maturity date without presenting the maturity theory).)

[8]For example, as part of a letter insisting that BNY follow the Noteholders' directives notwithstanding *NextBank I*, counsel for the Noteholders stated:

wrong, for a careful review of the record from *NextBank I* clearly demonstrates that the issue of whether FIRREA empowered the FDIC to prevent the Noteholders from enforcing early amortization against the Trust was both "submitted for judicial determination" and "actually and necessarily determined" by this Court in *NextBank I. Yamaha*, 961 F.2d at 254.

This conclusion is supported by a review of BNY's complaint in *NextBank I*. There, BNY alleged:

> 74.    The FDIC ignored the commencement of an Amortization Period and continued to act as if an Amortization Period had not commenced until at least July 2002. *The FDIC had no right to interfere with the property and the economic and contractual rights of third parties in relation to assets which are separate and apart from the receivership estate.* Distributions to Noteholders should have been made in accordance with the terms of the Master Indenture. The FDIC failed to apply these collections to pay down the outstanding principal of the Notes, as required by the Master Indenture. In addition, this failure to amortize has resulted in a greater allocation of losses to the Notes than would have otherwise occurred under the terms of the Master Indenture.

> 75.    As a result of its failure to begin the Amortization Period at the proper time,

---

- [*NextBank I*] does not address the liability of the [Trust] in any way;
  . . . .
- Neither did the court hold that an Early Amortization Event did not occur in February 2002;
- Nowhere in [*NextBank I*] did the court rule that the Early Amortization Event in February 2002 was not enforceable against the [Trust];
- Nowhere in [*NextBank I*] did the court rule that any of the provisions of the Indenture could not be enforced against the [Trust];
- Nothing in [*NextBank I*] excused the [Trust] from making principal repayments under the Early Amortization waterfall starting in February 2002; and
- Nothing in [*NextBank I*] excuses the [Trust] from the Event of Default arising from the non-payment of principal caused by the delay in honoring the Early Amortization Period in February 2002.

(Christensen Decl. Ex. 16 at 3–4.)

> the FDIC wrongfully took and converted the *assets of the Trust*, without proper or just compensation, in violation of (i) *the property rights of third persons, that is, the Noteholders and the Indenture Trustee, on their behalf*, and (ii) *the perfected first priority security interest of the Indenture Trustee on behalf of the Noteholders* to such assets to secure repayment of the Notes.

(Christensen Decl. Ex. 11 at 16–17 (emphasis added).)

Similarly, during the November 2004 arguments on the FDIC's motion to dismiss, BNY repeatedly emphasized that, by ignoring the ipso facto clause, the FDIC had impermissibly prevented acceleration when acceleration "was a right between the note holders and the trust." (*NextBank I* Hr.'g Tr. at 19–20; *see id.* at 26–27 ("In Count VI, they're trying impermissibly to repudiate the rights and obligations between two other parties."); *id.* at 45–46 ("They didn't allow a contractual right of another party with yet another third party to be given effect.").)  In support of this argument, BNY reasoned:

> If there is a contract with 100 parties, [the FDIC is] not entitled to meddle with the rights and obligations between and among the other 99.
> If it is a right or obligation to which the bank has one of their rights or obligations okay.  You can enforce, despite an acceleration clause, that accelerates some obligation of the bank, *but not that accelerates some obligation of a trust, a separate entity*.  That's not the purpose of a receiver in bankruptcy or common law.
> It is not within the power of a receiver at common law to do anything but step into the shoes of the failed institution, the bankrupt party, and act on its behalf.  And deal with its rights and obligations under a contract not somebody else's rights and obligations under a contract.

(*Id.* at 48 (emphasis added).)  In light of BNY's arguments and its complaint in *NextBank I*, there can be no doubt that the enforceability of early amortization against the Trust was a central issue that BNY "submitted for judicial determination."  *Yamaha*, 961 F.2d at 254.

Similarly, this Court's September 2006 Memorandum Opinion leaves no doubt that the FDIC's authority to prevent enforcement of the Master Indenture's ipso facto clause against the

Trust was an issue that was "actually and necessarily determined" in *NextBank I*. *Yamaha*, 961

F.2d at 254. For example, in reaching its decision to award judgment for the FDIC, the Court

relied on portions of FIRREA's legislative history that reflected Congress's intention to "codif[y]

the common law rule that ipso facto clauses are void as contrary to public policy." *NextBank I*,

453 F. Supp. 2d at 96; *accord id.* ("Contracts often have a provision specifying that the contract

is automatically in default on the appointment of a receiver or conservator, or similar event.

Such provisions are generally held void and section 211 merely codifies the common law rule."

(quoting 135 Cong. Rec. S2381 (daily ed. Mar. 8, 1989) (statement of Sen. Garn)).) Also, the

Court expressly rejected BNY's arguments that the practice of securitization is not viable unless

investors can enforce ipso facto clauses and recoup their investments at an accelerated rate upon

the appointment of a receiver. *See id.* at 97. In doing so, the Court relied on documents that

expressly warned the Noteholders, before they purchased their NextBank notes, that the FDIC

could prevent the commencement of early amortization. *See id.* (quoting the December 6, 2000,

offering memorandum warning prospective Noteholders of the FDIC's "power . . . to prevent or

require the commencement of an early amortization period" and a NextBank opinion letter

predicating the advice offered to BNY on an assumption that BNY would "not attempt to

foreclose on the Receivables or the proceeds thereof after the appointment of the FDIC as

conservator or receiver . . . without the existence of an event of default other than the

appointment of a conservator or receiver").[9]

_____

[9]In addition to the warnings received from offering memoranda and opinion letters, the
Noteholders received the following warning from BNY upon the FDIC's appointment as
receiver: "[T]he FDIC may have the power to prevent the triggering of automatic default or
acceleration provisions, such as the Early Amortization Period, regardless of the terms of the
Transfer and Servicing Agreement, the Indenture, or the instructions of those authorized to direct

In attempting to distinguish *NextBank I* from the New York interpleader, BNY and the Noteholders continue their attempt to elevate form over substance.  (*See id.* at 100–01.)  Because this Court decided in *NextBank I* that the Master Indenture's ipso facto clause was void, and therefore unenforceable by any party, and that the FDIC is excused from making accelerated payments to the Trust, there can be no basis for arguing that the Trust should make accelerated payments to the Noteholders.  Therefore, collateral estoppel forecloses the Noteholders' present theory of entitlement to the NextBank receivables; the November 2006 notices of default have no effect; and, by discontinuing its monthly payments to the FDIC and initiating the New York interpleader, BNY has violated this Court's September 2006 judgment and order.  The Court will therefore grant the FDIC's motion for judgment on Count I.

## IV.    Remedies

Having determined that the FDIC is entitled to judgment on Count I, the Court must address the question of remedies.  As explained herein, the Court will issue some, but not all, forms of injunctive relief requested by the FDIC, and it will deny the FDIC's request for attorney's fees.

### A.    Injunctive Relief

#### 1.    Injunction against Pending and Future Proceedings

"Basic power to protect the preclusive effects of a federal judgment by injunction may well inhere in the very existence of federal courts.  If a more definite grant of general authority is needed, it can be found in the All Writs Act."  18 Charles Alan Wright et al., *Federal Practice &*

---

the Indenture Trustee's actions."  *Id.* at 90 (quoting BNY's letter to the Noteholders of February 14, 2002).

*Procedure*, § 4405 (2d ed. 2002); *see, e.g., Thomas v. Albright*, 77 F. Supp. 2d 114, 118–19

(D.D.C. 1999) ("This Court has ancillary jurisdiction in this matter to vindicate its authority and

effectuate its decree in the underlying class action settlement and consent decree.  Neither party

has suggested otherwise.  Class counsel also suggests that the Court retains jurisdiction and

injunctive power to effectuate its judgment under the All Writs Act." (citations omitted)), *aff'd*

*sub nom. Thomas v. Powell*, 247 F.3d 260 (D.C. Cir. 2001); *see* 28 U.S.C. § 1651(a) (2006)

("The Supreme Court and all courts established by Act of Congress may issue all writs necessary

or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

law.").

　　　　Injunctions to protect the preclusive effect of prior federal judgments "may issue against

proceedings in state courts or other federal courts."  18 Wright et al., *supra*, § 4405; *see, e.g.,*

*Thomas*, 247 F.3d at 265–66 (affirming an injunction against proceedings in D.C. Superior

Court); *In re March*, 988 F.2d 498, 500 (4th Cir. 1993) (upholding an injunction against

bankruptcy court proceedings); *Broad. Music, Inc. v. CBS, Inc.*, 424 F. Supp. 799, 802 (S.D.N.Y.

1976) (enjoining relitigation in New York state court of an issue previously decided in federal

court).  When such injunctions issue against state courts, they come within the "relitigation

exception" to the Anti-Injunction Act, 28 U.S.C. § 2283.  *See, e.g., Chick Kam Choo v. Exxon*

*Corp.*, 486 U.S. 140, 147 (1988) ("The relitigation exception was designed to permit a federal

court to prevent state litigation of an issue that previously was presented to and decided by the

federal court.  It is founded in the well-recognized concepts of *res judicata* and collateral

estoppel."); *see* 28 U.S.C. § 2283 (2006) ("A court of the United States may not grant an

injunction to stay proceedings in a State court except as expressly authorized by Act of Congress,

or where necessary in aid of its jurisdiction, *or to protect or effectuate its judgments*." (emphasis added)).

In determining whether to award injunctive relief to effectuate a prior judgment, the central consideration is whether "the claims or issues which the federal injunction insulates from litigation . . . have been actually decided by the federal court" in its prior decision. *Chick Kam Choo*, 486 U.S. at 148. Accordingly, in determining whether to award injunctive relief, a court should first carefully consider the claims and issues raised in the suit to be enjoined and then, by reviewing the record and judgment from the original suit, determine whether the same claims or issues were previously decided. *See, e.g.*, *id.* ("The Court assessed the precise state of the record and what the earlier federal order *actually* said; it did not permit the District Court to render a *post hoc* judgment as to what the order was *intended* to say."); *Thomas*, 247 F.3d at 263 ("[W]e must therefore compare the complaint in the Superior Court to the record in the class action in order to determine whether, in order for the plaintiff to succeed in Superior Court, that court will have to rule upon an issue or claim already decided by the federal district court or the court of appeals.").

Here, this Court has previously decided the central issue of the New York interpleader - - whether the Master Indenture's ipso facto clause and its early amortization requirement are enforceable. As to that issue, equitable considerations strongly favor an injunction. "The injury to [the FDIC] by having to endure wasteful relitigation in [another] court of an issue already finally decided by this Court is clearly irreparable." *Thomas*, 77 F. Supp. 2d at 123; *accord Broadcast Music*, 424 F. Supp. at 802 ("The waste inherent in the enormously expensive relitigation of matters which have been definitively determined constitutes irreparable injury in

29

itself."). Furthermore, there is no harm to BNY or the Noteholders in preventing them from relitigating an issue that they already had a full and fair opportunity to litigate before this Court and that they will have an opportunity to relitigate before the D.C. Circuit. *See In re March*, 988 F.2d at 500; *Thomas*, 424 F. Supp. at 123. The Noteholders should not be permitted to make an end run around this Court's judgment and the appellate process by collaterally attacking this Court's judgment in another forum. *See In re March*, 988 F.2d at 500 (explaining that the All Writs Act "empowers a federal court to . . . prevent collateral attack of its judgments," and characterizing the losing party's decision to file a new action in bankruptcy court without seeking a stay of the district court's judgment pending appeal as "an attempt to end run, at the last minute, the district court's judgment"). Most importantly, an injunction will serve the public interest. Because the NextBank securitization transaction is highly complex, the initial determination of the early amortization issue consumed the resources of this Court for over three years. Injunctions against relitigation are particularly desirable when the initial proceedings were lengthy and complex. *See, e.g.*, *Michigan v. City of Allen Park*, 573 F. Supp. 1481, 1477 (E.D. Mich. 1983) ("It has also been held that a multiplicity of prior actions is not a prerequisite to the issuance of an injunction where the prior litigation has been unusually protracted or burdensome, and the losing party simply refuses to be bound by the outcome."). "[T]he courts, both federal and state, are burdened enough without having their calendars cluttered by the redetermination of matters already decided or being used as tactical mechanisms in the wars between economic giants." *Broadcast Music*, 424 F. Supp. at 802.

However, during the December 2006 hearing before Judge Haight, the Noteholders appear to have raised an additional claim to the NextBank receivables - - based on the maturity

date of the Series 2000-1 notes - - which they apparently claim is not dependent on the enforceability of early amortization. (*See* S.D.N.Y. Hr'g Tr. at 39, 49; *see also supra* note 7.) To the extent that this alternative claim has been raised in the interpleader, it may present new issues and this Court may not enjoin future litigation regarding this claim.[10]

For the foregoing reasons, the Court will grant in part the FDIC's "Emergency Motion to Stay Related Cases," and it will enjoin BNY, the Noteholders, and any parties acting in concert with them from relitigating the issue of whether early amortization under the Master Indenture's ipso facto clause is enforceable. The injunction will apply to all pending and future proceedings in federal or state court, except for the pending D.C. Circuit appeal.

### 2.     Disbursement of Missed Transferor Interest Payments

Because *NextBank I* held that early amortization based solely on NextBank's receivership is unenforceable, the FDIC is necessarily entitled to immediate payment of the funds that BNY was scheduled to disburse in November 2006, December 2006, and January 2007. The monthly accounting statements approved by BNY reflect (and BNY concedes) that absent early amortization the funds at issue were portions of the Transferor Interest - - not portions of the Collateral. (*See, e.g.*, Hr'g Tr. at 74 (conceding that the payments from November 2005 through October 2006 constituted "transferor interest being distributed," and that the notices of default purporting to enforce early amortization against the Trust were the only conceivable basis for transforming the Transferor Interest into Collateral); Christensen Supp. Decl. Ex. 1 at 1 (describing the funds scheduled for payment to the FDIC on November 15, 2006, as "Transferor

---

[10]For the same reason, the Court is not in a position to order the Series 2000-1 Noteholders to surrender their notes. (*See* Proposed Order of Dec. 15, 2006 at 2.)

Allocations/Distributions" in accounting statements approved and distributed by BNY).)  BNY and the Noteholders have no right to the Transferor Interest or the related monthly distributions. (*See, e.g.*, Hr'g Tr. at 62 ("[N]obody disputes that transferor interest goes to the bank, collateral goes to the noteholders.").)

     Moreover, the FDIC is entitled to interest earned on the collections during the time that BNY improperly refused to disburse them.  The accounting statements approved by BNY reflect that the FDIC would, under the ordinary terms of the NextBank securitization agreement, receive interest earned on the Transferor Interest collections.  (*See, e.g.*, Christensen Supp. Decl. Ex. 1 at 1 (showing interest earned on the collections as part of the scheduled disbursement to the FDIC).)  For the duration of the present dispute, the collections have been kept in an interest-bearing account.  (Hr'g Tr. at 58.)  BNY's decision to file the New York interpleader did not extinguish the FDIC's rights to interest on the Transferor Interest collections.  *See, e.g.*, *Powers v. Metro. Ins. Co.*, 439 F.2d 605, 609 (D.C. Cir. 1971) (suggesting that whether to award prejudgment interest in an interpleader action may "depend upon equitable considerations"); J.E. Keefe, Jr., *Allowance of Interest on Interpleaded or Impleaded Disputed Funds*, 15 A.L.R.2d 473, § 1[b] (1951) ("Any interest earned on the funds while deposited subject to the order of the court may be recovered by the successful litigant."); *id.* § 5 ("However, if disputed funds held by a depository bank subject to the order of a court should draw interest while on deposit, the person determined to be the owner of the funds may be entitled to such interest."); 7 Wright et al., *supra*, § 1716 ("The general practice is that any interest accruing on an interpleader fund deposited in

the court is distributed to the claimants.").[11]  Any other conclusion would create a windfall for BNY.

Thus, the Court will direct BNY, within five calendar days of this Court's order, to release to the FDIC the funds described under the "Transferor Allocations/Distributions" headings of the November 2006, December 2006, and January 2007 accounting statements, including interest.[12]

### 3.    Injunction against Further Interference with Transferor Interest Payments

Because this Court decided in *NextBank I*, and the parties do not now dispute, that the Transferor Interest belongs to the FDIC, the Court will grant the FDIC's request that BNY be permanently enjoined from distributing the Transferor Interest to anyone but the FDIC. Consistent with this injunction, BNY must continue to make the scheduled monthly payments of "Transferor Allocations/Distributions," as described on the monthly accounting statements, to the FDIC unless the D.C. Circuit reverses this Court's determination that the Master Indenture's ipso facto clause is unenforceable.

---

[11]Although in some circumstances the filing of an interpleader action by a disinterested stakeholder may preclude the victorious claimant from recovering prejudgment interest, the FDIC is not seeking prejudgment interest here.  *See Powers*, 439 F.2d at 609.

[12]The Court's Order is consistent with Judge Haight's Order, granted at the request of the Noteholders during the December 2006 hearing, that BNY make no distribution of any "collateral funds currently in its possession as indenture trustee" without a further order from the New York district court.  (S.D.N.Y. Hr'g Tr. at 83.)  As explained above, absent early amortization in February 2002, the funds that BNY was scheduled to pay the FDIC in November 2006, December 2006, and January 2007 were necessarily distributions of Transferor Interest and did not constitute Collateral.

### B.    Attorney's Fees and Costs

Finally, the Court must determine whether to order BNY or its counsel to pay the FDIC's

attorney's fees and costs.  Under what has come to be known as the "American rule," parties

must ordinarily "shoulder their own counsel fees and other litigation expenses absent statutory or

contractual authority for an alternative allocation."  *Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d

178, 180 (D.C. Cir. 1980).  "Over the years, however, courts have carved out several narrowly

defined exceptions, by one of which 'a court may assess attorney's fees . . . when the losing party

has 'acted in bad faith, vexatiously, wantonly or for oppressive reasons.'"  *Id.* (quoting *Alyeska*

*Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)).  The FDIC asks the Court

to award fees and costs either under the judge-made "bad-faith" exception or under 28 U.S.C.

§ 1927, which permits courts to hold counsel liable for excess costs, fees, and expenses

reasonably incurred because counsel has "multiplie[d] the proceedings in any case unreasonably

and vexatiously."  28 U.S.C. § 1927 (2006).

The rationale for the bad-faith exception is punitive.  *E.g., Chambers v. Nasco, Inc.*, 501

U.S. 32, 53 (1991).

> Not surprisingly, then, '(t)he standards for bad faith are necessarily stringent,' and the
> fee-shifting sanction is invocable only for some dominating reason of justice.  A
> party is not to be penalized for maintaining an aggressive litigation posture, nor are
> good faith assertions of colorable claims or defenses to be discouraged.  But
> advocacy simply for the sake of burdening an opponent with unnecessary
> expenditures of time and effort clearly warrants recompense for the extra outlays
> attributable thereto.

*Lipsig*, 663 F.2d at 180–81 (alteration in original) (quoting *Adams v. Carlson*, 521 F.2d 168, 170

(7th Cir. 1975)).  "Further, a finding of bad faith must be supported by 'clear and convincing

evidence.'" *Assoc. of Am. Physicians and Surgeons v. Clinton*, 187 F.3d 655, 660 (D.C. Cir.

1999).

      To award attorney's fees and costs in connection with the present action, the Court would have to find either that the Noteholders or BNY forced the FDIC to file suit by their conduct in New York or that BNY's manner of defending the present action showed bad faith. *See, e.g.*, *Hall v. Cole*, 412 U.S. 1, 15 (1973) (explaining that "'bad faith' may be found not only in the actions that led to the lawsuit, but also in the conduct of the litigation"). Although it is true that collateral estoppel forecloses the theory relied on by the Noteholders to instruct BNY to discontinue the FDIC's monthly payments and to initiate a lawsuit in New York, the Court cannot find clear and convincing evidence that the Noteholders and BNY acted solely for the sake of harassment. *Cf. McLaughlin v. Bradlee*, 803 F.2d 1197, 1205 (D.C. Cir. 1986) ("Taken together, the three previous suits had resolved the questions in this case against McLaughlin, and the decisions that came later had already begun to rely on the preclusive effect of decisions in the other courts. Even after the District Court had issued a final judgment in this case finding preclusion appropriate, and had warned McLaughlin that the court had seriously considered applying sanctions, he persisted in filing four insubstantial motions."). Moreover, there is not clear and convincing evidence that the parties themselves - - as opposed to their counsel - - caused the present action to be defended in a vexatious or dilatory manner. *Cf. Chambers*, 501 U.S. at 38, 57–58 (noting that Chambers was personally responsible for the objectionable conduct).

      Similarly, the Court is not persuaded that the conduct of BNY's counsel warrants attorney's fees and costs under § 1927. In this litigation, counsel's conduct, while questionable, has not crossed the line to become sufficiently egregious to warrant a punitive remedy.

**VI.    Conclusion**

For the foregoing reasons, the Court will deny BNY's motion to dismiss, grant the

FDIC's motion for summary judgment, and grant in part the FDIC's motion to stay the New

York proceedings.


                                _____s/_____
                                ELLEN SEGAL HUVELLE
                                United States District Judge

Date: January 29, 2007